**FILED**

04 JUN 16 PM 5:58

U.D. OF ALABAMA

# IN THE UNITED DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

JANICE MORGAN, BARBARA          )
RICHARDSON, CORA CANNON,        )
on behalf of themselves  and all others   )
similarly situated,              )
                                 )
        Plaintiffs,       )
                                 )
vs.                              )      **CIVIL ACTION NUMBER:**
                                 )      **CV-01-C-0303-W**
                                 )
FAMILY DOLLAR STORES, INC.,      )
                                 )
        Defendants.       )


## PLAINTIFFS' OPPOSITION TO DECERTIFICATION OF COLLECTIVE ACTION


                Robert L. Wiggins, Jr.
                Robert F. Childs, Jr.
                Gregory O. Wiggins
                Counsel for the Plaintiffs

OF COUNSEL:
**WIGGINS, CHILDS, QUINN & PANTAZIS, P.C.**
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203
205/314-0500

294

The Court has already determined that the opt-in plaintiffs are similarly situated to one another and certified the case to proceed as a collective action. *Memorandum Opinion* at 2-5 (Doc. 61) attached as Exhibit A. The principal basis of such decision was a finding that the opt-ins' managerial duties "were minimal as compared to other job duties they regularly performed" and that they typically spend "75-90% of their time performing non-managerial duties such as operating the cash registers, stocking shelves, unloading trucks, and performing janitorial duties." *Id.* at 5. Family Dollar has not contested such facts in its decertification brief or affidavits. All the discovery has shown that the Court's findings on this point were correct. Defendant has presented no contrary evidence disputing the high proportion of Store Managers' time spent in non-managerial duties.

The fact that 75-90% of a Store Manager's time is spent on non-management duties is common to all of the opt-in plaintiffs and makes them "similarly situated" for purposes of continued certification as a collective action. Such a high percentage of non-managerial duties bears on the central element of plaintiffs' overtime claim. The FLSA regulations provide: (1) that employees are not "*bona fide* executives*" or exempt from overtime unless they exercise executive authority as their "primary duty"; and (2) an employee's executive duties are usually not primary if they spend less than 50% of their time performing such duties. 29 C.F.R. §541.103. Defendant does not contest that all of the opt-ins spend substantially less than 50% of their time in managerial duties, just as the Court has already found. *Memorandum Opinion* at 2-5 (Doc 61). This fact predominates over all others and makes the plaintiffs "similarly situated" for purposes of the FLSA's collective action provision.

Family Dollar has offered no evidence that the amount of time opt-ins spend performing managerial duties varies above or below 50% according to the type of store they are assigned or any other factor. Nor has it offered any evidence that any particular opt-in or type of store varies from the Court's finding that 75-90% of a Store Manager's time is spent performing non-managerial duties. *See*

1

Memorandum *Opinion* at 2-5 (Doc. 61).  Although such factors as a store's size, location, inventory, sales, shrinkage, budget, or District Manager's oversight are discussed in the Company's brief and affidavits, those factors are never linked-up to particular managerial duties or shown to affect the amount of time spent in non-management duties.  Nor are such factors ever connected to a particular opt-in plaintiff or group of plaintiffs.  The Court has already found that "simply noting" differences in store sizes, locations and sales volumes does not establish "that the job responsibilities and salaries of Store Managers are not similar." *Memorandum Opinion* at 5 (Doc. 61).  Despite controlling much of the evidence on this point, Family Dollar has still not come forward with evidence showing that any such store variable affect the amount of time Store Managers perform non-management duties.

Family Dollar's brief and affidavits concede that the opt-in plaintiffs are similar to one another on virtually every point it raises, arguing that 90% to 97% of them testified that they interviewed, trained, scheduled, and directed the work of store employees.  Def. Decert. Br. at 23.  Those percentages are high enough standing alone to demonstrate that the plaintiffs are similarly situated for purposes of the FLSA.  Plaintiffs' evidence shows that the percentages are actually even higher than the 90-97% level of similarity demonstrated by the defendant.  Plaintiffs' summary of the opt-ins' depositions shows that virtually all of them — 98% to 100% — testified that they had *no authority* on their own to hire, fire, discipline or promote Assistant Managers. *See* Exhs. B & P attached.  Nor did they have authority to give pay raises or even close the store in an emergency.  The vast majority also testified that they did not have authority on their own to hire, promote, discipline, terminate, set schedules or give pay raises to lower level employees without their District Manager.  Such high levels of similarity shown in both the defendants and the plaintiffs' deposition summaries demonstrates conclusively that the Court correctly found the opt-ins to be "similarly situated" and entitled to proceed as a collective action.

Defendant argues, however, that 46% of the opt-ins testified that they have *no authority* to hire employees.  Def. Decert. Br. at 20.  If this were true, that 46% would be entitled to summary judgment against the defendant for not being paid overtime.  Family Dollar, of course, contests summary judgment, or any other judgment for that matter, on the ground that *all* of the opt-ins have authority to hire, fire, discipline or promote.  That contention demonstrates again that each of the plaintiffs are similarly situated and will be subject to a common defense at trial.  Family Dollar will try to prove at trial that all of the opt-ins have *the same* authority to hire, fire, discipline or promote, while plaintiffs will show that they don't, not just through their own testimony, but through the testimony of their experts, defendant's officials and the Company's own records and policies.

Who wins that dispute, of course, is irrelevant to the decertification issue currently before the Court.  All that is relevant for present purposes is that this is a common issue to be tried and that it goes to the central element of each opt-ins' claim and defendant's defense of such claims.  The evidence and jury instructions will address the same issue at trial for all of the opt-in plaintiffs — whether they have the authority *on their own* to hire, fire, discipline, promote, grant pay raises, or exercise any of the other managerial discretion typically bestowed on a "*bona fide* executive," as that term is used in the FLSA and the accompanying regulations.  The Court has already found that Store Managers "cannot hire, discipline, and/or terminate employees without first obtaining permission from their supervisor."  *Memorandum Opinion* at 5 (Doc. 61).  The opt-ins' deposition testimony confirms that the vast majority of opt-ins had no such authority on their own to hire, fire, discipline, promote, give pay raises, set schedules, or otherwise exercise a *bona fide* executive's discretion or authority.  *See* Exh. B & P.[1]

---

[1] Although it is an issue that goes primarily to the merits at trial rather than whether the plaintiffs are similarly situated for decertification purposes, defendant's charts attempting to summarize the opt-ins' depositions on a collective basis are outrageously inaccurate and incomplete. Family Dollar represents that 52% of the opt-ins testified that they have the authority to hire employees when in fact *all* of them — 100% — said they have no such authority to hire or promote

I.    **FAMILY DOLLAR HAS NOT CONTESTED THE PRINCIPAL BASIS OF THE COURT'S FINDING THAT THE OPT-INS' CLAIMS ARE SIMILARLY SITUATED AND SHOULD PROCEED AS A COLLECTIVE ACTION**

The Court has already found that the opt-in plaintiffs are "similarly situated" and that their claims should proceed as a collective action under §16(b) of the Fair Labor Standards Act. *See Memorandum Opinion* at 2-5 (Doc. 61). Discovery has since confirmed that such findings were correct. Family Dollar does not contest the principal basis for the Court's decision — that plaintiffs' managerial duties "were minimal as compared to other job duties they regularly performed" and that Store Managers "spent approximately 75-90% of their time performing non-managerial duties such as operating the cash register, stocking shelves, unloading trucks, and performing janitorial duties." *Memorandum Opinion* at 2-5 (Doc. 61). The Court was very specific in finding that the opt-in plaintiffs were similar to one another in working "sixty to eighty hours per week," and performing managerial duties "for only approximately five to ten hours per week" with the "[t]he remainder of their time . . . spent performing non-managerial functions, including . . . operating cash registers, stocking merchandise, and performing various janitorial duties." *Id.* at 2. On this basis, the Court found that the opt-in plaintiffs were "similarly situated" because "[e]ven though they worked between twenty and fifty hours per week in excess of the required forty hours, and the *vast majority* of their hours worked were spent performing non-managerial job functions, the employees did not receive any overtime compensation." *Id.* at 2 & 5 (emphasis added).

Now that discovery is closed, Family Dollar has not argued even once in their brief or affidavits that the foregoing findings about the amount of time spent in non-managerial duties are wrong or

---

Assistant Managers on their own and virtually all of them testified that they have no such authority to hire *any* employees on their own. *See* Exhs. B & P attached. Similar misrepresentations abound throughout defendant's brief and affidavits. Rather than 33% to 73% of the opt-ins testifying that they had the authority to discipline or terminate employees, all 100% of them testified that they have no such authority on their own without their District Manager. *Id.* In addition, all of the opt-ins testified that they do not have the authority on their own to determine pay raises or to even close the store in an emergency. *See* Pl. Exhs. B & P attached.    *Id.*

contrary to the evidence. *At no point* in its decertification brief or affidavits does Family Dollar dispute

such facts, or even address them. It never argues that plaintiffs do not, in fact, spend "75-90% of their

time performing non-managerial duties," as the Court has already found, or that Store Managers'

managerial duties are not "minimal as compared to other job duties they regularly performed," just as

the Court found them to be in its initial findings. *Memorandum Opinion* at 2 & 5. Nor does the

defendant  ever argue that any opt-in or group of opt-ins are different than  the norm because they

spend less than the "75-90% of their time performing non-management duties" that has already been

found by the Court to be typical. *Id.* at 5.

Defendant's silence in the face of the Court's finding that the opt-ins spend "75-90%" of their

time performing non-managerial duties" precludes any argument that the opt-ins have no common

characteristic or issue to be tried. Such facts are enough standing alone to require a single trial in a

collective action on the issue of whether the executive exemption can apply where, as found by the

Court, "the vast majority of their hours worked were spent performing non-managerial job functions."

*Id.* at 2. That is a question of fact and law  common to every opt-in plaintiff which makes decertification

completely inappropriate. Plaintiffs are not required to show at this stage that they will prevail on the

merits of such common issue of law and fact. Plaintiffs may lose at trial on such issues, or they may

win, but that does not detract from the fact that such determination will apply to every opt-in plaintiff

alike on a collective basis. The only relevant question at the decertification stage is whether such a

common question exists.

The reason that Family Dollar has not contested the Court's findings on these points or argued

that the percentage of time spent in non-managerial duties is not as high as that already found,  or that

it varies from one opt-in plaintiff or store to another, is that  the discovery has not provided any basis

for such a contention.  The large number of opt-in's depositions taken by the Company showed that

they averaged more than 87% of their time in non-management duties and that none of them spent less time in non-managerial duties than the 75% found by the Court. *See* Exhibit B.   There is also considerable other evidence that shows the Court's original findings on this  point are still accurate, including:

- An expert with many years experience auditing FLSA compliance for the Department of Labor has found that Store Managers at Family Dollar spend a "small fraction" of their time on management duties and the vast majority of their time — 75% to 90% — on non-management duties like unloading trucks, stocking shelves, cashiering and janitorial clean-up. *See* Bill Belt Report at 11 attached as Exh. C.

- A second expert who also has many years of compliance- audit experience at the Department of Labor testified that in "all the  thousands of cases in which [he has] been involved, [he has] never seen retail store managers who spend as little time in performing management duties as the Family Dollar store manager opt-in Plaintiffs."  Prelim. Expert Report of Brian T. Farrington at 6 (attached as Exh. D).

- A high-level Company official, Bill Broome, Vice President of Operations, admitted that the percentage of time  Store Managers spend in such non-management duties is so great that it contributes to the high turnover rate for Store Managers (40%).   Broome Depo. 45-48 (attached as Exh. J). [2]

- The experts further testified that even the small percentage of time spent on duties that might be considered managerial in other enterprises are shared with, and performed by, hourly *non-exempt* employees at Family Dollar.  Belt Report at 11-12.  Non-exempt hourly employees control the keys to the store, open and close the store, count and deposit cash and other receipts at the bank, post sales data to the Company's books, order stock, and approve checks and refund/return requests.  *Id.*

- The Company's 1997  Store Policy Manual applicable to all stores states that Store Managers must clean and straighten stores and that non-exempt hourly

---

[2]  Broome, in explaining the 40% turnover of Family Dollar Store Managers, identified store workload and relationships with Family Dollar District Managers as factors in the loss. Broome Depo. at 45 (attached as Exh. J). When asked for a definition of 'store workload,' Broome testified that the phrase referred to a Store Manager's duty to "receive freight, ring cash register, set schematics, merchandise shelves, build displays, interact w/ customers." *Id.* at 45-48.

employees should order merchandise. Exh. E at D-95, 116.[3]

The small amount of time spent on management duties is not only common to all of the opt-ins, but addresses the most critical element of their claim. To be a "bona fide executive" covered by the exemption in §213(a)(1) of the FLSA, the regulations require that an employee's "primary duty" be management of the enterprise. *See Brock v. Norman's Country Market*, 835 F.2d 823, 825-26 (11th Cir. 1988); *Bradford v. Bed Bath & Beyond, Inc.*, 184 F. Supp. 2d 1342 (N.D. Ga. 2002). The FLSA regulation states that "[i]n the ordinary case it may be taken as a good rule of thumb that primary duty means the major part, or over 50 percent of the employee's time" and that "an employee who spends over 50 percent of his time in management would have management as his primary duty." 29 C.F.R. § 541.103; *see also Norman's Country Market*, 835 F.2d at 825; *Bradford*, 184 F. Supp. 2d at 1346.

Thus, the predominant factual issue for each opt-ins' claim is the amount of time spent in non-managerial duties — an issue that none of the opt-ins have been shown to differ from the 75-90% finding already entered by the Court. That alone makes them similarly situated for purposes of the FLSA.

## II.    THE TIME SPENT IN NON-MANAGEMENT DUTIES DOES NOT VARY SIGNIFICANTLY FROM ONE STORE OR REGION TO ANOTHER

Not only has the Court already found that the opt-in plaintiffs commonly spend "75-90% of their time performing non-management duties," but it also found that such percentage and duties do not vary significantly from one store or region to another and that the opt-in plaintiffs are "similarly situated" for this reason. *Memorandum Opinion* at 5 (Doc. 61) (attached in Appendix A). Although "this

_____

[3] The 1997 Store Policy Manual states that store management should participate in cleaning and straightening stores. Exh. E, at D-95. The Manual also states that Store Managers are not responsible on their own for the task of ordering merchandise; indeed, the Manual provides that Assistant Managers, Floor Supervisors, and Head Cashiers – all non-exempt employees – should be trained in proper procedures for ordering with PDT-3100, an electronic scanning system, and that once they have an understanding of such procedures, they should be assigned a specified area of merchandise to order each week. *Id.* at D-116. Once an employee is competent with the responsibility, the employee is to order merchandise with a minimum of supervision and is accountable for any orders he or she places. *Id.* at D-116.

Court acknowledges that there exist some differences . . . in terms of pay scale and job duties," it found

that such differences are not significant and did not make the finding that most of their time was spent

in non-managerial duties atypical for any segment of the opt-in class. *Id.* at 5-6. More specifically, the

Court found that even though "stores have different locations, or . . . various sizes, and sell different

volumes of merchandise," these factors do not indicate "that the job responsibilities and salaries of

Store Managers are not similar." *Id.* at 5 (Doc. 61). The Court's finding on this point was as follows:.

> . . . while this court acknowledges that there exist some differences between the named
> Plaintiffs and the opt-ins in terms of pay scale and job duties, these differences do not
> preclude a [collective action]. After all, the requirement in *Dybach* is that Plaintiffs be
> similarly situated; *Dybach* does not require that they be identically situated. Furthermore,
> simply noting that stores have different locations, are of various sizes, and sell different
> volumes of merchandise does not conclusively indicate that the job responsibilities and
> salaries of Store Managers are not similar. Once again, the applicable standard is
> "similarly situated" — not identically situated — and it is a matter within the sound
> discretion of the trial court to determine whether the standard has been satisfied. This
> Court finds that Plaintiffs have satisfied this standard.

*Mem. Opinion* at  5 (Doc. 61).

The Eleventh Circuit has twice reached the same conclusion, holding that geographical

variations do not support decertification of an FLSA action. *See Hipp v. Liberty National Life Ins. Co.*,

252 F.3d 1208, 1219 (11th Cir. 2001)(Defendant "emphasizes that Plaintiffs in this case worked in

different geographical locations.  This factor is not conclusive.  The plaintiffs in *Grayson* worked in

several states, and the court still held that they met the similarly situated requirement. . . .") (citing

*Grayson v. K-Mart Corp.,* 79 F.3d 1086, 1091, 1098-99 (11th Cir. 1996).[4]

---

[4] Prevailing precedent and authority have roundly rejected the defendant's arguments about variations by store
or geographical region. *Bradford*, 184 F. Supp. 2d at 1351-1352; *Crain*, 1992 WL 91946, at *3 ("That the plaintiffs and the
potential claimants may have worked in different areas of the country, on different types of rigs, and performed different
jobs is not dispositive. . . .  The Court accepts defendant's contention that the number of meetings or training sessions
attended or the actual amount of time spent engaged in these activities may have varied from place to place, rig to rig, or
hitch to hitch.  But what matters is that the fundamental allegation – that according to company policy the time spent in
job related meetings and training was uncompensated – is 'common to all the [FLSA] plaintiffs and dominated each of their
claims.'") (citations and footnote omitted; alteration in original); *Moss*, 201 F.R.D. at 410-11 ("[The defendant] has devoted
much attention to differences in the name and opt-in plaintiffs' job duties, geographic assignments and hourly billing rates.

Discovery has now confirmed the correctness of the Court's findings on this point. The evidence shows that more than 85% of the opt-ins' time on average is spent on non-managerial duties in both large stores and small;  rural stores and urban; stores with large and small sales, inventory, shrinkage, and payroll budgets; stores with frequent and less frequent involvement of District Managers; stores with several Assistant Managers and stores with none; stores that pay the Store Manager a large salary and those that do not; stores that pay a large performance bonus and those that pay none; stores that are difficult to operate and those that are easier. *See* Pl. Exhs. B & P attached. None of these variations are relevant because the percentage of time spent in non-management duties remains at the same 75-90% found by the Court for *all* of such stores and opt-in managers.[5]

Defendant confirms that there is little or no difference in Store Manager's duties from store to store by stressing the high level of similarity between the opt-ins on virtually every point it makes, such as its contention  that "[t]he vast majority, 90 percent of deposed Plaintiffs [testified] that they trained new employees" and "interviewed prospective employees"; that "89 percent of the deposed Plaintiffs testified that they were responsible for setting or adjusting the work of store employees"; that 87 percent said they "directed the work of their store employees," that 97 percent said they were "responsible for

---

Irrespective of these differences, each of the plaintiffs assert a common claim; i.e., that [the defendant] violated the FLSA by failing to compensate them with overtime wages for their work .... Also, variations in the plaintiffs' duties, job locations and hourly billing rates do not differentiate the collective basis of the class to the extent that it defeats the primary objective of a § 216(b) action."); *Scott v. Aetna Services, Inc.,* 210 F.R.D. 261, 265 (D. Conn. 2002); *Shain,* 40 F. Supp. at 490 ("It is of course true . . . that many differences exist between the plaintiff and other employees of the defendant even though engaged in the same type of work, such differences being as to the time worked, wages actually due, and hours of overtime involved. *But such differences merely mean that their positions and claims are not identical; it does not follow that they are not similar.  Employees may be similarly situated without being identically situated.*") (emphasis added). Defendant cites two cases  — *Harper v. Lovett's Buffet, Inc.,* 185 F.R.D. 358 (M.D. Ala. 1999) and *Brooks v. BellSouth Telecomm., Inc.,* 164 F.R.D. 561 (N.D. Ala. 1995) — that are not contrary to the foregoing authority.

     [5] Defendant's affidavits state that *the stores* vary by size, sales and other factors, but *never say* that the opt-ins' managerial duties vary by such factors or that the managers in one type of store perform more or different managerial duties than those in another type of store.  The factors argued by the defendant are simply a *non-sequitur* to the issue of whether Store Managers perform sufficient managerial functions to qualify for the bona fide executive exemption under the FLSA. Family Dollar has merely trotted out a list of factors without ever saying if or how they affect whether someone has managerial duties or the amount of time spent in non-managerial duties.

maintaining production and sales records;" that 71 percent said they had "responsibility for appraising or reviewing their employees' job performance;" and that "[m]ore than three quarters of the deposed Plaintiffs also [testified] that they planned the work of their employees." Def. Decert. Br. at 23-24.

Such a remarkable degree of similarity between the opt-in plaintiffs' situations shows conclusively that they are "similarly situated" and that decertification should be denied. Plaintiffs' summary of the opt-ins' deposition testimony shows an even higher degree of similarity, confirming the Court's initial finding of fact on this point. *See* Exhibit B. Plaintiffs' deposition summary shows that:

- 100% of the opt-ins testified that they didn't have authority on their own to terminate or discipline employees;

- 100% said they didn't have the authority to give pay raises or close the store for emergencies on their own;

- 100% of the opt-ins testified they didn't have the authority to hire or promote Assistant Managers on their own;

- More than 95% said they didn't have the authority to hire lower-level employees, like Cashiers or Stockers, on their own;

- 99.13% testified they weren't responsible for the store's operations on their own.

- More than 99% said they didn't have sole authority to set employees' schedules;

Plf. Exhs. B & P attached.

## III. DISCOVERY HAS SHOWN THAT THE COURT'S ORIGINAL FINDINGS IN SUPPORT OF CERTIFICATION WERE CORRECT

### A. Authority To Hire, Fire Or Discipline

The Court has already found that the first 142 Store Managers who opted-in "cannot hire, discipline, and/or terminate employees without first obtaining permission from their supervisor." *Memorandum Opinion* at 5 (Doc. 61). Discovery since then has shown that to be true for all the store managers. First, *every* opt-in deponent questioned about their authority to discipline or terminate

10

employees on their own testified that they had no such authority. *See* Exhibits B & P. Second, *every* opt-in deponent who was questioned about their authority to hire Assistant Managers on their own testified that they had no such authority, and virtually all of those questioned about their authority to hire lower-level employees on their own, like cashiers or stockers, said that they had no such authority. *Id.* Thus, the Court was correct in finding that Store Managers "cannot hire . . . employees without first obtaining permission from their supervisor." *Memo. Op.* at 5 (Doc. 61).

Defendant attempts to sow confusion on this issue by categorizing opt-ins as having "authority" to hire, fire or discipline when all they really said was that they could do so referring to the number of opt-in *with permission* of their District Managers — an entirely different question that bears little or no weight in deciding whether someone exercises the discretion of a "*bona fide*" executive required to be exempt from overtime under the FLSA. Even *non-exempt* hourly Assistant Managers can hire, fire or discipline with permission of the District Manager. Family Dollar *totally misrepresents* the opt-ins' deposition testimony in arguing that 54% of the opt-in deponents said they had "authority" to hire when, in fact, those deponents testified that they couldn't do so on their own without their District Managers. *See* Exhibits B & P. Defendant's misrepresentation on such "authority" issues is particularly egregious in light of its own testimony that *none* of the Store Managers have the authority to hire or promote Assistant Managers. Barkus Depo. at 240, *See also* Exh. F (Frank Vogt Email: "No Manager can promote anyone to a Asst. Mgr.; Second Asst., or Third Key Position. Only the District Manager has the authority to do this. . . ."). Its Senior Vice President of Operations, Bill Barkus, testified as follows:

> Q.     Store manager cannot promote an assistant store manager to store manager?
> A.     That's correct.

Barkus Depo. at 240 (9/19/02). In addition, defendant's own job description confirms that Store

11

Managers have no authority to hire, fire or discipline.  Such descriptions list nothing about such authority among the duties and responsibilities set forth in the job descriptions.  *See* Exh. G attached. Defendant mischaracterizes virtually all of the opt-in deponents' testimony about "authority" to hire on their own.  A long list of examples is provided in Exhibit B.

Family Dollar is even more disingenuous in its representation that 33% of the opt-in deponents said they had "authority" to fire employees.  Def. Decert. Br. at 20.  What *every one* of those deponents really said was that they had *no* such authority on their own *without permission* of their District Manager.

The same pattern of misrepresentation of the opt-ins' deposition testimony also occurs in defendants' representation that 73% of them said they had "authority" to discipline employees.  Again, defendant counts someone as having said they have such "authority" when all they really testified was that they had *no such authority on their own* without their District Manager.  Defendant's 73% representation is built on such confusion.  *See* Exhs. B & P attached.  The Court's original finding was correct — that Store Managers  "cannot hire, discipline and/or terminate employees without first obtaining permission of their supervisor."  *Memo. Op.* at 5 (Doc.61).

Even if that were not the case, management duties as a combination may render an employee an executive, but one alone, such as the authority to hire and fire, is insufficient.  Les A. Schneider and J. Larry Stine, 1 Wage and Hour Law: Compliance & Practice § 5:4 at 130  (Suppl. 2002) (attached as Exh. H).  The limited role of Store Managers in hiring, firing, disciplining and terminating employees is the type of involvement typically associated with a "working foreman" or  "working supervisor" who are non-exempt under the FLSA.  The FLSA regulations use the "working foreman" or "working supervisor" category  to denote a non-exempt employee *"who regularly performs 'production' work or other work which is unrelated or only remotely related to his [or her] supervisory activities."* 29 C.F.R. § 541.115(a).  As described by such regulation, the "working supervisor most commonly found in industry works

12

alongside his subordinates." *Id.* at § 541.115(b). "Such employees . . . perform the same kind of work as that performed by their subordinates, and also carry on supervisory functions." *Id.* The regulation states: "Clearly, the work of the same nature as that performed by the employees' subordinates must be counted as nonexempt work and if the amount of such work performed is substantial the exemption does not apply." *Id.; see also* ,Les A. Schneider and J. Larry Stine, 1 Wage and Hour Law: Compliance & Practice § 5:17 at 37 (Suppl. 2002) ("If the working foreman performs non-exempt work of any character in excess of the percentage limitation of the long test or outside the primary duty in the short test, the working foreman will lose the executive exempt status."), attached as Exh. H.

Notably, in upholding a district court's finding that a grocery store's department managers were non-exempt under the short test, the Eleventh Circuit employed the "working foremen" concept to describe the nature of the aggrieved's work. *See Norman's Country Mkt.,* 835 F.2d at 826 and n. 2; *see also Donovan v. Norman's Country Mkt.,* No. GCA 81-0049-MMP, 1986 WL 15394, at *4-5 ( N.D. Fla.).

## B.    Other Management Functions

Defendant argues a list of "other management functions" performed by Store Managers that they contend 78% to 97% of the opt-ins testified they had authority to perform, such as interviewing, training, setting work schedules, directing and planning employees' work, maintaining records, giving raises. The only relevance this argument has to decertification is that such percentages show a high level of similarity between the opt-outs. It is irrelevant for decertification purposes whether such authority actually exists. That is an issue on the merits at trial, not decertification.

Even if that were not the case, defendant's charts purporting to summarize the opt-ins' deposition testimony grossly mischaracterizes what each of them said about their authority to interview, train, set schedules, direct and plan work, maintain records, evaluate employees and give pay raises. Rather than saying they had the authority to do these things on their own, virtually all of them testified

13

that they had no such authority. *See* Pl. Exh. B & P. Plaintiffs have also shown in the attached Exhibits N and P that defendant's argument about other management functions is largely premised on misrepresentation of the opt-ins' testimony. Each "other management function" addressed in Family Dollar's brief and affidavits is considered in separate subsections *infra* in light of what the opt-ins really said in their depositions.

### 1.     Pay Increases

Store Managers cannot make decisions regarding pay rates or give pay raises, and they have no authority to fire, extend work shifts, or add employees during the holiday season. *Id.* Family Dollar vice-presidents Barkus and Broome acknowledged that Store Managers do not have the authority to give pay increases. *See* Barkus Depo., at 241 (Assistant Manager pay increases accomplished by Store Manager appraisal with District Managers); Broome Depo., at 197-98 (Store Managers have to receive approval from District Managers before giving raises).

### 2.     Training Employees

Defendant argues that 90% of the opt-in plaintiffs testified that they participate in training, but so do non-management and non-exempt employees.   Training employees is not an executive or management function because even non-management or non-exempt employees train.[6]  Plaintiffs' expert, Bill Belt, testified  that Family Dollar training is conducted primarily "on-the-job" for cashiers, stockers, and Assistant Managers, and there exists no structured training program. Belt Rept., at 3, 12.[7]
Moreover, defendant's counsel mischaracterizes what the opt-ins actually said about training.   For

---

[6] For example, in large retail stores where replenishing stock on the sales floor is customarily assigned to nonexempt employees, a manager's work in replenishing stock on the sales floor is not exempt. (*Id.* § 5:11 at 25) (citing 29 C.F.R. § 541.108(c)).

[7] Defendant concedes that only 16 opt-in plaintiffs have served as certified training managers (*see* Def.'s Brief, at 9-10).  That does not establish any significant variability among a group of more than 2,500 opt-ins.  Given that the training consisted of instruction in non-management duties, such training duties were not really an exempt function in the first place.

example, defendant's chart lists Sharrian Gustavus as testifying that she was responsible for training employees, such as Stockers or Cashiers, but she really testified that she had no such responsibility:

> What about the stockers and the cashiers, did you yourself have to train
> them on anything?
> A.     No.
> Q.     Were you responsible for seeing that they got trained?
> A.     No.

Gustavus at 69.   Family Dollar mischaracterizes John McGinnis' testimony on the same point, listing him as having said he trained employees when he actually said he didn't train them and that the hourly non-exempt employees did  the training.  McGinnis Depo. at 173.

### 3.     Scheduling, Planning And Directing Employees' Work

Defendant argues in a similarly misleading way that 90% of the opt-ins deposed said they were "responsible for setting or adjusting the work of store employees" (Def. Decert. Br. at 23), but  their testimony was often jut the opposite — that they could set schedules on their own or that their authority was no different than that of non-exempt Assistant Managers. *See* Exh.B attached.  For example, the defendant's chart lists Duane Watson as having testified that he set the schedules of employees, but his actual testimony was quite different — that "the district manager made the schedule for each store." Watson Depo. at 80.  Watson's testimony was as follows:

> Q.     Let's talk about doing the scheduling. Okay?
> A.     Yes.
> Q.     Tell me how you got that done.
> A.     Again, the district manager made the schedule for each store.

Watson Depo. at 80.  He also testified that  he had no authority to schedule employees for overtime work. Watson Depo. at 143-144.  Michael Johnson's testimony was mischaracterized in the same way. Rather than saying he set the employees' schedules, he really said he didn't.  Johnson Depo. at 62.

> Q. Okay. Well, let's talk about some of those specifically. The schedule, do you
> make out the schedule now?
> A.     We have a corporate staff schedule so the company makes out our

15

schedule.

Johnson Depo. at 62. Vivian Smith's testimony is also mangled in defendant's chart. She said that the corporate office sets schedules, not her. Smith Depo. At 146.

> Q. Who was responsible for scheduling?
>
> A. Corporate. They sent us down a laminated sheet and told us exactly what
> they wanted.

Smith Depo. at 146. John Miller's testimony was misrepresented in the same way. He didn't say that he scheduled or set employees' hours, as defendant's chart says, but that the schedule was "set in stone" by others and that he couldn't deviate from it without permission of his District Manager. Miller at 50-51. Nor could he schedule employees to work overtime. *Id.* He testified that he would be disciplined if he deviated from the store budget controlling hours worked and overtime handed down by his superiors. *Id.*

Family Dollar's own documents confirm for all the opt-ins that scheduling was not something that they were allowed to do on their own in the way a bona fide executive would do. The Company has a *Staff Schedule Frequently Asked Questions* (attached as Exh. I) which states that only a District Manager may alter a manager's workweek schedule. *Id.* As a result of this overarching policy, the document provides that a Store Manager may not move employee coverage from slower days to busier days and *must* adhere to the corporate-mandated schedule; only District Managers and Regional Vice Presidents may change an Assistant Manager's schedule to reflect training activities; Store Managers need District Manager and Regional Vice President approval to schedule an additional early morning crew for restocking activities; and Store Managers should discuss any exceptions to the corporate-mandated schedule with District Managers. *Id.* These policies apply to all Store Managers, regardless of store size, location, etc.

The same type of discrepancies occur with defendants' representation that 87% of the opt-ins testified that they "directed the work of their store employees" and that 78% of them testified they "planned the work of their subordinates." What they really said most often was that they did *not have such responsiblity* for the store operations on their own. *See* Exhibit B attached. Def. Decert. Br. at 23.[8] Plaintiffs' expert, Mr. Belt also found that Store Managers at Family Dollar engage in minimal supervision of other employees and that such Managers often supervise no one because they are the only employee in the store for significant periods of time. Belt Rpt.. at 11. In addition to the vast amount of time spent on non-management duties, plaintiffs' expert, Bill Belt, determined that what few management duties were performed by Store Managers were shared with hourly employees. To wit, Belt stated the following purported management duties were shared with hourly employees:

- Control over the keys to lock/unlock the store (Belt Rept. at 11);
- Counting cash/checks, preparing bank deposits, and depositing money at banks (id.);
- Posting cash register sales data to Beat Yesterday Books, which involved no analysis of data (*id.*);
- Ordering stock, which was a simple process involving an electronic scanner and thus, took only one to five hours of time per week (*id.*); and
- Check approval, refunds/exchange approvals (*id.* at 12).

### 4.    Recordkeeping

Defendant argues that 97 percent of the deposed opt-ins testified that "they were responsible for maintaining production or sales records and other management reports," but it fails to tell the Court that the deponents only averaged 23.69 minutes per day in this function and that the same paperwork was done by non-exempt hourly employees, showing once again that such paperwork was not really a "management" function at all.

### 4.    Working At More than One Store

---

[8] Defendant further contends that the Store Manager is "the only *salaried* employee in the store responsible for supervising the hourly employees on a daily basis" (Broome Aff. At ¶11), but does not dispute that the non-exempt Assistant Manager also supervises the hourly employees on a daily basis.

Defendant argues that some of the opt-ins might work at more than one store at a time or temporarily help another Store Manager or District Manager in another store. Plaintiffs have shown in the attached Exhibit N that defendants have mischaracterized various opt-ins' testimony on this point. Even if true, working at more than one store would not undermine the finding of similarly situated opt-in plaintiffs, as evidenced by the following authority:

> Also meritless is [the defendant's] contention that the inconsistency of the alleged evidence of pattern or practice makes the court's factual determination clearly erroneous. The evidence as a whole clearly suffices to establish the existence of a pattern or practice, at least as a 'just and reasonable inference.' Though some employees testified that they received thirty minute breaks, that testimony pales in comparison to the much more extensive testimony that the pattern of conduct was to the contrary.

*Donovan v. Bel-Loc Diner, Inc.*, 780 F.2d 1113, 1116 (4th Cir. 1985), *abrogation on other grounds recog. by, Pforr v. Food Lion, Inc.*, 851 F.2d 106, 110 (4th Cir. 1988); *see also Bradford*, 184 F. Supp. 2d at 1351 ("Assuming that this statement is true, some Plaintiffs may have already received compensation for overtime worked. The existence of this issue does not preclude collective adjudication of the exemption issue."); *cf., Kascycki*, 599 F. Supp. at 869 ("Therefore, while the minimum wage may have been paid to some employees for some workweeks, during other workweeks . . . defendants violated the minimum wage provision with respect to at least every employee . . . .").

### 5.    Interviewing Prospective Employees

Defendant's representation that 90% of the opt-ins testified that "they interviewed prospective employees" mischaracterizes much of their testimony by ignoring the distinction between merely participating in the interview *with the permission of their superior* and having the managerial authority or discretion to interview *on their own.* Virtually all of the opt-ins testified that they did not have sole authority to interview because either they had to have the permission of their District Manager or non-exempt Assistant Managers conducted such interviews. *See* Exhs. B & P attached.

18

### 6.   District Manager's Oversight

The defendant also attempts to portray dissimilar employment settings by referring to the differences in store oversight by District Managers. *See* Def.'s Brief, at 14-16. As an initial matter, diverging frequencies in District Manager store visits are irrelevant because those visits are most frequently undertaken to insure that the Store Managers are performing non-exempt tasks properly. The differing frequencies tend to show only that some Store Managers are more adept at unloading trucks, stocking shelves, and cashiering, not performing managerial duties.

The same problem renders Family Dollar's arguments regarding T5 stores and shrink size irrelevant. *See* Def.'s Brief, at 16-17. The differences in shrink size, which results in a different level of District Manager oversight, only pertains to the performance of largely non-exempt duties such as unloading trucks, stocking shelves, inventory control, etc. Further, only a few Store Managers have testified as to the management of T5 stores, so this point applies to very few of the opt-ins if any.

## IV.   BONA FIDE MANAGERIAL DISCRETION HAS BEEN REMOVED FROM THE STORE MANAGERS IN A WIDE VARIETY OF AREAS TRADITIONALLY ENTRUSTED TO A TRUE EXECUTIVE

*Bona fide* executive employees must exercise discretion, and this discretion must be as to policy and not merely the mechanics of performing a job. Les A. Schneider and J. Larry Stine, 1 Wage and Hour Law: Compliance & Practice § 5:10 at 23 (2000) (attached as Exh. H). In addition to not being allowed to interview, hire, promote, discipline, terminate, give pay raises, set schedules or otherwise operate the store, on their own, Store Managers at Family Dollar are prohibited from exercising discretion in a wide variety of other managerial functions that are traditionally entrusted to *bona fide* executives. For example, defendant's own Store Policy Manual shows the following restrictions on Store Manager's discretion that   is common to each of the opt-in plaintiffs, making them "similarly situated" regarding the following:

19

- For contemplated store closings due to abnormal power outage, serious leaking from roof and walls, etc., the Store Manager must contact the District Manager, and if unable to find him or her, the Regional Vice President. The District Manager or Regional Vice President will decide if the store should close. (1997 Store Policy Manual, at D-89.)

- **"No one at store level has authority to sign trash agreements/contracts."** If problems occur with trash collection, then the Store Manager must discuss it with the District Manager. "Any extra pick-ups required must be pre-approved by the District Manager." (*Id.*) (emphasis in original).

- Family Dollar's Office Schematic gives detailed instructions on where items may be placed in an office, including such detailed instructions as to which desk drawers may contain particular forms. (*Id.* at D-311-318.)

- The District Managers contract and schedule floor care contractors, and if a Store Manager has any problems with a contractor, he or she must notify the District Manager. (*Id.* at D-105.)

- If a Store Manager has problems with a cash register that the Family Dollar Help Desk can not handle, then he or she must contact the District Manager for direction. (*Id.*)

- If a store has a pest control problem, the Store Manager must contact the District Manager, who is responsible for making exterminating arrangements. (*Id.* at D-107.)

- The Manager's Monthly Planning Calendar gives an overview of all activities per month on a daily and weekly basis. The calendar is designed to assist Store Management organize work load for the month. (*Id.* at D-240-41.)

- Each week, all stores receive via personal computer directions from Family Dollar's corporate headquarters regarding all aspects of day to day operations. (*Id.* at D-321.)

## V. DEFENDANT HAS MISREPRESENTED THE TESTIMONY OF PLAINTIFFS' EXPERTS

In an effort to buttress its argument regarding disparate job duties, Family Dollar attempts to coopt the testimony of plaintiffs' expert Belt by mischaracterizing what he said. Def.'s Decert. Br., at 10. First, it argues that Belt testified "'it's hard to find . . . exactness when you travel around the country.'" *Id.* (citing Deposition of Bill Belt, at 220). That reference, however, was to the conduct of

DOL investigations in different parts of the country, not the job duties of Family Dollar Store Managers. *See* Bill Belt's Rebuttal Affidavit to Defendant's Brief in Support of Motion to Decertify, at 2-3 (attached as Exh. O). Family Dollar then asserts that Belt found "significant differences" on several issues. Def.'s Decert. Br., at 10. Belt explains, however, that his phrase "significant differences" referred *only* to Family Dollar's inconsistent training programs for hourly and salaried employees, not to any other aspect of a Store Manager's duties or responsibilities. Belt testified that variations in training programs for hourly and salary employees bears no relevance to the determination of exempt status. Belt Rebut. Aff., at 3-4. Subsequently in his Rebuttal Affidavit, Belt declared that he did not discover "significant differences" in his findings regarding supervising personnel, Store Manager insurance of compliance with operational policy, and employee scheduling. *Id.* at 4-5. In sum, the defendant wholly misrepresents Belt's testimony regarding the opt-ins' job duties.

Family Dollar's primary argument that regional differences indicate diverging factual settings rests upon a wholesale misrepresentation of the Belt's testimony. First, Belt did not testify that he found assertions regarding the insurance of compliance with operational functions "all over the board," *see* Def.'s Brief, at 12. Rather, Belt stated that assertions regarding the number of hours Store Managers were required to work to earn their salary were "all over the board." Belt Rebut. Aff., at 6. Further, the defendant's recitation of Belt's testimony that it is "'hard to find . . . exactness when you travel around the country,'" *see* Def.'s Brief, at 13, does not support Family Dollar's argument that Belt testified that "regional variations exist which make it impossible to make a generalization on whether a company properly classified its employees as exempt." *Id.* As provided above, Belt explained that his testimony referred to the conduct of DOL investigations, not whether a nationwide collective action may be maintained. *See* Belt Rebut. Aff., at 2-3. Indeed, Belt opposes Family Dollar's entreaty by stating that the DOL commonly extrapolates from "one or more case investigations to a company-wide violation,"

21

thus "achieving compliance in large enterprises, especially those spread over large geographical areas . . . ." *Id.* at 2. The "DOL often litigates cases involving large enterprises where violations may be present without making physical investigations of each and every establishment." *Id.* "Hundreds, if not thousands, of DOL investigations have used findings at a small number of locations to make generalizations regarding whether a company properly classified its employees as exempt." *Id.* at 3.

Family Dollar also cites Belt in support of its argument that differences in oversight by District Managers "make this action inappropriate for collective treatment." Def.'s Brief, at 16. However, Belt's testimony that each Store Manager's authority varied from District Manager to District Manager, *see* Belt Depo., at 394, "pertains solely to the hiring process at Family Dollar stores," not the oversight practices of defendant's District Managers. Belt Rebut. Aff., at 7. And while Belt may have found some differences in hiring responsibility between Family Dollar Store Managers, he stated that the defendant made no attempt to ascertain the extent of such differences. *Id.* Indeed, Belt found that the authority to hire employees is not a factor paramount in importance vis-a-vis other management indicia. *Id.*

Finally, Family Dollar misquotes Belt in representing that he did not find "any consistent pattern" among the evidence he reviewed and that the opt-in plaintiffs' testimony was "all over the board." Def.'s Brief, at 27. As Belt explained, his finding of no "consistent pattern" referred to the scheduling of employee hours at stores; indeed, it did not even refer to the authority of Family Dollar Store Managers to schedule employees, an issue more germane to the inquiry before the Court. Belt Rebut. Aff., at 7-8. Likewise, the quote "all over the board" only referred to Store Manager responsibility to ensure compliance with operational policy, not all of the duties and factual circumstances of the plaintiffs. *Id.* at 7. Contrary to Family Dollar's assertions, Belt's "testimony is narrowly tailored to only two specific areas of work at Family Dollar." *Id.* at 8.

In like fashion, Family Dollar also cites plaintiffs' expert Farrington for its argument that the

22

"executive exemption must be determined individually based on each employee's job duties." Def.'s Brief, at 26 (citing Brian Farrington Depo., at 119-24). Farrington's testimony reveals an opposite conclusion, however. After agreeing with Family Dollar's counsel that the exemption is determined by an individualized determination of each Store Manager's duties, he proceeds "with [the] obvious codicil that after you talk to or read accounts from or get information about a number of people who occupy that position and the information all comes back basically the same, then you can – and we did [this] everyday [at the DOL's Wage and Hour Division] – extrapolate to the whole group." Farrington Depo., at 122. Therefore, the defendant has again misrepresented the testimony of one of plaintiffs' experts in an effort to bolster its untenable arguments.

## VI.    THE LEGAL STANDARDS FOR DECERTIFICATION HAVE NOT BEEN MET BY FAMILY DOLLAR

This Court has already correctly applied the FLSA's standard for allowing a case to proceed as a collective action by holding that "the applicable standard is 'similarly situated' — not identically situated — and it is a matter within the sound discretion of the trial court to determine whether the standard has been satisfied." *Memorandum Opinion* at 5 (Doc. 61). The Eleventh Circuit has repeatedly held that "Plaintiffs need show only that their positions are similar, not identical, to the positions held by the putative class members.'" *Hipp v. Liberty National Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir. 2001) (quoting *Grayson v. K-Mart Corp.*, 79 F.3d 1086, 1097 (11th Cir. 1996) (other citations and original alterations omitted).[9]

It is also well recognized that "the requirements for pursuing a § 216(b) class action are

---

[9] *See also Bradford v. Bed Bath & Beyond, Inc.*, 184 F. Supp. 2d 1342, 1345 (N.D. Ga. 2002) (Story, J.) ("The representative plaintiffs bear the burden of demonstrating that they and the class members they seek to represent are similarly situated. . . . This burden is not a heavy one. . . . Plaintiffs need not show that their positions are identical to the putative class members' positions; a class may be certified under the FLSA if the named plaintiffs can show that their positions were similar to those of the absent class members.") (citing *Grayson*, 79 F.3d at 1096, 1097).

independent of, and unrelated to, the requirements for class action under Rule 23 of the Federal Rules of Civil Procedure." *Grayson*, 79 F.3d at 1096 n. 12 (citing *LaChapelle v. Owens Illinois, Inc.*, 513 F.2d 286, 289 (5ᵗʰ Cir. 1975) (Rule 23 and § 216(b) actions are "mutually exclusive and irreconcilable")).[10] Indeed, the "'similarly situated requirement of § 216(b) is more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance).'" *Hipp*, 252 F.3d at 1219 (quoting *Grayson*, 79 F.3d at 1095); *see also Bradford*, 184 F. Supp. 2d at 1345 ("Same"); *Reed v. Mobile County School System*, 246 F. Supp. 1227, 1233 n. 10 (S.D. Ala. 2003) (Same) As the Eleventh Circuit has stated, a "'unified policy, plan, or scheme of discrimination may not be required to satisfy the more liberal similarly situated requirement of § 216(b).'" *Hipp*, 252 F.3d at 1219 (quoting *Grayson*, 79 F.3d at 1097).[11]

The court in *Stone v. First Union Corp.* has provided a clear and useful explanation of the similarly-situated standard vis-a-vis the Eleventh Circuit's proclamation that it is less stringent than Rule 20: "[a] party seeking joinder of claimants under Rule 20 must establish two prerequisites: (1) a right to relief arising out of the same transaction or occurrence, or series of transactions or occurrences, and (2) some question of law or fact common to all persons seeking to be joined." *Stone*, 203 F.R.D. at 540-41 (citing *Alexander v. Fulton County*, 207 F.3d 1303, 1323 (11ᵗʰ Cir.

---

[10] *See also Bradford,* 184 F. Supp. 2d at 1345 (same); *Stone v. First Union Corporation,* 203 F.R.D. 532, 541-42 (S.D. Fla. 2001) (same) ; *cf.,* Fed. R. Civ. P. 23 adv. cmt. note (1966) ("The present provisions of 29 U.S.C. § 216(b) are not intended to be affected by Rule 23, as amended.").

[11] *See also Baum v. Shoney's Inc.*, No. 98-423-CV-ORL-19B, 1998 U.S. Dist. LEXIS 21484, *4 (M.D. Fla. Dec. 3, 1998) ("In determining whether potential class members are similarly situated, the Eleventh Circuit does not require a showing that potential class members were together the victims of a single decision, policy, or plan.") (internal citations omitted); *cf., Shain v. Armour & Co.*, 40 F. Supp. 488, 490 (W.D. Ky. 1941) ("The evident purpose of the Act is to provide one law suit in which the claims of different employees, different in amount but all arising out of the same character of employment, can be presented and adjudicated, regardless of the fact that they are separate and independent of each other. In such instances, where liability is denied by the employer, there are certain questions of both law and fact which are common to all employees engaged in the same character of work.") (*quoted in, Tumminello v. U.S.*, 14 Cl. Ct. 693, 696 n. 4 (1988)).

2000)).  The *Stone* court explained further:

> In determining what constitutes a transaction or occurrence for the purposes of Rule 20(a), courts treat the term transaction flexibly. . . .  It may comprehend a series of many occurrences, depending not so much upon the immediateness of their connections as upon their logical relationships. . . .  *By implication, 'similarly situated,' being a more elastic standard, may be satisfied even if the common nexus is not derived from the same transactions or occurrences, but the allegations and threshold proofs of 'pattern and practice' discrimination are based upon different transactions or occurrences which are logically connected. . . .*
>
> The second prong of Rule 20 does not require that all questions of law and fact raised by the dispute be common, but only that some question of law or fact be common to all parties. . . .  If the 'similarly situated' standard is more flexible, it necessarily follows that some common questions of law or fact, but not all, must be shared among the putative plaintiffs with the named plaintiffs in the collective action.  By implication, while a 'unified policy, plan, or scheme of discrimination' can satisfy the 'similarly situated' threshold if sufficiently pled and established, its absence alone does not mean that the criteria cannot otherwise be established by other means.

*Id.* (emphasis added) (citing *Alexander,* 207 F.3d at 1323; *Grayson,* 79 F.3d at 1095-96).

"Accordingly, that the plaintiffs are 'similarly situated' may be established even if the transactions or occurrences are not identical. . . .  Moreover, by implication not all questions of law or fact must be common; rather, it is enough if some questions of law or fact are common to all parties, *even if such questions do not predominate.*"  *Id.* (emphasis added).

## VII.  FAMILY DOLLAR'S OTHER "INDIVIDUALIZED" DEFENSES MAY BE ADJUDICATED COLLECTIVELY

### A.  The Supposed Factual Differences in Pay Provisions are Meritless

Contrary to defendant's argument, the opt-in plaintiffs' differing salaries do not make calculation of hourly rates for damage awards difficult or unduly individualized.  *Bradford,* 184 F. Supp. 2d at 1346 ("The differing salaries do not create an individual issue because, if necessary, the compensation due to each Plaintiff can be calculated using a formula to figure the expected hourly rate for each employee based on his or her annual salary.").  The calculation of hourly rates may be accomplished by expert

25

evidence rendered through computer analysis, regardless of differing salaries.[12]  In the same respect, comparison of Store Manager salaries with subordinate salaries – one of the factors provided by § 541.103 for the determination of the executive exemption — also may be accomplished through expert analysis using computer models.  *See* Affidavit of Edwin L. Bradley regarding defendant's motion to decertify.  *Id.*  If there existed a policy establishing a uniform amount of hours per week, then representative testimony will establish the average number of hours worked over that standard.

### B.    Statute Of Limitations

Family Dollar argues that its statutes of limitations defenses require decertification because of the individualized nature of such defense.  This argument, however, succinctly demonstrates the defendant's misapprehension of the collective adjudication protocol.  Although the opt-in plaintiffs may have opted into this case on varying dates, and their dates of employment with Family Dollar may also vary considerably, ascertaining whether the opt-in plaintiffs consented to join this lawsuit by their respective limitations period involves a straightforward review of data calculations performed by a computer.  Indeed, that the defendant listed the opt-in plaintiffs whom it seeks to dismiss from this case portrays the ease at which the limitations issue may be decided.  In essence, that some issues in this case must be adjudicated for each opt-in plaintiff individually does not transform into the assertion that there are "individualized" determinations at issue which would encompass separate "mini-trials."  Suffice it to say, all issues in this cases may be readily adjudicated with the aid of representative evidence, expert testimony, and computational analysis.

### C.    Bankruptcy Defense

The same err applies to the defendant's arguments regarding the bankruptcy issues.  In addition, the defendant has identified only 35 opt-in plaintiffs to whom the bankruptcy issues apply.  This small

---

[12] *See* Expert Statistical Report of Dr. Edwin L. Bradley on class certification issues.

fraction of the opt-in plaintiffs does not come close to mandating decertification of this collective action as a whole or for the few class members subject to such bankruptcy issues.

Family Dollar also errs in arguing that those opt-in plaintiffs who did not accurately report their weekly work hours would be subject to an individualized estoppel defense. *See* Def.'s Brief, at 24 n. 14. Store Managers were paid on a salary basis, regardless of the number of hours they worked per week. Indeed, Family Dollar's attempt to track the number of hours worked by Store Managers, without actually providing them overtime compensation for those hours worked beyond the statutory bar, represents an almost perverse manipulation of a law enacted to protect American workers.

## VIII.   FAIRNESS AND PROCEDURAL CONCERNS SUPPORT MAINTENANCE OF THIS COLLECTIVE ACTION

As plaintiffs have previously demonstrated, the prevailing standards regarding representative testimony eradicate any fairness and procedural concerns infusing this collective action. *See* Pls. Resp. to Def.'s Opp. to Limitation of Discovery on Opt-In Pls., filed Nov. 26, 2003, at 7-14 (Doc. No. 122). *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) and its progeny clearly hold that similarly situated plaintiffs may rely upon representative testimony to recover relief from an employer violating the FLSA. The same principles inhere in this case.

Family Dollar presents several arguments regarding fairness and procedural concerns that it believes are dispositive of the similarly situated issue. However, the defendant errs in all of its arguments and analyses.

First, the defendant once again argues that *Cameron-Grant v. Maxim Healthcare Servs., Inc.*, 347 F.3d 1240 (11th Cir. 2003), stands for the proposition that FLSA collective actions require the personal participation of each opt-in plaintiff in a case. Family Dollar has trumpeted this argument on several occasions, and in doing so it continually asserts, via implication, that the representative testimony standards created by the Supreme Court in *Mt. Clemens* and advanced in countless other cases, including

27

the Eleventh Circuit's *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468 (11ᵗʰ Cir. 1982) and

*Brennan v. General Motors Acceptance Corp.*, 482 F.2d 825 (5ᵗʰ Cir. 1973) decisions, have been

overruled by the panel deciding *Cameron-Grant*.   As put, the defendant's argument was, is, and

continually will be absurd in all respects.  The Defendant errs in extrapolating from *Cameron-Grant* the

conclusion that all opt-in plaintiffs in an FLSA collective action must "generate" liability on their

respective claims.   To the contrary, *Mt. Clemens* and its progeny clearly holds that plaintiffs may

demonstrate liability and entitlement to damages for similarly situated opt-in plaintiffs through the use

of representative testimony.   That is to say, the issue in *Cameron-Grant* revolved around the status of

named plaintiffs in class adjudications, not the prevailing methods for proving liability and damages in

such lawsuits.

The defendant argues that plaintiffs have not set forth any evidence of a common plan or policy

to deprive Family Dollar Store Managers of overtime compensation, yet, as recounted above, the

Eleventh Circuit does not require the existence of a common plan or policy to maintain a collective

action.  *See Hipp*, 252 F.3d at 1219.   Nevertheless, plaintiffs have produced evidence evincing a

common practice of Store Managers working exorbitant hours in non-management capacities and not

being paid overtime compensation for that work.

Family Dollar avers that adjudication of this case would entail the holding of hundreds of

minitrials, but as explained previously, the use of representative testimony will preclude the

convening of such hearings.  Furthermore, the defendant's argument that individual opt-in plaintiffs

will each bring an action if this case is decertified is simply erroneous.  To the contrary, decertification

of this collective action will cause unjustifiable harm for the opt-in plaintiffs, the intended beneficiaries

of the "humanitarian and remedial" aspects of the FLSA. See <u>Bradford</u>, 184 F. Supp. 2d at 1351 ("As

a practical matter. [sic] Plaintiffs can hardly be expected to pursue these small claims individually, so

there is little likelihood that their rights will be vindicated in the absence of a collective action.").

The defendant also argues that no FLSA exemption case of this scope has ever proceeded through trial to final judgment, but the defendant conveniently fails to acknowledge the exemption cases of this scope that have obviously settled before trial due to the prevailing culpability of the defendants. *See, e.g., Bradford*, 184 F. Supp. 2d 1342. Moreover, the two FLSA exemption cases cited by Family Dollar to note their reversal on appeal, *Southern Maryland Hosp.* and *DeSisto*, contain particular circumstances that are most helpful for plaintiffs in the case at bar: those two cases were reversed and remanded for further proceedings -- not dismissed -- due to a lack of the requisite amount of representative testimony, not because of the impropriety of representative testimony. *See Southern MD Hosp.*, 43 F.3d 949; *DeSisto*, 929 F.2d 789. Indeed, the court in *S. MD Hosp.* held that a small number of employees may represent the interests of a larger number if "the representative employee[s] performed substantially similar, if not identical, work to the non-testifying employees[,]" *S. MD Hosp.*, 43 F.3d at 951 (citing *DeSisto*, 929 F.2d at 793), but it found that the plaintiffs failed to garner the 2.5% of employee testimony it deemed sufficient to serve as representative evidence. *S. MD. Hosp.*, 43 F.3d at 951. In this case, the 10% representative evidence accumulated thus far more than satisfies the requirements set forth in *S. MD Hosp.* and *DeSisto*.

Family Dollar's final argument, that the use of representative evidence raises due process concerns because it is denied the right to prove its exemption defense on an individual basis, bears no merit at all. Again, plaintiffs fail to comprehend how the defendant may move for summary judgment on the exemption defense as a collective issue, and then argue in an alternate proceeding that its defense may only be proved on an individualized basis. Indeed, Family Dollar commits a fundamental error in stating that a jury may be confused by instructions that the opt-in plaintiffs are similarly situated while the exemption defense is an individualized issue. *See* Def.'s Brief, at 29. To the contrary, instructing

29

a jury that the opt-in plaintiffs are similarly situated should be followed with the direction that representative testimony may be utilized to impose liability and fashion relief for all of the opt-in plaintiffs.  Furthermore, if this case is limited to 355 opt-in plaintiffs, then the defendant's concerns evaporate: the use of summarized deposition testimony as evidence for the individuals deposed, and as representative evidence for the remaining 105 opt-in plaintiffs who were not, will accord relief for all of the opt-in plaintiffs.

The cases that Family Dollar cites in support of its due process concerns do not compel an opposite finding.  *See* Def.'s Brief, at 29.  *In re Chevron U.S.A., Inc.*, 109 F.3d 1016 (5th Cir. 1997) -- a Rule 23 class action where the plaintiffs brought claims for personal injury, wrongful death, and property damage stemming from the defendant's alleged environmental pollution -- clearly raised individualized claims far more complicated than those in the case at bar: "The selected thirty (30) cases included in the district court's 'unitary trial' are not cases calculated to represent the group of 3,000 claimants.  Thus, the results that would be obtained from a trial of these thirty (30) cases lack the requisite level of representativeness so that the results could permit a court to draw sufficiently reliable inferences about the whole that could, in turn, form the basis for a judgment affecting cases other than the selected thirty."  *Id.* at 1020.  It is important to note that the Court of Appeals remanded the case for development of a better method to obtain representative proof, not to sever the class altogether.  Of course, plaintiffs demonstrated previously that the courts in *S. MD. Hosp.* and *DeSisto* took the same action: they remanded the cases for additional representative evidence, not a dismissal of the collective actions.  And for related reasons, *Lusardi v. Xerox Corp.*, 122 F.R.D. 463 (D.N.J. 1988) is inapposite: that collective action was decertified because the plaintiffs brought ADEA claims evincing divergent circumstances regarding decentralized decisionmaking by individual supervisors.

30

Respectfully submitted,

Robert L. Wiggins, Jr.
Robert F. Childs, Jr.
Gregory O. Wiggins
Counsel for the Plaintiffs

OF COUNSEL:
**WIGGINS, CHILDS, QUINN & PANTAZIS, P.C.**
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203
205/314-0500

## CERTIFICATE OF SERVICE

I do hereby certify that I have mailed a copy of the above and foregoing, by U.S. Mail, properly addressed and postage prepaid, on:

James Walker May
T. Matthew Miller
Arnold W. Umbach, III
Abdul K. Kallon
Ronald H. Kent
BRADLEY, ARANT, ROSE & WHITE, LLP
One Federal Place
1819 5th Avenue North
Birmingham, Alabama 35203

This the 16th day of June, 2004.

OF COUNSEL

31