FILED

2005 Jun-06  AM 11:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# EXHIBIT 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DIVISION OF ALABAMA

3                  WESTERN DIVISION

4

5    JANICE MORGAN, BARBARA          )

6    RICHARDSON, CORA CANNON,        )

7    LAURIE R. TROUT (WILSON)        )

8    on behalf of themselves         )

9    and all others similarly        )

10   situated,                       )

11             Plaintiffs,           )

12   v.                              )    CV-01-C-0303-W

13   FAMILY DOLLAR STORES,           )

14   INC.,                           )

15             Defendants.           )

16

17              S T I P U L A T I O N S

18             IT IS STIPULATED AND AGREED

19   by and between the parties through their

20   respective counsel, that the deposition of

21   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

22             KARL HAIGLER          COPY

23   * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

# BIRMINGHAM REPORTING SERVICE

1  Dollar Stores, who is defendant in the

2  lawsuit we presently have pending in the

3  Northern District of Alabama.  As I

4  understand it from your attorney, you are

5  not an expert in this case but rather been

6  used as a technical consultant.  And I

7  guess I should address it to you.  Am I

8  correct in that understanding?

9       **MR. MAY:**  He has not been

10  designated and he is not designated as an

11  expert.  He has not been engaged in

12  connection with this litigation.  He was

13  not engaged by Family Dollar in connection

14  with this litigation.  He was engaged by

15  Family Dollar well prior to this

16  litigation and is totally unassociated and

17  without the knowledge of this litigation.

18  **(Whereupon, Plaintiffs' Exhibit No. 1,**

19  **NOTICE OF DEPOSITION, was marked for**

20  **identification and the same is attached**

21  **hereto.)**

22       **MR. CHILDS:**  Okay.  First off, I

23  guess I'm going to put into evidence as

1    with John Clifford and Jim May back in May

2    of last year --

3         A   Yes.

4         Q   -- that was here in Birmingham?

5         A   No, that was at Family Dollar.

6         Q   Family Dollar in -- where are they

7    located, Charlotte?

8         A   Yes.

9         Q   Okay.  And how long was that

10   meeting?

11        A   I think it was about an hour, an

12   hour and a half.  It wasn't that long.

13        Q   And what did you discuss in that

14   meeting?

15        A   The background of the Must Program

16   and how the job profiling came out of the

17   -- and what we did the job profiling for

18   in the terms of the Must Program.

19        Q   Okay.  And what did you tell them

20   in answer to what you did the work

21   profiling for in regard to the Must

22   Program?

23        A   Well, this was specifically a

1  project to develop training inside the

2  stores or -- either inside the stores or

3  for people who wanted to go to work for

4  Family Dollar in assistant manager

5  positions.  That was our focus.

6      Q  The assistant manager, not the

7  manager?

8      A  Yes, that is correct.

9      Q  Okay.

10     A  Yeah.  So I was the lead in the

11  project, and I involved some associates in

12  South Carolina, the state of South

13  Carolina, who were experts in using

14  material from the WPS, the Work Profiling

15  System, to develop curriculum for

16  training.  So the reason we did the -- I

17  was explaining in the meeting that the

18  reason we did the profiling was in order

19  for my associate at the South Carolina

20  Workplace Resource Center, Joan Mason, I

21  was using this information with her to

22  give her some guidance in developing the

23  training program for the assistant manager

1    position.  So that's what the meeting was

2    about.

3        Q  In doing this work, were you

4    attempting to identify all of the duties

5    and responsibilities of the assistant

6    manager store manager?

7        A  No.

8        Q  Were you trying to determine all

9    the duties and responsibilities of the

10   store managers?

11       A  No.

12       Q  Only those that could be utilized,

13   in your opinion, to help train somebody?

14       A  Well, the process that we used is

15   to identify the critical task categories

16   that are most critical to achieving the

17   job objectives.  So, it would be -- in

18   terms of the process, we asked each of the

19   subject matter expert groups in three

20   cities -- that is, in Atlanta, Charlotte,

21   and Columbia -- to help us by defining

22   their job in terms of their main function

23   and their job objectives.  They did that

1    on a blank piece of paper each time.  I

2    facilitated that -- gathering that

3    information.  And from that information,

4    we then said, "What are the critical task

5    categories that would help you achieve

6    those job objectives?"  So, they had a

7    choice of thirty-one task categories.  And

8    in each group, they narrowed it down to

9    eight to twelve task categories to help

10   achieve those job objectives.

11       Q   But you weren't going through and

12   actually trying to define for store

13   managers exactly what percent of the day

14   was spent performing specific tasks in

15   their store?

16       A   No.

17       Q   And you weren't trying to do that

18   for the associate or assistant managers

19   either?

20       A   That's correct.

21       Q   And in fact, you did not attempt to

22   inquire of your subject matter experts how

23   much time, for instance, they spent

# BIRMINGHAM REPORTING SERVICE

1  categories are reflected on the cards,

2  these cards.  And it's from these

3  thirty-one task categories that the

4  subject matter experts chose; the top

5  eight to twelve that are most critical for

6  their job objectives.

7      Q   So, in essence, the subject matter

8  experts were shown the tasks as put in

9  place by the SHL Work Profiling System

10  Program?

11      A   That's correct.

12      Q   They were not allowed to go in, so

13  to speak, on a clean slate and pick the

14  task categories themselves; they would

15  have been confined to those that were part

16  of the SHL Work Profiling System?

17      A   That's correct.

18      Q   'Did you give any consideration to

19  going in with a blank slate as opposed to

20  trying to limit the tasks that they could

21  list by -- to those that were part of the

22  SHL Work Profiling System?

23      A   No.

1    good at it.  So the question was:  How

2    good do we need to be in order to develop

3    technical details; and then -- for

4    training; and then if we wanted to do that

5    across a number of jobs, how would we be

6    able to compare results across a number of

7    jobs?  So all of that pointed to me that

8    we needed to do a more standardized --

9    have a more standardized way of collecting

10   job information.

11       Q  Well, let me ask you a more

12   important question.  As of 2000, weren't

13   you working for SHL?

14       A  Yes.

15       Q  So would SHL want you to be using a

16   system that was used at a company that you

17   used to work at as opposed to their work

18   profiling system?  Weren't you, in fact,

19   selling your own system at that time?

20       A  I'm trying to understand the

21   question.

22       Q  Well, in 2000, you were working for

23   SHL?

1    focus groups across three markets would be

2    adequate for the purposes of developing

3    training.  I said that based on not only

4    understanding the system and having used

5    the system for that purpose in the past,

6    but also in having worked with the

7    Workplace Resource Center in South

8    Carolina who had used the same system.

9    So, my idea was to try to build on the

10    work in the experience I already had

11    myself, as well as they had, and use the

12    system that Family Dollar owned; that is,

13    the Work Profile System.

14        Q  Do you feel that this system and

15    program would be sufficient for

16    determining what work was being performed

17    by all Family Dollar Store managers in all

18    stores?

19        A  Say that again.

20        Q  Do you think this program and the

21    work that was done as part of this would

22    be sufficient for you to determine the

23    actual work that was being performed by

# BIRMINGHAM REPORTING SERVICE

1    store managers in twenty-five hundred

2    Family Dollar Stores?

3        MR. MAY:  Object to the form.  You

4    can answer it.

5        A  For the purposes of training

6    around, particularly, in a pre-employement

7    mode, I think it would -- it would not be

8    sufficient.  I think it would be a

9    starting point but not sufficient.

10       Q  Would it be sufficient to answer a

11   question as to whether a store manager

12   should be included within the exempt

13   category under the Fair Labor Standards

14   Act?

15       MR. MAY:  Object to the form.

16       Q  In your opinion?

17       MR. MAY:  You haven't established

18   that he has any background and ability in

19   that.

20       MR. CHILDS:  Well, I assume he'll

21   tell me if he can't.

22       Q  Go ahead.

23       A  I don't know, actually, because the

1       Charlotte?

2            A   I would not.

3            Q   Okay.   You, in essence, had how

4       many total people as subject matter

5       experts for store managers?

6                MR. MAY:   For all three sessions?

7                MR. CHILDS:   Yes.

8            A   Well, I didn't keep track of the

9       number, but we requested between four and

10      six for each session.

11           Q   Okay.   So the most you would have

12      had would have been eighteen subject

13      matter experts; is that correct?

14           A   Right.

15           Q   Okay.

16           A   That's -- from memory, right.

17           Q   All right.   And they -- you put

18      them into focus groups?

19           A   Correct.

20           Q   So you would have had either a team

21      of four in a focus group or a team of six

22      in a focus group for Atlanta, and then the

23      same thing for Columbia and the same thing

1   for Charlotte?

2        A   Four, five, or six.

3        Q   Four, five, or six, okay.   And I

4   notice under Bob, Pat, and Opal, we have

5   Winslow, Harold, and Loyd?

6        A   Right.

7        Q   Are they also subject matter

8   experts?

9        A   Yes.

10        Q   And Marcus, Donna, and Rodney, the

11   same, subject matter experts?

12        A   Store managers, right, in the store

13   manager focus groups.

14        Q   Okay.   So we have got -- all right.

15   So you said there were between twelve and

16   eighteen.   Why do we only have the names

17   of nine on this document?

18        A   I don't know if that's all

19   inclusive.   I don't know if that's all

20   inclusive.   In other words, there may have

21   been more people there and just to

22   identify the file, that may have been the

23   names used to identify the file.   There

1    analysis for corporate jobs?

2         A   Job profiling, right.

3         Q   Job profiling, okay.  That's the

4    same as doing a job analysis; right?

5         A   No, it's not.

6         Q   What's the difference?

7         A   Job profiling is using this

8    particular system.

9         Q   The SHL Work Profiling System?

10        A   Right.  Job analysis would involve

11   doing other -- typically things that

12   people do when they're doing -- setting up

13   selection systems, which would include

14   critical incident -- and this is what the

15   SHL psychologist did with me with Kraft.

16   So, since I'm not industrial or

17   organizational psychologist, whenever

18   there's a system that we're putting in

19   place that involves a WPS, the WPS is

20   always the first step.  There's additional

21   steps that take place in job analysis,

22   including critical incident repertoire

23   grid analysis.