FILED
2007 May-15 PM 12:35
U.S. DISTRICT COURT
N.D. OF ALABAMA

20:51:27

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| JANICE MORGAN, et al., | * | |
| Plaintiffs, | * | CV-01-UWC-0303-W |
| | * | February 27, 2006 |
| vs. | * | Tuscaloosa, Alabama |
| | * | 9:05 A.M. |
| FAMILY DOLLAR STORES, INC., | * | |
| Defendant. | * | |

****************************

VOLUME 4
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE CHIEF JUDGE U.W. CLEMON
And a Jury

FOR THE PLAINTIFFS:

HON. ROBERT L. WIGGINS, JR., ESQ.
HON. C. MICHAEL QUINN, ESQ.
HON. GREGORY O. WIGGINS, ESQ.
HON. HERMAN N. JOHNSON, JR., ESQ.
HON. ROCCO CALAMUSA, ESQ.
WIGGINS, CHILDS, QUINN & PANTAZIS
301 19th Street, North
Birmingham, AL 35203-3204

HON. J. ALLEN SCHREIBER, ESQ.
HON. P. MARK PETRO, ESQ.
TWO METROPLEX DRIVE, SUITE 250
BIRMINGHAM, AL 35209

FOR THE DEFENDANT:

HON. JAY D. ST. CLAIR, ESQ.
HON. ABDUL K. KALLON, ESQ.
HON. JAMES WALKER MAY, ESQ.
HON. RONALD H. KENT, JR., ESQ.
HON. T. MATTHEW MILLER, ESQ.
BRADLEY, ARANT, ROSE & WHITE
P. O. Box 830709
Birmingham, AL 35203

HON. J. MARK WHITE, ESQ.
HON. AUGUSTA S. DOWD, ESQ.
WHITE, ARNOLD, ANDREWS & DOWD
2025 3rd Avenue North, Suite 600
Birmingham, AL 35203

(Continued)

Christina K. Decker, RPR, CRR
Federal Official Court Reporter
101 Holmes Avenue, NE, Suite 305
Huntsville, AL 35801

Penny L. Enoch, RPR
Federal Official Court Reporter
1729 5th Avenue North, Room 325
Birmingham, AL 35203

INDEX

| Witnesses: | Direct | Cross | Redirect | Recross |
| --- | --- | --- | --- | --- |
| WILLIAM L. BRADLEY | 4 | 8 | 37<br>54 | 52 |
| BRUCE E. BARKUS | 60<br>144 | 92 | 130 | 142 |
| Plaintiffs rest | 146 | | | |
| Motions | 146 | | | |
| JANICE MORGAN | | 156 | | |
| DIANE NEWELL | 158 | 168 | 175 | |
| KAY SPANOGLE | 176 | 210 | 231 | |

February 27, 2006 9:05 a.m.

PROCEEDINGS:

THE COURT: Good morning, ladies and gentlemen, I trust you all had a good weekend. Good.

The plaintiffs will call their next witness.

MR. R. WIGGINS: Your Honor, we were, by agreement --

THE COURT: Oh, yes, that's right. This is cross-examination.

THE CLERK: Dr. Bradley, I would like to remind you that you're still under oath.

MR. R. WIGGINS: And, Your Honor, we have one additional question, something relating to data we got over the weekend.

THE COURT: Any objection?

MR. KENT: No.

**DIRECT EXAMINATION(continued)**

**BY MR. ROBERT WIGGINS**:

Q. Dr. Bradley, in your chart, Exhibits 215 to 219, those went through April 9th, 2005; correct?

A. Yes, sir, that's correct.

Q. And over the weekend you have been able to update that but for some additional weeks since April 9th?

A. Yes, sir. From April 10th to the end of the year

09:22:02 through December, I think, 24th, 2005.

09:22:05 Q. Okay. And Exhibits 235 through 239, you have
09:22:12 those in front of you?

09:22:13 A. Yes, sir, I do.

09:22:14 Q. Are those the supplemental weeks of back pay
09:22:19 calculations since April 9th, 2005?

09:22:22 A. Yes, sir, they are.

09:22:23 Q. They are done exactly the same way as Exhibits
09:22:26 215 through 219?

09:22:28 A. Yes, sir, they are.

09:22:30 Q. And to get a total back pay for someone on this
09:22:36 supplemental list, you would have to add their number in
09:22:40 Exhibit 235 through 239 to their number in Exhibit 235
09:22:47 through 239; correct?

09:22:49 A. From the new one from 235 to 239, and you'd add
09:22:54 the number to the corresponding one, 215 to 219.

09:22:58 Q. Okay. For example, if the back pay were
09:23:03 calculated according to Exhibit 215, you would have to
09:23:07 add the supplemental data for showing on Exhibit 235?

09:23:13 A. That's correct.

09:23:13 Q. And for 216, you would have to add what's on 236?

09:23:20 A. That's correct.

09:23:21 MR. ROBERT WIGGINS: We offer Exhibits 235
09:23:29 through 239.

09:23:30 MR. KENT: Your Honor, we have no objection

09:23:32 other than to renew our objection to the unreported hours.

09:23:36 THE COURT: The objection is overruled. Plaintiffs' Exhibits 235 to 239 are received in evidence.

09:23:45 MR. R. WIGGINS: May we publish to the jury, Your Honor?

09:23:47 THE COURT: They may be published to the jury.

09:23:50 MR. KENT: May it please the Court.

09:23:50 THE COURT: Cross-examination. Yes, sir.

09:23:50 MR. KENT: Thank you, Your Honor.

09:23:56 **CROSS-EXAMINATION**

09:23:57 **BY MR. KENT:**

09:23:58 Q. Good morning, Dr. Bradley.

09:25:27 A. Good morning.

09:25:28 Q. Now, Dr. Bradley, your expertise is in the area of mathematics; correct?

09:25:33 A. Mathematics, statistics and computer.

09:25:37 Q. You're not an expert in the Fair Labor Standards Act; correct?

09:25:40 A. That's correct.

09:25:41 Q. In fact, you have had no legal training for the Fair Labor Standards Act; correct?

09:25:46 A. That's correct.

09:25:47 Q. You are not here to offer an opinion on whether the plaintiffs in this case should or should not be paid overtime; correct?

A. That is correct.

Q. Okay. Let's take a look at what you have done in -- I'm going to show you those charts. If you want to refer to them, you can, about things that you may or may not have done.

You understand that there's two different time periods at issue; correct?

A. That is correct.

Q. There's the time period August 23rd, 2004; is that correct?

A. That's correct.

Q. And before August 23rd, 2004, the salary test was $250; correct?

A. That is correct.

Q. And on and after August 23rd, 2004, the salary test was $455; correct?

A. Yes, sir, that's correct.

Q. And as far as you know, every plaintiff in this case meets those tests; correct?

A. I would agree with that, yes.

Q. Now, the second test is what I think people have been referring to as the primary duty test. Are you

09:26:57 familiar with that?

09:26:57 A. I am familiar with that, yes, sir.

09:26:59 Q. And you understand that one of the things that you are to look at under the primary duty test is the comparative pay of the store manager to the hourly employees at the store; correct?

09:27:17 A. I am not sure about that, no, sir.

09:27:19 Q. Well, there's 1,424 plaintiffs in this case; correct?

09:27:24 A. That sounds right, yes.

09:27:25 Q. Did you look at the range of pay of the store managers in this case?

09:27:32 A. At one time I have looked at the range of the salaries, but I don't remember -- I mean, it varies by year, it varies by store.

09:27:40 Q. Did you look at how many store managers are paid over $30,000 a year?

09:27:44 A. I -- I didn't look at it that way, no, sir. I didn't do that.

09:27:48 Q. How many managers are paid over $40,000 a year?

09:27:52 A. No, sir.

09:27:52 Q. Over $50,000 per year?

09:27:54 A. No, sir, I didn't look at that.

09:27:56 Q. But you are aware that many store managers are paid over $30,000 per year; correct?

09:28:01 A. Well, I mean, the word "many" is a relative term, but there are store managers that are paid over $30,000 a year, yes.

09:28:11 Q. And you are aware that some store managers are paid over $50,000 a year, like R. C. Fowlkes?

09:28:16 A. I believe that's correct, yes.

09:28:18 Q. In fact, Mr. Fowlkes is paid around $56,000 a year; correct?

09:28:22 A. I couldn't say what it is. I don't remember him specifically, but I know there are some that are.

09:28:26 Q. I've put a stack of documents up there next to you --

09:28:31 A. Yes.

09:28:31 Q. -- and one of them is Mr. Fowlkes' payroll data history. Are you familiar with those?

09:28:39 A. I have looked at those one time, yes.

09:28:41 Q. Let me just show you this -- and I have given you a calculator --

09:28:45 THE COURT: Well, was this a matter inquired of the witness on direct?

09:28:54 MR. R. WIGGINS: No, sir, it was not.

09:28:58 MR. KENT: Your Honor, I believe that this all goes under the umbrella of the damage calculation.

09:29:08 MR. R. WIGGINS: I --

09:29:09 THE COURT: The objection is sustained.

09:29:13 BY MR. KENT:

09:29:13 Q. Dr. Bradley, did you look at the -- in any way, 09:29:19 the comparative pay of the average store manager's 09:29:24 salary to the average clerk's pay?

09:29:29 MR. R. WIGGINS: Objection, Your Honor. 09:29:30 Same objection. Same line of inquiry.

09:29:35 THE COURT: Was this a matter covered in the 09:29:40 direct examination?

09:29:40 MR. R. WIGGINS: No, it was not. But no -- 09:29:43 he covered back pay.

09:29:46 THE COURT: Yes, sir.

09:29:47 MR. KENT: Your Honor, I believe that 09:29:52 Dr. Bradley was asked questions about the store 09:29:54 manager's pay, and, in fact, was shown a chart that was 09:29:57 used by the defendants in opening that looked at hourly 09:30:00 wages for store managers.

09:30:03 MR. R. WIGGINS: Your Honor, the chart was 09:30:05 looked at how to calculate back pay, how to calculate 09:30:09 overtime pay, not --

09:30:11 THE COURT: He may be asked questions to the 09:30:13 extent that he relied on the chart or testified about 09:30:17 the chart on direct examination, he may be inquired 09:30:22 concerning that matter on cross.

09:30:29 BY MR. KENT:

09:30:29 Q. I will move on. The third test to look at is the

09:30:38 two employee test; correct?

09:30:40 A. I'm trying to read your charts. Yes, two
09:30:46 employee test.

09:30:47 Q. And here, you had to be given two assumptions;
09:30:55 correct?

09:30:56 A. There are two elements to that computation,
09:31:00 that's correct.

09:31:00 Q. One, is what two employees equals?

09:31:03 A. What two full-time equivalent equals, that's
09:31:08 correct.

09:31:08 Q. As it's written here, it's two employees;
09:31:11 correct?

09:31:11 A. Yeah, what the work of two employees would equal
09:31:15 to. That's correct.

09:31:15 Q. And the second one is what customarily and
09:31:18 regularly equals; right?

09:31:19 A. Right. What's the definition of customary and
09:31:23 regular, that's correct.

09:31:24 Q. And based upon the assumptions that you were
09:31:26 given for those two tests, you determined that 199
09:31:33 plaintiffs did not meet the test; but 1,225 did meet the
09:31:39 test; correct?

09:31:39 A. Well, that's not quite right. I determined that
09:31:44 199 clearly did not meet the test. But what you have to
09:31:48 realize is my -- when I computed that test and computed

09:31:53 the number of hours that the manager was supervising, I was giving the manager credit for all hours worked during the week by all subordinate employees, and that included even time the manager may not have been in the store; for example, if he didn't work Sundays or Tuesday. So, if anything, that's the bottom number of employees that would fail the test.

09:32:14 That was clearly -- because you were giving him credit for all the hours in the store, when we know he has to be present in the store to supervise two or more employees.

09:32:22 Q. You don't know, Dr. Bradley, whether the test requires that the store manager be present; correct?

09:32:27 A. I've -- say do I know for sure? Possibly not, but my basis to which I've chosen that rule says that, yes, they do.

09:32:45 Q. Dr. Bradley, you are not aware of any rule, are you, that requires the store manager to be present in order to satisfy the two employee test, are you?

09:33:00 A. I can't recall the rule right offhand, but I am aware that from things I've read, it's my understanding the store manager needs to be present when he's supervising employees.

09:33:15 Q. If you can recall that rule, let us know, okay?

09:33:18 A. I will.

09:33:19 Q. Thank you. Now, in terms of the full -- the two employee test, you were told to assume that two employees equals two full-time employees; correct?

09:33:38 A. Well, yes. And that's based also on the -- as I mentioned before, the Department of Labor handbook which says 80 hours.

09:33:48 Q. Well, it also says that full-time may be something other than 80 hours; correct?

09:33:56 A. But it does -- but that has to be --

09:33:59 Q. You answered my question.

09:34:00 A. Yes, it does, but can I finish?

09:34:03 Q. Thank you.

09:34:03 A. May I answer?

09:34:04 Q. You know that full-time at Family Dollar is 30 hours; correct?

09:34:11 A. All right. Let me say this: My understanding is that full-time at Family Dollar is 30 hours. However, the rule --

09:34:21 MR. R. WIGGINS: Objection, Your Honor.

09:34:22 THE COURT: One at a time.

09:34:23 MR. R. WIGGINS: This is the second time that he's cut the witness off in midsentence. I object to that.

09:34:29 MR. KENT: Your Honor, he's going beyond what my question is in attempting to testify on his own,

09:34:34 outside of what my question is.

09:34:35 THE COURT: The objection is overruled.

09:34:37 THE WITNESS: It's true that Family Dollar
09:34:40 considers full-time 30 hours. And, in fact -- in fact,
09:34:44 FLSA says the employer can define what they mean by
09:34:48 full-time or part-time. However, FLSA also says --

09:34:51 BY MR. KENT:

09:34:51 Q. Dr. Bradley --

09:34:53 MR. R. WIGGINS: Don't cut him off. We
09:34:54 object.

09:34:55 THE COURT: The objection is sustained. You
09:34:57 may continue.

09:34:58 THE WITNESS: So the -- but the FLSA rules
09:35:01 clearly state that that does not mean that you are then
09:35:05 exempt from the application of the FLSA, as they define
09:35:08 it.

09:35:09 The full-time is for purposes of that -- of
09:35:12 that employer, but that doesn't mean that you can ignore
09:35:15 the rules of the FLSA, which are at the 40 hours.

09:35:18 BY MR. KENT:

09:35:18 Q. Thank you. If a full-time at Family Dollar is 30
09:35:23 hours, then the two full-time equivalent would be 60
09:35:29 hours; correct?

09:35:29 A. No. As I just pointed out, the two full-time
09:35:33 equivalent would still be 80 hours.

09:35:36 Q. Not necessarily, Dr. Bradley. You just said in
09:35:39 certain instances full-time may be something other than
09:35:42 80 hours; correct?
09:35:43 A. Yeah, but the rule says full-time for an industry
09:35:46 standard, and an employer alone cannot establish an
09:35:49 industry standard. And it also says -- now, it also
09:35:52 says that in no case will the number of hours be less
09:35:56 than 35.
09:35:56 Q. Well, was that in effect prior to 2006?
09:36:00 A. I think it was in effect prior to 2004, yes, in
09:36:09 the labor handbook.
09:36:51 Q. Dr. Bradley, these are the Field Operation
09:36:54 Handbook that you were given; correct?
09:36:57 A. Yes, that's correct.
09:36:59 Q. Where does it say that it can never be less than
09:37:04 75?
09:37:05 A. You mean -- excuse me, 35?
09:37:08 Q. I'm sorry, 35.
09:37:10 A. It was in another --
09:37:14 Q. It was in another document that you had never
09:37:18 seen before until Friday; correct?
09:37:20 A. That's not true.
09:37:22 MR. R. WIGGINS: Objection, Your Honor.
09:37:23 THE COURT: Overruled.
09:37:24 Q. This is the document that you were given to do

09:37:28 your test, and nowhere, nowhere, does it say that it can
09:37:34 never be less than 70, does it?
09:37:35 A. No, it doesn't on that --
09:37:38 MR. R. WIGGINS: Objection, Your Honor.
09:37:40 THE COURT: What's the basis of your
09:37:41 objection?
09:37:42 MR. R. WIGGINS: The objection is the
09:37:44 regulations he relied upon were put on the board
09:37:46 Thursday. This is a 1984 document. The ones he relied
09:37:51 upon were on the board on Thursday when he testified,
09:37:53 and they should use those.
09:37:56 MR. KENT: Your Honor, I believe I am
09:37:58 allowed to cross-examine the witness on what he was
09:38:00 shown and what he wasn't. And if it turns out that he
09:38:03 did not rely on what was shown to him on Thursday, but
09:38:07 instead relied on this, he should be allowed to be
09:38:10 cross-examined on it.
09:38:11 THE COURT: I agree. Did you rely on this
09:38:13 document?
09:38:14 THE WITNESS: Well, I relied on that
09:38:16 document, plus other documents on the web site. And I
09:38:18 think at the time he was taking my deposition in 2004, I
09:38:23 described having gone through the web site and looked at
09:38:26 various documents. I don't recall all of them I looked
09:38:28 at, but that's one I presented. I presented that at my

09:38:32 deposition for 80 hours.

09:38:33 But he's asking a different question now. 09:38:36 That will show the 80 hours. He's asking the question 09:38:38 of whether it can be less than 70, and I'm saying it 09:38:42 cannot be.

09:38:42 THE COURT: Objection overruled. You are 09:38:45 saying it cannot be?

09:38:46 THE WITNESS: Cannot be, yes, sir.

09:38:48 BY MR. KENT:

09:38:48 Q. All right. So to move forward, then, 09:38:50 Dr. Bradley, if the rule is that full-time at Family 09:38:57 Dollar can equal 30, then two full-time would equal 60; 09:39:02 correct?

09:39:02 A. Two full-time equals 60. But I keep coming back 09:39:06 to the fact that the FLSA still requires the 40 09:39:11 standard.

09:39:12 Q. I'm not interested in your opinion of what the 09:39:14 FLSA requires. What I'm asking you is if it allows 09:39:19 Family Dollar to consider full-time as 30, then two 09:39:22 full-time would be 60; correct?

09:39:24 A. And I said it allows Family Dollar to consider 09:39:27 full-time whatever they want to, but not when it comes 09:39:30 to application to FLSA.

09:39:31 Q. Fair enough, Dr. Bradley. Did you do any report 09:39:38 that looked at whether -- how often the store managers

would meet the two employee requirement if it equaled 60 hours?

A. Actually, I did.

Q. And how often did -- first of all, where is that report?

A. Well, it wasn't one that I submitted, but you asked if I ever did it.

Q. Okay.

A. And you had raised this point in my deposition. And frequently after my deposition or testimony, I will investigate a particular point, in case it comes up again.

Q. And how many employees met the requirement at 60 hours?

A. There were, I believe, 25 that did not meet the requirement -- assuming, now for the moment, that I am assigning all supervised -- I mean, all subordinate hours at a store, regardless of when they were worked, to the manager.

Q. I understand. Thank you. The second factor that you had to be given is the definition of customarily and regular; correct?

A. That's correct.

Q. And you were told what customarily and regularly means by somebody who is being paid $225 an hour by

09:40:53 plaintiffs' counsel to tell you what it means; correct?

09:40:56 A. No, that's not quite correct. I had conversation
09:41:00 with plaintiffs' counsel, and my understanding they were
09:41:03 basing that on case law. And I have since reviewed --

09:41:06 Q. Dr. Bradley, I do not believe you want to open up
09:41:10 the door for discussing case law in this case.

09:41:13 MR. R. WIGGINS: Objection, Your Honor. He
09:41:14 doesn't need admonition from Mr. Kent.

09:41:17 THE COURT: The objection to the
09:41:18 argumentative nature of the last statement is sustained.

09:41:21 BY MR. KENT:

09:41:21 Q. Did you rely on what somebody who is being paid
09:41:27 $225 an hour by plaintiffs' counsel to determine to use
09:41:36 standard to define customarily and regularly?

09:41:39 A. I don't know what somebody's being paid, but I
09:41:43 discussed with several people, with plaintiffs' counsel,
09:41:47 what customarily and regularly was, besides the case
09:41:53 law.

09:41:53 Q. You know that nowhere in the regulations is there
09:41:59 a specific number definition for customarily and
09:42:03 regularly; correct?

09:42:04 A. That is correct.

09:42:05 Q. You know that the only thing that is defined in
09:42:11 the regulations is that customarily and regularly is
09:42:14 something that is, number one, less than constantly, but

09:42:18 number two, more than occasionally; correct?

09:42:22 A. That is correct. And that has been defined recently by a federal judge. Those exact -- that exact definition.

09:42:36 Q. Dr. Bradley, I ask that you stick to the questions. Okay?

09:42:47 Did you look at how often Family Dollar would have met the requirements at a percentage of 60 percent or 70 percent?

09:43:02 A. No, sir. But the charts that I gave the jury, they can certainly figure that out, because I have all the computations -- I have all the number of weeks there.

09:43:12 Q. Well, one thing that you could have done with that chart is, you could have listed everybody; correct? All 1,424 plaintiffs; correct?

09:43:21 A. I could have, yes.

09:43:23 Q. And if you had done that for everybody except for those 199, most, if not everybody, would have met the requirement 100 percent of the time; correct?

09:43:34 A. No, I disagree with that.

09:43:36 Q. Do you know?

09:43:37 A. I -- I'm -- I just know it won't be a hundred percent of the time. I know there are people -- I'm not saying there weren't some that weren't a hundred percent

of the time that worked a short percent, but there would be a lot between 80 and a hundred percent.

Q. Do you know how many would be at a hundred percent?

A. I don't know. I did not run that calculation.

Q. Okay. Well, another thing that you could have done is, you could have taken an average, couldn't you? You could have -- I am going to look at all 1,424 plaintiffs for the entire period at issue, and I'm going to come up with an average of how often the requirement's met or not.

A. Well, I could have, but then that gives -- what that does is that allows store managers that actually, say, do it 90 or 100 percent of the time, offset of managers only doing it 60 or 65 percent of the time. So, therefore, you are now passing people that are clearly failing it with people that are clearly passing it. So I don't believe that average would be probative to the question at hand.

Q. If the case law allows for it, then it would be something you should do; correct?

A. Well, I don't know if it's something I should do. If you're telling me case law, you would have to show it to me, that case law says that's the way you do it.

Q. Assume that case law does say that you can do it

09:44:57 that way.

09:44:57 A. So that you are going to give credit for people
09:44:59 that don't make it for people that do make it, is
09:45:03 basically what you are saying.

09:45:05 Q. That's right.

09:45:06 A. I don't believe that's true, but I don't argue
09:45:09 about it.

09:45:09 Q. Okay. Well, the next thing that you did was you
09:45:15 calculated your calculation of damages; correct?

09:45:20 A. That's correct, yes, sir.

09:45:22 Q. Could we get slide 4?

09:45:35 Do you remember, Dr. Bradley, being asked about
09:45:38 this chart last Thursday?

09:45:41 A. Certain aspects of it, yes, sir, I do.

09:45:45 Q. Let's be clear on what this chart is saying.
09:45:52 This is a chart that is saying if a store manager is
09:45:57 paid $705 a week and works 58 hours, that store manager
09:46:07 is making the same amount of money as an hourly employee
09:46:13 who is paid 10.50 per hour and paid at overtime rate of
09:46:19 $15.75; correct?

09:46:22 A. That's what it's saying. And that would be true
09:46:27 if he worked 58 hours every week, and every single week
09:46:33 he always worked 58 hours.

09:46:35 Q. But let's take an example. You have two people
09:46:39 living next door to each other, one is a Family Dollar

09:46:43 store manager. He makes $705 a week and he works on
09:46:49 average 58 hours. The neighbor is paid hourly at 10.50
09:46:56 per hour. That particular week, he works 58 hours.
09:47:03 At the end of the week, when they compare their
09:47:09 paychecks, they will be the same; correct?
09:47:09 A. Right. But --
09:47:10 Q. I am going to recap. The difference is that if
09:47:14 the hourly employee works more or less hours, there will
09:47:19 be a difference; correct?
09:47:20 A. That's correct.
09:47:21 Q. If the hourly employee works more than 58 hours,
09:47:25 they will make more money?
09:47:27 A. That's absolutely correct.
09:47:29 Q. But if they work less than 58 hours, they will
09:47:32 make less?
09:47:33 A. That's correct.
09:47:34 Q. So, in effect, what Family Dollar has done for
09:47:39 those store managers that average 58 hours, is they have
09:47:43 guaranteed them 18 hours of overtime at $15.75; correct?
09:47:50 A. Now, I disagree, because the store manager is not
09:47:53 hired in at an hourly rate. He's not hired in at 10.50
09:47:57 an hour. He is not told his hourly rate is 10.50. He's
09:48:01 told his salary is $705. There's a big difference.
09:48:05 For example, if he were to work, for example, 65
09:48:10 hours to get that thing to come out to be 705, his

09:48:14 hourly rate will have to drop below $10 an hour. In other words, his hourly rate is not constant as his neighbor's is.

09:48:22 Q. Do you know what the hourly rate would be if he averaged 64 hours?

09:48:28 A. I don't know what it is.

09:48:29 Q. Well, if I told you that the overtime rate is $13.59 cents, would that sound right?

09:48:38 A. His base rate or the average rate would have to be less than $10 an hour.

09:48:43 Q. Would you take a look at what the average reported hours are for a store manager?

09:48:47 A. I think you asked me this once before, and I think I told you it was around 60 on an average for all weeks for all store managers.

09:48:54 Q. Well, if Family Dollar calculates around 58, would you have a disagreement with that?

09:48:59 A. I, you know, I can't -- it sounds close to what I calculated, so I can't say it's incorrect.

09:49:05 Q. Well, let's take a look at what you did.

09:49:11 Koni, can we get slide 5?

09:49:17 Do you see that, Dr. Bradley?

09:49:19 A. Yes.

09:49:20 Q. What you did was you took, assuming there's a weekly salary for $705, you divided the 705 by 40 hours;

09:49:37 correct?
09:49:37 A. That is correct, yes, sir.
09:49:38 Q. So you same up with an hourly rate of $17.63;
09:49:42 correct?
09:49:43 A. That would be correct, yes.
09:49:44 Q. And then you calculated the overtime rate, so
09:49:47 your overtime rate is $26.44; correct?
09:49:51 A. Let me -- can I verify this?
09:49:54 Q. Absolutely.
09:50:03 A. Yes. I agree with that, yes.
09:50:05 Q. So then you took that overtime rate of $26.44 and
09:50:10 you multiplied it by the 18 hours to come up with $475?
09:50:22 A. Yes, correct.
09:50:22 Q. And then you gave each plaintiff another six
09:50:27 hours; correct?
09:50:28 A. That's correct, yes.
09:50:29 Q. Which is another $158; correct?
09:50:32 A. That sounds right.
09:50:34 Q. So you came up with a new weekly salary of
09:50:41 $1,339; correct?
09:50:41 A. That's correct.
09:50:43 Q. Or a new annual salary of $69,654; correct?
09:50:51 A. If he worked that amount every week during the
09:50:55 year, yes.
09:50:56 Q. Well, what you're saying is the average is 60

09:51:01 hours, not 58; so it would actually be higher?

09:51:04 A. Well, you are just taking an average.

09:51:06 Q. I understand.

09:51:07 A. You would assume he worked that every week, and
09:51:09 that's not necessarily the case.

09:51:11 Q. That's the calculation you did, assuming those
09:51:13 numbers are correct?

09:51:13 A. Well, I never got to the new yearly salary. I
09:51:16 simply did that for each week, depending on the number
09:51:19 of hours they worked, and added those up. But you are
09:51:22 correct about that, yes.

09:51:23 Q. Okay. So, what happens is the higher somebody's
09:51:38 salary is, the higher your calculation of damages is
09:51:45 going to be; correct?

09:51:46 A. Yes. Obviously, they make more per hour on what
09:51:50 you calculate there, so the damages are.

09:51:52 Q. Do you have Plaintiff's Exhibit 216 in front of
09:51:56 you?

09:51:56 A. I should. Yes, sir, I do.

09:52:06 Q. Okay. Take a look at Mr. Fowlkes, I think who
09:52:11 makes over $50,000 a year. Can you tell me what the
09:52:14 damages are for R. C. Fowlkes?

09:52:16 A. Fowlkes?

09:52:17 Q. Yes, sir, who I believe you said made over
09:52:20 $50,000 a year.

09:52:33 A. R. C. Fowlkes. His damages with the six hours are $340,978 -- $340,978.04.
09:52:46 Q. Did you do any type of calculation to figure out what his salary would be if you added the $240,000 of damages on top of his salary?
09:52:55 A. Well, that's -- that's -- for the entire period of time, I don't know what period of time that covers.
09:53:00 Q. I understand.
09:53:01 A. That's not just for a year. That's for several years.
09:53:04 Q. How about Doris Moody? what are her damages?
09:53:07 A. Doris Moody? Her damages are $478,290.47.
09:53:25 Q. Now, notice that this morning your attorney introduced another exhibit, Plaintiffs' Exhibit 235, which is your calculation of damages for approximately an eight-month period; correct? from April to December?
09:53:47 A. Yes, sir, I agree with that. Yes.
09:53:50 Q. And for this eight-month period, your calculation of damages for Mr. R. C. Folkes is another $60,000; correct?
09:53:58 A. I would have to check that --
09:54:00 Q. Okay.
09:54:19 A. -- for Mr. Folkes.
09:54:21 Q. Yes, sir.
09:54:21 A. Is another $60,287.25; yes.

09:54:26 Q. Going back to -- you don't have pull it up, you can if you want to -- going back to Plaintiffs' 216, you said that you calculated Mr. Folkes as receiving another $60,000 for unreported time of six hours per week; correct?

09:54:45 A. Well, $60,000 for overtime plus six hours unreported, so it would be whatever it is over 40, plus the additional six.

09:54:54 Q. Okay. And I want to talk about the unreported hours.

09:54:59 A. Okay.

09:55:00 Q. Your total calculation for the unreported hours is an additional $12 million; correct?

09:55:09 A. I assume you're looking at Exhibit 216; am I correct?

09:55:17 Q. Yes, sir.

09:55:17 A. And so we're talking about for that period of time that's approximately -- well, it's a little over 11 million, plus an incremental part, so it would be a little over 12 million, yes, 12 million something.

09:55:35 Q. By the way, how much is plaintiffs' counsel paying you to come up with these reports?

09:55:41 A. Well, plaintiffs' counsel, for my time for analysis and consultation is $425 an hour, but I have staff that does a lot of this work, and that scale

09:55:55 slides from 110 to 275, depending upon what's being done.

Q. How much does it cost to testify?

A. Well, for -- my time for testifying is $600 an hour.

Q. How much do you think you have billed the plaintiffs in this case?

A. Last time I checked, for the three years that I have been involved in this case, approximately $150,000 for my --

Q. Let's talk about this $12 million. As part of your analysis, did you do any type of analysis to determine whether anybody was overreporting their time?

A. Well, I think we have talked about this before, in terms of overreporting. We don't actually have the -- we don't actually know the amount of time they over reported it, because they didn't report it. So I used the depositions to get an estimate for what the over-reporting time was.

Q. We will get to that. I will stick on that over-reporting. You know that most Family Dollar stores are open on average 74 hours per week; correct?

A. Well, I'm not saying that's wrong. I know somewhere between 70 and 90 hours per week, depending on the store.

09:57:11 Q. Did you look at how many people reported more than 74 hours?
09:57:17 A. There were people that reported more than 74 hours.
09:57:20 Q. Okay. Let's take a look at what you did. First, did you talk to any of the plaintiffs in this case to find out how much they were under reporting?
09:57:35 A. No. I did not talk personally with any of the plaintiffs.
09:57:37 Q. Did you visit any of the stores to get a better understanding of how the store managers report their time?
09:57:44 A. I did not do that, no.
09:57:45 Q. What you did was, you took a sample, and then you used that sample for everybody; correct?
09:57:58 A. Well, what I did is I took the sample of the 214 depositions that I had, computed it --
09:58:05 Q. Koni, slide 10, please.
09:58:07 A. -- an average from that, and then applied that to all of the 14 -- 17 is the number of people I have information on.
09:58:15 Q. So what you did is, you had 214 depositions that were reviewed; correct?
09:58:22 A. Correct.
09:58:23 Q. And actually, you didn't even review these

09:58:27 yourself, did you?

09:58:28 A. I had -- well, I had somebody -- one of the staff

09:58:31 in my office review these depositions, and -- which I

09:58:33 then went over the reviews and did the computations.

09:58:36 Q. So that's a yes, you did not review the

09:58:39 depositions?

09:58:39 A. I did not individually review all the

09:58:41 depositions, that's correct.

09:58:42 Q. Did you review any of the depositions?

09:58:44 A. I did review some of the depositions when the

09:58:47 persons first started to make sure that it was being

09:58:50 done accurately.

09:58:51 Q. How many would you say you reviewed?

09:58:53 A. I don't know, a couple.

09:58:55 Q. And so you didn't do anything with the 1,210

09:59:02 people; correct?

09:59:03 A. That's correct.

09:59:03 Q. Didn't talk to them, didn't do anything; correct?

09:59:07 A. Well, I did something, I had six hours. But the

09:59:12 point is, I did not talk with them. That's correct.

09:59:14 Q. We will get there. So the 214 depositions you

09:59:17 reviewed, you found in looking at the summaries 112

09:59:22 people actually reported their time accurately; correct?

09:59:27 A. That's correct.

09:59:27 Q. You found 30 people who may or may not have

09:59:32 underreported time, but you just didn't know; correct?
09:59:36 A. Well, I knew they did underreport their time. It
09:59:39 wasn't zero, but I didn't know how much it was.
09:59:41 Q. You did. I put the deposition summaries in front
09:59:47 of you.
09:59:47 A. Yes.
09:59:49 Q. Could you read the notes -- well, first of all,
09:59:51 take a look at your report where you determined what
09:59:54 category you put them in; and take a look at Glenda
09:59:57 Jackson and tell me which one of these three categories
10:00:01 you put Glenda Jackson.
10:00:03 A. Linda Jackson. I'd have to look at the -- let's
10:00:08 see -- was it Linda Jackson?
10:00:23 Q. Glenda?
10:00:25 A. Lynn?
10:00:26 Q. Glenda. I think she's number 73.
10:00:34 A. Oh, Glenda. I'm sorry. Glenda Jackson, right.
10:00:38 Q. You've got her as category 30; is that correct?
10:00:42 A. That's correct.
10:00:43 Q. Take a look at the deposition summary and tell me
10:00:46 what notes you relied upon to say that she should be in
10:00:49 this category of 30.
10:00:51 A. I'm trying to find which page --
10:00:54 Q. Okay.
10:00:54 A. -- she's on. I found it.

10:00:57 Q. Okay. Read what it says there.
10:00:58 A. It says "worked more than 48 hours per week."
10:01:02 Q. "Worked more than 48 hours a week." That's all it says?
10:01:07 A. That's correct.
10:01:08 Q. But yet you're saying she's definitely in the category of underreporting her time?
10:01:14 A. That's correct.
10:01:14 Q. Okay. So we know, or you determined, that 72 people have underreported their time by a known amount; correct?
10:01:29 A. By a known amount, correct.
10:01:31 Q. And you come up with this group of about 14 and a half; is that correct?
10:01:36 A. 14.75, actually.
10:01:38 Q. That would be 14.75?
10:01:40 A. Yes, sir.
10:01:41 Q. That should be 14.75?
10:01:43 A. Yes, sir, it should be.
10:01:44 Q. Now, what you did then is you took this 14.75, and you said, I'm going to give this same average to this group; correct?
10:02:01 A. That's correct.
10:02:01 Q. To Glenda Jackson, who said worked more than 48 hours, and then you took an average here and you shot it

10:02:11 up and gave it to everybody else?

10:02:14 A. That's correct. Well, actually, I didn't do
10:02:18 that. The average came out to be 7.03, and I gave them
10:02:22 six. And I think I explained why I did that when
10:02:25 Mr. Wiggins was questioning me. But due to statistical
10:02:30 principles, I know if I had applied this same method to
10:02:34 all of the 1,424 statistically, I feel confident with a
10:02:41 reasonable degree of scientific accuracy, the number of
10:02:44 reported hours would be at least six.

10:02:46 Q. Now, did you do anything to check this number?

10:02:51 A. Well, I had nothing else to check that difference
10:02:55 with.

10:02:55 Q. Okay. If you look at your report, I think you
10:02:59 have got Alice Duessler underreporting by 33 hours. Did
10:03:05 you talk to Ms. Duessler and say, "how are you
10:03:10 underreporting the 33 hours"?

10:03:11 A. I pointed out -- no, I did not. I used the
10:03:14 deposition.

10:03:14 Q. So your calculation, as long as this number's
10:03:22 correct, all these numbers are correct; right?

10:03:25 A. Pardon me. I can't see what you're saying.

10:03:26 Q. As long as this number's correct, everything else
10:03:30 will be correct; right?

10:03:31 A. That's correct.

10:03:31 Q. But if this number is wrong, all of this is

10:03:36 wrong; correct? It's like bowling --

10:03:38 A. Well, wait a minute.

10:03:40 Q. -- when you let the ball go, and you are a little
10:03:43 off here, by the time the ball gets down to where the
10:03:46 pins are, the ball could be in the gutter; right?

10:03:48 A. Well, I would agree with that, except I didn't
10:03:51 use the average of 67.03. I think I repeatedly said to
10:03:55 allow for possibilities, such as overreporting.

10:04:00 Q. Isn't the goal here to come up with the most
10:04:04 accurate number?

10:04:05 A. Sure.

10:04:05 Q. Not to come up with something high and say, I am
10:04:08 going to reduce a little bit --

10:04:11 A. Having been involved, I would rather in this case
10:04:15 underestimate the number of hours than overestimate.
10:04:18 And I tried to be very safe and secure about approaching
10:04:21 this thing several different ways to assure myself the
10:04:25 six hours was at least a low point at which the
10:04:30 overreporting would be.

10:04:31 Q. Okay. We don't have time to go through all 72 of
10:04:36 these, but are you aware that the four plaintiffs who
10:04:42 have come in and testified in that chair on the issue
10:04:47 have all said that they reported their time accurately?

10:04:51 A. Well, I am not -- well, I wasn't here or even
10:04:54 allowed to be in the courtroom to hear them, but I will

10:04:58 take your representation that's what they said.

10:05:01 Q. This is Misty Bice's trial testimony, I
10:05:05 understand. You testified that you reported your time
10:05:07 accurately; correct?

10:05:10 A. Yes, sir.

10:05:12 Q. How about Ms. Jones? "And according to your
10:05:14 deposition testimony, you reported your time accurately;
10:05:18 correct? Yes, sir. You reported your hours through the
10:05:23 computer in your store; right? laptop? Right, through
10:05:27 a computer. And you reported them accurately? Answer:
10:05:31 Yes, sir."

10:05:33 Now, let's pull up the last one. This is the
10:05:36 testimony of Janice Morgan, the named plaintiff in this
10:05:40 case. Do you know Ms. Morgan?

10:05:42 A. I actually met her for the first time last night
10:05:45 briefly.

10:05:45 Q. So you have never sat down with Ms. Morgan and
10:05:49 talked about whether she over or underreported her time?

10:05:53 A. No, sir, I have not.

10:05:54 Q. Right here she's testifying that she reports her
10:06:00 -- reported her time accurately; correct?

10:06:02 A. That's what she says, yes.

10:06:04 Q. Take a look at your report and tell me whether
10:06:09 she's -- in the 112 that said they reported their time
10:06:13 accurately or in another category?

10:06:15 A. She's in the category that estimates her underreporting by 27 hours.

10:06:21 Q. So you have Janice Morgan, the named plaintiff in this case, is underreporting by 27 hours, even though her trial testimony is that she reported her time accurately?

10:06:34 A. That's correct.

10:06:37 MR. KENT: Nothing further, Your Honor.

10:06:40 THE COURT: Redirect?

10:06:42 **REDIRECT EXAMINATION**

10:06:42 **BY MR. ROBERT WIGGINS**:

10:06:45 Q. Dr. Bradley, you have looked at the defendant's records on what they paid people?

10:06:56 A. Yes, sir, I have.

10:06:58 Q. When -- that's sort of broad, what they pay the store managers?

10:07:04 A. Yes, sir.

10:07:05 Q. Do those records reflect they pay anything for overtime?

10:07:09 A. No, they do not.

10:07:11 Q. All right. Let's look at slide 4 that Mr. Kent had on the board. Mr. Kent asked you questions about the defendant's slide 4 that they used in the opening statements.

10:07:37 When it says 18 times 57, $15.75 equals $283 for

10:07:44 overtime, in the real world -- they don't actually pay
10:07:50 overtime, do they?
10:07:51 A. No, sir, they do not.
10:07:52 Q. You were asked by Mr. Kent about the salary basis
10:07:58 test of $455 per week in order to be eligible, and so in
10:08:02 order to be a bona fide executive?
10:08:05 A. That's true, after August of 2004.
10:08:07 Q. Right. And on Mr. Kent's chart here -- I'm sorry
10:08:13 -- just to get us oriented, what Mr. Kent was asking you
10:08:17 about is this first test that you must meet. And if you
10:08:21 fail it, you're not exempt?
10:08:23 A. That's correct.
10:08:23 Q. And it says the manager is compensated on a
10:08:26 salary basis at a rate of not less than $455 per week;
10:08:31 correct?
10:08:31 A. Correct.
10:08:32 Q. Where is slide 4?
10:08:38 According to the defendant, they don't meet the
10:08:40 salary basis test; they pay 420?
10:08:44 A. If that -- if the person's getting a rate of
10:08:47 10.50 an hour, that's correct.
10:08:49 Q. Right. But the defendant claims that in the real
10:08:52 world they don't pay 420, they pay 455 or more?
10:08:58 A. Or more.
10:08:58 Q. That's what they claim?

A. That's correct.

Q. And you checked it and you found out that, in fact, Family Dollar does pay as the base rate before overtime more than that 420 they stuck in this example?

A. Yes, sir, that's correct.

Q. And -- but on the overtime part, under their example, if you just take their word for it that they're paying 18 hours of overtime or they should be, they don't pay any overtime but they should be paying 18 hours of overtime at 15.75, at $283.50 a week, what is that for 52 weeks for one person?

A. It's $14,742.

Q. Per person?

A. Per person.

Q. Per year?

A. Per year.

Q. There's 5,500 stores multiplied by 5,500 stores.

A. Okay. That's $81 million.

Q. Per year?

A. Per year.

Q. According to their own calculations, they save $81 million -- they save $81 million a year by not paying overtime?

A. Under that scenario, yes.

Q. This case is covering seven years. How much is

10:10:38 that --

10:10:38 MR. KENT: Counsel is leading the witness.
10:10:40 We object.

10:10:41 THE COURT: As to that last question, it's
10:10:43 not leading, and so I overrule that objection. There
10:10:47 were some other leading questions that were not objected
10:10:50 to.

10:10:51 The objection to the last question is
10:10:53 overruled.

10:10:53 THE WITNESS: That would be -- let's see. I
10:10:56 ran out of zeroes here on this calculator. What did I
10:11:00 say before? I've got to go back and redo this, I need
10:11:04 to use my calculator.

10:11:07 BY MR. R. WIGGINS:

10:11:07 Q. You don't have enough zeroes?

10:11:10 A. I don't have enough zeroes on his calculator.
10:11:33 That would be $576 million.

10:11:37 Q. If they had paid overtime, they would have had to
10:11:43 pay $76 million just for the seven years?

10:11:46 THE COURT: The objection to leading and
10:11:50 repetitious is sustained.

10:11:51 Q. Now, what is the back pay that you calculated,
10:11:58 compared to that $576 million that you say is owed to
10:12:05 these particular plaintiffs, the 1,424 in this case, or
10:12:10 26?

10:12:10 A. Let me add the numbers together. $50,689,947.
10:12:43 That's 50 million -- approximately $50.7 million.
10:12:48 Q. All right. Now, you were asked some questions
10:12:53 about whether you must be in the store to satisfy the
10:12:57 two full-time equivalent in order to supervise two
10:13:02 full-time equivalents, and you said there were some
10:13:06 regulations on that you couldn't put your finger on it.
10:13:12 I want to show you slide S5.
10:13:14 MR. KENT: Your Honor, we again would object
10:13:17 to the introduction of any regulation that this witness
10:13:20 has not seen to formulate his opinion. He has already
10:13:24 testified he hasn't seen it.
10:13:26 MR. R. WIGGINS: This was on the board.
10:13:28 THE COURT: Just a moment.
10:13:29 THE WITNESS: This was on the board
10:13:31 Thursday.
10:13:31 THE COURT: Yes. And had you seen it
10:13:33 before?
10:13:33 THE WITNESS: You know, you're asking me --
10:13:35 going through all these, do I recall particularly that
10:13:37 formulation of it, I don't know. I recall seeing
10:13:40 something like this.
10:13:44 MR. KENT: Your Honor, we would respectfully
10:13:47 request that if the witness can't verify he's even seen
10:13:51 it, that he not be allowed to be questioned about it. I

10:13:54 mean, saying I may or may not have seen it certainly isn't sufficient for it to be something he can be questioned about.

MR. R. WIGGINS: The question on cross was different than that. The question on cross was, it is the law, do you know the law.

BY MR. R. WIGGINS:

Q. Is there a law --

MR. KENT: Your Honor, and what I would say here is that if it's something that's in his report and he relied upon, that's one thing. But that is not in his report. We have already established that.

THE COURT: Well, did you rely on this in your report?

THE WITNESS: No, sir, I did not.

THE COURT: The objection is sustained.

BY MR. R. WIGGINS:

Q. Now, Dr. Bradley --

MR. KENT: Your Honor, we ask that it be taken down.

MR. R. WIGGINS: I have a second question on that, and that is, whether this regulation is consistent with what he found.

THE COURT: The objection is overruled.

THE WITNESS: Yes, it is.

BY MR. R. WIGGINS:

Q.  All right.  And read the language that's consistent with your findings and the way you did the calculations or the way you recommended doing them.

A.  Let's see.  It's the part that starts with "Thus, if two supervisors share responsibility for supervising the same two employees in the same department at the same time, neither supervisor would qualify".

And then, let's see, and:  "On the other hand, a full-time employee who works half of the time for one supervisor and the other half of the time for a different supervisor may be credited as a half-time employee for each supervisor."

Q.  Read the operative language again?

A.  "On the other hand, a full-time employee who works half of the time for one supervisor and the other half of the time for a different supervisor may be credited as a half-time employee for each supervisor."

Q.  When you said that you identified 199 people who didn't -- I forget the way you phrased it, didn't meet the test in any way, shape, or form, or something --

MR. KENT:  Your Honor, I object to the question.  It's leading.

Q.  Did you --

THE COURT:  Overruled.

10:16:02 Q. On the 199 calculations that you had, did you give each store manager credit for the time that they were off work and the store's being run by the assistant managers?

10:16:15 A. Yes, sir, that's what I said.

10:16:17 Q. What would be the correct way to do the two full-time equivalent under this regulation that we have on the board?

10:16:23 MR. KENT: Your Honor, we object, Your Honor. This is a witness who is already testifying he is not an expert on FLSA, he has no legal training in the Fair Labor Standards Act; and therefore, has no ability to apply this -- this writing here that's not even a regulation to the facts of this case.

10:16:44 THE COURT: The objection is overruled.

10:16:46 MR. R. WIGGINS: They opened the door.

10:16:50 THE WITNESS: Was there a question?

10:16:51 BY MR. R. WIGGINS:

10:16:51 Q. Yes. Given this regulation that you have just read saying that you don't supervise -- you don't credit a supervisor for time that someone else supervises an employee, what would be the correct way of calculating whether you meet the two full-time equivalent requirement to be exempt for overtime purposes?

10:17:14 MR. KENT: Your Honor, same objection.

10:17:16 THE WITNESS: You would have to take the actual scheduled time the store manager was in the store and the time he was in the store, you would have to take the subordinate hours the person for working was in there, and add those up, not just all the hours per week but those hours that correspond to the hours that he was in the store.

10:17:32 Q. All right. You were asked questions by Mr. Kent on another subject, and that is whether Family Dollar could substitute its own definitions of 30 hours being full-time for --

10:17:46 MR. KENT: Object, Your Honor. That is a mischaracterization of the testimony, and we object that we could submit our own, but rather complying with the law that full-time at Family Dollar equals 30.

10:17:59 THE COURT: Objection is overruled.

10:18:01 Q. Complying with the law. Let's look at T1. You mentioned 35 hours, not less than 35 hours.

10:18:12 MR. KENT: Your Honor, same objection. This witness has already testified that he has not seen --

10:18:17 THE WITNESS: I have seen this. This is what I gave Mr. Wiggins.

10:18:22 MR. KENT: This is not part of the report, Your Honor.

10:18:24 THE COURT: Objection is overruled.

10:18:26 THE WITNESS: This particular point --

10:18:27 THE COURT: I've made my ruling.

10:18:28 BY MR. R. WIGGINS:

10:18:28 Q. You were asked if even in a whole industry could elect for itself to substitute 30 hours, and I want to -- and you said, no, they cannot double over 35. Do you see that language in the Department of Labor Overtime Security Advisory?

10:18:49 A. Yes, sir.

10:18:50 Q. Read the language.

10:18:51 A. The last sentence of the first paragraph says: "While full-time generally means at least 40 hours per week in this context, the Department of Labor will recognize established industry standards defining full-time schedules as 37-and-a-half hours or 35 hours per week where appropriate, but not less than that."

10:19:11 Q. "Not less than that"?

10:19:12 A. That's correct.

10:19:13 Q. Has anyone ever suggested to you when Family Dollar took your deposition, or at any point in time, that one company, not a whole industry, could just define for itself what the law means?

10:19:30 MR. KENT: Objection, Your Honor.

10:19:31 THE COURT: The objection to leading is sustained.

10:19:34 THE WITNESS: Well, I think I pointed out --
10:19:36 THE COURT: Don't answer.
10:19:37 BY MR. R. WIGGINS:
10:19:37 Q. Have you ever seen anything that indicates a single company can define for itself less than 40 hours being full-time?
10:19:47 A. Yes.
10:19:47 Q. A single company?
10:19:51 A. I have not -- no -- yeah, have I seen it -- no, I have not.
10:19:54 MR. KENT: He has asked and answered the question.
10:19:56 THE WITNESS: I misunderstood the question.
10:19:58 THE COURT: Overruled.
10:20:01 Q. Double negatives.
10:20:02 A. You got me there.
10:20:05 Q. I know better to ask double negatives.
10:20:09 A. You outsmarted yourself that time.
10:20:12 Q. Yeah, I did.
10:20:18 Now, Mr. Kent asked you about this 1984 Field Operations Manual that you put on the board. Could we have that back on the board? And let me show you Mr. Kent's version.
10:21:14 First of all, what is the date at the top next to the word Field Operations Handbook?

10:21:21 A. April 18th, 1984.

10:21:23 Q. In the first paragraph, Section A, how is full-time defined?

10:21:29 A. It's defined as -- well, full-time is defined as two employees as 80 hours per week.

10:21:39 Q. In the second paragraph, how is full-time defined?

10:21:43 A. 80 hours per week.

10:21:46 Q. When it gives an example of less than 80 hours, does it in that same paragraph B, does it ever talk below 35?

10:22:00 MR. KENT: Your Honor, objection as to leading.

10:22:03 THE COURT: Sustained.

10:22:04 Q. What does that paragraph B say about 35?

10:22:08 A. Well, it says that there can be 35 or 37-and-a-half hours for full-time for certain industries, such as banking and insurance.

10:22:20 Q. Is Family Dollar in those industries?

10:22:22 A. No, sir.

10:22:22 Q. You were asked about the basis for defining customary and regular as 80 percent. And you mentioned case law and a federal judge having done so.

10:22:47 MR. KENT: Your Honor, we object to -- this is complete hearsay and would potentially violate prior

10:22:58 orders and the motion in limine that plaintiffs have
10:23:00 filed on this issue.

10:23:03 MR. R. WIGGINS: They opened the door, Your
10:23:05 Honor, and cut him off. He asked him for the basis, and
10:23:08 he said one basis was a federal court decision defining
10:23:11 customary and regular as 80 percent.

10:23:14 MR. KENT: No, Your Honor --

10:23:16 MR. R. WIGGINS: And I think we have the
10:23:17 right now to identify what he was talking about.

10:23:21 THE COURT: Well, is this something that you
10:23:24 -- this decision that you referred to, is it something
10:23:27 that you relied on in forming your opinions in the case?

10:23:32 THE WITNESS: The decision didn't come out
10:23:34 itself until September of last year.

10:23:37 THE COURT: All right. Then the objection
10:23:39 is sustained.

10:23:41 MR. KENT: Thank you, Your Honor.

10:23:42 BY MR. R. WIGGINS:

10:23:44 Q. Does that decision, having come out in September,
10:23:49 affect your opinion today?

10:23:50 MR. KENT: Your Honor, same objection.
10:23:52 Counsel is basically trying to testify, and it's
10:23:55 something that he should not be allowed to do.

10:23:58 THE COURT: I sustain the objection. Of
10:24:02 course, if there is a decision that the jury ought to

10:24:08 know about, effective, which on the basis of the charge
10:24:13 of the jury, the lawyers will give it to me and I will
10:24:16 incorporate it into my charge to the jury, if
10:24:20 appropriate.
10:24:21 MR. KENT: Thank you, Your Honor.
10:24:24 MR. R. WIGGINS: We would offer *Perez versus*
10:24:29 *Radio Shack.*
10:24:30 MR. KENT: And there's a whole host of cases
10:24:33 we would offer.
10:24:34 THE COURT: All right.
10:24:38 BY MR. R. WIGGINS:
10:24:38 Q. You were asked a question if -- on the two FTE
10:24:41 requirement, if there were people that fell between 80
10:24:48 percent and a hundred percent; and you said yes, there
10:24:50 were, worked -- what was the basis for that calculation,
10:25:01 in terms of whether you were giving credit for persons
10:25:05 who are being supervised by someone else, or just by the
10:25:08 store manager himself while he was in the store?
10:25:10 MR. KENT: Your Honor, we object to leading.
10:25:12 THE COURT: The objection is overruled.
10:25:14 THE WITNESS: Once again, that calculation
10:25:16 would have been based on all hours of subordinate
10:25:21 employees during the week, regardless of whether they
10:25:23 were being supervised by the store manager or not.
10:25:25 Q. Do you know of anybody who fell in the 80 percent

10:25:30 to 100 percent range for supervising full-time equivalents, when you counted only the hours that they were doing supervising?

A. Well, I don't -- you know, as I said before, it's impossible to do that calculation with the data you have, because we don't have it broken down by schedule of who was managing at what time of the week.

Q. In looking at the six unreported hours, did -- were persons who testified they reported all their hours included in the calculation that ended up with 7.1 hours or some --

MR. KENT: Objection, Your Honor. The question is leading.

THE COURT: Overruled.

THE WITNESS: Yes. I think I stated that the people that said they reported them accurately were included.

Q. So they brought the average -- what did they do to the average?

A. Well, they would bring the average down.

MR. R. WIGGINS: No other questions.

THE COURT: Recross?

MR. R. WIGGINS: Excuse me. Could I have just a moment?

**RECROSS-EXAMINATION**

10:27:23 **BY MR. KENT**:

10:27:24 Q. Dr. Bradley, I want to direct your attention back
10:27:27 to this chart, which is the chart that was used in
10:27:31 opening by Family Dollar, of what you've been questioned
10:27:35 about somewhat Thursday and today.

10:27:40 Mr. Wiggins asked you about what the salary is
10:27:48 for this individual, and attempted to get you to say
10:27:55 that the salary did not meet the $455 requirement;
10:28:00 correct?

10:28:01 A. He asked me that, yes.

10:28:02 Q. What does the top line of that chart say?

10:28:06 A. That it was a 705 salary.

10:28:08 Q. Thank you.

10:28:09 A. For someone --

10:28:10 Q. Now, let's go over exactly what this is saying
10:28:15 and what it's not saying; okay?

10:28:18 A. All right.

10:28:18 Q. And I want to refer you back to my prior example,
10:28:24 where you have one neighbor who is a Family Dollar store
10:28:31 manager and who is getting paid $705 a week and who is
10:28:38 working 58 hours a week; okay?

10:28:41 A. Okay.

10:28:42 Q. And he has a neighbor who is being paid hourly at
10:28:47 $10.50 per hour and who does work 58 hours per week;
10:28:57 okay?

10:28:57 A. Yes.
10:28:58 Q. At the end of the week, both neighbors have made the exact same amount of money; correct?
10:29:13 A. That's correct.
10:29:13 Q. So, if somehow internally the person who is being paid a salary was put into the wrong bucket and they say, well, we're going to do it hourly, this is what the hourly rate would be?
10:29:34 A. Well, no, I disagree with that. If he was put in the hourly bucket, his hourly rate would be the 705 divided by 40.
10:29:42 Q. No, it wouldn't. It would be this, if it was the 705 divided by 40 -- can we have that chart, Koni?
10:30:08 If it's the 705 divided by 40, that individual -- can you go down a little bit to weekly salary -- that individual is making $1,339; correct?
10:30:23 A. Well, with the six additional hours.
10:30:26 Q. Okay. Subtract the six additional hours out. Do you have a calculator there?
10:30:33 A. Yes. $1,180 and some odd cents.
10:30:47 Q. Okay. This individual, doing it your way, makes $1,180, not $705; correct?
10:30:57 A. Well, if he's getting appropriately compensated for his overtime, that's correct.
10:31:02 Q. Let's go back to the prior slide, if we could.

10:31:11 Store manager who is paid $705 a week and works 58 hours
10:31:18 is being compensated for every hour of overtime of these
10:31:27 18 hours at $15.75?

10:31:33 A. That's only true if he was -- if his hourly rate
10:31:37 were 10.50.

10:31:39 Q. Exactly.

10:31:40 A. I think that's where we have a difference of
10:31:43 opinion.

10:31:43 Q. Exactly.

10:31:43 A. The question becomes what is the basis for that
10:31:46 -- how many hours is the basis for that $705.

10:31:49 Q. Thank you.

10:31:50 MR. KENT: Nothing further, Your Honor.

10:31:53 **FURTHER REDIRECT EXAMINATION**

10:31:54 **BY MR. ROBERT WIGGINS**:

10:31:56 Q. Have you determined the number of people that
10:32:04 have their salary based on 48 hours?

10:32:08 A. I'd say it's virtually all of them.

10:32:11 Q. Did you look at that in the defendant's payroll
10:32:13 records?

10:32:15 MR. KENT: Your Honor, I object. This is
10:32:17 outside the scope of recross.

10:32:20 THE COURT: Well, as I have indicated every
10:32:23 time the issue comes up, as I read the Federal Rules of
10:32:29 Evidence, the -- there is no provision limiting what can

10:32:36 be elicited during redirect examination.

10:32:45 MR. KENT: Thank you, Your Honor.

10:32:48 BY MR. R. WIGGINS:

10:32:48 Q. Now, I think my question was: Did you look at 10:32:52 the defendant's payroll records to determine the number 10:32:55 of people or the percentage whose salary was based on 48 10:33:00 hours of work?

10:33:01 A. Well, what I looked at was the defendant's 10:33:04 payroll data to see which lists for each individual in 10:33:11 their pay period which is either a weekly or biweekly 10:33:14 pay period, what they wrote down or considered regular 10:33:17 hours for which the regular salary was based, and I have 10:33:21 a percentage of the number of pay periods that represent 10:33:24 48.

10:33:25 Q. Let me show you Exhibit 240. Is that the result 10:33:29 of that calculation?

10:33:30 A. Yes, sir, it is.

10:33:32 Q. What does it show?

10:33:34 A. It shows that for the -- there's well over -- 10:33:37 well, there's 103,172 payroll records in the data -- the 10:33:44 newest data I was provided by the defendant that covers 10:33:47 the period from, I believe, July 1999 through December 10:33:50 of 2005. And on 99.7 percent of those records, the 10:33:57 regular hours is 48. Some other value occurs on the 10:34:01 other 3/10ths of the time. And most of that appears to

10:34:06 be a computer glitches or data entry problems, or things
10:34:09 that occur when someone quits and leaves, or something
10:34:14 of that type.

10:34:15 So from my viewpoint of working these types of
10:34:18 data, the certainty there is, they're all listed as 48
10:34:22 hours for a weekly pay period.

10:34:24 Q. That's the hours they're paid for?

10:34:26 A. That's the hours that the salary represents,
10:34:29 that's correct.

10:34:29 Q. Is that the hours they actually worked?

10:34:31 A. No. Those -- that comes under another field,
10:34:34 which is called labor reporting hours where they
10:34:37 actually report the number of hours they've worked.

10:34:40 Q. The two neighbors that Mr. Kent asked you about a
10:34:43 moment ago on recross, what was your understanding of
10:34:47 those two neighbors? Were they -- were they both
10:34:51 exempt?

10:34:51 A. No, there's only one exempt. That was the Family
10:34:54 Dollar manager.

10:34:54 Q. Okay. So, one neighbor was exempt, the other
10:34:58 neighbor, in his example, was an hourly non-exempt
10:35:03 cashier, or something of that sort?

10:35:05 A. Or maybe even a different employer. But that's
10:35:07 correct, a non-exempt employee.

10:35:10 Q. All right. And in looking at store managers, are

10:35:23 they paid any overtime for any hours they work beyond
10:35:29 40?
10:35:30 A. Or beyond 48, either one, they're not paid
10:35:34 overtime for either one.
10:35:45 MR. R. WIGGINS: We offer Exhibit 240.
10:35:47 MR. KENT: No objection, Your Honor.
10:35:49 THE COURT: It's received in evidence.
10:35:52 MR. R. WIGGINS: And ask that it be
10:35:53 published to the jury.
10:35:54 THE COURT: It will be published to the
10:35:55 jury.
10:35:57 MR. R. WIGGINS: No other questions.
10:35:59 THE COURT: Ladies and gentlemen, we will
10:36:00 take our morning recess.
10:36:02 MR. KENT: Your Honor, will we have an
10:36:04 opportunity to follow up?
10:36:05 THE COURT: On --
10:36:07 MR. KENT: We have only two questions, Your
10:36:08 Honor.
10:36:08 THE COURT: No. This is -- we're finished
10:36:12 with this witness. Thank you, sir.
10:36:15 Ladies and gentlemen, we will take our
10:36:16 morning recess. We will be in recess until 10:40 by the
10:36:22 clock on the wall.
10:36:23 Please do not discuss the case among

10:36:25 yourselves or with anyone else. Do not allow the case
10:36:27 to be discussed in your presence.

10:36:30 We will have a long lunch today. I've got
10:36:34 to speak over at the Alabama Law School at 12:00. So
10:36:39 we'll probably recess about 11:45 and return at 1:30.
10:36:45 But in the meantime, keep an open mind. Don't discuss
10:36:49 the case.

10:36:50 (Recess taken at 10:30 a.m.)

10:37:18 (In open court, jury not present.)

10:37:18 THE COURT: There is Mr. Barkus' order that
10:37:23 I'm going to sign as soon as we can get it off the disk
10:37:26 and printed up.

10:37:28 MR. KALLON: Your Honor, good morning.
10:37:30 During the course of the trial, both sides have put up
10:37:32 on the board various documents which are not exhibits.
10:37:36 With your indulgence, Your Honor, our employers have
10:37:40 reminded me to read in the record a way to count all of
10:37:46 those slides that are not made exhibits.

10:37:49 So we would ask that, I guess, an order or a
10:37:51 statement from the bench to both sides to make as
10:37:54 exhibits for the end of the day, or at the end of each
10:37:57 witness, every slide that they put up on the board which
10:38:00 is actually not introduced as an exhibit for the record.

10:38:04 THE COURT: All right. Well, as you know,
10:38:07 Mr. Kallon, I won't permit lawyers to refer to exhibits

10:38:16 unless until they've been received in evidence. 10:38:19 And I've been a little derelict in this trial in 10:38:24 allowing y'all to get by with it.

10:38:26 But henceforth, let's adhere to the general 10:38:31 rule that you will not refer to an exhibit. You will 10:38:36 not display the exhibit to the jury before it's received 10:38:41 in evidence.

10:38:42 And to protect the record, as suggested by 10:38:49 Mr. Kallon, we will require you to prepare a standard 10:38:59 page type exhibit for any of the charts that you 10:39:03 referred to during the testimony of a witness and will 10:39:06 receive those in evidence.

10:39:09 MR. KALLON: Thank you, Your Honor.

10:39:11 MR. ST. CLAIR: If I may, Your Honor, some 10:39:12 of the things that have been displayed are not exhibits, 10:39:15 but more demonstrative tools; for example, these kinds 10:39:19 of charts.

10:39:19 THE COURT: Yes. Well, if they are -- if 10:39:23 they are demonstrative tools, don't display them before 10:39:28 the jury until you've gotten an agreement from the other 10:39:33 side that they may be displayed.

10:39:36 MR. ST. CLAIR: Very good.

10:39:37 MR. R. WIGGINS: We would like to say those 10:39:41 should be identified for the record so the appellate 10:39:44 record is clear.

10:39:45 MR. ST. CLAIR: And we agree with that, yes.

10:39:46 THE COURT: Anything else?

10:39:48 MR. KALLON: No, sir.

10:39:49 THE COURT: Thank you.

10:39:52 (Recess from 10:34 a.m. until 10:44 a.m.)

10:50:03 THE COURT: Plaintiffs will call their next 10:50:07 witness.

10:50:09 MR. R. WIGGINS: Plaintiffs call Bruce 10:50:12 Barkus.

10:50:16 **BRUCE EDWARD BARKUS, PLAINTIFFS' WITNESS, SWORN,**

10:50:20 THE CLERK: State your name for the record, 10:50:21 please.

10:50:21 THE WITNESS: Bruce Edward Barkus.

10:50:23 THE CLERK: And spell your last name for the 10:50:25 record, please.

10:50:26 THE WITNESS: B-A-R-K-U-S.

10:50:26 **DIRECT EXAMINATION**

10:50:28 **BY MR. R. WIGGINS:**

10:50:28 Q. Mr. Barkus, let me give you your deposition and 10:50:31 your prior testimony so it's handy if you need it.

10:50:36 A. Thank you.

10:50:37 Q. You were the executive vice-president for store 10:50:51 operations of Family Dollar; correct?

10:50:53 A. I was, yes, sir.

10:50:54 Q. Until June of last year?

10:50:56 A. Yes.
10:50:57 Q. When did you begin?
10:50:58 A. I started in June or July of 1999.
10:51:04 Q. And you have previously been designated by the company as their official spokesman?
10:51:13 A. Yes, previously.
10:51:14 Q. And, in fact, your deposition was taken with you as the designated representative to speak on behalf of the corporation; correct?
10:51:22 A. That's correct.
10:51:23 Q. One of the people you supervised was Bill Broome, who was a vice-president; correct?
10:51:27 A. That's correct, yes.
10:51:28 Q. But you were the executive vice-president in charge of the entire store operations throughout the United States; correct?
10:51:34 A. Yes, correct.
10:51:35 Q. And you would visit stores in terms of their operations and see their operations two or three days every week?
10:51:46 A. Yes.
10:51:47 Q. You would be in the store throughout the United States?
10:51:49 A. Yes.
10:51:49 Q. And you reported directly to the president?

10:51:54 A. I did, David Alexander.

10:51:56 Q. And is he the only president you ever reported to?

10:52:02 A. Early, I had reported to the CEO, Howard Levine, and I also reported to Phil Thompson, who was senior V.P. of operations when I first came on board.

10:52:13 Q. But you replaced him?

10:52:15 A. Yes.

10:52:16 Q. All right. So you were, so to speak, the top dog, in terms of operating stores; correct?

10:52:24 A. Yes. I was charge of the stores.

10:52:25 Q. Okay. And Family Dollar never did any study of the hours that the store managers were spending in the stores working, have they?

10:52:39 A. No.

10:52:40 Q. And Family Dollar never studied the tasks that the store managers were doing, working in the stores?

10:52:49 A. No.

10:52:50 Q. Family Dollar's never studied or tried to determine how much time they spent on each task in the stores?

10:52:59 A. There was some work done on the door to floor, you know, how much time was receiving trucks.

10:53:06 Q. But that was not for purposes of looking at their managerial duties?

10:53:12 A. No, sir.
10:53:12 Q. Family Dollar's never studied or looked into the managerial duties or the amount of time spent on managerial duties by store managers, have they?
10:53:24 A. No, sir.
10:53:24 Q. And Family Dollar's never done a study or attempted to determine whether store managers are, in fact, bona fide executives, exempt from overtime, have they?
10:53:37 A. No.
10:53:37 Q. In fact, Family Dollar doesn't even have a policy addressing Fair Labor Standards Act overtime requirements, does it?
10:53:51 A. Not that I am aware of.
10:53:53 Q. Now, that door-to-floor report that you said -- that was a study; correct?
10:54:00 A. It was a project, yes, sir.
10:54:03 Q. And it was a time -- time and motion study?
10:54:06 A. Not really a time and motion, it was looking at tasks going on in the store.
10:54:13 Q. And did you not testify in your deposition that it was a time and motion study, in part?
10:54:22 A. I may have. I don't recall.
10:54:27 Q. Okay. Well, look at -- your deposition is right there, let's see if we can refresh your recollection.

10:54:41 Look at Page 340, line 21. It's the bigger one.

10:55:02 Do you see there on line 22 where you said that
10:55:08 -- you were asked the question: "Did y'all actually do
10:55:10 a time and motion study on the amount of time it took to
10:55:13 do certain aspects of getting the merchandise from the
10:55:16 door to the floor?" Read your answer.

10:55:19 A. I'm sorry. Are you on 340? --

10:55:26 MRS. DOWD: I think you've got the wrong
10:55:29 page.

10:55:29 THE WITNESS: Because this is Mr. Broome.

10:55:31 Q. I'm sorry, what?

10:55:34 A. This says Mr. Broome. I'm sorry. Page 340?

10:55:43 Q. Let's get on the same page here. Let's look at
10:56:05 343. I apologize.

10:56:07 A. Okay.

10:56:09 Q. There at the top of the page, line 1. It says:
10:56:13 "Y'all actually did time and motion studies on the
10:56:15 amount of time it took to do certain aspects of getting
10:56:18 the merchandise from the door to the floor." Read your
10:56:21 answer.

10:56:22 A. "What we were looking at is we had the payroll
10:56:25 budget. We were saying, where is the most budget spent?
10:56:27 And wanted to find out the biggest activities in the
10:56:31 store, which is door to floor. And so we wanted to see
10:56:34 how we could improve it, and that's how we were working

on door to shelf."

Q. "Question: What was the biggest activity in the door to floor?"

A. "Merchandise, in general; just off loading and stocking."

Q. "Question: Taking it off the truck and putting it on the shelves?"

A. "Yes."

Q. All right. And, in fact, you determined that the biggest chunk of the store manager's time was being spent on that manual labor, unloading the trucks, getting it to the floor, and onto shelves?

A. Yes, that's correct.

Q. Now, you have a store policy manual; correct?

A. Yes.

Q. And when you first came to work at Family Dollar in 1999, there was a store policy manual?

A. Correct.

Q. And in 2002, under your direction, while you were in charge of Store Operations, a new store policy manual was put together and issued as the official policy of the company; correct?

A. Correct.

Q. And those -- the store policy manual, which is already in evidence -- I forget the number -- but that

store policy manual is something that the store managers are required to follow?

A. Yes.

Q. And if there are any revisions of the policy that applies, they will be in writing; correct?

A. I'm not sure that they'll be in writing.

Q. Turn to your prior testimony in the other volume, the smaller volume.

A. Okay.

Q. Page 45. You were asked this question -- starts on Page 44 -- you were asked the question on Page 44, line 16: "In any event, if there is a change in policy, it will be in some written form somewhere? Answer: Yes."

A. I'm sorry. I don't have that here.

Q. Page 40 --

MRS. DOWD: You've got him on the wrong page. Go to Page 43. That's what you're reading from.

MR. R. WIGGINS: All right.

Q. Look -- let me -- page numbers apparently are -- have shifted a little bit. Let me get you somewhat oriented. Right here. Page 44?

A. Okay.

Q. Line 16, is where I'm reading from. Do you see that?

11:00:32 A. Okay.
11:00:33 Q. And I'll go over it one more time for you. "In any event, if there is a change in policy, it will be in some written form somewhere?"
11:00:48 A. "Yes."
11:00:49 Q. All right. Turn the page. Line 6. "Question: Is there any written policy that you know of, any written Family Dollar policy, that says that the recommendations of store managers concerning the hiring, firing, promotions of employees, be given particular weight?
11:01:20 "Answer: I don't think it's written that way, no, sir."
11:01:25 A. That's what it says, yes.
11:01:27 Q. That's -- all right. And, in fact, there's nothing in writing in a policy or otherwise that says that a store manager can hire associates, is there?
11:01:43 A. Not that I know of.
11:01:45 Q. And there is nothing in writing that says that store managers can fire associates, is there?
11:01:57 A. Not that I know of.
11:02:01 Q. And there's nothing in writing, in a policy or otherwise, that says store managers can set the pay of associates, is there?
11:02:12 A. Not that I am aware of, no.

11:02:16 Q. And, in fact, it's the district managers who can veto any recommendation made by a store manager or an assistant store manager in regard to hiring, firing, or setting of pay?

11:02:39 A. Yes, they can.

11:02:41 Q. And, in fact, the district manager can set the pay of associates in stores without the store manager approving at all; correct?

11:03:00 A. I imagine they could.

11:03:08 Q. Look at Page 248 of your deposition -- I'm sorry, 250, line 2. "Question: Can a district manager give a raise to an assistant store manager without gaining the approval of the store manager? Answer: Yes."

11:03:54 That was your testimony; correct?

11:03:55 A. Yes. Yes.

11:03:56 Q. And you don't know of any training or instructions that have been given to store managers which tells them that they have the power to discharge a store employee, do you?

11:04:28 A. I don't know of any, no.

11:04:30 Q. And you don't know of any instructions or anything the store managers have been told that says that they can suspend an employee in their store on their own either, do you?

11:04:44 A. I don't know of any, no.

11:04:45 Q. And, in fact, you issued an email in February 2003, which told the store managers that if they tried to hire their own assistants on their own, they would be subject to being fired, terminated, didn't you?

11:05:16 A. Yes, I did.

11:05:18 Q. And you recall no point in time during your seven years at Family Dollar that that wasn't the policy, do you?

11:05:30 A. No, I don't.

11:05:32 Q. And I want to -- I want to look at some of your subordinate employees' actions in the emails based on your own instructions in that February 2003 email. Showing you exhibits --

11:05:59 MRS. DOWD: Your Honor --

11:06:01 Q. Let's look --

11:06:03 THE COURT: Mrs. Dowd?

11:06:03 MRS. DOWD: Yes, sir, Your Honor. He's handed him a binder. I don't know what's in it, but I suspect it's materials that this witness would have no direct knowledge about, and probably materials that are central to the motion in limine. I don't know what he's given him. I don't have a set of it.

11:06:24 THE COURT: I don't either.

11:06:26 MR. R. WIGGINS: These are company emails, Your Honor.

11:06:28 THE COURT: Company emails, he says.

11:06:30 MRS. DOWD: I understand what he says, but what he's calling the company emails are something that have been the subject of a motion in limine and are not materials that this company has produced -- I'm assuming -- I have not seen them -- they are not materials that this company has produced, but rather are, I imagine, emails that have come from other avenues that are not Family Dollar corporate documents.

11:06:58 Plus, I don't have them. Do you have a set for me so I could see what we're talking about?

11:07:06 MR. R. WIGGINS: Exhibit 10 with his own email and his subordinates' emails on the same subjects.

11:07:13 THE COURT: All right. You may proceed.

11:07:15 BY MR. R. WIGGINS:

11:07:15 Q. Look at Exhibit 10. That's already in evidence, but I want to get us oriented. That's your email of February 10 -- February 21, 2003, that we just talked about; correct?

11:07:34 A. It says February 20th, yes.

11:07:36 Q. And it was -- you sent that to all your district managers, as shown at the bottom of the page?

11:07:44 A. Yes.

11:07:45 Q. Let's look at what your district manager did with your instructions. Look at Exhibit 11.

MRS. DOWD: Your Honor, excuse me. Excuse me, Mr. Wiggins.

May I have a continuing objection to these documents that --

THE COURT: Yes.

MRS. DOWD: Thank you, Your Honor.

THE COURT: Now, Mr. Wiggins, I take it that these are emails generated by Family Dollar in the normal and ordinary course of its business?

MR. R. WIGGINS: Yes, sir, they are; from district managers and regional vice-presidents.

THE COURT: All right.

BY MR. R. WIGGINS:

Q. This is a district manager, or two of them, on Exhibit 11, who are implementing your own instruction that the store manager should never hire or terminate an assistant manager; correct?

A. Yeah. It says "never hire or terminate anyone or do the new hire or paperwork PAF until you call the DM."

Q. That's consistent with your policy that you issued in your email; correct?

A. The email said to get a second interview with the DM, yes.

Q. And if you don't -- if you try to hire someone on your own, even your own assistant, you will be fired;

11:09:10 correct?

11:09:11 A. Could lead to termination.

11:09:13 Q. All right. Let's look at Exhibit 12. This is someone that is actually given a performance improvement action plan for trying to hire their own assistant; correct? Tim Fiebiler?

11:09:34 A. I'm sorry, do you have a clearer copy?

11:09:38 Q. I can't see yours, but mine is pretty clear. It says --

11:09:46 A. What does it say here?

11:09:48 Q. Look right here. Says personal -- performance improvement action plan says check the box. He checked "written counseling"; correct?

11:09:55 A. Uh-huh.

11:09:56 Q. Then it says: "Infraction: Hired Tana Fernholz as an assistant manager without district manager approval"; correct?

11:10:07 A. Uh-huh. What's the rest of that line say?

11:10:09 Q. "Giving her 200 code for register before benchmark check was done. Starting Tana Fernholz and Shannon Nielsen as employees before a PAF was completed."

11:10:26 A. The PAF is the new hire paperwork. So I think part of this is someone didn't do the background check or the paperwork for the employee, the way it looks to

11:10:41 me.

11:10:41 Q. Then it says this -- this is what your district manager said, quote: "This will not be tolerated in the future. Any employee being considered for a management position has to be approved by the district manager first"; correct?

11:10:55 A. Uh-huh.

11:10:55 Q. All right. Now, that PAF that you said is the paperwork implementing a hire, that can only be done by a district manager; correct?

11:11:05 A. That's correct.

11:11:05 Q. So the store manager cannot even send in the paperwork to hire someone, much less hire them themselves, can they?

11:11:19 A. It's set upon the computer of the district manager. So that's what the requirement was.

11:11:26 Q. But the store managers have computers; correct?

11:11:29 A. Yeah. But it wasn't connected, my understanding, to the PAF store manager.

11:11:35 Q. But the store managers have computers connected to the corporate office of their own; correct?

11:11:39 A. Yes, they do.

11:11:40 Q. But only the district manager was connected in terms of being able to do the hiring, promotion, pay setting?

11:11:46 A. It was different software.

11:11:48 Q. And only the district manager could use that type of authorization known as the PAF?

11:11:53 A. That's correct.

11:11:54 Q. What's PAF stand for?

11:11:56 A. Personnel Action Form.

11:11:57 Q. Let's look at Exhibits 13, 14, 15, 16, just go on through there real quickly -- we're on a time limit.

11:12:14 But I want to establish that all these are emails by subordinates to you, district managers, regional vice-presidents, saying never, ever hire someone. You will be terminated if you do; correct?

11:12:28 A. Yes, it looks like that way.

11:12:43 MR. R. WIGGINS: We offer Exhibits 10 through 190, Your Honor.

11:12:48 MRS. DOWD: Your Honor, I repeat my objections. Number one, these are the subject of a motion in limine. Number two, there is no testimony other than the email generated by Mr. Barkus or under his -- that he ever saw these documents before the -- before -- in the ordinary and regular course of business. And number three, he has not authenticated the documents again as Family Dollar documents. So we have asserted --

11:13:18 THE COURT: Mrs. Dowd, Family Dollar denies

that these emails were generated by the Family Dollar managerial employees?

MR. ST. CLAIR: Your Honor, if I may address as to that.

Many of them are -- we do not. And we hope that they will be offered into evidence. The problem we have with this notebook, Your Honor, is there are a number of emails in there that are not from district managers, but rather from plaintiffs that are making self-serving hearsay statements.

THE COURT: All right. Let's take them up -- I take it you have identified those ones --

MR. ST. CLAIR: I'm sorry, Your Honor?

THE COURT: The emails that were generated by the store managers, who incidentally are managerial employees, aren't they?

MR. ST. CLAIR: They were at the time, Your Honor, but are plaintiffs here, Your Honor, and we don't think that it would be admissible under 402, but certainly not under 403, Your Honor.

The other point I would like to make, Your Honor, is some of the documents have handwritten statements added to them. I don't know if the ones that are being offered into evidence have had those taken off of them or not. But they would be inappropriate for

there to be editorial comments on the documents, Your Honor.

THE COURT: Unless the editorial comments were made by managerial employees of Family Dollar in the line and scope of their duties, as managerial employees.

MR. ST. CLAIR: Yes, sir. The comments that I'm referring to that appear to be to the lawyers, suggesting they were --

MR. R. WIGGINS: Those were removed, Your Honor. They are not in that book. They will not be offered.

THE COURT: All right.

MR. R. WIGGINS: There were two of them, two handwritten notes. We took them off. We offer Exhibits 10 through 190.

THE COURT: All right.

MR. ST. CLAIR: For the record, again, Your Honor, we object and state the specific grounds stated in our motion in limine and incorporate those.

THE COURT: The objection is overruled.

Plaintiffs' Exhibits 10 through 190 are received in evidence.

Tell me, Ms. Dowd, Mr. St. Clair, why these records are not business records of Family Dollar.

11:15:51 MR. ST. CLAIR: Your Honor, the issue is not so much business records --

11:15:54 THE COURT: That's what I really want to know about, why they don't qualify as business records.

11:15:58 MR. ST. CLAIR: I believe most of them do, Your Honor.

11:16:00 THE COURT: All right.

11:16:01 MR. ST. CLAIR: But, for example, a number of them are prior to the time period at issue in this lawsuit.

11:16:06 THE COURT: All right. I -- ladies and gentlemen, you will receive these exhibits as business records of Family Dollar.

11:16:28 MR. R. WIGGINS: May we publish, Your Honor?

11:16:31 THE COURT: Yes, they may be published. Although we know that there is no way in this world that these jurors are going to read these exhibits.

11:16:40 MR. R. WIGGINS: Your Honor, I had to read them.

11:16:41 THE COURT: Well, I mean, while you're examining the witness.

11:16:44 MR. R. WIGGINS: No, sir. I'm moving on to something else in just a minute.

11:17:05 BY MR. R. WIGGINS:

11:17:08 Q. Now, I want to talk a minute about the budget and

11:17:22 then come back to some of the emails on that.

11:17:31 A store manager, as part of performing his duties properly, is required to stay within the store payroll budget; correct?

11:17:42 A. Yes; required to stay in the budget unless extraordinary circumstances happen.

11:17:50 Q. But they have to get district manager approval if they go outside the budget, and are subject to discipline if they don't?

11:18:00 A. They could be subject to discipline, but there's many times that they don't get approval to go outside the budget.

11:18:06 Q. But there's also been times, as we see in these emails, where they're threatened with their job if they go one penny over their budget that's been given to them by their district manager; correct?

11:18:21 A. I'm sure you have a document that shows that, yes.

11:18:26 Q. And the district managers are judged in terms of their own performance and their own pay raises as to how much they stay within their budget; correct?

11:18:41 A. Yes. As part of business, they have to manage the budget.

11:18:45 Q. And the budget limits how much payroll they have; in fact, it's just a payroll budget, isn't it?

11:18:54 A. The budget's based on sales and store hours and then other factors.
11:18:58 Q. Those are the elements that go into the budget. But the budget itself is just covering payroll, nothing but payroll; correct?
11:19:06 A. It's covering hours, associate hours.
11:19:10 Q. It tells how many associate hours that managers are allowed to have?
11:19:17 A. Yes.
11:19:18 Q. If that's not enough, he has to do it himself, work whatever hours it takes; right?
11:19:23 A. Yeah. The job has to get done.
11:19:25 Q. So if you limit the budget, you've limited the staff, and you've made the store manager work everything else that's needed to be done; that's the way your system works, isn't it?
11:19:42 A. I mean, that's not the intent. Could that happen, yes. But no one's designed it that way.
11:19:48 Q. But you've known -- we took your deposition in 2002 -- you told us then that that's the way the system works; the budget staffs the store at just a certain level, and the store manager has to make up all the other hours?
11:20:07 A. Can you point that out to me?
11:20:11 Q. Yes. Turn to Page 322 of your deposition. And,

11:20:43 again, it's shifted a little bit. It's 324, line 11.

11:20:52 "Question: In many instances, the store managers will assume the duties of those associates so that their budget stays in line, or they come in under budget; correct? Answer: Yes."

11:21:09 A. That's correct.

11:21:10 Q. All right. Let's look at Page 313, a few pages before that -- Page 314, line 5: "When you have a store with only one or two associates in it, that assistant manager or store manager's going to be doing more of the normal duties and tasks that associates would do than in a store where there are 20 associates; is that correct? Answer: Yes." Do you see that?

11:22:05 A. I didn't, but I'm sure you're reading from it.

11:22:08 Q. And, in fact, the people under you, your district managers, they have sent emails out saying to the store managers, "I'm cutting your budget". It means, I'm taking away the hours of your subordinates; and you work the hours, 60, 70, 80, hours, whatever, haven't they?

11:22:35 A. I haven't seen it, but I'm sure you're referring to something.

11:22:39 Q. Yes. Exhibits 18 and 19, 25 through 29, 32, 33, 45, 154, 168; you go through the book, you see it over and over. I'm taking your budgets away. You work the hours.

11:22:56 MRS. DOWD: Your Honor, I object.

11:22:58 I wish to object, because he's testifying. 11:23:01 He didn't ask a question; he's just talking.

11:23:03 THE COURT: Well, actually, since he's an 11:23:08 adverse witness, he can lead him. And the witness knows 11:23:12 that if Mr. Wiggins says something that you don't have 11:23:15 an answer to, simply say, "I don't know".

11:23:19 MRS. DOWD: Your Honor, my complaint was 11:23:21 there was no question. In addition to his conversation, 11:23:24 he never posed a question to him.

11:23:28 MR. R. WIGGINS: I'll rephrase, Your Honor.

11:23:29 BY MR. R. WIGGINS:

11:23:29 Q. Exhibit 22, let's just take that as an example.

11:23:40 Do you see where from James Wilson, one of your 11:23:44 district managers to all of these stores, it says, 11:23:46 "ladies and gentlemen," and he -- it says here he's 11:23:52 going to take away their payroll dollar; correct? He 11:24:05 tells them how much he's going to take off; correct?

11:24:11 A. That's correct.

11:24:12 Q. And then he says, down at the bottom, right above 11:24:18 that, "if you're a four, you'll cut $10", et cetera. It 11:24:23 says, "folks, quite simple, if you are a 0, you will cut 11:24:27 $50 off your payroll." That is about six to seven hours 11:24:31 off the assistant managers; correct?

11:24:35 A. That's correct.

11:24:36 Q. And if the assistant manager is reduced six or seven hours, the store manager has to work those six or seven hours, doesn't he?
11:24:45 A. Well, I don't know that for a fact.
11:24:48 Q. You have a rule called 2.0 coverage?
11:24:53 A. Yes.
11:24:54 Q. That requires an assistant manager or manager in the store, and one other employee at all times?
11:24:59 A. Yes.
11:24:59 Q. You never allow the store to be open without an assistant manager running it or a store manager running it; correct?
11:25:07 A. That's correct.
11:25:07 Q. So if you take six or seven hours off the assistant manager, you necessarily have got to increase the store manager's time?
11:25:16 A. No. That's not correct.
11:25:18 Q. Is that not what the man says at the bottom of the page?
11:25:21 A. I mean, the store could be open 72 hours a week. And if the store manager's working 52 hours, then that would leave 20 hours that has to be covered by an assistant manager.
11:25:34 Q. Okay. And if you --
11:25:36 A. So --

11:25:37 Q. -- if you reduce those 20 hours by six or seven hours, as this man said in Exhibit 22, then the store manager's got to go up from 52 and make it up?

11:25:47 A. That would be if an assistant manager was working only 20 hours a week.

11:25:51 Q. Well, isn't it just a simple matter of logic that if the store manager's not in the store -- I'm sorry -- if the assistant manager's not in the store, then the store manager has to be in the store?

11:26:06 A. Yes.

11:26:07 Q. So if the assistant manager's not in the store for six or seven hours in a week that he would have been before you cut his budget, then that store manager has to be there that other six or seven hours, doesn't he?

11:26:18 A. There is the overlap, and that's how -- so there's overlap between a manager and assistant manager.

11:26:26 Q. Let's look -- do you know Dennis Heskett?

11:26:29 A. I know him.

11:26:30 Q. He was under you?

11:26:31 A. Yes.

11:26:32 Q. He was regional vice-president; correct?

11:26:34 A. He was a divisional vice-president.

11:26:36 Q. Divisional vice-president. He reported directly to you?

11:26:39 A. He was, yes.

11:26:39 Q. He had what, about 1,000 stores under him?
11:26:43 A. About 1,000 stores.
11:26:45 Q. A good man?
11:26:46 A. Yes.
11:26:46 Q. He knew the company policies?
11:26:48 A. Yes.
11:26:48 Q. Knew how it works?
11:26:49 A. Yes.
11:26:50 Q. He knows how the system works?
11:26:51 A. Yes.
11:26:52 Q. And we can take -- we can take it to the bank that if he tells us the system works in a certain way, it works that way, can't we?
11:27:00 A. I don't know what he said, but --
11:27:03 Q. Look at Exhibit 42. Do you see this memo from Mr. Dennis Heskett sent by Jo Ellen McDonald to her stores which says, second paragraph, "it is time for the 70-hour work weeks"?
11:27:38 A. Yes.
11:27:39 Q. Do you see down -- skipping down to near the bottom where it says "you must"? You see that paragraph starting "you must"?
11:27:49 A. Yes.
11:27:49 Q. Says: "You get the managers to work freight"; correct?

11:27:54 A. Yes.
11:27:55 Q. That's manual labor; correct?
11:28:06 A. Physical part of the job, yes.
11:28:08 Q. In fact, when we look through the emails, there are numerous examples under your running of the company operations, store operations, where the district manager has to control closing the store during hurricanes; correct?
11:28:34 A. I'm sorry. Say that again.
11:28:38 Q. The district manager is in charge of closing the store in hurricanes, isn't he?
11:28:44 A. The store manager's in charge of closing the store. We ask them to check and communicate with the district manager what's going on.
11:28:52 Q. Let me show you Exhibits 242 and 246, and ask, is this not an email in 2000, another one in 2001, to all store managers, which says -- read the part I've highlighted there.
11:29:11 MRS. DOWD: Excuse me. May I have a copy of what you're referring to there, before he reads aloud? And just a moment to look at it?
11:29:22 THE WITNESS: This is --
11:29:23 Q. Read the email sent to all store managers about who can decide to close the store in a hurricane.
11:29:29 A. This is --

11:29:30 MRS. DOWD: Your Honor, until the document's offered into evidence, I would object to any --

THE COURT: Are you using it -- are you using the document to refresh the witness' recollection, or what?

MR. R. WIGGINS: Yes, sir. He said he wasn't clear on the hurricanes, and I want to show him the email policy.

THE COURT: The objection is overruled.

THE WITNESS: This is from Sherri Johnson from the maintenance department. Says, "also prior to any store closing, you contact the district manager to obtain approval."

BY MR. R. WIGGINS:

Q. All right.

A. And the other says the same from Sherry.

Q. Then -- my time's about to run out, let me move over to another subject.

You had -- while you were there, at least as of 1992, when your deposition was taken, not -- 2002, when your deposition was taken, you had about 3,500 stores; correct?

A. When I started with the company, I think it was about 2,900; when I left, there was 5,700. So I don't know how many in 2002.

11:30:47 Q. Okay. But at the time of your deposition, you testified that you had about 3,500 stores at that time?
11:30:56 A. Okay.
11:30:56 Q. In 2002?
11:30:58 A. Okay.
11:30:58 Q. You've been building about 500 stores a year, haven't you?
11:31:02 A. Yes.
11:31:02 Q. But at the time you had 3,500 stores, in the prior three years, you had had 13,000 store managers in those stores, hadn't you?
11:31:14 A. I -- I don't follow what you're saying. I'm sorry.
11:31:20 Q. The turnover rate --
11:31:22 A. Oh, the turnover.
11:31:23 Q. -- is very, very high at Family Dollar?
11:31:25 A. Turnover rate for managers was about 40 percent. So if there was 3,500 stores, it would be, you know, 1,300 for that year.
11:31:36 Q. For that year.
11:31:37 A. (Nodded head.)
11:31:38 Q. All right. You don't recall testifying that you had 13,000 store managers in 3,500 stores in a three-year period?
11:31:47 A. If you're including the assistant managers, we

11:31:50 would have -- when I left the company, there was 8,000
11:31:54 assistant managers and about 80 percent turnover. So
11:31:57 that would increase the number, yes.

11:32:00 Q. You made about -- you had about 5 billion in
11:32:02 sales per year; correct?

11:32:03 A. Correct.

11:32:04 Q. You're building about 500 stores a year?

11:32:07 A. Correct.

11:32:08 Q. You're building new warehouses?

11:32:10 A. Yes.

11:32:10 Q. You've got executive bonuses --

11:32:13 A. Yes.

11:32:14 Q. -- that come out of that 5 billion?

11:32:16 A. Yes.

11:32:17 Q. You've got no net, to speak of?

11:32:20 A. Correct.

11:32:22 Q. The company is virtually debt free; correct?

11:32:26 MRS. DOWD: Your Honor, I object to the
11:32:29 relevance of the last question. And I've let this go
11:32:32 for several questions. I object to it.

11:32:34 THE COURT: All right. What's the relevance
11:32:38 of this?

11:32:40 MR. R. WIGGINS: Trying to establish, Your
11:32:41 Honor, the amount of money they've made off the practice
11:32:45 of not paying overtime; starting with what they've had

made and then to show the relationship to what part of it is from not paying overtime to the store managers.

MRS. DOWD: Your Honor, it -- I thought you were about to say something.

THE COURT: Is motive relevant?

MR. R. WIGGINS: Your Honor, what the -- this -- the previous motion in limine that you denied on this point is not going to motive. It's going to the profit from the practice and to willfulness.

THE COURT: All right. Objection is overruled.

MRS. DOWD: Thank you, Your Honor.

BY MR. R. WIGGINS:

Q. Out of that 5 billion, you pay your executive bonuses, you build your new warehouses, and you open your 500 stores a year; you pay off whatever debt you have, so you're debt free. You've got corporate jets. And you're left with 250 million a year profit, even after all that; correct?

MRS. DOWD: Your Honor, object -- object again, to -- on the same basis as before. It has no relevance to this litigation. And it's a 403 --

THE COURT: The objection is overruled.

MRS. DOWD: Thank you, Your Honor.

BY MR. R. WIGGINS:

11:34:03 Q. Correct?
11:34:04 A. The -- each year would be a different profit, so
11:34:08 the 250 million, I'm not sure what you're referring to.
11:34:12 Q. When we took your deposition in 2002, you said
11:34:16 that year was 263 million profit after all those, okay?
11:34:19 A. Okay.
11:34:19 Q. What is it last year, 2005?
11:34:23 A. I wasn't with the company when they closed, so --
11:34:25 Q. What about the end of 2004, what was your profit?
11:34:29 A. It was about -- I think it's about 5 percent
11:34:31 profit.
11:34:32 Q. But dollars, Mr. Barkus?
11:34:35 A. Probably about $200 million.
11:34:39 Q. All right. And that goes up about 15 percent a
11:34:41 year, doesn't it?
11:34:41 A. It does.
11:34:42 Q. And, in fact -- let's see slide 4. Defendant's
11:34:56 slide 4.
11:35:11 So before I ask you a question about this slide,
11:35:14 as I understand your testimony, since 1999, you've been
11:35:18 making between 200 million and 263 million profit a
11:35:23 year; correct?
11:35:24 A. I don't think that was -- I think it was a little
11:35:28 less, but I'm not sure. I'm not sure what it was in
11:35:32 '99.

Q. Okay.

A. But it's -- it's in that range, about 5 percent.

Q. All right. 5 percent of 5 billion?

A. Yes.

Q. All right. So that's about 250 million; right?

A. Last year's, yes.

Q. So that's what it's averaged. So in a seven-year period, you made about 1.4 billion profit?

A. Yes.

Q. Correct?

A. Yes.

Q. If we take that overtime, as we saw with the last witness, and calculate what you didn't pay in overtime to these store managers, that's about 560 million of that 1.4 billion profit, isn't it?

A. I guess.

Q. Okay. So, almost 50 percent of your profit is coming off the back of these store managers, not paying them for their labor?

THE COURT: The objection is sustained.

MRS. DOWD: Thank you, Your Honor.

MR. R. WIGGINS: No other questions.

THE COURT: We can begin the examination of the witness by Family Dollar.

**CROSS-EXAMINATION**

11:36:33 **BY MS. DOWD:**

11:36:54 Q. Mr. Barkus?

11:36:59 A. Hi, Ms. Dowd.

11:37:00 Q. Can I ask you just a couple of questions about 11:37:14 some of the emails.

11:37:16 He directed your attention to number 42, email 11:37:22 number 42.

11:37:30 A. Yes.

11:37:30 Q. And talking about 70-hour work weeks, et cetera. 11:37:34 Let me ask you: Can you give us the date of that email, 11:37:38 please, sir?

11:37:38 A. Yeah. The date is December 12th.

11:37:42 Q. Of '97?

11:37:43 A. I'm sorry. 1997, yes.

11:37:46 Q. Tell us what happens in the retail industry at 11:37:50 Christmastime, Mr. Barkus, please, sir.

11:37:52 A. For anyone that works in retail, it's wild. It's 11:37:57 all hours, all hands on deck. Most of us in retail 11:38:02 don't get a day off in the month of December.

11:38:06 Q. Except Christmas, maybe?

11:38:09 A. That's Christmas.

11:38:10 Q. And another document he talked to you about was 11:38:14 Exhibit 12, which is the Performance Improvement Action 11:38:21 Plan. Can you pull that?

11:38:32 A. Yes.

11:38:32 Q. Now, when you were reading the description, you made a reference in your -- in reading, to paperwork. And I'd ask you to elaborate, please, what it is about that description in paperwork that you found significant.

11:38:51 A. Well, it looks like, number one, the associate was working without having paperwork. You have to do the paperwork first before someone works. So, that's pretty important.

11:39:05 The other -- the other piece -- and I couldn't read it -- but it looks like a background check. And that's pretty important to make sure that people don't have a criminal record or other activities that have been -- you know, could be dangerous, could be theft.

11:39:24 Q. Could you tell us why -- what issues Family Dollar has had with -- with theft, for example, what you just mentioned, internally.

11:39:37 A. Most theft, in any retail, particularly in Family Dollar, in my experience, is really tied around associate theft. It's internal theft. It's sliding at the registers.

11:39:53 And what happens is, people in the center say, will you hook up? And that means, will you cut me a break, and then when you come to my store, I will cut you a break.

11:40:04 So the theft is very large. It's about 3 percent
11:40:09 of your total revenue. So about $150 million. We're
11:40:13 talking big numbers. So it's pretty important to have a
11:40:17 background check, because these background checks look
11:40:20 at other companies that people have been terminated from
11:40:23 other retailers for theft.

11:40:25 And, unfortunately, most of the theft that we
11:40:29 found were from assistant managers. I think it was like
11:40:35 60 or 70 percent of the theft was assistant managers.

11:40:38 Q. When you were at Family Dollar, was paperwork
11:40:42 kind of -- background paperwork that you're talking
11:40:46 about for applicants -- something that was addressed or
11:40:50 worked on?

11:40:51 A. Are you talking about like new hire paperwork,
11:40:56 application?

11:40:57 Q. Yes, sir.

11:40:58 A. When I joined the company, the new hire
11:41:02 paperwork, I heard from an HR, Sam McPherson had told me
11:41:08 that it was 12 percent complete. And so it was a big
11:41:11 focus to get paperwork completed correctly.

11:41:15 And there is -- you know, by the time you have
11:41:18 your I-9 forms, your tax forms, your application forms,
11:41:23 there's a lot of paperwork that has to go on, and it has
11:41:26 to be complete. So that's why there was a big emphasis
11:41:30 on completing paperwork.

11:41:31 Q. He also asked you or identified --
11:41:39 MS. DOWD: I don't think you offered Plaintiffs' 242 and 246.
11:41:44 MR. R. WIGGINS: Yes, we offer those. I meant to. 242 and 246, we offer that, Your Honor.
11:41:54 MRS. DOWD: That's not in the pile, Mr. Barkus. They're separate.
11:42:01 THE COURT: They were not offered today.
11:42:04 MR. R. WIGGINS: We offer those, Your Honor. We failed to, but we offer them.
11:42:09 THE COURT: Without objection, they're received in evidence.
11:42:16 BY MS. DOWD:
11:42:18 Q. Would you look at Exhibit 242 for a moment, please, Mr. Barkus?
11:42:25 A. I'm sorry, where would I find that?
11:42:27 Q. It's not in that binder. It's separate pieces of paper. Do you still have those in front of you? If not, I'll move on to something else.
11:42:36 A. Yes.
11:42:37 Q. Okay. Now, 242 and 246 both deal with the beginning of the hurricane season. Do you see that?
11:42:48 A. Yes.
11:42:48 Q. And if you would, read for us the first paragraph of those letters -- well, let me back up and say, Sherri

11:42:57 Johnson is who, the author of this email?

11:43:02 A. She's in charge of maintenance in the construction department, so she deals with contractors.

11:43:07 Q. And could you read her email to the store managers, please, that is Exhibit 242?

11:43:16 MR. R. WIGGINS: Your Honor, we would publish --

11:43:20 THE COURT: Pardon me?

11:43:21 MR. R. WIGGINS: May we publish 242 and 246?

11:43:24 THE COURT: Yes. They may be published to the jury.

11:43:30 BY MS. DOWD:

11:43:30 Q. If you'll read that opening paragraph.

11:43:32 A. Yes. "Today's the beginning of the Atlantic hurricane season. The following are procedures on how to handle any future approaching hurricanes: Prior to doing any of the following, please discuss with your district manager whether or not your store falls into any of the following criteria. Also, prior to any store closing, you contact your DM to obtain approval."

11:43:59 Q. Okay. Do you know of any instance of a store closing for a hurricane? Were you involved with any such incident when you were --

11:44:20 A. We've had a number of hurricanes. I can't tell you any individual store.

11:44:24 Q. Okay. I'm going to back up for a minute and let the jury hear the benefit of your employment background, Mr. Barkus. Where are you currently working?
11:44:37 A. I'm currently working with Ulta Cosmetics. It's a small chain of stores, about 170 stores, and I am the chief operating officer.
11:44:48 Q. Where are they located? Where are your corporate offices?
11:44:51 A. They're in Romeoville, Illinois, which is right outside of Chicago.
11:44:56 Q. How long have you been in that job?
11:44:58 A. I have been with them just over two months.
11:45:00 Q. And you left Family Dollar in June of 2005?
11:45:05 A. Yes.
11:45:05 Q. And in the interim, you've held another position; correct?
11:45:10 A. That's correct.
11:45:11 Q. Also in retail?
11:45:12 A. Yes.
11:45:12 Q. And who was that with?
11:45:14 A. General Nutrition Centers. It's a small store.
11:45:18 Q. What was your position there?
11:45:19 A. I was chief executive officer.
11:45:21 Q. Okay. So you are currently two jobs removed from Family Dollar; is that right?

11:45:26 A. Yes, Ms. Dowd.

11:45:27 Q. And when you were with Family Dollar, can you tell us briefly what job responsibilities you had from -- just run us quickly through your background there.

11:45:39 A. I was the -- I came in, the first couple of months was orientation, learning the company. Then I was a divisional vice-president for the first year of about 1,000 stores.

11:45:51 After being the divisional vice-president, I took over as senior vice-president of operations. And as senior vice-president of operations, I had all the stores, all the construction, maintenance, all the interfaces with HR, loss prevention, accounting, IT.

11:46:12 And after that position, I went to executive vice-president.

11:46:16 Q. What do you mean by interfaces?

11:46:20 A. Anything that occurs in a store impacts the rest of the organization. So if you have some marketing or merchandising that's going to come through, it has to filter to the stores so they know what's going on. And so the interface just makes sure that the merchandising that flows to the store or the marketing is also connected and is efficient as possible.

11:46:45 Q. And your last position with Family Dollar before you left was?

11:46:48 A. Was executive vice-president.

11:46:51 Q. Okay. And before you went -- came to Family Dollar, your career also had been in retail; right?

11:46:59 A. I've been in retail since I was 16 years old.

11:47:03 Q. Tell us who you worked for, just briefly.

11:47:05 A. I worked prior to that 21 years with Eckerd Corporation. I started out as a pharmacist, filling prescriptions; and worked my way through Eckerd Corporation.

11:47:18 When I left -- I was recruited by Family Dollar, I was V.P. of operations with Eckerd Drugs.

11:47:24 Q. Okay.

11:47:34 MRS. DOWD: Your Honor, do you want me to continue? You tell me --

11:47:38 THE COURT: Well, if this is a convenient stopping place.

11:47:42 MRS. DOWD: Yes, sir, it is. But I will do whatever the Court wants me to do.

11:47:45 THE COURT: All right. Ladies and gentlemen, we will take our lunch recess. We'll be in recess until 1:30. Please do not discuss the case among yourselves or with anyone else. Do not allow the case to be discussed in your presence, and keep an open mind.

11:48:00 Have a good lunch. See you at 1:30.

11:48:04 (Jury out at 11:40 a.m.)

11:48:37 THE COURT: Thank you, sir. See you at 1:30.

11:48:41 Anything else we need to take up right now?

11:48:43 MR. WHITE: Your Honor, I have one quick thing.

11:48:45 THE COURT: Sure.

11:48:49 MR. WHITE: Your Honor, the -- there's one of the plaintiffs named is Stephen Paul. And as Your Honor knows, there's been an issue about the whole work schedule and new work schedule. We have one of the schedules of Mr. Paul's store dated February 4th, '06, showing he is still using it. All I wanted to do was get it authenticated. And plaintiffs indicate they're not prepared to authenticate it, which means I've got -- I'm going to ask that they bring Mr. Paul all the way from Baltimore. I was made aware of this on Thursday.

11:49:26 THE COURT: Why can't the plaintiffs agree to this?

11:49:30 MR. WHITE: I don't know. But you asked what issue; that's the only issue I've got.

11:49:34 THE COURT: Mr. Wiggins, what is the problem with this? We are not going to bring anyone from Baltimore.

11:49:41 MR. G. WIGGINS: Your Honor, if you will look at the exhibit, you will see why I can't

11:49:46 authenticate it. Mr. Paul's name is not on here anywhere. I don't know who filled this out.

11:49:52 MR. WHITE: That's why we told them on Thursday, Your Honor, that it was from Mr. Paul. He's one of their clients.

11:49:57 We can't -- it's -- I would represent to you it came from his store in Baltimore, and that's why I advised them on Thursday.

11:50:06 THE COURT: Mr. Wiggins, you can get in touch with your client, can't you?

11:50:11 MR. G. WIGGINS: I've got phone numbers on him if they're still good.

11:50:14 THE COURT: Get in touch with him and tell him we will fax this document to him over lunch, and he can deny it or confirm it. If he denies it, you will bring him here, I take it?

11:50:28 MR. WHITE: Yes, sir.

11:50:29 THE COURT: All right.

11:50:30 MR. WHITE: Thank you.

11:50:33 THE COURT: We're in recess.

11:50:35 MR. WHITE: Thank you, Your Honor.

11:50:36 (Lunch recess from 11:44 a.m. until 1:30 p.m.)

13:41:37 THE CLERK: Remain seated and come to order.

13:41:40 (In open court, jury not present.)

13:41:40 THE COURT: Mr. Wiggins?
13:41:44 MR. G. WIGGINS: Your Honor, pursuant to your instructions, we have called Mr. Paul. He is at work. He does not have a fax machine. He's looking for a fax outlet so I can fax it to him.

13:41:55 But I do want to point out, Your Honor, that this document was not on the exhibit list and has never been produced to us before last Thursday, and it's not Bates stamped or anything. It's not on their exhibit list.

13:42:07 THE COURT: It's not on the exhibit list?

13:42:09 MR. WHITE: Your Honor, it didn't exist until February of 2006. And we mailed them -- I will bring you the letter -- we sent it to them by letter as soon as I got it. Hold on one second. Here it is. On February the 17th. I will bring this up, Your Honor.

13:42:26 We sent it to them. But if you will look at the date on it, Judge -- may I see it so -- dated February the 4th, 2006. And we sent -- on February 17th, we sent it, together with the charts and some other stuff.

13:42:47 MR. G. WIGGINS: Judge --

13:42:48 THE COURT: Well, did y'all agree that you would -- could add new witnesses and exhibits?

13:42:53 MR. G. WIGGINS: No, sir.

13:42:58 MR. WHITE: Well, Your Honor, I think

13:43:00 because the plaintiffs have said that the current staff
13:43:05 scheduler is what they said in opening, I don't know how
13:43:11 we could have met the exhibit list deadline on -- when
13:43:17 the exhibit didn't get created until the exhibit was
13:43:20 over --

13:43:20 THE COURT: I will tell you, there are any
13:43:22 number of papers that may be relevant in this trial that
13:43:26 have come into being since the last trial.

13:43:28 MR. WHITE: That's correct, Your Honor. And
13:43:29 I think the expert witness used something from a web
13:43:32 site that we haven't seen until they put it up there
13:43:35 last Friday -- Thursday. And so, you know --

13:43:39 THE COURT: Did the web site come into
13:43:42 evidence?

13:43:44 MR. WHITE: Yes. You have ruled that once
13:43:45 it goes up there, it comes in and goes in, and it got
13:43:50 displayed on multiple times. And I don't believe that
13:43:54 -- we're in an area, but I don't think that particular
13:43:58 thing that came from the Department of Labor web site's
13:44:01 ever been identified on any exhibit list.

13:44:03 MR. G. WIGGINS: Judge, that was a
13:44:06 demonstrative exhibit that has not been offered.

13:44:08 MR. WHITE: I will make this one
13:44:10 demonstrative.

13:44:12 MR. JOHNSON: I want to point out something

13:44:14 with respect to the DOL stuff, Your Honor.

13:44:17 The expert relied on that information. It 13:44:22 wasn't going to be introduced as substantive evidence. 13:44:25 It wasn't just demonstrative evidence, it was evidence 13:44:29 that the expert relied upon in his expertise.

13:44:31 THE COURT: All right.

13:44:35 MR. G. WIGGINS: Judge, I will also add -- 13:44:38 if you'll look at the letter --

13:44:40 MR. WHITE: You're right, Judge, that was 13:44:42 not part of the letter. That's correct.

13:44:45 MR. G. WIGGINS: It was not part of that.

13:44:46 THE COURT: Okay.

13:44:47 MR. WHITE: I didn't have it until we were 13:44:49 here. But, Your Honor, if I may be heard.

13:44:51 That -- on the experts, was not part of the 13:44:55 expert's report, was never identified when he published 13:44:59 the report as being something that he relied upon, and 13:45:02 he never filed an amended report that said "I now rely 13:45:05 on that".

13:45:06 THE COURT: Did you object on the ground 13:45:08 that it was not a listed exhibit?

13:45:10 MR. WHITE: What?

13:45:11 THE COURT: Did you object to what was 13:45:12 happening on the ground that it was not a listed 13:45:15 exhibit?

13:45:16 MR. WHITE: The web site stuff?

13:45:18 THE COURT: Yes.

13:45:19 MR. WHITE: I don't think -- I think it went 13:45:21 up as a demonstrative exhibit, and it ultimately got 13:45:26 marked.

13:45:26 THE COURT: Yeah. Did you object to it on 13:45:28 the ground that it was not listed?

13:45:30 MR. WHITE: Well, it was not offered as an 13:45:32 exhibit.

13:45:33 THE COURT: All right.

13:45:36 MR. G. WIGGINS: Your Honor, I would also 13:45:37 point out if they wanted to use this weekly schedule and 13:45:42 they're arguing that it's out of time, they just got it, 13:45:46 certainly work week schedules that exist, it would have 13:45:49 been timely, that they could have put on their exhibit 13:45:51 list and used and produced them to us, instead of 13:45:53 getting one last week.

13:45:56 MR. WHITE: I gave it to them when I got it 13:45:58 on Thursday.

13:45:59 THE COURT: Well, there are other weekly 13:46:02 time schedules, aren't there, Mr. White?

13:46:06 MR. WHITE: I don't know that I have with me 13:46:09 -- see, that one went out there in 2001. But this store 13:46:14 manager -- their client continues to still use that one 13:46:17 instead of the one they say that everybody's dictating

13:46:20 to use. That's what makes it relevant. What makes it
13:46:28 relevant is what they said in opening statement about
13:46:31 their theory of the case.
13:46:33 MR. G. WIGGINS: Relevance is not the issue.
13:46:35 It was not on the witness list. It wasn't there. It
13:46:39 hasn't been produced to us.
13:46:40 THE COURT: I sustain the objection.
13:46:43 MR. WHITE: Can I mark that for purposes of
13:46:45 the record and have it identified?
13:46:47 THE COURT: Yes, sir. Let's bring in the
13:46:50 jury.
13:46:52 (In open court, jury present at 1:39 p.m.)
13:47:41 THE COURT: Ms. Dowd?
13:47:43 MRS. DOWD: Yes, sir. Before I continue
13:47:44 with Mr. Barkus, we have an agreement with the
13:47:48 plaintiffs' counsel about certain exhibits that can come
13:47:50 in with Your Honor's permission.
13:47:51 THE COURT: Yes, ma'am.
13:47:52 MRS. DOWD: I will identify them for the
13:47:55 record. They're stacked right here.
13:47:56 Defendant's Exhibits 1922 is a policy
13:48:00 manual, 1997.
13:48:02 THE COURT: 1922, did you say?
13:48:04 MRS. DOWD: Yes, Your Honor.
13:48:05 Defendant's Exhibit 1923 is a store policy

13:48:08 manual revision, April 2002. You ready?

13:48:17 Defendant's 1924 is store policy manual
13:48:20 revision, August 2003.

13:48:29 Defendant's Exhibit 1927 is the Personnel
13:48:34 Training Manual for -- excuse me -- Personnel Training
13:48:42 Manual.

13:48:42 Defendant's 1928 is the associate handbook
13:48:46 for the stores for 1999.

13:48:50 And Defendant's 1929 is the associate
13:48:54 handbook for the stores January 11, '02.

13:49:03 THE COURT: Without objection, Defendant's
13:49:07 Exhibits 1922, 1923, 1924, 1927, 1928 and 1929 are
13:49:12 received in evidence.

13:49:16 MRS. DOWD: One more, Your Honor.
13:49:18 Defendant's 1925, which is the Customer Service Strands
13:49:23 of Family Dollar.

13:49:25 THE COURT: It's received in evidence.

13:49:28 MR. R. WIGGINS: I would note on that one
13:49:30 that the plaintiffs have already offered that as Exhibit
13:49:33 4.

13:49:33 THE COURT: It's already in?

13:49:35 MRS. DOWD: Your Honor, we'd like our own
13:49:37 accompanying one to go in to ensure that it's inclusive,
13:49:43 with the Court's permission.

13:49:45 THE COURT: Well, let's talk about this at

13:49:48 the next break.

13:49:49 MRS. DOWD: Yes, sir.

13:49:49 **CROSS-EXAMINATION(resumed)**

13:49:53 **BY MRS. DOWD:**

13:49:53 Q. Mr. Barkus, I have been told to speak up. So if 13:49:57 I am not speaking loudly enough for you to hear me or 13:50:01 others, let me know, please.

13:50:02 A. Yes, ma'am.

13:50:03 Q. When we took the break, you had just described 13:50:09 your responsibilities. And I want you to take a look -- 13:50:13 before you, you should see a document, Exhibit 2352. Do 13:50:19 you have that in front of you?

13:50:20 A. Yes, I do.

13:50:21 Q. And identify that document, please, by its title.

13:50:26 A. It's the Store Operations Chain of Command.

13:50:28 Q. Yes, sir.

13:50:30 MRS. DOWD: Your Honor, we offer that and 13:50:32 ask for permission to publish to the jury.

13:50:34 THE COURT: What's the number of the 13:50:36 exhibit, Ms. Dowd?

13:50:37 MRS. DOWD: 2352.

13:50:39 THE COURT: 2352?

13:50:41 MRS. DOWD: Yes, Your Honor.

13:50:41 THE COURT: Is received in evidence and may 13:50:43 be published to the jury.

13:50:49 BY MRS. DOWD:
13:50:50 Q. Mr. Barkus, will you -- do you recognize what is on the screen?
13:50:55 A. Yes, I do.
13:50:57 Q. And do you recognize that to be part of the organizational chart --
13:51:01 A. Yes, it is.
13:51:02 Q. -- for the company? Where would you last be in your last position for the company before you left?
13:51:11 A. I would be between the top two blocks, the blue and the green, the CEO and the divisional vice-president.
13:51:19 Q. And in that position, you would be reporting to whom?
13:51:26 A. I was reporting to the president and chief operating officer, who is not on that chart.
13:51:32 Q. Okay. And at the time you left, who -- who reported to you?
13:51:38 A. When I left, I had five divisional vice-presidents, and then a divisional vice-president of operations.
13:51:48 Q. So really, that -- see if I can do this -- how about that? All right. Let's back up.
13:51:58 You, in the reporting chain, were you there (indicating)?

13:52:02 A. Yes.

13:52:02 Q. Okay. And that's between CEO and divisional vice-president; correct?

13:52:07 A. Yes.

13:52:08 Q. And you were describing divisional vice-presidents. How many of those type, or level of people were there when you were there?

13:52:15 A. There was five divisional vice-presidents. Each of them had about 1,000 stores. And then there was a divisional vice-president of operations.

13:52:24 Q. Okay. Now, if you would, explain these levels for us so that this chart makes some sense to folks who don't know about Family Dollar.

13:52:40 A. The CEO is the chief executive officer of the company. The divisional vice-presidents would have under them, usually, four regional vice-presidents.

13:52:53 The division would include about 1,000 stores. There was an urban strategy, so some of those divisional vice-presidents had fewer stores, but more robust urban environments.

13:53:08 The regional vice-presidents underneath them had about 12 to 20 district managers. Overall, the company when I left, had 380 district managers. They had, I think it was 22 regional vice-presidents.

13:53:26 Q. Okay. So, if we were really doing the

13:53:29 comprehensive chart, there would be 22 regional
13:53:32 vice-president boxes?

13:53:33 A. 22 regional vice-presidents.

13:53:35 Q. And how many district managers?

13:53:37 A. About 380 --

13:53:39 Q. Okay.

13:53:39 A. -- district managers.

13:53:41 Q. And going -- continue, please.

13:53:44 A. The next -- the store managers, there would be
13:53:48 one store manager for every store. So when I left,
13:53:50 there was 5,700 store managers; and then reporting to
13:53:57 them would be store associates.

13:54:00 Overall, I think the company had 42,000
13:54:03 associates, and the majority of those would be working
13:54:07 in the stores.

13:54:07 Q. Now, on the district manager level, we've heard
13:54:20 testimony in this trial about the district manager. Do
13:54:24 you know what geographic territory or range a district
13:54:29 manager's area might cover?

13:54:32 A. The company operated in 44 states, so there was
13:54:37 380 district managers.

13:54:39 A district manager might have an area like --
13:54:44 there might be two in Atlanta. If it was a rural area,
13:54:49 the district manager could travel a couple of hours each
13:54:53 direction, if the stores are further apart.

13:54:57 Q. And the corporate offices of Family Dollar?
13:55:04 A. Charlotte, North Carolina.
13:55:06 Q. Okay. Thank you. Do you know, Mr. Barkus, what
13:55:13 the average sales volume is for an individual Family
13:55:18 Dollar store?
13:55:18 A. When I left the company, the average store did
13:55:22 just over a million dollars in sales.
13:55:24 Q. And of that million dollars, can you tell us, at
13:55:29 the time you left the company, what the average profit
13:55:31 was for Family Dollar on each of those stores?
13:55:35 A. The average profit would be about 50,000 to
13:55:41 $70,000; 5 to 7 percent. It is probably closer to 5
13:55:46 percent.
13:55:47 Q. And how about the average store size of a Family
13:55:51 Dollar store? did you know that when you were there?
13:55:54 A. Store size is about 8,000 square feet, to
13:55:58 probably -- if you go into a -- if you haven't been in a
13:56:02 Family Dollar, about the size of an Eckerd's or CVS
13:56:06 footprint, 7 to 9,000, would be a range.
13:56:09 Q. Are those stores you just mentioned competitors
13:56:13 of Family Dollar?
13:56:14 A. They are. Competitors would consist of anyone
13:56:20 that sells things like Tide or Clorox, Walmart, Kmart.
13:56:24 It could be Dollar General. It could be the drug
13:56:30 chains, CVS, Walgreen's; anyone that sells commodity

13:56:34 items would be a competitor.

13:56:36 Q. In your experience with Family Dollar, does 13:56:38 Family Dollar have a particular market niche?

13:56:42 A. The niche was generally a lower income customer 13:56:47 base, usually rural or urban environment. And so I 13:56:54 think the average income was about $20,000 on the 13:56:58 customer base.

13:56:59 Q. And how many people, Mr. Barkus, when you were 13:57:18 there, did Family Dollar hire a year?

13:57:20 A. The biggest year that I remember was about 90,000 13:57:29 people. But more recently, with the turnover coming 13:57:33 down, it was more like 70,000 people a year.

13:57:37 Q. And how many, if you know, from when you were 13:57:42 there, how many applications did the company give out 13:57:46 for potential hires each year?

13:57:48 A. The -- before we were working with Monster.com 13:57:54 type of activities, we would hand out about a million 13:57:58 applications a year.

13:57:59 Q. And do you know whether or not during the time 13:58:04 you were at Family Dollar, Family Dollar had a 13:58:07 philosophy concerning promotions?

13:58:10 A. The -- as a company, we tried to do is promote 13:58:16 from within. And so, come for a job, stay for a career. 13:58:22 And a lot of the regional vice-presidents started out as 13:58:25 store associates; store managers became district

managers; regionals, even divisional vice-presidents.

Q. You testified, I believe, that -- about the company's growth during the time that you were there. And correct me if I'm wrong, did you say that the company had about 2,700 stores when you got there?

A. I think it was about 2,900 --

Q. Okay.

A. -- when I joined the company in 1999.

Q. And when you left last year?

A. We were just about 5,700 stores.

Q. And tell us how that kind of growth in the company impacted hiring needs.

A. The -- that's a lot of growth. That's a lot of new stores. It's very impactful, particularly if it's in one particular area.

There's a lot of managers that you would hire, a lot of assistant managers, store associates. So it's very impactful.

Q. Do you know how many -- and I think you may have answered Mr. Wiggins with this question, but do you know how many new store managers were hired a year at Family Dollar at the time, say, when you left?

A. There was over 2,000 managers hired a year, 2,000 -- over 2,000 store managers. And then there was over -- I think it was over 6,000 assistant managers a

14:00:06 year.

14:00:11 Q. And you talked a little bit about turnover. And if you could, what -- I think you said that the -- or give us the percentage of store manager turnover the company experienced the year when you were there.

14:00:28 A. The store manager turnover was about 43 percent.

14:00:32 Q. What does "turnover" mean?

14:00:35 A. If someone leaves a position, either promoted or left the company, or just anyone that changed their role is a turnover.

14:00:46 Q. And did you give the figure and I missed it? What was the amount of turnover when you left in the store manager level?

14:00:55 A. Well, the store manager was 43 percent and the assistant manager was about 80 percent.

14:01:00 Q. Okay. And in terms of new hires resulting from that kind of turnover, can you tell us what the impact was, in terms of the numbers that Family Dollar needed to hire for both -- for, first, the store manager position?

14:01:27 A. The impact is that it's very costly when someone turns over. You have to, first of all, select, train -- the training would take four to six weeks. So that's all labor involved. And a new manager taking a position, every time a manager would leave, there's an

impact of the cost of the business. Frequently their team leaves, then the customers follow, and they leave and your shrink can go up. And shrink is, you know, lost -- lost product.

Q. Lost?

A. Product.

Q. Product. Okay.

A. Product and profit.

Q. Did you give a dollar figure for those hard costs, Mr. Barkus, if you knew them when you were there?

A. The costs of -- the hard costs of replacing a store manager was somewhere between 6 and $8,000 for the store manager.

Q. So if you have 5,700 store managers -- and how many assistants, did you say?

A. 8,000.

Q. And your 5,700 had a 40 percent turnover?

A. Yes.

Q. So in a store manager world, the 57 times 40 percent, what -- what number of turnover did you have in the store managers, roughly?

A. Roughly --

Q. Did you?

A. -- I'm thinking annually it's over 2,000 in store managers.

14:03:01 Q. How about in assistant managers who had a
14:03:04 turnover rate, I think you said, of 80 percent?
14:03:08 A. Over 6,000.
14:03:09 Q. Okay. So, therefore, in the store manager and
14:03:14 assistant manager positions, roughly speaking when you
14:03:18 were at Family Dollar, how many people a year were
14:03:21 turning over in those positions?
14:03:23 A. About 8,000.
14:03:24 Q. Mr. Barkus, obviously, you know this case is
14:03:38 about store managers. In your opinion, or can you tell
14:03:43 us, when you were at Family Dollar what you believed and
14:03:46 understood to be the duties and responsibilities of a
14:03:49 store manager?
14:03:51 A. The store manager's responsible for the
14:03:58 successful operation of a store, both in sales, customer
14:04:02 service, profit of that store. It's integral to the
14:04:10 community. People come to our stores from the
14:04:14 community, a lot of walk-in traffic.
14:04:17 So the manager is central to all that. At the
14:04:21 same time, the store has to be safe. There's a lot of
14:04:26 slip and falls. There could be a lot of armed robberies
14:04:30 that go on. And it's an environment where you want to
14:04:34 make sure that people are safe, and the manager's
14:04:38 responsible.
14:04:38 Q. All right. And in terms of the successful

14:04:43 operation of the store, what types of things go into
14:04:47 making a store successful?

14:04:50 A. The first thing would be customer service. The
14:04:55 relationship with the customers, making sure that they
14:04:58 feel comfortable in the store, that your prices are low.
14:05:02 It's a discount environment.

14:05:04 The company sold things at a very low retail
14:05:08 price. So, convenience is another big part of it. When
14:05:14 customers come in, you have to be in stock. So, a lot
14:05:17 of it has to do with the service, the price, the
14:05:20 convenience, the team in the store; you know, if they
14:05:25 set a good attitude, they're having fun with the
14:05:28 customers, are all generally reasons why a store is
14:05:31 successful.

14:05:36 Q. What was the role when you were at Family Dollar
14:05:42 of a store manager, if any, in hiring people at the
14:05:49 clerk, cashier, and stocking level?

14:05:51 A. The store manager was responsible for selecting
14:05:54 their team and hiring their associates.

14:05:57 Q. And what specific role or roles -- what did the
14:06:04 store manager actually do in the process of being
14:06:06 responsible, as you've described? What did it require?

14:06:09 A. A number of things. They would first have to do
14:06:13 an interview. They would make sure that the paperwork
14:06:16 is complete. In stores that required drug testing, they

14:06:21 would make sure that the drug testing was complete and accurate; that background checks were completed, when necessary. And then putting in their system.

14:06:34 Q. Okay. And you touched on this before the break, but what is the significance of the paperwork that you've identified that the store manager has to work through with a candidate for employment, at the cashier, clerk, or stocking level -- at the associate level?

14:06:56 A. Well, there's a lot of significance. One, most of it is required by law to be completed and done accurately. So that's the primary significance of having good documentation, that people go through the application process correctly. They have their I-9s completed correctly. And you want to make sure that you're hiring good people that have good background requirements.

14:07:21 Q. Well, in your experience with Family Dollar, did Family Dollar ever have any problems with employees resulting from a failure to do an appropriate background check on this paperwork?

14:07:39 A. I'm sure they have, but I can't think of any specific individuals.

14:07:46 Q. Now, for hiring of -- well, let me ask you this: An associate at the store, what categories of positions are we referring to when that term is used?

14:07:59 A. Associates would be generally hourly associates, and they would cover, you know, the areas of working on the register, stocking the store. So those would primarily be the hourly associates.

14:08:16 Q. And for hiring hourly associates, does the store manager have authority to do that?

14:08:25 A. Yes.

14:08:26 Q. Okay. Now, is a store manager's hiring situation different if the store manager is looking to hire an assistant manager?

14:08:41 A. Yes.

14:08:41 Q. And how is that?

14:08:43 A. We ask that the store managers partner up with the district manager and -- before they put someone in the system, so the district manager would also interview the person and make sure that everything was done accordingly.

14:09:03 Q. Can you tell us, during the time you were at Family Dollar, what you understood the reasons to be and why Family Dollar would want a district manager level person involved in the hiring of an assistant manager for the store?

14:09:22 A. I think our primary reason was that you wanted to make sure that the turnover rate dropped down. If your store manager wasn't hiring right or selecting the right

14:09:36 people, the district manager could also coach the store manager on the proper selection of people.

The second thing is, the district manager would walk people through the paperwork and make sure that they completed everything accurately.

Q. What types of assets of Family Dollar does an assistant manager have access to that -- does an assistant manager have access to?

A. The physical plant of the store. Each store would have the inventory, the cash, you know, on -- most of the transactions were cash transactions, the company didn't take charge cards. They took debit cards here recently, but it was mostly cash. So, between the product and the money.

Q. Okay. In your experience, did the assistant managers also have a key to the store?

A. Yes.

Q. Okay. Now, in your experience at Family Dollar, was there a correlation between hiring and success of the store manager?

A. Yes. The most successful store managers were able to hire a good team of people, and you see that in most retail stores. If you have a good team, the store's generally a success.

Q. Now, I want to turn your attention to what is in

14:11:13 evidence, I think, as Plaintiff's Exhibit 10, which is
14:11:18 the email from you dated February 20th, 2003.
14:11:31 Do you have it in front of you?
14:11:32 A. Yes, I do.
14:11:33 Q. Mr. Barkus, can you tell, as best you recall
14:11:46 today, what the reasons are for why that email went out?
14:11:49 A. I vaguely remember the email, and I don't think I
14:11:54 wrote it. But it's out under my name.
14:11:57 The -- I remember what was happening. We had a
14:12:03 measure of theft going on in the stores, and most of the
14:12:07 people that were being caught stealing were assistant
14:12:11 managers. So that's what stimulated this.
14:12:17 And I say "most", I think it was 60 or 70 percent
14:12:20 of the theft was coming from the assistant managers who
14:12:23 had keys to the store.
14:12:26 Q. Okay. This email that is Plaintiffs' Exhibit 10
14:12:32 is directed to what level of employee for Family Dollar?
14:12:37 A. It was directed towards the store managers. It's
14:12:42 --
14:12:42 Q. And concerning what level of employees for Family
14:12:44 Dollar?
14:12:44 A. It was primarily for assistant managers.
14:12:50 Q. Uh-huh. Do you know, Mr. Barkus -- do you have
14:13:04 any knowledge of anyone being terminated for failure to
14:13:07 comply with the statements made in this email?

14:13:11 A. No, I do not.

14:13:12 Q. How many emails -- if you know, at the time you were at Family Dollar, how many emails went out in a week company wide?

14:13:25 A. The head of IT once told me that the traffic of emails on a weekly basis was over 200,000 emails.

14:13:35 Q. A week?

14:13:35 A. A week.

14:13:36 Q. Okay. Mr. Barkus, how were -- when you were at Family Dollar, how were store managers paid?

14:13:47 A. Store managers were paid a salary, and they're paid a bonus based on the controllable profit in the store. The bonus is one percent of the controllable profit.

14:14:01 Q. What is "controllable profit"?

14:14:03 A. Controllable profit -- if you sell something for a dollar, and that dollar item costs 70 cents to the manufacturer that you bought it from, you have 30 cents worth of profit. Out of that 30 cents, you take out your expenses; and then what's left is controllable profit. And it's the variable expenses, like payroll or utilities.

14:14:32 Q. Does that calculation include compensation pay to company executives?

14:14:39 A. No.

14:14:40 Q. Mr. Barkus, in your experience in the retail industry, where you've been your entire career, is the way that Family Dollar compensates its store managers similar to or comparable to the way other retailers that compete with Family Dollar pay --

MR. R. WIGGINS: Objection, Your Honor, to no foundation laid, no relevance as to what other companies are doing.

THE COURT: Sustained.

Q. Mr. Barkus, how many hours were store managers expected to work while you were at Family Dollar?

A. 58 to 52. But generally, in retail, it's whatever it takes. Many times at Christmastime, it could be 70 hours; in the summertime, it may be less. But around the peak holidays, it gets extremely busy -- Thanksgiving, Mother's Day, Valentine's Day, all of those holidays usually put in more time.

Q. That's true in the industry, isn't it?

A. Yes.

MR. R. WIGGINS: Objection, Your Honor.

THE COURT: Sustained.

Q. I thought I heard you say 58 to 52 hours?

A. I'm sorry. 48 to 52.

Q. During the time that you were at Family Dollar, was an effort made by you to standardize the number of

14:16:06 hours that Family Dollar stores were open?
14:16:10 A. Yes.
14:16:10 Q. Tell us about that.
14:16:11 A. The store hours were pretty variable. Some would open at 9:00, some would close at 6:00, 7:00, some at 8:00 o'clock at night.
14:16:20 Q. You're talking about when you got there?
14:16:22 A. When I got there. And from a consumer's perspective, it's important to have consistent store hours. We tried to standardize as much as possible, come in at 9:00, close at 8:00, Monday through Saturday.
14:16:38 And then Sunday varied a little bit, but it was usually around 12:00 to 6:00, or 12:00 to 5:00 on a Sunday.
14:16:43 Q. And this was as of when you left them?
14:16:47 A. Yes.
14:16:48 Q. We've heard talk about schematics. And if you could just briefly tell us what your understanding of a schematic is.
14:16:57 A. A schematic is when you go into a retail store and you see a set presentation of what the goods look like, there's usually some sort of a layout that displays the goods. So it's a planogram or almost a design of having a standard presentation for the consumer.

14:17:19 When you go into the grocery store, you expect milk to be with the milk, and that's because of a schematic.

14:17:26 Q. Is the concept of a schematic, or the use of a schematic something that's unique to Family Dollar, in your experience?

14:17:34 A. No.

14:17:34 Q. I think you answered this, but what are the reasons why a company would want to use schematics?

14:17:44 A. Generally, you're better in stock, the customer has an easy time shopping, and it's easy to replenish and keep it up.

14:17:56 Q. And Family Dollar uses schematics; right?

14:18:02 A. Yes.

14:18:02 Q. And what percentage of the store merchandise in a Family Dollar store, if you knew when you were there, was set out on the floor according to a schematic provided by corporate?

14:18:18 A. More than 50 percent of the product carried in the store was basic -- basic schematic-type product. But it's probably more than 50 percent of the store is a basic schematic.

14:18:32 Seasonal schematics would come in. So if you might get some fashion items, you'd generally get a picture of how to set it. Some of the end caps were

14:18:42 designed with a schematic. So it would be over 50
14:18:45 percent. I don't know the total percent overall.

14:18:48 Q. We've heard the term in the past few days, a term
14:18:52 called "truck day".

14:18:56 Could -- when you were at Family Dollar, you had
14:18:58 some involvement with the process involving truck day;
14:19:04 isn't that right?

14:19:04 A. Yes, it is.

14:19:05 Q. Tell us what truck day is to Family Dollar.

14:19:09 A. Truck day is a big day in a store's life. You
14:19:15 usually get about 1,000 cases -- maybe 800 to 1,000
14:19:19 cases on a normal week; basic replenishment of what you
14:19:23 sold from the prior week. So the handling of those,
14:19:28 say, thousand cases, is important, how to get it done
14:19:30 quickly, get it on the shelf, get it displayed. It
14:19:35 takes a lot of effort. It's a once-a-week delivery.

14:19:39 Q. And who is it at the store level that has the
14:19:43 most control over that process?

14:19:46 A. The manager controls the process.

14:19:50 Q. And how does -- is truck day typically scheduled
14:19:58 for the same day each week, if you know?

14:20:01 A. Yes, it is.

14:20:01 Q. All right. For the person scheduling the
14:20:05 workers, what is the significance of knowing the day
14:20:09 that the truck will arrive?

A. The -- when the truck arrives, a lot of the product comes off the shelf, so you can make sure the people that can generally handle freight pretty well are the ones that are scheduled there and on time. So it's a matter of productivity to make sure that the freight gets out quickly.

And so, if the truck was late, the manager would have to shift associates around.

Q. When you refer to "manager", who are you referring to?

A. The store manager.

Q. Okay. And who was it, in your understanding, that has responsibility for scheduling the workers at a store?

A. The store manager.

Q. All right. And at the time you came to Family Dollar, the process of unloading took approximately how long?

A. The process of loading, we estimated, was over five days.

Q. Did that -- during the time you were at Family Dollar, did the efficiency of that process change?

A. It did. Our goal was 28 hours, but that was a great reduction, depending on the size of the truck. But we had improved it greatly.

14:21:30 Q. And the program that you refer to that improved it greatly was called what?
14:21:35 A. Originally, the program was called door-to-floor and that's exactly what happened. The product went from the truck onto the floor. And then the program was redesigned and called door-to-shelf. You want the goods on the shelf. And that's what it was called.
14:21:51 Q. Did you ever visit stores when you were at Family Dollar as an executive vice-president?
14:21:58 A. Yes.
14:21:59 Q. How often?
14:22:00 A. I was in the stores two to three days a week.
14:22:04 Q. Okay. Any idea of the number of stores each day?
14:22:08 A. Depending if it's in a rural market, you might -- because of the distance between stores, you might only get into four or five.
14:22:18 If it's more of a closely-knit urban market, maybe, you know, seven or eight. Christmastime, that might go up to ten stores.
14:22:29 Q. Did you ever participate or be -- get involved with a store on truck day?
14:22:36 A. Oh, sure.
14:22:36 Q. What did you do?
14:22:38 A. I've helped unload trucks, build end caps, build displays, recover a store, jump in and talk with the

14:22:47 manager while you're in the store; and just add another set of hands.

Q. Back when we talked about schematics and you -- I asked you about what percentage of the merchandise is put out pursuant to a schematic. For the remaining merchandise in that store, who is it that decided where that merchandise would go in the store?

A. A lot of times, the merchandise that didn't have a schematic had to be displayed in other locations. So it could be in what we call the "power aisle", which is the center of the store that doesn't have necessarily a full schematic. It could be on secondary end caps. It could be on risers, just anywhere where you can display -- the ledges were used. So anywhere we could display effectively the product.

Q. Who decides that?

A. The manager would direct, you know, who does it.

Q. Talking about the store manager?

A. Store manager.

MRS. DOWD: Thank you.

THE COURT: Redirect?

**REDIRECT EXAMINATION**

**BY MR. ROBERT WIGGINS:**

Q. Mr. Barkus, truck day, that's where you unload the truck?

14:24:22 A. Yes, sir.
14:24:22 Q. Is that manual labor, you're trying to get it unloaded within that 28-hour time span?
14:24:30 A. Yes.
14:24:31 Q. That's 28 work hours; right?
14:24:33 A. Store hours. I mean, 28 hours in the store.
14:24:38 Q. Yes. So it spans two days?
14:24:42 A. It does.
14:24:43 Q. Okay. And you say the manager is heavily involved in that?
14:24:50 A. Yes.
14:24:50 Q. In fact, the schedules that come out from corporate always have the managers scheduled for the truck day to make sure he's unloading that truck; correct?
14:24:59 A. I don't know if it's always, but I think it's probably a very high percent.
14:25:03 Q. Schematics, you said, are to make it easier on the customer; correct?
14:25:08 A. The customer and the store.
14:25:10 Q. And the district managers are allowed to vary the schematics?
14:25:14 A. Very rarely.
14:25:16 Q. Your strands, your training manuals that are in evidence, they say directly, do they not, that if a

14:25:25 store was to change the schematic, the district manager
14:25:27 is the only one that can do that?
14:25:29 A. They happen to orient the store --
14:25:32 Q. You don't know the practice on that?
14:25:33 A. No. Huh-uh.
14:25:36 Q. You testified, as I understood your testimony
14:25:40 with Mrs. Dowd, that store managers do have the
14:25:45 authority to hire associates?
14:25:48 A. Yes.
14:25:48 Q. Turn in your deposition to your sworn testimony.
14:26:07 Turn to page -- let me find the page. Did you -- while
14:27:23 I'm looking for the page, let me ask you this question:
14:27:27 You testified, when I was asking you the
14:27:29 questions, that the -- a policy or a practice at Family
14:27:37 Dollar is in writing, if it exists; correct?
14:27:40 A. Yes, you did.
14:27:41 Q. And I asked you, when I was asking you questions,
14:27:46 "Is there anything in writing that says the store
14:27:50 manager can hire associates?" You said "no"?
14:27:54 A. Right.
14:27:55 Q. An associate includes a cashier?
14:27:57 A. Yes.
14:27:58 Q. It includes a stocker; correct?
14:28:04 A. Yes.
14:28:04 Q. It's not just the assistant store manager that

14:28:10 the store manager cannot hire, is it?

14:28:13 A. No. I was referring to assistant managers and hourly associates.

14:28:20 Q. When you -- I'm not clear on what you mean by that. But just to start from scratch --

14:28:27 A. Yes.

14:28:27 Q. -- you've testified that there's nothing in writing which says that a store manager can hire associates?

14:28:37 A. Yes.

14:28:37 Q. All right. And there is nothing in writing that says that a store manager or an assistant store manager's recommendation will be given any particular weight, is there?

14:28:55 A. That's correct.

14:28:55 Q. Now, you were asked about your Exhibit 10, your email of February 21st, 2003, you -- that's the one where you said don't hire any assistant manager or you'll be fired.

14:29:23 You testified when I asked you the questions, that that had always been the policy, didn't you?

14:29:29 A. I don't remember the testimony.

14:29:34 Q. Well, that has always been the policy, hasn't it?

14:29:38 A. I don't know always.

14:29:40 Q. Well, let's look at your testimony. If you'll

14:29:59 turn to the smaller transcript that you have there.
14:30:20 It's right around Page 50. Look at -- let's look at
14:30:29 Page 50, if I can find it real quick. And look at Page
14:31:13 49. It starts at the bottom of Page 49 and goes to the
14:31:17 top of Page 50, starts with line 24, speaking of Exhibit
14:31:22 10, your email.

14:31:23 "Question: So you don't recall a time when it
14:31:27 was not the policy? Answer: No, sir." That's your
14:31:35 testimony; correct?

14:31:37 A. Yes.

14:31:37 Q. And, in fact, it says on the face of the email
14:31:45 that it, quote, "restates the policy"; correct?

14:31:49 A. It does.

14:31:49 Q. You testified that there's 200,000 emails a week?

14:32:00 A. Yes.

14:32:00 Q. And that's because the district managers are
14:32:04 bombarding these stores with instructions, and running
14:32:09 the store basically through emails, aren't they?

14:32:12 A. I think the average store gets about ten emails a
14:32:15 day.

14:32:18 Q. You testified about bonus.

14:32:23 A. Yes.

14:32:24 Q. You -- a store manager is entitled to whatever
14:32:28 bonus he is to receive, even if he worked 40 hours;
14:32:31 correct?

14:32:31 A. Yes.
14:32:32 Q. He's not required to work 70 or 80 hours to get the bonus, is he?
14:32:37 A. No, he's not.
14:32:37 Q. And, in fact, the chart that the defendant's been using used a number of 58 hours. I note that there's testimony higher than that. But let's just stick with 58. 58 hours is 3,016 hours per year on a 52-week year, isn't it?
14:33:01 A. I take your word for it.
14:33:05 Q. All right. I used a calculator before I started the questioning. I think we all know it's 3,016 hours, just at 58 hours a week.
14:33:16 Now, Mr. Broome testified yesterday or last Thursday that the bonus can be around a few hundred dollars up to a thousand or something. Is that consistent with your memory?
14:33:28 A. I think my memory was 1,800 was the average.
14:33:32 Q. Well, let's take 1,800 divided by 3,000 hours. That's less than a dollar an hour; correct?
14:33:40 A. Yes.
14:33:41 Q. Down around 60 cents an hour; correct?
14:33:46 A. Yes.
14:33:47 Q. If you paid overtime for that hour, you wouldn't pay 60 cents. You'd pay, according to the Defendant's

14:33:55 Slide 4, $15 for that hour, wouldn't you?
14:34:00 A. If you're saying you did the math.
14:34:03 Q. So you've never intended, and the company has
14:34:08 never even pretended that the bonus that could
14:34:12 substitute 50 cents, 60 cents, 70 cents an hour were the
14:34:18 overtime law?
14:34:21 A. I don't think anyone looked at it, no.
14:34:23 Q. Turn to -- turn to email -- Exhibit 33. It was
14:35:01 -- it was suggested during your examination by the
14:35:05 company that these long hours are just around
14:35:12 Christmastime. This is an email in July, is it not?
14:35:19 A. Yes, it is.
14:35:20 Q. And it says here in the last sentence of the
14:35:25 first paragraph, "If you're trending over your payroll,
14:35:29 the store manager will be working the extra hours to
14:35:33 ensure your payroll is under"; correct?
14:35:36 A. It does.
14:35:37 Q. And that is showing that practice that I was
14:35:40 talking to you about earlier; that if you cut the
14:35:43 budget, the payroll budget, the store manager is left
14:35:46 having to work more hours to make up for it; correct?
14:35:52 A. No, I don't know that the manager makes up for
14:35:55 it. The tasks have to be done.
14:35:59 Q. Who makes -- if you cut the payroll of the
14:36:01 associates, who else is left but the manager to work the

hours to make up for the cut?

A. Well, everyone could do a little bit more, so it could be the hourly associates, it could be the assistant managers.

Q. But when you say they could do a little bit more, the cashiers don't work for free?

A. True.

Q. If you cut their payroll, they go home?

A. That's true.

Q. The only one that can't go home is the manager?

A. That's true.

Q. And he's the one that's got to pick up the slack when you cut his budget, his payroll budget?

A. It's also the productivity of all the associates. So if everyone picks up the slack, the work can get done.

Q. If everyone picked up the slack, you wouldn't need to cut the payroll budget, would you?

A. But it sounds like someone -- a manager was overspending. And so you have to manage by a budget, so they were overspending, so they had to go back.

Q. But throughout these emails, we see district managers saying, "I'm cutting your payroll budget, you make up the time." And that's the practice, isn't it?

A. I don't know that to be a fact, no.

14:37:08 Q. Look at Exhibit 39. This is January 7th, 1999; correct?
14:37:20 A. Yes. Before I was with the company.
14:37:24 Q. All right. And this practice -- we've got emails of that. But this is after Christmas, obviously; correct?
14:37:32 A. Yes, in January.
14:37:33 Q. And it says, second sentence: "I know that you are all very tired from Xmas"; correct?
14:37:38 A. Yes.
14:37:39 Q. "But you're required to work a minimum of 48 hours that the store is open for business. Many of you do not have enough trend staff to be working less than 60 hours per week"; correct?
14:37:54 A. That's what it says, yes.
14:37:56 Q. And that's in January, after they're very tired at Christmas?
14:37:59 A. Yes.
14:38:00 Q. And that's the practice at Family Dollar -- never let up, always make them work, build your profits, with unpaid labor, isn't it?
14:38:13 A. I mean --
14:38:15 MRS. DOWD: Your Honor, I object.
14:38:16 THE COURT: I didn't understand the last question.

14:38:18 Q. I said the practice at Family Dollar is the one we saw in that last email: Never let up, even right after Christmas, build your profits, make them work; don't pay them for their time beyond 40. That's how you build your profits at Family Dollar?

14:38:36 THE COURT: The objection is sustained.

14:38:38 MRS. DOWD: Thank you.

14:38:41 Q. Now, you testified about the job duties of the store manager and the assistant store manager. Let me show you what you identified in your deposition as the essential job functions. This is Exhibit 6.

14:39:17 Do you recall that job description called "Essential Job Functions of the Store Manager"?

14:39:25 A. Yes, I do.

14:39:27 Q. And look at the next exhibit. Do you recall the "Essential Job Functions of the Assistant Store Manager"?

14:39:42 A. Yes, I do.

14:39:42 Q. And those, in fact, were the assigned regular job duties of the assistant store managers as shown in Exhibit 7; correct?

14:39:55 A. I haven't seen these before the court case. But they were before I came with the company.

14:40:04 Q. But you testified in September 2002 that these were an accurate reflection of the assistant store

14:40:14 manager's job duties, essential tasks; correct?
14:40:17 A. These are tasks, yes.
14:40:20 Q. And you testified in that same deposition of
14:40:22 September 2002, after you'd been with the company for
14:40:25 three years, that these were still the current,
14:40:28 essential job duties of a store manager, too, didn't
14:40:31 you?
14:40:31 A. Yes.
14:40:32 Q. And they list the fact that a store manager is
14:40:39 expected, as an essential part of his job, that he run
14:40:45 the cash register, stock the shelves, unload the truck,
14:40:49 and do all the other manual labor?
14:40:51 A. Yes.
14:40:51 Q. It does not say anything about hiring anybody on
14:40:56 the job description for store manager, does it?
14:40:59 A. No, I don't see it does.
14:41:13 Q. And the assistant store manager job description,
14:41:16 called Essential Job Functions, is Exhibit 7. It shows
14:41:21 that the assistant store manager, his regularly assigned
14:41:26 essential duties are the same ones as for the store
14:41:31 manager; virtually word for word; correct?
14:41:36 A. Yes.
14:41:43 MR. WIGGINS: We offer Exhibits 6 and 7,
14:41:45 Your Honor.
14:41:45 THE COURT: Without objection, Plaintiff's

14:41:49 Exhibits 6 and 7 are received in evidence.

14:41:51 Q. You had this chart --

14:41:59 MR. R. WIGGINS: May I publish, Your Honor?

14:42:01 THE COURT: Yes. You may publish it to the
14:42:03 jury.

14:42:05 Q. One quick thing: You were asked about this
14:42:13 chart. I don't remember the -- Exhibit 2352?

14:42:19 A. Yes.

14:42:19 Q. Okay. One clarification. You say it left you
14:42:24 out; correct?

14:42:25 A. Yes.

14:42:26 Q. It also leaves the store managers out, doesn't
14:42:31 it?

14:42:31 A. Yes.

14:42:31 Q. You were asked some questions about customer
14:42:46 service, and that being the most important thing for the
14:42:50 success of the store; correct?

14:42:52 A. Yes, one of the most important.

14:42:54 Q. That's the duty of cashiers?

14:42:58 A. It's everyone in the store.

14:43:00 Q. Everyone. You said it was important to have team
14:43:06 attitude, that's for everybody in the store?

14:43:09 A. Yes.

14:43:09 Q. Thank you.

14:43:32 THE COURT: Re- -- well, further examination

14:43:35 by the defendant?

14:43:44 **RECROSS EXAMINATION**

14:43:45 **BY MRS. DOWD:**

14:43:46 Q. Mr. Barkus, looking at the document that the
14:44:00 plaintiffs just offered, the Essential Job Functions, I
14:44:03 didn't write down the -- I think it's Exhibit 6 --

14:44:06 A. Yes.

14:44:06 Q. -- of the store manager? The first of those
14:44:11 functions is, what, please, sir?

14:44:16 A. For the store manager?

14:44:18 Q. Yes, sir.

14:44:19 A. Supervise all store personnel, including
14:44:22 assigning tasks, ensuring compliance with merchandising
14:44:25 and operational policies, and locking and unlocking the
14:44:29 store.

14:44:29 Q. All right, sir. And he asked you with regard to
14:44:32 that exhibit, and I direct your attention to number 10
14:44:35 about working as a cashier.

14:44:39 Could you tell us, please, sir, after looking at
14:44:45 that -- well, why don't you just read us, first, the
14:44:47 first two lines?

14:44:49 A. Of the work as cashier, or under that?

14:44:51 Q. Just that line and the next.

14:44:54 A. "Work as cashier when needed and be able to
14:44:57 perform all the cashier tasks, including but not limited

14:45:00 to" --

14:45:02 Q. That's all. Thank you very much. And do you read that to be that the store manager works when needed as a cashier?

14:45:10 A. Yeah. The line -- it's just like when you go to the grocery store, if the line's backed up, the manager jumps in, opens up another register.

14:45:19 Q. And, in your opinion, based on your experience at Family Dollar, does this document provide a comprehensive printout or statement of the duties and responsibilities of a Family Dollar store manager?

14:45:35 A. These are a lot of tasks, and I don't think it covers the whole position. Because, as pointed out, it doesn't talk about the selection, the motivation, the direction of the store team that the manager sets the tone of in a particular store.

14:45:53 Q. When you were at Family Dollar, Mr. Barkus, did Family Dollar expect the store manager to constantly direct, monitor, and manage their store?

14:46:04 A. Yes. The store manager was responsible for the store.

14:46:08 Q. Who was ultimately accountable for the store?

14:46:10 A. The store manager.

14:46:15 MRS. DOWD: Thank you, Mr. Barkus.

14:46:17 THE WITNESS: You're welcome.

14:46:23 **FURTHER REDIRECT EXAMINATION**

14:46:23 **BY MR. R. WIGGINS:**

14:46:23 Q. Mr. Barkus --

14:46:24 A. Yes, sir.

14:46:25 Q. -- the job description says at the top "Essential
14:46:28 Job Functions"; correct?

14:46:29 A. Yes.

14:46:30 Q. Doesn't say "comprehensive", does it?

14:46:32 A. It doesn't.

14:46:34 Q. It does say "essential"?

14:46:36 A. Yes.

14:46:36 Q. And read the assistant store manager item, that
14:46:44 number one.

14:46:46 A. "Supervise personnel in the absence of store
14:46:52 manager, including assigning tasks, ensuring compliance
14:46:55 with merchandising and the operational policies, and
14:46:59 locking and unlocking the store."

14:47:01 Q. So the assistant store manager supervises on the
14:47:08 same basis as the store manager when the store manager
14:47:10 has his off day, vacations, whatever?

14:47:13 A. In the absence of the manager, yes.

14:47:16 Q. And store managers are scheduled to be off, or
14:47:19 supposed to be scheduled to be off as the standard
14:47:25 matter of course two days a week, aren't they?

14:47:26 A. Yes.

Q. And you're the head of store operations, you know what a lead man is?

A. No.

Q. You know what a working foreman is?

A. No.

Q. So you have never bothered to look at the fact that the Department of Labor regulations say that a lead man, or a working foreman, a straw boss, that type of job, is not exempt from overtime?

MRS. DOWD: Your Honor -- are you done? I object to the question in that, number one, he has said he testified; and number two, it's argumentative, and the use of the word "bothered".

THE COURT: Overruled.

Q. Did you, in your six or seven years as store operations, ever try to determine if your store managers were lead men, lead persons, or working foremen under the Department of Labor regulations; and, therefore, not exempt from overtime?

A. No, I didn't.

MR. R. WIGGINS: No questions.

MRS. DOWD: Your Honor, may the witness be excused?

THE COURT: Yes. The witness may be excused.

14:48:44 (Witness excused.)

14:48:44 MRS. DOWD: Thank you, Your Honor.

14:48:47 THE COURT: Plaintiffs will call their next witness?

14:48:53 MR. R. WIGGINS: Plaintiffs have no further witnesses, Your Honor.

14:49:00 THE COURT: Okay. Ladies and gentlemen, would you take -- would you retire to the jury room? Do not discuss the case among yourselves or allow the case to be discussed in your presence, and keep an open mind.

14:49:13 (Jury out at 2:43 p.m.)

14:49:50 (In open court, jury not present.)

14:49:50 MR. ST. CLAIR: Your Honor, the defendant has some motions.

14:49:55 THE COURT: Okay.

14:49:57 MR. ST. CLAIR: I believe --

14:50:23 MR. R. WIGGINS: Plaintiffs are resting, Your Honor. The plaintiffs are resting.

14:50:26 THE COURT: Yes. All right.

14:50:31 MR. R. WIGGINS: Mr. St. Clair said he wasn't sure.

14:50:36 MR. ST. CLAIR: Your Honor, the defendants have some motions.

14:51:39 THE COURT: All right. I've read the motion. Anything else you want to say about it?

14:51:45 MR. ST. CLAIR: I think it's self-evident, Your Honor. If you'd like to hear argument, I will. If you don't --

14:51:53 THE COURT: I don't need argument. I overrule the motion.

14:52:08 MR. ST. CLAIR: We have a brief to go with this one, Your Honor. I would like to be heard just briefly on these next motions, Your Honor.

14:54:22 THE COURT: Yes, sir. In addition -- I've read your brief. What else do you wish to say on the motion to be decertified and proceed only on the claims the plaintiffs have testified in chief?

14:54:35 MR. ST. CLAIR: Your Honor, if you have read the brief and you don't care to hear from me, I don't need to say anything.

14:54:40 THE COURT: I have. The motion is denied.

14:54:43 MR. ST. CLAIR: The final motion, Your Honor, deals with rebuttal witnesses. And here's our concern, with all candor to the Court and my brothers at the bar: The Court has entered a particular order which has worked well so far. Our concern, Your Honor, is that we will see witnesses for the first time in rebuttal who didn't testify in the case in chief. We will then not have an opportunity, as I understand it under the Court's plan, to present rebuttal witnesses to

14:55:22 them.

14:55:24 We don't think it's fair, Your Honor, for
14:55:26 the plaintiffs to not to call persons in their case in
14:55:30 chief and wait until rebuttal to call them, when we
14:55:34 don't have an opportunity to respond. But particularly
14:55:39 when Your Honor has said the plaintiffs were entitled --
14:55:42 were obligated to anticipate the affirmative defense in
14:55:49 their case in chief.

14:55:51 Your Honor ordered them to list 60
14:55:54 witnesses, the first 60 witnesses; and they called seven
14:55:58 plaintiffs, Your Honor. That's all that's testified, is
14:56:01 seven plaintiffs. Those seven plaintiffs, Your Honor,
14:56:04 are not from a representative cross section of the
14:56:10 thousands of Family Dollar stores.

14:56:12 And so we just -- and my brothers at the bar
14:56:15 are clever lawyers, and I respect them for that. But I
14:56:20 just think it not fair, Your Honor, for Your Honor to
14:56:24 say, list your witnesses, call them in your case in
14:56:29 chief; and then if they're not called in the case in
14:56:33 chief, to then call them in he rebuttal.

14:56:39 THE COURT: Mr. Wiggins?

14:56:40 MR. R. WIGGINS: Your Honor, what your order
14:56:44 said -- and Mr. Kallon clarified this in his brief when
14:56:49 this issue came up about two weeks ago -- was that of
14:56:52 those witnesses that testified -- just of those that

14:56:55 testified -- they would anticipate. Did not say we had to put on -- just whole hog into their affirmative defense. And we have done what Mr. Kallon said and what we understood from your order to be.

Secondly, I think the defendant keeps overlooking the fact that we've put on direct evidence of 1,426 people through the records. We show they worked over 40; they did not get paid for over 40. And the defendant has stipulated to that fact. The Court entered an order saying the stipulations from the first trial would be binding in this trial.

So the notion that we have to have -- that we don't have just direct evidence out of their own records. And secondly, out of Mr. Barkus' testimony, is wrong; we have direct evidence from Mr. Barkus, Mr. Broome, from the whole group, and from their own records, that's sufficient to carry all 1,426 employees.

MR. ST. CLAIR: If I my respond to that, Your Honor. The issues being tried in front of this jury are not whether the plaintiffs were an employee of Family Dollar Store. That's not disputed. That they were paid by salary. That's not disputed.

What the jury is being asked to decide, I submit ultimately, Your Honor, is primary duty. I suppose there's some issue about two or more employees.

14:58:21 But it's primary duty. What did I do on a day-to-day basis? And they've only put seven people up. Again, Your Honor, all from small, rural, low-volume stores, not a representative cross-sampling of the stores as a whole.

Where is Atlanta? Where is New Orleans? Where's Jackson, Mississippi, Your Honor? Where's Memphis? Where's Birmingham? Where's Tuscaloosa? Where's Montgomery? Where's Detroit? This jury is not getting an accurate cross-section, Your Honor. And we just don't think that's fair.

They're the master of their case. And, again, I have tremendous respect for my brothers at the bar. They're my friends. And I would expect them to try the case in a manner that they think and best calculated to play to what juries want to hear. But we submit, Your Honor, that that's not what the law permits.

THE COURT: All right. I'm going to deny the motion of the defendant as a matter of judgment of law as to all claims to work performed on or after August 2004; and I'm going to carry with the case the motion to exclude rebuttal witnesses, et cetera.

MR. ST. CLAIR: Thank you, Your Honor.

THE COURT: We'll resume -- ladies, how much

15:00:00 time do you want for a break?

15:00:03 MR. WHITE: Are you talking to me, Judge?

15:00:06 MR. ST. CLAIR: He's talking to the persons 15:00:08 doing the work.

15:00:09 THE COURT: All right. Let's resume at 5 15:00:12 after 10:00 -- I'm sorry --

15:00:18 MR. ST. CLAIR: We may need five more 15:00:20 minutes.

15:00:21 THE COURT: 5 after 3:00.

15:00:30 (Recess from 2:53 p.m. until 3:10 p.m.)

15:17:49 THE COURT: Mr. White?

15:17:49 MR. WHITE: Your Honor, I have marked as 15:17:49 Defendant's Exhibit Number 2350 the Family Dollar weekly 15:17:49 work --

15:17:49 THE COURT: Mr. White, we can't hear you.

15:17:49 MR. WHITE: I'm sorry, Your Honor. Excuse 15:17:50 me. I had marked as Defendant's Trial Exhibit 2350, 15:17:50 Family Dollar Weekly Work Schedule dated February 4th, 15:17:50 2006, by Mr. Stephen Paul in Baltimore. I've also 15:17:50 marked on Defendant's 2351 a purported copy of the 15:17:50 weekly work schedule or schedule planner. The Court has 15:17:50 ruled that we would not be permitted to admit these.

15:17:50 I would make an offer of proof briefly that 15:17:50 we would have inquired of Mr. Bill McCarthy, who is the 15:17:50 person that prepares the schedule planners for Family

15:17:50 Dollar, he testified later concerning the fact that there are store managers that obviously still use what we call the old work schedule, even though we get the new work schedule. And we would have inquired of Mr. McCarthy concerning the differences between what the store manager is posting on Exhibit 2350 versus 2351. And so I'll get those to Mr. Smitherman, Your Honor.

15:17:50 THE COURT: All right.

15:17:50 MR. WHITE: Thank you, Your Honor.

15:17:50 THE COURT: Thank you.

15:17:52 MR. G. WIGGINS: Your Honor, just one other issue that we might bring up.

15:17:57 THE COURT: Yes, sir.

15:17:58 MR. G. WIGGINS: We have a pending motion, Your Honor, before the Court in regards to objections to two of the witnesses we understand are going to be their first two witnesses. We would like to take this up at this time.

15:18:10 THE COURT: And who are they?

15:18:12 MR. G. WIGGINS: I'm sorry?

15:18:13 THE COURT: What witnesses?

15:18:14 MR. G. WIGGINS: They plan on calling Janice Morgan and an individual by the name of Diane Newell. Ms. Newell was not identified on the defendant's initial disclosure, was not identified on his supplemental

15:18:29 disclosure, was not identified on the defendant's second
15:18:32 supplemental disclosure.

15:18:35 THE COURT: Well, was Ms. Newell identified
15:18:37 on any of your disclosures?

15:18:40 MR. G. WIGGINS: No, sir. And she was not
15:18:42 identified on their witness list.

15:18:44 THE COURT: Tell me about Ms. Newell,
15:18:48 Mr. May.

15:18:49 MR. MAY: Yes, sir. Ms. Newell is a
15:18:53 district manager in Georgia. She was the woman who
15:18:58 hired Janice Morgan. She was, for a full month, I
15:19:05 believe, during the time, Ms. Morgan's district manager
15:19:07 while she was a store manager. She --

15:21:32 THE COURT: With that understanding, the
15:21:32 objection is overruled.

15:21:32 MR. G. WIGGINS: Your Honor, there's also --
15:21:32 we understand the defendants plan on recalling Janice
15:21:32 Morgan to the stand. We believe that Ms. Morgan was
15:21:32 presented in our case. She was thoroughly
15:21:32 cross-examined in our case, and we see no reason to
15:21:32 recall Ms. Morgan to the stand.

15:21:32 THE COURT: Did I prevent the defendant from
15:21:32 asking any questions of Ms. Morgan when she testified
15:21:32 initially?

15:21:32 MR. G. WIGGINS: No, sir.

15:21:32 THE COURT: Mrs. Dowd?

15:21:32 MRS. DOWD: Your Honor, she's a named plaintiff, and we have limited examination from her on an adverse basis. I think we're entitled to recall a party in our case in chief as -- as has been done throughout, at least, my career. We do it frequently, Your Honor. And I --

15:21:32 THE COURT: That's not the usual way that I do it. Usually when I -- when a witness is called, I expect that when the witness is excused from the witness stand, he or she has been examined thoroughly on all the issues that he or she is going to testify to in the case.

15:21:32 MRS. DOWD: Your Honor --

15:21:32 THE COURT: Now, are you calling Ms. Morgan to rebut something?

15:21:32 MRS. DOWD: I am calling her on a very limited basis, on deposition testimony. And it -- I don't know that I would call it necessarily simply rebuttal, I would view it obviously rebuttal to testimony that came in the plaintiffs' case. Yes.

15:21:33 THE COURT: Well, why couldn't you have asked her that on cross-examination?

15:21:33 MRS. DOWD: Your Honor, I could have, but it was -- it was cross-examination, and I -- my expectation

15:21:38 was that I would be able to call her for this limited basis.

15:21:48 Ms. Morgan was the first witness called to the stand, Your Honor, and the limited area that I planned to go into with her is an area that did evolve later in the testimony.

15:22:01 And, Your Honor, if it helps you any, I think it's about two minutes of examination.

15:22:07 THE COURT: Well, that helps me a lot.

15:22:10 MRS. DOWD: That's what it is.

15:22:12 THE COURT: All right. The objection is overruled.

15:22:15 MRS. DOWD: Thank you, Your Honor.

15:22:16 THE COURT: Let's bring in the jury.

15:22:56 (In open court, jury present at 3:15 p.m.)

15:23:09 THE COURT: Ladies and gentlemen, the plaintiffs have rested their case.

15:23:13 In a Fair Labor Standards Act case such as this, the plaintiff or plaintiffs basically have to prove two things in their main case. And the first of which is that they were employed by defendant; and second, that they worked for more than 40 hours during the week and were not paid overtime. They also have to prove that they worked in interstate commerce. That issue is really not contested.

15:24:05 Now, if the plaintiffs show these things, 15:24:08 plaintiffs have the burdens of proof on those two 15:24:11 things. Plaintiffs show these things, then the 15:24:16 defendant has to show that the plaintiffs were not 15:24:24 covered by the Fair Labor Standards Act, that they were 15:24:27 exempt from the Fair Labor Standards Act. This is 15:24:31 called an affirmative defense, and the defendant has the 15:24:35 burden of proof on the affirmative defense.

15:24:38 And so we now turn to the defendant, Family 15:24:43 Dollar's affirmative defense that these plaintiffs were 15:24:47 not covered by the act, because it says they were 15:24:50 executive employees. Ms. Dowd?

15:24:55 Q. Hello, Ms. Morgan --

15:25:00 THE CLERK: Ms. Morgan, I would like to 15:25:02 remind you that you are still under oath.

15:25:02 **FURTHER CROSS-EXAMINATION**

15:25:04 **BY MRS. DOWD:**

15:25:04 Q. In front of you is your deposition. Could you 15:25:07 please turn to Page 186? It's marked with the yellow 15:25:12 post-it down at the bottom. Go to line 22. If you will 15:25:16 pull that up, please. And I want you to read along with 15:25:18 me.

15:25:19 I will ask the question and ask you if you would, 15:25:21 Ms. Morgan, to answer, please. Are you there? You got 15:25:30 it?

15:25:36 "Did you have a store operations or store procedures or guidelines in the stores you were store manager of?"

15:25:43 A. "There was a book.

15:25:44 Q. "Did you ever look at it?

15:25:46 A. "It was just kind of French to me. You know, it would give you a guideline, like on scheduling, how you should schedule your people and stuff like that. There was nothing in there that --

15:25:56 Q. "Okay.

15:25:56 A. "-- that helped me at all. I mean, if I needed to know something, I'm the person that's better for me for somebody to speak to me in English than to go read it out of a book.

15:26:06 Q. "Well, at the risk of doing to you what I fussed at Allen for doing to you, listen to my question. Did you ever look at the guidelines or the policy manuals or the books you had in the store?

15:26:26 A. "Yes, sir, I looked at them. That's why I said that they were just Greek to me.

15:26:30 Q. "You said they were French.

15:26:34 A. "French. I can't read either one."

15:26:38 MRS. DOWD: That's all, Your Honor. Thank you.

15:26:42 THE COURT: Examination by the plaintiff?

15:26:45 MR. SCHREIBER: No questions.

15:26:46 THE COURT: Thank you, Ms. Morgan.

15:26:48 Defendants will call their next witness.

15:26:51 MR. MAY: Family Dollar calls Diane Newell.

15:27:00 **DIANE NEWELL, DEFENDANT'S WITNESS, SWORN**

15:27:03 Having been sworn, testified as follows:

15:27:03 THE CLERK: State your name for the record,

15:27:40 please.

15:27:40 THE WITNESS: My name is Diane Newell.

15:27:40 THE CLERK: And spell your last name for the

15:27:40 record.

15:27:43 THE WITNESS: N-E-W-E-L-L.

15:27:44 **DIRECT EXAMINATION**

15:27:45 **BY MR. MAY:**

15:27:46 Q. Ms. Newell, I represent Family Dollar, as you

15:27:51 know. Will you tell us where you live and who you are

15:27:56 employed by?

15:27:57 A. I live in Rome, Georgia. I am employed by Family

15:28:01 Dollar Corporation.

15:28:01 Q. And what position do you hold at Family Dollar?

15:28:05 A. District manager.

15:28:06 Q. And how long have you had that position?

15:28:09 A. I've been a district manager for 14 years.

15:28:14 Q. How long have you worked for -- adjust the

15:28:18 microphone until you have it comfortable there. The

15:28:20 court reporters have to hear -- we all have to hear.
15:28:25 How long have you worked for Family Dollar?
15:28:26 A. March will be 17 years.
15:28:28 Q. And what positions did you hold before you got up
15:28:33 to district manager?
15:28:34 A. I started out as a manager trainee and then was a
15:28:38 manager.
15:28:39 Q. Have you always been over in Georgia?
15:28:42 A. Yes. Well, I did work in the store in
15:28:45 Chattanooga, Tennessee.
15:28:46 Q. All right. Do you know Ms. Janice Morgan that is
15:28:51 sitting at the table, the plaintiff in this case?
15:28:53 A. Yes, I do.
15:28:54 Q. How do you know her?
15:28:55 A. She started out as an assistant in one of my
15:28:58 stores, and she was a manager at another store for me.
15:29:01 Q. And how did she start as an assistant?
15:29:03 A. She went into the store in Dalton, 1503.
15:29:07 Johnny Harris, the manager at that time,
15:29:09 interviewed her. He called me and told me he had a good
15:29:12 candidate for an assistant. I talked to her briefly on
15:29:15 the phone, and he hired her that day.
15:29:17 Q. And what store was that, just so we're clear?
15:29:19 A. That was 1503, Dalton, Georgia.
15:29:22 Q. Okay. And do you have Dalton today?

15:29:25 A. No, sir, I don't.
15:29:26 Q. Okay. But you had it back then?
15:29:28 A. Yes.
15:29:28 Q. And I guess that would have been in 2000?
15:29:33 A. 2000, yes, sir.
15:29:34 Q. How many stores did you have back then in 2000?
15:29:38 A. At that time, I had 20.
15:29:40 Q. All right. And tell us, just so we get some
15:29:43 orientation -- 20 stores, were they all in Georgia?
15:29:47 A. Yes, sir. Well, a few of them were in
15:29:49 Chattanooga, Tennessee, outside of Chattanooga, East
15:29:52 Ridge.
15:29:52 Q. And geographically, how far apart or how did that
15:29:56 lay out?
15:29:57 A. At that time, that was 150 miles from one store
15:30:00 to the furtherest.
15:30:02 Q. And did Ms. Morgan move from the Dalton store as
15:30:09 assistant manager?
15:30:09 A. Yes. In April of 2000, she was promoted to store
15:30:13 manager in the Varnel store, 3574.
15:30:16 Q. All right. And how did that happen?
15:30:19 A. She had stated that she would be interested in
15:30:21 being a manager, and she was doing a good job as an
15:30:24 assistant manager at the 1503 store. So, I approached
15:30:28 her and she -- she accepted the position as manager of

Varnel.

Q. And do you recall the volume of that store, by any chance, at that time?

A. I think it was around the 750 range at that time.

Q. Do you still have the Varnel store?

A. No, sir.

Q. Now, how long did Ms. Morgan work as a store manager at Varnel, in your district?

A. She worked from April to the very end of July in my district as manager.

Q. So --

A. Four months.

Q. -- four months?

A. Yes, sir.

Q. And during those four months, did Ms. -- well, why don't you tell the ladies and gentlemen of the jury what sort of authority you considered Ms. Morgan to have for hiring in her store in Varnel when she was store manager, now?

A. Ms. Morgan was the manager of the store. It was her responsibility to hire the employees that she needed at that location.

Q. Did she have to call you ahead of time to get your approval in order to hire a cashier or clerk?

A. No. For clerks, there was no approval needed.

15:31:42 Q. Now -- and I used the term "cashier", and I think maybe you've taught me -- what is the term? What is the proper term for -- not talking about the store manager, not talking about the assistant manager, but other employees in the store, hourly employees, what's the term that you use as district manager for Family Dollar?

15:32:01 A. I call them clerks.

15:32:03 Q. All right. And you -- you did not -- Ms. Morgan didn't have to have your authority?

15:32:08 A. No, sir.

15:32:08 Q. What about for assistant manager, if she needed an assistant manager, what did you consider her authority in that regard to be?

15:32:16 A. She did have to call me for -- to consult with me to hire an assistant. But that was at her -- you know, she had picked the person that she wished to speak with me about, and then she talked to me. And I would either talk to the person over the phone or visit; and then she would hire, if that's the person she was comfortable with.

15:32:37 Q. Did you have any disputes or problems between the two of you the four months she worked for you?

15:32:45 A. No. Janice was a good manager for me.

15:32:48 Q. Did you talk with Ms. Morgan at all before she took the store manager's job -- she had been an

assistant manager, let me just be sure that's straight.

A. Correct.

Q. She had been an assistant manager --

MR. SCHREIBER: Object to leading, Your Honor.

THE COURT: Objection is sustained.

Q. Did you have any conversation with Ms. Morgan at all about the hours she was going to be expected to work in Varnel when you offered her the store manager job?

A. Well, as an assistant, she had been working in the store and she saw what that manager was doing. But I do state that they should average at least 52 hours a week.

Q. Is that still the way you have it in your stores?

A. That's still -- I tell anybody that I am interviewing for the manager's position, that the average they do need to work in a building is 52 hours.

Q. What about, was there ever any need to discipline in Ms. Morgan's store?

Well, let me ask you this: What did you consider her authority or responsibility to be as the store manager in Varnel to discipline employees, if they needed it?

A. She had total authority to discipline employees.

Q. Did she have to call you in advance?

A. No, she didn't. But she did call me if she had an issue to talk to me about it.

Q. She did?

A. Yes.

Q. Do you remember a specific time?

A. She had a young lady that had worked there, I think about four months before -- she had worked there before Janice got there. A customer had come in and stated that she thought the girl was on drugs. They had found a joint in the store somewhere, and that she was going to go ahead and terminate her.

I told her she had to have proof to terminate the girl, that was just hearsay at that point.

Q. Were you over there present when this conversation was going on?

A. Not -- she called me on the phone for that. I did go down and talk to the employee.

Q. Tell us about that.

A. To be honest, I don't remember a lot of what me and her stated, you know. I told her that it was questioned that she was doing drugs in the building, and I think -- the way I remember it, is she said she wasn't.

And I then told Janice that she had to have proof that the girl had done the drugs, before we could

15:35:13 terminate her for that. And that I would check to see if, by chance, we could pop a drug test on her. I'd have to get it approved by corporate.

Q. And what happened?

A. Janice then talked to the girl, and the girl quit.

Q. Did Ms. Morgan have a budget?

A. Yes, sir, she did.

Q. And how did that work?

A. The corporate office --

MR. SCHREIBER: Your Honor, I think this is outside what Mr. May has said he was calling this witness for.

THE COURT: Objection is overruled.

MR. MAY: Thank you, Your Honor.

Q. Tell the ladies and gentlemen of the jury how Ms. Morgan's budget worked at Varnel.

A. The corporate office issues me, as a district, a budget for each store. I then, in turn, issue that budget to the store.

She was just given a budget as a guideline to manage.

Q. Did you set the budget for Ms. Morgan's store over in Varnel?

A. No. The corporate office sets the budgets. We

15:36:17 do have a little bit of input, if the manager has given
15:36:20 raises that need to be inputted. We can up it, if need
15:36:24 be. Where if the manager gives us input that
15:36:27 something's changing, like a business coming in, that
15:36:31 could cause us to have more sales, we can input more
15:36:33 payroll.

15:36:34 Q. What -- does it go -- always go up? Can it
15:36:40 sometimes -- a store manager --

15:36:42 THE COURT: The objection is sustained.

15:36:44 Q. How -- what input, besides what you just told us,
15:36:54 if any, did you have in setting the budget for the
15:36:57 stores in your district?

15:36:58 A. Very little. Very little. That comes from the
15:37:01 corporate.

15:37:01 Q. Now, who, in Ms. -- well, did you consider the 52
15:37:12 hours you told Ms. Morgan to be an appropriate number
15:37:19 that you would expect her to have worked?

15:37:21 MR. SCHREIBER: Object to leading, Your
15:37:23 Honor.

15:37:23 THE COURT: Sustained.

15:37:24 Q. Have you been a store manager before?

15:37:27 A. Yes. I was a store manager for over two years.
15:37:31 Well, two years.

15:37:32 Q. What -- from your experience as a store manager,
15:37:35 what does it take to run a Family Dollar store in the

15:37:38 way of hours a week?

15:37:39 A. I ran a store at 52 or less. Some weeks it might 15:37:43 be more. It's according to what might be going on in 15:37:47 the building -- inventories, Christmas.

15:37:49 If I wanted to take an extra hour for lunch, I 15:37:52 took that. If I needed to leave early, I took that. If 15:37:55 I was out sick, I got paid. So I ran a store with less 15:37:59 than 52 hours.

15:38:01 Q. Who did you expect in Ms. Morgan's store would do 15:38:12 the scheduling of employees?

15:38:13 A. Ms. Morgan.

15:38:14 Q. Who did you expect would deal with customer 15:38:20 complaints in Ms. Morgan's store?

15:38:22 A. Ms. Morgan.

15:38:23 Q. How often did you visit the stores in your 15:38:31 district, or Ms. Morgan's stores?

15:38:35 A. Ms. Morgan's store, she was a new manager. When 15:38:38 she first took it, I think the first month I was there 15:38:41 three times. The next month -- the next three months, 15:38:44 one time each month until the end of June, we did a 15:38:48 reset in her store. It was a Sales 2000, just putting 15:38:51 in a few extra calendars. I was there three days for 15:38:58 that.

15:38:58 Q. How was it that -- Ms. Morgan left your district, 15:39:00 I take it?

15:39:01 A. Yeah. She come to me and asked me -- or told me that she would like to get a transfer to Alabama because most of her family lived in Alabama. And, you know, I hated to see her go, but she -- we contacted Kay Spanogle, which is the DM in that area. And she did have a location to put Janice. So she went to Kay at that point.

15:39:25 Q. In Alabama?

15:39:26 A. In Alabama.

15:39:27 Q. At her request?

15:39:28 A. At her request.

15:39:29 Q. Did you have any say-so on that?

15:39:31 A. No. When a manager comes and asks for a transfer, I mean, I told her I hated to see her go and I did. She was a good manager.

15:39:38 Q. What did you consider Ms. Morgan's most important duty as the Varnel store manager?

15:39:48 A. Managing the everyday operations of the store.

15:39:51 MR. MAY: Answer their questions, please, ma'am.

15:39:53 THE COURT: Cross-examination?

15:39:53 **CROSS-EXAMINATION**

15:39:54 **BY MR. SCHREIBER:**

15:39:55 Q. Good afternoon. Ms. Newell, you and I have never met, have we?

15:40:06 A. No, sir, we haven't.
15:40:07 Q. In fact, Ms. Morgan was a good enough manager that you recommended her to go to Alabama; correct?
15:40:16 A. Yes, I did.
15:40:17 Q. You don't dispute that Ms. Morgan worked more than 52 hours a week, do you?
15:40:24 A. I can't dispute that, no, sir.
15:40:25 Q. Well, if the company records indicate she worked well in excess of 60 hours a week, you're not here to dispute that, are you?
15:40:31 A. No, I am not.
15:40:32 Q. You are not here in front of this jury to tell them you have any knowledge as to why or why she was not paid any overtime; isn't that true?
15:40:40 A. She's salary. She should not have been paid overtime.
15:40:43 Q. You didn't make that decision for Family Dollar, did you?
15:40:45 A. I put her in as a manager. So, yes.
15:40:47 Q. But that decision was made by corporate, wasn't it?
15:40:50 A. That decision to make her manager and put her salary was by me, sir.
15:40:55 Q. Thank you. So is it your testimony that the only reason Ms. Morgan was not receiving overtime is because

she's salaried?

A. She -- you know, she asked to be put in as a manager and she knows that they were salary. So, yes, sir.

Q. So, just so this jury understands, as the manager of Family Dollar, district manager, it's your understanding that the only reason - or the reason that Ms. Morgan didn't get paid overtime is because she was salaried?

A. Yes, sir.

Q. All right. Now, let's talk about this budget a little bit. As district manager, you got notes from the corporate office to reduce budget, didn't you?

A. Not from the corporate office, no, sir.

Q. You never got an email from anyone saying you need to cut the store's budget?

A. We would get emails occasionally from our regionals if we had overspent payroll telling us to get it back in line, sir.

Q. And you also would get emails occasionally when sales were poor and they wanted you to cut the budget; correct?

A. Correct.

Q. And they would tell you as district manager, Ms. Newell, we want you to cut 10, 20 or $30 this week

15:42:03 out of your budget for this quarter; you've gotten those
15:42:05 emails, haven't you?
15:42:06 A. We have in the past, yes.
15:42:07 Q. All right. And the effect of those emails, when
15:42:11 you cut $30 out of payroll budget, the store manager's
15:42:15 going to have to work those hours, aren't they?
15:42:17 A. No, sir, they're not. They can cut that off of a
15:42:20 cashier, have a cashier come in an hour later, send a
15:42:24 cashier home an hour --
15:42:26 Q. So we understand each other, that's $30 less that
15:42:30 they have to spend on people in the store; correct?
15:42:32 A. Correct.
15:42:32 Q. All right. And the only person that's not paid
15:42:35 by the hour, as you just said, would be Ms. Morgan as
15:42:38 the store manager?
15:42:39 A. Yes.
15:42:40 Q. All right. Now, your hours in Georgia for the
15:42:44 store were, what? What were the hours of your store
15:42:47 being open?
15:42:47 A. They were open 9:00 to 8:00, and I believe it was
15:42:52 12:00 to 5:00 on Sunday, or 12:00 to 6:00.
15:42:55 Q. So, around 70?
15:42:57 A. 72 hours.
15:42:59 Q. 72 hours a week?
15:43:04 A. Yes, sir.

Q. All right. When you were talking with Mr. May about the individual who was smoking marijuana, before Ms. Morgan terminated her, she called you, didn't she?

A. Yes, she did.

Q. All right. And you told her you couldn't fire her, didn't you?

A. I told her we needed to catch her in the act --

Q. And she told --

A. -- to terminate her.

Q. -- she told you on the phone that she found the marijuana that this person had?

A. She told me she found the marijuana, but not in that person's pocketbook or anywhere.

Q. Well, we do agree when she called you and said she caught an employee with marijuana, you told her she couldn't fire her; we agree with that, don't we?

A. Correct.

Q. When Ms. Morgan was out of her store on vacation -- you knew there was a time when she wasn't even in her store, didn't you?

A. Yes.

Q. You fired two of her employees while she was gone, didn't you?

A. She had two employees -- and she had just taken over the building -- that were literally --

15:44:04 Q. Didn't you fire two of her employees while she was gone?
15:44:07 A. Yes, sir, for fist fighting in the store.
15:44:09 Q. But while she was gone, you went in and fired them both, didn't you?
15:44:13 A. Correct.
15:44:13 Q. All right. There was also a cashier one time that was caught stealing money. Do you remember that?
15:44:21 A. I don't remember that.
15:44:22 Q. Are you saying it didn't happen, or you don't remember?
15:44:25 A. I don't remember that happening.
15:44:26 Q. You don't remember one way or the other?
15:44:28 A. No.
15:44:45 MR. SCHREIBER: One moment.
15:44:48 MR. MAY: Is that it?
15:44:49 MR. SCHREIBER: I said just wait a second.
15:45:03 Q. There were times that Ms. Morgan got overtime, isn't there, or have you ever looked at the payroll records?
15:45:09 A. As a manager?
15:45:10 Q. Yes.
15:45:11 A. Salary. That's not overtime.
15:45:13 Q. No. I'm talking about in her store, you allowed her to have overtime?

15:45:17 A. She occasionally had some, yes.

15:45:19 Q. And in order to get that overtime, you had to approve it; correct?

15:45:22 A. Yes.

15:45:22 Q. She couldn't just do that on her own? You had to approve overtime; correct?

15:45:29 A. I don't necessarily approve all overtime. Some managers use it and I find out when they send me their figures.

15:45:36 Q. It -- if Ms. -- you don't dispute that Ms. Morgan called you if she ever needed overtime, would you?

15:45:41 A. I don't dispute it, but I don't remember if she did --

15:45:45 Q. One way or another --

15:45:46 THE COURT: I think we should be clear here: Are you talking about overtime --

15:45:52 MR. SCHREIBER: For other employees.

15:45:54 THE COURT: -- for other employees?

15:45:55 MR. SCHREIBER: Yes, sir.

15:45:55 Q. You don't dispute that, you just don't know one way or another; correct?

15:45:59 A. Correct.

15:46:00 Q. Is that right?

15:46:00 A. That's right.

15:46:01 Q. Okay.

15:46:11 MR. SCHREIBER: That's all I have, Your Honor.

15:46:12 THE COURT: All right. Redirect?

15:46:14 **REDIRECT EXAMINATION**

15:46:14 **BY MR. MAY:**

15:46:16 Q. Mrs. Newell, just to be clear, did you make the decision to classify the store manager position as exempt under the law, the legal decision?

15:46:31 A. No, I did not make the legal decision.

15:46:34 Q. And tell us, just so we're clear, what, if anything, you remember about the two employees fighting incident, and how that occurred and how you got involved.

15:46:46 A. Janice had asked to go to Canada, I believe it was, and she had been titled as store manager. And so she was out of town, and these two employees were literally fighting. I mean, fist fighting in the store. Customers called to complain, and Janice was gone and would be gone, I believe, two weeks.

15:47:07 So it is a company violation, major policy violation to be fighting on the premises of the store. So I had to terminate them, because she was not there to do it.

15:47:17 Q. On that marijuana issue, the employee with marijuana, did you have any conversation with Ms. Morgan

15:47:35 about the possibility or requirement of rehabilitation
15:47:39 or rehab, drug rehab?

15:47:40 A. No, sir. Family Dollar doesn't have a rehab
15:47:44 program that I know of.

15:47:47 MR. MAY: That's all I have.

15:47:48 THE COURT: Recross?

15:47:49 MR. SCHREIBER: No, sir.

15:47:50 THE COURT: Thank you, ma'am.

15:47:51 THE WITNESS: Thank you, sir.

15:47:52 THE COURT: Defendant will call its next
15:47:54 witness.

15:47:55 MR. WHITE: Kay Spanogle.

15:48:05 **KAY SPANOGLE, DEFENDANT'S WITNESS, SWORN**

15:48:19 THE CLERK: State your name for the record,
15:48:21 please.

15:48:47 THE WITNESS: Sharon Kay Spanogle.

15:48:48 **DIRECT EXAMINATION**

15:48:51 **BY MR. WHITE:**

15:48:52 Q. Ms. Spanogle, where do you reside?

15:48:57 A. Owens Crossroads, Alabama.

15:48:59 Q. And what's that close to?

15:49:01 A. It's about halfway between Huntsville and
15:49:04 Guntersville.

15:49:05 Q. By whom are you employed?

15:49:06 A. Family Dollar.

15:49:06 Q. In what capacity?
15:49:09 A. As a district manager.
15:49:10 Q. How long have you been a district manager at Family Dollar?
15:49:14 A. For about ten years.
15:49:15 Q. Have you ever been a store manager at Family Dollar?
15:49:18 A. Yes. I ran Store 334 in Huntsville for three years.
15:49:23 Q. During the time that you were a store manager at the store in Huntsville, tell us how many hours you averaged a week as a store manager in Huntsville.
15:49:34 A. 48 to 52.
15:49:37 Q. Were there occasions when you exceeded 52 hours?
15:49:40 A. Yes, sir. During inventory time, usually around Christmas, Easter, some of the major holidays.
15:49:47 Q. In addition to working at Family Dollar both as a store manager and now as a district manager, where else -- where else have you worked during your career?
15:49:59 A. Toys R Us for three years.
15:50:01 Q. And how long have you been in the retail?
15:50:04 A. Pretty much all my life.
15:50:07 Q. And were you also in a family business growing up?
15:50:10 A. Yes. I had a craft store, and a previous to that

15:50:15 I did work for a company called Trichem, which is a
15:50:18 commission-based sales job.
15:50:22 Q. Did your family have a business when you were
15:50:25 growing up?
15:50:25 A. Yes, they did. My father owned a camera business
15:50:28 and a produce market.
15:50:29 Q. And did you work in his business?
15:50:33 A. Yes, I did.
15:50:34 Q. Tell the ladies and gentlemen of the jury when
15:50:38 you were a store manager in that Huntsville store, what
15:50:41 were your general duties and responsibilities for those
15:50:44 three years?
15:50:45 A. I was responsible for hiring and training my
15:50:51 associates, my assistant. I opened and closed the
15:50:54 store. I set monthly schematics. I did the monthly
15:51:00 planner, price changes. Actually, during the time I was
15:51:06 a manager of that store, I did a complete remodel of the
15:51:09 store.
15:51:10 Q. While you were store manager, did you hire
15:51:13 employees?
15:51:14 A. Yes, I did.
15:51:15 Q. Did you discipline employees while you were
15:51:17 there?
15:51:18 A. Yes, sir, I did.
15:51:19 Q. While you were store manager, did you have any

15:51:22 responsibilities with scheduling or the staff that
15:51:26 worked in the store?

15:51:28 MR. QUINN: Objection. Leading.

15:51:32 THE COURT: Sustained.

15:51:32 Q. What responsibilities did you have, if any,
15:51:34 relative to the scheduling of employees in the store?

15:51:37 A. I was totally responsible for setting the
15:51:40 schedule in my store at that time.

15:51:41 Q. And you became a district manager when?

15:51:48 A. I was taken out of my store in July of 1993 as
15:51:58 Lewis DeCarlo's assistant, and I was officially promoted
15:52:01 in October of that year.

15:52:03 Q. Of 1993?

15:52:04 A. Yes, sir, that's correct.

15:52:05 Q. And you have remained a district manager since
15:52:07 then?

15:52:07 A. Yes, I have.

15:52:09 Q. Tell the ladies and gentlemen of the jury what a
15:52:13 district manager -- or in your case, what you do as a
15:52:15 district manager at Family Dollar.

15:52:16 A. I spend most of my time as an auditor. I'm
15:52:21 responsible for -- my main job would be to hire
15:52:29 qualified store managers and help with the training of
15:52:33 those managers. I do store audits. I help with the
15:52:38 inventories. If they have a special project that would

15:52:42 need to be taken care of in the store, like a major
15:52:45 reset, I would be involved in that.
15:52:49 Q. Where -- do you have an office?
15:52:52 A. Yes, I do.
15:52:53 Q. Where is your office?
15:52:53 A. It's at Store 404 in Huntsville.
15:52:57 Q. And do you use that as your office on a frequent
15:53:00 basis?
15:53:01 A. Not really. I do most of my office work at home
15:53:05 now, just because I have DSL, and it's easier to get on
15:53:10 line and do my work from home.
15:53:11 Q. How many stores in your district?
15:53:13 A. Currently, I have 21.
15:53:16 Q. Tell us, geographically, where your district
15:53:21 covers.
15:53:21 A. I have Huntsville, Alabama. I have the Decatur
15:53:24 area, Athens. I go all the way to Russellville,
15:53:27 Alabama -- and that's the store that's the most distance
15:53:31 from my home.
15:53:32 Q. Can you describe for the jury a typical day that
15:53:37 you have as a district manager, what would -- you would
15:53:40 be doing?
15:53:40 A. Normally, I get up, I check my emails on the
15:53:43 computer, will answer any of those that has an urgency
15:53:46 to it. Then I would go to visit -- you know, depending

15:53:52 on what's going on in the day, I could go visit several
15:53:55 stores; or if we have inventory, I may go to that store
15:53:59 and help with the inventory prep, and get the store
15:54:02 ready for the next day. So I may stay in one store for
15:54:05 a whole day.

15:54:05 Q. Do you have -- what are your responsibilities
15:54:07 relative to inventory of the 21 stores in your district?

15:54:12 A. I supervise the preparation to get ready for the
15:54:17 inventory. I usually go in two days ahead of time and
15:54:21 make sure that the stockroom is ready, that all the
15:54:23 merchandise is labeled and set up correctly, will pre-
15:54:26 count that.

15:54:27 And then the day before, will go back in and I
15:54:29 will supervise the precounting of the merchandise on the
15:54:32 sales floor that we're responsible for.

15:54:35 Q. On that, what are your duties, if any, on the
15:54:37 actual inventory day?

15:54:38 A. Inventory day, I'm there as an auditor to make
15:54:42 sure the company that we -- an outside company that
15:54:45 comes in to do the physical inventory, that there are
15:54:49 people that are counting correctly. And there are
15:54:52 reports that I look at during the period of the
15:54:54 inventory to make sure that they haven't miskeyed a
15:54:58 number, or, you know, got a huge quantity of something.

15:55:00 Q. In the 21 stores in your district, does each

15:55:05 store have a store manager?
15:55:06 A. Yes, they do.
15:55:07 Q. What -- what effect, if any, does it have on your
15:55:12 job as district manager when you have an experienced
15:55:18 store manager?
15:55:19 A. Well, obviously, an inexperienced store manager
15:55:23 is going to take up more of my time than someone, say,
15:55:26 that's been around for 15 to 20 years.
15:55:29 An inexperienced manager, I will visit more
15:55:33 frequently than I would someone that knows what they're
15:55:36 doing and doesn't need as much supervision.
15:55:38 Q. What is the distance from your home to the
15:55:41 furtherest store in your district?
15:55:43 A. I believe it's around 110 miles.
15:55:45 Q. Is that one way?
15:55:46 A. Yes, sir. That's from where I live to
15:55:48 Russellville.
15:55:49 Q. And that store is where?
15:55:51 A. Russellville, Alabama.
15:55:52 Q. How frequently do you visit the 21 stores in your
15:56:00 district?
15:56:00 A. Again, it depends on the stores that may have new
15:56:08 managers; could be a high-risk store. So, the store
15:56:12 that's in Russellville, I may only go once a month.
15:56:15 Some stores I visit biweekly; and some stores

15:56:19 that have a greater need for supervision, I will -- I
15:56:23 might get in those once a week.
15:56:24 Q. What do you mean by the term "high-risk store"?
15:56:29 A. Stores that have had huge inventory losses, store
15:56:36 may be -- could be the location they're in, could be the
15:56:40 staff that's in the building, or the clientele that we
15:56:43 have in the area is just -- has had continuous high
15:56:47 shrinks.
15:56:48 Q. How often does Family Dollar inventory an
15:56:52 individual store?
15:56:53 A. At least once a year. If it's a high shrink
15:56:56 store, it will be taken, again, a second time in the
15:56:58 year.
15:56:58 Q. So, are there at least 21 times during the year
15:57:01 you are involved in the inventory process?
15:57:04 A. Yes, sir, that's correct.
15:57:05 Q. And what -- how many hours or days does it take
15:57:09 for you, as the district manager, for that inventory
15:57:12 process?
15:57:12 A. We start three weeks before inventory. We have
15:57:17 an inventory calendar that we go by, and so we should
15:57:20 visit at least once a week for those three weeks. And
15:57:23 then the week of inventory, I'm in the building for
15:57:26 three days in a row.
15:57:27 Q. What role, if any, do you have as the district

manager in the hiring of employees at an individual store, other than the store manager?

A. I don't have any that's not my responsibility. I'm strictly responsible for hiring the managers, and the managers hire their assistants and their clerks.

Q. Do you have any role in the hiring of the assistant managers in the stores in your district?

A. I do like to have my managers call me. Fortunately, I have a number of long-term managers, and they actually help me. They will put the assistant managers through the hiring process, and then they'll call and say, "hey, I think this is a great candidate". And they'll -- at that point in time, before we actually hand them the keys, I do like to have a conversation with them, strictly for shrink reasons.

Q. Who is responsible on the employees in the store, other than the store manager and the assistant manager, for interviewing potential employees?

A. Excuse me, could you repeat that?

Q. Sure. Other than the store manager -- and I'll come back -- you hire store managers; right?

A. Yes, that's correct.

Q. Other than store managers and -- well, let me ask you this: Other than store managers, what is the process, as far as interviewing potential employees, in

15:58:59 an individual store?

15:59:00 A. In my district, if there's an opening in the store, we like to have -- the store manager talks to the person. It's a good thing if the assistant manager can talk to the person; and it's not a bad idea for the other cashiers in the building to, you know, just chat with that person, to make sure they're a good fit for the store.

15:59:21 Q. What tests, if any, are given to a potential employee in an individual store?

15:59:28 A. We have a Stanton survey that they go through. And then we have an esteem process and a background check that's done on these employees.

15:59:37 Q. Who administers those tests in the individual store?

15:59:41 A. The store manager.

15:59:41 Q. Do you ever administer those tests to employees in an operating, individual store in your district?

15:59:48 A. No, sir.

15:59:48 Q. Now, tell us what process you go through when you're hiring a store manager.

15:59:55 A. Normally, like I said, I have already good, long-term managers. Depending on if it's someone that I have recruited from the outside from another retailer, I will do the interview part; and then I would send them

16:00:14 to have their Stanton and esteem, when that
16:00:17 automatically triggers the background check. And when
16:00:21 that's completed, you know, then I would place them with
16:00:24 a certified training manager.

16:00:27 Q. And who -- who is the person from Family Dollar
16:00:31 that offers the store manager the job?

16:00:33 A. I do. If it's in my district.

16:00:36 Q. And who is it that tells them what salary they're
16:00:40 going to make?

16:00:40 A. I do.

16:00:41 Q. Do you tell the store managers, when you're
16:00:43 hiring them, anything about the hours they're expected
16:00:46 to work?

16:00:46 A. Yes, sir. I do tell them that they're required
16:00:48 to work a minimum of 52 hours. And I let them know
16:00:51 upfront that depending on the time of year, inventory,
16:00:58 there could be times when they will have to work more
16:01:01 than that.

16:01:03 Q. You said the term -- you used the term that you
16:01:06 had some long-term managers. What are the longest term
16:01:11 store managers that you have in your district?

16:01:12 A. Currently, I just had one lady retire at 20
16:01:16 years. And the manager at 404 is coming up on her 20
16:01:21 years.

16:01:21 Q. So, both of these employees have been a store

16:01:25 manager at those stores for 20 years -- or with Family
16:01:29 Dollar?
16:01:29 A. With Family Dollar. They have managed different
16:01:32 stores in the district.
16:01:32 Q. Do you know how long either or both of them were
16:01:36 store managers?
16:01:36 A. I don't know the answer to that. Both of these
16:01:42 ladies were actually hired and have been with Family
16:01:45 Dollar longer than I have. So I don't recall if they
16:01:48 started as an assistant, or if they were hired in as a
16:01:51 manager.
16:01:51 Q. So, 13 years ago when you started as district
16:01:55 manager, they were in place?
16:01:57 A. Yes. They actually trained me.
16:01:59 Q. And how often do you have to visit their stores?
16:02:03 A. I stop by -- the one manager at 404, that's where
16:02:11 my office is, so I stop in and out of there to pick up
16:02:14 my mail and do a few things. But to do an actual store
16:02:18 visit, not very often.
16:02:19 Q. In your individual stores in your district, who
16:02:23 is responsible for training the employees in the
16:02:27 individual stores?
16:02:27 A. The store manager's responsible for the training
16:02:30 in the stores.
16:02:30 Q. What training responsibility, if any, do you have

16:02:36 as a district manager as it relates to the 21 stores in your district?
16:02:39
16:02:40 A. Are you speaking just store managers, or --
16:02:46 Q. What training of anybody? As a district manager, do you have any responsibilities or duties associated with training the people -- whether it's store manager or otherwise -- in the stores?
16:02:50
16:02:53
16:02:56
16:02:58 A. The only time I would do training is if I'm doing a visit in the store and I see something that needs attention; I would take the time to show them how it should be done correctly.
16:03:01
16:03:03
16:03:07
16:03:07 Q. What responsibilities do you have on a daily basis in the 21 individual stores in your district for the handling of cash and receipts?
16:03:11
16:03:14
16:03:16 A. None. I'm not responsible for any of the money in the stores.
16:03:20
16:03:20 Q. Who is responsible?
16:03:21 A. The store manager.
16:03:23 Q. Do you have a key to any of the 21 stores in your district?
16:03:26
16:03:26 A. No, sir, I do not.
16:03:27 Q. Well, what about the one your office is in?
16:03:30 A. I don't have a key to the front door. They have to be open or in the building for me to get into my office.
16:03:33
16:03:35

Q. Who, in your district, is responsible and accountable for the daily operations of an individual store?

A. The store manager.

Q. Now, I gather, based on what you've said, you travel a good deal?

A. Yes, sir, I do.

Q. Can you tell us how many miles or days, or how much you travel in a given period?

A. During a week's time, it usually averages from 500 to about 750 miles a week.

Q. Are you familiar with the term "merchandising"?

A. Yes, sir. That would, to me, means the manner in which the product that comes in off the truck is displayed in the store for the customer to purchase.

Q. Are you familiar with the door-to-shelf program?

A. Yes, sir.

Q. What is the door-to-shelf program?

A. That's the process that the store managers and associates go through when they receive a freight delivery. That's the way the truck comes in to the back door, the way it's unloaded and the way it's processed to the sales floor.

Q. What, as district manager, are your duties and responsibilities in ensuring that the door-to-shelf

16:04:57 program is carried out?

16:04:58 A. The only thing I would have to do with that is if
16:05:02 it's a new store manager and they're struggling with
16:05:04 getting their freight out in a timely manner, we might
16:05:08 go back through some retraining and make sure that the
16:05:11 process is set up correctly in the store.

16:05:13 Q. Who is the person in the individual store that
16:05:16 Family Dollar holds accountable and responsible for
16:05:19 ensuring that the door-to-shelf program is carried out?

16:05:22 A. The store manager.

16:05:23 Q. Who is it that Family Dollar holds accountable
16:05:30 and responsible in an individual store for seeing that
16:05:34 the store is properly merchandised?

16:05:36 A. The store manager.

16:05:38 Q. Who is it that Family Dollar considers
16:05:45 responsible and accountable for dealing with customer
16:05:48 complaints at the store?

16:05:50 A. The store manager would be responsible for
16:05:53 handling customer complaints, unless the complaints was
16:05:56 actually on the store manager. And then at that point,
16:05:58 I would have to handle it.

16:05:59 Q. That's my next question. When, if ever, and how
16:06:03 do you get involved in a customer complaint? How would
16:06:05 that happen?

16:06:06 A. Only if it's called into the home office. And

16:06:09 like I said, the complaint would be on the store
16:06:12 manager.
16:06:12 Q. Are you familiar with schematics?
16:06:15 A. Yes, sir, I am.
16:06:16 Q. Tell us your understanding of schematics.
16:06:18 A. The schematics is given to us on a monthly basis,
16:06:24 and it is so -- the product is placed in the stores so
16:06:28 that when the freight comes into the store, people in
16:06:32 the store know where to put it. And then it also helps
16:06:36 with customer convenience, because they know where to go
16:06:39 and find certain items that they're shopping for.
16:06:43 Q. Have you ever heard of the term "flip-flop", as
16:06:46 it relates to the merchandising in a Family Dollar
16:06:49 store?
16:06:49 A. No, sir, I'm not sure what you're referring to
16:06:53 there.
16:06:54 Q. Well, is there any -- in your district, or to
16:06:57 your knowledge, in -- you have also supervised other
16:07:01 districts temporarily --
16:07:03 MR. QUINN: Objection to leading.
16:07:05 THE COURT: Sustained.
16:07:05 Q. Have you ever supervised districts other than the
16:07:07 one you supervise?
16:07:08 A. Yes, sir, I have.
16:07:09 Q. Okay. Is there a custom or practice, if you

16:07:14 know, in any district you have ever supervised where on an annual basis merchandise from one side of the store is flip-flopped with merchandise on the other side?

16:07:26 MR. QUINN: Objection. Leading.

16:07:28 THE COURT: The objection -- hold on a minute. The objection is overruled.

16:07:36 Q. You may answer.

16:07:37 A. Okay. Thank you.

16:07:39 The only time that the store would be totally flipped from one side to the other would be if a company remodel, like if it's an older store, and in that -- the only reason we would do it then is we have to totally switch out the fixtures. And they will flip the hard lines to the soft lines side, because it's easier to move the clothing rounders and start with the gondolas on the other side. That's the only time I would know that would ever happen.

16:08:13 Q. Anything other than that, where there's a major movement of merchandise within the store?

16:08:18 A. Not to my knowledge.

16:08:20 Q. What is the purpose of the schematics?

16:08:24 A. Schematics, like I said earlier, does help the -- with the process of the freight flow so that -- the boxes actually have a label on it, so it shows what department they go into. And it makes it easier for the

16:08:42 people that work in the store to actually move the
16:08:44 freight from the stockroom out onto the gondolas so they
16:08:47 know where it goes.

16:08:48 Q. What correlation is there, if any, between
16:08:52 schematics and inventory control?

16:08:54 A. It's very important. Because if you don't have
16:08:59 your schematics set up properly, you can't order
16:09:03 correctly, can't do your cycle counts correctly; and
16:09:08 that results in lack of inventory, because you're not
16:09:11 going to get the right stuff back into the building for
16:09:14 the customers to purchase.

16:09:15 Q. What is a cycle count?

16:09:17 A. That's something we do once a week to count items
16:09:24 that we're low of in stock. We'll either be totally out
16:09:27 of it, or we have one or two or three, maybe, on the
16:09:30 shelf. We will cycle count those, count it and send it
16:09:33 into the home office, so they can reset the computer and
16:09:35 make sure we're getting all the items we're supposed to.

16:09:38 Q. Who is accountable and responsible in the
16:09:41 individual store for ensuring that the cycle count is
16:09:44 done?

16:09:44 A. The store manager does that.

16:09:46 Q. Do you have any involvement as the district
16:09:47 manager in the cycle count?

16:09:49 A. No, sir.

16:09:49 Q. What correlation is there, if any, between the cycle count and the ordering of merchandise for the store?
16:09:56 A. Could you rephrase that, please?
16:10:03 Q. Let me rephrase that. How -- how -- how is ordering done in -- individual ordering done of merchandising, done in individual stores in your district?
16:10:13 A. Okay. My district is actually on a replenishment program they do, too. They order with PDT gun. They will scan the item, and then they'll put in the quantity that they would like to receive. And that's primarily done for special, like end caps in their supply items, and then they rely on the cycle counts to get the data integrity correct.
16:10:45 Q. Okay. You gave us some new terms. What is a PDT gun?
16:10:49 A. That's the unit that we use to scan the merchandise with.
16:10:58 Q. And it reads barcodes?
16:11:01 A. Yes, sir.
16:11:01 Q. You said you are on a replenishment program. Tell us what you mean by the term "replenishment program".
16:11:09 A. The corporate office -- when you're on a

16:11:12 replenishment program, you cycle count items that you're out of. And they -- that resets, and they will send you the items that you're out of; rather than the old way where we actually scanned the item and said how many of them we wanted. Now, it does have to be done weekly.

16:11:32 Q. What role do you have in ordering or replenishing the stores?

16:11:36 A. None.

16:11:37 Q. Who is accountable and responsible for ordering and replenishing the merchandise in the stores?

16:11:43 A. The store manager is.

16:11:44 Q. What role do you have at the individual stores in your district in employee discipline, if any?

16:11:54 A. The only person that -- that I would discipline would be the store manager. And the store manager's responsible for any discipline of assistant managers or clerks.

16:12:04 Q. Are there payroll budgets in the stores in your district?

16:12:14 A. Yes, sir, there is.

16:12:15 Q. Are you familiar with --

16:12:20 MR. WHITE: Your Honor, this is already an exhibit, exhibit -- let me see -- would you bring up Exhibit 2326, Koni, please?

16:12:31 Q. While she's bringing that up, did there come a

16:12:35 time when Family Dollar changed the way that personnel
16:12:40 were scheduled in the stores?

16:12:43 A. Yes, sir. Probably about four years ago. What
16:12:48 you have on the board there is what we did when I was a
16:12:50 store manager.

16:12:51 Q. And how long did it continue?

16:12:53 A. Oh, well, we did that when I started about 13
16:12:59 years ago. And I think -- I'm pretty sure it was about
16:13:05 four years ago when we received the staff scheduler.

16:13:10 MR. WHITE: Could I have, Koni -- don't put
16:13:12 it on the board -- Exhibit 2327?

16:13:14 THE COURT: Do you have it in a folder, too?

16:13:17 MR. WHITE: No. I have it here, Your Honor.
16:13:19 Let me -- I can do it this way, Judge.

16:13:23 I don't -- is 2327 -- I think it's in as a
16:13:27 Plaintiff's Exhibit, Judge, but since it's on here, I'll
16:13:30 use this.

16:13:31 Q. Let me show you -- and I will --

16:13:35 MR. WHITE: Your Honor, I will mark this as
16:13:39 2327 A and B.

16:13:42 Q. Do you recognize these blowups?

16:13:43 A. Yes, sir.

16:13:44 Q. What do those appear to you to be?

16:13:46 A. It is a Weekly Work Schedule for a store that has
16:13:50 150 hours.

16:13:53 Q. Do you have any stores with 150 hours?
16:13:55 A. Yes, sir, I do.
16:13:56 Q. And do you have stores that have different work schedules?
16:14:00 A. Yes, sir. I have several stores that have 135 hours; and I think my highest one goes up to about 200.
16:14:13 MR. WHITE: Judge, I'm going to get a sticker. This is a blowup of this. And let me put a sticker on this.
16:14:25 Q. Let me show you 2327, and ask you if you recognize that.
16:14:37 A. Yes, sir.
16:14:41 Q. Is that what you talked about that's blown up here?
16:14:45 A. Yes, sir, it is.
16:14:47 MR. WHITE: We would offer 2327.
16:14:49 THE COURT: It's received in evidence.
16:14:51 Q. Looking back at the one that's blown up behind me, that Exhibit -- Koni, if you'll put it back up there -- 2326, Koni, if you would leave that up there, if you will.
16:15:28 Who filled out the blanks in 2326, that form?
16:15:37 A. The store manager was responsible for doing this schedule on a weekly basis.
16:15:45 Q. I think you said during the years you were a

16:15:47 store manager, you used those?

16:15:47 A. Yes, sir, that's correct.

16:15:48 Q. And when you used those, tell the ladies and gentlemen of the jury how you would go about filling out that schedule.

16:15:56 A. That was a very time-consuming schedule that we did. You had to put in the hours that the manager, assistant manager -- didn't show it printed on there -- but you would add the cashiers at the bottom of that. And then you would manually have to figure out the hours that each person worked, and do the math at the end of it to make sure that it came out correctly at the end.

16:16:22 Q. The blanks that are down here at the bottom, first, when you were a store manager, who filled those out?

16:16:29 A. We did as a store manager.

16:16:30 Q. Did -- was this form continued to be used after you became a district manager?

16:16:36 A. Yes, sir.

16:16:37 Q. Do you know how many different staff schedulers, similar to 2327, that you use in your district?

16:16:55 A. No, sir. I don't know the exact number. I do have about half of my district is on 135 hours. I probably have three or four stores that's on 150; a couple that's at about 180; and I think my highest one

16:17:10 is up to 200.

16:17:11 Q. Okay. Tell us how a store manager in your
16:17:15 district utilizes the weekly work schedule similar to
16:17:21 this one, the store manager. How do they use it?

16:17:24 A. My people use it strictly as a template to work
16:17:30 the hours that's needed for when the truck's coming in,
16:17:33 and to make sure that they have proper coverage. And
16:17:37 due to -- in a weekly time, if someone has a doctor's
16:17:41 appointment or off on vacation, where if they use a
16:17:45 grease pencil, to draw lines through this and mark in if
16:17:47 somebody's going to have to work for another person,
16:17:50 they make changes on this.

16:17:52 Q. When it comes in to the store manager, does it
16:17:54 look exactly like 2327?

16:17:57 A. Yes, sir. It's just like this, just a laminated
16:18:01 schedule.

16:18:02 Q. Why is it laminated?

16:18:04 A. Because it has to last for 13 weeks, and they
16:18:09 have to be able to erase on it, using a dry eraser or
16:18:14 grease pencil on it.

16:18:15 Q. And the weekly work schedule, where -- how does
16:18:19 the store manager get it in your district?

16:18:22 A. You're talking about, how did they receive this?

16:18:25 Q. Right.

16:18:26 A. When it comes out once every three months, I will

16:18:29 bring it to them on my store visits.

16:18:32 Q. And they get, what, four a year?

16:18:36 A. Yes, sir. That's correct.

16:18:37 Q. Where do you get them?

16:18:38 A. They're sent to me from the corporate office.

16:18:41 Q. Are any -- do any of them contain the names, 16:18:45 either when you get them or when you deliver them to the 16:18:49 store manager, of any employee in any store in your 16:18:52 district?

16:18:52 A. No, sir. They're -- they're just like this. 16:18:55 It's generic. It says manager, assistant. And it will 16:18:58 say -- it actually says part-time associate on here, 16:19:01 even though they may have a full-time associate.

16:19:04 Q. What is the purpose of you giving this to the 16:19:07 store manager?

16:19:07 A. They use it as a training tool so that they know 16:19:12 how many hours that they're supposed to work based on 16:19:14 the payroll budget that they're given.

16:19:17 Q. Are they given any information about the dollars 16:19:21 that they have in their payroll budget -- the individual 16:19:26 store?

16:19:27 A. The individual store receives a 13-week budget 16:19:31 once every quarter that will show their sales and their 16:19:33 payroll.

16:19:34 Q. Is this document that's given to them, which is

16:19:37 expressed in hours, does it correlate in any way to the budget -- the dollar budget?

16:19:44 A. Most of the time, we have to make some adjustments to it.

16:19:48 Q. And who makes those adjustments?

16:19:50 A. The store manager does.

16:19:51 Q. What examples, if any, can you think of where you would have to make the adjustment?

16:20:00 A. Well, the budget only comes out once every three months. If we've hired someone new or given someone a pay raise, the dollars may not match the hours; because we -- we now have someone that makes $7 an hour instead of $6. And if they work 30 hours, that's an extra $30 that I may have to help them with.

16:20:24 Q. Do you ever have to go into any of the stores with a grease pencil and make any changes to any of these schedules?

16:20:30 A. No, sir.

16:20:30 Q. Who is the person that Family Dollar holds accountable and responsible for filling out, keeping up with weekly work schedules?

16:20:42 A. The store manager's responsible for managing their schedule and their budget each week.

16:20:46 Q. Do you have any sort of district budget?

16:20:54 A. My district budget would be the total of my 21

16:21:01 stores' budget added together.

16:21:03 Q. And is that just payroll?

16:21:04 A. Yes, it is. Well, it shows the sales and it 16:21:07 shows the payroll.

16:21:08 Q. Do you have the ability to change, on a district 16:21:12 level, the payroll budget?

16:21:14 A. Yes, sir. I can make some minor adjustments, 16:21:17 depending on like I used a while ago, if I have a store 16:21:21 that now needs a little bit more, I can move money 16:21:25 around a little bit.

16:21:26 Q. Can the store manager in your district change 16:21:28 their payroll budget?

16:21:30 A. If they have a situation where we have somebody 16:21:35 new, or we've made a pay change, they just bring it to 16:21:39 my attention and we make that adjustment.

16:21:41 Q. Do you ever, as a district manager, perform any 16:21:50 physical tasks in carrying out your job?

16:21:53 A. Yes, sir. There's times when I transfer 16:21:57 merchandise from store to store. If we have -- we're 16:22:01 doing a remodel, or a store, you know, for whatever 16:22:05 reason, may need some help. I'm in there with blue 16:22:09 jeans and tennis shoes and Family Dollar shirt, just 16:22:11 like the manager. I'll help them.

16:22:13 Q. Do you have any -- do you ever participate in any 16:22:17 way in any of the stores in your district in stocking or

16:22:21 merchandising?

16:22:21 A. Yes, sir, I do.

16:22:22 Q. What would that include?

16:22:24 A. Normally, like I said, it will be a store that's 16:22:28 gotten behind, for whatever reason. Could be that we 16:22:32 had to terminate the manager, or they lost some people 16:22:34 and got behind, and I would go in and help them reset 16:22:37 the end caps, negotiate the monthly planner, help them 16:22:40 catch up schematics.

16:22:41 Q. Do you ever perform any maintenance or cleaning 16:22:52 tasks in your job as a district manager?

16:22:54 A. Well, yes, sir. If I'm in a store and, you know, 16:22:58 a customer says, there's a spill over here, then I'm the 16:23:01 one that goes and gets the mop and the bucket and cleans 16:23:03 it up -- you know, if I'm the closest one to it.

16:23:08 Q. Who is responsible on -- in the individual stores 16:23:12 for ensuring that the premises are maintained in a safe 16:23:15 manner?

16:23:15 A. The store manager.

16:23:16 Q. Earlier, I think you said there was an occasion 16:23:22 when you covered another district.

16:23:25 A. Yes, that's correct. I did hold Linda Taylor's 16:23:29 district when she was out for surgery in -- I think it 16:23:35 was December of 2000 through April of 2001, I believe is 16:23:48 the correct dates.

16:23:48 Q. Generally, what geographic area did that store cover?
16:23:52 A. At that time, we've switched stores back and forth several times, but she went all the way from Boaz down to Sylacauga at that time; and over as far as Leeds.
16:24:09 Q. During that period of time, when you had both districts, what was the total number of stores you were functioning as district manager?
16:24:18 A. I had 36 stores.
16:24:19 Q. Was there an employee at one of those stores by the name of Misty Bice?
16:24:24 A. Yes, sir. She was the store manager in Pell City, I believe.
16:24:31 Q. Did you have, during the time that you were over that district, did you have any communication or contact with Ms. Bice?
16:24:39 A. I think only once. I did have another store manager from Mobile that came up and was helping me as an assistant; and she was responsible -- she stayed mostly in the southern end of the district and I handled the northern stores.
16:24:56 Q. When you say "an assistant", was she an assistant district manager?
16:25:01 A. Yes.

16:25:01 Q. Are there any occasions in your district where store managers are sent to other stores?

16:25:08 A. Yes, sometimes they go. My district, they will go, like, to help with inventory prep. And I have stores that are close together, like in Huntsville and in Decatur. So, those store managers kind of help each other. It's more of a social thing, they'll go "I'll help you with your inventory, if you'll help me with mine."

16:25:30 And it's a lot easier and a lot more fun to prepare for an inventory if you have several people. And that's the way we do it in my district.

16:25:39 Q. Do store managers ever get temporarily moved on the occasion of new store openings?

16:25:48 A. Yes, sometimes.

16:25:52 Q. What --

16:25:53 A. It's usually their choice. They ask to go to the new store.

16:25:56 Q. What would be the circumstances where an existing store manager would be involved in relation to a new store opening?

16:26:03 A. I do have them help with the process. We're responsible for hiring all the temporary people that it takes to open up a new store. It's usually about 30 people. And so I would have like four to six managers

16:26:17 come in to help me, because you can have as many as 200 people show up at one time.

16:26:22 And you need help with, you know, giving the Stanton surveys, giving the drug tests; managers will be interviewing. And we pick the best, you know, out of that group of people to start the store opening process.

16:26:36 Q. Do you know Janice Morgan, the lady seated right here (indicating)?

16:26:39 A. Yes, I do.

16:26:40 Q. And was there an occasion when Ms. Morgan was the store manager in your district?

16:26:44 A. Yes. She came to me, I believe, in August of 2000. I had a new store opening in Somerville, Alabama. And she was -- had asked to transfer from Georgia. And it just happened that the manager I had for that store was out -- I believe he had a worker's comp accident and was unable to go open that store. So it was available, and Janice moved to Alabama and took it.

16:27:12 Q. Had she transferred from another district?

16:27:15 A. Yes, she did transfer to me.

16:27:17 Q. And who was her district manager from whom she transferred?

16:27:21 A. Diane Newell.

16:27:22 Q. How long did Ms. Morgan remain as a store manager in your district?

16:27:26 A. I believe she stayed until December of that same year, so --

16:27:33 Q. 2000?

16:27:34 A. -- 2000. So, end of August through December.

16:27:36 Q. During the entire year of 2000, am I correct that you were still using the old work schedule form, you were not using this form?

16:27:47 A. I believe so.

16:27:49 Q. Okay. What was the occasion for Ms. Morgan leaving your district?

16:28:04 A. She told me that her husband was ill, and she needed to move closer to where he was currently at, to be able to take care of him after his surgery, I believe.

16:28:17 Q. During the time that Ms. Morgan was in your district, did she ever hire any employees at her store?

16:28:24 A. Yes, sir, I believe she did.

16:28:25 Q. During the time she was at -- in your district, did she ever terminate any employees in your store -- in her store?

16:28:33 A. Yes, sir, I think she did.

16:28:35 Q. During the time that she was there, did she -- do you ever -- let me ask you this: In your district, did you require Ms. Morgan to call you any time she exceeded the payroll budget?

16:28:54 A. I don't remember about having to call me. I do
16:28:59 have -- I did have them send in their sales and payroll
16:29:02 on a -- on Saturday night to let me know, you know, if
16:29:08 they had overtime or -- I remember one email in
16:29:11 particular where she said that she had used overtime and
16:29:14 she had hired somebody, because she had had to let
16:29:17 another person go.
16:29:18 Q. Did she -- well, that report that you get on
16:29:24 every Saturday, is that the report you just mentioned
16:29:30 that came, is that -- did you say that came on Saturday?
16:29:33 A. Yes, sir. It's just an email from the store
16:29:36 manager to let me know what their sales and payroll was
16:29:38 for the week. It's not really a report, it's just an
16:29:41 email. And they'll put their sales, their payroll, and
16:29:45 might say how much their damages are, or any other
16:29:47 little information they think I need to know for the
16:29:50 week.
16:29:50 Q. Is that information that's already happened, or
16:29:53 is that telling you what she expects is going to happen
16:29:56 in the next week?
16:29:57 A. It would have already have occurred. It would be
16:29:59 Sunday morning before I would have received the email.
16:30:01 Q. What role or assistance did you play in any way
16:30:10 in trying to help Ms. Morgan transfer from your
16:30:13 district?

16:30:14 A. When -- I believe Diane called and said that she had a person that was already trained that wanted to move to the area. And I just agreed to the transfer, because I had a need at that moment. I had a store opening, and didn't have a manager ready to go in it.

16:30:34 Q. No, I mean when she left your district.

16:30:36 A. Oh, when she left the district. I did send an email to Linda Taylor to let her know that Diane had already asked -- she was -- she was going to leave my district anyway, and we were trying to see if she would have an opening in another district that would be closer to where she needed to be relocated.

16:30:55 Q. Did Ms. Morgan ever indicate to you that she was upset or angry with Ms. Taylor?

16:31:01 A. Not at that time, no, sir.

16:31:04 Q. And I think you said she left in December of 2000?

16:31:11 A. Yes, sir, I believe that's correct.

16:31:12 Q. In your district, based on your experience, what's the most important job that the store manager has at a Family Dollar store?

16:31:21 A. It would be hiring and training good assistants and associates.

16:31:27 Q. Would you answer their questions, please?

16:31:31

**CROSS-EXAMINATION**

16:31:31 **BY MR. QUINN:**

16:31:34 Q. Did you bring any of these emails that you were
16:31:42 talking about with --

16:31:44 A. No, sir.

16:31:46 MR. WHITE: Your Honor, I can be heard on
16:31:47 that, but I will tell you it's the same problem we had
16:31:50 earlier. They're not on the exhibit list.

16:31:53 THE COURT: All right. The objection is
16:31:54 sustained.

16:31:56 MR. WHITE: I'm happy to furnish a copy to
16:31:59 counsel, if he would like. Do you want one, Mike?

16:32:01 MR. QUINN: Yeah. Why don't you get them
16:32:03 together for me?

16:32:04 MR. WHITE: Okay. Sure.

16:32:05 BY MR. QUINN:

16:32:05 Q. Let's start -- which one of these is 2327? Where
16:32:19 is it marked?

16:32:57 While he's looking for that, let me ask you
16:32:59 something else about these schedules.

16:33:03 Do you have plaintiffs' exhibits in front of you?
16:33:07 Do you have any exhibits in front of you?

16:33:09 A. The only thing I have, sir, is this (indicating).

16:33:17 Q. Let me show you what's previously been marked as
16:33:38 Plaintiffs' Exhibit Number 8. Are you familiar with
16:33:41 that?

16:33:41 A. Yes, sir, I've seen it before.

16:33:45 Q. Will you put up Plaintiffs' Exhibit Number 8?
16:33:53 And what is that document?

16:33:54 A. It's a Staff Schedule Frequently Asked Questions.

16:33:59 Q. All right. And go down, if you would, to the
16:34:04 fourth question, if you would highlight the fourth
16:34:07 question. And you were talking about changes being made
16:34:16 to this particular document.

16:34:18 Would -- that question asks: "Can the schedule
16:34:23 be changed to give the manager a five-and-a-half-day
16:34:27 work week instead of a five-day work week?" Would you
16:34:29 read the answer, please?

16:34:31 A. Says: "This change can only be made by the
16:34:34 district manager and should only be made as long as
16:34:36 total hours and coverage for each day are not increased
16:34:40 or decreased. This change must be immediate when the
16:34:44 store rating is less than a five."

16:34:46 Q. All right. And then if you go to the next
16:34:48 question, if you'd pop up the next question, please.
16:34:52 And, again, this is a question that a store manager
16:34:54 might have:

16:34:55 "Can I move coverage from slower stores, (i.e.,
16:35:00 non truck weekdays) to Fridays, Saturdays and Sundays
16:35:04 when we are busiest?" And would you read that, please?

16:35:07 A. Says: "No. Schedules are designed to give a

16:35:10 coverage that is based on store volume and store hours."

16:35:13 Q. All right. And then the next question, if you would, please: "Can I change the schedule of the assistant manager to reflect a 48- or 52-hour work week when in training?"

16:35:25 And what is the answer to that?

16:35:27 A. "No. This change can only be made by the DM or RVP if the change is made. The total hours in coverage for each day should not be increased or decreased and the store payroll budget must be met. It is very important to control the use of overtime dollars."

16:35:44 Q. Okay. And now, if you go down to this last part of this where it's all highlighted, please. And if you'd read the last sentence starting with, "the store manager." That would be right here (indicating).

16:36:00 A. "The store manager should discuss with the district manager regarding any exceptions to the schedule."

16:36:05 Q. You have to be involved in that, don't you?

16:36:08 A. I can only speak for my district, and my managers make all the changes to their schedule. I don't --

16:36:21 Q. And they don't -- and is it your testimony to this jury that they -- that they do that and that they don't involve you?

16:36:30 A. Yes, sir. They make changes of the schedule all

16:36:34 the time.

16:36:35 Q. And they don't involve you?

16:36:36 A. That's correct.

16:36:37 Q. Did you know that's a violation of the policy --

16:36:40 MR. WHITE: Object to that as policy, Your 16:36:43 Honor. I don't believe that's been identified as 16:36:44 policy.

16:36:45 THE COURT: Overruled.

16:36:46 THE WITNESS: This is just a guideline in my 16:36:48 district. This is -- this serves as a template, like I 16:36:52 spoke earlier about.

16:36:53 Q. All right. And you were talking about some other 16:36:57 things as well. Let's talk for a minute about 16:37:05 merchandising.

16:37:06 I think that you were asked some questions about 16:37:11 the store managers' involvement with the merchandise in 16:37:16 the store. You are aware that a -- that Family Dollar 16:37:20 has a merchandiser at corporate; right?

16:37:25 A. Yes, sir. They have someone that buys 16:37:28 merchandise.

16:37:30 Q. Let me see Plaintiffs' Exhibit Number 4. Do we 16:37:45 have another small one? Instead of trying to use this 16:37:56 big fat thing, I'm just going to stand here with you.

16:37:59 A. Okay.

16:38:00 Q. Do you recognize this document?

16:38:03 A. Yes, sir. It's a copy of the customer service
16:38:06 Strand.
16:38:07 Q. The Strands. And we will identify it for the
16:38:09 purposes of the jury as Plaintiffs' Exhibit Number 4,
16:38:12 which you have.
16:38:14 You see this particular document that deals with
16:38:30 -- well, I just had it -- let's just talk about this
16:38:39 while I have it -- the staff schedule which I was
16:38:41 talking about a minute ago.
16:38:42 A. Yes, sir.
16:38:43 Q. And do you see where it says here that "the staff
16:38:47 schedule is the first critical component in the staffing
16:38:50 section. The staff schedule allows the district
16:38:54 managers to help the store managers"; correct?
16:38:56 A. Yes, sir.
16:38:56 Q. And "the district manager assesses the components
16:38:59 of the staff schedule." Do you see that?
16:39:02 A. Yes, sir. I see it.
16:39:03 Q. "The district manager must gather the information
16:39:06 to be used for this staff schedule"; is that correct?
16:39:09 A. That's what it says.
16:39:11 Q. Okay. You also talked about customer
16:39:16 merchandising. If you look at this, isn't there a
16:39:23 computer system that deals with the merchandising called
16:39:28 the CARS, or CARES system?

16:39:31 A. CARS.

16:39:32 Q. CARS system?

16:39:33 A. That was a predecessor, I believe, to the 16:39:35 replenishment program that we're on now.

16:39:38 Q. But the replenishment program is computerized; is 16:39:41 that correct?

16:39:41 A. Yes, sir, it is.

16:39:41 Q. And the computer, through the use of the cash 16:39:46 register, determines what's been bought and sold and how 16:39:52 to replenish the store, doesn't it?

16:39:54 A. Yes, sir. That's why we have to do cycle counts, 16:40:00 though, for the errors that --

16:40:02 Q. And trained cashiers can do cycle counts also, 16:40:07 can't they?

16:40:08 A. Yes, sir, they could.

16:40:10 Q. Trained stockers can do cycle counts, can't they?

16:40:12 A. Yes, sir, if they're trained to do it.

16:40:14 Q. Assistant managers can do cycle counts, can't 16:40:17 they?

16:40:17 A. Yes, sir.

16:40:17 Q. That's not just a duty for the store manager, is 16:40:21 it?

16:40:21 A. No, sir.

16:40:22 Q. And as far as customer complaints are concerned, 16:40:27 the staff -- the Strands request and indicate that you,

16:40:37 as the district manager, should be involved, as well as
16:40:41 even down to the associate in customer complaints,
16:40:46 customer service, things of that nature; isn't that
16:40:49 right?

16:40:49 A. Yes, sir. But if the store manager's in the
16:40:52 store and a customer complains to her, she's going to do
16:40:55 her best to make that customer happy right then and
16:40:58 there.

16:40:58 Q. And so is the cashier. If the customer complains
16:41:01 to a cashier, the cashier's going to do everything
16:41:04 within his or her power to take care of that problem as
16:41:07 well?

16:41:07 A. The cashier's probably going to call the manager.

16:41:10 Q. It's not your testimony the cashiers never take
16:41:13 care of customer problems by themselves, is it?

16:41:15 A. No, sir. I'm sure that cashiers could.

16:41:18 Q. Now, you talked about Janice Morgan working for
16:41:25 you. Do you remember when she became the store manager
16:41:32 at a new store?

16:41:33 A. Yes, in August of 2000.

16:41:35 Q. And in that particular instance when that store
16:41:38 was opened, isn't it a fact that after the store had
16:41:43 been set up, that -- or during the time that the store
16:41:48 was being set up, that a lot of people were hired in to
16:41:52 assist in the setup of the store, and that then you

16:41:56 selected who was going to be hired in that particular
16:41:59 store to work with her?
16:42:02 A. We had already went through the hiring process
16:42:07 before Janice asked for the transfer. We had already
16:42:11 went through this with the other manager that was now
16:42:13 unavailable to take the job.
16:42:15 So when Janice transferred, she just transferred
16:42:19 to the store that was already, you know, set up and
16:42:21 ready to go.
16:42:22 Q. Do you remember that one of the particular people
16:42:25 that you hired was the son of a store manager? Do you
16:42:28 remember that?
16:42:29 A. I believe there was one that was the son of a
16:42:32 store manager.
16:42:32 Q. And do you remember that Janice wasn't
16:42:34 particularly interested in hiring that particular
16:42:37 person, and you did anyway?
16:42:38 A. I -- I don't remember any part of that, sir.
16:42:44 Q. Do you remember also that later she had problems
16:42:48 with that particular individual; and that she wanted to
16:42:52 terminate that employee, but that you resisted for quite
16:42:56 some time, but then finally did agree to terminate that
16:42:59 employee?
16:42:59 A. No, sir. I don't remember how long he worked
16:43:02 there --

16:43:02 Q. You don't remember that? Do you remember making an example out of Janice, because she filled up her own fire extinguisher, or had it filled up? Do you remember that?

16:43:13 A. No, sir. I don't recall anything about that.

16:43:15 Q. Do you ever remember cutting her payroll at the end of the week, on a Thursday or a Friday, when Friday was truck day, and her telling you that that was going to require more hours of her to unload the truck?

16:43:31 A. No, sir, I don't remember that conversation.

16:43:33 Q. Do you ever remember being parked outside of her store for approximately an hour, watching her sweep the outside of the store and later telling her, "yeah, I watched you clean up the outside of the store"; and her asking, "well, why didn't you come help me"?

16:43:52 A. No, sir, I don't recall that.

16:43:54 Q. Are you familiar with the district manager essential functions or job description?

16:44:07 A. No, sir.

16:44:08 Q. Let me show you what we've previously marked as Plaintiffs' Exhibit Number 9, and ask you if you recognize that?

16:44:18 MR. WHITE: What's the number, Mike?

16:44:21 MR. QUINN: Number 9.

16:44:26 MR. WHITE: Do you have a copy?

16:44:30 MR. QUINN: Yes.

16:44:34 BY MR. QUINN:

16:44:34 Q. Do you recognize -- that is a company document, 16:44:37 isn't it, Family Dollar Stores, Inc., District Manager 16:44:41 Job Description?

16:44:42 A. I've never seen it, sir.

16:44:44 Q. All right. Let me ask you this question: Do you 16:44:50 agree that your basic responsibility as a district 16:44:56 manager is to serve as the corporate representative in 16:44:59 charge of all store activities within your assigned 16:45:03 district?

16:45:04 A. Yes, sir.

16:45:06 Q. So you do agree that that is a -- that is your 16:45:10 basic responsibility; correct? You are the corporate 16:45:17 representative in charge of all store activities within 16:45:19 your district?

16:45:20 A. Not the --

16:45:22 Q. That's what that says, isn't it?

16:45:25 A. That's what it says, all store activities, but 16:45:27 I'm not responsible for the activities in the store. 16:45:29 I'm responsible for the manager.

16:45:31 Q. Do you know why it says that, then?

16:45:32 A. No, sir. I've never seen that before.

16:45:35 Q. Okay. Have you ever seen a store manager's job 16:45:46 description?

16:45:46 A. Yes, sir, I do believe I've seen that before.
16:45:50 Q. Okay.
16:45:51 A. A long time ago.
16:46:26 Q. Let me show you the store manager and the 16:46:29 assistant manager job descriptions, and tell me whether 16:46:32 you've seen those before. That's Plaintiffs' 6 and 7. 16:46:41 You've already got them. 6 and 7.
16:46:43 MR. WHITE: I don't remember that one that 16:46:45 said store manager job description.
16:46:47 MR. QUINN: Well, essential functions. I'm 16:46:50 sorry.
16:46:50 MR. WHITE: May we ask counsel to properly 16:46:53 identify -- if he's got one that says job descriptions, 16:46:56 I'd like to see it.
16:46:58 MR. QUINN: No. It's the essential 16:46:59 functions.
16:47:00 MR. WHITE: Essential functions. Oh, okay.
16:47:03 THE WITNESS: No, I don't think this is what 16:47:06 I thought it was.
16:47:06 BY MR. QUINN:
16:47:06 Q. Okay. That's fine. Don't recognize either one 16:47:07 of them?
16:47:08 A. Huh-uh.
16:47:09 Q. Okay. One more thing about the Strands, and then 16:47:18 I'll move on. And I showed you this earlier: You are

16:47:22 familiar with the company Strands?
16:47:24 A. Yes, sir.
16:47:25 Q. All right. And if you go to the very first page,
16:47:32 do you agree that the Family Dollar Store Team is headed
16:47:35 up by you right here (indicating); is that you?
16:47:40 A. No, sir, I'm not in charge of the stores. I'm in
16:47:43 charge of --
16:47:44 Q. What does that say right there?
16:47:45 A. It says "The Family Dollar Store Team".
16:47:47 Q. Right. And then what does that say?
16:47:50 A. It says "district manager".
16:47:51 Q. Okay. Now, how long have you been a district
16:47:53 manager?
16:47:53 A. Since October of 1996.
16:47:58 Q. And how much are you making now?
16:48:11 A. I make about $58,000 a year.
16:48:15 Q. And you work for Family Dollar?
16:48:18 A. Yes, sir.
16:48:19 Q. And you've come here to testify on behalf of
16:48:21 Family Dollar; correct?
16:48:22 A. Yes, sir.
16:48:22 Q. Did you review any of these documents that I have
16:48:26 shown you before you came here today?
16:48:28 A. Some of the documents, I saw.
16:48:30 Q. Did you -- have your lawyers ever shown you this

16:48:35 Strand that shows you as the head of the store?

16:48:37 A. No, sir, they have not.

16:48:38 Q. Did they ever show you any of this stuff about 16:48:42 scheduling?

16:48:43 A. Yes, sir.

16:48:43 Q. Did they show you the stuff about merchandising? 16:48:47 Did they go over any of this with you before your 16:48:50 testimony?

16:48:51 A. Yes, sir.

16:48:51 Q. They did?

16:48:52 A. Some of it.

16:48:53 Q. Do you know that there are documents that cover 16:48:56 this that are different from what you are testifying to 16:48:58 today?

16:48:59 A. There's numerous documents. I mean, as far as 16:49:04 like store manuals and -- the Strands are fairly new. 16:49:08 We -- as the company grows and things change, we change 16:49:13 and update materials. Some of those materials you 16:49:16 showed me were old.

16:49:18 Q. Well, now -- we have Strands that we've 16:49:22 introduced. Are you telling me that there are newer 16:49:25 ones that we haven't been given by the company?

16:49:28 A. No, sir.

16:49:28 Q. Okay. And have you seen -- put up Plaintiffs' 16:49:45 Exhibit 10, please. And if you could blow it up a

16:49:52 little bit so we can see it a little better.

16:50:02 Do you know who Bruce Barkus is?

16:50:03 A. Yes, sir.

16:50:04 Q. And he's your boss -- or he's one of your bosses?

16:50:09 A. He used to be.

16:50:10 Q. Used to be one of your bosses. And do you
16:50:13 remember getting this email as a district manager and
16:50:19 sending it on to your -- to your managers or assistant
16:50:26 managers? Have you ever seen this before?

16:50:28 A. I'm trying to read it to see, sir.

16:50:35 THE COURT: Do you have a paper copy of this
16:50:37 so that she won't have to strain?

16:50:43 MR. QUINN: Certainly.

16:50:43 Q. Here. This is probably much better.

16:50:46 A. My sight's not good. Thank you. Could you
16:51:05 restate the question, please?

16:51:06 Q. My question is: Have you seen this email? Do
16:51:12 you remember seeing this email when it went out February
16:51:14 the 20th, 2003?

16:51:16 A. I don't recall seeing it. I mean, that's been a
16:51:23 while.

16:51:23 Q. Has -- has this email -- are you familiar with
16:51:27 this email sitting here today?

16:51:29 A. Yes, sir, I have seen it before.

16:51:31 Q. Okay. And isn't it -- it is a document that

16:51:37 Mr. Barkus sent out; correct?
16:51:40 A. Yes, sir. That's what it says.
16:51:41 Q. And do you agree that the policy is as he has
16:51:45 stated in this email, as far as hiring assistant
16:51:50 managers and other -- other employees who may hold keys
16:51:56 to the store; that you, as the district manager, must
16:52:01 interview those people and approve their hiring?
16:52:07 You don't disagree with that, do you?
16:52:11 A. No, sir. We do try to talk to all the key
16:52:15 carriers.
16:52:15 Q. And do you remember -- have you ever terminated
16:52:18 anybody that you can remember for violating -- a store
16:52:21 manager for violating the key policy?
16:52:23 A. For --
16:52:27 MR. WHITE: Object to the form of the
16:52:28 question, Your Honor.
16:52:29 Q. Do you remember terminating --
16:52:29 THE COURT: Just a moment.
16:52:32 MR. WHITE: Object to the form of the
16:52:33 question. When he says "key policy", I don't know if he
16:52:37 means a policy related to keys, or an important policy.
16:52:40 THE COURT: All right. The objection is
16:52:42 overruled.
16:52:42 BY MR. QUINN:
16:52:42 Q. Do you remember ever firing anybody for them

16:52:48 giving a key to someone that had not passed through this
16:52:53 particular policy?
16:52:54 A. No, sir. I don't remember anyone being
16:53:00 terminated because they had not talked to me first.
16:53:03 Q. Okay. Well, do you remember terminating a store
16:53:05 manager in 2002, and it had to do with the key policy?
16:53:09 A. If you gave me the name, I would say whether I
16:53:18 remember the person or not. But I don't --
16:53:21 Q. Okay. Patty Watson, at the Hazel Green, Alabama
16:53:35 store?
16:53:35 A. Yes, sir, I do remember Patty.
16:53:37 Q. And she was a store manager?
16:53:39 A. Yes, she was.
16:53:40 Q. And you remember that being around 2002?
16:53:43 A. Yes, sir. That's the approximate date.
16:53:48 Q. And do you remember that she was terminated
16:53:50 because she gave a cashier a key?
16:53:54 A. Yes, that is correct.
16:53:55 Q. And that cashier had not been approved, had not
16:54:00 -- had not gone through this process of being approved
16:54:03 by you to be a key holder?
16:54:04 A. Well, she also had not had a background check, or
16:54:08 any of that stuff done at that time, either. She was
16:54:10 just a cashier.
16:54:10 Q. How long was Mr. Barkus your boss?

16:54:21 A. I don't recall the exact time of his employment
16:54:30 with Family Dollar.
16:54:32 Q. Would you agree with me that Mr. Barkus should be
16:54:36 very well versed in the policies and procedures as they
16:54:39 apply to the district managers and the store managers?
16:54:43 MR. WHITE: Objection, Your Honor. Outside
16:54:45 the scope of direct examination.
16:54:47 MR. QUINN: No, I don't believe it is.
16:54:48 She's gone into what the store managers' duties are,
16:54:52 what their responsibilities are, their importance --
16:54:56 THE COURT: I take it this is a preliminary
16:54:59 question, Mr. Quinn?
16:55:01 MR. QUINN: (Nodded head.)
16:55:01 THE COURT: All right. What's the ultimate
16:55:04 question?
16:55:05 BY MR. QUINN:
16:55:05 Q. If, in fact, Mr. Barkus testified that most of
16:55:09 the time of a store manager is spent unloading trucks,
16:55:16 stocking the shelves, cleaning, and running the cash
16:55:19 register, you would not agree -- you would not disagree
16:55:22 with Mr. Barkus, would you?
16:55:24 MR. WHITE: Objection, Your Honor.
16:55:26 THE COURT: Overruled.
16:55:28 THE WITNESS: Yes, I would disagree with
16:55:29 Mr. Barkus in that.

16:55:30 Q. So you would disagree with your boss?
16:55:32 A. Yes.
16:55:33 Q. And say that -- and say that that is not?
16:55:36 A. Most of their time is not spent on those tasks you just named.
16:55:40 Q. Well, if that's so, then why did you have to reduce the pay of one of your store managers because they had hurt their back, and they couldn't unload the -- unload the truck, or run the cash register, or do those other things that I just talked about that Mr. Barkus says that a store manager spends most of their time?
16:56:06 A. You'll need to tell me who you're referring to, sir.
16:56:10 Q. Do you remember a lady by the name of Judy Crier?
16:56:13 A. Yes, I do.
16:56:14 Q. And do you remember that Judy Crier hurt her back?
16:56:18 A. Yes, she did.
16:56:19 Q. And do you remember that at the time Judy Crier hurt her back, she was making 485 a week, and you kept it at 485 a week until you got caught; and then you had to reduce it to 400 a week. And you testified in your deposition that the reason you had to was because she wasn't able to unload the truck, do the freight, do all

16:56:43 the heavy lifting stuff. So "in order for her to have
16:56:46 the money in her payroll, I hired an extra person, and
16:56:50 then I had to reduce it to 400." Do you remember that
16:56:52 testimony?

16:56:53 A. Yes, sir, I do.

16:56:54 Q. Would you agree or disagree with Mr. Barkus if he
16:57:03 says that there is nothing in writing that indicates
16:57:05 that a store manager has the right to hire or fire
16:57:11 employees?

16:57:12 A. Could you rephrase that question, please?

16:57:18 Q. Sure. Would you agree or disagree with
16:57:20 Mr. Barkus, your boss, if he said there's nothing in
16:57:24 writing, that all policies are in writing, but there is
16:57:26 no written policy that allows the store manager to hire
16:57:29 or fire, without district manager approval?

16:57:32 A. I don't know if there's -- is or not.

16:57:35 Q. So you would not disagree with him, then?

16:57:39 A. I personally do not know if there's one in
16:57:46 writing or not.

16:57:47 Q. Okay. And if he said that there is not a policy
16:57:51 that says that those recommendations from the store
16:57:56 managers are going to be given any particular weight;
16:57:59 again, you cannot disagree with him, can you?

16:58:02 A. Yes, sir, I can disagree with him.

16:58:05 Q. Well, do you disagree with your boss when he says

16:58:09 that, in fact, there are no written policies that deal
16:58:14 with that?
16:58:15 A. I personally don't know if there is or not.
16:58:17 Q. And that is my question. You don't know, and so
16:58:20 you have no reason to disagree, do you?
16:58:22 A. Right.
16:58:23 Q. Are you familiar with the Personal Action Form,
16:58:31 or the PAF form?
16:58:32 A. Yes, sir.
16:58:33 Q. Is it correct that that is a -- Mr. Barkus
16:58:37 testified that that is a computer system that is only in
16:58:42 the district managers' computers? Do you understand
16:58:46 that to be so?
16:58:48 A. No, sir. The PAF is done at the store level.
16:58:52 It's in the -- each store has their own computer in the
16:58:55 back office, and the store managers do PAFs all the
16:58:58 time.
16:58:58 Q. Is the -- is the door-to-shelf policy actually a
16:59:17 policy talking about unloading the truck and getting the
16:59:22 goods onto the shelf? Isn't that what the door-to-shelf
16:59:26 policy is?
16:59:27 A. Yes, sir. It is the process for how we take the
16:59:31 merchandise from the truck to the sales floor.
16:59:32 Q. Okay. You agree that the budget is set by the
16:59:58 home office?

16:59:59 A. Yes, sir, it is.
17:00:00 Q. And the budget is sent to you?
17:00:03 A. Yes, sir.
17:00:03 Q. And then you send it on to the store manager?
17:00:06 A. That's correct.
17:00:07 Q. And the budget determines the hours that can be worked --
17:00:15 A. Yes, sir.
17:00:17 Q. -- at the particular store?
17:00:18 A. Yes, sir.
17:00:19 Q. And that the -- and that the only person who is not limited in the number of hours that they can work is the store manager; is that correct?
17:00:29 A. The store manager can use the budget to decide who works what hours in the store. So...
17:00:40 Q. Well, but my question to you, just as you showed here, the staff schedule is sent and it's got the hours on it; correct?
17:00:48 A. Yes. But they can mark through that with a grease pencil and change those hours.
17:00:52 Q. And that takes what, 15, 20 minutes?
17:01:01 A. Depending on how many changes they need to make.
17:01:01 Q. They do that based on who's going to be in or out, or whatever?
17:01:02 A. That's correct.

17:01:02 Q. It still comes to them set; correct?

17:01:06 A. It does come to them that way. It's strictly a template used to show them what hours need to be worked on a given day.

17:01:13 Q. I understand that, and I'm not quibbling with you about that. But we all know, don't we, and you know this, and the number of hours are set by the budget, the amount of money that they've got and they can't deviate from the budget without going through you and you going to the regional vice-president; you can't give them more money without checking with somebody; isn't that right?

17:01:41 A. If they have made a change, I -- I can help them make a change in their budget.

17:01:46 Q. Which is exactly my question. But one of the big ways that the money is made by Family Dollar is to stay within that budget as much as possible, isn't it?

17:01:56 A. Well, yes, sir. That's one of our main expenses. If we control that, then it helps --

17:02:01 MR. QUINN: No further questions.

17:02:03 THE COURT: Redirect?

17:02:04 **REDIRECT EXAMINATION**

17:02:04 **BY MR. WHITE:**

17:02:06 Q. How long have the Strands been in existence, if you know?

17:02:14 A. I don't know.

17:02:16 Q. Has it been since you became a district manager?

17:02:18 A. Yes, sir. It's recent within the last couple of years.

17:02:22 Q. And do you know Bill McCarthy?

17:02:24 A. Yes, I do.

17:02:25 Q. Who is Bill McCarthy?

17:02:27 A. He's the gentleman at the corporate office that allocates the payroll.

17:02:34 Q. During all the years you have been a district manager, have you ever been disciplined by Family Dollar for how you run your district?

17:02:41 A. No, sir.

17:02:43 MR. WHITE: That's all.

17:02:46 THE COURT: Recross?

17:02:48 MR. QUINN: No questions.

17:02:50 THE COURT: Okay. Thank you, ma'am. You may come down.

17:02:58 Ladies and gentlemen, we will take our evening recess. We will be in recess until 9:00 o'clock in the morning. Please do not discuss the case among yourselves or with anyone else. Do not allow it to be discussed in your presence, and keep an open mind.

17:03:10 Have a good evening. We'll see you tomorrow.

17:03:13 (Jury out at 4:55 p.m.)

17:03:36 THE COURT: Court's still in session.

17:03:56 MR. KALLON: Your Honor, briefly, just several administrative issues.

17:03:59 Family Dollar has a copy of the demonstrative exhibits that we placed on the bulletin board during the course of today's testimony and cross-examined of some witnesses; one for the Court and one for plaintiffs' counsel.

17:04:18 But the main thing, Your Honor, is in the course of Mr. Barkus' examination by Family Dollar, we offered our own copy of the Strands. And --

17:04:31 THE COURT: Yes.

17:04:32 MR. KALLON: -- and plaintiffs' counsel mentioned they already had one and you wanted to address whether we could put in our own version or not.

17:04:39 THE COURT: All right. Well, plaintiffs, why don't we substitute the defendant's version of the Strands for yours?

17:04:47 MR. R. WIGGINS: We'll look at it tonight, Your Honor.

17:04:50 THE COURT: All right. We don't need two --

17:04:53 MR. R. WIGGINS: I agree.

17:04:54 THE COURT: -- identical copies of the same exhibit in there.

17:04:57 MR. KALLON: Your Honor, I wanted to also

17:04:59 say the case the opponent rendered, we would ask at least tomorrow morning, if not tonight, plaintiffs also present to the Court their copy of the demonstrative exhibits they presented in the course of today's trial.

17:05:13 THE COURT: All right. Now, there is a motion, which I intend to grant, Mr. Kallon, to read Ms. Felicia Coleman's trial testimony to the jury. Is there an objection to that?

17:05:44 MR. JOHNSON: I'm sorry, Your Honor. I guess one thing is that we would like to know is, how is she made unavailable.

17:05:53 THE COURT: She's made unavailable because she's had some surgery.

17:05:59 MR. WHITE: Believe me, Your Honor, if we could get her here, we sure would.

17:06:03 MR. JOHNSON: I wasn't familiar with the motion to --

17:06:05 MR. KALLON: I filed it Friday afternoon.

17:06:07 THE COURT: She's had open heart surgery.

17:06:10 MR. WHITE: There's been a lot of prayers offered for Ms. Coleman.

17:06:13 MR. JOHNSON: We're fine with that, Your Honor. That's fine.

17:06:17 MR. KALLON: Mr. Smitherman advised me that I haven't marked as an exhibit the demonstrative

17:06:22 exhibits we used today; those are Defendant's Exhibits 2353. Mr. Wiggins -- Greg has them. We offer 2353, Your Honor.

THE COURT: It's received in evidence.

MR. KALLON: Thank you.

THE COURT: All right. Are there any other matters we can take up here today?

MR. WHITE: I don't think so, Judge. Thanks anyway.

THE COURT: Thank you all. We'll see you tomorrow.

(Court adjourned at 4:59 p.m.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Christina K. Decker 3-22-06

Christina K. Decker, RPR, CRR Date

Federal Official Court Reporter