FILED
2007 May-15  PM 12:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

1        IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF ALABAMA
2               WESTERN DIVISION

3   JANICE MORGAN, et al.,        *
           Plaintiffs,            *     CV-01-UWC-0303-W
4                                 *     February 28, 2006
    vs.                           *     Tuscaloosa, Alabama
5                                 *     9:05 A.M.
    FAMILY DOLLAR STORES, INC.,   *
6        Defendant.               *
    * * * * * * * * * * * * * * * * * * * * * * * * * * * *

7

8                      VOLUME 5
                TRANSCRIPT OF JURY TRIAL
9   BEFORE THE HONORABLE CHIEF JUDGE U.W. CLEMON
                   And a Jury

10  FOR THE PLAINTIFFS:

11  HON. ROBERT L. WIGGINS, JR., ESQ.
    HON. C. MICHAEL QUINN, ESQ.
12  HON. GREGORY O. WIGGINS, ESQ.
    HON. HERMAN N. JOHNSON, JR., ESQ.
13  HON. ROCCO CALAMUSA, ESQ.
    WIGGINS, CHILDS, QUINN & PANTAZIS
14  301 19th Street, North
    Birmingham, AL 35203-3204
15
    HON. J. ALLEN SCHREIBER, ESQ.
16  HON. P. MARK PETRO, ESQ.
    TWO METROPLEX DRIVE, SUITE 250
17  BIRMINGHAM, AL  35209

18  FOR THE DEFENDANT:

19  HON. JAY D. ST. CLAIR, ESQ.
    HON. ABDUL K. KALLON, ESQ.
20  HON. JAMES WALKER MAY, ESQ.
    HON. RONALD H. KENT, JR., ESQ.
21  HON. T. MATTHEW MILLER, ESQ.
    BRADLEY, ARANT, ROSE & WHITE
22  P. O. Box 830709
    Birmingham, AL  35203
23
    HON. J. MARK WHITE, ESQ.
24  HON. AUGUSTA S. DOWD, ESQ.
    WHITE, ARNOLD, ANDREWS & DOWD
25  2025 3rd Avenue North, Suite 600
    Birmingham, AL  35203

1                         (Continued)

2

3    Christina K. Decker, RPR, CRR
     Federal Official Court Reporter
     101 Holmes Avenue, NE, Suite 305
4    Huntsville, AL 35801

5

6    Penny L. Enoch, RPR
     Federal Official Court Reporter
7    1729 5th Avenue North, Room 325
     Birmingham, AL  35203

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2   Witnesses:          Direct   Cross   Redirect   Recross

 3   LINDA TAYLOR           4       26       42          49
                                             53
 4
     BILL McCARTHY          56      62 (voir dire)
 5                          64      90      122

 6   LEONA SPIESMAN        125     143      149

 7   SHERRY WALDEN         158     166

 8   PRISCILLA SANTOS      172     186      198        200

 9   LATICIA BRISCO        200     221      261        266

10   CATHY JENNE           270     292      304

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| | 1 | February 28, 2006                                    9:05 a.m. |
| | 2 | PROCEEDINGS: |
| 09:13:08 | 3 | THE COURT:  Good morning, ladies and |
| 09:13:10 | 4 | gentlemen.  I trust you had a good evening.  The |
| 09:13:12 | 5 | defendant will call its next witness. |
| 09:13:14 | 6 | MR. ST. CLAIR:  The defendant calls Linda |
| 09:13:16 | 7 | Taylor, Your Honor. |
| 09:13:18 | 8 | THE COURT:  All right. |
| 09:13:19 | 9 | **LINDA TAYLOR, DEFENDANT'S WITNESS, SWORN** |
| 09:13:20 | 10 | THE CLERK:  State your name for the record, |
| 09:13:21 | 11 | please. |
| 09:13:22 | 12 | THE WITNESS:  My name's Linda Taylor. |
| 09:13:29 | 13 | THE CLERK:  Spell your last name for the |
| 09:13:31 | 14 | record, please. |
| 09:13:32 | 15 | THE WITNESS:  T-A-Y-L-O-R. |
| 09:13:35 | 16 | **DIRECT EXAMINATION** |
| 09:13:35 | 17 | **BY MR. ST. CLAIR:** |
| 09:13:35 | 18 | Q.  Mrs. Taylor, I know you have a soft voice.  Speak |
| 09:13:40 | 19 | into the microphone.  You may need to pull it closer to |
| 09:13:42 | 20 | you so everybody can hear you. |
| 09:13:44 | 21 | A.  Thank you. |
| 09:13:45 | 22 | Q.  Where do you work? |
| 09:13:46 | 23 | A.  I work in northeast Alabama. |
| 09:13:50 | 24 | Q.  For what company? |
| 09:13:51 | 25 | A.  Family Dollar Store. |

09:13:52    1        Q.   How long have you worked for Family Dollar?

09:13:53    2        A.   Well, January was 26 years.

09:13:57    3        Q.   All right.  Take us through the positions that

09:14:00    4   you have held with the company, Ms. Taylor.  You don't

09:14:02    5   have to be exact about the dates, but as best you can

09:14:05    6   recall.

09:14:06    7        A.   Okay.  I started at Store 317 in Attalla,

09:14:12    8   Alabama, as a part-time cashier.

09:14:14    9        Q.   Let me stop you now.  Tell us where Attalla is.

09:14:18   10        A.   It's sort of close to Gadsden, Alabama.  It's

09:14:23   11   just a small town, Gadsden area.

09:14:25   12        Q.   Okay.  And your first job was what, now?

09:14:27   13        A.   I was like a part-time cashier.

09:14:30   14        Q.   All right.  How long did you do that job?

09:14:33   15        A.   Just a few months.

09:14:35   16        Q.   And then what did you do?

09:14:36   17        A.   I was promoted to assistant manager at that time.

09:14:39   18        Q.   And what part of the state did you work in as

09:14:43   19   assistant manager?

09:14:44   20        A.   Also in Attalla, Alabama.

09:14:46   21        Q.   How long were you an assistant manager?

09:14:48   22        A.   About six months, I think.

09:14:51   23        Q.   And then what happened?

09:14:52   24        A.   I was promoted to the store manager at the

09:14:55   25   Attalla store.

09:14:56  1     Q.   And, approximately, what year did you become a

09:14:59  2  store manager?

09:15:00  3     A.   I'm not sure what the year is.  It's just been 26

09:15:10  4  years ago, about 25 years ago.

09:15:11  5     Q.   All right.  Did you get a promotion from there?

09:15:14  6     A.   No.  I stayed as store manager for approximately

09:15:18  7  18 years.

09:15:19  8     Q.   And then what changed?

09:15:21  9     A.   After that, I was promoted to district manager.

09:15:25  10     Q.   And is that the position you hold today?

09:15:27  11     A.   Yes, it is.

09:15:28  12     Q.   When did you get promoted to district manager?

09:15:30  13     A.   In May, it will be seven years ago.

09:15:34  14     Q.   All right.  So that would have been about 1999?

09:15:37  15     A.   Thereabout, yes, sir.

09:15:38  16     Q.   Does that sound right?

09:15:41  17     A.   Yes.

09:15:41  18     Q.   Now, when you became district manager, you were

09:15:43  19  no longer stationed in one store?

09:15:45  20     A.   That's right.

09:15:45  21     Q.   You now cover many stores?

09:15:48  22     A.   Yes, I do.

09:15:49  23     Q.   And how many stores are in your district?

09:15:55  24     A.   I have 20 at this time.

09:15:56  25     Q.   Now, where do you live?

09:15:58    1       A.   I live in Boaz, Alabama.

09:16:00    2       Q.   All right.  And for those of us that are not from

09:16:03    3   that part of the state, can you describe for us where

09:16:06    4   that is?

09:16:07    5       A.   If anybody knows where Gadsden, Alabama is, it's

09:16:11    6   approximately 18 miles north.

09:16:12    7       Q.   All right.  Now, said you have about 20 stores in

09:16:17    8   your district?

09:16:18    9       A.   Yes.

09:16:18   10       Q.   How big of an area does that cover?

09:16:21   11       A.   I go all the way to Stevenson, Alabama; it's

09:16:26   12   almost to the Tennessee line.  I go as far south as

09:16:31   13   Childersburg, Sylacauga area.

09:16:33   14       Q.   Now, let me direct your attention to the 2000-

09:16:37   15   2002 time frame.  Do you recall a person by the name of

09:16:41   16   Misty Bice?

09:16:42   17       A.   Yes, I do.

09:16:43   18       Q.   And how did you know her?

09:16:46   19       A.   She was a store -- assistant manager, I believe,

09:16:50   20   when I took the district.  Then she was promoted after

09:16:55   21   the manager there retired, and she was store manager.

09:17:00   22       Q.   And she was one of the store managers in your

09:17:02   23   district?

09:17:03   24       A.   Yes, she was.

09:17:03   25       Q.   So what I want to talk about now is the

09:17:11  1  relationship you had with Misty Bice and the other store

09:17:15  2  managers in your district.

09:17:17  3      A.  Okay.

09:17:17  4      Q.  Do you understand what we're talking about now?

09:17:20  5      A.  Yes, sir.

09:17:20  6      Q.  Now, first, let me understand this:  The store

09:17:23  7  where Ms. Bice worked was where?

09:17:25  8      A.  Pell City, Alabama.

09:17:27  9      Q.  And that's how far from your home?

09:17:31  10     A.  It's 56 miles.

09:17:34  11     Q.  What -- do you have an office?

09:17:36  12     A.  Yes, I do.

09:17:37  13     Q.  Where is your office?

09:17:38  14     A.  It's in Boaz, Alabama.

09:17:39  15     Q.  And so how far -- the store where Misty Bice

09:17:43  16  worked, how far was it from your office?

09:17:46  17     A.  That's about 60 miles.

09:17:48  18     Q.  How often did you get down to that store while

09:17:52  19  Misty Bice was the manager?

09:17:53  20     A.  I try to visit each store at least once a month;

09:17:56  21  and if they've got inventory, I usually visit more than

09:18:00  22  once.

09:18:01  23     Q.  All right.  Now, when you say "they've got

09:18:04  24  inventory", what does that mean?

09:18:05  25     A.  That's when they inventory stock in the store to

09:18:09   1   see how much merchandise they have.

09:18:11   2        Q.   How often does happen?

09:18:12   3        A.   Once a year.

09:18:13   4        Q.   Now -- so, if you're in the Pell City store,

09:18:16   5   where she is, only one day out of the month, do you have

09:18:19   6   any contact with her for the other 29 days?

09:18:23   7        A.   Sometimes we have phone calls and sometimes

09:18:26   8   email.

09:18:27   9        Q.   And, in your best judgment back in the 2000-2002

09:18:35   10   time frame, how often would you call Misty Bice?

09:18:38   11        A.   Not often.

09:18:38   12        Q.   What's your best judgment?

09:18:41   13        A.   I wouldn't say over once a week, if that much.

09:18:44   14        Q.   How often would you send her an email?

09:18:46   15        A.   That depends if -- once or twice a week,

09:18:53   16   sometimes not that.

09:18:53   17        Q.   Let's talk about what store managers do.  You

09:18:59   18   were store manager for many years and you managed it;

09:19:02   19   right?

09:19:03   20        A.   Yes, I was.

09:19:03   21        Q.   All right.  So -- well, I tell you what, before

09:19:06   22   we talk about what they do, let's talk about what they

09:19:08   23   don't do.

09:19:09   24        Can a store manager for Family Dollar, if they

09:19:13   25   don't like the name of the store, can they just change

09:19:16  1   the name of it?

09:19:17  2       A.  No, they cannot.

09:19:19  3       Q.  If they want to just say, "well, I don't like the

09:19:22  4   name Family Dollar, I'm going to call it" --

09:19:24  5               THE COURT:  The objection to leading is

09:19:26  6   sustained.

09:19:26  7               MR. ST. CLAIR:  I will go on, Your Honor.

09:19:28  8       Q.  Does Family Dollar sell beer?

09:19:29  9       A.  No, we don't.

09:19:31  10      Q.  Could a store manager say, "well, I'm just going

09:19:34  11  to start selling beer"?

09:19:35  12              MR. G. WIGGINS:  Your Honor, same objection.

09:19:37  13              THE COURT:  Your objection to leading is

09:19:39  14  sustained.

09:19:39  15      Q.  Does the store manager have the authority to sell

09:19:44  16  whatever product they want to sell in the store?

09:19:46  17              MR. G. WIGGINS:  Same objection, Your Honor.

09:19:48  18              THE COURT:  Sustained.

09:19:48  19      Q.  Does the store manager have the authority to

09:19:55  20  determine the prices --

09:19:58  21              MR. G. WIGGINS:  Same objection, Your Honor.

09:19:59  22      Q.  -- that product will be sold for?

09:20:02  23              THE COURT:  Sustained.

09:20:03  24              MR. ST. CLAIR:  I'm sorry, Your Honor?

09:20:05  25              THE COURT:  I sustained the objection.

```
09:20:07   1              MR. ST. CLAIR:  Yes, sir.

09:20:08   2       Q.  Does the -- well, let me ask this:  Does the

09:20:12   3   store manager set the --

09:20:16   4              MR. G. WIGGINS:  Your Honor, it's leading

09:20:17   5   again.

09:20:17   6              THE COURT:  It is.  Sustained.

09:20:19   7              MR. ST. CLAIR:  Well, I'll move on to a

09:20:22   8   different subject, Your Honor.

09:20:23   9              THE COURT:  All right.

09:20:24  10       Q.  When you were a store manager, how many hours did

09:20:26  11   you work a week?

09:20:27  12       A.  I worked approximately 52, 50.  It depended each

09:20:34  13   week.  Different -- around Christmas, I might work 55.

09:20:38  14       Q.  What was -- is there a slow time of the year?

09:20:41  15       A.  Yes, they are.

09:20:43  16       Q.  And what are the slow times of the year?

09:20:45  17       A.  Usually in January, February, that time.

09:20:47  18       Q.  And let's stop and talk about that for a minute.

09:20:51  19   This store in Pell City where Ms. Bice worked, was it a

09:20:58  20   what y'all refer to as a high volume store?

09:21:01  21       A.  No, sir.

09:21:02  22       Q.  And what time of the morning would that store

09:21:08  23   open?

09:21:08  24       A.  9:00 a.m.

09:21:09  25       Q.  And have you been in stores like that one around
```

09:21:14  1    that time of day?

09:21:15  2        A.  Yes, I have.

09:21:16  3        Q.  Are there -- when -- let's see -- it's a Tuesday

09:21:19  4    morning in February.  When you open a Family Dollar

09:21:21  5    Store at 9:00 o'clock in the morning, are the people

09:21:25  6    waiting to get in?

09:21:26  7        A.  Not usually, no.

09:21:27  8        Q.  Is -- are there times when there's no customers

09:21:31  9    in the store?

09:21:32  10       A.  Absolutely.

09:21:33  11       Q.  What's the longest period of time that you've

09:21:37  12   seen where there's nobody in the store, no customers?

09:21:40  13            MR. G. WIGGINS:  Your Honor, unless she has

09:21:42  14   personal knowledge of Pell City every day, I don't know

09:21:44  15   how in the world she can answer that question.

09:21:46  16            THE COURT:  The objection is overruled.

09:21:49  17       Q.  Do you remember my question?  My question is --

09:21:52  18   we'll break it down.  While you were a store manager,

09:21:55  19   what was the longest period of time you could go where

09:21:58  20   there wasn't anybody in the store?

09:22:00  21       A.  It can be up to an hour, hour and a half.

09:22:02  22       Q.  And for that hour, hour and a half, what's going

09:22:07  23   on in the store?

09:22:08  24       A.  Well, if the employees are doing what they're

09:22:11  25   supposed to be doing, they're supposed to be stocking or

09:22:15  1    other activities.

09:22:16  2        Q.  Are they busy 100 percent of the time?

09:22:19  3        A.  I'm sure they're not.

09:22:22  4        Q.  Now, let's talk about what a store manager does,

09:22:29  5    what you did as a store manager -- or what the store

09:22:32  6    managers do that report to you.

09:22:34  7            Do store managers have any authority and

09:22:39  8    responsibility to tell the other people in the store

09:22:41  9    what to do?

09:22:41  10       A.  Yes, they do.

09:22:43  11       Q.  Explain that for us.  How does that work?

09:22:46  12       A.  Well, they have to tell the other employees, the

09:22:49  13   cashiers, they have to tell the cashier who -- which

09:22:53  14   one's going to be running the register that day, which

09:22:55  15   one's going to be stocking certain areas and different

09:22:58  16   things.

09:22:58  17       Q.  All right.  Let me stop you right there.  How

09:23:00  18   many cash registers are in Family Dollar Stores?

09:23:03  19       A.  Most of them have two.

09:23:04  20       Q.  And are -- is someone on both of those cash

09:23:11  21   registers all the time?

09:23:11  22       A.  No, sir, they're not.

09:23:13  23       Q.  Who decides who's going to be running the cash

09:23:16  24   register versus putting out stock?

09:23:17  25       A.  The store manager.

09:23:18  1      Q.  Tell us what other involvement, if any, the store

09:23:22  2   manager has in telling the other employees what to do.

09:23:26  3      A.  They have full authority to tell them what to do.

09:23:28  4      Q.  If an employee misbehaves, let's say is running a

09:23:38  5   cash register, talking on a cell phone; does the store

09:23:42  6   manager have any authority to do anything about that?

09:23:45  7      A.  Yes, they do.

09:23:46  8      Q.  What should a store manager do in that situation?

09:23:48  9      A.  Well, they should coach the person and let them

09:23:54  10  know that that's not the proper thing to do on their

09:23:56  11  job.

09:23:56  12     Q.  If they keep doing that, do they have the

09:24:01  13  authority to write them up?

09:24:03  14     A.  Yes, they do.

09:24:04  15     Q.  If they keep doing that, do they have the

09:24:09  16  authority to terminate them?

09:24:11  17            MR. G. WIGGINS:  Object to leading, Your

09:24:13  18  Honor.

09:24:13  19            THE COURT:  The objection to leading is

09:24:15  20  sustained.

09:24:16  21            MR. ST. CLAIR:  Well, I don't know any other

09:24:17  22  way to ask it, Your Honor, than this:

09:24:19  23     Q.  Do the store managers have the authority to

09:24:22  24  terminate?

09:24:22  25     A.  Yes.

09:24:22  1    Q.  As a store manager yourself -- let's focus now on

09:24:28  2    cashiers or clerks -- as a store manager yourself, did

09:24:32  3    you ever terminate a cashier or clerk?

09:24:37  4    A.  Yes.

09:24:38  5           MR. G. WIGGINS:  Object to leading, Your

09:24:39  6    Honor.

09:24:39  7           THE COURT:  Overruled.

09:24:40  8    Q.  Did you ever terminate a cashier or clerk as a

09:24:44  9    store manager?

09:24:44  10   A.  Yes.

09:24:45  11   Q.  Did you have to get anybody's approval to do

09:24:47  12   that?

09:24:47  13   A.  No, I did not.

09:24:48  14   Q.  The store managers who report to you right now,

09:24:53  15   do they have the authority to terminate?

09:24:57  16          MR. G. WIGGINS:  Object to leading, Your

09:24:58  17   Honor.

09:25:04  18          THE COURT:  The objection is sustained.

09:25:06  19   Q.  What role, if any, do the store managers that

09:25:10  20   report to you have in decisions to terminate employees?

09:25:15  21   A.  They have full authority to terminate.

09:25:19  22   Q.  Do they exercise that authority?

09:25:23  23   A.  Yes, they do.

09:25:24  24   Q.  Can you give us some examples of how store

09:25:28  25   managers in your district have exercised that authority?

09:25:30  1      A.   Well, whenever they have someone they have proper

09:25:36  2   ground to terminate, when they've done their proper

09:25:39  3   paperwork and writeups and counseling, then they take

09:25:43  4   the proper action and they make that decision.

09:25:45  5      Q.   What communication, if any, do they have to have

09:25:50  6   with you before doing that?

09:25:51  7      A.   They don't have to have any.  A few of them call

09:25:56  8   if they're not comfortable with how to word something,

09:25:59  9   or the proper paperwork or procedures, if they haven't

09:26:03  10   been a manager there for very long.  But they have the

09:26:08  11   ability and the authority to make their own decisions to

09:26:11  12   do so.

09:26:12  13           THE COURT:  So what you're saying is that

09:26:15  14   the store manager has the authority to terminate an

09:26:22  15   employee, get that employee off the premises; the

09:26:25  16   termination is final before the district manager knows

09:26:30  17   anything about it?

09:26:31  18           THE WITNESS:  Yes, sir, they do.

09:26:32  19           THE COURT:  All right.

09:26:33  20      Q.   Now, let's look at the other end of the

09:26:37  21   employment spectrum -- hiring, bringing people.  Again,

09:26:42  22   I'm talking about clerks and cashiers now, the people

09:26:45  23   that run the cash register, the stockers, and so forth.

09:26:50  24   Let's just leave the assistant manager out of it.

09:26:52  25           What role, if any, do store managers play in the

09:26:57    1    hiring of clerks and cashiers?

09:26:59    2        A.   They hire all their clerks and cashiers.

09:27:02    3        Q.   All right.   Well, tell us how they do that.

09:27:05    4        A.   They take applications.   They review the

09:27:08    5    applications.   They call for references.   They interview

09:27:13    6    the applicant.   They make their decision if they're --

09:27:18    7    if they're going to hire them.   They set their pay of

09:27:22    8    how much they're going to pay them.   And complete all of

09:27:27    9    the proper paperwork.

09:27:28   10        Q.   What -- well, what approval, if any, do store

09:27:35   11    managers have to have from you before hiring a cashier

09:27:39   12    or a clerk?

09:27:40   13        A.   None.

09:27:40   14        Q.   Now, I want to change subjects a little bit to

09:27:48   15    still talking about what store managers do --

09:27:52   16    scheduling, deciding who comes to work when.   Are you

09:27:56   17    understanding what I'm talking about?

09:27:57   18        A.   Yes.

09:27:58   19        Q.   What role, if any, do store managers play in

09:28:02   20    deciding when their employees are going to have to come

09:28:06   21    to work and when they get to go home?

09:28:10   22        A.   They have full authority to decide.   They make

09:28:12   23    the decisions themselves.

09:28:13   24        Q.   Now, we've seen here something called the staff

09:28:16   25    scheduler.   Are you familiar with that?

09:28:18  1      A.   Yes, I am.

09:28:19  2      Q.   Does the -- is that staff scheduler used in your

09:28:25  3   -- in the stores in your district?

09:28:26  4      A.   Yes, it is.

09:28:27  5      Q.   Does -- even with that staff scheduler, do the

09:28:31  6   store managers play a role in deciding, for example, who

09:28:35  7   has to come in and work morning shift and who has to

09:28:39  8   work night shift?

09:28:40  9           MR. G. WIGGINS:   Object to leading, Your

09:28:42  10  Honor.

09:28:42  11          THE COURT:   Sustained.

09:28:43  12     Q.   Let me rephrase it.   Even with the staff

09:28:47  13  scheduler, what role, if any, do store managers play in

09:28:50  14  determining who works what time of day?

09:28:53  15     A.   They make the decision themselves when their

09:28:58  16  employees come in, whenever they need them.

09:29:04  17     Q.   Now, let's talk about payroll, getting paid.   The

09:29:13  18  -- what role, if any, do store managers play in making

09:29:18  19  sure that the employees in their store get paid?

09:29:21  20     A.   They have to make sure that their hours are --

09:29:25  21  they clock in and out, and their hours are correct, and

09:29:30  22  -- to be paid.

09:29:31  23     Q.   And tell us how that process works.

09:29:33  24     A.   The cashiers clock in when they come to work, and

09:29:37  25  they clock out when they leave.   The manager reviews it

09:29:40  1   at the end of the week to ensure that the times is right

09:29:43  2   that they clocked in and out correctly that they paid --

09:29:46  3       Q.  Did -- let me stop you there.  What authority, if

09:29:50  4   any, does the manager have to change the time that's

09:29:55  5   been entered in on the time clock?

09:29:57  6       A.  They don't -- they should not change the hours on

09:30:00  7   it.

09:30:00  8       Q.  What if someone's clocked in incorrectly, they

09:30:05  9   punch somebody else's card?

09:30:07 10       A.  They clock in and out on their own number.  They

09:30:10 11   don't clock in with cards.

09:30:11 12       Q.  And so, what role do the store managers have in

09:30:15 13   getting that information from the store to the payroll

09:30:19 14   people who are going to issue the payroll checks?

09:30:22 15       A.  It's entered in the computer.  It goes from the

09:30:25 16   register to the computer.  And then when it compiles at

09:30:29 17   night, it pulls that information out to the corporate

09:30:32 18   office.

09:30:33 19       Q.  Let me -- on this topic of schedule, do -- what

09:30:41 20   authority, if any, do store managers have to work

09:30:45 21   overtime in their store?

09:30:46 22       A.  They have full authority.

09:30:50 23       Q.  Well, do they have to -- let me direct your

09:30:54 24   attention to a document I've put in front of you.  It's

09:30:57 25   an email that you wrote that's been introduced into

09:31:03    1    evidence as Plaintiff's Exhibit 20.  I think they've

09:31:06    2    duplicated it as Plaintiffs' Exhibit 34.  Do you have

09:31:09    3    that in front of you?

09:31:10    4         A.   Yes, I do.

09:31:11    5         Q.   And was that an email that you wrote?

09:31:13    6         A.   Yes, it is.

09:31:14    7         Q.   April 22nd, 2003?

09:31:16    8         A.   Yes.

09:31:16    9         Q.   And you say store managers -- well, just read it,

09:31:20   10    that first sentence.

09:31:21   11         A.   Okay.  "Some of you have been working your

09:31:24   12    employees overtime.  This has not been approved.  Some

09:31:28   13    of you continue to go over payroll.  This will stop, or

09:31:33   14    you will be written up.  If I can't keep the district

09:31:37   15    payroll in line, then I am written up.  Overtime and

09:31:43   16    over payroll stop."

09:31:44   17         Q.   Why did you write this email?

09:31:46   18         A.   At that time, I had a couple of managers that was

09:31:49   19    not properly staffing their store.  When someone quit,

09:31:55   20    or they terminated someone, they would wait to restaff

09:31:59   21    their store and work the employees they had overtime.

09:32:04   22    And this was an incident that it was several weeks that

09:32:07   23    they did this.  And that was the reason for this.

09:32:13   24         Q.   Now, when you say that they waited several weeks

09:32:15   25    to restaff their stores, tell us what that means.

09:32:19   1       A.   They just did not hire someone else and be --

09:32:25   2   taking applicants or getting anybody else in to staff

09:32:30   3   their store properly.

09:32:30   4       Q.   In those -- let me stop and talk about that.   The

09:32:34   5   stores in your district -- of course, you have the store

09:32:37   6   manager.

09:32:37   7       A.   Yeah.

09:32:37   8       Q.   How many other employees are in your store?

09:32:39   9       A.   Three to four.

09:32:41   10      Q.   Do you have any stores that have only one person

09:32:45   11  other than the store manager?

09:32:46   12      A.   No, sir.

09:32:47   13      Q.   And so if a store is -- normally has four

09:32:52   14  employees, the situation you're talking about, someone

09:32:56   15  quit or was fired, or whatever, and went down to three;

09:32:59   16  am I understanding you correctly?

09:33:01   17      A.   Yes.

09:33:01   18      Q.   And in that situation, what is the store manager

09:33:03   19  expected to do?

09:33:04   20           MR. G. WIGGINS:   Object to leading, Your

09:33:07   21  Honor.

09:33:07   22           THE COURT:   Overruled.

09:33:11   23           THE WITNESS:   Would you repeat it, sir?

09:33:12   24      Q.   Yes, ma'am.   In that situation where they've lost

09:33:16   25  an employee, they have less than a full complement, what

| | | |
|---|---|---|
| 09:33:19 | 1 | is the store manager expected to do? |
| 09:33:21 | 2 | A.   To hire someone else. |
| 09:33:22 | 3 | Q.   And the situation you were addressing here in |
| 09:33:25 | 4 | Plaintiffs' Exhibit 20, what had happened? |
| 09:33:27 | 5 | A.   The store manager had went several weeks and had |
| 09:33:30 | 6 | not even made any attempt to hire anyone else.  They |
| 09:33:35 | 7 | were working the employees they had overtime. |
| 09:33:38 | 8 | Q.   Well, why was that a concern to you? |
| 09:33:41 | 9 | A.   Well, it's not the best use of their payroll. |
| 09:33:45 | 10 | They can get more hours and cover their store and get |
| 09:33:49 | 11 | the work done and -- it's just more efficient. |
| 09:33:54 | 12 | Q.   All right.   Let's stop and talk about payroll |
| 09:33:58 | 13 | budgets now.   Do store managers set the payroll budgets |
| 09:34:01 | 14 | for their store? |
| 09:34:02 | 15 | A.   No, they do not. |
| 09:34:04 | 16 | Q.   Do you set them? |
| 09:34:06 | 17 | A.   No, I do not. |
| 09:34:06 | 18 | Q.   Do you know who does? |
| 09:34:08 | 19 | A.   Someone over me. |
| 09:34:09 | 20 | Q.   Are you held responsible -- well, what -- what |
| 09:34:14 | 21 | role, if any, do you have in managing the payroll budget |
| 09:34:20 | 22 | in your district? |
| 09:34:21 | 23 | A.   I'm supposed to manage the payroll budget in my |
| 09:34:31 | 24 | district. |
| 09:34:31 | 25 | Q.   And looking back at your email, you say here, "if |

09:34:35  1    I can't keep the district payrolls in line, then I am

09:34:38  2    written up"?

09:34:39  3         A.   Yes, sir.

09:34:39  4         Q.   Tell us what that means.

09:34:41  5         A.   Well, I'm expected to manage my district's

09:34:45  6    payroll; just like the store managers are supposed to

09:34:48  7    manage their payroll.

09:34:50  8         Q.   All right.  Let me now turn to a different

09:34:56  9    subject, or duty and responsibility of store managers;

09:34:59  10   and that's ordering merchandise, having things in the

09:35:02  11   store to sell.

09:35:03  12        What role, if any, do store managers play in

09:35:06  13   that?

09:35:07  14        A.   They order their store.

09:35:08  15        Q.   Tell us what that means.

09:35:11  16        A.   They have to order the store to make sure they

09:35:15  17   have the proper merchandise and enough for the

09:35:20  18   customers.

09:35:20  19        Q.   Now, can -- what -- do store managers have the

09:35:25  20   authority to just put things in the store anyplace they

09:35:28  21   want to put them?

09:35:29  22        A.   No, sir, they don't.

09:35:30  23        Q.   And why is that?

09:35:32  24        A.   We have a layout of the store, and what we call

09:35:36  25   schematics.  This is to help properly supply the

09:35:41  1    customers with what they need.  And we have it in a

09:35:44  2    certain area where the customers can find it.

09:35:47  3        Q.  You said you've got about 20 stores in your

09:35:49  4    district?

09:35:50  5        A.  Yes.

09:35:50  6        Q.  What effort, if any, do you make to make sure

09:35:54  7    that all the stores in your district have the product

09:36:03  8    and merchandise put out in the same place?

09:36:03  9        A.  I'm supposed to check on visits to make sure all

09:36:06  10   schematics are up to date, where the new merchandise is

09:36:08  11   coming in is properly put on the shelves and for the

09:36:12  12   customers.

09:36:13  13       Q.  All right.  Now, Ms. Bice testified about

09:36:16  14   something that I think she called "flip-flopping" the

09:36:20  15   store.  Have you ever heard of that phrase?

09:36:23  16       A.  No, sir, I have not.

09:36:25  17       Q.  Have you -- do you have any knowledge about any

09:36:29  18   policy or practice at Family Dollar about moving

09:36:34  19   merchandise around to make it hard for customers to find

09:36:37  20   it?

09:36:37  21       A.  No, sir, I have not.

09:36:38  22       Q.  Have you ever heard of anything like that?

09:36:41  23       A.  No, sir.

09:36:41  24       Q.  This store at Pell City where Ms. Bice worked,

09:36:49  25   they've just put a Wal-Mart Supercenter up there,

09:36:53  1   haven't they?

09:36:53  2      A.  Yes.

09:36:54  3      Q.  It's right there off the interstate --

09:36:56  4            MR. G. WIGGINS:  Object to leading.

09:36:57  5            THE COURT:  The objection to leading is

09:36:59  6   sustained.

09:37:00  7            MR. ST. CLAIR:  I'm sorry, Your Honor.

09:37:00  8      Q.  Is there a Wal-Mart Supercenter in Pell City?

09:37:04  9      A.  Yes, they are.

09:37:05  10     Q.  How far is it from the Family Dollar where

09:37:07  11  Ms. Bice worked?

09:37:08  12     A.  It's approximately a mile.

09:37:09  13     Q.  And you have been in retail for how long?

09:37:13  14     A.  26 years.

09:37:14  15     Q.  Based on your 26 years' experience in retail, if

09:37:17  16  you purposefully tried to make it hard --

09:37:20  17           THE COURT:  Hold on just a moment.

09:37:41  18     Q.  Now, let me just ask it this way:  Have you ever

09:37:46  19  directed your store managers to make it hard for

09:37:49  20  customers to find product in your store?

09:37:52  21     A.  No, sir.

09:37:52  22     Q.  What role, if any, do store managers play in

09:38:02  23  handling customer complaints?

09:38:04  24     A.  I usually handle the customer complaints.  They

09:38:08  25  come to me.

09:38:09  1      Q.   What if somebody comes into the store and says,

09:38:12  2   "this box of Tide that I bought had a hole in it and I

09:38:15  3   want to see the manager"?

09:38:16  4      A.   The manager takes care of that.

09:38:18  5      Q.   Do you even have a key to the stores?

09:38:26  6      A.   No, sir, I do not.

09:38:28  7      Q.   In your -- based on your position in overseeing

09:38:42  8   store managers, what's the most important function or

09:38:47  9   job or duty of store managers?

09:38:50  10     A.   It's staffing their store properly, managing it

09:38:54  11  to where it will be profitable.

09:38:58  12          MR. ST. CLAIR:   Thank you, Ms. Taylor.   I

09:38:59  13  wish you'd answer their questions now, please, ma'am.

09:39:01  14          THE COURT:   Cross-examination?

09:39:02  15                   **CROSS-EXAMINATION**

09:39:03  16  **BY MR. GREG WIGGINS:**

09:39:05  17     Q.   Good morning, Mrs. Taylor.

09:39:06  18     A.   Good morning, sir.

09:39:07  19     Q.   Ms. Taylor, your counsel directed you to a

09:39:19  20  particular email that you had sent.   Do you have that in

09:39:23  21  front of you?

09:39:23  22     A.   Yes, I do.

09:39:24  23     Q.   Plaintiffs' Exhibit 20, I think it is?

09:39:27  24     A.   Sir?

09:39:28  25     Q.   Plaintiffs' Exhibit 20?

09:39:30  1    A.  Yes, sir.

09:39:30  2    Q.  And if I understood, I wrote it down, when you

09:39:34  3  sent the email, you sent it because a couple of managers

09:39:39  4  were abusing overtime because they weren't staffing

09:39:42  5  their store; did I hear you correctly?

09:39:45  6    A.  Yes, sir.

09:39:45  7    Q.  Now, the fact of the matter is, you sent this

09:39:49  8  email to all of your managers, not just a couple?

09:39:52  9    A.  I have a distribution list that has everybody --

09:39:57  10  every store, and I just sent the email out to the whole

09:39:59  11  district.

09:40:00  12    Q.  So every one of your store managers in your

09:40:03  13  district -- I believe you said you had 20 stores?

09:40:06  14    A.  Yes.

09:40:06  15    Q.  So all 20 store managers got this particular

09:40:08  16  email?

09:40:09  17    A.  I suppose so.

09:40:10  18    Q.  And so if there's only a couple -- 18 of your

09:40:15  19  store managers were not abusing or getting overtime, but

09:40:18  20  you wanted to make sure they understood that there is no

09:40:21  21  overtime allowed by the store manager, that's what you

09:40:24  22  were telling in this email?

09:40:25  23    A.  No, sir, that's not --

09:40:27  24    Q.  Well, let's read it.  Read your P.S., your last

09:40:30  25  sentence that you sent to all store managers.

09:40:32  1      A.   "Overtime and over payroll must stop."

09:40:39  2      Q.   That's what you tell your store managers; right?

09:40:41  3  all 20 of them?

09:40:43  4      A.   That's what I sent to all stores.

09:40:45  5      Q.   To the ones that were violating and the ones that

09:40:47  6  were not violating, you wanted to make sure that there

09:40:50  7  was going to be no overtime unless you approved it?

09:40:53  8      A.   The stores that this was for, they -- the

09:40:57  9  managers know which stores that this is for.

09:41:00  10     Q.   You don't say anything about it:  "This only

09:41:03  11  applies to Store 1882 or 2143", or "you store managers

09:41:08  12  know which ones are violating."  You sent it to all of

09:41:11  13  them, didn't you?

09:41:12  14     A.   This was sent to all.

09:41:14  15     Q.   Ones who were violating and not violating, you

09:41:17  16  wanted to make sure that in the future, "no overtime"?

09:41:20  17     A.   That's not what I'm saying.

09:41:21  18     Q.   That's what your email says, though, isn't it?

09:41:23  19     A.   The store managers have full authority, if they

09:41:26  20  need to use overtime for any reason, to do so.  I have

09:41:30  21  not reprimanded anyone for doing that.

09:41:32  22     Q.   That's not what you say in your email, is it,

09:41:35  23  Ms. Taylor?

09:41:35  24     A.   Well, no, sir.

09:41:36  25     Q.   You tell "no overtime, no going over budget

09:41:41   1    period."  And, the fact of the matter is, at the end of

09:41:43   2    that statement you put about 15 exclamation points,

09:41:48   3    don't you, emphasizing the point, do you not?

09:41:52   4        A.   Yes.

09:41:58   5        Q.   Now, if I understood your direct examination,

09:42:06   6    you're taking a position here today that store managers

09:42:12   7    have the authority to fire?

09:42:14   8        A.   Yes, they do.

09:42:16   9        Q.   Dan, will you give me H1?

09:42:24   10           Do you recognize this document, Ms. Taylor?

09:42:28   11       A.   Yes, I do.

09:42:29   12       Q.   And it says:  "You must contact your district

09:42:33   13   manager or regional vice-president before conducting a

09:42:37   14   discharge", doesn't it?

09:42:37   15       A.   I don't think that's the full policy.

09:42:38   16       Q.   Is that what it says?

09:42:41   17       A.   Sir?

09:42:41   18       Q.   Is that what it says?

09:42:41   19       A.   That's what it says there.

09:42:43   20       Q.   And then it says:  "When conducting a discharge,

09:42:46   21   keep the conversation on the facts of the discharge, do

09:42:49   22   not waiver from issue."  Do you know where this document

09:42:52   23   comes from?

09:42:52   24       A.   I'm not sure.

09:42:54   25       Q.   It comes from the Family Dollar policy, doesn't

09:42:57  1    it?

09:42:57  2        A.  I'm not sure.

09:42:58  3        Q.  You've seen it before, though, haven't you?

09:43:02  4        A.  Yes, but I'm not sure.

09:43:04  5        Q.  Dan, give me H2.

09:43:06  6        This --

09:43:29  7            MR. GREG WIGGINS:  May I approach, Your

09:43:30  8    Honor?

09:43:30  9            THE COURT:  Yes.

09:43:31  10       Q.  Ms. Taylor, I want to show you a document and ask

09:43:34  11   you, do you recognize this particular document?

09:43:40  12       A.  Yes, I do.

09:43:41  13       Q.  And what is that particular document?

09:43:43  14       A.  It's a Selection for Success.

09:43:45  15       Q.  This is a Family Dollar policy; correct?

09:43:48  16       A.  I'm not sure it's policy.

09:43:50  17       Q.  You're not sure it's policy?

09:43:52  18       A.  It's Selection for Success is hiring your people.

09:43:56  19       Q.  This is what Family Dollar, hiring and firing,

09:43:59  20   this is what -- the procedures and policy at Family

09:44:02  21   Dollar wants the store manager to follow; correct?

09:44:03  22       A.  I suppose so, yes.

09:44:05  23       Q.  Now, look, if you will, to this section right

09:44:14  24   here I'm pointing to.  If you could read that for me,

09:44:17  25   please, ma'am.  The title is "conducting a decision-

09:44:19  1    making final written step."  What does the policy say?

09:44:24  2       A.  It says:  "This is the last chance before

09:44:27  3    discharge.  Before conducting a decision-making final

09:44:32  4    written step, contact your district manager.  Inform

09:44:36  5    him, her or of your decision.  It's always good to

09:44:41  6    partner with your supervisor.  If your DM is not

09:44:45  7    available, contact your regional vice-president."

09:44:48  8       Q.  So, according to this policy here of Family

09:44:50  9    Dollar, "prior to making a decision to discharge, the

09:44:55  10   store manager must first contact the district manager

09:44:58  11   and partner with him or her in making that decision"; is

09:45:02  12   that correct?

09:45:02  13      A.  That's what it says.

09:45:04  14      Q.  And if you'll -- turning to the next page under

09:45:10  15   the section entitled "Discharge", read the highlighted

09:45:15  16   part that I have there for you, Ms. Taylor.

09:45:17  17      A.  "You must contact your district manager and

09:45:20  18   regional vice-president before conducting a discharge."

09:45:23  19      Q.  It doesn't say you have the option, does it?  It

09:45:26  20   says you must; is that correct?

09:45:28  21      A.  Yes.

09:45:28  22      Q.  And if they can't get ahold of you in regards to

09:45:34  23   a discharge, they're to contact the regional

09:45:37  24   vice-president; correct?  Is that correct?

09:45:53  25      A.  Yes.

09:45:54  1    Q.  Dan, give me Exhibit 10.

09:46:13  2        Ms. Taylor, do you know who Bruce Barkus is?

09:46:15  3    A.  Yes, I do.

09:46:17  4    Q.  Who is he?

09:46:17  5    A.  I'm not sure what his title was.  He was

09:46:20  6    vice-president.

09:46:22  7    Q.  He was in corporate office; correct?

09:46:25  8    A.  Yes.

09:46:25  9    Q.  Vice-president of Operations?

09:46:26  10   A.  Yes.

09:46:27  11   Q.  And you're in Operations; correct?

09:46:30  12   A.  I'm in Operations?

09:46:32  13   Q.  As a district manager, you are under him in the

09:46:35  14   Operations department; correct?

09:46:36  15   A.  Yes.

09:46:37  16   Q.  I want to show you what I've put on the screen

09:46:40  17   here, which has been previously marked as Exhibit 10.

09:46:45  18       Do you recognize this particular email,

09:46:48  19   Ms. Taylor?

09:46:49  20   A.  Yes.

09:46:53  21   Q.  Dan, if you would go to the second paragraph and

09:47:01  22   pull up the second paragraph, please, sir.

09:47:13  23       Now, Mr. Barkus is stating in his email that was

09:47:18  24   sent Friday, February 21st, 2003, that he is restating

09:47:26  25   the policy; correct?  in the first sentence?

09:47:31    1      A.  I cannot read it from here, sir.

09:47:34    2      Q.  I've placed in front of you, Ms. Taylor, Exhibit

09:47:58    3  10.  It's on the board.

09:47:59    4      The first sentence of the second paragraph, does

09:48:02    5  Mr. Barkus, in an email that was sent to all the

09:48:05    6  district managers for Family Dollar, state that:  "The

09:48:09    7  purpose of this memo is to restate this policy so

09:48:12    8  everyone fully understands"; correct?

09:48:13    9      A.  That's what he says, yes, sir.

09:48:15   10      Q.  It says -- then he goes on to state that "Any

09:48:18   11  store manager, assistant manager, or any other associate

09:48:21   12  who the store manager has recommended to carry keys to a

09:48:26   13  Family Dollar Store must be approved in person by the

09:48:28   14  district manager"; correct?

09:48:29   15      A.  That's what it says, yes.

09:48:31   16      Q.  And the people that carry the keys to the store

09:48:34   17  are the manager and the assistant manager; correct?

09:48:36   18      A.  Yes.

09:48:37   19      Q.  And in some instances, there's a position -- or

09:48:40   20  was a position known as third key; correct?

09:48:42   21      A.  Yes.

09:48:45   22      Q.  And, in fact, in some situations, a third key can

09:48:48   23  also carry the keys to the store?

09:48:49   24      A.  Yes.

09:48:50   25      Q.  And before a person can be hired into the

09:48:53   1   position of a key carrier, you, as a district manager,

09:48:57   2   had to approve that decision, didn't you?

09:48:59   3      A.   I let the manager make the decision.

09:49:02   4      Q.   Would you agree that Mr. Barkus states that in

09:49:05   5   his email that you are to make that decision pursuant to

09:49:11   6   policy?

09:49:12   7      A.   That is what I have to approve, yes.

09:49:15   8      Q.   Okay.  Now, Mr. Barkus also tells you in that

09:49:25   9   email that violation of this policy could result in the

09:49:30  10   termination of the store manager; is that correct?

09:49:33  11      A.   I'm not -- I didn't understand you, sir.

09:49:36  12      Q.   The last sentence of the paragraph I have pulled

09:49:38  13   up here on paragraph 2 states:  "A violation of this

09:49:41  14   policy is a serious infraction and may result in

09:49:44  15   disciplinary action, up to and including possible

09:49:48  16   termination"?

09:49:48  17      A.   Yes, it does.

09:49:49  18      Q.   And he's restating -- he's not stating, he's

09:49:52  19   restating the policy that's been in existence for some

09:49:56  20   time with Family Dollar; correct?

09:49:57  21      A.   Yes.

09:49:57  22      Q.   And you don't know of any document that's

09:50:00  23   replaced this document, do you?

09:50:02  24      A.   Not to my knowledge.

09:50:08  25      Q.   Mr. St. Clair had asked you some questions in

09:50:20  1  regards to -- when he's talking about job duties, that

09:50:23  2  the store manager had the authority to instruct

09:50:25  3  employees when in the store, either giving them job

09:50:28  4  assignments or correcting them if they were misbehaving.

09:50:32  5  Do you remember that testimony?

09:50:33  6      A.  Yes, I do.

09:50:34  7      Q.  And that is also the role of the assistant

09:50:36  8  manager also; correct?

09:50:37  9      A.  Most of the time, the manager has to do the

09:50:40  10  disciplinary action.

09:50:40  11      Q.  And if the store manager is not there and an

09:50:47  12  assistant manager sees someone talking on a cell phone,

09:50:50  13  using Mr. St. Clair's example, the assistant manager has

09:50:53  14  the authority to tell them "hang the phone up, you're at

09:50:55  15  work"?

09:50:55  16      A.  Yes, they do.

09:50:56  17      Q.  If he or she sees an assistant manager

09:50:59  18  misbehaving or violating one of the policies, the

09:51:02  19  assistant manager has the authority to verbally warn

09:51:05  20  them and discipline them; correct?

09:51:06  21      A.  Yes, they do.

09:51:07  22      Q.  Are -- strike that.  Are you familiar,

09:51:29  23  Ms. Taylor, with an employee by the name of Valerie

09:51:32  24  Stockdale?

09:51:33  25      A.  Yes, I am.

09:51:34   1      Q.   Who is she?

09:51:34   2      A.   She's my store manager at Talladega, Alabama.

09:51:38   3      Q.   And she's currently employed by you; correct?

09:51:41   4      A.   Yes, she is.

09:51:42   5      Q.   And has Ms. Stockdale herself ever complained to

09:51:45   6   you about the hours she was working, the low payroll,

09:51:48   7   and how she needed more payroll, because she was working

09:51:51   8   too many hours?

09:51:52   9      A.   I had all of my managers at one time or another

09:51:55  10   do that, yes.

09:51:55  11      Q.   And, in fact, she sent you an email specifically

09:51:58  12   in regards to that, did she not?

09:52:00  13      A.   I don't know.

09:52:02  14      Q.   Let me show you what has been marked as

09:52:12  15   Plaintiffs' Exhibit 190.  This is an email, from Valerie

09:52:25  16   Stockdale to you; correct?

09:52:28  17      A.   Yes.

09:52:29  18      Q.   And it's sent -- the month's not real clear, but

09:52:32  19   it's sent the 7th day of some month in 2002; correct?

09:52:36  20      A.   Yes.

09:52:37  21      Q.   And in the -- well, just read the whole email for

09:52:46  22   me, if you will.

09:52:47  23          MR. ST. CLAIR:  Your Honor, I object.

09:52:49  24   That's already in evidence.

09:52:50  25          THE COURT:  Well, is this a preliminary

09:52:52  1   inquiry?

09:52:54  2                   MR. G. WIGGINS:  Yes.

09:52:55  3                   THE COURT:  Overruled.  Go ahead.

09:52:58  4                   MR. G. WIGGINS:  Thank you, Your Honor.

09:53:02  5                   THE WITNESS:  "Linda, the only reason

09:53:03  6   payroll wasn't only over $20 is because I worked days

09:53:09  7   this past week, open to close, all day except Sunday.

09:53:15  8   And I worked 6:30 on that day.  I had to completely put

09:53:22  9   out freight by myself with" -- part of it's cut off --

09:53:28  10  "Connie coming in both days at 12:00 to run register and

09:53:31  11  put up repacks.  This is not something I am going to be

09:53:38  12  able to continue to do.  I worked 65 hours this week.

09:53:44  13  Something has got to be done about this" -- I assume it

09:53:50  14  says "payroll situation."

09:53:53  15                  MR. ST. CLAIR:  Your Honor, we renew our

09:53:55  16  objection to this exhibit.  It's an out-of-court

09:54:00  17  statement by a plaintiff that we have not had an

09:54:03  18  opportunity to cross-examine the person that wrote it.

09:54:04  19                  So we renew our objection.

09:54:07  20                  THE COURT:  This is Plaintiffs' Exhibit 190?

09:54:09  21                  MR. G. WIGGINS:  Yes.

09:54:09  22                  THE COURT:  Is it already in evidence?

09:54:12  23                  MR. G. WIGGINS:  Yes, sir.  It's already

09:54:13  24  admitted, and it's a business record and an exception to

09:54:17  25  Mr. --

09:54:19    1              MR. ST. CLAIR:  Again, Your Honor, this is
09:54:21    2    something that a plaintiff wrote in this lawsuit after
09:54:23    3    filing the lawsuit.  They can't just write any self-
09:54:25    4    serving statement they want and then it's in evidence
09:54:28    5    and I don't get to cross-examine her about it.
09:54:31    6              And that's our objection to this document,
09:54:34    7    Your Honor.
09:54:34    8              THE COURT:  Let me see the document.  This
09:54:50    9    is a document to you?
09:54:52   10              THE WITNESS:  Yes, it is.
09:54:55   11              THE COURT:  Oh.  The objection is overruled.
09:54:57   12    BY MR. G. WIGGINS:
09:54:57   13      Q.  In this email, Ms. Stockdale, your store manager,
09:55:02   14    said this past week she worked 65 hours; correct?
09:55:06   15      A.  Yes, she does.
09:55:07   16      Q.  And that during that time, she was the only one
09:55:10   17    in the store putting out freight by herself; correct?
09:55:12   18      A.  That's what she's saying, yes.
09:55:14   19      Q.  Now, in your direct examination, I didn't hear
09:55:17   20    anything from you in regards to managers putting out
09:55:20   21    freight.  But that's a regular job duty, isn't it?
09:55:24   22      A.  That is part of their job duty, yes.
09:55:26   23      Q.  And some days they'll be in there all by
09:55:29   24    themselves doing nothing but unloading freight; correct?
09:55:34   25      A.  No, sir.

09:55:34  1    Q.  Are there occasions where a store manager would

09:55:37  2    go to a store and be there from, say, 9:00 to 1:00

09:55:40  3    o'clock by themselves?

09:55:41  4    A.  On some occasions, but they don't have to be.

09:55:43  5    That's their choice.

09:55:46  6    Q.  It's not their choice, but the payroll's choice,

09:55:49  7    isn't it?

09:55:49  8    A.  They have proper coverage for the store, and how

09:55:52  9    they arrange it for the people and the employees to come

09:55:54  10   in is their choice.

09:55:55  11   Q.  When you say "they arrange", isn't it a fact,

09:55:58  12   Ms. Taylor, that the arranging is done by corporate when

09:56:02  13   they give the store managers these weekly schedules,

09:56:05  14   isn't it?

09:56:05  15   A.  This is a guideline for the managers.  They have

09:56:08  16   the full authority to change them.

09:56:11  17   Q.  The fact of the matter is, though, corporate

09:56:16  18   wants them to follow that weekly staff schedule as

09:56:20  19   closely and as succinctly as possible; is that not

09:56:24  20   correct?

09:56:25  21   A.  This is a guideline for them to use to --

09:56:28  22   especially for the managers that haven't been managing

09:56:32  23   for a long time -- to give them a guideline of when

09:56:36  24   their store hours needs to be for their staff.  Yes.

09:56:40  25   Q.  Now, you don't have a weekly schedule for any

09:56:44   1   experienced managers and experienced managers.  You have

09:56:46   2   a schedule for the store, regardless of if they're

09:56:51   3   inexperienced or experienced; correct?

09:56:52   4       A.  Yes.

09:56:53   5       Q.  And I want to show you -- can you put up

09:56:56   6   Plaintiffs' Exhibit 8?  This has been identified as a

09:57:04   7   corporate document.  And I want you -- Dan, if you'll go

09:57:09   8   down to question number 1, 2, 3, 4, 5.

09:57:13   9           Before we go there, Ms. Taylor, let me ask you:

09:57:15  10   It's not your testimony, is it, that store managers have

09:57:17  11   the authority to move coverage from slower days to

09:57:23  12   faster days and make changes in any way, shape, or form,

09:57:27  13   is it?  That's not your testimony?

09:57:29  14       A.  They can.  They have the authority to do that,

09:57:32  15   yes.

09:57:32  16       Q.  From the corporate office:  "Question:  Can I

09:57:36  17   move from slower days (i.e., non-truck weekdays) to

09:57:39  18   Fridays, Saturdays or Sundays when we are busiest?"  And

09:57:42  19   what does corporate tell the store managers?  Right

09:57:46  20   there (indicating).

09:57:47  21       A.  I can't see that.

09:57:48  22       Q.  I'm sorry.  Here's the question (indicating).

09:58:07  23       A.  I need to read that?

09:58:08  24       Q.  Yes, ma'am.

09:58:09  25       A.  "Can I move coverage from slower days to Friday,

09:58:14  1   Saturday or Sunday, when we are the busiest?"

09:58:17  2       Q.  And the answer from corporate headquarters is

09:58:20  3   what?

09:58:21  4       A.  I don't know.

09:58:21  5       Q.  Well, there it is.  The answer is right there

09:58:23  6   below it.

09:58:24  7       A.  Oh, I'm sorry.

09:58:26  8       Q.  That's okay.

09:58:27  9       A.  "No.  Schedules are designed to give coverage

09:58:29  10  that is based on store volume and store hours."

09:58:32  11      Q.  And then if you'll look at the next question.

09:58:40  12  Can you pull up the next question also?  The next

09:58:44  13  question reads:  "Can I change the schedule of assistant

09:58:47  14  manager to reflect a 48 or 52-hour workweek when in

09:58:51  15  training?"

09:58:52  16      Again, corporate tells them "no"; correct?

09:58:55  17      A.  Yes.

09:59:00  18      Q.  All right.  Then the question -- Question Number

09:59:11  19  4 from corporate:  "Can this" -- "can the schedule be

09:59:17  20  changed to give the manager a 5 1/2 day workweek instead

09:59:20  21  of a 5-day workweek?"  And who is the only person that

09:59:26  22  corporate says has the authority to make that change?

09:59:28  23      A.  "This change can only be made by district

09:59:36  24  manager."

09:59:36  25      Q.  Doesn't say the store manager has that authority,

09:59:39  1   does it?

09:59:40  2       A.   Not on this document, sir.

09:59:43  3       Q.   It says you have that authority; is that correct?

09:59:46  4       A.   Yes, it does.

10:00:05  5             MR. G. WIGGINS:  Your Honor, may I have one

10:00:07  6   second?

10:00:07  7             THE COURT:  Yes.

10:00:32  8             MR. G. WIGGINS:  Your Honor, at this time,

10:00:34  9   we would have no further questions of Ms. Taylor, but we

10:00:39  10  ask that she not be released.

10:00:40  11            THE COURT:  All right.  Redirect?

10:00:43  12            MR. ST. CLAIR:  Thank you, Your Honor.  May

10:00:44  13  I see the documents you asked her about?

10:00:48  14        Would you pull up the first slide that he

10:00:50  15  had for this witness, please?

10:00:54  16            **REDIRECT EXAMINATION**

10:00:55  17  **BY MR. ST. CLAIR:**

10:00:57  18       Q.   Let me go back and go over some of these things

10:01:06  19  that the lawyer's gone over with you.  Look at this

10:01:09  20  slide he showed you up here.

10:01:14  21        Is -- show me where on here, if at all, it says

10:01:20  22  that a store manager must get somebody's approval to

10:01:25  23  terminate someone.

10:01:27  24            MR. G. WIGGINS:  Your Honor, we object to

10:01:29  25  leading.

10:01:30    1              THE COURT:  Sustained.

10:01:31    2       Q.   This slide that you were shown, does it say that

10:01:36    3    a store manager has to get approval?

10:01:38    4              MR. G. WIGGINS:  Same objection, Your Honor.

10:01:40    5              THE COURT:  Same ruling.

10:01:41    6       Q.   Do your store managers have to get your approval

10:01:52    7    before terminating employees in your store?

10:01:56    8              MR. G. WIGGINS:  Same objection, Your Honor.

10:01:58    9              THE COURT:  Let her answer it.

10:02:03   10              MR. ST. CLAIR:  I'll rephrase it, Judge.

10:02:05   11              THE COURT:  All right.

10:02:06   12    BY MR. ST. CLAIR:

10:02:06   13       Q.   What role, if any, do you play when store

10:02:12   14    managers in your district want to terminate cashiers or

10:02:16   15    clerks?

10:02:16   16       A.   They terminate their own cashiers.

10:02:20   17       Q.   And the way that you run your district in the

10:02:23   18    real world, the way you run your district in the real

10:02:27   19    world, is that any different than what they're showing

10:02:40   20    up here on the board?

10:02:40   21              MR. G. WIGGINS:  Objection to leading, Your

10:02:40   22    Honor.

10:02:40   23              THE COURT:  Sustained.

10:02:40   24              MR. ST. CLAIR:  Well, let me see the next

10:02:40   25    one you showed her.  The next one?  Yes, sir.  The one

10:03:10  1    after that.

10:03:11  2            There was another chart, I believe, that you

10:03:14  3    showed that had Plaintiffs' Exhibit 3 on the bottom of

10:03:17  4    it.  No; there was one you showed one that said

10:03:20  5    Plaintiffs' Exhibit 3 on the bottom.

10:03:35  6    Q.  Now, this was a chart you were shown.  Does the

10:03:44  7    -- does this say -- well, what, if anything, does this

10:03:48  8    say about the store manager needing to get somebody's

10:03:51  9    approval to terminate somebody?

10:03:53  10   A.  Could you repeat it, sir?  I didn't hear it.

10:03:58  11   Q.  What, if anything, does this say about a store

10:04:02  12   manager having to get somebody's approval to terminate

10:04:05  13   someone?

10:04:06  14   A.  It doesn't.

10:04:07  15   Q.  Now, Mr. Wiggins also showed you some documents,

10:04:16  16   official company policies.  Do you know what the Strands

10:04:19  17   are?

10:04:20  18   A.  Yes, I do.

10:04:21  19   Q.  And to whom are the Strands -- those are training

10:04:25  20   materials?

10:04:26  21   A.  Yes, they are.

10:04:26  22   Q.  And who are they meant to train?

10:04:29  23   A.  They're meant to train store managers, the

10:04:32  24   associates, and the assistant managers.

10:04:34  25   Q.  And there's some parts of it that deal with

10:04:38  1   termination?

10:04:39  2       A.   Yes.

10:04:39  3       Q.   And the section he showed you about "conducting a

10:04:46  4   decision-making final written step"?

10:04:48  5       A.   Yes.

10:04:49  6       Q.   Okay?  And there's this sentence, it's talking

10:04:55  7   about the contact between store managers and district

10:05:02  8   managers --

10:05:02  9       A.   Yes.

10:05:03  10      Q.   -- right?  And it's indicating what the store

10:05:06  11  managers should tell a district manager; right?

10:05:08  12      A.   Yes.

10:05:09  13      Q.   Read what it says right there.  That sentence

10:05:15  14  that begins with "Inform".

10:05:16  15      A.   "Inform him or her of your decision."

10:05:22  16      Q.   Now, you were asked some questions about Valerie

10:05:43  17  Stockdale.  Do you know Ms. Stockdale?

10:05:46  18      A.   Yes, I do.

10:05:47  19      Q.   And they showed you some memos -- some emails she

10:05:51  20  sent you after this lawsuit was filed?

10:05:54  21      A.   Yes.

10:05:54  22      Q.   Do you know that she's a plaintiff in this

10:05:56  23  lawsuit?

10:05:57  24      A.   Yes, I do.

10:05:58  25      Q.   How far is she right now from the courthouse?

| | | |
|---|---|---|
| 10:06:06 | 1 | How far is Ms. Stockdale right now from this courthouse? |
| 10:06:09 | 2 | A.   I don't know. |
| 10:06:09 | 3 | Q.   How far is her store from this courthouse? |
| 10:06:12 | 4 | A.   Say about 65 miles. |
| 10:06:17 | 5 | Q.   Where is her store? |
| 10:06:18 | 6 | A.   Talladega, Alabama. |
| 10:06:19 | 7 | Q.   Have you seen her here today anywhere? |
| 10:06:21 | 8 | A.   No, I haven't. |
| 10:06:23 | 9 | Q.   Do you have any way of knowing that what she |
| 10:06:29 | 10 | wrote in that email after filing this lawsuit is true? |
| 10:06:32 | 11 | MR. G. WIGGINS:   Objection. |
| 10:06:32 | 12 | THE COURT:   The objection to leading is |
| 10:06:34 | 13 | sustained. |
| 10:06:35 | 14 | Q.   Do you have any way -- do you know one way or |
| 10:06:38 | 15 | another what she put in that email is true? |
| 10:06:41 | 16 | MR. G. WIGGINS:   Same objection. |
| 10:06:42 | 17 | THE COURT:   The objection is sustained. |
| 10:06:44 | 18 | Q.   What is Mrs. -- Mrs. Stockdale is describing for |
| 10:06:47 | 19 | you in that email what she's claiming as having in her |
| 10:06:50 | 20 | store -- |
| 10:06:51 | 21 | A.   Yes. |
| 10:06:52 | 22 | Q.   -- were you in the store at the time that |
| 10:06:55 | 23 | happened? |
| 10:06:55 | 24 | A.   No, I was not. |
| 10:06:56 | 25 | Q.   Now, if you would put up again the "Staff |

| | | |
|---|---|---|
| 10:07:09 | 1 | Schedule Frequently Asked Questions", please, sir. |
| 10:07:13 | 2 | MR. WHITE:  It's Number 8, Plaintiffs' 8. |
| 10:07:18 | 3 | Q.  Have you ever seen this document before today? |
| 10:07:26 | 4 | A.  Yes. |
| 10:07:29 | 5 | Q.  When did you see it? |
| 10:07:31 | 6 | A.  I'm not sure. |
| 10:07:36 | 7 | Q.  Do you know when it was prepared? |
| 10:07:38 | 8 | A.  No, I don't know. |
| 10:07:41 | 9 | Q.  Do -- what I want to focus on is the real world |
| 10:07:46 | 10 | of what happens in your district. |
| 10:07:49 | 11 | What role do store managers play in your district |
| 10:07:54 | 12 | in determining who works mornings and who works nights |
| 10:07:57 | 13 | and what time people come in and go home? |
| 10:08:00 | 14 | A.  Store managers. |
| 10:08:00 | 15 | Q.  Now, one last thing.  Do you know Janice Morgan |
| 10:08:09 | 16 | that's sitting here today? |
| 10:08:10 | 17 | A.  I don't know that I've ever met her. |
| 10:08:12 | 18 | Q.  But have you talked with her? |
| 10:08:13 | 19 | A.  Yes, I have. |
| 10:08:15 | 20 | Q.  All right.  And tell us about that conversation. |
| 10:08:18 | 21 | A.  She had called me.  It was in December.  I'm not |
| 10:08:25 | 22 | sure of what year -- |
| 10:08:26 | 23 | MR. G. WIGGINS:  Your Honor, we are going to |
| 10:08:29 | 24 | object to this question.  It's beyond the scope of the |
| 10:08:32 | 25 | direct. |

| | | |
|---|---|---|
| 10:08:32 | 1 | MR. ST. CLAIR:  As Your Honor has previously |
| 10:08:36 | 2 | informed me about, there's no such rule. |
| 10:08:39 | 3 | THE COURT:  Objection overruled. |
| 10:08:41 | 4 | Q.  Tell me about the conversation you had with |
| 10:08:44 | 5 | Mrs. Morgan. |
| 10:08:44 | 6 | A.  She called me wanting to transfer to |
| 10:08:49 | 7 | Childersburg, Alabama, that's where her husband was at. |
| 10:08:50 | 8 | Q.  When she called you, was she already working for |
| 10:08:53 | 9 | Family Dollar? |
| 10:08:53 | 10 | A.  Yes, she was. |
| 10:08:54 | 11 | Q.  What was her position? |
| 10:08:55 | 12 | A.  Store manager. |
| 10:08:56 | 13 | Q.  And so she was calling you about a transfer? |
| 10:08:59 | 14 | A.  She wanted a transfer to Childersburg, Alabama as |
| 10:09:03 | 15 | store manager, if I had one available. |
| 10:09:04 | 16 | Q.  Did she ask you about an assistant manager's job? |
| 10:09:07 | 17 | A.  No, she did not. |
| 10:09:08 | 18 | Q.  When asking to transfer to a different store |
| 10:09:14 | 19 | manager's job, did -- what, if anything, did she say |
| 10:09:17 | 20 | about wanting to get paid by the hour? |
| 10:09:20 | 21 | A.  None. |
| 10:09:21 | 22 | Q.  What, if anything, did she say about only taking |
| 10:09:27 | 23 | a job if she didn't get a raise? |
| 10:09:32 | 24 | A.  She didn't mention that at all. |
| 10:09:38 | 25 | Q.  Were you able to find a place for her in |

10:09:44  1    Childersburg?

10:09:45  2        A.  No, I was not.  I had a manager that was on

10:09:48  3    maternity leave at that time, and I informed her that if

10:09:52  4    the manager chose to come back to work, that I would not

10:09:56  5    have a position.

10:09:56  6        Q.  And -- and what happened?

10:10:01  7        A.  The manager returned to work, and I didn't have a

10:10:04  8    position at that time.

10:10:07  9            MR. ST. CLAIR:  That's all I have, Your

10:10:08  10   Honor.

10:10:08  11           THE COURT:  Recross?

10:10:09  12                    **RECROSS EXAMINATION**

10:10:10  13   **BY MR. G. WIGGINS:**

10:10:12  14       Q.  Ms. Taylor, you're here to testify in regards to

10:10:14  15   your district and your district only; right?

10:10:16  16       A.  Yes, I am.

10:10:17  17       Q.  You don't have any knowledge of these policies

10:10:20  18   that you're violating are also violated in other

10:10:23  19   districts, do you?

10:10:24  20       A.  Sir?

10:10:24  21       Q.  You don't know the policies that you're violating

10:10:27  22   in your district are also violated in other districts,

10:10:30  23   do you?

10:10:30  24       A.  I'm not sure what other district managers do,

10:10:33  25   sir.

10:10:34   1      Q.   And in the real world, we have a policy manual,
10:10:36   2   don't we?
10:10:37   3      A.   Yes, we do.
10:10:38   4      Q.   And in the real world, Family Dollar expects you
10:10:40   5   to follow that policy manual, don't we?
10:10:42   6      A.   It's a guideline, yes, sir.
10:10:44   7      Q.   And, in fact, in the real world, you're evaluated
10:10:47   8   based on your compliance with the policy manual and the
10:10:50   9   other policies and procedures of Family Dollar?
10:10:53  10      A.   No, I'm not.
10:10:54  11      Q.   You're not?  Well, let's look at an evaluation.
10:11:05  12   You're evaluated on the stores in your district in
10:11:11  13   various categories, are you not, such as schematics?
10:11:15  14      A.   Sir, I'm not hearing what you're saying.  I have
10:11:19  15   a hearing problem, I'm sorry.
10:11:20  16      Q.   I'll come back to that in just a second.
10:11:31  17           You yourself as a district manager, you don't
10:11:35  18   have the authority to change Family Dollar policies and
10:11:38  19   procedures, do you?
10:11:38  20      A.   No, sir, I do not.
10:11:40  21      Q.   And you don't have the authority as a district
10:11:41  22   manager to make policies and procedures, do you?
10:11:43  23      A.   No, I don't.
10:11:44  24      Q.   And what you're expected to do is follow policies
10:11:47  25   and procedures?

| | | |
|---|---|---|
| 10:11:48 | 1 | A.  I'm expected to. |
| 10:11:51 | 2 | Q.  And you don't decide whether or not managers are |
| 10:11:54 | 3 | exempt or not, do you? |
| 10:11:55 | 4 | A.  No, sir. |
| 10:11:55 | 5 | Q.  Let me get this evaluation. |
| 10:12:15 | 6 | MR. ST. CLAIR:  May I have a copy, please? |
| 10:12:23 | 7 | Q.  Ms. Taylor, I'm going to show you a form and I |
| 10:12:27 | 8 | will ask you -- this is not your evaluation -- |
| 10:12:31 | 9 | MR. ST. CLAIR:  Well, Your Honor, we object |
| 10:12:32 | 10 | to asking questions -- |
| 10:12:33 | 11 | THE COURT:  Sustained. |
| 10:12:34 | 12 | Q.  Do you recognize the form? |
| 10:12:36 | 13 | A.  Yes, I do. |
| 10:12:38 | 14 | Q.  What is that form? |
| 10:12:39 | 15 | A.  It's a performance review. |
| 10:12:42 | 16 | Q.  On what position? |
| 10:12:43 | 17 | A.  District managers. |
| 10:12:45 | 18 | Q.  Is this the form that was used to evaluate you? |
| 10:12:49 | 19 | A.  Yes, it was. |
| 10:12:50 | 20 | Q.  Now, on Page 1, you're evaluated in Section 1 on |
| 10:13:03 | 21 | the business results of the stores in your district; |
| 10:13:06 | 22 | correct? |
| 10:13:06 | 23 | A.  Yes. |
| 10:13:06 | 24 | Q.  You're evaluated with the payroll; correct? |
| 10:13:13 | 25 | A.  Yes. |

| | | |
|---|---|---|
| 10:13:14 | 1 | Q.  The controllable profit? |
| 10:13:19 | 2 | A.  Yes, I am. |
| 10:13:20 | 3 | Q.  The net profit? |
| 10:13:22 | 4 | A.  Yes. |
| 10:13:24 | 5 | Q.  And on Page 2, you're evaluated in regards to the |
| 10:13:33 | 6 | stores in your district's recovery; correct? |
| 10:13:37 | 7 | A.  Yes. |
| 10:13:40 | 8 | Q.  In regards to the store's shrink control? |
| 10:13:44 | 9 | A.  Yes. |
| 10:13:45 | 10 | Q.  In regards to the store's monthly planner? |
| 10:13:48 | 11 | A.  Yes. |
| 10:13:49 | 12 | Q.  In stock position? |
| 10:13:51 | 13 | A.  Yes. |
| 10:13:53 | 14 | Q.  Door-to-shelf program, unloading trucks? |
| 10:13:57 | 15 | A.  Yes. |
| 10:13:57 | 16 | Q.  Turnover ratio in the stores? |
| 10:14:01 | 17 | A.  Yes. |
| 10:14:02 | 18 | Q.  These are all areas that you are evaluated by the |
| 10:14:11 | 19 | regional vice-president; correct? |
| 10:14:12 | 20 | A.  Yes, I am. |
| 10:14:14 | 21 | Q.  And they're all based on the stores in your |
| 10:14:18 | 22 | district? |
| 10:14:19 | 23 | A.  Yes, they are. |
| 10:14:20 | 24 | Q.  So if I ask you again whether or not your job |
| 10:14:30 | 25 | performance is evaluated based on the stores in your |

| | | |
|---|---|---|
| 10:14:33 | 1 | district, what would your answer be? |
| 10:14:34 | 2 | A.   To a point, yes, they are.  It's my -- it's my |
| 10:14:38 | 3 | job to make sure that I have the right managers in the |
| 10:14:42 | 4 | store to manage the building to where they will be |
| 10:14:45 | 5 | profitable. |
| 10:14:46 | 6 | Q.   And that's part of the evaluation, isn't it? |
| 10:14:48 | 7 | A.   Yes. |
| 10:14:49 | 8 | Q.   And that's one of about 25 categories; right? |
| 10:14:52 | 9 | A.   Yes. |
| 10:14:59 | 10 | MR. G. WIGGINS:  Your Honor, we have no |
| 10:15:00 | 11 | further questions.  But again, I would ask that this |
| 10:15:03 | 12 | witness not be excused. |
| 10:15:04 | 13 | MR. ST. CLAIR:  I have just a few, Your |
| 10:15:06 | 14 | Honor. |
| 10:15:06 | 15 | THE COURT:  Sure. |
| 10:15:08 | 16 | **REDIRECT EXAMINATION** |
| 10:15:09 | 17 | **BY MR. ST. CLAIR:** |
| 10:15:12 | 18 | Q.   Do you do a good job? |
| 10:15:17 | 19 | A.   Sir? |
| 10:15:17 | 20 | Q.   Do you do a good job? |
| 10:15:19 | 21 | A.   I think I do, yes, sir. |
| 10:15:20 | 22 | Q.   Do you get good reviews? |
| 10:15:22 | 23 | A.   Sometimes, yes. |
| 10:15:23 | 24 | Q.   Has anyone with Family Dollar ever told you that |
| 10:15:27 | 25 | the way you're running your district is wrong? |

| | |
|---|---|
| 10:15:29 | 1 |
| 10:15:33 | 2 |
| 10:15:35 | 3 |
| 10:15:37 | 4 |
| 10:15:37 | 5 |
| 10:15:40 | 6 |
| 10:15:43 | 7 |
| 10:15:46 | 8 |
| 10:15:47 | 9 |
| 10:15:48 | 10 |
| 10:15:51 | 11 |
| 10:15:53 | 12 |
| 10:15:55 | 13 |
| 10:16:03 | 14 |
| 10:16:07 | 15 |
| 10:16:11 | 16 |
| 10:16:13 | 17 |
| 10:16:14 | 18 |
| 10:16:16 | 19 |
| 10:16:20 | 20 |
| 10:16:21 | 21 |
| 10:16:22 | 22 |
| 10:16:24 | 23 |
| 10:16:27 | 24 |
| 10:16:28 | 25 |

A.   No.

MR. ST. CLAIR:  That's all I have, judge.

MR. G. WIGGINS:  Nothing further at this time, Your Honor.

THE COURT:  All right.  Thank you, ma'am.

MR. ST. CLAIR:  If I may, Your Honor, there was something about not being allowed to let this witness leave?

THE COURT:  Yes.

MR. ST. CLAIR:  I'm sorry?

MR. G. WIGGINS:  We'll put her on call.

MR. ST. CLAIR:  If we may, I don't think she should have to stay around the courthouse.

MR. G. WIGGINS:  That's fine, Your Honor. As long as she's on call and will be here within --

MR. ST. CLAIR:  Don't go too far.

THE COURT:  All right.

MR. G. WIGGINS:  Actually, Your Honor, could we ask for an on-call -- she said she was only 65 miles from here?

THE COURT:  Where do you live?

THE WITNESS:  I live in Boaz, Alabama.

THE COURT:  So you're 60 -- you're about 120 miles.

THE WITNESS:  Yes, I am.

| | | |
|---|---|---|
| 10:16:29 | 1 | THE COURT:  Uh-huh. |
| 10:16:32 | 2 | MR. G. WIGGINS:  Three hour call, Your |
| 10:16:36 | 3 | Honor, would that be fair? |
| 10:16:36 | 4 | THE COURT:  What are you going to ask her? |
| 10:16:39 | 5 | MR. ST. CLAIR:  Yeah.  Yeah. |
| 10:16:41 | 6 | MR. G. WIGGINS:  We believe there will be |
| 10:16:43 | 7 | some issues come up with another witness that this |
| 10:16:46 | 8 | witness could have relevant testimony to. |
| 10:16:48 | 9 | THE COURT:  Is it another witness that the |
| 10:16:50 | 10 | defendant is going to call? |
| 10:16:51 | 11 | MR. G. WIGGINS:  Yes, sir. |
| 10:16:52 | 12 | THE COURT:  All right.  So stay around the |
| 10:16:54 | 13 | rest of the day. |
| 10:16:55 | 14 | THE WITNESS:  Yes, sir. |
| 10:16:56 | 15 | MR. ST. CLAIR:  Is it someone that's going |
| 10:16:58 | 16 | to be called today?  We have given you a list -- |
| 10:17:02 | 17 | MR. G. WIGGINS:  Based on your list, yes. |
| 10:17:04 | 18 | THE COURT:  Who is your witness? |
| 10:17:05 | 19 | MR. G. WIGGINS:  Mr. McCarthy. |
| 10:17:07 | 20 | THE COURT:  Is he going to be called? |
| 10:17:09 | 21 | MR. WHITE:  He's next.  I'm standing here |
| 10:17:12 | 22 | waiting to be -- |
| 10:17:13 | 23 | THE COURT:  No promises.  Just wait until |
| 10:17:17 | 24 | the end of the day. |
| 10:17:18 | 25 | THE WITNESS:  Yes, sir. |

| | | |
|---|---|---|
| 10:17:18 | 1 | THE COURT:  Thank you, ma'am. |
| 10:17:20 | 2 | MR. ST. CLAIR:  Thank you, Your Honor. |
| 10:17:22 | 3 | THE COURT:  Defendant will call its next |
| 10:17:24 | 4 | witness. |
| 10:17:25 | 5 | MR. WHITE:  Bill McCarthy. |
| 10:17:51 | 6 | **BILL MCCARTHY, DEFENDANT'S WITNESS, SWORN,** |
| 10:17:52 | 7 | THE CLERK:  State your name for the record, |
| 10:17:53 | 8 | please. |
| 10:17:54 | 9 | THE WITNESS:  My name is Bill McCarthy. |
| 10:18:01 | 10 | THE CLERK:  Spell your last name for the |
| 10:18:03 | 11 | record, please. |
| 10:18:04 | 12 | THE WITNESS:  M-c-C-A-R-T-H-Y. |
| 10:18:06 | 13 | **DIRECT EXAMINATION** |
| 10:18:06 | 14 | **BY MR. WHITE:** |
| 10:18:07 | 15 | Q.  Where do you reside, Mr. McCarthy? |
| 10:18:09 | 16 | A.  I live in Charlotte, North Carolina. |
| 10:18:11 | 17 | Q.  By whom are you employed? |
| 10:18:13 | 18 | A.  I'm employed by Family Dollar Stores. |
| 10:18:14 | 19 | Q.  How long have you been employed by Family Dollar? |
| 10:18:17 | 20 | A.  I've been with the company a little over four |
| 10:18:21 | 21 | years. |
| 10:18:22 | 22 | Q.  What is your title and position? |
| 10:18:25 | 23 | A.  I'm the Director of Financial Analysis and |
| 10:18:28 | 24 | Planning for Store Operations Department. |
| 10:18:31 | 25 | Q.  Have you ever been a store manager? |

10:18:33  1    A.  No, sir, I haven't.

10:18:35  2    Q.  Tell me what the director of Financial Planning

10:18:41  3  and Analysis does at Family Dollar.

10:18:42  4    A.  Well, amongst other tasks, I'm responsible for

10:18:47  5  the sales and payroll budgeting for our almost 6,000

10:18:53  6  stores.  I'm also responsible for analysis of how we do

10:18:59  7  on our actuals versus our budgets.

10:19:02  8       I'm responsible for head count at the store

10:19:06  9  operations corporate level, such as district managers,

10:19:09 10  regional vice presidents, and vice presidents.

10:19:13 11       I am also responsible for distributing

10:19:16 12  information reports to various levels of the store

10:19:20 13  operations department.

10:19:23 14       And I also review and analyze reports from other

10:19:27 15  departments within the company.

10:19:29 16    Q.  Is your department separate from the payroll

10:19:34 17  department?

10:19:34 18    A.  Yes, it is.

10:19:35 19    Q.  So what involvement, if any, do you have in

10:19:42 20  preparing the staff scheduler?

10:19:44 21    A.  The staff scheduler is prepared by me in my

10:19:50 22  department for the stores each quarter.

10:19:55 23            MR. WHITE:  Koni, would you bring up 2326,

10:19:57 24  which is in evidence, Your Honor.

10:19:59 25            THE COURT:  All right.

10:19:59   1      Q.   Do you recognize Exhibit 2326, which is on the

10:20:03   2   screen?

10:20:03   3      A.   Yes, I do.

10:20:04   4      Q.   And what is that, Mr. McCarthy?

10:20:09   5      A.   That is a document, the weekly work schedule,

10:20:14   6   which was in use prior to the staff schedule that was

10:20:19   7   done at the corporate level.

10:20:20   8      Q.   Did you have anything to do with the creation of

10:20:23   9   that document?

10:20:24  10      A.   No, sir.  That precedes my time at Family Dollar.

10:20:28  11      Q.   Are any store managers, to your knowledge, still

10:20:32  12   using the old weekly work schedule?

10:20:34  13      A.   Yes, they are.

10:20:37  14              MR. R. WIGGINS:  Objection, Your Honor.

10:20:39  15   There's no basis been laid for him knowing anything the

10:20:43  16   stores --

10:20:43  17              THE COURT:  What are the bases of your

10:20:44  18   knowledge?

10:20:45  19              THE WITNESS:  I've called and spoken to

10:20:47  20   store managers and asked them if they use that, and

10:20:49  21   they've told me yes.

10:20:51  22              MR. R. WIGGINS:  Hearsay, Your Honor.

10:20:53  23              THE WITNESS:  I have asked them to give me a

10:20:55  24   copy.

10:20:55  25              THE COURT:  The objection is sustained.

| | | |
|---|---|---|
| 10:20:57 | 1 | MR. R. WIGGINS:  The -- |
| 10:20:58 | 2 | MR. WHITE:  Your Honor -- Your Honor, I |
| 10:21:02 | 3 | believe -- |
| 10:21:02 | 4 | THE COURT REPORTER:  One at a time, please. |
| 10:21:02 | 5 | THE COURT:  I usually say that. |
| 10:21:07 | 6 | MR. R. WIGGINS:  District managers on their |
| 10:21:09 | 7 | witness list can be called -- |
| 10:21:11 | 8 | MR. WHITE:  Your Honor, we're prepared to |
| 10:21:12 | 9 | call Mr. Stephen Paul, who has been the subject of |
| 10:21:15 | 10 | another matter and prepared to testify. |
| 10:21:18 | 11 | THE COURT:  Gentlemen.  Gentlemen.  First of |
| 10:21:21 | 12 | all, one of you talk at a time. |
| 10:21:26 | 13 | Now, Mr. Wiggins? |
| 10:21:28 | 14 | MR. R. WIGGINS:  If they want to talk about |
| 10:21:30 | 15 | witnesses that are not on the witness list, they should |
| 10:21:32 | 16 | do that outside the presence of the jury and get a |
| 10:21:35 | 17 | ruling by the Court.  It should not be -- it should not |
| 10:21:37 | 18 | be just volunteering that here in the courtroom. |
| 10:21:40 | 19 | THE COURT:  Mr. McCarthy, you have never |
| 10:21:43 | 20 | been a store manager? |
| 10:21:44 | 21 | THE WITNESS:  No, sir, I haven't. |
| 10:21:45 | 22 | THE COURT:  Have you personally witnessed a |
| 10:21:48 | 23 | store manager using one of these forms? |
| 10:21:50 | 24 | THE WITNESS:  I have personally seen those |
| 10:21:52 | 25 | forms filled out and in stores. |

10:21:53   1          THE COURT:  And have you -- you have seen a
10:21:56   2   store manager complete one of the forms?
10:21:58   3          THE WITNESS:  No, I have not.
10:21:59   4          THE COURT:  The objection is sustained.
10:22:04   5   BY MR. WHITE:
10:22:05   6     Q.  The current staff scheduler, are you familiar
10:22:13   7   with that?
10:22:13   8     A.  Yes.  I am very familiar with the current staff
10:22:17   9   schedule.
10:22:18  10     Q.  Tell the ladies and gentlemen of the jury what
10:22:20  11   involvement you have in preparing -- and the term we
10:22:25  12   have used is staff scheduler -- is there a term that you
10:22:29  13   use different than that at Family Dollar?
10:22:30  14     A.  The term we use is schedule; other people call it
10:22:36  15   weekly work schedule, work schedule, or weekly schedule.
10:22:40  16          My involvement with the staff schedule is
10:22:43  17   actually I am the creator of it in its current form.
10:22:47  18   Every quarter, I look at the payroll budgets that the
10:22:54  19   stores have, and I try to create the staff schedule and
10:22:55  20   assign a staff schedule to each store that closest
10:22:59  21   matches that store's conditions with regards to the day
10:23:05  22   that the truck comes in, with regards to what their
10:23:06  23   hours of operation, and with regards to what their
10:23:09  24   budget says their labor hours are on a weekly basis.
10:23:12  25     Q.  Do you -- do you recognize Exhibit -- what is in

10:23:16  1    evidence as Exhibit 2327 on the screen?

10:23:19  2        A.   Yes.   That is a sample staff schedule that I

10:23:22  3    provided.

10:23:22  4        Q.   And let me show you the demonstrative blowups

10:23:31  5    that I think I've identified and not offered yet -- 23,

10:23:36  6    27 A and B.   Do you recognize those are blowups of that

10:23:41  7    document?

10:23:41  8        A.   Yes, they are.

10:23:42  9        Q.   All right.   Now, Mr. McCarthy, tell us how long

10:23:50  10   you have been involved in preparing this document.

10:23:53  11       A.   I've been involved in preparing this document

10:23:57  12   since my start at Family Dollar in early 2002.

10:24:00  13       Q.   How long has Family Dollar used the weekly work

10:24:04  14   schedule similar to what you see as Exhibit 2327?

10:24:08  15       A.   Similar to what we see, it's been in use since

10:24:11  16   about December of 2001.

10:24:13  17       Q.   Prior to these 2001, the old one, 2326 that was

10:24:20  18   up there, is that what was used?

10:24:22  19              MR. ROBERT WIGGINS:   Object.   Objection,

10:24:23  20   Your Honor.   That's already been excluded.   And he has

10:24:26  21   no knowledge, it's -- the only thing he knows is some

10:24:29  22   telephone calls, and that's not admissible evidence.

10:24:32  23   The Court's already excluded this same --

10:24:35  24              MR. WHITE:   I think he answered -- may I be

10:24:37  25   heard, Your Honor?

10:24:38  1          THE COURT:  The objection is overruled.

10:24:40  2          MR. WHITE:  Thank you.

10:24:41  3          MR. R. WIGGINS:  We object to lack of

10:24:43  4  foundation.

10:24:45  5          MR. WHITE:  Just a minute.  Mr. Wiggins is

10:24:46  6  not through.

10:24:47  7          MR. R. WIGGINS:  We object to lack of

10:24:49  8  foundation.

10:24:49  9          THE COURT:  Do you want to take him on voir

10:24:52 10  dire?

10:24:52 11          MR. R. WIGGINS:  Yes, sir.

10:24:53 12          THE COURT:  All right.

10:24:55 13                  **VOIR DIRE EXAMINATION**

10:24:55 14  **BY MR. R. WIGGINS:**

10:24:55 15     Q.  Sir, did you not testify a moment ago that you

10:24:58 16  began work after the old schedule ceased to be used and

10:25:01 17  the new schedule was already in place?

10:25:03 18     A.  The old schedule -- the old weekly work schedule,

10:25:08 19  the document, is even still today currently available.

10:25:11 20     Q.  Sir.  Sir, did you understand my question?  You

10:25:14 21  said this new schedule came in, in December 2001;

10:25:19 22  correct?

10:25:19 23     A.  That is correct.

10:25:20 24     Q.  You were not hired until January or February

10:25:23 25  2002; correct?

| | | |
|---|---|---|
| 10:25:23 | 1 | A.   February 2002. |
| 10:25:25 | 2 | Q.   So why are you trying to tell us things that were |
| 10:25:29 | 3 | happening when you didn't even work for the company -- |
| 10:25:31 | 4 | THE COURT:  No.  No, Mr. Wiggins, that's not |
| 10:25:34 | 5 | the way to do it. |
| 10:25:36 | 6 | MR. R. WIGGINS:  Yes, sir. |
| 10:25:36 | 7 | Q.   You don't have any knowledge before you were ever |
| 10:25:39 | 8 | hired about how Family Dollar operated, do you? |
| 10:25:41 | 9 | A.   But what I can tell you -- |
| 10:25:42 | 10 | Q.   Sir, do you? |
| 10:25:43 | 11 | A.   No. |
| 10:25:47 | 12 | MR. R. WIGGINS:  We object to him trying to |
| 10:25:48 | 13 | get into evidence things that preceded him working for |
| 10:25:52 | 14 | the company, Your Honor. |
| 10:25:52 | 15 | MR. WHITE:  Your Honor, may I be heard |
| 10:25:54 | 16 | briefly? |
| 10:25:55 | 17 | THE COURT:  Yes. |
| 10:25:56 | 18 | MR. WHITE:  It's already in evidence.  2326 |
| 10:25:58 | 19 | is already in evidence.  And it's been testimony |
| 10:26:01 | 20 | throughout -- I will withdraw the question about it. |
| 10:26:03 | 21 | But the suggestion that it's not in evidence is wrong. |
| 10:26:05 | 22 | THE COURT:  All right. |
| 10:26:08 | 23 | MR. R. WIGGINS:  What the question, Your |
| 10:26:09 | 24 | Honor, was, has it been used?  This witness -- |
| 10:26:14 | 25 | THE COURT:  He said he would withdraw the |

10:26:19  1   question.  Next question.

10:26:22  2               MR. WHITE:  Is Mr. Wiggins still up or is it

10:26:28  3   my turn?

10:26:29  4               THE COURT:  It's your turn.

10:26:31  5               MR. WHITE:  He's through?  Thank you, Your

10:26:33  6   Honor.

10:26:33  7               **DIRECT EXAMINATION(resumed)**

10:26:33  8   **BY MR. WHITE:**

10:26:33  9     Q.  Tell the ladies and gentlemen of the jury --

10:26:37 10   first, has the -- the staff scheduler, has it remained

10:26:42 11   the same from the beginning of time that you began to

10:26:45 12   work on it?

10:26:45 13     A.  No.  There's been some changes over time from the

10:26:49 14   document that we originally started with.  It's evolved

10:26:52 15   and it continues to evolve, going forward.

10:26:54 16     Q.  And tell us how you go about creating the weekly

10:26:59 17   staff schedule -- I mean, the staff schedule.

10:27:02 18     A.  With regards to the creation of the staff

10:27:05 19   schedule itself and the assigning to the individual

10:27:08 20   stores, the staff schedule that best meets their needs,

10:27:12 21   first we look at what their payroll budget is that's

10:27:15 22   rolled back from the district managers.

10:27:17 23         We then use a calculation to determine what the

10:27:21 24   labor hours for the store is.  Those are the hours that

10:27:24 25   the store uses to complete their taxes on a weekly

10:27:28  1   basis.

10:27:29  2           We then look at what day the truck comes for the

10:27:32  3   store -- Monday through Sunday.  And then we look at

10:27:35  4   what hour the store closes on a Monday through Saturday

10:27:38  5   basis.

10:27:39  6           Using those three criteria, we issue a staff

10:27:43  7   schedule to the store.  There's about 256 different

10:27:46  8   varieties of staff schedulers to meet those

10:27:49  9   combinations, and we issue the staff schedule that's

10:27:51  10  closest to the store.

10:27:53  11          Then what I do is I take the template for the

10:27:55  12  staff schedules, I send it to our print shop at the

10:27:58  13  corporate office and ask them to print me roughly 5,700

10:28:03  14  staff schedules.  They print those staff schedules on 11

10:28:16  15  by 17 paper, on an A side and B side.  And then they

10:28:16  16  send those staff schedules to another outside print shop

10:28:17  17  that laminates them.

10:28:19  18          They return them to me.  And myself and a few

10:28:22  19  co-workers get together in a room; what we do is we

10:28:25  20  basically have sheets that say this store within this

10:28:29  21  district gets a staff schedule, and we basically take

10:28:32  22  the 256 stacks of staff schedules and collate them so

10:28:37  23  that each district has the staff schedules for the

10:28:40  24  stores in their districts.  And then we mail them out.

10:28:42  25      Q.  Does -- when the staff schedulers that you mail

10:28:47  1    out, do they look like 23 -- that example, I think, of

10:28:51  2    2327?

10:28:53  3        A.  Yes, they do.  This is the latest version of

10:28:56  4    staff schedule version 14.

10:28:58  5        Q.  Do the staff schedulers, when you mail them out,

10:29:01  6    have any of these blanks filled in, for example, like

10:29:08  7    the weekend --

10:29:10  8        A.  No, they don't.  They're exactly as printed

10:29:13  9    there.

10:29:13  10       Q.  And are the staff schedulers, are they

10:29:16  11   specifically designed for an individual store?

10:29:21  12       A.  They're designed to be the closest for that

10:29:24  13   store's needs.  There are about 500 stores that have

10:29:29  14   different circumstances that their staff schedule isn't

10:29:32  15   going to be exactly what they need, and adjustments are

10:29:35  16   going to have to be made at the store level to make the

10:29:38  17   staff schedule work for them if they want to use the

10:29:41  18   template.

10:29:42  19       Q.  What are the categories you use when you prepare

10:29:44  20   the staff scheduler to create these 200-some-odd

10:29:48  21   different ones?

10:29:49  22       A.  Well, looking at the labor hours in this example,

10:29:52  23   this staff schedule shows 150 labor hours; 52 for the

10:29:57  24   manager and then 98 hours of labor for hourly

10:30:02  25   associates, including the assistant managers and the

10:30:03  1   clerks.

10:30:03  2      Q.   It's -- is anyone's name filled out when they

10:30:07  3   leave you?

10:30:08  4      A.   No.  We don't really know.  We associate -- when

10:30:11  5   we assign these, we don't know the manager's name; we

10:30:14  6   don't know the assistant's names, the clerk's names or

10:30:17  7   the hours they necessarily need to work around their

10:30:20  8   daily lives schedule.  We also don't know whether

10:30:23  9   they're going to use an A or a B or both in their

10:30:28  10  practice.

10:30:28  11     Q.   Well, the A is on one side of what goes out and

10:30:31  12  the B is on the other.  I've got them on two boards

10:30:35  13  here.  What's the difference between the A and the B?

10:30:38  14     A.   Well, one of the -- one of the changes that we

10:30:42  15  made probably about two-and-a-half years ago to the

10:30:45  16  staff schedule was that store managers said, well, the

10:30:49  17  schedule's good, but we'd like to have it so there's

10:30:53  18  some variety.

10:30:54  19          The manager was scheduled to work every Sunday or

10:30:56  20  the assistant was scheduled to work every Sunday.  Can

10:30:59  21  we do something to have some variety there?  And that's

10:31:02  22  what we developed, the A and the B.

10:31:04  23          On the A side, the manager -- the manager is

10:31:07  24  scheduled to have off on Sundays.  And on the B side the

10:31:11  25  assistant manager is scheduled to have off on Sundays.

10:31:14   1   And what this is designed to allow them to do is to use

10:31:17   2   one side of the schedule one week and then flip it to

10:31:20   3   the other side of the schedule the other week so that

10:31:22   4   the manager and the assistant can have alternating weeks

10:31:26   5   off.

10:31:26   6       Q.   And why is it laminated?

10:31:28   7       A.   It's laminated so they can take a grease pencil

10:31:31   8   and write the week ending date.  They can put the

10:31:34   9   manager's name in, the assistant manager's name, A and

10:31:37  10   B, and the associates.  And that they can also make

10:31:41  11   changes to reflect their individual employee's names,

10:31:44  12   their store's needs, or changes in their schedules.

10:31:47  13       Q.   Once the store manager receives one of these, how

10:31:51  14   long are they supposed to use it until they get a new

10:31:54  15   one?

10:31:54  16       A.   We issue these every quarter.  So they would use

10:31:57  17   them for 13 weeks of the quarter.

10:31:59  18       Q.   And what happens at the end of that quarter with

10:32:02  19   that staff schedule?

10:32:02  20       A.   At the end of the quarter, we issue a new one,

10:32:05  21   and the store manager can dispose of it or keep it in

10:32:08  22   their files, or whatever they'd like to do with it.

10:32:11  23       Q.   They're not required to return it to you?

10:32:13  24       A.   No, sir.

10:32:14  25       Q.   Now, down here in this corner of the exhibit

10:32:21  1    there, it says Version 14, 11/7/05.  What, if anything,

10:32:27  2    does that mean to you?

10:32:29  3        A.   Basically, it means that this is the staff

10:32:31  4    schedule, the 14th version of it.  And we sent these out

10:32:35  5    to the print shop on November 7th, 2005, which tells me

10:32:39  6    they were in use for second quarter of 2006.

10:32:42  7        Q.   How many different versions since you've been

10:32:45  8    involved have there been?

10:32:46  9        A.   We're working on our 15th version, or our third

10:32:49  10   quarter business, so it would be 15 quarters with the

10:32:53  11   staff schedules.

10:32:53  12       Q.   When will the next version go out?

10:32:55  13       A.   The next version will go out actually next week

10:32:59  14   when I get back to the office.

10:33:02  15       Q.   Up at the top it says, 150 hours.  What, if

10:33:06  16   anything, does that mean?

10:33:07  17       A.   Basically, that means that this store's payroll

10:33:11  18   budget, when you work back to the calculation factor

10:33:15  19   what the manager makes and what the average hourly wage

10:33:18  20   for the associates, that that totals up to about 150

10:33:22  21   hours of labor, including the manager.

10:33:25  22            This store, if they use this 150 hours, they will

10:33:28  23   get close to or slightly below what their payroll budget

10:33:32  24   is.

10:33:35  25       Q.   Do any of the staff schedulers ever have dollars

10:33:39   1   on them, or just hours?

10:33:41   2       A.   No.   They're only given as hours and a template,

10:33:46   3   a guideline.

10:33:46   4       Q.   And do different staff schedulers have different

10:33:49   5   hours?

10:33:50   6       A.   Absolutely.   Our staff schedules, the smallest

10:33:53   7   staff schedules for the smallest sales volume in the

10:33:56   8   stores are 135 labor hours, and the largest are up to

10:34:01   9   370 labor hours.

10:34:03  10       Q.   And why -- what is the correlation between the

10:34:06  11   volume of sales and the number of hours that appear on

10:34:09  12   the staff scheduler?

10:34:10  13       A.   Well, the smallest volume stores have the least

10:34:16  14   amount of customer transactions.   They have the least

10:34:19  15   amount of freight that comes through the back door.

10:34:22  16   They have the least amount of need to recover the store,

10:34:25  17   basically clean up the store each night.   So they have

10:34:28  18   less employees and less payroll dollars.

10:34:30  19           A store that does 500 or $600,000 a year in sales

10:34:34  20   is going to need less employees than a store that's

10:34:38  21   doing two-and-a-half million or 3 million in sales.

10:34:41  22   Those less employees and less payroll translates to less

10:34:44  23   labor hours each week.

10:34:46  24       Q.   At my request, did you prepare a summary chart

10:35:15  25   that would able -- would enable you to demonstrate to

10:35:21   1   the jury the different varieties of staff schedulers?

10:35:23   2       A.   Yes, I did.

10:35:24   3       Q.   Let me show you Exhibit 2325, and ask you if you

10:35:30   4   recognize that?

10:35:31   5       A.   That's the exhibit that I have prepared for you

10:35:35   6   at your request.

10:35:38   7                THE COURT:   What's the number of the

10:35:40   8   exhibit?

10:35:41   9                MR. WHITE:   2325, Your Honor.

10:35:42  10                THE COURT:   All right.

10:35:44  11                MR. WHITE:   We would move to admit 2325.

10:35:46  12                MR. R. WIGGINS:   No objection, Your Honor.

10:35:48  13                THE COURT:   Without objection, it's received

10:35:50  14   in evidence.

10:35:56  15                MR. WHITE:   And I think I have 12 copies.

10:35:58  16          May I publish, Your Honor?   May I publish, Your

10:36:00  17   Honor, to the jury?

10:36:01  18                THE COURT:   It may be published to the jury.

10:36:03  19                MR. WHITE:   Thank you.

10:36:04  20   BY MR. WHITE:

10:36:05  21       Q.   Do we have enough?   Okay.   Look with me at

10:36:31  22   Exhibit 2325, please, Mr. McCarthy.   Under the right

10:36:37  23   column where it says "staff schedule", there's a 135 at

10:36:43  24   the top, 370 at the bottom.   What does that show?

10:36:46  25       A.   Those are the labor hours that the staff schedule

10:36:49  1  are broken up into blocks, from 135 labor hours per week

10:36:53  2  to 370 labor hours per week for our largest staff

10:36:58  3  schedule.

10:36:58  4      Q.  Tell me what you mean by the term "labor hours".

10:37:00  5      A.  Labor hours are the number of hours of labor that

10:37:04  6  a store would use in a weekly time frame, i.e., if the

10:37:08  7  manager works 52 hours and there's a hundred hours of

10:37:14  8  associate labor between the assistant manager and the

10:37:16  9  clerks, that would be 152 labor hours each week.

10:37:20  10      Q.  So the store manager's hours are in the numbers

10:37:25  11  that are under "staff schedule"; right?

10:37:27  12      A.  That is correct.

10:37:28  13      Q.  And how many hours do you attribute to the store

10:37:30  14  manager?

10:37:30  15      A.  52.

10:37:32  16      Q.  Under the column "number of stores", what does

10:37:36  17  that show?

10:37:38  18      A.  What that's showing here is the number of stores

10:37:41  19  during the first quarter of 2006 that will issue that

10:37:45  20  staff schedule.

10:37:46  21      Q.  And the third one where it says "number of

10:37:51  22  varieties", what does that indicate?

10:37:54  23      A.  What that means is that, for example, the 150

10:37:59  24  hour staff schedule, we've got 12 varieties of staff

10:38:02  25  schedules.  Those varieties include different hours of

10:38:05  1   operation, whether they close at 7:00 p.m. or 8:00 p.m.

10:38:08  2   nightly; and different days that they receive their

10:38:11  3   trucks, whether it be a Tuesday truck or a Friday truck.

10:38:16  4       Q.   And that adds up to that -- are there 256

10:38:23  5   varieties or different staff schedulers?

10:38:27  6       A.   Yes, they are.

10:38:28  7       Q.   Now, the column "average volume", what does that

10:38:32  8   show?

10:38:32  9       A.   What that shows is, for example, the 150 hour

10:38:36  10  staff schedule.  Of the 886 stores that received 150

10:38:43  11  hour staff schedule, their average sales volume on an

10:38:47  12  annual year basis was $792,000.

10:38:53  13      Q.   And the -- I think you testified earlier about

10:38:56  14  sales volume, what that factor is -- but when you look

10:39:00  15  at average volume, that's the average sale of those

10:39:04  16  stores that get that schedule or a variety of that

10:39:07  17  schedule?

10:39:08  18      A.   That is correct.

10:39:09  19      Q.   How does the store -- how is a store manager

10:39:21  20  supposed to use the staff schedules?

10:39:24  21      A.   Well, basically, they receive the staff schedule

10:39:27  22  from their district manager.  And at the top here, where

10:39:31  23  it says the "week ending", they're to put what week

10:39:36  24  they're doing the schedule for; and then fill in the

10:39:38  25  names for the manager, assistant managers, a week.  Some

10:39:44  1   stores are large enough to have three assistant

10:39:46  2   managers, and fill in the names of the part-time

10:39:48  3   associates.

10:39:49  4        The next thing that they do is they go through

10:39:51  5   the schedule and they make adjustments as needed to

10:39:54  6   match their employees' times, i.e., if a -- let's say

10:39:59  7   the manager can't work -- looking at the 40A you've got

10:40:03  8   there, let's say that the manager can't work on Tuesday,

10:40:10  9   but he's available to work on Sunday; he would be able

10:40:13  10  to cross out his time on Tuesday and have the assistant

10:40:16  11  manager work those hours; whereas he would take this

10:40:20  12  shift on Sunday and give the assistant manager off.

10:40:23  13       Or vice versa, if some of their associates

10:40:27  14  perchance couldn't close but could open on a Wednesday,

10:40:30  15  they could swap associate B and associate C.

10:40:35  16   Q.  Do the 256 different varieties of staff

10:40:42  17  schedulers cover every single situation a store manager

10:40:48  18  might face?

10:40:49  19   A.  No.  There are --

10:40:50  20            MR. R. WIGGINS:  Objection, Your Honor.

10:40:53  21  This man has never been a store manager; he is in

10:40:56  22  Charlotte.

10:40:56  23            THE COURT:  The objection is sustained on

10:40:58  24  that basis, and leading.

10:41:00  25            Is this a convenient time for a break?

| | | |
|---|---|---|
| 10:41:02 | 1 | MR. WHITE:  Yes, sir. |
| 10:41:03 | 2 | THE COURT:  Ladies and gentlemen, we will be |
| 10:41:04 | 3 | in recess until ten minutes of 11:00 by the clock on the |
| 10:41:09 | 4 | wall.  Please do not discuss the case with yourselves or |
| 10:41:11 | 5 | anyone else.  Do not allow it to be discussed in your |
| 10:41:13 | 6 | presence, and keep an open mind. |
| 10:41:15 | 7 | THE WITNESS:  Should I stay here, Judge? |
| 10:41:17 | 8 | THE COURT:  Oh, no.  You take a break, too. |
| 10:41:20 | 9 | MR. WHITE:  For right now, just for now. |
| 10:41:23 | 10 | (Jury out at 10:35 a.m.) |
| 10:41:45 | 11 | MR. WHITE:  Does Your Honor want to take up |
| 10:41:49 | 12 | a couple of matters logistically now, or when we come |
| 10:41:53 | 13 | back? |
| 10:41:54 | 14 | THE COURT:  Well, no.  Let's do it later. |
| 10:41:57 | 15 | Does it deal with this witness? |
| 10:41:58 | 16 | MR. WHITE:  No. |
| 10:41:59 | 17 | THE COURT:  Okay.  Let's do it later. |
| 10:42:01 | 18 | MR. WHITE:  Okay. |
| 10:42:41 | 19 | THE COURT:  What are they? |
| 10:42:43 | 20 | MR. WHITE:  Well, one of them, Your Honor, |
| 10:42:45 | 21 | is -- I will tell you the ones I will address. |
| 10:42:53 | 22 | Judge, Your Honor, not on our list today, |
| 10:42:56 | 23 | but we were looking at putting on our list tomorrow an |
| 10:43:00 | 24 | executive of Family Dollar whose name is Barry Sullivan. |
| 10:43:04 | 25 | THE COURT:  Yes. |

10:43:05   1          MR. WHITE:  He took Mr. Barkus' place.  He

10:43:11   2     was -- I would admit to the Court he was not on our

10:43:13   3     initial disclosures.  He was on one of our witness

10:43:18   4     lists.

10:43:18   5          I have made counsel for the plaintiffs aware

10:43:23   6     and they object to us bringing him.  And I was trying to

10:43:26   7     get a ruling from the Court rather than bringing him all

10:43:29   8     the way from Charlotte prior to --

10:43:33   9          MR. R. WIGGINS:  Yes, sir.  Your Honor, as

10:43:34   10    we stated when this was brought up off the record back

10:43:38   11    in chambers, this witness is -- was not designated as a

10:43:42   12    30(b)(6) spokesman.  He's not been -- we have not had a

10:43:48   13    chance to depose him.  And he took over for Mr. Barkus

10:43:53   14    last June, so there was plenty of time to give us notice

10:43:56   15    if they were going to try to use him as their spokesman.

10:43:59   16    So we object.

10:44:01   17          THE COURT:  All right.  The objection is

10:44:03   18    sustained.

10:44:04   19          MR. WHITE:  Judge, the other matter that we

10:44:07   20    don't need to take up now, but we all need to not forget

10:44:10   21    is, you wanted us to reconcile the Strands.

10:44:12   22          THE COURT:  Yes.

10:44:13   23          MR. WHITE:  We will continue to work on

10:44:16   24    those.

10:44:16   25          MR. R. WIGGINS:  We're working on those.

10:44:18   1          MR. WHITE:  The other thing, Your Honor, and

10:44:19   2    I think maybe Jay wants to speak to that generally, but

10:44:22   3    specifically, as to Mr. McCarthy.

10:44:24   4          I think counsel's inquiry of McCarthy has

10:44:28   5    opened the door for us to, in fact, get Mr. Stephen Paul

10:44:31   6    here.  The exhibit that was -- has been in evidence,

10:44:36   7    this Court has heard a lot of testimony about the use of

10:44:39   8    2326, the old scheduler.  And I think we would be -- we

10:44:44   9    would be allowed to inquire of Mr. McCarthy while he's

10:44:48  10    here now, about the comparison he's done with Mr. Paul's

10:44:52  11    use of the old one versus the staff scheduler.

10:44:54  12          Now, generally -- and I understand the --

10:44:56  13    that the plaintiffs do not wish, or will not make him

10:44:59  14    available.  Mr. Paul is on their list of 60, Your Honor.

10:45:03  15          MR. R. WIGGINS:  Your Honor, this exhibit

10:45:04  16    they're speaking of is the one the Court excluded

10:45:07  17    yesterday because it's not on their exhibit list, was

10:45:10  18    never disclosed, and it is not in evidence.  And you

10:45:14  19    asked us at lunch to call Mr. Paul.

10:45:16  20          We came back after lunch.  We told you that

10:45:19  21    we had, and the Court then excluded the exhibit because

10:45:22  22    it just hadn't been on their exhibit list.  So I don't

10:45:27  23    think that by asking on voir dire whether this man has

10:45:32  24    knowledge and him saying he doesn't, he was hired in

10:45:35  25    January of 2002, that opens any door.

10:45:38  1          THE COURT:  I don't think it does either.

10:45:40  2          MR. WHITE:  Jay wants to be heard generally

10:45:44  3    on plaintiffs not being made available.

10:45:47  4          THE COURT:  Okay.

10:45:47  5          MR. ST. CLAIR:  We have requested from

10:45:48  6    plaintiffs that they make available eight of the

10:45:53  7    plaintiffs who are among those that are designated trial

10:45:56  8    representatives to be called by the defendant.  And

10:46:02  9    they've not yet indicated their agreement to do so.  And

10:46:06 10    so, absent that agreement, Your Honor, we would ask the

10:46:10 11    Court order that the plaintiffs have these eight

10:46:13 12    available to be called as witnesses.

10:46:16 13          MR. R. WIGGINS:  Your Honor, these are eight

10:46:17 14    people that are beyond the hundred mile limit.  In the

10:46:22 15    first trial, the defendant was allowed to put them on

10:46:25 16    through depositions.  I assume that they have that same

10:46:29 17    entitlement under the rules this time.

10:46:34 18          But as far as us bringing witnesses here

10:46:36 19    that are beyond the subpoena power, we've never agreed

10:46:39 20    to do that, and it's not required.

10:46:40 21          THE COURT:  Their depositions have been

10:46:42 22    taken?

10:46:42 23          MR. R. WIGGINS:  Yes, sir.

10:46:43 24          THE COURT:  Do you want to read their

10:46:44 25    depositions in evidence?

```
10:46:47   1            MR. ST. CLAIR:  We'd like to call them, just
10:46:49   2   as they did Mr. Barkus.  We'd like to have them live
10:46:53   3   here in court.  Failing which, we'd like to be able to
10:46:55   4   point out to the jury that their absence raises
10:47:00   5   inferences about what their testimony would be.
10:47:02   6            MR. R. WIGGINS:  Mr. Barkus was required to
10:47:04   7   come, because he had represented to us that he was
10:47:06   8   coming, until Saturday morning.  As of Friday afternoon,
10:47:10   9   he was voluntarily coming, and Saturday morning, he up
10:47:12  10   and changed.  And that does not apply to these
10:47:15  11   witnesses.
10:47:16  12            MR. ST. CLAIR:  They filed a witness list
10:47:18  13   with this Court that said, "here are the first 60
10:47:21  14   witnesses we're going to call."  And a number of these
10:47:23  15   are on a list.  That's a representation to this Court
10:47:26  16   that they were going to be here and testify live at this
10:47:28  17   trial.
10:47:29  18            THE COURT:  Well, the usual rule is that it
10:47:32  19   doesn't require, but that does not preclude another
10:47:36  20   party from calling them.  Now, you want to call these
10:47:39  21   people as adverse witnesses?
10:47:42  22            MR. ST. CLAIR:  That's correct, Your Honor.
10:47:44  23            MR. R. WIGGINS:  They are beyond the
10:47:45  24   subpoena power of the Court, Your Honor, and we do not
10:47:48  25   have them available.  And if they have their
```

| | | |
|---|---|---|
| 10:47:51 | 1 | depositions, that's the way the rules are set up for |
| 10:47:53 | 2 | that type of person. |
| 10:47:58 | 3 | MR. ST. CLAIR:  Again, Your Honor, if I may |
| 10:48:00 | 4 | point out, these are plaintiffs.  These aren't just -- |
| 10:48:02 | 5 | these are the people bringing the lawsuit. |
| 10:48:05 | 6 | THE COURT:  Yeah.  You're right.  The |
| 10:48:08 | 7 | plaintiffs will -- plaintiffs' counsel will have them |
| 10:48:11 | 8 | ready. |
| 10:48:13 | 9 | MR. ST. CLAIR:  Thank you, Your Honor. |
| 10:48:14 | 10 | THE COURT:  Now, you want them brought |
| 10:48:16 | 11 | tomorrow? |
| 10:48:16 | 12 | MR. ST. CLAIR:  Yes, Your Honor. |
| 10:48:18 | 13 | THE COURT:  All right. |
| 10:48:30 | 14 | (Recess from 10:41 a.m. until 10:55 a.m.) |
| 10:58:30 | 15 | (At bench:) |
| 10:58:30 | 16 | MR. G. WIGGINS:  We want to make one other |
| 10:58:32 | 17 | argument, something that was said that was not quite |
| 10:58:34 | 18 | accurate before the jury comes in. |
| 10:58:36 | 19 | THE COURT:  About what? |
| 10:58:38 | 20 | MR. G. WIGGINS:  That they wanted -- these |
| 10:58:39 | 21 | people were on our short list.  They're not on our short |
| 10:58:42 | 22 | list. |
| 10:58:42 | 23 | THE COURT:  They're not? |
| 10:58:43 | 24 | MR. G. WIGGINS:  No. |
| 10:58:44 | 25 | MR. WHITE:  They're not on your 60? |

| | | |
|---|---|---|
| 10:58:47 | 1 | MR. G. WIGGINS:  No. |
| 10:58:47 | 2 | THE COURT:  Not on the 60? |
| 10:58:49 | 3 | MR. WHITE:  Stephen Paul's not on there. |
| 10:58:51 | 4 | THE COURT:  If they're not on the 60, they |
| 10:58:53 | 5 | don't have to come unless y'all pay for them. |
| 10:58:55 | 6 | MR. WHITE:  Well, it's not my money.  Let me |
| 10:59:01 | 7 | tell you what I think when they send this in.  I think |
| 10:59:05 | 8 | they said a list.  But I think when -- let me let Jay |
| 10:59:09 | 9 | and Jim respond to that, because I think they said |
| 10:59:11 | 10 | here -- |
| 10:59:12 | 11 | THE COURT:  Let's do it at the next break. |
| 10:59:15 | 12 | MR. WHITE:  Let me get them.  Next break, |
| 10:59:17 | 13 | Judge? |
| 10:59:18 | 14 | THE COURT:  Yes. |
| 10:59:19 | 15 | MR. WHITE:  Okay. |
| 11:01:01 | 16 | (In open court, jury present at 10:55 a.m.) |
| 11:01:23 | 17 | THE COURT:  Continue the examination. |
| 11:01:35 | 18 | MR. WHITE:  May it please the Court. |
| 11:01:37 | 19 | THE COURT:  Mr. White. |
| 11:01:38 | 20 | BY MR. WHITE: |
| 11:01:38 | 21 | Q.  Mr. McCarthy, are you familiar with the term |
| 11:01:41 | 22 | "truck day"? |
| 11:01:41 | 23 | A.  Yes, I am. |
| 11:01:42 | 24 | Q.  What relationship, if any, does truck day at |
| 11:01:49 | 25 | Family Dollar Stores have in your preparation of your |

11:01:52  1    staff schedules?

11:01:53  2        A.   Truck day plays a very important part.  Truck

11:01:56  3    days is the day that our truck is received at the store.

11:02:00  4    The vast majority of the stores receive truck one day a

11:02:04  5    week, and that's when the store has to unload all the

11:02:07  6    freight for that week and get it on the shelves; that

11:02:10  7    way customers can come and purchase it.

11:02:13  8            It ends up taking a large portion of their weekly

11:02:17  9    labor hours in order to process that truck and get it

11:02:21  10   out on the floor and on the shelves.  That way the

11:02:24  11   customers can come in and do business.

11:02:25  12       Q.   Why do you use 52 hours as your assumption for

11:02:32  13   store manager's time when you work on the schedules?

11:02:36  14       A.   For as long as I've been at Family Dollar, we've

11:02:39  15   always gone under the assumption a manager had a 52-hour

11:02:44  16   work week.

11:02:45  17       Q.   Do you have anything to do with setting the

11:02:49  18   actual dollar budget for payroll for each quarter?

11:02:52  19       A.   No, it's at the company level.  We start off with

11:02:57  20   -- based on each year, we look at the next year and see

11:03:00  21   what we're going to have as far as sales, based on

11:03:03  22   trends and the calendar and how the holidays are

11:03:06  23   looking, and so forth and so on, as well as the

11:03:12  24   merchandise that we're going to have in the stores.

11:03:12  25           And from those sales, we then generate what our

11:03:13  1  payroll budget's going to need to take care of all those

11:03:17  2  transactions and that freight.  Then they break it out

11:03:20  3  into a quarter.

11:03:21  4       And from the quarterly level is what I get it

11:03:24  5  from.  And then I start to do my payroll allocation each

11:03:27  6  quarter to the store level.

11:03:28  7       Q.  And who gives you the actual dollar figure?

11:03:31  8       A.  The actual dollar figure comes from our

11:03:34  9  vice-president of finance, Marty Sowers.

11:03:37  10      Q.  And do you then take on a quarterly basis a gross

11:03:43  11  dollar figure and translate it into hours across these

11:03:46  12  various schedules?

11:03:47  13      A.  Yes.  I allocate that large -- almost like a pie.

11:03:50  14  And I take that pie and I have to slice it into almost

11:03:53  15  6,000 fair and equitable pieces, based on the criteria

11:03:56  16  for each store.

11:03:58  17      Q.  What effect, if any, does a store's performance

11:04:02  18  in the last quarter have upon your process going

11:04:07  19  forward, as far as doing the payroll budget?

11:04:09  20      A.  It -- the prior quarter's performance has some

11:04:14  21  effect, but more importantly is how the projection for

11:04:17  22  the next quarter is going to be, according to how I'm

11:04:21  23  getting payroll for.

11:04:22  24      For example, we just completed -- or this last

11:04:24  25  week, we just completed our second quarter, which is

11:04:26  1  December, January and February.  And traditionally, our

11:04:29  2  second quarter, the Christmas holiday quarter, we ended

11:04:33  3  up doing more sales at each store than we do the prior

11:04:35  4  quarter.

11:04:36  5       So we end up allocating more payroll for second

11:04:39  6  quarter than we would to a store for first quarter to

11:04:42  7  handle those anticipated sales.

11:04:44  8    Q.  Do you get any information going forward to

11:04:49  9  prepare the next quarter on how a store or a district or

11:04:54  10  -- has performed under the budget they received the

11:04:58  11  prior quarter?

11:04:58  12    A.  I do get the information, but that really doesn't

11:05:01  13  play into their -- their budget for the next quarter, as

11:05:05  14  far as how they performed, actual versus budget, the

11:05:08  15  prior quarter.

11:05:09  16    Q.  Are -- let me ask you this:  Are store managers

11:05:23  17  and district managers, to your knowledge, required to

11:05:26  18  abide by the staff scheduler you prepared completely?

11:05:31  19            MR. R. WIGGINS:  Objection, Your Honor.

11:05:33  20            THE COURT:  The objection to leading is

11:05:35  21  sustained.

11:05:36  22            MR. R. WIGGINS:  Object to lack of

11:05:38  23  knowledge.  He's not a store manager, not a district

11:05:40  24  manager.  He sits in the offices at charlotte.

11:05:43  25            MR. WHITE:  Your Honor, may I be heard

| | | |
|---|---|---|
| 11:05:44 | 1 | briefly? |
| 11:05:45 | 2 | THE COURT:  Yes, sir. |
| 11:05:46 | 3 | MR. WHITE:  Could we ask that we not be |
| 11:05:48 | 4 | giving speaking objections?  I understood that was the |
| 11:05:51 | 5 | rule. |
| 11:05:51 | 6 | THE COURT:  All right. |
| 11:05:59 | 7 | MR. R. WIGGINS:  We move to exclude the last |
| 11:06:01 | 8 | question and answer, Your Honor. |
| 11:06:02 | 9 | THE COURT:  All right.  The last question |
| 11:06:04 | 10 | and answer are stricken. |
| 11:06:09 | 11 | BY MR. WHITE: |
| 11:06:12 | 12 | Q.  Have you, at my request, obtained and prepared |
| 11:06:22 | 13 | information relating to how much overtime Family Dollar |
| 11:06:25 | 14 | has spent? |
| 11:06:26 | 15 | A.  Yes, I have. |
| 11:06:27 | 16 | Q.  How much employee payroll overtime has Family |
| 11:06:33 | 17 | Dollar spent in the last year? |
| 11:06:34 | 18 | A.  In the calendar year 2005, we paid just under |
| 11:06:40 | 19 | $20 million in overtime.  It was 900 -- $19,963,000 in |
| 11:06:48 | 20 | overtime. |
| 11:06:48 | 21 | Q.  Did you obtain overtime payment information for |
| 11:06:52 | 22 | the year prior to that? |
| 11:06:52 | 23 | A.  Yes.  It was -- for fiscal year 2004 was slightly |
| 11:06:58 | 24 | over $16 million in overtime. |
| 11:07:00 | 25 | Q.  And what does that translate to insofar as hours? |

11:07:05    1       A.   On a biweekly basis -- because we pay our payroll

11:07:10    2   biweekly, it's a little bit over 63,000 hours of

11:07:15    3   overtime every biweekly period.

11:07:17    4       Q.   And that average of 63,000 hours of overtime

11:07:22    5   every two weeks, what period of time have you computed

11:07:27    6   that average on?

11:07:28    7       A.   That's over the calendar year -- fiscal year

11:07:31    8   calendar year 2005, which was December 27th, 2004, to

11:07:36    9   December 25th, 2005.

11:07:39   10       Q.   Now, that overtime would have been paid to a

11:07:44   11   non-salaried employee; correct?

11:07:46   12            MR. R. WIGGINS:   Object to leading the

11:07:48   13   witness.

11:07:48   14            THE COURT:   The objection to leading is

11:07:50   15   sustained.

11:07:50   16       Q.   Who would receive that overtime based on that

11:07:54   17   calculation?

11:07:55   18       A.   That would be assistant managers and clerks.

11:07:56   19       Q.   Did you obtain -- how many employees, if you

11:07:59   20   know, does Family Dollar currently have?

11:08:01   21       A.   As of the end of January, we had 43,206

11:08:07   22   employees.

11:08:08   23       Q.   Did you, at my request, obtain information over

11:08:13   24   the past several years concerning the average

11:08:17   25   compensation paid for all store managers and all

11:08:20   1   associates?

11:08:20   2       A.   Yes, I did.

11:08:21   3       Q.   Let me show you Exhibit 2324, and ask you if you

11:08:35   4   can identify that?

11:08:36   5       A.   This is the analysis that I prepared for you,

11:08:39   6   which shows average manager salary, assistant manager

11:08:41   7   wage and clerk wage, going back from 1999 through the

11:08:47   8   most current 2006.

11:08:48   9       Q.   And this does not break out the 1,400 plaintiffs

11:08:53  10   in this case, does it?

11:08:55  11       A.   No, it does not.  This is for the entire company.

11:08:58  12               MR. WHITE:   We would offer 2324.

11:09:00  13               THE COURT:   Without objection, it's received

11:09:03  14   in evidence.

11:09:03  15               MR. WHITE:   Would you show 2324?  And may I

11:09:07  16   publish, Your Honor?

11:09:07  17               THE COURT:   It may be published to the jury.

11:09:13  18   BY MR. WHITE:

11:09:15  19       Q.   Looking at Exhibit 2324, Mr. McCarthy, under

11:09:44  20   manager's salary, what have you placed in that column?

11:09:47  21       A.   Each year during the second quarter, I took the

11:09:52  22   total managers of the company and averaged them out to

11:09:55  23   come up with the average salary.

11:09:57  24            It shows back in 1999 the average manager's

11:10:00  25   salary was $553, all the way to fiscal year 2006, in

11:10:06   1   which the average manager's salary was $671.

11:10:10   2       Q.   Have the number of stores remained constant over

11:10:14   3   these years?

11:10:14   4       A.   No, they have not.

11:10:15   5       Q.   And your exhibit -- your other exhibit you had, I

11:10:22   6   think 2323, I believe, had 5,700 stores?

11:10:29   7       A.   Yes.

11:10:30   8       Q.   And as of what period of time did you prepare

11:10:33   9   that?

11:10:34   10      A.   This was second quarter, 2006 is when I prepared

11:10:38   11  this.

11:10:38   12      Q.   And the under the manager's salaries -- under the

11:10:46   13  assistant manager wages, what is that information?

11:10:49   14      A.   This is showing the assistant manager's wage.  I

11:10:52   15  took all of the assistant managers in the company for

11:10:54   16  each quarter in question, and divided by the number of

11:10:58   17  assistant managers.

11:10:58   18      Q.   And this would be for all of the stores in Family

11:11:02   19  Dollar, not just the stores where the plaintiffs worked;

11:11:07   20  is that correct?

11:11:07   21      A.   That is correct.  This is for the entire company

11:11:09   22  at that time.

11:11:09   23      Q.   Did you do the same type of computation as to the

11:11:12   24  clerks?

11:11:12   25      A.   Absolutely.

11:11:13     1        Q.   Do you know what the average annual store sales

11:11:23     2    are at Family Dollar?

11:11:24     3        A.   As of fiscal year 2005, the average store had

11:11:31     4    $1,026,000 in sales.

11:11:33     5        Q.   And do you know what the average store inventory

11:11:37     6    is for all stores at Family Dollar?

11:11:39     7        A.   At the end of December, it was $253,000 in

11:11:43     8    inventory at the store level.

11:11:45     9        Q.   Did you also at my request obtain the numbers on

11:12:03    10    the average number of people hired per district

11:12:09    11    throughout the whole store?

11:12:11    12        A.   Yes, I did throughout the company.

11:12:12    13        Q.   What period of time did you do that?

11:12:14    14        A.   That was over calendar year 2005.

11:12:20    15        Q.   And is -- did you break that up by district?

11:12:22    16        A.   Yes, I did.  I divided by the number of

11:12:25    17    districts.

11:12:25    18        Q.   What were the number of store managers hired, if

11:12:29    19    you know, per district in 2005?

11:12:33    20        A.   It was about 9.1 store managers hired per

11:12:36    21    district for calendar year 2005.

11:12:39    22        Q.   What was the average number of assistant

11:12:43    23    managers?

11:12:43    24        A.   Assistant managers was higher, at a little over

11:12:46    25    26.

11:12:46  1    Q.   And the average number of clerks hired per
11:12:49  2  district over that calendar year?
11:12:50  3    A.   Because we have a large amount of clerk turnover,
11:12:54  4  it was just over 141 clerks hired per district.
11:13:09  5         MR. WHITE:   Let me have one minute, Judge,
11:13:12  6  to confer.
11:13:13  7         THE COURT:   All right.
11:13:28  8    Q.   And you are not the person that did calculations
11:13:32  9  on the individual plaintiffs, or the group of plaintiffs
11:13:35  10 and their salaries, are you?
11:13:37  11   A.   No.
11:13:37  12   Q.   Thank you.
11:13:38  13        MR. WHITE:   Judge, that's it.
11:13:40  14        THE COURT:   Cross-examination?
11:13:41  15            **CROSS-EXAMINATION**
11:13:41  16 **BY MR. R. WIGGINS:**
11:13:44  17   Q.   Good morning, Mr. McCarthy.
11:13:59  18   A.   Good morning.
11:14:00  19   Q.   How long have you been with Family Dollar?
11:14:04  20   A.   Last week -- or actually two weeks ago Monday was
11:14:07  21 four years for me.
11:14:08  22   Q.   And where is your office?
11:14:10  23   A.   We're officed in Matthews, North Carolina, which
11:14:14  24 is just outside of Charlotte.
11:14:16  25   Q.   That's the corporate office?

11:14:18  1    A.   Yes, it is.

11:14:18  2    Q.   You only work at the corporate office for Family

11:14:21  3    Dollar?

11:14:21  4    A.   That is correct.  That's where my office is.

11:14:23  5    Q.   And what's your education?

11:14:25  6    A.   Well, I graduated high school, Cooper City High

11:14:30  7    School in 1991.  Then I attended a year and a half at

11:14:35  8    the University of Florida.  I ended up leaving for

11:14:38  9    family medical reasons.

11:14:39  10        And since then, I have attended -- I have taken

11:14:43  11   college courses at a variety of different institutions,

11:14:45  12   such as Broward Community College in south Florida, and

11:14:53  13   Central Piedmont College in Charlotte, North Carolina.

11:14:57  14   Q.   What was your job back there -- how old are you,

11:15:00  15   by the way?

11:15:01  16   A.   I'm 32.

11:15:02  17   Q.   Okay.  What was your job background before you

11:15:04  18   came to Family Dollar?

11:15:05  19   A.   Prior to Family Dollar, back in the early to

11:15:10  20   mid-'90s, I actually owned my own taxi cab company for

11:15:18  21   three years.

11:15:18  22        Upon leaving that industry, I went to join the

11:15:20  23   equipment rental business as a financial analyst in

11:15:24  24   Pompano Beach, Florida.  I worked there for a few years.

11:15:27  25        And then was recruited by an equipment rental

11:15:30  1   company in Charlotte, North Carolina, where I relocated

11:15:33  2   and made my home.  I was a financial analyst for them

11:15:38  3   for almost three years.

11:15:39  4        And then was recruited by another company in

11:15:42  5   Miami in the equipment rental industry; was transferred

11:15:47  6   on a project to California, and then made my way back to

11:15:50  7   Charlotte, where I started with Family Dollar.

11:15:52  8        Q.   Okay.  And do you have a degree in accounting?

11:15:54  9        A.   No, sir, I do not.

11:15:55 10        Q.   Auditing?

11:15:56 11        A.   Nope.

11:15:57 12        Q.   Financial planning?

11:15:57 13        A.   No, sir, I do not have a college degree.

11:15:59 14        Q.   Now, you said that you do the store payroll for

11:16:05 15   all the stores; is that correct?

11:16:08 16        A.   I do the payroll budgets and the sales budgets

11:16:11 17   for all the stores in the company.  That's correct.

11:16:13 18        Q.   And you said it's, what, 6,000 approximately

11:16:17 19   stores?

11:16:17 20        A.   There's a little bit under 6,000 stores.

11:16:20 21        Q.   As I understand your testimony, that's a sort of

11:16:23 22   a top-down process where you take the big number and you

11:16:27 23   chop it into smaller numbers until you get to the store?

11:16:29 24        A.   I start with a large number, and then basically I

11:16:32 25   build up from a bottom on a store-by-store basis to come

| | | |
|---|---|---|
| 11:16:35 | 1 | up to meet my number at the top. |
| 11:16:37 | 2 | Q.  You start off with a number that you're given by |
| 11:16:40 | 3 | management; correct? |
| 11:16:41 | 4 | A.  That is correct. |
| 11:16:41 | 5 | Q.  Is that about -- I think you said at one point in |
| 11:16:45 | 6 | your deposition, 460 million? |
| 11:16:50 | 7 | A.  In fiscal year 2005, it was roughly 460 million. |
| 11:16:55 | 8 | Now it's over $500 million a year. |
| 11:16:57 | 9 | Q.  You started with about $500 million.  The first |
| 11:17:00 | 10 | step in getting each store's payroll budget is to look |
| 11:17:07 | 11 | at your historical sales background? |
| 11:17:09 | 12 | A.  No.  Actually, the first step in determining a |
| 11:17:12 | 13 | store's actual budget is to look at what their projected |
| 11:17:16 | 14 | sales for the next quarter's going to be. |
| 11:17:19 | 15 | Q.  As I understood your testimony before, you look |
| 11:17:22 | 16 | at the historical sales, past sales; you send those down |
| 11:17:26 | 17 | to the district manager to look at.  He adjusts them up |
| 11:17:28 | 18 | or adjusts them down, as far as what he projects for the |
| 11:17:32 | 19 | coming period? |
| 11:17:33 | 20 | A.  What we send them is, we send to each district |
| 11:17:37 | 21 | manager on a store-by-store basis what the projections |
| 11:17:41 | 22 | for the quarter, what last year's is, to kind of give |
| 11:17:43 | 23 | them a comparison and show them where we get the |
| 11:17:46 | 24 | comparison from.  But the district manager is allowed |
| 11:17:48 | 25 | and is encouraged to change those projections up or |

11:17:51  1  down, based on their individual understanding of the

11:17:54  2  market conditions, their store conditions and their

11:17:57  3  employees.

11:17:57  4      Q.  And that, then, becomes what's known as the sales

11:18:01  5  budget?

11:18:01  6      A.  That is correct.  They will send back to me what

11:18:06  7  becomes the sales budget.

11:18:07  8      Q.  When you say they "roll back" to you the sales

11:18:10  9  budget, that's the district manager?

11:18:11  10     A.  The district manager rolls back to me what the

11:18:13  11 sales projection is, what the sales budget is for each

11:18:17  12 store within their district.

11:18:18  13     Q.  Okay.  And then you take that and you plug in

11:18:21  14 these factors you told us about on your direct exam --

11:18:25  15 risk class, covered ratio, hours the store's open,

11:18:29  16 average hourly wage of the associates, store manager

11:18:32  17 wage -- and you come up with a payroll budget; correct?

11:18:35  18     A.  That is correct.

11:18:35  19     Q.  That's just a draft budget, it's not the final;

11:18:39  20 correct?

11:18:39  21     A.  That is correct.

11:18:40  22     Q.  You send it down to the regional vice-president

11:18:43  23 and the district manager for them to work on; correct?

11:18:47  24     A.  Yes.

11:18:47  25     Q.  They can take the budget that you proposed and

11:18:51   1    they can take money that you have proposed for one store

11:18:56   2    and move it to another store; correct?

11:18:58   3        A.   The district manager's allowed to move dollars

11:19:01   4    from store to store, or he's allowed to leave them as

11:19:04   5    they were.

11:19:05   6        Q.   And that's in his discretion, the district

11:19:07   7    manager's discretion; correct?

11:19:10   8        A.   He can, correct.

11:19:11   9        Q.   It's your job to get a fair and equitable

11:19:15  10    division of that big number, 460 million, or $500

11:19:18  11    million; correct?

11:19:19  12        A.   That is correct.

11:19:19  13        Q.   So what you send the district manager is what you

11:19:22  14    believe to be the fair and equitable decision between

11:19:24  15    the stores for payroll; correct?

11:19:28  16        A.   Yes.

11:19:29  17        Q.   Okay.   But the district manager in his discretion

11:19:32  18    can take money from one store that you decide was fair

11:19:36  19    and equitable, and give it to another store manager in

11:19:39  20    another store?

11:19:40  21        A.   That is correct.   They can move dollars from

11:19:43  22    store A to store B.

11:19:46  23        Q.   So the result of robbing Peter to pay Paul by the

11:19:52  24    district managers can be that some stores have enough

11:19:55  25    payroll to operate on, others don't, and you then have

11:19:59  1    to step in and put a floor or a minimum back in of 2.0

11:20:03  2    coverage; correct?

11:20:04  3        A.   There are actually two minimums, 2.0 coverage and

11:20:09  4    135 labor hours.

11:20:11  5        Q.   Okay.  2.0 coverage and 135 hours is the minimum;

11:20:16  6    correct?

11:20:17  7        A.   Those are the minimum allowed payroll per store.

11:20:21  8        Q.   So if a district manager takes from one store and

11:20:26  9    gives it to another store, causing that first store that

11:20:29  10   he took from to be below 135 hours, or below two people

11:20:34  11   in the store for each hour the store's open, then you

11:20:38  12   have to restore that when it comes back to you to get

11:20:40  13   that store that got taken from, back to the minimum;

11:20:43  14   correct?

11:20:43  15       A.   If any store's below the minimum allowable

11:20:47  16   payroll, I will increase it to at least the minimum

11:20:50  17   before rolling it out the store level.

11:20:52  18       Q.   So, after the district manager gets done with his

11:20:55  19   moving the money around from store to store, you can set

11:20:59  20   back in and add some more money, up to the minimum 135

11:21:04  21   hours per pay period, that's every two weeks, for the

11:21:09  22   store that got taken from; correct?

11:21:11  23       A.   Actually, that's not correct.  It's not 135 labor

11:21:16  24   hours per pay period, it's 135 labor hours per week.

11:21:20  25       Q.   Per week.  I'm sorry.  But other than my mistake

11:21:22   1   on that, the process that I described is correct, is it

11:21:25   2   not; that you will bring the store that got taken from

11:21:29   3   back to the minimum of 135 hours a week?

11:21:31   4       A.   Yes.   We make sure that no store has a budget

11:21:34   5   below the minimum allowable.

11:21:36   6       Q.   And that 135 minimum includes the 52 hours of the

11:21:40   7   store manager?

11:21:40   8       A.   That is correct.

11:21:41   9       Q.   All right.   And when you say 2.0 -- I think I've

11:21:46   10  already covered it, but I want to make sure -- what you

11:21:48   11  mean by 2.0 minimum coverage is that two people should

11:21:51   12  be in the store, on average, every hour the store is

11:21:55   13  open?

11:21:55   14      A.   That is correct.

11:21:56   15      Q.   Okay.   And you're not involved with that process

11:22:09   16  of -- that the district managers go through of robbing

11:22:13   17  Peter to pay Paul, are you?

11:22:14   18      A.   No.

11:22:16   19      Q.   And up to this point in the process -- well,

11:22:21   20  let's establish what point in the process we've gotten

11:22:23   21  to so far.

11:22:24   22          At this point, when it's rolled back to you,

11:22:27   23  after coming from the district manager the second

11:22:30   24  time -- first time was when they rolled you back the

11:22:34   25  sales budget, now they're rolling you back the payroll

11:22:37  1  budget after they allocated it differently than you

11:22:40  2  planned, sometimes -- up to that point in the process is

11:22:44  3  where you can then do your staff scheduler, from the

11:22:47  4  payroll budget?

11:22:48  5     A.  That is correct.

11:22:48  6     Q.  Okay.  Up to that point of the process, the store

11:22:52  7  manager hasn't been involved at all, has he?

11:22:54  8     A.  Correct.

11:22:55  9     Q.  So we now have a payroll budget for a store,

11:23:03  10  store manager's never been involved, we're going to now

11:23:06  11  set the staff schedule; correct?

11:23:08  12     A.  Yes.

11:23:08  13     Q.  All right.  You take the -- what you call the

11:23:13  14  labor hours, you explained to Mr. White what the labor

11:23:16  15  hours are, correct?

11:23:19  16     A.  We take the budget and we convert the budget to

11:23:23  17  labor hours.

11:23:24  18     Q.  Yes.  Those are hourly labor hours after you back

11:23:29  19  off the store manager's 52 hours; correct?

11:23:31  20     A.  No.  The labor hours include the store manager's

11:23:35  21  52 hours.

11:23:36  22     Q.  Okay.  But you -- okay.  So you have a term

11:23:40  23  "labor hours", that includes the manager's 52 hours?

11:23:43  24     A.  Absolutely.

11:23:43  25     Q.  You have a term "hourly labor hours", that does

11:23:47   1   not include the store manager's hours?

11:23:48   2      A.   That's correct.

11:23:49   3      Q.   Okay.  So you're taking the labor hours, and

11:23:52   4   you're converting it to one of these schedules that

11:23:54   5   Mr. White showed us?

11:23:55   6      A.   Correct.

11:23:56   7      Q.   Okay.  Now, let's just get one out so we're all

11:23:59   8   on the same page.  This is the schedule I'm talking

11:24:03   9   about.

11:24:03  10      A.   Uh-huh.

11:24:04  11      Q.   And the one you're talking about; correct?

11:24:06  12      A.   Yes.

11:24:07  13      Q.   I think that's 2327, if I remember what Mr. White

11:24:12  14   says.  Yes.  Defendant's Exhibit 2327 is the one I'm

11:24:16  15   referring to, for the record.

11:24:30  16           So then we know that what you're doing is you're

11:24:36  17   taking your labor hours that are allowed by the payroll

11:24:40  18   budget that the district manager has sent back to you in

11:24:42  19   a final form, and you're converting it to actual times

11:24:49  20   of day for each person that will work those hours;

11:24:54  21   correct?

11:24:55  22      A.   Not necessarily.  What I'm doing is I'm taking

11:24:59  23   the payroll budget that the district manager sends to me

11:25:03  24   and converting it to labor hours, and then matching the

11:25:06  25   labor hours the day that the truck comes to the store,

11:25:10   1   or is scheduled to come to the store, and the hours of

11:25:13   2   operation for the store, to match it to the closest

11:25:15   3   staff schedule.

11:25:16   4       Q.   Okay.  Do you have this in front of you --

11:25:19   5       A.   Yes, I do.

11:25:20   6       Q.   -- a copy?  Which day is -- so, I guess I do need

11:25:25   7   to get this up on -- which day is the truck day?

11:25:29   8       A.   For this schedule, 40A, the truck day is Friday.

11:25:35   9       Q.   Does it show right on the form that you print up

11:25:45  10   in your printing office up in Charlotte which day is the

11:25:49  11   truck day?

11:25:49  12       A.   Yes.  You can see down at the bottom.  And

11:25:51  13   additionally, you can tell, because on Friday there's

11:25:54  14   four hours here for associate C that has 0, no beginning

11:25:58  15   or end time.  The manager needs to fill that in, based

11:26:01  16   on that truck time.

11:26:02  17       Q.   Okay.  So you look at the -- your labor hours;

11:26:07  18   you look at your truck day; you look at your hours the

11:26:10  19   store's open; and then you come up with the way those

11:26:16  20   hours should be used in the schedule; correct?

11:26:19  21       A.   You come up with the staff schedule for the

11:26:22  22   store, yes.

11:26:23  23       Q.   And you said there are 200-and-some-odd types,

11:26:28  24   but what you actually do is, you have a single schedule

11:26:33  25   for each store.

11:26:35  1        I think when you testified last time, I was

11:26:37  2   talking with you, it's 5,700 stores at that time.  You

11:26:40  3   said you had 5,700 individual schedules, one per store?

11:26:46  4   A.   There's 256 varieties, and we will issue one

11:26:49  5   schedule per store.  That is correct.

11:26:50  6   Q.   And so your office will take -- will have 5,700

11:26:55  7   individual schedules that you will prepare, collate,

11:26:59  8   send to the district managers?

11:27:00  9   A.   Yes.

11:27:01  10  Q.   The district managers will then be responsible

11:27:04  11  for giving those to their store managers?

11:27:16  12  A.   Yes, and reviewing the process.

11:27:16  13  Q.   Okay.  Now, let's take this down for a minute.

11:27:18  14  You said there were about 500, though, you mentioned --

11:27:34  15  I had not heard that before -- you said in your direct,

11:27:37  16  500 approximately of the 5,700, that are of a type that

11:27:44  17  need some adjustment that don't fit exactly within the

11:27:46  18  schedules that are sent out?

11:27:48  19  A.   That is correct.

11:27:48  20  Q.   You don't know if any of the plaintiffs in this

11:27:51  21  case, the 1,426 people, fall within one of those 500

11:27:58  22  schedules that need some adjustment?

11:27:59  23  A.   No, I don't.

11:28:00  24  Q.   And let's go back just one step about the payroll

11:28:13  25  budget.  Once those payroll dollars are established,

11:28:20   1   after you've sent them to the district manager, the

11:28:23   2   district manager sends them around, sends them back to

11:28:25   3   you in final form, and that becomes the final payroll

11:28:29   4   budget; at that point, the store managers are

11:28:32   5   responsible for landing their expenditures, the money

11:28:37   6   they spend on payroll to the budget?

11:28:40   7       A.   Yes, for 13 weeks.

11:28:41   8       Q.   Yes.  And that's a term of art that you use in

11:28:44   9   Family Dollar, that you're, quote, "responsible for

11:28:47  10   landing their payroll to the budgeted dollars"?

11:28:52  11       A.   I wouldn't say that that's a term that I use.

11:28:54  12       Q.   Well, you used it last time you testified, is the

11:28:57  13   reason I was thinking it might be a term of art.  You

11:29:00  14   said that you're "responsible for landing their actual

11:29:03  15   money spent on payroll on people to the budget"?

11:29:08  16       A.   I used --

11:29:10  17       Q.   Yes, you did.  You want to see it?  Page 149 of

11:29:14  18   your transcript.

11:29:15  19       A.   It's not a term I usually use, but that's fine.

11:29:18  20       Q.   And the metaphor you were telling us about there

11:29:22  21   with landing, was sort of landing an airplane on a

11:29:25  22   target; correct?

11:29:26  23       A.   Okay.

11:29:27  24       Q.   That's really the process of the payroll budget,

11:29:31  25   as the store managers have to use them; correct?

| | | |
|---|---|---|
| 11:29:33 | 1 | A.  Yes. |
| 11:29:34 | 2 | Q.  Or that's the design of the system? |
| 11:29:36 | 3 | A.  The design of the system is that we issue a sales |
| 11:29:39 | 4 | budget and a payroll budget for each store to give the |
| 11:29:42 | 5 | store the guidelines to work with. |
| 11:29:43 | 6 | Q.  And they're responsible for landing their store |
| 11:29:48 | 7 | to the budgeted number; correct? |
| 11:29:50 | 8 | A.  They're responsible for achieving their sales of |
| 11:29:53 | 9 | payroll budgets. |
| 11:29:54 | 10 | Q.  Okay.  Now, going back then to the second step |
| 11:29:56 | 11 | after you got them their payroll dollars -- is there |
| 11:30:02 | 12 | something over here?  Okay.  You were looking over |
| 11:30:05 | 13 | there.  I didn't know.  Are you ready? |
| 11:30:08 | 14 | A.  Yes. |
| 11:30:09 | 15 | Q.  And you've converted those dollars to your |
| 11:30:14 | 16 | schedule that we have here on the board -- |
| 11:30:17 | 17 | A.  Yes. |
| 11:30:18 | 18 | Q.  -- Exhibit 2327.  The store managers are |
| 11:30:26 | 19 | responsible for complying with these schedules -- |
| 11:30:30 | 20 | they're mandatory, aren't they? |
| 11:30:33 | 21 | A.  The staff schedules are issued to every store, |
| 11:30:42 | 22 | and the store manager's responsible for placing the |
| 11:30:45 | 23 | staff schedule and utilizing it. |
| 11:30:47 | 24 | Q.  Okay.  Now, I want to talk about how you arrive |
| 11:30:58 | 25 | at the 5,700 schedules that you give to the stores to do |

11:31:06   1    what you just said.  You said two things I want to go

11:31:13   2    back on.

11:31:15   3         One is, you said 52 hours is the hour you always

11:31:19   4    use ever since you've been at the company for store

11:31:22   5    managers; is that correct?

11:31:22   6         A.   That is correct.

11:31:23   7         Q.   And, in fact, in your prior testimony, you said

11:31:26   8    that is, quote, "absolutely one of the laws that every

11:31:30   9    manager has 52 hours in their schedule"; correct?

11:31:34  10         A.   The 52 hours is what the accepted schedule is for

11:31:41  11    managers, since prior to my time coming to Family

11:31:44  12    Dollar.  52 is what we've used since the day I started,

11:31:48  13    and we've never wavered from that.

11:31:50  14         Q.   Okay.  But on their payroll checks, we've seen in

11:31:54  15    evidence and you've seen them, too, they're just paid

11:31:59  16    for 48 hours on those checks?

11:32:01  17         A.   I do not work in the payroll department.  I don't

11:32:05  18    handle manager or any associate checks.  So, I'm really

11:32:09  19    not privy to that information.

11:32:11  20         Q.   Mr. White had asked you to run some numbers.  Did

11:32:13  21    he ask you to run the number that Dr. Bradley ran, which

11:32:17  22    is Exhibit 240, where 99.9 percent of the checks showed

11:32:23  23    48 hours on them?

11:32:24  24              MR. WHITE:  Your Honor, I'm not going to

11:32:26  25    object to the question, but I don't want it to be deemed

11:32:28  1   a waiver of any work product.

11:32:31  2                 THE COURT:  Sustained.

11:32:32  3                 THE WITNESS:  No.  Mr. White has not asked

11:32:34  4   me to do anything of that sort -- of that nature.

11:32:36  5       Q.  So you can't dispute that 99.9 percent of the

11:32:40  6   paychecks show 48 hours is what they're being paid for?

11:32:43  7       A.  I can't dispute or confirm, because it's not an

11:32:46  8   area that's within my responsibility within the company.

11:32:48  9   I can't confirm or deny anything that I have no

11:32:50  10  knowledge about.

11:32:51  11      Q.  Second thing I wanted to ask you about how you

11:32:55  12  get these schedules, those 5,700 schedules that are sent

11:33:00  13  out to the individual stores.

11:33:03  14          You said that it is designed to support the

11:33:06  15  door-to-shelf program; correct?

11:33:07  16      A.  What I said today is that it's designed to

11:33:12  17  support the needs of the store, which would include the

11:33:15  18  door-to-shelf program.

11:33:16  19      Q.  Okay.  Now, down to the point -- and that's -- by

11:33:22  20  the way, door-to-shelf program, that's the truck day

11:33:26  21  process; correct?

11:33:26  22      A.  The door-to-shelf program is basically a way that

11:33:29  23  we looked at all phases of freight handling at the store

11:33:34  24  level, from when the truck actually arrives at the back

11:33:37  25  door to the store, to the unloading of the truck on the

11:33:39    1    carts; and then the product going from the carts to the

11:33:41    2    sales floor, and from the sales floor on to the shelves

11:33:45    3    for the customer.  And it's the most efficient means

11:33:48    4    that we've found to do that.

11:33:50    5        Q.  And we heard Mr. Broome or Mr. Barkus, one, I

11:33:54    6    can't remember who, say that the truck day is expected

11:33:59    7    to be done in 28 hours; correct?

11:34:04    8        A.  The door-to-shelf process is expected to be

11:34:06    9    completed 24 to 28 hours is the benchmark.

11:34:10   10        Q.  24 to 28?

11:34:11   11        A.  That is correct.

11:34:11   12        Q.  In fact, if you schedule -- in doing these

11:34:14   13    schedules for the store, you schedule for the truck day

11:34:18   14    and the morning after the truck day?

11:34:20   15        A.  That is correct.

11:34:21   16        Q.  And the reason that you're doing that is to make

11:34:23   17    sure there's adequate coverage to get that truck

11:34:26   18    unloaded on truck day and the morning after truck day?

11:34:29   19        A.  Yes.

11:34:29   20        Q.  And that's the -- the truck day and the morning

11:34:32   21    after truck day, that's where you get your 24 to 28

11:34:35   22    hours?

11:34:36   23        A.  No.  Actually, the 24 to 28 hours is a frame of

11:34:39   24    time; i.e., if a store receives their truck at 5:00

11:34:43   25    p.m., then they have from 24 hours from 5:00 p.m. to

11:34:47  1   complete their truck.  If they receive their truck at
11:34:49  2   6:00 in the morning, that would mean they had 24, 28
11:34:52  3   hours to 6:00 in the next morning to complete the truck.
11:34:55  4   And they probably ought to have it completed by about
11:34:58  5   10:00 a.m.
11:34:58  6      Q.  Yeah.  You did a good job of making straightening
11:35:02  7   my question out.
11:35:03  8         What my question was:  These are not labor hours
11:35:06  9   we're talking about, these are hours of the day, like
11:35:09 10   6:00 o'clock to 10:00 o'clock, that type of hour?
11:35:11 11      A.  No, sir.  Some stores have anywhere from 12 labor
11:35:16 12   hours to handle their truck, all the way up to a
11:35:19 13   hundred.
11:35:19 14      Q.  Yeah, okay.  So the 24 to 28 hours are
11:35:22 15   chronological hours?
11:35:25 16      A.  Absolutely.
11:35:26 17      Q.  Okay.  Now, I want to clear up one other thing.
11:35:32 18   When you say there's 2.0 coverage is your minimum, does
11:35:40 19   that mean you have two full-time equivalents?
11:35:43 20      A.  No.  The two full-time equivalents is different
11:35:49 21   than coverage -- what that entails is the average number
11:35:53 22   of employees that are in the building for every hour the
11:35:56 23   store's open.
11:35:57 24      Q.  Okay.  I want to make sure I understand that.
11:36:06 25   Full-time -- when you say a store's got minimum 2.0

11:36:11   1    coverage, that includes the store manager?

11:36:13   2        A.   That is correct.

11:36:14   3        Q.   We're not talking about two full-time equivalents

11:36:17   4    of non manager, non-store manager?

11:36:20   5        A.   We're not talking about two employees on the

11:36:22   6    payroll.  We're talking about two employees in the

11:36:24   7    building on average every hour the store's open.

11:36:27   8        Q.   Okay.  Now, I want to get clear on this full-time

11:36:33   9    equivalent, because that's one of the tests here that

11:36:35  10    we've been interested in.

11:36:38  11        To get two full-time equivalents, walk me through

11:36:49  12    how you would do that calculation.

11:36:51  13        A.   Okay.

11:37:03  14        Q.   Okay.  I'm ready.

11:37:04  15             MR. WHITE:  Your Honor, I'm going to object.

11:37:06  16             THE COURT:  The objection is sustained.

11:37:12  17        Q.   In your schedules that Mr. White went over with

11:37:16  18    you, let's look at one.  Tell us how to read these

11:37:37  19    schedules.

11:37:38  20        A.   Okay.

11:37:38  21        Q.   I don't know if we're close enough for the jury

11:37:40  22    to see it.

11:37:57  23        Tell us, while I hold it until we get another one

11:38:01  24    -- how do you read these schedules?

11:38:02  25        A.   Okay.  Well, there's a couple of very important

11:38:05   1   pieces of information on these schedules.  The first one

11:38:08   2   would be that there's 150 labor hours on the staff

11:38:13   3   schedule.

11:38:13   4       Q.  That's right here (indicating)?

11:38:14   5       A.  Yes, it is.

11:38:15   6       Q.  Let's see if that will come off.  There's also a

11:38:18   7   space there for the week ending so that the store

11:38:21   8   manager can say that this is the schedule for this week,

11:38:23   9   as opposed to the schedule for next week?

11:38:26   10          Okay.  There we are.

11:38:27   11      A.  Gives the employees a frame of reference.

11:38:29   12      Q.  Okay.  All right.  So we have week ending.  All

11:38:33   13  right.

11:38:33   14      A.  Then there's the listing of the associates in the

11:38:36   15  store.  You've got a manager in this example.  You've

11:38:38   16  got an assistant manager that's working 30 hours.

11:38:41   17  That's assistant manager A.  You've got part-time

11:38:45   18  associate A is working 21 hours.  Part-time associate B

11:38:49   19  who is working 20.5.  And you've got a third part-time

11:38:53   20  associate C, who is working 18.5.

11:38:57   21      Q.  Which day are you on?  Are you on Sunday?  Was

11:38:59   22  that Sunday you were talking about?

11:39:01   23      A.  Are you -- is that a 40A or 40B?

11:39:04   24      Q.  I'm sorry?

11:39:05   25      A.  I'll switch to a 40B.  That will show the

11:39:08   1    assistant manager at 38 hours.  A part-time associate A

11:39:11   2    at 23.  Part-time associate B at 20.5 --

11:39:15   3        Q.  I'm sorry.  You've got me lost now.  Let me catch

11:39:20   4    up with you.

11:39:20   5        A.  If you look on the far right.

11:39:22   6            MR. R. WIGGINS:  Can he step down, Your

11:39:22   7    Honor?

11:39:22   8            THE COURT:  Yes.

11:39:25   9            THE WITNESS:  I will try to project my

11:39:27  10    voice, now that I don't have the benefit of a microphone

11:39:29  11    now.

11:39:29  12        Q.  Yeah.

11:39:30  13        A.  But you've got a couple of different items here.

11:39:33  14    First off, the manager who is working 52 hours a week.

11:39:36  15    And if you add up their hours for each day, it's going

11:39:39  16    to total 52.

11:39:41  17        Q.  Right.

11:39:41  18        A.  You've got an assistant manager A, who's

11:39:44  19    scheduled to work 38 hours per week.  You've got

11:39:47  20    part-time associate A at 23.  You've got part-time

11:39:52  21    associate B at 20.5.  And lastly, you've got part-time

11:39:57  22    associate C at 16.5.

11:39:59  23            If you add up the hours for all of these

11:40:02  24    associates, you'll come up to the 150 hours.

11:40:04  25        Q.  Okay.  Okay.  And then reading down, as I

11:40:09    1    understand it, the manager is working 8.5 hours, that's

11:40:13    2    this number, there is 9:30 to 6:30, minus 30 minutes for

11:40:18    3    lunch.

11:40:18    4        A.  Correct.

11:40:19    5        Q.  Then we know the assistant manager -- he's off

11:40:21    6    that day, assistant manager A is off.  Assistant manager

11:40:26    7    B is not scheduled.  Associate A is off.  Associate B is

11:40:29    8    off.  And Mr. C or Ms. C is there 6.5 hours?

11:40:35    9        A.  That is correct.

11:40:35   10        Q.  And so we know, then, as I read this, that the

11:40:39   11    manager came in at 9:30 and was by himself until 11:30?

11:40:43   12        A.  That is correct.

11:40:44   13        Q.  11:30.  Ms. C. came in and stayed until 6:30, at

11:40:50   14    which time the manager and C closed the store?

11:40:54   15        A.  That's correct.

11:40:55   16        Q.  So we know, then, that the manager was

11:41:01   17    supervising someone 6.5 hours that day; is that right?

11:41:05   18                MR. WHITE:  Your Honor, I've got an erasable

11:41:08   19    pen, rather than mark on the exhibit.

11:41:12   20                MR. R. WIGGINS:  I'm sorry.  I apologize.

11:41:14   21                THE WITNESS:  I made the same mistake, too.

11:41:17   22    BY MR. R. WIGGINS:

11:41:17   23        Q.  Yeah.  All right.  Let's use Mr. White's.  He's

11:41:31   24    better prepared.

11:41:33   25        A.  What's your question?

11:41:34   1      Q.   I think we established -- let's make sure -- that

11:41:38   2   6.5 hours is how much time the manager had supervised

11:41:43   3   someone that day.

11:41:44   4      A.   That is correct.

11:41:44   5      Q.   Okay.  Why don't you just total it up for us

11:41:47   6   across there.

11:41:48   7      A.   You'll have to bear with me a few moments.

11:41:51   8      Q.   Tuesday -- I mean, Monday, how many hours is the

11:41:55   9   manager supervising someone?  nine?  Okay.

11:42:02  10           Wednesday, how many hours is the manager

11:42:03  11   supervising a subordinate?  nine?  All right.

11:42:18  12      A.   Thursday being the manager's day off.

11:42:20  13      Q.   Okay.  11 on Friday?

11:42:33  14      A.   Correct.

11:42:34  15      Q.   And on Saturday, the last day of the week, how

11:42:41  16   many is he supervising?  9.5?  And so add that up for

11:42:48  17   us, 6.5, 9, 9.50 and 11 and 9.5 totals what?

11:42:56  18      A.   Roughly 50 hours per week.

11:43:00  19      Q.   50 hours per week he's supervising an employee;

11:43:04  20   correct?

11:43:04  21      A.   Make sure I did my math correctly.  50 hours per

11:43:14  22   week.

11:43:14  23      Q.   And that 50 hours is divided between six

11:43:19  24   different employees; correct?

11:43:21  25      A.   Actually, it'd be four different employees.

| | | |
|---|---|---|
| 11:43:23 | 1 | Q.  Four different employees, correct. |
| 11:43:25 | 2 | A.  Yes. |
| 11:43:25 | 3 | Q.  So we know that none of them are full-time, so |
| 11:43:28 | 4 | you have to use full-time equivalents? |
| 11:43:31 | 5 | A.  That's not true. |
| 11:43:32 | 6 | MR. WHITE:  Objection, Your Honor.  This |
| 11:43:34 | 7 | witness has not been found as having any knowledge or |
| 11:43:36 | 8 | authority on the full-time equivalents, or the law on |
| 11:43:40 | 9 | that. |
| 11:43:40 | 10 | MR. R. WIGGINS:  I'm not talking about the |
| 11:43:42 | 11 | law, Your Honor.  Family Dollar -- |
| 11:43:43 | 12 | MR. WHITE:  It's a term of art, Your Honor. |
| 11:43:45 | 13 | MR. R. WIGGINS:  I'm referring to Family |
| 11:43:46 | 14 | Dollar's use. |
| 11:43:47 | 15 | BY MR. R. WIGGINS: |
| 11:43:47 | 16 | Q.  But anyway, let's just get an answer to my |
| 11:43:51 | 17 | question.  Anyway, those 50 hours are divided among four |
| 11:43:56 | 18 | people, not two people; correct? |
| 11:43:58 | 19 | A.  That's correct. |
| 11:43:59 | 20 | Q.  Okay.  So if we -- if -- if full-time |
| 11:44:04 | 21 | equivalent -- |
| 11:44:05 | 22 | A.  No, actually, let me go back and -- for example, |
| 11:44:09 | 23 | here, the -- the manager is supervising for 9.5 hours on |
| 11:44:14 | 24 | Saturday. |
| 11:44:14 | 25 | Q.  Correct. |

11:44:15  1       A.   But at the time, he's supervising one employee

11:44:17  2   for 4.5 hours.   He's supervising another employee for

11:44:22  3   5.5 hours.   He's supervising another employee for half

11:44:26  4   of that time.

11:44:26  5       So when you add the 4.5, the 5.5 and half, it's

11:44:31  6   greater than 9.45.   He's supervising more hours, but

11:44:36  7   he's in a supervisory capacity for 9.5 hours of that

11:44:39  8   day.

11:44:40  9       Q.   Okay.

11:44:40  10      A.   So I didn't know what you were asking for

11:44:42  11  exactly.   If you're asking for the number of employee

11:44:44  12  hours he supervises, the math's a little bit different.

11:44:47  13      Q.   All right.   Well, give us that math.

11:44:50  14      A.   All right.   You'll have to bear with me again as

11:44:53  15  I break up -- that is 9.   Actually, I do not have --

11:45:13  16  this one's not going to erase, either.   Total of 15.5.

11:46:03  17  I apologize for my handwriting, it's pretty bad.

11:46:08  18      You have got 5.5.   You have got 4.5.   Here we've

11:46:15  19  got 5.5.   Here we've got 4.5.   And then here we've got

11:46:20  20  half hour.   So the 5.5 to 4.5 is 10.   10.5 hours there.

11:46:25  21      So, in total, our store manager is 10.5, 19.5,

11:46:33  22  24.5, 40 even, and then 50.5 hours of employee labor

11:46:43  23  that he is supervising.

11:46:44  24      Q.   Per week?

11:46:45  25      A.   Per week, on this schedule.

| | | |
|---|---|---|
| 11:46:47 | 1 | Q.  And that's not 80 hours, is it? |
| 11:46:50 | 2 | A.  No, it's not. |
| 11:46:51 | 3 | Q.  Okay.  Not 70, 60 hours, either? |
| 11:46:57 | 4 | A.  No. |
| 11:46:58 | 5 | Q.  So this -- on these stores that have 150 hours, |
| 11:47:03 | 6 | they don't supervise -- a store manager doesn't |
| 11:47:05 | 7 | supervise two full-time equivalents for 80 hours? |
| 11:47:12 | 8 | MR. WHITE:  Objection, Your Honor. |
| 11:47:13 | 9 | Q.  They supervise 50.5 hours, by the system? |
| 11:47:18 | 10 | MR. WHITE:  Your Honor, he's arguing, as |
| 11:47:19 | 11 | opposed to -- |
| 11:47:20 | 12 | Q.  Correct? |
| 11:47:21 | 13 | THE COURT:  He's what? |
| 11:47:24 | 14 | MR. WHITE:  I said -- I had objected and he |
| 11:47:26 | 15 | continues to talk through this. |
| 11:47:28 | 16 | THE COURT:  All right.  Give me a chance to |
| 11:47:34 | 17 | rule on it. |
| 11:47:35 | 18 | THE WITNESS:  Yes, sir. |
| 11:47:36 | 19 | MR. WHITE:  I renew my objection. |
| 11:47:38 | 20 | THE COURT:  The objection is overruled. |
| 11:47:41 | 21 | THE WITNESS:  In answer to your question, |
| 11:47:42 | 22 | even though the manager's not here on this day |
| 11:47:45 | 23 | Thursday -- |
| 11:47:45 | 24 | BY MR. R. WIGGINS: |
| 11:47:45 | 25 | Q.  Whoa, whoa, whoa. |

| | | |
|---|---|---|
| 11:47:46 | 1 | A.  He's still responsible for -- |
| 11:47:48 | 2 | THE COURT:  Just -- |
| 11:47:50 | 3 | MR. R. WIGGINS:  Your Honor, he's not a |
| 11:47:52 | 4 | store manager.  He's not a district manager.  He's not |
| 11:47:55 | 5 | out in the field. |
| 11:47:56 | 6 | MR. WHITE:  Objection to speaking |
| 11:47:58 | 7 | objections. |
| 11:47:59 | 8 | THE COURT:  Your objection is sustained. |
| 11:48:01 | 9 | MR. WHITE:  He asked a question and you |
| 11:48:04 | 10 | overruled.  The witness was answered, and I ask him to |
| 11:48:07 | 11 | be allowed to answer. |
| 11:48:07 | 12 | MR. R. WIGGINS:  It's a nonresponsive |
| 11:48:09 | 13 | answer. |
| 11:48:09 | 14 | THE COURT:  The witness will be allowed to |
| 11:48:11 | 15 | complete his answer. |
| 11:48:12 | 16 | THE WITNESS:  Even though the manager's not |
| 11:48:14 | 17 | in the store, the manager's responsibility is for the |
| 11:48:17 | 18 | entire store and the employees in that store. |
| 11:48:19 | 19 | So even though he's not here on Thursday, he |
| 11:48:22 | 20 | is responsible for the actions of his employees. |
| 11:48:24 | 21 | BY MR. R. WIGGINS: |
| 11:48:24 | 22 | Q.  Okay.  So you're saying that every hour the store |
| 11:48:28 | 23 | is open, he's on duty; correct? |
| 11:48:32 | 24 | A.  Not that he's on duty, but responsible for the |
| 11:48:36 | 25 | actions of the employees at the store. |

11:48:37  1       Q.  He is -- he is working, in your mind, every hour
11:48:41  2   the store's open?
11:48:42  3       A.  No.
11:48:43  4       Q.  You're not paying him for his off day, when he's
11:48:48  5   working, for those hours; you're paying him for 52
11:48:53  6   hours, you said; correct?
11:48:54  7       A.  He's scheduled for 52 hours.
11:48:56  8       Q.  You're paying, according to the paychecks, only
11:48:59  9   for 48 hours?
11:49:00  10      A.  I have no knowledge of that.
11:49:01  11      Q.  You're not paying him for his off days --
11:49:04  12              THE COURT:  Is there any reason why the
11:49:05  13   witness can't come back to the witness stand?
11:49:07  14              THE WITNESS:  What's that, Your Honor?
11:49:09  15              THE COURT:  Come back to the witness stand.
11:49:11  16              MR. WHITE:  I would object.  This is
11:49:12  17   argumentative.
11:49:13  18              THE COURT:  It is argumentative.
11:49:14  19   BY MR. R. WIGGINS:
11:49:14  20      Q.  Sir, let me ask you a different question.  Isn't
11:49:18  21   it true that for those stores in the 135 hour, 140, 145
11:49:26  22   hours, it's only going to get worse; that number 50.5 is
11:49:32  23   only going to go down for how many hours that store
11:49:34  24   manager is supervising people?
11:49:36  25      A.  I'd have to do the actual calculations on a staff

11:49:41   1   schedule to be certain.  However, on a 135-hour staff

11:49:45   2   schedule, with the manager working 52 hours, that means

11:49:48   3   that there's 83 hours of hourly labor at the store

11:49:52   4   level.

11:49:52   5        Q.  But not while he's in the store?

11:49:54   6        A.  Once again, I'd have to look at the individual

11:49:57   7   staff schedules to be able to tell it for certain.

11:49:59   8        Q.  What you just said about 52 minus -- strike that.

11:50:04   9   135 minus 52, is also true for this 150-hour schedule;

11:50:10  10   isn't it?

11:50:10  11        A.  That would be the 150-hour schedule; the manager

11:50:14  12   worked 52 hours and there's 98 hours of hourly labor on

11:50:18  13   the store.

11:50:18  14        Q.  We know there's 98 hours left for the non-store

11:50:24  15   manager after the 52 is backed off.  But we also know

11:50:27  16   that on a -- 50.5 of those hours are hours that he is

11:50:31  17   supervising someone rather than the assistant manager;

11:50:38  18   correct?

11:50:38  19        A.  What we know is that on that schedule, when the

11:50:41  20   manager is in the building, less -- there are 50.5 hours

11:50:45  21   of hourly labor that are going on while he's in the

11:50:48  22   building.

11:50:48  23        Q.  And what we know from this schedule, if you just

11:50:51  24   add the assistant manager's hours up the same way, is

11:50:54  25   that those other 48 hours, 47.5 hours, the assistant

11:51:02  1    manager is doing the supervision without the store

11:51:06  2    manager; correct?

11:51:06  3        A.  I'm trying to do the math in my head.  I'd have

11:51:20  4    to go back and calculate specifically for the assistant

11:51:23  5    manager to be sure.

11:51:25  6        Q.  Well, we know for a certain fact you told us --

11:51:29  7        A.  Actually, that would not be correct, because that

11:51:31  8    47.5 hours would include the 38 hours that the assistant

11:51:34  9    manager himself is working, and he doesn't necessarily

11:51:38 10    supervise himself.

11:51:48 11        Q.  That's true.  So let's take off the assistant

11:51:48 12    manager.  Let's take off 5, 6.5; that's 11.5.  Let's

11:51:48 13    take off 12; that's 23.5.  Take off 29.5 and take off

11:51:53 14    8.5.

11:51:53 15        A.  So we subtract out 38 hours --

11:51:56 16        Q.  Yes.

11:51:56 17        A.  -- that would mean there's 47.5 minus 38 is 9.5

11:52:02 18    hours.

11:52:02 19        Q.  Okay.  And that's just for assistant manager A?

11:52:09 20        A.  That's for assistant manager A.

11:52:11 21        Q.  Okay.  But we can take these schedules of yours

11:52:17 22    and we can take the 135-hour type, all the way up, and

11:52:24 23    we can see for ourselves on these schedules when a store

11:52:30 24    manager is in the store on-site supervising someone,

11:52:34 25    can't we?

11:52:35  1      A.   We can do the math.

11:52:39  2      Q.   Yes.   And we would do it the way you just showed

11:52:42  3  us how to do it in the last series of questions;

11:52:45  4  correct?

11:52:45  5      A.   I'd have to give it more consideration to make

11:52:48  6  sure it's a full, complete answer, but --

11:52:50  7      Q.   And you cannot tell us that even for one of these

11:52:54  8  5,700 schedules it shows the store manager supervising

11:53:04  9  two or more full-time equivalents per week --

11:53:08  10              MR. WHITE:   Objection.

11:53:09  11     Q.   -- while he's in the store --

11:53:11  12              MR. WHITE:   Objection.

11:53:12  13     Q.   - can you?

11:53:12  14              MR. WHITE:   Not been tendered or offered for

11:53:15  15  any purpose --

11:53:16  16              THE COURT:   Objection sustained.

11:53:18  17              MR. WHITE:   We would ask for the question

11:53:21  18  and answer be disregarded.

11:53:21  19              THE COURT:   The jury will disregard that

11:53:25  20  answer.

11:53:28  21  BY MR. R. WIGGINS:

11:53:30  22     Q.   Now, I want to show you your prior testimony,

11:53:39  23  sir.

11:53:54  24              MR. WHITE:   What page?

11:53:56  25              MR. R. WIGGINS:   Page 183.

| | | |
|---|---|---|
| 11:53:59 | 1 | MR. WHITE:  Is that deposition or testimony? |
| 11:54:02 | 2 | MR. R. WIGGINS:  That's his testimony. |
| 11:54:11 | 3 | MR. WHITE:  May I ask Mr. -- the Court for |
| 11:54:13 | 4 | Mr. Wiggins to give me that earlier cite that he |
| 11:54:16 | 5 | referenced?  I think you said Page 149. |
| 11:54:22 | 6 | MR. R. WIGGINS:  I don't remember that. |
| 11:54:23 | 7 | THE WITNESS:  I believe he said 149. |
| 11:54:26 | 8 | BY MR. R. WIGGINS: |
| 11:54:26 | 9 | Q.  Okay.  Page 183, sir.  I had asked you the |
| 11:54:32 | 10 | question about the 2.0 part-time employees.  That's your |
| 11:54:41 | 11 | coverage ratio, your average coverage; remember what we |
| 11:54:48 | 12 | were talking about earlier? |
| 11:54:49 | 13 | A.  2.0 is the minimum allowable coverage.  The |
| 11:54:53 | 14 | coverage for first quarter 2006 was actually 2.43. |
| 11:54:57 | 15 | Q.  Okay. |
| 11:54:59 | 16 | MR. WHITE:  May we have a line reference, |
| 11:55:00 | 17 | Your Honor? |
| 11:55:01 | 18 | THE COURT:  Yes, sir. |
| 11:55:02 | 19 | MR. R. WIGGINS:  Page 183, line 2. |
| 11:55:05 | 20 | Q.  I am going to read the question, you read the |
| 11:55:07 | 21 | answer. |
| 11:55:10 | 22 | "But 2.0 is part-time employees, which would be |
| 11:55:15 | 23 | one full-time equivalent; and then store manager, that |
| 11:55:18 | 24 | would be one person, and then that would be two?" |
| 11:55:21 | 25 | MR. WHITE:  Objection, Your Honor. |

| | | |
|---|---|---|
| 11:55:22 | 1 | THE COURT:  The objection is sustained. |
| 11:55:26 | 2 | Q.  Look at what you told us on that page.  I want to |
| 11:55:32 | 3 | ask you a question. |
| 11:55:33 | 4 | MR. WHITE:  May I ask before counsel gets to |
| 11:55:36 | 5 | go into this, Your Honor, for him to make an |
| 11:55:41 | 6 | out-of-presence-of-the-jury proffer to where we're |
| 11:55:43 | 7 | going -- |
| 11:55:43 | 8 | THE COURT:  Where are we going, Mr. Wiggins? |
| 11:55:47 | 9 | MR. R. WIGGINS:  His explanation for the 2.0 |
| 11:55:50 | 10 | coverage that he covered with Mr. White, I don't think |
| 11:55:52 | 11 | is complete.  There's another aspect to that. |
| 11:55:56 | 12 | THE COURT:  I don't think this line of |
| 11:55:58 | 13 | questioning is helpful to the jury. |
| 11:56:00 | 14 | MR. WHITE:  Okay. |
| 11:56:01 | 15 | MR. R. WIGGINS:  I couldn't hear you, Your |
| 11:56:02 | 16 | Honor. |
| 11:56:02 | 17 | THE COURT:  I don't think this line of |
| 11:56:04 | 18 | questioning is helpful to the jury. |
| 11:56:06 | 19 | MR. R. WIGGINS:  All right. |
| 11:56:09 | 20 | Q.  You testified -- |
| 11:56:27 | 21 | MR. R. WIGGINS:  We have no further |
| 11:56:28 | 22 | questions, Your Honor. |
| 11:56:29 | 23 | THE COURT:  Any redirect? |
| 11:56:31 | 24 | **REDIRECT EXAMINATION** |
| 11:56:31 | 25 | **BY MR. WHITE:** |

11:56:42   1    Q.   On the 2327 on the scheduler up at the top

11:56:51   2    right-hand corner is some typing.  Does that appear on

11:56:54   3    the staff schedulers you sent out?

11:56:56   4    A.   Yes, it does.

11:56:57   5    Q.   And what does that say?

11:56:59   6    A.   It says, "it is the store manager's

11:57:02   7    responsibility to properly schedule and manage their

11:57:06   8    employees to meet the workload and budget on a weekly

11:57:11   9    basis."

11:57:11  10    Q.   Was there a period of time where a document

11:57:13  11    called Frequently Asked Questions went out from Family

11:57:16  12    Dollar?

11:57:16  13    A.   Yes, there was.

11:57:17  14    Q.   When was that?

11:57:18  15    A.   It was approximately fiscal year -- early fiscal

11:57:23  16    year 2004, I would believe.  I don't have an exact date.

11:57:27  17    Q.   Does that document continue to be sent out and

11:57:29  18    published?

11:57:30  19    A.   No, it hasn't been published for at least two

11:57:32  20    years.

11:57:32  21         MR. R. WIGGINS:  Your Honor, I'm going to

11:57:34  22    object unless a predicate has been laid.  It's not his

11:57:39  23    document.

11:57:39  24         THE COURT:  Sustained.

11:57:40  25    Q.   Did the document come out from which -- the

| | | |
|---|---|---|
| 11:57:42 | 1 | department you're in? |
| 11:57:43 | 2 | MR. R. WIGGINS:  Objection. |
| 11:57:45 | 3 | THE WITNESS:  I distribute them out -- |
| 11:57:47 | 4 | THE COURT:  You said you distribute the |
| 11:57:48 | 5 | documents.  Does your department compose them? |
| 11:57:51 | 6 | THE WITNESS:  Someone in my department |
| 11:57:53 | 7 | composed the document.  However, I was responsible for |
| 11:57:56 | 8 | distributing it, although I did not author it. |
| 11:57:58 | 9 | THE COURT:  And you had nothing to do with |
| 11:58:00 | 10 | the authorship of the document. |
| 11:58:03 | 11 | THE WITNESS:  I did not -- I did not write |
| 11:58:06 | 12 | the document. |
| 11:58:06 | 13 | THE COURT:  The objection is sustained. |
| 11:58:08 | 14 | MR. WHITE:  Okay. |
| 11:58:09 | 15 | BY MR. WHITE: |
| 11:58:09 | 16 | Q.  If you know, do you know when the last time the |
| 11:58:13 | 17 | document was distributed? |
| 11:58:19 | 18 | A.  I do know.  It was over two years ago. |
| 11:58:19 | 19 | Q.  Okay. |
| 11:58:19 | 20 | MR. WHITE:  Thank you. |
| 11:58:21 | 21 | MR. R. WIGGINS:  No further questions. |
| 11:58:22 | 22 | THE COURT:  Thank you. |
| 11:58:23 | 23 | MR. WHITE:  Might he be excused to go back |
| 11:58:25 | 24 | to Charlotte? |
| 11:58:27 | 25 | THE COURT:  He may be excused.  The |

| | | |
|---|---|---|
| 11:58:29 | 1 | defendant will call the next witness. |
| 11:58:32 | 2 | MR. ST. CLAIR: Your Honor, there was the |
| 11:58:33 | 3 | issue of Ms. Taylor being held pending this witness' |
| 11:58:37 | 4 | testimony, and I'm just wondering if she can now be |
| 11:58:40 | 5 | released. |
| 11:58:41 | 6 | THE COURT: Not yet. The defendant will |
| 11:58:42 | 7 | call its next witness. |
| 11:58:44 | 8 | MR. KENT: Your Honor, we call Lee Spiesman. |
| 11:59:24 | 9 | **LEONA SPIESMAN, DEFENDANT'S WITNESS, SWORN,** |
| 11:59:25 | 10 | THE CLERK: State your name for the record, |
| 11:59:27 | 11 | please. |
| 11:59:28 | 12 | THE WITNESS: Leona Spiesman. |
| 11:59:36 | 13 | THE CLERK: Spell your last name for the |
| 11:59:36 | 14 | record. |
| 11:59:37 | 15 | THE WITNESS: S-P-I-E-S-M-A-N. |
| 11:59:42 | 16 | **DIRECT EXAMINATION** |
| 11:59:42 | 17 | **BY MR. KENT:** |
| 11:59:43 | 18 | Q. Ms. Spiesman, good morning. |
| 11:59:47 | 19 | A. Good morning. |
| 11:59:47 | 20 | Q. Can you tell the jury who you're employed by? |
| 11:59:49 | 21 | A. Family Dollar. |
| 11:59:50 | 22 | Q. And what is your position? |
| 11:59:51 | 23 | A. I'm the Director of Corporate Back Office |
| 11:59:54 | 24 | Applications. |
| 11:59:55 | 25 | Q. How long have you held that position? |

11:59:56   1      A.   Since September of 2004.

11:59:59   2      Q.   Can you tell the jury what your department does?

12:00:02   3      A.   I work in the Information Technology department,

12:00:05   4   and it's our -- I work for the operations group, and

12:00:08   5   it's our responsibility to make sure that the

12:00:11   6   applications function correctly and the data is stored

12:00:14   7   properly.

12:00:15   8      Q.   When you say that the applications -- refer to

12:00:19   9   applications and data, can you tell the jury what you're

12:00:22   10   referring to?

12:00:22   11      A.   Yeah.  We use Oracle application for our

12:00:29   12   financial and payroll processing.

12:00:30   13      Q.   Oracle is what?

12:00:32   14      A.   Just a specific application.

12:00:33   15      Q.   Software?

12:00:34   16      A.   Yes.  I'm sorry.

12:00:36   17      Q.   And this software is used to store what type of

12:00:41   18   information?

12:00:42   19      A.   We store our employee records and our payroll

12:00:46   20   transactions, as well as our general ledger

12:00:49   21   transactions.

12:00:49   22      Q.   Does it -- when you say "payroll", are you

12:00:52   23   referring to store level employees?

12:00:53   24      A.   Yes, all associates, all stores, as well as

12:00:57   25   corporate.

12:00:57    1    Q.   Okay.   And what do you do in your job?

12:00:59    2    A.   My job is to oversee a team of about 14 people.

12:01:06    3    And I oversee the operations and support of the

12:01:12    4    financial and HR systems or applications software, as

12:01:18    5    well as the Intel applications.

12:01:20    6    Q.   Now, at my direction, did you collect the payroll

12:01:27    7    information for the plaintiffs in this case, the hourly

12:01:31    8    employees at the store?

12:01:32    9    A.   Yes, I did.

12:01:33   10    Q.   Let me show you what's been marked as Defendant's

12:01:42   11    Exhibit 1930, starting at Page 5414.   Can you identify

12:01:51   12    what that is?

12:01:52   13    A.   This payroll report is for one of the opt-ins

12:02:00   14    showing his information, the store that he worked at,

12:02:05   15    the pay ending date, his personal information, his gross

12:02:10   16    wages and salary for that pay ending date, as well as

12:02:13   17    the hours reported.

12:02:15   18         This particular associate or store manager is

12:02:19   19    working for biweekly payroll, and that's where we see

12:02:23   20    both weeks of labor recordings.   And then beneath that,

12:02:29   21    we list all of the associates --

12:02:30   22    Q.   Let me stop you right there.

12:02:31   23    A.   Sure.

12:02:32   24    Q.   Did you complete one of those reports for all of

12:02:34   25    the plaintiffs in the case?

128

12:02:35  1    A.  Yes, we did.

12:02:37  2         MR. KENT:  Your Honor, we have all of the

12:02:39  3    printout reports, and we've already given them to the

12:02:43  4    other side.  There are about 13 boxes.  We'd offer them

12:02:46  5    into evidence.  We'll have one complete set for the jury

12:02:48  6    to take back with it.

12:02:50  7         THE COURT:  All right.

12:02:51  8         MR. JOHNSON:  No objection, Your Honor.

12:02:53  9         THE COURT:  It's received in evidence.

12:02:55  10   BY MR. KENT:

12:02:55  11   Q.  Can you pull up this first page?  If, Ms.

12:03:00  12   Spiesman, if we can briefly go through it just so if the

12:03:02  13   jury wants to take a look at one of these, they can

12:03:06  14   understand where you've put everything.

12:03:09  15        Koni, just highlight the top section first.

12:03:13  16        Okay.  Walk us through this section.  And, first,

12:03:16  17   what employee is this for?

12:03:18  18   A.  There is for R. C. Fowlkes, Jr.

12:03:22  19   Q.  Okay.  And what does this right here (indicating)

12:03:26  20   tell us?

12:03:27  21   A.  That would be the store that he was manager of

12:03:29  22   for that pay ending date that he commenced with.

12:03:32  23   Q.  All right.  And is the pay ending date of 7-14,

12:03:37  24   does that mean that the Saturday that he stopped working

12:03:39  25   that week?

12:03:40   1      A.   Yes.

12:03:41   2      Q.   Okay.   Then --

12:03:43   3      A.   Or two weeks.

12:03:43   4      Q.   Okay.   And this part's self-explanatory.   Explain

12:03:48   5   to us what the gross pay represents.

12:03:50   6      A.   His gross pay would be any wages of any type that

12:03:53   7   he would have received that pay period.

12:03:55   8      Q.   What pay period would that represent?

12:03:57   9      A.   This is pay ending 7-14-99.

12:04:02   10      Q.   How long of a period?

12:04:03   11      A.   In this particular case, it's for a two-week

12:04:08   12   period, because over to the right we see two entries for

12:04:11   13   weekly hours reported.

12:04:13   14      Q.   Okay.   Let's talk about that.   You're referring

12:04:16   15   right here (indicating)?

12:04:17   16      A.   Yes.

12:04:17   17      Q.   Okay.   Explain to the jury, if you would, what

12:04:20   18   these three items are.

12:04:21   19      A.   The top number, the 134.50 will be a combination

12:04:26   20   of the two below.   We have a biweekly pay period which

12:04:32   21   would be for two weeks.   And so the total hours reported

12:04:35   22   is a summary of those two weeks, and then beneath that

12:04:41   23   would be the individual weeks reported.

12:04:44   24      Q.   Okay.   And so to figure out the weekly pay, you

12:04:47   25   would take this and divide it by two?

12:04:48  1      A.   You would take the salary and divide it by two.

12:04:51  2      Q.   Okay.  And the bonus, representing the bonus the

12:04:54  3  store manager receives?

12:04:55  4      A.   Yes.

12:04:56  5      Q.   Koni, can we go to the bottom part?  And I think

12:05:01  6  that will be good.

12:05:02  7           Explain to us what this information is right here

12:05:06  8  (indicating).

12:05:06  9      A.   We were asked to print or combine into one report

12:05:14  10  a listing of all of the associates that were paid for

12:05:17  11  working in that store, the same stores listed above for

12:05:23  12  that same pay ending date.

12:05:25  13          We listed the associate's personal information

12:05:28  14  and we -- when we report our labor again because of a

12:05:34  15  two-week pay period, we report it in terms for hourly in

12:05:37  16  terms of weeks one and two.  So our first column

12:05:41  17  represents the hours worked during -- we can -- one or

12:05:44  18  the first week of the pay period.

12:05:47  19          The next column would be the overtime hours

12:05:49  20  worked by those store associates during that same first

12:05:53  21  week, where the next two columns would be the regular

12:05:57  22  hours; and overtime for the second week of the pay

12:05:59  23  period.  And then the gross would be their total gross

12:06:02  24  wages for that two-week period.

12:06:05  25      Q.   Okay.  And then down here?

12:06:06    1        A.   And those are just the totals or the sum of all

12:06:09    2    the entries.

12:06:10    3        Q.   And so if the jury wanted to pull up the report

12:06:12    4    for anybody, any plaintiffs who testified in this case,

12:06:16    5    or otherwise, and find out how much overtime the

12:06:20    6    employees of the store were working, where would they

12:06:22    7    look?

12:06:22    8        A.   They would look in both overtime -- that the

12:06:25    9    hourly associates worked?

12:06:26   10        Q.   Yes, ma'am.

12:06:27   11        A.   In the overtime hours week one column, and also

12:06:30   12    the overtime hours week two column.

12:06:33   13        Q.   Okay.  Thank you.  Now, based upon this

12:06:40   14    information, were you able to calculate the average

12:06:46   15    salary for the plaintiffs in this case?

12:06:50   16        A.   Yes.

12:06:51   17        Q.   And what is the average salary?

12:06:55   18             MR. JOHNSON:  Your Honor, we would like to

12:06:56   19    lodge an objection.  We believe these calculations to

12:06:59   20    any expert testimony and this witness was never

12:07:02   21    designated as an expert in this case.

12:07:06   22             MR. KENT:  It's taking an average.

12:07:08   23             THE COURT:  It's just a matter of adding up

12:07:10   24    things and dividing them?

12:07:11   25             THE WITNESS:  Just adding and dividing and

| | | |
|---|---|---|
| 12:07:13 | 1 | multiplying. |
| 12:07:14 | 2 | THE COURT:  The objection is overruled. |
| 12:07:16 | 3 | BY MR. KENT: |
| 12:07:18 | 4 | Q.  Okay. |
| 12:07:21 | 5 | A.  The average salary for -- monthly for 2005 is -- |
| 12:07:30 | 6 | was $3,073. |
| 12:07:33 | 7 | Q.  Can you convert that into a weekly amount? |
| 12:07:36 | 8 | A.  Yeah.  That weekly would be 709.60. |
| 12:07:40 | 9 | Q.  I will put store manager.  7-0 -- |
| 12:08:08 | 10 | A.  709.60. |
| 12:08:10 | 11 | Q.  What about for the assistant manager? |
| 12:08:11 | 12 | A.  His hourly associate, so his average for 2005 was |
| 12:08:17 | 13 | $8.49. |
| 12:08:20 | 14 | Q.  And how about for the clerks? |
| 12:08:21 | 15 | A.  For 2005 is $6.91. |
| 12:08:26 | 16 | Q.  Okay.  Now, in addition to the salary for the |
| 12:08:50 | 17 | plaintiffs in this case, were you able to look at the |
| 12:08:55 | 18 | average recorded hours for the store manager? |
| 12:08:58 | 19 | A.  Yes. |
| 12:08:59 | 20 | Q.  Let me show you what has been marked as |
| 12:09:05 | 21 | Defendant's Exhibit 1943A, and see if you can identify |
| 12:09:11 | 22 | that document. |
| 12:09:13 | 23 | A.  Yes. |
| 12:09:13 | 24 | Q.  Can you tell us what that is? |
| 12:09:15 | 25 | A.  Yeah.  We -- I received, in addition to the list |

12:09:22  1    of names of the associates, what we called an opt-in

12:09:28  2    date.  And we did -- in this particular case, we went

12:09:32  3    back three years prior to that opt-in date and averaged

12:09:37  4    out all occurrences of their labor recordings, and

12:09:40  5    listed them individually by name.

12:09:43  6        Q.  Okay.  So this report shows them by name?

12:09:46  7        A.  Yes.

12:09:46  8        Q.  So if the jury wants to take a look at Janice

12:09:49  9    Morgan, they can look alphabetically?

12:09:52  10       A.  Yes.

12:09:53  11              MR. KENT:  We offer 1943A.

12:09:55  12              THE COURT:  1943A?

12:09:57  13              MR. KENT:  Yes, sir.

12:09:57  14              THE COURT:  It's received in evidence.

12:10:00  15              MR. KENT:  May we publish it to the jury,

12:10:02  16   Your Honor?

12:10:03  17              THE COURT:  Yes, it may be published to the

12:10:07  18   jury.

12:10:07  19   BY MR. KENT:

12:10:07  20       Q.  I put another report next to you, Mrs. Spiesman.

12:10:10  21   Can you tell us what that the report is?

12:10:12  22       A.  Yes.  For the same data that -- so the same time

12:10:19  23   frame, the same calculations, the same averages per

12:10:23  24   associate.  And all we did was sort it by -- in the

12:10:27  25   column for average labor recording for --

| | | |
|---|---|---|
| 12:10:32 | 1 | Q.  So it's -- |
| 12:10:34 | 2 | A.  Sorry. |
| 12:10:34 | 3 | Q.  -- the only information being the same just |
| 12:10:37 | 4 | ranked differently? |
| 12:10:37 | 5 | A.  Yes. |
| 12:10:38 | 6 | MR. KENT:  Your Honor, we'd offer |
| 12:10:39 | 7 | Defendant's Exhibit 1943B. |
| 12:10:41 | 8 | THE COURT:  It's received in evidence, and |
| 12:10:43 | 9 | it may be published to the jury. |
| 12:10:45 | 10 | MR. KENT:  Thank you, Your Honor. |
| 12:10:46 | 11 | Q.  In addition to looking at the average recorded |
| 12:10:52 | 12 | hours, were you able to calculate the amount of overtime |
| 12:11:01 | 13 | to claimed damages in this case for the plaintiffs in |
| 12:11:04 | 14 | the case, if you had to convert their salary to the |
| 12:11:09 | 15 | hourly basis? |
| 12:11:10 | 16 | A.  Yes. |
| 12:11:10 | 17 | MR. JOHNSON:  Your Honor, we would like to |
| 12:11:11 | 18 | reserve the objection again on the witness offering |
| 12:11:15 | 19 | expert testimony. |
| 12:11:15 | 20 | THE COURT:  All right.  The objection is |
| 12:11:17 | 21 | overruled. |
| 12:11:17 | 22 | Q.  Let me show you what's been marked as Defendant's |
| 12:11:21 | 23 | Exhibit 1959A.  Can you identify that document? |
| 12:11:26 | 24 | A.  Yes. |
| 12:11:26 | 25 | Q.  Can you tell us what that is? |

| | | |
|---|---|---|
| 12:11:29 | 1 | A.  Yes.  What we asked to do is we converted -- took |
| 12:11:37 | 2 | the store manager's salary and adjusted it, or added to |
| 12:11:43 | 3 | it, the store manager bonus that they would have |
| 12:11:47 | 4 | received, and spread that store manager bonus over the |
| 12:11:50 | 5 | time frame going backwards.  So that would have resulted |
| 12:11:56 | 6 | in total dollars paid, or an adjusted salary. |
| 12:12:00 | 7 | We took that adjusted salary amount and we |
| 12:12:03 | 8 | divided it by 52, to get an hourly rate.  We then took |
| 12:12:09 | 9 | the hours from 40 to 52 and multiplied that by .5, or |
| 12:12:19 | 10 | half a percent of the total hourly rate that we had |
| 12:12:25 | 11 | calculated.  And then all hours over 52, we would have |
| 12:12:29 | 12 | multiplied it that times one-and-a-half percent, one and |
| 12:12:33 | 13 | a half times the hourly rate. |
| 12:12:36 | 14 | MR. KENT:  Your Honor, we'd offer |
| 12:12:38 | 15 | Defendant's Exhibit 1959A. |
| 12:12:40 | 16 | THE COURT:  It's received in evidence. |
| 12:12:42 | 17 | MR. KENT:  May we publish it to the jury? |
| 12:12:44 | 18 | THE COURT:  You may publish it to the jury. |
| 12:12:47 | 19 | BY MR. KENT: |
| 12:12:47 | 20 | Q.  Can you explain the difference in the last two |
| 12:12:50 | 21 | columns? |
| 12:12:50 | 22 | A.  Yes.  The first column is a two-year summary, so |
| 12:12:53 | 23 | we would have started from their opt-in date and going |
| 12:12:56 | 24 | back two years previous to that and applied the same |
| 12:13:00 | 25 | calculation to every week that we had reported hours. |

12:13:05  1          The next column is a three-year period, so we

12:13:08  2   would have gone back an additional one-year period to

12:13:11  3   pick up any hours reported.

12:13:13  4      Q.   Okay.  And where would you find the total, if at

12:13:15  5   all?

12:13:15  6      A.   The total is on the back page, the last page.

12:13:20  7      Q.   In addition to looking at the store manager, were

12:13:25  8   you able to look at how many people -- how many hourly

12:13:30  9   employees worked at the store each week?

12:13:32 10      A.   Yes.

12:13:33 11      Q.   Let me show you what's been marked as Defendant's

12:13:52 12   Exhibit 1740A.  Can you identify this document?

12:13:57 13      A.   Yes.

12:14:01 14      Q.   In this document, we're listing all of these

12:14:09 15   store managers, the opt-ins.  And for each week that

12:14:14 16   they were a store manager, we incremented or listed or

12:14:22 17   added the number of weeks supervised.  So the number of

12:14:25 18   weeks supervised represented the number of weeks they

12:14:28 19   were store managers.

12:14:29 20          And in the next column where it indicates "number

12:14:31 21   of weeks met criteria" -- okay.  The next one is the

12:14:45 22   number of weeks where associates were paid -- two or

12:14:52 23   more associates were paid in that store for the same pay

12:14:55 24   ending date?  This is not looking at hours?

12:14:59 25      A.   No.  This is looking at the stores.

12:15:01    1        Q.   Distinguish between someone that worked 20 or 30

12:15:06    2    hours?

12:15:06    3        A.   No.

12:15:07    4        Q.   Just number of hours somebody worked at the

12:15:10    5    store?

12:15:10    6        A.   Yes.

12:15:10    7        Q.   And does this report have any type of totals or

12:15:16    8    summaries?

12:15:16    9        A.   No, it does not.   They're individual.

12:15:22   10        Q.   Okay.

12:15:23   11             MR. KENT:   Your Honor, we offer Defendant's

12:15:25   12    Exhibit 1740A.

12:15:26   13             MR. JOHNSON:   Same objection, Your Honor, as

12:15:28   14    to expert testimony.

12:15:30   15             THE COURT:   It's received in evidence over

12:15:32   16    objection of the plaintiff.

12:15:34   17             MR. KENT:   May we publish?

12:15:35   18             THE COURT:   Yes.

12:15:36   19    BY MR. KENT:

12:15:36   20        Q.   I believe you have Defendant's Exhibit 1740B in

12:15:39   21    front of you?

12:15:40   22        A.   Yes, I do.

12:15:40   23        Q.   And can you tell us the difference between

12:15:45   24    Defendant's Exhibit 1740A and Defendant's Exhibit 1740B?

12:15:49   25        A.   A was for a two-year period, looking back two

12:15:58  1   years that they were store managers; and 1740B is going

12:16:03  2   back three years.

12:16:04  3        Q.   Otherwise, they're the same?

12:16:06  4        A.   Yes.

12:16:07  5             MR. KENT:   Your Honor, we offer 1740B.

12:16:09  6             MR. JOHNSON:   Same objection.

12:16:10  7             THE COURT:   Same ruling.   It's received in

12:16:13  8   evidence.

12:16:14  9   BY MR. KENT:

12:16:14  10       Q.   Okay.   Ms. Spiesman, we talked about looking at

12:16:20  11  the number of employees at the store.   Using your

12:16:24  12  information, were you able to look at the hours --

12:16:26  13       A.   Yes.

12:16:27  14       Q.   -- that the hourly employees were at the store?

12:16:43  15            I'm going to put in front of you six

12:16:47  16  exhibits, the first one is Defendant's Exhibit 1742A.

12:16:53  17  Can you identify that exhibit, please?

12:16:55  18       A.   Yes.   In this calculation, we were going from --

12:17:04  19  excuse me -- again, two-year looking back, so we were

12:17:08  20  looking from the opt-in date back two years.   And we set

12:17:12  21  a criteria of on 60 hours, which meant that each time

12:17:20  22  for a payroll period or a week, the total hours reported

12:17:27  23  by the store associates equaled 60 hours or more, we

12:17:32  24  would have added that number -- or we would have added

12:17:35  25  one to the number of weeks that they met the criteria.

| | | |
|---|---|---|
| 12:17:39 | 1 | MR. KENT:  Your Honor, we offer Defendant's |
| 12:17:41 | 2 | Exhibit 1742A. |
| 12:17:42 | 3 | MR. JOHNSON:  Same objection as to expert |
| 12:17:44 | 4 | testimony. |
| 12:17:44 | 5 | THE COURT:  All right.  It's received in |
| 12:17:46 | 6 | evidence over objection. |
| 12:17:48 | 7 | MR. KENT:  May we publish to the jury, Your |
| 12:17:50 | 8 | Honor? |
| 12:17:50 | 9 | THE COURT:  It may be published to the jury. |
| 12:17:52 | 10 | BY MR. KENT: |
| 12:17:52 | 11 | Q.  Ms. Spiesman, if we could look at this document |
| 12:17:56 | 12 | for a second, the right-hand column has the category |
| 12:18:07 | 13 | "damages".  What does that represent? |
| 12:18:08 | 14 | A.  That is damages calculated using 52 hours for a |
| 12:18:15 | 15 | two-year period. |
| 12:18:16 | 16 | Q.  You're saying damages? |
| 12:18:18 | 17 | A.  Yes. |
| 12:18:18 | 18 | Q.  If we look at the last page, focus on the totals |
| 12:18:28 | 19 | that you have on the bottom, that 99.01 percent.  Can |
| 12:18:32 | 20 | you tell us what that is? |
| 12:18:33 | 21 | A.  We added the number of weeks supervised and the |
| 12:18:46 | 22 | number of weeks where the criteria was met, and that is |
| 12:18:46 | 23 | the percentage of number of times met. |
| 12:18:46 | 24 | Q.  For everyone? |
| 12:18:46 | 25 | A.  For everyone. |

12:18:47  1    Q.  In other words, if you looked at the plaintiffs

12:18:49  2  as a group, the percentage would be 99.1 percent

12:18:52  3  compliance?

12:18:53  4    A.  Yes.

12:18:53  5    Q.  And below that, you've got three totals.  Can you

12:18:57  6  tell us what those represent?

12:18:58  7    A.  What these are, is a -- a sum of the damages.

12:19:04  8  And the first one says "below 80 percent".  And so if

12:19:07  9  you were to find 80 percent on the report, we would

12:19:11  10  start beneath that row and add up the damage column --

12:19:15  11  or the dollar amounts in the damage column.

12:19:17  12    Q.  What is the dollar amount below 80 percent?

12:19:20  13    A.  54,744.19.

12:19:24  14    Q.  And I believe your next document is Defendant's

12:19:30  15  Exhibit 1742B.  Can you tell us what the difference is

12:19:34  16  between that and Defendant's Exhibit 1742A?

12:19:38  17    A.  On -- the reports are the same, with the

12:19:40  18  exception that in order to meet the criteria, the total

12:19:46  19  hours worked by the store associates would have to have

12:19:48  20  been 70 hours or more.

12:19:50  21    Q.  Otherwise, the same?

12:19:52  22    A.  Yes.

12:19:52  23    Q.  Okay.  And so, in other words, if we looked at

12:19:55  24  the last page, we'll see the same calculation totals?

12:19:58  25    A.  Yes.

```
12:20:00   1              MR. KENT:  Your Honor, we would offer
12:20:02   2    Defendant's Exhibit 1742 B.
12:20:04   3              MR. JOHNSON:  Same objection.
12:20:05   4              THE COURT:  It's received in evidence over
12:20:06   5    objection.
12:20:07   6              MR. KENT:  May we publish to the jury?
12:20:09   7              THE COURT:  It may be published to the jury.
12:20:12   8    Pretty soon, we'll have to get a wheelbarrow for these
12:20:16   9    jurors.
12:20:17  10              MR. KENT:  That's why we left the boxes
12:20:19  11    outside.
12:20:23  12              THE COURT:  How many more exhibits are you
12:20:24  13    going to offer -- how many more exhibits do you plan to
12:20:27  14    offer?
12:20:28  15              MR. KENT:  I have four more, Your Honor.
12:20:30  16              THE COURT:  All right.
12:20:32  17    BY MR. KENT:
12:20:32  18      Q.  Do you have 1742C?
12:20:34  19      A.  Yes.
12:20:34  20      Q.  Can you identify that document?
12:20:36  21      A.  Yes.  This is also the same time frame, the
12:20:39  22    two-year period; and the criteria on this report was a
12:20:43  23    total of 80 hours.
12:20:44  24      Q.  Okay.  So these -- these last three reports that
12:20:49  25    we've had, they've all been looking at a two-year
```

| | | |
|---|---|---|
| 12:20:53 | 1 | period; correct? |
| 12:20:53 | 2 | A.  Yes. |
| 12:20:53 | 3 | Q.  60 hours, 70 hours a week? |
| 12:20:56 | 4 | A.  Yes. |
| 12:20:57 | 5 | MR. KENT:  Your Honor, we'd offer 1742C. |
| 12:21:00 | 6 | THE COURT:  Received in evidence over |
| 12:21:01 | 7 | objection. |
| 12:21:02 | 8 | MR. JOHNSON:  Same objection. |
| 12:21:03 | 9 | BY MR. KENT: |
| 12:21:03 | 10 | Q.  Just to speed things up, the next three documents |
| 12:21:06 | 11 | that you have, Defendant's Exhibit 1742D, E, and F, is |
| 12:21:17 | 12 | that the same calculation of 60 hours, 70 hours and 80 |
| 12:21:20 | 13 | hours, but over a three-year period? |
| 12:21:22 | 14 | A.  Yes, it is. |
| 12:21:23 | 15 | MR. KENT:  Your Honor, we would offer 1742C, |
| 12:21:27 | 16 | 1742D, and 17 -- 1742D, E, and F. |
| 12:21:33 | 17 | THE COURT:  Over objection, they're received |
| 12:21:36 | 18 | in evidence. |
| 12:21:37 | 19 | MR. JOHNSON:  Same objection. |
| 12:21:38 | 20 | MR. KENT:  May we publish to the jury? |
| 12:21:39 | 21 | THE COURT:  It may be published to the jury. |
| 12:22:26 | 22 | MR. KENT:  Your Honor, that's all we have. |
| 12:22:28 | 23 | THE COURT:  All right.  Cross-examination? |
| 12:22:32 | 24 | MR. JOHNSON:  Thank you, Your Honor. |
| 12:22:34 | 25 | **CROSS-EXAMINATION** |

**BY MR. JOHNSON:**

12:22:34  1

12:22:35  2     Q.  Good afternoon, Mrs. Spiesman.

12:22:50  3     A.  Good afternoon.

12:22:51  4     Q.  I want to ask you questions about this criteria

12:22:59  5  that you had on your objections -- on your exhibits.

12:23:03  6  Please look at Exhibits 1742A, 1742B, please.

12:23:21  7     A.  Okay.

12:23:22  8     Q.  Now, you said that -- let's look at 1742A first.

12:23:28  9  The calculations that you performed in this exhibit was

12:23:32  10  based upon a 60-hour -- it's based upon 60 hours?

12:23:37  11     A.  Yes.  The criteria was 60 hours.

12:23:39  12     Q.  60 hours for whom?

12:23:41  13     A.  For all store associates that worked in that

12:23:45  14  store for that pay period -- or that week.

12:23:48  15     Q.  For that week.  Okay.  There are not any laws or

12:23:56  16  regulations or guides under the FLSA or Fair Labor

12:24:03  17  Standards Act that says that 30 hours is considered

12:24:05  18  full-time; correct?

12:24:08  19          MR. KENT:  Your Honor.  We object.  The

12:24:10  20  witness has not been called as an expert in FLSA.

12:24:13  21          THE COURT:  The objection is sustained.

12:24:15  22     Q.  Why, in this particular instance, did you use the

12:24:20  23  criteria of 60 hours?

12:24:23  24     A.  I was given the criteria of what two put in.  So

12:24:30  25  I just pulled the numbers.  I was given directions.

12:24:34   1      Q.   Right.   You just basically just plugged in some
12:24:37   2   numbers; correct?
12:24:38   3      A.   Well, I retrieved the data from the payroll
12:24:42   4   transactions.
12:24:42   5      Q.   But this 60 hours as a criteria was given to you;
12:24:47   6   correct?
12:24:47   7      A.   Yes.
12:24:48   8      Q.   And you don't know why it was given to you;
12:24:50   9   correct?
12:24:53  10            MR. KENT:   Your Honor, we object to -- that
12:24:57  11   could invade the attorney-client privilege.
12:24:58  12            THE COURT:   Overruled.
12:25:00  13            THE WITNESS:   I -- I would estimate that it
12:25:08  14   was given to set some type of --
12:25:12  15            THE COURT:   If you don't know, just say you
12:25:14  16   don't know.
12:25:16  17            THE WITNESS:   I don't know.
12:25:18  18   BY MR. JOHNSON:
12:25:18  19      Q.   Okay.   That's good enough.
12:25:27  20            Now, looking at 742A through F.   Now, you
12:25:37  21   performed those calculations by crediting the store
12:25:41  22   managers with all of the hours worked by the hourly
12:25:45  23   employees; correct?
12:25:48  24      A.   Correct; the work hours.
12:25:51  25      Q.   But you know that the store managers could not

| | | |
|---|---|---|
| 12:25:52 | 1 | have worked all of those hours credited to the hourly |
| 12:25:59 | 2 | associates? |
| 12:25:59 | 3 | MR. KENT:  Your Honor.  We object.  No |
| 12:26:01 | 4 | foundation laid.  The witness works at the store level. |
| 12:26:05 | 5 | THE COURT:  This is cross-examination.  If |
| 12:26:07 | 6 | she doesn't know, she'll say she doesn't know. |
| 12:26:12 | 7 | THE WITNESS:  I know the hours that were |
| 12:26:16 | 8 | recorded into the system, and that's what we used, so -- |
| 12:26:20 | 9 | BY MR. JOHNSON: |
| 12:26:20 | 10 | Q.  Right.  So you don't know, for example, if you |
| 12:26:26 | 11 | have the 80 hours for the hourly associates for a |
| 12:26:31 | 12 | particular workweek; you don't know whether the store |
| 12:26:35 | 13 | managers worked those entire 80 hours, do you? |
| 12:26:37 | 14 | A.  No, I do not know that. |
| 12:26:38 | 15 | Q.  You don't know whether the store managers were |
| 12:26:40 | 16 | there for all of those 80 associate hours, do you? |
| 12:26:44 | 17 | A.  I do not. |
| 12:26:46 | 18 | Q.  That's just an assumption that you made within |
| 12:26:50 | 19 | all of these Exhibits 1742A through F; correct? |
| 12:26:53 | 20 | A.  I just reported the hours there. |
| 12:26:58 | 21 | Q.  Okay.  Now, let's take a look at Exhibits |
| 12:27:15 | 22 | 1959A -- |
| 12:27:27 | 23 | A.  Okay. |
| 12:27:29 | 24 | Q.  Now, these are damage calculations that you made |
| 12:27:37 | 25 | for the plaintiffs in this case, based upon the 52-hour |

| | | |
|---|---|---|
| 12:27:44 | 1 | workweek; correct? |
| 12:27:45 | 2 | A.   Correct. |
| 12:27:46 | 3 | Q.   Now, why did you use 52 hours as to criteria? |
| 12:27:54 | 4 | A.   Again, I was given that number to use. |
| 12:27:57 | 5 | Q.   Okay.  Now, are you aware that our expert in this |
| 12:28:12 | 6 | case, Dr. Bradley, took a look at your most recent |
| 12:28:17 | 7 | payroll data sets from 1999 to 2005, and found that the |
| 12:28:23 | 8 | regular hours reported -- not the labor hours reported |
| 12:28:27 | 9 | -- but the regular hours reported for store managers, |
| 12:28:32 | 10 | 99.7 percent of the time were 48 hours? |
| 12:28:36 | 11 | MR. KENT:  Your Honor, I think this question |
| 12:28:38 | 12 | is simply testifying -- |
| 12:28:40 | 13 | THE COURT:  Well, if she knows, she can |
| 12:28:45 | 14 | answer. |
| 12:28:45 | 15 | THE WITNESS:  Can you give me those |
| 12:28:47 | 16 | classifications again? |
| 12:28:48 | 17 | BY MR. JOHNSON: |
| 12:28:48 | 18 | Q.   Sure.  In the most recent payroll data that we |
| 12:28:53 | 19 | were given by the defendant, by your company, to our |
| 12:28:57 | 20 | expert, there are columns that were listed, labor hours |
| 12:29:03 | 21 | actually reported, and regular hours reported? |
| 12:29:06 | 22 | A.   Uh-huh. |
| 12:29:07 | 23 | Q.   And the regular hours reported consistently was |
| 12:29:11 | 24 | 48 hours, 99.7 percent of the time.  So you are aware of |
| 12:29:16 | 25 | that? |

12:29:16  1    A.   Yes.

12:29:16  2    Q.   Okay.  And so you have no dispute with

12:29:20  3  Dr. Bradley's calculations that for 99.7 percent of the

12:29:26  4  time, 48 hours was recorded as the regular hours for

12:29:30  5  store managers -- or for the plaintiffs in this case?

12:29:34  6    A.   Yeah, but that would not be their labor recording

12:29:37  7  hours.

12:29:37  8    Q.   Right.  The labor recording hours could be over

12:29:45  9  48; correct?

12:29:46  10   A.   Correct.

12:29:47  11   Q.   Could be 50 hours, 65 hours?

12:29:50  12   A.   Correct.

12:29:50  13   Q.   We're just talking about what was consistently in

12:29:53  14  the regular hours reporting?

12:29:54  15   A.   Correct.

12:29:54  16   Q.   And doesn't the payroll data sets -- this most

12:30:00  17  recent set, also say that the pay was for those regular

12:30:03  18  hours reported?

12:30:04  19   A.   That -- the regular salary is for the week.

12:30:16  20   Q.   Uh-huh.

12:30:17  21   A.   And the 48 hours is a -- is scheduled hours.

12:30:26  22   Q.   Scheduled hours?

12:30:28  23   A.   In a payroll system -- if you have a weekly

12:30:31  24  payroll -- I'm sorry -- if you have a salary, you need

12:30:37  25  to have some way of distributing the salary, if for any

12:30:41    1    reason an associate does not work or is hired in the

12:30:46    2    middle of that week or is terminated in the middle of

12:30:50    3    the week.  And so the Oracle payroll system uses a

12:30:58    4    schedule.  And the schedule applied for store managers

12:31:00    5    is 48 hours.

12:31:01    6        Q.  Okay.

12:31:15    7             MR. JOHNSON:  One minute, Your Honor.

12:31:25    8        Q.  There's an exhibit, Defendant's Exhibit 2324.

12:31:33    9    Let me see if it's up here.  This is it.  Take a look at

12:31:42   10    that, please.

12:31:58   11        Have you seen this exhibit before?

12:32:00   12        A.  No, I have not.

12:32:01   13        Q.  This is the first time you've seen it today?

12:32:04   14        A.  Yes.

12:32:05   15        Q.  Okay.  Now, when you testified before in this

12:32:25   16    case, you had different calculations, didn't you -- for

12:32:31   17    the damages for the plaintiffs?

12:32:34   18        A.  Yes.

12:32:34   19        Q.  You remember what those calculations were for the

12:32:39   20    plaintiffs?

12:32:40   21        A.  In terms of dollar amount, or methodology?

12:32:43   22        Q.  Both.

12:32:44   23        A.  From methodology, we did the same calculations

12:32:53   24    with 40, 48 and flex hours, in addition to the 52.  And

12:32:59   25    I don't recall the exact dollar amounts.  The -- that's

12:33:06   1   it.

12:33:06   2       Q.   All right.   So in your prior testimony, you gave

12:33:10   3   those calculations based upon 40-hour work week, 48-hour

12:33:14   4   work weeks, 52, and just this nebulous matter or

12:33:22   5   fluctuating matter, and now you want to present us with

12:33:25   6   a 52-hour calculation; right?

12:33:27   7       A.   That's what was presented.

12:33:31   8       Q.   Okay.   And you don't have any opinion as to

12:33:39   9   whether the 52 hours is the correct calculation, do you?

12:33:42  10       A.   I do not.

12:33:43  11       Q.   Okay.   You don't know what the 48 number is, do

12:34:01  12   you?

12:34:01  13       A.   No, I do not.

12:34:04  14           MR. JOHNSON:   That's all I have, Your Honor.

12:34:06  15           THE COURT:   Redirect?

12:34:07  16           MR. KENT:   Your Honor, just one question.

12:34:07  17                    **REDIRECT EXAMINATION**

12:34:08  18   **BY MR. KENT:**

12:34:08  19       Q.   Ms. Spiesman, for this same time period that you

12:34:12  20   looked at the store manager's salary, what was the

12:34:18  21   average store manager's -- store manager's reported

12:34:21  22   hours for the same time period?

12:34:23  23       A.   For 2005, it was averaged to 58.52.

12:34:29  24       Q.   58.52?

12:34:34  25       A.   52.

```
12:34:34   1        Q.   52?
12:34:34   2        A.   52.
12:34:40   3             THE COURT:  Do you have another question of
12:34:42   4   the witness?
12:34:42   5             MR. KENT:  No, Your Honor.
12:34:45   6             THE COURT:  Do you have another question for
12:34:48   7   the witness?
12:34:49   8             MR. KENT:  No, Your Honor.
12:34:50   9             THE COURT:  All right.  Anything else?
12:34:52  10             MR. JOHNSON:  That's it, Your Honor.
12:34:53  11             THE COURT:  Thank you, ma'am.
12:34:55  12             THE WITNESS:  Thank you.
12:34:55  13             THE COURT:  And you're excused.
12:34:57  14                   (Witness excused.)
12:34:57  15             THE WITNESS:  Thank you.
12:34:57  16             THE COURT:  Ladies and gentlemen, we'll take
12:34:58  17   our lunch recess.  We will be in recess until 1:30.
12:35:03  18             Please do not discuss the case among
12:35:05  19   yourselves or with anyone else.  Do not allow the case
12:35:08  20   to be discussed in your presence.  Keep an open mind --
12:35:12  21   I'm sorry, we won't be returning at 1:30.  I have to
12:35:17  22   take a guilty plea.  Let's make it 1:45.  Have a good
12:35:22  23   lunch.
12:35:23  24             MR. KENT:  Your Honor, could we collect the
12:35:25  25   extra -- I was asking if we could collect the extra
```

12:35:28  1   exhibits just to keep them out of the way?  I was just

12:35:32  2   asking if we can -- oh, thank you.

12:35:35  3                (Jury out at 12:29 p.m.)

12:35:59  4             (In open court, jury not present.)

12:35:59  5             THE COURT:  Is there any need to keep

12:36:07  6   Ms. Taylor?

12:36:18  7                MR. R. WIGGINS:  No, sir.

12:36:19  8             THE COURT:  All right.  She's excused.

12:36:23  9                MR. ST. CLAIR:  Can I go with her, Your

12:36:26 10   Honor?

12:36:35 11             THE COURT:  By all means.

12:36:36 12             Anything else we need to take up while the

12:36:38 13   jury's out?  All right.  Thank you.

12:36:42 14          (Lunch recess from 12:30 until 1:45 p.m.)

12:51:46 15             (In open court, jury not present.)

14:05:06 16          MR. G. WIGGINS:  There is an issue that I

14:05:09 17   believe Augusta and I want to argue outside the presence

14:05:13 18   of the jury.

14:05:23 19          MR. R. WIGGINS:  Your Honor?

14:05:24 20          THE COURT:  Yes, sir.

14:05:25 21          MR. R. WIGGINS:  We're about to reach a

14:05:27 22   stage of the case right after the next witness -- and

14:05:31 23   the next witness I think is going to be short -- where

14:05:35 24   they're going to begin to put on store managers in

14:05:38 25   stores not at issue in this case.  In other words, store

14:05:42  1  managers who worked in different stores, in different

14:05:46  2  stores than the plaintiffs, to our knowledge.

14:05:49  3          We do not believe --

14:05:51  4          THE COURT:  These are store managers who

14:05:53  5  work in stores other than the stores where the 1,300 or

14:06:02  6  some odd plaintiffs worked?

14:06:06  7          MR. R. WIGGINS:  Yes, sir.  There are stores

14:06:07  8  that there's no claim against those stores, involving

14:06:11  9  those stores.  And we don't think the defendant is able

14:06:14  10  to carry their burden with that type of evidence.  It

14:06:18  11  doesn't meet even threshold relevance.

14:06:24  12          THE COURT:  All right.  Let me hear from the

14:06:26  13  defendant.

14:06:27  14          MR. ST. CLAIR:  Thank you, Your Honor.  The

14:06:29  15  number of these plaintiffs, and I believe all of them,

14:06:32  16  Your Honor -- excuse me, store managers -- worked under

14:06:34  17  the direction of district managers who also supervise

14:06:39  18  some of the plaintiffs.  So it's not just --

14:06:43  19          THE COURT:  Well, insofar as the witness,

14:06:47  20  supervise one or more of the plaintiffs --

14:06:52  21          MR. ST. CLAIR:  I may have misspoke, Your

14:06:54  22  Honor.  These are store managers, so they were under the

14:06:56  23  supervision of district managers whose conduct is at

14:06:59  24  issue.

14:07:01  25          One of the issues here is how the district

14:07:03  1   managers relate to the store managers.  Some of the

14:07:06  2   1,400 plaintiffs were under the supervision of the same

14:07:10  3   district managers as these store managers.

14:07:11  4              THE COURT:  How many of these store managers

14:07:15  5   -- how many of these store managers who worked under the

14:07:23  6   same district manager as the plaintiffs do you intend to

14:07:31  7   call?

14:07:32  8              MR. ST. CLAIR:  Your Honor, I think we're

14:07:34  9   going to call about five of them.  My guess is the whole

14:07:38  10  presentation won't take, on direct examination, two

14:07:45  11  hours -- 30 minutes a person.

14:07:48  12             MR. R. WIGGINS:  Your Honor, it confuses the

14:07:49  13  issue of the case to put on store managers in different

14:07:53  14  stores.

14:07:53  15             MR. ST. CLAIR:  Well --

14:07:54  16             MR. R. WIGGINS:  If they -- they should put

14:07:55  17  on the district managers for these plaintiffs, and

14:07:58  18  they're not going to do it, and it's going to be

14:08:01  19  confusing.  It's going to be confusing to the jury for

14:08:04  20  us to start trying some other person that doesn't have a

14:08:09  21  claimed store.

14:08:11  22             MR. ST. CLAIR:  If I may, Your Honor.

14:08:12  23             THE COURT:  Yes, sir.

14:08:13  24             MR. ST. CLAIR:  Part of the plaintiffs' case

14:08:15  25  is to say this is the way Family Dollar does business

14:08:19  1   throughout its company.

14:08:19  2        THE COURT:  I don't believe that's their

14:08:21  3   position.  I believe it's the position of the plaintiffs

14:08:24  4   that as to Family Dollar's relationship with me --

14:08:34  5        MR. R. WIGGINS:  Yes, sir.

14:08:34  6        THE COURT:  -- I am not an executive.

14:08:39  7        MR. ST. CLAIR:  And if I may, Your Honor,

14:08:41  8   we've heard from only seven plaintiffs.  We have -- we

14:08:44  9   have no testimony, direct testimony, from - they have

14:08:49  10  more than 1,400 plaintiffs.

14:08:51  11       MR. R. WIGGINS:  We have direct evidence --

14:08:52  12       THE COURT:  Mr. Wiggins, don't interrupt

14:08:55  13  him.  Let him finish what he's saying.

14:08:58  14       MR. R. WIGGINS:  I'm sorry.

14:08:59  15       MR. ST. CLAIR:  So the way they have tried

14:09:01  16  to portray to the jury how those other 1,400 plaintiffs

14:09:04  17  have been treated is through company policies, and

14:09:07  18  saying that there's a uniform way of doing business

14:09:12  19  across the country -- and the company, Your Honor.

14:09:16  20       And we think it's just fair in order for the

14:09:20  21  jury to see others that --

14:09:22  22       THE COURT:  But the plaintiffs who have not

14:09:25  23  testified in this case, the opt-in plaintiffs, have said

14:09:29  24  in effect that our claims are the same as those of the

14:09:32  25  plaintiffs who have testified.

14:09:35  1              MR. R. WIGGINS:  Yes, sir.  And they have

14:09:36  2    also presented their own testimony through the company

14:09:39  3    records -- not their testimony.  They have presented

14:09:41  4    through the company records, their individual fact that

14:09:43  5    they weren't paid for hours over 40 and they worked over

14:09:48  6    40.  That was the purpose of Dr. Bradley's testimony.

14:09:51  7              MR. KALLON:  Your Honor, I may be able to

14:09:54  8    shortchange this a little.

14:09:55  9              This issue came up in the last trial and you

14:09:58 10    addressed it.  You allowed us to call five store

14:10:02 11    managers, including Ms. Felicia Coleman, who you have

14:10:04 12    already allowed us to read her testimony.

14:10:06 13    I've got the transcript from the last trial --

14:10:08 14              THE COURT:  I remember that I did last time.

14:10:12 15              MR. KALLON:  I think, if I may, Your

14:10:14 16    Honor -- and I quote directly from the transcript --

14:10:17 17    this is you speaking.  This is how you were able to

14:10:21 18    address the concerns of Mr. Wiggins raised the last

14:10:25 19    time:

14:10:26 20              "I am going to give a cautionary instruction

14:10:28 21    to the jury that the defendant has the burden of proving

14:10:32 22    that each of the named plaintiffs is an exempt employee;

14:10:36 23    and that this evidence about other store managers who

14:10:40 24    were not opt-in plaintiffs in this case, is being

14:10:43 25    allowed on the limited basis to provide a full picture

14:10:47  1    of the general duties of store managers."

14:10:52  2                MR. R. WIGGINS:  Your Honor, we contend that

14:10:55  3    the full picture should come from these stores that are

14:10:57  4    at issue; not bigger stores, different stores, other

14:11:02  5    parts of the country.  They should come from these

14:11:04  6    stores.

14:11:08  7                THE COURT:  All right.

14:11:11  8                MR. WHITE:  Your Honor, may I say one thing?

14:11:13  9                THE COURT:  Yes, sir.

14:11:13  10               MR. WHITE:  On numerous occasions,

14:11:15  11   plaintiffs' counsel in the presence of the jury have

14:11:17  12   used the term -- I believe they used it in opening --

14:11:19  13   custom, practice, and habit of Family Dollar.  And

14:11:22  14   that's the whole story.

14:11:28  15               MR. R. WIGGINS:  Your Honor --

14:11:28  16               THE COURT:  All right.

14:11:28  17               MR. R. WIGGINS:  -- the testimony has been

14:11:29  18   that some of these stores don't follow policy.  That's

14:11:33  19   what these witnesses will end up saying.  They don't

14:11:36  20   follow the policy.

14:11:37  21               That does not prove that our clients were

14:11:39  22   not subject to those policies.

14:11:40  23               THE COURT:  Well, I'm sure that on

14:11:42  24   cross-examination, you'll show them what the policy is

14:11:45  25   and ask them why they don't follow it.

| | | |
|---|---|---|
| 14:11:48 | 1 | MR. ST. CLAIR:  We may hear about it in |
| 14:11:49 | 2 | closing argument. |
| 14:11:50 | 3 | THE COURT:  All right.  I'll overrule the |
| 14:11:52 | 4 | plaintiffs' objection.  But let me know who you plan to |
| 14:11:59 | 5 | call of the first of these five witnesses so I can give |
| 14:12:03 | 6 | the cautionary instruction to the jury. |
| 14:12:06 | 7 | MR. ST. CLAIR:  I think it would be the |
| 14:12:07 | 8 | first witness up. |
| 14:12:08 | 9 | MR. MAY:  No, the second. |
| 14:12:09 | 10 | MR. ST. CLAIR:  Second.  Do I understand you |
| 14:12:13 | 11 | will limit us to five? |
| 14:12:13 | 12 | THE COURT:  Yes. |
| 14:12:15 | 13 | MR. ST. CLAIR:  Does that include |
| 14:12:16 | 14 | Ms. Coleman's deposition? |
| 14:12:18 | 15 | MR. MAY:  Trial transcript. |
| 14:12:20 | 16 | MR. ST. CLAIR:  Excuse me.  Trial testimony. |
| 14:12:22 | 17 | THE COURT:  Yes.  I'm doing it this time |
| 14:12:24 | 18 | just like I did last time. |
| 14:12:25 | 19 | MR. ST. CLAIR:  Do you mind if we read that |
| 14:12:27 | 20 | to the jury? |
| 14:12:28 | 21 | MR. KALLON:  That was the motion that was |
| 14:12:30 | 22 | granted. |
| 14:12:31 | 23 | MR. R. WIGGINS:  Your Honor, I think last |
| 14:12:32 | 24 | time you ruled that they were not to be read, that they |
| 14:12:36 | 25 | were simply to be in the record. |

| | | |
|---|---|---|
| 14:12:38 | 1 | THE COURT:  No.  They filed -- Family Dollar |
| 14:12:41 | 2 | filed a specific motion asking that it be read, and I |
| 14:12:45 | 3 | think you didn't oppose it.  But, in any event, it will |
| 14:12:50 | 4 | be read. |
| 14:12:51 | 5 | MR. ST. CLAIR:  Very good.  Thank you, Your |
| 14:12:54 | 6 | Honor. |
| 14:12:56 | 7 | THE COURT:  Let's bring in the jury. |
| 14:13:12 | 8 | (In open court, jury present at 2:05 p.m.) |
| 14:13:34 | 9 | THE COURT:  Defendant will call its next |
| 14:13:36 | 10 | witness. |
| 14:13:37 | 11 | MR. KENT:  Your Honor, Family Dollar calls |
| 14:13:39 | 12 | Sherry Walden. |
| 14:13:51 | 13 | **SHERRY WALDEN, DEFENDANT'S WITNESS, SWORN** |
| 14:13:54 | 14 | THE CLERK:  State your name for the record, |
| 14:13:55 | 15 | please. |
| 14:13:59 | 16 | THE WITNESS:  Sherry Walden. |
| 14:14:10 | 17 | THE CLERK:  And spell your last name for the |
| 14:14:12 | 18 | record, please. |
| 14:14:13 | 19 | THE WITNESS:  W-A-L-D-E-N. |
| 14:14:16 | 20 | **DIRECT EXAMINATION** |
| 14:14:16 | 21 | **BY MR. KENT:** |
| 14:14:17 | 22 | Q.  Ms. Walden, good afternoon. |
| 14:14:21 | 23 | A.  Good afternoon. |
| 14:14:22 | 24 | Q.  Could you tell the jury who you're employed by? |
| 14:14:24 | 25 | A.  Family Dollar. |

14:14:25   1      Q.   And what is your position?

14:14:26   2      A.   Payroll director.

14:14:27   3      Q.   How long have you been -- held that position?

14:14:29   4      A.   Since '99.

14:14:32   5      Q.   As the payroll director, can you briefly tell the

14:14:35   6   jury what you do?

14:14:36   7      A.   We collect data from the stores, their hours.  We

14:14:42   8   pay their people, and we store the data.

14:14:44   9      Q.   Are you familiar with how store managers are

14:14:47  10   paid?

14:14:48  11      A.   Yes.

14:14:49  12      Q.   At Family Dollar, how many hours do you work to

14:14:57  13   be considered full-time?

14:14:57  14      A.   30.

14:14:58  15      Q.   I want to focus your attention on the sick pay

14:15:03  16   policy of the store managers.  Okay?

14:15:08  17      A.   Okay.

14:15:08  18      Q.   Can you tell jury what the sick pay policy is for

14:15:12  19   Family Dollar store managers?

14:15:13  20      A.   Salary people get a week of sick pay per illness.

14:15:18  21      Q.   Let's take an example.

14:15:21  22      A.   Okay.

14:15:22  23      Q.   When an employee is sick ten days in a row, how

14:15:27  24   would they be paid under the sick pay policy?

14:15:29  25      A.   They would get a week of sick pay.

14:15:31  1    Q.   And then what would happen that second week?

14:15:33  2    A.   If they have disability insurance, the disability

14:15:35  3    would pick up.

14:15:36  4    Q.   And if they did not?

14:15:38  5    A.   Then they wouldn't get paid.

14:15:40  6    Q.   Let's take a situation where they're sick one

14:15:42  7    week, they come back, they work two days, and then

14:15:44  8    they're sick the rest of the week.

14:15:46  9    A.   They would get another week of sick pay.

14:15:48 10    Q.   They'd get paid the first week?

14:15:50 11    A.   First week of sick, two days regular, and then

14:15:53 12    another week of sick pay.

14:15:54 13    Q.   Okay.  I want you to assume that an employee is

14:16:01 14    sick the entire week, and is sick through Wednesday of

14:16:07 15    that second week, and then comes back and works

14:16:11 16    Thursday, Friday and Saturday.  How would the employee

14:16:14 17    be paid in that situation?

14:16:15 18    A.   They would get a week of sick pay, and then they

14:16:19 19    would get the next couple of days off without pay,

14:16:22 20    unless they have a disability; and then when they came

14:16:25 21    back, they would get a partial week paid.

14:16:28 22    Q.   How does Family Dollar calculate that partial

14:16:30 23    week paid?

14:16:32 24    A.   It's a prorated -- it's based on 48 hours, six

14:16:39 25    days.  And if they worked three days, then they would

14:16:44  1   get paid three days.

14:16:45  2        Q.   And you mentioned it's based on 48 hours?

14:16:49  3        A.   Yes.

14:16:50  4        Q.   Is that the 48 hours shows up on the paycheck?

14:16:53  5        A.   Yes.

14:16:54  6        Q.   Let me show you what's already been admitted into

14:16:58  7   evidence as Plaintiffs' Exhibit Number 230.  Do you see

14:17:11  8   the number 48 right up here (indicating)?

14:17:17  9        A.   Yes.

14:17:17 10        Q.   Is this the 48 you're referring to?

14:17:21 11        A.   Yes.

14:17:21 12        Q.   Now, is that telling the store manager that their

14:17:24 13   salary is compensating them for 48 hours?

14:17:27 14             THE COURT:  The objection to leading is

14:17:29 15   sustained.

14:17:29 16        Q.   Ms. Walden, tell the ladies and gentlemen of the

14:17:33 17   jury what that 48 is referring to.

14:17:36 18             MR. G. WIGGINS:  Same objection, Your Honor.

14:17:38 19             THE WITNESS:  The system uses it to

14:17:39 20   prorate --

14:17:40 21             THE COURT:  Wait a minute.  What is the

14:17:40 22   basis of the objection?

14:17:41 23             MR. G. WIGGINS:  Other than it's hearsay,

14:17:43 24   there's no foundation for it.

14:17:45 25             THE COURT:  Are you familiar with this

14:17:46   1   document?

14:17:47   2              THE WITNESS:  Yes.  This is our pay stub.

14:17:49   3              THE COURT:  All right.  And how are you

14:17:54   4   familiar with it?

14:17:54   5              THE WITNESS:  That's how we pay our

14:17:56   6   employees with the pay stub.

14:17:58   7              THE COURT:  And what's your role in that

14:18:01   8   function?

14:18:02   9              THE WITNESS:  Well, I'm the payroll

14:18:04  10   director, but my employees issue the paychecks, and this

14:18:07  11   is the paycheck that they receive.

14:18:08  12              THE COURT:  All right.  The objection is

14:18:10  13   overruled.

14:18:10  14              MR. G. WIGGINS:  Your Honor?

14:18:11  15              THE COURT:  Yes.

14:18:12  16              MR. G. WIGGINS:  I would ask:  Does she set

14:18:14  17   this policy in determining, or is this some procedure

14:18:18  18   she follows?

14:18:19  19              THE COURT:  Well, you can ask her that on

14:18:21  20   cross-examination.

14:18:22  21   BY MR. KENT:

14:18:23  22      Q.  Mrs. Walden, can you explain what that 48

14:18:27  23   represents?

14:18:27  24      A.  Yes.  In our payroll system, employees are given

14:18:36  25   hours for their week.  So, for a store employee, it's 48

14:18:40  1    hours; for a corporate employee, it's 40 hours.  And

14:18:46  2    that 48 is used to determine their pay when the person

14:18:50  3    is hired in the middle of the pay week; if a person is

14:18:55  4    terminated in the middle of a pay week; whether it's the

14:18:58  5    beginning, the end.  That number is used to prorate

14:19:02  6    their pay for their start and their end, or if they go

14:19:05  7    out on leave.

14:19:07  8        Q.   In the example we were talking about, how would

14:19:10  9    that paid employee came back to work Thursday, Friday

14:19:14 10    and Saturday -- how would, if at all, that 48 be used?

14:19:17 11        A.   It uses it to prorate to see how much pay they

14:19:21 12    would be due based on the day of the week they came back

14:19:24 13    during the workweek.

14:19:25 14        Q.   You've talked about somebody who starts at Family

14:19:29 15    Dollar a partial week.  Let's assume somebody starts on

14:19:32 16    Saturday.  Is that the last day of the pay period?

14:19:33 17        A.   Yes, it is.

14:19:34 18        Q.   Okay.  How would that, if at all, affect the 48?

14:19:37 19        A.   If they started on Saturday, the last day of the

14:19:39 20    pay period, the system would pay them one day.

14:19:43 21        Q.   And what if the store manager made a deal with

14:19:47 22    whoever hired them, the district manager, that they were

14:19:49 23    getting paid the full week, what would happen then?

14:19:51 24             MR. G. WIGGINS:   Object to leading, Your

14:19:53 25    Honor.

14:19:55  1          THE COURT:  Overruled.

14:19:58  2      Q.  You can answer.

14:19:59  3      A.  Can you repeat the question?

14:20:01  4      Q.  Sure.  What would happen in a situation where the

14:20:04  5  store manager starts on a Saturday, the last day of the

14:20:06  6  pay period, that they had worked out a deal with the

14:20:10  7  district manager, or whoever hired them, that they were

14:20:12  8  going to pay for the entire week?

14:20:13  9      A.  Well, our system is going to pay it based on

14:20:16  10  those 48 hours and what they worked during the week when

14:20:19  11  their hire date was.

14:20:21  12          There could be an exception why the DM requested

14:20:24  13  us to pay them the full week or a partial week.  And we

14:20:28  14  would request approval from Store Ops; and if they

14:20:31  15  approved it, we would pay them the full week.

14:20:34  16      Q.  Would this number change if the store manager was

14:20:40  17  told they were only going to have to work 40 hours a

14:20:46  18  week?

14:20:46  19      A.  No.  That's not based on their hours worked.

14:20:48  20      Q.  What if they were told they were going to have to

14:20:50  21  work 60 hours a week?

14:20:51  22      A.  No.

14:20:52  23      Q.  Is this number the same for a district manager?

14:20:54  24      A.  No.  For the corporate salary people, it's 40.

14:20:58  25  It's based on a five-day week.

14:21:00  1    Q.   Do the hourly employees have a number there?

14:21:03  2    A.   They don't, because they have hours -- they're

14:21:06  3  paid by the hour.  So whatever hours they worked shows

14:21:09  4  on the check.

14:21:09  5    Q.   Changing gears a little bit, Ms. Walden.  At our

14:21:15  6  direction, were you asked to get some payroll data from

14:21:19  7  certain plaintiffs in the case?

14:21:20  8    A.   Yes.

14:21:21  9    Q.   Let me show you what's been marked as Defendant's

14:21:28  10 Exhibits 1936, 1406, and 1408.  Can you identify those

14:21:38  11 three documents, please?

14:21:40  12   A.   Okay.  The first document is the time sheets for

14:21:46  13 Store 2559.  The manager at the store is Laurie Trout.

14:21:51  14   Q.   What time period do these documents cover?

14:21:54  15   A.   It's week ending July 7th, 1999, and it started

14:22:02  16 with April -- April 7th, 1999.

14:22:06  17   Q.   Time period she was a store manager?

14:22:07  18   A.   Goes from April to July 1999.

14:22:10  19   Q.   How about for the second set of documents?

14:22:12  20   A.   Okay.  That's Store 3024.  And the manager is

14:22:19  21 Linda Smith.  And it's the time sheets that shows all

14:22:24  22 the employees that worked in the store.

14:22:25  23   Q.   And the third set of documents?

14:22:28  24   A.   It's Store 868.  And the manager is Cora Cannon.

14:22:40  25   Q.   And what are the dates for her?

14:22:43  1      A.   It goes from December '98 to December '99.

14:22:55  2           MR. KENT:   Your Honor, we would offer

14:22:57  3   Defendant's Exhibits 1396, 1406, and 1408.

14:23:03  4           THE COURT:   Without objection, they are

14:23:05  5   received in evidence.

14:23:06  6           MR. KENT:   Thank you, Your Honor.   I have no

14:23:08  7   further questions.

14:23:09  8           THE COURT:   Cross-examination?

14:23:10  9                      **CROSS-EXAMINATION**

14:23:10  10  **BY MR. G. WIGGINS:**

14:23:12  11     Q.   Good afternoon, Ms. Walden.

14:23:16  12     A.   Good afternoon.

14:23:17  13     Q.   How are you?

14:23:18  14     A.   Good.

14:23:18  15     Q.   In 48 hours, the check that Mr. Kent was asking

14:23:39  16  you about where it says regular salary 48, is that

14:23:43  17  uniform for all store managers, that appears on all

14:23:47  18  store managers' checks?

14:23:48  19     A.   Yes.

14:23:48  20     Q.   And I might have misunderstood you, but when

14:23:55  21  you're figuring the hourly rate for a store manager

14:24:01  22  where they worked -- they start either in the middle of

14:24:04  23  a week, or they end in the middle of a week, you used

14:24:09  24  the 48-hour calculation to determine your hourly rate?

14:24:12  25     A.   We don't determine the hourly rate.   We determine

14:24:13   1    a daily rate.

14:24:14   2        Q.   A daily rate, based on a 48-hour calculation?

14:24:17   3        A.   Yes.  Yes.

14:24:18   4        Q.   And that's for all store managers?

14:24:20   5        A.   Yes.

14:24:20   6        Q.   I believe you testified that 30 hours was

14:24:27   7    considered full-time at Family Dollar?

14:24:29   8        A.   Yes, it is.

14:24:30   9        Q.   And that's for store associates?

14:24:33   10       A.   For all associates.

14:24:34   11       Q.   And if that's full-time, do employees start

14:24:39   12   receiving overtime compensation once they hit the 30-

14:24:42   13   hour mark?

14:24:43   14       A.   No.  They receive overtime after 40.

14:24:46   15       Q.   So 30-hour full-time, that only applies to

14:24:49   16   receiving benefits?

14:24:50   17       A.   Yes.

14:24:51   18       Q.   Has nothing to do with compliance with the Fair

14:24:56   19   Labor Standards Act, or anything like that, as far as

14:24:57   20   overtime is concerned?

14:24:58   21       A.   Right.  That's based on 40 hours.

14:25:01   22       Q.   And you -- you don't make decisions yourself on

14:25:10   23   who gets paid or when they get paid, if they're out or

14:25:13   24   they're working or how many hours they're working; is

14:25:16   25   that correct?

14:25:16    1       A.    Could you repeat it?

14:25:19    2       Q.    As far as a manager -- if a manager works 58

14:25:22    3   hours, works 48 hours, works 90 hours, you don't make a

14:25:25    4   decision --

14:25:26    5       A.    No, we don't, not in Payroll.

14:25:28    6       Q.    And you didn't make the decision as to whether or

14:25:30    7   not these employees were exempt or not, either, did you?

14:25:33    8       A.    No.

14:25:34    9       Q.    And as part of your job duties as a Payroll

14:25:41   10   Director, do you and/or your staff -- are there certain

14:25:48   11   flags that are set up to monitor hourly employees of the

14:25:55   12   -- hours the employees work?

14:25:56   13              MR. KENT:   Your Honor, I would object.   That

14:25:58   14   is outside the scope of direct.

14:26:01   15              MR. G. WIGGINS:   Well, Your Honor, he just

14:26:02   16   introduced three exhibits with hourly employees only.

14:26:06   17              MR. KENT:   It goes to monitoring hourly

14:26:10   18   work.

14:26:11   19              THE COURT:   Overruled.

14:26:12   20              THE WITNESS:   We have exceptions.   We have

14:26:14   21   an exception report when the time sheets come in.   We

14:26:19   22   get 19,000 pages of time sheets.   There's no way in one

14:26:23   23   way that our department can monitor the time sheets.   So

14:26:26   24   we have an exception report.

14:26:28   25              That exception report tells us who has

14:26:31  1    exceptions that we need to address.

14:26:33  2    BY MR. G. WIGGINS:

14:26:33  3        Q.   And what are some examples of those exceptions?

14:26:36  4        A.   Mispunches is our most common --

14:26:39  5        Q.   Okay.

14:26:40  6        A.   -- exception.  It's where a person for the day

14:26:44  7    should have four punches, and they only have three.  We

14:26:47  8    have to call the store to find out what the punches are

14:26:50  9    that's missing so that we can pay them correctly.

14:26:52  10       Q.   Any other examples that you know of for

14:26:55  11   exceptions?

14:26:56  12       A.   If daily hours are greater than 14.99, that could

14:27:04  13   also come from a mispunch, or it could come from -- if a

14:27:10  14   person had a mispunch and the manager went to correct it

14:27:13  15   and they keyed in the a.m. and p.m. wrong, they would

14:27:17  16   overpay them 12 hours, and so the person might have 23

14:27:20  17   hours for that one day because of how the punch was put

14:27:23  18   in incorrectly.

14:27:25  19            So, again, we would call the store to find out

14:27:27  20   what the correct punches were.

14:27:28  21       Q.   Are those exceptions, are they automatically

14:27:31  22   flagged through a computer system?

14:27:32  23       A.   Yes.

14:27:33  24       Q.   You literally don't have someone sitting there

14:27:35  25   looking at 19,000 pieces of paper; the computer spits

14:27:39   1   out those exceptions?

14:27:40   2       A.   Right.   The average is 1,800 pages of exceptions

14:27:43   3   that we look at.

14:27:44   4       Q.   Have you ever had any exception reports in

14:27:47   5   regards to monitoring whether or not there were 80 hours

14:27:53   6   of associate labor being worked in the store per week?

14:27:56   7       A.   No.

14:27:56   8       Q.   Would that be something that the computer system

14:28:00   9   would be easy to set up?

14:28:01  10       A.   Well, the flag for the 14.99 should flag it for

14:28:06  11   us to look at it if there was a problem.

14:28:08  12       Q.   And you recall me asking you in your deposition

14:28:10  13   whether or not Family Dollar could set up a system

14:28:15  14   within its payroll to make an exception report for

14:28:19  15   stores as to whether or not there were two or more

14:28:22  16   employees working 80 hours at a store?   Do you recall me

14:28:25  17   asking you that question?

14:28:26  18       A.   No, I don't recall it.

14:28:27  19       Q.   Okay.   Well, let me ask you now, and we will see

14:28:30  20   if we need to go to your deposition.

14:28:32  21           Could Family Dollar set up an exception report

14:28:35  22   which would tell Family Dollar when there were not two

14:28:37  23   or more employees working in the store for 80 hours?

14:28:40  24       A.   Yes.   It's possible.

14:28:42  25       Q.   Okay.   And you've never been instructed to do

14:28:44  1   that, have you?

14:28:45  2       A.  No.

14:28:45  3       Q.  Would that be something difficult to do?

14:28:47  4       A.  It -- it would be difficult, but it can be done,

14:28:53  5   yes.

14:28:53  6       Q.  And -- one second.

14:29:08  7           MR. G. WIGGINS:  I have no further questions

14:29:10  8   at this time.

14:29:11  9           MR. KENT:  Nothing further.  May she be

14:29:13  10  excused, Your Honor?

14:29:14  11          THE COURT:  Yes, she may be excused.

14:29:23  12          Ladies and gentlemen, I have told you

14:29:31  13  earlier that the defendant has the burden of proof of

14:29:36  14  its affirmative defense; the affirmative defense being

14:29:43  15  that the plaintiffs' store managers are executive

14:29:48  16  employees; and, therefore, exempt from the overtime

14:29:51  17  requirements of the Fair Labor Standards Act.

14:29:55  18          The next five witnesses who will be called

14:30:00  19  by the defendant are called for a limited purpose.  The

14:30:11  20  defendant has the obligation, under law, to prove that

14:30:17  21  each of the plaintiffs is an executive employee.  The

14:30:32  22  witnesses who are now being called are store managers.

14:30:40  23  The fact that they may or may not be executive employees

14:30:47  24  is not controlling as to whether or not these plaintiffs

14:30:52  25  in this case are executive employees.

14:31:01  1              But I am permitting the defendant to call

14:31:01  2     these store managers so that they may give testimony on

14:31:06  3     what they understood the custom and practice of the

14:31:09  4     company to be.  And you will receive that testimony for

14:31:14  5     that purpose only.

14:31:53  6              MR. MAY:  Mr. Kallon has gone to the witness

14:31:56  7     room to get our next witness, Your Honor.

14:31:57  8              THE COURT:  All right.

14:32:04  9              MR. MAY:  Family Dollar calls Priscilla

14:32:08  10    Santos.

14:32:20  11         **PRISCILLA SANTOS, DEFENDANT'S WITNESS, SWORN,**

14:32:20  12             THE CLERK:  State your name for the record,

14:32:22  13    please.

14:32:24  14             THE WITNESS:  Priscilla Santos.

14:32:28  15             THE CLERK:  And spell your last name for the

14:32:30  16    record, please.

14:32:31  17             THE WITNESS:  S-A-N-T-O-S.

14:32:33  18                    **DIRECT EXAMINATION**

14:32:33  19    **BY MR. MAY:**

14:32:34  20      Q.  Good afternoon, Ms. Santos.

14:32:36  21      A.  Hello.

14:32:37  22      Q.  Where do you live?

14:32:38  23      A.  I live in Kenosha, Wisconsin.

14:32:42  24      Q.  Where do you work?

14:32:42  25      A.  I work for Family Dollar.

14:32:43  1      Q.   And what do you do for Family Dollar?

14:32:45  2      A.   Right now, I'm an assistant district manager.

14:32:47  3      Q.   Have you ever been a store manager?

14:32:49  4      A.   Yes, I have.

14:32:50  5      Q.   How long have you worked for Family Dollar?

14:32:51  6      A.   Be six years in May.

14:32:53  7      Q.   And when were you last store manager?

14:32:56  8      A.   I got this promotion week of Thanksgiving.

14:33:00  9      Q.   What store did you have last?

14:33:05 10      A.   Store 4014 in Kenosha, Wisconsin.

14:33:10 11      Q.   Did you have another store?

14:33:11 12      A.   No, that was the only store.

14:33:12 13      Q.   Did you start off as a store manager?

14:33:13 14      A.   No, sir.  I started offer as an assistant store

14:33:16 15  manager.

14:33:16 16      Q.   Tell us how you got to be hired by Family Dollar

14:33:21 17  as an assistant store manager.

14:33:23 18      A.   They were doing a store opening in this little

14:33:27 19  town I live in; Kenosha.  I went in to apply.  They did

14:33:31 20  not have any openings in management.  They'd already

14:33:33 21  filled the positions.

14:33:33 22           Within two months, the store manager called me,

14:33:36 23  asked me to come in for an interview, and that's what I

14:33:38 24  did.  Within a matter of 24, 48 hours, I got a call

14:33:43 25  back.  After I had gone in and interviewed with the

14:33:45  1   store manager, and offered me the position as an
14:33:48  2   assistant manager.
14:33:48  3       Q.  Did you ever talk to or meet a district manager
14:33:52  4   in that process?
14:33:53  5       A.  No, I did not.
14:33:54  6       Q.  How long was it before you became a store
14:33:59  7   manager?
14:33:59  8       A.  I was hired in May, and I believe I took over the
14:34:03  9   store that I started as an assistant in July.
14:34:05  10      Q.  And so you became the store manager in July?
14:34:09  11      A.  Yes.
14:34:10  12      Q.  And as the store manager of that store, and
14:34:14  13  that's the only store you've worked -- will you give us
14:34:17  14  the number again?
14:34:18  15      A.  Store 4014 in Kenosha, Wisconsin.
14:34:20  16      Q.  I didn't write it down.
14:34:21  17      A.  That's okay.
14:34:23  18      Q.  How many hours a week did you work as store
14:34:26  19  manager?
14:34:26  20      A.  Store manager, it varied anywhere from 50 to 55.
14:34:31  21      Q.  Did you ever work longer?
14:34:33  22      A.  Sometimes I worked longer.
14:34:34  23      Q.  Did you ever work less?
14:34:36  24      A.  There was a couple of times I worked less, yeah.
14:34:38  25      Q.  What was the annual sales volume of that store,

1    4014?

2       A.   Right before I took it over, it was just shy of a

3    hundred -- of a million dollar a year store.  Within six

4    months from the time I took over, that store had turned

5    into a million dollar store before it was projected to

6    be.

7       Q.   Did you take any credit for that?

8       A.   I tried.

9       Q.   Can a store manager, in your opinion, affect

10   store sales?

11      A.   I believe they can.

12      Q.   Will you tell us how?

13      A.   I believe that it's up to the store manager to go

14   in and to do the merchandising and to make sure that we

15   have everything that our customers need.

16      Q.   What was your last salary as a store manager?

17      A.   My last salary as a store manager was $670 a

18   week.

19      Q.   Did you get any bonuses?

20      A.   I did.  My bonuses --

21      Q.   I'm sorry.

22      A.   -- my bonuses for this last inventory, the last

23   year was enough to pay for five round-trip airline

24   tickets to Houston, and a mini van for 11 days.  So I

25   got a nice bonus.

14:35:42   1    Q.   What was your highest bonus?

14:35:44   2    A.   That was last year's bonus.  It was right at

14:35:47   3  three grand.

14:35:48   4    Q.   Did you ever run a cash register as a store

14:35:52   5  manager?

14:35:52   6    A.   Sure, I did.

14:35:53   7    Q.   Why was that?

14:35:54   8    A.   Because I felt that was part of my job duties.  I

14:35:57   9  believe in getting my customers in and out.

14:35:59  10         If my cashier had a line, then I'm going to go up

14:36:02  11  there, because I'm one of these -- when I shop myself, I

14:36:05  12  hate waiting in line somewhere.  So that was the whole

14:36:08  13  plan; let's get the customer in, get them out.

14:36:10  14    Q.   What is truck day?

14:36:12  15    A.   Truck day is where we get our shipment.  And

14:36:15  16  that's the shipment that we stock only the shelves for

14:36:19  17  the customers to purchase.  It could be everyday items.

14:36:22  18  It could be promotional items.

14:36:24  19    Q.   How does that work?

14:36:25  20    A.   The truck pulls up to the back door; and at my

14:36:27  21  store, it was always on a Wednesday.  I scheduled my

14:36:31  22  staff to meet me there.

14:36:32  23         The truck would pull up to the back door.  We

14:36:35  24  would unload the truck, take the boxes.  They would roll

14:36:38  25  down onto a roller, conveyor belt roller.

14:36:41  1        We took up the boxes from there and put them on
14:36:44  2   designated U-boats, the carts we push them to the sales
14:36:47  3   floor on.  And I would assign certain people certain
14:36:49  4   departments to stock.
14:36:50  5        Q.  Did you do anything to prepare as store manager
14:36:57  6   for truck day?
14:36:57  7        A.  Yes, I did.
14:36:58  8        Q.  Before the truck actually arrived?
14:36:59  9        A.  Yes.
14:37:00  10       Q.  What?
14:37:00  11       A.  Well, I made sure the back room was ready,
14:37:02  12   prepped and ready to get the truck in.
14:37:04  13       I also made sure that I had enough staff there to
14:37:07  14   help get the freight processed within the time frame.
14:37:09  15       Q.  Did you get an invoice prior to truck day?
14:37:12  16       A.  Yes, we did.
14:37:13  17       Q.  Did you look -- do you look at that before truck
14:37:16  18   day comes?
14:37:17  19       A.  I did.  I thought it was very important to look
14:37:19  20   at it to know what I was getting in the building.
14:37:21  21       Q.  Did you ever do any written evaluations while you
14:37:26  22   were store manager of employees?
14:37:28  23       A.  Yes, I did.
14:37:28  24       Q.  Tell us very briefly about that.
14:37:30  25       A.  Okay.  Once a year, during our inventory

14:37:34 1  process -- and every employee that works in our store

14:37:37 2  gets an evaluation, and -- whether it's the assistant

14:37:40 3  managers or the -- or the clerks.

14:37:41 4     Q.  And who filled those out?

14:37:45 5     A.  I filled them out for my assistants and my

14:37:49 6  clerks.

14:37:49 7     Q.  Did you play any role in scheduling employees,

14:37:53 8  telling employees when to work?

14:37:55 9     A.  Yes.  I --

14:37:56 10    Q.  How did that work?

14:37:57 11    A.  -- I knew what my budget was for payroll, and I

14:38:02 12 worked my schedule around that.  You know, I scheduled

14:38:05 13 people to come in to fit the dollar amount that I was

14:38:08 14 given per payroll.

14:38:10 15    Q.  Do you understand the term "staff scheduler"?

14:38:12 16    A.  Yes, I do.

14:38:13 17    Q.  Did you have staff schedulers at your Store 4014?

14:38:16 18    A.  When I first started with the company, we did

14:38:19 19 not, but we do now.

14:38:20 20    Q.  Did you use both --

14:38:22 21    A.  Yes.

14:38:22 22    Q.  -- forms?

14:38:23 23    A.  Yes.

14:38:23 24    Q.  Did the staff scheduler you received for your

14:38:27 25 store fit your store?

14:38:31  1     A.   No.

14:38:31  2     Q.   Tell us about that.

14:38:33  3     A.   The staff scheduler that they sent us showed that

14:38:38  4  I had -- should have had like five employees to put on

14:38:41  5  the -- on my staff scheduler, where I only had three

14:38:45  6  employees.

14:38:46  7          So, therefore, I had to make some adjustments.

14:38:48  8  So I felt that that was the right thing to do.

14:38:50  9     Q.   Did you ever have to change it during the week?

14:38:53  10    A.   Just around truck day.  If the truck was going to

14:38:57  11 be late, then I would alter people's schedule a little

14:39:00  12 bit.

14:39:00  13    Q.   And you mentioned the budget.

14:39:02  14    A.   Uh-huh.

14:39:02  15    Q.   Will you elaborate on what that is?

14:39:05  16    A.   The budget is what I'm given as a store manager

14:39:09  17 for my particular store.  An example, if I'm given

14:39:14  18 $1,400 a week for a budget, that's what I have to

14:39:17  19 distribute among my employees.

14:39:19  20    Q.   And could you -- could you go over budget ever?

14:39:23  21    A.   No, I did not.

14:39:24  22    Q.   Were you able to cover the store with the budget,

14:39:35  23 labor budget you were given?

14:39:37  24    A.   Yes, I was.

14:39:38  25    Q.   Let's talk briefly about your district manager.

14:39:43   1   Did you have more than one?

14:39:44   2       A.  Yes, I did.

14:39:46   3       Q.  How often did your district managers visit, if

14:39:50   4   there was a difference among them, the ones you had that

14:39:54   5   were sent?

14:39:54   6       A.  I feel that I ran a good store, so my district

14:39:58   7   manager came in maybe once a month.

14:40:00   8       Q.  Once a month, out of all of them?

14:40:02   9       A.  Pretty much, yeah.

14:40:04  10       Q.  How many did you have?  I should have asked that.

14:40:06  11       A.  Counting the district managers that were only

14:40:08  12   holding the district, we probably -- our area went

14:40:11  13   through seven.  Seven to eight.

14:40:12  14       Q.  Seven.  What did your store managers or your

14:40:20  15   district manager do when they came to the store once a

14:40:23  16   month?

14:40:23  17       A.  They would come in, they would look at the

14:40:26  18   logbook that we write down our stuff in, where our daily

14:40:30  19   deposits to our cash handling for our cashiers.  They

14:40:35  20   would tour the store, and they would leave us some notes

14:40:37  21   to do.

14:40:38  22       Q.  How long did those visits take?

14:40:42  23       A.  It depended on the DM.  I have had DMs in and out

14:40:47  24   of my store within 30 minutes.  I have had some DMs that

14:40:50  25   would stay there a couple of hours.

14:40:52  1      Q.  Did you do to-do lists for your employees?

14:40:54  2      A.  Yes, I did.

14:40:55  3      Q.  Tell us a little bit about that.

14:40:57  4      A.  I always -- every morning when I got to work, I

14:41:00  5  would get there about an hour, hour and a half before

14:41:03  6  the store opened, and I would walk the store.

14:41:05  7      I would prioritize what needed to be done,

14:41:09  8  whether it was the health and beauty needed to be

14:41:12  9  restocked versus chemicals needed to be restocked, or

14:41:16  10  soft lines needed to be cleaned up.

14:41:18  11      Q.  You understand the term "merchandising"?

14:41:22  12      A.  Yes, I do.

14:41:23  13      Q.  Tell us what that means.

14:41:26  14      A.  To me, merchandising means making sure that I

14:41:28  15  have the right merchandise out there for my customers.

14:41:30  16  I have to make it presentable for my customers to --

14:41:36  17  like a grab-me kind of thing, impulse buying.

14:41:39  18      I want to show a display and say, "okay, here's

14:41:42  19  some Hawaiian Punch, and here's some cups," and relate

14:41:45  20  the items together.

14:41:47  21      Q.  Schematics; what are schematics?

14:41:49  22      A.  Schematics is a layout of what the company sends

14:41:55  23  us.  It's everyday merchandise.  Schematic is everyday

14:41:59  24  merchandise that we will carry.

14:42:00  25      Q.  Is there a difference between -- have you ever

14:42:04  1    heard the term "promotional merchandise"?

14:42:06  2        A.  Yes, I have.

14:42:07  3        Q.  Have you ever heard the term "schematic

14:42:10  4    merchandise"?

14:42:10  5        A.  Yes, I have.

14:42:11  6        Q.  Is there a difference?

14:42:14  7        A.  Yes.  Yes and no.

14:42:14  8        Q.  All right.  Well, not being well versed in

14:42:18  9    retail, despite my history with this case, would you

14:42:21  10   please then describe that for us?

14:42:23  11       A.  Okay.  The schematic merchandise was what we

14:42:25  12   always carried.  Promotional merchandise is, say,

14:42:29  13   barbecue grills.  That's a promotional item.  Charcoal,

14:42:33  14   that's a promotional item.

14:42:35  15           Now, we do get some of our schematic items that

14:42:38  16   come in that will be a promotional item also.  We'll

14:42:41  17   get, like, say, 30 cases of Hawaiian Punch or -- yes, we

14:42:45  18   carry it, but we know that that's not all going to go

14:42:47  19   out onto one shelf that it's designed for, so we have to

14:42:51  20   promotionalize it somewhere.

14:42:52  21       Q.  What does that mean?  What do you do with it?

14:42:55  22       A.  Make it look nice on the shelf, or make a nice

14:42:58  23   floor stack of it.

14:43:00  24       Q.  Did you do ordering in your store?

14:43:03  25       A.  Yes, I did.

14:43:04   1     Q.   How did that work?

14:43:06   2     A.   Every Monday morning, we placed our orders in our

14:43:10   3   store.   Once again, I would get there early.   I believed

14:43:14   4   in getting to work early.

14:43:15   5         I would take our PDT gun and I would walk the

14:43:18   6   stores, 4 foot by 4 foot section, and order what I

14:43:22   7   needed for my store that was a schematic item.

14:43:24   8     Q.   Who did the ordering in your store?

14:43:26   9     A.   I did.

14:43:26  10     Q.   Why was that?

14:43:28  11     A.   I just felt more comfortable with me doing the

14:43:31  12   order.   I knew that I was going to get in what I needed.

14:43:34  13     Q.   Let's turn to closing your store in emergency

14:43:42  14   situations or unusual situations.

14:43:44  15     A.   Okay.

14:43:44  16     Q.   Kenosha is a little bit further north than here?

14:43:49  17     A.   Yes, it is.

14:43:50  18     Q.   I suspect you have some snow and ice up that way?

14:43:53  19     A.   Yes, we do.

14:43:54  20     Q.   All right.   Tell us what procedures you followed

14:43:57  21   if you had a heavy snow and ice day in Kenosha, which I

14:44:01  22   suspect would have different effects than it might have

14:44:04  23   in Tuscaloosa, Alabama.   But anyway, tell us about that.

14:44:07  24     A.   A couple of years ago, we had a blizzard come

14:44:10  25   through, and it was my first blizzard there in Kenosha.

14:44:13  1    When it was getting later in the day, probably about

14:44:16  2    4:00 o'clock, I was listening to -- I had the radio in

14:44:19  3    the store onto the news channel.  They were talking

14:44:22  4    about the blizzard was coming through.  And I made a

14:44:25  5    decision that when it started getting so white outside,

14:44:28  6    it was like you couldn't see anything but the snow and

14:44:31  7    nothing -- no far distance, I took it upon myself to

14:44:36  8    shut my store down early to get my employees home, so

14:44:38  9    they could get home to safety before it got too bad that

14:44:42  10   they could not drive.

14:44:43  11       Q.   Did you seek your district manager's approval for

14:44:47  12   that?

14:44:47  13       A.   No, I did not.

14:44:48  14       Q.   Did you let him or her know?

14:44:51  15       A.   After I sent everybody home and I locked up the

14:44:54  16   store, I called them on my way home.

14:44:56  17       Q.   You have tornadoes in Wisconsin?

14:44:59  18       A.   Not very often.

14:45:01  19       Q.   Do you have a procedure for dealing with

14:45:04  20   tornadoes in the store?

14:45:05  21       A.   If those sirens are blasting and it's been

14:45:10  22   spotted, we're closing up shop and I'm letting my

14:45:13  23   employees go home to their family.

14:45:15  24       Q.   Who does the hiring in your store?

14:45:18  25       A.   I do.

14:45:19   1        Q.   Is your district manager involved in that?

14:45:24   2        A.   No.   If I have decided to hire someone that is,

14:45:29   3   say, an assistant manager, for example, I'm the one that

14:45:33   4   has to work with that person, not my district manager.

14:45:36   5   So, therefore, I'm going to hire them.   But I will call

14:45:39   6   my DM later on and say, "just so you know, I hired

14:45:42   7   Sally.   I think she's going to make a great assistant."

14:45:45   8        Q.   How about with cashiers and clerks, any

14:45:47   9   difference?

14:45:47  10        A.   No difference at all.

14:45:49  11        Q.   Who does the discipline in your store?

14:45:53  12        A.   I do, as long as it involves an assistant manager

14:45:57  13   or cashiers and clerks.

14:45:58  14        Q.   Well, is there anybody else in your store?

14:46:03  15        A.   Well, if I get in trouble, then my DM is going to

14:46:06  16   discipline me.

14:46:07  17        Q.   Okay.

14:46:08  18        A.   Which has never happened.

14:46:09  19        Q.   If you give a written warning, do you have to

14:46:12  20   call your district manager?

14:46:13  21        A.   No, I do not.

14:46:14  22        Q.   How about a discharge?   Do you have to get

14:46:18  23   approval for discharge?

14:46:19  24        A.   No, I do not.   No.

14:46:20  25        Q.   Does your district manager get involved, or maybe

14:46:26  1   you've never had this -- have you ever had a situation

14:46:30  2   with discharge with an assistant manager?

14:46:31  3       A.   Yes, I have.   My very first assistant manager,

14:46:33  4   three months after he was in the position, I fired him.

14:46:35  5       Q.   What was your district manager's involvement in

14:46:39  6   that?

14:46:39  7       A.   None.

14:46:45  8               MR. MAY:   Answer plaintiffs' counsel's

14:46:48  9   questions.

14:46:48  10              THE COURT:   Cross-examination?

14:46:49  11                    **CROSS-EXAMINATION**

14:46:49  12  **BY MR. CALAMUSA:**

14:46:54  13      Q.   Good afternoon, Ms. Santos.   How are you?

14:46:58  14      A.   I'm great.   How are you?

14:46:59  15      Q.   Your current position, you're an assistant

14:47:03  16  district manager?

14:47:03  17      A.   Yes.

14:47:04  18      Q.   When were you promoted?

14:47:05  19      A.   Week of Thanksgiving.

14:47:06  20      Q.   Just within the last few months?

14:47:08  21      A.   Uh-huh.

14:47:09  22      Q.   Prior to that, you had been six years in your

14:47:11  23  current position as store manager?

14:47:12  24      A.   Almost six years.   I have had an assistant

14:47:16  25  district manager job once before temporarily.

14:47:19   1      Q.   When was that?

14:47:19   2      A.   About four years ago.

14:47:20   3      Q.   How long did you hold it temporarily?

14:47:22   4      A.   Two-and-a-half months.

14:47:23   5      Q.   And then went back to the store manager and have

14:47:25   6   recently been promoted up to an assistant district

14:47:28   7   manager?

14:47:28   8      A.   Correct.

14:47:28   9      Q.   And am I correct you are not a plaintiff in this

14:47:31  10   lawsuit; correct?

14:47:33  11      A.   No.

14:47:35  12      Q.   Okay.  Your payroll budget, did you say $1,400?

14:47:42  13      A.   That's just a rough estimate, yes.  It varies.

14:47:45  14      Q.   So at the time you left, the last time you were

14:47:48  15   there, your payroll budget was $1,400 for your store?

14:47:51  16      A.   Yes, it was.

14:47:52  17      Q.   And your salary, you said, was 670?

14:47:54  18      A.   It was like 680, 670, something like that.

14:47:57  19      Q.   Okay.  I wrote 670.  You take that off the top?

14:48:01  20      A.   Uh-huh.

14:48:01  21      Q.   And that left you, if my math is right, $730 a

14:48:07  22   week to staff your store with hourly people; right?

14:48:11  23      A.   Correct.

14:48:12  24      Q.   So you had $730 a week to staff -- you said you

14:48:19  25   had three people at the time?

14:48:20   1    A.   Three clerks and an assistant, so four people.

14:48:23   2    Q.   So four people, $730 left over after your salary?

14:48:28   3    A.   Uh-huh.

14:48:28   4    Q.   So, of course, your store was fully staffed the

14:48:31   5    whole time with that much budget?

14:48:32   6    A.   If you call it fully staffed, sure.

14:48:34   7    Q.   You mentioned -- you mentioned the time that you

14:48:57   8    had closed your store, emergency closing.  I want to

14:49:34   9    show you a policy that has been provided to us by Family

14:49:45  10    Dollar; and for identification purposes, this number

14:49:49  11    down here is a Bates number that the company puts on the

14:49:52  12    documents they give us.  It's Defendant's Exhibit --

14:49:57  13              MR. MAY:  Is this in evidence?

14:50:00  14              MR. CALAMUSA:  Yes.

14:50:02  15              MR. MAY:  Can we get the exhibit number?

14:50:04  16    It's being published to the jury.

14:50:06  17              MR. CALAMUSA:  It's Defendant's Exhibit --

14:50:08  18    no, sir, I don't know the number.  I can get it for you.

14:50:10  19              MR. MAY:  Your Honor, I'd just like to know

14:50:13  20    which manual it's out of.

14:50:15  21              MR. CALAMUSA:  2003.

14:50:23  22    BY MR. CALAMUSA:

14:50:23  23    Q.   Ms. Santos, this is the -- under store standard,

14:50:28  24    the 2003 policy manual.  Can you read for us, please,

14:50:32  25    the highlighted portion, the first -- the second

1   paragraph regarding ice?

2       A.   Do you mind if I have the document?   I need my

3   bifocals, and I didn't wear those.   Sorry.

4       Q.   I understand.   I have glasses, too.   Sorry.

5       A.   "When faced with making a decision to close a

6   store for snow or ice, store management is to contact

7   the district manager, making him or her partner in the

8   decision."

9       Q.   That's in the 2003 policy manual; correct?

10      A.   Correct.

11      Q.   And it says that "prior to closing the store,

12  you're to contact your DM, making him or her a partner

13  in that decision"; right?

14      A.   Right.

15      Q.   Do I understand, first, before we go into some

16  other policies, you, as a store manager, are responsible

17  for following policy, are you not?

18      A.   I am responsible.

19      Q.   Has your DM ever told you, or your regional

20  vice-president, or anyone above them, say, "Ms. Santos,

21  I know you're my store manager, you can disregard all

22  these volumes of policies we've had"?

23      A.   No.   Nobody's ever told me that.

24      Q.   Your bonus --

25               THE COURT:   Well, I take it, then, on the

14:51:54  1    closing the store business, you were not aware of this

14:51:56  2    policy?

14:51:56  3                    THE WITNESS:  No, sir.

14:51:57  4                    THE COURT:  All right.

14:52:01  5    BY MR. CALAMUSA:

14:52:01  6        Q.   You were issued the 2003 manual, weren't you?

14:52:04  7        A.   Yes, I probably was.

14:52:05  8        Q.   And in the -- every manual that you've gotten

14:52:10  9    since you've been store manager, has at the front that

14:52:13  10   "every store manager and assistant manager is

14:52:17  11   responsible for reading the manual and understanding the

14:52:19  12   policies"; correct?

14:52:21  13       A.   Correct.

14:52:21  14       Q.   Okay.  You told us about your last bonus that you

14:52:31  15   got as a store manager.  And it was the highest one

14:52:36  16   you've gotten your whole time; right?

14:52:38  17       A.   It was.

14:52:38  18       Q.   And you told me $3,000, I think; correct?

14:52:41  19       A.   Roughly 3,000.

14:52:43  20       Q.   If you would, you also told us on average that

14:52:49  21   year that you worked about 55 hours a week?  I made a

14:52:53  22   note of it.

14:52:54  23            So could you multiply for me, Ms. Santos, 55

14:52:57  24   times 52 weeks in a year?  And what's that?

14:53:05  25       A.   2,860.

14:53:08  1     Q.   So for that year that you received a bonus, you

14:53:11  2  worked approximately 2,860 hours; right?

14:53:14  3     A.   Okay.

14:53:15  4     Q.   Okay?  Now, can you take your $3,000 and divide

14:53:19  5  it by that 2,860?  Tell me what that bonus comes out to

14:53:27  6  be per hour for that 2,000 hours -- 2,800 hours you had

14:53:32  7  to work.

14:53:32  8     A.   I -- I don't -- I don't understand this.

14:53:35  9     Q.   Take 3,000 and divide it by 28 --

14:53:40  10    A.   0.9 --

14:53:42  11    Q.   No, I'm sorry.  The other way.  2,860 divided by

14:53:47  12  3,000.

14:53:50  13    A.   0.95.

14:53:52  14    Q.   So it's about 95 cents an hour?

14:53:57  15    A.   Sure.

14:53:58  16    Q.   And that's the most you got or -- excuse me --

14:54:02  17  received in all your years?

14:54:03  18    A.   If that's the way you choose to look at it.  I

14:54:14  19  don't look at it like that.

14:54:14  20    Q.   The hiring.

14:54:16  21    A.   Okay.

14:54:17  22    Q.   You told us that you hire in your store?

14:54:21  23    A.   I do.

14:54:22  24    Q.   You don't get district manager approval?

14:54:24  25    A.   No.

14:54:25  1      Q.   And you do that because you're the store manager?

14:54:27  2      A.   That's right.

14:54:28  3      Q.   Do you understand that there is a policy with

14:54:34  4  Family Dollar that says that a store manager cannot hire

14:54:43  5  or promote an assistant manager or a third key without

14:54:47  6  the DM approving that person in person?

14:54:50  7      A.   I have never seen a policy that stated that.

14:54:55  8      Q.   Do you know who Mr. Barkus is?

14:54:57  9      A.   Never met him personally, but I've heard of him.

14:55:00  10     Q.   You've heard of him; correct?

14:55:02  11     A.   Yes.

14:55:02  12     Q.   Executive vice-president over Operations?

14:55:04  13     A.   Correct.

14:55:04  14     Q.   Would be your DM's boss, and in essence, your

14:55:10  15  boss at the time he was there.

14:55:12  16     A.   Okay.

14:55:13  17     Q.   The -- you did tell me, though, that when you did

14:55:22  18  hire, you would call your DM to be sure that you let him

14:55:27  19  know that you had done so; right?

14:55:28  20     A.   I kept him a partner in what I was doing, but I

14:55:32  21  ultimately made the decision.

14:55:37  22     Q.   If your DM told you that you couldn't hire

14:55:42  23  without his approval, would you have done so?

14:55:44  24     A.   Probably, because I'm the one that has to work

14:55:47  25  with these people, not my district manager.

```
14:55:50   1      Q.   Even if it violated policy?
14:55:52   2      A.   Probably.
14:55:53   3      Q.   Because you believe as store manager you have
14:55:56   4  that right to hire your people, don't you?
14:55:58   5      A.   That's right.
14:55:59   6      Q.   But if you didn't have that right, would you
14:56:01   7  agree with me that that would lessen your authority in
14:56:04   8  that store?
14:56:05   9      A.   No, I don't agree with that.  I believe that the
14:56:09  10  district manager would back whatever the store manager
14:56:15  11  -- in my case, my district manager had full faith in me
14:56:19  12  of running my store.
14:56:20  13      Q.   Yes, ma'am.  But you said you would violate
14:56:22  14  policy if you had to, because, by God, you're the store
14:56:26  15  manager and you have the right to hire whomever you
14:56:28  16  want; right?
14:56:29  17      A.   Yes.
14:56:30  18      Q.   On termination -- you know what the Strands are,
14:56:48  19  don't you?
14:56:49  20      A.   They came out a couple of years after I was --
14:56:51  21  about a year or so after I was hired by Family Dollar.
14:56:54  22      Q.   So while you were store manager, the Strands have
14:56:57  23  been in place; correct?
14:56:58  24      A.   Yes.
14:56:58  25      Q.   And as an assistant district manager, the Strands
```

14:57:01   1   are in place?

14:57:02   2       A.   Yes.

14:57:02   3       Q.   And the Strands set forth -- are training modules

14:57:06   4   or training policies for store managers, assistant

14:57:09   5   managers, even down to the cashiers; right?  as to the

14:57:12   6   ways in which Family Dollar works, and its policies and

14:57:15   7   procedures are?

14:57:15   8       A.   They're guides.

14:57:16   9       Q.   They're training --

14:57:18   10      A.   Training tools to guide.

14:57:21   11      Q.   They are the policies in which individuals are

14:57:23   12   trained on.  You would agree with that, wouldn't you?

14:57:25   13      A.   I agree that we use those to train people with.

14:57:29   14      Q.   And you're training them on policies and

14:57:34   15   procedures and the practices of Family Dollar, and the

14:57:37   16   way Family Dollar wants to do business; correct?

14:57:38   17      A.   Correct.

14:57:39   18      Q.   Let me show you a document from the Strands --

14:57:46   19   and so your counsel will know what I'm talking about,

14:57:49   20   it's D12891, which is previously in evidence as the

14:57:55   21   Strands put into evidence by the defendant.

14:57:58   22           MR. MAY:  Your Honor, that doesn't tell

14:58:00   23   counsel -- I need the Exhibit Number.

14:58:02   24           MR. QUINN:  Plaintiffs' 4.

14:58:05   25           MR. CALAMUSA:  Plaintiffs' 4.  Y'all

14:58:06  1    submitted all the Strands yesterday.  So you would

14:58:08  2    have --

14:58:08  3            MR. MAY:  We did submit the Strands, Your

14:58:11  4    Honor.  But we asked plaintiffs' counsel to agree to

14:58:13  5    substitute, and we haven't gotten an answer yet.  So

14:58:16  6    it's not substituted, so I'm having a little bit

14:58:19  7    difficulty finding the page because of that.  And I need

14:58:22  8    a number, other than that number, which was a Bates

14:58:25  9    number.

14:58:26  10            MR. CALAMUSA:  It's Exhibit 4, Your Honor.

14:58:28  11            MR. MAY:  Which page of Exhibit 4?

14:58:31  12            MR. CALAMUSA:  Plaintiffs' Exhibit 4, Bates

14:58:33  13    number 12891.

14:58:37  14    BY MR. CALAMUSA:

14:58:37  15    Q.  Under "conducting a decision, making/final

14:58:41  16    written step".  See that part?  And I'll bring it up

14:58:44  17    there for you.

14:58:45  18    A.  Thank you.

14:58:46  19    Q.  If you would, Ms. Santos, first sentence says,

14:58:55  20    what?

14:58:55  21    A.  "This is a last chance before a discharge" --

14:58:59  22    before -- "before conducting a decision-making final

14:59:04  23    written step, contact your district manager."

14:59:06  24    Q.  And that's -- that's part of what is taught to

14:59:10  25    all store managers and assistant managers; right?

14:59:13  1     A.  Yes.

14:59:13  2     Q.  And if on Page 22 of the same document, which is

14:59:20  3  Bates number 12894, there's a part for actual discharge,

14:59:30  4  the next -- which is the next step in the process?

14:59:34  5          THE COURT:  Let me ask you this:  As a store

14:59:39  6  manager, do you discharge employees?

14:59:40  7          THE WITNESS:  Yes, sir, I do.

14:59:41  8          THE COURT:  And you do so without consulting

14:59:43  9  with district manager?

14:59:44  10          THE WITNESS:  Yes, sir, I do.

14:59:45  11          THE COURT:  All right.

14:59:46  12  BY MR. CALAMUSA:

14:59:46  13     Q.  And you do that, despite the fact that the

14:59:49  14  training -- the training Strands and the policies of

14:59:51  15  Family Dollar say what, Ms. Santos, under "discharge",

14:59:55  16  second paragraph, please.

14:59:56  17     A.  "You must contact your district manager or

14:59:59  18  regional vice-president".

15:00:01  19     Q.  Keep going.

15:00:02  20     A.  "Before conducting a discharge".

15:00:05  21     Q.  And that's before you conduct a discharge;

15:00:08  22  correct?

15:00:08  23     A.  That's what it reads.

15:00:09  24     Q.  And it says "must"; correct?

15:00:11  25     A.  Yes.

15:00:12    1       Q.   What's your definition of "must", Ms. Santos?

15:00:15    2       A.   "Must" means you need to do it.

15:00:17    3       Q.   Not optional; correct?

15:00:21    4       A.   Correct.

15:00:22    5       Q.   You have worked your entire time as a store

15:00:43    6   manager in Store 4014; is that right?

15:00:46    7       A.   I stated in the beginning I was an assistant

15:00:48    8   manager there for a couple of months there first, and

15:00:51    9   then I was in that store.

15:00:51   10       Q.   I wrote Wisconsin.  I'm sorry, I didn't write

15:00:54   11   where.

15:00:55   12       A.   Kenosha.

15:00:55   13       Q.   You are not here and cannot testify, can you, as

15:01:01   14   to what goes on in the 1,424 other plaintiffs' stores,

15:01:07   15   can you?

15:01:07   16       A.   I can only tell you what happens in my district,

15:01:10   17   or my store.

15:01:11   18       Q.   In your store?

15:01:12   19       A.   My own store.

15:01:13   20       Q.   And you can't tell us, can you, then, Ms. Santos,

15:01:17   21   what other district managers in the 14 -- or the 1,424

15:01:22   22   plaintiffs' district managers may do throughout the

15:01:24   23   country, other than what happens in your individual

15:01:26   24   store?

15:01:27   25       A.   Correct.

15:01:27   1      Q.   One final -- education.   What's your educational

15:01:38   2    history?

15:01:38   3      A.   My educational history?

15:01:40   4      Q.   Yes, ma'am.

15:01:41   5      A.   Graduated high school and went a little bit of

15:01:45   6    college.

15:01:45   7      Q.   How long in college?

15:01:46   8      A.   Year and a half, two years.

15:01:48   9      Q.   Thank you, Ms. Santos.

15:01:51  10           THE COURT:   Redirect?

15:01:52  11                    **REDIRECT EXAMINATION**

15:01:54  12    **BY MR. MAY:**

15:01:54  13      Q.   Just very briefly, Mrs. Santos.   I should have

15:01:58  14    done this the first time.

15:01:59  15           Would you name the district managers that you

15:02:01  16    have said you had, the ones you can name.   You said

15:02:03  17    there were about seven.

15:02:05  18      A.   Russell Brown.   Bobbi Zawada.

15:02:10  19      Q.   Can you come close to spelling that for the court

15:02:13  20    reporter?

15:02:13  21      A.   Bobbi, B-O-B-B-I, Z-A-W-A-D-A.

15:02:19  22      Q.   All right.   That's two.

15:02:21  23      A.   Frank Perccue.

15:02:23  24      Q.   You might want to do that one, too.

15:02:26  25      A.   P-E-R-C-C-U-E, I believe.   That's a tough one.

15:02:34  1        Q.   All right.   That's three.

15:02:35  2        A.   Christopher Howdrowski.

15:02:39  3        Q.   I'm getting looks.   I think you need to spell

15:02:41  4   that one, too.

15:02:42  5              THE COURT:   We're here in the deep South.

15:02:48  6              THE WITNESS:   I'm sorry.

15:02:53  7   H-O-W-D-R-O-W-S-K-I.   I feel like I'm back in school.

15:02:56  8        Q.   All right.   Who else?

15:02:58  9        A.   Ann Marie Vamp, V-A-M-P.   And there was a few

15:03:05  10  holding ones in between that I don't remember who their

15:03:08  11  names were.

15:03:08  12       Q.   All right.   Did that -- did any of those changes,

15:03:12  13  if you know, result from realignment of districts, that

15:03:17  14  is, changes in who had responsibility for what stores?

15:03:20  15       A.   A few of them did, yes, but just a few.

15:03:24  16       Q.   Have you ever been disciplined for hiring or

15:03:30  17  firing employees without consulting your district

15:03:33  18  manager?

15:03:33  19       A.   No, I have never been disciplined.

15:03:38  20       Q.   As an assistant DM or district manager, you

15:03:44  21  require the store managers to get your approval to hire

15:03:47  22  or fire?

15:03:47  23       A.   No.   I ask them to do the same thing that I

15:03:51  24  always did.   Just let me know what you're doing, keep me

15:03:54  25  informed.

| | | |
|---|---|---|
| 15:03:56 | 1 | MR. MAY:  That's all, Your Honor. |
| 15:03:59 | 2 | THE COURT:  Recross? |
| 15:04:00 | 3 | **RECROSS EXAMINATION** |
| 15:04:02 | 4 | **BY MR. CALAMUSA:** |
| 15:04:02 | 5 | Q.  Can you name for me any of the 1,424 plaintiffs |
| 15:04:05 | 6 | in this case that are in the stores in which you are now |
| 15:04:10 | 7 | assistant DM for? |
| 15:04:12 | 8 | A.  I have no clue. |
| 15:04:13 | 9 | THE COURT:  Anything further? |
| 15:04:15 | 10 | MR. CALAMUSA:  Nothing. |
| 15:04:15 | 11 | THE COURT:  Thank you, ma'am.  You're |
| 15:04:17 | 12 | excused. |
| 15:04:17 | 13 | MR. MAY:  She is excused? |
| 15:04:19 | 14 | THE COURT:  She is excused.  Plaintiffs will |
| 15:04:22 | 15 | call the next witness. |
| 15:04:23 | 16 | MR. MAY:  We call Laticia Brisco. |
| 15:05:02 | 17 | **LATICIA BRISCO, DEFENDANT'S WITNESS, SWORN** |
| 15:05:03 | 18 | THE CLERK:  State your name for the record, |
| 15:05:05 | 19 | please. |
| 15:05:07 | 20 | THE WITNESS:  Laticia Brisco. |
| 15:05:15 | 21 | THE CLERK:  Spell your last name. |
| 15:05:18 | 22 | THE WITNESS:  B-R-I-S-C-O. |
| 15:05:26 | 23 | **DIRECT EXAMINATION** |
| 15:05:26 | 24 | **BY MR. MILLER:** |
| 15:05:28 | 25 | Q.  Good afternoon, Mrs. Brisco. |

15:05:29    1       A.   Good afternoon.

15:05:31    2       Q.   Tell us where you work, please.

15:05:33    3       A.   I work for Family Dollar Stores.

15:05:35    4       Q.   And how long have you worked for Family Dollar?

15:05:37    5       A.   Nine years.

15:05:38    6       Q.   When did you first start?

15:05:41    7       A.   November 5th of 1996.

15:05:44    8       Q.   And which positions have you held with Family

15:05:47    9   Dollar?

15:05:47   10       A.   Store manager.  And now I'm Human Resource

15:05:50   11   Manager for Region 21.

15:05:53   12       Q.   And your current position is Human Resource

15:05:55   13   Manager?

15:05:56   14       A.   Excuse me?

15:05:56   15       Q.   Human Resource Manager?

15:05:58   16       A.   Yes.

15:05:58   17       Q.   Since when?

15:05:59   18       A.   I've been doing it almost two years.  September

15:06:04   19   will be two years.

15:06:05   20       Q.   Prior to working at Family Dollar, had you worked

15:06:12   21   in retail before?

15:06:14   22       A.   Yes, sir, I had.  I started out, I think it was

15:06:18   23   about in 1985, '86, somewhere around in there, started

15:06:24   24   out in McCrory's Department Store in Houston, worked

15:06:27   25   about nine years at McCrory's; and went from clerk to

15:06:32  1   store supervisor to co-manager.  Left McCrory's and went

15:06:36  2   to McFrugal's briefly for about three years as a

15:06:40  3   co-manager.  And then I went to Dollar General for about

15:06:43  4   a year, about two years I think as a store manager, and

15:06:46  5   then I came to Family Dollar.

15:06:46  6       Q.  How were you paid as a store manager at Dollar

15:06:50  7   General?

15:06:50  8       A.  A salary.

15:06:51  9       Q.  And were your job duties similar --

15:06:56  10              MR. CALAMUSA:  Object, Your Honor.

15:06:57  11              THE COURT:  Pardon me?  What is the

15:06:59  12  objection?

15:06:59  13              MR. CALAMUSA:  He asked what her job duties

15:07:01  14  were at Dollar General, were they similar and how she

15:07:06  15  was paid at Dollar General.

15:07:06  16              THE COURT:  The objection is sustained.

15:07:08  17  BY MR. MILLER:

15:07:08  18      Q.  How did you come to be employed at Family Dollar,

15:07:15  19  Mrs. Brisco?

15:07:15  20      A.  While working at Dollar General, the guy that's a

15:07:18  21  district manager for Family Dollar at the time came into

15:07:18  22  the Dollar General store that I was working -- and I had

15:07:21  23  previously known him for from my work at McCrory's.  I

15:07:25  24  knew him.

15:07:26  25              When McCrory's closed, I went to Mc Frugal's, and

15:07:30  1    he came to Family Dollar.  We lost contact.

15:07:31  2         And at that -- so I guess a couple of years past,

15:07:34  3    and he came into a Dollar General Store and saw me

15:07:38  4    working and offered me employment with Family Dollar.

15:07:40  5    Thought about it for a month and made the decision to

15:07:42  6    come to work with Family Dollar.

15:07:44  7    Q.   Okay.  Did you have any discussions with district

15:07:49  8    manager, Mr. -- what was his name?

15:07:52  9    A.   Lonnie McCafferty.

15:07:54  10   Q.   -- McCafferty regarding the details of what the

15:07:57  11   store manager position would entail?

15:08:00  12   A.   Yes, I did.  He talked to me about basically

15:08:03  13   about coming to work for Family Dollar -- coming to work

15:08:06  14   for Family Dollar.  I knew at the time what the

15:08:09  15   responsibilities of a store manager was.  I came with,

15:08:12  16   at that time, about 15 years of retail management

15:08:14  17   experience at the time I came to Family Dollar.

15:08:17  18        So we didn't really talk a lot about the job

15:08:19  19   duties.  He talked to me a lot about the career path of

15:08:22  20   Family Dollar, which was the deciding factor for me to

15:08:25  21   come to work at Family Dollar.

15:08:27  22        He told me about the growth potential; that I

15:08:29  23   could start out as a manager and that was a career path

15:08:32  24   for me and that was -- that, along with the benefits,

15:08:35  25   was a deciding factor for me to come.  So he talked more

15:08:38  1    to me about opportunity with Family Dollar.

15:08:40  2        Q.  Okay.  And tell us about that.

15:08:43  3        A.  About the opportunity?

15:08:45  4        Q.  Yes, ma'am.

15:08:46  5        A.  Well, when he talked to me, he told me about the

15:08:49  6    career path, like I said.  But as I thought about it, I

15:08:52  7    don't have a college degree.  I was not -- I didn't go

15:08:54  8    to college.

15:08:55  9        So when he explained to me about, you know,

15:08:58  10   Family Dollar didn't require that I have that college

15:09:00  11   degree, that if I went in and applied myself and worked,

15:09:03  12   that they had a path laid for me.  And I'm a product of

15:09:06  13   that path, exactly what he said to me is what happened.

15:09:09  14       I went in.  I was a manager.  I started out at a

15:09:11  15   store that maybe did 700,000 or 700 a year up each --

15:09:18  16   and moved from one store to another store.  In all, I

15:09:22  17   ran five stores as a store manager for Family Dollar.

15:09:25  18   Each move I made was a lateral move.

15:09:27  19       I went from a store that was doing, you know, X

15:09:30  20   amount of dollars up to a million dollars, up to a

15:09:32  21   million, 1.2, up to 2 million.  Each time I moved, it

15:09:35  22   was a lateral move for me, meaning I was on that career

15:09:39  23   path they'd talked to me about.

15:09:40  24       I had worked in every area in Houston, every

15:09:43  25   neighborhood.  I worked, you know, every class.  So I

15:09:46   1   was on that path that he had told me about.

15:09:48   2       Q.   Did you have any discussion before being hired

15:09:53   3   about your pay from Mr. McCafferty?

15:09:57   4       A.   Can you repeat the question?

15:09:58   5       Q.   I'm sorry.  Did you have any discussions with

15:10:00   6   Mr. McCafferty about your pay?

15:10:02   7       A.   Yes, I did.  I don't remember exactly what my

15:10:05   8   salary was when I came to work.  I know that we agreed

15:10:08   9   upon a salary, and I accepted that salary and came to

15:10:11   10  work for Family Dollar.

15:10:12   11      Q.   What about your hours?  Did you have any

15:10:13   12  discussion about that?

15:10:14   13      A.   He had stated it was 48 to 52, you know, in a

15:10:18   14  regular -- you know, that was the hours that I was to

15:10:20   15  work.  But I knew coming into the store as a store

15:10:24   16  manager with my work experience as a manager, that that

15:10:28   17  are some weeks I didn't work 48 hours.  There were some

15:10:30   18  I worked 35 to 40.  There was some weeks I may have

15:10:34   19  worked more, depending on what the season was and what

15:10:36   20  the need was of the store.

15:10:37   21      Q.   Did you have an understanding about what your

15:10:40   22  salary was intended to cover?

15:10:42   23      A.   Yes, I did.  My salary was to -- was intended to

15:10:46   24  cover me managing the store, which I did.

15:10:48   25      Q.   Okay.  Did your starting salary -- I believe you

15:10:51  1   testified you worked -- couldn't remember exactly what

15:10:54  2   that was.  Did that change over time; and if so, how?

15:10:58  3       A.  Yes, sir.  Each time I moved from one store to

15:11:00  4   another store, I remember the -- the merit increase, it

15:11:06  5   was somewhere between 30 and $50 each time I moved.

15:11:09  6           So, yes.  To answer your question, it would be

15:11:12  7   yes.

15:11:12  8       Q.  Did you receive any training when you first began

15:11:15  9   at Family Dollar?

15:11:17  10      A.  Yes, I did.

15:11:18  11      Q.  Who trained you?

15:11:19  12      A.  I trained for five weeks with another store

15:11:23  13  manager.  His name was Leo Gomez.  He trained me for

15:11:27  14  five weeks.  After my five weeks, I took over the store

15:11:31  15  that I trained in.

15:11:32  16      Q.  Have you received any benefits as a result of

15:11:38  17  your advancement through the company?

15:11:41  18      A.  Yes, I have.  I would say that the benefits are

15:11:46  19  great.  The benefits that I feel that I've received with

15:11:50  20  the advancement with Family Dollar is one that they put

15:11:53  21  me on a career path, something with a future.  And to

15:11:57  22  me, that's the greatest benefit of all --

15:12:00  23          MR. CALAMUSA:  Your Honor, I object to the

15:12:00  24  relevance of --

15:12:01  25          THE COURT:  Sustained.

15:12:02   1      Q.   What were your job duties as a store manager?

15:12:10   2      A.   My job duties as a store manager were to manage

15:12:12   3  the store.

15:12:15   4      Q.   Did you have any involvement in the hiring of

15:12:19   5  employees?

15:12:19   6      A.   Yes, I did.   I hired every employee for my store.

15:12:23   7  Hired and trained.   I screened and sourced the

15:12:26   8  applicants, interviewed them, and hired to staff my

15:12:29   9  store.

15:12:29  10      Q.   What was your district manager's involvement in

15:12:33  11  that process?

15:12:34  12      A.   He didn't have any.

15:12:35  13      Q.   Ms. Brisco, are you familiar with a group of

15:12:39  14  documents called the Strands?

15:12:41  15      A.   Yes, sir, I am.

15:12:41  16      Q.   What are those?

15:12:42  17      A.   Those are modules that are a reference, a

15:12:47  18  reference to help you in different facets of Family

15:12:51  19  Dollar.   One is merchandising; one is loss prevention;

15:12:55  20  one is customer service; and number four being career

15:12:58  21  development.

15:12:58  22      Q.   Okay.   The Strands have a section that discusses

15:13:02  23  the hiring process?

15:13:03  24      A.   Yes, it would.   Selection for success module in

15:13:08  25  the Strands.

15:13:08   1    Q.   I believe that document is in evidence as a large

15:13:11   2    stack, Plaintiffs' Exhibit 4.   But is the green document

15:13:15   3    that's a notebook that's right next to you, is that one

15:13:18   4    of the Strands?

15:13:18   5    A.   Yes, sir, it is.

15:13:19   6    Q.   Okay.   And which one is that?

15:13:21   7    A.   That's Strands 4, Career Development.

15:13:24   8    Q.   Okay.   Could you look with me -- I have tabbed

15:13:27   9    the page in there with a little pink tab.   And this is

15:13:32   10   Page 2.   Are you looking with me at that document?

15:13:51   11   A.   Yes, I am.

15:13:52   12   Q.   Do you recognize that?

15:13:53   13   A.   Yes, I do.

15:13:54   14   Q.   Is that a document you're familiar with?

15:13:56   15   A.   Yes, sir.

15:13:58   16   Q.   Koni -- let me ask you, while they're looking, is

15:14:24   17   this section of the document that you're looking at,

15:14:27   18   does it relate to store manager?

15:14:28   19   A.   Yes, it does.

15:14:29   20   Q.   Okay.   Is that something that you trained

15:14:32   21   employees on in your position?

15:14:33   22   A.   Yes, sir.

15:14:34   23   Q.   Let's just take a quick look at that document.

15:14:40   24   According to this document, as a store manager, what is

15:14:44   25   your role in the hiring process?

15:14:46   1     A.   My role as a store manager is to screen and

15:14:50   2   select -- screen, select, interview, and select the

15:14:52   3   applicants, the employees to staff my store.

15:14:55   4     Q.   Does this document say who the hiring employee

15:15:00   5   is?

15:15:00   6     A.   Yes.

15:15:00   7     Q.   Who is the hiring employee?

15:15:01   8     A.   The store manager.

15:15:04   9     Q.   This document also talks about a recommendation

15:15:07  10   process?

15:15:07  11     A.   Uh-huh.

15:15:08  12     Q.   How does that work?

15:15:09  13     A.   Well, the best way to explain it, if I was going

15:15:13  14   to interview for a particular position in my store, and

15:15:17  15   I would interview five candidates looking for one, I

15:15:21  16   would maybe narrow it down to two.   And whomever I

15:15:24  17   select at the end, that would be the one I'm

15:15:25  18   recommending for myself, for me to hire as the manager

15:15:28  19   as an associate in my store.

15:15:29  20     Q.   In your district, did you make a recommendation

15:15:32  21   to someone else about who to hire?

15:15:34  22     A.   No.   That was for me.

15:15:35  23     Q.   As a store manager, did you have any involvement

15:15:45  24   in employee discipline?

15:15:46  25     A.   Yes, I did.

15:15:48    1      Q.   And what was that involvement?

15:15:49    2      A.   I took care of all the discipline in the store.

15:15:54    3      Q.   Can you give us an example?

15:15:57    4      A.   Okay.  If I had an issue with an associate, just

15:16:00    5   say, for instance, an associate was tardy, we know the

15:16:03    6   schedule's made and I need them to show up on time.  If

15:16:06    7   they're tardy the first time, I'm going to address the

15:16:09    8   issue with the associate in verbal.  Second time if

15:16:11    9   they're tardy, I'm going to address the issue with the

15:16:14   10   associate with written PIP form, which is a Personnel

15:16:18   11   Improvement Form, wanting them to make an improvement.

15:16:21   12   Third time still tardy, not better, I'm going to make

15:16:24   13   the decision to dismiss them from working for Family

15:16:26   14   Dollar.

15:16:26   15      Q.   Did your district manager have a role in that

15:16:29   16   process?

15:16:29   17      A.   No, he didn't.  However, I did email him and keep

15:16:32   18   him in the loop to what I had done.  But to get to the

15:16:34   19   points of a discharge, I have -- I would already have

15:16:37   20   documentation on that applicant, on that employee.  So

15:16:39   21   each time I would write them up, I would in email --

15:16:43   22   email the district manager to make them aware of the

15:16:46   23   situation that was going on in the store, but it was my

15:16:48   24   decision to discharge them from Family Dollar.  I did it

15:16:52   25   based on them being tardy.

15:16:55   1                    THE COURT:  But you would -- you would

15:16:57   2   notify the district manager only after you had

15:17:02   3   discharged the employee?

15:17:02   4                    THE WITNESS:  Yes, sir, I would.  Thank you.

15:17:04   5                    THE COURT:  All right.

15:17:06   6   BY MR. MILLER:

15:17:06   7       Q.  Now, Ms. Brisco, as a store manager, did you

15:17:08   8   stock shelves?

15:17:09   9       A.  Yes, sir, I did.

15:17:10  10       Q.  How often would do you that?

15:17:12  11       A.  Daily, or as needed.  Daily, I would say.  Daily,

15:17:19  12   I would say.

15:17:19  13            Because if my truck came on Tuesday and we

15:17:21  14   stocked the store, we was finished on Wednesday, but I

15:17:24  15   was leaving the store on Thursday and I had an end cap

15:17:26  16   of Charmin and the end cap was empty, my job was to make

15:17:31  17   sure that that merchandise was out there to please the

15:17:33  18   customers.  So if it meant me stocking the shelf, then

15:17:36  19   yes, I stock the shelf.

15:17:37  20       Q.  Was there ever any involvement by other employees

15:17:47  21   in that process?

15:17:47  22       A.  Yes, it was.  If I seen the shelf empty, and I

15:17:47  23   was busy or had an associate on the floor, I would

15:17:47  24   direct them to go and get that merchandise to fill that

15:17:48  25   end cap for the customer.  So, yes, sir.

15:17:50  1      Q.   Did you ever have other people who came to your

15:17:54  2  store to help with the stocking?

15:17:56  3      A.   At one time, we had a mobile stocking team

15:17:59  4  briefly.   That was something that they were trying, but

15:18:02  5  we no longer have it.

15:18:03  6      Q.   As store manager, what was your involvement, if

15:18:09  7  any, in the promotion process?

15:18:10  8      A.   I had a lot of involvement in that.   My -- one of

15:18:14  9  my passions as a store manager was to make sure that my

15:18:18  10  associates had a fair chance to be promoted.   After all,

15:18:21  11  that's what happened to me.

15:18:23  12          So I always wanted to train them to be efficient

15:18:26  13  and know -- you know -- know the job, know the job very

15:18:31  14  well, train them very well.   So that if the opportunity

15:18:35  15  came for a promotion and the district manager or another

15:18:37  16  store manager, perhaps, needed an associate and couldn't

15:18:40  17  find them, I would always recommend my own associate.

15:18:43  18          So I made sure that most of them were promoted --

15:18:47  19  a lot of them were promoted.   And some of the associates

15:18:50  20  I hired as clerks, it gives me great joy to go into a

15:18:54  21  store -- and know I had an impact in someone being

15:18:57  22  promoted in Family Dollar; and go into a store and see

15:19:00  23  an associate I hired as a clerk with no experience and

15:19:02  24  trained them and groomed them, and now they're store

15:19:05  25  managers or assistant managers.   It gives me great joy.

15:19:08  1      Q.   Did you ever have involvement in hiring store

15:19:12  2  manager?

15:19:12  3      A.   Yes, I did.

15:19:13  4      Q.   Were you ever involved in the opening process for

15:19:20  5  stores?

15:19:20  6      A.   Yes, sir.

15:19:21  7      Q.   What was your involvement?

15:19:22  8      A.   That was a period of time where I was not

15:19:25  9  assigned to a store, awaiting for the next store I was

15:19:29  10  going to be promoted to, and had trained the manager to

15:19:32  11  replace me and would go out to the new stores.  And as

15:19:34  12  we opened a new store, we would hire at the stores --

15:19:39  13  going to start on a Tuesday, we would hire that Friday

15:19:41  14  before the Tuesday.  And at that time, we would screen

15:19:44  15  and -- screen applicants and hire maybe 30 -- 30

15:19:48  16  employees that day to start work the following Tuesday.

15:19:51  17  And those individuals I have to train in new stores and

15:19:54  18  make them, you know, learn Family Dollar.

15:19:56  19      Q.   As a store manager, did you ever run the cash

15:20:01  20  register?

15:20:01  21      A.   Yes, sir, I did.

15:20:02  22      Q.   How often would do you that?

15:20:05  23      A.   Daily, weekly.  I mean, I can't put a time limit

15:20:08  24  on it.  Just whenever needed.

15:20:10  25           If I went to the front and there was a line and

15:20:12   1   there was customers waiting and I didn't have a cashier

15:20:14   2   right then, cashier at lunch, I have to get on the

15:20:17   3   register and open another.  It depends on the situation.

15:20:21   4       Q.  Did you have any problem in employee pay raises

15:20:25   5   while you were store manager?

15:20:26   6       A.  Yes, sir, I did.  Yes, sir.  If I felt that I had

15:20:29   7   an employee that was doing an exceptional job and showed

15:20:32   8   me, you know, outstanding -- just doing outstanding job,

15:20:37   9   then doing it effectively, I always made sure they was

15:20:41  10   compensated for the work that they did.

15:20:43  11       Q.  Did you, as a store manager, ever clean the

15:20:46  12   store?

15:20:46  13       A.  Yes -- yes, sir, I did.  I cleaned the store,

15:20:51  14   because I set the standard in the store.  So I would

15:20:54  15   clean the store, and everybody knew what the standard

15:20:56  16   was.

15:20:56  17           And if I wanted to create the team atmosphere

15:21:00  18   that I wanted in my store, I had to lead by example, so

15:21:03  19   I cleaned the store.  Whatever needed to be done, as far

15:21:06  20   as cleaning, I did.

15:21:07  21           I set the standard in my store.

15:21:09  22       Q.  Did you have any involvement as a store manager

15:21:11  23   in employee work assignments?

15:21:14  24       A.  Yes, sir, I did.

15:21:15  25       Q.  And what was that?

15:21:16  1      A.   I would come into the store basically 7:00, 7:30

15:21:22  2  in the morning.  I would walk the store.  I would

15:21:24  3  decide, you know -- I would walk the store before anyone

15:21:27  4  got there, except me.  And I would decide -- look around

15:21:29  5  and decide what the tasks were for the day.  I would

15:21:32  6  number them.  If it was 30 tasks, I would number them on

15:21:35  7  a sheet of paper.

15:21:36  8      Then I would go back to my schedule and see who

15:21:38  9  all was scheduled that day.  Then I would go back and

15:21:41  10  assign tasks to each individual associate.  And as they

15:21:43  11  came in and they came to me for their assignments, I

15:21:47  12  gave it to them.  Not only did I give it to them, I made

15:21:50  13  sure I checked for clarification to make sure she

15:21:52  14  understood what their task was.  Then we went about our

15:21:55  15  day executing the tasks.

15:21:56  16      Q.   Who was in charge of your store when you worked

15:22:02  17  there?

15:22:02  18      A.   I was.

15:22:03  19      Q.   All right.  Why do you say that?

15:22:06  20      A.   Well, when I was not there, I would leave good

15:22:09  21  directions of what I wanted to get accomplished in my

15:22:11  22  absence.  I made it a habit, if I was off on Tuesday, I

15:22:14  23  would call my store Tuesday morning to make sure that

15:22:16  24  everything was running smoothly, everyone went to the

15:22:19  25  bank, everybody showed up.

15:22:21  1        And sometimes toward the end of the afternoon or

15:22:24  2   late evening, I would call again to check on them to

15:22:26  3   make sure that everything was on track and that they

15:22:30  4   were doing what I left for them to do.

15:22:30  5        So I managed the store in my absence also.

15:22:33  6   Q.  Could you please tell the jury your role as store

15:22:40  7   manager on truck day?

15:22:41  8   A.  My role as a store manager on truck day was to be

15:22:45  9   in the back right in the -- right in the mix of things.

15:22:48  10       I will go -- when the truck would pull up, I

15:22:53  11  would go to the stockroom door.  I would take the seal

15:22:56  12  off the truck.  The trucks are sealed.  I have to take

15:22:59  13  the seal off to make sure it's not broken, because I'm

15:23:01  14  responsible, as the manager, for the assets in the

15:23:04  15  store.

15:23:04  16       Once we broke the seal, we proceed with unloading

15:23:07  17  the truck.  At that time, I would be back there lifting,

15:23:10  18  delegating, telling the associates, you know, stack the

15:23:13  19  bleach over here, put the Palmolive over here, put the

15:23:16  20  seasonal to the left.  So I was back there giving

15:23:19  21  directions.

15:23:20  22  Q.  Did you have U-boats that were already lined up

15:23:23  23  so that the employees would know where to put things?

15:23:26  24  A.  Yeah.  Yes, sir, we did.  We had U-boats, but the

15:23:29  25  U-boats are labeled by departments.  And it may say

15:23:31  1   food, department 12.

15:23:33  2        However, I may have ordered a special order.  I

15:23:34  3   may have ordered -- just because it say department 12,

15:23:38  4   because I may have made a special order of 40 cases of

15:23:41  5   juice, where obviously they're not going to fit on the

15:23:44  6   U-Boat, I have to give the directions to where I wanted

15:23:46  7   them to be placed.

15:23:47  8   Q.  Did you have anything that you did as a store

15:23:49  9   manager prior to truck day, compared to truck day?

15:23:52  10  A.  Yes, sir.  About -- a couple of days, my truck

15:23:55  11  would come on Mondays.

15:23:56  12       Typically, Friday -- Thursday evening or Friday

15:23:59  13  morning, an invoice would print up.  I would take the

15:24:02  14  invoice, look at it so that I was aware to what I was

15:24:04  15  getting in.  And the things that I was getting in large

15:24:07  16  quantities at that time, I planned -- I made a mental

15:24:10  17  plan of what I was going to do with it so when the truck

15:24:12  18  came, it flowed smoothly, because I was back there.  I

15:24:15  19  knew what was coming and I could direct them better.

15:24:18  20  Q.  Did you have any role with ordering the store?

15:24:23  21  A.  Yes, sir.

15:24:23  22  Q.  How -- just very briefly, what would you do to

15:24:28  23  order the store?

15:24:29  24  A.  I would -- I would -- I would -- first of all, I

15:24:32  25  would watch my sales over the week, and I would

15:24:35  1    anticipate sales when I order -- if I ordered in -- I

15:24:39  2    just take a basic department 20, which is HBA 9 and 20.

15:24:44  3    I would go to department 9, and if I had 12 Suave on the

15:24:49  4    counter and it's January 30th, and I know that the first

15:24:54  5    of the month is coming and we sell Suave the first, I

15:24:56  6    may not need it the day I'm ordering.

15:24:58  7         But as a manager, I need to be proactively

15:25:01  8    thinking about what I am going to need, anticipating

15:25:03  9    sales for the next week.  So I will make a decision

15:25:06 10    where -- to order that item or not.

15:25:09 11    Q.  As a store manager, did you ever supervise any

15:25:13 12    employees?

15:25:13 13    A.  Excuse me?

15:25:13 14    Q.  I'm sorry.  I will try to speak up.  As a store

15:25:16 15    manager, did you ever supervise any employees?

15:25:18 16    A.  Yes, sir, I did.

15:25:19 17    Q.  Tell us about that.

15:25:22 18    A.  Well, I think as a store manager, I was

15:25:26 19    supervising and managing on a daily basis every day.  So

15:25:30 20    all aspects of running my store, I supervised on a daily

15:25:34 21    basis.  Whether it be cleaning the store, stocking the

15:25:38 22    shelves, creating excellent customer service, greeting

15:25:41 23    the customers, just whatever, I was always training and

15:25:44 24    supervising and coaching my associates on a daily basis.

15:25:47 25    Q.  Is there a new hire package in the stores?

15:25:51  1    A.  Yes, sir.

15:25:51  2    Q.  Did you have any role in the development of that

15:25:56  3 package?

15:25:56  4    A.  No.

15:25:56  5    Q.  Do store managers have any input into that?

15:26:01  6    A.  In making and developing the packet?

15:26:04  7    Q.  The new hire forms, information?

15:26:07  8    A.  No.

15:26:07  9    Q.  What interaction did you have with your district

15:26:11  10 manager?

15:26:11  11    A.  I interacted with him -- I would like to say on a

15:26:16  12 biweekly basis.  I was a CTM manager, which is a

15:26:20  13 Certified Training Manager, and he didn't visit me as

15:26:24  14 much as he would visit stores that was not training

15:26:29  15 stores.

15:26:29  16    He would come by, and typically, he would find

15:26:32  17 everything in order, so he wouldn't spend a lot of time

15:26:34  18 there.  So I would see him biweekly, at most.

15:26:37  19    Q.  Tell us again the names of your DMs.

15:26:40  20    A.  I had -- when I came to Family Dollar, I worked

15:26:43  21 for Lonnie McCafferty as the district manager for most

15:26:48  22 of my years as a store manager.  I think the last year

15:26:51  23 before I was promoted, I had one district manager, Mike

15:26:54  24 McKinley.

15:26:55  25    Q.  How did the assistant store managers in your

15:26:59  1    store, how did their job duties compare to yours?

15:27:02  2       A.   How did they compare?  I would say basically as a

15:27:06  3    store manager, I wanted to make sure that they knew how

15:27:09  4    to do everything that I knew how to do, so they -- you

15:27:12  5    know, the job wasn't very much different.  The

15:27:15  6    difference was I could hire and fire for my store, and

15:27:18  7    they couldn't do that.

15:27:19  8         But I wanted them to learn every other thing that

15:27:24  9    I knew, so when opportunity presented itself, I could

15:27:27  10   make sure that they was ready to be promoted.

15:27:29  11      Q.   Did you have any involvement with outside

15:27:32  12   contractors, vendors?

15:27:33  13      A.   Yes, sir, I did.  I had a guy that would come by

15:27:37  14   and do the windows that I solicited.  I got him on my

15:27:40  15   own.  He came by and we hired him to do the windows.  He

15:27:44  16   would do them once a month.

15:27:45  17        I also had a floor contractor.  We had two or

15:27:48  18   three running around in the market.  But I decided to

15:27:50  19   pick the one that I felt was best.  And he did the

15:27:54  20   floors up until I left as store manager.

15:27:55  21      Q.   As a store manager, what did you consider to be

15:27:58  22   your most important job duties?

15:27:59  23      A.   My most important job duty would be to satisfy

15:28:02  24   the customer.  I think without the customers, they

15:28:06  25   really don't -- you don't need a manager, you don't need

15:28:10  1   an associate without the customer.  That was my most

15:28:12  2   important job, was to take care of the customers.  And

15:28:15  3   that would roll back to me making sure that I had the

15:28:18  4   merchandise they wanted to buy.  My in stock needed to

15:28:22  5   be there.

15:28:22  6        I needed to be able to train my associates to

15:28:24  7   give exceptional customer service.  So it all goes back

15:28:28  8   to the customer.

15:28:32  9        Q.  Thank you, Ms. Brisco.

15:28:33  10            MR. MILLER:  Please answer his questions.

15:28:35  11            THE COURT:  Cross-examination?

15:28:36  12                      **CROSS-EXAMINATION**

15:28:40  13   **BY MR. CALAMUSA:**

15:28:51  14        Q.  Good afternoon, Ms. Brisco.

15:28:53  15        A.  Good afternoon.  How are you?

15:28:54  16        Q.  I'm doing good.  And you?

15:28:56  17        A.  Fine, thank you.

15:28:59  18        Q.  You started your testimony by telling us that you

15:29:03  19   were -- had been promoted to Human Resource manager;

15:29:06  20   correct?

15:29:07  21        A.  Yes.  Yes, sir.

15:29:07  22        Q.  And you said as of September, it's been about two

15:29:10  23   years?  I think I wrote down.

15:29:12  24        A.  Well, it will be -- this September will be two

15:29:14  25   years.

15:29:14  1    Q.  Yes, ma'am.  You were promoted October of 2004;

15:29:17  2  right?

15:29:17  3    A.  Uh-huh.  Yes, sir.

15:29:18  4    Q.  Okay.  And prior to that, how long did you serve

15:29:21  5  as a store manager?

15:29:21  6    A.  With Family Dollar?

15:29:22  7    Q.  Yes, ma'am.

15:29:23  8    A.  About eight years; right into eight.

15:29:26  9    Q.  And I'm correct that you were deposed in this

15:29:31  10  lawsuit, designated as a witness by Family Dollar, and

15:29:33  11  deposed in this lawsuit in April of 2004; right?

15:29:37  12    A.  I don't remember that exact date.  I thought it

15:29:40  13  was 2003.  I'm not sure.

15:29:41  14    Q.  Yes, ma'am.  Let me help you out.  Let me show

15:29:57  15  you -- this is a copy of the transcript from the

15:30:00  16  deposition we took.  And will you tell me what the date

15:30:02  17  is?

15:30:02  18    A.  Okay.  It says April 14, 2004.

15:30:05  19    Q.  Okay.  2004.  So you were store manager for eight

15:30:08  20  years; and within six months of you testifying and being

15:30:13  21  designated as a witness, you were promoted to Human

15:30:16  22  Resource manager; correct?

15:30:18  23    A.  Yes, sir, that's correct.

15:30:19  24    Q.  All right.  Now, the store -- you're not a

15:30:25  25  plaintiff in this lawsuit?

15:30:27   1      A.   No, sir, I'm not.

15:30:28   2      Q.   Okay.  The stores in which you have worked, I

15:30:34   3   believe you said there have been five?

15:30:36   4      A.   Yes, sir.

15:30:36   5      Q.   And the last store, can you give me that number?

15:30:41   6      A.   The last store number I managed was Store 4775 in

15:30:46   7   Houston, Texas on Griggs and Cullen.

15:30:50   8      Q.   Now, I thought you told us during your direct

15:30:53   9   examination that each step of the way in your career as

15:30:57   10  store manager, you moved laterally to a store, but the

15:31:02   11  stores increased.  Is that what I understood you to say?

15:31:06   12     A.   Yes, sir.

15:31:06   13     Q.   But isn't it true that you testified in your

15:31:10   14  deposition that when you moved from one store to the

15:31:13   15  next, that the stores were the same volume, except for

15:31:16   16  the last store?

15:31:18   17     A.   No, sir.  I don't recall that.

15:31:20   18     Q.   Okay.  Let me show you up here on this transcript

15:31:28   19  and give the page we go to.

15:31:32   20     A.   And this deposition was taken in 2004?

15:31:36   21     Q.   Yes, ma'am.

15:31:37   22     A.   I ran two other stores, I think, since this

15:31:39   23  deposition.  So based on this, that would be correct,

15:31:42   24  sir.

15:31:42   25     Q.   Now, help me understand that, first, because I

15:31:46   1   understand that you have worked at Store 3530?

15:31:49   2       A.   3530, that's correct.

15:31:51   3       Q.   And that was the first store that you were a

15:31:53   4   store manager in?

15:31:54   5       A.   Yes, sir.

15:31:54   6       Q.   And you held that for two years?

15:31:56   7       A.   Yes, sir.

15:31:56   8       Q.   It was a medium-sized store?

15:32:00   9       A.   Yes, sir.

15:32:00   10      Q.   And as of April of 2004, you didn't know the

15:32:03   11  sales volume?

15:32:05   12      A.   No.

15:32:05   13      Q.   Okay.  Your next move was to a store on I-10 and

15:32:09   14  Rockword?

15:32:10   15      A.   Yes, sir.

15:32:10   16      Q.   You stayed there about a year?

15:32:11   17      A.   Yes, sir.

15:32:12   18      Q.   And that was also a medium-sized store?

15:32:14   19      A.   The size of the store was medium, but the volume

15:32:17   20  was different.  Size and volume is two different things.

15:32:20   21      Q.   Yes, ma'am.

15:32:21   22      A.   Okay.

15:32:21   23      Q.   Your next store was 4607?

15:32:23   24      A.   Yes, sir.

15:32:24   25      Q.   You were there about a year and a half?

15:32:26  1      A.   Yes.

15:32:26  2      Q.   Size was a small store, but about the same volume

15:32:29  3   as the one that you had been to previously?

15:32:31  4      A.   Yes, sir.

15:32:32  5      Q.   Your next was 4608?

15:32:34  6      A.   Yes, sir.

15:32:35  7      Q.   That was also a small store, as size goes.   And

15:32:39  8   it had about the same volume as 4607; right?

15:32:45  9      A.   I don't recall, maybe.   But --

15:32:48  10     Q.   All right.   And then your next move was to 4775?

15:32:52  11     A.   Yes, sir.

15:32:52  12     Q.   Okay.   That's one, two, three, four, that's five

15:32:56  13  stores?

15:32:56  14     A.   Yes.

15:33:00  15     Q.   Okay.   And you're in 4775 at the time we took

15:33:01  16  your deposition?

15:33:02  17     A.   Yes, sir -- no, I was not in 4775 when you took

15:33:05  18  my deposition.

15:33:06  19     Q.   What store were you in, ma'am?

15:33:07  20     A.   I want to say it was 4607 when I did the

15:33:11  21  deposition, which would have been -- I spent the year

15:33:14  22  and a couple of months in 4775, and I did this

15:33:18  23  deposition in 2004.

15:33:19  24     Q.   Yes, ma'am.   I understand you went to 4775 in

15:33:22  25  September of '03.   Does that sound about right?

15:33:25  1      A.   Yeah, maybe so, yeah.

15:33:29  2      Q.   Okay.

15:33:29  3      A.   I've only been there a few months at that time.

15:33:32  4      Q.   Let's talk about 4775.  That's the last store you

15:33:37  5  worked in as a store manager?

15:33:37  6      A.   Yes, sir.  And each store that I went to from

15:33:41  7  3530 to each store I progressed to, they were projected

15:33:43  8  to do X amount of dollars.  And if they didn't do that

15:33:46  9  amount, I had an opportunity to advance, because I

15:33:48 10  wanted the challenge.  So they were projected to do that

15:33:51 11  amount.

15:33:51 12      Q.   Yes, ma'am.

15:33:52 13      A.   Okay.

15:33:52 14      Q.   And to move to 4775, the reason you moved is

15:33:56 15  because it was closer to where you lived, too; that was

15:33:59 16  also part of why you moved to 4775?

15:34:01 17      A.   The distance was about the same.

15:34:02 18      Q.   Did you not tell me that the reason you went to

15:34:05 19  that store was because it was closer to your home?

15:34:07 20      A.   Less freeway traffic.

15:34:10 21      Q.   That was the reason you gave me?

15:34:11 22      A.   I don't recall it.  I don't recall.

15:34:12 23      Q.   That's not important.  Let's talk about 4775.

15:34:17 24      A.   Okay.

15:34:18 25      Q.   What region was that store in?

15:34:19  1       A.   Region 21.

15:34:21  2       Q.   Who was your RVP?

15:34:22  3       A.   At the time, I went through two RVPs.  Lonnie

15:34:29  4   McCafferty was the RVP at 4775 -- excuse me.

15:34:32  5       Q.   RVP or DM?

15:34:34  6       A.   By the time I went to 4775, I had a new RVP.

15:34:38  7   Lonnie McCafferty was promoted and my district manager

15:34:41  8   was now Michael McKinley.

15:34:42  9       Q.   Who was the RVP prior to Mr. McCafferty?

15:34:46  10      A.   We had about three.  There was one just for a

15:34:51  11  little while, I had Dennis Heskett.  Before Dennis

15:34:55  12  Heskett, I had Steve Phillips.  I think before Steve

15:34:58  13  Phillips, we had -- we had Frank Vogt.

15:35:03  14      Q.   Frank Vogt?

15:35:04  15      A.   Yes.

15:35:06  16      Q.   Let's talk about the last store, 4775.  As I

15:35:11  17  understand, you had in that store four full-time

15:35:14  18  employees and four part-time; correct?

15:35:23  19      A.   I'm not absolutely sure.  If I remember right

15:35:27  20  now.

15:35:30  21      Q.   Let's look at the deposition, Page 23 --

15:35:33  22      A.   Okay.

15:35:34  23      Q.   -- if you would.  I'm sorry, it's going to be on

15:35:47  24  24 --

15:35:47  25      A.   Okay.

15:35:49  1    Q.  -- at line 2.  I asked you:  "How many full-time

15:35:57  2  employees have you had at 4775 at one time?"  And your

15:36:03  3  answer?

15:36:03  4    A.  You want me to answer?

15:36:05  5    Q.  Would you read it?

15:36:06  6    A.  It says "three."  And then I said --

15:36:08  7    Q.  And then I asked:  "How many part-time?"  And

15:36:10  8  your answer?

15:36:10  9    A.  I said "four.  I'm sorry, sir.  Add one.  I have

15:36:13  10  four full-time associates and one part-time.  And I

15:36:16  11  think I also included" --

15:36:17  12    Q.  I'm sorry.  You misread that.  "I have four

15:36:20  13  full-time associates and four part-time associates"; is

15:36:23  14  that what it says?

15:36:23  15    A.  Yes.

15:36:24  16    Q.  Thank you.  Let me ask you this:  You testified

15:36:27  17  about truck day.

15:36:28  18    A.  Uh-huh.

15:36:29  19    Q.  And how you would get out there and move some

15:36:32  20  freight on truck day?

15:36:33  21    A.  Yes, sir.

15:36:33  22    Q.  Isn't it a fact that when you were in 4775, you

15:36:38  23  didn't unload trucks, because you had a -- what's called

15:36:41  24  a mobile stocking crew, plus these other employees?

15:36:44  25    A.  That's not correct, sir.

| | | |
|---|---|---|
| 15:36:46 | 1 | Q.   All right.   Ms. Brisco, will you turn within that |
| 15:36:50 | 2 | deposition to Page 41?   Okay.   Top of the page, line 1: |
| 15:37:04 | 3 | "And when the truck comes to the store, you're now out |
| 15:37:07 | 4 | on Monday, did you unload it?   Do you assist in loading |
| 15:37:11 | 5 | the truck?"   And your answer? |
| 15:37:17 | 6 | A.   That say, "not presently." |
| 15:37:19 | 7 | Q.   And I ask:   "Who does it presently?"   And what's |
| 15:37:22 | 8 | your answer, Ms. Brisco? |
| 15:37:23 | 9 | A.   "I have a stocking crew.   And I'm one of the |
| 15:37:26 | 10 | stores that's on the mobile stocking team." |
| 15:37:29 | 11 |             THE COURT:   I'm sorry.   Would you read |
| 15:37:32 | 12 | loudly enough for all the jurors to hear? |
| 15:37:36 | 13 |             THE WITNESS:   Okay.   I'm sorry. |
| 15:37:38 | 14 | Q.   I asked:   "Who does it presently?"   And your |
| 15:37:40 | 15 | answer? |
| 15:37:40 | 16 | A.   "I have a stocking crew.   I have -- I'm one of |
| 15:37:46 | 17 | the stores that's on the mobile stocking team." |
| 15:37:48 | 18 | Q.   Okay.   And so we understand what the mobile |
| 15:37:51 | 19 | stocking team is, those are individuals that come from |
| 15:37:54 | 20 | outside your store to assist in unloading the truck on |
| 15:37:59 | 21 | truck day; correct? |
| 15:38:00 | 22 | A.   They came -- yes, they did, yes. |
| 15:38:03 | 23 | Q.   So in addition to the four full-time employees |
| 15:38:06 | 24 | and the four part-time employees -- strike that. |
| 15:38:09 | 25 |             Let me ask you this:   In addition to the |

15:38:11  1   employees you had on your payroll, you had people come

15:38:15  2   in to your store to help unload the truck; correct?

15:38:19  3       A.   Yes, I did.   One of those mobile stocking team

15:38:31  4   employees was my full-time associate.

15:38:31  5       Q.   Okay.

15:38:31  6       A.   Okay.

15:38:31  7       Q.   So that would be one of the ones that you were

15:38:31  8   adding?

15:38:31  9       A.   Yeah.

15:38:31  10      Q.   Sure.

15:38:31  11      A.   It wouldn't be four.   It would be one full-time

15:38:31  12  associate, and one -- myself -- if my truck was at 7:00,

15:38:34  13  I would get there at 7:00 with my one mobile stocking

15:38:38  14  guy that works in my store three days a week.   If we

15:38:40  15  started at 7:00; at 30 minutes later, 7:30, one mobile

15:38:44  16  stocking team employee would show up.

15:38:45  17      Q.   Okay.   And that mobile stocking team employee

15:38:48  18  came to your store to help unload the truck; correct?

15:38:52  19      A.   His job was to start putting out the freight that

15:38:55  20  was stacked on the floor.

15:38:56  21      Q.   Let's take it to the next step.   This mobile

15:38:59  22  stocking team, in addition to unloading freight, would

15:39:01  23  also come back the next day to stock the shelves;

15:39:05  24  correct?

15:39:05  25      A.   To stock what was left over.

15:39:07  1      Q.   And isn't it true that when you were at 4775, the

15:39:11  2  last store that you had, you didn't stock the shelves,

15:39:16  3  because you had a stocking crew to do so?

15:39:18  4      A.   That's not true.

15:39:19  5      Q.   All right.  Ms. Brisco, let's look at page 42 of

15:39:23  6  your deposition.  I'm sorry, let's start over here on

15:39:36  7  Page 43.

15:39:37  8      A.   Okay.

15:39:38  9      Q.   I asked you at line 17:  "How much time would you

15:39:46 10  spend stocking shelves?"  And your answer?

15:39:51 11      A.   "The store that I am in now, sir, you -- excuse

15:39:56 12  me -- you go in, they unload the truck on Monday.  On

15:39:59 13  Mondays before the mobile stocking team leave, they put

15:40:03 14  out the bulk of the truck.  On Tuesdays, I'm back at

15:40:05 15  6:00 and the mobile stocking team puts out the remainder

15:40:08 16  of the truck.  And so what's left over is just bits and

15:40:13 17  pieces.  So I'm not doing the actual stocking."

15:40:16 18      Q.   Okay.  So, in addition to your full-time

15:40:21 19  employees, your part-time employees, you had the

15:40:24 20  stocking crew that would unload the truck and stock the

15:40:28 21  shelves; right?

15:40:29 22      A.   They would unload and stock the shelves along

15:40:33 23  with my assistants.  I helped.

15:40:36 24      Q.   You testified, "so I'm not doing actual

15:40:39 25  stocking."  Did I read that right?

15:40:40  1    A.   That's what it says.

15:40:41  2    Q.   Let's add one more person to your --

15:40:44  3    A.   Okay.

15:40:44  4    Q.   -- that comes in your store and does this work.

15:40:47  5         You also had, in addition to the full-time

15:40:50  6    employees, the part-time employees and the stocking

15:40:52  7    group, you had what's known as a stock lines person,

15:40:56  8    didn't you?

15:40:56  9    A.   Excuse me?

15:40:57  10   Q.   A stock lines person, I think is what you refer

15:41:00  11   to.  Didn't you have someone that came in and restocked

15:41:03  12   your clothes?

15:41:05  13   A.   No.  We didn't have -- we had a soft lines

15:41:08  14   coordinator, if that's what you're referring to.

15:41:12  15   Q.   Did the coordinator come in and put tags on

15:41:16  16   clothes and help restock?

15:41:17  17   A.   Very rarely.

15:41:19  18   Q.   Let's talk about how long you were -- you were on

15:41:37  19   a shift, you were there about nine hours a day?

15:41:41  20   A.   It just depends.  It just depends on what the day

15:41:45  21   was, what the situation was.  It just depends.

15:41:48  22   Q.   And the store before 4775, when you actually had

15:41:55  23   to unload the trucks and stock the shelves?

15:41:58  24   A.   Yes, sir.

15:41:58  25   Q.   Do you remember me asking you to tell us the

15:42:03  1   percentage of time that you spent unloading the trucks,
15:42:07  2   stocking the shelves, cleaning the bathroom, cleaning
15:42:11  3   the store, running the cash register, and organizing
15:42:15  4   shelves?  Do you remember me asking you that previously?
15:42:19  5        A.   No, I don't.
15:42:20  6        Q.   Why don't you tell me, Ms. Brisco, at the stores
15:42:23  7   you were at before 475, where you actually had to unload
15:42:27  8   the trucks and stock the shelves?
15:42:28  9        A.   Uh-huh.
15:42:29 10        Q.   What percentage of your time was spent unloading,
15:42:33 11   stocking, running of register, cleaning the bathrooms,
15:42:37 12   cleaning the floors?
15:42:38 13        A.   I couldn't put a time limit on it.  I just did it
15:42:43 14   anytime.  It depended on the situation, what the freight
15:42:46 15   load was.  I did it as needed.
15:42:48 16        Q.   Turn to Page 93.  Starting on Page 1, Ms. Brisco.
15:43:03 17   I'm sorry, line 1.
15:43:05 18        I asked you a question, it says:  "What
15:43:08 19   percentage of your time is spent unloading the trucks,
15:43:10 20   running the cash register, cleaning the stores,
15:43:14 21   stocking, organizing the shelves, cleaning the
15:43:17 22   restrooms?  How much of your time is done on a daily
15:43:20 23   basis doing those type things?"
15:43:22 24        And then I say:  "You can answer it again, Mrs.
15:43:25 25   Brisco."  And you said?  Just read your answer.  "I

| | | |
|---|---|---|
| 15:43:31 | 1 | didn't say anything." |
| 15:43:32 | 2 | A.  Right here?  (Indicating). |
| 15:43:34 | 3 | Q.  Yes, ma'am. |
| 15:43:34 | 4 | A.  Yes.  "Anything -- I have to answer that" -- |
| 15:43:36 | 5 | Q.  "I don't have an answer for that"? |
| 15:43:37 | 6 | A.  "I don't have" -- |
| 15:43:38 | 7 | Q.  Then I said:  "Well, you're at a store nine hours |
| 15:43:41 | 8 | a day?"  Your answer? |
| 15:43:42 | 9 | A.  I'm sorry.  I'm trying to follow you and I can't |
| 15:43:48 | 10 | see that. |
| 15:43:49 | 11 | Q.  Yes, ma'am. |
| 15:43:50 | 12 | A.  Where are you? |
| 15:43:51 | 13 | Q.  Right here, (indicating). |
| 15:43:53 | 14 | A.  Okay. |
| 15:43:53 | 15 | Q.  I say:  "Well, you're at the store nine hours a |
| 15:43:56 | 16 | day?"  And your answer? |
| 15:43:57 | 17 | A.  "Yes." |
| 15:43:57 | 18 | Q.  "How much in that nine hours is spent performing |
| 15:44:01 | 19 | those tasks, approximately?"  Your answer? |
| 15:44:04 | 20 | A.  "All day long." |
| 15:44:05 | 21 | Q.  Okay.  And in addition to testifying to it there, |
| 15:44:12 | 22 | let's look at the smaller transcript that's up there. |
| 15:44:31 | 23 | It's a little smaller. |
| 15:44:32 | 24 | A.  Okay. |
| 15:44:32 | 25 | Q.  We're going to start on Page 241, right here at |

15:44:36  1   line 3, where I say:  "In fact, I asked you how long did

15:44:41  2   it take you, what percentage of time was spent

15:44:45  3   unloading, stocking, organizing, cleaning?"

15:44:47  4        And you said:  "Out of nine hours, all day";

15:44:51  5   correct?

15:44:51  6     A.  Yes.  I'm the store manager all day, so all day.

15:44:54  7   I'm doing it all day, I'm working.  I'm stocking,

15:44:58  8   training, coaching, running my store.

15:45:00  9     Q.  I didn't ask you in that question about training.

15:45:03  10  I asked you "unloading the truck, cleaning, doing those

15:45:06  11  physical tasks"?

15:45:07  12    A.  I can't put a time on it, because anytime it's

15:45:09  13  needed to be done, I'm doing it.  So --

15:45:11  14    Q.  The -- the discipline.  I'm sorry, Ms. Brisco.

15:45:26  15  But I thought I understood you to say that you could

15:45:30  16  discipline employees, and, in fact, you could terminate

15:45:33  17  your employees; am I right?

15:45:34  18    A.  Yes.

15:45:35  19    Q.  Isn't it true that you, in fact, have not -- did

15:45:38  20  not, during the time you were store manager, terminate

15:45:41  21  any hourly employees?

15:45:42  22    A.  I have.

15:45:45  23    Q.  All right.  Ms. Brisco, let's -- let's pull out

15:45:50  24  the deposition again.

15:45:51  25    A.  Okay.

15:45:52   1        Q.   Look at Page 81.

15:46:03   2        A.   81?

15:46:08   3        Q.   Uh-huh.

15:46:09   4        A.   Okay.

15:46:10   5        Q.   Line 24, down at -- "Question:  Have you

15:46:14   6    terminated hourly employees?"  Answer?

15:46:20   7        A.   I'm trying to figure out where you are.  "No, I

15:46:25   8    haven't had to do that yet.  But there was -- sir,

15:46:27   9    excuse me.  This was in -- this was prior to me having

15:46:31  10    to do that to an assistant manager."

15:46:33  11        Q.   Tell me -- you had an assistant manager -- I'm

15:46:38  12    sorry.  You had an assistant manager who you terminated?

15:46:41  13        A.   Yes.

15:46:41  14        Q.   And in doing so, what did you terminate the

15:46:44  15    person for?

15:46:44  16        A.   Integrity issues, taking things from the store.

15:46:49  17        Q.   And tell me what happened.

15:46:51  18        A.   Excuse me?

15:46:51  19        Q.   Tell us what happened.

15:46:52  20        A.   She was sliding merchandise at the register.

15:46:56  21        Q.   Which meant she rang one thing up and walked out

15:46:59  22    with some other merchandise?

15:47:01  23        A.   Well, actually, it was a little different.  She

15:47:04  24    put the things in the bag for herself; and as she put

15:47:07  25    the things in the bag, another associate had told me

15:47:10  1    that she felt like this assistant manager was taking

15:47:13  2    things from the store that she did not pay for.

15:47:16  3         When I went to the store, I went home -- I went

15:47:20  4    home that evening and she called me.  So when the store

15:47:22  5    was closing at 8:00 o'clock, about 7:30 I was at the

15:47:25  6    store, but they didn't realize I was at the store.

15:47:28  7         When I drove up, as they was leaving, I did a bag

15:47:31  8    search, and she was, in fact, shopping, and she could

15:47:33  9    not produce a receipt.  I terminated her at that time.

15:47:36  10        Q.   Well, didn't you call the police?

15:47:38  11        A.   Excuse me?

15:47:38  12        Q.   You actually called the police on the woman?

15:47:40  13        A.   Yes, I did.

15:47:41  14        Q.   And she never showed back up to work, is what

15:47:44  15   happened?

15:47:44  16        A.   No.  We terminated her that night and she went to

15:47:46  17   jail.

15:47:47  18        Q.   Mrs. Brisco, didn't you testify earlier that you

15:47:50  19   called the police, they carried her off, and she never

15:47:53  20   showed back up to work?

15:47:54  21        A.   Because she was terminated.

15:47:56  22        Q.   You never spoke to her?

15:48:00  23        A.   I spoke to her the night that we called the

15:48:03  24   police.  I spoke to her when I addressed her to do a bag

15:48:06  25   search and asked her to produce her receipt.

15:48:10  1          THE COURT:  And then you told her she was

15:48:12  2    fired.

15:48:12  3          THE WITNESS:  Yes, sir.  And I asked the

15:48:13  4    police to advise her not to come back in the store,

15:48:16  5    because she was terminated.

15:48:42  6      Q.  The ordering in your store?

15:48:58  7      A.  Yes, sir.

15:48:59  8      Q.  Your store was on an auto replenishment program,

15:49:05  9    was it not?

15:49:06  10      A.  No, sir.

15:49:06  11      Q.  Are you telling me that 465 was not a

15:49:15  12    replenishment program, Ms. Brisco?

15:49:16  13      A.  No, sir, it was not.  We did have cards, but it

15:49:19  14    was not on auto replenishment in the store.

15:49:23  15      Q.  Ms. Brisco, turn to Page 59, please.

15:49:26  16      A.  Okay.  Okay.

15:49:27  17      Q.  Last line, line 24 on Page 59:  "Is your store on

15:49:38  18    an automatic replenishment, in that items come every

15:49:43  19    week, regardless of whether or not you're ordering

15:49:46  20    them?"  Your answer?

15:49:47  21      A.  "I think they are getting that way, but the store

15:49:50  22    is not a hundred percent there yet."

15:49:52  23      Q.  Okay.  So your store was on the program?

15:49:56  24      A.  Not --

15:49:57  25      Q.  Maybe not a hundred percent, but it was on the

15:49:59   1   program?

15:49:59   2       A.   On some items, very few.

15:50:01   3       Q.   Isn't it true, Ms. Brisco, that as far as

15:50:06   4   ordering goes in the store you worked in, 475, that you

15:50:10   5   did not order auto replenishment, seasonal merchandise,

15:50:16   6   ad items, and clothes?

15:50:19   7       A.   That's not a hundred percent correct.  I did have

15:50:23   8   the ability to go in and order seasonal merchandise.

15:50:26   9           I remember a particular time when a customer

15:50:29   10  wanted coolers -- I remember, a customer wanted coolers.

15:50:33   11  They only shipped me maybe 20.  The customer had a

15:50:37   12  desire for 50.  I called the buyer, that's a seasonal

15:50:41   13  item.  They put them on the next truck.

15:50:42   14      Q.   Let's look at your deposition -- do you

15:50:43   15  understand, Ms. Brisco, that when you were deposed, you

15:50:48   16  were sworn in before you started?  Do you understand?

15:50:51   17      A.   Yes, sir, I was.

15:50:52   18      Q.   And in fact, in April, 2004, which was closer to

15:50:56   19  the time you were, in fact, in 475 than you are now --

15:51:00   20      A.   Yes.

15:51:00   21      Q.   -- right?  You were in the store at the time I

15:51:03   22  took the deposition; correct?

15:51:04   23      A.   Yes.

15:51:04   24      Q.   And you hadn't been promoted to HR manager at the

15:51:07   25  time I took your deposition; right?

| | | |
|---|---|---|
| 15:51:08 | 1 | A.   No, I had not. |
| 15:51:10 | 2 | Q.   Look at Page 60 again. |
| 15:51:11 | 3 | A.   Okay. |
| 15:51:12 | 4 | Q.   Starting at line 10. |
| 15:51:14 | 5 | A.   Okay. |
| 15:51:15 | 6 | Q.   "Everything that shows up on that truck you |
| 15:51:17 | 7 | ordered?"  Your answer? |
| 15:51:19 | 8 | A.   "No.  No, I'm sorry.  The seasonal stuff we don't |
| 15:51:22 | 9 | order.  Ad items we don't order.  We have an opportunity |
| 15:51:25 | 10 | to reorder some ad items if we see them in a circular." |
| 15:51:29 | 11 | Q.   "But no."  Then I asked -- |
| 15:51:34 | 12 | A.   "But no, we don't order them, but we have an |
| 15:51:36 | 13 | opportunity to go back and order them." |
| 15:51:37 | 14 | Q.   I asked:  "Other than ad items or seasonal items, |
| 15:51:40 | 15 | do I understand, then, that you actually placed the |
| 15:51:42 | 16 | order for everything else that shows up on that truck?" |
| 15:51:45 | 17 | Your answer? |
| 15:51:46 | 18 | A.   "And not clothes." |
| 15:51:48 | 19 | Q.   Okay. |
| 15:51:49 | 20 | A.   Basically, yes. |
| 15:51:50 | 21 | Q.   "And what about automatic replenishment items? |
| 15:51:54 | 22 | You wouldn't be ordering those if they come in |
| 15:51:56 | 23 | automatically?"  Your answer? |
| 15:51:58 | 24 | A.   "No." |
| 15:51:58 | 25 | Q.   "So you don't order the clothes.  You don't order |

| | | |
|---|---|---|
| 15:52:02 | 1 | the seasonal.  You don't order the ads, and you don't |
| 15:52:06 | 2 | order the automatic replenishment; is that right?" |
| 15:52:09 | 3 | A.   Yes. |
| 15:52:09 | 4 | Q.   Your answer? |
| 15:52:10 | 5 | A.   "Yes." |
| 15:52:10 | 6 | Q.   "What else appears on that truck that you do not |
| 15:52:15 | 7 | order?" |
| 15:52:16 | 8 | A.   "I can't think of anything else, sir." |
| 15:52:18 | 9 | Q.   The testimony on -- on raises.  You're in HR now, |
| 15:52:52 | 10 | so you know what policy manuals are? |
| 15:52:54 | 11 | A.   Yes, I do. |
| 15:52:56 | 12 | Q.   And you have policy manuals in your store? |
| 15:52:58 | 13 | A.   Yes. |
| 15:52:58 | 14 | Q.   And you are the store manager responsible for |
| 15:53:01 | 15 | following store manuals; correct? |
| 15:53:03 | 16 | A.   Correct. |
| 15:53:03 | 17 | Q.   Under wage increases -- Dan, can I have this |
| 15:53:10 | 18 | turned on? |
| 15:53:31 | 19 | Under "Wage Increase Procedures", second |
| 15:53:37 | 20 | paragraph on -- can you see this right here, where it |
| 15:53:41 | 21 | says:  "The district manager will review wage increase |
| 15:53:44 | 22 | recommendations with the regional vice-president?"  Do |
| 15:53:47 | 23 | you see that? |
| 15:53:48 | 24 | A.   I'm trying to see it. |
| 15:53:50 | 25 | Q.   Yes, ma'am.  "And store managers will be informed |

15:53:54    1   whether or not the recommendations are granted."  Do you

15:53:56    2   see that?  I will be glad to bring it up to you.

15:53:59    3      A.  I can see it.  I'm trying to find out where we

15:54:02    4   are.

15:54:02    5      Q.  Do you understand that's the wage increase

15:54:04    6   procedure that you're telling us you want to ensure that

15:54:07    7   your people get compensated, but isn't it true that

15:54:11    8   under the policy, all you do is the district manager or

15:54:15    9   the regional vice-president are the individuals that

15:54:18   10   have to review any recommendations for wages?

15:54:21   11      A.  That has not been my experience.

15:54:23   12      Q.  So you can just give anybody a raise anytime you

15:54:27   13   want?

15:54:27   14      A.  Yes, sir, I did.

15:54:28   15            THE COURT:  Before talking with the district

15:54:31   16   manager?

15:54:31   17            THE WITNESS:  No.  What I would do, Your

15:54:32   18   Honor, is I would call the district manager.  If I had

15:54:34   19   that associate doing an excellent job, you know, and

15:54:38   20   just progressing well, I would call the district manager

15:54:41   21   on one of his visits to my store, I would let him know

15:54:45   22   this person is, you know, a great employee, doing a

15:54:48   23   wonderful job.  I feel like this is the one that I

15:54:51   24   really, you know, earned this.  And tell him what I

15:54:56   25   wanted to do, and I haven't got any push back from them.

15:54:59  1   They've agreed with what I said.

15:55:01  2      Q.   You got no push back from them, and they agreed

15:55:09  3   with what you said?

15:55:09  4      A.   Yes, in my store.

15:55:10  5      Q.   You couldn't on your own willy-nilly run off and

15:55:14  6   do it; you had to tell them and get them to agree with

15:55:17  7   you?

15:55:17  8      A.   Well, I feel like I did, because I told them and

15:55:19  9   it happened.  It was based on my recommendation, what I

15:55:23 10   wanted.

15:55:23 11      Q.   You were talking discharge?

15:55:25 12      A.   Yes, sir.

15:55:26 13      Q.   You are aware of what the Strands were?

15:55:28 14      A.   Yes, sir, I am.

15:55:29 15      Q.   And in your position as store manager, you knew

15:55:31 16   what the Strands are -- you know as HR manager what they

15:55:34 17   are?

15:55:34 18      A.   Yes, sir.

15:55:35 19      Q.   Okay.  Are you aware with this Strand right here,

15:55:40 20   that states:  "Conducting a decision making/final

15:55:43 21   written step before conducting a decision making/final

15:55:48 22   written step, contact your district manager."

15:55:53 23      A.   Are you telling me if that's what I read?

15:55:55 24      Q.   Yes, ma'am.  Is that what you read?

15:55:57 25      A.   That's what I read there, yes.

15:55:59   1    Q.   That's what's in the Strands, that's what

15:56:01   2  employees are taught?

15:56:02   3              THE COURT:   Is that what you're supposed to

15:56:04   4  do?

15:56:05   5              THE WITNESS:   Sir, to be honest, I haven't

15:56:07   6  looked at that particular part of the Strand, to be

15:56:09   7  honest with you.   That's not what I have done.   But I

15:56:12   8  don't know that word for word.   I haven't looked at that

15:56:15   9  one.

15:56:15  10              THE COURT:   All right.

15:56:16  11  BY MR. CALAMUSA:

15:56:16  12    Q.   Let's look at the next part of the Strand on

15:56:19  13  discharge.   The Strand states you "must contact your

15:56:23  14  district manager or regional vice-president before

15:56:26  15  conducting a discharge".   That's what the Strand says,

15:56:28  16  isn't it?

15:56:29  17    A.   I'm sorry, sir.   I don't recall that it's saying

15:56:34  18  that.   I haven't looked at the Strand word for word.

15:56:37  19  That is not what I done in my store.

15:56:38  20        When I'm going to discharge an individual, if it

15:56:42  21  was a level 5, then they knew that it was a level 5,

15:56:45  22  except if it was integrity issues.   If I was going to

15:56:50  23  discharge Jackie for tardiness or for things that

15:56:54  24  violated policy, she knew, because she had been warned

15:56:58  25  one, two and three.   So it wasn't a surprise to anyone.

15:57:01  1         And each time I wrote them up, I made the

15:57:05  2    district manager aware of what I said or what happened.

15:57:07  3         Q.  Yes, ma'am.  When you wrote up employees, you

15:57:09  4    told the district manager?

15:57:10  5         A.  Yes.  I always kept them in the loop as to what

15:57:13  6    was going on in the store.

15:57:14  7         Q.  This example -- you used a name, Jackie, who the

15:57:18  8    person that was tardy -- if you're going to discharge,

15:57:20  9    you would know because you would walk through these

15:57:22  10   steps?

15:57:23  11        A.  Right.  Yes.

15:57:24  12        Q.  You now did.  The only person you told us you

15:57:27  13   discharged was a person on an integrity issue, so you

15:57:30  14   haven't discharged any hourly employees?

15:57:31  15        A.  In -- sir --

15:57:33  16             THE COURT:  Is that a question?

15:57:35  17        Q.  Yes.  She hasn't discharged any hourly employees,

15:57:38  18   so this example here, what I do when I discharge people,

15:57:41  19   it never -- you never did?

15:57:42  20        A.  But that's what I'm training -- the managers that

15:57:44  21   I'm training, I'm taking them through those steps.

15:57:47  22        Q.  The store manager in your store -- actually,

15:58:02  23   first you told me Mr. Vogt was your --

15:58:12  24        A.  Excuse me?

15:58:13  25        Q.  You told me Frank Vogt was your RVP?

15:58:16  1    A.   Yes.

15:58:22  2    Q.   I show you what's been marked and is into

15:58:26  3  evidence as down here Plaintiffs' Exhibit 18 --

15:58:37  4    A.   Excuse me --

15:58:38  5         MR. MILLER:   We assert our prior objections

15:58:41  6  to this document.

15:58:42  7         THE COURT:   Overruled.

15:58:43  8    Q.   And I'm going to bring you a copy.

15:59:01  9         MR. MILLER:   Your Honor --

15:59:04  10   Q.   Ms. --

15:59:05  11        THE COURT:   Yes, sir?

15:59:06  12        MR. MILLER:   I'd also note that this

15:59:09  13  document has writing all over it.   And I'm not sure what

15:59:14  14  that's from, or -- I don't know if Ms. Brisco's ever

15:59:19  15  even seen this document.

15:59:22  16        THE COURT:   The objection is overruled.

15:59:23  17  BY MR. CALAMUSA:

15:59:23  18   Q.   Ms. Brisco, Frank Vogt was the RVP?

15:59:27  19   A.   Yes, he was.

15:59:27  20   Q.   And this email from him was sent December of '02

15:59:32  21  to store managers?

15:59:33  22   A.   I don't know that.   Mr. Vogt was my -- was my RVP

15:59:37  23  for the first two years I was with Family Dollar.   I

15:59:39  24  have had no dealings with them for -- '96 and '97.

15:59:43  25  After that point, he was no longer the RVP for my

15:59:46   1   region.

15:59:46   2      Q.   Okay.  So you haven't seen this email, then, from

15:59:50   3   Mr. Vogt that says "no manager promoting third key

15:59:56   4   position"?

15:59:56   5      A.   No, sir, I've never seen that.

15:59:58   6      Q.   Only the DM has the authority to do that?

16:00:01   7      A.   He was only my RVP for the first two years of my

16:00:05   8   being employed at Family Dollar.

16:00:11   9            MR. MILLER:  Your Honor, we would object to

16:00:12  10   continuing to question this witness about a document

16:00:15  11   she's never seen.

16:00:16  12      Q.   Now, Ms. Brisco, you were employed for six years.

16:00:23  13   When were you made a store manager?

16:00:27  14      A.   With Family Dollar?

16:00:28  15      Q.   Yes, ma'am.

16:00:28  16      A.   I was hired on as a store manager.  When I came

16:00:31  17   to them, I was hired on as a store manager.

16:00:33  18      Q.   And what year was that?

16:00:34  19      A.   I want to say it was November the 5th, I believe,

16:00:37  20   1996.

16:00:38  21      Q.   You were shown in the examination by your

16:00:43  22   attorney a part of this Strands that you seem to

16:00:47  23   remember when questioned by them that was called

16:00:52  24   selecting candidates.  Do you remember them showing you

16:00:54  25   that?

16:00:54  1      A.   Yes, sir.

16:00:55  2      Q.   And, in fact, they showed it to you kind of a

16:00:57  3   little bit like this, that said you are the hiring

16:01:00  4   authority; is that correct?

16:01:01  5                MR. MILLER:   Objection, Your Honor.   We

16:01:03  6   showed her the entire document.

16:01:04  7                THE WITNESS:   I seen the whole document.   I

16:01:06  8   have it here.

16:01:07  9                THE COURT:   Just a moment.   The objection is

16:01:09  10  overruled.

16:01:10  11  BY MR. CALAMUSA:

16:01:10  12     Q.   This is part of what you were shown; correct?

16:01:14  13     A.   Yeah.   I have the whole page in front of me.

16:01:16  14     Q.   Turn to the next page, if you would.

16:01:18  15     A.   Sure.

16:01:19  16     Q.   The page that you weren't shown.   Learning

16:01:22  17  objectives.   After completing this section, "the store

16:01:27  18  manager should be able to" -- what's the last one say?

16:01:31  19     A.   "The store manager should be able to"?

16:01:34  20     Q.   Yes, ma'am.   The very last one, this has a check.

16:01:39  21     A.   "Make an informed recommendation for hiring or

16:01:40  22  not hiring a candidate."

16:01:42  23     Q.   It doesn't say make the decision, does it?   It

16:01:46  24  says make "a recommendation"?

16:01:47  25     A.   No.   That's what it says on there, however,

16:01:49  1   that's not what I did in my store.

16:01:51  2       Q.   This was the Strands on selecting candidates that

16:01:55  3   you as a certified manager would go over with the

16:01:58  4   employees, and you as a manager and someone in HR are

16:02:01  5   required to follow; right?

16:02:02  6       A.   Yeah, that's -- I mean, yeah.

16:02:05  7       Q.   Thank you.  Do you know --

16:02:33  8                 THE COURT:  How much more do you have for

16:02:36  9   this witness?

16:02:36  10                MR. CALAMUSA:  Ten more minutes, Your Honor.

16:02:39  11                THE COURT:  Okay.  Break.

16:02:43  12                Don't discuss the case among yourselves or

16:02:45  13   with anyone else.  Don't allow it to be discussed in

16:02:51  14   your presence, and keep an open mind.

16:02:51  15                     (Jury out at 4:00 p.m.)

16:02:51  16                (In open court, jury not present:)

16:03:22  17                THE COURT:  Anything we need to take up?

16:03:24  18                MR. ST. CLAIR:  I need to make sure we're

16:03:26  19   clear on what the obligation or rules, or the

16:03:29  20   defendant's right to call plaintiffs.

16:03:32  21                THE COURT:  Any of the plaintiffs who were

16:03:35  22   here, you can call them.

16:03:36  23                MR. ST. CLAIR:  And there was the issue of

16:03:38  24   plaintiffs who are not here, if the company is willing

16:03:42  25   to pay for them to come here, if we have the right to

| | | |
|---|---|---|
| 16:03:47 | 1 | that -- |
| 16:03:49 | 2 | THE COURT:  Well, which ones are you |
| 16:03:51 | 3 | thinking about? |
| 16:03:52 | 4 | MR. ST. CLAIR:  I'm sorry, Your Honor?  For |
| 16:03:54 | 5 | example, one of the named plaintiffs has not testified, |
| 16:03:57 | 6 | Ms. Richardson. |
| 16:03:58 | 7 | THE COURT:  You want to pay for her expenses |
| 16:04:01 | 8 | to come here? |
| 16:04:02 | 9 | MR. ST. CLAIR:  Yeah.  Is that -- yes, sir. |
| 16:04:04 | 10 | Yes, Your Honor. |
| 16:04:06 | 11 | MR. KALLON:  Judge -- |
| 16:04:08 | 12 | MR. ST. CLAIR:  And we have a list here, |
| 16:04:10 | 13 | Your Honor, which we had supplied many years ago. |
| 16:04:13 | 14 | THE COURT:  How many? |
| 16:04:14 | 15 | MR. ST. CLAIR:  It's a total of eight. |
| 16:04:15 | 16 | THE COURT:  And you'll pay for their |
| 16:04:18 | 17 | expenses? |
| 16:04:19 | 18 | MR. KALLON:  Judge, these are -- |
| 16:04:20 | 19 | Ms. Richardson, in particular, was a named plaintiff who |
| 16:04:23 | 20 | lives in Boaz -- not Boaz -- Eutaw, Alabama.  I mean, |
| 16:04:28 | 21 | this is not a situation -- |
| 16:04:30 | 22 | THE COURT:  Yeah.  Well, Eutaw is within 40 |
| 16:04:35 | 23 | miles.  You won't have to pay for her. |
| 16:04:37 | 24 | MR. KALLON:  And same thing for Mrs. Brown. |
| 16:04:39 | 25 | THE COURT:  Who? |

| | | |
|---|---|---|
| 16:04:40 | 1 | MR. KALLON:  Shellah, S-H-E-L-L-A-H, Brown, |
| 16:04:46 | 2 | who I believe is from Talladega or -- |
| 16:04:47 | 3 | THE COURT:  Talladega? |
| 16:04:48 | 4 | MR. KALLON:  I'm not sure, Your Honor. |
| 16:04:50 | 5 | THE COURT:  How many miles is Talladega?  If |
| 16:04:54 | 6 | you want to call her here, and if you want to call any |
| 16:04:58 | 7 | of the plaintiffs here and they live more than 30 miles |
| 16:05:03 | 8 | from this courthouse, pay for them. |
| 16:05:09 | 9 | MR. ST. CLAIR:  Very good, Your Honor.  And |
| 16:05:11 | 10 | we've supplied previously the list to the plaintiffs, |
| 16:05:14 | 11 | and so those -- we'll pay expenses and they'll bring |
| 16:05:17 | 12 | them here. |
| 16:05:18 | 13 | THE COURT:  All right. |
| 16:05:19 | 14 | MR. ST. CLAIR:  Very good. |
| 16:05:20 | 15 | MR. G. WIGGINS:  May I be heard? |
| 16:05:21 | 16 | THE COURT:  Yes. |
| 16:05:22 | 17 | MR. G. WIGGINS:  I wanted to, for the |
| 16:05:24 | 18 | record, to make sure that it's clear that these |
| 16:05:26 | 19 | individuals were not on our short witness list that we |
| 16:05:29 | 20 | provided. |
| 16:05:31 | 21 | MR. KALLON:  Ms. Richardson was. |
| 16:05:32 | 22 | THE COURT:  That doesn't matter. |
| 16:05:34 | 23 | MR. G. WIGGINS:  Excuse me.  Ms. Richardson |
| 16:05:36 | 24 | is not on that list to begin with. |
| 16:05:38 | 25 | THE COURT:  Mr. Wiggins, you understand I |

| | | |
|---|---|---|
| 16:05:40 | 1 | don't even want to hear that. |
| 16:05:41 | 2 | Do you have something else? |
| 16:05:42 | 3 | MR. G. WIGGINS:  Judge, we will do our |
| 16:05:44 | 4 | absolute best to get these people from all over the |
| 16:05:47 | 5 | country in here, but it's going to be extremely |
| 16:05:49 | 6 | difficult to get them in here within the 24 to 36 hours. |
| 16:05:53 | 7 | We're talking about people -- |
| 16:05:54 | 8 | MR. WHITE:  Sorry.  I apologize. |
| 16:05:56 | 9 | MR. G. WIGGINS:  -- up in the northeast, up |
| 16:05:58 | 10 | in the midwest, work -- I don't know what these people |
| 16:06:02 | 11 | do.  I will do my best to get them here, if they want to |
| 16:06:04 | 12 | pay for it. |
| 16:06:05 | 13 | THE COURT:  How many of these plaintiffs |
| 16:06:06 | 14 | have you listed? |
| 16:06:08 | 15 | MR. WHITE:  Eight. |
| 16:06:08 | 16 | THE COURT:  Eight?  And who are they? |
| 16:06:10 | 17 | MR. WHITE:  They have had it for several |
| 16:06:12 | 18 | days. |
| 16:06:12 | 19 | MR. ST. CLAIR:  I'll read the names, Your |
| 16:06:14 | 20 | Honor.  Shellah, I believe it's Brown; Rita Stroud, |
| 16:06:23 | 21 | Porfiorio Barros, Earl Butler, Jr., Earl Fowler, Bill |
| 16:06:32 | 22 | Detter, Paul Palladin, and Barbara Richardson. |
| 16:06:37 | 23 | MR. WHITE:  We gave them a list the Saturday |
| 16:06:39 | 24 | before we started the trial. |
| 16:06:40 | 25 | THE COURT:  Of these specific eight names? |

| | | |
|---|---|---|
| 16:06:43 | 1 | MR. G. WIGGINS:  That is absolutely not |
| 16:06:45 | 2 | true, Your Honor.  Absolutely not true. |
| 16:06:47 | 3 | MR. MAY:  Your Honor, may I? |
| 16:06:48 | 4 | THE COURT:  Yes, sir. |
| 16:06:49 | 5 | MR. MAY:  Mr. Wiggins and I spoke by |
| 16:06:51 | 6 | telephone.  I was at my home at my home desk.  I spoke |
| 16:06:55 | 7 | to him and gave him the names of the plaintiffs that we |
| 16:06:59 | 8 | were anticipating wanting to call. |
| 16:07:01 | 9 | THE COURT:  That -- that included these |
| 16:07:05 | 10 | eight plaintiffs -- |
| 16:07:07 | 11 | MR. ST. CLAIR:  It did, Your Honor. |
| 16:07:09 | 12 | MR. MAY:  Mr. Wiggins says it was Monday |
| 16:07:11 | 13 | night.  I recall it was Saturday, but I will go with his |
| 16:07:15 | 14 | Monday night.  That's before trial started. |
| 16:07:18 | 15 | THE COURT:  All right. |
| 16:07:21 | 16 | MR. MAY:  He may be correct. |
| 16:07:23 | 17 | THE COURT:  How many class -- how many |
| 16:07:30 | 18 | lawyers for the class -- how many lawyers for the |
| 16:07:33 | 19 | collective assembly? |
| 16:07:36 | 20 | MR. G. WIGGINS:  One, two, three, four, |
| 16:07:38 | 21 | five. |
| 16:07:38 | 22 | THE COURT:  All right.  One of y'all in the |
| 16:07:41 | 23 | next hour and a half or so will call these seven people. |
| 16:07:48 | 24 | The one who lives in Eutaw will be available tomorrow. |
| 16:07:51 | 25 | But call the other seven people and tell me by the end |

16:07:54  1   of the day what difficulty, if any, that plaintiff was

16:07:59  2   going to have in being here.

16:08:02  3            MR. G. WIGGINS:  Thank you, Your Honor.

16:08:09  4            MR. WHITE:  What time?

16:08:10  5            THE COURT:  Oh, I didn't tell the jury what

16:08:11  6   time to come back, did I?  4:15.

16:08:20  7            MR. QUINN:  Are we in recess, Your Honor?

16:08:22  8            THE COURT:  Yes.  You're in recess.

16:08:22  9        (Recess taken from 4:00 p.m. until 4:15 p.m.)

16:26:00  10           (In open court, jury not present.)

16:26:00  11           THE COURT:  All right.  Ladies and

16:26:06  12  gentlemen, I have to bring to your attention that we

16:26:09  13  have received an unsolicited note from one of the

16:26:13  14  jurors.  And I will just read it.  It's 30 hours -- "if

16:26:20  15  30 hours is considered full-time, do clerks get sick

16:26:24  16  pay, vacation pay, or medical benefits?"

16:26:29  17           Now, I think I've told this jury that

16:26:35  18  they're not allowed to ask questions.

16:26:39  19           MR. QUINN:  Or start their deliberations.

16:26:42  20           THE COURT:  What -- how do you suggest I

16:26:45  21  respond to this, if at all?

16:26:51  22           MR. QUINN:  Read the question again, please,

16:26:53  23  sir.

16:26:53  24           THE COURT:  "If 30 hours is considered

16:26:56  25  full-time, do clerks get sick pay, vacation pay, or

16:27:01   1   medical benefits?"

16:27:04   2            MR. JOHNSON:  The answer is no, I think,

16:27:06   3   Your Honor.

16:27:08   4            MR. ST. CLAIR:  Your Honor, our suggestion

16:27:09   5   would be to say to them that it's not appropriate at

16:27:13   6   this time in the case that I answer any questions from

16:27:15   7   the jury.

16:27:16   8            THE COURT:  Well, I don't think they asked

16:27:18   9   for me to answer it, but I will just tell the jury that

16:27:21   10  it's not permitted to ask questions.  If that's what

16:27:24   11  y'all --

16:27:26   12           MR. ST. CLAIR:  That's a question they want

16:27:27   13  to have asked?

16:27:28   14           MR. QUINN:  That's a question they want to

16:27:30   15  have asked?

16:27:30   16           THE COURT:  This is a question they want an

16:27:32   17  answer to.

16:27:32   18           MR. QUINN:  Yeah.  Yeah.  They want an

16:27:34   19  answer to that question.

16:27:36   20           Well, I would suggest that just during the

16:27:39   21  course of the testimony, from now to the end of the

16:27:41   22  testimony, that we answer that question.

16:27:41   23           THE COURT:  Well, I will tell the jury --

16:27:44   24  I'll tell the jury that they are not allowed to ask

16:27:49   25  questions, but that the Court will ask this question of

| | | |
|---|---|---|
| 16:27:59 | 1 | the next company official who testifies. |
| 16:28:05 | 2 | Do y'all object to that, or what? |
| 16:28:08 | 3 | MR. ST. CLAIR:  What was the question? |
| 16:28:10 | 4 | Well, Your Honor, I suspect this:  If Your Honor |
| 16:28:12 | 5 | doesn't ask it, someone in the courtroom will. |
| 16:28:14 | 6 | THE COURT:  "If 30 hours is considered full- |
| 16:28:18 | 7 | time, do clerks get sick pay, full pay or medical |
| 16:28:23 | 8 | benefits?" |
| 16:28:23 | 9 | "If 30 hours is considered full-time, do |
| 16:28:26 | 10 | clerks get sick pay, vacation pay, or medical benefits?" |
| 16:28:31 | 11 | MR. WHITE:  My concern is if you said |
| 16:28:33 | 12 | something like the next company official, they would |
| 16:28:35 | 13 | think it would be the next store manager witness or |
| 16:28:38 | 14 | something. |
| 16:28:39 | 15 | I understand the mission.  I was trying to |
| 16:28:41 | 16 | think -- |
| 16:28:42 | 17 | THE COURT:  Well, what do you suggest? |
| 16:28:43 | 18 | MR. WHITE:  I think you say that they're not |
| 16:28:46 | 19 | permitted to ask questions at the time, but their |
| 16:28:48 | 20 | question has been communicated to the lawyers. |
| 16:28:51 | 21 | THE COURT:  All right.  All right. |
| 16:28:54 | 22 | MR. WHITE:  How about that? |
| 16:28:55 | 23 | MR. R. WIGGINS:  I didn't hear that. |
| 16:28:58 | 24 | MR. QUINN:  Just say the question has been |
| 16:29:00 | 25 | communicated to the lawyers. |

16:29:01  1          THE COURT:  Okay.

16:33:35  2              (In open court, jury present.)

16:33:35  3          THE COURT:  Ladies and gentlemen, I've

16:33:38  4   received this note, and I remind you that the jurors are

16:33:41  5   not permitted to ask questions.  But I have passed the

16:33:47  6   note on to -- well, I've told the lawyers about the

16:33:51  7   note, so hopefully the issue will be addressed before

16:33:56  8   all the evidence is in.

16:34:02  9              Mr. Calamusa?

16:34:04 10   BY MR. CALAMUSA:

16:34:04 11      Q.  Mrs. Brisco, before the break, we talked for a

16:34:08 12   second about Mr. Vogt, V-O-G-H-T; isn't that right?

16:34:12 13      A.  Yes, sir.

16:34:13 14      Q.  He was your RVP for a period of time?

16:34:15 15      A.  Yes, sir.

16:34:15 16      Q.  When he was your RVP, did you follow the

16:34:19 17   directions sent down to him?

16:34:22 18      A.  I followed my district manager.  I didn't have

16:34:25 19   any indirect or direct conversation or emails, anything

16:34:30 20   from him that I recall today.

16:34:32 21      Q.  If your RVP told you to do something, would you

16:34:36 22   follow it?

16:34:37 23      A.  Yes, I would.

16:34:38 24      Q.  And you know who Bruce Barkus is?

16:34:42 25      A.  Yes.

16:34:43  1    Q.   He is the executive vice-president of Store

16:34:46  2  Operations; correct?

16:34:47  3    A.   Yes.

16:34:47  4    Q.   And we saw a chart of hierarchy the other day;

16:34:50  5  he's the top man of Store Operations; right?

16:34:52  6    A.   Yes, sir, he was.

16:34:53  7    Q.   If Mr. Barkus sent down a policy, would you

16:34:59  8  follow it?

16:34:59  9    A.   I would if -- I mean, I would.  It depends on the

16:35:06  10  situation.  I would -- I work directly with my district

16:35:09  11  manager.  And if I had a problem with the policy that I

16:35:12  12  felt that didn't work for me, I'd have a discussion with

16:35:15  13  them.  So...

16:35:16  14    Q.   Has your district manager ever told you to

16:35:18  15  disregard a policy that came from the RVP?

16:35:21  16    A.   No, he has not.

16:35:23  17    Q.   Has he ever told you to disregard a policy that

16:35:26  18  came from Bruce Barkus?

16:35:27  19    A.   No, he has not.

16:35:28  20    Q.   Has he ever told to you disregard a policy that's

16:35:31  21  found in the policy manual or the Strands?

16:35:33  22    A.   No, he has not.

16:35:34  23    Q.   You have an assistant manager in your stores;

16:35:44  24  correct?  When you were in the store, you had assistant

16:35:46  25  managers?

16:35:46  1    A.   Yes, sir, I did.

16:35:47  2    Q.   And there was a period of time on a normal week

16:35:52  3    where you were in the store at the same time as your

16:35:54  4    assistant; right?

16:35:55  5    A.   Yes, sir.

16:35:56  6    Q.   And I'm correct, aren't I, that when you both

16:35:58  7    were in the store at the same time, the two of you

16:36:02  8    shared supervisory responsibilities; right?

16:36:04  9    A.   If we both was in the store?  It depends on the

16:36:08  10   -- yeah.  That could be possible.

16:36:11  11   Q.   Remember me asking -- I think I've covered this:

16:36:16  12   "But when you and your assistants are in the store at

16:36:20  13   the same time, I think you've told me, but is it true

16:36:22  14   that y'all did share some of the supervisory

16:36:24  15   responsibilities?"  And you answered "yes, sir"?

16:36:26  16   A.   That could be true, yeah.

16:36:27  17   Q.   Okay.  Now, you told me about your last store

16:36:37  18   having a mobile stocking team?

16:36:38  19   A.   Yes, sir.

16:36:39  20   Q.   Are you aware -- you tell me any of the 1,424

16:36:43  21   plaintiffs that also had a mobile stocking team?

16:36:46  22   A.   I don't even know who the plaintiffs are, so I

16:36:49  23   can't answer that.

16:36:50  24   Q.   So I assume, then, you can't tell me any of the

16:36:53  25   1,424 plaintiffs that had as big of a staff as you did?

16:36:56    1    A.   I don't know, sir.

16:36:58    2    Q.   Or were given the resources that you were given

16:37:00    3    in your store, you just don't --

16:37:04    4    A.   I don't know anything about that.

16:37:04    5    Q.   And you'd also, then, I would assume, not be able

16:37:10    6    to sit here and testify as to what goes on, on a

16:37:13    7    day-to-day basis in any of the 1,424 plaintiffs' stores?

16:37:17    8    A.   No, sir.  I can only testify as to what took

16:37:20    9    place in my store.

16:37:21   10    Q.   And, then, you cannot tell us what any of the

16:37:25   11    1,424 plaintiffs' district managers may have told them

16:37:29   12    they have to do?

16:37:30   13    A.   No, sir, I cannot.

16:37:31   14    Q.   Or what authority they have or not have?

16:37:33   15    A.   No, sir, I cannot.

16:37:34   16    Q.   You -- you testified today as to how you handle

16:37:40   17    certain policies, and you can't tell us whether or not

16:37:45   18    1,424 plaintiffs that are in this case chose to

16:37:49   19    disregard the hiring policies and emails, can you?

16:37:52   20    A.   No, sir.  Again, I can only tell you what I did

16:37:54   21    in my store in my particular situations.

16:37:58   22    Q.   Which would then lead me to assume that I'm

16:38:02   23    correct you can't tell me what the 1,424 plaintiffs did,

16:38:06   24    if any of them, disregarded the discharge policies?

16:38:08   25    A.   No, I don't know.  I wouldn't be able to tell you

16:38:11  1   that.

16:38:11  2       Q.  Because you don't know any of these individuals,

16:38:24  3   you also then do not know if any of the 1,424 plaintiffs

16:38:33  4   disregarded or handled any of the policies the way you

16:38:37  5   do?

16:38:38  6       A.  No, I can't answer that.  I don't know, sir.

16:38:40  7       Q.  And you don't know what their DMs told them?

16:38:43  8       A.  No, sir, I do not.

16:38:44  9       Q.  What their actual duties were on a day-to-day,

16:38:48  10  real-world basis?

16:38:49  11      A.  I don't know what took place in their stores, no,

16:38:52  12  sir, I don't know.  I only know what happened in my

16:38:54  13  stores.

16:38:54  14      Q.  Or what their primary duty was, you have no idea?

16:38:58  15      A.  I would -- no.  I just know what my job is as a

16:39:04  16  store manager should be -- I can't answer that.

16:39:08  17      Q.  You don't know?

16:39:09  18      A.  I can't answer that.

16:39:10  19              MR. CALAMUSA:  Thank you.

16:39:14  20              THE COURT:  Redirect?

16:39:15  21                  **REDIRECT EXAMINATION**

16:39:16  22  **BY MR. MILLER:**

16:39:18  23      Q.  Ms. Brisco, you testified earlier that you're in

16:39:24  24  a position with Human Resources?

16:39:26  25      A.  Yes, sir, I am.

16:39:27    1      Q.   Can you tell me if a clerk is scheduled to work

16:39:31    2   30 hours, does that mean they're entitled to benefits?

16:39:34    3      A.   I'm not absolutely sure on that.  I'm the Human

16:39:38    4   Resource manager.  I haven't really gotten into that

16:39:42    5   phase of it, so I don't think I can answer that

16:39:45    6   question.

16:39:45    7      Q.   Are you familiar with the associate handbook?

16:39:49    8      A.   Vaguely.

16:39:50    9      Q.   You were asked some questions earlier about

16:40:01   10   ordering?

16:40:02   11      A.   Yes.

16:40:03   12      Q.   You were asked about clothing and seasonal

16:40:09   13   items --

16:40:10   14      A.   Yes.

16:40:10   15      Q.   -- and I believe replenishment items?

16:40:15   16      A.   Yes.

16:40:15   17      Q.   You were asked what else appears on the truck

16:40:20   18   that you don't order.  Do you remember that?

16:40:22   19      A.   That I don't order?

16:40:23   20      Q.   Yes, ma'am.  That was the question you were

16:40:24   21   asked?

16:40:25   22      A.   Yes.

16:40:25   23      Q.   What I would like to know is, what appears on the

16:40:28   24   truck that you do order?

16:40:29   25      A.   I would probably say 80 percent of the store is

16:40:35   1   schematic merchandise.  A schematic item in the store
16:40:38   2   are items that the customer can come in the store on a
16:40:42   3   daily basis and always find Tide.  You can always find
16:40:46   4   Dove.  You can always find the basic everyday living --
16:40:51   5   a seasonal item is an item that we only carry for that
16:40:54   6   particular period.  Coolers, fans, you won't find in the
16:40:57   7   winter in Family Dollar.  Those are items that I don't
16:40:59   8   directly order.
16:41:00   9        However, I do have the ability to call the buyer
16:41:02   10  if I need more.  The schematic items are all coming on
16:41:05   11  the same truck.
16:41:07   12  Q.   You testified about -- or were asked questions
16:41:11   13  about a mobile stocking team.
16:41:13   14  A.   Yes, sir.
16:41:13   15  Q.   Did you have stores -- did I understand correctly
16:41:17   16  in some stores that were covered by the mobile stocking
16:41:19   17  team and some that weren't?
16:41:21   18  A.   Yes, sir.  Out of the five stores I ran, only the
16:41:24   19  last store was a test store for a brief period that --
16:41:28   20  the mobile stocking team.  I did not have them in the
16:41:30   21  four stores previous to 4775.
16:41:34   22  Q.   You were also asked about you and the assistant
16:41:39   23  manager being in the store at the same time?
16:41:40   24  A.   Yes.
16:41:41   25  Q.   And having -- sharing some of the same

16:41:42   1   responsibilities?

16:41:43   2      A.   Yes.   Yes, sir.   Basically, the assistant manager

16:41:47   3   could run the front end, hire -- I would like to give

16:41:52   4   you a situation.

16:41:53   5         If both of us are there and a customer come in

16:41:55   6   and a customer have a problem, the assistant manager

16:41:57   7   will come to me and ask me for directions.   So I'm still

16:42:02   8   the person in charge.

16:42:03   9         There are some things, like if we have a cashier

16:42:05   10  in the front and both of us are there, somebody hit the

16:42:07   11  bell and they need a void, that assistant manager can

16:42:10   12  take care of that void and don't need to come and get

16:42:13   13  me, because both of them are there.   That's something

16:42:15   14  that she can do with both of us there.   Either one of

16:42:18   15  that's closest to the front, if that's what they need to

16:42:21   16  do is turn the key to do a void, either one of us can do

16:42:24   17  it.

16:42:24   18        That's what I mean when I say share the

16:42:27   19  responsibility.

16:42:28   20     Q.   Are you involved as a store manager in training

16:42:32   21  the assistant manager?

16:42:32   22     A.   Yes, I am.

16:42:33   23     Q.   Are you involved in training them to do some of

16:42:36   24  those tasks?

16:42:37   25     A.   Yes --

| | | |
|---|---|---|
| 16:42:38 | 1 | MR. CALAMUSA:  Objection. |
| 16:42:39 | 2 | THE COURT:  The objection to leading is |
| 16:42:41 | 3 | sustained.  Ladies and gentlemen, disregard the last |
| 16:42:45 | 4 | question and answer. |
| 16:42:48 | 5 | BY MR. MILLER: |
| 16:42:48 | 6 | Q.  Ms. Brisco, as regards to you as the store |
| 16:42:53 | 7 | manager, what role does the assistant manager have in |
| 16:42:55 | 8 | giving, if any, in giving you directions? |
| 16:42:58 | 9 | A.  No directions.  They don't give me any |
| 16:43:01 | 10 | directions.  I give them to them. |
| 16:43:02 | 11 | Q.  What role, if any, does the assistant manager |
| 16:43:04 | 12 | have in evaluating you? |
| 16:43:05 | 13 | A.  None. |
| 16:43:07 | 14 | Q.  What role, if any, does the assistant manager |
| 16:43:09 | 15 | have in disciplining you? |
| 16:43:12 | 16 | A.  None. |
| 16:43:13 | 17 | Q.  Do you have any role in that regard as to the |
| 16:43:18 | 18 | assistant manager? |
| 16:43:19 | 19 | A.  Yes, I do. |
| 16:43:20 | 20 | Q.  And as to -- between the two of you, if you and |
| 16:43:24 | 21 | the assistant manager are both in the store, is one of |
| 16:43:26 | 22 | you in charge? |
| 16:43:27 | 23 | A.  Yes, I am. |
| 16:43:34 | 24 | MR. MILLER:  Thank you, Ms. Brisco. |
| 16:43:37 | 25 | THE WITNESS:  Thank you. |

<u>**RECROSS EXAMINATION**</u>

<u>**BY MR. CALAMUSA:**</u>

Q.   80 percent is the number I wrote down.  Did I write that down?  80 percent of your store is governed by schematics?

A.   Yes.  I said about 80 percent.

Q.   And you're aware, aren't you, Ms. Brisco, of the company policy that says "under no circumstances should schematics be altered without approval from the district manager"?

A.   No, sir, I am not.

Q.   Find the small transcript.  Page 249?

A.   Uh-huh.

MR. MILLER:  Your Honor, I believe this may be outside the scope of direct.  He's asking about altering schematics and I asked about ordering.

MR. CALAMUSA:  He talked about schematics and how much was schematics.

THE COURT:  The objection is overruled.

BY MR. CALAMUSA:

Q.   The question, starting at line 23 there, Ms. Brisco:  "Are you aware that company policy states that monthly schematics differ from store to store, depending on layout?  The last line says, quote:  'Under no circumstances should schematics be altered without

| | | |
|---|---|---|
| 16:45:01 | 1 | approval from the district manager,' closed quotes.  Are |
| 16:45:04 | 2 | you aware of that?"  And your answer? |
| 16:45:06 | 3 | A.   I'm still trying to find where you're reading at. |
| 16:45:10 | 4 | Q.   I'm so sorry.  Right here (indicating). |
| 16:45:14 | 5 | A.   Okay. |
| 16:45:15 | 6 | Q.   "Under" -- quote, "under no" -- last line says: |
| 16:45:18 | 7 | "Under no circumstances should the schematics be altered |
| 16:45:21 | 8 | without approval from the district manager.  Are you |
| 16:45:24 | 9 | aware of that?"  And your answer? |
| 16:45:25 | 10 | A.   "Yes, I am."  What I mean -- |
| 16:45:28 | 11 | Q.   I'm sorry. |
| 16:45:29 | 12 | A.   Can I clarify?  What I meant is the policy may |
| 16:45:33 | 13 | state that -- I misunderstood the way you asked me the |
| 16:45:35 | 14 | question. |
| 16:45:36 | 15 | That may be the policy, but as the store manager, |
| 16:45:39 | 16 | I make the decision based on what I need in my store. |
| 16:45:43 | 17 | Every schematic is not a fit for that store. |
| 16:45:46 | 18 | You, as the manager, have to determine -- I know |
| 16:45:48 | 19 | what sells in my store.  Something called for one vase, |
| 16:45:51 | 20 | and I know it's an excellent item and I need five vases, |
| 16:45:56 | 21 | then I can, too, alter that schematic. |
| 16:45:59 | 22 | Q.   And you have to notify your DM? |
| 16:46:02 | 23 | A.   Well, I can keep them in the loop and let them |
| 16:46:05 | 24 | know that this is what I feel strongly about in my |
| 16:46:09 | 25 | store.  And, again, I haven't had them tell me not to. |

16:46:12    1      Q.   But you have to tell them.

16:46:14    2           Now, I understand they're going to testify that

16:46:17    3    -- or you've testified they may not tell you no, you

16:46:20    4    can't, but the policy is what your practice is, if

16:46:23    5    you're going to make these changes, you let your DM

16:46:27    6    know; right?

16:46:27    7      A.   I would keep them in the loop, but I still could

16:46:30    8    make the decision.  I'm sorry.

16:46:31    9           THE COURT:  Well, you say you keep them in

16:46:34   10    the loop, but you make the decision?

16:46:35   11           THE WITNESS:  Yes.

16:46:35   12           THE COURT:  Are you saying that even if they

16:46:37   13    tell you don't do it, you'll do it?

16:46:40   14           THE WITNESS:  What I'm saying, Your Honor, I

16:46:41   15    believe is, because of my years experience as a store

16:46:43   16    manager, that when I went to them, I pretty much had all

16:46:46   17    the facts.  And, you know, I had the numbers to back me

16:46:49   18    up on a particular item.

16:46:51   19           If we had Gain in the schematic from

16:46:53   20    corporate, shows one vase, and I knew based on my

16:46:57   21    percentage of sales on that item that we sell 25, and

16:47:02   22    they want to cut it down to one, I had the facts, and I

16:47:04   23    did not have them tell me not to do it, is what I'm

16:47:06   24    trying to say.

16:47:09   25           MR. CALAMUSA:  Your Honor, I may be able to

| | | |
|---|---|---|
| 16:47:11 | 1 | clear it up real quick. |
| 16:47:14 | 2 | BY MR. CALAMUSA: |
| 16:47:14 | 3 | Q.   Looking at Page 83 over here, right here at 17. |
| 16:47:28 | 4 | "Can you change the schematics of your store?" |
| 16:47:31 | 5 | A.   And I say "yes". |
| 16:47:32 | 6 | Q.   "Any way you want?" |
| 16:47:33 | 7 | A.   "Excuse me?" |
| 16:47:35 | 8 | Q.   "You can set the store up any way you want?" |
| 16:47:40 | 9 | Your answer? |
| 16:47:40 | 10 | A.   I said "no, they give us a schematic to go by." |
| 16:47:43 | 11 | Q.   "Okay.  You have to follow the schematics?" |
| 16:47:45 | 12 | A.   You have the follow the schematic flow. |
| 16:47:47 | 13 | Q.   Read the answer, please. |
| 16:47:49 | 14 | A.   Oh, I'm sorry.  Okay.  Which number did you stop |
| 16:47:54 | 15 | on?  I'm sorry. |
| 16:47:55 | 16 | Q.   We stopped on 24. |
| 16:47:57 | 17 | A.   Okay. |
| 16:47:57 | 18 | Q.   "You have to follow the schematic?" |
| 16:47:59 | 19 | A.   "Well, in some instances, you can make changes, |
| 16:48:02 | 20 | but you have to -- on those you can -- you have to let |
| 16:48:05 | 21 | your DM know." |
| 16:48:06 | 22 | Q.   "So the only changes you can make to the |
| 16:48:09 | 23 | schematic are those that you notify your DM of?" |
| 16:48:12 | 24 | A.   "You can make them, sir, but you just --" |
| 16:48:15 | 25 | Q.   "You're not supposed to?" |

16:48:26  1      A.   "Well, you can.  You let him know beforehand.

16:48:26  2      Q.   "So you have to follow the schematic.  If you're

16:48:26  3  going to vary from the schematic, you're required to let

16:48:26  4  your DM know; right?"

16:48:27  5      A.   "Yes.  I don't know if you're required, but

16:48:30  6  that's what I do."

16:48:33  7               MR. CALAMUSA:  Thank you, Ms. Brisco.

16:48:34  8               THE WITNESS:  Thank you.

16:48:35  9               MR. MILLER:  Nothing further.  May the

16:48:37  10  witness be excused?

16:48:38  11               THE COURT:  Yes.  The witness may be

16:48:40  12  excused.

16:48:40  13                    (Witness excused.)

16:48:40  14               THE WITNESS:  Thank you, Your Honor.

16:48:42  15               THE COURT:  Thank you.  Defendant will call

16:48:44  16  its next witness.

16:48:46  17               MR. KALLON:  Your Honor, we call Cathy

16:48:49  18  Jenne.

16:49:08  19          **CATHY JENNE, DEFENDANT'S WITNESS, SWORN,**

16:49:10  20               THE CLERK:  State your name for the record,

16:49:11  21  please.

16:49:12  22               THE WITNESS:  Cathy Jenne.

16:49:22  23               MR. KALLON:  Good afternoon, Ms. Jenne.

16:49:22  24               THE CLERK:  Spell your last name for the

16:49:24  25  record, please.

|          |    |                                                      |
|----------|----|------------------------------------------------------|
| 16:49:24 | 1  | THE WITNESS:  J-E-N-N-E. |
| 16:49:24 | 2  | **DIRECT EXAMINATION** |
| 16:49:29 | 3  | **BY MR. KALLON:** |
| 16:49:29 | 4  | Q.  Ms. Jenne, good afternoon. |
| 16:49:31 | 5  | A.  Good afternoon. |
| 16:49:31 | 6  | Q.  How are you today? |
| 16:49:32 | 7  | A.  I'm good, thank you. |
| 16:49:34 | 8  | Q.  Ms. Jenne, tell the jury where you live, please. |
| 16:49:38 | 9  | A.  Pardon me? |
| 16:49:39 | 10 | Q.  Please tell the jury where you live. |
| 16:49:40 | 11 | A.  I live in Gallion, Ohio. |
| 16:49:42 | 12 | Q.  And for those of us who are not from the Ohio |
| 16:49:45 | 13 | area, please tell us where Gallion is in relation to |
| 16:49:49 | 14 | Cleveland or any of the big cities. |
| 16:49:51 | 15 | A.  It's 60 miles north of Columbus. |
| 16:49:53 | 16 | Q.  And how long have you lived in that area? |
| 16:49:55 | 17 | A.  Oh, about 44 years. |
| 16:49:57 | 18 | Q.  Pretty much that's where you're from? |
| 16:50:00 | 19 | A.  Pretty much so, yes. |
| 16:50:01 | 20 | Q.  Ms. Jenne, where do you work? |
| 16:50:03 | 21 | A.  I work for Family Dollar in Mansfield, Ohio. |
| 16:50:06 | 22 | Q.  And how long have you worked at Family Dollar? |
| 16:50:08 | 23 | A.  Eight years. |
| 16:50:09 | 24 | Q.  Please take us through your employment history |
| 16:50:12 | 25 | from the date you were hired to your current position. |

16:50:15   1    A.   Okay.  I hired in as an assistant manager.  I was

16:50:23   2  an assistant manager for two-and-a-half months and

16:50:27   3  became the store manager, and I've been in that store

16:50:29   4  the whole time.

16:50:30   5    Q.   You've been a store manager for roughly how long?

16:50:33   6    A.   Almost my entire career with Family Dollar.

16:50:36   7  Almost eight years.

16:50:37   8    Q.   Please tell the ladies and gentlemen of the jury

16:50:39   9  what you do as a store manager.

16:50:41  10    A.   I direct my people that I have.  I have three

16:50:49  11  assistants, two full-time and one part-time.  And I

16:50:52  12  direct my cashiers.

16:50:53  13       I do help unload the truck.  I do price changes,

16:50:58  14  cycle counts.  I protect the assets of the store.  I

16:51:02  15  tell my people what I need done when I'm not there, make

16:51:06  16  sure that the things are done.

16:51:09  17    Q.   How many hours a week is considered full-time?

16:51:12  18    A.   52 -- well, full-time for cashiers is 30 hours.

16:51:19  19    Q.   And your full-time cashiers, do they get -- I'm

16:51:23  20  sorry -- your full-time, 30-hour employees, do they get

16:51:26  21  paid vacations?

16:51:27  22    A.   Yes, they do, if they're full-time.

16:51:30  23    Q.   How long do they have to be employed before they

16:51:34  24  get vacations?

16:51:35  25    A.   One year.

16:51:36  1      Q.   And after a year's work of service, how much
16:51:41  2   vacation are they eligible for?
16:51:42  3      A.   One week.
16:51:43  4      Q.   And does that number increase as the years of
16:51:48  5   service increase?
16:51:49  6      A.   Yes, it does.
16:51:50  7      Q.   And how does it increase?
16:51:51  8      A.   I don't really know the time table, but I think
16:51:57  9   it's after three years -- two years, you might get an
16:52:03 10   extra day tacked on as a full-time.
16:52:07 11           I went straight to two weeks, because I was in
16:52:10 12   management.  So -- I'm not sure just exactly how Human
16:52:19 13   Resources dictates that to us, you know.  They let us
16:52:21 14   know which of our employees has vacation time coming and
16:52:24 15   how much.
16:52:26 16                    THE COURT:  But this is for the --
16:52:29 17                    THE WITNESS:  Assistants.
16:52:30 18                    THE COURT:   -- the assistants and the
16:52:32 19   cashiers?
16:52:33 20                    THE WITNESS:  Okay.  My assistants in my
16:52:35 21   store, I require them to work 40 hours.
16:52:37 22   BY MR. KALLON:
16:52:37 23      Q.   Ms. Jenne, I think Your Honor's question -- my
16:52:40 24   question was more so, who becomes eligible for vacation?
16:52:45 25   Is that only the assistants?

16:52:47  1      A.   No, it's the cashiers, if they work X number of

16:52:51  2  hours.

16:52:52  3                  THE COURT:   And what is that number?

16:52:54  4                  THE WITNESS:   30 hours a week.

16:52:56  5                  THE COURT:   All right.   The cashiers become

16:52:57  6  eligible for vacation if they work 30 hours a week?

16:53:03  7                  THE WITNESS:   Yes, sir.

16:53:03  8                  THE COURT:   And the -- are they eligible for

16:53:07  9  sick pay?

16:53:07  10                 THE WITNESS:   No, Your Honor.

16:53:08  11                 THE COURT:   Are they eligible for medical

16:53:11  12  benefits?

16:53:11  13                 THE WITNESS:   Yes, Your Honor.

16:53:13  14                 THE COURT:   And what medical benefits are

16:53:15  15  the cashiers who work 30 hours a week?

16:53:19  16                 THE WITNESS:   There's insurance, there's

16:53:22  17  401-K, there is stock option, there is dental, there is

16:53:28  18  prescription card.

16:53:30  19                 THE COURT:   All right.   And how about the --

16:53:33  20  the stockers?

16:53:36  21                 THE WITNESS:   I don't have any stockers,

16:53:37  22  sir.

16:53:38  23                 THE COURT:   All right.

16:53:39  24                 THE WITNESS:   No.

16:53:39  25                 THE COURT:   You only have cashiers and

16:53:43 1   assistants?

16:53:43 2                   THE WITNESS:  Yes, sir.

16:53:44 3                   THE COURT:  Okay.  And the cashier is

16:53:51 4   full-time at 40 hours a week?

16:53:54 5                   THE WITNESS:  At 30.

16:53:55 6                   THE COURT:  At 30?

16:53:56 7                   THE WITNESS:  Uh-huh.

16:53:56 8                   THE COURT:  The assistant is full-time at

16:53:58 9   40.

16:53:58 10                  THE WITNESS:  The assistants are full-time

16:54:00 11  at 30, according to the company.  But I require them to

16:54:03 12  work 40 hours, because they're single mothers and they

16:54:08 13  have high maintenance teenagers, so I feel they deserve

16:54:12 14  the 40 hours.

16:54:13 15                  THE COURT:  I see.

16:54:15 16  BY MR. KALLON:

16:54:17 17     Q.  Mrs. Jenne, take us through your daily routine.

16:54:21 18  What, if anything, do you to plan for work day?

16:54:26 19     A.  I go in, I open my store, take the deposit to the

16:54:29 20  bank, I look around.  The first thing when I get back

16:54:33 21  from the bank, the first thing I do is a walk my store.

16:54:38 22  Anything that I see that needs cleaned up, fixed, I have

16:54:44 23  things -- a to-do list, and I start writing down.

16:54:46 24      I make sure that my cashiers maintain the front

16:54:50 25  portion of the store so they can always cover their

16:54:54    1   register area and protect the front of the store.  So

16:54:58    2   it's their job to keep that cleaned up, put any freight

16:55:02    3   away, any shoes, keep our stock lines cleaned.

16:55:06    4        It's up to my assistants to empty out the

16:55:09    5   stockroom for me.  I do help put freight out on freight

16:55:12    6   day and probably the day after.  But then my week is

16:55:16    7   taken up doing price changes, cycle counts, making sure

16:55:25    8   that they're doing what I've asked them to do, that they

16:55:28    9   get it done.

16:55:29   10        Q.  And how do you communicate to the employees, I

16:55:32   11   guess, the task that you want them to do on a day-to-day

16:55:35   12   basis?

16:55:36   13        A.  I have things, a to-do list that I utilize.  And

16:55:40   14   in the mornings, I make a list of what I want to do, and

16:55:43   15   I lay it on the break table.  So when they come in, they

16:55:46   16   check that list.

16:55:47   17        Q.  And what, if anything, do you do in the course of

16:55:50   18   the day to check to see if the things on the to-do list

16:55:53   19   have been carried out?

16:55:55   20        A.  I -- I go up to them and make sure that, you

16:55:59   21   know, they have performed the duties that I've asked

16:56:02   22   them to do for that day.  I check.  I double check them,

16:56:05   23   make sure it's done the way I want it done.

16:56:08   24        Q.  Have you ever had a situation where someone did

16:56:12   25   not do an assigned task?

16:56:14  1     A.  Yes, I have.

16:56:14  2     Q.  When that situation arose, tell the jury how you

16:56:18  3  would handle that situation.

16:56:19  4     A.  I checked the day's receipts, and if we were

16:56:26  5  extremely busy, then I could understand why they did not

16:56:30  6  get that task done, and I postponed it until the next

16:56:32  7  day.

16:56:34  8     If we were a very slow day and the task didn't

16:56:38  9  get done and I couldn't see where they progressed to

16:56:42  10  anything during the day, then I would write them up.

16:56:45  11    Q.  And I take it in light of what you've said as a

16:56:51  12  store manager, do you have any responsibility for

16:56:56  13  disciplining the employees at your store?

16:56:57  14    A.  Yes, I do.

16:56:58  15    Q.  And have you, in fact, done so in the course of

16:57:02  16  your career as a store manager?

16:57:03  17    A.  Yes, I have.

16:57:04  18    Q.  Without getting into too much detail, please give

16:57:08  19  the ladies and gentlemen of the jury an example -- some

16:57:10  20  examples, excuse me, of some of the things that you've

16:57:14  21  disciplined employees for.

16:57:15  22    A.  Not showing up for work, not calling in.  If it

16:57:22  23  was an extenuating circumstance, I would let it ride.

16:57:25  24  If they had been there for any length of time, I would

16:57:29  25  write them up.  That's basically the biggest thing, is

16:57:36   1   -- is the no-show, or not calling into work.

16:57:40   2        I have disciplined them with a writeup as far as

16:57:42   3   not getting something done that I asked them to do when

16:57:46   4   we were not very busy.  But mainly, my store runs very

16:57:50   5   smoothly, sir.

16:57:51   6   Q.   Tell the ladies and gentlemen of the jury, I

16:57:53   7   guess, the different steps of the discipline process.

16:57:56   8   A.   Okay.  The first step is a verbal warning; the

16:58:01   9   second step is a written warning; and the third step is

16:58:07  10   a decision-making step.

16:58:10  11        And that's where the cashier or the -- my

16:58:13  12   assistant, if they repeatedly has -- have done something

16:58:17  13   that I have asked them not to do, that's when I write

16:58:21  14   them up, and I tell them:  You have so many days -- and

16:58:25  15   I usually give them three days -- to make up your mind

16:58:29  16   whether you want to work for me and do it my way, or

16:58:32  17   whether you want to just go on down the highway.

16:58:35  18   Q.   And that is the point of the process of the

16:58:39  19   decision-making step?

16:58:40  20   A.   Yes.

16:58:41  21   Q.   Who was making the decision, I guess, during the

16:58:44  22   decision-making process?

16:58:45  23   A.   It was the employee at that point.

16:58:48  24   Q.   And what's the decision that the employee is

16:58:50  25   making at that point?

16:58:51    1        A.   Whether they want to do things the way I have
16:58:54    2   asked them to do and trained them to do and do it my
16:58:57    3   way; or, whether they want to just go find another job.
16:59:01    4        Q.   And if the individual, I guess, does not improve
16:59:06    5   his or her behavior, what is the next step after the
16:59:10    6   decision-making process?
16:59:11    7        A.   I dismiss them the next occurrence.
16:59:14    8        Q.   I'm sorry?
16:59:15    9        A.   I dismiss them at the next occurrence.
16:59:18   10        Q.   Before we get to the dismissal part, focusing in
16:59:22   11   on the first three parts of the verbal warning, a
16:59:26   12   written warning, and a decision-making process, is there
16:59:30   13   any requirement that you consult your district manager
16:59:34   14   before you engage in any one of those steps?
16:59:36   15        A.   No, sir.
16:59:37   16        Q.   Do you inform your district manager of the
16:59:40   17   decisions that you have made along the way?
16:59:42   18        A.   Not normally.
16:59:48   19             THE COURT:   So the district manager doesn't
16:59:49   20   know about a discharge until after you have discharged
16:59:54   21   an employee?
16:59:55   22             THE WITNESS:   Sometimes, yes, sir.
16:59:56   23             THE COURT:   All right.
16:59:58   24   BY MR. KALLON:
17:00:01   25        Q.   Are you saying in response to Your Honor's

17:00:04   1   questions, there are times when your DM knows ahead of

17:00:04   2   time of a discharge decision?

17:00:06   3       A.   Yes.   It just all depends on the circumstances,

17:00:11   4   and the level of the infraction as to whether I contact

17:00:15   5   her or not.

17:00:16   6       Q.   Now, tell the jury, I guess, what level of

17:00:19   7   infractions that you will not contact the district

17:00:23   8   manager for; and then my follow-up question is, the

17:00:28   9   types you would contact the district manager for?

17:00:30  10       A.   I would not contact the district manager for a

17:00:33  11   level 1 to, say, a level 3; like insubordination, not

17:00:39  12   performing the duties that I have asked them to do, not

17:00:42  13   -- absenteeism could be one of them.   I wouldn't, you

17:00:46  14   know -- I would not bring the district manager into

17:00:49  15   something like that.

17:00:49  16       Q.   Is a level 1 -- I'm sorry to interrupt you, Ms.

17:00:54  17   Jenne -- level 1 through 3 infractions, are those the

17:00:57  18   type that you follow the steps of the discipline that

17:01:02  19   you mentioned for them?

17:01:03  20       A.   Yes, sir.

17:01:03  21       Q.   And what is, I guess, the next one would be a

17:01:06  22   level 4 and level 5?

17:01:07  23       A.   A level 4 and a level 5 -- a level 5 is probably

17:01:11  24   the most serious, and that's dishonesty.   If you kept --

17:01:17  25   if you find them taking something that doesn't belong to

17:01:20   1  them, eating a candy bar and not paying for it, then I'm

17:01:24   2  going to get my DM called, because I am going to be mad

17:01:27   3  and upset, and she needs to help me in that step.

17:01:30   4      Q.   Is the level 4, level 5 infraction the types that

17:01:36   5  can result in immediate termination?

17:01:38   6      A.   Yes, it can.

17:01:39   7      Q.   And for those infractions, you contact your

17:01:43   8  district manager?

17:01:44   9      A.   Yes, sir.

17:01:45  10      Q.   And tell us, I guess, the conversation that you

17:01:51  11  have with your district manager on those occasions.

17:01:53  12      A.   Well, for instance, I had a cashier that did an

17:02:01  13  order cancel.  She ran a customer through.  She did the

17:02:05  14  order cancel, gave the customer the merchandise, and put

17:02:09  15  the money on the -- underneath the counter.  I'm not

17:02:15  16  saying that's theft, because she concealed it under the

17:02:19  17  counter, it wasn't on her body.  But it didn't go in the

17:02:23  18  cash register.  I went immediately to my district

17:02:26  19  manager.

17:02:26  20      Q.   And I guess why, if you're uncertain if the

17:02:31  21  person has engaged in theft, why did you feel the need

17:02:35  22  on that occasion to consult with the district manager?

17:02:37  23      A.   Because at that point, I feel Loss Prevention

17:02:41  24  should get involved, plus, it's to protect me and the

17:02:44  25  company.

17:02:45   1      Q.   What is Loss Prevention, by the way?

17:02:47   2      A.   Loss Prevention is -- we have a Loss Prevention

17:02:53   3    man in our area, and he deals with dishonesty, integrity

17:02:58   4    issues, things along those lines.

17:03:01   5      Q.   And in carrying out his duties, if you know, tell

17:03:04   6    the ladies and gentlemen of the jury what he does when

17:03:08   7    you call him.

17:03:09   8      A.   He will come in and conduct interviews with

17:03:14   9    everybody involved.

17:03:15  10      Q.   And then at the end of those interviews, do you

17:03:20  11    get the results of the interviews, or investigations,

17:03:23  12    for lack of a better term?

17:03:25  13      A.   Yes.

17:03:25  14      Q.   How many employees, ma'am, do you currently have

17:03:30  15    at your store?

17:03:31  16      A.   I have two part-time -- or two full-time

17:03:34  17    assistants, one part-time assistant, and three part-time

17:03:38  18    cashiers.

17:03:39  19      Q.   And who hired those employees?

17:03:43  20      A.   I hired each and every one of them.

17:03:46  21      Q.   Okay.  Let's take them a step at a time.  Walk

17:03:49  22    the ladies and gentlemen of the jury through your hiring

17:03:52  23    process as it relates to the cashiers only, and then

17:03:56  24    we'll talk about the assistant managers next.

17:03:59  25      A.   I reviewed the applications that I got in.  I

17:04:05    1    decided which ones I wanted to interview and I called

17:04:08    2    them in for an interview.

17:04:10    3         After I interviewed them, I let my two full-time

17:04:15    4    assistants interview them also, because we work as a

17:04:18    5    team in my store.  And I want everybody to be able to

17:04:21    6    work together.

17:04:22    7         So once my assistants spoke with them, then they

17:04:26    8    sat down and I sat down, and we discussed each

17:04:32    9    applicant, and I made my decision.

17:04:33   10    Q.   Let me back up for a minute.  When you're

17:04:38   11    reviewing the applications to decide who you're going to

17:04:42   12    bring in for an interview, what traits or

17:04:44   13    characteristics are you looking for?

17:04:45   14    A.   I look for stability, to see if they job hop, you

17:04:49   15    know, one month at this job, one month at another job.

17:04:52   16    I look for retail experience.  I -- I look for their

17:04:57   17    education.

17:04:59   18    Q.   Why is, I guess, job stability an important

17:05:03   19    criteria for you -- I'm sorry -- that you consider?

17:05:06   20    A.   It's expensive to train somebody on a job.  And I

17:05:09   21    don't want to put my time and effort into training

17:05:13   22    someone and having that charged against my store, if

17:05:16   23    they're just going to be there for a month or two and

17:05:19   24    then go down the highway.

17:05:20   25         I want someone -- my assistants have been with me

17:05:24  1   for at least four years, and my goal is to have my

17:05:28  2   cashiers to be longevity also.

17:05:31  3      Q.   Now, the next phase is, you bring them in for an

17:05:35  4   interview.  What are you looking for when you interview

17:05:39  5   the prospective candidates?

17:05:42  6      A.   For cashiers?

17:05:42  7      Q.   Yes, ma'am.

17:05:42  8      A.   I'm looking for retail experience.  I'm looking

17:05:47  9   for cash register experience.  I'm looking for, again,

17:05:52  10  job stability.

17:05:55  11     Q.   And I think the next thing is, you said you let

17:05:58  12  your two full-time assistants interview the candidates

17:06:02  13  as well?

17:06:02  14     A.   Yes, I do.

17:06:03  15     Q.   Is that a policy or a mandate that came down from

17:06:08  16  the district manager?

17:06:08  17     A.   No, that was my decision, because we work as a

17:06:11  18  team in my store.

17:06:11  19     Q.   And after the interviews have been conducted,

17:06:15  20  what's the next phase?

17:06:17  21     A.   My assistants and I discuss the applicants, and

17:06:20  22  then I make a decision.

17:06:22  23     Q.   Has there ever been an occasion where you and

17:06:25  24  your assistants disagreed as to who to hire?

17:06:29  25     A.   Yes, there has been.

17:06:30  1      Q.   And who was ultimately hired in those occasions?

17:06:33  2      A.   I hired who I wanted, if we disagreed.

17:06:37  3      Q.   Now, for cashiers and stockers, do you have --

17:06:40  4  I'm sorry -- you don't have any stockers; correct?

17:06:43  5      A.   No, sir.

17:06:43  6      Q.   For cashiers, do you have to get in touch with

17:06:46  7  your district manager to get approval before they are

17:06:50  8  hired?

17:06:50  9      A.   No, sir.

17:06:51  10     Q.   Do you follow the same hiring procedure for

17:07:01  11  assistant managers?

17:07:01  12     A.   Pretty much.

17:07:03  13     Q.   Is there an additional step that you conduct for

17:07:07  14  assistant managers that you do not conduct for cashiers?

17:07:09  15     A.   Yeah.

17:07:10  16     Q.   And what is that step, ma'am?

17:07:12  17     A.   I will contact my DM, and I will talk to her

17:07:17  18  about the candidate.  And then she will come and

17:07:21  19  interview the candidate, and then we'll discuss who I

17:07:26  20  have -- you know, who I have asked her to come speak

17:07:28  21  with.  And if I feel comfortable with the candidate,

17:07:34  22  then I hire them.

17:07:35  23     Q.   Now, when you contact your district manager for

17:07:39  24  assistant manager candidates, are you presenting

17:07:42  25  multiple candidates?

17:07:43  1      A.   Sometimes, not all the time.

17:07:46  2      Q.   Are the candidates that you've presented, have

17:07:51  3   they, I guess, gone through the interview process, for

17:07:53  4   lack of a better term?

17:07:54  5      A.   The ones that I have, my main assistant has only,

17:07:59  6   because she was a manager for a store a few years ago

17:08:04  7   prior to.

17:08:05  8           But my other assistants came into my store as

17:08:10  9   cashiers, and I promoted them to assistants.

17:08:14  10     Q.   And when you promoted them to an assistant, did

17:08:17  11  the district manager have to talk to them first before

17:08:19  12  you gave them keys to the store?

17:08:20  13     A.   No.  No, she didn't.

17:08:22  14     Q.   Did the district manager chat with them or talk

17:08:25  15  with them at any point after you promoted them?

17:08:29  16     A.   After I promoted them, yeah; if they were in

17:08:32  17  there for a store visit.  But to make a special trip to

17:08:36  18  come in and talk to them, no.

17:08:37  19     Q.   As I understand it, for an assistant manager to

17:08:41  20  be hired or promoted, unlike cashiers, you have to

17:08:46  21  conduct a background check; is that correct?

17:08:48  22     A.   Yes.

17:08:49  23     Q.   Do you conduct those background checks for

17:08:56  24  prospective managers at your stores?

17:08:58  25     A.   Yes.

17:08:58  1      Q.  Tell the jury, I guess, why is it that you would

17:09:00  2  conduct a background check for an assistant manager

17:09:06  3  person, but not for cashier.

17:09:09  4      A.  Because you're turning over the keys to the

17:09:11  5  store, and they have access to all the assets in that

17:09:14  6  store.  And you need somebody with a good reputation,

17:09:19  7  good integrity, somebody that has not been arrested for

17:09:23  8  -- for anything.  You want to make sure that, you know,

17:09:27  9  you have a good candidate there.

17:09:29  10     Q.  Now, during the course of your career as a store

17:09:32  11 manager, have you ever presented a candidate either for

17:09:35  12 promotion or for hiring straight into the position as an

17:09:40  13 assistant manager that was rejected by the district

17:09:43  14 manager?

17:09:43  15     A.  No.

17:09:44  16     Q.  Now, once a person has been hired, who is

17:09:51  17 responsible for making sure that they get trained?

17:09:54  18     A.  I am.

17:09:54  19     Q.  Do you do all the training yourself?

17:09:58  20     A.  Yes, I do.

17:09:59  21     Q.  And that's for the assistant managers?

17:10:02  22     A.  Yes.

17:10:02  23     Q.  What about for cashiers, do you do all the

17:10:05  24 training yourself?

17:10:06  25     A.  No.  I -- my assistants help me in their

17:10:10  1    training.

17:10:10  2       Q.   Tell us, I guess, if you hire a new cashier, tell

17:10:16  3    the jury what steps you take to make sure that person

17:10:20  4    gets trained before they are turned loose on the cash

17:10:23  5    register.

17:10:24  6       A.   Okay.  They stand with -- for half a day, they

17:10:30  7    stand with either myself or one of my assistants at the

17:10:34  8    cash register and watch us run transactions.

17:10:37  9            The second half of their shift, they are on their

17:10:41  10   cash register and we are standing there with them.  When

17:10:46  11   they're not busy, we've got them out on the floor,

17:10:50  12   showing them what I expect them to do in the course of

17:10:53  13   their shift.

17:10:54  14      Q.   On those occasions, ma'am, when you delegate the

17:10:57  15   training of a cashier to other employees of the store,

17:11:01  16   do you do any followup to see if the person's being

17:11:03  17   properly trained?

17:11:04  18      A.   Yes, I do.

17:11:05  19      Q.   Does the training stop after the cashier, I

17:11:11  20   guess, is turned fully loose to the cash register?

17:11:14  21      A.   No.  Training goes on all the time.  All the

17:11:26  22   time.  No matter how long you've been there.  It's just

17:11:26  23   an ongoing thing.  There's always something to learn,

17:11:26  24   something to be trained on.

17:11:26  25      Q.   And who is responsible for training assistant

17:11:29  1    managers?

17:11:29  2        A.   I am, sir.

17:11:31  3        Q.   When you train assistant managers, what is the

17:11:34  4    goal, I guess, the ultimate goal that you're trying to

17:11:38  5    accomplish?

17:11:38  6        A.   To make them promotable, to give them their own

17:11:42  7    store.

17:11:42  8        Q.   How long, I guess, does it typically take to

17:11:46  9    train an assistant to the point where you feel

17:11:49  10   comfortable, either letting them open the store on their

17:11:54  11   own or close a store on their own?

17:11:56  12       A.   Three weeks.

17:11:57  13       Q.   And how about, how long does it typically take,

17:12:02  14   in your mind, to fully train an assistant to the point

17:12:06  15   where you feel they're promotable?

17:12:09  16       A.   At least six weeks.

17:12:14  17       Q.   After an assistant has been trained, how does

17:12:21  18   that person know what they're supposed to do on a

17:12:24  19   day-to-day basis?

17:12:26  20       A.   They know the aspects of the job.  They know --

17:12:32  21   by that point, they know what I expect of my people, of

17:12:35  22   my assistants; and with the help of the things -- to-do

17:12:42  23   list that I keep.

17:12:45  24       Q.   How about when you're not there?  How does the

17:12:48  25   assistant manager know what to do?

| | | |
|---|---|---|
| 17:12:49 | 1 | A.  I leave a list, like before I came to down here, |
| 17:12:53 | 2 | I left a -- four pages of who I wanted to do what and |
| 17:12:59 | 3 | when I wanted it done by. |
| 17:13:00 | 4 | Q.  Ms. Jenne, at your store, who does the assistant |
| 17:13:05 | 5 | manager report to? |
| 17:13:05 | 6 | A.  Myself. |
| 17:13:06 | 7 | Q.  As to you and the assistant manager, who does the |
| 17:13:09 | 8 | employees see as their boss? |
| 17:13:11 | 9 | A.  Myself. |
| 17:13:12 | 10 | Q.  Now, there's been some testimony in this case |
| 17:13:16 | 11 | about truck day.  And I know you've not sat in the |
| 17:13:19 | 12 | courtroom, but are you familiar with truck day? |
| 17:13:21 | 13 | A.  Yes, I am. |
| 17:13:22 | 14 | Q.  When do you start planning -- let me back up.  I |
| 17:13:25 | 15 | apologize.  When is your truck day? |
| 17:13:27 | 16 | A.  My truck day is on Wednesdays. |
| 17:13:29 | 17 | Q.  And when do you start planning for your truck |
| 17:13:32 | 18 | day, ma'am? |
| 17:13:33 | 19 | A.  I will pull the invoice on Friday evening, and I |
| 17:13:36 | 20 | start at that point. |
| 17:13:39 | 21 | Q.  When you say "the invoice", keep in mind we've |
| 17:13:44 | 22 | never worked at a Family Dollar and certainly never |
| 17:13:46 | 23 | managed one -- |
| 17:13:46 | 24 | A.  It's a list of everything that's coming in on my |
| 17:13:49 | 25 | truck the following Wednesday. |

17:13:51  1    Q.   And once you get that list on Friday, tell the

17:13:53  2  jury what you do with it.

17:13:55  3    A.   I sit down in the office, and I go through and

17:13:58  4  figure out, look and see what they're sending me in,

17:14:02  5  because I have to go out on the floor and I have to make

17:14:05  6  room for all this stuff.

17:14:06  7    Q.   And once you figure out what's coming in, what do

17:14:10  8  you do as far as the employees of the store, getting

17:14:13  9  them ready?

17:14:14 10    A.   I let the girls know what is coming in on the

17:14:16 11  truck, what I expect them -- like my main assistant

17:14:20 12  usually takes care of all the paper products.  So I'll

17:14:24 13  let her know what's coming in, and I'll tell her she

17:14:27 14  needs to go to the center of the store where we bulk

17:14:31 15  stack our paper products.  She needs to get that area

17:14:34 16  ready, and prepare to make space to put all this.

17:14:37 17    Q.   And when the truck comes, the back door is open;

17:14:41 18  is that correct?

17:14:41 19    A.   Yes, sir.

17:14:42 20    Q.   What, if anything, do you do with the back door

17:14:49 21  being open to watch to make sure that there's no theft

17:14:54 22  at your store?

17:14:55 23    A.   I'm in that stockroom, and I'm helping unload the

17:14:58 24  truck.  I'm telling the girls, you know, what carts I

17:15:04 25  want the merchandise on and who needs to take which cart

17:15:05  1   to what part of the store.  And I'm in that stockroom,

17:15:08  2   making sure nothing goes out the back door.

17:15:10  3       Q.  Ms. Jenne, there's been testimony in this case,

17:15:13  4   and, again, you were not here, but there's been

17:15:15  5   testimony that you guys utilize U-boats that have labels

17:15:19  6   on them that pretty much tells people what goes in what

17:15:23  7   cart.  Do you utilize U-boats at your store?

17:15:26  8       A.  We utilize U-boats.  We don't have labels on

17:15:29  9   them.

17:15:29  10      Q.  As a store manager, you have done some manual

17:15:38  11  tasks; right?

17:15:39  12      A.  Yes.

17:15:40  13      Q.  As a store manager, what would you say you spend

17:15:43  14  the bulk of your time doing?

17:15:44  15      A.  Managing my people.

17:15:47  16      Q.  And what is the most important duty that you

17:15:51  17  perform as a store manager, ma'am?

17:15:52  18      A.  Managing my people and protecting the assets of

17:15:55  19  my store.

17:15:56  20          MR. KALLON:  Thank you, Mrs. Jenne.  Please

17:15:58  21  answer plaintiffs' counsel's questions.

17:16:10  22                    **CROSS-EXAMINATION**

17:16:10  23  **BY MR. JOHNSON:**

17:16:12  24      Q.  Good afternoon, Ms. Jenne.

17:16:22  25      A.  Good afternoon.

17:16:23  1      Q.   My name is Rusty Johnson.

17:16:37  2           I understand you testified that you have two

17:16:43  3  assistant managers -- two full-time?

17:16:45  4      A.   Two full-time assistants.

17:16:47  5      Q.   And one part-time assistant manager?

17:16:49  6      A.   Yes, sir.

17:16:49  7      Q.   And one of those full-time assistant managers --

17:16:55  8  oh, no, both of them have been with you for at least

17:16:58  9  four years; correct?

17:16:59  10     A.   Yeah, I believe so.

17:17:00  11     Q.   Okay.  How many other employees do you have in

17:17:05  12  the store?

17:17:05  13     A.   I have three part-time cashiers.

17:17:08  14     Q.   Okay.  So you have six employees in total?

17:17:12  15     A.   Yes, sir.

17:17:13  16     Q.   Okay.  Now, you were talking about discipline,

17:17:24  17  and you mentioned a final step within the discipline

17:17:32  18  frame work; it's called decision-making step, final

17:17:37  19  step?

17:17:40  20     A.   Well, that's not the final step.

17:17:40  21     Q.   Well, the final step is discharge; correct?

17:17:41  22     A.   Discharge or retention, whatever, you know.  If

17:17:45  23  they want to buckle down and do it the way I want it

17:17:47  24  done, then they're retained.  But, you know, during that

17:17:55  25  course, I'm on them.  I want to make sure they're doing

17:18:01   1   what I want, when I want it done, and how I want it

17:18:04   2   done.   If they don't, then it goes to discharge.

17:18:08   3        Q.   Right.   Well, the three steps that you listed, I

17:18:13   4   guess the first three initial steps were, one, a verbal

17:18:18   5   warning?

17:18:18   6        A.   Uh-huh.

17:18:19   7        Q.   And then, two, was the written warning?

17:18:21   8        A.   Written warning.

17:18:22   9        Q.   And then the third was the decision-making

17:18:26   10  step/final step?

17:18:27   11       A.   Right.

17:18:27   12       Q.   Right.   And you testified that there was no

17:18:32   13  requirement to inform your district manager that you

17:18:36   14  were taking step three; correct?

17:18:39   15       A.   No.   There's no requirement.

17:18:40   16       Q.   Okay.   I want to show you something here.   Are

17:18:47   17  you familiar with the Strands?

17:18:48   18       A.   Yes, I am.

17:18:49   19       Q.   Okay.   What are the Strands?

17:18:50   20       A.   They're a training tool that we utilize.

17:18:55   21       Q.   Okay.   Let me show you here -- and this is a page

17:19:04   22  from out of one of the Strands.   It's been marked

17:19:07   23  already as an exhibit in this case.   And I want to focus

17:19:25   24  on that third step there that we just talked about:

17:19:29   25  "Conducting a decision making/final written step."   Can

17:19:32  1    you see that, ma'am?

17:19:33  2        A.   I can.

17:19:35  3        Q.   Let me see if I can blow it up some more for you.

17:19:41  4    Okay.  Okay.  Can you read that second sentence, please?

17:19:46  5        A.   "Before conducting a decision making/final

17:19:52  6    written step, contact your district manager."

17:19:55  7        Q.   Right.  That's not stated in the terms of

17:19:59  8    something that's recommended, is it?

17:20:01  9        A.   I don't understand, sir.

17:20:02  10       Q.   I mean, according to the terms or pursuant to the

17:20:07  11   terms of what you just read in that sentence, you must

17:20:09  12   contact the district manager before taking this step;

17:20:13  13   correct?

17:20:13  14       A.   I don't.  I never -- I've never been disciplined

17:20:16  15   for not doing that.

17:20:17  16       Q.   Right.  But you would be -- you would admit that

17:20:22  17   the actions you take are contrary to what this policy

17:20:24  18   here stated?

17:20:25  19       A.   Before conducting it, yeah.

17:20:27  20       Q.   Okay.

17:20:28  21       A.   It says "contact your district manager."

17:20:29  22       Q.   Right.  And you're not a plaintiff in this case,

17:20:34  23   are you?

17:20:35  24       A.   No, sir.

17:20:35  25       Q.   So you don't know what the plaintiff, the 1,424

17:20:42  1  plaintiffs in this case, do with respect to this policy,

17:20:45  2  do you?

17:20:46  3      A.   I don't know what anybody does with respect to

17:20:48  4  this policy, except for myself.

17:20:50  5      Q.   You only know about your store?

17:20:51  6      A.   That's correct.

17:20:52  7      Q.   Okay.  You also mentioned certain levels of

17:21:05  8  discipline?

17:21:06  9      A.   Uh-huh.

17:21:06  10     Q.   Level 1 through level 5?

17:21:09  11     A.   Yeah.

17:21:09  12     Q.   Just -- where's that policy, with respect to the

17:21:13  13  levels of discipline listed within the Family Dollar

17:21:17  14  policy documents?

17:21:21  15     A.   It has been so many years since I've read the

17:21:25  16  policy manual, I can't sit here and honestly tell you

17:21:28  17  where that's listed.

17:21:29  18     Q.   So you're saying it is listed, but you just don't

17:21:33  19  remember?

17:21:33  20     A.   No, I'm not saying that.  I'm saying I just can't

17:21:37  21  tell you.

17:21:37  22     Q.   You don't know whether there's a policy at Family

17:21:40  23  Dollar with respect to levels of discipline?

17:21:42  24     A.   No.

17:21:42  25     Q.   Okay.

17:21:44   1     A.   I know from discussions, you know, with my

17:21:49   2   district manager, level 1, level 2.

17:21:52   3     Q.   Right.  You don't know, though, whether these

17:21:55   4   levels of discipline are applied at any of the stores

17:21:58   5   where the 1,424 plaintiffs in this case work, are you?

17:22:05   6     A.   No.  I would have no idea, sir.

17:22:07   7     Q.   Now, did I understand you to testify that you

17:22:17   8   promoted individuals to assistant store manager

17:22:21   9   positions without informing your district manager?

17:22:24   10     A.   I discussed it with her.

17:22:28   11     Q.   Okay.  What about hiring assistant managers?  you

17:22:32   12   always had to have the district manager interview the

17:22:34   13   particular candidate; correct?

17:22:35   14     A.   To tell you the Gospel truth, I have never just

17:22:39   15   outright hired.  I've always promoted within my store.

17:22:43   16     Q.   Oh, okay.  So you never hired an assistant

17:22:45   17   manager for your store?

17:22:46   18     A.   I've promoted them.

17:22:48   19     Q.   Promoted them.  So, when you testified a few

17:22:58   20   minutes ago about if you were hiring an assistant

17:23:02   21   manager, you would contact the district manager, and the

17:23:04   22   district manager would interview --

17:23:06   23     A.   Would interview them.

17:23:07   24     Q.   Is that a policy that you were referring to?

17:23:10   25     A.   I don't know that that's a policy.  It's out of

17:23:15    1    respect and -- for the district manager, plus to

17:23:18    2    reassure myself that I am making the right decision as

17:23:22    3    to who I want.   Because she will come in and she will

17:23:27    4    interview my candidate, and she will make her

17:23:30    5    recommendation.

17:23:32    6        Q.   So you're saying that this is just a practice

17:23:35    7    that you've developed over the years?

17:23:37    8        A.   This is the way we've done it in my store, sir.

17:23:40    9        Q.   Okay.   And so you've always promoted your

17:23:46   10    assistant managers.

17:23:46   11            Did your district manager interview the assistant

17:23:50   12    manager candidates before you --

17:23:51   13        A.   No.

17:23:52   14        Q.   -- but -- you did not?

17:23:54   15        A.   But I discussed the promotions with my district

17:23:57   16    manager, but she did not come in and interview them.

17:24:00   17        Q.   Okay.   Can you pull up Exhibit 10, please, sir?

17:24:10   18    Hold on for one moment.

17:24:12   19            Do you know an individual by the name of Bruce

17:24:14   20    Barkus?

17:24:15   21        A.   Yes, I do.

17:24:17   22        Q.   Who is Bruce Barkus to you?

17:24:21   23        A.   He's a -- was a corporate executive.

17:24:21   24        Q.   Okay.   You don't have any -- I mean, you do know

17:24:26   25    that he was a senior vice-president of Family Dollar at

17:24:29  1   one point?

17:24:30  2       A.   Yes.   Uh-huh.

17:24:31  3       Q.   Great.   Can you pull up Exhibit 10, please?   And

17:24:40  4   just highlight just the "to from, re and date", please.

17:24:52  5       Do you ever remember receiving an email from

17:24:55  6   Bruce Barkus on February 20th, 2003?

17:24:59  7       A.   Yes, sir.

17:24:59  8       Q.   How about pulling up the first part there?   First

17:25:08  9   paragraph.

17:25:13  10      So, you've seen this email before; correct?

17:25:16  11      A.   Yes, sir.

17:25:17  12      Q.   Okay.   And in this email, Mr. Barkus says that he

17:25:27  13  wants "to remind you that it's the policy that the

17:25:30  14  district managers interview all assistant manager

17:25:34  15  candidates, whether newly hired or internal promotion

17:25:38  16  candidates"?

17:25:39  17      A.   Yes, sir.

17:25:39  18      Q.   But you just stated that your district manager

17:25:45  19  didn't hire or didn't interview all of your assistant

17:25:49  20  manager candidates; correct?

17:25:50  21      A.   Correct.

17:25:51  22      Q.   And you would agree that the practice in your

17:25:54  23  store contravenes this policy up here in this email from

17:25:59  24  Mr. Barkus; right?

17:26:00  25      A.   I've never been disciplined in any way for the

17:26:04  1    way I do things, so...

17:26:06  2        Q.  But that's not my question, ma'am.  You would

17:26:10  3    agree that the practice in your store violates the

17:26:14  4    policy up here in the email?

17:26:16  5        A.  If that's a policy, yes, I agree.

17:26:18  6        Q.  Well, let me just read the first few words of

17:26:25  7    this:  "I want to remind that you it is the policy."

17:26:28  8    And this is the senior vice-president of Store

17:26:31  9    Operations; right?

17:26:31  10       A.  Uh-huh.

17:26:32  11       Q.  So it is the policy; right?

17:26:33  12       A.  If he says so, yes, sir.

17:26:35  13       Q.  All right.  You can take it down.

17:26:41  14           So when you received this email, how did you

17:26:46  15   respond to it or react to it?

17:26:48  16       A.  I read it.  But I believe when that email came

17:26:51  17   out, my assistants were already intact.  I don't

17:26:57  18   remember the date on that, but --

17:27:02  19       Q.  Dan, how about pulling up the second paragraph,

17:27:05  20   please.  I'm sorry, the third paragraph.

17:27:22  21           Can you read that paragraph, please?

17:27:24  22       A.  Out loud or to myself?

17:27:27  23       Q.  Oh, no.  Out loud.

17:27:30  24       A.  "Please notify your district manager immediately

17:27:34  25   by email if you believe any key carrier in your store

17:27:37  1   has not been interviewed and approved by the district

17:27:39  2   manager.  Any management person or key carrier currently

17:27:42  3   on staff who has not been interviewed personally and

17:27:45  4   approved by the district manager must receive such an

17:27:48  5   interview by April 1st, 2003.  Once this grace period

17:27:54  6   has ended, the district manager will be held personally

17:27:57  7   responsible for the final approval of the associates in

17:28:02  8   his or her district who carry keys in our stores."

17:28:07  9       Q.  So you didn't take this action with respect to

17:28:10  10  the assistant store managers in your store; correct?

17:28:14  11      A.  No.

17:28:14  12      Q.  Your district manager didn't come in and

17:28:16  13  interview?

17:28:17  14      A.  No.

17:28:17  15      Q.  Okay.  And you would agree that, once again, what

17:28:22  16  you did in your store violates this paragraph of the

17:28:25  17  email; correct?

17:28:26  18      A.  According to that paragraph.

17:28:30  19      Q.  Okay.  And if I understand correctly, you don't

17:28:37  20  know anything about the hiring practices of the 1,424

17:28:43  21  plaintiffs in this case at their stores?

17:28:45  22      A.  No, sir.

17:28:46  23      Q.  Now, with respect to training, you say that you

17:29:05  24  engage in training of your cashiers; correct?

17:29:08  25      A.  Yes, sir.

17:29:08   1       Q.   And in addition, your assistant managers would

17:29:12   2   also engage in this training?

17:29:14   3       A.   Yes, sir.   Uh-huh.

17:29:16   4       Q.   Do your cashiers engage in training newly hired

17:29:20   5   cashiers?

17:29:21   6       A.   No, sir.

17:29:21   7       Q.   Okay.   So they don't do anything like trying to

17:29:24   8   show them what the ropes are?

17:29:25   9       A.   No, sir.

17:29:26  10       Q.   Help them out there if they're out there

17:29:29  11   together?

17:29:29  12       A.   No.

17:29:30  13       Q.   So, if I understand correctly, then, you don't

17:29:53  14   have any knowledge about what the 1,424 plaintiffs in

17:30:00  15   this case do in their stores?

17:30:02  16       A.   No, I don't.

17:30:03  17       Q.   Okay.   You were talking about truck day at one

17:30:26  18   point?

17:30:26  19       A.   Yes, sir.

17:30:27  20       Q.   And unloading the freight from the truck and

17:30:30  21   stocking the shelves?

17:30:32  22       A.   Yes, sir.

17:30:32  23       Q.   And you have your assistant managers assist you

17:30:39  24   with this unloading the truck?

17:30:40  25       A.   Yes, sir.

17:30:41   1       Q.   And stocking the shelves?

17:30:42   2       A.   Uh-huh.

17:30:44   3       Q.   They've been with you for four years, at least,

17:30:49   4   you said?

17:30:50   5       A.   Uh-huh.   Uh-huh.

17:30:51   6       Q.   So other than discussing with them what's coming

17:30:55   7   in on the truck via inventory, how much other guidance

17:30:59   8   do you give them?

17:31:00   9       A.   Quite a bit of guidance.   There's a lot of stuff

17:31:03  10   that comes in on the trucks that is non-schematic, non-

17:31:06  11   basic items.   I have reviewed the -- the ad planner for

17:31:12  12   the month, I know where I want that merchandise to go.

17:31:15  13   And I direct them as to where I want them to put it.

17:31:18  14       Q.   You said you receive a planner for the month?

17:31:21  15       A.   Yes, sir.

17:31:22  16       Q.   And who gives you the planner?

17:31:24  17       A.   It comes from our corporate office.

17:31:26  18       Q.   Okay.

17:31:32  19               MR. JOHNSON:   That's all.   Thank you.

17:31:33  20               THE WITNESS:   Uh-huh.

17:31:34  21               MR. KALLON:   Your Honor, I want to send

17:31:36  22   Ms. Jenne back to Ohio, so can I please do a short

17:31:39  23   redirect?

17:31:39  24               THE COURT:   Yes.

17:31:41  25               MR. KALLON:   And I thank the Court and the

17:31:43  1    jury's indulgence.

17:31:43  2                    **REDIRECT EXAMINATION**

17:31:44  3    **BY MR. KALLON:**

17:31:44  4       Q.  Ms. Jenne, I was reminded by my colleague,

17:31:48  5    Mr. May, I did not ask you the names of the district

17:31:51  6    managers.  Can you please tell us?

17:31:51  7            I know it's been eight years.  Can you tell us

17:31:54  8    the names of the DMs you've had over the years?

17:31:58  9       A.  Only two, Deb Bloughthold (phonetic) and Karen

17:32:01  10   Viech (phonetic).

17:32:02  11      Q.  This email from Barkus that has been flashed

17:32:07  12   repeatedly in this case, let's focus on the real world

17:32:10  13   for a minute.  Does that email deal at all with hiring

17:32:13  14   of cashiers?

17:32:15  15      A.  No, sir.

17:32:15  16      Q.  You, in fact, hire your cashiers?

17:32:16  17      A.  Yes.

17:32:17  18      Q.  Without consulting your district manager?

17:32:18  19      A.  Yes, I do.

17:32:19  20      Q.  And when Mr. Barkus' email came out, I think you

17:32:23  21   told Mr. Johnson this -- you already have your

17:32:25  22   assistants in place?

17:32:26  23      A.  Yes, sir.

17:32:26  24      Q.  You already had background checks on them?

17:32:28  25      A.  Yes, sir.

17:32:29   1      Q.   And your district manager had already met them?

17:32:31   2      A.   Yes, sir.

17:32:32   3      Q.   Have you ever been disciplined for hiring,

17:32:37   4   disciplined for firing anybody without consulting your

17:32:39   5   district manager?

17:32:40   6      A.   No, sir, I haven't.

17:32:41   7            MR. KALLON:  Thank you, ma'am.

17:32:43   8            THE WITNESS:  You're welcome.

17:32:44   9            THE COURT:  Recross?

17:32:45   10           MR. JOHNSON:  No recross, Your Honor.

17:32:47   11           THE COURT:  Thank you.  Thank you, ma'am.

17:32:49   12           THE WITNESS:  Thank you, Your Honor.

17:32:50   13           THE COURT:  Ladies and gentlemen, time to go

17:32:53   14   home.  Don't make up your mind about the case.  Don't

17:33:00   15   talk with anybody about it.  Have a good evening, good

17:33:04   16   dinner.

17:33:04   17           See you tomorrow morning at 9:00.

17:33:06   18           (Jury out at 5:26 p.m.)

17:33:40   19           THE COURT:  What about the plaintiffs'

17:33:43   20   availability tomorrow, the opt-in plaintiffs?

17:33:48   21           MR. G. WIGGINS:  Your Honor, Barbara

17:33:52   22   Richardson will be here tomorrow.

17:33:55   23           THE COURT:  Okay.

17:33:57   24           MR. G. WIGGINS:  Rita Stroud Lipsey is no

17:34:01   25   longer employed at the work number we had with her.  We

17:34:05  1    called another number we had on her, it was

17:34:08  2    disconnected.  We had one other number we called and did

17:34:10  3    not find her as Rita, but left a message on that number.

17:34:15  4                 THE COURT:  All right.

17:34:16  5                 MR. G. WIGGINS:  Porfiorio Barrus.  By the

17:34:19  6    way, Ms. Lipsey is out of Dayton, Ohio.

17:34:22  7                 Mr. Barrus is out of Palm Beach, no longer

17:34:25  8    employed with his current employer.  We called that

17:34:27  9    number.  We called his --

17:34:29  10                THE COURT:  Do you have a home number for

17:34:31  11   him?

17:34:31  12                MR. G. WIGGINS:  Yes, sir.  We called that,

17:34:32  13   no answer.  No machine.  We'll try back tonight.

17:34:35  14                THE COURT:  Okay.

17:34:36  15                MR. G. WIGGINS:  Earl Butler out of Tulsa

17:34:39  16   Oklahoma, two numbers and neither were the correct.

17:34:41  17   We're checking to see if we have another one.

17:34:43  18                Earl Fowler out of South Carolina.  We

17:34:47  19   called his home number and left a message for him to

17:34:50  20   call us back.

17:34:52  21                Paul Palladin, Winfield, Massachusetts is

17:34:55  22   now working at Trader Joe's.  He works from 3:00 until

17:34:59  23   closing tomorrow.  He's attempting to see what he can do

17:35:01  24   as far as getting off, and he'll call us back tonight.

17:35:05  25                Bill Detter, out of new Mexico.  Home number

17:35:07  1   on him.  We called and left a message, and we left -- or

17:35:11  2   told him to call us back.

17:35:13  3              Shellah Brown, we talked to her, she said

17:35:17  4   she has to work tomorrow from 8:00 to close; from 8:00

17:35:21  5   to 8:00.

17:35:22  6              THE COURT:  Where is she?

17:35:23  7              MR. G. WIGGINS:  She is in Pell City,

17:35:25  8   Alabama.  I think that's Shellah Brown, not Shellah

17:35:31  9   Brown.  So we've been able to get numbers.  We have left

17:35:35  10  messages.

17:35:36  11             THE COURT:  Now, the last one, Ms. Brown, so

17:35:39  12  she could be here Thursday?

17:35:42  13             MR. G. WIGGINS:  I did not check on her

17:35:43  14  schedule for Thursday, Your Honor, but I can certainly

17:35:46  15  do that.

17:35:46  16             THE COURT:  Well, no.  Tell her if she's

17:35:49  17  going to remain a plaintiff in this case, she is going

17:35:53  18  to be here Thursday.

17:35:54  19             MR. G. WIGGINS:  I can certainly do that,

17:35:57  20  Your Honor.

17:35:58  21             THE COURT:  We're talking about two people

17:35:59  22  that we know about?

17:36:00  23             MR. G. WIGGINS:  Yes, sir.  And I've left

17:36:02  24  messages, and I'll continue to follow up on them.

17:36:04  25             THE COURT:  Sure.  All right.  Anything

| | | |
|---|---|---|
| 17:36:06 | 1 | else? |
| 17:36:08 | 2 | MR. ST. CLAIR:  Nothing from the defendant, |
| 17:36:09 | 3 | Your Honor. |
| 17:36:09 | 4 | THE COURT:  All right.  Thank you all.  See |
| 17:36:11 | 5 | you tomorrow. |
| 17:36:13 | 6 | MR. ST. CLAIR:  Thank you, Your Honor.  Good |
| 17:36:15 | 7 | night. |
| 17:36:16 | 8 | MR. KALLON:  Your Honor, consistent with |
| 17:37:03 | 9 | your ruling from the bench yesterday about making |
| 17:37:07 | 10 | exhibit blowups each side put up on the board, Family |
| 17:37:14 | 11 | Dollar used one today that we have marked as Defendant's |
| 17:37:17 | 12 | 2354, and ask -- and that's the document that |
| 17:37:21 | 13 | plaintiffs' counsel Bates labeled D14394.  It's |
| 17:37:26 | 14 | Defendant's Exhibit 2354. |
| 17:37:29 | 15 | THE COURT:  All right.  Received in |
| 17:37:31 | 16 | evidence. |
| 17:37:31 | 17 | MR. CALAMUSA:  It's already in evidence, |
| 17:37:33 | 18 | Your Honor, as part of the Strands. |
| 17:37:34 | 19 | THE COURT:  All right.  It's part of the |
| 17:37:36 | 20 | Strands? |
| 17:37:36 | 21 | MR. CALAMUSA:  The second page of that |
| 17:37:38 | 22 | document they're not putting into evidence, so we'll |
| 17:37:40 | 23 | mark and put into evidence the second page, if you -- if |
| 17:37:43 | 24 | we need to put it in as well, though it's already in the |
| 17:37:46 | 25 | Strands book. |

17:37:47   1              THE COURT:   What about attach it?   Gym clip

17:37:53   2    it to that page.

17:37:54   3              MR. KALLON:   That's not a problem.

17:37:56   4              MR. JOHNSON:   About the other documents and

17:38:06   5    slides we've used in this case, Your Honor, we have them

17:38:06   6    copied up.   But as you can see, people are starting to

17:38:06   7    use other ones, so we will wait until we have a whole

17:38:07   8    stack and introduce it as one exhibit.

17:38:09   9              THE COURT:   All right.   Fine.   Thank you.

17:38:11  10              MR. KALLON:   The problem with that is I

17:38:13  11    think my appellate lawyers are telling me we need to do

17:38:17  12    them on a daily basis, so they can try to follow the

17:38:20  13    trial record and match them with documents.   So if

17:38:24  14    you're going to do them as one exhibit, still separate

17:38:28  15    them by day, please.

17:38:29  16              MR. JOHNSON:   By day?

17:38:31  17              MR. KALLON:   By day.

17:38:32  18              MR. ST. CLAIR:   We need to be able to know

17:38:34  19    which demonstrative exhibits we use with which exhibits.

17:38:37  20              THE COURT:   Yeah.   Let's separate them by

17:38:39  21    day.   Thank you.

17:38:43  22              (Court adjourned at 5:31 p.m.)

          23

          24

          25

1                              CERTIFICATE

2

3

4          I certify that the foregoing is a correct

5     transcript from the record of proceedings in the

6     above-entitled matter.

7

8

9

10

11                                              03-27-06

12     Christina K. Decker, RPR, CRR                Date

13     Federal Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25