FILED

2007 May-15 PM 12:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

1           IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ALABAMA
2                    WESTERN DIVISION

3    JANICE MORGAN, et al.,        *
              Plaintiffs,          *    CV-01-UWC-0303-W
4                                  *    March 1, 2006
     vs.                           *    Tuscaloosa, Alabama
5                                  *    9:05 A.M.
     FAMILY DOLLAR STORES, INC.,   *
6         Defendant.               *
     *****************************

7
                        VOLUME 6
8                TRANSCRIPT OF JURY TRIAL
         BEFORE THE HONORABLE CHIEF JUDGE U.W. CLEMON
9                     And a Jury

10   FOR THE PLAINTIFFS:

11   HON. ROBERT L. WIGGINS, JR., ESQ.
     HON. C. MICHAEL QUINN, ESQ.
12   HON. GREGORY O. WIGGINS, ESQ.
     HON. HERMAN N. JOHNSON, JR., ESQ.
13   HON. ROCCO CALAMUSA, ESQ.
     WIGGINS, CHILDS, QUINN & PANTAZIS
14   301 19th Street, North
     Birmingham, AL 35203-3204
15
     HON. J. ALLEN SCHREIBER, ESQ.
16   HON. P. MARK PETRO, ESQ.
     TWO METROPLEX DRIVE, SUITE 250
17   BIRMINGHAM, AL  35209

18   FOR THE DEFENDANT:

19   HON. JAY D. ST. CLAIR, ESQ.
     HON. ABDUL K. KALLON, ESQ.
20   HON. JAMES WALKER MAY, ESQ.
     HON. RONALD H. KENT, JR., ESQ.
21   HON. T. MATTHEW MILLER, ESQ.
     BRADLEY, ARANT, ROSE & WHITE
22   P. O. Box 830709
     Birmingham, AL  35203
23
     HON. J. MARK WHITE, ESQ.
24   HON. AUGUSTA S. DOWD, ESQ.
     WHITE, ARNOLD, ANDREWS & DOWD
25   2025 3rd Avenue North, Suite 600
     Birmingham, AL  35203

1                        (Continued)

2

3    Christina K. Decker, RPR, CRR
     Federal Official Court Reporter
     101 Holmes Avenue, NE, Suite 305
4    Huntsville, AL 35801

5

6    Penny L. Enoch, RPR
     Federal Official Court Reporter
7    1729 5th Avenue North, Room 325
     Birmingham, AL  35203

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2     Witnesses:          Direct   Cross   Redirect   Recross

 3     STEVE WARREN            4       21       40         42

 4     FELICIA COLEMAN        45       64       83
       (By transcript)
 5
       KATIA BREAUX           94      106      110        113
 6
       WILLARD GREEN         118      123      138
 7
       STEVE SCHAAL          141      147
 8
       BARBARA RICHARDSON 168        225      246        258
 9                                            260

10     EDWIN L. BRADLEY      263      283      294

11     STEVE PHILLIPS        296

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

| | | |
|---|---|---|
| | 1 | March 1, 2006                                        9:00 a.m. |
| | 2 | PROCEEDINGS: |
| 09:01:13 | 3 | THE COURT:  Good morning, ladies and |
| 09:13:14 | 4 | gentlemen.  I trust you had a good evening.  The |
| 09:13:17 | 5 | defendant will call its next witness. |
| 09:13:18 | 6 | MR. MAY:  Defendant Family Dollar calls |
| 09:13:21 | 7 | Steve Warren. |
| 09:13:22 | 8 | **STEPHEN WARREN, DEFENDANT'S WITNESS, SWORN** |
| 09:13:23 | 9 | THE CLERK:  State your name for the record, |
| 09:13:25 | 10 | please. |
| 09:13:26 | 11 | THE WITNESS:  Stephen Warren. |
| 09:13:32 | 12 | THE CLERK:  Spell your last name for the |
| 09:13:34 | 13 | record, please. |
| 09:13:35 | 14 | THE WITNESS:  W-A-R-R-E-N. |
| 09:13:36 | 15 | **DIRECT EXAMINATION** |
| 09:13:37 | 16 | **BY MR. MAY:** |
| 09:13:37 | 17 | Q.  Good morning, Mr. Warren. |
| 09:13:38 | 18 | A.  Good morning. |
| 09:13:39 | 19 | Q.  Where are you from? |
| 09:13:41 | 20 | A.  I'm from Richmond, Virginia. |
| 09:13:44 | 21 | Q.  Welcome to Tuscaloosa. |
| 09:13:46 | 22 | A.  Thank you, sir.  Glad to be back. |
| 09:13:48 | 23 | Q.  You've been here before? |
| 09:13:50 | 24 | A.  I used to live in Tuscaloosa. |
| 09:13:52 | 25 | Q.  Sir? |

09:13:53  1    A.   I lived here for two-and-a-half years.

09:13:55  2    Q.   Doing what?

09:13:56  3    A.   I was a retail manager for G. C. Murphy Company

09:14:00  4  here in Tuscaloosa.

09:14:01  5    Q.   And when was that?

09:14:02  6    A.   Back in 1984, I believe.

09:14:05  7    Q.   What do you do now?

09:14:08  8    A.   I'm a retail manager for Family Dollar Stores.

09:14:12  9    Q.   Where is that?

09:14:13  10   A.   Here in Richmond, Virginia.

09:14:14  11   Q.   What's your store number?

09:14:16  12   A.   4247, Richmond, Virginia.

09:14:19  13   Q.   How long have you had that position?

09:14:20  14   A.   I've been at this location for about one year

09:14:24  15  now.

09:14:24  16   Q.   How long have you been with Family Dollar?

09:14:27  17   A.   Approximately ten years.

09:14:29  18   Q.   Have you ever been anything other than a store

09:14:33  19  manager?

09:14:33  20   A.   Not with Family Dollar, no.  I've been with

09:14:37  21  Family Dollar for about ten years.  They hired me as a

09:14:40  22  store manager.

09:14:40  23   Q.   And you have had other stores?

09:14:43  24   A.   Yeah.  I've ran three different stores for Family

09:14:47  25  Dollar.

09:14:47  1      Q.   As a store manager?

09:14:49  2      A.   As a store manager, yeah.

09:14:51  3      Q.   Let's talk a bit about the store you're at now

09:14:55  4    that's in Richmond.   How many employees do you have

09:14:58  5    there?

09:14:59  6      A.   Right at the present time, we have ten employees.

09:15:02  7      Q.   What's your salary?

09:15:07  8      A.   I make $935 a week.

09:15:10  9      Q.   Do you get bonus?

09:15:11  10     A.   Once a year during inventory, I get one percent

09:15:15  11   of my bonus of the profit of the store.

09:15:17  12     Q.   And did you get a bonus last year?

09:15:21  13     A.   Yes, sir, I did.

09:15:22  14     Q.   Have you gotten a bonus every year?

09:15:24  15     A.   Every year I've been with Family Dollar, yes.

09:15:27  16     Q.   What's your highest bonus?

09:15:29  17     A.   My highest bonus was 6,500 bucks.   I had a good

09:15:34  18   year.

09:15:34  19     Q.   What kind of annual sales do you have at your

09:15:37  20   original location -- at the store you're at now?

09:15:40  21     A.   At the present store, we do approximately a

09:15:43  22   million seven a year.

09:15:44  23     Q.   That's sales, not profit?

09:15:46  24     A.   Yeah.   That's sales.

09:15:48  25     Q.   What kind of hours do you work as store manager?

09:15:51   1    A.   My hours are basically about 50, 52 hours a week.

09:15:57   2    Q.   Do you work more than that?

09:15:58   3    A.   Sometimes I do, depends on the situation.

09:16:01   4    Q.   Do you work less than that?

09:16:02   5    A.   Less than 52?

09:16:05   6    Q.   Yes, sir.

09:16:05   7    A.   Sometimes I do; when the situation warrants

09:16:07   8 itself.

09:16:08   9    Q.   As the store manager there, do you think you can

09:16:12  10 affect the sales volume of that store?

09:16:14  11    A.   Oh, yes.  I'm totally responsible for the sales

09:16:18  12 in the store.  You know, it's what they trained me for,

09:16:21  13 what Family Dollar trained me for was to run the store.

09:16:24  14    Q.   Do you think you have the ability to increase

09:16:26  15 sales?

09:16:26  16    A.   Oh, most definitely.

09:16:29  17    Q.   How do you do that?

09:16:30  18    A.   Well, basically, merchandising the store.  Retail

09:16:34  19 is very simple, really.  It's just the buying and

09:16:37  20 selling of merchandise, you know.  You're responsible

09:16:40  21 for ordering your store every week, make sure we have

09:16:43  22 the product that the customer comes in to buy every

09:16:46  23 week.

09:16:46  24    Q.   As a store manager there, do you run the cash

09:16:50  25 register from time to time?

09:16:51  1    A.   Has happened sometimes.   Cashier calls in sick,

09:16:55  2  maybe you get a little extra busy during the first of

09:16:59  3  the month, you have to open up another register.

09:17:01  4        Everybody -- you know, everybody hates to stand

09:17:04  5  in line.

09:17:04  6    Q.   Do you have truck day at your store?

09:17:08  7    A.   Once a week, every Monday morning at 6:00 a.m.

09:17:11  8    Q.   Are you involved?

09:17:12  9    A.   Oh, yes.  Most of the time.

09:17:15  10   Q.   Describe what -- we don't need to take a long

09:17:18  11 time.  I think we've taken a long time sometimes.  We

09:17:22  12 don't need to.  But describe briefly for us truck day at

09:17:27  13 your store.

09:17:27  14   A.   Well, like I said, the truck usually gets there

09:17:30  15 at 6:00 a.m. Monday morning.  And first thing we have to

09:17:33  16 do is check the seal on the truck, make sure it hasn't

09:17:37  17 been broken.  That's usually the manager's

09:17:39  18 responsibility.  He's responsible for everything that

09:17:41  19 comes in that store.

09:17:41  20       So after we check the seal, we break the seal.

09:17:44  21 We set up the rollers to unload the truck.  We unload it

09:17:48  22 to the U-boats, take them out to the sales floor, and

09:17:51  23 stock the shelves.  Basically, that's it in a nutshell.

09:17:56  24   Q.   How long does that take usually take?

09:17:57  25   A.   Depending on the amount of cartons.   Usually we

09:17:59   1   get 12 to 15 cartons a week, and it usually takes four

09:18:03   2   to five hours to unload a truck.

09:18:05   3       Q.   And how long does it take you to get it to the

09:18:08   4   shelves?

09:18:10   5       A.   Oh, depending on who's there to help unload it

09:18:11   6   and who's there to help stock it, it really will take at

09:18:14   7   least two days to fully stock the shelves.

09:18:17   8       Q.   To get it fully done?

09:18:18   9       A.   Get everything completed.

09:18:20   10      Q.   All right.  Let's change gears a little bit.  Do

09:18:23   11   you do written evaluations of your employees?

09:18:25   12      A.   Yes.  I'm responsible for writing up any employee

09:18:28   13   for whatever infraction they may have, whether it's a

09:18:31   14   good -- sometimes it's good things.

09:18:32   15      Q.   I'm not talking about discipline.  We'll get to

09:18:35   16   that in a second.  I'm talking about evaluations or

09:18:39   17   performance appraisals.

09:18:40   18      A.   Once a year, we do appraisals on each employee.

09:18:43   19      Q.   And who does that?

09:18:44   20      A.   The store manager.  I do, myself.

09:18:46   21      Q.   How about on the assistant manager, who does

09:18:51   22   that?

09:18:51   23      A.   I do the one on the assistant manager.  Anybody

09:18:54   24   that works in the store, I do the appraisal on.

09:18:56   25      Q.   How is it decided at your store when employees

09:19:03   1   work and what their hours of work, or what time they

09:19:06   2   come in?

09:19:07   3       A.   Well, we have -- the home office sends us a staff

09:19:10   4   scheduler, which is an indication of the hours, you

09:19:14   5   know, based on what they feel the volume of the store

09:19:17   6   does.

09:19:17   7           Then we have to take that and make any

09:19:20   8   adjustments we need to it to, you know, fit our

09:19:23   9   particular location.  You know, each store's a little

09:19:27  10   different.  So, you know, I have to make sure I have

09:19:30  11   coverage on the sales floor, register operations, you

09:19:33  12   know, depending on the amount of people I have working

09:19:36  13   for me.

09:19:37  14       Q.   So, do you change it after it gets to you in

09:19:41  15   blank form?

09:19:41  16       A.   I have to change it weekly.  Each week, I make a

09:19:45  17   new schedule out, yes.

09:19:46  18       Q.   And who's -- who is your boss, by position?  What

09:19:49  19   position is your boss?

09:19:51  20       A.   My district manager would be my immediate

09:19:52  21   supervisor.

09:19:53  22       Q.   And who is that?

09:19:54  23       A.   That's Mark Aldinger.

09:19:57  24       Q.   Spell that for the court reporter, if you would.

09:20:00  25       A.   Mark, M-A-R-K, A-L-D-I-N-G-E-R.

09:20:05   1      Q.   And have you had more than one district manager

09:20:07   2   during the course --

09:20:08   3      A.   Yes.   Ten years ago when I was hired at Family

09:20:11   4   Dollar, I had Joe Zakinsky, Z-A-K-I-N-S-K-Y.   He was the

09:20:17   5   one -- the district manager that interviewed me and

09:20:21   6   eventually hired me for Family Dollar.

09:20:24   7      Q.   Hired you as a store manager?

09:20:25   8      A.   Hired me as a store manager.

09:20:26   9      Q.   And then any others besides those two?

09:20:28  10      A.   Yeah.   About a year after that, he they split the

09:20:32  11   district up, and Jeff Engler, E-N-G-L-E-R, became my

09:20:37  12   district manager.   And he was my district manager for

09:20:40  13   about six, seven years.

09:20:41  14      Q.   So those are the only three?

09:20:43  15      A.   That's the only three I've worked for, yes.

09:20:46  16      Q.   Does your district manager have keys to your

09:20:47  17   store?

09:20:47  18      A.   No, sir, he does not.

09:20:49  19      Q.   Do you?

09:20:50  20      A.   We have three keys to the store.   Myself, I have

09:20:54  21   one; I have two assistants, each have one.

09:20:57  22      Q.   Has any of your district managers ever had keys

09:21:00  23   to your store?

09:21:01  24      A.   Not to my knowledge, no.

09:21:03  25      Q.   How often does your present district manager

09:21:06  1   visit you?

09:21:07  2       A.  He doesn't visit my store but maybe once every

09:21:12  3   two weeks for a couple of hours at a time.

09:21:16  4       Q.  What does he do when he comes?

09:21:18  5       A.  Generally, we walk the store, we have an Anytime

09:21:23  6   5 report we fill out.  We make notes on the Anytime 5

09:21:27  7   report on conditions of the store, what needs to be

09:21:29  8   corrected, what needs to be done.  Then we date it.  He

09:21:35  9   leaves that in my possession.  And for the next two

09:21:38  10  weeks, that's kind of my overall agenda, if there's

09:21:44  11  things that need to be done.

09:21:45  12      Q.  Do you put out lists to your employees?

09:21:48  13      A.  Oh, each day I go in and I walk the store.  And

09:21:54  14  it doesn't take but a few minutes to walk around the

09:21:57  15  store, see anything that -- whether it's end caps need

09:22:00  16  changing, or merchandise needs filling up; something

09:22:04  17  needs to be recovered that wasn't done the night before.

09:22:06  18  You know, I just make little mental notes.

09:22:09  19          I go back to the office and make a list of things

09:22:11  20  I want to get accomplished for the day, and I assign

09:22:14  21  them out, as far as who's going to be here today.

09:22:17  22  Sometimes it's, you know, just one other person other

09:22:19  23  than myself there.

09:22:20  24      Q.  All right.  You used the term "merchandising."

09:22:25  25  And maybe we've beat it to death, but tell us what you

09:22:28  1   mean by "merchandising."

09:22:29  2       A.   Well, "merchandising" basically is having the

09:22:34  3   right merchandise in the store for the customer.  I

09:22:37  4   mean, you know, like I said before, retail is really

09:22:40  5   simple, it's just buying and selling merchandise.  You

09:22:43  6   know, you order the merchandise and you display it.

09:22:45  7       You can make out merchandise -- bulk merchandise

09:22:49  8   displays that attract customers' attention, you know,

09:22:53  9   for particular items for sale.  Stuff like that actually

09:22:57  10  gets you extra sales.

09:22:58  11      Q.   Now, you talked about having two assistant

09:23:02  12  managers?

09:23:02  13      A.   Correct.

09:23:03  14      Q.   Has every store you had always had two?

09:23:08  15      A.   Every store I've had has had two, you know.  At

09:23:13  16  one time -- there's been sometimes, situations, where

09:23:17  17  the assistant manager has been promoted to another store

09:23:20  18  and I've been left with one assistant.

09:23:22  19      Usually we have to train somebody who's always

09:23:25  20  training to step in the role of it as an assistant or as

09:23:28  21  a floor supervisor, as we used to call them -- third key

09:23:33  22  carrier, what they're called now sometimes.

09:23:35  23      Q.   You also mentioned -- while we're on assistant

09:23:38  24  manager, who is the assistant manager's boss?

09:23:41  25      A.   Who is his boss?

09:23:44   1      Q.   Yes.

09:23:45   2      A.   I am.

09:23:45   3      Q.   Sir?

09:23:46   4      A.   I am his boss.

09:23:47   5      Q.   Okay.  Does your assistant manager -- do your

09:23:56   6   assistant managers have the same authority you do?

09:23:59   7      A.   In a -- to a point, yes, they have.  They have a

09:24:03   8   lot of my authority, as far as what I've trained them to

09:24:06   9   do or what they've been trained to do.

09:24:08   10          You know, basically, it makes your job easier if

09:24:11   11   you can train someone other than yourself how to do the

09:24:14   12   same thing, you know.

09:24:16   13      Q.   You mentioned ordering.  Briefly tell us how that

09:24:21   14   works.

09:24:22   15      A.   How to order the store?

09:24:23   16      Q.   Yeah.

09:24:24   17      A.   Well, we have a little machine we call a PDT

09:24:27   18   machine that stamps labels on the counter, and we just

09:24:30   19   walk up and down the counter, basically with the

09:24:33   20   machine, scanning items that we need to fill back up on.

09:24:36   21          And you get this -- you know, knowing what

09:24:39   22   to order -- kind of experience of ordering every week.

09:24:42   23   The more you order, the more you know what you need, you

09:24:46   24   know, how much you need of it.

09:24:48   25          So you just scan it, put the quantity in you want

09:24:52    1    to have shipped to you.

09:24:53    2        Q.  So, do you get to decide?

09:24:55    3        A.  Oh, yeah.  You're the one that's doing the

09:24:57    4    ordering.

09:24:57    5        Q.  Is there an automatic replenishment system?

09:25:01    6        A.  Well, there is a replenishment system where -- I

09:25:06    7    don't know how it works, as far as if you -- if the

09:25:10    8    computer feels like you need more of something, they'll

09:25:13    9    ship you something based on your last year's sales;

09:25:17   10    something peaks in the season because of the time of the

09:25:22   11    year, it's going to sell more than other times, and this

09:25:27   12    replenishing system will send you extra of that.

09:25:31   13        Q.  Can you rely on that?

09:25:32   14        A.  Oh, you can't rely on that to have everything the

09:25:36   15    customer wants, no.

09:25:38   16        Q.  All right.  Let's move to closing your store.

09:25:41   17    You have some ice and snow occasionally in the Richmond

09:25:44   18    area?

09:25:44   19        A.  Oh, yes.  We have bad winters almost every year.

09:25:48   20        Q.  All right.  How does it work if you're having bad

09:25:51   21    enough weather to consider closing your store?  How is

09:25:55   22    that decision made?

09:25:55   23        A.  Well, if we know ahead of time that -- the

09:25:58   24    weather report is not an exact science, either, but if

09:26:02   25    we know that the weather's going to be bad, the district

09:26:05  1   manager may even send out a notice saying, well,

09:26:08  2   depending on the conditions, you know, inform him.  And

09:26:10  3   it's always good to inform your boss that you're going

09:26:14  4   to close your store.

09:26:16  5        But as far as in an emergency situation, it gets

09:26:19  6   more than what they predicted, and you look outside the

09:26:21  7   windows and you see, well, the roads are getting

09:26:25  8   terrible, you know, and you have three or four employees

09:26:27  9   in your store that live a distance from the store --

09:26:31  10  safety is always an issue.  It's -- you're responsible

09:26:34  11  for your employees.  And you don't want some employee

09:26:38  12  having to drive through icy roads back home just to, you

09:26:42  13  know, save a few bucks.

09:26:44  14       So I may say -- and I live a good distance from

09:26:47  15  the store, and I think of my safety, too -- it's time to

09:26:50  16  close the store and get home, you know.

09:26:52  17  Q.  Do you have to get approval in advance from your

09:26:55  18  district manager?

09:26:56  19  A.  Well, it's not a bad idea to call the district

09:26:59  20  manager if you can get ahold of him and inform him of

09:27:03  21  the situation.  But as far as approval, I don't think

09:27:04  22  he's ever said, no, you can't, you know.  You just make

09:27:07  23  that decision to inform him of it.

09:27:10  24  Q.  All right.  Let's move to hiring.  Who does the

09:27:13  25  hiring in your store?

09:27:14  1    A.  I do all the hiring in my store.

09:27:15  2    Q.  When you say "all", does that include every

09:27:19  3  position?

09:27:19  4    A.  Every position to be filled, I do the hiring.

09:27:22  5  They have to work for me, you know.

09:27:24  6    Q.  What's your district managers's involvement in

09:27:27  7  hiring?  Let's start with clerks.

09:27:29  8        I think the term that has been used is "clerk,"

09:27:32  9  "cashier," "stocker," but are there any -- is the term

09:27:35  10  "stocker" really a term of a position in your store?

09:27:39  11    A.  Well, no.  It's -- it's a position that we call,

09:27:44  12  you know, as far as -- it's the person that we may hire

09:27:48  13  as a position to unload the truck, pull out the heavy

09:27:54  14  freight, chemicals, stuff like that, you know.  Some

09:27:58  15  guys come in and they want a job, and they're not

09:28:01  16  applying for a cashier's job.  They may say, well, you

09:28:04  17  know, I can do stock.

09:28:07  18        So if we have a position open for stocking, we'll

09:28:10  19  hire him.

09:28:13  20    Q.  All right.  What's your district manager's

09:28:14  21  involvement in hiring cashiers, clerks, or stockers?

09:28:17  22    A.  He has no involvement whatsoever in my hiring of

09:28:20  23  stockers or cashiers.

09:28:21  24    Q.  How about assistant managers?

09:28:22  25    A.  In assistant managers' situation, he has some

09:28:28    1    involvement to the extent that I bring him in as a

09:28:33    2    partner.  I say, "this guy I want to make an assistant

09:28:37    3    manager.  I've trained him, he's capable, he's

09:28:41    4    responsible."

09:28:42    5         You know, I'll send him the information so he can

09:28:45    6    forward to the home office information to receive a

09:28:49    7    background check, because before we hand over the store

09:28:52    8    keys to a -- an employee who maybe has been a cashier or

09:28:57    9    stocker for a year or so, we want to do a background

09:29:02   10    check, wanting to make sure that he's responsible

09:29:06   11    enough, doesn't have any legal matters that could cause

09:29:09   12    any problems down the road.

09:29:11   13         So we do a background check on it.  That's why I

09:29:15   14    usually pull in the district manager and make him a

09:29:17   15    partner in this.

09:29:18   16    Q.  Who makes the final decision?

09:29:20   17    A.  It's my decision whether to hire the guy or

09:29:25   18    promote him.

09:29:26   19    Q.  Let's move to just -- or to promoting, is that

09:29:30   20    what you said?

09:29:30   21    A.  Yes.  If he's been an employee and he's, like I

09:29:34   22    said, shown the ability to -- the responsibility and

09:29:38   23    wants to learn, wants to, you know, grow with the

09:29:40   24    company, you know, there's so many of our store managers

09:29:43   25    have started out as a stocker or cashier at one point in

09:29:46  1    their career.

09:29:49  2        Q.   All right.  Let's turn to the other end of the

09:29:51  3    process in employment, discipline, discharge.  Who's

09:29:56  4    responsible for that in your store?

09:29:57  5        A.   Here again, it's the store manager's

09:29:59  6    responsibility to control the four walls in the store.

09:30:03  7    Whatever goes on in the store, you know, he's

09:30:05  8    responsible for.

09:30:07  9        So if there's a customer complaint, if there's a

09:30:12  10   -- an employee whose register comes up short all the

09:30:15  11   time, the manager is responsible for either training or

09:30:19  12   disciplining the associate.

09:30:22  13       Q.   And that manager, in your store, is you?

09:30:25  14       A.   Yes, that's me.

09:30:26  15       Q.   And do you get your district manager involved in

09:30:30  16   that?

09:30:30  17       A.   Not on a normal basis, no.  If it was a special

09:30:35  18   situation where, you know, we felt an employee was

09:30:39  19   stealing from the company or passing merchandise, we may

09:30:44  20   call in Loss Prevention, maybe set up kind of like a

09:30:50  21   sting information to catch them passing merchandise.

09:30:52  22       But if it's an out-and-out flagrant violation

09:30:56  23   where we caught them stealing money, you know, it's

09:30:59  24   automatic dismissal.

09:31:01  25       Q.   All right.  Before I turn you over to plaintiffs'

09:31:04  1    counsel, I think you used the term "Anytime 5", which

09:31:08  2    may be a new term in the courtroom.  Can you tell us

09:31:12  3    what that means?

09:31:13  4        A.   Well, Anytime 5 is basically a piece of paper

09:31:21  5    that has five different areas in the store that the

09:31:26  6    district manager -- well, actually, the manager and his

09:31:29  7    entire crew should look at there.  It's kind of like a

09:31:34  8    rule of thumb to run your store by.  You know, it goes

09:31:38  9    along with having too many outs, why do you have too

09:31:41 10    many outs?  Recovery of the store.

09:31:44 11        You're just kind of checking off this little list

09:31:47 12    to see that you're following procedures to run an

09:31:51 13    efficient, clean, you know, shoppable store for the

09:31:54 14    customer.

09:31:54 15        Q.   All right.  To move us along, "outs" means --

09:31:58 16        A.   "Outs" mean you're out with the merchandise.  You

09:32:01 17    either didn't -- you failed to order it or it was failed

09:32:04 18    to be shipped by the replenishment system.

09:32:06 19        Q.   And "recovery" means?

09:32:07 20        A.   Straight -- basically facing the merchandise and

09:32:10 21    straightening the counters, putting things where they

09:32:13 22    belong.

09:32:14 23             MR. MAY:  Thank you, Mr. Warren.  Answer

09:32:15 24    their questions.

09:32:16 25             THE WITNESS:  Thank you.

| | | |
|---|---|---|
| 09:32:17 | 1 | THE COURT:  Cross-examination? |
| 09:32:18 | 2 | **CROSS-EXAMINATION** |
| 09:32:19 | 3 | **BY MR. CALAMUSA:** |
| 09:32:21 | 4 | Q.  Good morning, Mr. Warren.  How are you today? |
| 09:32:23 | 5 | A.  Fine, thank you. |
| 09:32:25 | 6 | Q.  You've been with the company ten years; is that |
| 09:32:30 | 7 | correct? |
| 09:32:30 | 8 | A.  That's correct, sir. |
| 09:32:30 | 9 | Q.  And I think we all know this, but you're not a |
| 09:32:35 | 10 | plaintiff in this case, are you? |
| 09:32:36 | 11 | A.  No, sir, I am not. |
| 09:32:37 | 12 | Q.  You, currently in your store in Richmond |
| 09:32:41 | 13 | Virginia, have ten employees? |
| 09:32:42 | 14 | A.  At current, yeah, including myself. |
| 09:32:45 | 15 | Q.  Including yourself? |
| 09:32:46 | 16 | A.  Right. |
| 09:32:47 | 17 | Q.  Nine other employees? |
| 09:32:48 | 18 | A.  Nine other employees; right. |
| 09:32:49 | 19 | Q.  Two assistant managers? |
| 09:32:50 | 20 | A.  Two assistants. |
| 09:32:51 | 21 | Q.  And if I understand right, you've always had two |
| 09:32:54 | 22 | assistant managers other than when someone leaves, |
| 09:32:56 | 23 | you've got a brief period of time until someone becomes |
| 09:32:59 | 24 | an assistant manager? |
| 09:32:59 | 25 | A.  That's correct. |

09:33:00  1      Q.   Are you -- you gave me some -- you gave us your

09:33:07  2   salary.   It's $935 a week, that's your current salary?

09:33:14  3      A.   That's correct.

09:33:14  4      Q.   What was your starting salary?

09:33:16  5      A.   I believe it was 750 a month -- 750 a week.

09:33:20  6      Q.   And how many raises have you gotten?

09:33:23  7      A.   I've had approximately -- had a raise every year,

09:33:28  8   around 25, 30 bucks every year a week.

09:33:32  9      Q.   So you start around 750, and every year for the

09:33:36  10  last ten years, your salary has increased 25, 30 bucks

09:33:40  11  to get up to this 900 bucks?

09:33:42  12     A.   Right.

09:33:43  13     Q.   And you told us about your last bonus that was

09:33:46  14  6,500?

09:33:46  15     A.   No, that was not my last one.

09:33:48  16     Q.   That was your --

09:33:49  17     A.   That was my highest.

09:33:50  18     Q.   When was that?

09:33:51  19     A.   That was -- that was probably about four years

09:33:55  20  ago.   I was running a store on Jefferson Davis there in

09:34:00  21  Richmond at the time, was just taking off.   I mean,

09:34:06  22  Kmart down the street had closed.   It was the only place

09:34:09  23  to shop, and we were rolling in -- in sales.

09:34:11  24     Q.   All right.   You -- Kmart closed, you didn't have

09:34:14  25  a competition right there close to you, so your store

09:34:18    1    was just booming?

09:34:19    2        A.   Right.

09:34:19    3        Q.   And you got a high bonus?

09:34:20    4        A.   Oh, yeah.  We had a good inventory and profit at

09:34:24    5    the store.

09:34:24    6        Q.   Your employees get raises because of that

09:34:26    7    inventory?

09:34:26    8        A.   Well, they got raises on their appraisals, yes.

09:34:29    9        Q.   Okay.  What was your last year's bonus?

09:34:32   10        A.   Last year, we -- my bonus -- and it's hard for me

09:34:37   11    to remember dollar amount, because I have direct deposit

09:34:40   12    and my wife takes care of the check, so I don't get to

09:34:43   13    see the check no more.

09:34:44   14        Q.   I understand.  I understand.

09:34:46   15        A.   I think it was somewhere near 1,000.

09:34:50   16        Q.   And is that about normal?

09:34:55   17        A.   Yeah.  One percent -- we had a higher shrinkage

09:35:00   18    in the store I was at, so the profit was down.

09:35:03   19        Q.   So the 6,500 you wanted to tell us about was a

09:35:09   20    rarity, it was because there was no competition in that

09:35:11   21    store boom that year?

09:35:13   22        A.   It was an extremely good year.

09:35:15   23        Q.   But on normal, your normal bonus that you get is

09:35:18   24    about 1,000?

09:35:19   25        A.   Well, my normal average bonus would probably be

09:35:24   1   around 15 to 1,800.

09:35:25   2       Q.   You got $1,000 this past year, is that my

09:35:28   3   understanding?

09:35:29   4       A.   Yeah, that's correct, about 1,000.

09:35:31   5       Q.   Let me hand you a calculator real quick.   And I

09:35:42   6   wrote down that you averaged between 55 and 52 -- I'm

09:35:47   7   sorry, 55 to 58 hours; is that right?

09:35:53   8       A.   Pardon me?

09:35:54   9       Q.   The number of hours that you average a week range

09:35:57  10   between 52 and 58?

09:35:58  11       A.   Between 50 and 55 normally.

09:36:01  12       Q.   Let's do the math.   Take your calculator up there

09:36:04  13   and multiply 55 hours a week times 52 weeks in a year.

09:36:10  14       A.   Okay.

09:36:11  15       Q.   What's that number?

09:36:12  16       A.   2,860.

09:36:13  17       Q.   And if you would, would you divide that by the

09:36:22  18   $1,000 bonus?

09:36:23  19       A.   Divide it by 1,000?

09:36:25  20       Q.   Yeah -- or divide 1,000 by that, actually.

09:36:29  21   Mr. McCarthy was better at math than I am.

09:36:36  22       A.   .035.

09:36:38  23       Q.   Do it the other way.

09:36:42  24       A.   Okay.

09:36:42  25       Q.   I had it right the first time.

09:36:44  1     A.   28 what?

09:36:46  2     Q.   2,860.

09:36:50  3     A.   Divided by what?

09:36:51  4     Q.   $1,000.  Oh, okay.

09:36:55  5     A.   Oh, okay.  It's 28.5.

09:36:58  6     Q.   Let me ask you -- about 28 cents an hour;

09:37:05  7  correct?

09:37:06  8     A.   Whatever it comes out to, 28.5.

09:37:09  9     Q.   Let me ask you this:  You've got ten employees in

09:37:15  10  your store now.  And make sure I understand, it's --

09:37:20  11  everyone else has come in and testified -- you can only

09:37:23  12  tell us about what you do on a daily basis; right?

09:37:27  13     A.   Correct.

09:37:27  14     Q.   You don't know about the other 1,424?

09:37:30  15     A.   I have no idea, no.

09:37:31  16     Q.   All right.  And so you can't tell us how many of

09:37:34  17  the 1,424 people have ten employees in the store like

09:37:38  18  you do?

09:37:39  19     A.   I have no idea.

09:37:40  20     Q.   Okay.  And you can't tell us what the 1,424

09:37:44  21  plaintiffs in this case do in the real world on a daily

09:37:47  22  basis, can you?

09:37:48  23     A.   No, sir.

09:37:49  24     Q.   What their actual job duties are?

09:37:51  25     A.   I have no idea what they do.

09:37:53  1    Q.   And what their primary duty is?

09:37:56  2    A.   I have no idea.

09:37:57  3    Q.   Okay.  The -- you used the term "merchandising"

09:38:04  4    and I wrote it down, and as I understand the retail

09:38:07  5    business, merchandising is a fairly simple process;

09:38:09  6    right?

09:38:09  7    A.   I think so, yeah.

09:38:10  8    Q.   It's ordering and stocking the shelves; correct?

09:38:13  9    A.   That's basically it.

09:38:15  10   Q.   Not real difficult?

09:38:17  11   A.   I don't think it is, no.

09:38:18  12   Q.   All right.  And am I correct that the ordering

09:38:21  13   process can be and is done by not only you, but your

09:38:27  14   assistant managers as well?

09:38:28  15   A.   If they're training to do an order, yeah.

09:38:32  16   Q.   And yours are, I would assume, aren't they?

09:38:35  17   A.   I think it's a priority to train your people to

09:38:38  18   do what I can do.

09:38:39  19   Q.   Your assistant managers do that ordering;

09:38:41  20   correct?

09:38:41  21   A.   Not on a normal basis, no.  I mean, I give them a

09:38:45  22   section.  They can order occasionally, but I usually do

09:38:49  23   the ordering.

09:38:49  24   Q.   And when they're doing that ordering, they're

09:38:51  25   paid hourly, aren't they?

09:38:53   1      A.   Yes, sir.

09:38:53   2      Q.   The evaluations, I do understand that your

09:38:58   3   testimony is you fill out the evaluations on your

09:39:01   4   employees; right?

09:39:01   5      A.   That's correct.

09:39:02   6      Q.   And then you send them to the DM; correct?

09:39:05   7      A.   Generally, he comes to the store to look them

09:39:10   8   over.

09:39:10   9      Q.   So he actually reviews the evaluation and signs

09:39:13   10   off and approves them; right?

09:39:14   11      A.   There's a place for him to sign the evaluations.

09:39:17   12      Q.   And so he signs and approves the evaluations

09:39:20   13   given to the employees?

09:39:20   14      A.   Right.

09:39:21   15      Q.   You can't give your employees a pay raise, can

09:39:24   16   you, on your on, make the decision -- I'm going to give

09:39:28   17   Joe Smith a pay raise today?

09:39:30   18      A.   Yeah.   No, I can.

09:39:32   19      Q.   You can give them whatever raise you want?

09:39:35   20      A.   Now, I don't actually enter it in the computer,

09:39:38   21   but he doesn't enter into the computer until I send him

09:39:42   22   an email saying "I want to give Joe a raise, 25 cents an

09:39:46   23   hour."

09:39:46   24      Q.   And the DM then has to make the decision, based

09:39:57   25   on your suggestion, and he makes the decision as to

09:40:01    1    whether or not to give a pay raise; correct?

09:40:04    2        A.   He follows through on my suggestion.

09:40:08    3        Q.   You're aware of the policy manuals?

09:40:10    4        A.   I'm aware of them, yes.

09:40:12    5        Q.   Do you follow the policies manuals of Family

09:40:15    6    Dollar?

09:40:15    7        A.   That would depend on the policy that, you know,

09:40:17    8    you were asking me about.

09:40:18    9        Q.   So, some policies you decide to follow, some you

09:40:21   10    don't?

09:40:22   11        A.   No.   I mean, whether or not - you'd have to give

09:40:24   12    me a specific and I can tell you whether or not I follow

09:40:26   13    it.   I don't know all the policies by heart.

09:40:28   14        Q.   Do you follow the wage increase policy that I've

09:40:32   15    put up on the board, which is part of the 1997 policy

09:40:39   16    manual?   "Each store manager's responsible for reviewing

09:40:43   17    and submitting an evaluation form" --

09:40:50   18                   MR. MAY:   What year is this?

09:40:51   19                   MR. CALAMUSA:   '97.

09:40:52   20        Q.   "The district manager will review wage

09:40:54   21    recommendations with the regional vice-president.   Store

09:40:59   22    managers will be informed whether or not the

09:41:00   23    recommendations are granted."   That's the policy, isn't

09:41:03   24    it?

09:41:03   25        A.   That's the policy now, yeah.

09:41:05  1    Q.   You are told whether or not the raise goes

09:41:09  2   through?

09:41:09  3    A.   Well, I'm never actually told.  I just usually go

09:41:12  4   on to my payroll on the computer and look it up to see

09:41:16  5   if, you know, their raise has gone into effect.

09:41:19  6    Q.   So --

09:41:20  7    A.   -- they never come back and tell me.

09:41:21  8    Q.   They don't ever tell you?

09:41:23  9    A.   No.

09:41:23  10   Q.   You just say, I want this person -- here's the

09:41:26  11  evaluation, it's inventory time.  I want this person --

09:41:29  12  I'm talking too fast for her -- I want this person to

09:41:32  13  get a raise based on the inventory?

09:41:35  14   A.   It's not just based on inventory, no.  I mean, if

09:41:38  15  someone's been there six months and he's a hard worker

09:41:43  16  and I feel he deserves a raise, you know, especially a

09:41:43  17  stocker taking a little bit of heavy weight off of me,

09:41:43  18  helping me out, I may suggest and send an email to the

09:41:57  19  district manager to increase his pay 25 cents an hour.

09:41:58  20   Q.   You suggest?

09:41:59  21   A.   Well, I recommend.

09:42:00  22   Q.   But you don't make the final decision; right?

09:42:03  23  You would agree with that?

09:42:04  24   A.   Well, I've never made a recommendation that was

09:42:08  25  denied, so...

09:42:09   1      Q.   You don't make the actual decision?

09:42:11   2      A.   I don't actually put the raise in the computer,

09:42:14   3   no.

09:42:14   4      Q.   You make a suggestion and a recommendation to

09:42:17   5   your DM who, according to the policy, has to talk to the

09:42:22   6   RVP?

09:42:22   7      A.   I don't -- now, that's past me.  I don't know if

09:42:25   8   he does any talking to the RVP or not.

09:42:27   9      Q.   When the inventory takes place once a year,

09:42:31   10   usually --

09:42:32   11      A.   Right.

09:42:32   12      Q.   -- your DM is there present for the inventory;

09:42:35   13   correct?

09:42:35   14      A.   Correct.

09:42:36   15      Q.   So your DM observes the employees during the

09:42:39   16   inventory time, too, doesn't he?

09:42:41   17      A.   I would imagine he observes them.

09:42:47   18      Q.   You make a to-do list on a daily basis?

09:43:00   19      A.   I wouldn't say it's every morning, no.  On the

09:43:05   20   twelfth morning, there doesn't need to be a list made.

09:43:10   21   We know what's going to happen.  Truck, stock the

09:43:15   22   shelves.

09:43:15   23      Q.   Routine, every day, that cashier knows he or she

09:43:18   24   is running the cashier and straightening up around the

09:43:21   25   front?

09:43:21  1      A.   Right.

09:43:22  2      Q.   That stocker knows that he's to move that freight

09:43:25  3  from the back to the front; right?

09:43:27  4      A.   That's correct.

09:43:27  5      Q.   Routine, everyday stuff?

09:43:28  6      A.   Right.

09:43:29  7      Q.   Nothing that you have to make a big detailed list

09:43:32  8  of, "John, here's what all" -- you know what every

09:43:35  9  employee's going to do, because it's fairly routine;

09:43:38  10  right?

09:43:38  11      A.   Well, on certain days, yes.  It's fairly routine.

09:43:41  12      Q.   Majority of the days, Mr. Warren, it's a routine

09:43:44  13  job in merchandising.  The cashier knows what the

09:43:48  14  cashier does; correct?

09:43:50  15      A.   Basically, yes.

09:43:51  16      Q.   Okay.  The -- you're always given the rare

09:44:03  17  exception and had two assistant managers.  Now, those

09:44:06  18  assistant managers also open and close the store; right?

09:44:08  19      A.   Right.

09:44:09  20      Q.   And when they're responsible for opening, they

09:44:12  21  complete the paperwork; correct?

09:44:13  22      A.   Most of the time, yes.

09:44:21  23      Q.   And when they're responsible for closing the

09:44:26  24  store, they complete the paperwork at night?

09:44:27  25      A.   Correct.

09:44:28  1    Q.   Assistant managers also make the bank deposits?

09:44:33  2    A.   I have one that does and one that can't.

09:44:37  3    Q.   The one that does, you would agree with me that

09:44:42  4    handling that money would be pretty important, wouldn't

09:44:44  5    you?

09:44:44  6    A.   Oh, definitely.

09:44:47  7    Q.   And you've got an hourly employee handling the

09:44:51  8    money just like you handle the money; correct?

09:44:53  9    A.   Correct.

09:44:53  10   Q.   And you have an hourly employee filling out the

09:44:56  11   paperwork, just like you fill out the paperwork?

09:44:58  12   A.   Correct.

09:44:59  13   Q.   Staff schedulers came into being when, do you

09:45:07  14   remember?

09:45:07  15   A.   A few -- couple of years back.

09:45:11  16   Q.   Did you get some training on how those worked,

09:45:13  17   received some policies and memos?

09:45:15  18   A.   Yeah, I'm sure we did.

09:45:17  19   Q.   Dan, can I have Exhibit 8, if possible?

09:45:25  20        There's been testimony, Mr. Warren, that when

09:45:30  21   staff schedulers came out, something called "Staff

09:45:33  22   Scheduler Frequently Asked Questions" were issued.  Do

09:45:36  23   you recall that?

09:45:38  24   A.   Not specifically, no.  I'm not saying it didn't

09:45:47  25   come out, I didn't glance it over.

09:45:49 1    Q.  Let's look down one, two, three, four, five.
09:45:55 2  Will you read that question and the answer on the Staff
09:45:59 3  Scheduler Frequently Asked Questions that came out with
09:46:03 4  the -- with the -- when the schedules were implemented?
09:46:07 5    A.  "Can I move coverage from slower days, that is,
09:46:11 6  non truck week days, to Fridays, Saturdays or Sundays
09:46:16 7  when we are busiest?"  Answer --
09:46:18 8    Q.  And what does the corporate say?
09:46:20 9    A.  "No.  Schedules are designed to give coverage
09:46:23 10  that is based on store volume and store hours."
09:46:26 11    Q.  Okay.  Now, skip on down two more questions.  One
09:46:32 12  that says:  "Can I change the schedule to provide an
09:46:35 13  additional early morning crew for restocking higher
09:46:40 14  volume stores?"
09:46:41 15    What did corporate say the answer to that
09:46:44 16  question was when they implemented the staff schedules?
09:46:49 17    A.  It says:  "Door-to-shelf standards are based on
09:46:53 18  productivity, and if you require an additional early
09:46:55 19  morning crew to restock, it must be approved by the DM
09:46:59 20  and RVP."
09:47:01 21    Q.  Okay.  Do you know, Mr. Warren, how many of 1,424
09:47:07 22  plaintiffs follow this policy and how many do not?
09:47:10 23    A.  Do I know how many?
09:47:11 24    Q.  Yes, sir.
09:47:12 25    A.  No, I have no idea.

09:47:13  1    Q.   So you can't testify and dispute the fact that if

09:47:18  2    1,424 store managers say they followed this policy

09:47:22  3    that's regarding how to handle staff schedulers, you

09:47:26  4    can't dispute that?

09:47:27  5    A.   No, sir.

09:47:28  6    Q.   Okay.  Thank you.  Discipline.  You told me it

09:47:42  7    was your responsibility to discipline and counsel your

09:47:46  8    employees?

09:47:46  9    A.   Correct.

09:47:47  10   Q.   If you're not in the store, the assistant manager

09:47:50  11   also has the authority to counsel employees; correct?

09:47:54  12   A.   Well, normally, I would get a phone call at home

09:47:59  13   if I'm not there.

09:48:00  14   Q.   There was an example used -- cashier's talking on

09:48:04  15   her cell phone instead of cashiering.  Assistant manager

09:48:09  16   can go counsel her and say, "get off the gone and get"

09:48:14  17   --

09:48:14  18   A.   I would hope he would, yes.

09:48:15  19   Q.   So the right to counsel and coach the employees

09:48:18  20   is not exclusive to you as store manager?

09:48:20  21   A.   No.  I think it's whoever's in charge of the

09:48:22  22   store at the time.  They should have that responsibility

09:48:25  23   if they have the training.

09:48:26  24   Q.   And if you and the assistant are there at the

09:48:30  25   same time and you're in the back doing something and the

09:48:33  1  assistant's in the front, the assistant has the

09:48:36  2  authority to coach and counsel employees as to what to

09:48:38  3  do?

09:48:38  4      A.   Well, in a situation like that, I would think he

09:48:41  5  could tell the cashier to hang the phone up and wait on

09:48:44  6  customers, yeah.  I hope he's got that much

09:48:46  7  responsibility.

09:48:46  8      Q.   Correct.  And that's that assistant manager that

09:48:49  9  has that responsibility to do this, and he's paid

09:48:51  10  hourly; right?

09:48:52  11      A.   He's an hourly employee, correct.

09:48:54  12      Q.   And he's eligible for overtime, isn't he?

09:48:57  13      A.   If he works over 40, he gets paid for overtime.

09:49:00  14      Q.   Hiring.  I wrote down that your DM is involved in

09:49:14  15  the hiring of assistant managers, and you said some

09:49:18  16  involvement; right?

09:49:19  17      A.   I make him a partner in it.

09:49:22  18      Q.   And you make him a partner in it.  First of all,

09:49:25  19  is that because that's what you were taught you were

09:49:28  20  supposed to do as part of the Strands and the training

09:49:31  21  procedures?

09:49:31  22      A.   Well, yeah.  It's somewhere in there that the

09:49:34  23  district manager is supposedly to interview anybody that

09:49:39  24  carries keys to the store, which, you know, I mean, it's

09:49:42  25  a business.

09:49:42   1      Q.   And isn't it -- doesn't policy also say not only

09:49:46   2   is he supposed to interview, but, in fact, approve the

09:49:51   3   people that are going to carry the keys; which would be

09:49:54   4   your assistant managers and third keys?

09:49:55   5      A.   Yeah.   There again, that is a policy.

09:49:57   6      Q.   Okay.   Do you follow that policy?

09:49:59   7      A.   Well, in my situation at my store, I have an

09:50:04   8   assistant that was a store cashier that I promoted to an

09:50:11   9   assistant in the store, and I -- I made my district

09:50:15   10  manager aware of the situation.   I ran a background

09:50:21   11  check.   He approved it over the phone.   But he actually

09:50:26   12  never interviewed the employee.

09:50:26   13     Q.   He had seen that employee before, hadn't he?

09:50:29   14     A.   I'm sure he had seen her when he was in the

09:50:32   15  store --

09:50:32   16     Q.   He had met her face to face, and you just told

09:50:36   17  me, I want to make sure you called him and he approved

09:50:39   18  it; right?

09:50:39   19     A.   Right.

09:50:40   20     Q.   Because that's what the policy says, that the

09:50:43   21  district manager must approve the hiring and/or

09:50:45   22  promotion of these individuals?

09:50:47   23     A.   Yeah.   But he doesn't actually make the

09:50:49   24  promotion.   I mean, he wouldn't -- she would still be a

09:50:52   25  cashier if I did not promote her to an assistant.

09:50:55   1      Q.   No.   She would still be a cashier, too, if he

09:50:58   2   didn't approve it; right?

09:50:59   3      A.   Well, he'd have to -- I'm not sure.   Seriously, I

09:51:07   4   mean, if he told me I could not have her as an

09:51:10   5   assistant, it would have to be a pretty good reason why

09:51:13   6   not.   I mean, did he see her steal or something?

09:51:17   7          In the real world, he would not say no, unless I

09:51:20   8   had a reason for him to say no.

09:51:21   9      Q.   The question is:   You can't make her an assistant

09:51:28   10  manager unless he approves it; correct?

09:51:31   11     A.   I -- I did, though.   You know, I mean --

09:51:34   12     Q.   In that situation?

09:51:35   13     A.   He eventually did approve it, yes.

09:51:37   14     Q.   In that situation, you called and said, "I want

09:51:39   15  this person to be promoted."   He got to run the

09:51:43   16  background check and other information, and he called

09:51:45   17  you back, and it's your testimony he approved it; right?

09:51:47   18     A.   He approved it.   But like I said, if he hadn't

09:51:51   19  approved it, I don't know that she still wouldn't be an

09:51:54   20  assistant.

09:51:54   21              THE COURT:   Well, how could that be?

09:51:56   22              THE WITNESS:   Well, if I promoted her to

09:51:58   23  assistant, the only thing that he actually instigated

09:52:02   24  was the background check on her.   It came back approved

09:52:07   25  from the home office.

09:52:08  1              THE COURT:  Yes, sir.  I understand that.

09:52:10  2     But you -- apparently, it's your position that you don't

09:52:14  3     really need the approval of the district manager,

09:52:17  4     that --

09:52:18  5              THE WITNESS:  Well, I wouldn't say -- I

09:52:20  6     wouldn't say I wouldn't need it, but -- and I probably

09:52:23  7     would not have promoted her if I didn't get it.

09:52:26  8              But she was made the third key or the

09:52:30  9     assistant when I got the approval that came over the

09:52:33 10     computer from the home office.  You know, then she was

09:52:37 11     given the keys to the store.  You know, I would assume

09:52:43 12     that since he sent in the background check, that he did

09:52:46 13     approve it.

09:52:47 14              THE COURT:  Yes, sir.  That's a given that

09:52:49 15     he did approve it.  But as I understood what you were

09:52:51 16     saying, it is that even if he hadn't approved it, she

09:52:55 17     may, nonetheless, have been --

09:52:58 18              THE WITNESS:  Well, no.  I guess back-

09:52:59 19     tracking now, I guess if I hadn't gotten the approval

09:53:03 20     from the home office saying that she was recommended,

09:53:05 21     that I could not have made her one.

09:53:06 22              THE COURT:  All right.

09:53:08 23              THE WITNESS:  Uh-huh.

09:53:09 24     BY MR. CALAMUSA:

09:53:11 25        Q.  You talked about weather and having to close the

09:53:17  1   store.  And I wrote down that you -- your DM sometimes

09:53:22  2   sends you notices of what the weather's going to be

09:53:26  3   like; correct?

09:53:26  4       A.  In an extreme case, yeah.

09:53:28  5       Q.  And that you keep your DM informed as to the

09:53:31  6   situation at your store?

09:53:34  7       A.  Correct.

09:53:35  8       Q.  And that then you, in partner with the DM, make a

09:53:43  9   decision as to what to do about the store and the safety

09:53:45  10  of the employees; right?

09:53:47  11      A.  Right.

09:53:48  12      Q.  Am I correct, Mr. Warren, that all the employees

09:54:00  13  in your store -- from cashier to stocker, assistant

09:54:05  14  manager, and yourself -- are all responsible for

09:54:12  15  customer service?

09:54:13  16      A.  That would be a correct statement.

09:54:14  17      Q.  And all those individuals are responsible for

09:54:17  18  controlling shrink?

09:54:20  19      A.  Correct.

09:54:21  20      Q.  Who's your RVP?

09:54:29  21      A.  Right now, it's Deloris Wechsler.  Just changed.

09:54:35  22      Q.  Who was it before Mr. Wechsler?

09:54:37  23      A.  George Flassic.

09:54:38  24      Q.  Did you have any others since you've been there?

09:54:41  25      A.  Not -- no.  Actually, I think when I first

09:54:50  1   started ten years ago, there was a regional

09:54:54  2   vice-president -- was someone else.  I have a hard time

09:54:57  3   remembering his name now, because he's been gone, and

09:55:00  4   George Flassic became the regional vice-president.

09:55:02  5        Q.  Thank you, Mr. Warren.

09:55:08  6        A.  You're welcome.

09:55:09  7             THE COURT:  Redirect?

09:55:09  8             MR. MAY:  I will be brief, Your Honor.

09:55:10  9                    **REDIRECT EXAMINATION**

09:55:11  10  **BY MR. MAY:**

09:55:15  11       Q.  There was that situation you were talking about

09:55:17  12  where you get phone calls at home when there's --

09:55:19  13  sometimes when there's discipline to be imposed on an

09:55:22  14  employee by the assistant manager?  Remember that --

09:55:25  15       A.  Yeah.

09:55:26  16       Q.  -- Mr. Calamusa was asking you?  Do you call your

09:55:29  17  assistant manager to -- when you're the manager and

09:55:33  18  you're there at the store and you're about to discipline

09:55:37  19  an employee, did you look up the assistant manager at

09:55:39  20  home and call him or her?

09:55:41  21       A.  No, sir.

09:55:42  22       Q.  Now, you talked about an assistant manager you

09:55:45  23  don't let make deposits?

09:55:47  24       A.  Well, no, it's not that I don't let her.  She's

09:55:51  25  new, and I haven't trained her to make the deposit.  She

09:55:54   1   doesn't have transportation to go to the bank.

09:55:57   2       Q.   Who made that decision?

09:56:00   3       A.   I did.

09:56:00   4       Q.   And on background checks, is that what you're

09:56:03   5   talking about the approval comes from the home office?

09:56:07   6       A.   Yeah.   The form is submitted through the computer

09:56:09   7   for background check.   It usually takes two or three

09:56:14   8   days to receive a response from the home office, like an

09:56:16   9   email in the morning.   And it just states, recommends or

09:56:19  10   not to recommend.

09:56:19  11       Q.   And is that what you are talking about earlier --

09:56:22  12             MR. CALAMUSA:   Object to leading, Your

09:56:24  13   Honor.

09:56:24  14             THE COURT:   Sustained.

09:56:26  15       Q.   Do you know what's done in a background check?

09:56:29  16       A.   I just know that I think it's some legal issues

09:56:33  17   looked at.   Not specifics, no, I don't.

09:56:35  18       Q.   Okay.   When you're running a cash register, do

09:56:41  19   you still supervise?

09:56:42  20       A.   Oh, yes, sir, all the time.

09:56:43  21       Q.   What do you think your most important duty is?

09:56:47  22       A.   Well, I'm -- basically, I'm responsible for what

09:56:50  23   goes on the four walls in my store, you know, from

09:56:54  24   ordering the merchandise, to receiving it, to stocking

09:56:58  25   it.

09:56:59  1        I mean, it's -- like I said before, retail is

09:57:02  2   really fairly simple.  You're just trying to provide a

09:57:06  3   product for the customer.  Anybody that's ever been in

09:57:11  4   shopping some place went to pick up an item and the item

09:57:15  5   wasn't there, they would be disappointed, because that's

09:57:17  6   what they're used to buying.

09:57:19  7        That's really a key responsibility of the manager

09:57:21  8   is to make sure that item's always there when you go in

09:57:24  9   to shop.

09:57:26  10                 MR. MAY:  Thank you, sir.

09:57:28  11                 THE COURT:  Recross?

09:57:30  12                 **RECROSS EXAMINATION**

09:57:30  13   **BY MR. CALAMUSA:**

09:57:30  14     Q.   Mr. Warren, did I just understand you to tell

09:57:33  15   Mr. May that the assistant manager who doesn't make bank

09:57:40  16   deposits, I thought you told him because she was new and

09:57:43  17   she didn't have transportation to go to the bank, that's

09:57:45  18   why she doesn't make the deposits?

09:57:48  19     A.   Well, I haven't trained her to make the deposit.

09:57:51  20     Q.   And then didn't you say she has no

09:57:53  21   transportation?

09:57:53  22     A.   No, she doesn't drive.

09:57:55  23     Q.   You didn't make that decision that she doesn't

09:57:57  24   have transportation, did you?

09:57:59  25     A.   No, I didn't make the decision.

09:58:01  1      Q.   I thought you answered to him and he said, "Was
09:58:03  2  that a decision you made?"  You said "yes."  And I
09:58:06  3  wanted to make sure I understood it, that she can get
09:58:08  4  back and forth to the bank?
09:58:10  5      A.   Well, no.  She can probably -- she doesn't have
09:58:14  6  -- she doesn't have a license.  She doesn't have a
09:58:16  7  vehicle to drive to the bank.
09:58:17  8      Q.   Thank you.  Now, the most important job you said
09:58:22  9  dealt with -- and you told us this earlier -- the
09:58:26  10  merchandising phase, the ordering, the receiving, and
09:58:29  11  the stocking; right?
09:58:31  12      A.   Basically, right.
09:58:32  13      Q.   And you've also told us that that's a fairly
09:58:36  14  simple process to you?
09:58:36  15      A.   To me, it is.  Yes.
09:58:38  16      Q.   And make sure I'm right -- but ordering,
09:58:42  17  stocking, and receiving is not only done by you as a
09:58:46  18  store manager, but also done by your assistant managers
09:58:50  19  who are paid hourly; correct?
09:58:51  20      A.   Correct.
09:58:52  21      Q.   And the stocking and receiving is also done by
09:58:56  22  hourly people?
09:58:57  23      A.   Correct.
09:58:59  24          MR. CALAMUSA:  Thank you, sir.
09:59:01  25          MR. MAY:  No further questions, Your Honor.

| | | |
|---|---|---|
| 09:59:03 | 1 | THE COURT:  Thank you, sir. |
| 09:59:06 | 2 | THE WITNESS:  Thank you, Your Honor. |
| 09:59:07 | 3 | MR. MAY:  Is the witness excused, sir? |
| 09:59:08 | 4 | THE COURT:  Yes, sir.  The witness is |
| 09:59:10 | 5 | excused. |
| 09:59:10 | 6 | (Witness excused.) |
| 09:59:11 | 7 | THE COURT:  The defendant will call its next |
| 09:59:12 | 8 | witness. |
| 09:59:13 | 9 | MR. KALLON:  Your Honor, we call Ms. Felicia |
| 09:59:16 | 10 | Coleman by deposition. |
| 09:59:17 | 11 | THE COURT:  All right. |
| 09:59:20 | 12 | MR. KALLON:  And, Your Honor, we will |
| 09:59:22 | 13 | request that you explain to the jury why it is -- |
| 09:59:24 | 14 | THE COURT:  All right.  I was about to do |
| 09:59:26 | 15 | that.  Ladies and gentlemen, ordinarily, before a case |
| 09:59:37 | 16 | is tried, the lawyers for the opposite side will take a |
| 09:59:45 | 17 | deposition of the witness.  You've seen some of those |
| 09:59:51 | 18 | depositions already. |
| 09:59:52 | 19 | Depositions are usually taken to determine |
| 09:59:57 | 20 | what knowledge, what facts a particular witness has. |
| 10:00:03 | 21 | Now, most often, depositions are used to try to impeach |
| 10:00:11 | 22 | the testimony of a witness, to show that the witness |
| 10:00:14 | 23 | says something different in her deposition than she said |
| 10:00:18 | 24 | at trial.  That's one use of a deposition. |
| 10:00:22 | 25 | Depositions may also be used when a witness |

| | | |
|---|---|---|
| 10:00:26 | 1 | is unavailable to appear personally at trial and testify |
| 10:00:32 | 2 | before the jury.  This witness -- gentlemen, are you |
| 10:00:40 | 3 | using the deposition or her prior testimony? |
| 10:00:42 | 4 | MR. KALLON:  Trial testimony, Your Honor. |
| 10:00:43 | 5 | THE COURT:  This witness testified at the |
| 10:00:49 | 6 | earlier trial in this case.  She is no longer available, |
| 10:00:57 | 7 | by virtue of illness, to appear and testify again.  And |
| 10:01:03 | 8 | so her testimony at the earlier trial is now going to be |
| 10:01:09 | 9 | read to you, the jury. |
| 10:01:12 | 10 | And you should consider in weighing, that |
| 10:01:17 | 11 | is, evaluate the prior testimony that's being read to |
| 10:01:21 | 12 | you, just as you would consider and evaluate it if she |
| 10:01:27 | 13 | were here personally testifying. |
| 10:01:33 | 14 | MR. KALLON:  Thank you, Your Honor. |
| 10:01:33 | 15 | **FELICIA COLEMAN, DEFENDANT'S WITNESS,** |
| 10:01:33 | 16 | **(Reading prior testimony in record.)** |
| 10:01:37 | 17 | **(Mr. Kallon reading):** |
| 10:01:37 | 18 | Q.  *Ms. Coleman, good afternoon, please, ma'am.* |
| 10:01:40 | 19 | A.  *Good afternoon.* |
| 10:01:41 | 20 | Q.  *How are you today?* |
| 10:01:42 | 21 | A.  *Nervous.* |
| 10:01:43 | 22 | Q.  *I want to make sure we get you on and off very* |
| 10:01:47 | 23 | *quickly, ma'am.  I appreciate you being here.  Tell me,* |
| 10:01:51 | 24 | *where do you live?* |
| 10:01:51 | 25 | A.  *Tuscaloosa.* |

10:01:52  1    Q.   Are you a native of Tuscaloosa?

10:01:55  2    A.   Yes.

10:01:56  3    Q.   And how long have you lived here?

10:01:59  4    A.   Well, I was born in Greene County, and I went to

10:02:02  5    school in Tuscaloosa.

10:02:03  6    Q.   And where do you currently work, ma'am?

10:02:06  7    A.   Family Dollar.

10:02:06  8    Q.   How long have you worked for Family Dollar?

10:02:07  9    A.   Well, I have been back at Family Dollar for eight

10:02:10  10   years.  I had a break in service, add it all up, it's

10:02:14  11   almost 14 years.

10:02:15  12   Q.   Well, for the last eight years when you've been

10:02:19  13   back, what position have you held?

10:02:20  14   A.   Store manager.

10:02:21  15   Q.   And currently, I guess, you are store manager at

10:02:24  16   which --

10:02:25  17   A.   The one -- excuse me?  I'm nervous.  The one on

10:02:29  18   Culver Road near Stillman College.

10:02:33  19   Q.   How long have you been a manager at that store,

10:02:36  20   ma'am?

10:02:36  21   A.   We opened it in 1999.

10:02:38  22   Q.   And how many employees do you have working for

10:02:40  23   you at that store?

10:02:41  24   A.   About eight.

10:02:42  25   Q.   And who hired those employees, ma'am?

10:02:44  1    A.  *I did.*

10:02:44  2    Q.  *Walk the jury through the hiring process that's*

10:02:49  3    *utilized at your store.  Well, first, you get your*

10:02:53  4    *applications in?*

10:02:54  5    A.  *Yes.*

10:02:54  6    Q.  *And what happens after that?*

10:02:55  7    A.  *I review the applications before -- because I*

10:02:59  8    *look for certain people.  I'm very particular.  I*

10:03:03  9    *forever recruit all the time.  I look at applications.*

10:03:05  10   *And everywhere I shop, I look for employees.  And --*

10:03:09  11   Q.  *What are you looking for, with respect to*

10:03:11  12   *employees or prospective employees?*

10:03:14  13   A.  *Someone sort of like me.*

10:03:15  14   Q.  *Which is?  What do you mean by that?*

10:03:18  15   A.  *Someone that's not afraid of hard work.  And I*

10:03:22  16   *never lie to them.  I let them know that it's going to*

10:03:25  17   *be hard work.  And when I find a good candidate, I check*

10:03:28  18   *their references.  I want to find out what they've done,*

10:03:31  19   *where they've worked before, where they went to school,*

10:03:33  20   *things like that.*

10:03:34  21        *I interview them.  I let them talk to me.  You*

10:03:37  22   *learn a lot more when they talk to you.  And when I hire*

10:03:40  23   *them, I initiate a Stanton survey -- I'm sorry.  I'm*

10:03:45  24   *nervous.*

10:03:46  25   Q.  *That's okay.  And background check, drug tests,*

10:03:52    1    things like that.  You have never testified in court

10:03:55    2    before, have you?

10:03:56    3        A.   Never.

10:03:56    4        Q.   This is foreign territory?

10:03:58    5        A.   I hope it's the last time.

10:04:00    6        Q.   After you review the application, you said you

10:04:03    7    decide to bring them in for interviews?

10:04:05    8        A.   Yes.

10:04:06    9        Q.   Are you the only person at your store that

10:04:09   10    interviews the candidates?

10:04:10   11        A.   Probably.  I should be.  But I have a cashier

10:04:13   12    that I let talk to them, and one of my stock guys talk

10:04:15   13    to them.

10:04:16   14        Q.   Why do you do that, ma'am?

10:04:18   15        A.   People.  People are a little more at ease with

10:04:20   16    people they're going to work with.  And sometimes they

10:04:23   17    find out things from them that I wouldn't find out.

10:04:26   18        Q.   And once, I guess, the person's been interviewed,

10:04:30   19    I assume -- I guess you have multiple candidates?

10:04:33   20        A.   Oh, yes.

10:04:34   21        Q.   And you interview multiple people.  What system

10:04:38   22    do you use to know which one of them to give the job to?

10:04:42   23        A.   What system do I use?

10:04:43   24        Q.   Or what are you looking for when you interview

10:04:46   25    people?  What sets somebody apart from somebody else?

10:04:51   1       A.   I want to find out about their work experience.
10:04:53   2   I have hired employees who had no work experience and
10:04:56   3   they worked out really well.  Sometimes they go to
10:04:59   4   school, things like that.
10:05:00   5       But I really want someone that's not afraid of
10:05:03   6   work, that's going to be good to the customers, things
10:05:06   7   like that.
10:05:07   8       Q.   Why do you prefer an employee who is going to be
10:05:10   9   good to the customers?
10:05:11   10      A.   Customers is my business.  That's what keeps us
10:05:15   11  in business.
10:05:16   12      Q.   And once you've made a determination to hire --
10:05:19   13  I'm sorry, let me back up.
10:05:21   14      Is your district manager involved in the hiring
10:05:24   15  process at all in your store?
10:05:26   16      A.   What do you mean involved in it?
10:05:29   17      Q.   Well, does the district manager interview any
10:05:34   18  prospective candidate?
10:05:35   19      A.   I think I only had one -- one that was
10:05:37   20  interviewed by my district manager.
10:05:39   21      Q.   And how many people have you hired in the eight
10:05:42   22  years since you've been back to Family Dollar, just
10:05:45   23  ballpark figure?
10:05:46   24      A.   Probably about 20.  Not all of them worked for
10:05:49   25  me.  I have given them to other stores.

10:05:51  1      Q.  *Have you ever been disciplined for hiring*

10:05:55  2  *anybody, I guess, the other 19, from the 20 that you've*

10:06:00  3  *mentioned, ma'am?*

10:06:00  4           MR. KALLON:  And at this point, Your Honor

10:06:03  5  asked Ms. Coleman:  *"Well, I am not sure, Ms. Coleman,*

10:06:08  6  *whether you fully answered the question about*

10:06:10  7  *involvement, if any of the district managers in your*

10:06:13  8  *decision to hire.  Do you have any?"*

10:06:15  9           THE WITNESS:  *The district manager had no*

10:06:17  10  *decision in my hiring.  Sometimes they worked there two*

10:06:19  11  *or three months before the district manager meets them.*

10:06:23  12           THE COURT:  *I see.*

10:06:26  13      Q.  *Now, who is your current district manager?*

10:06:30  14      A.  *That's hard to say.  Well, Peggy Pedigo was.*

10:06:34  15      Q.  *When Ms. Pedigo was your district manager, how*

10:06:39  16  *often did she stop by the store, ma'am?*

10:06:40  17      A.  *How often?  It could be a couple of months*

10:06:43  18  *sometimes.*

10:06:43  19      Q.  *I take it during an interview, you would see*

10:06:46  20  *Ms. Pedigo at some other locations?*

10:06:49  21      A.  *Yes, because I do training, and sometimes I go to*

10:06:53  22  *other stores to help out.  I see her in those locations.*

10:06:54  23      Q.  *Do you know Ms. Barbara Richardson, who is*

10:06:59  24  *sitting here behind you, ma'am?*

10:07:01  25      A.  *Yes.*

10:07:01   1      Q.   All right.   I apologize for blocking your view.

10:07:06   2   You say from time to time your district managers ask you

10:07:09   3   to go to other stores?

10:07:11   4      A.   Yes.

10:07:11   5      Q.   What are you asked to do when you go to those

10:07:15   6   stores?

10:07:15   7      A.   Well, it's always to assist the other store for

10:07:17   8   whatever they need.   Sometime it's to help clean up the

10:07:20   9   store, to stock, to help, to interview, things like

10:07:23  10   that, whatever they need.

10:07:30  11              MR. KALLON:   Your Honor, just for context

10:07:32  12   for the jury, can I tell them who Barbara Richardson is;

10:07:35  13   please?   At the last trial, Ms. Richardson had already

10:07:39  14   testified before this part of the testimony.

10:07:41  15              THE COURT:   All right.   Yeah.

10:07:42  16              MR. KALLON:   Ms. Richardson is one of the

10:07:44  17   plaintiffs in the case.   Sorry about not clarifying that

10:07:48  18   earlier.

10:07:49  19              Back to the transcript:

10:07:50  20      Q.   And when you go to these places, is there a

10:07:53  21   district -- I'm sorry -- is there a store manager at

10:07:56  22   these stores that you go to?

10:07:57  23      A.   Sometimes.

10:07:58  24      Q.   The ones that the store manager's not there, are

10:08:02  25   you sent there by yourself to go manage the store?

10:08:04  1      A.   Well, sometimes.   Rarely, I'm -- I'm there just
10:08:09  2   to manage them.   I'm usually there to help do whatever's
10:08:13  3   needed, but I do manage while I'm there.
10:08:15  4      Q.   Who are you managing, ma'am?
10:08:17  5      A.   Whatever employees are there.
10:08:18  6      Q.   Let's focus on the training part, when we're
10:08:21  7   saying to go help other managers.   Has one of those
10:08:24  8   managers been Ms. Richardson?
10:08:26  9      A.   Yes.   I have -- I was sent to her store when she
10:08:31 10   was -- when she was manager, to assist with training,
10:08:35 11   with hiring, interviewing.
10:08:36 12      Q.   How long had Ms. Richardson been in management
10:08:39 13   when you were sent to her to assist and to train and to
10:08:42 14   help with her?
10:08:42 15      A.   I think probably a year, or a little better than
10:08:45 16   a year.
10:08:45 17      Q.   And when you were there interacting with
10:08:50 18   Ms. Richardson and the other employees of that store,
10:08:53 19   did you identify any potential problems or issues at
10:08:57 20   that store?
10:08:57 21      A.   Usually training issues.
10:08:58 22      Q.   What do you mean by that?
10:09:00 23      A.   Oh, Barbara, she's an outstanding worker, but
10:09:03 24   sometimes managers have a problem when they're promoted
10:09:06 25   with the transition from being a clerk to manager, and

| | | |
|---|---|---|
| 10:09:08 | 1 | they don't always do a lot of training of their |
| 10:09:11 | 2 | employees. |
| 10:09:11 | 3 | Q.   What's the benefit, I guess, of training the |
| 10:09:14 | 4 | employees? |
| 10:09:15 | 5 | A.   What's -- I'm sorry? |
| 10:09:17 | 6 | Q.   Why is it important to train employees? |
| 10:09:19 | 7 | A.   For -- for performance, for the store to run |
| 10:09:23 | 8 | easier.  All of my employees are thoroughly trained, and |
| 10:09:26 | 9 | it makes it a lot easier for me. |
| 10:09:28 | 10 | Q.   Who is responsible at your store for making sure |
| 10:09:31 | 11 | the employees are trained? |
| 10:09:32 | 12 | A.   Well, I -- I'm responsible for them being |
| 10:09:36 | 13 | trained.  But I don't do all the training.  Sometimes my |
| 10:09:38 | 14 | assistant trains. |
| 10:09:39 | 15 | Q.   And for the times when you're not the one doing |
| 10:09:42 | 16 | the training specifically, do you at all follow up to |
| 10:09:45 | 17 | see if the employee's being trained improperly? |
| 10:09:48 | 18 | A.   Absolutely. |
| 10:09:49 | 19 | Q.   Let's fast forward.  You've hired a person, the |
| 10:09:53 | 20 | person's been trained, and a person has started working |
| 10:09:57 | 21 | for you.  Is that the end of that person's training? |
| 10:10:00 | 22 | A.   No. |
| 10:10:00 | 23 | Q.   Do you ever stop training your employees? |
| 10:10:03 | 24 | A.   I never stop training my employees.  I never stop |
| 10:10:06 | 25 | learning. |

10:10:06    1    Q.   And what are you training your employees for
10:10:09    2  ultimately?
10:10:10    3    A.   Promotion.
10:10:10    4    Q.   And how many of your employees have been promoted
10:10:13    5  to store management positions, for example?
10:10:16    6    A.   Probably four or five to store managers.
10:10:18    7    Q.   For the employees that are working at your store,
10:10:21    8  take the jury throughout your daily routine.  How do you
10:10:25    9  go about setting the work for the day?
10:10:27   10    A.   I usually go into my store about an hour early in
10:10:30   11  the morning before we open, walk the store, and set my
10:10:33   12  priorities for the day, making to-do lists.
10:10:36   13    Q.   And who was that to-do list directed to?
10:10:39   14    A.   They're for employees, as well as myself.
10:10:41   15    Q.   And once you have listed the items on the to-do
10:10:44   16  list, what do you do with it?
10:10:46   17    A.   Well, I have a clipboard.  I hang it.  They know
10:10:49   18  where to go and look for it once they finish whatever it
10:10:53   19  -- whatever it is I have assigned them to do.  They have
10:10:55   20  to sign it.
10:10:56   21    Q.   So the to-do list is each item having a name
10:11:00   22  associated with it?
10:11:01   23    A.   Yes, it does.
10:11:02   24    Q.   Now, I take it from time to time you've had
10:11:06   25  employees who had not done what you have told them to do

10:11:09   1   or employees who have had employee issues.  How do you

10:11:13   2   deal with those employee issues?

10:11:14   3       A.   Once in a while, I have something that wasn't

10:11:17   4   completed, and I always find out why it wasn't done.

10:11:19   5   Sometimes there's a good reason for it.

10:11:21   6           If I have something to -- if I gave something to

10:11:24   7   my stock guy to do and he ended up assisting with the

10:11:30   8   running the cash register or something like that, that's

10:11:32   9   fine.  I don't have a problem.

10:11:33  10       Q.   Assuming there's not a good reason why a person

10:11:38  11   did not do what you told them to do, what do you do with

10:11:41  12   that individual?

10:11:41  13       A.   We would -- I would give them a coaching or a

10:11:44  14   counseling session.

10:11:44  15       Q.   If they don't improve, what's the next step of a

10:11:48  16   coaching or counseling?

10:11:48  17       A.   Then they would be -- they would be -- I would

10:11:52  18   write them up.

10:11:52  19       Q.   And if they did not improve after you write them

10:11:56  20   up, what's the next stage?

10:11:57  21       A.   Usually, they do.  But if they don't, you know --

10:12:01  22   but if they don't, they -- they don't improve when we

10:12:05  23   sit down and talk about it and the coaching and conduct,

10:12:08  24   they just -- if they just didn't do it and I did the

10:12:11  25   write ups -- which I can't remember any times when I had

10:12:14  1  *to go any further with it.  Most of my employees --*

10:12:17  2        MR. KALLON:  And then the question came from

10:12:20  3  Your Honor.

10:12:20  4        *THE COURT:  You really don't remember ever*

10:12:22  5  *having to fire anybody?*

10:12:24  6        *THE WITNESS:  Not lately.  But yes, I do*

10:12:26  7  *remember having to fire someone a while back.*

10:12:29  8        *THE COURT:  All right.*

10:12:33  9  *Q.  Ms. Coleman, when you counsel or write up*

10:12:36  10  *employees, are you required to notify your district*

10:12:39  11  *manager before doing that?*

10:12:40  12  *A.  Well, I've never notified --*

10:12:45  13  *Q.  Have you ever been written up --*

10:12:48  14        *THE COURT:  In the instances you actually*

10:12:53  15  *fired someone way back, did you get the approval of your*

10:12:57  16  *district manager before you fired him?*

10:13:00  17        *THE WITNESS:  No, sir.  But I let the*

10:13:01  18  *district manager know they were fired.*

10:13:04  19        *THE COURT:  Were they gone at the time you*

10:13:08  20  *let the district manager know?*

10:13:09  21        *THE WITNESS:  Yes.  Yes, sir.  They were*

10:13:11  22  *very gone.*

10:13:13  23  *Q.  Ms. Coleman, you've not been here, but there's*

10:13:18  24  *been some testimony about what they call truck day.  For*

10:13:21  25  *those of us who don't work at Family Dollar, tell us*

10:13:24   1   what truck day is.

10:13:25   2      A.   Truck day for a lot of managers is a pain in the

10:13:28   3   you know where.   No disrespect, Your Honor, but it is.

10:13:32   4           Truck day at our store, I try to make it a

10:13:35   5   little more pleasurable.   We get an invoice the day

10:13:39   6   before, sometimes two days before the truck, and I

10:13:41   7   review it to see what we're getting in.

10:13:43   8      Q.   And why are you reviewing it?   Why do you do

10:13:46   9   that, ma'am?

10:13:46   10      A.   Sometimes we get a lot of merchandise that we

10:13:48   11   didn't order.   They chose to send it to us.   And I had

10:13:52   12   made such an exciting thing out of it that we can hardly

10:13:56   13   wait to get it anymore.

10:13:57   14      Q.   All right.   Tell the jury, I guess, you have at

10:14:00   15   your store, I guess, basic items, things that you order;

10:14:04   16   correct?

10:14:04   17      A.   Yes, sir.

10:14:05   18      Q.   And are you saying in this incident the company

10:14:10   19   from time to time will send you some other things?

10:14:12   20      A.   Almost weekly.

10:14:13   21      Q.   And what do you mean that you have made it an

10:14:15   22   exciting thing?   Please explain what you mean by that.

10:14:18   23      A.   Well, my employees, especially the cashiers that

10:14:22   24   interact with the customers daily, always let the

10:14:25   25   customers know when we get something new.

1    So when we -- when I review the invoice, find out

2  where we're getting something new, maybe some different

3  kinds of mirrors, or candles, or vases, or whatever

4  heavy, I always let the cashiers know, so they can let

5  the customers know and we watch for it.

6    And when it comes -- the truck -- when it comes

7  off the truck, so we could take it to the floor and let

8  the cashiers promote it, sell it.

9    Q.  And what are some of the tools, I guess, that you

10  will use at the store to promote items that you get that

11  you didn't order?

12    A.  Well, I have a little contest between associates.

13  We -- it all started when the Dollar General opened up

14  in my area and they were sort of kicking my butt a

15  little bit with sales, and I had to do something, since

16  I don't take food stamps.  And I had to try to level the

17  playing field.  So I --

18    Q.  When you say the Dollar General opened near you?

19    A.  Yes, sir.

20    Q.  And I guess what you're telling the jury is when

21  that store opened, that impacted your sales?

22    A.  Absolutely.

23    Q.  What, if anything, did you do, I guess, to get

24  your sales back up?

25    A.  Well, one of the things, I went to visit the

10:15:34  1   *store, because -- took off my Family Dollar uniform,*

10:15:37  2   *went in like a customer, and checked them out.*

10:15:40  3           *THE COURT:  Spying?*

10:15:42  4           *THE WITNESS:  Yes, sir.  I needed to see*

10:15:44  5   *what weaknesses they had.  They had all sorts of*

10:15:48  6   *merchandise we didn't have, so -- but I found out that*

10:15:50  7   *they were not good to customers -- good in customer*

10:15:52  8   *service.  And so I go back to my store and we start*

10:15:56  9   *doing curb service.  We take the bags to the car and let*

10:15:59  10  *them drive up to the door, let them take it out, just*

10:16:02  11  *things like that.*

10:16:03  12    Q.  *Did your district manager tell you to do that?*

10:16:05  13    A.  *My district manager didn't know it.*

10:16:08  14    Q.  *That was my next question.  Did you tell your*

10:16:10  15  *district manager you were going to do that?*

10:16:12  16    A.  *No, sir.*

10:16:13  17    Q.  *All right.  The truck comes in.  Let me back up*

10:16:17  18  *for a minute.  You say as a result of Dollar General*

10:16:19  19  *opening up, you created a competition among your*

10:16:24  20  *employees?*

10:16:24  21    A.  *Yes.*

10:16:24  22    Q.  *Tell us about that competition, please.*

10:16:25  23    A.  *Well, it generated more sales, which is what we*

10:16:29  24  *needed to do.  To try to get my sales up, I was losing*

10:16:32  25  *business.  And we try to make the store as pleasant as*

10:16:35  1  possible for people to shop and --

10:16:37  2      Q.  What's the prize for the employees?  What's the

10:16:40  3  reward?

10:16:41  4      A.  Lunch.  Everyone eats lunch.

10:16:43  5      Q.  And who pays for that lunch?

10:16:45  6      A.  I do.

10:16:47  7      Q.  And how often?

10:16:48  8      A.  McDonald's.

10:16:50  9      Q.  How often would you provide that lunch, please,

10:16:53 10  ma'am?

10:16:53 11      A.  It was sometimes a weekly thing, and depending on

10:16:56 12  a month, sometimes monthly.

10:16:58 13      Q.  Ms. Coleman, for those of us who have not worked

10:17:02 14  at Family Dollar, the truck comes in?

10:17:04 15      A.  Okay.

10:17:04 16      Q.  Is it just an easy thing of taking boxes and

10:17:07 17  putting them somewhere?

10:17:08 18      A.  Yeah, we have a system.  We have a system for

10:17:12 19  unloading the truck that --

10:17:13 20      Q.  And I guess -- take us to your freight.  As I've

10:17:16 21  learned, you guys used at your company what is called

10:17:19 22  process freight?

10:17:20 23      A.  That's correct.

10:17:21 24      Q.  Take us through, I guess, what you do first --

10:17:23 25  you get that invoice, I guess, you said; correct?

10:17:26    1    A.   Yes.

10:17:26    2    Q.   And you review it to see what you get.   All

10:17:30    3    right.   Once the truck comes in, what do you do with

10:17:33    4    respect to that invoice, if anything?

10:17:34    5    A.   Well, I already decided it the day before the

10:17:37    6    truck, where everything's going to go.   Who's going to

10:17:40    7    work, who's going to -- you know -- how we're going to

10:17:43    8    do it.   The whole idea is to get the freight to the

10:17:45    9    floor as fast as possible.

10:17:47   10    Q.   Do your customers know when your truck is coming

10:17:50   11    in?

10:17:50   12    A.   I think the whole neighborhood knows, yes, sir.

10:17:53   13    Q.   Does that mean you see an increase of traffic on

10:17:56   14    truck day?

10:17:56   15    A.   Yes, sir.

10:17:57   16    Q.   So your priority, then, is what, once a truck

10:18:01   17    comes in?

10:18:01   18    A.   To get the freight off the truck and get it to

10:18:05   19    the floor so we can sell it.

10:18:06   20    Q.   And I guess to help you do -- that you're telling

10:18:09   21    the jury that you start planning the day before?

10:18:11   22    A.   Oh, yes.

10:18:12   23    Q.   And what does the planning involve, again?

10:18:14   24    A.   Reviewing the invoice, because it tells what you

10:18:18   25    you're getting.

10:18:19   1      Q.   *Once you know what you're getting, then what?*

10:18:21   2      A.   *Then they plan.  Then I plan for the truck.  And*

10:18:25   3   *usually, I try to be there myself.  We separate the new*

10:18:29   4   *stuff, and what we didn't order; the new merchandise*

10:18:33   5   *from the regular schematic merchandise.*

10:18:35   6      Q.   *All right.  Now, that's another phrase that's*

10:18:37   7   *been used by a witness.*

10:18:39   8      A.   *Schematic?*

10:18:39   9      Q.   *Yes, ma'am.*

10:18:41  10      A.   *It's just a layer of the store that tells you*

10:18:43  11   *where all the merchandise goes.*

10:18:46  12      Q.   *All right.  From a given truck, what percentage*

10:18:48  13   *of your truck is schematic items?*

10:18:51  14      A.   *What percentage?*

10:18:52  15      Q.   *Yeah.  Break it down for us.  You say there are*

10:18:56  16   *schematic items and then there are items that you have*

10:18:59  17   *ordered?*

10:18:59  18      A.   *Right.*

10:18:59  19      Q.   *Schematic items generally make up how much of*

10:19:03  20   *what you get?*

10:19:03  21      A.   *Probably about 95 percent.*

10:19:04  22      Q.   *And the other 5 percent?*

10:19:06  23      A.   *Depending on the season.*

10:19:07  24      Q.   *And the other 5 percent is what?*

10:19:09  25      A.   *What we call the good stuff, the stuff that we*

10:19:13   1   want to sell to the customers right away.

10:19:14   2       Q.  And where do you normally put that stuff, what

10:19:18   3   part of the store?

10:19:18   4       A.  I usually send it to the front so that my

10:19:21   5   cashiers can start right away letting my customers know

10:19:24   6   we got it.

10:19:25   7       Q.  Does Family Dollar tell where you to place that

10:19:27   8   item in the store?

10:19:28   9       A.  Sometimes it's an item they want put on an end

10:19:31   10  cap or weekly planner-type thing.  Most generally, it's

10:19:34   11  not, and so we can have a lot of fun with it, and we do.

10:19:37   12      Q.  Ms. Coleman, the eight employees who work for

10:19:40   13  you, who is their boss?

10:19:42   14      A.  Could you repeat that?

10:19:43   15      Q.  Yes, ma'am.  The eight people of that store, who

10:19:46   16  is the boss?

10:19:46   17      A.  The boss of the eight people that work for me?

10:19:49   18      Q.  Yes, ma'am.

10:19:49   19      A.  I am.

10:19:50   20      Q.  You've got an assistant manager; correct?

10:19:52   21      A.  Yes, sir.

10:19:53   22      Q.  And that assistant manager --

10:19:55   23      A.  Works for me, too.

10:19:56   24      Q.  That assistant manager does some of the same

10:19:59   25  things that you do at times; correct?

| | | |
|---|---|---|
| 10:20:01 | 1 | A.   *Absolutely.* |
| 10:20:02 | 2 | Q.   *They open?* |
| 10:20:02 | 3 | A.   *Sure.* |
| 10:20:03 | 4 | Q.   *They close?* |
| 10:20:03 | 5 | A.   *Yes, sir.* |
| 10:20:04 | 6 | Q.   *And some of the paperwork that you do, they do?* |
| 10:20:08 | 7 | A.   *Yes, sir.* |
| 10:20:09 | 8 | Q.   *And you still claim that you are in charge of* |
| 10:20:11 | 9 | *your store?* |
| 10:20:12 | 10 | A.   *Always.* |
| 10:20:14 | 11 | Q.   *Why do you say that, ma'am?* |
| 10:20:15 | 12 | A.   *Because I run the store.  I'm the store manager.* |
| 10:20:17 | 13 | *If you have a problem with that, when y'all all take a* |
| 10:20:20 | 14 | *break, go over to my store and ask who's in charge.* |
| 10:20:23 | 15 | MR. KALLON:  *Thank you, Mrs. Coleman.* |
| 10:20:24 | 16 | THE WITNESS:  *You're welcome.* |
| 10:20:34 | 17 | MR. R. WIGGINS:  *All right.  We're at line* |
| 10:20:38 | 18 | *19 of Page 266.* |
| 10:20:40 | 19 | **CROSS-EXAMINATION** |
| 10:20:40 | 20 | **BY MR. R. WIGGINS:** |
| 10:20:40 | 21 | Q.   *You say you've got eight employees in your store?* |
| 10:20:43 | 22 | A.   *And a trainee.* |
| 10:20:45 | 23 | Q.   *I'm sorry?* |
| 10:20:46 | 24 | A.   *I also have a manager trainee, but I have eight* |
| 10:20:50 | 25 | *employees of my very own, yes, sir.* |

10:20:52   1     Q.   *How long has that manager trainee been in that*
10:20:55   2   *store with you?*
10:20:56   3     A.   *About a month.*
10:20:57   4     Q.   *And on the eight employees, you have yourself,*
10:20:59   5   *the store manager; correct --*
10:21:01   6     A.   *Yeah.*
10:21:01   7     Q.   *-- the assistant manager?  Not to lead, I believe*
10:21:08   8   *is what the transcript says.  Do you have more than one*
10:21:11   9   *manager or just one?*
10:21:12   10     A.   *Yes, sir.  I have two.*
10:21:14   11     Q.   *You have two assistant managers?*
10:21:16   12     A.   *Yes, sir.*
10:21:17   13     Q.   *And then how many associates do you have?*
10:21:20   14     A.   *Four or five.*
10:21:21   15     Q.   *If you count -- okay?*
10:21:26   16     A.   *If you counted me -- you counting me?*
10:21:29   17     Q.   *Excuse me?*
10:21:30   18     A.   *I'm sorry.  I didn't know if you were counting*
10:21:33   19   *me.  I'm sorry.*
10:21:34   20     Q.   *No.  No.  So are both of your assistant managers*
10:21:37   21   *full-time employees?*
10:21:39   22     A.   *Yes, sir.*
10:21:39   23     Q.   *So you have three full-time employees in your*
10:21:43   24   *store?*
10:21:43   25     A.   *Four.*

10:21:44  1      Q.   Four?

10:21:46  2      A.   Yes, sir.

10:21:46  3      Q.   Who is the fourth?

10:21:48  4      A.   One of my stock guys.

10:21:49  5      Q.   I see.  So you have four full-time employees?

10:21:53  6      A.   Yes, sir.

10:21:53  7      Q.   And then the others are part-time employees?

10:21:58  8      A.   Yes, sir.

10:21:59  9      Q.   Would it surprise you to know -- let me ask you

10:22:02 10  -- have you ever seen the job description for the store

10:22:05 11  manager?

10:22:05 12      A.   I have seen it.

10:22:06 13      Q.   Have you ever seen the job description?

10:22:09 14      A.   Which one?  Because they've got a new one.

10:22:13 15      Q.   They've got a new one?  I'm talking about the old

10:22:16 16  one and the new one.  Have you seen them both?

10:22:18 17      A.   Yes, sir.  I may not remember, but, yes, sir.  I

10:22:21 18  have seen them.

10:22:21 19      Q.   Have you ever seen the job description for the

10:22:25 20  assistant store manager?

10:22:25 21      A.   Yes, sir.

10:22:26 22      Q.   Have you noticed that they are the same?

10:22:28 23      A.   Almost.

10:22:29 24      Q.   And isn't it true that the assistant manager does

10:22:33 25  the same things that you do in the store?

| | | |
|---|---|---|
| 10:22:35 | 1 | A.   Almost.   Almost all the same things that I do. |
| 10:22:40 | 2 | Yes, sir. |
| 10:22:40 | 3 | Q.   And when you were not at the store, because you |
| 10:22:44 | 4 | don't work every day; correct? |
| 10:22:45 | 5 | A.   Correct. |
| 10:22:46 | 6 | Q.   The assistant -- do you have an assistant manager |
| 10:22:50 | 7 | who is full-time who is running that store? |
| 10:22:52 | 8 | A.   I have two of them. |
| 10:22:53 | 9 | Q.   And are they running the store when you're off? |
| 10:22:57 | 10 | A.   They're running it today. |
| 10:22:59 | 11 | Q.   Okay. |
| 10:23:02 | 12 | THE COURT:  What did you earn last year? |
| 10:23:07 | 13 | THE WITNESS:  What did I earn personally? |
| 10:23:09 | 14 | THE COURT:  Yes, ma'am. |
| 10:23:13 | 15 | THE WITNESS:  Roughly about 48. |
| 10:23:16 | 16 | THE COURT:  About $48,000? |
| 10:23:17 | 17 | THE WITNESS:  Yes, sir. |
| 10:23:18 | 18 | THE COURT:  That include the bonus? |
| 10:23:20 | 19 | THE WITNESS:  No, sir. |
| 10:23:22 | 20 | THE COURT:  What was the bonus? |
| 10:23:23 | 21 | THE WITNESS:  Probably about three. |
| 10:23:25 | 22 | THE COURT:  About $3,000? |
| 10:23:26 | 23 | THE WITNESS:  Yes, sir. |
| 10:23:30 | 24 | Q.   Ms. Coleman, before you came back to Family |
| 10:23:33 | 25 | Dollar, did you leave Family Dollar and go to work for |

10:23:37    1    *Service Merchandise?*

10:23:38    2        *A.  Yes, sir.*

10:23:39    3        *Q.  And did you leave -- did you tell your district*

10:23:44    4    *manager that the reason that you were leaving Family*

10:23:47    5    *Dollar was for a better job and because of the stress?*

10:23:50    6        *A.  I never mentioned the word 'stress'.  I did say*

10:23:53    7    *it was a better job.*

10:23:54    8        *Q.  Okay.  If the word 'stress' appears in your*

10:23:58    9    *personnel files as the reason, would you agree or*

10:24:02   10    *disagree with that?*

10:24:02   11        *A.  That it was stressful?*

10:24:05   12        *Q.  Yes.*

10:24:05   13        *A.  It -- I would agree that it was stressful, but I*

10:24:10   14    *don't remember saying that I was leaving because of the*

10:24:12   15    *stress.  No, sir.*

10:24:12   16        *Q.  And when you went to Service Merchandise, did you*

10:24:16   17    *go there as an assistant store manager?*

10:24:18   18        *A.  As a co-manager, yes, sir.*

10:24:21   19            *THE COURT:  Did you go as an assistant or as*

10:24:26   20    *a store manager?*

10:24:27   21            *THE WITNESS:  Not -- they only had one store*

10:24:29   22    *manager and three co-managers.  I went as a co-manager.*

10:24:34   23            *THE COURT:  A co-manager?*

10:24:35   24            *THE WITNESS:  Yes.*

10:24:35   25            *THE COURT:  Is that the same thing as an*

10:24:38  1   *assistant manager?*

10:24:39  2   *THE WITNESS:  It paid more money, assistant.*

10:24:41  3   *They -- they used -- they say co-manager in that they*

10:24:46  4   *had like four people running the store and I was one of*

10:24:50  5   *them.*

10:24:52  6   *THE COURT:  I see.*

10:24:53  7   *THE WITNESS:  A general manager and three*

10:24:55  8   *other co-managers.*

10:24:57  9   *THE COURT:  All right.  There was a general*

10:24:58  10  *manager and co-managers?*

10:25:00  11  *THE WITNESS:  Yes, sir.*

10:25:04  12  *Q.  But I think that you indicated that, in fact,*

10:25:06  13  *your assistant manager could interview for positions in*

10:25:10  14  *your store, either one of your assistant managers could*

10:25:14  15  *do that; correct?*

10:25:15  16  *A.  I didn't -- did I say that?*

10:25:16  17  *Q.  Well, did they have authority to interview?*

10:25:18  18  *A.  Well, one of my assistants has the authority to*

10:25:22  19  *interview.  Yes, sir.*

10:25:22  20  *Q.  Okay.  Now, I'm going to show you some policies*

10:25:25  21  *up here on the screen that I want to ask you some*

10:25:29  22  *questions about.  D6, it is -- is it true, Ms. Coleman,*

10:25:45  23  *that you were required to do a pre-employment check that*

10:25:49  24  *you have to send to the home office before you can offer*

10:25:53  25  *someone a job?*

10:25:53   1      A.   I wouldn't want to offer someone a job until I

10:25:57   2  check the background and did a drug test and the

10:26:01   3  Stanton.

10:26:01   4      Q.   And isn't it also true for management that you

10:26:05   5  have to receive authorization to hire before you can

10:26:08   6  hire that person after you send that information in;

10:26:12   7  isn't that true?

10:26:13   8      A.   I didn't know that.

10:26:14   9      Q.   That's their policy.  Did you know that?

10:26:17  10      A.   Let me see, I think -- I think I read it

10:26:21  11  probably.

10:26:21  12      Q.   Okay.  All right.  Do you agree that that is the

10:26:26  13  policy, wouldn't you?

10:26:27  14      A.   I --

10:26:30  15              THE COURT:  Well, you agree that's --

10:26:34  16              THE WITNESS:  I agree that's the policy.

10:26:36  17              THE COURT:  Just a moment.  You agree that

10:26:40  18  that is what you see on the board there, but it is also

10:26:45  19  true that you didn't follow this policy?

10:26:47  20              THE WITNESS:  I did the -- I did all the

10:26:49  21  things necessary.

10:26:50  22              THE COURT:  But in terms of getting --

10:26:53  23              THE WITNESS:  Approval.

10:26:54  24              THE COURT:   -- approval before you hired a

10:26:57  25  person, you didn't do that, did you?

```
10:27:00   1              THE WITNESS:  No, sir, I didn't.
10:27:05   2       Q.  You didn't get approval?
10:27:06   3       A.  No, sir.
10:27:07   4       Q.  But did you know that was the policy that you
10:27:11   5  were supposed to get approval?
10:27:13   6       A.  I guess probably.  It didn't register with me,
10:27:16   7  but, yes, sir, it is the policy.
10:27:19   8       Q.  Okay.  Would you go --
10:27:22   9       A.  And --
10:27:23  10       Q.  -- would you go to D5?  Did you know that --
10:27:33  11  isn't it true that, in fact, what you were supposed to
10:27:36  12  do is make recommendations for hire?
10:27:38  13       A.  Recommendations to who?
10:27:40  14       Q.  Recommendations to your district manager.
10:27:42  15       A.  I --
10:27:44  16       Q.  Did you know that?
10:27:45  17       A.  That's what it says, yes, sir.
10:27:47  18       Q.  Did you know that?
10:27:49  19       A.  I probably knew it somewhere in the back of my
10:27:52  20  head.
10:27:52  21       Q.  And you don't disagree that that is, in fact, the
10:27:57  22  policy?
10:27:57  23       A.  I don't disagree that's the policy.
10:27:59  24       Q.  Okay.
10:28:03  25              THE COURT:  But you didn't do it?
```

| | |
|---|---|
| 10:28:05 | 1 |
| 10:28:09 | 2 |
| 10:28:10 | 3 |
| 10:28:14 | 4 |
| 10:28:14 | 5 |

THE WITNESS:  No, sir.

Q.  But you didn't do it?

A.  Can I explain?

Q.  Yes, ma'am.

A.  Okay.  I'm very good at that.  And I do good hiring, and my district manager took candidates that I hire.  So did -- so did other stores.  And so, I guess I just knew that I was doing a good job, and I call it common sense.

Q.  D1.  Did you -- isn't it true that you could not hire an assistant manager before the district manager interviewed that assistant manager?

A.  It's true that that's what that says, yes, sir.

Q.  And it's true that was the policy; correct?

A.  It's true that that is the policy.

Q.  Okay.

THE COURT:  And it's true that you didn't do it?

THE WITNESS:  It's also true that I didn't do it.

(Laughter.)

Q.  E1.  After the store employees had been there for 90 days, is it true that you and the district manager would sit down and review that employee and see whether they would become entitled to employee benefits?

10:29:31  1      A.   It's true that I sat down with that employee and

10:29:34  2  did an evaluation and I sent a recommendation to my

10:29:38  3  district manager if they should get a raise, that's

10:29:40  4  true.

10:29:41  5      Q.   Okay.  G4.

10:29:45  6      A.   Wouldn't happen to have a glass of water, would

10:29:47  7  you?

10:29:50  8              THE COURT:  Yes, ma'am.  We'll get one for

10:29:51  9  you.

10:29:52  10             THE WITNESS:   Thank you.

10:30:01  11     Q.   While he's doing that, let me go on.  Isn't it

10:30:05  12  true you and the assistant manager were the ones that

10:30:08  13  were responsible to keep the associates working at the

10:30:12  14  expected performance level; that was both yours and the

10:30:16  15  associate and your assistant manager's job?

10:30:19  16     A.   Is that in the policy manual, too?

10:30:21  17     Q.   It is.

10:30:22  18     A.   You can slip -- put it up there and let me see

10:30:25  19  it.

10:30:26  20     Q.   He's having problems slipping it.

10:30:28  21     A.   I told you I'm ever learning.

10:30:31  22     Q.   I know.  There it is.

10:30:33  23     A.   Well, I'll be darned.

10:30:38  24     Q.   Let me ask you this.

10:30:41  25     A.   Yes, sir.

10:30:41  1    Q.  *Did you have a store policy manual in your store?*

10:30:44  2    A.  *I've got two of them, sir.*

10:30:45  3    Q.  *Okay.  So there it is.  So you agree with that,*

10:30:48  4    *that was the policy?*

10:30:49  5    A.  *Yes, sir.*

10:30:49  6    Q.  *Okay.  F1.  Okay.  Let me just ask you:  I bet*

10:31:03  7    *you know this one, didn't you -- isn't it true and*

10:31:06  8    *didn't you know that before you could give anybody a pay*

10:31:09  9    *raise, you had to ask your district manager?*

10:31:11  10   A.  *District manager has to key it in.*

10:31:14  11   Q.  *Well, the district manager has to approve it,*

10:31:18  12   *according to the policy.  Did you know that?*

10:31:20  13   A.  *I recommended the raises that my employees got.*

10:31:23  14   *She knew.  My district manager wasn't there to know what*

10:31:27  15   *they did.  But I have never been turned down.  She*

10:31:31  16   *always keyed in what I recommended, yes, sir.*

10:31:33  17   Q.  *But you -- did you -- but you did have to*

10:31:38  18   *recommend to the district manager?*

10:31:40  19   A.  *Oh, absolutely, you're right.  I knew that one.*

10:31:43  20   Q.  *H1.  Did you know that you could not recommend*

10:31:53  21   *discharge without going through your district manager?*

10:31:55  22   A.  *No.*

10:31:56  23   Q.  *You didn't?  He never told you that or she never*

10:31:59  24   *told you that?*

10:32:00  25   A.  *I worked for lots of district managers.  I've*

10:32:04  1    never had anyone tell me I couldn't fire anyone.

10:32:07  2        Q.  Did you see that's the policy?

10:32:09  3        A.  I see it now.

10:32:10  4        Q.  Okay.  J1.  You didn't set the hours that your

10:32:21  5    store could be opened and closed, did you?

10:32:23  6        A.  Oh, no, sir.

10:32:24  7        Q.  That came from home office?

10:32:26  8        A.  Yes, sir.

10:32:26  9        Q.  You didn't make the decision.  You didn't make

10:32:29  10   the decision who could hold keys in your store, did you?

10:32:33  11   Didn't that also come from the district manager?

10:32:35  12       A.  What do you mean who could hold keys?

10:32:39  13       Q.  Who was entitled to a key in your store?

10:32:42  14       A.  My assistant and me.

10:32:43  15       Q.  And that's -- and you knew that because that was

10:32:45  16   the rule that came from the district manager; correct?

10:32:48  17       A.  Yes, sir.

10:32:49  18       Q.  Did you know that?

10:32:50  19       A.  Came from the district manager?

10:32:54  20       Q.  That was the rule that came from the home office?

10:32:57  21       A.  From the home office, yes, sir.

10:32:59  22       Q.  Okay.  And did you know that you couldn't close

10:33:01  23   your store if you had a tornado or hurricane or

10:33:06  24   flooding, without calling your district manager?  Did

10:33:09  25   you know that?

10:33:09   1    A.  *I heard something like that.  But you know -- you*
10:33:12   2    *know what?  We had a tornado a couple of years ago and I*
10:33:15   3    *heard that it was coming through Fosters.  If you're not*
10:33:18   4    *from here, Fosters is just right down the road.*
10:33:22   5    Q.  *Yes.*
10:33:23   6    A.  *I wasn't about to go ask my district manager*
10:33:25   7    *anything when the tornado's on the ground.  I took my*
10:33:28   8    *two customers that were in the store and my employees to*
10:33:30   9    *the back room.  And I locked that door and I asked the*
10:33:33   10   *only person that I could to stop the tornado.*
10:33:35   11   Q.  *To stop it?*
10:33:37   12   A.  *That's who I called.*
10:33:40   13                    (Laughter.)
10:33:41   14   Q.  *That's who you called?*
10:33:42   15   A.  *That's who I called.  Now --*
10:33:49   16   Q.  *Let me ask you:  Did you know, though, that there*
10:33:52   17   *was a policy on the books that said you couldn't do*
10:33:55   18   *that?*
10:33:55   19   A.  *Yeah.  Yeah.  I knew that.*
10:33:57   20   Q.  *Okay.*
10:33:58   21   A.  *I'm not stupid.  If the tornado's coming through*
10:34:02   22   *this courthouse, me and the Judge going to get behind*
10:34:06   23   *this desk.  I'm not asking any rules.*
10:34:09   24                    (Laughter.)
10:34:10   25   Q.  *Okay.  Did you know that?  Did you ever hire the*

10:34:13 1  contractors who cleaned your floors?

10:34:15 2      A.  I -- did I hire them?  No, sir.

10:34:18 3      Q.  You weren't allowed to do that.  Did you?

10:34:21 4      A.  Years ago, we did.

10:34:22 5      Q.  But you weren't allowed to do that, were you?

10:34:25 6      A.  Years ago.

10:34:27 7      Q.  You had to call the district manager?

10:34:29 8      A.  Years ago.  We can now.  They've gotten better.

10:34:33 9  All we have to do -- home office takes care of all that.

10:34:36 10     Q.  All that stuff?

10:34:39 11     A.  All that stuff.

10:34:40 12     Q.  The exterminator?

10:34:43 13     A.  The exterminator, the trash, everything.

10:34:45 14     Q.  That's all taken care of?

10:34:47 15     A.  Uh-huh.

10:34:48 16     Q.  Does the district manager establish how much cash

10:34:50 17 accumulation you can have in your store?

10:34:53 18     A.  The district manager, the home office.

10:34:57 19     Q.  Uh-huh.

10:34:57 20     A.  The home office does.

10:34:59 21     Q.  He does that?

10:35:00 22     A.  How much?

10:35:02 23     Q.  How much cash can you keep at one time in the

10:35:05 24 store, he establishes that.  And that determines when

10:35:08 25 you're going to make a bank deposit, doesn't it?

10:35:11  1    A.  *Yes, sir.  Would it surprise you to know when we*
10:35:15  2   *were in banking, we had the same policy at the bank?*
10:35:17  3    Q.  *Would not.  Would not.  And when you were in*
10:35:20  4   *banking, I suspect they had a couple of rules that were*
10:35:23  5   *a lot like these -- petty cash, you couldn't increase*
10:35:27  6   *petty cash without the district manager's approval,*
10:35:30  7   *could you?*
10:35:30  8    A.  *Tell the truth, I don't know who increased petty*
10:35:33  9   *cash.*
10:35:34  10   Q.  *Okay.*
10:35:36  11   A.  *I think it was Loss Prevention.*
10:35:39  12   Q.  *And if the register came up short, did you know*
10:35:41  13  *that it was a rule for the cashier to call the district*
10:35:45  14  *manager and not you, to report the theft?*
10:35:48  15   A.  *Need to show me that one.*
10:35:50  16   Q.  *I will.  A8?*
10:35:54  17   A.  *The cashier calls the district manager.*
10:35:56  18   Q.  *Would you read --*
10:35:56  19   A.  *If the register is short and the cashier's to*
10:35:59  20  *describe the person suspected of the theft and notify*
10:36:03  21  *the district manager and the local police.*
10:36:06  22   Q.  *And that was quotation marks around it.  Could*
10:36:15  23  *you indicate the quotation marks when you read this next*
10:36:19  24  *part?  We're at line 23.*
10:36:21  25   A.  *Okay.*

10:36:21   1      Q.   I'm going to start with the word K8.

10:36:24   2      A.   'The cashier calls the district manager.'   Would

10:36:27   3   you -- question mark -- I mean, quotations:   'If the

10:36:31   4   register is short, the cashier is to describe the person

10:36:33   5   suspected of the theft and notify the district manager

10:36:35   6   and local police', end quote.

10:36:38   7      Q.   Okay.   There's that one.

10:36:42   8           THE COURT:   You were not aware of the policy

10:36:46   9   of this policy, were you?

10:36:47  10           THE WITNESS:   When -- when they talking

10:36:50  11   about theft, they want the cashier to remember

10:36:53  12   everything so that we can --

10:36:55  13           THE COURT:   Yes, ma'am.   But did you know

10:36:57  14   that the cashier was supposed to call the district

10:37:00  15   manager, rather than you?

10:37:02  16           THE WITNESS:   I honestly didn't know that.

10:37:06  17      Q.   Let me ask you this, Ms. Coleman.   It sounds like

10:37:11  18   that there were a lot of things that you didn't do that

10:37:13  19   your -- that you didn't know that you were supposed to

10:37:16  20   get approval from the district manager; isn't that

10:37:19  21   right?

10:37:19  22      A.   I don't know what it sounds like to you.   You

10:37:21  23   need to rephrase that question.   That don't -- that

10:37:25  24   don't sound too good.   I'm not going to say that's

10:37:28  25   right.

10:37:28   1      Q.   Well, we've already gone through quite a few
10:37:31   2   things that you didn't know; right?   that you know you
10:37:35   3   don't do?

10:37:36   4      A.   Either I didn't know or I just didn't do it.
10:37:38   5   Yes, sir.

10:37:38   6      Q.   Or you didn't do it?

10:37:43   7      A.   Yes, sir.

10:37:44   8      Q.   And by doing those things that you didn't check
10:37:47   9   with the district manager about, such as the hiring and
10:37:50  10   the firing, such as the other things that you talked
10:37:53  11   about, that made you feel like the store manager of that
10:37:56  12   store, didn't it?

10:37:57  13      A.   That's not going to make me feel like store
10:38:00  14   manager.   I'm the store manager, number one.   Number
10:38:03  15   two, those are guidelines that they give us to go by.
10:38:09  16   It's not the Bible.   And I do follow, you know, policy,
10:38:11  17   except for the hiring and the firing and stuff like
10:38:14  18   that.

10:38:14  19           And they tell me don't do it, I have never been
10:38:18  20   disciplined for anything for any reason.   If they flat
10:38:20  21   out tell me, don't do it, I don't do it.

10:38:23  22      Q.   And if -- and you have never been told not to do
10:38:27  23   it, have you?

10:38:27  24      A.   No, sir.

10:38:28  25      Q.   And so because you have been able to do these

| | |
|---|---|
| 10:38:31 | 1 |
| 10:38:35 | 2 |
| 10:38:35 | 3 |
| 10:38:38 | 4 |
| 10:38:39 | 5 |
| 10:38:42 | 6 |
| 10:38:42 | 7 |
| 10:38:42 | 8 |
| 10:38:46 | 9 |
| 10:38:49 | 10 |
| 10:38:52 | 11 |
| 10:38:52 | 12 |
| 10:38:55 | 13 |
| 10:38:59 | 14 |
| 10:39:01 | 15 |
| 10:39:04 | 16 |
| 10:39:05 | 17 |
| 10:39:06 | 18 |
| 10:39:08 | 19 |
| 10:39:08 | 20 |
| 10:39:12 | 21 |
| 10:39:14 | 22 |
| 10:39:19 | 23 |
| 10:39:19 | 24 |
| 10:39:21 | 25 |

things, you're actually really the manager of the store,
aren't you?

   A.  I am actually the manager of that store, no
matter what.

   Q.  And you are not a plaintiff in this lawsuit, are
you?

   A.  No, sir.

   Q.  And you talked about training.  There was not any
formalized training that you were given by home office
or by the district manager to train the employees, was
there?

   A.  What do you mean?  I don't get you.

   Q.  Well, you were talking about you had a way of
training.  That's the way you trained.

   A.  I am a certified trainer for Family Dollar.

   Q.  You are a certified trainer?

   A.  Yes, sir.

   Q.  Did you ever go work at other stores?

   A.  Yes, sir.

   Q.  And when you worked at those other stores, did
you do manual labor at those stores?

   A.  What do you mean, manual?

   Q.  Like --

   A.  What's that mean?

   Q.  -- like, did you stock the shelves?

10:39:23   1    A.   Yes, sir.  I did -- do the same thing in my

10:39:28   2  store.

10:39:28   3    Q.   Did you help unload the truck?

10:39:31   4    A.   Yes, sir, do it at my store.

10:39:33   5    Q.   Did you mop the floors?

10:39:34   6    A.   Yes, sir, when they need it.  I either mop it or

10:39:37   7  can delegate it.  Being the store manager, you can

10:39:39   8  delegate it if you wish.

10:39:41   9    Q.   And other things you did -- I'm sorry.  I misread

10:39:45  10  that.  And other things.  You did that at the other

10:39:47  11  store, and you also did those things at your store?

10:39:49  12    A.   Absolutely.  If the store -- if the store needs

10:39:53  13  mopping, I can either mop it myself or I can get someone

10:39:56  14  else to do it.  And a lot of times I chose to do it,

10:39:59  15  because I want my employees to think -- I don't want

10:40:02  16  them thinking that I don't -- that I think I'm too good

10:40:05  17  to do these things.  And I don't do -- I don't ask them

10:40:09  18  to do anything I wouldn't do.

10:40:11  19    Q.   Okay.

10:40:13  20         THE COURT:  You've got two minutes.

10:40:19  21         MR. QUINN:  Thank you.

10:40:19  22    Q.   And if you couldn't have hired and you couldn't

10:40:21  23  have fired and you couldn't have set pay for the

10:40:24  24  employees and the other things, would you have still

10:40:27  25  felt like you were a store manager if you couldn't do

| | | |
|---|---|---|
| 10:40:30 | 1 | *those things?* |
| 10:40:31 | 2 | *A.   If I couldn't?* |
| 10:40:33 | 3 | *Q.   Yes.* |
| 10:40:34 | 4 | *A.   If I couldn't hire?* |
| 10:40:35 | 5 | *Q.   If you couldn't hire and you couldn't fire?* |
| 10:40:38 | 6 | *A.   And I couldn't fire?* |
| 10:40:40 | 7 | *Q.   And you couldn't make pay changes, would you have* |
| 10:40:43 | 8 | *still felt like you were a store manager, a true store* |
| 10:40:45 | 9 | *manager?* |
| 10:40:45 | 10 | *A.   If I couldn't hire and I couldn't fire and I* |
| 10:40:49 | 11 | *couldn't make pay changes, would I still feel like a* |
| 10:40:52 | 12 | *store manager?* |
| 10:40:53 | 13 | *Q.   Yes.* |
| 10:40:54 | 14 | *A.   If I do the same things that I do now, yes, I* |
| 10:40:58 | 15 | *would.* |
| 10:40:58 | 16 | *Q.   But now you hire and you fire, don't you?* |
| 10:41:01 | 17 | *A.   Yes, sir, I do.* |
| 10:41:02 | 18 | *Q.   Okay.  You do, and you told us that.* |
| 10:41:07 | 19 | *THE COURT:  Well, I think that's enough.* |
| 10:41:11 | 20 | *MR. QUINN:  Okay.* |
| 10:41:17 | 21 | *THE COURT:  Redirect?* |
| 10:41:17 | 22 | ***REDIRECT EXAMINAITON*** |
| 10:41:17 | 23 | ***BY MR. KALLON:*** |
| 10:41:33 | 24 | ***MR. KALLON:***  *Ma'am, on Page 287, beginning* |
| 10:41:35 | 25 | *with line 16.* |

10:41:42   1      Q.   *Ms. Coleman, who is in charge of your store?*

10:41:44   2      A.   *I am.*

10:41:44   3      Q.   *Are you held accountable for what goes on in your*

10:41:47   4   *store?*

10:41:47   5      A.   *Yes, sir.*

10:41:48   6      Q.   *Thank you, ma'am."*

10:41:54   7              MR. KALLON:   We're done.

10:41:55   8              MR. R. WIGGINS:   That's all, Your Honor.

10:41:57   9              THE COURT:   Step down.

10:41:59  10              Ladies and gentlemen, we will take our

10:42:00  11   morning recess.   We will be in recess until 10 minutes

10:42:06  12   to 11:00 by the clock on the wall.   Please do not

10:42:09  13   discuss the case among yourselves.   Do not allow the

10:42:11  14   case to be discussed in your presence, and keep an open

10:42:15  15   mind.

10:42:35  16              (Jury out at 10:35 a.m.)

10:42:39  17              THE COURT:   Anything we need to take up

10:42:44  18   outside the presence of the jury?

10:42:47  19              MR. KALLON:   Anything further from the

10:42:51  20   updates on the plaintiffs from yesterday?

10:42:52  21              MR. G. WIGGINS:   We have one update, Your

10:42:55  22   Honor.

10:42:55  23              THE COURT:   Yes, sir.

10:42:56  24              MR. G. WIGGINS:   On Mr. Detter.   I reported

10:43:00  25   yesterday we had left a message.   He did call us back

10:43:03   1   last night.  He has just been transferred to New Mexico.

10:43:08   2   He accepted a new job.  He is -- his new vice-president

10:43:13   3   is coming and will be at the store the next week and

10:43:16   4   would create a great hardship for him to come.  I told

10:43:20   5   him I would report that to the Court.

10:43:23   6                THE COURT:  All right.  Well, what does the

10:43:30   7   defendant expect to elicit from him that cannot be

10:43:33   8   elicited from the other plaintiffs?

10:43:35   9                MR. ST. CLAIR:  I'm sorry?  I didn't hear

10:43:37  10   you, Your Honor.

10:43:37  11                THE COURT:  What do you expect to elicit

10:43:40  12   from him that cannot be elicited from the other

10:43:42  13   plaintiffs?

10:43:43  14                MR. KALLON:  Your Honor, on

10:43:44  15   cross-examination of our witnesses, the point has been

10:43:47  16   made over and over again that our witnesses are in an

10:43:52  17   island by themselves, and the entire collective songs

10:43:54  18   from the same Bible.

10:43:54  19                Mr. Detter was the individual who said in

10:43:57  20   the course of being a store manager, he recommended all

10:44:00  21   the want-to-be hires, and I think 99 plus of them were

10:44:03  22   approved, and the same thing on the terminations.  So I

10:44:06  23   think it's very important to us that he show up so we

10:44:09  24   can accurately show that he did from the testimony that

10:44:14  25   we referred about.

10:44:15  1      And I'd also like to add that Mr. Barkus

10:44:18  2  faced a hardship; and he, in fact, came down and he is

10:44:21  3  not a party to this lawsuit.  Mr. Detter is, in fact, a

10:44:24  4  plaintiff, and cannot now say "my work is too

10:44:29  5  important."  He chose to join this lawsuit in Alabama

10:44:32  6  like the rest of the plaintiffs, and I think that he

10:44:35  7  needs to show up or be dismissed from the case.

10:44:38  8      THE COURT:  Why can't you read his trial

10:44:39  9  testimony?

10:44:41  10      MR. KALLON:  We can, Your Honor, but, again,

10:44:43  11  the plaintiffs could have read Mr. Barkus' testimony if

10:44:46  12  they felt that it would have a better impact with him

10:44:49  13  being live.  Just as much as I would prefer Ms. Coleman

10:44:53  14  to be here this morning, Your Honor, and we did that by

10:44:55  15  transcript, because she was not available.

10:44:58  16      I think Mr. Barkus had the same constraints

10:45:02  17  as Mr. Detter.  Mr. Barkus has started a new job, he met

10:45:05  18  with the board last week.  He felt this was a very

10:45:09  19  important week for him, but he chose to come at the last

10:45:13  20  minute.

10:45:14  21      I think Mr. Detter should be held to the

10:45:16  22  same standard as the plaintiffs.

10:45:18  23      THE COURT:  Mr. Kallon, he chose to come, at

10:45:21  24  least in part, because he was informed that I was going

10:45:28  25  to issue a subpoena to require him to be here.

10:45:31  1            MR. KALLON:  And that's fine, Your Honor.  I
10:45:33  2    don't think you need to subpoena the plaintiff, but if
10:45:36  3    that's what you need to do, we can do as well, Your
10:45:39  4    Honor.
10:45:39  5            THE COURT:  All right.  He has to be here,
10:45:40  6    or his claim will be dismissed.
10:45:43  7            MR. KALLON:  Thank you, Your Honor.
10:45:44  8            MR. G. WIGGINS:  Your Honor, Mr. -- if I
10:45:47  9    understood Mr. Kallon, Mr. Kallon said that they wanted
10:45:50  10   to put him on because he is not an island to himself.
10:45:54  11   But his trial testimony is exactly on those points.  If
10:45:57  12   that is the reason they want him, they can elicit that
10:46:00  13   from the trial testimony.
10:46:01  14            It was very clear in the trial testimony --
10:46:03  15            THE COURT:  Well, would you -- what do you
10:46:06  16   want to show by his testimony, Mr. Kallon?
10:46:09  17            MR. KALLON:  Judge, you know, that his
10:46:13  18   primary duty as management -- this is what the case was
10:46:16  19   about, that he supervised employees.
10:46:18  20            THE COURT:  He's not going to say that, is
10:46:21  21   he?
10:46:21  22            MR. KALLON:  I think the jury can infer,
10:46:23  23   based on his demeanor, his appearance, that he, in fact,
10:46:26  24   is a manager, that he's different from the selected
10:46:29  25   plaintiffs in -- that have been presented in this case.

10:46:33  1    I mean, I don't think that plaintiffs can avoid showing

10:46:35  2    up in their own lawsuit that they have physically opted

10:46:38  3    into in Alabama.

10:46:40  4            And I understand he lives in New Mexico, but

10:46:42  5    he did not have to join this lawsuit in Alabama, and he

10:46:46  6    did.  So he needs to be here.

10:46:47  7            We placed him on notice before yesterday, I

10:46:50  8    believe.  I'm not certain about that.  We were offering

10:46:54  9    to pay for him to come.  Again, for that which I

10:46:58  10   disagree, but I understand that we need to do that and

10:47:01  11   we are paying for him.

10:47:02  12           So I think we would prefer, Your Honor, and

10:47:05  13   -- we'll go with your ruling -- but we would prefer his

10:47:09  14   live testimony over his prior testimony being read.  I

10:47:13  15   think it's a lot more effective when the witness is in

10:47:16  16   the courtroom, as opposed to doing it by deposition.

10:47:19  17   And I think we lose a tactical advantage when we read

10:47:25  18   things by deposition.

10:47:27  19           Ms. Coleman, I felt, was a very credible

10:47:29  20   witness when she was here.  The jury was able to assess

10:47:32  21   her credibility based on her demeanor.  And I think all

10:47:35  22   of that is lost when you read something into the record.

10:47:38  23   And that's my only --

10:47:40  24           THE COURT:  All right.  All right.  He will

10:47:42  25   be here or he'll be dismissed.

| | | |
|---|---|---|
| 10:47:45 | 1 | MR. KALLON:  Thank you, Your Honor. |
| 10:47:51 | 2 | MR. ST. CLAIR:  And the same for the |
| 10:47:52 | 3 | remaining people on the list. |
| 10:47:54 | 4 | THE COURT:  What about the remaining people |
| 10:47:56 | 5 | on the list? |
| 10:47:58 | 6 | MR. G. WIGGINS:  Your Honor, as I said, I do |
| 10:48:00 | 7 | not have an update, other than what I gave yesterday. |
| 10:48:03 | 8 | THE COURT:  Oh.  You have not heard from |
| 10:48:05 | 9 | them? |
| 10:48:05 | 10 | MR. G. WIGGINS:  I have not heard from them. |
| 10:48:06 | 11 | THE COURT:  We can't -- I cannot require |
| 10:48:09 | 12 | them to be here if they haven't been notified.  Anything |
| 10:48:17 | 13 | else? |
| 10:48:21 | 14 | MR. G. WIGGINS:  Your Honor, may I also |
| 10:48:23 | 15 | add -- |
| 10:48:24 | 16 | THE COURT:  Yes, sir. |
| 10:48:25 | 17 | MR. G. WIGGINS:  Now, your instruction |
| 10:48:26 | 18 | yesterday to me was after I told you we had spoken with |
| 10:48:30 | 19 | Shellah Brown, that she should be here Thursday or be |
| 10:48:34 | 20 | dismissed. |
| 10:48:35 | 21 | THE COURT:  Correct. |
| 10:48:36 | 22 | MR. G. WIGGINS:  I attempted last night to |
| 10:48:37 | 23 | call her both at work and at home up until about 9:30, |
| 10:48:43 | 24 | 10:00 o'clock at night.  I've gotten no response.  I |
| 10:48:46 | 25 | haven't been able to tell her yet, but I am still |

10:48:49  1   trying.

10:48:49  2              THE COURT:  Now, where is she?

10:48:50  3              MR. G. WIGGINS:  She's in Pell City.

10:48:52  4              THE COURT:  Yes, she has got to be here.  If

10:48:56  5   she's not here, I guess someone out of your office can

10:49:00  6   take a note and put it on her door in Pell City.  It's

10:49:03  7   not that far.  If she's not here, she will be dismissed.

10:49:08  8              MR. G. WIGGINS:  Yes, sir.

10:49:09  9              MR. ST. CLAIR:  And, Your Honor, she works

10:49:10 10   for Family Dollar, if they need --

10:49:12 11              THE COURT:  She works at Family Dollar now?

10:49:14 12              MR. ST. CLAIR:  Yes, Your Honor.  If they

10:49:16 13   needed to get in touch with their client, we'd be glad

10:49:19 14   to help.

10:49:19 15              THE COURT:  All right.  Well, sure.  All

10:49:21 16   right.

10:49:21 17              MR. G. WIGGINS:  That's where I've been

10:49:23 18   calling her is Family Dollar.

10:49:24 19              MR. ST. CLAIR:  Well, she must not be one of

10:49:27 20   those that works 80 hours a week.

10:49:29 21                        (Laughter.)

10:49:31 22              MR. G. WIGGINS:  That's exactly where I got

10:49:33 23   her yesterday, Your Honor.  She was working 8:00 to

10:49:37 24   8:00.

10:49:39 25              MR. ST. CLAIR:  Now, Your Honor, this, I

10:49:41  1   must say, reaches into the motion that Your Honor is

10:49:44  2   carrying with the case dealing with rebuttal witnesses.

10:49:49  3         You know, the plaintiffs picked seven to put on

10:49:51  4   in their case in chief.  We're wanting to show seven.

10:49:56  5   Apparently, we're only going to get two.

10:49:59  6             I do think in fairness, Your Honor, if they

10:50:01  7   have -- we've seen at least one other plaintiff staying

10:50:05  8   around town this week.

10:50:07  9             THE COURT:  Who is that?

10:50:08  10            MR. ST. CLAIR:  Mr. West.

10:50:09  11            THE COURT:  And you want to call him?

10:50:11  12            MR. ST. CLAIR:  Well, I don't know him --

10:50:13  13            THE COURT:  Let me just put -- if you want

10:50:16  14   to call -- is Mr. West in Tuscaloosa?

10:50:21  15            MR. R. WIGGINS:  He was, yes.

10:50:23  16            THE COURT:  All right.  Yeah.  Well, you can

10:50:25  17   call him.

10:50:26  18            MR. ST. CLAIR:  And, Your Honor, we think in

10:50:29  19   fairness, if they have people already that they're

10:50:31  20   planning to call as rebuttal witnesses, then since we've

10:50:34  21   not been able to have access to the first eight that we

10:50:39  22   wanted, that they should disclose those who they're

10:50:44  23   holding back to call in the case when we're not going to

10:50:47  24   be able to have rebuttal on them.

10:50:51  25            THE COURT:  All right.  We have just about

10:50:58  1    used up this recess time.  We will revisit this issue at

10:51:07  2    another time.

10:51:07  3                MR. WHITE:  Are we going to be beyond the

10:51:10  4    ten 'til?

10:51:11  5                THE COURT:  Pardon me?

10:51:12  6                MR. WHITE:  Are you going to extend the

10:51:14  7    break to 11:00?

10:51:15  8                THE COURT:  No, I'm not going to extend it

10:51:17  9    to 11:00.  Five 'til.

11:02:27  10      (Recess taken from 10:44 a.m. until 10:55 a.m.)

11:02:27  11                THE COURT:  Mr. White?

11:02:30  12                MR. WHITE:  Bob's got something, Your Honor.

11:02:32  13                MR. R. WIGGINS:  Your Honor, we did not know

11:02:34  14    this was their next series of witnesses.  They've taken

11:02:37  15    them a little bit out of order.  I would have raised

11:02:42  16    this before the break.

11:02:43  17                The next four or five witnesses are not on

11:02:49  18    their witness list.  And we object to them.  They are

11:02:55  19    district managers that were not disclosed.

11:03:01  20                MR. WHITE:  I can speak for this witness,

11:03:03  21    Your Honor.  She was the district manager for Mr. Greg

11:03:06  22    Pellegrin who has testified, and one of the few

11:03:11  23    plaintiffs that have offered live testimony in this

11:03:14  24    case.  And she served while she was an assistant store

11:03:20  25    manager, and we're calling her in rebuttal of

11:03:23    1    Mr. Pellegrin's testimony --

11:03:25    2                THE COURT:  She will be limited to rebuttal.

11:03:28    3                MR. R. WIGGINS:  What's happened on a prior

11:03:30    4    witness in this case on this particular trial, Judge, is

11:03:34    5    that they seem to have a different view of rebuttal as

11:03:36    6    we do.

11:03:37    7                THE COURT:  Okay.  Well, let's see.  You say

11:03:39    8    she is going to rebut the testimony of whom?

11:03:43    9                MR. WHITE:  Greg Pellegrin.

11:03:47   10                THE COURT:  All right.  All right.

11:03:53   11                MR. R. WIGGINS:  What happened with the

11:03:55   12    prior witnesses, Your Honor, is that they went into the

11:03:58   13    case in chief on the affirmative defense.

11:04:02   14                Now, Mr. Pellegrin had a claim for three

11:04:07   15    years, and they've known of it, and they've known of the

11:04:09   16    defense.  They pled it.  These witnesses go to

11:04:13   17    affirmative defense.

11:04:15   18                THE COURT:  We don't have the written

11:04:16   19    testimony, do we?

11:04:18   20                MR. R. WIGGINS:  Yes, sir, we do.

11:04:19   21                THE COURT:  We have his written testimony?

11:04:22   22                MR. CALAMUSA:  Yes, sir.

11:04:23   23                THE COURT:  She's going to be limited to

11:04:24   24    rebutting what Mr. Pellegrin said.

11:04:28   25                MR. WHITE:  Let me tell you one other area.

11:04:30  1              THE COURT:  Yes, sir.

11:04:31  2              MR. WHITE:  The questions from the jury from

11:04:34  3   -- you told us about, I'm going to use her to point to

11:04:39  4   the employee handbook that shows where the benefits of

11:04:44  5   the full-time stuff is listed.

11:04:46  6              THE COURT:  No, you're not.  You're going to

11:04:49  7   use somebody else that's a listed witness.

11:04:52  8              MR. R. WIGGINS:  I can see what's about to

11:04:54  9   happen, Judge.  We're going to be popping up and down

11:04:57  10  objecting, because I still think they've got a very

11:05:02  11  different view of what's rebuttal than we do.

11:05:04  12             THE COURT:  All right.  Well, we'll just

11:05:07  13  cross that bridge when we come to it.

11:05:09  14             Let's bring the jury in.

11:05:33  15    (In open court, jury present at 11:00 o'clock a.m.)

11:06:01  16        **KATIA BREAUX, DEFENDANT'S WITNESS, SWORN,**

11:06:02  17             THE CLERK:  State your name for the record,

11:06:05  18  please.

11:06:06  19             THE WITNESS:  Katia Breaux.

11:06:11  20             THE CLERK:  Spell your last name for the

11:06:12  21  record, please.

11:06:14  22             THE WITNESS:  B-R-E-A-U-X.

11:06:16  23                 **DIRECT EXAMINATION**

11:06:16  24  **BY MR. WHITE:**

11:06:16  25     Q.   Where do you reside?

11:06:18   1            THE COURT:  Just a moment.  Now, ladies and
11:06:20   2    gentlemen, Ms. Breaux is being called as a rebuttal
11:06:23   3    witness.  She will rebut -- or is being called to rebut
11:06:28   4    the testimony of Mr. Greg Pellegrin, and she will be
11:06:31   5    limited to that rebuttal.
11:06:34   6            Mr. White.
11:06:35   7    BY MR. WHITE:
11:06:35   8       Q.   Where do you reside, Ms. Breaux?
11:06:38   9       A.   Cecilia, Louisiana.
11:06:40  10       Q.   And by whom are you employed?
11:06:42  11       A.   Family Dollar.
11:06:42  12       Q.   How long have you been employed at Family Dollar?
11:06:45  13       A.   Seven years.
11:06:47  14       Q.   And what is your position with Family Dollar?
11:06:50  15       A.   District manager.
11:06:52  16       Q.   Have you also, prior to that, been an assistant
11:06:56  17    district manager?
11:06:56  18       A.   Yes, sir, I was.
11:06:57  19       Q.   Did you both, as an -- well -- have you been a
11:07:00  20    store manager?
11:07:01  21       A.   Yes, sir, I was prior to that also.
11:07:03  22       Q.   First, as a store manager, did you have occasion
11:07:06  23    and opportunity to observe Greg Pellegrin --
11:07:13  24            MR. CALAMUSA:  Object, Your Honor.
11:07:14  25            THE COURT:  Let him finish the question.

11:07:16   1       Q.   -- while a store manager, did you have occasion

11:07:17   2   and opportunity to observe Greg Pellegrin while he was

11:07:23   3   serving as a store manager?

11:07:24   4       A.   Yes, sir.

11:07:24   5       Q.   As an assistant district manager, did you have

11:07:29   6   occasion and opportunity to observe --

11:07:29   7       A.   Yes.

11:07:33   8       Q.   First -- first -- occasion and opportunity to

11:07:35   9   observe Mr. Pellegrin while he was a store manager?

11:07:38  10       A.   Yes, sir, I did.

11:07:39  11       Q.   Did you, as an assistant district manager, have

11:07:42  12   occasion to be a supervisor of Mr. Pellegrin?

11:07:46  13       A.   Yes, sir, I was.

11:07:47  14       Q.   Thereafter, as a district manager, did you have

11:07:51  15   occasion and opportunity to observe Mr. Pellegrin in the

11:07:57  16   operation of his store?

11:07:57  17       A.   Yes, sir, I was.

11:07:58  18       Q.   And thereafter, as a district manager, was there

11:08:01  19   a period of time when you observed Mr. Pellegrin as a

11:08:06  20   store manager?

11:08:07  21       A.   Yes.

11:08:08  22       Q.   Now, at the time Mr. Pellegrin left Family

11:08:13  23   Dollar, his district manager was who?

11:08:15  24       A.   Walt Garris.

11:08:20  25       Q.   And how long did Mr. Garris assume the role as

11:08:23  1  his district manager?

11:08:24  2      A.  I can't give you an exact time frame.  A couple

11:08:26  3  of months.

11:08:27  4      Q.  Couple of months?

11:08:28  5      A.  Yes, sir.

11:08:28  6      Q.  Is Mr. Garris currently deceased?

11:08:31  7      A.  Yes, sir, he is.

11:08:32  8      Q.  Prior to coming with Family Dollar, would you

11:08:42  9  briefly give your work history?

11:08:47  10              MR. CALAMUSA:  Object, Your Honor.

11:08:49  11              THE COURT:  The objection is sustained.

11:08:50  12      Q.  Prior to coming to Family Dollar, did you have

11:08:53  13  retail experience?

11:08:54  14              MR. CALAMUSA:  Objection, Your Honor.

11:08:56  15              THE COURT:  Sustained.

11:08:57  16              MR. WHITE:  Was that sustained, too, Judge?

11:08:59  17              THE COURT:  Yes, sir.

11:09:00  18  BY MR. WHITE:

11:09:01  19      Q.  How many times, in your role as assistant

11:09:08  20  district manager and district manager, did you have to

11:09:11  21  observe -- how many opportunities did you actually

11:09:15  22  physically observe Mr. Pellegrin operating his store?

11:09:19  23      A.  Probably more than 20, 22 times, somewheres

11:09:22  24  around there.

11:09:23  25      Q.  What, if anything, did you observe about

11:09:26  1   Mr. Pellegrin fulfilling his role as store manager?

11:09:31  2       A.   Store conditions were continuously deteriorating.

11:09:35  3       Q.   And what do you mean about "store conditions

11:09:38  4   continuously deteriorating"?

11:09:39  5                 MR. CALAMUSA:   Object, Your Honor.   Can we

11:09:42  6   approach?

11:09:42  7                 THE COURT:   What does this rebut, Mr. White?

11:09:45  8                 MR. WHITE:   His direct testimony about him

11:09:47  9   carrying -- about what he was doing and carrying out his

11:09:51  10  duties as store manager.   He was put on direct and he

11:09:53  11  testified to great extent about how he operated his

11:09:57  12  store; and he also testified, Your Honor, that the store

11:10:00  13  was on the way up instead of down.

11:10:03  14                THE COURT:   All right.

11:10:04  15                MR. CALAMUSA:   The testimony was on the way

11:10:06  16  up in sales, Your Honor.   Nothing about the conditions

11:10:08  17  of the store which led to the evidence that you have

11:10:11  18  struck.

11:10:11  19                THE COURT:   I will withhold ruling on the

11:10:13  20  objection at this time.

11:10:16  21  BY MR. WHITE:

11:10:16  22      Q.   What do you mean, first, as to his store about

11:10:20  23  you observed the deterioration?

11:10:25  24      A.   Greg started coming to work unshaven, ruffled

11:10:30  25  clothes, like he had slept in his clothes, hair not cut.

11:10:36   1          His store conditions were very unclean, not

11:10:38   2   recovered, boxes everywhere.  And he was progressively

11:10:43   3   getting worse.

11:10:43   4      Q.  Did you ever have an occasion, while

11:10:47   5   Mr. Pellegrin was there, to have any involvement at all

11:10:52   6   in an inventory process?

11:10:54   7      A.  Yes.  I went and helped him to clean up his store

11:10:58   8   to get it ready for inventory.

11:11:00   9      Q.  And what did you observe on that occasion?

11:11:03   10     A.  Greg was very to himself, didn't have very good

11:11:09   11  leadership qualities.  I had no -- had no ongoing

11:11:16   12  knowledge about what was going on in the surroundings of

11:11:19   13  the store.

11:11:19   14          THE COURT:  I take it you were the district

11:11:21   15  manager at the time?

11:11:21   16          THE WITNESS:  No, Your Honor.  At that time,

11:11:23   17  I was a store manager, and I had been sent over there to

11:11:26   18  clean up his store to get it ready for inventory at that

11:11:33   19  particular time.

11:11:33   20  BY MR. WHITE:

11:11:33   21     Q.  Well, let's confine it to the time while you were

11:11:36   22  either the assistant district manager, or district

11:11:39   23  manager.

11:11:39   24          Did you have occasion to go to his store?

11:11:41   25     A.  Yes, sir, I did.

11:11:42  1    Q.  And what -- well, first of all, were there

11:11:45  2  occasions when his store was not in some condition you

11:11:47  3  considered unsatisfactory?

11:11:48  4    A.  No.  There was a couple of times where actually

11:11:53  5  the store looked okay, you know.  I'm not going to say

11:11:54  6  that it was beautiful and exceptional, but it was

11:11:57  7  passable.

11:11:57  8    Q.  And were you made, or did you get reports and

11:12:02  9  were you familiar during the time you provided

11:12:05  10  supervisory duties, with how the store sales were doing?

11:12:09  11    A.  Yeah.  The sales were decreasing; we had more

11:12:13  12  complaints; boxes everywhere, being unable to be

11:12:18  13  shopped.  The sales were just -- it was going down.

11:12:21  14    Q.  When you say -- I think you used the term "the

11:12:24  15  store was not recovered", what does that mean?

11:12:27  16    A.  In a normal day when customers shop and they

11:12:33  17  don't either want certain items, they put them back

11:12:37  18  wherever.  And not recovering a store is not putting

11:12:42  19  everything back where it belongs, cleaning, sweeping,

11:12:45  20  dust mopping, you know, taking out the trash, cleaning

11:12:49  21  the bathroom.  That's a whole part of recovering the

11:12:52  22  store.

11:12:53  23    And if you don't do it, the store's in disarray

11:12:57  24  and you can't find anything.

11:12:58  25    Q.  Did you ever, while you were either an assistant

11:13:01    1    district manager or district manager, have any

11:13:03    2    discussions with him about the condition of his store?

11:13:05    3        A.   Oh, absolutely.

11:13:06    4        Q.   And was that on more than one occasion?

11:13:08    5        A.   Oh, yes, sir.

11:13:09    6        Q.   And what were those discussions?

11:13:11    7        A.   Just training his people; he wasn't training his

11:13:14    8    people to recover; he wasn't taking care of the

11:13:20    9    employees to make sure that they did the work.  He

11:13:23   10    didn't follow up on it.

11:13:24   11            When he closed the store, he didn't recover the

11:13:27   12    store himself, so his employees surely did not.  That

11:13:31   13    was all discussed in length.  I had been there

11:13:36   14    previously to clean up his store and told him, this is

11:13:39   15    how our store needs to be.  It has to be every day.

11:13:51   16        Q.   How long -- let me ask you this:  Other than

11:14:01   17    counseling with him, in talking with him and training as

11:14:06   18    you mentioned, did you say or do anything else to

11:14:09   19    Mr. Pellegrin related to the condition of his store on

11:14:12   20    any of these 20-plus occasions?

11:14:14   21        A.   I helped him clean it up.

11:14:18   22        Q.   Were there ever any occasions where you went to

11:14:22   23    his store and he was not present?

11:14:24   24                MR. CALAMUSA:  Object to leading, Your

11:14:26   25    Honor.

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
| 11:14:26 | 1  | THE COURT:  It's a preliminary question, I               |
| 11:14:29 | 2  | take it?                                                  |
| 11:14:30 | 3  | MR. WHITE:  Yes.                                          |
| 11:14:31 | 4  | THE WITNESS:  I'm sorry?                                  |
| 11:14:32 | 5  | THE COURT:  The objection is overruled.                  |
| 11:14:34 | 6  | THE WITNESS:  I'm sorry, could you repeat                 |
| 11:14:36 | 7  | the question?                                            |
| 11:14:36 | 8  | BY MR. WHITE:                                             |
| 11:14:36 | 9  | Q.  Were there ever any occasions at all where you       |
| 11:14:39 | 10 | went through his store and he was not present?           |
| 11:14:42 | 11 | A.  Yes.                                                  |
| 11:14:42 | 12 | Q.  And tell the ladies and gentlemen of the jury        |
| 11:14:44 | 13 | about that occasion or occasions.                        |
| 11:14:46 | 14 | A.  I went into -- well, one time, he was present the    |
| 11:14:53 | 15 | -- I went into his store to get some fixtures, some      |
| 11:14:56 | 16 | steel to build other shelves in another store.           |
| 11:14:59 | 17 | I was in his store over an hour, and he had no           |
| 11:15:02 | 18 | clue that I had been in his store.  And I was an         |
| 11:15:05 | 19 | assistant DM at that time.  And I called the district    |
| 11:15:08 | 20 | manager to inform him of what was going on with the      |
| 11:15:11 | 21 | store.                                                    |
| 11:15:12 | 22 | At other times, a couple of other times I went in       |
| 11:15:16 | 23 | his store and he was not there.  His employees were      |
| 11:15:19 | 24 | doing what they wanted, nobody was paying attention to   |
| 11:15:22 | 25 | anything that was going on.                              |

11:15:23  1      Q.   In the few months that Mr. Garris was his

11:15:27  2   district manager --

11:15:28  3      A.   Yes, sir.

11:15:28  4      Q.   -- did you have occasions during that limited

11:15:31  5   period of time, after you were no longer his DM,

11:15:36  6   Mr. Garris was, did you have occasions to visit his

11:15:38  7   store?

11:15:38  8      A.   Yes, sir, I did.

11:15:39  9      Q.   And what condition was his store during those

11:15:43  10   visits?

11:15:43  11      A.   Still continuously just going downhill.  It was

11:15:48  12   very severe.

11:15:49  13            THE COURT:  You say very severe?

11:15:50  14            THE WITNESS:  Yes, Your Honor.

11:15:51  15            THE COURT:  So I take it that you have some

11:15:54  16   written documentation of his failure to adequately

11:15:58  17   perform?

11:15:58  18            THE WITNESS:  No.

11:15:59  19            MR. WHITE:  Your Honor, may I be heard on

11:16:01  20   that?

11:16:01  21            THE COURT:  Yes, sir.

11:16:02  22            MR. WHITE:  I think counsel would rather we

11:16:04  23   hear that up here.

11:16:14  24                  (At bench:)

11:16:14  25            MR. WHITE:  Judge, we've got his termination

11:16:19   1   notice.

11:16:21   2                  MR. CALAMUSA:  But they have no

11:16:22   3   documentation leading up to the termination, Judge.

11:16:27   4                  MR. WHITE:  She can answer?

11:16:29   5                  THE COURT:  She can answer.

11:16:30   6                  MR. CALAMUSA:  That's not rebuttal.

11:16:34   7                  MR. WHITE:  Judge, it doesn't matter.

11:16:36   8                  THE COURT:  Let me see the paper.

11:16:58   9                  MR. CALAMUSA:  He failed to raise it, Your

11:17:00  10   Honor.  And then brought it up outside the presence of

11:17:02  11   the jury of what happened, after he never raised it in

11:17:05  12   his examination of Mr. Pellegrin, and said he -- did not

11:17:08  13   allow him to go into it.

11:17:27  14                  MR. WHITE:  That's the separation form.

11:17:29  15   It's a Family Dollar document that's been provided to

11:17:32  16   them.

11:17:33  17                  THE COURT:  All right.

11:17:33  18                  MR. WHITE:  What I will do is mark this and

11:17:36  19   put it in.  Is that what you want me to do?

11:17:38  20                  THE COURT:  No, I don't want you to do it,

11:17:42  21   but I'm not going to stop you.  You can object to it.

11:18:03  22                  MR. CALAMUSA:  Your Honor, may I say one

11:18:04  23   more thing up here outside the jury?

11:18:07  24                  THE COURT:  Yes.

11:18:07  25                  MR. CALAMUSA:  Mark?

| 11:18:07 | 1 | MR. WHITE:  Just one second. |

11:18:07   1          MR. WHITE:  Just one second.

11:18:25   2          MR. CALAMUSA:  I'm going to go ahead and

11:18:28   3   note now that objection to anything of Mr. Pellegrin's

11:18:34   4   termination, because that is clearly not rebuttal

11:18:36   5   because it was not testified to by Mr. Pellegrin,

11:18:37   6   anything that the Court order Mr. White ask the witness

11:18:42   7   regarding termination.

11:18:43   8          THE COURT:  You object on the record?

11:18:45   9          MR. CALAMUSA:  Yes, sir.

11:18:55  10   (End of bench conference.  In open court, jury present.)

11:18:55  11          THE COURT:  The question that I put to you

11:18:56  12   was this:  Are there any written records that you made

11:19:02  13   concerning any warnings, that kind of thing, that you

11:19:05  14   did of Mr. Pellegrin about his unacceptable performance?

11:19:13  15          THE WITNESS:  I do not have those records,

11:19:14  16   no, sir.

11:19:15  17          THE COURT:  All right.  Next question?  No,

11:19:19  18   sir.

11:19:19  19          MR. WHITE:  Okay.

11:19:27  20          THE COURT:  You say you don't have those

11:19:29  21   records.  There are records somewhere?

11:19:31  22          THE WITNESS:  Not that I know of.

11:19:32  23          THE COURT:  Not that you know of.  All

11:19:34  24   right.

11:19:38  25   BY MR. WHITE:

11:19:38  1     Q.  Where would such records ordinarily be kept on a

11:19:42  2  store manager?

11:19:42  3     A.  I'm sorry.  I didn't hear the question.

11:19:43  4     Q.  Where would the records be kept by Family Dollar

11:19:47  5  on a store manager concerning performance?

11:19:50  6     A.  It depends.  Some may -- sometimes they're kept

11:19:55  7  in the store files, and some district managers have kept

11:19:57  8  the files on store managers.

11:20:12  9              MR. WHITE:  Judge, give me one second.

11:20:14  10             THE COURT:  Yes, sir.

11:20:34  11    Q.  While you have no documents with you today, on

11:20:39  12 how many occasions, if any, did you personally counsel

11:20:44  13 or discuss with Mr. Pellegrin the condition of his

11:20:47  14 store?

11:20:48  15    A.  Four or five times.

11:20:56  16             MR. WHITE:  Your Honor, at the break, I will

11:20:58  17 make a proffer.

11:20:59  18             THE COURT:  Yes, sir.  Cross-examination?

11:21:01  19                    **CROSS-EXAMINATION**

11:21:02  20 **BY MR. CALAMUSA:**

11:21:03  21    Q.  How long were you the assistant district manager,

11:21:14  22 Mrs. Breaux?

11:21:15  23    A.  I don't know the exact amount of time, sir.

11:21:17  24    Q.  Give me the date, please.

11:21:18  25    A.  I don't recall the date.  Six months, seven

11:21:21   1   months, somewheres around there.

11:21:22   2       Q.   Six to seven months as assistant DM?

11:21:26   3       A.   Yes, sir.

11:21:26   4       Q.   And then you became a district manager; correct?

11:21:28   5       A.   Yes.

11:21:29   6       Q.   And what was your district?

11:21:30   7       A.   District 230.

11:21:33   8       Q.   What district was Mr. Pellegrin's store in when

11:21:36   9   you became district manager?

11:21:38  10       A.   District 6.

11:21:42  11       Q.   So the period of time you were a district

11:21:44  12   manager, you were not a district manager for

11:21:46  13   Mr. Pellegrin's store, that's Mr. Klinepeter; correct?

11:21:51  14       A.   That's correct.

11:21:51  15       Q.   And you were only assistant DM six or seven

11:21:54  16   months, and that was prior to becoming a DM; right?

11:21:58  17       A.   Yes.

11:21:58  18       Q.   And then, as I understand, Mr. Klinepeter left

11:22:06  19   the company; and there was about a month, month and a

11:22:10  20   half period between Mr. Klinepeter and -- is it Garris?

11:22:15  21       A.   Yes.

11:22:15  22       Q.   And for that month, month and a half you served

11:22:18  23   as acting DM over not only your whole district, but

11:22:22  24   Mr. Pellegrin's district as well?

11:22:24  25       A.   Actually, it's not acting DM.  I was a DM for two

11:22:28  1  districts.

11:22:28  2      Q.   Okay.  How many stores were in your -- your

11:22:33  3  district, District 230?

11:22:35  4      A.   I'm sorry.  How were they what?

11:22:37  5      Q.   How many stores were in 230 at this time?

11:22:40  6      A.   At 230, 13, 14.  I don't remember.  I don't

11:22:43  7  recall the exact number.

11:22:44  8      Q.   And tell me how many stores were in the district

11:22:48  9  that Mr. Klinepeter had that you took over for that

11:22:52 10  month, month and a half period for Mr. Garris?

11:22:54 11      A.   18, 19, maybe.

11:22:57 12           THE COURT:  And so how many times did you

11:22:59 13  visit Mr. Pellegrin's store when you served as the DM

11:23:03 14  over the two districts?

11:23:04 15           THE WITNESS:  Three or four times.

11:23:07 16      Q.   And I wrote down that you came to his store more

11:23:14 17  than 20 times?

11:23:15 18      A.   Yes.

11:23:16 19      Q.   And that's as an assistant manager and as an

11:23:19 20  acting DM?

11:23:19 21      A.   No, that's as store manager, assistant DM and DM.

11:23:24 22      Q.   In the six to seven months you were the assistant

11:23:28 23  DM --

11:23:29 24      A.   Yes.

11:23:30 25      Q.   -- how many times did you observe his store when

11:23:32   1   you had authority over him?

11:23:37   2       A.   I -- I don't know the exact number.

11:23:41   3       Q.   Give me an approximate amount.  You gave me 20

11:23:43   4   times that you've observed him.  When you had actual

11:23:47   5   authority over Mr. Pellegrin, how many times did you

11:23:50   6   visit?

11:23:50   7       A.   About a dozen.  About a dozen times.

11:23:53   8       Q.   Okay.  And so the rest of the times you were

11:23:58   9   there, you were just as another store manager assigned

11:24:02   10  to that -- to go move freight and help with inventory by

11:24:05   11  the district manager; correct?

11:24:06   12      A.   I was always Mr. Klinepeter's right hand.  I did

11:24:11   13  not have formally the title of assistant DM; but within

11:24:14   14  30 days after I was hired with Family Dollar as a store

11:24:18   15  manager in Lafayette, I was prepping stores for

11:24:22   16  inventory.  I was off coaching store managers, I was

11:24:27   17  helping store managers, including running my store.

11:24:31   18      Q.   How long was Mr. Klinepeter the DM?

11:24:33   19      A.   I started in '99, and Mr. Klinepeter was gone in

11:24:41   20  2001.  So, two years with him.

11:24:44   21      Q.   Mr. Klinepeter's still alive; correct?

11:24:46   22      A.   Yes.

11:24:47   23      Q.   And he was the district manager over

11:24:49   24  Mr. Pellegrin during that time period; correct?

11:24:51   25      A.   Yes.

11:24:51   1        Q.   Do you know what year, Ms. Breaux, you actually

11:25:04   2   took the title of assistant manager?

11:25:05   3        A.   Assistant district manager?

11:25:09   4        Q.   I'm sorry.  Assistant district manager?

11:25:12   5        A.   No, sir, I do not.

11:25:13   6        Q.   And do I understand that while you were the

11:25:31   7   assistant district manager for six to seven months, and

11:25:36   8   for that month, month and a half where you served as

11:25:41   9   district manager over two districts, you visited his

11:25:43  10   store, I've noted, twelve times; correct?

11:25:45  11        A.   Yes.

11:25:48  12        Q.   So, twelve times in eight months; correct?

11:25:51  13        A.   About.

11:25:52  14        Q.   And you have no documentation of any written

11:25:58  15   warnings or counselings regarding performance; correct?

11:26:02  16        A.   No, sir, I do not.

11:26:06  17             MR. CALAMUSA:  Thank you, Ms. Breaux.

11:26:07  18             THE COURT:  Redirect?

11:26:09  19                    **REDIRECT EXAMINATION**

11:26:10  20   **BY MR. WHITE:**

11:26:11  21        Q.   During the period of time that you were either

11:26:14  22   assistant district manager or district manager, could

11:26:17  23   Mr. Pellegrin hire and fire his employees in the store?

11:26:21  24        A.   Absolutely.  He was required to.

11:26:22  25        Q.   During the time that you were his superior,

11:26:26  1    either as assistant DM or DM, could Mr. Pellegrin

11:26:30  2    interview job applicants?

11:26:32  3        A.  Yes, sir.

11:26:33  4        Q.  And during the time that you were his superior,

11:26:42  5    was the staff scheduler used, or was the one we've seen

11:26:48  6    before, the blank one?

11:26:49  7        A.  The one we've seen before.

11:26:51  8        Q.  I'm sorry.  Let me pull that up for you.

11:26:55  9             THE COURT:  And do so in an un-needed

11:27:04 10    fashion.

11:27:05 11             MR. WHITE:  Okay.  I'll close my eyes and

11:27:08 12    ask Ms. Koni to pull up -- let me find the number,

11:27:12 13    Judge.  What is that, 20?  I think it's 2336.

11:27:22 14        Q.  Can you see the screen without me pointing you in

11:27:25 15    that direction?

11:27:26 16        A.  I can see the screen.  I see the screen.  "Family

11:27:29 17    Dollar Work Schedule".

11:27:30 18        Q.  Do you recognize 2326?

11:27:32 19        A.  Absolutely.

11:27:33 20        Q.  What is that?

11:27:34 21        A.  That is our - what we use to make our schedules

11:27:36 22    with.

11:27:36 23        Q.  All right.  Did there come a time when in the

11:27:40 24    districts you were supervising while Mr. Pellegrin was

11:27:42 25    there that that was no longer used?

11:27:45  1          MR. CALAMUSA:  I object, Your Honor, unless

11:27:47  2     it's specifically when she was supervising

11:27:50  3     Mr. Pellegrin.

11:27:52  4          MR. WHITE:  That was what I said, Your

11:27:55  5     Honor, if he was listening to the question.

11:27:55  6          THE COURT:  Yes.  The objection is

11:27:56  7     overruled.

11:27:56  8     BY MR. WHITE:

11:27:56  9     Q.  During the time you were supervising, was that

11:27:58  10    form used?

11:27:59  11    A.  Yes, that's what was used.

11:28:01  12    Q.  And did that -- during the time Mr. Pellegrin was

11:28:05  13    there, did your district ever change over to the new

11:28:09  14    staff scheduler?

11:28:10  15    A.  No, sir.

11:28:10  16    Q.  Was the new staff scheduler already in effect

11:28:16  17    during this time?

11:28:17  18          THE COURT:  Is this rebuttal, Mr. White?

11:28:23  19          MR. WHITE:  Yes, sir.

11:28:24  20    Q.  You said he used the new one?

11:28:26  21    A.  Yes, sir.

11:28:28  22    Q.  In the district that you were there while

11:28:31  23    Mr. Pellegrin was there?

11:28:32  24          MR. CALAMUSA:  Object, Your Honor, to

11:28:33  25    leading.

| | | |
|---|---|---|
| 11:28:33 | 1 | THE COURT: Go ahead. Overruled. |
| 11:28:35 | 2 | Q. In the district while you were supervising |
| 11:28:38 | 3 | Mr. Pellegrin, did you require the use of the new staff |
| 11:28:42 | 4 | schedule? |
| 11:28:42 | 5 | A. No, sir. |
| 11:28:47 | 6 | MR. WHITE: Thank you, Judge. |
| 11:28:48 | 7 | THE COURT: Recross. |
| 11:28:50 | 8 | **RECROSS EXAMINATION** |
| 11:28:50 | 9 | **BY MR. CALAMUSA:** |
| 11:28:52 | 10 | Q. Ms. Breaux, isn't it true that while you were |
| 11:28:54 | 11 | assistant district manager, you went to Mr. Pellegrin's |
| 11:28:59 | 12 | store and interviewed three applicants for a cashier |
| 11:29:02 | 13 | position? |
| 11:29:02 | 14 | A. That's -- not to my recollection. |
| 11:29:08 | 15 | Q. Do you remember an Ora Wolfe that was hired as a |
| 11:29:11 | 16 | clerk or cashier? |
| 11:29:12 | 17 | A. No, sir. |
| 11:29:12 | 18 | Q. You have no recollection of Ms. Wolfe? |
| 11:29:15 | 19 | A. No, sir. |
| 11:29:15 | 20 | Q. Can you sit here and deny to us that you, in |
| 11:29:18 | 21 | fact, did not go to Mr. Pellegrin's store while |
| 11:29:22 | 22 | assistant DM, interview three applicants, and choose |
| 11:29:26 | 23 | Ms. Wolfe for the clerk position and inform |
| 11:29:29 | 24 | Mr. Pellegrin and his assistant, this is who the clerk |
| 11:29:32 | 25 | is going to be? |

11:29:33  1       A.  No, sir.  I really have no recollection of that.

11:29:35  2       Q.  So you don't deny that one way or the other, you

11:29:37  3   just don't recall?

11:29:38  4       A.  I do not recall.

11:29:39  5       Q.  Promotions.  Fran Tribe was promoted to assistant

11:29:49  6   manager within Mr. Pellegrin's store.  Do you recall

11:29:51  7   that?

11:29:51  8       A.  No, sir.

11:29:52  9       Q.  Don't remember that either?

11:29:53 10       A.  No, sir.

11:29:54 11       Q.  So can you deny for us that Mr. -- Ms. Tribe was

11:29:59 12   promoted to assistant manager by Mr. Klinepeter, the

11:30:04 13   district manager?

11:30:04 14       A.  I don't know.

11:30:07 15            MR. WHITE:  Objection to what Mr. Klinepeter

11:30:10 16   did, Your Honor.

11:30:11 17            MR. CALAMUSA:  She was his assistant DM,

11:30:14 18   right-hand person.

11:30:14 19            THE COURT:  Objection is overruled.

11:30:16 20   BY MR. CALAMUSA:

11:30:16 21       Q.  You cannot deny the fact that Mr. Pellegrin sat

11:30:19 22   there and testified, sworn testimony, that

11:30:22 23   Mr. Klinepeter promoted this employee to assistant

11:30:25 24   manager without his input or recommendation?

11:30:27 25       A.  I can't deny or acknowledge.  I have no

11:30:30   1   recollection.

11:30:31   2     Q.   When you -- isn't it true that when you were

11:30:41   3   assistant district manager, you, in fact, went to the

11:30:44   4   stores and interviewed applicants for jobs?

11:30:51   5     A.   You have to understand, you know -- District 6 at

11:30:55   6   that time had over 30 stores, I had my own store to run.

11:30:59   7   I have no recollection.  I mean, I've had up to 35

11:31:02   8   stores.  Do you know how many employees that is?  You

11:31:05   9   know --

11:31:06   10     Q.   Yes, ma'am.

11:31:06   11     A.   I've had store managers call me and say,

11:31:09   12   "Ms. Kat, will you come and help us?"  I have store

11:31:12   13   managers today that call me --

11:31:13   14           THE COURT:  Well, actually, the question was

11:31:19   15   whether you recalled having interviewed applicants.  And

11:31:24   16   I take it your answer is, no, you don't recall?

11:31:26   17           THE WITNESS:  I don't recall, Your Honor.

11:31:27   18   I'm sorry.

11:31:28   19           THE COURT:  But you don't deny it?

11:31:30   20           THE WITNESS:  I don't deny it, but I don't

11:31:32   21   recall, no.

11:31:32   22           THE COURT:  All right.  Fine.

11:31:33   23   BY MR. CALAMUSA:

11:31:33   24     Q.   So while you're district manager, you don't

11:31:36   25   remember if you interviewed these individuals?

11:31:38  1     A.  No, sir, I don't.

11:31:40  2     Q.  But you're able to remember here today everything

11:31:43  3  about the conditions of Mr. Pellegrin's store?

11:31:45  4     A.  Well, you know, store conditions is very

11:31:48  5  important to our customers.  It's important to our

11:31:51  6  associates.

11:31:52  7     Q.  So --

11:31:53  8     A.  You know, so as an assistant DM, even as a store

11:31:56  9  manager before I got promoted to assistant DM, we work

11:32:01  10  directly with the store manager, because they're in

11:32:03  11  control.  You know, they have to train their employees.

11:32:07  12  You know, anytime there's a problem in the store, I go

11:32:10  13  directly to the store manager and ask them, you know,

11:32:12  14  you have to do this, you have to train your employees.

11:32:15  15  You know, the more you train your employees, the less

11:32:17  16  you have to do.

11:32:19  17     Do you understand what I am saying?  So --

11:32:20  18     Q.  Yes, ma'am.

11:32:21  19     A.  -- dealing with all these employees in the

11:32:24  20  stores, I don't recall dealing with an employee in the

11:32:25  21  store.

11:32:26  22     I have managers today that call me and say,

11:32:28  23  "Ms. Kat, please come help me talk to this person."

11:32:31  24  "I'll be glad to come help you."

11:32:34  25     Q.  And you go do that as a district manager, just

11:32:36  1    like you did when you were the assistant manager --

11:32:39  2    excuse me -- assistant district manager?

11:32:41  3        A.   Sure.   I will go help anybody that calls me and

11:32:45  4    asks me that.   I've unloaded -- taken off my jacket and

11:32:48  5    helped a store manager unload a truck in the rain.   That

11:32:52  6    doesn't bother me.

11:32:52  7        Q.   And part of what you did as an assistant district

11:32:55  8    manager for those months was interview candidates for

11:32:59  9    hire?

11:32:59  10       A.   Very possible.

11:33:01  11               MR. CALAMUSA:   Thank you.

11:33:05  12               MR. WHITE:   Your Honor, I just need to check

11:33:08  13   one exhibit.

11:33:08  14               THE COURT:   All right.

11:33:29  15               MR. WHITE:   No questions.

11:33:29  16               THE COURT:   All right.   Thank you, ma'am.

11:33:33  17   Defendant will call its next witness.

11:33:36  18               MR. MAY:   Family Dollar calls Willard Green.

11:33:50  19               THE COURT:   Is he being called as a rebuttal

11:33:53  20   witness?

11:33:54  21               MR. MAY:   Yes, sir.   Ms. Cutchall's district

11:33:54  22   manager.

11:34:19  23           **WILLARD GREEN, DEFENDANT'S WITNESS, SWORN,**

11:34:20  24               THE CLERK:   State your name for the record,

11:34:21  25   please.

| | | |
|---|---|---|
| 11:34:23 | 1 | THE WITNESS:  Willard Green. |
| 11:34:25 | 2 | THE CLERK:  Spell your last name for the |
| 11:34:28 | 3 | record, please. |
| 11:34:29 | 4 | THE WITNESS:  G-R-E-E-N. |

**DIRECT EXAMINATION**

5

**BY MR. MAY:**

| | | |
|---|---|---|
| 11:34:38 | 6 | |
| 11:34:39 | 7 | Q.   Mr. Green, where do you live? |
| 11:34:41 | 8 | A.   I live in Shreveport, Louisiana. |
| 11:34:43 | 9 | Q.   And who do you work for? |
| 11:34:45 | 10 | A.   Family Dollar. |
| 11:34:46 | 11 | Q.   What do you do? |
| 11:34:47 | 12 | A.   I am a project manager for the Store Development |
| 11:34:50 | 13 | Department. |
| 11:34:51 | 14 | Q.   And very briefly, tell us what that -- is |
| 11:34:54 | 15 | involved in that. |
| 11:34:55 | 16 | A.   Basically, I go from store to store and determine |
| 11:34:58 | 17 | if we need renovations, and do drawings for the stores |
| 11:35:01 | 18 | and help set up in the store. |
| 11:35:03 | 19 | Q.   And how long have you been in that job? |
| 11:35:05 | 20 | A.   Been in that job about two years now. |
| 11:35:07 | 21 | Q.   How long have you been with Family Dollar? |
| 11:35:08 | 22 | A.   19 years. |
| 11:35:09 | 23 | Q.   Have you ever been a district manager? |
| 11:35:12 | 24 | A.   I have. |
| 11:35:13 | 25 | Q.   Where were you a district manager? |

11:35:17  1    A.   Shreveport, Louisiana.

11:35:19  2    Q.   Do you know a lady by the name of Ms. Wilma

11:35:23  3  Cutchall, who is a plaintiff in this case and who has

11:35:26  4  testified here?

11:35:26  5    A.   Yes, I do.

11:35:27  6    Q.   How do you know her?

11:35:29  7    A.   She was a store manager and an assistant manager

11:35:30  8  for me for about a year.

11:35:31  9    Q.   How long did you know her?

11:35:34  10   A.   I knew her for about probably 16 months.

11:35:37  11   Q.   And what relationship did you have with her in a

11:35:47  12  job relationship?  You may have answered.  Were you her

11:35:51  13  district manager?

11:35:51  14   A.   I was her district manager.  She was an assistant

11:35:53  15  at one time, and then I promoted her to a store manager.

11:35:56  16   Q.   How many stores did you have at that time?

11:35:59  17   A.   I had 18.

11:36:01  18   Q.   Did you ever visit her store?

11:36:06  19   A.   Pardon?

11:36:07  20   Q.   You ever visit Ms. Cutchall's store --

11:36:10  21   A.   Yes, sir.

11:36:10  22   Q.   -- Ms. Wilma Cutchall?  And what kind of time

11:36:15  23  would you spend in her store when you visited?

11:36:17  24   A.   Depending on the nature of the visit, an ordinary

11:36:20  25  visit would be one and a half to two hours; and a

11:36:23  1   complete audit would be four to six hours.

11:36:25  2       Q.  And did you visit her store on those kinds of

11:36:30  3   visits?

11:36:31  4       A.  Yes.

11:36:31  5       Q.  And what did you do when you visited?

11:36:34  6       A.  Went over detail paperwork, audited the cash and

11:36:39  7   sales reports, audited discrepancies; and then visited

11:36:43  8   around on the sales floor, and pointed out things that

11:36:46  9   needed to be done, company policies that needed to be

11:36:51  10  implemented, things that needed to be taken care of in

11:36:54  11  the store.

11:36:54  12      Q.  From your standpoint, did you and Ms. Cutchall

11:36:57  13  get along?

11:36:57  14      A.  Yes, sir.

11:36:58  15      Q.  During the period you were her district manager

11:37:02  16  and she was a store manager, she reported directly to

11:37:06  17  you?

11:37:06  18      A.  Yes, sir.

11:37:07  19      Q.  During that period of time -- focusing on the

11:37:12  20  period of time of when you were her boss, her direct

11:37:14  21  boss -- did you consider her to have the authority to

11:37:17  22  direct the employees in the store, in her store?

11:37:20  23      A.  Yes, sir.

11:37:21  24      Q.  Did you consider her to have the authority to

11:37:25  25  schedule her employees?

11:37:26  1      A.   Yes.

11:37:27  2      Q.   Did she have to call you in order to schedule

11:37:30  3  employees or change schedules?

11:37:32  4      A.   No.

11:37:32  5      Q.   Did you consider Ms. Cutchall, during the period

11:37:43  6  of time you were her boss as a district manager and she

11:37:44  7  was a store manager, that period of time, did you

11:37:47  8  consider her to have the authority to hire clerks and

11:37:49  9  cashiers in her store?

11:37:51  10     A.   Yes, sir, I did.

11:37:52  11     Q.   Were you involved if Ms. Cutchall needed to hire

11:37:57  12  a clerk or cashier in her store?

11:37:58  13     A.   No, sir.

11:37:59  14     Q.   Did she need to seek your approval in any way

11:38:04  15  ahead of time?

11:38:04  16     A.   No, sir.

11:38:04  17     Q.   Did she do that?

11:38:05  18     A.   No.

11:38:06  19     Q.   Seek approval?

11:38:08  20     A.   No.

11:38:08  21     Q.   Did she hire cashiers and clerks?

11:38:11  22     A.   She did hire cashiers and clerks, uh-huh.

11:38:13  23     Q.   Now, during the period of time that you were her

11:38:17  24  district manager, she was the store manager reporting

11:38:20  25  directly to you.  Tell us about the process that was

11:38:24   1   involved if an assistant manager needed to be replaced

11:38:29   2   in Ms. Cutchall's store.

11:38:30   3       A.   The process for assistant managers was an ongoing

11:38:34   4   thing.  Actually, a good assistant manager would be

11:38:37   5   promoted to a manager later on.

11:38:39   6           So, every store would interview possible

11:38:43   7   applicants for an assistant manager.  They would do the

11:38:48   8   screening process.  And then before that assistant was

11:38:51   9   hired, either for her store or for the district -- a

11:38:56  10   district store, then I would go over it with her.  We

11:38:59  11   would get together and mutually agree that this person

11:39:03  12   was capable of handling our stores; and we would make a

11:39:07  13   decision then to hire her or to not hire her.

11:39:09  14       Q.   How would you describe the ultimate decision that

11:39:13  15   was made about an assistant manager?

11:39:14  16       A.   It was a joint thing between us.

11:39:17  17       Q.   Now, did Ms. Cutchall have an assistant manager

11:39:21  18   when you were her district manager?

11:39:23  19       A.   Yes, sir.

11:39:23  20       Q.   And what did you -- did you -- let me start over.

11:39:28  21   Sorry.

11:39:29  22           What did you consider the authority of the

11:39:31  23   assistant manager in Ms. Cutchall's store to be in

11:39:35  24   relationship to her job or her position as store

11:39:38  25   manager?

11:39:38   1     A.   Ms. Cutchall would have been the ultimate

11:39:42   2  authority of the store, make the final decision; the

11:39:48   3  assistant was a key-carrying employee that opened and

11:39:51   4  closed, and was responsible in Mrs. Cutchall's absence.

11:39:56   5          They had similar duties, but the ultimate

11:39:59   6  final decision was Ms. Cutchall's, as the store manager.

11:40:02   7     Q.   Did you consider Ms. Cutchall, during that period

11:40:05   8  of time you were her boss, to have authority over her

11:40:08   9  assistant manager?

11:40:08  10     A.   Yes, sir.

11:40:14  11          MR. MAY:  Answer their questions, Mr. Green.

11:40:16  12          THE COURT:  Cross-examination?

11:40:20  13          MR. JOHNSON:  Thank you, Your Honor.

11:40:23  14                **CROSS-EXAMINATION**

11:40:23  15  **BY MR. JOHNSON:**

11:40:24  16     Q.   Good morning, Mr. Green.  How are you?

11:40:35  17     A.   Fine.

11:40:35  18     Q.   My name is Rusty Johnson.

11:40:50  19          Now, let's talk about this scheduling that you

11:40:57  20  had.  You said that Ms. Cutchall had authority to do the

11:41:04  21  schedules in the store; right?

11:41:05  22     A.   Yes, sir.

11:41:06  23     Q.   When did she actually work under you as a store

11:41:11  24  manager?

11:41:11  25     A.   This was probably in around 2001 for about a

11:41:19  1    year -- 2001 to 2002.

11:41:22  2        Q.  2001 to 2002?

11:41:24  3        A.  Yes, sir.

11:41:24  4        Q.  Were the staff schedulers in use at that time?

11:41:29  5        A.  It had been implemented, yes, sir.

11:41:31  6        Q.  Okay.  And didn't you give instructions to

11:41:39  7    Ms. Cutchall that if there are any changes that needed

11:41:42  8    to be made to the staff scheduler, that you needed to

11:41:45  9    approve those changes?

11:41:46  10       A.  No, sir.

11:41:46  11       Q.  So you didn't do that?

11:41:49  12       A.  No.

11:41:49  13       Q.  Okay.  And so, she could just make any changes,

11:41:54  14   or make the schedule any way she wanted to?

11:41:57  15       A.  She could make revisions to the schedule.  And we

11:42:01  16   actually had a grease pencil that was supplied to make

11:42:06  17   changes on an -- on an ongoing basis, individual.  And

11:42:10  18   that manager -- each manager had the authority to make

11:42:13  19   some changes in case they needed to.

11:42:15  20       Q.  Okay.  Do you know a gentleman by the name of

11:42:24  21   Frank Vogt?

11:42:25  22       A.  Yes, sir, I do.

11:42:26  23       Q.  Who's Frank Vogt?

11:42:27  24       A.  He's the regional vice-president of the area that

11:42:31  25   we were in.

11:42:31   1      Q.   Right.   And so, he had authority over you;
11:42:34   2  correct?
11:42:35   3      A.   Yes, sir.
11:42:35   4      Q.   And didn't Mr. Vogt give you instructions to give
11:42:43   5  to the store managers as to what they should do with the
11:42:46   6  schedules?
11:42:46   7      A.   As to -- I'm not sure I understand the question.
11:42:52   8      Q.   Sure.   Didn't Mr. Vogt give you instructions to
11:42:56   9  give to store managers as to how they should construct
11:42:59  10  their schedule?
11:43:01  11      A.   Yes, sir.
11:43:01  12      Q.   Yes.   Right.   So, it wasn't that Ms. Cutchall had
11:43:05  13  just free will to make out the schedules any way she
11:43:10  14  wanted to; correct?
11:43:11  15      A.   No.
11:43:11  16      Q.   Right.   In fact -- Dan, if you'll pull up Exhibit
11:43:17  17  18, please.
11:43:18  18              MR. MAY:   Is this in evidence?
11:43:20  19              MR. JOHNSON:   Yes.
11:43:22  20              MR. MAY:   Do you have an extra copy?
11:43:35  21              MR. JOHNSON:   Dan, how about blow up just
11:43:37  22  the first "from/to subject and date", please.
11:43:46  23  BY MR. JOHNSON:
11:43:46  24      Q.   So this is an email from Frank Vogt, December
11:43:50  25  17th, 2002.   You were to receive this email; correct?

11:43:54   1    A.   Yes, sir.   I should have, uh-huh.

11:43:56   2    Q.   Okay.   Dan, let's go down to the -- the paragraph

11:44:05   3    that begins "the second assistant or third key", and

11:44:11   4    just highlight -- no, go down farther to the next

11:44:16   5    paragraph, to -- just highlight "second assistant" down

11:44:20   6    "the first assistant".   There you go.

11:44:28   7         It says here:   "The second assistant or third key

11:44:31   8    are not allowed to open and close except when the

11:44:34   9    manager or assistant manager goes on vacation or they

11:44:37   10   are out sick."   Do you see that?

11:44:39   11   A.   I see it.   Yes, sir.

11:44:41   12   Q.   So that's giving an instruction as to how

11:44:44   13   Ms. Cutchall should schedule the store; correct?

11:44:46   14   A.   Yes, it is.

11:44:49   15   Q.   It also says "there are no exceptions to this";

11:44:53   16   right?

11:44:53   17   A.   That's what it says.

11:44:56   18   Q.   Okay.   And then in the next paragraph, it says,

11:45:03   19   or next line:   "Every manager will alternate weekends

11:45:05   20   closings with their first assistant, not the second

11:45:08   21   assistant or third key.   Every manager will close three

11:45:12   22   nights a week and alternate this with their first

11:45:15   23   assistant."   You see that; right?

11:45:19   24   A.   It's what it says, yes.

11:45:20   25   Q.   That's also giving her instructions as to how she

11:45:24 1   should make her schedule; right?

11:45:26 2       A.   Right.

11:45:26 3       Q.   Now, Dan, how about pull up the next paragraph:

11:45:36 4   "Again, it has come to my attention that some managers

11:45:40 5   are thinking they can have a second assistant then they

11:45:44 6   could use them to open and close the store.  This stops

11:45:48 7   now.  If DST is working 100 percent store.  If Anytime 5

11:45:57 8   then you take two complete days off.  This still means

11:46:01 9   you must work 52 hours, which would be two 11-hour days

11:46:05 10  and three 10-hour day.  Some of you are taking the two

11:46:09 11  days and coming in at noon a few days a week."

11:46:12 12      That's giving explicit instructions how the store

11:46:15 13  manager is to schedule her time?

11:46:17 14      A.   It is.  It is.

11:46:18 15      Q.   Right.  Now, you also stated that the process for

11:46:40 16  hiring or promoting an assistant manager was a joint

11:46:46 17  ultimate decision, that was maybe between you and

11:46:49 18  Ms. Cutchall?

11:46:49 19      A.   Yes, sir.

11:46:50 20      Q.   Dan, how about highlighting the first paragraph,

11:46:54 21  please.  This is also from Mr. Vogt.

11:47:02 22      He says:  "No manager can promote anyone to

11:47:04 23  assistant manager, second assistant, or third key

11:47:07 24  position.  Only the district manager has the authority

11:47:09 25  to -- has the authority to do this and the" -- there's a

11:47:15   1   typo -- "and the have the key -- and only you the PAF in

11:47:21   2   promoting someone to this position."

11:47:24   3         I guess he wasn't a good typist.  But he's saying

11:47:28   4   only you have the authority to promote an assistant

11:47:30   5   manager to the assistant manager, and you have to key?

11:47:34   6       A.  That's correct.

11:47:34   7       Q.  So you have the final decision-making authority

11:47:38   8   on hiring and promoting individuals to the assistant

11:47:41   9   manager position; correct?

11:47:43   10       A.  Right.

11:47:43   11       Q.  Right.  Third key position, too; right?

11:47:46   12       A.  Yes.

11:47:47   13       Q.  Second assistant?

11:47:48   14       A.  Yes.

11:47:48   15       Q.  Okay.  And so you saw this email back then;

11:47:52   16   correct?

11:47:53   17       A.  I don't recall that particular email, but it

11:47:56   18   would have been within my time frame.

11:47:57   19       Q.  Right.

11:47:58   20       A.  Yes.

11:47:58   21       Q.  Right.  Right.  Right.  Do you know an individual

11:48:08   22   by the name of Bruce Barkus?

11:48:10   23       A.  I do.

11:48:10   24       Q.  And who was Bruce Barkus?

11:48:12   25       A.  He was senior vice-president of Operations.

11:48:15  1      Q.   Right.   And do you remember receiving a directive

11:48:19  2   from Mr. Barkus in 2002 that only you have the authority

11:48:23  3   to approve and hire individuals for assistant manager

11:48:28  4   positions?

11:48:28  5      A.   Yes.

11:48:29  6      Q.   Yes.   You remember that?

11:48:30  7      A.   Yes, I remember.

11:48:31  8      Q.   It was an email that was sent out by him;

11:48:34  9   correct?

11:48:34  10     A.   Yes.

11:48:35  11     Q.   Okay.   Now, when you would visit Ms. Cutchall's

11:48:50  12  store, you would conduct Anytime 5; correct?

11:48:53  13     A.   Yes, sir.

11:48:53  14     Q.   What's Anytime 5?

11:48:55  15     A.   It's a scoring system -- pardon me if I don't

11:48:59  16  recall the exact terminology, because it's been a couple

11:49:01  17  of years I haven't been involved in it.

11:49:04  18          But it was a scoring system to score the store on

11:49:06  19  a 1 to 5 basis, on five particular categories.

11:49:11  20     Q.   Right.   Right.   This would include stuff like

11:49:13  21  schematics?

11:49:13  22     A.   Right.

11:49:14  23     Q.   Making sure all of that was in order; right?

11:49:17  24     A.   Exactly.

11:49:17  25     Q.   You would do the Anytime 5 report; correct?

11:49:19  1     A.   Exactly.

11:49:20  2     Q.   You would say, "Mrs. Cutchall come with me, bring

11:49:23  3  a pad, and let me tell you what I need for you to do in

11:49:26  4  the store"?

11:49:26  5     A.   Right.

11:49:27  6     Q.   And so she would follow behind you and you would

11:49:29  7  read out a list of things that she'd write down;

11:49:32  8  correct?

11:49:32  9     A.   Right.

11:49:33  10    Q.   That's a task list; right?

11:49:35  11    A.   Yes.

11:49:35  12    Q.   Right.  And as you probably remember, she would

11:49:38  13  take that list and tape it up beside her time clock;

11:49:41  14  correct?

11:49:42  15    A.   Or in the office or somewhere.

11:49:44  16    Q.   Somewhere in the office; right.  And then the

11:49:47  17  employees would go and perform those tasks; right?

11:49:49  18    A.   Exactly.

11:49:50  19    Q.   And you would do this on each visit.  You would

11:49:53  20  create a task list --

11:49:53  21    A.   Yes.

11:49:54  22    Q.   -- of things that needed to be done in the store?

11:49:56  23    A.   Yes.

11:49:57  24    Q.   All right.  And you also assigned tasks that came

11:50:05  25  from Mr. Vogt; correct?

11:50:06  1      A.   Yes, sir.

11:50:07  2      Q.   Right.  Now, pull up Exhibit 165, please.  Let me

11:50:23  3  just come up there and show you this.

11:50:31  4      Actually, we have this new-fangled technology

11:50:35  5  here that he's telling me how to use.  This has already

11:50:38  6  been admitted into evidence.

11:50:40  7      This is Plaintiffs' Exhibit 165, another email

11:50:43  8  from Frank Vogt.  This one is around the same time,

11:50:46  9  November 20th, 2002.  So you would have received this

11:50:50 10  email; correct?

11:50:51 11      A.   Yes, sir.  Should have.

11:50:52 12      Q.   Okay.  Says here, he's been getting reports about

11:51:03 13  the Christmas blitz, about the wrong schematics on the

11:51:08 14  shelves.  Do you see that on the first paragraph?

11:51:11 15      A.   Yes, sir, I see it.

11:51:12 16      Q.   And he's instructing you to tell all of the store

11:51:16 17  managers to take down the blue schematics, or the blue

11:51:20 18  label schematics, and put up the red label schematics;

11:51:22 19  right?

11:51:22 20      A.   Yes.

11:51:23 21      Q.   Right.  And then in the next paragraph, he's

11:51:26 22  telling you to tell the store managers that there's a

11:51:30 23  Sponge Bob toy; right?

11:51:32 24      A.   Yes.

11:51:33 25      Q.   This is for some -- I guess for an advertisement

11:51:36  1   and -- he says here that, "the Sponge Bob toy should be

11:51:43  2   left in the back of the store until a particular ad

11:51:46  3   comes out;" right?

11:51:48  4      A.  Yes, sir.

11:51:48  5      Q.  Right.  That's another task that he's just giving

11:51:51  6   you instructions about what you should tell the store

11:51:54  7   managers; right?

11:51:54  8      A.  Correct.

11:51:54  9      Q.  Right.  Now, let's go down to the last paragraph.

11:51:59  10  He's telling you to tell the store employees where they

11:52:04  11  should hang up the five-foot inflatable snowman; right?

11:52:09  12     A.  That's correct.

11:52:10  13     Q.  And where they should put the fiber optic house?

11:52:14  14     A.  Right.

11:52:14  15     Q.  And so there is -- what was Mr. Vogt's position,

11:52:17  16  regional vice-president?

11:52:18  17     A.  Regional vice-president.

11:52:18  18     Q.  And so he would give these detailed instructions

11:52:22  19  to you to tell your store managers; right --

11:52:23  20     A.  Yes, sir.

11:52:23  21     Q.  -- about things that needed to be done in the

11:52:25  22  store?

11:52:25  23     A.  Correct.

11:52:25  24     Q.  And you would pass on those instructions?

11:52:27  25     A.  Yes.

11:52:28  1    Q.   Okay.   Now, do you remember an assistant manager

11:52:48  2   that worked for Ms. Cutchall by the -- her name's Paula?

11:52:54  3    A.   I don't recall the name.   Again, it's been a

11:52:57  4   couple of years, so I don't recall.

11:52:58  5    Q.   Right.   You don't ever remember sitting down with

11:53:02  6   Paula when she was hired and telling Paula in front of

11:53:07  7   Ms. Cutchall that she had the same authority as

11:53:11  8   Ms. Cutchall?

11:53:11  9    A.   No, sir, I don't.

11:53:12  10    Q.   So you're not denying whether that happened or

11:53:15  11   not, you just don't remember?

11:53:17  12    A.   I don't recall it, no.

11:53:18  13    Q.   You don't recall it.   Right.

11:53:35  14        Now, with respect to -- back to the situation on

11:53:38  15   hiring.   Do you recall an incident where an employee for

11:53:44  16   Ms. Cutchall called her a "bitch"?

11:53:48  17    A.   No, sir, I don't.

11:53:49  18    Q.   You don't?

11:53:50  19    A.   I don't.

11:53:51  20    Q.   So you don't recall terminating an employee for

11:53:53  21   that?

11:53:53  22    A.   I don't.

11:53:54  23    Q.   Okay.   So you wouldn't deny that having occurred?

11:54:00  24    A.   I don't recall it.   I don't know that it

11:54:02  25   occurred, no.

11:54:02   1     Q.   Right.  Right.  But you would agree that you had

11:54:11   2   the final authority in terminating employees in

11:54:16   3   Ms. Cutchall's store?

11:54:17   4     A.   For something of that nature, insubordination, it

11:54:22   5   would have been her authority to take care of that.

11:54:24   6     Q.   It would have been her authority --

11:54:26   7     A.   At that point, yes.  If that happened, she could

11:54:29   8   have taken care of it.

11:54:31   9     Q.   And you -- is that based upon Family Dollar

11:54:33   10   policy?

11:54:34   11     A.   It -- for insubordination and theft, the manager

11:54:40   12   has the authority to terminate that person, yes.

11:54:42   13     Q.   But you don't -- so you recall that policy, but

11:54:46   14   you don't -- you don't recall this particular incident?

11:54:49   15     A.   I don't recall that incident happening in that

11:54:51   16   store, no.

11:54:52   17     Q.   So you don't recall Ms. Cutchall calling you up

11:54:56   18   after it occurred, and telling you that this person has

11:55:02   19   been disrespectful to her?

11:55:04   20     A.   I don't recall that, no.

11:55:04   21     Q.   And you don't recall you telling her that you

11:55:09   22   were in the area, and you will be at the store, when

11:55:12   23   does she come on?  She said 2:00 o'clock.  And you said,

11:55:15   24   "I'll be there and talk to her then"?

11:55:18   25     A.   I don't recall it.

11:55:18   1       Q.   And you don't recall arriving at the store before
11:55:22   2   2:00 o'clock and Mrs. Cutchall calling up the employee
11:55:25   3   to come in early, and then you terminated her when she
11:55:30   4   arrived?
11:55:30   5       A.   I don't recall it, no.
11:55:32   6       Q.   Okay.  And you don't recall ever telling
11:55:35   7   Ms. Cutchall during any of these conversations with her
11:55:37   8   that she could "go ahead and terminate the employee,
11:55:40   9   it's your call"?
11:55:41  10       A.   No, sir.  I don't recall.
11:55:43  11       Q.   Okay.  Now, you said when you did the Anytime 5,
11:55:57  12   you would also do the schematics.  That includes office
11:56:01  13   schematics; right?
11:56:03  14       A.   Yes.
11:56:04  15       Q.   And you remember doing the Anytime 5 office
11:56:09  16   schematic check for Ms. Cutchall at one point?
11:56:13  17       A.   I'm sure I did, I don't recall --
11:56:14  18       Q.   Right.
11:56:15  19       A.   -- a specific incident, no.
11:56:16  20       Q.   You don't recall there being a picture of her ten
11:56:21  21   grandchildren on the desk in the store, and you telling
11:56:25  22   her that "this picture does not conform to the office
11:56:29  23   schematic and, therefore, you need to take it home"?
11:56:31  24       A.   No, sir, I don't.
11:56:32  25       Q.   You don't remember that?

11:56:33  1    A.   No.

11:56:34  2    Q.   You don't deny that occurred, you just don't

11:56:37  3    remember?

11:56:37  4    A.   Well, something like that, I would not have told

11:56:39  5    her to take them out.  I mean, that would have not been

11:56:43  6    a reason for her to take them away.

11:56:44  7    Q.   So if Ms. Cutchall said that it happened, you're

11:56:48  8    saying she lied about it?

11:56:49  9    A.   No.  I'm just saying I don't recall it.  But I

11:56:52  10   wouldn't have made her take it out, had I seen it there.

11:56:55  11   Q.   Right.  Right.  Fair enough.  Now, your position

11:57:12  12   now is the project manager for Store Development?

11:57:15  13   A.   Yes, sir.

11:57:16  14   Q.   And you've had that position for two years?

11:57:18  15   A.   Two years, uh-huh.

11:57:19  16   Q.   And you had another position with Family Dollar

11:57:22  17   before that; correct?  before the project manager

11:57:25  18   position?

11:57:25  19   A.   I was a district manager, yes, sir.

11:57:27  20   Q.   You were district manager; right?  Right?

11:57:29  21   A.   Right.

11:57:30  22   Q.   Why did you leave this district manager position

11:57:32  23   to take up this project manager position?

11:57:35  24   A.   I had some inventories that were not up to

11:57:41  25   standard, and I was asked to step down.

11:57:45   1      Q.   Right.  So you had bad inventories in your

11:57:49   2   district; right?

11:57:50   3      A.   I had, yes.

11:57:51   4      Q.   And from your long-time experience as a district

11:57:54   5   manager, you know that usually district managers are

11:57:56   6   fired when they have huge bad inventories; correct?

11:58:00   7      A.   It -- there had been occasions, yes.

11:58:02   8      Q.   Yes.  But you were asked to continue in your

11:58:06   9   employment, just step down from being a district

11:58:08  10   manager?

11:58:08  11      A.   That's correct.

11:58:08  12      Q.   Right.  And when did this happen, 2003?

11:58:13  13      A.   2003, yes.

11:58:14  14      Q.   Right.  And it would have been hard to find

11:58:16  15   another job at that time; right?

11:58:17  16      A.   I'm not sure it would have been -- how much

11:58:23  17   difficulty it would have been.

11:58:24  18      Q.   Because you didn't have to look for one, because

11:58:26  19   Family Dollar gave you an opportunity to continue your

11:58:29  20   livelihood; right?

11:58:30  21      A.   Yes, sir.  At a different place, yes.

11:58:34  22      Q.   At a different place?

11:58:35  23      A.   Yes.

11:58:36  24      Q.   Even though you had all of these bad inventories?

11:58:39  25      A.   Yes.  I had some bad inventories.

| | | |
|---|---|---|
| 11:58:41 | 1 | Q.  Right. |
| 11:58:42 | 2 | A.  Yes. |
| 11:58:42 | 3 | Q.  And you're grateful to Family Dollar for not |
| 11:58:46 | 4 | firing you at that time; right? |
| 11:58:47 | 5 | A.  I am, yes. |
| 11:58:48 | 6 | Q.  Right. |
| 11:59:03 | 7 | MR. JOHNSON:  That's all I have. |
| 11:59:05 | 8 | THE COURT:  Redirect? |
| 11:59:06 | 9 | **REDIRECT EXAMINATION** |
| 11:59:07 | 10 | **BY MR. MAY:** |
| 11:59:09 | 11 | Q.  Mr. Green, were you the district manager over |
| 11:59:18 | 12 | Wilma Cutchall for the whole time she was the store |
| 11:59:21 | 13 | manager? |
| 11:59:21 | 14 | A.  No, sir. |
| 11:59:22 | 15 | Q.  So there were -- if you know, can you tell us if |
| 11:59:27 | 16 | there were other district managers beyond just one |
| 11:59:29 | 17 | other? |
| 11:59:30 | 18 | A.  I've -- don't recall specifically, but I think |
| 11:59:36 | 19 | there was at least two others. |
| 11:59:37 | 20 | Q.  Could the incident about the grandchildren and |
| 11:59:40 | 21 | the pictures been somebody other than you? |
| 11:59:42 | 22 | A.  It could have been, yes. |
| 11:59:43 | 23 | Q.  Now, Mr. Johnson asked if you were grateful to |
| 11:59:49 | 24 | Family Dollar.  Would that gratefulness extend to not |
| 11:59:54 | 25 | telling the straight, honest truth in this court? |

11:59:57  1    A.   Absolutely not.

11:59:58  2    Q.   When you were Ms. Cutchall's district manager,

12:00:07  3    who was responsible for employee discipline in her

12:00:11  4    store?

12:00:11  5    A.   She was responsible.

12:00:14  6    Q.   Now, you've said that you didn't remember the

12:00:21  7    event where an employee allegedly called Ms. Cutchall by

12:00:25  8    a dirty name, or an ugly name, and I think you

12:00:29  9    classified that -- or characterized that as possibly

12:00:34  10   insubordination?

12:00:34  11   A.   Yes, sir.  I don't recall it, no.

12:00:36  12   Q.   With respect to that event -- and I believe you

12:00:45  13   said Ms. Cutchall had the authority to terminate in that

12:00:49  14   event?

12:00:50  15   A.   Yes, sir.

12:00:50  16   Q.   With respect to that event, if Ms. Cutchall had

12:00:53  17   called you and asked you to get involved and deal with

12:00:59  18   it, would you have?

12:01:01  19   A.   Yes, sir.

12:01:03  20   Q.   And there was a question about task lists, or

12:01:11  21   to-do lists when you visited the store left for

12:01:17  22   Ms. Cutchall?

12:01:17  23   A.   Yes.

12:01:18  24   Q.   What did you expect to happen with respect to

12:01:21  25   that?

12:01:21  1      A.  Well, as he mentioned, she would have posted it

12:01:24  2  on the office wall and assigned some of those tasks to

12:01:27  3  different employees.  And there was a time frame that

12:01:32  4  she should complete those things.

12:01:34  5          And then if I was not going to be back there, she

12:01:37  6  would send me an email that she completed the tasks, and

12:01:40  7  at least I would know that they had been done.

12:01:42  8      Q.  Now, I don't want to waste our time by putting

12:01:46  9  some of those slides back up there.  But one of them, I

12:01:51  10  think you were shown, suggested that -- the email

12:01:55  11  suggested that store managers needed to be taking some

12:01:58  12  days off.  Do you think that's a good idea?

12:02:01  13      A.  It is, yes, sir.

12:02:05  14              MR. MAY:  Thank you.

12:02:06  15              MR. JOHNSON:  That's all we have, Your

12:02:08  16  Honor.

12:02:08  17              THE COURT:  All right.  The defendant will

12:02:12  18  call its next witness.

12:02:25  19              MR. MILLER:  Your Honor, Family Dollar calls

12:02:27  20  Steve Schaal.

12:02:34  21              THE COURT:  Is he a rebuttal witness?

12:02:37  22              MR. MILLER:  Yes, Your Honor.  Mr. Schaal

12:02:41  23  was a district manager for Ms. Adams.

12:03:07  24              **STEVE SCHAAL, DEFENDANT'S WITNESS, SWORN,**

12:03:09  25              THE CLERK:  State your name for the record,

12:03:11  1    please.

12:03:13  2                    THE WITNESS:  Steve Schaal.

12:03:21  3                    THE CLERK:  And spell your last name for the

12:03:23  4    record, please.

12:03:24  5                    THE WITNESS:  S-C-H-A-A-L.

12:03:24  6                         **DIRECT EXAMINATION**

12:03:32  7    **BY MR. MILLER:**

12:03:32  8        Q.   Late morning, Mr. Schaal.   Where are you from?

12:03:35  9        A.   Kansas City.

12:03:36 10        Q.   Kansas City?

12:03:39 11        A.   Kansas City, Missouri.

12:03:43 12        Q.   There's a Kansas City, Kansas, also?

12:03:44 13        A.   Kansas City, Kansas and Kansas City, Missouri.

12:03:50 14        Q.   Where do you work?

12:03:51 15        A.   Family Dollar Stores.

12:03:52 16        Q.   And how long did you work for Family Dollar

12:03:53 17    Stores?

12:03:54 18        A.   About twelve-and-a-half years.

12:03:57 19        Q.   And what positions have you worked in with Family

12:04:00 20    Dollar?

12:04:00 21        A.   I was hired as a store manager for about two

12:04:07 22    years; became a district manager; and then kind of had a

12:04:13 23    title change about nine months ago and was called an

12:04:19 24    area operations manager, very similar to a district

12:04:23 25    manager.

12:04:23    1       Q.   Did you have a store manager named Bernice Adams

12:04:28    2   who worked in your district?

12:04:29    3       A.   Yes, I did.

12:04:30    4       Q.   And has your district remained the same during

12:04:34    5   the period you've been there, or has it changed over

12:04:38    6   time?

12:04:38    7       A.   It's changed a lot over time.

12:04:39    8       Q.   And does that mean district -- stores in your

12:04:43    9   district during different time periods?

12:04:44   10       A.   That's correct.

12:04:45   11       Q.   Approximately how many stores were in your

12:04:47   12   district, to the best of your recollection, when

12:04:50   13   Ms. Adams was a store manager?

12:04:52   14       A.   Probably about -- about 24.

12:04:59   15       Q.   And what was the greatest distance between the

12:05:02   16   stores in your district when Ms. Adams was a store

12:05:06   17   manager?

12:05:06   18               MR. CALAMUSA:   Objection, Your Honor.   This

12:05:08   19   isn't rebuttal to Ms. Adams' testimony.

12:05:11   20               THE COURT:   How is this rebuttal?

12:05:15   21               MR. MILLER:   It goes to how much

12:05:17   22   involvement, how often he would have been there, the

12:05:19   23   distance between the stores.

12:05:20   24               THE COURT:   The objection is sustained.

12:05:23   25   BY MR. MILLER:

12:05:25   1    Q.   How often did you visit Mrs. Adams' stores while

12:05:27   2    you were a district manager?

12:05:28   3    A.   Approximately once a month.

12:05:30   4    Q.   And what do you recall about Ms. Adams' position?

12:05:36   5    A.   When I first -- when I first met her, I had taken

12:05:45   6    the district that encompassed Wichita, Kansas and

12:05:50   7    Peoria, Kansas; and her store was in Peoria, Kansas,

12:05:58   8    which we shortly thereafter closed that location.

12:06:02   9         And after that location was closed, she became

12:06:04   10   kind of a troubleshooter for me on that side of the

12:06:08   11   district.  So she worked several different locations on

12:06:12   12   the Kansas side.

12:06:13   13   Q.   When you were Ms. Adams' district manager, could

12:06:18   14   she hire employees in her store?

12:06:20   15   A.   Absolutely, yes.

12:06:22   16   Q.   And what was the process during that time period?

12:06:25   17   A.   When it came to clerks, the standard process, we

12:06:34   18   have a Stanton test, which is a computer survey that

12:06:39   19   they take, and drug screening; and she would do that

12:06:42   20   process and the interview process, and then determine

12:06:46   21   whether to hire that person.

12:06:49   22        The only difference might be if it were an

12:06:52   23   assistant manager, which she would still make the -- do

12:06:57   24   the same things, but it would just be a phone call to

12:07:01   25   me, so I could have a short conversation with that

12:07:03  1   person.  But it was ultimately her decision to hire

12:07:09  2   those people.

12:07:10  3      Q.  Okay.  While you were Ms. Adams' district

12:07:16  4   manager, could she schedule employees?

12:07:18  5      A.  Yes, sir.

12:07:19  6      Q.  And how did that work?

12:07:21  7      A.  At the time, they created a weekly work schedule

12:07:29  8   that was basically a handwritten schedule at that time.

12:07:34  9   And they -- really, the only stipulation would be we

12:07:40  10  tried to have it done by --

12:07:42  11     Q.  Keep your voice up.  I'm sorry.

12:07:44  12     A.  Okay.  By Friday.  So it was posted by Friday

12:07:48  13  before the next week.  But, you know, she would just

12:07:52  14  create the schedule based on what she felt the store

12:07:54  15  needed.

12:07:54  16     Q.  While you were Ms. Adams' district manager, could

12:08:01  17  she evaluate employees?

12:08:03  18     A.  Yes.

12:08:03  19     Q.  What was your role in that process, if any?

12:08:06  20     A.  It was really up to her.  She would do the

12:08:12  21  evaluation of her employees.  At inventory time is

12:08:16  22  usually when we do an evaluation for the whole store,

12:08:20  23  anybody at the location.

12:08:22  24          So the manager would do that evaluation on her

12:08:25  25  assistant and the employees.  And then make those

12:08:29    1    recommendations to me for any pay increase that she

12:08:36    2    would recommend they have.

12:08:38    3        Q.   What weight, if any, would you give to store

12:08:43    4    managers' recommendations?

12:08:44    5        A.   About 99 percent of it was their -- I don't

12:08:50    6    remember ever -- ever disagreeing with -- with the

12:08:52    7    recommended pay increase from Ms. Adams, or any other

12:08:58    8    manager, for that matter.

12:08:59    9        Q.   While you were Ms. Adams' district manager, could

12:09:03   10    she make employee work assignments in her stores?

12:09:07   11        A.   Yes.   That was part of her responsibility was to

12:09:12   12    delegate the work assignments.

12:09:14   13        Q.   Did you ever have bad weather in your districts

12:09:18   14    in Kansas or Missouri?

12:09:28   15        A.   Occasionally, we get tornadoes, ice, snow,

12:09:32   16    everything on occasion, definitely be the case.

12:09:36   17        Q.   What is the store manager's role in the store

12:09:38   18    closing in the event of bad weather in your district?

12:09:43   19        A.   I -- if it -- if the weather becomes a threat,

12:09:48   20    they can -- they can close the store.   And if it's at

12:09:51   21    risk, we need to get the employees at home, I just ask

12:09:54   22    for a phone call so I'm notified that the store will be

12:09:57   23    closing early.

12:09:59   24        Q.   What was -- when Ms. Adams was in your district,

12:10:05   25    could she recommend promotion?

A.   Oh, absolutely.

Q.   And what was her role in that process, or what would her role have been in that process if she had done so?

A.   This may be where she would have a particular, for instance, a cashier, that she felt might be a strong assistant manager candidate.  And she had -- could be through email or phone call, to just let me know if there is a candidate for an assistant manager, whether it be her store or another store.

And so any manager would have that same, you know --

MR. CALAMUSA:   Objection, Your Honor.

THE COURT:   The objection is sustained.

Q.   And what -- what weight, if any, would you have given those recommendations?

A.   A lot of weight.  I mean, it's -- if the manager, you know, feels strongly about that person --

MR. CALAMUSA:   Objection, Your Honor, unless he can give specific examples as to Ms. Adams.  He's talking generalities --

THE COURT:   The objection is sustained.

Q.   Who was responsible -- while Ms. Adams was the store manager in your district, who was responsible for the employee discipline in her store?

12:11:32   1        A.   Ms. Adams would have been.

12:11:34   2        Q.   While Ms. Adams was the store manager in your

12:11:38   3    district, was there a certain number of hours that store

12:11:43   4    managers were expected to work?

12:11:45   5        A.   We -- we -- the company has a guide that says a

12:11:52   6    store manager worked about 50 -- based on a 52-hour

12:11:56   7    program.  That is something that is not put out there

12:12:02   8    that you have to work 52 hours.  That's what the

12:12:07   9    schedule is designed around.

12:12:08   10            I'm not a schedule watcher to know exactly what

12:12:14   11   hours the manager is there, you know.  I look at store

12:12:18   12   conditions and things like that.  So if a manager can do

12:12:21   13   the job in less hours than that, that's great.  You

12:12:25   14   know, if it's more hours than that -- you know, that

12:12:28   15   happens, too, occasionally.

12:12:29   16            But it was based on a 52-hour week, but that

12:12:33   17   wasn't something that was, you know, that we demanded

12:12:38   18   it, to see a schedule at that rate.

12:12:42   19       Q.   While Ms. Adams was a store manager in your

12:12:45   20   district, did you have keys to the stores in your

12:12:48   21   district?

12:12:48   22       A.   No.

12:12:53   23            MR. MILLER:  Thank you, Mr. Schaal.  Please

12:12:57   24   answer their questions.

12:12:58   25                    **CROSS-EXAMINATION**

**BY MR. CALAMUSA:**

12:12:59   1

12:13:01   2   Q.   Is it Schaal?

12:13:06   3   A.   Schaal, yes.

12:13:07   4   Q.   I'm Calamusa.  I want to make sure I get it

12:13:13   5   right.

12:13:14   6        How long were you a district manager?

12:13:16   7   A.   I've been a district manager for about ten years.

12:13:22   8   The new title, Area Operations manager, it's still

12:13:27   9   basically the same as a district manager.  And that's

12:13:30   10  only taken place in the last -- well, since June,

12:13:34   11  beginning of June of '05.

12:13:35   12  Q.   How long were you Ms. Adams' district manager?

12:13:38   13  A.   About two years.

12:13:43   14  Q.   Can you give me the dates in which you served as

12:13:47   15  district manager over a store, or stores, she worked in?

12:13:51   16  A.   No, I could not give you the date.  I could give

12:13:56   17  you approximate times.

12:13:59   18  Q.   Please.

12:14:00   19  A.   It would have been from early '99 to probably

12:14:05   20  early 2001.

12:14:08   21  Q.   Now, you've told us, I believe, and Ms. Adams

12:14:13   22  testified to this, that she was known as a

12:14:14   23  troubleshooter; right?

12:14:16   24  A.   Yeah.  Yes, sir.

12:14:18   25  Q.   And you'd agree that she was a very good

12:14:21  1   employee, wouldn't you?

12:14:22  2       A.   Yeah.   She did a good job.

12:14:24  3       Q.   Hard-working?

12:14:25  4       A.   Yes.

12:14:26  5       Q.   Dedicated?

12:14:27  6       A.   Yes.

12:14:28  7       Q.   Okay.   And as a troubleshooter, she bounced from

12:14:32  8   store to store; right?

12:14:34  9       A.   That's correct.

12:14:35  10      Q.   And it was probably, what, four months, I

12:14:38  11  believe, the longest that she was ever in a store?   Does

12:14:42  12  that sound about right to you?

12:14:43  13      A.   I don't recall.   She was at several stores, I

12:14:52  14  recall that.   I don't recall how long she would have

12:14:55  15  been in a particular store.

12:14:56  16      Q.   But you wouldn't dispute, right, as a

12:15:00  17  troubleshooter, moving from store to store that had

12:15:02  18  problems, she'd go to that store, stay for about four

12:15:05  19  months, sometimes longer, sometimes less; and then to

12:15:09  20  another one and do it?

12:15:10  21      A.   That would sound about right.

12:15:13  22      Q.   You also would agree because she was a hard

12:15:16  23  worker, she knew the policies, too, didn't she, of the

12:15:18  24  company?

12:15:19  25      A.   As far as -- yeah, for the most part, yes.

12:15:23  1    Q.   You talked about recommending promotions, and I'm

12:15:36  2    sitting there listening and you were talking in

12:15:38  3    generalities.

12:15:38  4         So I want to know, can you give me specific names

12:15:41  5    of individuals that she recommended to you to promote?

12:15:45  6    A.   I can't recall specifically --

12:15:54  7    Q.   Okay.

12:15:55  8    A.   -- with her, no.

12:15:56  9    Q.   So when you were talking in generalities about

12:15:58  10   recommending things to you for promotion, you would

12:16:01  11   agree that all she was doing and all she had the

12:16:04  12   authority to do, was recommend; correct?

12:16:08  13   A.   No.  She could -- I mean, she could recommend --

12:16:20  14   she could recommend to me if she thought someone would

12:16:24  15   be a good assistant manager --

12:16:25  16   Q.   Yes.

12:16:25  17   A.   -- possibly, and that may indicate it could be in

12:16:30  18   a different location.

12:16:31  19        Now, if she has an assistant manager, a candidate

12:16:34  20   for her own store that she was at, you know, she could

12:16:41  21   put that person -- put that person in that position.

12:16:44  22   Q.   She could promote that person to the assistant

12:16:46  23   manager without you approving it?

12:16:47  24   A.   Yes.  The only thing that we ask is that I speak

12:16:51  25   to that person.

12:16:51   1      Q.   Mr. Schaal, you testified earlier that she would

12:16:56   2   recommend and you would have to approve; right?   Any

12:17:01   3   assistant manager, third key or second assistant, isn't

12:17:04   4   it the policy of this company that you have to approve

12:17:07   5   those individuals to be hired and/or promoted?

12:17:09   6      A.   No.   I -- I do not make that final decision.   I

12:17:13   7   am a part of that process.

12:17:14   8      Q.   Do you know who Bruce Barkus is?

12:17:17   9      A.   Yes, I do.

12:17:18  10      Q.   And he was executive vice-president of Store

12:17:22  11   Operations?

12:17:22  12      A.   Yes.

12:17:23  13      Q.   Are you aware of him setting policy that says,

12:17:29  14   for an assistant manager, a second assistant, or a third

12:17:32  15   key, that a store manager cannot promote or hire; that

12:17:36  16   that only goes to the district manager for approval and

12:17:39  17   final decision?

12:17:43  18      A.   I don't recall that.   I mean, I can tell you the

12:17:46  19   way I have done it in my twelve years I have been a part

12:17:51  20   of -- a part of the process, but it's the manager's

12:17:56  21   discretion.

12:17:56  22      Q.   Number 10, please.

12:17:58  23           You're part of the process --

12:17:59  24              THE COURT:   The way you've done it, it's

12:18:01  25   been the manager's discretion to hire or not to hire,

12:18:04   1   but the district manager did not have to approve of it?

12:18:08   2          THE WITNESS:  Yes, sir, Your Honor, that's

12:18:11   3   correct.

12:18:11   4          THE COURT:  All right.

12:18:11   5          THE WITNESS:  We were just simply a part of

12:18:13   6   it, Your Honor.

12:18:14   7   BY MR. CALAMUSA:

12:18:14   8      Q.  But you would agree that you can't sit here today

12:18:18   9   and name for me anyone that Ms. Adams hired on her own,

12:18:24  10   or promoted to assistant manager, second assistant, or

12:18:30  11   third key; right?

12:18:31  12      A.  I do not recall anybody.

12:18:33  13      Q.  Let me help you out with the policy, sir.  That's

12:18:36  14   an email that's previously into evidence as exhibit --

12:18:39  15   Plaintiffs' Exhibit Number 10, I believe.  It is an

12:18:45  16   email from Bruce Barkus, February 20th of 2003.  Do you

12:18:49  17   see that?

12:18:49  18      A.  Yes, sir.

12:18:50  19      Q.  And during that time period, you were, in fact, a

12:18:55  20   district manager; right?

12:18:55  21      A.  That is correct.

12:18:57  22      Q.  And at the very bottom, before Dan blew it up,

12:19:02  23   he's a step ahead of me -- it says copy to -- "CC to

12:19:06  24   district manager"; right?

12:19:07  25      A.  That's correct.

| | | |
|---|---|---|
| 12:19:07 | 1 | Q. And that would have been you? |
| 12:19:14 | 2 | A. Right. |
| 12:19:15 | 3 | Q. And you would have received this? |
| 12:19:17 | 4 | A. It would have come to me. |
| 12:19:18 | 5 | Q. And you understand who Mr. Barkus is, and you |
| 12:19:21 | 6 | understand, don't you, Mr. Schaal, that this is a policy |
| 12:19:25 | 7 | of the company? |
| 12:19:26 | 8 | A. Yeah. I'm trying to read it here. |
| 12:19:32 | 9 | Q. Sure, please. Let me help you. First paragraph, |
| 12:19:38 | 10 | third sentence: "I want to remind you that it is the |
| 12:19:41 | 11 | policy of Family Dollar that district managers interview |
| 12:19:45 | 12 | all assistant manager candidates, whether newly hired or |
| 12:19:49 | 13 | internal promotion candidates." You understood that was |
| 12:19:51 | 14 | the policy? |
| 12:19:52 | 15 | A. That -- that would be correct. |
| 12:19:54 | 16 | Q. And you, in fact, did that. You interviewed |
| 12:19:57 | 17 | every assistant manager candidate; correct? |
| 12:20:02 | 18 | A. That is correct. |
| 12:20:03 | 19 | Q. All right. Now, next -- let's look at the next |
| 12:20:09 | 20 | paragraph. It says: "The purpose of the memo is to |
| 12:20:11 | 21 | restate this policy so everyone fully understands." |
| 12:20:17 | 22 | Again, Mr. Schaal, you agree with us -- me -- |
| 12:20:21 | 23 | that this was the policy of the company that's stated |
| 12:20:24 | 24 | forth here, and he's restating the policy; right? |
| 12:20:27 | 25 | A. Correct. |

12:20:27  1    Q.  "Any store manager, assistant manager, or any

12:20:30  2  other associate whom the store manager has recommended

12:20:35  3  to carry keys to a Family Dollar Store, must be approved

12:20:38  4  in person by the district manager prior to being hired,

12:20:42  5  promoted, and/or given keys to the store.  Violation of

12:20:47  6  this policy is a serious infraction and may result in

12:20:51  7  disciplinary action up to and including possible

12:20:54  8  termination."  Did I read that right?

12:20:57  9    A.  Yes, sir.

12:20:58  10    Q.  That's the policy; correct?

12:21:00  11    A.  That -- that is what this says.

12:21:06  12    Q.  And on these candidates that were promoted, you

12:21:11  13  had met all of them, hadn't you?

12:21:13  14    A.  Yes.

12:21:13  15    Q.  Okay.  Even though you don't remember any

12:21:16  16  specifics for me, but you had met them all, and you

12:21:19  17  were, in fact, interviewing them, and you were, in fact,

12:21:21  18  approving them, were you not; just like the policy says?

12:21:26  19    A.  I don't know if I'd say -- and I -- I understand

12:21:31  20  what this says, but I -- in my time of doing this, it

12:21:41  21  has always just been a -- a conversation --

12:21:45  22    Q.  I want to know about Ms. Adams, specifically to

12:21:48  23  Ms. Adams.  That's what you're here for, to tell us and

12:21:51  24  rebut her testimony.

12:21:52  25         Is there an occasion in which Ms. Adams has

12:21:56  1   promoted or hired an assistant manager without your

12:21:59  2   approval?

12:21:59  3       A.  I -- I don't recall.

12:22:03  4       Q.  Thank you.  Now, two final points, I think.  You

12:22:09  5   said evaluations.

12:22:13  6           You, as a district manager for any evaluation

12:22:17  7   Ms. Adams did, you had to review it and sign it as well;

12:22:21  8   correct?  That's the evaluation process?

12:22:27  9       A.  On an employee's evaluation -- I'm trying to

12:22:35  10  recall what it says.  But the manager -- the manager is

12:22:38  11  the one that fills out the evaluation and signs it,

12:22:43  12  along with the employee.

12:22:44  13      Q.  And there's also a blank for the DM to sign?

12:22:49  14      A.  I'm just --

12:22:51  15      Q.  And evaluations are done at inventory time;

12:22:55  16  correct?

12:22:55  17      A.  That's correct.

12:22:55  18      Q.  And you're present for inventory?

12:22:57  19      A.  That's correct.

12:22:58  20      Q.  And you observe the employees?

12:22:59  21      A.  That's correct.

12:23:00  22      Q.  And when you visit the store, you observe

12:23:02  23  employees as well; right?

12:23:03  24      A.  That's correct.

12:23:04  25      Q.  Pay raises.  You are the individual who approves

| | | |
|---|---|---|
| 12:23:11 | 1 | pay raises; correct? |
| 12:23:12 | 2 | A.  I -- I -- I input the pay raises. |
| 12:23:17 | 3 | Q.  You approve the pay raises, Mr. Schaal. |
| 12:23:20 | 4 | A.  Yeah.  I would approve and then put the pay raise |
| 12:23:24 | 5 | based on the manager's recommendation. |
| 12:23:26 | 6 | Q.  Are you aware of any instance in which Ms. Adams |
| 12:23:30 | 7 | gave somebody a pay raise without your approval? |
| 12:23:33 | 8 | A.  Specific to Ms. Adams, I don't recall. |
| 12:23:36 | 9 | Q.  Are you aware of any instance in which Ms. Adams |
| 12:23:40 | 10 | violated company policies, regarding hiring, firing, |
| 12:23:46 | 11 | discipline, pay raises, evaluations -- |
| 12:23:51 | 12 | A.  No. |
| 12:23:51 | 13 | Q.  -- store closing procedures, how to handle |
| 12:23:54 | 14 | paperwork? |
| 12:23:56 | 15 | A.  No, sir. |
| 12:23:57 | 16 | Q.  Did Ms. Adams follow the company policies, and |
| 12:24:02 | 17 | was a good employee of Family Dollar; correct? |
| 12:24:05 | 18 | A.  Yes. |
| 12:24:06 | 19 | Q.  Paycheck.  Store manager's paychecks say 48 |
| 12:24:15 | 20 | hours, don't they? |
| 12:24:16 | 21 | A.  I believe that's correct, yes. |
| 12:24:20 | 22 | Q.  Okay.  Thank you. |
| 12:24:21 | 23 | MR. CALAMUSA:  One second, Your Honor. |
| 12:24:30 | 24 | Q.  Do you know what the Strands are? |
| 12:24:32 | 25 | A.  Yes, sir. |

12:24:32   1        Q.   What are they?

12:24:35   2        A.   They're training --

12:24:36   3               THE COURT:  Isn't this beyond the scope?

12:24:41   4               MR. CALAMUSA:  Well, I'm about to show him a

12:24:43   5   Strand that talks about employee referrals, Your Honor,

12:24:45   6   and it has a thing at the bottom.

12:24:46   7               THE COURT:  All right.

12:24:47   8               MR. CALAMUSA:  I wanted to set it up and

12:24:49   9   make sure he knew --

12:24:51  10   BY MR. CALAMUSA:

12:24:51  11        Q.   You know what the Strands are, don't you?

12:24:52  12        A.   Yes, I do.

12:24:53  13        Q.   Let me show you a page out of the Strands, and

12:24:56  14   it's Bates numbered D14379, regarding employee

12:25:04  15   referrals.  You see that?

12:25:06  16        A.   Yes.

12:25:07  17        Q.   Read the last sentence, please.

12:25:11  18        A.   "Decision to hire based on qualifications remains

12:25:15  19   with the district manager."

12:25:17  20               MR. CALAMUSA:  Thank you, Mr. Schaal.

12:25:26  21               THE COURT:  Redirect?

12:25:27  22               MR. MILLER:  Nothing further, sir.

12:25:28  23               THE COURT:  Thank you, sir.

12:25:29  24               MR. MILLER:  May this witness be excused?

12:25:32  25               THE COURT:  Yes.  He may be excused.

| | | |
|---|---|---|
| 12:25:35 | 1 | MR. MILLER:  Thank you. |
| 12:25:36 | 2 | THE COURT:  Defendant will call another |
| 12:25:38 | 3 | witness. |
| 12:25:39 | 4 | MR. KALLON:  Your Honor, can we get a lunch |
| 12:25:42 | 5 | break? |
| 12:25:42 | 6 | THE COURT:  Yeah, when I say so. |
| 12:25:44 | 7 | MR. KALLON:  Okay.  We call plaintiff |
| 12:25:50 | 8 | Barbara Richardson. |
| 12:25:55 | 9 | THE COURT:  I say so, ladies and gentlemen. |
| 12:25:59 | 10 | Ms. Richardson may take some time. |
| 12:26:02 | 11 | Let's go to lunch, please.  Don't discuss |
| 12:26:04 | 12 | the case.  Don't make up your mind, and have a good |
| 12:26:08 | 13 | lunch.  Be back by 1:30. |
| 12:26:19 | 14 | (Lunch recess from 12:20 p.m. until 1:30 p.m.) |
| 12:26:34 | 15 | (In open court, jury not present.) |
| 12:26:34 | 16 | THE COURT:  Anything we need to take up |
| 12:26:35 | 17 | while the jury's out? |
| 12:26:36 | 18 | MR. KALLON:  Yes, Your Honor.  I want to |
| 12:26:40 | 19 | give you advance notice.  I think we're down to, at |
| 12:26:45 | 20 | most, two, but probably one, unless I rethink it, live |
| 12:26:50 | 21 | witness for the day.  The rest of our case will be |
| 12:26:54 | 22 | whatever plaintiffs will show up.  I think there's only |
| 12:26:59 | 23 | one here today and that's Ms. Richardson. |
| 12:27:03 | 24 | To fill in the time, if Your Honor wants us |
| 12:27:05 | 25 | to, we may introduce some other testimony by deposition |

12:27:09   1   from plaintiff.  But I think we're coming down, again --

12:27:14   2   speaking out of turn, I need to consult with my

12:27:16   3   colleagues -- but for this afternoon, we had planned to

12:27:19   4   specifically call adverse plaintiffs.

12:27:20   5            THE COURT:  Well, Mr. Kallon, you probably

12:27:22   6   remember from your days as my law clerk, I don't like to

12:27:25   7   have depositions read right after lunch.

12:27:27   8            MR. KALLON:  I understand that, Your Honor.

12:27:30   9       We will call Ms. Richardson live after lunch.

12:27:32  10   But I don't believe -- I think the other plaintiffs will

12:27:35  11   not get here --

12:27:36  12            THE COURT:  Are any of the other plaintiffs

12:27:38  13   available, live plaintiffs?

12:27:41  14            MR. R. WIGGINS:  No, sir.

12:27:42  15            THE COURT:  All right.

12:27:45  16            MR. KALLON:  I just wanted you to know that,

12:27:47  17   Your Honor.  But I think the end from our side is

12:27:52  18   coming.  Hopefully you will appreciate that and keep

12:27:55  19   that in mind this afternoon.

12:27:56  20            THE COURT:  What?

12:27:59  21            MR. MAY:  How we going to end it?

12:28:02  22            MR. KALLON:  That's what I'm saying to the

12:28:04  23   Judge.  The end will be to the plaintiffs that we can

12:28:07  24   get here tomorrow.

12:28:07  25            THE COURT:  Yes.

| | | |
|---|---|---|
| 12:28:08 | 1 | MR. KALLON:  So please keep that in mind. |
| 12:28:10 | 2 | THE COURT:  Right.  What we'll do is when we |
| 12:28:12 | 3 | finish with the live witnesses here, Ms. Richardson, |
| 12:28:16 | 4 | then you will begin reading the deposition testimony. |
| 12:28:20 | 5 | MR. KALLON:  Yes, Your Honor. |
| 12:28:21 | 6 | THE COURT:  And if we finish up with that, |
| 12:28:24 | 7 | then the plaintiffs will go on with their rebuttal; and |
| 12:28:37 | 8 | then we'll take the -- your remaining witness or |
| 12:28:40 | 9 | witnesses out of turn tomorrow morning. |
| 12:28:43 | 10 | MR. R. WIGGINS:  When will we start, Judge? |
| 12:28:45 | 11 | I didn't catch that. |
| 12:28:46 | 12 | THE COURT:  Pardon me? |
| 12:28:47 | 13 | MR. R. WIGGINS:  When did you say we will |
| 12:28:48 | 14 | start? |
| 12:28:49 | 15 | THE COURT:  Well, if the defendant finishes |
| 12:28:53 | 16 | with Ms. Richardson and its deposition testimony this |
| 12:28:58 | 17 | evening, you'll start this evening. |
| 12:29:01 | 18 | MR. R. WIGGINS:  Okay.  Steve Phillips, is |
| 12:29:03 | 19 | he testifying?  He's on the list for today. |
| 12:29:05 | 20 | MR. KALLON:  That's why I say I'll consult |
| 12:29:07 | 21 | with my colleagues.  We have one, maybe two witnesses at |
| 12:29:10 | 22 | most.  But we may very well have Ms. Richardson. |
| 12:29:13 | 23 | MR. R. WIGGINS:  We ask that Steve Phillips |
| 12:29:15 | 24 | remain, because we may call him. |
| 12:29:17 | 25 | MR. KALLON:  He's not here right now.  You |

12:29:20  1    can go get him in the courtroom if he's here.

12:29:22  2              MR. R. WIGGINS:  He's on today's list.  We

12:29:24  3    were told he was going to be a witness today.

12:29:26  4              THE COURT:  Well, if he's not here, I don't

12:29:28  5    know if there's anything we can do about that.

12:29:30  6              MR. R. WIGGINS:  Oh, he's in Tuscaloosa,

12:29:31  7    Your Honor.

12:29:32  8              THE COURT:  He is?

12:29:32  9              MR. R. WIGGINS:  Yes, sir.

12:29:36  10             THE COURT:  All right.  Well, if he's here,

12:29:39  11   if he's in Tuscaloosa, defendant will make him

12:29:45  12   available.

12:29:47  13             Anything else, Mr. White?

12:29:50  14             MR. WHITE:  Would you like to take up the

12:29:52  15   matter on the document now or wait --

12:29:54  16             THE COURT:  No, let's take it up now.

12:29:56  17             MR. WHITE:  That way you have a nice lunch,

12:29:59  18   maybe.

12:30:00  19             Your Honor, during the testimony of

12:30:03  20   Ms. Breaux, I -- she was asked both by the Court,

12:30:08  21   without objection by the plaintiff, and then

12:30:12  22   subsequently followed up by the plaintiffs, a line of

12:30:16  23   inquiry about a lack of any documentation related to

12:30:20  24   plaintiff Pellegrin's --

12:30:22  25             THE COURT:  Let me correct it this way:  The

12:30:26 1 question put to her was whether she, whether she had

12:30:29 2 made any documents.

12:30:33 3        MR. WHITE:  Well, that's where I'm headed.

12:30:40 4 If it's a question of authenticity, and I've got to

12:30:40 5 bring somebody down from Charlotte to do that, I thought

12:30:43 6 it was covered pretrial.  This is a part of a personnel

12:30:46 7 file the plaintiff has been produced forever,

12:30:48 8 relating --

12:30:49 9        THE COURT:  But she said, as I recall, she

12:30:52 10 said that she had not created any such document.

12:30:55 11        MR. WHITE:  That is correct, Your Honor.

12:30:57 12 But she got on cross-examination, inquiries about, does

12:31:03 13 such documentation exist?  And that's what opened the

12:31:07 14 door.  Is there any documentation on this?  And that's

12:31:12 15 where -- that's where the door got opened by the

12:31:15 16 plaintiffs.

12:31:16 17        And so, all I was going to do, Judge, I was

12:31:18 18 merely going to approach her and show her the exhibit,

12:31:23 19 represent what it was, and then merely move its

12:31:27 20 admission.

12:31:28 21        THE COURT:  Okay.

12:31:29 22        MR. CALAMUSA:  Your Honor, what was asked of

12:31:30 23 her was, in her twelve times visiting his store, did she

12:31:33 24 have ever document any of this situation.  The document

12:31:37 25 he's trying to enter into evidence is a PAF entered by

12:31:42  1    Mark Garris.  She wasn't even the acting DM, assistant

12:31:47  2    DM, nothing.  She had her own district.

12:31:49  3             This is a document by Mr. Garris that

12:31:51  4    basically notes Mr. Pellegrin's discharge.  This witness

12:31:54  5    had nothing to do with it.

12:31:56  6             MR. WHITE:  Your Honor --

12:31:56  7             THE COURT:  That was my understanding.

12:31:58  8             MR. WHITE:  -- but, Your Honor, Mr. Garris

12:31:59  9    is deceased.  That is an official business record of

12:32:02  10   Family Dollar.

12:32:04  11            Now, they -- they're the ones that argue --

12:32:06  12   may I have my exhibit back?  Identifying for the record,

12:32:11  13   Exhibit Number 0954, Your Honor, which clearly shows

12:32:18  14   unacceptable store conditions.

12:32:19  15            I went back and looked at what Mr. Pellegrin

12:32:22  16   testified on direct, and he -- great lengths by his

12:32:25  17   counsel, about 90 percent of the time he was working on

12:32:28  18   that store, making sure it was clean, washing windows,

12:32:31  19   cleaning bathrooms, doing all those things.  90 percent

12:32:34  20   of his time.

12:32:35  21            And I think we would be entitled merely to

12:32:38  22   offer that exhibit through that witness in view of their

12:32:40  23   cross.  I would offer it as a Court's Exhibit.

12:32:43  24            THE COURT:  All right.  It will be marked

12:32:45  25   and received in evidence -- and received -- not in

12:32:50   1    evidence, but received as an offer of proof, and it will

12:32:54   2    be a part of the record.

12:32:55   3                MR. WHITE:   If you have a lunch, I can bring

12:32:59   4    it back up again.

12:33:02   5                THE COURT:   No, don't bring it back up.

12:33:04   6                MR. G. WIGGINS:   Your Honor, there's one

12:33:05   7    other issue I would like the Court to address.   On the

12:33:09   8    reading of the depositions, are they going to be allowed

12:33:11   9    to read the entire deposition in the record, are they

12:33:13   10   going to be allowed to pick?   And if they're going to be

12:33:16   11   allowed to pick, can we get advanced notice of what

12:33:19   12   they're going to pick?

12:33:20   13               THE COURT:   Well, what's your intention?

12:33:22   14               MR. KALLON:   Your Honor, I just want to

12:33:24   15   remind you -- I think we will not read the entire

12:33:27   16   deposition.   I mean --

12:33:28   17               THE COURT:   These will be depositions of --

12:33:31   18               MR. KALLON:   These are depositions of

12:33:33   19   plaintiffs.

12:33:33   20               THE COURT:   I see.   Well, you can pick.

12:33:36   21               MR. KALLON:   We filed a motion for trial

12:33:38   22   plan asking the Court to allow both sides, I think, a

12:33:41   23   week or two before trial to list depositions.   And they

12:33:44   24   opposed them.

12:33:46   25               And Your Honor denied our motion to that.

| | | |
|---|---|---|
| 12:33:49 | 1 | And you did.  It's on the record. |
| 12:33:52 | 2 | MR. R. WIGGINS:  Your Honor, your ruling on |
| 12:33:53 | 3 | that -- |
| 12:33:54 | 4 | THE COURT:  You're winning on this one, |
| 12:33:58 | 5 | Mr. Kallon. |
| 12:33:59 | 6 | MR. ST. CLAIR:  I keep trying to teach him, |
| 12:34:03 | 7 | Your Honor. |
| 12:34:05 | 8 | One final issue. |
| 12:34:06 | 9 | MR. R. WIGGINS:  Could I be heard on that |
| 12:34:08 | 10 | issue? |
| 12:34:08 | 11 | MR. ST. CLAIR:  I'm sorry. |
| 12:34:11 | 12 | MR. R. WIGGINS:  Your ruling at the first |
| 12:34:12 | 13 | trial, Judge, was that they could put depositions in |
| 12:34:15 | 14 | that would go to the jury room, but they would not be |
| 12:34:17 | 15 | read. |
| 12:34:19 | 16 | Now, are we going to start reading them? |
| 12:34:21 | 17 | That's not what we did. |
| 12:34:22 | 18 | THE COURT:  Yeah.  If you read a deposition, |
| 12:34:25 | 19 | that deposition is not going into the jury room. |
| 12:34:31 | 20 | MR. ST. CLAIR:  We have our choice, whether |
| 12:34:32 | 21 | to read it or mark it as an exhibit? |
| 12:34:34 | 22 | THE COURT:  Yes. |
| 12:34:36 | 23 | MR. R. WIGGINS:  We need to know the pages, |
| 12:34:37 | 24 | Your Honor, if they're not reading the whole -- |
| 12:34:39 | 25 | THE COURT:  You'll know the pages.  You will |

12:34:41  1   get to read whatever pages you want to read after they

12:34:44  2   finish.

12:34:45  3              MR. R. WIGGINS:  May we request we be told

12:34:48  4   in advance so we'll know which ones -- all right.

12:34:52  5              THE COURT:  All right.  Tell us which

12:34:54  6   depositions --

12:34:55  7              MR. ST. CLAIR:  I gave them a list last

12:34:56  8   night.

12:34:56  9              THE COURT:  Tell me the ones you plan to

12:34:59 10   read into evidence this afternoon.  Yeah, you're going

12:35:02 11   to know before we leave here.  We're going to know what

12:35:06 12   deponents you're going to read today.

12:35:09 13              MR. ST. CLAIR:  Today?  It's the same list I

12:35:15 14   gave them yesterday even, Your Honor.  Angela Alexander;

12:35:20 15   Krista Allen; Harvey Attaway; Cheryl Backus; Suzette

12:35:25 16   Barbe; Deloris Barber; Charles Bennett; Porfiorio

12:35:32 17   Berrios; Julie Blakeney; Katherine Bracey; Tyrus Bremer;

12:35:40 18   Judy Brown; Thomas Brown; Dianne Brown-Owens, and Earl

12:35:46 19   Butler.

12:35:48 20              MR. CALAMUSA:  What were those last ones?

12:35:50 21   They were not provided.  From Tom Brown now was not

12:35:53 22   provided.

12:35:54 23              MR. ST. CLAIR:  Well, Mr. Butler is one of

12:35:56 24   the eight, Your Honor, that we requested to be brought

12:35:59 25   here live.  And so included among those that we might

12:36:02  1   read are those eight -- let's see -- the eight

12:36:07  2   plaintiffs we wanted, only two are going to be here.  So

12:36:10  3   the other six that we requested live, we may read from

12:36:14  4   those as well.

12:36:15  5              THE COURT:  Sure.  All right.

12:36:17  6              MR. ST. CLAIR:  One final point, Your Honor.

12:36:19  7   We've -- counsel have been cooperating and exchanging

12:36:23  8   nightly the names of the witnesses they plan to call the

12:36:26  9   next day.

12:36:26  10              THE COURT:  Yes, sir.

12:36:28  11              MR. ST. CLAIR:  We've not been -- they

12:36:30  12   probably didn't expect to call any witnesses today, but

12:36:32  13   now it appears they may.

12:36:34  14              THE COURT:  Now it appears they may not,

12:36:36  15   after all these depositions.

12:36:38  16              MR. ST. CLAIR:  Some of them will be very

12:36:40  17   short.

12:36:40  18              THE COURT:  All right.

12:36:42  19              MR. ST. CLAIR:  But I think it's only fair

12:36:43  20   that we get notice now about any -- the rebuttal

12:36:47  21   witnesses that they plan to call.

12:36:49  22              MR. R. WIGGINS:  I don't think they're going

12:36:50  23   to be that short, Judge, because they can't pick and

12:36:53  24   choose in the deposition.  We're going to have to read

12:36:55  25   the rest that he leaves out.

12:36:56   1          THE COURT:  You will have today to read all

12:36:57   2   the rest of it?  No, you don't.

12:36:59   3          MR. R. WIGGINS:  We're going to be -- try to

12:37:01   4   be judicious.  We don't even know what pages they want

12:37:04   5   to read.  We don't know --

12:37:06   6          MR. G. WIGGINS:  Based on what they just

12:37:07   7   indicated, some of them are going to be very short.

12:37:09   8   Obviously, they know the pages now.  I don't see the

12:37:11   9   harm in them turning over the pages to us so we can cut

12:37:15  10   ours down also.

12:37:17  11          THE COURT:  Well, here's what I'm going to

12:37:19  12   do:  I'm going to require you, the defendant, to tell

12:37:25  13   the plaintiffs' lawyers before you leave out of here,

12:37:28  14   the order in which you intend to read the depositions.

12:37:32  15          MR. ST. CLAIR:  Okay.  Fair enough, Your

12:37:33  16   Honor.

12:37:33  17          THE COURT:  All right.  Thank you.  Off the

12:37:33  18   record.

12:38:41  19       (Lunch recess from 12:38 p.m. until 1:30 p.m.)

13:45:40  20          (In open court, jury present.)

13:45:40  21          THE COURT:  Defendant will call its next

13:45:45  22   witness.

13:45:46  23          MR. KALLON:  Your Honor, we call Ms. Barbara

13:45:48  24   Richardson.

13:45:50  25          **BARBARA G. RICHARDSON, DEFENDANT'S WITNESS,**

13:45:53  1   Having been sworn, testified as follows:

13:45:53  2                  THE CLERK:  State your name for the record,

13:45:55  3   please.

13:45:55  4                  THE WITNESS:  Barbara G. Richardson.

13:45:59  5                  THE CLERK:  Spell your last name.

13:46:00  6                  THE WITNESS:  R-I-C-H-A-R-D-S-O-N.

13:46:03  7                          **DIRECT EXAMINATION**

13:46:04  8   **BY MR. KALLON.**

13:46:05  9       Q.  Mrs. Richardson, good afternoon to you again.

13:46:08  10      A.  Excuse me?

13:46:09  11      Q.  I said, good afternoon, ma'am.

13:46:11  12      A.  Good afternoon.

13:46:12  13      Q.  Mrs. Richardson, you are a plaintiff in this

13:46:14  14   case?

13:46:14  15      A.  Yes.

13:46:15  16      Q.  You were hired by Family Dollar in 1994; is that

13:46:18  17   correct?

13:46:18  18      A.  Correct.

13:46:19  19      Q.  And you eventually became a store manager;

13:46:23  20   correct?

13:46:23  21      A.  No.  Cashier first.

13:46:25  22      Q.  I know that.  I'm sorry, I was speeding things

13:46:28  23   up.  You eventually became a store manager at some

13:46:30  24   point; correct?

13:46:31  25      A.  Yes, I did.

13:46:31  1   Q.  And then you stepped down from the store

13:46:33  2   manager's position sometime in 2001?

13:46:36  3   A.  Yes.

13:46:36  4   Q.  Okay.  You've not been here, but both sides have

13:46:42  5   established that there are three -- there are two

13:46:46  6   different tests to determine if someone's exempt from

13:46:49  7   overtime.

13:46:50  8       You left before 2000 -- I'm sorry.  You left in

13:46:55  9   2001; correct?

13:46:56  10  A.  Yes.

13:46:57  11  Q.  So the test that applies to you is the one before

13:47:00  12  August of 2004 then; correct?

13:47:05  13  A.  I guess it would be.

13:47:08  14  Q.  All right.  And I'll come back to that.  Let me

13:47:13  15  back up now.  And you were telling me earlier you were

13:47:16  16  hired in as a cashier; correct?

13:47:17  17  A.  Yes, I were.

13:47:18  18  Q.  And prior to being hired, you would shop at the

13:47:24  19  store; correct?

13:47:25  20  A.  The one in -- Demopolis store.

13:47:28  21  Q.  And you developed a relationship with one of the

13:47:31  22  employees of that store named Mrs. Diane Agee?

13:47:34  23  A.  Yes.

13:47:34  24  Q.  And at some point, Ms. Agee became a store

13:47:38  25  manager?

13:47:38   1      A.   Yes, she did.

13:47:39   2      Q.   And in the course of -- did she become a store

13:47:44   3   manager in Demopolis?

13:47:46   4      A.   In Demopolis.

13:47:47   5      Q.   And were you hired for the Demopolis store?

13:47:51   6      A.   I was hired in Eutaw.

13:47:53   7      Q.   And who hired you?

13:47:54   8      A.   Dianne Agee.

13:47:56   9      Q.   And in the course of shopping at the Family

13:47:59  10   Dollar, you told Ms. Agee that you were interested in a

13:48:03  11   job; correct?

13:48:04  12      A.   Yes, I did.

13:48:05  13      Q.   And about a month later, she called you and told

13:48:08  14   you to come in?

13:48:09  15      A.   Yes.

13:48:10  16      Q.   And she gave you what you guys called the Stanton

13:48:15  17   survey?

13:48:15  18      A.   Well, I filled the application out first.

13:48:17  19      Q.   Yes, ma'am.  I'm sorry.  You filled out the

13:48:20  20   application; correct?

13:48:21  21      A.   Correct.

13:48:22  22      Q.   Did she interview you at that point or

13:48:24  23   afterwards?

13:48:24  24      A.   She interviewed me after I did the Stanton.

13:48:27  25      Q.   Okay.  You took the Stanton.  It's not a test you

13:48:31  1   can study for, is it?

13:48:32  2       A.   No.

13:48:33  3       Q.   It's a very simple, basic straightforward exam;

13:48:36  4   correct?

13:48:37  5       A.   Well, for some people, yeah.

13:48:38  6       Q.   All it asks you is integrity-type questions;

13:48:42  7   correct?

13:48:42  8       A.   Correct.

13:48:43  9       Q.   And after you, I guess, passed the Stanton, what

13:48:48  10  was the next step in your hire?

13:48:50  11      A.   Well, I passed the Stanton, she called me the

13:48:55  12  same night I passed the Stanton and she told me that she

13:48:59  13  had talked to her DM, and her DM told her to go ahead

13:49:02  14  and hire me, because my test scores were real high.

13:49:05  15      Q.   Okay.  Now, back up for a minute now.  Before the

13:49:09  16  hiring phase, Ms. Agee interviewed you; correct?

13:49:13  17      A.   Yes.

13:49:13  18      Q.   And in the course of that interview, she posed to

13:49:17  19  you some integrity-type questions; correct?

13:49:19  20      A.   Yes.

13:49:20  21      Q.   And she didn't ask you anything, of course, that

13:49:23  22  that you felt was inappropriate; is that correct?

13:49:26  23      A.   No, she didn't.

13:49:27  24      Q.   And then the next day is when she called and

13:49:29  25  offered you the job; correct?

13:49:31   1      A.   Yes, she did.

13:49:31   2      Q.   And you started two days later?

13:49:33   3      A.   No.   I had to do other tests, urine tests and --

13:49:38   4      Q.   All right.   She sent you for the drug screen?

13:49:40   5      A.   Yes.

13:49:41   6      Q.   And after the drug screen was when you started?

13:49:43   7      A.   Yes.

13:49:43   8      Q.   And you personally -- I know you just testified

13:49:52   9   that Ms. Agee purportedly told her DM told her to hire

13:49:56  10   you.   You did not have a conversation with the district

13:49:58  11   manager, did you?

13:49:59  12      A.   No, not as cashier.

13:50:01  13      Q.   In fact, you did not meet the district manager

13:50:05  14   until some months after you were hired; correct?

13:50:06  15      A.   About a month and a half, couple of months.

13:50:09  16      Q.   And after you started working, Ms. Agee was one

13:50:12  17   that trained you; is that correct?

13:50:13  18      A.   As a cashier, yes.

13:50:15  19      Q.   And she is the one who is your boss?

13:50:16  20      A.   Yes.   Cashier.

13:50:17  21      Q.   And she was the one who gave you daily

13:50:20  22   assignments?

13:50:20  23      A.   Yes.

13:50:21  24      Q.   And she is the one who, around inventory time,

13:50:25  25   perhaps, did your evaluation?

| | | |
|---|---|---|
| 13:50:27 | 1 | A.   Her and the district manager. |
| 13:50:29 | 2 | Q.   And you worked for Ms. Agee, I guess, from 1994 |
| 13:50:37 | 3 | on until sometime in 1996, when she approached you and |
| 13:50:43 | 4 | talked to you about being the assistant manager; |
| 13:50:45 | 5 | correct? |
| 13:50:45 | 6 | A.   Yes, I did. |
| 13:50:46 | 7 | Q.   And when she approached you, you felt that you |
| 13:50:51 | 8 | were not ready to be an assistant manager yet; is that |
| 13:50:54 | 9 | true? |
| 13:50:54 | 10 | A.   No, I wasn't ready. |
| 13:50:55 | 11 | Q.   And she was the one that assured you and |
| 13:50:59 | 12 | ultimately convinced you that you would be a good |
| 13:51:02 | 13 | assistant manager? |
| 13:51:03 | 14 | A.   No, I wasn't ready at the time.  I didn't take it |
| 13:51:07 | 15 | the first time. |
| 13:51:09 | 16 | Q.   Ma'am, but she was the one that ultimately |
| 13:51:12 | 17 | assured you that you would make a good assistant |
| 13:51:14 | 18 | manager, and you ultimately accepted the position; |
| 13:51:16 | 19 | correct? |
| 13:51:16 | 20 | A.   No.  She had to talk to the DM first before I |
| 13:51:20 | 21 | could accept the job. |
| 13:51:21 | 22 | Q.   Well, that's a different question, ma'am.  My |
| 13:51:24 | 23 | question was simple.  When Ms. Agee first approached |
| 13:51:27 | 24 | you, you said you were not ready for the assistant |
| 13:51:30 | 25 | manager responsibility; correct? |

13:51:31  1      A.   Correct.

13:51:32  2      Q.   And my question is just a basic one:   She

13:51:35  3  ultimately convinced you that, based on her observation

13:51:39  4  of your performance, she felt you were ready to be an

13:51:43  5  assistant manager?

13:51:43  6      A.   Yeah.   She felt I was ready, yes.

13:51:45  7      Q.   And you eventually accepted a position; correct?

13:51:48  8      A.   Yeah.   I accepted after I talked to the DM, yes.

13:51:51  9      Q.   I know that.   That was my next question to you.

13:51:54  10  Ms. -- was it Ms. Pedigo at that point?

13:51:57  11      A.   She talked to me first about it.

13:51:59  12      Q.   Yeah.   Ms. Pedigo came and talked to you about

13:52:02  13  the position; correct?

13:52:03  14      A.   Yes.

13:52:03  15      Q.   And after Ms. Pedigo left, Ms. Agee promoted you

13:52:09  16  to the position?

13:52:09  17      A.   Yes.

13:52:10  18      Q.   And eventually -- that was in roughly 1996?

13:52:19  19      A.   I can't remember the dates.

13:52:20  20      Q.   You worked as a cashier roughly for two years?

13:52:23  21      A.   I can't remember -- I really can't remember.

13:52:25  22      Q.   That's fine.

13:52:26  23      A.   It's been a while.

13:52:27  24      Q.   But eventually, Ms. Agee was transferred from

13:52:30  25  that store to Tuscaloosa; correct?

13:52:31  1      A.  Yes.

13:52:32  2      Q.  And before she transferred, she approached you

13:52:36  3  about being the assistant manager; in other words,

13:52:38  4  replacing her at that store; correct?

13:52:40  5      A.  Yes.

13:52:41  6      Q.  And you told her at that point that you did not

13:52:47  7  want the position, because it was too much

13:52:49  8  responsibility; correct?

13:52:50  9      A.  Yes.

13:52:51 10      Q.  In other words, before you became the manager,

13:52:55 11  you knew the store manager job had a lot of

13:52:59 12  responsibility; correct?

13:53:00 13      A.  Well, yes, it --

13:53:02 14      Q.  You knew exactly what the job entailed?

13:53:05 15      A.  Yes, I did.

13:53:07 16          MR. QUINN:  Judge, object.  She hadn't

13:53:09 17  finished her answer.  If she may be allowed to finish

13:53:11 18  her answers before he asks the next question.

13:53:14 19          THE WITNESS:  Yeah, I knew it.

13:53:16 20          THE COURT:  She may.

13:53:16 21  BY MR. QUINN:

13:53:16 22      Q.  I apologize for cutting you off at any point.  If

13:53:21 23  you feel like you need to elaborate --

13:53:23 24      A.  I felt it would be a lot of responsibility.  But

13:53:25 25  it wasn't business like, it was because of personal

13:53:28   1   reasons is why I felt like I couldn't do the job then,

13:53:31   2   because it was personal reasons.

13:53:32   3       Q.   Mrs. Richardson, you've given a deposition in

13:53:36   4   this case; correct?

13:53:37   5       A.   Yes.

13:53:38   6       Q.   And you've testified after the deposition in a

13:53:41   7   similar proceeding like this; correct?

13:53:42   8       A.   Yes.

13:53:43   9       Q.   And you've never once in one of those two

13:53:45   10  settings mentioned anything about personal

13:53:47   11  responsibility, have you?

13:53:48   12      A.   No, I haven't.

13:53:49   13      Q.   Okay.  Well, let me back up and go back to my

13:53:53   14  questions.

13:53:53   15      A.   But I did have personal reasons.

13:53:54   16      Q.   That's fine.  I'm not disputing that at all.  My

13:53:57   17  only point is, you did not mention that in your prior

13:54:00   18  two testimonies, did you?

13:54:01   19      A.   Well, he didn't ask.

13:54:02   20      Q.   Okay.  Your lawyer's question to you, as well as

13:54:05   21  my law firm lawyers, questioned you previously; correct?

13:54:09   22      A.   Yes.  Nobody asked.

13:54:11   23      Q.   Thank you.  Before you became the store manager,

13:54:16   24  you knew exactly what the job involved; correct?

13:54:19   25      A.   Yes, I did.

13:54:19  1      Q.   You had watched Ms. Agee since 1984?

13:54:23  2      A.   Yes.

13:54:24  3      Q.   You knew she ran the cash register at times?

13:54:26  4      A.   Yes, she did.

13:54:27  5      Q.   You knew she unloaded trucks?

13:54:29  6      A.   That's correct.

13:54:29  7      Q.   And you saw her stock the shelves?

13:54:31  8      A.   Correct.

13:54:31  9      Q.   And you also saw from time to time her clean up

13:54:34  10  in the store?

13:54:35  11     A.   Correct.

13:54:36  12     Q.   And you knew that she was paid a salary; correct?

13:54:38  13     A.   Yeah.

13:54:39  14     Q.   And you knew there were times when she worked

13:54:42  15  more than 40 hours; correct?

13:54:43  16     A.   Lots of times.

13:54:44  17     Q.   Correct?  And you knew regardless of any hours

13:54:48  18  she worked, she made the same salary; correct?

13:54:50  19     A.   Yes.

13:54:51  20     Q.   Okay.  And, of course, you eventually were

13:55:02  21  approached to take the job a second time; correct?

13:55:05  22     A.   Yes.

13:55:05  23     Q.   And that time, you accepted the job; correct?

13:55:09  24     A.   Yes, I did.

13:55:10  25     Q.   But when you were approached a second time,

13:55:14  1  again, because of the responsibility, you told them you

13:55:18  2  would try it out; isn't that true, ma'am?

13:55:21  3      A.  Yes.

13:55:21  4      Q.  Okay.

13:55:22  5      A.  I still had personal reasons.

13:55:23  6      Q.  And the reason, ma'am, why you tried it out, why

13:55:27  7  you said you would try it out, is because the job had a

13:55:32  8  lot of responsibility; isn't that true, ma'am?

13:55:38  9      A.  Yes, it did have a lot of responsibility.

13:55:41  10      Q.  Thank you.  And, of course, after you became the

13:55:48  11  store manager, you were responsible for making sure that

13:55:54  12  either you or the assistant did the cash and sales

13:55:57  13  report every day?

13:55:58  14      A.  Yes.

13:55:59  15      Q.  You also were responsible for making sure the

13:56:01  16  store did, what you guys call PPC reports; correct?

13:56:05  17      A.  Yes.

13:56:05  18      Q.  And you were responsible for making sure the

13:56:09  19  store -- the store did cashier audits, cash handling and

13:56:12  20  point-of-sale reports; correct?

13:56:14  21      A.  Correct.

13:56:15  22      Q.  And you were responsible for making sure the

13:56:17  23  store ordered merchandise every week; correct?

13:56:20  24      A.  Well, the assistant manager could do all those

13:56:23  25  things, too.

13:56:24  1      Q.   Ma'am, I don't dispute that.  My question is:
13:56:27  2   You, as a store manager, were ultimately responsible for
13:56:30  3   making sure those things got done?
13:56:32  4      A.   Yes, we were.
13:56:33  5      Q.   Okay.  And, in fact, to help you perform your
13:56:38  6   duties, from time to time you delegated some of your
13:56:42  7   duties to the assistant manager; correct?
13:56:44  8      A.   No.  She -- she was responsible for everything I
13:56:49  9   did, she did, too.  It was both our responsibilities.
13:56:53  10     Q.   Ms. Richardson, when you became the store
13:56:56  11  manager, you moved up from the assistant manager
13:56:59  12  position; correct?
13:56:59  13     A.   Yes.
13:57:00  14     Q.   And there was a vacancy for an assistant manager
13:57:02  15  job; correct?
13:57:03  16     A.   Yes.
13:57:03  17     Q.   And was the person promoted from within or from
13:57:06  18  the outside?
13:57:06  19     A.   From inside.
13:57:07  20     Q.   And you had to train this person; correct?
13:57:10  21     A.   No, not really.  She was already trained.  She
13:57:13  22  was already working at the store.
13:57:14  23     Q.   She was working at the store as a what?
13:57:17  24     A.   Cashier.
13:57:18  25     Q.   Correct.  And as a cashier, did she have any

13:57:20  1    responsibility for the paperwork that the manager or the

13:57:24  2    assistant manager did?

13:57:25  3        A.   Not the paperwork, no.

13:57:27  4        Q.   So when she became the assistant manager, she had

13:57:30  5    to be trained on that paperwork; correct?

13:57:32  6        A.   Yes.  I trained her on the paperwork.

13:57:34  7        Q.   And you were the one that trained her on the

13:57:35  8    paperwork?

13:57:36  9        A.   Yes.

13:57:36  10        Q.   That was my question.  I'm sorry for not being

13:57:39  11    clear.

13:57:40  12            When you became the manager, you were paid a

13:57:42  13    salary; correct?

13:57:43  14        A.   Yes, I were.

13:57:44  15        Q.   And at the time when you left, I believe your

13:57:48  16    salary was roughly $435 a week; correct?

13:57:52  17        A.   Yes, that's correct.

13:57:53  18        Q.   And this was prior to 2004.  So for part 1, you

13:58:03  19    would agree that you made over $250 a week; correct?

13:58:06  20        A.   Yes, I did.

13:58:06  21        Q.   And at the store, every week that you were there

13:58:12  22    as a manager, you had at least two employees on the

13:58:14  23    payroll; correct?

13:58:15  24        A.   Would you rephrase that again?

13:58:21  25        Q.   Yes, ma'am.  The time when you worked as a

13:58:24  1   manager, from the day you started until you stepped down

13:58:27  2   in 2001, every week when you did the schedule, you

13:58:31  3   scheduled more than two employees for that week?

13:58:34  4       A.  I scheduled -- well, yes.  Yes.  I went by the

13:58:38  5   schedule that was posted up in the office for us to go

13:58:40  6   by, yes.

13:58:41  7       Q.  I'll come back to that.  But actually, let me

13:58:45  8   finish that now.

13:58:46  9           When you became the manager, your district

13:58:49  10  manager -- and that's Peggy Pedigo; correct?

13:58:52  11      A.  Yes.

13:58:52  12      Q.  And that's the same district manager as Felicia

13:58:55  13  Coleman has; is that correct?

13:58:56  14      A.  Yes, it is.

13:58:57  15      Q.  When you became the store manager, Ms. Pedigo sat

13:59:01  16  you down and showed you how to do the schedule; correct?

13:59:04  17      A.  Not really set me down.  She brought schedules in

13:59:07  18  and had us to post them up side the wall and told us it

13:59:12  19  was A and B schedule, and those are the schedules we're

13:59:15  20  supposed to go by.

13:59:16  21      Q.  Ms. Richardson --

13:59:17  22      A.  In order to stay within the payroll budget.

13:59:19  23      Q.  -- Ms. Richardson, I think that maybe you were

13:59:26  24  referring to a staff schedule which was not in place

13:59:30  25  when you were the store manager when you said you used

13:59:32   1   the paper schedule?

13:59:33   2       A.  Paper schedule.

13:59:35   3       Q.  That's what you used?

13:59:36   4       A.  Paper schedule.

13:59:38   5       Q.  You didn't use this template that the jury has

13:59:41   6   seen -- and I know you were not here, I'm not sure if

13:59:45   7   you can see from there -- but you didn't use a staff

13:59:47   8   scheduler that looked like this?  (Showing chart.)

13:59:49   9       A.  Not like that.

13:59:50   10      Q.  Okay.  And so for the schedule at your store,

13:59:57   11  Ms. Pedigo sat you down the first time.  She made out a

14:00:04   12  practice schedule for you; correct?

14:00:06   13      A.  She didn't set me down.  She brought it in with

14:00:10   14  her.  But she brought the payroll budget, she brought

14:00:12   15  schedules in, too; A and B schedule on paper.

14:00:19   16      Q.  Bear with me for a minute.  Let me find the right

14:00:22   17  reference point, and I will direct you to it shortly.

14:00:42   18          Go with me to page 84 -- well, let me back

14:00:51   19  up.  Well, let's go to page 84.  If counsel wants me to,

14:00:58   20  I'll back up.  But just to speed things up, go to line

14:01:01   21  12 on page 84.  Follow me.  And if you disagree, I will

14:01:04   22  get back to the point.

14:01:06   23          But the question was:  "Okay.  I'm trying to

14:01:10   24  understand what you mean when you say Ms. Pedigo has

14:01:13   25  made out a schedule.  Are you talking about" -- and you

14:01:17  1  said -- what was your answer on line 16?

14:01:19  2      A.  "A practice schedule."

14:01:23  3      Q.  And then the question was:  "A practice one?"

14:01:27  4  And what did you say?

14:01:28  5      A.  "Yes, sir."  That's what I mean, a practice

14:01:32  6  schedule.  That's the schedule we have to go by.  She

14:01:36  7  didn't actually make the schedule.

14:01:38  8      Q.  I'm sorry, ma'am.  The next question was:  "So

14:01:40  9  she doesn't do it every week?"  And what was your

14:01:43  10  answer, line 20?

14:01:46  11      A.  "No, sir."

14:01:47  12      Q.  Then the next question was:  "You do one every

14:01:52  13  week?"  And what was your answer, ma'am?

14:01:53  14      A.  "Yes, sir, you do."

14:01:54  15      Q.  So Ms. --

14:01:56  16          MR. QUINN:  To make it complete, I would ask

14:01:58  17  you to go back -- if you're attempting to impeach her.

14:02:03  18          MR. KALLON:  I'm not --

14:02:05  19          THE COURT:  Mr. Quinn, that's improper.  Do

14:02:08  20  you have an objection?

14:02:09  21          MR. QUINN:  I have an objection.  It's not

14:02:12  22  impeachment, and nothing that he just read is

14:02:14  23  impeachment.  And I would ask that you read page 81,

14:02:17  24  which is consistent with your testimony.

14:02:19  25          MR. KALLON:  Her testimony is, ma'am --

14:02:22   1            THE COURT:  No.

14:02:22   2            MR. KALLON:  Sorry, Your Honor.

14:02:24   3            THE COURT:  Direct your remarks to me.  The

14:02:27   4   objection is overruled.

14:02:28   5            You may read the text in when you take the

14:02:33   6   witness --

14:02:34   7            MR. KALLON:  Thank you, Your Honor.

14:02:35   8   BY MR. KALLON:

14:02:35   9   Q.  Now, when you became a manager, Ms. Pedigo

14:02:39  10   brought some schedules to your store to show you some

14:02:42  11   examples that you can follow.  Is that your testimony?

14:02:44  12   A.  Yes.

14:02:44  13   Q.  And then after that, you made out a schedule for

14:02:48  14   the employees in your store going forward?

14:02:50  15   A.  Yeah, going by the ones she had on the board.

14:02:52  16   Q.  Okay.  And you did that every week; correct?

14:03:00  17   A.  Yes.

14:03:00  18   Q.  And you wanted to make sure the employees knew

14:03:03  19   when they were supposed to come in?

14:03:04  20   A.  Yes.

14:03:05  21   Q.  And you wanted them at work, of course?

14:03:08  22   A.  Yes.

14:03:08  23   Q.  Thank you.  All right.  Now, your store was open

14:03:17  24   for 66 hours; correct?

14:03:20  25   A.  From 9:00 to 7:00 every day.

14:03:26   1       Q.   9:00 to 7:00, Monday through Saturday; correct?

14:03:28   2       A.   And Sundays 12:00 to 6:00.

14:03:31   3       Q.   So 9:00 to 7:00 -- that's 60, Monday through

14:03:38   4   Saturday; and then Sunday from 12:00 to 6:00.  So that's

14:03:42   5   66 hours for the week; correct?

14:03:43   6       A.   Yes.

14:03:44   7       Q.   And you had a payroll budget of roughly $1,100;

14:03:48   8   correct?

14:03:49   9       A.   1,050 at first and then it went up to 1,100.

14:03:52   10      Q.   Okay.  And from that payroll budget, you deducted

14:03:56   11  your salary; correct?

14:03:57   12      A.   Yes.

14:03:57   13      Q.   And your salary, again, when you left was $435 a

14:04:02   14  week?

14:04:02   15      A.   Yes.

14:04:02   16      Q.   And I think you have a calculator there.  You

14:04:06   17  don't have to do the math, but if you want to, you feel

14:04:09   18  free to do so.

14:04:09   19           When you left, you had a payroll budget of $1,100

14:04:12   20  a week; correct?

14:04:13   21      A.   Yes.

14:04:13   22      Q.   And your salary when you left was $435 a week?

14:04:17   23      A.   Yes, it was.

14:04:18   24      Q.   That left you with $665 to divide up to the

14:04:25   25  employees at your store; correct?

14:04:26  1      A.   Yes.

14:04:27  2      Q.   And the highest paid employee at your store was

14:04:31  3   the assistant manager; correct?

14:04:33  4      A.   Yes, it was.

14:04:34  5      Q.   And she made $6 an hour?

14:04:36  6      A.   $6 an hour.

14:04:38  7      Q.   And everyone else made minimum wage, or less than

14:04:41  8   $6 an hour?

14:04:42  9      A.   A little less, not much.

14:04:43  10     Q.   So, if we do a simple math; you take the 6.65

14:04:49  11  that you had and you divide it by 6, you would get over

14:04:53  12  a hundred hours of labor hours every week; correct?

14:04:57  13     A.   I imagine.  I don't know.

14:04:58  14     Q.   You can use the calculator if you want.  You take

14:05:01  15  6.65, divide it by 6, what do you get?  There's a

14:05:06  16  calculator in front of you.

14:05:08  17     A.   I guess that's it.  You say it is.

14:05:10  18     Q.   Well, I don't want you to guess.  I'm sorry.

14:05:13  19  Just indulge me for a minute.

14:05:16  20          THE COURT:  No, that's -- I don't require

14:05:19  21  somebody to use a calculator.

14:05:20  22          MR. KALLON:  I'm sorry, Your Honor.  I

14:05:22  23  apologize.  The witness said she guessed.

14:05:25  24     Q.   I don't want you to guess.  If you disagree with

14:05:27  25  me, let me know.

14:05:28  1              THE COURT:  Well, of course, it is

14:05:29  2  sufficient to say "I don't know".

14:05:31  3              THE WITNESS:  I really don't know.

14:05:32  4              THE COURT:  All right.

14:05:32  5  BY MR. KALLON:

14:05:32  6     Q.  All right.  If you take $600, for example, and

14:05:36  7  you divide it by 6, you will get 100?

14:05:39  8     A.  100.

14:05:40  9     Q.  Correct.  So if you get -- if you take 6.65 and

14:05:44  10  you divide it by 6, you will get slightly more than a

14:05:47  11  100?

14:05:47  12     A.  Yes.

14:05:48  13     Q.  So you will agree with me that you had over a

14:05:51  14  hundred hours' worth of payroll labor hours every week

14:05:55  15  when you worked as a store manager?

14:05:56  16     A.  After I paid the other people.

14:05:58  17     Q.  After you paid yourself?

14:06:00  18     A.  After I paid myself, yes.

14:06:02  19     Q.  Okay.  And your store was open for 66 hours?

14:06:05  20     A.  Yes, it was.

14:06:07  21     Q.  Correct.  So in other words, you had, if you

14:06:10  22  wanted to, you had enough payroll hours to have at least

14:06:15  23  one person at that store every hour the store was open;

14:06:20  24  correct?

14:06:20  25     A.  Yes.

14:06:21  1    Q.   And then you will have, I guess, 34 additional

14:06:26  2  hours left from the 100 labor hours; correct?

14:06:30  3    A.   Yes.  But you're putting two people in the store

14:06:33  4  at one time, one other person?

14:06:35  5    Q.   You had me -- the 100 hours we're talking about,

14:06:40  6  Ms. Richardson, does not include your time?

14:06:43  7    A.   My time.

14:06:43  8    Q.   Correct.  So if you wanted to, for the entire

14:06:44  9  time when the store was open, from 9:00 to 7:00, Monday

14:06:48  10  through Saturday; and from 12:00 to 6:00, because you

14:06:52  11  had over a hundred hours of payroll, you could have one

14:06:55  12  additional employee in that store for all of those

14:06:58  13  hours?

14:06:59  14    A.   I had more than one employee in the store at

14:07:01  15  once.

14:07:01  16    Q.   Correct.  That's my point.  I mean, if you wanted

14:07:04  17  to, my only point here is, ma'am, if you wanted to, you

14:07:08  18  could have at least one employee at the store for each

14:07:12  19  hour the store was open -- in addition to you being

14:07:17  20  there?

14:07:18  21    A.   Sometimes it was two people there --

14:07:21  22    Q.   -- sometimes it was more than two --

14:07:22  23    A.   -- sometimes three.  Depends on what time it was.

14:07:24  24    Q.   And sometimes it was only one person there?

14:07:26  25    A.   Yes.

14:07:27   1      Q.   And that was you?

14:07:28   2      A.   Yes.

14:07:28   3      Q.   And that was --

14:07:30   4      A.   -- very seldom, no.

14:07:31   5      Q.   That was a choice that you made on those

14:07:33   6   occasions to be --

14:07:34   7      A.   No, not really.

14:07:36   8      Q.   Say if you worked alone, it was because somebody

14:07:39   9   did not show up for work?

14:07:41   10     A.   Or someone was sick.

14:07:42   11     Q.   Okay.  So most of the time, for your store, you

14:07:46   12   had sufficient payroll dollars to staff the store?

14:07:50   13     A.   Yes.

14:07:50   14     Q.   And you brought in the bulk of your employees on

14:07:54   15   truck day; correct?

14:07:55   16     A.   Yes.

14:07:55   17     Q.   And then on the weekends, because you had more

14:07:58   18   traffic on the weekends?

14:08:00   19     A.   Sometimes.  Sometimes.

14:08:05   20     Q.   You would agree with me, though, that you would

14:08:07   21   have more employees at work on a Saturday, as opposed to

14:08:10   22   a Monday or Tuesday morning?

14:08:11   23     A.   Well, that's the way she fixed the schedule up.

14:08:14   24   We're more busier on the weekend than through the week.

14:08:17   25     Q.   That's just retail.  Most people work during the

14:08:20  1   week, so most people shop on the weekends than on the

14:08:22  2   evenings?

14:08:22  3      A.   Yeah.

14:08:23  4      Q.   Okay.  So it makes sense, from a payroll point of

14:08:25  5   view, as a manager, to schedule your store to have the

14:08:29  6   most staff in there on your busy times?

14:08:32  7      A.   Yeah.  Like I say, I'm not doing the scheduling.

14:08:36  8   I'm going by the schedule she posted in the store, I had

14:08:38  9   to go by the one she had posted up.

14:08:41  10     Q.   Ma'am, you said these were practice schedules

14:08:44  11  that she brought for you to follow?

14:08:45  12     A.   Correct.  Yeah.  But we had to stay within that

14:08:48  13  payroll budget.

14:08:49  14     Q.   You had 1,100 of payroll budget at the end, and

14:08:52  15  once you take your salary out, you had over $600 to

14:08:57  16  divide up to the employees as you see fit; correct?

14:09:00  17     A.   Not as I see fit, no.  Because I had people

14:09:05  18  working 30 and sometimes 40 hours.

14:09:08  19     Q.   That's what I meant.  I think we're speaking the

14:09:12  20  same language.  You decided with your 600-plus dollars

14:09:15  21  in payroll for the employees?

14:09:16  22     A.   No, I did not decide.

14:09:17  23     Q.   You decided which employees got what dollars?

14:09:20  24     A.   No, I did not decide.

14:09:22  25     Q.   Ma'am, who did the schedule at your store?  I

14:09:25  1    think we've already talked about this.

14:09:27  2        A.   The schedule was posted up side the wall, and I

14:09:30  3    was going by the schedule that was posted up that the DM

14:09:33  4    had set forth for me to go by.

14:09:36  5              THE COURT:  Well, who put the names on the

14:09:38  6    schedule?

14:09:38  7              THE WITNESS:  I put the names.

14:09:40  8              THE COURT:  So you decided who would work a

14:09:42  9    particular schedule?

14:09:43  10              THE WITNESS:  Yes, sir.

14:09:43  11              THE COURT:  All right.

14:09:45  12              MR. KALLON:  Thank you, Your Honor.

14:09:47  13    BY MR. KALLON:

14:09:47  14        Q.   And you would agree with me, ma'am, that one of

14:09:50  15    the biggest responsibilities that you did, one of the

14:09:53  16    largest responsibilities that you did as a manager was

14:09:57  17    to do the scheduling?

14:10:00  18        A.   Not really.

14:10:01  19        Q.   All right.  You did the schedule each week;

14:10:04  20    correct?

14:10:05  21        A.   Yes.

14:10:05  22        Q.   And it's important for the store to be staffed;

14:10:08  23    correct?

14:10:08  24        A.   Yes, it is.

14:10:09  25        Q.   You can't sell if you don't have employees there

14:10:11   1    to assist the customers; correct?

14:10:13   2       A.   Yes.

14:10:14   3       Q.   And the employees at the store, at least from

14:10:19   4    their perspective, wanted to get as many hours as they

14:10:23   5    could?

14:10:23   6       A.   Yes, I did.   But that's not the most important

14:10:26   7    thing at the store is scheduling.

14:10:28   8            You have to make sure you get the freight out in

14:10:30   9    order for the customers to have -- to buy the

14:10:32  10    merchandise in order to make money.

14:10:35  11       Q.   I understand that.   And I'm not saying the most

14:10:37  12    important thing that you did was scheduling.

14:10:39  13            I'm saying one of the most important things that

14:10:42  14    you did was to schedule people to help you with what you

14:10:44  15    just talked about.

14:10:46  16                 MR. QUINN:   Objection.   She's -- that

14:10:48  17    question's been asked and she has answered.

14:10:51  18                 THE COURT:   Sustained.

14:10:52  19       Q.   Ma'am, the employees at your store, every week

14:11:01  20    they wanted to know the hours you assigned them to work?

14:11:04  21       A.   Yes.

14:11:07  22       Q.   And, in fact, some of them asked you to give them

14:11:10  23    more hours than you had given to them?

14:11:13  24       A.   No, I couldn't do that.

14:11:17  25       Q.   Well, I know that you couldn't do that, perhaps.

14:11:20   1   But my question was not whether you did it or not.  My

14:11:23   2   question was:  Did some employees ask you to give them

14:11:26   3   more work hours than you had scheduled them for?

14:11:29   4      A.  Yes, they would ask, but I -- I didn't do it,

14:11:32   5   because I couldn't.

14:11:35   6      Q.  And so you would agree with me --

14:11:37   7      A.  Unless somebody was out sick.

14:11:37   8      Q.  -- you would agree with me, ma'am, that for those

14:11:41   9   employees, one of the important things that you did as a

14:11:44  10   manager, was schedule?

14:11:50  11             MR. QUINN:  Objection.  Again, asked and

14:11:52  12   answered, now twice.

14:11:54  13             MR. KALLON:  I don't think I've asked that

14:11:55  14   question, Mr. Quinn.

14:11:57  15             MR. QUINN:  Objection.

14:11:58  16             THE COURT:  The objection is overruled.

14:12:00  17   This is, in fact, cross-examination.

14:12:05  18             MR. KALLON:  I'm sorry, Your Honor?

14:12:05  19             THE COURT:  I overrule the objection.

14:12:07  20             MR. KALLON:  Thank you.

14:12:08  21             THE WITNESS:  What was the question?

14:12:09  22   BY MR. KALLON:

14:12:09  23      Q.  Yes, ma'am.  I'm sorry.  I said for the employees

14:12:12  24   at your store who you've testified to, looked at the

14:12:18  25   schedule, wanting to know when they were coming to work

14:12:21   1   and wanted to get as more hours than they can.  For

14:12:24   2   those employees at the store, you would agree with me

14:12:26   3   that one of the most important things you did was the

14:12:29   4   schedule?

14:12:29   5   A.  Not really.

14:12:32   6   Q.  Okay.  Thank you, ma'am.  And, of course, as a

14:12:39   7   manager, I think you've testified to this, after you did

14:12:42   8   the schedule, from time to time you would change it;

14:12:45   9   correct?

14:12:45   10   A.  Yes.

14:12:45   11   Q.  For example, I think you testified in your

14:12:48   12   deposition that one of the schedules that Ms. Pedigo

14:12:52   13   gave you as a practice, had the assistant manager

14:12:56   14   working on the weekends, and you changed it to take

14:12:59   15   those weekend duties away from her; correct?

14:13:02   16   A.  Yes.

14:13:03   17   Q.  And then, of course, when employees would have

14:13:06   18   emergencies during the week, if they needed time off,

14:13:10   19   you would accommodate them?

14:13:11   20   A.  Yes, you would have to fill the schedule in.

14:13:14   21   Q.  And as a store manager, you're responsible for

14:13:18   22   making sure that the store orders merchandise every

14:13:21   23   week; is that correct?

14:13:22   24   A.  Well, the assistant manager could order, too.

14:13:27   25   Yes, I ordered.  The assistant manager can order, too.

14:13:29    1       Q.   And, again, I appreciate that.   And I know that's

14:13:32    2    the theme.   But my question is:   As a store manager, you

14:13:38    3    were responsible for making sure the store did the order

14:13:41    4    every week?

14:13:42    5       A.   Well, yes.   And --

14:13:44    6       Q.   Thank you, ma'am.

14:13:45    7       A.   -- I've ordered as a stocker, I've ordered since

14:13:50    8    I've been a stocker.

14:13:52    9       Q.   Ma'am, bear with me for a minute.   I will direct

14:13:58    10   you -- look with me to the smaller transcript on Page

14:14:09    11   205, line 20.   Are you there, ma'am, on line 20?

14:14:26    12      A.   Yes.

14:14:26    13      Q.   The question was:   "Okay.   And, of course, as a

14:14:30    14   store manager, you're also responsible for making sure

14:14:32    15   the store ordered the merchandise each week?"   What was

14:14:35    16   your answer?

14:14:36    17      A.   "Yes."

14:14:36    18      Q.   Okay.

14:14:37    19      A.   But I'm not arguing that.   I haven't too long

14:14:41    20   ordered as a stocker.

14:14:44    21      Q.   Ms. Richardson --

14:14:45    22      A.   -- and this -- I mean --

14:14:47    23      Q.   Ms. Richardson, as part of carrying out your

14:14:50    24   duties as a store manager, you delegated some functions

14:14:52    25   to the employees of the store; correct?

14:14:54   1     A.   Yes, I did.

14:14:55   2     Q.   The delegation of those duties did not relieve

14:14:59   3   you of the responsibility of seeing to it that they were

14:15:02   4   carried out ultimately; correct?

14:15:04   5     A.   That's right.

14:15:04   6     Q.   Thank you.  So, in other words, regardless of who

14:15:08   7   did it at the store, be it the assistant manager or the

14:15:11   8   cashier, as a store manager, my question is -- and I

14:15:16   9   think you've answered it yes -- you were ultimately

14:15:20  10   responsible for making sure the ordering was done every

14:15:23  11   week?

14:15:23  12     A.   Me and the assistant.  Because normally, I'm not

14:15:26  13   always there the day of ordering.  If I'm not there,

14:15:29  14   then the assistant manager has to order.

14:15:30  15     Q.   And then when you come back on your off days,

14:15:33  16   when you return to the store, you would check the

14:15:36  17   paperwork to make sure everything was done properly?

14:15:39  18     A.   Make sure she's initialed and I initialed, too.

14:15:43  19   We have to cover each other.

14:15:44  20     Q.   Okay.  You would agree that ordering merchandise

14:15:47  21   is an important function?

14:15:49  22     A.   Yes, it is.

14:15:50  23     Q.   And it's retail, it's basic, you can't sell what

14:15:56  24   you don't have?

14:15:57  25     A.   Correct.

14:15:57  1    Q.   And so when did you the ordering or when your

14:16:00  2    store did the ordering, you make sure that you ordered

14:16:04  3    sufficient quantities?

14:16:05  4    A.   Yes.

14:16:05  5    Q.   For example, I think you testified that at your

14:16:09  6    store, bleach and paper products were the top sellers?

14:16:13  7    A.   Yes.

14:16:14  8    Q.   And so when you ordered those items, you over

14:16:18  9    ordered, for lack of a better term?

14:16:20  10   A.   Sometimes, yes.

14:16:21  11   Q.   In other words, you did not always just order to

14:16:24  12   fill the shelves?

14:16:26  13   A.   Most of the time, yes.

14:16:28  14   Q.   But for paper products and for bleach, at times,

14:16:32  15   you ordered to anticipate business flow and customer

14:16:36  16   traffic?

14:16:36  17   A.   Yes.

14:16:37  18   Q.   And you did that, of course, to try to increase

14:16:45  19   the sales at your store; correct?

14:16:46  20   A.   Yes.

14:16:48  21   Q.   And increase in sales, of course, could mean

14:16:51  22   potentially that shrink levels are down; increase in

14:16:57  23   sales could potentially mean a bigger bonus for you as a

14:17:01  24   manager; correct?

14:17:02  25   A.   Correct.

14:17:02   1     Q.   And, of course, increasing sales could also lead

14:17:06   2   to a bigger payroll budget for the store?

14:17:08   3     A.   Not really.

14:17:08   4     Q.   Okay.  And, of course, the merchandise that you

14:17:15   5   sell at the store is not free to Family Dollar; correct?

14:17:18   6     A.   No.

14:17:19   7     Q.   You need to sell to pay for the merchandise;

14:17:23   8   correct?

14:17:23   9     A.   Yes.

14:17:24  10     Q.   You need to sell to have revenue for employees'

14:17:30  11   salary, including yours?

14:17:31  12     A.   Yes, you do.

14:17:35  13     Q.   And you already agreed that the ultimate

14:17:40  14   responsibility for making sure the store ordered every

14:17:42  15   week was --

14:17:43  16     A.   Yes, me and assistant manager.

14:17:44  17     Q.   But regardless of who does it, ma'am, you make

14:17:48  18   sure that the store ordered merchandise every week?

14:17:52  19     A.   If I'm not there, I can't make sure it's ordered.

14:17:55  20   All I do is tell her to order it if I'm not there.  She

14:17:58  21   orders the store.  If I'm not there to order, she has to

14:18:01  22   order.

14:18:01  23     Q.   Ma'am, I think you've testified just now and

14:18:05  24   before, when you leave your store on your days off --

14:18:08  25     A.   Yes.

14:18:08    1    Q.  -- you leave to-do lists for the employees;
14:18:11    2  correct?
14:18:11    3    A.  Yes, I do.
14:18:11    4    Q.  And that includes the assistant manager?
14:18:13    5    A.  Yes.
14:18:14    6    Q.  And you tell them what you want them to do in
14:18:16    7  your absence?
14:18:17    8    A.  Just basic cleaning and straightening, that's it.
14:18:20    9    Q.  And then when you come back after your off day,
14:18:24   10  with your time off, you will check to see if the
14:18:27   11  employees did what you told them to do?
14:18:29   12    A.  Yes, I would.
14:18:30   13    Q.  Okay.
14:18:31   14    A.  I do that now.
14:18:32   15    Q.  All right.
14:18:32   16    A.  As a stocker.
14:18:34   17    Q.  And you will agree with me, ma'am, that if you
14:18:38   18  were leaving and you told the assistant to order, when
14:18:41   19  you came back, you would check to see if the ordering
14:18:45   20  was done?
14:18:46   21    A.  Yes.
14:18:46   22    Q.  And you will agree with me, ma'am, that ordering
14:18:49   23  is an important part of a manager's job?
14:18:52   24    A.  Yes, it is.
14:18:53   25    Q.  And regardless of how long it took you or took

14:18:57  1    the store to order, it was pretty important that the

14:19:01  2    store ordered merchandise every week?

14:19:03  3        A.   Yes.  You have to order every week.

14:19:05  4        Q.   And, again, that's because you can't sell what

14:19:08  5    you don't have at the store; correct?

14:19:09  6        A.   That's correct.

14:19:10  7        Q.   And you would agree with me, then, one of your

14:19:15  8    primary duties as a manager was to make sure the store

14:19:18  9    ordered merchandise every week?

14:19:20  10       A.   Yeah.  Me and the assistant manager, yes.

14:19:23  11       Q.   Thank you.  The assistant reported to you;

14:19:27  12   correct?

14:19:27  13       A.   Yes.

14:19:28  14       Q.   Thank you.  You told the employees at your store

14:19:34  15   what you do; in other words, you gave them directions?

14:19:39  16       A.   I gave them directions?

14:19:41  17       Q.   Yeah.  You gave them instructions.  I'm sorry.

14:19:44  18       A.   Well, I'm not there, yes.  Basically cleaning and

14:19:48  19   straightening.

14:19:48  20       Q.   When you're there, you also tell them what you

14:19:51  21   want them to do at times?

14:19:51  22       A.   Yeah, I would tell them in the morning.

14:19:54  23       Q.   For example, if you have two cashiers, for

14:19:56  24   example, at the store at the same time, you would tell

14:20:00  25   which one of them you wanted to be the backup cashier;

14:20:02    1   correct?

14:20:03    2       A.   Yes.

14:20:03    3       Q.   And then you would tell the other one to maybe

14:20:07    4   start to unload freight?

14:20:08    5       A.   Yes.

14:20:09    6       Q.   And you also -- you have a stock -- you have --

14:20:14    7   at your store you had an employee who was a stocker;

14:20:17    8   correct?

14:20:17    9       A.   Yes.

14:20:17   10       Q.   And one of them was Alonzo Nolan?

14:20:22   11       A.   Yes.

14:20:22   12       Q.   And Mr. Nolan worked as a store custodian

14:20:25   13   full-time?

14:20:26   14       A.   Yes, he did.

14:20:27   15       Q.   And he came to your store part-time?

14:20:29   16       A.   Yes.

14:20:29   17       Q.   And when he arrived at work, he came to you to

14:20:32   18   find out what you wanted him to do?

14:20:34   19       A.   He already know what to do.  Stock.  All he do is

14:20:40   20   go to the back room and pull the freight and start

14:20:42   21   stocking.

14:20:42   22       Q.   When he goes to the back room, there's a lot of

14:20:45   23   merchandise back there?

14:20:46   24       A.   Yes, it is.

14:20:47   25       Q.   You would tell him from time to time which one

14:20:49  1    you wanted him to focus on first?

14:20:51  2        A.  Not really.

14:20:52  3        Q.  Okay.

14:20:53  4        A.  He already know what to do.

14:20:54  5        Q.  You never told Mr. Nolan what areas to prioritize

14:20:59  6    first?

14:20:59  7        A.  He already know what areas to go to when he comes

14:21:01  8    to work.

14:21:02  9        Q.  All right.  I know that.  I know that's what

14:21:04  10   you're saying.  But the question is -- and the answer

14:21:07  11   will be "no" -- I want to make sure before I leave this

14:21:10  12   point:  Mr. Nolan, yes, knows what to do?

14:21:13  13       A.  Yes.

14:21:13  14       Q.  But my question is:  You have never told

14:21:16  15   Mr. Nolan what areas you want him to focus on at any

14:21:20  16   time when you were the store manager?

14:21:21  17       A.  Yeah.  One or two times, yes.

14:21:24  18       Q.  Okay.  And you've also used Mr. Nolan to help in

14:21:30  19   the recovery process?

14:21:31  20       A.  That's everybody's business.

14:21:32  21       Q.  In other words, all he did was just not stock --

14:21:36  22       A.  He stocked and recovered.

14:21:37  23       Q.  -- you assigned him to recover as well?

14:21:39  24       A.  That's everybody's business, recovery.

14:21:41  25       Q.  And recovery is divided up in sections.  And you

14:21:49   1   told the employees which areas you wanted them to

14:21:51   2   recover?

14:21:51   3      A.   Yes.

14:21:52   4      Q.   As a store manager, you were always responsible

14:22:02   5   for your store; correct?

14:22:04   6      A.   Yes.

14:22:04   7      Q.   In fact, you were responsible even when you were

14:22:07   8   not there?

14:22:07   9      A.   Not really.   The assistant manager was

14:22:11   10  responsible when I'm not there.

14:22:12   11     Q.   I think we've already established that when you

14:22:16   12  left, you left them to-do lists; correct?

14:22:19   13     A.   Yes.

14:22:19   14     Q.   And, in fact, when you were away from the store,

14:22:22   15  I think your testimony is the employees called you, your

14:22:27   16  words, "all the time"?

14:22:27   17     A.   Yes, they did, because we were all friends,

14:22:30   18  close, on business and personal matters, yes.

14:22:33   19     Q.   But they called you for business matters at

14:22:36   20  times?

14:22:36   21     A.   Mostly personal.

14:22:37   22     Q.   They called you for business matters at time;

14:22:40   23  right?

14:22:40   24     A.   At times, yes.

14:22:41   25     Q.   And then when you were off and you came back to

14:22:44   1   work, you would check not only your to-do lists to make

14:22:48   2   sure those things had been done, you would check on all

14:22:50   3   the other paperwork that was taken care of during your

14:22:54   4   absence?

14:22:54   5       A.   Yes.   I had to, because when the district manager

14:22:57   6   comes in and everything is not right, then she's going

14:23:00   7   to look at me.

14:23:00   8       Q.   Correct.   Because you were the store manager?

14:23:02   9       A.   Me and assistant managers, it falls on both of

14:23:06  10   us.

14:23:06  11       Q.   So when there's an issue -- you've just said it,

14:23:10  12   the Court heard it -- when the DM comes in, she's going

14:23:13  13   to look to you; correct?

14:23:15  14       A.   She checks everything, yes.   Whatever she wants

14:23:18  15   done and it's not done, she looks our way.

14:23:21  16       Q.   And that's why after your off day, when you came

14:23:25  17   back, you checked on all the paperwork; correct?

14:23:28  18       A.   Yes.

14:23:28  19       Q.   To make sure it was done right?

14:23:30  20       A.   Yes.

14:23:31  21       Q.   Ma'am, regardless of what you were doing at that

14:23:40  22   store, you were always in charge; correct?

14:23:44  23       A.   I guess I was.

14:23:47  24       Q.   If you're running the cash register, stocking or

14:23:50  25   unloading the truck, you were still in charge of that

14:23:53  1   store?

14:23:54  2       A.  Not really.  The DM is really in charge, district

14:23:58  3   manager.

14:23:58  4       Q.  Ms. Pedigo came to your store once a month,

14:24:02  5   correct?

14:24:02  6       A.  Once a month, yes.

14:24:03  7       Q.  And there were some months when she didn't even

14:24:05  8   come by?

14:24:06  9       A.  Sometimes.  But I talked to her three or four

14:24:08  10  times a week.

14:24:09  11      Q.  Well, I think we've established earlier in your

14:24:13  12  deposition -- I'm sorry, when I say "earlier" -- in your

14:24:17  13  deposition, you said you spoke to her three or four

14:24:19  14  times a month; correct?

14:24:21  15      A.  Yes, I did.

14:24:24  16      Q.  All right.

14:24:25  17      A.  But I testified that I -- I made a mistake on

14:24:29  18  that.  I meant to say "weeks", "three or four times a

14:24:33  19  week".  I talked to her on the phone three or four times

14:24:36  20  a week.

14:24:36  21      Q.  That's you calling her at times when you needed

14:24:39  22  guidance or something?

14:24:40  23      A.  Yes.  I have to call her and she calls me.

14:24:42  24      Q.  And she will call you to check and see if

14:24:45  25  everything was okay?

14:24:45   1       A.   Yes.

14:24:46   2       Q.   Mrs. Pedigo was there as a resource?

14:24:47   3       A.   Yes.

14:24:48   4       Q.   Thank you.  And I think the phrase that you used

14:24:53   5   in your testimony earlier, ma'am, is regardless of what

14:24:57   6   you were doing in that store, you did it with your "head

14:25:01   7   up"; correct?

14:25:02   8       A.   Yes.

14:25:02   9       Q.   In other words, what you meant by that is and

14:25:05  10   what you mean by that is, if you were stocking or

14:25:07  11   running the cash register, you were looking up at the

14:25:12  12   employees and at the customers?

14:25:13  13       A.   Yes.

14:25:14  14       Q.   To make sure that no one was doing anything

14:25:17  15   inappropriately?

14:25:17  16       A.   Yes.  I do that now, even as a stocker.

14:25:20  17       Q.   And your phrase that you used is, you were always

14:25:24  18   "observing and listening"; correct?

14:25:26  19       A.   Yes.  That's me.

14:25:27  20       Q.   All right.  The difference now is, as a stocker,

14:25:31  21   if something goes wrong, if that store has a huge shrink

14:25:35  22   -- and a shrink is a loss; correct?

14:25:36  23       A.   Yes.

14:25:37  24       Q.   -- the store manager is the one that's held

14:25:40  25   accountable for that?

14:25:40    1        A.   Yes.

14:25:41    2        Q.   Not the stocker?

14:25:42    3        A.   No.

14:25:42    4        Q.   Thank you.  And the reason why you stock or ran

14:25:48    5    the cash register with your head up and, the reason why

14:25:52    6    you always observed and listened is because you were

14:25:55    7    responsible for the merchandise at that store?

14:25:57    8        A.   All of us was responsible for the merchandise.

14:26:00    9        Q.   Ma'am --

14:26:01   10        A.   Everybody work at the store responsible for that

14:26:04   11    store.

14:26:04   12        Q.   -- as a store manager, you were responsible for

14:26:06   13    the merchandise in the store?

14:26:08   14        A.   Me and everybody else, yes.

14:26:10   15        Q.   Would you please turn to the small transcript,

14:26:14   16    Page 219, let's start with line 13.  Are you ready,

14:26:30   17    ma'am?

14:26:31   18                    MR. QUINN:  What page?

14:26:32   19                    MR. KALLON:  Page 319 on the small

14:26:36   20    transcript.

14:26:36   21                    THE WITNESS:  Page 219?

14:26:37   22    BY MR. KALLON:

14:26:37   23        Q.   "And again, you were on the floor, although you

14:26:41   24    were doing something, you were still watching and

14:26:42   25    listening?"  What was your answer, ma'am?

14:26:46   1       A.   What number that was?

14:26:48   2       Q.   Page 219, line 13.

14:26:52   3       A.   "Yes."

14:26:52   4       Q.   And your answer was yes.  Let me start over:

14:26:55   5   "And, again, you were on the floor, although you were

14:26:58   6   doing something, you were still watching and listening?"

14:27:02   7       A.   "Yes."

14:27:02   8       Q.   "And I think the phrase that you used in your

14:27:05   9   deposition is:  I always observe and listen."

14:27:10  10       A.   And I do.  I do that now.

14:27:12  11       Q.   I'm sorry, ma'am.  Just answer the question.

14:27:14  12       A.   Yes, I do.

14:27:15  13       Q.   I'm sorry.  Let me start over.  Right now all

14:27:19  14   we're doing is reading.  I'll read line 17 again.

14:27:25  15           The question, so you can read your answer.  "And

14:27:25  16   I think the phrase that you used in your deposition is:

14:27:29  17   I always observe and listen?"  What was your answer?

14:27:31  18       A.   "Yes."

14:27:32  19       Q.   "Question:  And you've got to do that?"  What was

14:27:35  20   your answer?

14:27:36  21       A.   "Yes."

14:27:36  22       Q.   "Because you're responsible for the merchandise

14:27:40  23   in that store?"

14:27:41  24       A.   "Yes, I am."  Everybody in there --

14:27:43  25       Q.   I'm sorry, ma'am, just -- we're just reading your

14:27:47 1   questions right now, and I'll give you an opportunity to

14:27:50 2   elaborate.

14:27:51 3        "Question:  Because you're responsible for the

14:27:54 4   merchandise in that store?"  What was your answer?

14:27:56 5   A.  "Yes."

14:27:57 6   Q.  "Question:  And if you don't observe or listen,

14:28:01 7   come inventory time, you would have a huge shrink?"  And

14:28:07 8   what was your answer, ma'am?

14:28:08 9   A.  "Yes."

14:28:09 10  Q.  And, of course, before we went to this

14:28:15 11  transcript, I was asking you questions:  As a store

14:28:17 12  manager, when there's a huge shrink, you're the one

14:28:20 13  who's held responsible; correct?

14:28:22 14  A.  Yes.

14:28:22 15  Q.  Thank you.  And that's what happened when you

14:28:30 16  moved from the -- from the store manager position in

14:28:34 17  2001, to assistant manager, it was because your store

14:28:37 18  had a huge shrink; correct?

14:28:39 19  A.  Yes, it is.

14:28:40 20  Q.  Now, I think you said about $116,000 worth of a

14:28:44 21  loss?

14:28:44 22  A.  Yes.

14:28:44 23  Q.  In other words, based on the merchandise that

14:28:48 24  came in at the store that you were supposed to have,

14:28:51 25  your store had $116,000, which was either lost to

14:28:57   1   internal theft with employees, or from customer theft;

14:29:00   2   correct?

14:29:00   3       A.   Yes.

14:29:00   4       Q.   And as a result of that shrink, you went from

14:29:03   5   manager to assistant manager?

14:29:05   6       A.   I stepped down.

14:29:06   7       Q.   And everybody else was terminated; correct?

14:29:09   8       A.   All but one employee.

14:29:10   9       Q.   You or someone else?

14:29:12   10      A.   Cashier.

14:29:12   11      Q.   And your contention, of course, is you stepped

14:29:16   12  down voluntarily?

14:29:17   13      A.   Yes, I did.

14:29:18   14      Q.   And your district manager at the time, or

14:29:21   15  throughout the entire time when you were store manager,

14:29:26   16  is Ms. Peggy Pedigo; is that correct?

14:29:29   17      A.   Yes, it was.

14:29:30   18      Q.   And because you were responsible for the

14:29:34   19  merchandise, I think that's why you say "as a manager"

14:29:38   20  -- and I'm quoting from your deposition, pages 144, 145,

14:29:42   21  if you want to verify.  You say:  "As a manager," and I

14:29:46   22  quote, "I like to check up on the store.  I want to make

14:29:51   23  sure everything is going all right."

14:29:55   24           And that is what you did as a manager; correct?

14:29:57   25      A.   This is the deposition?

14:29:59    1      Q.   Yes, ma'am.   The big transcript, I'm sorry.

14:30:02    2   Pages 144 and 145.

14:30:24    3      A.   144 and 145?

14:30:27    4      Q.   Yeah.

14:30:28    5      A.   What line?

14:30:30    6      Q.   Line 21 is the part that I quote, and you can

14:30:37    7   read the entire page.   We were talking about in your

14:30:39    8   deposition about you coming in to check on the store on

14:30:43    9   your off days, or when you've been away.

14:30:46   10           And on line 21 and 22, you said:   "I like to

14:30:49   11   check on the store"; correct?

14:30:50   12      A.   Yes.

14:30:51   13      Q.   And if you flip to the next page, the very top of

14:30:55   14   page 145, you say:   "I want to check in, make sure

14:31:03   15   everything is going all right."   You said that; correct?

14:31:07   16      A.   Yes.

14:31:07   17      Q.   And that's because you were held responsible for

14:31:11   18   that store; correct?

14:31:12   19      A.   Yes, I was.   Me and assistant manager, yes.

14:31:15   20      Q.   And when you were coming in to check in --

14:31:21   21   according to 144 and 145 -- it was when the assistant

14:31:24   22   manager was there; correct?

14:31:25   23      A.   Yes.

14:31:26   24      Q.   Okay.   As a store manager, there were employees

14:31:40   25   who were hired for your store; correct?

14:31:42  1      A.   Yes.

14:31:42  2      Q.   And I think you testified that Ms. Pedigo, when

14:31:46  3  you became the store manager, told you to go ahead and

14:31:51  4  hire someone if you needed somebody; correct?

14:31:53  5      A.   Yes, she did.

14:31:54  6      Q.   Okay.  And so after that, when you had a vacancy,

14:32:00  7  you would review the applications; correct?

14:32:03  8      A.   Yes.

14:32:03  9      Q.   And you will decide which employees to bring in

14:32:07  10  for an interview, correct?

14:32:08  11      A.   No.  I didn't decide which ones to bring in.

14:32:11  12      Q.   You did not decide who to bring in?

14:32:13  13      A.   I talked to her first, then I went over the

14:32:16  14  application.

14:32:17  15      Q.   Okay.

14:32:18  16      A.   Did the interviewing process.

14:32:20  17      Q.   Well, let's take them one step at a time now.

14:32:25  18  Your contention is, Ms. Pedigo was involved and decided

14:32:32  19  who to bring in for interviews?

14:32:34  20      A.   Yes.

14:32:34  21      Q.   All right.  Let's take the employees who were

14:32:37  22  hired that you were involved in.  There was one named

14:32:41  23  Cassandra Carter; correct?

14:32:43  24      A.   Yes.

14:32:43  25      Q.   And she was hired in to replace Lameka Woods;

| | | |
|---|---|---|
| 14:32:51 | 1 | correct? |
| 14:32:51 | 2 | A.   Yes. |
| 14:32:52 | 3 | Q.   You had a vacancy because Ms. Woods was |
| 14:32:55 | 4 | terminated; correct? |
| 14:32:57 | 5 | A.   Yes. |
| 14:32:57 | 6 | Q.   You reviewed ten applications; correct? |
| 14:33:00 | 7 | A.   I can't recall how many. |
| 14:33:03 | 8 | Q.   And if you don't recall how many you reviewed, |
| 14:33:10 | 9 | then you probably will not remember what you bring them |
| 14:33:14 | 10 | in for.  So let me help you -- |
| 14:33:19 | 11 | MR. QUINN:  Excuse me for interrupting. |
| 14:33:21 | 12 | Judge, can we approach? |
| 14:33:22 | 13 | MR. KALLON:  Sure.  I'm sorry.  Judge, do |
| 14:33:24 | 14 | you want us to approach? |
| 14:33:26 | 15 | THE COURT:  Yes.  Yes. |
| 14:33:35 | 16 | (At bench:) |
| 14:33:35 | 17 | MR. QUINN:  Are we dealing with a 45-minute |
| 14:33:41 | 18 | rule -- |
| 14:33:41 | 19 | THE COURT:  No. |
| 14:33:41 | 20 | MR. QUINN:  -- on this? |
| 14:33:43 | 21 | THE COURT:  No. |
| 14:33:43 | 22 | MR. QUINN:  No? |
| 14:33:45 | 23 | THE COURT:  How much more do you have? |
| 14:33:46 | 24 | MR. KALLON:  Hiring and firing, and then |
| 14:33:50 | 25 | some other stuff. |

14:33:51   1              MR. QUINN:  Okay.

14:33:52   2              THE COURT:  Well --

14:33:53   3              MR. KALLON:  I'll speed it up, Your Honor.

14:33:55   4              THE COURT:  Well, we do have a rule, but I

14:33:58   5    thought we were --

14:34:01   6              MR. KALLON:  The problem is, she's just

14:34:08   7    being contentious and arguing stuff she doesn't need to

14:34:11   8    argue.

14:34:11   9              THE COURT:  Okay.  All right.

14:34:23  10                  (End of bench conference.)

14:34:28  11    BY MR. KALLON:

14:34:28  12       Q.  There was a Cassandra Carter that was hired at

14:34:31  13    your store; correct?

14:34:32  14       A.  Yes.

14:34:33  15       Q.  If you will turn with me to page 53 of your

14:34:39  16    deposition, the big transcript.  And I'm going to go to

14:34:50  17    line 9, just so you can confirm that we were talking

14:34:53  18    about Ms. Carter.

14:34:55  19              You see that question:  "How did you pick

14:34:58  20    Ms. Carter as one to call?"

14:34:59  21       A.  Yes.

14:34:59  22       Q.  All right.  And go down with me to line 23 of

14:35:04  23    page 53 and then flip over to 54.  The question was:

14:35:08  24    "How many applications would you say you had to look

14:35:11  25    through?"  What was your answer?

14:35:13  1      A.   "Not many, probably about ten."

14:35:15  2      Q.   "About ten; correct?"

14:35:16  3      A.   "Yeah, probably about ten."

14:35:18  4      Q.   And I went on down and said:  "Did you call" --

14:35:24  5  reading down from line 5 -- "did you call anybody else

14:35:27  6  besides Ms. Carter?"  And then we subsequently asked you

14:35:33  7  on line 13:  "How many people came in?"  And what was

14:35:35  8  your answer there?

14:35:36  9      A.   "About three."

14:35:37  10     Q.   Keep going.

14:35:38  11     A.   "Three more besides her."

14:35:41  12     Q.   So you reviewed ten applications; correct?

14:35:44  13     A.   Yes.

14:35:45  14     Q.   And you brought in four people to interview;

14:35:50  15  correct?

14:35:50  16     A.   Yes.

14:35:52  17     Q.   And as a result of the interviews, you selected

14:36:00  18  Ms. Carter --

14:36:01  19     A.   Yes.

14:36:01  20     Q.   -- for the position; correct?

14:36:02  21     A.   Yes.

14:36:03  22     Q.   And the thing you liked about Ms. Carter was she

14:36:06  23  had a lot of job history and she had never been

14:36:09  24  terminated from a position; correct?

14:36:11  25     A.   Yes.

14:36:11  1     Q.   Okay.  And once you selected her, of course, you

14:36:19  2  told her what you expected of her.  You gave her the

14:36:22  3  policy book --

14:36:23  4     A.   Yeah.

14:36:23  5     Q.   -- and you told her when to report to work?

14:36:25  6     A.   Yes.

14:36:25  7     Q.   And then you submitted the paperwork to cooperate

14:36:29  8  so that she could get paid; correct?

14:36:33  9     A.   Yes.

14:36:33 10     Q.   And then the next person that I have down being

14:36:35 11  hired is a guy named D. J. Carpenter; correct?

14:36:39 12     A.   D. J. Carpenter, yes.

14:36:42 13     Q.   You hired him because you needed a stock guy?

14:36:45 14     A.   Yes.  I needed one, I needed to hire somebody.

14:36:47 15     Q.   Okay.  And you agreed you needed somebody to help

14:36:51 16  with you the stocking; correct?

14:36:52 17     A.   Yes.

14:36:53 18     Q.   And, again, you interviewed Mr. Carpenter?

14:36:59 19     A.   Carpenter, yes.

14:36:59 20     Q.   Ms. Pedigo was not involved in the interview

14:37:03 21  process; correct?

14:37:04 22     A.   I talked to her first.

14:37:05 23     Q.   I know that, but she did not actually interview

14:37:08 24  Mr. Carpenter?

14:37:08 25     A.   No.

14:37:09   1       Q.   Likewise, she did not interview Ms. Cassandra
14:37:14   2   Carter?
14:37:14   3       A.   No, she didn't.
14:37:15   4       Q.   Those were the two people you wanted hired at
14:37:17   5   your store; correct, when you were store manager?
14:37:19   6       A.   Yes.
14:37:19   7       Q.   And both of them were hired; correct?
14:37:21   8       A.   Yes, they were.
14:37:22   9       Q.   And, in fact, Mrs. Pedigo told you if you needed
14:37:26  10   somebody hired, go ahead and do so?
14:37:28  11       A.   Go ahead and hire someone.
14:37:30  12       Q.   Thank you.  And then people were terminated at
14:37:32  13   your store, when you were a store manager; correct?
14:37:35  14       A.   Yes.
14:37:36  15       Q.   And I think there were two people that I remember
14:37:39  16   from your prior testimony, and both were terminated for
14:37:43  17   essentially sliding merchandise?
14:37:44  18       A.   Yes.
14:37:45  19       Q.   In other words, letting a customer walk out with
14:37:49  20   more merchandise than they paid for?
14:37:50  21       A.   Yes.
14:37:51  22       Q.   And for the first one -- and you may remember the
14:37:56  23   employee's name, in your deposition you didn't -- but
14:37:59  24   for the first one, you were on the floor; correct?  And
14:38:03  25   you noticed a buggy full of stuff go to the cash

14:38:09    1    register; correct?

14:38:10    2        A.   That's the second one, I think.

14:38:11    3        Q.   Okay.  What was the first one about?

14:38:13    4        A.   Cassandra Carter was the first.  Candice Rancher

14:38:18    5    was the second.

14:38:18    6        Q.   Candice was the second?

14:38:21    7        A.   Cassandra was first one.

14:38:22    8        Q.   Let's talk about Candice.  Candice, again, you

14:38:25    9    were on the floor; correct?

14:38:25   10        A.   Yes, uh-huh.

14:38:26   11        Q.   And you said earlier you kept your head up?

14:38:30   12        A.   Yes.

14:38:30   13        Q.   Correct?

14:38:31   14        A.   Yes.

14:38:31   15        Q.   And you were observing and listening?

14:38:34   16        A.   Yes.

14:38:34   17        Q.   And you noticed that the customer had a bag full

14:38:38   18    of stuff, or cart full of stuff; correct?

14:38:40   19        A.   Yes, she did.

14:38:41   20        Q.   Went to the register?

14:38:43   21        A.   Yes.

14:38:43   22        Q.   And then you started listening in for the rings?

14:38:46   23        A.   Yes, I did.

14:38:47   24        Q.   And then you noticed that the cashier did not

14:38:51   25    ring up as much merchandise as you saw on the cart?

14:38:57  1    A.  Yes.

14:38:58  2    Q.  And so when she was finished, you went up there

14:39:02  3  and confronted the two of them; correct?

14:39:04  4    A.  Yes.

14:39:05  5    Q.  You gave the customer, I guess, a refund after

14:39:13  6  you verified that their receipt did not match what they

14:39:17  7  had on their sacks; correct?

14:39:18  8    A.  Yes, I did.

14:39:19  9    Q.  And then you brought Ms. Rancher to the back

14:39:24  10  room; correct?

14:39:24  11    A.  Took her up in the office.

14:39:24  12    Q.  And you fired her?

14:39:27  13    A.  Yes, I did.

14:39:27  14    Q.  And then after you fired her was when you called

14:39:30  15  your district manager; correct?

14:39:30  16    A.  I called the district manager after, but -- we

14:39:34  17  had some trouble with this girl before.

14:39:36  18    Q.  I'm sorry?

14:39:37  19    A.  We had had some trouble with this girl before, me

14:39:39  20  and Peggy had talked about this girl two times before --

14:39:43  21  before this even happened.  And she told me if she -- if

14:39:46  22  she -- if I catch her doing this, yes, terminate her.

14:39:49  23    Q.  You terminated her before calling your DM;

14:39:54  24  correct?

14:39:54  25    A.  Yes.  But this had occurred before.  One of the

14:39:58  1    employees noticed it.

14:39:59  2         Q.   Okay.

14:40:00  3         A.   And she told me to keep an eye on it.

14:40:02  4         Q.   That's my question, though.   You terminated

14:40:05  5    before you called your district manager --

14:40:06  6         A.   Yes, I did.

14:40:07  7         Q.   -- and that was because of a prior understanding

14:40:11  8    you had with your district manager; correct?

14:40:12  9         A.   Yes.

14:40:12  10        Q.   And you sat here through the last time, you saw

14:40:17  11   those policies that were posted on the board, and this

14:40:19  12   jury has seen them as well, that says, before you

14:40:22  13   terminate anybody, you need to check with your district

14:40:25  14   manager first; correct?

14:40:26  15        A.   We had talked.   We had talked.

14:40:28  16        Q.   Correct.   So you made a -- you did not follow the

14:40:32  17   policy that particular time, because you and your

14:40:35  18   district manager had a prior arrangement?

14:40:38  19        A.   Yeah, we did have a prior arrangement.

14:40:40  20        Q.   Thank you.

14:40:40  21        A.   She told me if I caught her doing something, yes,

14:40:44  22   go ahead and terminate, because we didn't need that at

14:40:47  23   the store.

14:40:47  24        Q.   Correct.   So your district manager, Ms. Pedigo,

14:40:50  25   made an exception to the written policy that you're

14:40:53  1  familiar with that said, before you terminate anyone,

14:40:56  2  call me first; correct?

14:40:57  3      A.  Yes, she did.

14:40:58  4      Q.  And you, of course, were not terminated for that?

14:41:01  5      A.  No.

14:41:01  6      Q.  You were not terminated --

14:41:03  7      A.  She told me to terminate her beforehand.

14:41:05  8      Q.  I know -- I'm not arguing with you.  I'm just

14:41:09  9  trying to prove a point that that was a time when there

14:41:11  10  was a deviation from the policy; correct?

14:41:14  11      A.  I guess there were --

14:41:15  12          MR. QUINN:  I object to that, Your Honor.  I

14:41:16  13  think that's argumentative, as to whether or not it was

14:41:18  14  a deviation from the policy.

14:41:20  15          She contacted the district manager, she had

14:41:23  16  spoken to the district manager, and she had gotten

14:41:26  17  permission.  I think that's exactly what the policy says

14:41:29  18  she's supposed to do.

14:41:30  19          MR. KALLON:  And, of course, when the prior

14:41:32  20  witnesses testified today, you guys argued extensively

14:41:35  21  that they breached the policy --

14:41:37  22          MR. QUINN:  No.  I think that's

14:41:38  23  argumentative.

14:41:39  24          THE COURT:  Ladies and gentlemen, this is

14:41:41  25  not the time for argument.  I'm going to overrule the

14:41:44  1    objection.  You may proceed.

14:41:47  2    BY MR. KALLON:

14:41:47  3        Q.  Ms. Richardson, you were not disciplined for

14:41:52  4    firing that employee before calling Ms. Pedigo, were

14:41:54  5    you?

14:41:55  6        A.  No, I weren't.

14:41:56  7        Q.  And as far as you know, Ms. Pedigo was not

14:41:58  8    disciplined for allowing you to fire somebody without

14:42:01  9    calling her first?

14:42:01  10        A.  I don't know.

14:42:02  11        Q.  And you and Ms. Coleman shared the same district

14:42:06  12    manager?

14:42:06  13        A.  Yes, we did.

14:42:07  14        Q.  Thank you.  And there was another employee,

14:42:10  15    Cassandra, who was also terminated?

14:42:13  16        A.  Who?

14:42:13  17        Q.  There was a second employee that was terminated;

14:42:16  18    correct?

14:42:16  19        A.  Cassandra and Candice.  That was Candice Rancher.

14:42:20  20        Q.  We just talked about Candice.

14:42:21  21        A.  Yes.

14:42:22  22        Q.  The other was Cassandra Carter?

14:42:25  23        A.  Yes.

14:42:25  24        Q.  She was terminated for sliding merchandise?

14:42:27  25        A.  Yes.

14:42:27  1      Q.   And those were the only two employees that you

14:42:30  2  wanted to terminate at your store; correct?

14:42:33  3      A.   It was all -- yes.

14:42:35  4      Q.   And both of them were terminated?

14:42:37  5      A.   Yes.

14:42:37  6      Q.   In other words, you never went to your district

14:42:40  7  manager and said, I want to terminate someone and she

14:42:43  8  told you no?

14:42:44  9      A.   Cassandra Carter.

14:42:45  10     Q.   And that was --

14:42:46  11     A.   She didn't tell me no.  I talked to her about

14:42:50  12  Cassandra Carter first.

14:42:50  13     Q.   And she said yes?

14:42:51  14     A.   Yes.

14:42:52  15     Q.   That's my question.  I'm sorry for not being

14:42:54  16  clear.

14:42:54  17           You never went to your district manager with

14:42:58  18  a termination and your district manager reject it;

14:43:01  19  correct?

14:43:02  20     A.   No.

14:43:02  21     Q.   And, again, all the employees that you wanted

14:43:04  22  hired that you recommended for hiring were hired;

14:43:07  23  correct?

14:43:07  24     A.   Yes.  She gave me permission, yes.

14:43:09  25     Q.   And as a store manager, you counsel the employees

14:43:11  1    when they step out of line; correct?

14:43:13  2         A.   I never counseled anybody.

14:43:17  3         Q.   You had good employees?

14:43:18  4         A.   Yeah.

14:43:20  5         Q.   And the only ones to step out of line were the

14:43:23  6    two that you reported to the district manager -- I'm

14:43:26  7    sorry, Cassandra, who you reported to the district

14:43:28  8    manager; and Candice, who you terminated?

14:43:30  9         A.   Those are the only ones I caught.

14:43:32  10        Q.   And at the store level, the assistant manager

14:43:42  11   reported to you; correct?

14:43:44  12        A.   Yes.

14:43:45  13        Q.   And the rest of the employees reported to you;

14:43:47  14   correct?

14:43:47  15        A.   Yes.

14:43:47  16        Q.   And one of the many things that you did, of

14:43:52  17   course, as a store manager is to enforce Family Dollar's

14:43:56  18   policies and procedures at your store?

14:43:57  19        A.   Yes.

14:43:59  20             MR. KALLON:   Thank you.   Thank you, ma'am.

14:44:09  21             THE COURT:   You may proceed with the

14:44:12  22   examination.

14:44:12  23             MR. QUINN:   Excuse me?

14:44:13  24             THE COURT:   You may proceed.

14:44:14  25             MR. QUINN:   Thank you.

14:44:17   1          <u>CROSS-EXAMINATION</u>

14:44:17   2    <u>BY MR. QUINN</u>:

14:44:18   3       Q.   Ms. Richardson, when you had -- when there was

14:44:26   4    any shortage while you were the store manager, tell us

14:44:34   5    what you did as a result of that.

14:44:36   6       A.   After -- I stepped down to cashier.

14:44:42   7       Q.   Okay.  And who did you tell that you were going

14:44:45   8    to step down?

14:44:46   9       A.   Ms. Pedigo.

14:44:47  10       Q.   And why did you tell her you were stepping down?

14:44:50  11       A.   I didn't want the position anymore.

14:44:52  12       Q.   And what have you been doing since?

14:44:55  13       A.   Well, since then, I've been assistant manager

14:44:59  14    again.

14:45:00  15       Q.   All right.  Well, what was your position until

14:45:02  16    you became an assistant manager again?

14:45:04  17       A.   I was cashier first.  The position I had before

14:45:08  18    that I stepped down to was cashier, and I stepped back

14:45:11  19    up to assistant manager.

14:45:11  20       Q.   Were you asked --

14:45:12  21       A.   Yes.

14:45:13  22       Q.   -- to step back up?

14:45:14  23       A.   Ms. Pedigo asked me to step back up.

14:45:17  24       Q.   Have you been asked to become a store manager

14:45:19  25    again?

14:45:20   1        A.   Well, by Ms. Coleman, yes.

14:45:22   2        Q.   So -- so what happened to you was not held

14:45:26   3    against you?

14:45:26   4        A.   No.  No.

14:45:27   5        Q.   And it was your choice?

14:45:29   6        A.   It was my choice.

14:45:30   7        Q.   On the front of your store, what numbers,

14:45:41   8    telephone numbers appear?

14:45:43   9        A.   On the door, the left corner, right corner of the

14:45:47  10    door is district manager's, the manager's number, and

14:45:51  11    the assistant manager's.

14:45:53  12        Q.   Now, you were asked some questions about doing

14:46:01  13    the paperwork.  First of all, what kind of paperwork are

14:46:05  14    we talking about?

14:46:06  15        A.   Log book, refund audits, cashier audits,

14:46:14  16    deposits, store deposits, things of that nature.

14:46:17  17        Q.   And who does those?

14:46:19  18        A.   Assistant manager and I do.

14:46:20  19        Q.   On the days that you are not there, who does

14:46:25  20    them?

14:46:25  21        A.   Assistant manager.

14:46:25  22        Q.   On the days that you were there, who does them?

14:46:29  23        A.   I do.

14:46:30  24        Q.   On the days that you are there and you do them,

14:46:34  25    does the assistant manager have anything to do with

14:46:38   1   those papers?

14:46:40   2      A.   Yes.   We have to verify and we have to initial

14:46:42   3   after each of them.

14:46:43   4      Q.   Does -- on the days that the assistant manager is

14:46:46   5   not there, does she still have to verify what you do

14:46:50   6   with your -- with the paperwork?

14:46:52   7      A.   Yes, she do.

14:46:53   8      Q.   Do you both have to initial it?

14:46:56   9      A.   We both have to.

14:46:57   10      Q.   And like that, as he was questioning you, on the

14:47:01   11   days that you're off and you come back in --

14:47:03   12      A.   Yes.

14:47:03   13      Q.   -- you do the same thing --

14:47:04   14      A.   Same thing.

14:47:05   15      Q.   -- don't you, so that you both have to check

14:47:09   16   behind each other --

14:47:10   17      A.   Each other.   Yes, sir.

14:47:11   18      Q.   -- concerning the paperwork?

14:47:12   19      A.   Yes.

14:47:13   20      Q.   So, whose responsibility is it?   Is it any more

14:47:16   21   yours than hers?

14:47:17   22      A.   No.

14:47:18   23      Q.   Now, how long does it take to do that paperwork

14:47:21   24   in the course of a day?

14:47:23   25      A.   No more than 45 minutes.

14:47:25  1    Q.  Now, you -- he was also asking you questions
14:47:30  2  about ordering.  I want to talk a minute about ordering.
14:47:35  3  How do you order?
14:47:37  4    A.  We have a small computer, hand-held computer.
14:47:40  5  It's PDT gun.
14:47:42  6    Q.  You have a gun?
14:47:43  7    A.  Yes.
14:47:43  8    Q.  Okay.  Now, what do you do with the gun?
14:47:46  9    A.  We have to go to the shelves and scan.  It's got
14:47:50 10  a scanner on each item.  You have to scan and put in the
14:47:54 11  quantity.
14:47:54 12    Q.  Who does that?
14:47:55 13    A.  Pretty much anybody can do that.
14:47:58 14    Q.  After it's done, what happens?  If -- once it
14:48:02 15  gets in the gun, what happens?
14:48:03 16    A.  You take it up to the computer and have it done
14:48:07 17  over the computer, it's sent to home office.
14:48:09 18    Q.  Sent to the home office.  Is that something that
14:48:13 19  you or the assistant manager have to do, is to take it
14:48:16 20  to the computer; or does whoever scan the gun do that?
14:48:20 21    A.  Whoever scans the gun can do that, because I've
14:48:26 22  done it about a few weeks back.
14:48:27 23    Q.  You're a stocker?
14:48:29 24    A.  Yes.
14:48:29 25    Q.  Do you do that now as a stocker --

14:48:31  1      A.   I have done it.

14:48:32  2      Q.   -- at your store?

14:48:32  3      A.   I have done it, about three or four weeks ago.

14:48:35  4      Q.   Okay.  And after all of that is done, as -- as

14:48:41  5  the store manager or as the store assistant manager, is

14:48:46  6  there anything else that either you or the assistant

14:48:50  7  manager have to do to complete that order; or is it

14:48:53  8  completed once it goes into the computer?

14:48:56  9      A.   It's completed once it goes into the computer.

14:48:59  10     Q.   Is there any paperwork you have to fill out?

14:49:01  11     A.   No.  We have paperwork come down off the

14:49:04  12  computer --

14:49:04  13     Q.   Okay.

14:49:05  14     A.   -- and print out.

14:49:06  15     Q.   It's a printout?

14:49:07  16     A.   It's a printout.

14:49:08  17     Q.   And the printout says what?

14:49:10  18     A.   Everything you have ordered.

14:49:11  19     Q.   Let me see if I've got it straight.  You use the

14:49:14  20  gun to order?

14:49:15  21     A.   Yes, sir.

14:49:15  22     Q.   And the gun tells you how many quantities are in

14:49:18  23  a particular -- you may have a six-pack or a

14:49:22  24  twelve-pack, or something like that; right?

14:49:24  25     A.   That quantity is on the shelf.

14:49:25    1      Q.   You have to order one or the other?

14:49:26    2      A.   Yes.

14:49:27    3      Q.   You have to count what's on the shelf?

14:49:28    4      A.   Yes.

14:49:29    5      Q.   And then -- then the -- you push the button or

14:49:32    6  does the -- does the gun do it automatically?

14:49:36    7            MR. KALLON:  Your Honor, Mr. Quinn is

14:49:37    8  repeatedly leading the witness.

14:49:40    9            THE COURT:  Sustained.

14:49:41   10            MR. KALLON:  Thank you.

14:49:42   11  BY MR. QUINN:

14:49:42   12      Q.   What do you do?

14:49:43   13      A.   Push the button.

14:49:44   14      Q.   Push the button.  Okay.  How long, in the course

14:49:49   15  of the day, does it take -- withdraw that.

14:49:53   16           Do you order every day?

14:50:03   17      A.   No, sir.  Once a week.

14:50:03   18      Q.   And how long does it take to order?

14:50:03   19      A.   Take about an hour.

14:50:03   20      Q.   How much of that ordering is done just by you,

14:50:09   21  the store manager?

14:50:09   22      A.   Well, I might be -- probably a little over 50

14:50:16   23  percent of it, because I might order 300 piece and

14:50:20   24  they'll send 800.

14:50:21   25      Q.   Does anybody else -- my question is:  Are you the

14:50:25    1    only one doing it?

14:50:26    2        A.   No.   The assistant manager, or either -- I have

14:50:27    3    done it as a stocker.

14:50:30    4        Q.   You were asked questions about the schedule.

14:50:42    5    Does the schedule already have all of the hours that

14:50:48    6    each person in your store is going to work computed?

14:50:53    7        A.   Yes, it does have how many hours -- like cashier;

14:50:59    8    number one cashier, number two cashier.   It would have

14:51:03    9    the hours posted over on the side.

14:51:04   10        Q.   And you fill the name in?

14:51:06   11        A.   Yes.

14:51:06   12        Q.   Okay.   And -- and if someone is sick or someone

14:51:13   13    is out, are you allowed to -- to -- to change not the

14:51:21   14    total number of hours, but what -- are you ever allowed

14:51:25   15    to change the total number of hours?

14:51:28   16        A.   No.

14:51:30   17        Q.   You --

14:51:32   18        A.   Yes.   We have to change total number of hours, if

14:51:35   19    someone's out sick.   If someone's out sick.

14:51:37   20        Q.   Okay.   And when you do that, do you have to

14:51:40   21    report that to the district manager?

14:51:41   22        A.   No, because it -- you know, we still stay within

14:51:47   23    that payroll budget --

14:51:48   24        Q.   You have to stay within the payroll budget?

14:51:51   25        A.   Yes.

14:51:51   1       Q.   You cannot deviate from the payroll budget?

14:51:53   2       A.   No.  No.

14:51:54   3       Q.   Now, do you just work hours in the store, or do

14:51:59   4   you work hours when the store is not open?

14:52:00   5       A.   I have worked when the store wasn't open.

14:52:03   6       Q.   How many hours do you think you work, say, before

14:52:07   7   opening?

14:52:07   8       A.   We used to open up at 9:00.  I have been there

14:52:13   9   from 7:00 to 9:00 sometimes.

14:52:14  10       Q.   How about after it closes?

14:52:16  11       A.   I'm never there after it closes, unless it's

14:52:19  12   inventory and everybody's there.

14:52:21  13       Q.   Okay.  What is the most hours that any one of

14:52:24  14   your people that work in that store other than yourself

14:52:27  15   is allowed to work?

14:52:28  16       A.   The assistant manager works 40.  She can't get no

14:52:34  17   more than 40.

14:52:35  18       Q.   And how many did you say that you average working

14:52:39  19   as the store manager?

14:52:40  20       A.   From 69 to 70, sometimes 80.

14:52:48  21       Q.   And using just 60 as a figure and -- how much

14:52:59  22   were you making, you were making 435 --

14:53:02  23       A.   A week.

14:53:03  24       Q.   -- a week?  That's 60 hours into 435, if my math

14:53:08  25   is correct, is $7.25 an hour?

14:53:11   1     A.   Yes.

14:53:11   2     Q.   What's your job now?

14:53:15   3     A.   Stocker.

14:53:15   4     Q.   How much are you making an hour as a stocker?

14:53:18   5     A.   7.95.

14:53:20   6     Q.   So you're making more as a stocker an hour than

14:53:23   7   you were as a store manager?

14:53:25   8             MR. KALLON:   Objection, Your Honor.   One,

14:53:31   9   it's argumentative, Your Honor; and, two, he's also

14:53:35  10   leading the witness.

14:53:36  11             THE COURT:   The objection is sustained.

14:53:38  12     Q.   How much are you making as a stocker?

14:53:40  13     A.   7.95 an hour.

14:53:42  14     Q.   How long were you a store manager?

14:54:13  15     A.   For like two years and four months, something

14:54:15  16   like that.

14:54:16  17     Q.   Okay.   Now, am I -- am I correct that you -- that

14:54:31  18   you were told by the store manager that she had gotten

14:54:35  19   approval to hire you from the district manager?

14:54:37  20     A.   Yes.

14:54:38  21     Q.   Okay.   Now, you became an assistant manager.   Did

14:54:44  22   you talk to the district manager before you became an

14:54:47  23   assistant manager?

14:54:47  24     A.   Yes, I did it.

14:54:50  25     Q.   Did you ever have an occasion to recommend

14:54:56  1    someone to become an assistant manager while you were a

14:54:59  2    store manager?

14:55:00  3        A.   Yes.

14:55:02  4        Q.   And in that instance, who did you recommend that

14:55:07  5    person to?

14:55:08  6        A.   To the district manager.

14:55:09  7        Q.   And what did the district manager do after you

14:55:12  8    recommended?

14:55:15  9        A.   She -- she hired her.

14:55:17  10       Q.   Did she have --

14:55:18  11       A.   She promoted her.

14:55:19  12       Q.   -- did she have to come to the store?

14:55:22  13       A.   Yeah.  She had to come in.

14:55:24  14       Q.   Tell the jury what she had to do to promote that

14:55:27  15   person.

14:55:28  16       A.   She had to come in and do -- to her computer, she

14:55:31  17   had to put the PAF and put her wages in, what she was

14:55:34  18   going to be making.

14:55:35  19       Q.   So she didn't let you do it?

14:55:37  20       A.   No, I doesn't do that.

14:55:38  21       Q.   You don't do that?

14:55:40  22       A.   No, sir.

14:55:40  23       Q.   And am I right, that during the time you were a

14:55:49  24   store manager that you probably hired two people, and

14:55:55  25   were involved in the terminations of two people?

14:55:57  1    A.  Yes.

14:55:57  2    Q.  Okay.  And we'll talk about those in a minute.

14:56:07  3  Let me ask you this:  While you were a cashier and a

14:56:13  4  store manager -- excuse me, an assistant store manager,

14:56:21  5  were you able to -- to watch and observe the store

14:56:27  6  manager?

14:56:27  7    A.  Yes.

14:56:27  8    Q.  Did you observe that the store manager worked

14:56:35  9  more hours than you did as a cashier or -- as a cashier?

14:56:39  10    A.  Yes.

14:56:39  11    Q.  And was that the responsibility that you were

14:56:46  12  talking about when you were asked the question, more

14:56:51  13  responsibility was more hours?

14:56:53  14    A.  Yes.

14:56:53  15    Q.  And what was the personal reason that for a while

14:56:58  16  you were opposed or just really didn't want to take on

14:57:01  17  those extra hours?

14:57:02  18    A.  I -- I had a -- kind of like a big burden on me

14:57:08  19  at the time.

14:57:08  20    Q.  And what was that?

14:57:11  21    A.  I had a sick child.

14:57:11  22    Q.  What illness did your child have?

14:57:12  23    A.  Cancer.

14:57:14  24        MR. KALLON:  Judge --

14:57:14  25        THE COURT:  Sustained.

14:57:16  1          MR. KALLON:   Thank you.

14:57:17  2   BY MR. QUINN:

14:57:17  3      Q.  Did you -- did you have to be persuaded to take

14:57:25  4   the store manager job?

14:57:27  5      A.  Somewhat.   Somewhat.

14:57:32  6      Q.  But you eventually took it?

14:57:35  7      A.  Yes, I took it.

14:57:37  8      Q.  Did you receive any training --

14:57:51  9      A.  No, sir.

14:57:52  10     Q.  -- to be a store manager?

14:57:53  11     A.  No, sir.

14:57:53  12     Q.  Did you receive any training to be an assistant

14:57:59  13  manager?

14:57:59  14     A.  Not really.

14:58:02  15     Q.  Now, I want to talk about the -- the hires that

14:58:15  16  you were involved with.   And the first one that we'll

14:58:21  17  talk about is Ms. Carter, okay?

14:58:23  18     A.  Yes.

14:58:23  19     Q.  Now, what was the occasion for you hiring

14:58:34  20  Ms. Carter?

14:58:35  21     A.  We needed a cashier.

14:58:38  22     Q.  Did -- did -- and -- and tell the jury about the

14:58:44  23  conversation you had with the district manager about

14:58:45  24  that.

14:58:46  25     A.  Well, I called her and she told me I really

14:58:53  1    needed another cashier, because I had lost one and we

14:58:56  2    really needed another one.  So she told me to go ahead

14:58:59  3    and hire one.

14:59:00  4        Q.  And so you did -- I think you've already

14:59:03  5    testified.  What did you do in order to hire Ms. Carter?

14:59:06  6        A.  I looked through applications, did Stanton tests,

14:59:11  7    drug tests.  And after I did that, I called her and let

14:59:16  8    her know everything had came through and was approved.

14:59:19  9    And I talked to the district manager and let her know

14:59:22  10   that everything came through.

14:59:23  11       Q.  So did you talk to the district manager and give

14:59:27  12   her a recommendation, and she then said you could hire

14:59:31  13   that person?

14:59:32  14       A.  Yes.

14:59:32  15       Q.  You did involve the district manager --

14:59:35  16       A.  Yes.

14:59:36  17       Q.  -- didn't you?  Did you believe that that was

14:59:39  18   following policy?

14:59:40  19       A.  Yes.

14:59:41  20       Q.  Did you believe that you could hire her, even

14:59:44  21   though she had said go on and hire somebody, without

14:59:48  22   calling her and getting her involved in who you were

14:59:51  23   selecting?

14:59:52  24       A.  No.

14:59:52  25       Q.  Now, you hired somebody else.  You hired a

14:59:57  1    gentleman.  What was his name?

14:59:59  2        A.  D. J. Carpenter.

15:00:01  3        Q.  And in that instance, did you involve the

15:00:04  4    district manager?

15:00:05  5        A.  Yes.

15:00:05  6        Q.  Tell the jury about that.  What did you do?

15:00:07  7        A.  She came to the store, the district manager came

15:00:09  8    to the store and told me I really needed some more help

15:00:13  9    to help me and the assistant manager in the back.

15:00:15  10            So she told me to go ahead and hire a guy.  Pull

15:00:19  11   some applications and hire somebody.

15:00:21  12       Q.  So what did you do?

15:00:22  13       A.  I pulled applications, went through applications

15:00:25  14   and did Stanton tests, drug tests, and called her.

15:00:28  15       Q.  Again, you called her?

15:00:29  16       A.  Let her know I was getting ready to hire

15:00:32  17   somebody.

15:00:32  18       Q.  Did you ask her for approval?

15:00:34  19       A.  Yes.

15:00:35  20       Q.  Are those the only hires that you remember that

15:00:40  21   you were involved in?

15:00:41  22       A.  Yes, sir.

15:00:41  23       Q.  Were there other hires in your store while you

15:00:44  24   were there that you were not involved in?

15:00:46  25       A.  Yes, sir.

15:00:47  1      Q.   Tell the jury about those.

15:00:49  2      A.   I went on vacation, and Ms. Felicia Coleman and

15:00:54  3  Peggy Pedigo hired people while I was on vacation.

15:00:58  4      Q.   How many did they hire while you were on

15:01:01  5  vacation?

15:01:01  6      A.   Two.

15:01:01  7      Q.   Did you have anything to do with it?

15:01:03  8      A.   No, sir.

15:01:03  9      Q.   Had they -- did they wait until you got back from

15:01:08 10  vacation, or call you, or ask you, or anything like

15:01:11 11  that?

15:01:11 12      A.   They told me when I got back they had hired

15:01:13 13  somebody.

15:01:13 14      Q.   Did they involve you in the process at the time

15:01:18 15  that they hired them?

15:01:20 16      A.   No.

15:01:21 17      Q.   I guess you knew -- did you know that, what --

15:01:29 18  did you need the help?

15:01:30 19      A.   I imagine.

15:01:32 20      Q.   And do you know whether you had talked about

15:01:35 21  needing the help?

15:01:36 22      A.   No, I can't recall.

15:01:38 23      Q.   Did -- okay.  Now, the two incidents that were

15:01:49 24  talked about regarding the firing.  The first one, in

15:01:52 25  fact, was a lady that you had hired, Ms. Carter;

15:01:56   1   correct?

15:01:56   2       A.   Yes.

15:01:56   3       Q.   Okay.   And what happened in that instance?

15:02:03   4       A.   She was caught sliding merchandise.

15:02:07   5       Q.   Did you follow the policy on termination?

15:02:10   6       A.   Yes.   I called Peggy first, Ms. Pedigo first.

15:02:14   7       Q.   You did?

15:02:14   8       A.   On that one, yes.

15:02:16   9       Q.   Okay.   And did you have -- was it your

15:02:19  10   understanding on the policy that you had to get approval

15:02:22  11   from her to terminate?

15:02:23  12       A.   Yes.

15:02:23  13       Q.   And did you get that approval?

15:02:25  14       A.   Yes.

15:02:25  15       Q.   And then the second one, let's talk about that.

15:02:28  16   How many times had you talked to Ms. Pedigo about the

15:02:34  17   Rancher woman before she ultimately was terminated?

15:02:40  18       A.   A couple of times, we talked about it.

15:02:42  19       Q.   Had you asked Ms. Pedigo to terminate her before

15:02:48  20   this time, or had -- or had you just talked about what

15:02:52  21   you thought she was doing?

15:02:54  22       A.   We talked about termination.   She said if I

15:02:57  23   walked up on her doing that, I should terminate her.

15:02:59  24       Q.   So did she give you the prior approval for that

15:03:03  25   termination?

15:03:04  1      A.   Yes.

15:03:04  2      Q.   And about how long was that before you actually

15:03:08  3  caught her again doing that?

15:03:09  4      A.   About three weeks.

15:03:10  5      Q.   About three weeks.   Could you have terminated her

15:03:16  6  if you had not talked to Ms. Pedigo?

15:03:18  7      A.   No.

15:03:19  8      Q.   You were asked questions about your supervising.

15:03:50  9  During the course of the day, how much time do you spend

15:03:57  10  unloading the truck, stocking the shelves, running the

15:04:04  11  cash register, cleaning the store?   How much -- what

15:04:11  12  percentage of the day do you spend doing that?

15:04:13  13      A.   80 percent.

15:04:14  14      Q.   Does that ever go higher than that?

15:04:17  15      A.   No.

15:04:20  16      Q.   Or lower than that?

15:04:21  17      A.   No.   Never.   Never lower.

15:04:24  18      Q.   And during -- let's talk about a truck day, okay?

15:04:33  19  How big was your truck?

15:04:34  20      A.   None -- none less than 800.

15:04:39  21      Q.   Excuse me?

15:04:40  22      A.   None less than 800 pieces a week.

15:04:43  23      Q.   All right.   And generally, when you unloaded the

15:04:47  24  truck, who was with you?

15:04:48  25      A.   Assistant manager.

15:04:49   1      Q.   Anybody else?

15:04:51   2      A.   Until I hired -- we got -- we hired a stock guy.

15:04:54   3      Q.   For how long a period of time after you became a

15:04:58   4   store manager did just you and the assistant manager

15:05:00   5   unload the truck?

15:05:01   6      A.   Oh, I've been unloading the truck for -- I think

15:05:07   7   I missed five trucks in twelve years.

15:05:09   8      Q.   But I'm saying what period of time after you

15:05:12   9   became store manager before you hired some help, did

15:05:14   10  just you and the assistant manager unload it?

15:05:16   11     A.   Until we got the stock guy.   We hired a stock

15:05:19   12  guy.

15:05:20   13     Q.   Do you know how long that was?

15:05:22   14     A.   I sure don't.

15:05:23   15     Q.   And then when you got the stock guy, did he help

15:05:26   16  unload the truck?

15:05:27   17     A.   Yes.   It was three of us then.

15:05:30   18     Q.   Did you tell them what to do, or did you unload

15:05:34   19  the truck, too?

15:05:34   20     A.   I unloaded the truck, too.

15:05:36   21     Q.   Did the assistant manager know what to do about

15:05:39   22  unloading the truck?

15:05:40   23     A.   Yes.   She unloaded, too.   All three of us.

15:05:46   24     Q.   And who -- did the stocker learn how to unload

15:05:49   25  the truck?

15:05:49   1      A.   Yes, sir.

15:05:50   2      Q.   Did you have to tell the stocker what to do?

15:05:53   3      A.   No, sir.

15:05:53   4      Q.   And how long would it take to unload that truck?

15:05:59   5      A.   Sometimes about an hour and a half -- from hour

15:06:03   6   and a half to two hours.

15:06:04   7      Q.   And when -- after you unloaded, what have you got

15:06:07   8   to do?

15:06:07   9      A.   Start putting it out, working it out on the

15:06:11  10   shelves.

15:06:11  11      Q.   How long you got to get it out, according to the

15:06:13  12   rules?

15:06:14  13      A.   Within 24 hours.

15:06:15  14      Q.   Who does that?

15:06:16  15      A.   I do.  Managers, cashiers, assistant manager and

15:06:23  16   the stocker.  Everybody.  But mostly me --

15:06:27  17             THE COURT:  Isn't this kind of repetitious,

15:06:30  18   Mr. Quinn?

15:06:31  19             MR. QUINN:  Excuse me?

15:06:32  20             THE COURT:  Isn't this kind of repetitious?

15:06:36  21             MR. QUINN:  It's not repetitious of her, but

15:06:38  22   it is of other witnesses.

15:06:39  23             THE COURT:  Isn't this beyond the scope of

15:06:44  24   the direct?

15:06:44  25             MR. QUINN:  This is my -- that was adverse.

15:06:46   1    This is direct, is my understanding, I thought.

15:06:51   2              THE COURT:  Well, it's not cross, because

15:06:53   3    she's your witness, but you didn't call her.  I mean,

15:06:56   4    she's identified with you and a plaintiff, but you

15:06:58   5    didn't call her as a witness, did you?

15:07:00   6              MR. QUINN:  No.  They called her as an

15:07:02   7    adverse witness.

15:07:03   8              THE COURT:  Yes, sir.

15:07:04   9              MR. QUINN:  I'm about through, Your Honor.

15:07:14  10              THE COURT:  Good.

15:07:15  11    BY MR. QUINN:

15:07:15  12       Q.  You were asked, I believe, about the store

15:07:18  13    schematics and where the things go on the shelf?

15:07:21  14       A.  Yes.

15:07:21  15       Q.  Do you know what an end cap is?

15:07:23  16       A.  Yes, sir.

15:07:24  17       Q.  Were you allowed to -- to change end caps or do

15:07:32  18    anything like that?

15:07:32  19       A.  No, sir.  We got a monthly planner that's sent in

15:07:36  20    every month that we have to display certain items on the

15:07:39  21    end caps and the tables.

15:07:49  22       Q.  And did you ever get in trouble for doing it

15:07:55  23    differently?

15:07:55  24       A.  Yes, sir.

15:07:56  25       Q.  When was that?

15:07:57  1    A.   When I was manager.   I put some different stuff

15:08:02  2  that wasn't supposed to go on there, and she made me

15:08:05  3  move -- put the right stuff on it.

15:08:07  4    Q.   Who is "she"?

15:08:08  5    A.   Peggy Pedigo, the district manager.

15:08:11  6          MR. QUINN:   That's all I've got.   Thank you.

15:08:14  7          THE COURT:   Redirect?

15:08:15  8          MR. KALLON:   Thank you, Your Honor.

15:08:15  9                 **REDIRECT EXAMINATION**

15:08:15  10  **BY MR. KALLON:**

15:08:16  11    Q.   Ms. Richardson, I beg your indulgence, just a few

15:08:22  12  more questions.

15:08:24  13          Many of the questions that were posed to you were

15:08:26  14  about the employees that were hired during your

15:08:29  15  vacation.   The truth of the matter is, before you left

15:08:31  16  for vacation, you told Ms. Pedigo that you needed some

15:08:35  17  help at your store; correct?

15:08:37  18    A.   No.   I don't recall.

15:08:38  19    Q.   Go with me to the small transcript on Page 225.

15:08:53  20  I'm going to start with line number 20.   Are you there

15:08:57  21  yet, ma'am?

15:08:58  22    A.   No, not yet.

15:08:59  23    Q.   I'm sorry.   Just let me know when you are.

15:09:02  24    A.   I'm here.

15:09:03  25    Q.   "Question:   Before leaving on vacation, you had a

15:09:08   1    conversation with Ms. Pedigo in which you said you

15:09:11   2    needed some part-time help?"  What was your answer,

15:09:15   3    ma'am?

15:09:15   4        A.  "Yes."

15:09:16   5        Q.  "And that's the reason, ma'am, why they came and

15:09:20   6    hired the employees at your store; correct?"

15:09:22   7        A.  "No."  I was nervous and I didn't know what I was

15:09:25   8    saying.  No.

15:09:28   9        Q.  All right.  So --

15:09:30   10       A.  "Not while I was out."

15:09:31   11       Q.  All right.  The reason why I would ask you that

15:09:37   12   question and get that answer is because you had

15:09:40   13   testified about that earlier.  So let me see if I can

15:09:43   14   find the other reference.

15:09:45   15       Go with me to the big transcript on Pages 65 and

15:09:55   16   68.  Bear with me, that's a broad range.  I will find

15:10:00   17   you the right pages soon.

15:10:21   18       And you're saying in your testimony at trial is

15:10:24   19   they hired these individuals without your knowledge?

15:10:27   20       A.  Which page?  65 or 86?

15:10:30   21       Q.  No.  I'm asking you, your question -- your

15:10:33   22   deposition testimony -- stay away from that for now.

15:10:36   23   Your testimony is, in the small transcript, when you

15:10:39   24   said "yes", you're saying that that is not true, you

15:10:46   25   were nervous?

15:10:47   1        A.   Yes, I was.

15:10:48   2        Q.   So, Ms. Richardson, and -- Ms. Richardson, you're

15:11:00   3   saying that Ms. Pedigo and Ms. Coleman, I think, came to

15:11:05   4   your store and hired employees without your knowledge?

15:11:12   5        A.   Yes.

15:11:12   6        Q.   And --

15:11:15   7        A.   I found out about it when I came back off

15:11:18   8   vacation.

15:11:18   9        Q.   -- when you came back.   And you were told, I

15:11:21   10   guess when you came back, that they felt that you needed

15:11:23   11   more help?

15:11:24   12        A.   Yes, I guess I did.

15:11:25   13        Q.   Correct.   And prior to that, or maybe after that,

15:11:31   14   D. J. Carpenter was hired as a stock guy, because

15:11:37   15   Ms. Pedigo said you needed more help; correct?

15:11:39   16        A.   Yes.

15:11:39   17        Q.   And I think you told Mr. Quinn that after

15:11:43   18   Mr. Carpenter was hired, he helped unload a truck;

15:11:46   19   correct?

15:11:46   20        A.   Yes.   He helped us unload.

15:11:49   21        Q.   And he helped stock shelves?

15:11:50   22        A.   Yes.

15:11:51   23        Q.   He was being hired helped your work load?

15:11:54   24        A.   And he helped run the cash register, too.

15:11:57   25        Q.   Is that a yes --

15:11:57  1     A.   Yes.

15:11:58  2     Q.   -- to him being hired?

15:11:59  3     A.   No.   That didn't stop my work load none.

15:12:02  4          THE COURT:   Did it help the work load?

15:12:04  5          THE WITNESS:   Not really.   I still did the

15:12:05  6     same thing I was doing.

15:12:06  7     BY MR. KALLON:

15:12:06  8     Q.   Well, you did -- but you had help this time;

15:12:09  9     correct?

15:12:10  10    A.   A little bit, not much.

15:12:12  11    Q.   And the two employees that were hired in your

15:12:15  12    absence, again, you came in, after you came back from

15:12:19  13    vacation, and you continued to put them on the schedule;

15:12:22  14    correct?

15:12:22  15    A.   Yeah.   They had hired them, I had to put them on

15:12:25  16    the schedule.

15:12:25  17    Q.   And their work that they did was work that needed

15:12:28  18    to be done at that store; correct?

15:12:29  19    A.   Yes.

15:12:30  20    Q.   Okay.   When Mr. Quinn was asking you a question,

15:12:39  21    you said you had been approached, or someone had

15:12:41  22    suggested to you subsequently -- or recently, excuse me,

15:12:46  23    that you should become a store manager again?

15:12:47  24    A.   Yes.

15:12:48  25    Q.   And that was Ms. Coleman?

15:12:49    1    A.   Yes, she was talking about it.   I told her no.

15:12:52    2    Q.   Ms. Coleman is a store manager; correct?

15:12:54    3    A.   Yes.

15:12:54    4    Q.   She's not a district manager; correct?

15:12:56    5    A.   No, she's not.

15:12:57    6    Q.   In other words, she does not have the authority

15:13:00    7   to promote you to store manager; correct?

15:13:02    8    A.   She was going to talk to the DM.

15:13:04    9    Q.   Okay.   She was going to talk to the DM --

15:13:06   10    A.   Yes.

15:13:07   11    Q.   -- and the DM, of course, would have to make the

15:13:09   12   decision if to bring you back to the position?

15:13:11   13    A.   Yes.

15:13:12   14    Q.   As a stocker right now, who is your boss?

15:13:23   15    A.   LaWanda Scott.

15:13:24   16    Q.   That's a store manager; correct?

15:13:26   17    A.   Yes.

15:13:26   18    Q.   Your salary when you left -- and let the jury be

15:13:30   19   clear -- you left in 2001; correct, as a store manager?

15:13:34   20    A.   Yes.

15:13:34   21    Q.   And you were making 435 an hour back then;

15:13:38   22   correct?

15:13:38   23    A.   435 a week.

15:13:40   24    Q.   A week.   I'm sorry.   I'm sorry.   And your

15:13:44   25   assistant manager was making $6 an hour back then;

15:13:47   1   correct?

15:13:47   2       A.   Yes.

15:13:48   3       Q.   And now, of course, you as a stocker make 7.75 an

15:13:53   4   hour; correct?

15:13:53   5       A.   7.95 an hour.

15:13:55   6       Q.   This is 2006; correct?

15:13:57   7       A.   Yes.

15:13:57   8       Q.   And in 2001, the wages were lower than they are

15:14:01   9   now; correct?

15:14:01   10      A.   Yes.

15:14:02   11      Q.   The assistant manager at your store makes more

15:14:04   12  than you now; correct?

15:14:04   13      A.   Yes.

15:14:05   14      Q.   And do you know by any chance what the store

15:14:09   15  manager makes?

15:14:10   16      A.   I sure don't.

15:14:10   17      Q.   Okay.   Mr. Quinn asked you a question about how

15:14:23   18  many hours you worked a week, and your testimony is 69

15:14:29   19  to 70, 80 hours?

15:14:31   20      A.   It was always fluctuating.

15:14:34   21      Q.   Regardless of how many hours that you worked in a

15:14:37   22  week, you reported your time accurately to Family

15:14:41   23  Dollar; correct?

15:14:41   24      A.   Later on, yes.   When I first started as manager,

15:14:47   25  I didn't have to clock in, because Peggy Pedigo told me

15:14:52  1   I didn't -- managers do not have to clock in, and wages

15:14:55  2   at the time was not reported.  And that was like a year

15:14:57  3   and a half, whole year and a half.

15:14:59  4       Q.  Let me refresh your memory.  I know that's your

15:15:03  5   story now --

15:15:04  6             MR. QUINN:  You going to refresh it twice or

15:15:06  7   once?

15:15:07  8             MR. KALLON:  I'm going to refresh it twice,

15:15:10  9   because she's going to tell me she was nervous once.

15:15:15 10       Q.  You testified twice prior to today?

15:15:17 11       A.  Yes.

15:15:17 12       Q.  Your deposition was taken in a conference room.

15:15:20 13   The jury was not present, but your lawyers were there;

15:15:23 14   correct?

15:15:23 15       A.  Yes.

15:15:23 16       Q.  And you were under oath; correct?  In other

15:15:28 17   words, before the deposition started, you were sworn

15:15:30 18   under oath?

15:15:35 19       A.  Yes.

15:15:35 20       Q.  Correct?  I'm sorry.  I didn't hear you.  I was

15:15:39 21   reading.  If you look to Page 150, please.

15:15:46 22       A.  In the --

15:15:47 23       Q.  In the big transcript.  Thank you for correcting

15:15:49 24   me.  Let's back up to Page 149 for a minute.  On line 8:

15:16:16 25   "Well, that is what I mean.  Don't you have to put a

15:16:19  1  time?"  What was your answer, line number 10?

15:16:22  2      A.  "On a computer."

15:16:25  3      Q.  "Question:  Right.  At the time that you were

15:16:27  4  there at the store?"  Answer?

15:16:29  5      A.  "Yes, sir.  Yes, sir."

15:16:29  6      Q.  "Question:  Each week?"

15:16:31  7      A.  "Right."

15:16:32  8      Q.  "Or after each day?"

15:16:34  9      A.  "After each day."

15:16:36  10     Q.  "And did you do that?"

15:16:37  11     A.  That didn't start when I first --

15:16:41  12     Q.  I'm sorry.  Just read the question.  I'm sorry.

15:16:44  13  Read the answer.  "And did you do that?"  Line 19.

15:16:49  14     A.  "Yes, sir."

15:16:50  15     Q.  "Did you report that the way it happened?"

15:16:52  16     A.  "Just the way it happened, yes."

15:16:55  17     Q.  All right.  And then Page 150, keep going.

15:16:59  18     A.  "If I came in at 7:00, I put in 7:00."

15:17:03  19     Q.  "If you left at 7:00?"

15:17:05  20     A.  "I would put 7:00."

15:17:07  21     Q.  Keep going.

15:17:09  22     A.  "If I took a break, I would report that too."

15:17:12  23     Q.  "Question:  So the reports of your time at the

15:17:15  24  store would be accurate, then?"

15:17:17  25     A.  "Yes, sir."

15:17:18  1      Q.   "You didn't ever underreport it or over report

15:17:22  2   it?"

15:17:22  3      A.   "No, sir."

15:17:23  4      Q.   All right.  Now, flip with me to the small

15:17:26  5   transcript on Page 226.  Are you on Page 226, ma'am?

15:17:44  6      A.   Yes.

15:17:45  7      Q.   And I think what I did there was just reference

15:17:48  8   you to your deposition.  So I apologize for being

15:17:50  9   repetitive.  Just to speed things up.

15:17:53  10          On Page 226, in the second transcript, you again

15:17:57  11  admitted you reported your time to Family Dollar

15:17:59  12  accurately; correct?

15:18:00  13     A.   What number?

15:18:01  14     Q.   On Page 226, beginning with line number 12 to

15:18:07  15  line number 21.  Do you agree with me that that

15:18:10  16  testimony says that you represented that you reported

15:18:14  17  your time to Family Dollar accurately?

15:18:15  18     A.   Yes, I did.

15:18:17  19     Q.   Okay.

15:18:18  20     A.   At first.

15:18:20  21     Q.   All right.  Now, flip with me to Page 221.  And

15:18:23  22  this is Mr. Schreiber --

15:18:24  23     A.   In the small one?

15:18:25  24     Q.   -- yes, ma'am.  Same page, just one page over.

15:18:28  25  This is Mr. Schreiber, your lawyer was questioning you.

| | | |
|---|---|---|
| 15:18:35 | 1 | On Page 221, line number 12: "Question: |
| 15:18:42 | 2 | And worked, according to Family Dollar's records, 60 |
| 15:18:47 | 3 | hours a week on average; right?" |
| 15:18:50 | 4 | A. "Yes, sir." |
| 15:18:50 | 5 | Q. Now, that's an average. That means sometimes you |
| 15:18:54 | 6 | worked more and times you worked less; correct? |
| 15:18:57 | 7 | A. Yes. |
| 15:18:57 | 8 | Q. Okay. And, of course, if you worked more hours, |
| 15:19:05 | 9 | it could be because you were short staffed; correct? |
| 15:19:07 | 10 | A. Yes. |
| 15:19:10 | 11 | Q. Could be because it's inventory time; correct? |
| 15:19:12 | 12 | A. Yes, around inventory. |
| 15:19:14 | 13 | Q. Or it could be around the Christmas holidays? |
| 15:19:16 | 14 | A. I worked sometimes -- sometimes worked all the |
| 15:19:19 | 15 | time anyway. I used to come in anyway when I worked. |
| 15:19:22 | 16 | When things get behind at the store. |
| 15:19:24 | 17 | Q. I'm not sure that answered my question. One of |
| 15:19:26 | 18 | the other times when you could work more hours is during |
| 15:19:29 | 19 | the Christmas holidays; correct? |
| 15:19:30 | 20 | A. Yes. Yes. |
| 15:19:31 | 21 | Q. And there were other occasions you're telling us |
| 15:19:33 | 22 | that would require you to work more hours at times; |
| 15:19:36 | 23 | correct? |
| 15:19:36 | 24 | A. It depends on work load. |
| 15:19:38 | 25 | Q. Correct. But there are times that you worked |

15:19:40   1   less than 60 hours a week; correct?

15:19:42   2       A.   Not many.

15:19:43   3       Q.   It's an average, so that means the average is 60.

15:19:48   4   So that means you worked more than 60, less than 60?

15:19:51   5       A.   Sometimes.

15:20:00   6               THE COURT:   Two minutes.

15:20:01   7               MR. KALLON:   Thank you, Your Honor.

15:20:02   8       Q.   Ma'am, you've already testified to this, but as a

15:20:05   9   store manager, one of your duties was to make sure the

15:20:08  10   order was done every week; correct?

15:20:11  11       A.   Yes, but it wasn't me.   It was the assistant

15:20:15  12   manager when I wasn't there to make the order, she had

15:20:17  13   to make the order.

15:20:18  14       Q.   And the assistant manager reported to you;

15:20:19  15   correct?

15:20:19  16       A.   Yes.

15:20:20  17       Q.   All right.   As the store manager, another one of

15:20:23  18   your duties is to make sure the shelves were full of

15:20:26  19   merchandise; correct?

15:20:27  20       A.   That's everybody's duty.

15:20:29  21       Q.   But again, you as a store manager had all the

15:20:32  22   responsibility for the four walls of your store;

15:20:36  23   correct?

15:20:36  24       A.   Yes.

15:20:37  25       Q.   Thank you.   Another one of the duties was to make

15:20:39  1    sure the store was shoppable or presentable to the

15:20:42  2    customers; correct?

15:20:43  3        A.   Everybody's duties, yes.

15:20:44  4        Q.   And you were the captain of that ship at that

15:20:48  5    store; correct?

15:20:48  6        A.   Yes.

15:20:49  7        Q.   Thank you.  And another one of your duties was to

15:20:51  8    protect the company's assets; correct?

15:20:53  9        A.   Yes.

15:20:54  10       Q.   And another one of your duties, of course, was to

15:20:58  11   make sure the employees came to work and did their jobs

15:21:02  12   when they were at work; correct?

15:21:03  13       A.   Yes.

15:21:03  14       Q.   And as a store manager, you were ultimately

15:21:06  15   responsible for that store?

15:21:09  16       A.   Yes, sir.  Everybody's responsible.

15:21:11  17       Q.   Ma'am, the question was, as a store manager, you

15:21:14  18   were the one who was held ultimately responsible for

15:21:16  19   that store; correct?

15:21:17  20       A.   Yeah.  If I'm there, yeah.

15:21:18  21       Q.   Ma'am, even when you were not there, you've

15:21:22  22   testified earlier, you were held accountable for that

15:21:24  23   store --

15:21:25  24       A.   How can I be accountable if I'm not there?

15:21:29  25   That's what the assistant manager is for.

15:21:30   1       Q.   That's one of the reasons why you said earlier

15:21:33   2   that you would stop and check with the store on your off

15:21:36   3   days; correct?

15:21:38   4       A.   I come in as friends, yes.

15:21:38   5       Q.   And when you returned to work after your off day,

15:21:42   6   you would check your to-do list to see if the work had

15:21:46   7   been completed; correct?

15:21:46   8       A.   Yes, I do check the list.

15:21:48   9       Q.   And you would check all the various paperwork to

15:21:50   10   make sure everything was in order?

15:21:52   11       A.   Yes.

15:21:53   12       Q.   And, again, the employees of the store, when you

15:21:55   13   were the store manager, reported to you; correct?

15:21:58   14       A.   Yes.

15:21:58   15           MR. KALLON:   Thank you, ma'am.

15:21:58   16                    **RECROSS-EXAMINATION**

15:21:58   17   **BY MR. QUINN:**

15:22:01   18       Q.   Who told you that you were responsible for the

15:22:04   19   store?

15:22:04   20       A.   The district manager.

15:22:05   21       Q.   And who controlled your responsibility that she

15:22:10   22   said you had for that store?

15:22:11   23       A.   District manager.

15:22:12   24       Q.   I want to cover two other things.  First of all,

15:22:18   25   tell the jury why, in your deposition, when asked if you

15:22:23    1    kept up with your time you said you did; and later, you

15:22:26    2    said that when you were asked if you kept up with all of

15:22:30    3    your time accurately, you said no.

15:22:33    4        A.   Okay.   When I first started as a manager, about a

15:22:36    5    year and a half into it, we had time clocks.   We didn't

15:22:41    6    record over the computer.   We didn't punch in over the

15:22:44    7    computer.

15:22:44    8        Q.   And did you --

15:22:46    9        A.   Peggy Pedigo told me I didn't have to clock in.

15:22:50   10    Managers do not clock in.

15:22:52   11        Q.   All right.   And one other thing I want to cover

15:22:55   12    that was covered by defense counsel regarding the two

15:23:01   13    people that were hired while you were gone.   Do you

15:23:04   14    remember being asked about that in your deposition;

15:23:06   15    right?

15:23:06   16        A.   Yes.

15:23:07   17        Q.   And you remember he went back to it in your

15:23:09   18    deposition, and he read a portion of it.   I want to read

15:23:13   19    another portion.

15:23:14   20            Turn to Page 67, if you would.   I'm going to

15:23:19   21    start at line 8.   Okay?

15:23:29   22        A.   67?

15:23:30   23        Q.   67.   I'm going to begin at line 8 and I will read

15:23:37   24    the question, I want you to read the answer.   "How did

15:23:40   25    the idea of hiring a part-time cashier come about?"

| | | |
|---|---|---|
| 15:23:43 | 1 | A.   "Well, Ms. Pedigo came to the store and she said |
| 15:23:46 | 2 | I really needed some more help on the cash register." |
| 15:23:49 | 3 | Q.   "Did you agree?" |
| 15:23:49 | 4 | A.   "Yes, sir." |
| 15:23:50 | 5 | Q.   "So would it be your testimony that it is |
| 15:23:54 | 6 | Ms. Pedigo's idea and not yours to hire somebody?" |
| 15:23:57 | 7 | A.   "Yes, sir." |
| 15:23:57 | 8 | Q.   "Then what happened with respect to getting |
| 15:24:00 | 9 | somebody?" |
| 15:24:00 | 10 | A.   "They hired her while I was on vacation.  The |
| 15:24:05 | 11 | manager in Tuscaloosa, the store manager and the |
| 15:24:07 | 12 | district manager." |
| 15:24:07 | 13 | Q.   "And is that how it happened?" |
| 15:24:08 | 14 | A.   "Yes." |
| 15:24:09 | 15 | Q.   Okay. |
| 15:24:10 | 16 | MR. QUINN:  That's all I have. |
| 15:24:12 | 17 | THE COURT:  Final question. |
| 15:24:12 | 18 | **REDIRECT EXAMINATION** |
| 15:24:14 | 19 | **BY MR. KALLON:** |
| 15:24:14 | 20 | Q.   Ma'am, you agree that you needed help; correct? |
| 15:24:18 | 21 | A.   Yes.  She say I need help.  She told me I need |
| 15:24:22 | 22 | help. |
| 15:24:22 | 23 | Q.   That's not my question.  Did you agree that you |
| 15:24:25 | 24 | needed help at the store? |
| 15:24:27 | 25 | A.   Yes.  She said I needed help. |

15:24:29  1      Q.   Are you saying -- Your Honor, you said one more

15:24:31  2   question.   Can I follow up?   Are you -- I just want to

15:24:35  3   ask:   Are you saying that you needed help, or are you

15:24:37  4   saying that I agree with that, because Ms. Pedigo said I

15:24:40  5   did?

15:24:40  6      A.   I agree with -- Ms. Pedigo said I needed help and

15:24:43  7   yes, I did need help.   She said I needed it.

15:24:46  8      Q.   Let me ask you a different question.   I want to

15:24:48  9   make sure you and I are on the same page.   Did you

15:24:51  10  believe that you needed help?

15:24:52  11     A.   Yes.

15:24:53  12     Q.   At that time?

15:24:55  13     A.   Yes, I did.

15:24:56  14              MR. KALLON:   Thank you, ma'am.

15:24:57  15              THE COURT:   Thank you, ma'am.

15:24:57  16              (Witness excused.)

15:25:00  17              THE COURT:   We'll be in recess, ladies and

15:25:02  18  gentlemen.   3:30.   Do not discuss the case among

15:25:06  19  yourselves, don't allow it to be discussed in your

15:25:08  20  presence, and keep an open mind.

15:25:11  21              (Jury out at 3:25 p.m.)

15:25:20  22              THE COURT:   I guess next we'll get to the

15:25:23  23  really exciting part of the trial.

15:25:27  24              MR. ST. CLAIR:   Your Honor, I have some very

15:25:29  25  good news.   I have some very good news.

15:25:31  1          THE COURT:  What is that?

15:25:35  2          MR. ST. CLAIR:  Your Honor, we're not going

15:25:36  3  to read depositions.

15:25:37  4          THE COURT:  Oh, great.  That is good news.

15:25:39  5          MR. ST. CLAIR:  What we will do instead,

15:25:41  6  Your Honor, is get copies of them made and submit them.

15:25:44  7  We cannot do it now.  We will have them --

15:25:46  8          THE COURT:  That will be fine.

15:25:48  9          MR. ST. CLAIR:  And so subject to that, Your

15:25:50  10  Honor, and, of course, the witnesses that --

15:25:54  11          THE COURT:  They'll be here tomorrow.

15:25:56  12          MR. ST. CLAIR:  And also, there are some

15:25:58  13  offers of proofs and some matters that don't need to

15:26:01  14  take place in the jury's presence, unless you need to.

15:26:05  15  That's all we have right now.

15:26:06  16          THE COURT:  All right.  Good.  Then the

15:26:10  17  plaintiffs will start calling their witnesses when we

15:26:12  18  return.

15:26:14  19          MR. R. WIGGINS:  Your Honor, one thing I

15:26:21  20  need to raise, Your Honor -- I'm assuming that because

15:26:24  21  they're resting, subject to two more witnesses, that any

15:26:28  22  motion we want to make will be tomorrow after --

15:26:30  23          THE COURT:  Yeah, right.

15:26:32  24          MR. ST. CLAIR:  Just so I'm clear, Your

15:26:34  25  Honor, we would be entitled to know their witnesses they

15:26:36  1   plan to call.

15:26:38  2              THE COURT:  Sure.

15:26:38  3              MR. ST. CLAIR:  That's something they should

15:26:39  4   do now?

15:26:40  5              THE COURT:  Yeah.  Yeah.

15:26:40  6         (Recess from 3:20 p.m. until 3:30 p.m.)

15:41:57  7            (In open court, jury present.)

15:41:57  8              THE COURT:  Ladies and gentlemen, the

15:42:00  9   defendant has two additional witnesses who will not

15:42:05  10  testify this afternoon.  And so I'm requiring the

15:42:09  11  plaintiffs to go forward with their case and we'll take

15:42:12  12  the defendant's witnesses tomorrow.  And after that

15:42:14  13  point, the defendant will have rested its case.

15:42:17  14    Mr. Wiggins?

15:42:18  15             MR. R. WIGGINS:  We would call Dr. Edwin

15:42:21  16  Bradley.

15:42:21  17             THE CLERK:  Dr. Bradley, I'd like to remind

15:42:23  18  you you're still under oath.

15:42:24  19             THE WITNESS:  Okay.

15:42:24  20    **EDWIN L. BRADLEY, PLAINTIFFS' WITNESS, RECALLED,**

15:42:25  21  **BY MR. R. WIGGINS:**

15:42:25  22    Q.  Dr. Bradley, we heard testimony yesterday

15:42:28  23  Mr. Kent put up on the board here store managers making

15:42:33  24  709.16 on the average.  These were the opt-in store

15:42:38  25  managers, as I understood the testimony.  Is that an

15:42:42   1   accurate average wage of the 1,424 plaintiffs for 1999?

15:42:48   2       A.   No, sir, it's not.

15:42:50   3       Q.   Is it accurate for 2000 or any year before 2005?

15:42:55   4       A.   No, sir.

15:42:56   5       Q.   Do you know the average wage of these plaintiffs

15:43:00   6   in this case for the years covered by this case --

15:43:03   7       A.   Yes, sir.

15:43:03   8       Q.   -- starting in 1999?

15:43:05   9       A.   Yes, sir, I do.

15:43:06   10      Q.   What was the average wage of these plaintiffs in

15:43:10   11  1999?

15:43:11   12      A.   $523 a week.   523.

15:43:17   13      Q.   I'm sorry?

15:43:18   14      A.   Pardon?  $523 per week in 1999.

15:43:24   15      Q.   All right.  What was their average salary in

15:43:28   16  2000?

15:43:28   17      A.   $542 per week.

15:43:31   18      Q.   And what was it in 2001?

15:43:37   19      A.   $555 per week.

15:43:39   20      Q.   And 2002?

15:43:44   21      A.   $581 per week.

15:43:46   22      Q.   And what was it in 2003?

15:43:50   23      A.   $623 per week.

15:43:52   24      Q.   2004?

15:43:55   25      A.   $668 per week.

15:43:57  1     Q.   2005?

15:44:01  2     A.   Well, I calculated it to be $706 per week, close

15:44:05  3  to the 709 that he --

15:44:07  4     Q.   Okay.  Now, also, yesterday, Ms. Spiesman put in

15:44:15  5  Exhibit 1742A through E.  These are the charts about two

15:44:29  6  full-time equivalents.

15:44:32  7          Have you had a chance to look at her exhibits

15:44:34  8  from yesterday, Exhibits 1742A through E?

15:44:39  9     A.   Yes, sir, I have.

15:44:39  10    Q.   And she's got a column in those exhibits called

15:44:43  11 "weeks met criteria and percent of weeks met criteria"?

15:44:49  12    A.   I see that, yes, sir.  She does.

15:44:51  13    Q.   And do you agree with her calculation?

15:44:59  14    A.   Well, I don't agree with her calculation for

15:45:02  15 several reasons.  Some of them have -- well, she has

15:45:06  16 criteria that varies from 60 hours per week, 70 hours

15:45:11  17 per week, or 80 hours per week.

15:45:13  18          But where I disagree is what I mentioned before,

15:45:17  19 that's assuming the store manager is presently

15:45:20  20 supervising employees for all hours which the employees

15:45:24  21 worked that week.

15:45:24  22          MR. KENT:  Your Honor, we object to the

15:45:26  23 opinion of whether the calculation is proper and he can

15:45:30  24 rebut the calculation itself.  But Ms. Spiesman offered

15:45:33  25 no testimony as to whether the calculation was proper,

15:45:35   1   not only, here's how the calculation is done.

15:45:38   2                This witness is now offering opinion which

15:45:40   3   is not rebuttal to anything Ms. Spiesman testified

15:45:43   4   about.

15:45:44   5                MR. R. WIGGINS:  Well, it is in rebuttal to

15:45:47   6   these two columns that I referred to, Your Honor.  These

15:45:50   7   two columns, we disagree with, the calculations.

15:45:55   8                THE COURT:  Well, I think -- I'm going to

15:45:57   9   sustain the objection to the question that was put to

15:46:00  10   the witness.

15:46:01  11                MR. R. WIGGINS:  Thank you, Your Honor.

15:46:02  12                THE COURT:  Because Ms. Spiesman was not

15:46:10  13   called as an expert witness.

15:46:10  14                MR. KENT:  Thank you.

15:46:12  15   BY MR. ROBERT WIGGINS:

15:46:12  16       Q.  Have you recalculated the weeks met criteria of

15:46:17  17   Ms. Spiesman in the 1742A through E for the hours that

15:46:24  18   the store managers were actually supervising someone?

15:46:27  19       A.  Well, I did it for -- I don't have that

15:46:31  20   information for the opt-in plaintiffs, but I do have

15:46:35  21   information on what store managers will be scheduled to

15:46:38  22   supervise each week.

15:46:40  23       Q.  And what --

15:46:41  24                MR. KENT:  Your Honor, again, I would

15:46:43  25   object.  That's outside the scope of what Ms. Spiesman

15:46:47   1   testified to.  It's not rebuttal to her.

15:46:50   2          MR. R. WIGGINS:  Your Honor, it's in direct

15:46:52   3   rebuttal to what Ms. Spiesman put into evidence.  And,

15:46:56   4   of course, we objected that what she was doing was

15:46:59   5   expert work.  But it also is in rebuttal to

15:47:02   6   Mr. McCarthy's testimony about the schedules that we

15:47:05   7   went through with them right before Ms. Spiesman.

15:47:07   8          THE COURT:  The objection is overruled.

15:47:09   9   BY MR. ROBERT WIGGINS:

15:47:09   10  Q.  All right.  What did you find?

15:47:10   11  A.  Well, I found in looking at those schedules that

15:47:14   12  82 and a half percent of Family Dollar's store managers

15:47:19   13  for stores, their manager will never -- excuse me.  For

15:47:22   14  82 and a half percent of the time for stores at Family

15:47:27   15  Dollar, the store manager will fail to supervise 80 or

15:47:31   16  more hours of subordinate employees, 80 percent of the

15:47:35   17  time.

15:47:36   18  Q.  And how did you arrive at that finding or

15:47:40   19  calculation?

15:47:40   20  A.  I used two sources:  One were the weekly

15:47:45   21  schedules and the other was --

15:47:46   22          MR. KENT:  Your Honor, I would renew our

15:47:49   23  objection.  If he's talking about the weekly schedules,

15:47:51   24  these are something the plaintiffs have had since day

15:47:54   25  one.  He could have done it during the discovery period,

15:47:57  1   written a report and we'd have a chance to depose him on

15:48:00  2   the issues.

15:48:00  3           This is not in rebuttal to anything offered

15:48:03  4   in rebuttal to Ms. Spiesman.

15:48:04  5           THE COURT:  Overruled.

15:48:05  6       Q.  How did you arrive at the finding that 82 and a

15:48:08  7   half percent of the stores of Family Dollar, the store

15:48:13  8   managers are not scheduled to supervise two full-time

15:48:18  9   equivalents?

15:48:18  10      A.  Well, I had schedules based on the staff --

15:48:23  11  staffing hours for the stores.  And I also had a

15:48:26  12  Defendant's Exhibit 2325, which then correlates the

15:48:30  13  number of stores to each of the staffing schedules.

15:48:33  14      Q.  All right.

15:48:33  15      A.  And so I was able to, from the staffing

15:48:36  16  schedules, able then to line up the times that the store

15:48:39  17  managers are present when subordinate employees are

15:48:42  18  there.

15:48:42  19          So then you can add up the subordinate hours

15:48:45  20  when the store manager is in the store.

15:48:46  21      Q.  All right.  And let me show you the schedules.

15:49:02  22  Let me show you the schedules, and see if you can

15:49:05  23  identify them.

15:49:12  24          MR. KENT:  Your Honor, we again object to

15:49:14  25  any testimony on these schedules.  It's not any part of

15:49:17   1   any report offered by Dr. Bradley.

15:49:19   2          THE COURT:  The objection is overruled.

15:49:20   3   Q.  Exhibit 279, do you recognize that?

15:49:23   4   A.  Yes.

15:49:24   5          MR. WHITE:  Your Honor, I realize this is

15:49:25   6   not my witness, but this is apparently going into

15:49:29   7   Mr. McCarthy's areas.  These are all staff schedulers.

15:49:33   8   I'd like to be heard on this matter, please, sir.

15:49:36   9          THE COURT:  All right.  Yes, sir?

15:49:40   10          MR. WHITE:  Your Honor, I would object to

15:49:41   11   this witness offering any opinion based on any use of

15:49:45   12   staff schedules.  He's not tendered as an expert, nor

15:49:51   13   has he given any sort of report or notice that he has

15:49:54   14   ever used or utilized or depended on.  The Court knows

15:49:58   15   that we have extensive evidence on this.

15:50:01   16          And while I would also say that, Your Honor,

15:50:04   17   apparently, he's been given exhibits that are -- that

15:50:07   18   have been admitted into evidence -- I don't remember if

15:50:11   19   they apply to him or not.  But I'm going to object to

15:50:14   20   just putting in a bunch of unauthenticated staff

15:50:18   21   schedules in that the witness has never -- he's tendered

15:50:21   22   as an expert he's never given a report on.

15:50:25   23          MR. R. WIGGINS:  These staff schedules are

15:50:26   24   theirs.  They have their Bates numbers on them, Judge.

15:50:29   25          THE COURT:  Do you deny that the staff

15:50:31  1   schedules are staff schedules of -- do you deny that

15:50:35  2   these documents, Mr. White, are business records of

15:50:39  3   Family Dollar?

15:50:40  4           MR. WHITE:  I have not even seen them,

15:50:43  5   Judge --

15:50:43  6           THE COURT:  Just --

15:50:44  7           MR. WHITE:  -- but I would say this --

15:50:46  8           THE COURT:  Just a moment.  Give them to

15:50:48  9   him, let him see them.

15:50:50  10          MR. WHITE:  Your Honor, I would say that

15:50:51  11  counsel has previously objected on the authenticity on

15:50:55  12  these very documents.

15:50:56  13          THE COURT:  Mr. White.  Mr. White, I want

15:50:58  14  you to look at those records and tell me whether you

15:51:03  15  deny that they're business records of Family Dollar.

15:51:12  16          MR. WHITE:  Your Honor, I -- I know I'm

15:51:14  17  sitting, excuse me.  If I can confirm the Bates stamps.

15:51:17  18  Why don't you let him go ahead, if it's on an

15:51:21  19  authenticity question, and if it's nothing in here,

15:51:24  20  we'll come back.

15:51:26  21          THE COURT:  All right.

15:51:26  22  BY MR. ROBERT WIGGINS:

15:51:26  23    Q.  The exhibit is in front of you, Doctor.  How did

15:51:32  24  you use that to arrive at 80 percent of the stores that

15:51:35  25  do not -- have two-full time equivalents?

15:51:39   1      A.   Each schedule has on it the time -- the actual

15:51:43   2   time of day the manager is supposed to be in the store,

15:51:47   3   and then also the time of day that the assistant manager

15:51:50   4   and the other subordinate employees are -- so, for

15:51:55   5   example, if, for example, on Monday here, the first one

15:51:57   6   the manager is scheduled to be in the store from 9:00 to

15:52:01   7   7:30 p.m.

15:52:02   8      So, for example, if anybody that's in there

15:52:04   9   during that period of time he's supervising as long as

15:52:07  10   they're there during that period.  For example, the

15:52:10  11   assistant manager shows up at 8:30, so he doesn't get

15:52:13  12   that half hour supervising the assistant manager because

15:52:15  13   he doesn't arrive -- the manager himself doesn't arrive

15:52:17  14   until 9:00.

15:52:18  15      But then I add up all the hours during that

15:52:22  16   period of time, so it's a fairly straightforward

15:52:25  17   computation.

15:52:25  18      There are cases where there's just -- a person is

15:52:29  19   scheduled for a certain amount of hours and no

15:52:33  20   particular time's given.  I assign that to the manager

15:52:36  21   always.  I give them the benefit of the doubt the

15:52:39  22   employee would be there when he's there.  So I did that

15:52:41  23   for each of these schedules here.  And there are ones

15:52:45  24   for various size stores ranging from 135 staff hours all

15:52:49  25   the way up to, I believe it's 370 staff hours.

15:52:52  1      Q.   Okay.   Now, yesterday, Mr. McCarthy, who is the

15:52:58  2  -- said he is the one that does the schedules for Family

15:53:03  3  Dollar does -- I think he said 5,700 of them, or

15:53:07  4  something, he went through one of these schedules as an

15:53:10  5  example and told us how to do it.

15:53:11  6      He gave us his totals across here arriving at

15:53:15  7  50.5 hours for this particular Defendant's Exhibit 4327.

15:53:21  8      Will you show us, using this as an example, how

15:53:27  9  you arrived at the numbers that you used?

15:53:31 10          MR. WHITE:   I object again, Your Honor.

15:53:33 11          THE COURT:   Overruled.

15:53:34 12          MR. WHITE:   This is an area that I don't

15:53:35 13  think it's proper rebuttal.

15:53:37 14          THE COURT:   It's overruled.

15:53:38 15          MR. R. WIGGINS:   Can he step down and show

15:53:40 16  us, Your Honor?

15:53:41 17          THE COURT:   Yes.

15:53:48 18          THE WITNESS:   On the first day, the manager

15:53:53 19  is there from 9:30 to 6:00.   That is Sunday.   That is

15:53:55 20  the entire time the store's open.   So any hour that's

15:53:57 21  under that, he is going to be supervising.   There's one

15:54:00 22  employee that's from -- for six-and-a-half hours, and he

15:54:02 23  gets six-and-a-half hours.

15:54:04 24          On Monday, he's also there the entire time

15:54:06 25  the store's open from 8:00 a.m. to 8:30 p.m.   So,

15:54:09   1   consequently, he gets the entire amount of time for the

15:54:13   2   subordinate.   Five plus four is nine.

15:54:17   3            Now, on Tuesday, he opens the store at 8:30,

15:54:20   4   but he's going to leave at 3:30.  And you see the

15:54:23   5   assistant manager comes in at 3:30.  So he doesn't get

15:54:25   6   any of the assistant manager's time, because the

15:54:27   7   assistant manager arrives to take over when he leaves.

15:54:30   8            But you can see here's the employee from

15:54:33   9   11:00 to 3:30, which is within his 8:30 to 3:30 time

15:54:38  10   period.  He gets those four hours.  And then he does not

15:54:40  11   get five hours here, because this employee doesn't

15:54:43  12   arrive until 3:30.  He gets four hours, only supervising

15:54:47  13   one employee for four hours.

15:54:49  14            On Wednesday, he doesn't arrive until 3:30

15:54:52  15   in the afternoon, but he closes the store at 8:30.  So,

15:54:56  16   therefore, since the assistant manager is there from

15:54:59  17   8:30 to 3:30, he gets up -- sorry.  The assistant

15:55:08  18   manager is running the store until he arrives.

15:55:12  19            Now, you can see here is an employee that's

15:55:14  20   there from 8:30 a.m. -- excuse me, 11:30 to 8:30 p.m.

15:55:18  21   and he overlaps.  If assistant manager arrived at 3:30,

15:55:23  22   from 3:30 to 8:30, there will be five hours.  That's

15:55:25  23   where you get the five here.  Okay?

15:55:27  24            So now he's off on Thursday, so he gets no

15:55:30  25   hours for Thursday.  He doesn't supervise any employee.

15:55:35   1          On Friday, he comes in at 9:00, leaves at

15:55:39   2   8:30.  So the assistant manager is opening the store at

15:55:41   3   8:30, so he gets all but one half hour, the assistant

15:55:45   4   manager's time.  So he gets five-and-a-half hours there.

15:55:48   5   He gets the five-and-a-half hours here, which is 11 plus

15:55:52   6   the 4 is -- I say it's 15 hours at least, not 15 and a

15:55:56   7   half.

15:55:57   8          Then on Saturday, he opens the door at 7:00,

15:56:01   9   he's going to leave at 5:00.  The assistant manager,

15:56:04  10   however, comes in at 11:30 a.m. but leaves later than

15:56:07  11   the manager does at 8:30.  So that's three-and-a-half

15:56:10  12   hours he doesn't supervise -- excuse me, supervising.

15:56:13  13          And there's two -- the problem with this

15:56:16  14   calculation is there's actually two ways to do it.  You

15:56:19  15   can see that the assistant manager is in the store for

15:56:22  16   actually nine hours, but they only give him eight and a

15:56:25  17   half, because a half hour for dinner or lunch.

15:56:27  18          Now, generally, when I was doing these, I

15:56:30  19   would give that extra half hour to him to supervise when

15:56:33  20   the other guys are on the lunch hour.  This could well

15:56:36  21   be five-and-a-half hours as opposed to five, and that

15:56:39  22   would be the normal way I would compute that.

15:56:41  23          The other employee's there the whole time,

15:56:43  24   four-and-a-half hours that he's there.  Four and a half

15:56:45  25   to five and a half is ten.  And then this other employee

15:56:49   1   comes at 4:30, half of that, so that would be 10 and a

15:56:52   2   half hours.

15:56:54   3   BY MR. ROBERT WIGGINS:

15:56:54   4       Q.  All right.  So do you come up to the same totals

15:56:57   5   as Mr. McCarthy did on that Exhibit 2327?

15:57:01   6       A.  I think -- I do not argue that it could be 50 and

15:57:04   7   a half, because he probably put the lunch hour on this

15:57:08   8   also, within a half an hour.

15:57:09   9       Q.  So you did this work the same way Mr. McCarthy --

15:57:13   10              MR. KENT:  Your Honor, I object to leading.

15:57:14   11              THE COURT:  The objection to leading is

15:57:16   12   sustained.

15:57:16   13      Q.  All right.  You can take your seat.  Thank you.

15:57:34   14              Now, Dr. Bradley, you have all those

15:57:39   15   schedules in front of you as Exhibit 279.  Did you go

15:57:42   16   through them and do this type of tabulation that you

15:57:46   17   showed us on this board, Defendant's Exhibit 2327, for

15:57:52   18   all those schedules in front of you in Exhibit 279?

15:57:55   19      A.  Yes, sir.

15:57:55   20      Q.  And did you reflect your totals in each column

15:58:00   21   for Sunday through Saturday on each schedule?

15:58:03   22      A.  Yes, sir, I did.

15:58:04   23      Q.  So anybody that wants to check you can check

15:58:07   24   whether you did the math right?

15:58:09   25      A.  That's correct.

15:58:10    1                    MR. R. WIGGINS:  We would offer Exhibit 279.

15:58:13    2                    MR. KENT:  We object.  Outside the scope of

15:58:16    3    rebuttal.

15:58:16    4                    THE COURT:  What's the number?

15:58:18    5                    MR. R. WIGGINS:  Exhibit 279.

15:58:20    6                    THE COURT:  The objection is overruled.

15:58:22    7    Plaintiff's Exhibit 279 is received in evidence.

15:58:25    8                    MR. R. WIGGINS:  May we publish, Your Honor?

15:58:27    9                    THE COURT:  It may be published to the jury.

15:58:29   10                    MR. R. WIGGINS:  I will say this:  We just

15:58:31   11    have one copy.

15:58:32   12                    THE COURT:  Well, do not publish it.

15:58:35   13                    MR. WHITE:  May I inquire, is Exhibit 279

15:58:38   14    just these schedules you have given --

15:58:41   15                    MR. R. WIGGINS:  Yes.

15:58:41   16                    MR. WHITE:  Your Honor, they do have our

15:58:42   17    Bates numbers.

15:58:43   18                    THE COURT:  All right.

15:58:45   19                    MR. WHITE:  There's no report attached to

15:58:47   20    your copy.

15:58:48   21    BY MR. ROBERT WIGGINS:

15:58:48   22        Q.  Now, Dr. Bradley --

15:58:51   23                    MR. WHITE:  May I inquire, Your Honor,

15:58:53   24    nothing in our exhibit -- these are not in ours?

15:58:56   25                    MR. R. WIGGINS:  Correct.

15:58:58   1    Q.   Dr. Bradley, you said 82.5 percent of the stores

15:59:06   2    that did not schedule their store manager to supervise

15:59:12   3    two FTE, how many stores is that?

15:59:16   4    A.   That is 4,772 stores.

15:59:21   5    Q.   All right.   And did you look at -- did you make a

15:59:29   6    distinction between those stores as to ones that never

15:59:32   7    met it versus occasionally?

15:59:34   8    A.   Yes.   In other words, there were, for all

15:59:38   9    staffing, that I believe was 180 hours or below, no

15:59:43   10   schedule ever met supervising two or more employees for

15:59:49   11   80 hours 80 percent of the time.   So all stores for

15:59:52   12   which staffing hours are 180 or less failed that

15:59:55   13   criteria.

15:59:56   14   Q.   How many stores was that?

15:59:57   15   A.   4,772.

16:00:00   16   Q.   Now, did you also -- what was the total number

16:00:05   17   again that failed?

16:00:05   18   A.   4,772.

16:00:08   19   Q.   All right.   So that left how many?

16:00:11   20   A.   600.

16:00:11   21   Q.   600?   All right.   What is that 600?

16:00:15   22   A.   Those are what I call occasionally fail.   Those

16:00:18   23   -- those are the ones that had staffing hours of either

16:00:20   24   190 hours per week or 200 hours per week.   And I think

16:00:25   25   for the 190, they failed at about 58 percent of the

16:00:32   1   time; and for the 200, I believe they failed at about a

16:00:39   2   third of the time.

16:00:39   3        Q.   All right.   And I -- we'll change course and go

16:00:49   4   back to one thing.   Then we'll be just about done.

16:00:52   5        When I took you through the 1999, 2000, 2001, et

16:00:59   6   cetera, average salary, and you gave us the numbers, did

16:01:04   7   you notice anything about the effective length of

16:01:12   8   service on those averages?

16:01:14   9        A.   Yes.   The opt-in plaintiff is a fixed class of

16:01:19   10  people; that is, they're not entering into the Family

16:01:26   11  Dollar workforce continuously.   So, for example, once

16:01:28   12  you reach, I think it's 2003, no more plaintiffs could

16:01:32   13  have entered into the case.   So the only ones that are

16:01:35   14  left from like 2003, 2004 and 2005 are people that were

16:01:39   15  there earlier than that, so they have longer tenure than

16:01:42   16  the average Family Dollar store manager would have.

16:01:45   17       So, for example, by the time you reach 2005,

16:01:48   18  there's only 96 Family Dollar store manager plaintiffs

16:01:52   19  still working at Family Dollar, and their average tenure

16:01:55   20  is about eight years; whereas, in general, the average

16:01:58   21  tenure at Family Dollar is between two and three years.

16:02:01   22  So that extra length of time that would force them --

16:02:04   23  would cause them to have a higher salary.

16:02:05   24       Q.   Okay.   Now, did you actually write down the

16:02:13   25  figures that show that relationship between length of

16:02:17  1   service and average salary?

16:02:18  2       A.   Yes, sir, I did.

16:02:19  3       Q.   And let me show you Exhibit 280.

16:02:22  4            MR. KENT:   Your Honor, we object to this.

16:02:24  5   It's outside the scope.   It rebuts nothing.

16:02:28  6            THE COURT:   The objection is overruled.

16:02:30  7       Q.   What is 280?

16:02:33  8       A.   280 is a chart that shows for each year, 1999

16:02:36  9   through 2005, the average pay for the opt-in store

16:02:42  10  manager plaintiffs; and the average years of service and

16:02:46  11  the number of store manager plaintiffs that are present

16:02:49  12  during that year.

16:02:50  13      Q.   All right.

16:02:53  14           THE COURT:   Now, let me ask you this,

16:02:57  15  Mr. Wiggins:   What does this rebut?

16:03:00  16           MR. R. WIGGINS:   They have put in two

16:03:02  17  charts, Your Honor.   Let me get it out.

16:03:05  18           They put in exhibit -- first, the flip chart

16:03:11  19  and then Exhibit 2324.   2324 took year-by-year average

16:03:16  20  salary of all store managers, whether they were

16:03:19  21  plaintiffs or not.

16:03:19  22           THE COURT:   All right.

16:03:21  23           MR. R. WIGGINS:   And they were saying

16:03:23  24  that --

16:03:24  25           THE COURT:   You've answered.

16:03:25   1            MR. R. WIGGINS:  Well, okay.

16:03:27   2            THE COURT:  It's received in evidence.

16:03:29   3            MR. R. WIGGINS:  Okay.

16:03:30   4   BY MR. ROBERT WIGGINS:

16:03:30   5     Q.  And the average salaries that you found to be

16:03:40   6   related to the length of service that you had at Family

16:03:45   7   Dollar, is that reflected on Exhibit 278?

16:03:49   8     A.  Yes, it is.

16:03:50   9            MR. R. WIGGINS:  We offer Exhibit 278.

16:03:53  10            MR. KENT:  Your Honor, we would also -- I'm

16:03:57  11   sorry.  Your Honor, we'd also object to this exhibit.

16:04:01  12   Plaintiffs' 278 is not in rebuttal to anything.

16:04:04  13            THE COURT:  The objection is overruled.

16:04:06  14            MR. R. WIGGINS:  May we publish?

16:04:07  15            THE COURT:  It may be published to the jury.

16:04:09  16            MR. R. WIGGINS:  All right.

16:04:09  17   BY MR. ROBERT WIGGINS:

16:04:10  18     Q.  And then, Dr. Bradley, when you -- going just

16:04:36  19   briefly back to finish this calculation based on Exhibit

16:04:43  20   279, the schedules, did you write down the numbers that

16:04:50  21   -- of the categories that you've already told us about,

16:04:53  22   as far as the number of stores that failed to have two

16:04:57  23   full-time equivalents scheduled for their store

16:04:57  24   managers?

16:05:01  25     A.  Yes, sir.

16:05:02   1      Q.   And what is that exhibit number?

16:05:05   2      A.   274.

16:05:06   3      Q.   And does that accurately reflect the numbers

16:05:10   4   you've given here to us today?

16:05:13   5      A.   Yes, it does.

16:05:14   6            MR. R. WIGGINS:  We offer 274.

16:05:16   7            MR. KENT:  Your Honor -- Your Honor, first,

16:05:21   8   let me put on the record that I'm just being handed this

16:05:24   9   report for the first time right now.  And I object to

16:05:28  10   this, because it, again, does not rebut anything or any

16:05:34  11   exhibit that was introduced by Ms. Spiesman.  And

16:05:44  12   this --

16:05:44  13            THE COURT:  Who testified about full-time

16:05:52  14   equivalent employees for the defendant, Mr. Wiggins?

16:05:57  15            MR. R. WIGGINS:  Yesterday morning,

16:05:59  16   Mr. McCarthy and Ms. Spiesman did.  They were back to

16:06:02  17   back.

16:06:03  18            MR. WHITE:  I can speak to Mr. McCarthy, if

16:06:05  19   the Court will permit me.

16:06:06  20            THE COURT:  Yes, sir.

16:06:07  21            MR. WHITE:  When he attempted to try to

16:06:08  22   elicit some answers, every objection on two FTE was

16:06:12  23   sustained, and the Court made a finding Mr. McCarthy was

16:06:16  24   not offered on two FTE.  I objected when he tied to do

16:06:22  25   it and you sustained the objections.

16:06:24  1          MR. R. WIGGINS:  I'm not saying, Your Honor,

16:06:25  2     that he was offered for -- on the two FTE regulation,

16:06:29  3     but he testified about these schedules, and how you --

16:06:32  4     how they identified the time that a manager is

16:06:37  5     supervising --

16:06:38  6          MR. WHITE:  No, Your Honor, he did not.  And

16:06:40  7     I would ask the Court to give us an opportunity to be

16:06:42  8     heard.  Mr. McCarthy testified about how generic

16:06:45  9     schedules were prepared.

16:06:47  10          When you look at the exhibit Mr. Wiggins is

16:06:50  11     using, as Mr. McCarthy testified, it clearly shows a

16:06:53  12     number of handwritten entries on top of the printed

16:06:56  13     numbers, which proves -- Mr. McCarthy also, Your Honor,

16:07:01  14     said, I think there are 272 variables, even before you

16:07:07  15     start handwriting.

16:07:09  16          And I would dare say if he's going the

16:07:11  17     tender him as an expert on those schedules, he has not

16:07:14  18     laid a predicate as to what he's examined, other than a

16:07:18  19     very few documents.  And I would object to him giving

16:07:22  20     anything relative to the staff schedule.

16:07:25  21          MR. R. WIGGINS:  Your Honor, Ms. Spiesman

16:07:26  22     testified that --

16:07:28  23          THE COURT:  Well, I tell you what:  You'll

16:07:31  24     have tonight to do this.  Go through the transcript and

16:07:35  25     point out the testimony on exhibits that serve as a

16:07:44  1    basis for rebuttal to Exhibit 274, and be prepared to

16:07:48  2    address that tomorrow morning.

16:07:49  3            I will not rule on the objection at this

16:07:52  4    point.

16:07:52  5            MR. WHITE:  Thank you, Your Honor.

16:07:54  6            MR. KENT:  Thank you, Your Honor.

16:07:55  7            MR. R. WIGGINS:  All right.  No further

16:07:56  8    questions.

16:07:57  9            THE COURT:  Cross-examination?

16:07:57  10                      **CROSS-EXAMINATION**

16:07:57  11   **BY MR. KENT:**

16:07:59  12       Q.  Dr. Bradley, let me quickly address your

16:08:03  13   calculations on the salary.  You've had this information

16:08:09  14   for how long now?

16:08:10  15       A.  I've had this data for two weeks.

16:08:13  16       Q.  How long have you had the data set for 1999,

16:08:17  17   2000, 2001, 2002, 2003, and 2004?

16:08:24  18       A.  Probably since at least the early part of 2004.

16:08:33  19       Q.  Okay.

16:08:33  20       A.  For some of those years, yes.

16:08:35  21       Q.  And we have never seen this information from you

16:08:38  22   before today, have we?

16:08:39  23       A.  I don't believe you have.

16:08:40  24       Q.  Yet, you know even as last June, that we were

16:08:45  25   presenting these numbers to the jury; correct?

16:08:47  1      A.   I just don't recall.  I do not recall.

16:08:52  2      Q.   Okay.  Well, let me ask you this:  Were you asked

16:08:55  3  prior to last night to calculate these numbers?

16:08:58  4      A.   I was asked a couple of days ago.

16:09:03  5      Q.   For the first time ever?

16:09:05  6      A.   Yes.

16:09:06  7      Q.   Okay.  These numbers you gave, do they include

16:09:09  8  bonuses?

16:09:10  9      A.   They do not.

16:09:11  10     Q.   Did you look at bonuses?

16:09:12  11     A.   I did not.

16:09:13  12     Q.   Were you asked to?

16:09:14  13     A.   No, sir.

16:09:15  14     Q.   You know there's been testimony about bonuses in

16:09:18  15  this case?

16:09:19  16     A.   I -- I understand that's true, yes.

16:09:23  17     Q.   Okay.  But you weren't asked to look at those?

16:09:25  18     A.   No, sir.

16:09:26  19     Q.   Let's turn to your analysis on the two employee

16:09:35  20  test.  How long have you had that same information?

16:09:41  21     A.   You mean these schedules?

16:09:43  22     Q.   No.  What I'm talking -- well, yes, the

16:09:47  23  schedules.

16:09:47  24     A.   I've had those since this last weekend.

16:09:51  25     Q.   How long did you know that Family Dollar uses the

16:09:57  1    staff scheduler?

16:09:59  2        A.   As I think I just told you, as of last weekend.

16:10:02  3        Q.   So your attorneys told you for the first time

16:10:07  4    this past weekend:  You know what?  Family Dollar uses a

16:10:10  5    staff scheduler.

16:10:12  6        A.   That's correct.

16:10:13  7        Q.   Okay.  Even though they've had the staff

16:10:17  8    scheduler for over two years now?

16:10:19  9            MR. R. WIGGINS:  Objection, Your Honor.  He

16:10:21  10   can't testify.  He's not a witness.

16:10:23  11            THE COURT:  Sustained.

16:10:25  12            MR. KENT:  If he doesn't know, he can say he

16:10:27  13   doesn't know.

16:10:27  14            THE COURT:  No, he won't, because I just

16:10:29  15   sustained the objection.

16:10:30  16            MR. KENT:  Thank you, Your Honor.

16:10:31  17   BY MR. KENT:

16:10:31  18       Q.   Were you told anything about the staff scheduler

16:10:33  19   prior to this past weekend?

16:10:36  20       A.   No, sir.

16:10:37  21       Q.   Were you asked at any time prior to this past

16:10:42  22   weekend to prepare any type of report that looked at how

16:10:48  23   often a store manager is in the store versus not in the

16:10:51  24   store?

16:10:51  25       A.   No, sir.

16:10:52    1      Q.   Okay.   So, to get to the bottom of your analysis,
16:10:57    2   if the law is that it doesn't matter whether the store
16:11:01    3   manager's in the store or not, then this report that you
16:11:04    4   have just done is irrelevant; would you agree with that?
16:11:06    5      A.   Well, that's not for me to decide.
16:11:09    6      Q.   I'm just asking you.   If the test is that it
16:11:13    7   doesn't matter whether the store manager is in the
16:11:16    8   store, physically in the store, then this report is not
16:11:21    9   applicable?
16:11:21   10      A.   If that were the case.   Like I said, that's not
16:11:24   11   my area to determine that.
16:11:25   12      Q.   I understand.   Would you agree with me?
16:11:28   13      A.   I said I did.   I agreed with you.
16:11:29   14      Q.   Okay.   In terms of looking at the report, do you
16:11:38   15   know whether these staff schedulers are actually used?
16:11:41   16      A.   Well, I don't know first hand.   I was told they
16:11:46   17   were used.
16:11:46   18      Q.   Okay.   Now, you're assuming that to do this
16:11:51   19   report, that the store manager works 52 hours?
16:11:54   20      A.   No.   I'm assuming he's scheduled for 52 hours.   I
16:11:58   21   said it's based on what he was scheduled.
16:12:00   22      Q.   Okay.   So if the test is to look at how many
16:12:02   23   hours he actually works, then your test, again, would
16:12:06   24   not be applicable?
16:12:07   25      A.   If it's based on how many he's -- actually works,

16:12:10  1    that would be true.

16:12:11  2       Q.   Okay.  And, in fact, you've previously done a

16:12:15  3    report where you've said you've calculated that the

16:12:18  4    store manager underreports their time on average by six

16:12:22  5    hours; correct?

16:12:23  6       A.   That's correct.

16:12:23  7       Q.   But yet, you didn't add that in for this report?

16:12:26  8       A.   That's correct.

16:12:27  9       Q.   But you could have?

16:12:28  10      A.   I could have, but this -- this analysis was based

16:12:33  11   on what was scheduled for the store manager.

16:12:35  12      Q.   Dr. Bradley, what I want to focus on is the real

16:12:44  13   world.  Okay?  I don't want to focus on what you could

16:12:49  14   argue on one hand or what you could argue on the other

16:12:53  15   hand.  I want to focus on the real world.

16:12:55  16           MR. R. WIGGINS:  Your Honor, I object to

16:12:57  17   that.  These schedules are the real world.  Mr. McCarthy

16:13:01  18   said that.  They're used every day.

16:13:03  19           THE COURT:  Well, let me object to the --

16:13:06  20   let me rule on the objection to the statement.  You may

16:13:14  21   go ahead and ask your question of the witness.

16:13:16  22           MR. KENT:  Thank you, Your Honor.

16:13:18  23   BY MR. KENT:

16:13:18  24      Q.   If it turns out -- well, first, let me take one

16:13:25  25   step back.

16:13:25  1          You understood that Family Dollar calculated

16:13:28  2   that the store manager, on average, reports 58.52 hours;

16:13:33  3   correct?

16:13:34  4      A.  Well, that's -- you told me that's your

16:13:36  5   calculation, and I said I came up with something similar

16:13:38  6   to that.

16:13:39  7      Q.  And after I told you that, did you go and verify

16:13:41  8   that?

16:13:41  9      A.  Well, I think I told you that I had a number that

16:13:44  10  was closer to 60.  I think we discussed that.

16:13:46  11     Q.  Okay.  So your number's actually higher?

16:13:49  12     A.  I said that.

16:13:50  13     Q.  Okay.  But yet, for doing this report, you didn't

16:13:53  14  use 60, you used 52?

16:13:55  15     A.  Because the report was based on the number of

16:13:58  16  scheduled hours.

16:13:59  17     Q.  Okay.  Why didn't you do it based upon the number

16:14:02  18  of actual hours?

16:14:03  19     A.  Because I did the report based on the number of

16:14:07  20  scheduled hours.

16:14:08  21     Q.  So if the law requires us to look at what's

16:14:10  22  scheduled, your report would be applicable; but if the

16:14:14  23  law requires us to look at what actually happened, your

16:14:17  24  report would not be applicable; correct?

16:14:18  25     A.  That's a possibility, yes.

16:14:20  1      Q.   In looking at this information, did you review

16:14:31  2   Mr. McCarthy's testimony?

16:14:33  3      A.   No, I did not.

16:14:35  4      Q.   Did you look at the testimony in this case to

16:14:45  5   determine how often store managers use the staff

16:14:51  6   scheduler?

16:14:52  7      A.   No, I did not.

16:14:53  8      Q.   Now, the information that we've given to you, you

16:14:59  9   have the actual reported hours for every employee of the

16:15:04  10  store; correct?  on a weekly basis?

16:15:06  11     A.   I have -- you know, it's been a while since I

16:15:10  12  looked at the actual employees, because I was adding

16:15:12  13  them up.  But I don't know that I have the actual times

16:15:16  14  the manager of the store -- I think I mentioned the last

16:15:19  15  time -- compared to the time of the employees in the

16:15:22  16  store.

16:15:22  17     Q.   I understand.  What I'm saying is you have the

16:15:25  18  weekly reported total hours for the hourly employees at

16:15:28  19  the store?

16:15:28  20     A.   That's correct.  And I said that.  Yes.

16:15:30  21     Q.   So, in other words, you could go -- when you say

16:15:33  22  for week X, I want to look at the assistant manager and

16:15:44  23  the three clerks in the store, and I'm going to take a

16:15:48  24  look at their total hours, you could have done that;

16:15:50  25  right?

16:15:50  1      A.   That's correct.

16:15:51  2      Q.   And you could have determined how often, if at

16:15:56  3  all, they ever followed any staff scheduler; correct?

16:16:02  4      A.   Are you saying in terms of total hours?

16:16:05  5      Q.   Yes, sir.

16:16:06  6      A.   That would have been a possibility, if I had one

16:16:09  7  of the pieces of the information, and that is which

16:16:12  8  staff scheduler went with which store, which I only had

16:16:16  9  for a very brief period of time.  I did not have that

16:16:18  10  for every week.

16:16:19  11      Q.   You could have looked for all of the weeks for

16:16:24  12  any of the store managers, and seen, does that store

16:16:29  13  manager have a repeated total number of hourly hours for

16:16:33  14  the hourly associates of the store; correct?

16:16:36  15      A.   I said that you can add them up for the

16:16:39  16  associates of the store.  I said that.

16:16:40  17      Q.   Did you do that?

16:16:41  18      A.   No, I did not.

16:16:42  19      Q.   Did you do any type of analysis to determine how

16:16:48  20  often the hours reported by the employees at the store

16:16:55  21  were the same from week to week?

16:16:57  22      A.   No.

16:16:58  23      Q.   You could have done that?

16:17:00  24      A.   That's -- I could have done that, yes.

16:17:02  25      Q.   But you didn't?

16:17:03   1      A.   I did not.

16:17:04   2      Q.   Because you weren't asked to?

16:17:06   3      A.   I was asked to do what I did and that was to take

16:17:09   4   the scheduled hours and compare them to the employees

16:17:19   5   and the managers.

16:17:51   6            MR. ST. CLAIR:   Excuse us, Your Honor.   It's

16:17:53   7   the first time we've seen these reports.   Can we have a

16:17:56   8   moment to discuss them?

16:17:57   9            THE COURT:   All right.

16:17:57  10   BY MR. KENT:

16:17:57  11      Q.   Let me ask two questions:   Isn't it the case that

16:18:05  12   you're only looking at the reported -- hours or the

16:18:10  13   scheduled hours, I'm sorry, not only for the store

16:18:15  14   manager, but also for the hourly employees?

16:18:18  15      A.   Yes, sir, that's correct.

16:18:19  16      Q.   And you know from testimony in this case that

16:18:26  17   Family Dollar's paid over $19 million in overtime this

16:18:29  18   past year?

16:18:30  19            MR. R. WIGGINS:   Objection, Your Honor.

16:18:32  20   That's not --

16:18:32  21            THE COURT:   Well, he can answer if he knows.

16:18:34  22            THE WITNESS:   I mean, that's my

16:18:36  23   understanding from charts that I've seen.

16:18:38  24   BY MR. KENT:

16:18:38  25      Q.   So, in other words, you already knew that, yet

16:18:40  1   you didn't factor that into your analysis?

16:18:44  2       A.   As I said before, I worked with the schedule.   I

16:18:48  3   didn't factor overtime for the store manager or the

16:18:51  4   employees.

16:18:51  5            THE COURT:   Keep your voice up.   Keep your

16:18:54  6   voice up so that all the jurors can hear what you're

16:18:56  7   saying.

16:18:56  8            THE WITNESS:   Sorry.

16:18:57  9            THE COURT:   All right.

16:18:58  10  BY MR. KENT:

16:18:58  11      Q.   And so -- and not even did you not add any

16:19:02  12  overtime, but you had all these staff schedulers and you

16:19:07  13  had all the handwritten notes on them; correct?

16:19:09  14      A.   That's correct.

16:19:11  15      Q.   Did you take into account any of the handwritten

16:19:14  16  notes?

16:19:14  17      A.   No, sir, I did not.

16:19:15  18      Q.   Okay.   Dr. Bradley, my first question to you last

16:19:26  19  Thursday was:   "You are not an expert in the Fair Labor

16:19:33  20  Standards Act; correct?"

16:19:33  21      A.   You asked me that, that's correct.

16:19:34  22      Q.   And, in fact, you have had no legal training in

16:19:39  23  the Fair Labor Standards Act; correct?

16:19:41  24      A.   That is correct.

16:19:42  25      Q.   Let me ask you this:   How much more did you get

16:19:46   1   paid for doing these reports over the weekend?

16:19:49   2       A.   I don't know.

16:19:52   3       Q.   Dr. Bradley, if actual amount of overtime was

16:20:31   4   63,000 hours every two weeks, did your report take into

16:20:37   5   account any of those 63,000 hours?

16:20:41   6       A.   No, sir.

16:20:41   7       Q.   Over what time period did you use these staff

16:20:49   8   schedulers?

16:20:51   9       A.   I don't understand the question.

16:20:53   10      Q.   Well, did you apply these schedules that are a

16:20:56   11  part of this exhibit in front of you, from 1999 forward,

16:21:03   12  or for over what period?

16:21:05   13      A.   This is for 2006 is what I'm applying this.

16:21:08   14      Q.   Didn't do anything for 2005?

16:21:11   15      A.   No, sir.

16:21:12   16      Q.   Were you asked to do this report this past June?

16:21:19   17      A.   No, sir.

16:21:19   18      Q.   You were only asked to do it over this past

16:21:24   19  weekend?

16:21:24   20      A.   Yes, sir, that's correct.

16:21:33   21      Q.   Dr. Bradley, how long have you been retained by

16:21:35   22  plaintiffs' counsel in this case?

16:21:37   23      A.   I think I said last time, I believe it was

16:21:39   24  sometime in 2003, but I -- it's been so long ago, I

16:21:43   25  can't remember.

16:21:43   1    Q.   About two-and-a-half or three years?

16:21:45   2    A.   Well, it would be three years, yes.

16:21:47   3    Q.   And you testified last Thursday that you charged

16:21:50   4    approximately $150,000?

16:21:53   5    A.   I said that's approximately correct, that's

16:21:55   6    right.

16:21:55   7    Q.   Approximately.  Yet, on the eve of almost the

16:22:00   8    last day of trial --

16:22:02   9          THE COURT:  I think this is getting to be

16:22:04  10    much too argumentative.

16:22:05  11          MR. KENT:  I apologize, Your Honor.

16:22:08  12          THE COURT:  All right.

16:22:09  13    BY MR. KENT:

16:22:09  14    Q.   It's correct to say that even though you've been

16:22:12  15    involved in this case for two-and-a-half or three years,

16:22:16  16    for the first time we're seeing this analysis; correct?

16:22:19  17    A.   Yes, sir.

16:22:20  18          MR. KENT:  Nothing further, Your Honor.

16:22:21  19          THE COURT:  All right.

16:22:21  20                    **REDIRECT EXAMINATION**

16:22:23  21    **BY MR. R. WIGGINS:**

16:22:23  22    Q.   Dr. Bradley, is there anything that Mr. Kent has

16:22:27  23    asked you about that could be done that the company is

16:22:32  24    unable to do?

16:22:33  25    A.   No, sir.

16:22:36  1   Q.  Do you have any data that you've used that didn't
16:22:40  2   come from Family Dollar?
16:22:41  3   A.  No, sir.
16:22:43  4   Q.  Now, I want you to think hard about everything he
16:22:45  5   asked you about:  Could you have done this, could you
16:22:48  6   have done that, did you do this, did you do that; based
16:22:52  7   on your analysis of their information, could they have
16:22:56  8   looked at their own data --
16:23:01  9           THE COURT:  The objection to leading is
16:23:03  10  sustained.
16:23:03  11          MR. KENT:  Thank you, Your Honor.
16:23:18  12          MR. R. WIGGINS:  No other questions, Your
16:23:19  13  Honor.
16:23:19  14          THE COURT:  All right.
16:23:19  15          THE WITNESS:  Thank you, Your Honor.
16:23:20  16          THE COURT:  The plaintiffs will call their
16:23:21  17  next witness.
16:23:24  18          MR. G. WIGGINS:  Your Honor, may we have one
16:23:25  19  minute?
16:23:26  20          THE COURT:  Yes, sir.  And remember, you
16:23:32  21  only asked for one minute.
16:23:33  22                   (Laughter.)
16:23:56  23          MR. R. WIGGINS:  Your Honor, we call Steve
16:23:59  24  Phillips.
16:23:59  25          THE COURT:  All right.

| | | |
|---|---|---|
| 16:25:18 | 1 | **STEVE PHILLIPS, DEFENDANT'S WITNESS, SWORN** |
| 16:25:18 | 2 | THE CLERK:  State your name for the record, |
| 16:25:22 | 3 | please. |
| 16:25:23 | 4 | THE WITNESS:  Steve Phillips. |
| 16:25:27 | 5 | THE CLERK:  Spell your last name for the |
| 16:25:29 | 6 | record, please. |
| 16:25:30 | 7 | THE WITNESS:  P-H-I-L-L-I-P-S. |
| 16:25:33 | 8 | **DIRECT EXAMINATION** |
| 16:25:34 | 9 | **BY MR. R. WIGGINS:** |
| 16:25:34 | 10 | Q.  Mr. Phillips, by whom are you employed? |
| 16:25:41 | 11 | A.  I'm sorry? |
| 16:25:41 | 12 | Q.  Who do you work for? |
| 16:25:43 | 13 | A.  Family Dollar. |
| 16:25:43 | 14 | Q.  Okay.  And how long -- |
| 16:25:45 | 15 | A.  I've been with Family Dollar for about 14 years. |
| 16:25:49 | 16 | Q.  All right.  What's your current job? |
| 16:25:51 | 17 | A.  I'm vice-president in Store Operations. |
| 16:25:54 | 18 | Q.  Where are you located? |
| 16:25:55 | 19 | A.  Located in the home office in Charlotte, North |
| 16:26:02 | 20 | Carolina. |
| 16:26:02 | 21 | Q.  All right.  And you're vice-president of Store |
| 16:26:05 | 22 | Operations.  Who was your boss until June of last year? |
| 16:26:07 | 23 | A.  My boss at the time was Bruce Barkus. |
| 16:26:10 | 24 | Q.  All right.  And who is under you? |
| 16:26:20 | 25 | A.  Who reports to me? |

16:26:23  1    Q.  Yes.

16:26:24  2    A.  I have four regional vice-presidents that report

16:26:27  3    to me at this time.

16:26:29  4    Q.  All right.  And do you have district managers

16:26:32  5    that are in your division?

16:26:34  6    A.  In that -- I have about 85 district managers that

16:26:38  7    report to the regional vice-presidents who report to me.

16:26:44  8    Q.  All right.  Do you have stores that are under

16:26:47  9    your command?

16:26:48  10   A.  We have -- it's approximately 1,400 stores in the

16:26:51  11   area that I am responsible for.

16:26:54  12   Q.  Okay.  And how long was Mr. Barkus your executive

16:27:04  13   vice-president that you reported to?

16:27:05  14   A.  Approximately five years.

16:27:14  15   Q.  All right.  Now, we've had in evidence these

16:27:19  16   Strands, the training module that's Exhibit 4,

16:27:24  17   Plaintiffs' Exhibit 4, and the defendants have put it

16:27:26  18   into evidence, too.  I don't remember their number.  And

16:27:29  19   we're going to get that straight pretty quick, which

16:27:32  20   one's going to be in the final exhibit.

16:27:33  21        But you were the lead person in charge of

16:27:37  22   developing those Strands; correct?

16:27:38  23   A.  Yes, sir.

16:27:40  24   Q.  And when -- who appointed you to develop those

16:27:45  25   training modules or Strands?

16:27:48  1      A.   Well, we got in a conversation with the other

16:27:53  2  VPs, Bruce Barkus and myself, talked about training

16:27:57  3  materials and resources.   And I got the job.   I'm not

16:28:03  4  sure through default, but I got the job to be the lead

16:28:06  5  person to put a group together to start working on

16:28:11  6  revising our training documents.

16:28:13  7      Q.   What year was that?

16:28:14  8      A.   I think we started the initial conversations in

16:28:19  9  the fall -- sometime in the fall of 1999.

16:28:23  10      Q.   Okay.   And who appointed you to be the head of

16:28:26  11  that project?

16:28:27  12      A.   Bruce Barkus.

16:28:28  13      Q.   And when you say you began to get the group

16:28:32  14  together, who was it that was used to develop the

16:28:37  15  Strands?

16:28:37  16      A.   We hired a person from outside the company.   Her

16:28:43  17  name is Cathy Fleming.   She was hired with -- she had a

16:28:49  18  background from HR in training and resource.   And we

16:28:53  19  hired her.   And she started the process of putting

16:28:56  20  together teams to put and write these documents and

16:28:59  21  resource books.

16:29:00  22      Q.   Okay.   And she got together a team of store

16:29:03  23  managers and district managers from a broad spectrum of

16:29:06  24  the company?

16:29:07  25      A.   She first started with -- got some regional

16:29:11   1   vice-presidents, district managers, and store managers

16:29:14   2   through the whole process.

16:29:15   3       Q.   But she tried to get a representative group from

16:29:19   4   across the company, a broad spectrum?

16:29:22   5       A.   Yes, sir.

16:29:22   6       Q.   And you built these Strands from the knowledge of

16:29:28   7   those store managers in that team, and from the

16:29:32   8   knowledge of those district managers in that team;

16:29:34   9   correct?

16:29:34  10       A.   We -- we built it from -- we started with some

16:29:38  11   old training resources, to begin with.  And we built,

16:29:43  12   from that point, and used other resources there were out

16:29:49  13   there what other retailers were doing, and built these

16:29:52  14   training resource books, which took about eight months

16:29:55  15   to put together.

16:29:56  16       Q.   All right.  And it was a very time-consuming

16:30:01  17   process; right?

16:30:01  18       A.   For the team members, yes, sir.

16:30:03  19       Q.   The team went through many drafts of the Strands,

16:30:07  20   red lined them, red circled and changed them back and

16:30:10  21   forth for eight months?

16:30:11  22       A.   We worked on them eight months.

16:30:13  23       Q.   All right.  And in the end, the entire group of

16:30:20  24   store managers, district managers, yourself, decided

16:30:26  25   that these Strands represented the way Family Dollar

16:30:30  1    does business; correct?

16:30:34  2        A.   They developed it for resource training materials

16:30:38  3    for anybody at the store level, different positions that

16:30:44  4    were different, things that we needed to train them on.

16:30:47  5        Q.   But what the store managers on the team and the

16:30:50  6    district managers on the team were building was a way to

16:30:54  7    train store managers, assistant managers, and cashiers

16:31:00  8    and stockers, in the tasks necessary to do their job?

16:31:04  9        A.   That was the foundation we started with.

16:31:06  10       Q.   And you've identified the tasks that it takes to

16:31:13  11   do those jobs from the people that were actually doing

16:31:16  12   them, the actual store managers, district managers;

16:31:17  13   correct?

16:31:18  14       A.   We -- the foundation started with just the basic

16:31:23  15   skill sets that we needed to start training.

16:31:25  16       Q.   And you were -- the team was instructed to

16:31:31  17   identify the current way that these tasks of store

16:31:35  18   managers were performed; correct?

16:31:38  19       A.   The books were said to be -- the initial Strands

16:31:47  20   were said to be general training for our people, with

16:31:54  21   this understanding we would add different things to it.

16:31:58  22   It might not encompass everything we were working on.

16:32:01  23   We had to devise a process how you continue education of

16:32:04  24   our people as we changed --

16:32:07  25       Q.   Yeah.

16:32:07  1        A.   -- every day, every month, so forth.

16:32:09  2        Q.   My question's probably bad.  But what you were

16:32:12  3    trying to do, as I understood you a minute ago, you were

16:32:15  4    trying to take your obsolete training from before 1999

16:32:18  5    and develop a current method of work, the tasks that

16:32:24  6    were done currently, so you would have an updated set of

16:32:27  7    training documents; correct?

16:32:29  8        A.   Well, there were some things that we carried

16:32:31  9    over.  There were some basic things that we carried over

16:32:34  10   from the training documents that we called -- I think

16:32:37  11   the name was Danny Dollar, things of that nature.

16:32:40  12        We carried some of those same things on into the

16:32:44  13   Strands, which is some basic retailing things that we

16:32:46  14   just carried further.

16:32:47  15       Q.   You carried the things that were still applicable

16:32:49  16   into it; correct?

16:32:50  17       A.   Yeah, how to answer the phone.

16:32:52  18       Q.   And then you added things that were new from

16:32:55  19   technology changes and different ways of conducting

16:32:58  20   business?

16:32:59  21       A.   At the time, there were some in there.  Yes, sir.

16:33:01  22       Q.   And you were trying to -- the Strands are to

16:33:04  23   train store employees; correct?

16:33:06  24       A.   There are different parts in for different levels

16:33:10  25   where you may be a cashier, you may be an assistant

16:33:13  1   manager, you may be a manager.  There's different things

16:33:15  2   for the different teams in there.  Based upon who you

16:33:19  3   were, what skill sets you came into the company with,

16:33:23  4   and what book or what Strand you may need to have some

16:33:27  5   additional training.

16:33:28  6       Q.   Okay.  And what you were trying to do is to train

16:33:31  7   the store employees, not only in their tasks, but in the

16:33:35  8   policy with the company; correct?

16:33:37  9       A.   No, sir.  Those are -- they were classified as

16:33:40  10  training resource, personal training development is what

16:33:44  11  the official plan was for taking a place out there that

16:33:47  12  you needed to train someone in customer service, answer

16:33:49  13  the phone, basic retail principles that -- some people

16:33:54  14  may not have any experience in retail, how to deal with

16:33:59  15  the public for the first time.

16:34:00  16      They were just some of those things in there for

16:34:03  17  different types of -- based on your experience level.

16:34:05  18      Q.   You came up with four Strands; correct?

16:34:07  19      A.   Yes, sir.

16:34:08  20      Q.   Strands 1 was, what, customer service?

16:34:12  21      A.   Well, there are four Strands.  One is customer

16:34:15  22  service, and I have to look at them to get the -- get

16:34:17  23  the sequence of 1, 2, 3, 4.

16:34:20  24      There's customer service, merchandising, loss

16:34:23  25  prevention and personal development.  And they may not

16:34:26  1   be the official names, but that's the four Strands.

16:34:29  2        Q.   Yeah.   I think the last one is career

16:34:31  3   development?

16:34:31  4        A.   Career development, yeah.

16:34:32  5        Q.   Hiring, promotions, that type of thing?

16:34:35  6        A.   I -- it's career development, based upon where

16:34:40  7   you are in the organization.

16:34:41  8        Q.   But when you testified the last time that you

16:34:49  9   were telling us about this in your transcript, you said

16:34:52  10  that the Strands are training policies that run the

16:34:57  11  company, didn't you?

16:35:00  12                 MR. MAY:   You got a page?

16:35:01  13                 MR. R. WIGGINS:   Page 45, lines 10 through

16:35:05  14  13.

16:35:06  15       Q.   Let me just show it to you.

16:35:18  16       A.   Okay.

16:35:18  17       Q.   Let me just read the question and you read the

16:35:21  18  answers, since that's the way we've all been doing it.

16:35:24  19       A.   Okay.

16:35:24  20       Q.   Let's just start at line 8, until we get both

16:35:30  21  questions and answers.   "Question:   That's what you

16:35:34  22  train them to do; correct?"   Read your answer.

16:35:36  23       A.   "In some of the tests we trained them to do, yes,

16:35:38  24  sir."

16:35:38  25       Q.   "Well, the Strands are the training in the

16:35:42  1  policies that run the company; correct?"

16:35:44  2      A.  "Well, that's part of the training."

16:35:46  3      Q.  "And that's what the store managers on the broad

16:35:53  4  spectrum team was attempting to do; correct?"

16:35:55  5      A.  "Yes, sir."

16:35:56  6      Q.  And you finished your work on the Strands and

16:36:07  7  issued them for use in all the stores in January of

16:36:12  8  2001; correct?

16:36:12  9      A.  I think we finished them -- that one may be

16:36:17  10  accomplished then.  We finished them in fall of 2000 --

16:36:20  11  I believe that's when we started printing them up and

16:36:23  12  doing the final reading.  That could have been in the

16:36:27  13  early spring of 2001.

16:36:28  14      Q.  You were also given a second project to come up

16:36:32  15  with an updated store policy manual?

16:36:35  16      A.  Yes, sir.

16:36:36  17      Q.  And Mr. Barkus appointed you to that project,

16:36:39  18  too?

16:36:39  19      A.  Yes, sir.

16:36:40  20      Q.  And that project was done in conjunction with

16:36:43  21  developing the Strands?

16:36:44  22      A.  It was done after we started with the Strands.

16:36:47  23      Q.  You started the Strands first; and then sometime

16:36:50  24  in 2000 or 2001, Mr. Barkus gave you this second

16:36:57  25  project?

16:36:57   1    A.   Yes, sir.

16:36:58   2    Q.   The second project was to take the existing store

16:37:01   3    policy manual, which we have in evidence and we've seen

16:37:03   4    a lot of it, and update it and make sure it's current?

16:37:06   5    A.   Yes, sir.

16:37:06   6    Q.   And you went through the same kind of process in

16:37:10   7    getting the new store policy manual developed that you

16:37:13   8    use for the Strands; that is, you got a broad spectrum

16:37:16   9    team of store managers, district managers, and people

16:37:20  10    from the legal department and from various departments

16:37:22  11    in the company, and you used their knowledge of how the

16:37:25  12    company operates to update and come up with a new store

16:37:29  13    policy manual?

16:37:29  14    A.   Yes, sir.   We used different offices in the

16:37:33  15    corporate office -- sales, audit, legal, whatever it may

16:37:36  16    be -- and then we also used the people from the field to

16:37:39  17    go through the current policy manual and do an update.

16:37:43  18    Q.   And the new store policy manual also, like the

16:37:54  19    Strands, went through many drafts, a lot of red lining,

16:37:58  20    circling, changing things around, so that the legal

16:38:02  21    department and the human resource department and all the

16:38:04  22    store managers, district managers, felt like they got it

16:38:08  23    right; correct?

16:38:09  24    A.   We tried to make it -- get it as updated as

16:38:13  25    possible to the time, and that was policies that could

16:38:17  1   have set in the eight months from start to finish with

16:38:21  2   that --

16:38:24  3       Q.   And when did you finish that project and issue a

16:38:27  4   new store policy manual?

16:38:29  5       A.   I think we got through somewhere in the fall of

16:38:35  6   2001.   I'd have to check my dates to be exactly clear

16:38:40  7   when the publish date was.

16:38:42  8       Q.   Okay.   And I believe you testified when we asked

16:38:46  9   you about this previously that?

16:38:52  10              MR. MAY:   Your Honor, while they're

16:38:54  11  conferring, I'm not objecting here until now, but it

16:38:57  12  looks like to me that it's a long way to rebuttal.   I'm

16:39:01  13  not sure what we're rebutting here yet, and we've been

16:39:05  14  going for about 15 minutes.

16:39:06  15              THE COURT:   All right.   What are we

16:39:07  16  rebutting?

16:39:09  17              MR. R. WIGGINS:   This is our case in chief

16:39:10  18  on their affirmative defense.   This is part of our case

16:39:15  19  in chief.

16:39:17  20              THE COURT:   All right.   Go ahead.   The

16:39:19  21  objection is overruled.

16:39:22  22  BY MR. R. WIGGINS:

16:39:22  23      Q.   Now, I'm not sure I got an answer to the last

16:39:26  24  question.   You testified earlier that you actually

16:39:34  25  issued the new store policy manual sometime in the

16:39:37    1    middle of 2002?

16:39:38    2       A.   We were through -- we may have been through -- we

16:39:47    3    did -- our final edits were, I think, the fall of 2001.

16:39:51    4       Q.   Okay.   And let me show you the - it's got an

16:40:02    5    April 2002 date on it.   This is -- in this trial -- you

16:40:09    6    can hang onto that.   You might need it.

16:40:11    7            In this trial, that's Defendant's Exhibit 1923.

16:40:15    8    Is that the store policy manual that your project team

16:40:18    9    developed?

16:40:18   10       A.   Yes, sir.

16:40:20   11       Q.   And from the -- all the store managers, district

16:40:28   12    managers, legal department, all the people you told us

16:40:31   13    were involved in that, you feel like you got it right,

16:40:35   14    that that represents the actual policies of the company

16:40:38   15    in 2002?

16:40:39   16       A.   Well, we hope we got most of it right.

16:40:44   17       Q.   And, in fact, you then, once you published that

16:40:48   18    in 2002, you started the project again and did it again

16:40:52   19    in 2003, didn't you?

16:40:54   20       A.   Yes, sir.   Yes, sir.

16:40:56   21       Q.   Same process, where you would get a team together

16:40:58   22    from all the broad spectrum of the store managers,

16:41:02   23    district managers, legal department, human resource

16:41:05   24    department, all the other departments; you go through

16:41:08   25    draft after draft, you look at new technology changes,

16:41:12  1    way of doing business, and you come up with your new

16:41:14  2    store policy manual; correct?

16:41:16  3        A.  Yes, sir.

16:41:16  4        Q.  And let me show you what's Defendant's Exhibit

16:41:19  5    1924 that's been received in evidence.  This is the

16:41:24  6    store policy manual that the company has offered for

16:41:29  7    2003.

16:41:30  8            Is that -- is that the one that you did for that

16:41:32  9    year?

16:41:41  10       A.  Yes, sir.

16:41:41  11       Q.  So the store policy manuals are built from the

16:41:45  12   ground up, from the stores up; right?

16:41:49  13       A.  They were -- they were built on the previous

16:41:54  14   policy manual as a foundation -- in fact, here's what we

16:41:58  15   have now and what do we need to change to bring our

16:42:01  16   manuals updated.  So we use that document to make those

16:42:04  17   changes in.

16:42:04  18       Q.  But it's not a top-down thing where anybody just

16:42:07  19   in Charlotte dreams it up, sends it down, forces it on

16:42:11  20   the store; the stores themselves participated and

16:42:13  21   developed these policy manuals?

16:42:15  22       A.  They participated on the subject matter, as far

16:42:18  23   as policy, how we do things.  For, like, centralized

16:42:23  24   banking that is -- that would have been a finance

16:42:29  25   subject that may have to be dealt with.

16:42:31  1    Q.  All right.  And the same thing with the Strands.

16:42:37  2  That was a bottom up, from the stores up, process;

16:42:41  3  correct?

16:42:41  4    A.  Yes.  What is the basic training resources do we

16:42:45  5  need to get in the field.

16:42:46  6    Q.  And the reason you needed to get these two

16:42:49  7  projects, the Strands and the new policy manuals,

16:42:52  8  because you were growing, the company was growing;

16:42:54  9  correct?

16:42:55  10   A.  The company was -- yes, sir.

16:42:57  11   Q.  Hiring a lot of new store managers?

16:42:59  12   A.  We were hiring all new cashiers, assistant

16:43:02  13  managers, managers, some with experience, some with no

16:43:05  14  experience.

16:43:05  15   Q.  And the store policy manual, that covers

16:43:10  16  operation of just the store, the stores; correct?

16:43:12  17   A.  The store policy manual, yes, sir.

16:43:14  18   Q.  I mean, I think you said in your earlier

16:43:17  19  testimony you were building about 500 stores a year?

16:43:21  20   A.  5 to 550, averaging in the last couple of years.

16:43:24  21   Q.  You had a lot of turnover.  We have heard numbers

16:43:27  22  of 2,000 new store managers a year.  Is that consistent

16:43:31  23  with your memory?

16:43:32  24   A.  Depends on what year you're referring to.

16:43:34  25   Q.  Well, but you had a big turnover in store

16:43:37  1    managers, didn't you?

16:43:38  2        A.   It depends on what area you're referring to.

16:43:42  3    Some areas we had very little turnover; other areas, you

16:43:48  4    may have much higher turnover in different types of

16:43:52  5    markets.

16:43:52  6        Q.   Okay.  And we've heard the number of 6,000 new

16:43:57  7    assistant managers per year.  Do you agree with that?

16:43:59  8        A.   New ones, I'd have to look at the numbers from HR

16:44:04  9    department to be -- to be more exact, how many assistant

16:44:08  10   managers we hire.

16:44:09  11        As we -- we normally have -- we have more than

16:44:14  12   that right now, so I couldn't tell you if your numbers

16:44:18  13   are correct or not, Mr. Wiggins.

16:44:20  14        Q.   Okay.  But the projects that you were the head of

16:44:24  15   for the Strands and new policy manual, that was to try

16:44:26  16   to have a training -- means of training all these new

16:44:31  17   store managers, all these new assistant store managers

16:44:35  18   and all these new cashiers; correct?

16:44:45  19        A.   It was a resource document to help people that

16:44:45  20   needed the help.

16:44:45  21        Q.   Yeah.

16:44:45  22        A.   Based on experience level that they may bring to

16:44:45  23   the table.

16:44:45  24        Q.   And you said it was really, to use your word, you

16:44:47  25   said it was to indoctrinate them in Family Dollar's way

16:44:51  1  of doing business in running a store?

16:44:52  2     A.  I'm not sure I used the word "indoctrination."  I

16:44:56  3  like to use the word "training" and "resource training"

16:44:59  4  a lot, but "indoctrination," I'm not sure if I used

16:45:02  5  that.

16:45:02  6     Q.  Well, let's look at Pages 21 and 22 of your

16:45:07  7  testimony.

16:45:09  8     A.  All right.

16:45:12  9     Q.  Bottom of Page 21.  The question was asked:  "Why

16:45:20  10  did you do the Strands, first?  Was there any reason for

16:45:23  11  that?"  Read your answer.

16:45:26  12     A.  I'm not sure what line you're on.

16:45:29  13     Q.  Line 14.  I'm sorry, sir.  Line 14 is the

16:45:32  14  question.  Line 16 starts your answer.

16:45:33  15     A.  16.  "Well, we needed current training resource

16:45:37  16  books to help our store employees as we were adding

16:45:40  17  stores when our stores' growth has been between 8 and 12

16:45:45  18  percent a year.  We're adding four, five, 600 stores a

16:45:49  19  year; and with the growth, we're in new areas through

16:45:52  20  the year.  We're now in Idaho."

16:45:57  21     Q.  Keep going.

16:46:00  22     A.  "We've had to have current training documents to

16:46:02  23  help our store people.  Some of them have never worked

16:46:05  24  retail before.  Some of them are long time -- some of

16:46:09  25  them have long time with other retailers, so we needed

16:46:11  1   resources that we could have at their level to help them

16:46:15  2   get indoctrinated into retail into Family Dollar."

16:46:19  3       Q.   Okay.  So you did say this is to indoctrinate

16:46:23  4   people in Family Dollar's way of doing things; correct?

16:46:25  5       A.   Indoctrinate people in retail into Family Dollar?

16:46:28  6       Q.   Right.

16:46:29  7       A.   Right.

16:46:30  8       Q.   Okay.  Do you know, though, if the old store

16:46:38  9   managers that have been there a long time, you know, ten

16:46:40 10   years, you know, they were last two or three, four, five

16:46:47 11   years, they've been with you for 10, 15 years, did they

16:46:50 12   have to go through the Strands?

16:46:51 13       A.   Are you talking about some that started 10 years

16:46:57 14   ago?

16:46:57 15       Q.   Yeah.  They were still -- once you started the

16:46:59 16   Strands you said in January 2001, did you make a manager

16:47:03 17   that had been running the store 10 years go through the

16:47:05 18   training of the Strands, or is this for the more recent

16:47:09 19   employees?

16:47:09 20       A.   Those are source documents, whoever needed them.

16:47:13 21       Q.   Okay.

16:47:13 22       A.   If the experienced manager needed some refresher

16:47:15 23   or something, they had those books there for their

16:47:18 24   disposal.  That was their choice.

16:47:20 25       Q.   But do you know if the company required all the

16:47:23   1   existing store managers to go through the Strands?

16:47:25   2       A.   No.  It was at the manager's discretion.

16:47:29   3       Q.   District manager's discretion?

16:47:30   4       A.   The store manager's.

16:47:32   5       Q.   Okay.  Because we've heard some store managers

16:47:35   6   take the stand and say they didn't know anything, much

16:47:38   7   about the Strands, if at all.  How did that happen?

16:47:45   8       A.   The store managers?  The ones that was at their

16:47:46   9   discretion.

16:47:47  10       Q.   Okay.  Some of the managers been there a while

16:47:52  11   could decide they continue to do things their way;

16:47:55  12   that's what you're saying?

16:47:56  13       A.   Things their way, depends on what level, how good

16:47:58  14   a job they did.

16:47:59  15       Q.   They really vary from one district to another?

16:48:02  16       A.   It could have.

16:48:02  17       Q.   Yeah.

16:48:03  18       A.   Based on experience level, the store manager, the

16:48:06  19   DM, what was going on in that particular area.

16:48:08  20       Q.   Right.  The store policy manual, as we heard from

16:48:11  21   Mr. Barkus and others, that's mandatory; correct?

16:48:14  22       A.   No, sir, not necessarily.

16:48:15  23       Q.   Look there on your first page of your two manuals

16:48:22  24   real quick.  You've got the only copy I had.  I want to

16:48:25  25   show you --

16:48:26  1    A.   Okay.

16:48:26  2    Q.   -- show you the sentence I'm talking about.  Read

16:48:29  3  this sentence right -- the one you developed, you were

16:48:32  4  the leader of the team?

16:48:33  5    A.   This one?

16:48:34  6    Q.   Yes.  Let's do 2003.  I think they're both the

16:48:37  7  same on this one.  Read the third paragraph.

16:48:41  8    A.   "Exceptance to any of these policies will require

16:48:50  9  upper level management, i.e., vice-president level and

16:48:55  10  above."

16:48:55  11   Q.   So if you're not a vice-president or above, you

16:48:59  12  have no power to make an exception to these policy

16:49:03  13  manuals, do you?

16:49:04  14   A.   In reality?

16:49:09  15   Q.   No, sir.

16:49:10  16   A.   It depends on what was going on, what policy you

16:49:15  17  were talking about.

16:49:16  18   Q.   They're -- let me ask you this:  You don't get

16:49:19  19  involved in hiring in the stores, do you?

16:49:21  20   A.   As store managers?

16:49:23  21   Q.   Yes.

16:49:24  22   A.   No, sir.

16:49:25  23   Q.   You don't get involved in hiring assistant store

16:49:28  24  managers?

16:49:28  25   A.   No, sir.

16:49:28   1    Q.   You don't get involved in hiring cashiers?

16:49:30   2    A.   No, sir.

16:49:31   3    Q.   And you got various layers between you and the

16:49:38   4    stores in that type of function; correct?

16:49:41   5    A.   I need to --

16:49:43   6              THE COURT:   Go ahead.

16:49:44   7              THE WITNESS:   There has been a couple of

16:49:46   8    cases where I have been involved in interviewing a

16:49:50   9    manager to be a store manager in a new area that may be

16:49:57   10   a DM somewhere down the road.

16:50:00   11   Q.   Just on a rare occasion?

16:50:01   12   A.   Yeah.   There's been a few occasions.

16:50:03   13   Q.   Okay.

16:50:04   14   A.   Just happened recently, the reason I brought it

16:50:07   15   up.

16:50:07   16   Q.   In the 1,400 stores below you, you have regional

16:50:10   17   vice-presidents, district managers, between you and the

16:50:12   18   stores?

16:50:12   19   A.   Yes, sir.

16:50:12   20   Q.   And it's -- really, a district manager is the

16:50:14   21   regional vice-president responsible for enforcing the

16:50:17   22   policies in the stores; correct?

16:50:19   23   A.   No, sir.   The -- running our stores is -- is the

16:50:25   24   -- everybody up and down the chain.   It's store manager,

16:50:29   25   assistant managers, district managers, regional

16:50:31   1   vice-presidents, vice-presidents, senior

16:50:35   2   vice-presidents.

16:50:35   3       Q.   Okay.   But both of the policy manuals that you

16:50:41   4   issued on your project team in 2002, 2003, said on their

16:50:47   5   first page, quote, "exceptions to any of these policies

16:50:51   6   would require upper level management authorization,

16:50:56   7   i.e., vice-president level or below"; correct?

16:50:59   8       A.   Yes, sir.

16:50:59   9       Q.   Okay.   Now, in fact, once you had developed these

16:51:09   10   new Strands, training people in your policies, training

16:51:15   11   them in the task of their job in running the store, and

16:51:17   12   you developed your new policy manual, both of which you

16:51:21   13   said was for the purpose of bringing everything up to

16:51:24   14   date and current as to how things are done at the moment

16:51:28   15   in Family Dollar, do you know anybody at that point who

16:51:32   16   sat down and made a decision as to whether, as described

16:51:36   17   in the policies, store managers are exempt from overtime

16:51:41   18   under the Fair Labor Standards Act?

16:51:43   19       A.   Would you repeat that question again?

16:51:46   20       Q.   Yeah.   Well, let's take it one step at a time.

16:51:50   21   Did you ever make a decision that the task and policies

16:51:55   22   and methods doing work in the stores, running the

16:51:58   23   stores, made someone exempt from overtime under the Fair

16:52:05   24   Labor Standards Act?

16:52:05   25       A.   No, sir.

16:52:07  1    Q.   That -- no one on your project team addressed

16:52:10  2  that issue either, did they?

16:52:12  3    A.   Talking about store managers?

16:52:15  4    Q.   Store managers, as to whether they are, in the

16:52:19  5  way described in your policies and in your training --

16:52:23  6  whether they are exempt from overtime -- did you know

16:52:26  7  anyone who made that decision once you updated all these

16:52:29  8  manuals and policies?

16:52:30  9    A.   The manuals were for all the people, so no one

16:52:33  10  particular position was -- was talked about.   It was

16:52:38  11  resource documents for cashiers, assistant managers and

16:52:41  12  managers.

16:52:41  13    Q.   But my question is this:   The defendant's now

16:52:45  14  rested, except for two of the plaintiffs, and I know

16:52:49  15  they didn't make the decision --

16:52:50  16          MR. MAY:   Your Honor, I object to counsel

16:52:52  17  testifying.

16:52:52  18          THE COURT:   Sustained.   Sustained.   The jury

16:52:57  19  will disregard the last statement.

16:52:59  20    Q.   At this point in the case, can you tell us who it

16:53:04  21  is that made the decision that any of these 1,424

16:53:07  22  plaintiffs, store managers, were exempt for overtime and

16:53:13  23  who made the decision?

16:53:15  24    A.   I'm not sure -- I don't know.   I --

16:53:19  25    Q.   Okay.

16:53:20   1        A.   I'm not sure what the question is.

16:53:23   2        Q.   It's not a question that's ever occurred to you?

16:53:27   3        A.   To who made that decision?

16:53:29   4        Q.   Yes.  Who made this decision?  We haven't heard

16:53:32   5   anybody say it's my decision, this is why I did it.  You

16:53:35   6   don't know who did it, do you?

16:53:36   7        A.   No, sir.

16:53:37   8             MR. R. WIGGINS:  Okay, thank you.

16:53:43   9             THE COURT:  Question by the defendant?

16:53:48  10             MR. MAY:  No questions, Your Honor.

16:53:49  11             THE COURT:  All right.  Thank you, sir.

16:53:52  12             THE WITNESS:  Thank you.

16:53:54  13             MR. WHITE:  May he be excused, Your Honor?

16:53:56  14             THE COURT:  Yes.  You're excused.

16:53:56  15             (Witness excused.)

16:53:59  16             THE COURT:  The plaintiffs will call their

16:54:00  17   next witness.

16:54:11  18             MR. R. WIGGINS:  Your Honor, we did not know

16:54:13  19   until around lunch that they were about to rest, and

16:54:16  20   we've exhausted the people we have available today.

16:54:20  21             We did not -- we were not given notice

16:54:22  22   before midday that they were going to -- that they were

16:54:25  23   that close to resting.  In fact, we got a witness list

16:54:29  24   today for ten to twelve people, including Mr. Phillips

16:54:32  25   on the list, and they decided not to call various

| | | |
|---|---|---|
| 16:54:35 | 1 | people. |
| 16:54:36 | 2 | THE COURT:  You don't have any other |
| 16:54:38 | 3 | plaintiffs who are going to testify in this case? |
| 16:54:42 | 4 | MR. WHITE:  He gave us a list that had a |
| 16:54:45 | 5 | third person on there today.  You are not going to call |
| 16:54:48 | 6 | Mr. Lands?  Jack Lands was on the list. |
| 16:54:51 | 7 | THE COURT:  Is Mr. Lands on the list? |
| 16:54:53 | 8 | MR. R. WIGGINS:  We're not calling him, Your |
| 16:54:55 | 9 | Honor.  He's not a plaintiff and we're not calling him. |
| 16:55:03 | 10 | Judge, we don't -- and let me say this, too, |
| 16:55:07 | 11 | Judge.  I think -- well, I'd rather say it outside the |
| 16:55:10 | 12 | presence of the jury -- but I think we are fairly close |
| 16:55:13 | 13 | to resting. |
| 16:55:18 | 14 | THE COURT:  Well, with that good news, I'll |
| 16:55:20 | 15 | let y'all go home. |
| 16:55:23 | 16 | (Laughter.) |
| 16:55:24 | 17 | THE COURT:  Please do not discuss the case |
| 16:55:26 | 18 | among yourselves, with anyone else, or allow it to be |
| 16:55:29 | 19 | discussed in your presence.  Keep an open mind. |
| 16:55:32 | 20 | We'll see you tomorrow at 9:00. |
| 16:56:10 | 21 | (Jury out of courtroom at 4:56 p.m.) |
| 16:56:10 | 22 | THE COURT:  Anything we need to take up? |
| 16:56:12 | 23 | MR. WHITE:  We just need their list, if they |
| 16:56:15 | 24 | have one.  But they have an hour. |
| 16:56:17 | 25 | MR. ST. CLAIR:  I would like to, at this |

16:56:18  1    time, Your Honor, just to make a motion for mistrial,

16:56:21  2    based upon the testimony given today by Dr. Bradley,

16:56:25  3    which was nothing more, we suggest, Your Honor, than a

16:56:28  4    supplementation of his report, and not in the nature of

16:56:33  5    rebuttal, because there was no expert witnesses called

16:56:35  6    in the defendant's case.

16:56:37  7            The basis for our motion for mistrial is as

16:56:41  8    follows:  First, Dr. Bradley is not qualified as an

16:56:44  9    expert on the Fair Labor Standards Act.  And yet, his

16:56:49  10   report is based upon assumptions about what the Fair

16:56:54  11   Labor Standards Act requires.  And he -- it has left the

16:56:57  12   jury with the impression that the law is -- that the

16:57:02  13   manager must be in the store physically in order for

16:57:06  14   that to count as management.  And that's not what the

16:57:09  15   law says.

16:57:12  16           Secondly, we were not provided with this

16:57:16  17   report by Dr. Bradley on a timely basis.  Had we been

16:57:20  18   provided this newfound report on a timely basis, we

16:57:26  19   would have had the opportunity to counter-designate an

16:57:30  20   expert based on that report.

16:57:31  21           THE COURT:  First of all, I did not

16:57:35  22   understand his testimony to be expert testimony.

16:57:39  23           And, secondly, what report are you referring

16:57:40  24   to?

16:57:43  25           MR. ST. CLAIR:  Well, there were several

16:57:45  1   documents that were admitted into evidence --

16:57:46  2            THE COURT:  You mean exhibits?

16:57:48  3            MR. ST. CLAIR:  I'm sorry, yes.  When I say

16:57:50  4   reports, I'm talking about the exhibits that came in

16:57:53  5   during his testimony.

16:57:53  6            THE COURT:  All right.

16:57:56  7            MR. ST. CLAIR:  And, again, Your Honor, just

16:57:59  8   so the record is clear, our concern is this:  That the

16:58:01  9   jury is now left with the impression that the law is

16:58:06  10  that a manager must be physically present in the

16:58:11  11  workplace in order for that to count as management of,

16:58:14  12  you know, the customary and regular test under the

16:58:18  13  exemption.  We submit that's not the law.

16:58:20  14            THE COURT:  What would the jury -- I think

16:58:24  15  the question was put to him:  If the law isn't that,

16:58:28  16  then these exhibits, in effect, are irrelevant, and he

16:58:36  17  agreed with that, didn't he?

16:58:38  18            MR. ST. CLAIR:  I believe that question was

16:58:39  19  asked and answered as the Court recalls.

16:58:40  20            THE COURT:  Yes.  So what's the basis of

16:58:43  21  your saying that he is -- that the jury can conclude

16:58:48  22  that the law is?

16:58:51  23            MR. ST. CLAIR:  Your Honor, the basis is the

16:58:53  24  last time you and I were together, I blew the roof off

16:58:56  25  the courthouse.  And if I blow the roof off the

16:58:58  1   courthouse this time, I just want to make sure I have

16:59:01  2   everything in the record that -- that the next lawyers

16:59:04  3   for this client will want to use on appeal.

16:59:06  4               THE COURT:  All right.

16:59:07  5               MR. WHITE:  Your Honor, I have additional

16:59:09  6   grounds, since some of it concerns Mr. McCarthy.

16:59:11  7               THE COURT:  Yes, sir.

16:59:12  8               MR. WHITE:  Because the plaintiffs changed

16:59:14  9   their theory during the course of Dr. Bradley's

16:59:16  10  testimony.  They represented to you, first, that he was

16:59:19  11  rebutting something that Mr. McCarthy said; then they

16:59:22  12  said, no, he's in our case in chief.

16:59:26  13              I think, Your Honor, that at minimum, his

16:59:29  14  testimony should be stricken and disallowed as any

16:59:32  15  reference at all to the staff scheduler or any exhibit

16:59:36  16  related to it.

16:59:37  17              THE COURT:  All right.

16:59:38  18              MR. R. WIGGINS:  Your Honor, we said both,

16:59:40  19  that Ms. Spiesman put a calculation in on the two FTEs

16:59:45  20  and countered every hour the store was open, whether the

16:59:49  21  manager was there or not.

16:59:50  22              We put in the opposite that we countered

16:59:53  23  when the store manager is in the store.  That's direct

16:59:55  24  rebuttal.  But even if it's not, it's part of our case

16:59:58  25  in chief, it's our first chance to respond to their

affirmative defense.

Ms. Spiesman took the stand.  The only other witness who took the stand --

THE COURT:  All right.  The motion for mistrial is denied.

Anything else we need to take up?

MR. KALLON:  Yes, Your Honor.  I just wanted to point out this is the third day, since you've said both sides would present its exhibits and blowups that we've used.  We have still not received the ones from the plaintiffs.  And, again, my appellate lawyers are telling me I need those for the record.

Thank you, Your Honor.

THE COURT:  Mr. Johnson?

MR. JOHNSON:  Yes, sir.  As I said yesterday, we are going to get those and do a day-by-day tally and present those to the Court.  We may offer, as we get it in today, some new exhibits, so we'll get those together.

THE COURT:  But the question, Mr. Johnson, is when?

MR. JOHNSON:  Would you like it by tomorrow? Because I can get it to you by tomorrow, Your Honor. But I was hoping just to do one big exhibit instead of doing several exhibits.

17:00:58  1          MR. ST. CLAIR:  Well, again, Your Honor, we

17:01:00  2   think it's better to be done on a day-by-day basis so

17:01:04  3   that way it will be easier to determine which

17:01:07  4   demonstrative exhibits we used with which witnesses.

17:01:10  5          THE COURT:  All right.  Have them ready by

17:01:12  6   tomorrow morning.

17:01:12  7          MR. JOHNSON:  Okay.

17:01:14  8          MR. ST. CLAIR:  There's one remaining issue

17:01:16  9   about the duplicate issue of the Strands.

17:01:19  10          THE COURT:  Yes.

17:01:21  11          MR. ST. CLAIR:  And I don't think that

17:01:22  12   that's yet been -- I think we're waiting for response

17:01:26  13   from the plaintiffs.

17:01:26  14          MR. R. WIGGINS:  Yes, sir.  We have found a

17:01:29  15   difference in the Strands, Your Honor, and we're going

17:01:32  16   to get with them about that.

17:01:33  17          THE COURT:  Pardon me?

17:01:34  18          MR. R. WIGGINS:  We have found part of the

17:01:35  19   Strands that the defendant's have in their notebooks --

17:01:38  20          THE COURT:  Yes.

17:01:39  21          MR. R. WIGGINS:  -- are missing some of the

17:01:41  22   parts of the Strands, and we're going to get with them

17:01:43  23   about that.

17:01:43  24          THE COURT:  When?

17:01:44  25          MR. R. WIGGINS:  We can do that right now.

17:01:45  1          THE COURT:  So I expect this issue to be

17:01:47  2  resolved when we begin court tomorrow.

17:01:54  3          MR. ST. CLAIR:  The only final thing I have,

17:01:55  4  Your Honor, is charge conference --

17:01:57  5          THE COURT:  I thought that was the last one.

17:02:01  6          MR. ST. CLAIR:  This is not a question.

17:02:03  7  Well, yeah, it is.  Charge conference, what's Your

17:02:07  8  Honor's thinking about that?

17:02:08  9          THE COURT:  Well, I'm thinking that I am

17:02:10  10  going to give the precise charge that I gave the last

17:02:12  11  time, unless y'all convince me that I shouldn't.  I

17:02:22  12  mean, you -- we've got the record of the last trial and

17:02:29  13  got your objections.  They're preserved for the record.

17:02:35  14      Do we need anything else?

17:02:37  15          MR. ST. CLAIR:  There's a few items that --

17:02:40  16  additional items that I think we'd like to just put on

17:02:43  17  the record, Your Honor, that were not there last time.

17:02:45  18          THE COURT:  Do you know what they are?

17:02:47  19          MR. ST. CLAIR:  I do.

17:02:47  20          THE COURT:  Yeah.

17:02:48  21          MR. ST. CLAIR:  I can, if you like, Your

17:02:50  22  Honor, I can give them to you right now.

17:02:52  23          THE COURT:  I'd appreciate it.

17:03:08  24          MR. ST. CLAIR:  There was a statement in the

17:03:09  25  list of management duties, you know, there's a part of

17:03:13  1    the law that says these are the management duties.  It's

17:03:15  2    basically tracking 29 CFR 541.102.  But in talking about

17:03:23  3    the budget, the way the regulation reads, Your Honor, is

17:03:27  4    planning and controlling the budget.  But the charge

17:03:30  5    that was given the last time also includes the term

17:03:34  6    "determining".  It says, "determining, planning and

17:03:37  7    controlling the budget."  And the regulation says just

17:03:42  8    "planning and controlling."

17:03:53  9              THE COURT:  All right.

17:03:54  10             MR. ST. CLAIR:  There was also a charge

17:03:56  11   given regarding shared responsibility.

17:03:59  12             THE COURT:  Yes, sir.

17:04:00  13             MR. ST. CLAIR:  That if two people share

17:04:02  14   responsibility, they can't both -- I believe that record

17:04:05  15   -- that objection is on the prior record, Your Honor.

17:04:07  16             THE COURT:  Yes, it is.

17:04:09  17             MR. ST. CLAIR:  If it is, I won't burden the

17:04:10  18   Court with that.

17:04:11  19             THE COURT:  All right.

17:04:12  20             MR. ST. CLAIR:  And also, I think all

17:04:13  21   objections are preserved on the working foreman --

17:04:17  22             THE COURT:  Right.

17:04:17  23             MR. ST. CLAIR:  -- objection.

17:04:18  24             THE COURT:  They are.

17:04:20  25             MR. ST. CLAIR:  Then this is one I'm not

17:04:22  1   sure is in the prior record, Your Honor.  In the damage

17:04:26  2   calculation --

17:04:27  3            THE COURT:  Yes.

17:04:28  4            MR. ST. CLAIR:  -- the prior charge says the

17:04:30  5   regular rate for a week is determined by dividing the

17:04:35  6   first 40 hours worked into the total wages paid for

17:04:38  7   those 40 hours.  We except to that.

17:04:43  8            And we believe the correct statement of the

17:04:44  9   law is that the regular rate for a week is determined by

17:04:49  10  dividing the amount paid by the number of hours for

17:04:55  11  which it was intended to compensate.  So, for example,

17:05:00  12  if it was intended to compensate for 48 hours, it should

17:05:03  13  be divided by 48.  If it was for 52, 52; or if it was

17:05:08  14  intended to compensate for all hours worked, which is

17:05:11  15  the defendant's position.

17:05:12  16           THE COURT:  All right.  Do you have an

17:05:16  17  Eleventh Circuit case on it?

17:05:18  18           MR. ST. CLAIR:  I don't, as I stand here

17:05:19  19  right now.  But that's the way it's defined in the

17:05:22  20  regulations, and I can cite Your Honor to the

17:05:26  21  regulations.

17:05:26  22           THE COURT:  All right.  And what regulation

17:05:32  23  do you want to cite me to?

17:05:34  24           MR. MILLER:  I believe it's 778, Your Honor.

17:05:36  25  I will go --

17:05:37    1           THE COURT:  You'll have it for me tomorrow?

17:05:39    2           MR. ST. CLAIR:  Yes.  We'll have that for

17:05:41    3   you in the morning, Your Honor.

17:05:41    4           THE COURT:  All right.

17:05:42    5           MR. ST. CLAIR:  Just a couple more, Your

17:05:44    6   Honor.  We would like to add -- these are just

17:05:45    7   regulations -- Sections 541.700(c).  I believe Your

17:05:52    8   Honor last time gave subsections (a) and (b), but not

17:05:55    9   (c).  And we think -- we would request Your Honor

17:05:59   10   include 541.700(c).  Also, 541.106(c).

17:06:09   11           And then finally, Your Honor, this is on the

17:06:14   12   closely related.  There's a regulation regarding closely

17:06:17   13   related duties to exempt, that's 541.703 subparagraph

17:06:23   14   (a), and 541.703 subparagraph (b), sub-subparagraphs 1,

17:06:29   15   2 and 5.  And that's all.

17:06:33   16           THE COURT:  Get me a copy of the regulations

17:06:38   17   in the morning.

17:06:38   18           MR. ST. CLAIR:  I will, Your Honor.

17:06:40   19           THE COURT:  All right.

17:06:40   20           MR. ST. CLAIR:  Oh, yes.  In Your Honor's

17:06:42   21   last time, you'll recall you gave an instruction on

17:06:45   22   missing witness.  And I think that may have -- that's

17:06:48   23   something that, you know, case specific.  I don't know

17:06:52   24   that that would be appropriate in this trial, except

17:06:55   25   perhaps for the plaintiffs who were not here.

17:06:58  1            THE COURT:  All right.

17:07:02  2            MR. ST. CLAIR:  I will get Your Honor those

17:07:03  3   regulations.

17:07:04  4            THE COURT:  All right.

17:07:13  5            MR. ST. CLAIR:  And, if Your Honor cares for

17:07:15  6   any briefing, legal briefing on the current duty, or

17:07:18  7   working foreman, or any other matters, we'll be happy to

17:07:22  8   give that to you.

17:07:23  9            THE COURT:  No, I don't need it on those

17:07:24  10  issues.

17:07:25  11            MR. ST. CLAIR:  Thank you, Your Honor.

17:07:30  12            THE COURT:  Anything else?

17:07:30  13            MR. WHITE:  Not today, Judge.  You want us

17:07:32  14  to be heard on Exhibit 274 in the morning; correct?

17:07:34  15            THE COURT:  Yes.

17:07:35  16            MR. WHITE:  We'll be ready.  Thank you,

17:07:36  17  Judge.

17:07:37  18            THE COURT:  Thank you.

17:07:39  19

17:07:40  20            (Court adjourned at 5:00 p.m.)

          21

          22

          23

          24

          25

CERTIFICATE

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Christina K. Decker*           3-9-06

Christina K. Decker, RPR, CRR           Date

Federal Official Court Reporter