FILED

2007 May-15 PM 12:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

1
2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

3  JANICE MORGAN, et al.,        *
            Plaintiffs,          *   CV-01-UWC-0303-W
4                                *   March 2, 2006
   vs.                           *   Tuscaloosa, Alabama
5                                *   9:10 A.M.
   FAMILY DOLLAR STORES, INC.,   *
6        Defendant.              *
   * * * * * * * * * * * * * * * * * * * * * * * * * *

7

8

VOLUME 7
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE CHIEF JUDGE U.W. CLEMON

9                        And a Jury

10  FOR THE PLAINTIFFS:

11  HON. ROBERT L. WIGGINS, JR., ESQ.
    HON. C. MICHAEL QUINN, ESQ.
12  HON. GREGORY O. WIGGINS, ESQ.
    HON. HERMAN N. JOHNSON, JR., ESQ.
13  HON. ROCCO CALAMUSA, ESQ.
    WIGGINS, CHILDS, QUINN & PANTAZIS
14  301 19th Street, North
    Birmingham, AL 35203-3204
15
    HON. J. ALLEN SCHREIBER, ESQ.
16  HON. P. MARK PETRO, ESQ.
    TWO METROPLEX DRIVE, SUITE 250
17  BIRMINGHAM, AL  35209

18  FOR THE DEFENDANT:

19  HON. JAY D. ST. CLAIR, ESQ.
    HON. ABDUL K. KALLON, ESQ.
20  HON. JAMES WALKER MAY, ESQ.
    HON. RONALD H. KENT, JR., ESQ.
21  HON. T. MATTHEW MILLER, ESQ.
    BRADLEY, ARANT, ROSE & WHITE
22  P. O. Box 830709
    Birmingham, AL  35203
23
    HON. J. MARK WHITE, ESQ.
24  HON. AUGUSTA S. DOWD, ESQ.
    WHITE, ARNOLD, ANDREWS & DOWD
25  2025 3rd Avenue North, Suite 600
    Birmingham, AL  35203

1                          (Continued)

2

3    Christina K. Decker, RPR, CRR
     Federal Official Court Reporter
     101 Holmes Avenue, NE, Suite 305

4    Huntsville, AL 35801

5

6    Penny L. Enoch, RPR
     Federal Official Court Reporter

7    1729 5th Avenue North, Room 325
     Birmingham, AL  35203

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                            I N D E X

2    Witnesses:          Direct   Cross   Redirect   Recross

3    Motions                4

4    BILL DETTER           66      36       59
     (Transcript read)
5

6    Motions              113

7                         125

8    Charge Conf.         128

9    Closing Arguments

10   By MR. CALAMUSA      150

11   By MR. KALLON        167

12   By MR. ST. CLAIR     194

13   By MR. WIGGINS       202

14

15

16

17

18

19

20

21

22

23

24

25
```

1   March 2, 2006                              9:10 a.m.

2                        <u>PROCEEDINGS</u>:

08:48:14   3              (In open court, jury not present.)

09:15:32   4              THE COURT:  Good morning, ladies and

09:15:34   5   gentlemen.

09:15:36   6              Mr. White?

09:15:36   7              MR. WHITE:  Your Honor, I'd like to be heard

09:15:38   8   on two matters related to two exhibits.

09:15:43   9              Yesterday, the plaintiffs offered Exhibit

09:15:45   10  279, which was a stack of staff schedulers, and I relied

09:15:52   11  upon their reputation that these documents were in the

09:15:57   12  same condition as when they were produced by my clients.

09:16:00   13  And as the Court is aware, you asked me to look, and all

09:16:03   14  I had time to do was confirm the Bates number.

09:16:06   15             In the intervening time, I have found that

09:16:09   16  the documents are altered and they contain innumerable

09:16:14   17  sorts of notations, obviously by Dr. Bradley, who used

09:16:19   18  them as a worksheet.

09:16:20   19             Your Honor, if you look down at a number of

09:16:24   20  them, you will see where he's doing his math,

09:16:26   21  calculations; and so, therefore, Your Honor, I would

09:16:29   22  like to renew my objections.  I apologize to the Court

09:16:33   23  that I did not discover this at the time it occurred.

09:16:37   24             But, quite frankly, I've relied upon what I

09:16:40   25  thought was the candor of my opponents that they

09:16:43  1   represented that these were in the same condition.  And

09:16:44  2   I would move to strike Exhibit 279, because it is not,

09:16:51  3   in fact, in the condition that it was delivered to the

09:16:54  4   plaintiffs.

09:16:54  5          THE COURT:  All right.  Here's what I am

09:16:55  6   going to do.  I am going to give you leave to substitute

09:17:01  7   a clean copy of the exhibit.

09:17:03  8          MR. WHITE:  Are you talking to the

09:17:05  9   plaintiffs?

09:17:06  10         THE COURT:  No, sir, I'm talking to the

09:17:08  11  defendant.

09:17:09  12         MR. R. WIGGINS:  Your Honor, Dr. Bradley was

09:17:11  13  asked the question:  Did you sum the columns and show

09:17:16  14  your results so we could check them and he said, yes.

09:17:19  15  And that's what he's referring to.

09:17:20  16         THE COURT:  Oh, well --

09:17:21  17         MR. R. WIGGINS:  It's a pencil notation that

09:17:24  18  adds the column up so the people can check --

09:17:28  19         MR. WHITE:  And, Judge, what that is, that

09:17:30  20  is additional testimony.  What the expert did is offer

09:17:33  21  the exhibits --

09:17:34  22         THE COURT:  Just a moment.

09:17:35  23         MR. WHITE:  Yes, sir, I'm sorry.

09:17:37  24         THE COURT:  Mr. White, are you saying that

09:17:38  25  he did not testify that he had made these additions?

09:17:42  1          MR. WHITE:  I -- I've looked at his

09:17:45  2   transcript.  I don't see anywhere he testified that "I

09:17:48  3   made these notations on this document."

09:17:50  4          And what it leads the jury to believe is

09:17:52  5   that Family Dollar, that this document that they've

09:17:55  6   represented as a business record, are these

09:17:57  7   calculations.  And I don't know what he portends to

09:18:00  8   argue from that, but I don't think it's my burden when

09:18:02  9   he altered the exhibit, for me to have to go back and

09:18:05  10  look through thousands of documents to find whatever it

09:18:09  11  is he has in there.

09:18:10  12         MR. R. WIGGINS:  The transcripts will show

09:18:14  13  that I specifically asked:  Did you put your totals on

09:18:18  14  the page so we can check your math?  Judge, we've got

09:18:21  15  the transcripts.

09:18:21  16         MR. WHITE:  Yes, I have it.

09:18:23  17         THE COURT:  Mr. Wiggins?

09:18:24  18         MR. R. WIGGINS:  Let me get the transcript,

09:18:26  19  Your Honor.

09:18:26  20         THE COURT:  All right.

09:18:30  21         MR. R. WIGGINS:  Can I borrow yours, Mark?

09:18:37  22  It doesn't have an index yet, or I can tell you where he

09:18:43  23  checked the math -- well, maybe it does have an index.

09:19:02  24         MR. WHITE:  If you look at the front, it

09:19:04  25  will be after the word "Bradley".  It gives the page

| | | |
|---|---|---|
| 09:19:07 | 1 | number. |
| 09:19:58 | 2 | MR. R. WIGGINS:  Here's one part, Your |
| 09:19:59 | 3 | Honor, on Page 280.  Referring to Exhibit 278.  That's |
| 09:20:06 | 4 | the one we're on, I think, isn't it? |
| 09:20:09 | 5 | THE CLERK:  279. |
| 09:20:11 | 6 | MR. WHITE:  No.  We're on 279. |
| 09:20:12 | 7 | MR. R. WIGGINS:  I'm sorry.  You're right. |
| 09:20:14 | 8 | "Question:  And then, Dr. Bradley, when you -- going |
| 09:20:17 | 9 | just briefly back, to finish this calculation, based on |
| 09:20:22 | 10 | Exhibit 279, the schedules, did you write down the |
| 09:20:25 | 11 | numbers, that of the categories that you've already told |
| 09:20:29 | 12 | us about, as far as the number of stores that failed to |
| 09:20:32 | 13 | have two full-time equivalents scheduled for their |
| 09:20:34 | 14 | stores?  Yes, sir." |
| 09:20:37 | 15 | MR. WHITE:  Your Honor, the numbers -- |
| 09:20:39 | 16 | MR. R. WIGGINS:  There was an earlier point |
| 09:20:41 | 17 | where I said that the jury could check his math, because |
| 09:20:45 | 18 | he had noted his totals. |
| 09:20:47 | 19 | THE COURT:  Read that. |
| 09:20:48 | 20 | MR. R. WIGGINS:  I'm looking for that part, |
| 09:20:50 | 21 | too. |
| 09:20:51 | 22 | MR. WHITE:  May I speak to the first point? |
| 09:20:53 | 23 | THE COURT:  No. |
| 09:20:54 | 24 | MR. R. WIGGINS:  By the way, the first one I |
| 09:20:56 | 25 | read, Mark, had highlighted in yellow. |

| | | |
|---|---|---|
| 09:20:59 | 1 | MR. WHITE:  Sure did, because it didn't |
| 09:21:02 | 2 | refer to this document, Your Honor. |
| 09:21:03 | 3 | MR. R. WIGGINS:  Exhibit 279 is right in the |
| 09:21:06 | 4 | face of it, Your Honor.  But the more important one I |
| 09:21:09 | 5 | want to find because I did want everybody to check it. |
| 09:21:12 | 6 | Now -- |
| 09:22:57 | 7 | MR. WHITE:  Judge if you want us to |
| 09:22:59 | 8 | substitute a clean one so we can move along, I'll do |
| 09:23:03 | 9 | that. |
| 09:23:04 | 10 | THE COURT:  All right. |
| 09:23:05 | 11 | MR. WHITE:  Thank you. |
| 09:23:06 | 12 | MR. R. WIGGINS:  Your Honor, it's in here. |
| 09:23:08 | 13 | I know it's in here, because I remember saying it. |
| 09:23:10 | 14 | THE COURT:  Well, we're not going to take |
| 09:23:13 | 15 | all morning for to you find it.  If you substitute a |
| 09:23:15 | 16 | clean copy, subject to -- with the understanding that |
| 09:23:21 | 17 | when you find the reference, Mr. Wiggins, that shows |
| 09:23:23 | 18 | that the witness testified that he made these additions |
| 09:23:27 | 19 | to the original exhibit, then that exhibit may remain |
| 09:23:35 | 20 | in. |
| 09:23:35 | 21 | MR. WHITE:  Your Honor, my only objection |
| 09:23:38 | 22 | would be -- assume that's there -- assume that's there. |
| 09:23:41 | 23 | It still doesn't come in on the business records. |
| 09:23:43 | 24 | THE COURT:  Why doesn't it? |
| 09:23:45 | 25 | MR. WHITE:  Because it's not kept -- this is |

09:23:46  1   not presented or offered, because it is kept and

09:23:49  2   maintained in the ordinary course of business.  So

09:23:52  3   that's my objection.

09:23:53  4           THE COURT:  All right.  That objection is

09:23:56  5   overruled.

09:23:56  6           MR. WHITE:  Your Honor, I think you still

09:23:58  7   wanted to hear from them on Exhibit 274.

09:24:01  8           THE COURT:  Yes, sir.

09:24:06  9           MR. R. WIGGINS:  Your Honor -- Your Honor,

09:24:17 10   first of all, as I said yesterday, the 80 percent or

09:24:24 11   82.5 percent that met the two FTE is -- that did not

09:24:31 12   meet the two full-time equivalent, which is shown on

09:24:34 13   Exhibit 274, is part of our case in chief.  But, it is

09:24:42 14   also in response to the 99 -- 99.1 percent that

09:24:48 15   Ms. Spiesman testified to.  She testified at Page 140,

09:24:55 16   lines 17 to 143, line 3, that she had determined that

09:25:02 17   99.1 percent of the store managers met the criteria for

09:25:06 18   two full-time equivalents.

09:25:08 19           Now, we're showing that, no, the number is

09:25:11 20   17.5 percent, given our method.

09:25:14 21           THE COURT:  All right.  What page does she

09:25:17 22   testify to that?

09:25:17 23           MR. R. WIGGINS:  She -- Page 140, line 17 to

09:25:21 24   143 line 3.  But she testifies on that subject matter

09:25:25 25   for four pages -- 139 to 143.  But the key part with the

09:25:29  1    99.1 percent is the -- those six lines I just listed.

09:25:34  2              THE COURT:  All right.

09:25:39  3              MR. R. WIGGINS:  Also, on cross-examination,

09:25:43  4    Mr. Johnson went into that, because she had gone into

09:25:47  5    it.  He questioned her about, well, your 99.1 percent is

09:25:51  6    based on giving the store managers credit for when

09:25:54  7    they're not in the store, and she said yes.  And we

09:25:57  8    think the proper method is you can't be supervising

09:26:02  9    somebody if -- someone if you're not even on duty.

09:26:06  10             Now, they say that's a legal dispute.  Maybe

09:26:08  11   it is.  We don't think it is.  But we think it's common

09:26:11  12   sense, you've got to be in the store to supervise

09:26:14  13   someone.

09:26:15  14             But putting that aside, we have the right I

09:26:18  15   think, to put our calculation in contradiction to

09:26:22  16   theirs.  So that's Page 145, line 16 to 146, line 9,

09:26:27  17   that Mr. Johnson cross-examined her on that subject.

09:26:31  18             Also, Mr. Johnson went into a related

09:26:35  19   subject on that calculation at Page 148, lines 10

09:26:39  20   through 24.

09:26:44  21             MR. QUINN:  Judge, I found the lines, if

09:26:46  22   you'd like for me to read them.

09:26:47  23             THE COURT:  Yes, sir.

09:26:48  24             MR. QUINN:  Page 275, beginning at line 21:

09:26:52  25   "All right.  You can take your seat.  Thank you."  This

09:26:54   1   is Mr. Wiggins talking.

09:26:57   2              "Now, Dr. Bradley, you have all those

09:26:59   3   schedules in front of you as Exhibit 279.  Did you go

09:27:02   4   through them and do this type of tabulation that you

09:27:06   5   showed us on this board" -- that's when this board was

09:27:09   6   up here with writing on it -- "Defendant's Exhibit 2327,

09:27:12   7   for all those schedules in front of new Exhibit 279?

09:27:18   8   Yes, sir.

09:27:18   9              "And did you reflect your totals in each

09:27:20   10  column for Sunday through Saturday on each schedule?

09:27:24   11  Yes, sir, I did.

09:27:25   12             "So anybody that wants to check, you can

09:27:28   13  check whether you did the math right?  That's right."

09:27:32   14             And then we offered the exhibit.

09:27:33   15             MR. WHITE:  All that does is authenticate --

09:27:36   16  he altered the exhibit.

09:27:37   17             MR. QUINN:  That he has that he got -- that

09:27:42   18  he wrote, Your Honor --

09:27:42   19             THE COURT:  Gentlemen, I have overruled.

09:27:46   20             MR. WHITE:  Your Honor, yesterday, as I

09:27:48   21  understood the plaintiffs, they first said that this 274

09:27:52   22  was offered in rebuttal to Mr. McCarthy's two FTE

09:27:59   23  testimony.  And one of the things you asked them to show

09:28:02   24  you was cites he testified on two FTE, which he did not.

09:28:06   25  They then said it was offered in the case in chief.

09:28:08    1           Mr. Wiggins, I agree with him.  This is a

09:28:11    2   legal issue that obviously is getting somewhere either

09:28:15    3   ending in Tuscaloosa or elsewhere -- I don't know --

09:28:19    4   about the plaintiffs' apparent theory, now that the

09:28:22    5   manager has to be physically present inside the store at

09:28:27    6   all times, and there is a dispute.

09:28:30    7           But here is the problem:  If you recognize

09:28:32    8   that there is a dispute, they now are offering

09:28:34    9   Dr. Bradley to give an opinion on the ultimate issue of

09:28:38   10   fact.  He was presented to the jury as their expert on

09:28:42   11   the other matters.  He then is recalled to the stand and

09:28:47   12   I -- I don't know, now, but his Exhibit 274 does, in

09:28:53   13   fact, state opinions about the number of stores where

09:28:56   14   the store manager is never scheduled.

09:28:59   15           The evidence is uncontradicted by five of

09:29:04   16   the seven -- yes, five of the eight plaintiffs have said

09:29:07   17   they used the old schedule, not this one.  One of them,

09:29:14   18   I don't think was asked by either side, which I found

09:29:16   19   surprising, when I was looking.  Two of them said yes,

09:29:18   20   on occasion, they had used it the staff schedule.

09:29:21   21           The problem is the evidence they have all

09:29:23   22   said is that this scheduler is modified on a regular

09:29:27   23   basis.  Even the exhibit that you just allowed in

09:29:30   24   clearly shows handwritten notations which Dr. Bradley

09:29:34   25   has said he ignored.

09:29:36   1          Your Honor, he ultimately gave an opinion on

09:29:39   2   what I think is the ultimate issue.

09:29:42   3          THE COURT:   What was -- what opinion was it?

09:29:44   4          MR. WHITE:   That the store manager is NEVER,

09:29:47   5   in all caps, scheduled to supervise subordinate

09:29:51   6   employees for 80-plus hours.   That's on the top line of

09:29:55   7   Exhibit 274.   And I expect what they want to do is turn

09:29:59   8   this into a demonstrative exhibit for -- I think David's

09:30:03   9   handing it to you, Judge -- I think they want to put

09:30:07   10  that on the board in final argument.

09:30:12   11         Let me tell you what we're fixing to run

09:30:15   12  into -- and I'm sorry, I didn't bring it until I was

09:30:18   13  thinking about it.   You remember that *Harcross Chemical*

09:30:21   14  case?   Judge Guin had a statistician who came in on that

09:30:25   15  anti-trust case and tried as a statistician to give an

09:30:29   16  opinion on antitrust, and the Eleventh Circuit sent it

09:30:34   17  back like a rocket?

09:30:36   18         This is a -- he's an expert

09:30:42   19  mathematician-statistician.   He -- you know, the fact he

09:30:45   20  may disagree on adding and subtracting is one thing, but

09:30:49   21  when they offer an exhibit that gives an opinion and he

09:30:51   22  has never --

09:30:52   23         THE COURT:   What is the opinion that he

09:30:53   24  gives in this exhibit?

09:30:55   25         MR. WHITE:   That the number of Family Dollar

09:30:57  1   stores where a store manager is never scheduled to

09:31:00  2   supervise subordinate employees is 4,720.

09:31:06  3                THE COURT:  That's a fact --

09:31:07  4                MR. WHITE:  No.

09:31:08  5                THE COURT:  -- as I see it.  This is a

09:31:11  6   witness' statement.

09:31:14  7                There are 4,172 stores where -- Family

09:31:19  8   Dollar Stores -- where the store manager is never

09:31:21  9   scheduled to supervise subordinate employees for 80-plus

09:31:25  10  hours.

09:31:25  11               MR. WHITE:  He has to make an assumption --

09:31:27  12               THE COURT:  It's a different issue as to

09:31:31  13  whether that complies with the FTE requirement.  That's

09:31:41  14  a legal issue.  But what he's just stated here, as I see

09:31:45  15  it, is a fact.

09:31:47  16               MR. WHITE:  May I --

09:31:48  17               THE COURT:  At least from his point of view.

09:31:51  18               MR. WHITE:  Well, to get to that statement,

09:31:53  19  he has to make certain assumptions.  He has to assume to

09:31:57  20  ignore the handwritten notations.  He has to assume to

09:32:00  21  ignore the uncontroverted evidence that there's 63,000

09:32:06  22  hours of overtime not reflected on the schedule.

09:32:10  23               He has to choose -- and the only person that

09:32:12  24  can make those assumptions and then get to an opinion

09:32:18  25  meets the definition under the rules of an expert.

09:32:21    1          THE COURT:  All right.

09:32:22    2          MR. WHITE:  And, Your Honor, that's my

09:32:24    3   objection.  And we would urge that 274, in your role as

09:32:30    4   gatekeeper -- especially in view of the fact he never

09:32:33    5   gave a report, never complied with any pretrial order,

09:32:36    6   never supplemented any report, took the stand, that it

09:32:39    7   be -- that the objection to the exhibit be sustained.

09:32:44    8          THE COURT:  All right.  The objection is

09:32:46    9   overruled.  The Court finds that Plaintiffs' Exhibit 274

09:32:49   10   is not an expert report.

09:32:53   11          Let's bring in the jury.

09:33:40   12            (In open court, jury present.)

09:33:40   13          THE COURT:  Good morning, ladies and

09:33:42   14   gentlemen.  We'll resume with the presentation of the

09:33:49   15   defendant's remaining two witnesses.

09:33:56   16          MR. MAY:  May it please the Court,

09:34:00   17   yesterday, since -- Your Honor, it's only one witness.

09:34:04   18   Family Dollar calls plaintiff Bill Detter.

09:34:07   19          MR. G. WIGGINS:  Your Honor, Mr. Detter got

09:34:12   20   on a flight this morning at 4:30 this morning out of

09:34:18   21   Albuquerque, New Mexico.  It's my understanding,

09:34:21   22   through, that his flight to Houston has been delayed.

09:34:24   23   He has been delayed getting here.

09:34:26   24          THE COURT:  All right.  We'll take him when

09:34:28   25   he gets here.

09:34:29   1          MR. G. WIGGINS:  I don't want to mislead the

09:34:31   2   Court.  His flight is either going to be here -- if his

09:34:34   3   flight leaves out of Houston, he will be in Birmingham

09:34:36   4   at 9:18.

09:34:38   5          THE COURT:  Yes.

09:34:39   6          MR. G. WIGGINS:  If that flight does not

09:34:41   7   leave, and he does not make the flight because of the

09:34:43   8   delay, he will not be in Birmingham until 12:15.

09:34:48   9          THE COURT:  We will take him when he gets

09:34:50   10   here.  Obviously, he can't testify until he gets here.

09:34:53   11          MR. G. WIGGINS:  I just wanted --

09:34:56   12          THE COURT:  If that's the defendant's last

09:34:58   13   witness, then we'll return to the plaintiffs' case.

09:35:10   14          MR. R. WIGGINS:  Your Honor, we have no

09:35:13   15   further witnesses.  We have some clean-up documents we'd

09:35:17   16   like to introduce outside the presence of the jury.

09:35:21   17          THE COURT:  Okay.  Ladies and gentlemen,

09:35:23   18   will you please retire to the jury room?

09:35:47   19          (In open court, jury not present.)

09:35:54   20          MR. R. WIGGINS:  Judge, I'm assuming that

09:35:56   21   Mr. Detter is going to open up some issue, but if he

09:36:03   22   does, we have no further issues, unless he opens some

09:36:07   23   further issue up.  We don't think he will.

09:36:10   24          THE COURT:  All right.

09:36:11   25          MR. R. WIGGINS:  During the hearing, Judge,

09:36:14  1   we had referred to the district manager job description.

09:36:17  2          THE COURT:  Yes.

09:36:18  3          MR. R. WIGGINS:  We'd like to offer that

09:36:20  4   Exhibit 9.

09:36:22  5          THE COURT:  Plaintiffs' Exhibit 9?

09:36:24  6          MR. R. WIGGINS:  Yes, sir.

09:36:24  7          THE COURT:  All right.  It's received in

09:36:32  8   evidence.

09:36:32  9          Any other exhibits?

09:36:54  10         MR. JOHNSON:  Yes.  Yes, Your Honor.  I have

09:36:59  11  the copies of the slides per day here, and I want to

09:37:01  12  read them into the record.

09:37:02  13         THE COURT:  All right.

09:37:03  14         MR. JOHNSON:  These that they pertain to.

09:37:11  15  February 21st, we have one that is Plaintiffs' Exhibit

09:37:20  16  283.

09:37:20  17         THE COURT:  It's received in evidence.

09:37:24  18         MR. JOHNSON:  We have another one from

09:37:26  19  February 21st, which is Plaintiffs' Exhibit Number 285.

09:37:33  20         THE COURT:  It's received in evidence.

09:37:36  21         MR. JOHNSON:  We have one on February 23rd,

09:37:50  22  which is Plaintiffs' Exhibit Number 254.

09:37:53  23         MR. ST. CLAIR:  Your Honor, just so I'm

09:37:55  24  clear, these are the demonstrative exhibits that were

09:37:58  25  Court Exhibits that will not go to the jury room?

09:38:03    1          MR. JOHNSON:  Well, most of these exhibits

09:38:06    2    were not introduced into evidence, but some of these are

09:38:10    3    slides, like some stuff from the store policy manual and

09:38:13    4    such --

09:38:13    5          THE COURT:  Well, if they're not going to go

09:38:16    6    into the jury room, I'm not going to receive them in

09:38:20    7    evidence, just put them into the record.

09:38:21    8          MR. JOHNSON:  That's right.

09:38:22    9          MR. ST. CLAIR:  It's my understanding these

09:38:24   10    are going to be recorded --

09:38:25   11          THE COURT:  285, 254 and the other one are

09:38:31   12    received in evidence.

09:38:32   13          MR. JOHNSON:  The other one from February

09:38:33   14    23rd, Your Honor, which is Plaintiffs' Exhibit 281?

09:38:39   15          THE COURT:  All right.

09:38:44   16          MR. WHITE:  Is that the same thing?

09:38:46   17          MR. JOHNSON:  No.

09:38:48   18          MR. ST. CLAIR:  But, I mean, those

09:38:51   19    demonstrative exhibits are going offered only for Court

09:38:53   20    Exhibits, not for publication to the jury?

09:38:56   21          MR. JOHNSON:  Right.

09:38:58   22          MR. ST. CLAIR:  We're just not being

09:39:00   23    supplied copies, Your Honor.

09:39:03   24          MR. JOHNSON:  And finally, Your Honor, on

09:39:07   25    March 1st, Plaintiffs' Exhibit Number 294.

09:39:11   1           THE COURT:  All right.  Any other exhibits?

09:39:16   2           MR. JOHNSON:  And just to clarify, Your

09:39:17   3 Honor, some of these exhibits, like as I said, are, for

09:39:21   4 example, slides that have already been published to the

09:39:23   5 jury that are copies of policies from the Strands and

09:39:28   6 from the store policy manual.  And we may use some like

09:39:33   7 in closing, but the Strands and the policy manual, of

09:39:36   8 course, they're all in evidence before the jury.

09:39:39   9           THE COURT:  Right.  Yeah.  Any of these

09:39:41  10 exhibits, demonstrative exhibits, which have not been

09:39:44  11 received in evidence, but were referred to during the

09:39:47  12 course of the trial, may be utilized during closing

09:39:51  13 argument.

09:39:52  14           MR. JOHNSON:  Yes.

09:39:54  15           MR. ST. CLAIR:  What about the demonstrative

09:39:56  16 exhibits that were not offered into evidence or received

09:39:59  17 in evidence?

09:39:59  18           THE COURT:  They may be used during closing

09:40:01  19 argument, but they won't go into the jury room.

09:40:06  20           MR. KALLON:  And, Your Honor?

09:40:07  21           THE COURT:  Yes, sir.

09:40:08  22           MR. KALLON:  I'm assuming for closing

09:40:11  23 argument, the same rules apply that any exhibits that

09:40:14  24 are put on the board will also be made a part of the

09:40:17  25 appellate record?

09:40:19   1          THE COURT:  Well, anything that is in the

09:40:22   2   record here will be a part of the appellate record.

09:40:25   3          MR. KALLON:  I'm sorry.  I was talking about

09:40:28   4   the demonstrative exhibits they used, the same reason

09:40:31   5   Mr. Johnson is making these demonstrative --

09:40:35   6          MR. ST. CLAIR:  Yeah.  If I'm understanding

09:40:37   7   my partner, we're saying the demonstrative exhibits

09:40:40   8   shown during closing argument should also be made a

09:40:44   9   separate Court Exhibit, so the record will then show

09:40:46   10  what was used during closing argument.

09:40:54   11          MR. JOHNSON:  If it's something -- I mean,

09:40:59   12  we've been somewhat over, I guess, inclusive of what

09:41:04   13  we're marking as the exhibits, but if -- if something's

09:41:09   14  already in the record, Your Honor, I don't see the

09:41:11   15  need --

09:41:13   16          THE COURT:  Me either.

09:41:14   17          MR. JOHNSON:  -- received in evidence.  I

09:41:16   18  don't see the need to produce it again.

09:41:17   19          THE COURT:  No.  There is no need to do it.

09:41:19   20          MR. ST. CLAIR:  For example, Your Honor,

09:41:22   21  suppose the demonstrative exhibit appears for the first

09:41:25   22  time during closing statement --

09:41:26   23          THE COURT:  It won't.  It won't.

09:41:29   24          MR. ST. CLAIR:  Well, you've just addressed

09:41:32   25  my concern.

```
09:41:32   1                    THE COURT:  All right.
09:41:33   2                    MR. JOHNSON:  And I have one more, Your
09:41:34   3    Honor.  On March 28th, Plaintiffs' Exhibit 290.
09:41:41   4                    MR. WHITE:  You mean February 28th?
09:41:44   5                    MR. JOHNSON:  February 28th.  I'm sorry.
09:41:47   6                    THE COURT:  All right.
09:41:53   7                    MR. WHITE:  Judge, while we wait, we will
09:41:55   8    endeavor to reconcile our list with Mr. Smitherman's.
09:41:59   9    And the only thing I can remember that we moved that was
09:42:01  10    not accepted was the termination notice on
09:42:08  11    Mr. Pellegrin.
09:42:09  12                    THE COURT:  All right.
09:42:09  13                    MR. WHITE:  But we will reconcile that.  And
09:42:12  14    I will wait for argument on the Court's ruling.
09:42:18  15                    THE COURT:  I've seen all these boxes that
09:42:22  16    the defendant has.
09:42:29  17                    Do you reasonably expect the jury to go
09:42:32  18    through those boxes of exhibits?
09:42:35  19                    MR. ST. CLAIR:  If they're what I believe
09:42:44  20    they are, Your Honor, those are the payroll records
09:42:44  21    relating to each of the plaintiffs.  I'm quite sure the
09:42:44  22    jury won't read all of them, but just to make sure we
09:42:47  23    meet our burden of proof as to the all of the class
09:42:52  24    members, we thought it prudent that the record should
09:42:56  25    have in it those payroll records.
```

09:42:58  1          It's really just a matter of making the

09:43:01  2  technical showing that may be required by the law.

09:43:05  3          MR. R. WIGGINS:  Your Honor, that's the

09:43:06  4  purpose of having summary exhibits of voluminous

09:43:11  5  documents.

09:43:12  6          What's going to happen, I'm afraid is,

09:43:15  7  they're going to pluck a document or two out of those 15

09:43:18  8  boxes and try to argue that as something typical, which

09:43:23  9  would mean the jury would have to go plowing through all

09:43:25  10  the documents.  And that's why we use summary exhibits.

09:43:29  11          And I thought Ms. Spiesman had given us the

09:43:32  12  summary of those exhibits.  That was my understanding of

09:43:35  13  the testimony.  So we'd object to just having a mass of

09:43:41  14  documents plunked down there in the back room with the

09:43:44  15  jury.  Lord knows what's in the boxes, or how they might

09:43:48  16  be used.

09:43:50  17          MR. ST. CLAIR:  Well, if I may, Your Honor.

09:43:53  18  If your concern is those boxes, those are the bankruptcy

09:43:56  19  documents that will not -- you know, that issue's going

09:44:00  20  to be dealt with outside the presence of the jury.

09:44:02  21          THE COURT:  Yeah.  But I'm talking about 12

09:44:05  22  other boxes -- David, what are those?

09:44:16  23          MR. ST. CLAIR:  Yes.  That's many boxes,

09:44:19  24  Your Honor.  You know, again, they will correct me if

09:44:26  25  I'm wrong -- again, Your Honor, it's our concern that

09:44:31  1   someone might say, well, you haven't met the elements of

09:44:35  2   your defense if you didn't offer this evidence as to

09:44:40  3   each of the plaintiffs.  That's our reason for doing it.

09:44:44  4            MR. R. WIGGINS:  Well --

09:44:45  5            THE COURT:  These are payroll records of the

09:44:47  6   plaintiffs?

09:44:48  7            MR. ST. CLAIR:  That's correct.  Well,

09:44:50  8   it's --

09:44:50  9            MR. R. WIGGINS:  No, and it includes others.

09:44:52  10           MR. ST. CLAIR:  And those who worked with

09:44:54  11  them.  For example, Your Honor, what those documents

09:44:56  12  show is that the plaintiff was paid by salary --

09:44:59  13           THE COURT:  Yes.

09:45:00  14           MR. ST. CLAIR:  -- and it shows the people

09:45:02  15  the plaintiff was supervising on a weekly basis.  In

09:45:06  16  other words, it -- so it addresses this issue.

09:45:09  17           THE COURT:  All right.  I see.  All right.

09:45:11  18           MR. ST. CLAIR:  If -- if the plaintiffs will

09:45:13  19  stipulate that we have satisfied all the elements of the

09:45:20  20  affirmative defense, then we perhaps could bypass that.

09:45:27  21           MR. R. WIGGINS:  We only want the Court to

09:45:31  22  decide on the motion, whether our motion for directed

09:45:34  23  verdict ought to be -- these documents don't go to an

09:45:41  24  issue for the jury to decide.  And how could they, to go

09:45:44  25  through 12 or 15 boxes.

09:45:48   1          It seems to be putting the jury in doubt of

09:45:53   2   their powers to decide this case because they've got a

09:45:56   3   bunch of boxes they can't go through.  It's

09:46:00   4   intimidating.

09:46:00   5          MR. ST. CLAIR:  Your Honor, that sounds

09:46:02   6   rather like the dog chasing the bus and then car.  They

09:46:07   7   chose to have 1,424 plaintiffs in one case.  We are

09:46:13   8   concerned that we have to meet certain just basic

09:46:18   9   evidentiary showing for all those plaintiffs.

09:46:21   10         MR. R. WIGGINS:  Yes, sir.  And the way you

09:46:22   11   do that is through summary exhibits.

09:46:25   12             MR. ST. CLAIR:  If --

09:46:26   13         MR. R. WIGGINS:  If those boxes show

09:46:28   14   something relevant about who they supervise and added up

09:46:32   15   the 80 hours, we would have the exhibit here summarizing

09:46:34   16   that, I promise you.

09:46:36   17         THE COURT:  Well, let me tell you my

09:46:39   18   concern.  My concern is this:  I will tell the jury that

09:46:43   19   it has to consider all of the evidence.  And a juror --

09:46:53   20   conscientious juror, could take the position that this

09:46:59   21   means we've got to go through each one of these

09:47:02   22   documents, each one of these boxes, and review each

09:47:11   23   document in each box.

09:47:15   24         And maybe that's what you want.  But if I

09:47:23   25   were a juror, I wouldn't do it.

09:47:26    1              MR. ST. CLAIR:  I will say this, Your Honor:

09:47:28    2    This is a hard-working jury that I have been present

09:47:30    3    with, but I don't expect they're going to do that,

09:47:33    4    either.

09:47:35    5              MR. R. WIGGINS:  I don't --

09:47:36    6              MR. ST. CLAIR:  Just for the Court, this is

09:47:38    7    the way it was tried last time, and we just don't see

09:47:42    8    any way around this need to satisfy this technical

09:47:46    9    element of proof.

09:47:47   10              THE COURT:  All right.  Well --

09:47:49   11              MR. R. WIGGINS:  Your Honor, I don't -- I

09:47:52   12    think this is going to become a red herring with the

09:47:55   13    jury and the arguments.

09:47:57   14              We're going to be forced to argue that

09:47:59   15    there's a needle in that haystack and they haven't

09:48:02   16    carried their burden, or they would have given us a

09:48:04   17    summary exhibit of what's in those boxes.  And it's

09:48:08   18    going to take us down a side path, and maybe a good side

09:48:12   19    path for me, it may be a bad one, I don't know.  But I'm

09:48:14   20    going to have to address it, or one of us is going to

09:48:17   21    have to address it.

09:48:18   22              We can't allow this mass of boxes to sit

09:48:22   23    there and they stare at it as if their defense is in

09:48:25   24    there somewhere.  If we --

09:48:28   25              THE COURT:  Well, you can argue that under

09:48:34  1   the rules of evidence they could have summarized what's

09:48:38  2   in the boxes and let it in.

09:48:44  3               MR. R. WIGGINS:  And like a missing witness,

09:48:48  4   there's a missing exhibit.

09:48:51  5               THE COURT:  There's not a missing exhibit.

09:48:51  6               MR. R. WIGGINS:  Missing something.

09:48:52  7               THE COURT:  But the summary is.

09:48:55  8               MR. ST. CLAIR:  For example, Your Honor,

09:48:56  9   Dr. Bradley got up and said if you look at the

09:49:00  10  schedules, the schedule -- and if we assume that

09:49:03  11  everybody works the hours that are on the schedule, then

09:49:06  12  here's how the math comes down.  He didn't base that on

09:49:12  13  what people actually worked.  These records show what

09:49:14  14  they actually worked.

09:49:15  15              MR. R. WIGGINS:  We agree.  But, Your

09:49:17  16  Honor --

09:49:17  17              MR. ST. CLAIR:  We --

09:49:18  18              THE COURT:  I don't need any more argument

09:49:20  19  on it.

09:49:20  20              MR. ST. CLAIR:  You see what I'm saying?

09:49:23  21              THE COURT:  Yes.

09:49:24  22              MR. ST. CLAIR:  The summary is what

09:49:25  23  Dr. Bradley could have done and didn't.

09:49:27  24              THE COURT:  The documents are in evidence.

09:49:29  25              MR. R. WIGGINS:  Yes, sir.  While we're on

09:49:32   1   the subject, putting the boxes aside, we seem to have a

09:49:36   2   fundamental misunderstanding of who has the burden of

09:49:40   3   proof.

09:49:41   4           They had to prove that those people

09:49:45   5   supervised two full-time equivalents.  They keep saying

09:49:48   6   that you could do it.  That's not our burden to do it.

09:49:52   7   It's their burden to do it.

09:49:56   8           THE COURT:  That's my understanding of the

09:49:58   9   law.

09:49:59   10          MR. ST. CLAIR:  And we -- we're -- we

09:50:02   11  believe we've met that burden, Your Honor.

09:50:03   12          THE COURT:  All right.  All right.  Now,

09:50:04   13  where are we?

09:50:07   14          MR. ST. CLAIR:  The only witness left is

09:50:09   15  this gentleman, the plaintiff, that Your Honor

09:50:12   16  instructed to come to court.

09:50:13   17          THE COURT:  Well, since we don't know what

09:50:15   18  time he's going to be here -- was his deposition taken?

09:50:20   19          MR. G. WIGGINS:  Yes, sir.

09:50:21   20          MR. ST. CLAIR:  He testified at the prior

09:50:23   21  trial as well, Your Honor.

09:50:25   22          I have a few housekeeping measures --

09:50:27   23          THE COURT:  The earliest that the witness

09:50:30   24  would be here would be 11:00 o'clock, wouldn't it?

09:50:34   25          MR. G. WIGGINS:  Your Honor --

09:50:35   1            THE COURT:  He's going to fly into the

09:50:37   2   Birmingham Airport?

09:50:38   3            MR. G. WIGGINS:  Yes, sir.  I would guess

09:50:40   4   maybe the earliest will be between 10:30 and 11:00, yes,

09:50:44   5   sir.  And I'm waiting for a phone call, to be honest

09:50:47   6   with you, on a runner standing at the airport whether he

09:50:50   7   got off on the 9:15.  I have not heard from him yet.

09:50:53   8            THE COURT:  All right.

09:50:54   9            MR. G. WIGGINS:  Just for the record, Your

09:50:56   10  Honor, also they had mentioned, and you had indicated,

09:51:00   11  Ms. Shellah, Shellah Brown did not testify.  She was

09:51:04   12  being dismissed, and the defendant had withdrawn their

09:51:07   13  request for Ms. Brown to testify is the reason she's not

09:51:10   14  testifying.

09:51:10   15           THE COURT:  All right.  All right.

09:51:12   16           MR. MAY:  If I might, Judge, one thing, Your

09:51:14   17  Honor, just for the record and to notify you, the

09:51:18   18  witness is Mr. Bill Detter.

09:51:20   19           THE COURT:  Yes.

09:51:21   20           MR. MAY:  He testified at the last trial.

09:51:23   21  His deposition, of course, was taken or he wouldn't have

09:51:26   22  testified the last time.  And he was one of the seven

09:51:30   23  individual plaintiffs who I gave Mr. Wiggins -- and I

09:51:33   24  correct the record.  He is right.

09:51:34   25           I think the actual names were given to him

09:51:36  1    on Monday, the 20th of February, before trial started.

09:51:40  2    So it's now March 2nd.

09:51:45  3            MR. R. WIGGINS:  But, Your Honor, we also

09:51:47  4    want the record to reflect that they requested an order

09:51:49  5    from you on March 1st.

09:51:51  6            THE COURT:  The -- if the witness is not

09:52:01  7    here by 11:00 o'clock, the defendant will be required to

09:52:12  8    use his prior testimony, either deposition or testimony

09:52:17  9    at trial.

09:52:18  10           MR. MAY:  I take it you would be denying the

09:52:21  11   motion to dismiss Mr. Detter as a part on the failure to

09:52:26  12   appear after his lawyers were given notice more than ten

09:52:29  13   days --

09:52:29  14           THE COURT:  Yes, sir.  Yes, sir.

09:52:32  15           MR. R. WIGGINS:  Your Honor -- the record --

09:52:34  16           THE COURT:  I'm not accepting what you just

09:52:37  17   said, Mr. May.

09:52:39  18           MR. MAY:  I understand.

09:52:40  19           THE COURT:  As a statement of the way it

09:52:42  20   evolved.  But I will -- with the understanding that the

09:52:46  21   guy is on his way here, I will deny a motion to dismiss

09:52:53  22   him as a plaintiff.

09:52:55  23           MR. ST. CLAIR:  Just a few more housekeeping

09:52:58  24   matters.

09:52:58  25           THE COURT:  Yes, sir.

09:53:00  1          MR. ST. CLAIR:  There's the issue of those

09:53:01  2  opt-in plaintiffs who were in bankruptcy.  And you

09:53:07  3  previously filed a motion on the documents that needed

09:53:09  4  to be offered as Court's Exhibits to deal with that.

09:53:12  5          MR. MILLER:  Yes, Your Honor.

09:53:13  6          MR. ST. CLAIR:  Is now a good time to do

09:53:15  7  that, Your Honor?

09:53:19  8          THE COURT:  Well, let's hold the record open

09:53:24  9  for that.  If the plaintiffs lose, it's a moot issue.

09:53:34  10  If they win, then we can take up that issue, unless you

09:53:41  11  see some reason why we shouldn't.  It's a legal issue.

09:53:46  12          MR. ST. CLAIR:  I defer to the Court's

09:53:50  13  discretion on that.

09:53:51  14          There was some other evidence admitted in

09:53:54  15  the other trial not admitted -- Mr. Clifford, an

09:53:57  16  attorney with the company, and some other exhibits that

09:53:59  17  went to the issue of the company's willfulness and also

09:54:04  18  good faith.  We have previously stipulated that those

09:54:08  19  offers, proffers of evidence carry over to this trial.

09:54:11  20          THE COURT:  Yeah.

09:54:12  21          MR. ST. CLAIR:  The only thing I would say,

09:54:13  22  Your Honor, is to make the record clear, that we're

09:54:16  23  offering that evidence on the issue both of willfulness,

09:54:21  24  which deals with the statute of limitations, but also

09:54:24  25  the issue of good faith, which goes to liquidated

09:54:30  1   damages -- which I believe is a matter for the Court --
09:54:34  2   as well as good faith can also be relevant to the issue
09:54:39  3   of liability at all.
09:54:41  4          And so I was just making a point, Your
09:54:43  5   Honor, that one option the Court has is to accept that
09:54:49  6   evidence, not to go to the jury, but to go just to Your
09:54:54  7   Honor.
09:54:54  8          THE COURT:  All right.  I'll accept it as
09:54:57  9   evidence before the Court, not the jury.
09:55:00  10         MR. ST. CLAIR:  Very good, Your Honor.
09:55:11  11         Oh, yeah, these are additional exhibits
09:55:13  12  offered on the issue of good faith and willfulness.
09:55:20  13         MR. MILLER:  Those would be, Your Honor, for
09:55:22  14  the record, Defendant's Exhibit 2336, 2356, 2357, 1954,
09:55:41  15  1955, and 2249.
09:55:44  16         THE COURT:  2-2-4 what?
09:55:46  17         MR. MILLER:  4-9, Your Honor.
09:55:48  18         THE COURT:  All right.
09:55:48  19         MR. R. WIGGINS:  Are these all the ones we
09:55:50  20  had from the last trial he was just referring to?
09:55:52  21         MR. MILLER:  And three additional.
09:55:54  22         MR. R. WIGGINS:  Can I see the three
09:55:56  23  additional?
09:55:58  24         MR. MILLER:  Absolutely.
09:56:13  25         THE COURT:  May I see the exhibits?

09:56:15   1          MR. MILLER:  Yes, Your Honor.

09:56:27   2          MR. R. WIGGINS:  Your Honor, we had a

09:56:28   3   lengthy hearing on this in the last trial, and we were

09:56:31   4   going to rely on what we said at that time.

09:56:37   5          MR. ST. CLAIR:  And, Your Honor, we don't

09:56:39   6   expect Your Honor to rule differently at this time, but

09:56:41   7   we're making a point that it also goes to this issue for

09:56:44   8   good faith that's a matter for the Court so it can be

09:56:47   9   accepted into evidence for just Your Honor and not the

09:56:49  10   jury.  That's, of course, without waiving our position,

09:56:53  11   and it should be admissible, too.

09:56:55  12          MR. R. WIGGINS:  In regards to the three new

09:56:58  13   ones that were not in that hearing, they're of the same

09:57:01  14   kind that were excluded.  And I do not believe these

09:57:06  15   were on their exhibit list, given the dates reflected on

09:57:12  16   the face of the documents.

09:57:21  17          MR. MILLER:  Your Honor, for the record, you

09:57:23  18   had asked at the last trial about Department of Labor

09:57:26  19   finding that Family Dollar store managers were exempt.

09:57:31  20      This is -- one of these documents is a finding

09:57:34  21   from the Department of Labor that occurred after the

09:57:37  22   last trial that obviously could not have been on the

09:57:40  23   exhibit list.  And I did obtain it from a FOIA request

09:57:44  24   from the Department of Labor.

09:57:46  25          THE COURT:  But, did you, prior to this

09:57:48  1  trial, file a motion to supplement the exhibits?

09:57:56  2          MR. MILLER:  I don't believe so, Your Honor.

09:58:07  3  It would be as well as rebuttal to their claim of

09:58:10  4  willfulness.

09:58:13  5          MR. R. WIGGINS:  They should have been

09:58:15  6  disclosed, Your Honor.  These are decisions that are

09:58:18  7  multiple pages.  We can't just respond here at the last

09:58:22  8  minute.

09:58:24  9          MR. ST. CLAIR:  And if I may, Your Honor, I

09:58:26  10 think I know how the Court's going to rule on the

09:58:29  11 admissibility to the jury.  But there's the separate

09:58:33  12 issue of admissibility just to the Court on the issue of

09:58:37  13 good faith that plaintiffs' counsel wants to address --

09:58:42  14 if it is necessary to do so after the verdict -- if

09:58:45  15 plaintiffs' counsel wants to have an opportunity to

09:58:47  16 respond to this, we certainly have no objection to that,

09:58:52  17 Your Honor.

09:58:57  18         MR. R. WIGGINS:  Well, I don't think that

09:59:02  19 cures the problem.

09:59:02  20         THE COURT:  All right.  Are we now at the

09:59:07  21 charge conference?

09:59:08  22         MR. G. WIGGINS:  Your Honor?

09:59:10  23         THE COURT:  We might as well be.

09:59:14  24         MR. ST. CLAIR:  I'm sorry.  There was a

09:59:16  25 couple of Social Security number --

09:59:21   1           THE COURT:  Mr. St. Clair, talk loud enough

09:59:28   2   for the court reporters to hear you.

09:59:28   3           MR. G. WIGGINS:  Your Honor, I've been

09:59:30   4   informed -- I got a phone call about Mr. Detter -- I've

09:59:33   5   been informed that he was not on the earlier flight.  He

09:59:35   6   is landing at 12:30 in Birmingham.

09:59:42   7           THE COURT:  You say he was not on the early

09:59:44   8   flight?

09:59:44   9           MR. G. WIGGINS:  No, sir.  He will not be

09:59:46  10   here -- as I indicated earlier, he would be here at

09:59:49  11   10:00 or 12:00 o'clock.  He does not land in Birmingham

09:59:53  12   until 12:30.

09:59:54  13           THE COURT:  All right.  Well, by that time,

09:59:59  14   this case will be argued.  Let's bring in the jury and

10:00:07  15   -- do y'all want to read these depositions?

10:00:09  16           MR. MAY:  There's one issue you need to know

10:00:11  17   about, Your Honor.

10:00:12  18           Mr. Detter was called by Mr. Calamusa in

10:00:14  19   their case, so the trial testimony, we would be calling

10:00:19  20   him in this case, and the trial testimony to us begins

10:00:22  21   with his examination.  And if we call him in our case, I

10:00:26  22   sure would like to have some explanations up front, but

10:00:30  23   I don't want to start with Mr. Calamusa, I want to start

10:00:32  24   with me.

10:00:32  25           THE COURT:  You mean the deposition?

| | | |
|---|---|---|
| 10:00:35 | 1 | MR. MAY:  Yes, sir.  It's not a deposition, |
| 10:00:39 | 2 | it was Mr. Kallon.  It was Mr. Kallon on day two of the |
| 10:00:42 | 3 | trial, examined him. |
| 10:00:43 | 4 | THE COURT:  You don't have his deposition? |
| 10:00:45 | 5 | MR. MAY:  I have his testimony, but I want |
| 10:00:47 | 6 | to read his trial testimony. |
| 10:00:50 | 7 | MR. R. WIGGINS:  You can't start with |
| 10:00:51 | 8 | cross-examination, Your Honor.  You have to start with |
| 10:00:54 | 9 | direct. |
| 10:00:54 | 10 | MR. MAY:  It's my witness. |
| 10:00:56 | 11 | MR. R. WIGGINS:  Cross-examination often |
| 10:00:57 | 12 | makes no sense out of context of what the direct |
| 10:00:59 | 13 | examination was. |
| 10:01:00 | 14 | MR. MAY:  And that's the reason he ought to |
| 10:01:02 | 15 | be dismissed. |
| 10:01:03 | 16 | THE COURT:  All right.  Well, let's bring in |
| 10:01:06 | 17 | the jury and we'll allow the defendant to call him as an |
| 10:01:12 | 18 | adverse witness. |
| 10:01:17 | 19 | (In open court, jury present at 9:54 p.m.) |
| 10:01:51 | 20 | THE COURT:  Ladies and gentlemen, we've |
| 10:01:53 | 21 | learned that a witness will not be here before 12:30, or |
| 10:02:00 | 22 | whatever, so we're going to proceed with the trial.  And |
| 10:02:03 | 23 | I'm allowing the defendant to call him as a witness by |
| 10:02:09 | 24 | way of his prior testimony in the case. |
| 10:02:16 | 25 | And this is the final witness of the |

10:02:20  1  defendant, and the plaintiffs have reserved the right to

10:02:27  2  call maybe one or two other witnesses after the

10:02:32  3  defendant finishes.

10:02:40  4         MR. MAY:  Yes, sir, Your Honor.  We'll have

10:02:42  5  one of our assistants read Mr. Detter's testimony in

10:02:45  6  response to my questioning.

10:02:57  7         THE COURT:  Okay.

10:02:58  8         MR. MAY:  Your Honor, just as I told the

10:03:00  9  Court, it's Mr. Kallon that did the examination last

10:03:03  10  time, but I'm going to read his part.

10:03:05  11         THE COURT:  Right.

10:03:05  12  **BILL DETTER, DEFENDANT'S WITNESS, BY TRANSCRIPT**

10:03:08  13     MR. MAY:  And we're beginning, for plaintiffs'

10:03:24  14     counsel, beginning on page 34.  Ready, witness?

10:03:32  15  A.  Yes, sir.

10:03:34  16                  **CROSS-EXAMINATION**

10:03:34  17  (Reading by Mr. May:)

10:03:35  18  Q.  *Mr. Detter, good morning, sir.*

10:03:38  19  A.  *Good morning.*

10:03:39  20  Q.  *My name is Abdul Kallon.  I'm one of the lawyers*

10:03:43  21  *for Family Dollar in this case.  Just --"*

10:03:45  22         THE COURT:  Just a minute, please.  Why

10:03:47  23  don't you start on the first page where he tells us his

10:03:51  24  full name?

10:03:52  25         MR. MAY:  His full name?

| | | |
|---|---|---|
| 10:03:55 | 1 | THE COURT:  Yes. |
| 10:03:56 | 2 | MR. MAY:  That would be Mr. Calamusa's exam. |
| 10:03:58 | 3 | THE COURT:  I understand.  But the jury |
| 10:04:00 | 4 | needs to know the full name of the witness. |
| 10:04:02 | 5 | MR. MAY:  Yes, sir.  *Bill Detter,* |
| 10:04:07 | 6 | *plaintiffs' witness, sworn.  State your name for the* |
| 10:04:11 | 7 | *record, please.  Bill Detter.  Spell your last name for* |
| 10:04:14 | 8 | *the record, please.  D-E-T-T-E-R.*" |
| 10:04:22 | 9 | THE COURT:  All right. |
| 10:04:24 | 10 | (Reading prior testimony by Mr. May:) |
| 10:04:24 | 11 | Q.  *Just following up on what Mr. Calamusa just* |
| 10:04:29 | 12 | *recently asked you, you would agree with me that there's* |
| 10:04:33 | 13 | *a process involved in unloading a truck; correct?* |
| 10:04:36 | 14 | A.  *Correct.* |
| 10:04:37 | 15 | Q.  *And that is, in fact, the management function;* |
| 10:04:40 | 16 | *correct?* |
| 10:04:41 | 17 | A.  *Correct.* |
| 10:04:42 | 18 | Q.  *Because one of the things you're doing is, one,* |
| 10:04:46 | 19 | *verifying that you did, in fact, receive what Family* |
| 10:04:49 | 20 | *Dollar corporate is alleging you received; correct?* |
| 10:04:51 | 21 | A.  *No, sir.* |
| 10:04:53 | 22 | Q.  *All right.  Now, the other thing you would look* |
| 10:04:55 | 23 | *at, as you unload, you're planning, you're deciding what* |
| 10:04:59 | 24 | *goes on the floor, what goes in the bathroom; correct?* |
| 10:05:02 | 25 | A.  *No, sir.* |

10:05:03    1    Q.  I believe that was back room.  You don't do
10:05:09    2    anything when you unload the truck, then?
10:05:11    3    A.  I handle the boxes.
10:05:13    4    Q.  All right.  Now, do you also agree with me, then,
10:05:16    5    sir, that stocking, keeping the shelves full, that that
10:05:19    6    is a management function?
10:05:21    7    A.  Correct.
10:05:21    8    Q.  When you left Family Dollar, was it in 2001, I
10:05:26    9    believe?
10:05:26    10    A.  No.  I left in 2003.
10:05:28    11    Q.  I apologize for that.  You were making
10:05:32    12    approximately $900 a week; correct?
10:05:35    13    A.  Correct.
10:05:35    14    Q.  And that's roughly $46,000 a year?
10:05:39    15    A.  Correct.
10:05:40    16    Q.  And you also were eligible for a bonus; correct?
10:05:44    17    A.  Correct.
10:05:44    18    Q.  And that bonus was based on performance --
10:05:47    19    meeting certain performance standards; correct?
10:05:50    20    A.  I'm not really sure what it is based on.  I know
10:05:54    21    how they have calculated it.
10:05:55    22    Q.  It was based on 1 percent of the controllable
10:05:58    23    profit at the store?
10:05:59    24    A.  Correct.
10:05:59    25    Q.  So there were years when you received it, as you

| | | |
|---|---|---|
| 10:06:04 | 1 | *pointed out to Mr. Calamusa, and years when you did not?* |
| 10:06:06 | 2 | *A.   Correct.* |
| 10:06:07 | 3 | *Q.   You were asked"* -- |
| 10:06:11 | 4 | *MR. MAY:   And then Judge Clemon asked:* |
| 10:06:14 | 5 | *THE COURT:   What's your educational* |
| 10:06:18 | 6 | *background?* |
| 10:06:19 | 7 | *THE WITNESS:   College graduate.* |
| 10:06:20 | 8 | *THE COURT:   College graduate?* |
| 10:06:23 | 9 | *THE WITNESS:   Yes.* |
| 10:06:24 | 10 | *Q.   You were asked about the staff schedule; correct?* |
| 10:06:26 | 11 | *A.   Correct.* |
| 10:06:26 | 12 | *Q.   When you first received that, it came with some* |
| 10:06:30 | 13 | *grease pencils?* |
| 10:06:31 | 14 | *A.   Yes.* |
| 10:06:31 | 15 | *Q.   And that was so you could make changes to it,* |
| 10:06:35 | 16 | *correct?* |
| 10:06:35 | 17 | *A.   With the district manager's approval.* |
| 10:06:38 | 18 | *Q.   And just so the jury's clear, I think you* |
| 10:06:41 | 19 | *testified on direct that you could not decide which* |
| 10:06:44 | 20 | *employees worked what hours.  Do you recall that* |
| 10:06:46 | 21 | *testimony?* |
| 10:06:46 | 22 | *A.   No.* |
| 10:06:47 | 23 | *Q.   In fact, you can't -- you could decide what your* |
| 10:06:52 | 24 | *employees worked which hours; correct?* |
| 10:06:54 | 25 | *A.   You had to assign a name to the hours that were* |

10:06:57  1   *scheduled.*

10:06:58  2   Q.  *And you were the one, as the manager, who made*

10:07:02  3   *that determination?*

10:07:04  4   A.  *Combination of myself and my assistant.*

10:07:06  5   Q.  *And when it came to scheduling at the store, also*

10:07:10  6   *the buck stopped with you; correct?*

10:07:12  7   A.  *No.*

10:07:13  8   Q.  *Let me -- at the store level, when it came to*

10:07:17  9   *scheduling, your testimony is the buck did not stop with*

10:07:20  10  *you; correct?*

10:07:20  11  A.  *Correct.*

10:07:21  12  Q.  *Let me -- you gave a deposition in this case;*

10:07:25  13  *correct, sir?*

10:07:25  14  A.  *Correct.*

10:07:26  15  Q.  *And you were under oath?*

10:07:27  16  A.  *Yes, sir.*

10:07:28  17  Q.  *Just like you are today; correct?*

10:07:30  18  A.  *Yes, sir."*

10:07:33  19        MR. MAY:  And Mr. Kallon approached Judge

10:07:36  20  Clemon and there was a discussion about that.  I'm going

10:07:38  21  to skip that, with plaintiff counsel's indulgence.

10:07:43  22        MR. R. WIGGINS:  That's fine.

10:07:47  23        MR. MAY:  And then we go down,

10:07:51  24  Mr. Whitfield, to Page 39, line 6, Mr. Kallon again.

10:08:06  25  Q.  *As it comes to schedule of the store, between you*

10:08:06  1    and the assistants, you had the final say; correct?

10:08:06  2        A.  Correct.

10:08:06  3        Q.  The buck stopped with you at the store level on

10:08:07  4    the scheduling?

10:08:07  5        A.  No, sir.

10:08:08  6        Q.  You had seven employees; correct?

10:08:12  7        A.  I averaged seven.

10:08:16  8        Q.  In both stores you worked in?

10:08:18  9        A.  Correct.

10:08:18  10       Q.  And those seven employees were full-timers?

10:08:21  11       A.  Some were full-time, some were part-time.

10:08:23  12       Q.  And in your deposition, you testified all seven

10:08:26  13   of them were full-timers; correct?

10:08:29  14       A.  Not at all times, no.

10:08:30  15       Q.  But generally, for those seven that you had, you

10:08:35  16   would agree with me that you had over 200 hours of labor

10:08:39  17   hours with those seven at both stores?

10:08:43  18       A.  Correct.

10:08:43  19       Q.  And your store was open for how many hours?

10:08:46  20       A.  It varied from 9:00 to 7:00 during the week to --

10:08:50  21       Q.  I'm sorry, collectively.  Roughly 67 to 70 hours?

10:08:55  22       A.  Roughly 77 hours a week.

10:08:57  23       Q.  And you had 200-man hours of not -- excluding

10:09:03  24   you, you had 200-plus hours of help at the store;

10:09:07  25   correct?

10:09:07   1      A.   *Correct.*

10:09:09   2      Q.   *So, technically, if you wanted to, you had man*

10:09:13   3   *hours available to have an employee, two employees at*

10:09:17   4   *the store -- at least two employees at the store every*

10:09:19   5   *time the store was open?*

10:09:21   6      A.   *Correct.*

10:09:22   7      Q.   *And then, of course, you would also at some point*

10:09:26   8   *overlap with those two; correct?*

10:09:27   9      A.   *Correct.*

10:09:28   10      Q.   *So, in other words, you were not the only one*

10:09:31   11   *working at the store?*

10:09:33   12      A.   *No, sir.*

10:09:33   13      Q.   *And you had 200-plus hours worth of help?*

10:09:38   14      A.   *The store had that much labor, yes.*

10:09:40   15      Q.   *You testified earlier that you were sent from*

10:09:43   16   *store to store to help out.  Do you recall that*

10:09:45   17   *testimony?*

10:09:46   18      A.   *Yes.*

10:09:46   19      Q.   *And generally, when you were pulled from your*

10:09:49   20   *store to go elsewhere, it was because the other store*

10:09:52   21   *was in a mess; correct?*

10:09:54   22      A.   *Correct.*

10:09:54   23      Q.   *The manager of that store was not performing his*

10:09:58   24   *duties; correct?"*

10:10:00   25           MR. MAY:  And there was an objection.  Let

10:10:02  1   me see if I can get to the right line.  I'm going to go

10:10:11  2   to line 14.

10:10:16  3      Q.  *Mr. Detter, were you asked by your district*

10:10:19  4   *managers to go to those stores and to help fix a problem*

10:10:22  5   *with those stores?*

10:10:28  6              *MR. CALAMUSA:  Object, Your Honor.*

10:10:29  7              *THE COURT:  I will let him answer that*

10:10:31  8   *question.*

10:10:31  9              *THE WITNESS:  I was asked to assist, yes.*

10:10:33  10     Q.  *And sometimes in the course of doing that fixing,*

10:10:36  11  *you were working side by side with that store's manager;*

10:10:39  12  *correct?*

10:10:39  13     A.  *Correct.*

10:10:40  14     Q.  *And you would show him how to do certain things?*

10:10:45  15     A.  *No.*

10:10:45  16     Q.  *But when you left that store, whatever issue*

10:10:48  17  *existed before you arrived, that issue was eliminated?*

10:10:52  18     A.  *That -- I don't know.*

10:10:56  19     Q.  *Well, when you left the store and returned to*

10:11:02  20  *your store, was the store a mess, the one that you had*

10:11:05  21  *just been to?*

10:11:05  22     A.  *The one that we had been at wasn't as messy as it*

10:11:10  23  *was when we got there.*

10:11:12  24              *THE COURT:  Well, when you say the store was*

10:11:14  25  *a mess, are you saying that at times you had to go to*

10:11:18  1   *another store because the merchandise hadn't been*

10:11:21  2   *unloaded from trucks and you had to unload the*

10:11:24  3   *merchandise?  Is that the kind of thing you did?*

10:11:26  4          THE WITNESS:  *That's part of what we did.*

10:11:29  5          THE COURT:  *And so when unloaded merchandise*

10:11:31  6   *that was on the truck at another store, you would*

10:11:34  7   *consider that store, then, being in a mess?*

10:11:37  8          THE WITNESS:  *Correct.*

10:11:38  9          THE COURT:  *All right.  What did you -- what*

10:11:43  10  *you did was go over, basically, and perform the manual*

10:11:46  11  *labor of removing the merchandise from the truck into*

10:11:49  12  *the store?*

10:11:50  13         THE WITNESS:  *And put it on the shelves.*

10:11:52  14         THE COURT:  *And put it on the shelves?*

10:11:53  15         THE WITNESS:  *Correct.*

10:11:54  16  BY MR. KALLON:

10:11:56  17     Q.  *And that was not the only thing you did,*

10:11:59  18  *Mr. Detter?*

10:11:59  19     A.  *Correct.*

10:11:59  20     Q.  *There were other things that you did?*

10:12:01  21     A.  *We also set schematics.*

10:12:03  22     Q.  *All right.  And setting schematics, making sure*

10:12:08  23  *you follow policy, you would agree that's a management*

10:12:11  24  *function; correct?*

10:12:12  25     A.  *I did not make sure that the management followed*

10:12:15    1    *policy, no.*

10:12:15    2        *Q.   That's not my question.   I apologize for not*

10:12:19    3    *being clear.   I said:   Setting schematics, making sure*

10:12:24    4    *store follows company policy with respect to schematics,*

10:12:27    5    *you would agree with me that that's a management*

10:12:29    6    *function?*

10:12:30    7        *A.   That's a function of every associate in the*

10:12:33    8    *store.*

10:12:33    9        *Q.   But, again, the associates at the store level*

10:12:36   10    *report to the store manager?*

10:12:37   11        *A.   Some reported to the assistant, some reported to*

10:12:41   12    *the manager.*

10:12:42   13        *Q.   Thank you, sir.   You were shown an email earlier*

10:12:46   14    *which I believe is Plaintiffs' Exhibit 136.   That's the*

10:12:49   15    *email you told the Court you received in your store;*

10:12:52   16    *correct?*

10:12:52   17        *A.   Correct.*

10:12:53   18        *Q.   Ben Spratlin was never your district manager, was*

10:12:57   19    *he?*

10:12:57   20        *A.   I don't recognize the name, no."*

10:13:00   21            MR. R. WIGGINS:   Your Honor, can I interject

10:13:02   22    one thing?   Exhibit 136 in this transcript is Exhibit 10

10:13:07   23    in this trial.

10:13:08   24            MR. MAY:   Yes, sir.   That's correct.   I'm

10:13:10   25    sorry, I didn't know the number right offhand.   I'm

10:13:13  1   having to read the transcript.  Picking back up.

10:13:16  2       Q.  *In fact, you never worked at Store 231 that's*

10:13:20  3   *listed there, have you?*

10:13:23  4       A.  *No.*

10:13:23  5       Q.  *Now, let's look at that email you have in front*

10:13:23  6   *of you.*

10:13:23  7       A.  *Yes.*

10:13:24  8       Q.  *The first line deals with an increase of a number*

10:13:28  9   *of assistant managers who were discharged on integrity*

10:13:30  10  *issues?*

10:13:31  11      A.  *Yes, sir.*

10:13:31  12      Q.  *Integrity issues would include assistant managers*

10:13:35  13  *stealing; correct?*

10:13:35  14      A.  *Correct.*

10:13:36  15      Q.  *And Mr. Barkus goes on to say, quote, 'before you*

10:13:41  16  *hire any person as a key holder, please contact your*

10:13:44  17  *district manager'; correct?*

10:13:45  18      A.  *Correct.*

10:13:46  19      Q.  *And the district managers, based on your*

10:13:50  20  *experience as it relates to key holders, they conducted*

10:13:54  21  *background checks?*

10:13:55  22      A.  *I'm not sure who performed the background checks.*

10:13:58  23      Q.  *But one of the things you asked the district*

10:14:00  24  *manager for, the district manager gave you, as it*

10:14:03  25  *related to assistant managers related to background*

10:14:06  1   *checks?*

10:14:06  2       A.  *Correct.*

10:14:07  3       Q.  *And the background check will tell you if the*

10:14:10  4   *person has a criminal record?*

10:14:12  5       A.  *I'm not sure what all it tells you.*

10:14:14  6       Q.  *Mr. Detter, you were the store manager for twelve*

10:14:18  7   *years; correct?*

10:14:19  8       A.  *Correct.*

10:14:19  9       Q.  *And in the course of that time period, you*

10:14:23  10  *received background information on -- on -- excuse me,*

10:14:27  11  *received background information on background checks?*

10:14:30  12      A.  *The only information we received as managers was*

10:14:33  13  *whether or not we could hire a potential associate.*

10:14:36  14      Q.  *After a background check had been run?*

10:14:39  15      A.  *Correct.*

10:14:39  16      Q.  *And as you sit here today, you're saying that you*

10:14:44  17  *don't know if a background check deals with a person's*

10:14:47  18  *criminal history or not?*

10:14:49  19      A.  *Because we did not get the results of the*

10:14:51  20  *background check.*

10:14:52  21      Q.  *But, in any event, Mr. Barkus goes on to say:*

10:14:55  22  *'Before anyone is hired or given a key to the store,*

10:14:58  23  *contact the district manager'; correct?*

10:14:59  24      A.  *It says they have to be approved by the district*

10:15:03  25  *manager.*

10:15:03  1    Q.   And, Mr. Detter, you wouldn't want anybody in

10:15:07  2    your store with a key who, for example, might have had a

10:15:10  3    criminal history that you didn't know about, would you?

10:15:12  4    A.   No, sir.

10:15:13  5    Q.   Because a person with the keys has access to

10:15:17  6    everything that's in the store; correct?

10:15:19  7    A.   If they were the key-carrying assistant manager.

10:15:22  8    Q.   Keeping the store clean is a management function;

10:15:25  9    isn't that correct?

10:15:26  10   A.   Correct.

10:15:26  11   Q.   In fact, you rank that pretty high, as far as

10:15:30  12   management function that you perform, right behind

10:15:33  13   customer service; correct?

10:15:34  14   A.   Yes, sir.

10:15:34  15   Q.   Customer service was your number one management

10:15:37  16   function that you did; correct?

10:15:39  17   A.   Correct.

10:15:40  18   Q.   And the second management function you did was

10:15:43  19   keeping the store clean, isn't that correct?   This is

10:15:46  20   your ranking them.

10:15:48  21   A.   Correct.

10:15:48  22   Q.   All right.   And then the third thing on your list

10:15:52  23   of management functions is making sure the shelves were

10:15:55  24   stocked; correct?

10:15:56  25   A.   Correct.

10:15:56  1       Q.  *And these two, keeping the store clean, making*

10:15:59  2  *sure the shelves are stocked, tie back into number one,*

10:16:03  3  *providing effective customer service; correct?*

10:16:06  4       A.  *Yes, sir.*

10:16:06  5       Q.  *You want your customers to come in and shop at a*

10:16:11  6  *clean store --*

10:16:12  7       A.  *Yes, sir.*

10:16:12  8       Q.  *-- correct?  You want to be able to find the*

10:16:16  9  *merchandise they are looking for; correct?*

10:16:18  10      A.  *Yes, sir.*

10:16:19  11      Q.  *And so customer service -- this is something that*

10:16:23  12  *you preached and practiced over and over again; isn't*

10:16:26  13  *that true?*

10:16:26  14      A.  *Something I practice frequently.*

10:16:29  15      Q.  *And then the next thing on your list of important*

10:16:32  16  *management functions was making sure the employees did*

10:16:36  17  *their job; correct?*

10:16:37  18      A.  *I don't understand.  What, now?*

10:16:40  19      Q.  *In your deposition, you were asked to rank the*

10:16:44  20  *management functions that you performed.  Number 1 on*

10:16:47  21  *your list was customer service.  Number 3 was keeping*

10:16:49  22  *the store clean.  Number 3 was keeping the stock on the*

10:16:54  23  *shelves.  And your fourth item was making sure the*

10:16:56  24  *employees did their jobs; isn't that correct, sir?*

10:16:58  25      A.  *I don't remember exactly.  But if that's what the*

10:17:02   1   *deposition shows, yes.*

10:17:03   2      *Q.   You could check it if you want.   It's on Page*

10:17:08   3   *176, if you want to.   If you look on Page 176, beginning*

10:17:12   4   *at line 175 -- excuse me.   Beginning at 175, line number*

10:17:17   5   *18 at 175, my question to you on line number 18 -- are*

10:17:22   6   *you there, sir?*

10:17:23   7      *A.   175?*

10:17:24   8      *Q.   Yes, sir.   175, line -- line number 18.   My*

10:17:30   9   *question to you was:  'What would be number 3?'   And*

10:17:35  10   *what did you say?*

10:17:36  11      *A.   'Number 3 would probably be keeping stock on the*

10:17:39  12   *shelves.'*

10:17:40  13      *Q.   All right.   And if you flip now to 176, line 2:*

10:17:44  14   *'What would be number 4?'*

10:17:45  15      *A.   My answer was:  'Ordering is number 4.'*

10:17:49  16      *Q.   Keep going.   Next question from me was:  'How*

10:17:53  17   *about making sure that the employees did their jobs to*

10:17:55  18   *the best of their ability?'   And you said you 'could put*

10:17:58  19   *that ahead of ordering'; correct?*

10:18:00  20      *A.   Correct.*

10:18:01  21      *Q.   So it would be after making sure the shelves were*

10:18:04  22   *stocked; correct?*

10:18:04  23      *A.   Correct.*

10:18:05  24      *Q.   And one way to make sure the employees did their*

10:18:09  25   *job was to make sure they were effectively trained;*

10:18:12  1  *correct?*

10:18:12  2  A.  *That would be part of it.*

10:18:13  3  Q.  *And you consider training -- you felt training of*

10:18:16  4  *employees was a very important thing; correct?*

10:18:18  5  A.  *Correct.*

10:18:21  6          MR. MAY:  I'm going to skip that counsel

10:18:26  7  interlude and go to line 14.

10:18:32  8  Q.  *To make sure the employees did their job as a*

10:18:32  9  *manager, you gave them directions, you instructed them,*

10:18:34  10  *you told them what to do; correct?*

10:18:36  11  A.  *Myself and my assistants.*

10:18:38  12  Q.  *And in the course of the day, after you,*

10:18:41  13  *Mr. Detter, had given them instructions and assignments,*

10:18:44  14  *you would go behind them and follow up to see if they*

10:18:47  15  *did what you told them to do; isn't that true, sir?*

10:18:51  16  A.  *Myself and my assistants.*

10:18:53  17  Q.  *If they didn't do what you told them to do, you*

10:18:57  18  *verbally warned them; correct?*

10:18:58  19  A.  *I wouldn't say warned.*

10:19:01  20  Q.  *You talked to them?*

10:19:02  21  A.  *Correct.*

10:19:03  22  Q.  *In fact, you said in your deposition you gave*

10:19:07  23  *verbal warnings over 50 times in the course of your*

10:19:10  24  *career as a manager?*

10:19:11  25  A.  *Correct.*

10:19:12   1      Q.   And this is something you didn't have to go to

10:19:15   2  the DM for; correct?

10:19:17   3      A.   Correct.

10:19:18   4      Q.   You did -- you just did it on your own?

10:19:21   5      A.   Myself and the assistants.

10:19:24   6      Q.   And, of course, unfortunately, some employees

10:19:27   7  just don't get it.  And at some point, you reached a

10:19:31   8  point where you want to terminate them; correct?

10:19:33   9      A.   Correct.

10:19:34  10      Q.   And when Mr. Calamusa was up here, you talked

10:19:38  11  about the one time when you wanted to terminate somebody

10:19:42  12  and your DM told you not to do so.  Do you recall that

10:19:45  13  testimony?

10:19:45  14      A.   That one incidence, yes.

10:19:49  15      Q.   Now, what you didn't tell the Court was that

10:19:52  16  since 2000, you had 30 employees that you wanted to be

10:19:57  17  terminated, that you made a recommendation to the

10:19:59  18  district manager, and he agreed with you 29 of the 30

10:20:04  19  times; correct?

10:20:05  20      A.   Correct.

10:20:06  21      Q.   So you would agree with me that when it comes to

10:20:10  22  terminations, your district manager gave your

10:20:13  23  recommendations particular weight; in other words, he

10:20:16  24  took your recommendations seriously?

10:20:18  25      A.   I would not say that, no.

10:20:21   1    Q.  *29 out of 30 were terminated?*

10:20:24   2    A.  *But that doesn't mean he took my recommendations*

10:20:27   3    *with any weight.*

10:20:28   4    Q.  *These are people that you went to the manager,*

10:20:32   5    *district manager, you said, this person is a goof off,*

10:20:37   6    *or whatever phrase you used, and I want them terminated;*

10:20:41   7    *correct?*

10:20:41   8    A.  *No, sir.*

10:20:41   9    Q.  *And 29 out of 30 were terminated, that's what you*

10:20:45   10   *said in your deposition -- excuse me.  That's what's in*

10:20:48   11   *your deposition.  We can go to it if you want."*

10:20:51   12              MR. MAY:  And then Mr. Calamusa made an

10:20:54   13   objection, which the Court sustained.  Line 22.

10:20:57   14   Q.  *Now, you consider terminations to be serious*

10:20:59   15   *matters, of course?*

10:21:01   16   A.  *Correct.*

10:21:02   17   Q.  *And before you terminate anybody, you want to*

10:21:05   18   *make sure you did it right and that you had all your*

10:21:08   19   *documentation together; correct?*

10:21:09   20   A.  *Yes, sir.*

10:21:10   21   Q.  *And if you went to the district manager to*

10:21:12   22   *terminate somebody, it was only after you had tried*

10:21:15   23   *everything and you felt that you had no choice but to*

10:21:18   24   *terminate?*

10:21:18   25   A.  *Yes, sir.*

10:21:19  1      Q.  *Now, let's talk about hiring for a moment -- for*
10:21:23  2  *a minute.  The store gets applications; correct?*
10:21:25  3      A.  *Correct.*
10:21:26  4      Q.  *And you guys reviewed them to determine who you*
10:21:29  5  *wanted to bring in for an interview; correct?*
10:21:32  6      A.  *Correct.*
10:21:32  7      Q.  *And then you interview these people at the store*
10:21:35  8  *level.  You guys decide collectively who you wanted to*
10:21:38  9  *hire; correct?*
10:21:39 10      A.  *Correct.*
10:21:39 11      Q.  *And, in fact, you had a system where you do it by*
10:21:42 12  *majority rule; correct?*
10:21:44 13      A.  *Yes.*
10:21:44 14      Q.  *In other words, you took into account what your*
10:21:47 15  *assistant managers had to say; correct?*
10:21:49 16      A.  *Yes.*
10:21:50 17      Q.  *And, in fact, you had a policy that if it was*
10:21:54 18  *just one assistant and the two of you could not agree,*
10:21:57 19  *you wouldn't hire that person; correct?*
10:22:00 20      A.  *I don't know if I'd call it a policy, but that*
10:22:03 21  *was the way it worked.*
10:22:04 22      Q.  *That was your practice?*
10:22:05 23      A.  *That was the practice in that store.*
10:22:08 24      Q.  *Okay.  And once you and the assistant decided who*
10:22:12 25  *you wanted, you then presented that candidate to the*

10:22:14   1    *district manager; correct?*

10:22:15   2        A.   *Correct.*

10:22:16   3        Q.   *And you said you had -- focusing on the last*

10:22:21   4    *couple of years -- on the last couple of years of your*

10:22:24   5    *employment, you had two district managers, one was a guy*

10:22:26   6    *named Kevin.  Do you remember Mr. Kevin's last name?*

10:22:30   7        A.   *The last two years of my employment?*

10:22:32   8        Q.   *The last two years you worked at -- you had a*

10:22:35   9    *district manager named Kevin, and you had another named*

10:22:38  10    *Kabalsky; correct?*

10:22:40  11        A.   *Last name Kabalsky doesn't ring a bell.*

10:22:44  12        Q.   *All right.*

10:22:44  13             MR. MAY:  And then there's a series where

10:22:46  14    it's being spelled for the court reporter.  And let's go

10:22:49  15    to line 24.

10:22:51  16        Q.   *I'm sorry, I was thinking about somebody else.*

10:22:54  17    *You had Bob Russell; correct?*

10:22:56  18        A.   *Correct.*

10:22:56  19        Q.   *And then you had a guy named Kevin before.*

10:23:00  20        A.   *Kevin was when I started.*

10:23:03  21        Q.   *During -- when Kevin was your district manager,*

10:23:05  22    *you went to him and presented a candidate; and on 35 to*

10:23:10  23    *40 times, he approved that candidate; correct?*

10:23:13  24        A.   *I believe that's accurate.*

10:23:15  25        Q.   *And the only time he said no was on six*

10:23:19   1   *occasions?*

10:23:20   2       A.  *Correct.*

10:23:21   3       Q.  *And he only said no because you didn't have the*

10:23:24   4   *payroll at your store to pay that employee; correct?*

10:23:26   5       A.  *No.  He turned down some, even though they --*

10:23:31   6       Q.  *Well, again, you gave a deposition in this case;*

10:23:34   7   *correct?*

10:23:34   8       A.  *Correct.*

10:23:35   9       Q.  *Give me a minute to find it myself and I will*

10:23:39   10  *lead you to the page.  If you flip to Page 53 for a*

10:23:42   11  *minute, sir.*

10:23:42   12      *All right.  Start with line 4 on Page 53.*

10:23:46   13  *'Question:  Okay.  I want to exclude a potential hiring*

10:23:51   14  *that would affect your payroll level.  Assume that this*

10:23:54   15  *is an opening and you can fill it within your payroll*

10:23:58   16  *budget, okay?  Next question:  Did Kevin ever say you*

10:24:02   17  *couldn't hire an applicant you recommended under that*

10:24:05   18  *situation?'  What was your answer?*

10:24:07   19      A.  *My answer was 'no'.*

10:24:09   20      Q.  *Thank you.  So, for Kevin, you went to him*

10:24:13   21  *anywhere from 35 -- I'm sorry -- anywhere from 41 to 46*

10:24:18   22  *times to hire somebody; correct?*

10:24:20   23      A.  *Correct.*

10:24:21   24      Q.  *And on 35 or 40 times, he said yes?*

10:24:26   25      A.  *Yes, sir.*

10:24:26  1    Q.  *And you would agree with me that he considered*

10:24:30  2  *your recommendations and gave them weight; correct?*

10:24:33  3    A.  *Mine and the assistants.*

10:24:37  4    Q.  *Now, for Bob Russell.  He was the last district*

10:24:40  5  *manager you had; correct?*

10:24:41  6    A.  *No, he wasn't the last one.*

10:24:43  7    Q.  *All right.  Well, let's talk about Mr. Russell*

10:24:45  8  *anyway.  You went to Mr. Russell on approximately 75*

10:24:49  9  *times to hire somebody -- excuse me -- someone when you*

10:24:53  10  *were at Store 708; correct?*

10:24:55  11    A.  *Correct.*

10:24:55  12    Q.  *And 60 times he said yes -- approved a candidate*

10:25:00  13  *that you presented to him; correct?*

10:25:02  14    A.  *That myself and my assistants presented, yes.*

10:25:05  15    Q.  *And on the 15 times when he said no, like*

10:25:09  16  *Mr. Kevin, it was because you didn't have the dollars at*

10:25:12  17  *your store to pay that employee; correct?*

10:25:13  18    A.  *Correct.*

10:25:15  19    Q.  *And when you were at Store Number 1314, you were*

10:25:19  20  *sent over there because the store was a mess; correct?*

10:25:21  21    A.  *Correct.*

10:25:22  22    Q.  *And you were transferred there, because the*

10:25:25  23  *manager who was there was not getting the job done.*

10:25:29  24          MR. MAY:  There's an objection by

10:25:31  25  Mr. Calamusa.  Then Mr. Kallon asked the question again.

10:25:34   1      Q. *That's what you were told?*

10:25:36   2      A. *Correct.*

10:25:36   3      Q. *And when you went over there, you had the*

10:25:39   4 *opportunity to hire four people; correct?*

10:25:42   5      A. *During the time frame that I was there.*

10:25:45   6      Q. *And on all four of those, your district manager,*

10:25:48   7 *Bob Russell, said yes?*

10:25:49   8      A. *Correct.*

10:25:50   9      Q. *All right. Based on my math, Kevin said 35 to 40*

10:25:57  10 *times 'yes'. Bob Russell, at your two stores, said*

10:26:01  11 *'yes' 64 times. That's 105 times, if my math is*

10:26:06  12 *correct. I may be off a couple of numbers, but that's*

10:26:09  13 *105 times when the candidate was presented to you at*

10:26:12  14 *your store level wanted to hire and that candidate was,*

10:26:17  15 *in fact, hired; correct?*

10:26:19  16      A. *That myself and my assistants recommended, yes.*

10:26:23  17      Q. *And the two of them, Kevin and Mr. Russell,*

10:26:28  18 *collectively only said 'no' on 21 times -- 15 for Bob*

10:26:32  19 *and six for Kevin?*

10:26:34  20      A. *Correct.*

10:26:34  21      Q. *And you would agree with me that both of your*

10:26:38  22 *managers gave your recommendations for hiring particular*

10:26:42  23 *weight?*

10:26:43  24      A. *It gave weight to myself and my assistant's*

10:26:47  25 *recommendations, yes.*

10:26:48  1      Q.   *Thank you, sir.*"

10:26:54  2              THE COURT:   Examination by the plaintiff?

10:26:58  3              MR. R. WIGGINS:   Continue right along where

10:27:03  4      you are.

10:27:03  5                      *REDIRECT EXAMINATION*

10:27:04  6      *BY MR. CALAMUSA:*

10:27:05  7      Q.   *Let's start with this hiring.  Mr. Kallon did*

10:27:10  8      *some numbers.  Why, if you're store manager, did you*

10:27:14  9      *even have to go to the district manager on however many*

10:27:17  10     *times you add it up?*

10:27:18  11     A.   *That was company policy.*

10:27:20  12     Q.   *Could you have done it on your own?*

10:27:24  13     A.   *No, sir.*

10:27:24  14     Q.   *If the person passed all the background checks,*

10:27:29  15     *the Stanton test, the drug tests, so they passed the*

10:27:33  16     *company policy, what they required, could you on your*

10:27:37  17     *own hire people for the store in which you were working*

10:27:39  18     *in?*

10:27:40  19     A.   *No, sir.*

10:27:40  20     Q.   *He asked you about scheduling.  You put names on*

10:27:45  21     *a schedule; is that right?*

10:27:46  22     A.   *Correct.*

10:27:47  23     Q.   *Is that the extent of what you did in regards to*

10:27:54  24     *scheduling employees in your stores?*

10:27:56  25     A.   *Yes, sir.*

10:27:56   1     Q.   *Could you put people on certain days if you*

10:28:00   2   *wanted to?*

10:28:00   3     A.   *No.*

10:28:00   4     Q.   *Could you add or subtract hours on days?*

10:28:04   5     A.   *No, sir.*

10:28:05   6     Q.   *Could you increase somebody on, or move somebody*

10:28:08   7   *from a Monday to a Friday?*

10:28:10   8     A.   *No, sir.*

10:28:11   9     Q.   *There was some talk about stocking, stocking and*

10:28:15  10   *unloading, and it's listed on the essential job*

10:28:18  11   *functions.  Tell me what you, as store manager, did in*

10:28:22  12   *regards to stocking.*

10:28:23  13     A.   *Carried a lot of boxes from the back of the truck*

10:28:26  14   *to the shelf.*

10:28:27  15     Q.   *In your stores, the two stores you worked in, on*

10:28:31  16   *a truck day, give me an approximate number of boxes that*

10:28:36  17   *would arrive.*

10:28:36  18     A.   *We received a full trailer, anywhere from 1,700*

10:28:41  19   *to 2,100 parts.*

10:28:42  20     Q.   *And this management function was to pick those*

10:28:45  21   *boxes up and move them to the shelves?"*

10:28:52  22          MR. KALLON:  *Objection.  Leading the*

10:28:54  23   *witness.*

10:28:54  24          THE COURT:  *Sustained.*

10:28:59  25     Q.   *What was the management function as part of*

10:29:01  1    *stocking?*

10:29:01  2        *A.   Take the boxes from the truck to the shelf.*

10:29:04  3        *Q.   Schematics -- setting schematics was mentioned in*

10:29:10  4    *the essential job functions -- on the essential job*

10:29:13  5    *functions.  Help us understand what that means, as far*

10:29:16  6    *as you as a manager.  What did you do?*

10:29:18  7        *A.   I took the information that was sent to the store*

10:29:27  8    *from the corporate office, shelf -- stuck shelf tags and*

10:29:28  9    *put them on the shelves that the corporate office*

10:29:29  10   *designated them to put them on.*

10:29:32  11       *Q.   Did you consider that to be manual labor?*

10:29:35  12       *A.   Yes, sir.*

10:29:35  13       *Q.   Customer service.  Mr. Kallon asked you a little*

10:29:38  14   *bit about customer service.  Who is responsible for*

10:29:41  15   *customer service in your store?*

10:29:43  16       *A.   Every employee we've got.*

10:29:46  17       *Q.   And is that the Family Dollar policy, that all*

10:29:49  18   *employees are responsible for customer service?*

10:29:51  19       *A.   Yes, sir.*

10:29:52  20       *Q.   Part of customer service -- and I think*

10:29:57  21   *Mr. Kallon talked about cleanliness of the store --*

10:30:00  22   *number 95, Exhibit 2 -- Page 95, Exhibit 2, store*

10:30:08  23   *recovery.  That's cleaning; is that right, Mr. Detter?*

10:30:11  24       *A.   Yes, sir.*

10:30:12  25       *Q.   And what does Family Dollar policy state in*

10:30:16   1   regards to who is responsible for cleaning?

10:30:18   2       A.   Every employee.

10:30:19   3       Q.   Tell me this:  What did you do as store manager

10:30:23   4   in regards to cleaning?  What was the big manager

10:30:26   5   function that you did on --

10:30:29   6       A.   I straightened shelves, swept floors, and cleaned

10:30:34   7   bathrooms.

10:30:35   8       Q.   Do you consider that to be manual labor or

10:30:38   9   supervisory?

10:30:38   10      A.   Manual labor.

10:30:40   11      Q.   Keys.  Keys to the store.  Mr. Kallon talked

10:30:45   12   about how important it was that the people that had keys

10:30:47   13   to your store passed the background checks and go

10:30:51   14   through all of the company procedures.  Do you agree

10:30:53   15   with that; right?

10:30:54   16      A.   Yes, sir.

10:30:56   17      Q.   You wanted people that were honest to have keys

10:30:59   18   to your store; right?

10:31:01   19      A.   Yes.

10:31:01   20      Q.   That had integrity; right?

10:31:04   21      A.   Yes.

10:31:05   22      Q.   Did you want assistant manager to have keys to

10:31:07   23   your store whom you caught stealing?

10:31:08   24      A.   No, sir.

10:31:11   25              MR. R. WIGGINS:  Mr. Kallon interjected, and

10:31:13  1    there's some colloquy.  "Overruled."  And then we have

10:31:17  2    another question on line 10 by Mr. Calamusa:

10:31:20  3        Q.  *Could you fire the individual whom you caught*

10:31:23  4    *stealing?*

10:31:23  5        A.  *No, sir.*

10:31:24  6        Q.  *Did you seek to fire the individual who was*

10:31:27  7    *caught stealing who had a set of keys?*

10:31:30  8        A.  *Yes, sir.*

10:31:30  9        Q.  *Training.  Who trained your cashiers?*

10:31:34  10       A.  *I had a lead cashier that did that.*

10:31:38  11       Q.  *There was some talk about your bonus.  And I*

10:31:41  12   *believe Mr. Kallon said your bonus was based on 1*

10:31:45  13   *percent of controllable profit.  Do you agree with that?*

10:31:47  14       A.  *That was my understanding, yes.*

10:31:49  15       Q.  *During the five years in question here, '99 until*

10:31:53  16   *you left in 2003, do you recall receiving $10,737 in*

10:32:00  17   *bonuses?*

10:32:01  18       A.  *Not at one time.*

10:32:03  19       Q.  *Over those five years?*

10:32:11  20       A.  *Probably fairly close.*

10:32:13  21       Q.  *Do you recall a year in which you received 4,000*

10:32:15  22   *in bonus?*

10:32:17  23       A.  *I know I received that much in -- I believe it*

10:32:21  24   *was 2001.*

10:32:22  25       Q.  *Calculator.  And there was a year in which you*

10:32:26  1    *received zero, I think you testified?*

10:32:28  2        A.  *Yes, sir.*

10:32:29  3        Q.  *And if you received a bonus of 4,000 --*

10:32:33  4            MR. R. WIGGINS:  And then there's an

10:32:35  5    objection by Mr. Kallon.  "Overruled".  And the question

10:32:38  6    continued.

10:32:40  7        Q.  *Would you put in 4,000?  We're talking about your*

10:32:44  8    *calculator.  If you received 4,000 in bonus and it's*

10:32:48  9    *based on 1 percent of controllable profits, what would*

10:32:51  10   *be the profit that Family Dollar made for the store that*

10:32:55  11   *you worked on 400?  Can you read that?*

10:33:00  12       A.  *400,000.*

10:33:02  13       Q.  *And the result of that, you got a 1 percent*

10:33:05  14   *profit?"*

10:33:07  15           MR. R. WIGGINS:  Then another objection,

10:33:10  16   which we're going to skip down.  Line 8.

10:33:14  17       Q.  *If in the five years you worked, Mr. Detter, you*

10:33:17  18   *made 10,737 in bonus -- 10,737 divided by five years,*

10:33:24  19   *Mr. Detter, can you read that for me?  Can you see that*

10:33:27  20   *far?*

10:33:28  21       A.  *2,147.40.*

10:33:31  22       Q.  *That's per year?"*

10:33:35  23           MR. R. WIGGINS:  Something's buzzing up

10:33:37  24   here.

10:33:37  25           THE COURT:  It is.

10:33:45  1      Q.   *That's per year.   If you divide that by 52 weeks,*
10:33:50  2  *can you read that?*
10:33:51  3      A.   *Roughly $41.30.*
10:33:55  4      Q.   *And I believe it's your testimony, and it's*
10:33:58  5  *undisputed, that you worked between 65 and 70 hours?*
10:34:01  6      A.   *Correct.*
10:34:02  7      Q.   *Let's do it by 65.   Divide that by $41 by 65*
10:34:08  8  *hours.   Can you read that?*
10:34:10  9      A.   *A little over 63 cents.*
10:34:13  10     Q.   *So 63 cents per hour?*
10:34:15  11     A.   *Per hour.*
10:34:18  12              MR. R. WIGGINS:  That's all I have on the
10:34:19  13  redirect.  Now, we'd like to read the direct
10:34:22  14  examination.
10:34:23  15              MR. MAY:  Your Honor, I object to reading
10:34:25  16  out of order.  Mr. Wiggins started at the back.
10:34:32  17              MR. R. WIGGINS:  Mr. May started in the
10:34:34  18  middle of the book.
10:34:36  19              MR. MAY:  That's the only place I could
10:34:38  20  start, Your Honor.  It's the only place Mr. Kallon
10:34:40  21  examined him.
10:34:41  22              MR. R. WIGGINS:  We have the right to read
10:34:43  23  the direct examination, because he only read the
10:34:44  24  cross-examination, Your Honor.
10:34:45  25              MR. MAY:  Well, Your Honor --

10:34:47    1            THE COURT:  And the cross-examination was

10:34:50    2    limited to matters inquired on in direct.

10:34:56    3            MR. R. WIGGINS:  But I don't believe --

10:34:58    4    recall, Your Honor, to be honest with you on -- at that

10:35:03    5    time.

10:35:03    6            MR. MAY:  This should have been taken up --

10:35:05    7            MR. R. WIGGINS:  I don't want to have to

10:35:07    8    recall another person for our case to read the other

10:35:09    9    part.  I think we should do it once.

10:35:13   10            MR. MAY:  That's not the question.

10:35:19   11            THE COURT:  Well, you would have directed --

10:35:25   12            MR. MAY:  In that instance, I understand

10:35:28   13    your ruling, Your Honor.

10:35:29   14            THE COURT:  All right.

10:35:30   15            MR. R. WIGGINS:  All right.  We're going to

10:35:32   16    start in the beginning now, with Mr. Calamusa's direct

10:35:37   17    examination.  Line 17, Page 4.

10:35:37   18                 *DIRECT EXAMINATION*

10:35:37   19    *BY MR. CALAMUSA:*

10:35:40   20       Q.  *Good morning, Mr. Detter.*

10:35:46   21       A.  *Good morning.*

10:35:47   22       Q.  *Are you formerly employed with Family Dollar?*

10:35:50   23       A.  *Yes, sir.*

10:35:50   24       Q.  *And what was the last position you held?*

10:35:52   25       A.  *Store manager.*

10:35:53  1    Q.   How long were you employed as the store manager?

10:35:56  2    A.   Twelve years.

10:35:58  3    Q.   Do you know the dates of that employment?

10:36:01  4    A.   1991 to 2003.

10:36:04  5    Q.   I want to focus this morning on your employment

10:36:07  6  with Family Dollar as a store manager from July 1999

10:36:10  7  until you left in 2003; okay?

10:36:14  8    A.   Okay.

10:36:14  9    Q.   During that period of time, July 1999 to 2003,

10:36:17  10  how many stores did you work in as an assistant manager?

10:36:19  11    A.   Two.

10:36:19  12    Q.   And where were those stores located?

10:36:21  13    A.   Both in Little Rock, Arkansas.

10:36:23  14    Q.   Do you recall the approximate square footage of

10:36:28  15  those two stores?

10:36:29  16    A.   Both of them were approximately 9,000 square

10:36:32  17  feet.

10:36:32  18    Q.   Do you recall the risk classification?

10:36:34  19    A.   At one point, they would be 3 and another 4.

10:36:36  20    Q.   Would you describe to us what that means?

10:36:38  21    A.   Risk factor was based on several factors:  Crime

10:36:43  22  area, whether or not we had bars on the window, number

10:36:45  23  of liquor stores in the area, conditions of the

10:36:48  24  neighborhood.

10:36:49  25    Q.   Was a 3 or 4 risk class high?

10:36:52 1    A.  *4 is the highest; 3 is next.*

10:36:54 2    Q.  *Do you recall the averages number of employees*

10:36:56 3    *you had in those two stores?*

10:36:57 4    A.  *Probably seven.*

10:36:59 5    Q.  *Probably -- and the number of district managers*

10:37:04 6    *during that time period?*

10:37:05 7    A.  *Five or six during that time frame.*

10:37:08 8    Q.  *Did --*

10:37:11 9            MR. R. WIGGINS:  And there's an

10:37:12 10   interruption, and continuing on line 12.  "Were those

10:37:15 11   employees" --

10:37:16 12           MR. MAY:  Your Honor?

10:37:17 13           THE COURT:  Yes, sir.

10:37:18 14           MR. MAY:  I object to Mr. Wiggins skipping

10:37:20 15   your questions.

10:37:21 16           MR. R. WIGGINS:  Well, I thought that was an

10:37:22 17   objection, Your Honor.  He's right, it's not an

10:37:26 18   objection, it's a question by the Court.  Line 6.

10:37:29 19           *THE COURT:  You said you had seven*

10:37:31 20   *employees, an averages of seven employees?*

10:37:32 21           *THE WITNESS:  Yes, sir.*

10:37:33 22           *THE COURT:  In each store?*

10:37:35 23           *THE WITNESS:  Yes, sir.*

10:37:36 24           *THE COURT:  All right.*

10:37:37 25           MR. R. WIGGINS:  Then back to Mr. Calamusa:

10:37:39   1      Q.   Were those employees full-time or part-time?

10:37:41   2      A.   Some were full-time, some were part-time.

10:37:44   3      Q.   What job classification were the full-time?

10:37:47   4      A.   I would have the assistant managers, floor

10:37:49   5   supervisors, cashiers.

10:37:51   6      Q.   Did your job duties vary, depending on which

10:37:54   7   store you worked at?

10:37:55   8      A.   No, sir.

10:37:56   9      Q.   Did the job duties vary based on the district

10:37:59   10  managers you had?

10:38:00   11     A.   No, sir.

10:38:00   12     Q.   Did your job duties vary at all, depending on the

10:38:04   13  size of the store?

10:38:04   14     A.   No.

10:38:05   15     Q.   Did your job duties vary depending on the number

10:38:08   16  of employees -- you said an average of seven -- when it

10:38:11   17  fluctuated, did you have job duties that varied?

10:38:14   18     A.   No.

10:38:14   19     Q.   Mr. Detter, were you ever sent temporarily to

10:38:17   20  another store?

10:38:17   21     A.   Yes, sir.

10:38:17   22     Q.   How many occasions do you think you were sent

10:38:20   23  temporarily to another store?

10:38:21   24     A.   During that time frame, ten, twelve.

10:38:24   25     Q.   And when you would go to these stores, what were

10:38:27  1   you doing?

10:38:28  2      A.  Throwing freight, cleaning up the store,

10:38:31  3   resetting schematics.

10:38:32  4      Q.  Was there a store manager in the store when you

10:38:35  5   were there doing that work?

10:38:36  6      A.  Yes, sir.

10:38:37  7      Q.  While you were there throwing freight, cleaning

10:38:40  8   up, setting schematics, were there other store managers

10:38:43  9   also doing those same things?

10:38:46  10     A.  Yes, sir.

10:38:47  11             THE COURT:  Why did you go to these other

10:38:49  12  stores?

10:38:49  13             THE WITNESS:  It was the district manager's

10:38:52  14  request.

10:38:53  15             THE COURT:  And could you have declined the

10:38:55  16  request?

10:38:55  17             THE WITNESS:  I probably could have

10:38:57  18  declined, but I don't think it would have been in the

10:38:59  19  interest of my job.

10:39:03  20             THE COURT:  When you were hired or promoted

10:39:04  21  to the position of store manager, was it your

10:39:07  22  understanding from time to time, notwithstanding your

10:39:10  23  official position as store manager, that you would be

10:39:13  24  called on or asked to volunteer to work in other stores,

10:39:16  25  essentially as a laborer?

10:39:17   1            THE WITNESS:  No.

10:39:20   2        Q.  When you were off being a laborer in these other

10:39:23   3    stores, were you supervising anybody?

10:39:25   4        A.  No, sir.

10:39:26   5        Q.  And who was running the store that you were

10:39:28   6    assigned to permanently while you were off doing this?

10:39:31   7        A.  My assistant managers.

10:39:32   8        Q.  You know why you and the other store managers

10:39:34   9    were sent to do this laborer job instead of sending

10:39:39   10   assistant managers or clerks or cashiers?

10:39:40   11       A.  Because we were free labor.

10:39:42   12       Q.  When you were placed -- excuse me, hired as a

10:39:45   13   store manager, what was your agreement with Family

10:39:47   14   Dollar as to the number of hours you would work?

10:39:49   15       A.  When I was first hired, it was to be 48 hours a

10:39:53   16   week.

10:39:53   17       Q.  And who told you that?

10:39:55   18       A.  My district manager.

10:39:56   19       Q.  Did that change during your employment as to --

10:39:59   20   were you ever told that would change, the number of

10:40:02   21   hours would be something different?

10:40:04   22       A.  At one point, I was told it changed to 52.

10:40:07   23       Q.  Who informed you of that?

10:40:09   24       A.  District manager.

10:40:10   25       Q.  Did your salary increase at all when your

10:40:13  1   *agreement with Family Dollar changed from 48 to 52*

10:40:16  2   *hours?*

10:40:16  3       A.  *No.*

10:40:16  4       Q.  *What was your understanding as to your*

10:40:18  5   *compensation for those 48 hours and then later 52?*

10:40:21  6       A.  *I would receive a weekly salary and potential*

10:40:25  7   *bonuses.*

10:40:25  8       Q.  *Does your store have a payroll budget?*

10:40:27  9       A.  *Yes, sir.*

10:40:27  10      Q.  *Who set the payroll budget?*

10:40:29  11      A.  *The corporate office.*

10:40:29  12      Q.  *Did you, as an individual holding the title of*

10:40:42  13  *store manager, have any input in the setting of the*

10:40:46  14  *payroll budget?*

10:40:46  15      A.  *No, sir.*

10:40:47  16      Q.  *There was a little talk yesterday about the*

10:40:53  17  *budget.  Will you explain to me what a payroll budget is*

10:40:58  18  *and what it controls?*

10:40:58  19      A.  *The corporate office gave us a number of dollars*

10:41:01  20  *to spend on the store.  Once we subtracted what the*

10:41:04  21  *store manager was paid, then we subtracted what the*

10:41:07  22  *assistant managers were paid.  The remaining dollars*

10:41:11  23  *were divided among the salary of the hourly employees.*

10:41:13  24      Q.  *Did the amount of your payroll budget affect the*

10:41:16  25  *number of hours you had to work?*

10:41:17   1    A.   Yes.

10:41:18   2    Q.   How was that?

10:41:19   3    A.   There wasn't enough payroll dollars to man the

10:41:23   4    store properly.

10:41:24   5    Q.   If you don't have enough hours left over to man

10:41:27   6    the store, could you, as store manager, put other hourly

10:41:31   7    employees in the store to help you?

10:41:33   8    A.   No, sir.

10:41:36   9    Q.   Who had to man the store and do the work if you

10:41:39   10   didn't have the payroll?

10:41:40   11   A.   Myself.

10:41:41   12   Q.   From 1999 until you left in 2003, what would you

10:41:45   13   say is the average number of hours you worked a week?

10:41:49   14   A.   Between 65 and 70.

10:41:52   15   Q.   Why, Mr. Detter, did you work those extra hours

10:41:55   16   if you're told by your district manager when you got the

10:41:58   17   job that you only had to work 48 and they later told you

10:42:03   18   you were required to work 52, why did you work the rest

10:42:08   19   of the hours?

10:42:09   20        MR. R. WIGGINS:   There was an objection.   It

10:42:11   21   was overruled.

10:42:12   22   A.   Needed to maintain standards and I needed to keep

10:42:15   23   my job.

10:42:15   24   Q.   Did you have anything else that you could have

10:42:17   25   been doing, other than working --

10:42:19  1          MR. MAY:  Your Honor, I object to reading

10:42:21  2     the question.  The objection was sustained, and I don't

10:42:23  3     want that answer out there.  I think you sustained the

10:42:25  4     objection.

10:42:26  5          MR. R. WIGGINS:  All right.  I didn't see

10:42:28  6     that.

10:42:28  7          THE COURT:  All right.  Objection is

10:42:29  8     sustained.

10:42:30  9          MR. R. WIGGINS:  20.  Next question.

10:42:31 10     Q.  *Let me show you an exhibit that was entered*

10:42:33 11     *yesterday.  Exhibit 10, entitled Essential Job Function*

10:42:38 12     *of the Store Manager.*

10:42:41 13          MR. R. WIGGINS:  Let's get the correct

10:42:42 14     number.  What is the Store Manager, Exhibit Number,

10:42:46 15     Essential Job Functions; do you know?

10:42:50 16          MR. QUINN:  6.

10:42:51 17          MR. JOHNSON:  6.

10:42:52 18          MR. R. WIGGINS:  What we're referring to as

10:42:55 19     Exhibit 10 is Exhibit 6 in this trial.  I would like to

10:42:58 20     substitute that, Your Honor, and I'm going to ask the

10:43:00 21     question --

10:43:01 22          MR. MAY:  Objection.

10:43:02 23          MR. R. WIGGINS:  I'm going to ask the

10:43:03 24     question with the right exhibit number.  Line 20.

10:43:05 25     Q.  *Let me show you an exhibit that was entered*

10:43:08   1    *yesterday, Exhibit 6, entitled Essential Job Functions*

10:43:12   2    *of the store manager.  There was some discussion of this*

10:43:14   3    *yesterday.  I want to talk about a couple of things on*

10:43:18   4    *the page.  Have you seen this document, Mr. Detter?*

10:43:23   5        *A.  Yes.*

10:43:23   6        *Q.  Let's look at number 8, if you would.  'Read' --*

10:43:33   7    *quote, 'read, plan, and stock schematics for proper*

10:43:39   8    *merchandise,' end quote.  Can you tell me what that*

10:43:42   9    *entailed?*

10:43:42   10       *A.  The corporate office sent schematics for the*

10:43:45   11   *store.  We had to be able to read that schematic and put*

10:43:48   12   *it into place in the store.*

10:43:50   13       *Q.  Mr. Kallon wanted me to ask it, so I will.  When?*

10:43:55   14   *Do you recall when you saw this?*

10:43:57   15       *A.  I don't recall the first time, no.*

10:43:59   16       *Q.  Look at -- there was some talk about some of the*

10:44:03   17   *ones yesterday, but I don't think we really discussed*

10:44:05   18   *the essential job functions listed, number 10, and the*

10:44:09   19   *subparts under that.*

10:44:11   20       *Were the essential job functions of a store*

10:44:13   21   *manager to ring up sales on the cash register?*

10:44:16   22       *A.  Yes, sir.*

10:44:16   23       *Q.  Were your essential job functions under store*

10:44:21   24   *manager --*

10:44:21   25            MR. MAY:  There's an objection there,

10:44:23   1    Mr. Wiggins.  A few lines down, it's sustained.

10:44:29   2                THE COURT:  Was it sustained?

10:44:32   3                MR. MAY:  16, I think.  It looks like 16 is

10:44:37   4    also sustained.

10:44:38   5                MR. R. WIGGINS:  Well, Your Honor, there was

10:44:40   6    an answer, and then there was an objection.

10:44:42   7                THE COURT:  Did I sustain the objection?

10:44:45   8                MR. MAY:  Yes, sir.

10:44:45   9                THE COURT:  Then don't answer the question.

10:44:48   10               MR. R. WIGGINS:  There was no motion to

10:44:49   11   exclude, but I'll move on.

10:44:51   12      Q.  *Look at the six bullet points here, Mr. Detter.*

10:44:54   13   *Were these bullet points and the things identified as an*

10:44:56   14   *Essential Job Function, in fact, an essential job*

10:44:59   15   *function for the store manager?*

10:45:06   16               MR. R. WIGGINS:  And it was sustained.

10:45:07   17   Mr. Calamusa then asked:

10:45:10   18      Q.  *Do the bullet points in this document,*

10:45:13   19   *defendant's document entitled Essential Job Functions,*

10:45:17   20   *set forth the job duties?*

10:45:18   21      A.  *Yes, sir.*

10:45:19   22      Q.  *Look over on Page 2.  The bullet point at the top*

10:45:23   23   *of the page.  Are those essential job functions of the*

10:45:26   24   *store manager?*

10:45:27   25      A.  *Yes, sir.*

10:45:28  1      Q.  *The section on Page 2 under number 11 where it*

10:45:32  2  *says, quote, 'work as a stock clerk,' end quote.  The*

10:45:37  3  *eight bullet points on this Essential Job Functions, are*

10:45:42  4  *those, in fact, the essential job functions of the store*

10:45:45  5  *manager?*

10:45:45  6      A.  *Yes, sir.*

10:45:45  7      Q.  *If you would turn over to Page 4 in the section*

10:45:49  8  *'Physical Activity'.  That's quotes around that word.*

10:45:54  9  *Did the job of store manager require climbing*

10:45:56  10  *frequently?*

10:45:57  11      A.  *Yes.*

10:45:57  12      Q.  *Stooping frequently?*

10:45:59  13      A.  *Yes.*

10:46:00  14          MR. MAY:  And there's a sustained objection

10:46:02  15  again, Bob.

10:46:03  16          MR. R. WIGGINS:  Okay.  Question, line 3,

10:46:06  17  page 15.

10:46:07  18      Q.  *'Walking and' -- there is quotes around this --*

10:46:10  19  *'walking and lifting', Mr. Detter.  Are those essential*

10:46:14  20  *job functions as a store manager?*

10:46:17  21      A.  *Yes, sir.*

10:46:17  22      Q.  *The defendant's document of Essential Job*

10:46:21  23  *Functions identifies the amount of time the physical*

10:46:25  24  *activities and physical demands would take by a store*

10:46:29  25  *manager.  Do you believe that those are accurate, the*

10:46:31  1  ones we're talking about?"

10:46:36  2        MR. R. WIGGINS:   There was an objection

10:46:36  3  interposed.   The Court then said:   *Well, rephrase your*

10:46:40  4  *question.*

10:46:41  5     Q.   *Are they accurate?*

10:46:41  6     A.   *Yes.*

10:46:42  7     Q.   *Tell me, if you would, Mr. Detter, what your*

10:46:46  8  *actual job duties were as a store manager.*

10:46:49  9     A.   *I unloaded trucks.   I stocked shelves.   I ran*

10:46:53  10 *registers.   I swept floors.   I cleaned bathrooms.   I set*

10:46:57  11 *schematics, changed light bulbs.*

10:46:59  12    Q.   *How often would your district manager visit you*

10:47:03  13 *at your store?*

10:47:03  14    A.   *About once every two weeks.*

10:47:05  15    Q.   *And how often did you speak -- communicate with*

10:47:08  16 *your district manager either over the phone or email?*

10:47:11  17    A.   *Basically, daily basis.*

10:47:15  18    Q.   *Did you receive assignments from the district*

10:47:18  19 *manager or even corporate via these emails?*

10:47:21  20    A.   *Yes, sir.*

10:47:22  21    Q.   *I guess I asked how often you communicated --*

10:47:25  22 *well, strike that.   Did you receive emails from the*

10:47:28  23 *corporate office?*

10:47:28  24    A.   *Yes, sir.*

10:47:28  25    Q.   *Tell me what emails from the corporate"* --

10:47:31  1          MR. R. WIGGINS:  I'm sorry.  I misread that.

10:47:33  2  Start over.

10:47:34  3     Q.  *Tell me what the emails from the -- that you*

10:47:38  4  *would receive from the DM or the corporate office would*

10:47:40  5  *entail.*

10:47:40  6     A.  *They normally dealt with company policies,*

10:47:46  7  *procedures, upcoming events, projects they wanted*

10:47:50  8  *accomplished in the stores.*

10:47:52  9          MR. R. WIGGINS:  Then there's a colloquy

10:47:53  10  with the Court, which goes on.  *Is there anything in the*

10:47:57  11  *exhibit -- 17, 18.*  All right.  Then question page 18,

10:48:06  12  line 7.

10:48:07  13     Q.  *If you would, Mr. Detter, look at the document I*

10:48:11  14  *was giving you, which is Plaintiffs' Number 136 -- which*

10:48:13  15  *in this case is Number 10 -- did you receive this*

10:48:17  16  *document while you were store manager?*

10:48:18  17     A.  *Yes, sir.*

10:48:21  18          MR. R. WIGGINS:  Plaintiffs offer Exhibit

10:48:23  19  110 -- I mean number 10.  We're going to skip that.

10:48:29  20  "All right."  The Court asked a question then, line 15.

10:48:35  21          THE COURT:  *And from what -- and from whom*

10:48:38  22  *-- how did you receive it?*

10:48:40  23     A.  *This came down as -- over the PC.*

10:48:43  24     Q.  *What's the PC?*

10:48:44  25     A.  *The personal computer in the offices, and email.*

10:48:50   1      Q.   *You got it while you were in the office as*
10:48:52   2   *assistant manager?*
10:48:52   3      A.   *Yes, sir.*
10:48:52   4      Q.   *All right.*
10:48:53   5           THE COURT:   It's received in evidence.   May
10:48:55   6   be published to the jury.
10:48:56   7      Q.   *Mr. Detter, who is this email from?*
10:49:00   8      A.   *It came from a Ben Spratlin, forwarded from Bruce*
10:49:05   9   *Barkus.*
10:49:06   10     Q.   *Who is Bruce Barkus?*
10:49:07   11     A.   *He was senior vice-president of Store Operations.*
10:49:10   12     Q.   *I want you to look at the first paragraph, third*
10:49:13   13   *line, starts with 'I' -- way over here -- and if you*
10:49:17   14   *would, would you read that?*
10:49:18   15     A.   *'I want to remind you that it is policy of Family*
10:49:24   16   *Dollar that district managers interview all assistant*
10:49:27   17   *manager candidates, whether newly hired or internal*
10:49:30   18   *promotion candidates.'*
10:49:32   19     Q.   *All right.*
10:49:32   20           MR. R. WIGGINS:   And for the record, there
10:49:34   21   were quotes around that; right?
10:49:35   22           MR. WHITFIELD:   Right.
10:49:36   23           MR. R. WIGGINS:   Then next question, the
10:49:38   24   next paragraph, the next sentence.
10:49:40   25     A.   *Quote, 'the purpose of this memo is to restate*

10:49:44 1    *this policy so everyone fully understands,' end quote.*

10:49:47 2        Q.   *If you would read one more sentence.*

10:49:50 3        A.   *Quote, 'any store manager, assistant manager, or*

10:49:52 4    *any other associate whom the store manager is*

10:49:55 5    *recommending to carry keys to a Family Dollar Store must*

10:49:59 6    *be approved in person by a district manager prior to*

10:50:02 7    *being hired, promoted, and/or given store keys,' end*

10:50:06 8    *quote.*

10:50:06 9        Q.   *What does Mr. Barkus say will happen if not?  The*

10:50:12 10   *next sentence.*

10:50:12 11       A.   *Quote, 'violation of this policy is a serious*

10:50:17 12   *infraction and may result in disciplinary action, up to*

10:50:20 13   *and including possible termination,' end quote.*

10:50:23 14       Q.   *And the time you were a store manager and held*

10:50:27 15   *that title, did you understand this to be the company*

10:50:29 16   *policy?*

10:50:30 17       A.   *Yes, sir.*

10:50:31 18       Q.   *And did you understand that a violation of this*

10:50:35 19   *policy could result in disciplinary action up to and*

10:50:38 20   *including termination?*

10:50:40 21       A.   *Yes, sir.*

10:50:42 22       Q.   *Did you, Mr. Detter, have the authority to hire*

10:50:45 23   *employees on your own?*

10:50:47 24       A.   *No, sir.*

10:50:47 25       Q.   *Did you -- could you interview employees?*

10:50:51  1      A.  Yes, sir.

10:50:52  2              THE COURT:  Well, actually, you had the

10:50:54  3      authority to interview employees and actually hire them,

10:51:00  4      but you had to get the approval of the district manager

10:51:02  5      before the hiring could be completed; correct?

10:51:05  6              THE WITNESS:  Correct.

10:51:08  7              THE COURT:  All right.  Put another way:

10:51:10  8      You couldn't simply interview a candidate, make sure

10:51:13  9      that the candidate's applications were all in order, and

10:51:16  10     then give the job to that candidate before you talked to

10:51:19  11     the district manager?

10:51:20  12             THE WITNESS:  No, sir, I could not.

10:51:22  13             THE COURT:  All right.

10:51:23  14     BY MR. CALAMUSA:

10:51:25  15     Q.  Did you have to give the district managers -- did

10:51:32  16     any candidate which you interviewed have to be pre-

10:51:35  17     approved in person by the district manager as this

10:51:37  18     document states?

10:51:39  19     A.  Yes, sir.

10:51:41  20             THE COURT:  The candidate, you couldn't

10:51:44  21     interview the candidate before you got the approval of

10:51:54  22     the district manager?

10:51:54  23             THE WITNESS:  For an assistant manager

10:51:54  24     position?

10:51:54  25             THE COURT:  You could not interview an

10:51:54  1   *assistant manager candidate without the prior approval*

10:51:54  2   *of the district manager?*

10:51:56  3            *THE WITNESS:  Correct.*

10:51:57  4            *THE COURT:  All right.*

10:51:58  5   *BY MR. CALAMUSA:*

10:51:59  6      *Q.  Let's talk about cashiers for a minute.  You did*

10:52:04  7   *interview cashiers?*

10:52:05  8      *A.  Yes, sir.*

10:52:06  9      *Q.  Who, other than yourself in the store, would*

10:52:09  10  *interview and make recommendations on cashiers?*

10:52:12  11     *A.  The assistant managers.*

10:52:14  12     *Q.  When assistant managers would interview and make*

10:52:20  13  *these recommendations, were you always present in those*

10:52:23  14  *interviews and involved in those recommendations?*

10:52:26  15     *A.  No, sir.*

10:52:27  16     *Q.  Were there occasions which you interviewed*

10:52:31  17  *candidates and recommended to the district manager and*

10:52:32  18  *the district manager did not accept your recommendation?*

10:52:35  19     *A.  Yes, sir.*

10:52:36  20     *Q.  Did you have any authority to promote anyone?*

10:52:38  21     *A.  No, sir.*

10:52:41  22            *THE COURT:  Well, again, did you have the*

10:52:43  23  *authority to recommend that the employee be promoted,*

10:52:46  24  *but before the promotion could be effective -- go into*

10:52:49  25  *effect, you had to get the approval of the district*

10:52:51  1   manager; is that correct?

10:52:52  2              THE WITNESS:  Correct.

10:52:54  3   BY MR. CALAMUSA:

10:52:55  4      Q.  Were there instances in which you made

10:52:57  5   recommendations, either for or against someone being

10:53:01  6   promoted, and the district manager didn't follow it?

10:53:04  7      A.  Yes, sir.

10:53:04  8      Q.  Terminating somebody.  Could you, as the

10:53:08  9   individual holding the title of a store manager,

10:53:12  10  terminate an employee in your store without getting the

10:53:14  11  district manager's approval?

10:53:15  12     A.  No, sir.

10:53:16  13     Q.  Was there occasion -- I'm sorry.  Was there an

10:53:22  14  occasion in which you wanted to terminate someone?

10:53:24  15     A.  Several.

10:53:26  16     Q.  Tell me about one of those.

10:53:28  17     A.  One of those involved an assistant manager that I

10:53:31  18  caught stealing.  I notified the district manager,

10:53:34  19  requested that I be allowed to terminate that associate.

10:53:37  20  He informed me that I needed to put them back to work,

10:53:41  21  so I did.

10:53:42  22             THE COURT:  When was this?

10:53:43  23             THE WITNESS:  2000, I believe.  Sometime

10:53:46  24  during the year 2000.

10:53:48  25             THE COURT:  And what was the name of the

10:53:50   1   *assistant manager?*

10:53:50   2              *THE WITNESS:  I can't recall the last name,*

10:53:53   3   *first name was Chris.*

10:53:56   4              *THE COURT:  Do you recall the name of your*

10:53:57   5   *district manager at the time?*

10:53:58   6              *THE WITNESS:  Bob Russell.*

10:54:00   7              *THE COURT:  All right.*

10:54:01   8   *BY MR. CALAMUSA:*

10:54:02   9      *Q.  And did you put that gentleman back to work?*

10:54:07  10      *A.  Yes, sir.*

10:54:07  11      *Q.  And were asked, or did you give an opinion as to*

10:54:11  12   *whether or not the person should be promoted later on?*

10:54:13  13      *A.  Yes.  I asked if they were ready for promotion*

10:54:19  14   *and I informed the district manager, no.*

10:54:22  15      *Q.  Was that individual promoted despite your*

10:54:24  16   *objection?*

10:54:25  17      *A.  Yes, sir.*

10:54:26  18      *Q.  Do you know what happened to that individual?*

10:54:30  19      *A.  They were promoted to store manager; and three*

10:54:33  20   *months later, terminated for theft.*

10:54:35  21      *Q.  Did you have any authority to give anybody -- or,*

10:54:41  22   *excuse me -- did you give any authority to decide*

10:54:44  23   *starting salary?*

10:54:44  24      *A.  No, sir.*

10:54:45  25      *Q.  Could you give employees, within the store that*

10:54:47   1   *you worked, warnings for discipline without seeking*

10:54:51   2   *district manager approval?*

10:54:52   3       A.   *Not without DM approval.*

10:54:54   4       Q.   *Was there an occasion when you wanted to give one*

10:54:57   5   *of your employees in your store a written reprimand, and*

10:55:00   6   *you had to go to the district manager and he denied it?*

10:55:03   7       A.   *Several.*

10:55:04   8       Q.   *Who determined the number of hours in which your*

10:55:07   9   *hourly employees worked?*

10:55:08   10      A.   *That came from corporate.*

10:55:10   11      Q.   *And how did it come down from corporate?*

10:55:13   12      A.   *Via the staff scheduler order.*

10:55:18   13      Q.   *I think it was discussed a little bit yesterday,*

10:55:20   14  *but I want to make sure --*

10:55:27   15              MR. R. WIGGINS:   The Court took a recess.

10:55:29   16  And then came back and says:   *"Continue direct*

10:55:32   17  *examination of the witness."*   Mr. Calamusa then asked:

10:55:34   18      Q.   *I believe you were going to tell us about the*

10:55:36   19  *staff scheduler.   Will you describe for us what that is*

10:55:40   20  *and what that term means?*

10:55:42   21      A.   *It's a computer-generated schedule that came down*

10:55:45   22  *from the corporate office instructing the manager how to*

10:55:48   23  *schedule the employees in the store.*

10:55:53   24              MR. R. WIGGINS:   Try to keep your voice up

10:55:54   25  there.   You're trailing off.

10:55:56   1      Q.   Help us understand if you have lived with it.

10:55:58   2   What do you mean instruct you how to schedule your

10:56:02   3   employees in the store?

10:56:03   4      A.   Came down with the listing of manager, assistant

10:56:06   5   manager, A and B, cashiers, A, B, C; listed total number

10:56:13   6   of hours for each of those employees, and how much hours

10:56:17   7   each day they could work.

10:56:18   8      Q.   After you took out your hours and had the

10:56:21   9   assistant managers, identify the day in which the hourly

10:56:25   10  employees could work, and the number of hours for that

10:56:28   11  day?

10:56:28   12     A.   Yes, sir.

10:56:29   13     Q.   Did you have any input into setting the days in

10:56:33   14  which your employees would work and the number of hours?

10:56:36   15     A.   No, sir.

10:56:36   16     Q.   If the staff scheduler came down and gave you a

10:56:41   17  cashier on Monday and somebody else in a different time

10:56:44   18  on Monday and you thought it would be better to have

10:56:47   19  them on Friday, could you make that change?

10:56:50   20     A.   Not without district manager approval.

10:56:53   21     Q.   Did you have a copy of the store policy manuals?

10:56:57   22     A.   Yes, sir.

10:56:57   23     Q.   I want you to look at Exhibit 2, Page number 50.

10:57:02   24  If you would look at -- let me get the right exhibit --

10:57:07   25  in your opinion, number --

10:57:24  1          MR. R. WIGGINS:  All right.  We think this

10:57:25  2  exhibit hasn't changed, but we'll be corrected if we're

10:57:29  3  wrong.  Line 21.

10:57:32  4    Q.  *And I want you to look at Exhibit 2, Page 50.  If*

10:57:35  5  *you would look at the page entitled 'Store Standard,*

10:57:36  6  *General Operating Policy', which the bottom has D00050.*

10:57:42  7  *Do you see that page?*

10:57:43  8    A.  *Yes, sir.*

10:57:44  9    Q.  *If you would --*

10:57:48  10          THE COURT:  *Does the jury have a copy of*

10:57:50  11  *this?  I believe so.  All right.*

10:57:56  12    Q.  *If you would, look at the fifth paragraph down*

10:58:00  13  *and read that for me, please.*

10:58:01  14    A.  *Where it's members of the management team?*

10:58:11  15          MR. R. WIGGINS:  I'm told that exhibit is

10:58:12  16  actually Exhibit 1 in this trial.  I apologize.  Where

10:58:17  17  did I leave off?

10:58:21  18          MR. WHITFIELD:  Line 10.

10:58:22  19          MR. R. WIGGINS:  10?

10:58:23  20          MR. WHITFIELD:  Yeah.  On 27.

10:58:28  21    Q.  *If you would, look at the fifth paragraph down*

10:58:30  22  *and read that for me, please.*

10:58:32  23    A.  *Where it's 'members of the management team'?*

10:58:34  24    Q.  *Yes, sir.*

10:58:35  25    A.  *Quote, 'members of the management team are:*

10:58:39  1  *Store manager, associate manager, assistant manager,*

10:58:43  2  *floor supervisor, and in some cases, a third key*

10:58:47  3  *person.'*

10:58:47  4  Q.  *Did you understand that this was Family Dollar's*

10:58:50  5  *definition of the members of the management?*

10:58:52  6  A.  *Yes, sir.*

10:58:52  7  Q.  *You held that title as store manager; correct?*

10:58:55  8  A.  *Correct.*

10:58:55  9  Q.  *You were paid a salary; correct?*

10:58:57  10  A.  *Correct.*

10:58:58  11  Q.  *Did you ever have an associate manager?*

10:59:00  12  A.  *No, sir.*

10:59:01  13  Q.  *Assistant managers, how were they paid?*

10:59:03  14  A.  *Hourly.*

10:59:03  15  Q.  *Floor supervisor, how were they paid?*

10:59:06  16  A.  *Hourly.*

10:59:06  17  Q.  *And third key person, how were they paid?*

10:59:09  18  A.  *Hourly.*

10:59:09  19  Q.  *If you would, Mr. Detter, turn to Page 95.  The*

10:59:14  20  *bottom will say D95.  At the top, quote, 'Store*

10:59:18  21  *Recovery,' end quote.  If you would read under 'Store*

10:59:21  22  *Recovery', would you read that first paragraph?*

10:59:23  23  A.  *Quote, 'it's every employee's responsibility to*

10:59:29  24  *assist in maintaining a clean and inviting shopping*

10:59:31  25  *environment for the customer.'*

10:59:32  1    Q.  *That's your understanding as a store manager of*
10:59:34  2  *what Family Dollar policy was as his responsibility, it*
10:59:39  3  *was to maintain a clean and inviting shopping*
10:59:43  4  *environment?*
10:59:43  5    A.  *Yes, sir.*
10:59:44  6    Q.  *Look at another page in the policy manual, 311.*
10:59:48  7  *Actually, before 311, let's go to 325 first, under*
10:59:52  8  *'Petty Cash'.  That's the fourth paragraph.  In order to*
10:59:55  9  *increase the petty cash in the store, what did that*
10:59:58  10  *require, Mr. Detter?*
10:59:59  11    A.  *It required the district manager's approval,*
11:00:02  12  *regional vice-president's approval, and notification to*
11:00:06  13  *the cash and sales department.*
11:00:07  14    Q.  *And then the next paragraph, quote, 'store*
11:00:10  15  *manager's accountability.'  We heard some talk of*
11:00:14  16  *accountability yesterday.  What is the first sentence*
11:00:17  17  *under -- in the store policy manual regarding*
11:00:20  18  *accountability setting?*
11:00:22  19    A.  *Quote, 'the store manager, assistant manager,*
11:00:25  20  *and/or floor supervisor are accountable for petty cash.'*
11:00:29  21    Q.  *End quote.  What was your understanding as to*
11:00:34  22  *Family Dollar's policy as to who was accountable?*
11:00:37  23    A.  *Yes, sir.*
11:00:37  24    Q.  *I misread that, I'm sorry.  Was that your*
11:00:40  25  *understanding as to Family Dollar's policy as to who was*

11:00:43  1   *accountable?*

11:00:44  2       A.  *Yes, sir.*

11:00:44  3       Q.  *Go to 311, please, document entitled 'Office*

11:00:48  4   *Procedures, Office Schematic.'  First, let me ask you*

11:00:51  5   *this:  There have been talks of schematics.  What is a*

11:00:53  6   *schematic?*

11:00:53  7       A.  *A schematic is a layout of a section of the store*

11:00:58  8   *that has shelf tags, location of product, spacing of the*

11:01:02  9   *product, and a description of the product itself.*

11:01:04  10      Q.  *Could you, as the individual holding this title*

11:01:07  11  *of store management, decide where you wanted to put*

11:01:10  12  *product in your store?*

11:01:11  13      A.  *No, sir.*

11:01:11  14      Q.  *Who made that decision?*

11:01:12  15      A.  *That came from the corporate office.*

11:01:14  16      Q.  *Could you as store manager decide what items to*

11:01:17  17  *display and where?*

11:01:18  18      A.  *No, sir.*

11:01:18  19      Q.  *It's summertime, Mr. Detter.  As store manager,*

11:01:24  20  *could you decide, hey, I think I'm going to sell more*

11:01:28  21  *suntan lotion, and put a display of suntan lotion right*

11:01:33  22  *when the people walk in the store?*

11:01:34  23      A.  *No, sir.*

11:01:34  24      Q.  *This is an office schematic.  Explain to me what*

11:01:38  25  *that is.*

11:01:38   1    A.   *Again, it's a schematic much as on the sales*

11:01:44   2    *floor.  But this pertained to the office of the store,*

11:01:47   3    *told us how to set up the file cabinets, where different*

11:01:50   4    *books went, different manuals went, different papers*

11:01:52   5    *went, as far as to tell us where to put the supplies*

11:01:55   6    *that we use in our office.*

11:01:57   7    Q.   *The last sentence under 'desk top', would you*

11:02:00   8    *read that for me?*

11:02:00   9    A.   *Quote, 'under no circumstances should store*

11:02:04   10   *supplies, merchandise, food and drink, or any other non-*

11:02:09   11   *office related items be placed on the desk top,' end*

11:02:12   12   *quote.*

11:02:12   13   Q.   *Could you as the individual holding this title of*

11:02:16   14   *store manager deviate in any way from this office*

11:02:21   15   *schematic?*

11:02:21   16   A.   *No, sir.*

11:02:21   17   Q.   *Did you as the individual holding the title of*

11:02:24   18   *store manager ever get reprimanded or counseled*

11:02:27   19   *regarding the office schematic?*

11:02:28   20   A.   *Not actually reprimanded.  But I was informed*

11:02:31   21   *that -- that I had the wrong type of container on the*

11:02:35   22   *desk for my paper clips, rubber bands, and ball point*

11:02:40   23   *pens.*

11:02:40   24   Q.   *The container, tell us what you mean container.*

11:02:43   25   A.   *I just had a little plastic -- had several that*

11:02:50  1   were lined up on the desk that held my supplies.

11:02:51  2       Q.   And who came in and told you you had the wrong

11:02:53  3   type of container to hold your pens and paper clips?

11:02:56  4       A.   The district manager.

11:02:57  5       Q.   Did you have to change it?

11:02:59  6       A.   He threw the old ones away and went to the shelf

11:03:03  7   in the store and brought back some new containers and

11:03:06  8   placed them on the desk.

11:03:07  9       Q.   How much -- what percentage of time would you

11:03:10  10  say, Mr. Detter, that you spent on unloading trucks,

11:03:13  11  stocking the shelves, running the cash register,

11:03:17  12  cleaning the floors, cleaning the bathrooms in the

11:03:21  13  store?

11:03:21  14      A.   90 percent.

11:03:22  15      Q.   You held the title store manager.  Why did you

11:03:26  16  not simply hire more employees or place more employees

11:03:29  17  in the store to help you do some of this manual labor?

11:03:32  18      A.   I didn't have the authority to hire them and I

11:03:35  19  didn't have the payroll to hire them.

11:03:37  20      Q.   Did you do evaluations?  Did you fill out

11:03:40  21  evaluations on employees in your store?

11:03:41  22      A.   I assisted with those evaluations.

11:03:44  23      Q.   Who also assisted you with the evaluations?

11:03:47  24      A.   For the cashiers, my assistant managers.

11:03:50  25      Q.   Did you have final approval as to those

11:03:52  1   *evaluations?*

11:03:53  2       A.   *No, sir.*

11:03:54  3       Q.   *Who did?*

11:03:55  4       A.   *The district manager.*

11:03:56  5       Q.   *Were there any occasions in which you handled*

11:03:59  6   *evaluations on the employees that were within your store*

11:04:05  7   *to the district manager and he or she changed those*

11:04:08  8   *evaluations?*

11:04:09  9       A.   *Yes, sir.*

11:04:10  10      Q.   *How often did that happen?*

11:04:11  11      A.   *During the time frame we're talking, no more than*

11:04:16  12  *two or four times.*

11:04:17  13      Q.   *You said that when you were hired, you were told*

11:04:20  14  *that you would get a salary, plus be eligible for bonus?*

11:04:23  15      A.   *Correct.*

11:04:24  16      Q.   *In the years in which we're talking about, 1999*

11:04:28  17  *until you left in 2003, were there times when you got no*

11:04:31  18  *bonus?*

11:04:32  19      A.   *Yes, sir.*

11:04:32  20      Q.   *And were there times when you did?*

11:04:34  21      A.   *Other times that I did.*

11:04:35  22      Q.   *You had assistants in your store?*

11:04:37  23      A.   *Yes, sir.*

11:04:38  24      Q.   *Did the job duties of the assistant vary in any*

11:04:41  25  *way in your job duties?*

11:04:42  1      A.   No, sir.

11:04:43  2      Q.   Were you responsible -- or let me ask this:  Your

11:04:47  3  store, was it also known as a training store for a

11:04:49  4  period of time?

11:04:50  5      A.   Yes, sir.

11:04:50  6      Q.   Tell me what that is.

11:04:53  7      A.   The district manager would send me potential

11:04:56  8  store managers that were to be trained, learn how to do

11:04:59  9  Family Dollar operations at my store.

11:05:02  10     Q.   When a new potential store manager would come to

11:05:05  11  your store, what was the first thing that you would

11:05:07  12  train them on?

11:05:07  13     A.   How to unload a truck.

11:05:09  14     Q.   What was the next thing you trained them on?

11:05:11  15     A.   How to put the freight on the shelf.

11:05:13  16     Q.   So the first two things that you would train

11:05:21  17  those soon-to-be store managers was unloading the truck

11:05:23  18  and stocking the shelves?

11:05:25  19     A.   Yes, sir.

11:05:25  20     Q.   Thank you, Mr. Detter.  That's all I have."

11:05:29  21            THE COURT:  Anything further of this

11:05:32  22  witness?

11:05:33  23            MR. MAY:  Nothing for this witness, Your

11:05:34  24  Honor.

11:05:34  25            THE COURT:  All right.  Any other evidence

```
11:05:37   1    in the case?

11:05:39   2              MR. ST. CLAIR:  Yes, Your Honor.  We have

11:05:41   3    the deposition excerpts.

11:05:43   4              THE COURT:  Pardon me?  Well, there's no

11:05:45   5    other witness to be called, is there?

11:05:48   6              MR. G. WIGGINS:  No, sir.

11:05:49   7              MR. R. WIGGINS:  Plaintiffs have no live

11:05:51   8    witnesses, Your Honor.

11:05:51   9              THE COURT:  All right.  It's 11:00 o'clock.

11:06:00  10         Ladies and gentlemen, there are a number of

11:06:03  11    things we have to do in your absence.  You will have a

11:06:07  12    long lunch break today.  When you come back at 1:00,

11:06:10  13    we'll begin the closing arguments, so you should be able

11:06:14  14    to begin your deliberations before the day is over.

11:06:18  15              You will be in recess until 1:00 o'clock.

11:06:21  16    Please do not discuss the case among yourselves or

11:06:24  17    anyone else.  Do not allow it to be discussed in your

11:06:26  18    presence.  And keep an open mind.

11:07:02  19              (Jury excused for lunch at 11:07 a.m.)

11:07:02  20              THE COURT:  All right.  Any other evidence?

11:07:07  21              MR. ST. CLAIR:  Your Honor, the evidence we

11:07:08  22    have are the deposition excerpts that's the Defendant's

11:07:14  23    Exhibit 2355.

11:07:16  24              THE COURT:  All right.

11:07:21  25              MR. JOHNSON:  And, Your Honor, we have
```

| | | |
|---|---|---|
| 11:07:22 | 1 | rebuttal. |
| 11:07:23 | 2 | THE COURT:  They are received in evidence. |
| 11:07:25 | 3 | And Plaintiffs' Exhibits -- |
| 11:07:27 | 4 | MR. JOHNSON:  295, Your Honor. |
| 11:07:29 | 5 | MR. ST. CLAIR:  Now, are these excerpts from |
| 11:07:31 | 6 | the same plaintiffs? |
| 11:07:33 | 7 | MR. JOHNSON:  Yes. |
| 11:07:35 | 8 | THE COURT:  Plaintiffs' Exhibit 295 is |
| 11:07:37 | 9 | received in evidence. |
| 11:07:42 | 10 | MR. JOHNSON:  And we have a copy for the |
| 11:07:43 | 11 | jury, Your Honor. |
| 11:07:44 | 12 | THE COURT:  All right. |
| 11:07:45 | 13 | MR. ST. CLAIR:  As we do as well, Your |
| 11:07:47 | 14 | Honor. |
| 11:08:01 | 15 | Your Honor, many trees have given their life |
| 11:08:04 | 16 | for this case. |
| 11:08:05 | 17 | THE COURT:  Any other evidence? |
| 11:08:08 | 18 | MR. R. WIGGINS:  Your Honor, we have -- they |
| 11:08:10 | 19 | read yesterday Felicia Coleman's deposition in the |
| 11:08:13 | 20 | record.  We have her district manager's deposition about |
| 11:08:20 | 21 | her, which is about two pages, we would like to read, |
| 11:08:26 | 22 | pages -- 145 -- starts at the bottom of Page 145, runs |
| 11:08:36 | 23 | to the top of 149. |
| 11:08:38 | 24 | MR. ST. CLAIR:  For what purpose is this |
| 11:08:40 | 25 | rebutting? |

11:08:41   1           MR. R. WIGGINS:  It's rebutting Felicia

11:08:44   2   Coleman's representation about her hiring authority.

11:08:49   3           THE COURT:  All right.  What's the number of

11:08:52   4   the exhibit?

11:08:57   5           MR. ST. CLAIR:  Who is the deponent?

11:08:59   6           MR. R. WIGGINS:  Peggy Pedigo, her district

11:09:02   7   manager.

11:09:08   8           MR. ST. CLAIR:  Your Honor, we would object

11:09:10   9   to offering a deposition of -- when there's no showing

11:09:16   10   that the witness is unavailable.  They've not made any

11:09:20   11   request to have her here.

11:09:22   12           MR. R. WIGGINS:  Adverse witness, Your

11:09:23   13   Honor, fully admissible.

11:09:24   14           THE COURT:  Is she an adverse witness?  The

11:09:27   15   objection is overruled.  What's the number of the

11:09:33   16   exhibit, Mr. Wiggins?

11:09:33   17           MR. G. WIGGINS:  296.

11:09:34   18           THE COURT:  296.  Received in evidence.  Any

11:09:38   19   other evidence in the case?

11:09:39   20           MR. R. WIGGINS:  Your Honor, we also have

11:09:40   21   our --

11:09:43   22           MR. MAY:  Was that her deposition, Your

11:09:48   23   Honor?  That's not even a deposition in this case, Your

11:09:51   24   Honor, Ms. Pedigo's.

11:09:53   25           MR. R. WIGGINS:  The rule permits an adverse

| | | |
|---|---|---|
| 11:09:55 | 1 | party's statement, if -- from any source, Your Honor. |
| 11:10:00 | 2 | It doesn't have to be in the case.  Rule 30 covers that. |
| 11:10:03 | 3 | THE COURT:  Well, no, it's not a Rule 30 |
| 11:10:07 | 4 | situation, it's a Rule 801.  It's Rule 801(d)(2)(D) |
| 11:11:16 | 5 | statement, isn't it? |
| 11:11:20 | 6 | MR. R. WIGGINS:  I don't have the rule in |
| 11:11:21 | 7 | front of me, Your Honor. |
| 11:11:22 | 8 | THE COURT:  All right.  Well, let me see the |
| 11:11:24 | 9 | statement. |
| 11:11:46 | 10 | MR. ST. CLAIR:  May we have a copy of the |
| 11:11:48 | 11 | proposed exhibit, please? |
| 11:13:29 | 12 | THE COURT:  All right. |
| 11:13:30 | 13 | MR. ST. CLAIR:  May I be heard, Your Honor? |
| 11:13:31 | 14 | THE COURT:  Yes, sir. |
| 11:13:33 | 15 | MR. ST. CLAIR:  I don't understand, first of |
| 11:13:35 | 16 | all, what testimony from Ms. Coleman this is intended to |
| 11:13:41 | 17 | rebut. |
| 11:13:42 | 18 | THE COURT:  It's intended to rebut |
| 11:13:44 | 19 | Ms. Coleman's testimony that she hired the employees in |
| 11:13:48 | 20 | her store. |
| 11:13:50 | 21 | MR. ST. CLAIR:  But I can't get from what |
| 11:13:53 | 22 | this is, that this is in any way different from that. |
| 11:13:57 | 23 | THE COURT:  Well, I see Page 148 -- |
| 11:14:05 | 24 | MR. ST. CLAIR:  She's talking about hiring |
| 11:14:08 | 25 | Rebecca Collins, who has not been previously invited in |

11:14:13  1   this lawsuit.

11:14:13  2          THE COURT:  Well, let me tell you how I read

11:14:15  3   it:  This witness, who I take it to be a district

11:14:20  4   manager of --

11:14:22  5          MR. R. WIGGINS:  She's district manager for

11:14:24  6   Ms. Coleman.

11:14:25  7          THE COURT:  Is she a district manager at

11:14:27  8   Family Dollar Stores?

11:14:29  9          MR. ST. CLAIR:  I don't know, Your Honor.

11:14:30  10         THE COURT:  Do you deny it?

11:14:32  11         MR. ST. CLAIR:  I don't have any reason to

11:14:33  12   deny that.

11:14:33  13         THE COURT:  Let's assume that she's a

11:14:36  14   district manager.  She says that she hired Rebecca

11:14:40  15   Collins on Felicia's recommendation; that Felicia has

11:14:48  16   brought her a lot of good people.

11:14:51  17         MR. ST. CLAIR:  Yes, Your Honor.

11:14:52  18         THE COURT:  And she made the decision to as

11:14:56  19   to what too pay Rebecca Collins.

11:15:00  20         MR. ST. CLAIR:  Right.

11:15:01  21         THE COURT:  And that Rebecca Collins was at

11:15:04  22   Felicia's store, 3812, on the west end of Tuscaloosa.

11:15:10  23   As I recall, that is the store that Ms. Coleman --

11:15:16  24         MR. ST. CLAIR:  I believe what this is

11:15:17  25   referring to, Your Honor, is the district manager hiring

11:15:21   1   Ms. Collins as a store manager --

11:15:25   2             MR. R. WIGGINS:  No, as assistant --

11:15:28   3             MR. ST. CLAIR:  -- on the recommendation of

11:15:29   4   Ms. Collins, another store manager.

11:15:31   5             THE COURT:  I see.

11:15:32   6             MR. R. WIGGINS:  It says she's assistant

11:15:34   7   manager, Your Honor.  Rebecca Collins was the assistant

11:15:37   8   manager in Felicia Coleman's store.

11:15:41   9             I might add, Your Honor, Peggy Pedigo, this

11:15:45  10   witness was on their witness list to be called, and they

11:15:47  11   decided not to call her.

11:15:49  12             MR. ST. CLAIR:  I must say they didn't tell

11:15:51  13   us last night when we were exchanging witnesses that

11:15:55  14   they were going to put her on either.

11:15:57  15             But, Your Honor, one cannot tell from this,

11:15:59  16   Your Honor, the way I read it, Your Honor, is that she

11:16:02  17   was an assistant to Ms. Coleman.  Ms. Coleman suggested

11:16:06  18   to her assistant manager, you might want to hire her as

11:16:08  19   a store manager.  She interviewed her and hired her as a

11:16:12  20   store manager.

11:16:13  21             MR. R. WIGGINS:  Family Dollar's records

11:16:14  22   show that Rebecca Collins is an assistant manager of

11:16:17  23   Felicia Coleman's store.  That's where she started and

11:16:21  24   that's what she was hired for.  It shows on the

11:16:23  25   transcript.

11:16:24    1            THE COURT:  Is she now a store manager?

11:16:25    2            MR. R. WIGGINS:  She later became a store

11:16:27    3    manager and was transferred to Midfield.  But she was

11:16:32    4    hired for Felicia Coleman's store.

11:16:34    5            THE COURT:  Where is the deposition?

11:16:38    6            MR. R. WIGGINS:  Where is the deposition?

11:16:39    7            THE COURT:  Give me the deposition.

11:16:56    8            The c0ourt reporters are going to take a --

11:17:00    9    do you want a 15-minute break -- 15-minute break while I

11:17:03   10    look at this deposition.

11:17:05   11            MR. R. WIGGINS:  We'll have to print it,

11:17:07   12    Your Honor.  We just have it on a disk.  We will print

11:17:11   13    it.  I've sent them out.

11:28:31   14      (Short recess taken at 11:10 a.m. until 11:25 a.m.)

11:28:31   15            THE COURT:  We're back on the record now.

11:28:33   16            We're talking about Plaintiffs' Exhibit

11:28:36   17    Number 298.  And as I understand it, plaintiffs have

11:28:51   18    offered this exhibit to call into question the testimony

11:29:03   19    of Ms. Coleman, that she hired the employees at her

11:29:09   20    store.

11:29:10   21            MR. R. WIGGINS:  Hired and set their pay.

11:29:14   22            THE COURT:  All right.  The objection is

11:29:16   23    overruled.  And I think I already overruled it, but

11:29:20   24    Plaintiffs' Exhibit 298 is received in evidence.

11:29:22   25            Any other exhibits?

11:29:24  1            MR. R. WIGGINS:  Your Honor, we would offer

11:29:26  2   to our deposition extracts, Exhibit 297.

11:29:38  3            THE COURT:  All right.  Received in

11:29:40  4   evidence.

11:29:41  5            MR. ST. CLAIR:  Well, Your Honor, if I may,

11:29:42  6   are those from the same -- from the depositions of the

11:29:45  7   plaintiffs that we offer?

11:29:47  8            MR. JOHNSON:  No.

11:29:49  9            MR. ST. CLAIR:  Well, Your Honor, they can't

11:29:50  10  just put in depositions of plaintiffs who haven't

11:29:54  11  testified.

11:29:54  12           THE COURT:  No, they can't.  That's not what

11:29:56  13  they're trying to do, is it?

11:30:01  14           MR. ST. CLAIR:  Yes.  That's exactly what

11:30:03  15  they're trying to do, Your Honor.

11:30:03  16           MR. JOHNSON:  We wanted to offer the

11:30:06  17  plaintiffs' deposition extracts who were deposed as

11:30:10  18  representative evidence.  And if not, we would like to

11:30:13  19  make an offer of proof.

11:30:14  20           THE COURT:  All right.  What's the number of

11:30:19  21  the exhibit?

11:30:20  22           MR. JOHNSON:  297.

11:30:21  23           THE COURT:  297?

11:30:23  24           MR. JOHNSON:  Yes, sir.

11:30:23  25           THE COURT:  You may make your offer of

11:30:26  1  proof.

11:30:26  2        MR. R. WIGGINS:  Your Honor, we offer

11:30:28  3  Exhibit 297.  Under the rule of completeness, we think

11:30:34  4  that to offer just part of the depositions that were

11:30:39  5  taken from the collective and picking the ones are not

11:30:47  6  best --

11:30:47  7        THE COURT:  Mr. Wiggins, if the defendant

11:30:49  8  has chosen a particular -- the deposition of a

11:30:52  9  particular plaintiff and placed extracts of that

11:30:59  10 deposition into evidence, you will be allowed to put in

11:31:03  11 the entire deposition of that plaintiff.  Are we

11:31:08  12 together on that?

11:31:10  13       MR. R. WIGGINS:  Yes, sir.

11:31:11  14       THE COURT:  Now, what's your argument?

11:31:13  15       MR. R. WIGGINS:  We were making an offer of

11:31:16  16 proof of the remaining depositions.

11:31:18  17       THE COURT:  All right.

11:31:19  18       MR. JOHNSON:  Yes, Your Honor.  There's just

11:31:22  19 certain case law out there about in collective actions,

11:31:25  20 you can introduce representative testimony through

11:31:28  21 depositions, and that's what we were attempting to do at

11:31:32  22 this instance.  So we're just making our offer of proof

11:31:35  23 on that.

11:31:38  24       THE COURT:  What is the case law you're

11:31:43  25 referring to?

11:31:44  1          MR. JOHNSON:  Let me grab a -- something

11:31:47  2    from over here.  This is *Secretary of Labor versus*

11:32:20  3    *DeSisto,* 929 F.2d 789 at 793, First Circuit.

11:32:29  4          THE COURT:  Do you have an Eleventh Circuit

11:32:31  5    case on it?

11:32:32  6          MR. JOHNSON:  No.

11:32:59  7          THE COURT:  These were depositions taken by

11:35:40  8    the defendant?

11:35:41  9          MR. R. WIGGINS:  Yes, sir.

11:35:41  10         MR. MAY:  Yes, sir.  Discovery depositions.

11:35:46  11         MR. R. WIGGINS:  Part of them have been

11:35:47  12   offered in trial, Your Honor.  They just offered part of

11:35:50  13   them.  They just didn't offer all of them.

11:35:53  14         MR. ST. CLAIR:  And, of course, Your Honor,

11:35:55  15   they're statements to adverse parties.  That's the whole

11:35:59  16   point.

11:35:59  17         THE COURT:  But part of these depositions

11:36:02  18   are in 297, part -- a part of these statements.

11:36:09  19         MR. ST. CLAIR:  I'm sorry?  I didn't

11:36:10  20   understand.

11:36:10  21         THE COURT:  I'm sorry.  Let me back up.

11:36:13  22         Are you representing to me, Mr. Wiggins,

11:36:15  23   that Plaintiffs' Exhibit 297 includes or consists of

11:36:30  24   depositions or extracts of depositions of plaintiffs for

11:36:40  25   whom the defendant has offered extracts of depositions?

11:36:44   1          MR. R. WIGGINS:  Offered extracts of other
11:36:47   2   members of the group deposed, not -- not these people.
11:36:51   3          MR. JOHNSON:  Not all 250 people in these
11:36:54   4   particular extracts.  I think they gave extracts from,
11:36:58   5   like, twelve people today.
11:36:59   6          MR. ST. CLAIR:  And they offered --
11:37:01   7          MR. JOHNSON:  This goes to --
11:37:04   8          MR. ST. CLAIR:  We had our extracts, Your
11:37:08   9   Honor.  They offered and testified the balance of those
11:37:12  10   depositions.  We're now talking about something
11:37:15  11   completely different, depositions for which we haven't
11:37:18  12   offered anything into evidence.
11:37:19  13          MR. JOHNSON:  That goes to balance.
11:37:22  14          MR. ST. CLAIR:  If it was just a party, it
11:37:24  15   would be like I take my own deposition and put it in at
11:37:26  16   trial.  We can't do that.  I might also add --
11:37:29  17          MR. R. WIGGINS:  They wanted to take 250
11:37:31  18   depositions, Your Honor, of the collective group.  You
11:37:33  19   allowed them to take 250.  They now have offered, I'm
11:37:38  20   told, twelve.  And we're offering the other, I guess,
11:37:41  21   238.
11:37:42  22          THE COURT:  And you're offering them for the
11:37:45  23   truth of the matter asserted?
11:37:47  24          MR. R. WIGGINS:  Yes, as sworn testimony
11:37:48  25   under the rules.  Yes.

11:37:50  1          MR. JOHNSON:  Yes.

11:37:51  2          THE COURT:  And you -- and you've not sought

11:37:56  3  a stipulation as to what these witnesses would say, if

11:37:59  4  called?

11:38:03  5          MR. R. WIGGINS:  During the earlier part of

11:38:05  6  the case, Judge, we could not come to an agreement about

11:38:08  7  stipulations on that.

11:38:09  8          MR. ST. CLAIR:  Your Honor, this is the

11:38:10  9  first time that I've heard anything about them offering

11:38:14 10  depositions in this case from people who were not called

11:38:16 11  as witnesses.  This is the very first time that issue

11:38:20 12  has been raised, Your Honor.

11:38:22 13          MR. R. WIGGINS:  It's not true, and it's

11:38:24 14  mainly because he just entered the case recently, Your

11:38:27 15  Honor.

11:38:27 16          These are on our exhibit list.  These -- and

11:38:33 17  there's nothing surprising about it.  We've argued this

11:38:37 18  before, it's just not -- it's no surprise to them.  We've

11:38:41 19  always said, if you offer part of 250, we're going to

11:38:44 20  offer the other part.

11:38:45 21          MR. ST. CLAIR:  And, Your Honor, I'm told,

11:38:48 22  at the pretrial conference said they will not be

11:38:50 23  admitted into evidence.  I wasn't at the pretrial

11:38:53 24  conference, but my partner was.

11:38:55 25          THE COURT:  Well, Plaintiffs' Exhibit 297 as

11:39:04  1   offered by the plaintiff is not received in evidence,

11:39:07  2   but it will be a part of the record.

11:39:11  3              Any other evidence from either party?

11:39:23  4              MR. R. WIGGINS:  We have motions on the --

11:39:26  5              THE COURT:  All right.  Do y'all want a

11:39:28  6   break --

11:39:29  7              MR. ST. CLAIR:  There's one minor issue

11:39:31  8   about the social security numbers.

11:39:33  9              MR. KENT:  We have one administrative

11:39:36  10  matter.  When Dr. Bradley entered damage reports,

11:39:40  11  Plaintiffs' 215, 216, 217, one individual identified,

11:39:46  12  Isaac Harris, but that person has the wrong social

11:39:49  13  security number.  And, therefore, the damage calculation

11:39:51  14  is really based upon another store manager who is not a

11:39:53  15  plaintiff in the case.

11:39:55  16              I addressed it with plaintiffs' counsel over

11:39:58  17  the weekend before my cross-examination of Dr. Bradley,

11:40:02  18  and they said that they would clarify that issue; and

11:40:03  19  therefore, I would not have to address it with

11:40:05  20  Dr. Bradley.

11:40:06  21              I have given them our damage calculation on

11:40:09  22  the classification errors under either one of

11:40:13  23  Dr. Bradley's calculation, Number 340 -- around 8,000

11:40:18  24  versus 5,000.  We just need a way to clarify that for

11:40:22  25  the jury for Plaintiffs' 215, 216 and 217.

| | | |
|---|---|---|
| 11:40:27 | 1 | MR. G. WIGGINS:  Mr. Kent's correct, Your |
| 11:40:29 | 2 | Honor.  We don't dispute the numbers he has. |
| 11:40:32 | 3 | THE COURT:  Well, who wants to offer the |
| 11:40:34 | 4 | stipulation to the jury? |
| 11:40:39 | 5 | MR. KENT:  Your Honor, we can address them. |
| 11:40:41 | 6 | THE COURT:  All right. |
| 11:40:42 | 7 | MR. G. WIGGINS:  We'll draft a stipulation. |
| 11:40:44 | 8 | THE COURT:  All right.  Anything else on the |
| 11:40:46 | 9 | evidence?  All the evidence is in that I am going to |
| 11:40:49 | 10 | allow in? |
| 11:40:50 | 11 | MR. ST. CLAIR:  Yeah.  There was an issue, |
| 11:40:52 | 12 | you'll recall, Your Honor, about the Strands, where they |
| 11:40:56 | 13 | had -- |
| 11:40:56 | 14 | THE COURT:  Right. |
| 11:40:57 | 15 | MR. ST. CLAIR:  Your Honor did not want |
| 11:40:59 | 16 | duplicate evidence in the record.  They were going to |
| 11:41:01 | 17 | check ours. |
| 11:41:02 | 18 | MR. R. WIGGINS:  Yes.  We've given them one |
| 11:41:07 | 19 | of the modules that was missing and told them there's |
| 11:41:10 | 20 | five just like it, and we have not been able to put our |
| 11:41:14 | 21 | fingers on the other five.  And we're going to get that |
| 11:41:17 | 22 | straight here in just a minute, but there are five |
| 11:41:20 | 23 | modules out of the Strands that are missing in the |
| 11:41:22 | 24 | documents that's in front of the Court at the moment. |
| 11:41:25 | 25 | And I understand that the one we have located and |

11:41:28   1   given there's not a problem with, they want to see the

11:41:31   2   other five that go with it.

11:41:32   3                THE COURT:  Well, of course they want to see

11:41:34   4   the other five.

11:41:35   5                MR. R. WIGGINS:  And somehow, it's been

11:41:37   6   mislaid.

11:41:37   7                THE COURT:  And where are they?

11:41:39   8                MR. R. WIGGINS:  It was mislaid overnight.

11:41:41   9   We can't -- we're searching for it in the boxes.

11:41:45  10                THE COURT:  All right.  Y'all better find it

11:41:51  11   in the next five minutes.

11:41:56  12                Do y'all want a break before we take up the

11:41:59  13   motions?

11:42:03  14                MR. WHITE:  Well, please, sir.

11:42:05  15                THE COURT:  All right.  15 until 12:00.

11:42:09  16                MR. MAY:  The old fellow is saying yes.

11:42:11  17                THE COURT:  15 before 12:00.

11:42:14  18                (Recess taken at 11:42.)

11:57:09  19                MR. ST. CLAIR:  Your Honor, we were

11:57:11  20   discussing Plaintiffs' Exhibit 298 while the court

11:57:15  21   reporters were out of the room.  And so I just want to

11:57:21  22   -- I want to state for the record, Your Honor, that the

11:57:25  23   defendants did object to Plaintiffs' Exhibit 298.

11:57:29  24                THE COURT:  All right.

11:57:30  25                MR. ST. CLAIR:  That's the deposition

11:57:32   1   excerpt of Ms. Pedigo and the grounds are that it was

11:57:36   2   not clear from the exhibit that will be given to the

11:57:39   3   jury that this in any way rebuts the deposition

11:57:43   4   testimony of Ms. Coleman.

11:57:45   5                THE COURT:  All right.  Thank you.

11:57:50   6                MR. G. WIGGINS:  Your Honor?

11:57:51   7                THE COURT:  Yes, sir.

11:57:52   8                MR. G. WIGGINS:  I have been advised that

11:57:56   9   there's an Exhibit Number 296, which is the district

11:58:02  10   manager job description and qualifications that was

11:58:05  11   taken from the Family Dollar web site that has not been

11:58:09  12   offered yet.

11:58:10  13                THE COURT:  296 is in evidence.

11:58:15  14                MR. G. WIGGINS:  They gave me the wrong

11:58:18  15   number.  299.

11:58:31  16                MR. ST. CLAIR:  Well, Your Honor, we object

11:58:32  17   to this.  It was not on the exhibit list.

11:58:38  18                THE COURT:  You object on the basis that it

11:58:40  19   was not on the exhibit list?

11:58:43  20                MR. ST. CLAIR:  That's correct, Your Honor.

11:58:44  21                THE COURT:  Show me where it's listed,

11:58:46  22   unless it's a rebuttal exhibit.

11:58:51  23                MR. G. WIGGINS:  I think it's both, Your

11:58:54  24   Honor.  I'm 90 percent sure, but let me get my exhibit

11:58:57  25   list.

11:59:16　1　　　　　　　　MR. ST. CLAIR:  Your Honor, we're checking.

11:59:18　2　I may have misspoken.  It my be on their exhibit list.

11:59:22　3　　　　　　　　THE COURT:  All right.

11:59:23　4　　　　　　　　MR. ST. CLAIR:  We'll look as well.  Well,

12:00:35　5　Your Honor, there is this entry on their exhibit list.

12:00:42　6　　　　　　　　THE COURT:  Pardon me?

12:00:44　7　　　　　　　　MR. ST. CLAIR:  Yes, Your Honor.  They have

12:00:46　8　this entry on the exhibit list that says "job

12:00:48　9　descriptions for the position of store manager,

12:00:51　10　assistant manager, and district manager," produced by

12:00:54　11　the defendant during the course of discovery.  It

12:00:57　12　doesn't list this document specifically, that's just in

12:01:01　13　sort of a broad category.  This document is off a web

12:01:08　14　site, I don't know that it's a job description.

12:01:11　15　　　　　　　　THE COURT:  Is it a Family Dollar web site?

12:01:13　16　　　　　　　　MR. ST. CLAIR:  It is.  It is a document

12:01:15　17　that we believe was produced during the course of this

12:01:16　18　case.

12:01:17　19　　　　　　　　THE COURT:  All right.  It's received in

12:01:19　20　evidence.

12:01:43　21　　　　　　　　MR. ST. CLAIR:  You got anything else up

12:01:44　22　your sleeve over there, Greg?

12:01:47　23　　　　　　　　MR. G. WIGGINS:  We're not through.

12:01:50　24　　　　　　　　MR. KENT:  Your Honor, there is one other

12:01:52　25　administerial (phonetic) matter.  You have asked us

| | | |
|---|---|---|
| 12:01:55 | 1 | about which version of the Strands with the plaintiffs. |
| 12:01:57 | 2 | We've compared the two, and there are some workbook |
| 12:02:00 | 3 | sections that are a part of Plaintiffs' Exhibit that |
| 12:02:03 | 4 | I've submitted along with ours.  So we will submit the |
| 12:02:06 | 5 | plaintiffs' version of the Strands. |
| 12:02:08 | 6 | THE COURT:  All right.  Are we now at the |
| 12:04:07 | 7 | motion stage? |
| 12:04:10 | 8 | MR. JOHNSON:  Yes, Your Honor. |
| 12:04:12 | 9 | THE COURT:  All right. |
| 12:04:13 | 10 | MR. JOHNSON:  First, Your Honor, we'd like |
| 12:04:14 | 11 | to move for judgment as a matter of law as to the |
| 12:04:21 | 12 | plaintiffs who did not customarily and regularly direct |
| 12:04:25 | 13 | two or more full-time employees or their equivalent. |
| 12:04:30 | 14 | With reference with first to using the |
| 12:04:36 | 15 | defendant's exhibits that they put into evidence, 1742A |
| 12:04:41 | 16 | through F? |
| 12:04:46 | 17 | THE COURT:  And what do those exhibits show? |
| 12:04:51 | 18 | MR. JOHNSON:  These are exhibits from Ms. |
| 12:04:54 | 19 | Spiesman that were introduced through Ms. Spiesman.  And |
| 12:04:58 | 20 | on 1742A, there are columns on here about the percentage |
| 12:05:04 | 21 | of time where opt-in plaintiff store managers -- |
| 12:05:08 | 22 | THE COURT:  All right.  Let me see -- |
| 12:05:10 | 23 | MR. JOHNSON:  -- have met the criteria. |
| 12:05:13 | 24 | THE COURT:  -- 1742A through F. |
| 12:06:02 | 25 | MR. JOHNSON:  If I may, Your Honor. |

| | | |
|---|---|---|
| 12:06:04 | 1 | THE COURT: Just a moment. Looking at |
| 12:06:24 | 2 | Defendant's Exhibit 1742A, it seems that only about -- |
| 12:06:53 | 3 | only about six of the plaintiffs did not customarily and |
| 12:07:04 | 4 | regularly supervise two or more employees. |
| 12:07:07 | 5 | MR. JOHNSON: Actually, Your Honor, I |
| 12:07:10 | 6 | believe based upon the calculation of the customarily |
| 12:07:13 | 7 | and regularly being less than or below 80 percent on |
| 12:07:17 | 8 | that last page there -- |
| 12:07:18 | 9 | THE COURT: Oh, okay. |
| 12:07:20 | 10 | MR. JOHNSON: -- you go to 1127, and that's |
| 12:07:25 | 11 | Lisa M. Carnes, and then go down from there and all of |
| 12:07:33 | 12 | those plaintiffs did not meet that 80 percent |
| 12:07:35 | 13 | requirement, according to defendant's calculation using |
| 12:07:39 | 14 | the 60 hours per week. And that's 1127 through 1141 on |
| 12:07:46 | 15 | 1742A. |
| 12:07:47 | 16 | THE COURT: All right. Lisa Carnes, you |
| 12:07:59 | 17 | say, the beginning? |
| 12:08:01 | 18 | MR. JOHNSON: Right. Lisa M. Carnes -- |
| 12:08:03 | 19 | THE COURT: What is the defendant's |
| 12:08:05 | 20 | response? |
| 12:08:06 | 21 | MR. ST. CLAIR: Your Honor, our response, |
| 12:08:08 | 22 | first, is there is no requirement in the law of any set |
| 12:08:11 | 23 | number of hours. The applicable regulation is 541.104. |
| 12:08:17 | 24 | And it says nothing in there about there having to be a |
| 12:08:21 | 25 | number of hours that one must work during the week to be |

| | | |
|---|---|---|
| 12:08:25 | 1 | considered full-time. |
| 12:08:27 | 2 | And secondly, there is no -- |
| 12:08:29 | 3 | THE COURT:  But you consider them full-time |
| 12:08:31 | 4 | at 60 hours a week? |
| 12:08:33 | 5 | MR. ST. CLAIR:  That's correct, Your Honor. |
| 12:08:35 | 6 | That's exactly correct. |
| 12:08:39 | 7 | But equally important, Your Honor, all the |
| 12:08:42 | 8 | law says is customary and regularly.  It doesn't assign |
| 12:08:47 | 9 | a percentage to that.  And elsewhere, that phrase is |
| 12:08:52 | 10 | defined in the regulations as being not constant, but |
| 12:08:56 | 11 | more than occasional. |
| 12:08:58 | 12 | THE COURT:  All right.  Anything else? |
| 12:09:01 | 13 | MR. ST. CLAIR:  Not from me, Your Honor. |
| 12:09:03 | 14 | MR. JOHNSON:  Your Honor, we have some cases |
| 12:09:04 | 15 | to offer.  The *Perez* case that we mentioned earlier in |
| 12:09:08 | 16 | this case, as well as the *Daylight Dairy* case on these |
| 12:09:12 | 17 | issues. |
| 12:09:13 | 18 | THE COURT:  I will grant judgment as a |
| 12:09:17 | 19 | matter of law -- |
| 12:09:17 | 20 | MR. ST. CLAIR:  I'm sorry, Your Honor? |
| 12:09:19 | 21 | THE COURT:  I'll grant judgment as a matter |
| 12:09:22 | 22 | of law to employee plaintiffs beginning with Lisa M. |
| 12:09:37 | 23 | Carnes, number 1127, down through 1141, Maxine Peters. |
| 12:09:50 | 24 | MR. JOHNSON:  Thank you, Your Honor. |
| 12:10:00 | 25 | THE COURT:  All right. |

| 12:10:01 | 1 | MR. JOHNSON:  Your Honor, on the same basis, |

12:10:01  1          MR. JOHNSON:  Your Honor, on the same basis,

12:10:07  2  Defendant's Exhibit 1742B.

12:10:10  3          THE COURT:  Hold on just one moment.

12:10:13  4          MR. JOHNSON:  Yes, sir.

12:10:18  5          THE COURT:  I'll grant judgment as a matter

12:10:20  6  of law.  The jury has to decide the amount.

12:10:23  7          MR. JOHNSON:  Okay, Your Honor.

12:10:25  8          THE COURT:  1742B?

12:10:27  9          MR. JOHNSON:  Yes, sir.  This is

12:10:36  10  representative defendant's calculations with respect to

12:10:39  11  70 hours per week that they consider full-time.  And

12:10:42  12  once again, looking at the 80 percent standard that

12:10:46  13  begins on Page 17, that will begin at 1083.  That's

12:10:55  14  plaintiff Vada Rose.

12:11:01  15          THE COURT:  All right.

12:11:02  16          MR. JOHNSON:  That goes down to 1141 again.

12:11:05  17          THE COURT:  And is it true that with respect

12:11:07  18  to Defendant's Exhibit 1742B, that the defendant

12:11:14  19  considers 70 hours per week as a full-time employment of

12:11:20  20  these employees --

12:11:22  21          MR. ST. CLAIR:  That's not correct, Your

12:11:24  22  Honor.  This is just a statement of fact, as Your Honor

12:11:26  23  said earlier.  This document does not express an opinion

12:11:31  24  on what the law is.  This document is just saying that

12:11:35  25  if one were to approach it this way, this is how it

12:11:43  1   would turn out.

12:11:44  2             It's the defendant's position, as I said

12:11:47  3   earlier, Your Honor, that, first of all, the law doesn't

12:11:50  4   put a set number for full-time.  The evidence in this

12:11:55  5   case is undisputed that Family Dollar Store full-time is

12:11:59  6   considered 30 hours.

12:12:00  7             And, secondly, the law does not put any

12:12:03  8   numerical formula for customary and regularly.  This is

12:12:07  9   not a statement by Family Dollar of what it believes the

12:12:11  10  law is.  This is just a calculation, as Your Honor said

12:12:15  11  about Dr. Bradley's calculation on rebuttal, that's just

12:12:20  12  a statement of fact.  It's a separate issue of what the

12:12:23  13  law is.

12:12:24  14            THE COURT:  Well, with respect to this

12:12:26  15  exhibit, do these -- does Family Dollar consider the

12:12:41  16  employees listed here as full-time employees?

12:12:49  17            MR. ST. CLAIR:  All the employees listed on

12:12:53  18  here, that I can't -- I don't know the answer to that.

12:12:56  19  Do they?

12:12:57  20            MR. KENT:  Your Honor, it's the same

12:12:59  21  employees for all six charts, A through F.  We have not

12:13:04  22  categorized them.

12:13:06  23            THE COURT:  So, Mr. Johnson, I only need to

12:13:09  24  deal with 1742A.

12:13:13  25            MR. JOHNSON:  Well, the consideration, Your

12:13:15  1    Honor, about what actually constitutes customarily and

12:13:18  2    regularly with respect to hours and percentage, is a

12:13:23  3    matter of law, but it can be decided by the Court, of

12:13:26  4    course.

12:13:27  5         In the *Perez* case, which was a summary

12:13:40  6    judgment case, the district court required that the

12:13:40  7    standard was 80 hours for full-time; and 80 percent,

12:13:40  8    with respect to whether something's customary and

12:13:40  9    regular.

12:13:41  10        We'd like for the Court to adopt that same

12:13:45  11   position, because we believe that is when the position

12:13:49  12   is most consistent with the Fair Labor Standards Act.

12:13:51  13        THE COURT:  Yes.  The Fair Labor Standards

12:14:03  14   Act more or less assumes 40 hours as regular, doesn't

12:14:07  15   it?

12:14:08  16        MR. JOHNSON:  Yes, Your Honor.  And their

12:14:10  17   statements would have been at DOL, there's never been 35

12:14:14  18   hours, with respect to 1742B, which is on the 70-hour

12:14:19  19   per week calculation.  That's consistent with the "no

12:14:22  20   less than 35 hours" guidance given by the Department of

12:14:28  21   Labor.

12:14:41  22        THE COURT:  Do you have a Department of

12:14:44  23   Labor regulation that you can cite to me?

12:14:49  24        MR. JOHNSON:  Let me see here.  Okay.  I

12:15:09  25   have a couple of different things, Your Honor.  One is

12:15:13    1    -- one of the things that we put up with Dr. Bradley.

12:15:16    2    It was from the Department of Labor's E-laws.  It's a

12:15:23    3    section on their web site that gives guidance to people

12:15:26    4    who are asking about overtime and executive employee

12:15:30    5    exemption.

12:15:31    6            And it says in the first paragraph of this

12:15:36    7    guidance, "a full-time employee generally means one who

12:15:40    8    works 40 or more hours per week; and the equivalent of

12:15:44    9    two or more full-time employees generally means a total

12:15:47   10    of 80 or more employee hours worked.  While full-time

12:15:51   11    generally means at least 40 hours per week in this

12:15:55   12    context, the Department of Labor will recognize

12:15:59   13    established industry standard defining full-time

12:16:01   14    schedules at 37-and-a-half hours or 35 hours per week

12:16:05   15    where appropriate, but not less than that."

12:16:08   16            And then in the preambles that came into

12:16:10   17    effect in the new regulations that came into effect on

12:16:14   18    August 23rd, 2004, the cite that I am about to read from

12:16:19   19    is 69 Fed Reg. 22135.

12:16:26   20            "The department does not believe additional

12:16:30   21    clarification is necessary.  It stands by its current

12:16:34   22    interpretation that an exempt supervisor generally must

12:16:37   23    direct a total of 80 employee hours of work each week as

12:16:42   24    to Wage and Hour Divisions, the Field Operations

12:16:45   25    Handbook states, however, circumstances might justify a

12:16:48  1   lower standard.  For example, firms in some industries

12:16:51  2   have standard work weeks of 37-and-a-half hours or 35

12:16:55  3   hours for their full-time employees.  In such cases,

12:16:58  4   supervision of employees working a total of 70 or 75

12:17:01  5   hours in a work week will constitute the equivalent of

12:17:04  6   two full-time employees."

12:17:05  7            So as he was saying, it was never less than

12:17:08  8   35 hours per week, Your Honor.

12:17:10  9            THE COURT:  All right.

12:17:14  10            MR. ST. CLAIR:  If I may address that, Your

12:17:15  11   Honor.

12:17:15  12            THE COURT:  Yes, sir.

12:17:17  13            MR. ST. CLAIR:  What my brother at the bar

12:17:19  14   just read is not a regulation.  It has no forcible arm

12:17:24  15   on it.  It is an advisement statement that has not gone

12:17:30  16   through formal ruling.  The regulation is 29 CFR Section

12:17:37  17   541.104.  And all that says is "the phrase two or more

12:17:45  18   employees means two full-time employees."  And the

12:17:48  19   regulations say nothing about what that means.

12:17:53  20            The evidence in this case is undisputed that

12:17:57  21   full-time at Family Dollar store begins at 30 hours.

12:18:06  22   541 is CFR Section 541.104.

12:18:11  23            MR. JOHNSON:  Is that under the new

12:18:13  24   regulations?

12:18:13  25            MR. ST. CLAIR:  It is.

12:18:15  1          MR. JOHNSON:  Under the old 541.5, I

12:18:18  2   believe; correct?

12:18:21  3          MR. ST. CLAIR:  And I might add this, Your

12:18:23  4   Honor -- thank you for pointing that out to me.

12:18:27  5          Prior to August 23, 2004, the regulations

12:18:30  6   did not even talk about full-time employees, I mean, in

12:18:37  7   terms of defining it.  In other words, for the whole

12:18:40  8   period at issue in this lawsuit, both before and after

12:18:43  9   August 23, 2004, there's been nothing in the law

12:18:46  10  specifying full-time as 40 hours.

12:18:49  11         MR. JOHNSON:  But the guidance given by the

12:18:51  12  Department of Labor, Your Honor, for example, through

12:18:54  13  the Field Operations Handbook, defined full-time as 80

12:19:01  14  hours per week, full-time -- two full-time employees or

12:19:03  15  their equivalent.  And the industry standards that we're

12:19:07  16  talking about was generally for the banking and

12:19:09  17  insurance industries.  As the *Perez* case states, the

12:19:14  18  standard for retail industry is usually if you have more

12:19:17  19  than 37 hours, or 35 hours of work per week.

12:19:23  20         THE COURT:  Is there anything in evidence

12:19:25  21  that shows what the industry standard is for retail

12:19:27  22  stores, such as Family Dollar?

12:19:29  23         MR. ST. CLAIR:  The only evidence in the

12:19:30  24  record, Your Honor, is 30 hours.

12:19:35  25         MR. WHITE:  The industry.

12:19:37   1              MR. JOHNSON:  That's not industry standard,

12:19:38   2    Your Honor.

12:19:39   3              THE COURT:  Yes.  So the answer to my

12:19:40   4    question is no.

12:20:37   5              When did these new standards go into effect?

12:20:41   6              MR. ST. CLAIR:  August 23, 2004, Your Honor.

12:20:45   7              MR. JOHNSON:  You said new schedules or

12:20:46   8    regulations?

12:20:47   9              THE COURT:  New regulations.

12:20:49  10              MR. JOHNSON:  Regulations, yes.  August

12:20:51  11    23rd, 2004.

12:21:24  12              THE COURT:  All right.  I find that based on

12:21:27  13    the reading in the *Perez* case, that 80 hours is the

12:21:37  14    appropriate standard.  And, therefore, Defendant's trial

12:21:46  15    Exhibit 1742C is applicable.

12:21:52  16              MR. JOHNSON:  Yes, Your Honor.  And that

12:21:55  17    would --

12:21:59  18              THE COURT:  And that would yield the result

12:22:02  19    that beginning with -- beginning on Page 16 with the

12:22:06  20    employee Catherine Elaine Alston --

12:22:10  21              MR. JOHNSON:  Yes, sir.

12:22:11  22              THE COURT:  -- and the employees following

12:22:23  23    her will be granted judgment as a matter of law on the

12:22:31  24    FTE requirement.

12:22:36  25              MR. JOHNSON:  And just for the record, Your

12:22:38  1   Honor, that number beside Ms. Alston is 979.  She's

12:22:43  2   number 979 in the list, going down to, once again,

12:22:48  3   number 1141, that ends with James E. Oliver.

12:22:57  4            THE COURT:  All right.

12:23:19  5            MR. JOHNSON:  Your Honor, Defendant's

12:23:23  6   Exhibits 1742D through 1742F, they go through the same

12:23:32  7   calculations, but for a three-year area, I guess taking

12:23:38  8   into account the willfulness issue.  And we'd like to, I

12:23:45  9   guess, just focus upon 1742F, because that's the one

12:23:49  10  that was most consistent with 1742C, with respect to the

12:23:53  11  80 percent --

12:23:54  12           THE COURT:  And that's something that you

12:23:56  13  will argue to the jury.

12:23:57  14           MR. JOHNSON:  On 1742F?

12:23:59  15           THE COURT:  Yes.

12:23:59  16           MR. JOHNSON:  Okay.

12:24:00  17           THE COURT:  Because the jury will make the

12:24:02  18  determination of whether there was willfulness.

12:24:04  19           MR. JOHNSON:  Yes, sir.

12:24:09  20           MR. ST. CLAIR:  Your Honor, I would like to

12:24:10  21  point this out, and this may come up later.

12:24:14  22           As I understand it, the case is being tried

12:24:16  23  as a representative case, so the whole class would rise

12:24:19  24  or fall on the plaintiffs that they chose to call to

12:24:23  25  testify in court.  We've -- now, of course, all of this

12:24:28  1   has just fractured that approach.  All of the testifying

12:24:32  2   plaintiffs are not in the group for which the Court is

12:24:37  3   granting judgment as a matter of law.

12:24:39  4           THE COURT:  Right.  I understand the

12:24:40  5   argument.

12:24:44  6           Anything else from the plaintiffs on the

12:24:52  7   motion for judgment as a matter of law?

12:24:53  8           MR. JOHNSON:  Well, Your Honor, we were

12:24:55  9   going to take a look at Dr. Bradley's exhibits on the

12:24:59  10  same issue, his calculations.  And these are Plaintiffs'

12:25:06  11  Exhibits -- let's take a look at it here -- 219, 218 --

12:25:18  12  I'm sorry, Your Honor -- yes.  It's 219, 218, 238 and

12:25:29  13  239.  The -- Dr. Bradley did his calculations based upon

12:25:36  14  the three-year statute of limitations.

12:25:40  15          We would still like to move for judgment as

12:25:42  16  a matter of law, Your Honor.  We believe the evidence in

12:25:45  17  this case, based upon the schedulers that were admitted

12:25:54  18  into evidence, and the calculations on those schedulers,

12:25:57  19  shows that defendant was willful and reckless -- had a

12:26:02  20  reckless disregard about whether --

12:26:04  21          THE COURT:  Mr. Johnson, I'm not the

12:26:08  22  appropriate forum to decide the question of recklessness

12:26:16  23  and willfulness and all of that.  Well, good faith, I

12:26:22  24  guess, yes, but not willfulness.  That's a jury

12:26:27  25  question.

| | | |
|---|---|---|
| 12:26:28 | 1 | MR. JOHNSON:  Yes, sir. |
| 12:26:29 | 2 | THE COURT:  Yes.  Anything else? |
| 12:26:32 | 3 | MR. JOHNSON:  We just have some written |
| 12:26:34 | 4 | motions, Your Honor, just regarding moving for judgment |
| 12:26:40 | 5 | as a matter of law. |
| 12:26:41 | 6 | THE COURT:  All right.  The defendant -- the |
| 12:27:16 | 7 | plaintiffs' motion for judgment as a matter of law for |
| 12:27:19 | 8 | willfulness is denied. |
| 12:27:28 | 9 | And plaintiffs' motion for judgment as a |
| 12:27:39 | 10 | matter of law on the substantive claim is denied except |
| 12:27:42 | 11 | as to the FTE requirement. |
| 12:27:59 | 12 | Anything else? |
| 12:28:01 | 13 | MR. ST. CLAIR:  I have a motion, Your Honor. |
| 12:28:03 | 14 | THE COURT:  All right. |
| 12:28:15 | 15 | MR. ST. CLAIR:  Defendant's move for |
| 12:28:17 | 16 | judgment as a matter of law on the remainder of the |
| 12:28:20 | 17 | claims, Your Honor, and let's take it one at a time. |
| 12:28:22 | 18 | The defendants are due judgment as a matter |
| 12:28:25 | 19 | of law on the two FTE issue for all those above the law |
| 12:28:33 | 20 | that the Court said.  It's undisputed that as to those |
| 12:28:38 | 21 | plaintiffs, that they meet the 80 hours, 80 percent of |
| 12:28:46 | 22 | the time rule, which the Court is applying to the case. |
| 12:28:50 | 23 | And so that is not an issue that the jury needs to |
| 12:28:56 | 24 | decide, as to the remaining plaintiffs. |
| 12:28:58 | 25 | THE COURT:  What about primary duty? |

12:29:01　1　　　　　　MR. ST. CLAIR:  That claim remains.  But

12:29:03　2　what I'm saying first is that the issue of whether the

12:29:07　3　remaining opt-ins meet the two FTE test.  There's no

12:29:13　4　disputed fact about that.

12:29:16　5　　　　　　MR. JOHNSON:  Well, Your Honor --

12:29:18　6　　　　　　MR. ST. CLAIR:  It would be error to submit

12:29:20　7　that issue to the jury, when that fact is undisputed.

12:29:24　8　　　　　　MR. JOHNSON:  Your Honor, that fact is not

12:29:26　9　undisputed, of course.  Those exhibits that were offered

12:29:29　10　into evidence by Dr. Bradley and Ms. Spiesman on the

12:29:35　11　baseline of this two FTE/80 issue doesn't take into

12:29:40　12　account whether the store managers were actually at the

12:29:41　13　store when these other -- when the hourly associates

12:29:45　14　were at the store performing their duties.  So it

12:29:48　15　doesn't tell you whether the store manager actually

12:29:50　16　supervised them.

12:29:51　17　　　　　　THE COURT:  Well, I'm going to charge the

12:29:53　18　jury that continuous on-site physical presence is not an

12:30:03　19　essential requirement of supervision, so long as the

12:30:07　20　supervision is manifested in other ways, such as

12:30:10　21　scheduling work shifts and that kind of thing.

12:30:13　22　　　　　　MR. JOHNSON:  Well, Your Honor, in our

12:30:16　23　estimation, that would be sort of an evisceration of the

12:30:23　24　FSLA.  There's long-standing --

12:30:26　25　　　　　　THE COURT:  I have told the jury to be back

|          |    |                                                                      |
|----------|----|----------------------------------------------------------------------|
| 12:30:26 | 1  | here at 1:00 o'clock, Mr. Johnson.  I am telling you                  |
| 12:30:29 | 2  | what I'm going to do, and you have an exception to it.                |
| 12:30:33 | 3  |          MR. JOHNSON:  We object to that, Your Honor.                 |
| 12:30:35 | 4  |          MR. ST. CLAIR:  For the sake of brevity,                    |
| 12:30:37 | 5  | Your Honor, the remaining are in our motions.  If you                |
| 12:30:41 | 6  | want to hear oral argument, I will; if you don't, I                  |
| 12:30:44 | 7  | don't.                                                               |
| 12:30:44 | 8  |          THE COURT:  No, I don't.                                     |
| 12:30:45 | 9  |          MR. ST. CLAIR:  Thank you.                                   |
| 12:30:46 | 10 |          THE COURT:  Thank you.                                       |
| 12:30:47 | 11 |          MR. ST. CLAIR:  One other thing, I move for                 |
| 12:30:49 | 12 | the record to decertify the class.  It's now established             |
| 12:30:53 | 13 | without doubt that all the opt-ins are not similarly                 |
| 12:30:57 | 14 | situated.                                                            |
| 12:30:57 | 15 |          THE COURT:  All right.                                       |
| 12:30:59 | 16 |          MR. ST. CLAIR:  At least as to the two FTE                  |
| 12:31:01 | 17 | requirement; some are getting judgment as a matter of                |
| 12:31:03 | 18 | law and some are not, so they can't be similarly                     |
| 12:31:07 | 19 | situated.                                                            |
| 12:31:07 | 20 |          THE COURT:  All right.  The motion is                       |
| 12:31:09 | 21 | denied.  Now, we're at the charge conference.                        |
| 12:31:11 | 22 |          Would you rather do the charge conference                   |
| 12:31:28 | 23 | after lunch?  Let's tell the jury to come back at 2:00               |
| 12:31:36 | 24 | o'clock.  All right.  And you be back here by 1:15.                  |
| 12:31:53 | 25 |          MR. ST. CLAIR:  For the charge conference?                  |

12:31:54  1          THE COURT:  Yes.  We'll let the jury come

12:31:56  2  back at 1:30, and we'll see how far we get.

12:32:00  3          How much time do you want for closing

12:32:01  4  argument?

12:32:12  5          MR. ST. CLAIR:  It certainly wouldn't take

12:32:14  6  more than an hour.

12:32:16  7          MR. WHITE:  An hour.

12:32:17  8          THE COURT:  All right.  Anything you want in

12:32:18  9  the charge that you haven't already given to me, you

12:32:20  10  need to give it to me now.

12:32:23  11          MR. WHITE:  All right, sir.

12:32:25  12          THE COURT:  All right.  Thank you.  We'll be

12:32:27  13  in recess until 1:15.

12:32:30  14      (Lunch recess from 12:25 p.m. to 1:15 p.m.)

13:26:37  15          (In open court, jury not present.)

13:26:41  16          THE COURT:  We're at the charge conference.

13:26:47  17      I will incorporate herein by reference the

13:26:51  18  objections and exceptions to the charge conference at

13:26:55  19  the last trial.  And I will tell you how I'm changing

13:26:59  20  the charge that I'm giving.

13:28:46  21          On Page 7, I've added the defendant's

13:28:54  22  requested charge concerning "directly and closely

13:29:12  23  related work".  Any objection?

13:29:21  24          MR. JOHNSON:  Yes, Your Honor.  We would

13:29:23  25  object to the inclusion of that language.  Let me just

13:29:30  1   get the regulation here.

13:29:35  2          Well, first, Your Honor, the citation to

13:29:39  3   that particular language -- and I believe it's 29 CFR

13:29:45  4   541.4703.

13:29:47  5          THE COURT:  Right.

13:29:49  6          MR. JOHNSON:  Cited to the new regulations.

13:29:53  7   That language is from the new regulations.

13:29:56  8          THE COURT:  All right.

13:29:57  9          MR. JOHNSON:  And they just pick examples

13:30:04  10  out of there, and we're -- we're adverse to having

13:30:07  11  examples of any industry put into the jury instructions.

13:30:12  12         THE COURT:  Well, here's what I say -- do

13:30:17  13  you have my charge before you?

13:30:20  14         MR. JOHNSON:  Yes, sir.

13:30:21  15         THE COURT:  Work that is directly and

13:30:24  16  closely related to the executive work is also considered

13:30:27  17  executive work.  The phrase "directly and closely

13:30:30  18  related" work may include physical tasks and menial

13:30:34  19  tasks that arise out of the executive duties, and the

13:30:38  20  routine work without which the executive employee's

13:30:40  21  executive work cannot be performed properly.

13:30:47  22         MR. JOHNSON:  What page was that, Your

13:30:50  23  Honor?  I didn't read that in the copy that I received.

13:30:53  24         THE COURT:  All right.  Well, you know,

13:30:54  25  probably --

| | | |
|---|---|---|
| 13:30:58 | 1 | MR. ST. CLAIR:  Your Honor, I think we |
| 13:30:59 | 2 | probably have been given a different document than Your |
| 13:31:02 | 3 | Honor has. |
| 13:31:02 | 4 | THE COURT:  Okay.  Well, maybe so.  Save |
| 13:31:08 | 5 | this -- |
| 13:31:11 | 6 | MR. ST. CLAIR:  What we got was maybe your |
| 13:31:13 | 7 | first draft of the last trial. |
| 13:32:36 | 8 | THE COURT:  I'm in the process of having |
| 13:32:38 | 9 | that run off now, but I think we can go forward. |
| 13:32:43 | 10 | Because basically what I did was to give the first three |
| 13:33:02 | 11 | sentences of the regulations, and I've omitted |
| 13:33:05 | 12 | references to all the examples.  And I sometimes change |
| 13:33:11 | 13 | the word "exempt" -- I tried to change the word "exempt" |
| 13:33:16 | 14 | in every instance where it appears, to "executive". |
| 13:33:21 | 15 | MR. JOHNSON:  Yes, sir, Your Honor.  If I |
| 13:33:24 | 16 | may, Your Honor, that is within the new regulations -- |
| 13:33:31 | 17 | within the old regulations at 29 USC Section 541.108. |
| 13:33:44 | 18 | First, Your Honor, in subsection (a), |
| 13:33:53 | 19 | there's a couple of sentences in there that we would |
| 13:33:56 | 20 | like to add to our objection to -- |
| 13:34:00 | 21 | THE COURT:  Hold on just a minute.  Where |
| 13:34:41 | 22 | would you suggest that I put this language, Mr. Johnson? |
| 13:34:48 | 23 | MR. JOHNSON:  Well, the first sentence that |
| 13:34:51 | 24 | you read, Your Honor -- and I have it here before me -- |
| 13:34:55 | 25 | you said it was pretty much on the enumerated pages, if |

13:35:00   1   you put in the old regulations, or the charge in the old

13:35:03   2   regulations.

13:35:03   3           THE COURT:  Yeah.

13:35:04   4           MR. JOHNSON:  Then we would like to add some

13:35:08   5   of the other language from the old regulations, the

13:35:11   6   general language, not the examples that's there.

13:35:15   7           THE COURT:  Hold on just a moment.

13:35:17   8           MR. JOHNSON:  Sure.

13:37:07   9           THE COURT:  So I would move it to the new

13:37:10   10   regulation section, and then add a paragraph that says:

13:37:12   11   The new regulations indicate -- the new regulations

13:37:33   12   indicate work that is directly and closely related to

13:37:38   13   the performance of executive work is also considered

13:37:42   14   executive work, et cetera, et cetera.  Finish those two

13:37:47   15   sentences.

13:37:47   16           What's your objection to that, Mr. Johnson?

13:37:50   17           MR. JOHNSON:  Well, Your Honor, in the old

13:37:53   18   regulations they give a characterization of work that is

13:37:58   19   directly and closely related in Section (g).

13:38:00   20           THE COURT:  Yes.

13:38:01   21           MR. JOHNSON:  It says "in deciding the

13:38:03   22   difficult cases about directly and closely related

13:38:07   23   tasks, you should keep in mind it is one of the

13:38:10   24   objectives of Section 541.1 to exclude from the

13:38:14   25   definition foremen who hold dual or combination jobs,

13:38:19  1  open paren, (see discussion of working foreman in

13:38:22  2  section 541.115), closed parens.  Thus, if work of this

13:38:27  3  kind takes up a large part of the employee's time, it

13:38:32  4  would be evidence that management of the department is

13:38:34  5  not the primary duty of the employee, that such work is

13:38:38  6  a production operation, rather than a function directly

13:38:40  7  and closely related to the supervisory or managerial

13:38:45  8  employees, and that the employee is -- is in reality a

13:38:49  9  combination foreman set-up man, foreman machine

13:38:53  10  adjustor, et cetera, rather than a bona fide executive.

13:38:57  11         So we would request that that language be

13:39:00  12  added on to that, about the how, if we take up the large

13:39:05  13  part of the employee's time, it will be evidence that

13:39:08  14  management is not the primary duty.

13:39:09  15         THE COURT:  In light of the other

13:39:11  16  instructions I'm going to give, I decline that request.

13:39:15  17  You have an exception.  Next?

13:39:17  18         MR. ST. CLAIR:  I just want to make -- were

13:39:19  19  you done?

13:39:21  20         MR. JOHNSON:  Just an objection.

13:39:23  21         MR. ST. CLAIR:  Did I understand Your Honor

13:39:24  22  to say that you would not include the third sentence

13:39:26  23  from 541.703(a), the one that reads:  "Thus, directly

13:39:32  24  and closely related work may include physical tasks or

13:39:36  25  menial tasks that" --

13:39:38  1          THE COURT:  Yeah.  I am going to include it.

13:39:40  2          MR. ST. CLAIR:  You are going to include it.

13:39:42  3  Thank you, Your Honor.

13:39:43  4          THE COURT:  Now, under two full-time

13:39:45  5  employee equivalent, I propose to give the following

13:39:54  6  charge, the substance of which was requested by the

13:39:59  7  defendant, though I'm not using any of the words

13:40:03  8  suggested by the defendant.  "Continuous physical

13:40:05  9  presence at the store is not an essential requirement

13:40:08  10  for supervision, so long as the supervision is

13:40:11  11  manifested in some other way, such as scheduling work

13:40:14  12  shifts or on-call availability."

13:40:18  13          MR. JOHNSON:  Well, I objected to this

13:40:22  14  earlier, Your Honor, and still lodge the same objection.

13:40:25  15          THE COURT:  All right.  So it's preserved.

13:40:27  16  Anything new?

13:40:28  17          MR. JOHNSON:  Other than the objection and

13:40:29  18  the argument that --

13:40:30  19          THE COURT:  All right.  That's preserved.

13:40:32  20  Anything else?

13:40:33  21          MR. JOHNSON:  No, Your Honor.

13:40:34  22          THE COURT:  All right.  Now, the defendant

13:40:35  23  has also requested that I charge on concurrent duties;

13:40:42  24  specifically, Section 4 -- 541.106 and 541.700, and I'm

13:41:04  25  declining to give those requested charges.  I think it's

13:41:09   1   otherwise covered by the charge I'm giving.

13:41:15   2            MR. ST. CLAIR:  And our exception is noted

13:41:17   3   for the record.

13:41:18   4            THE COURT:  All right.  Any other requested

13:41:20   5   charges?

13:41:21   6            MR. ST. CLAIR:  Your Honor, I don't think

13:41:23   7   we've seen the one yet, but there was the issue of

13:41:26   8   calculating the base rate.

13:41:30   9            THE COURT:  Yes, sir.  You requested that I

13:41:32  10   charge about --

13:41:37  11            MR. ST. CLAIR:  Yeah.  We were requesting

13:41:38  12   the language that is in Section 778.114 -- no, excuse

13:41:48  13   me, Your Honor.  That's the wrong -- it's 778.113.  It

13:41:54  14   says, which brings up "if an employee is employed solely

13:41:58  15   on a weekly salary basis with regularly hour rate of pay

13:42:03  16   on which time and a half must be paid as computed by

13:42:06  17   dividing the salary by the number of hours which the

13:42:10  18   salary is intended to compensate."  The charge that was

13:42:13  19   given last time said 40.  And I -- the law says it's the

13:42:17  20   hours intended to compensate, and I just -- we think the

13:42:22  21   correct way to do it is to track the regulation.

13:42:25  22            But if Your Honor does want to do that, I

13:42:27  23   would respectfully suggest there's been no evidence that

13:42:30  24   the salaries here were intended to compensate beyond 40

13:42:34  25   hours.

13:42:35   1              MR. JOHNSON:  Well, Your Honor, of course,

13:42:37   2     we believe there's been plenty of evidence in this case

13:42:40   3     that the salaries at the least were maybe for 48 hours,

13:42:47   4     but definitely for the full 30 hours.

13:42:50   5              THE COURT:  I take it that both of you agree

13:42:52   6     that when I charged the jury last time this way, that it

13:42:58   7     was error.  The FLSA requires the employer to pay its

13:43:03   8     employees at a rate at least one and a half times their

13:43:07   9     regular rate for the time worked in any one work week

13:43:11  10     over 40 hours.

13:43:14  11              MR. JOHNSON:  That's correct.

13:43:15  12              MR. ST. CLAIR:  That is the issue.

13:43:18  13              THE COURT:  The regular rate for a week is

13:43:20  14     determined by dividing the first 40 hours worked into

13:43:25  15     the total wages paid for those 40 hours.

13:43:29  16              MR. ST. CLAIR:  That's where the problem is,

13:43:32  17     Your Honor.  I think that the correct way to charge it

13:43:34  18     is this first sentence here of Section 778.103.  And I

13:44:01  19     have a copy of that if you --

13:44:02  20              THE COURT:  Yeah.  Let me see it.

13:44:50  21              So the phrase would read:  "The regular wage

13:44:53  22     for the week is determined by dividing the salary by the

13:45:01  23     number of hours which the salary is intended to

13:45:04  24     compensate"?

13:45:06  25              MR. ST. CLAIR:  That's correct, Your Honor.

13:45:08   1                MR. JOHNSON:  And we would object, Your

13:45:09   2    Honor, just to lodge an objection.  We believe that 40

13:45:12   3    hours is what the FLSA says in Section 207, and that

13:45:16   4    should be the standard for calculating the regular rate

13:45:19   5    in this case.

13:45:23   6                The evidence has --

13:45:24   7                THE COURT:  Well, these are salaried

13:45:26   8    employees, aren't they?

13:45:28   9                MR. JOHNSON:  Yes, they are, Your Honor.

13:45:31  10                THE COURT:  They're weekly salaried

13:45:34  11    employees?

13:45:35  12                MR. JOHNSON:  Yes, sir.

13:45:35  13                THE COURT:  All right.  Well, the objection

13:45:37  14    will be overruled.

13:45:38  15                MR. JOHNSON:  Okay.

13:45:47  16                MR. KALLON:  Your Honor, can I get something

13:45:49  17    clarified, please?

13:45:50  18                THE COURT:  Yes.

13:45:51  19                MR. KALLON:  I don't want to run afoul in

13:45:54  20    closing argument.  I was going to use the concurrent

13:45:57  21    duties reg that I used in the opening, which I believe

13:46:01  22    Your Honor said you're not going to charge the jury

13:46:04  23    because it's covered more or less in the charge.

13:46:08  24                I wanted to get clarification that I can

13:46:09  25    still use that --

13:46:10  1          THE COURT:  Hold on just a minute, let me

13:46:11  2   finish with that before I start --

13:46:15  3          MR. KALLON:  I'm sorry, Your Honor.

13:46:17  4          THE COURT:  Let me finish what I'm doing

13:46:19  5   here.

13:47:17  6          Let me revisit this issue.  What you would

13:47:20  7   have me to say, Mr. St. Clair, is that the regular rate

13:47:27  8   is determined by dividing the salaries by the number of

13:47:31  9   hours which the salary was intended to compensate.  And

13:47:34  10  in this case, you say the salary was intended to

13:47:39  11  compensate for 58 -- 52 hours?

13:47:41  12         MR. ST. CLAIR:  Well, that's what some of

13:47:42  13  the plaintiffs have testified.

13:47:43  14         THE COURT:  Or 48 hours?

13:47:44  15         MR. ST. CLAIR:  Right.  Some of them have

13:47:46  16  said 48, some of them have said 52.

13:47:48  17         THE COURT:  So, in effect, what you -- this

13:47:52  18  would change the law, wouldn't it?

13:47:54  19         MR. ST. CLAIR:  No, sir, Your Honor.

13:47:54  20         THE COURT:  Doesn't the law say 40 hours?

13:47:58  21         MR. ST. CLAIR:  Let's say this, Your Honor.

13:48:00  22  For math purposes, I'm paid a salary of $1,000 a week,

13:48:06  23  but I'm told that it's for 50 hours.  So that what you

13:48:10  24  do is take the thousand and divide it by 50, and that's

13:48:14  25  my regular rate.

13:48:15  1          Now you go back and start paying time and a

13:48:18  2   half after 40.  In other words, it's a two-part

13:48:22  3   calculation, if you see what I'm saying.

13:48:25  4          THE COURT:  I see, yeah.

13:48:26  5          MR. ST. CLAIR:  First part, since they

13:48:27  6   didn't have an hourly rate, we have to figure it out.

13:48:30  7   But everybody agrees that we start paying it beginning

13:48:33  8   at 40.

13:48:34  9          THE COURT:  All right.

13:48:35  10          MR. ST. CLAIR:  But -- yeah.  In all these

13:48:37  11   charts and everything that have been calculated by the

13:48:40  12   experts and so forth, have that two-part analysis.

13:48:43  13          THE COURT:  Right.  Thank you.  Mr. Kallon?

13:48:46  14          MR. KALLON:  Yes, sir.  I was going to flash

13:48:49  15   up, Your Honor -- I can bring it up for you if you want,

13:48:52  16   I think.  It's just a straight quotation from the reg.

13:48:59  17   It was a chart that I used in my opening argument on

13:49:02  18   concurrent duties.  And I wanted to know if I did that

13:49:08  19   -- I didn't want to run afoul of the Court.

13:49:20  20          Your Honor, may I approach?

13:49:21  21          THE COURT:  Yes.  Don't I cover this in

13:50:55  22   other parts of the charge?

13:50:57  23          MR. KALLON:  You may, Your Honor.  I

13:50:58  24   apologize for --

13:50:59  25          THE COURT:  Well, I don't call it concurrent

13:51:02  1   duties, and you would request that I call it concurrent

13:51:07  2   duties.

13:51:08  3           MR. ST. CLAIR:  Well, I think his question

13:51:10  4   was, do you mind if he uses that as a demonstrative?

13:51:16  5           THE COURT:  Oh, no, I don't mind.

13:51:18  6           MR. JOHNSON:  Even though you decide not to

13:51:20  7   use that particular example, 541.106(b), I assume that's

13:51:24  8   what's being referenced there as an assistant manager in

13:51:27  9   a retail establishment.

13:51:29  10          THE COURT:  Right.

13:51:29  11          MR. JOHNSON:  And we believe it was excluded

13:51:31  12  because it's unduly prejudicial to put an example in the

13:51:34  13  jury charges, and we would -- and we would think that

13:51:36  14  putting it up as a demonstrative exhibit would also

13:51:41  15  serve the same effect.  Especially since it would have a

13:51:45  16  citation to the Code of Federal Regulations on it.

13:51:50  17          MR. ST. CLAIR:  Well, Your Honor, I'm rather

13:51:52  18  sure that they're going to be flashing some email

13:51:54  19  advisories from the Department of Labor in their

13:51:59  20  argument that are not even in the CFR.

13:52:02  21          MR. JOHNSON:  My understanding with respect

13:52:03  22  to that, Your Honor, is that you've already ruled on

13:52:06  23  what the standard is for customarily and regularly, it's

13:52:10  24  80 hours at 80 percent.  So that is the law in this

13:52:18  25  case.

| 13:52:48 | 1 | THE COURT:  Well, on reconsideration, I |

13:52:48    1    THE COURT:  Well, on reconsideration, I
13:52:57    2    think I'll say something about concurrent duty.  Here's
13:55:22    3    what I intend to say:  An executive employee may perform
13:55:32    4    non-exempt or non-managerial duties concurrent with the
13:55:36    5    executive duties, so long as the non-exempt duties are
13:55:41    6    not his primary duty.
13:55:47    7         Objections or suggestions for change?
13:55:58    8         MR. JOHNSON:  Is this coming under the new
13:56:02    9    regulation section, Your Honor?
13:56:04   10         THE COURT:  Well, I take it from the -- I
13:56:06   11    take it from Section 541 --
13:56:14   12         MR. JOHNSON:  106.
13:56:14   13         THE COURT:  -- 106 concerning duties.
13:56:19   14         MR. ST. CLAIR:  Again, Your Honor, just for
13:56:22   15    the record, the defendant would propose and request that
13:56:24   16    the Court just charge the jury on Section 541.106 in its
13:56:29   17    entirety.
13:56:29   18         THE COURT:  All right.  All right.  The
13:56:35   19    objection to that request is denied, and the objection
13:56:40   20    is preserved.
13:56:41   21         MR. JOHNSON:  And --
13:56:43   22         THE COURT:  And the plaintiffs' objection to
13:56:46   23    what is being charged is also overruled.
13:56:53   24         MR. JOHNSON:  And, Your Honor, is this
13:56:55   25    coming under the new regulations, in the new regulation

| | | |
|---|---|---|
| 13:57:00 | 1 | section?  Because if it is, the working foreman and |
| 13:57:02 | 2 | working supervisor standard -- and it's commensurate |
| 13:57:05 | 3 | with what we did at the last trial -- was commenced in |
| 13:57:08 | 4 | the old regulation section. |
| 13:57:10 | 5 | THE COURT:  Well, I had planned to charge |
| 13:57:12 | 6 | this that I've just indicated just before I started |
| 13:57:15 | 7 | talking about work employment. |
| 13:57:19 | 8 | MR. JOHNSON:  Okay.  In both sections. |
| 13:57:22 | 9 | THE COURT:  I'm only going to charge it |
| 13:57:25 | 10 | once. |
| 13:57:25 | 11 | MR. JOHNSON:  Okay.  Okay. |
| 13:57:29 | 12 | THE COURT:  Anything else? |
| 13:57:39 | 13 | All right.  Are y'all ready to argue? |
| 13:57:55 | 14 | MR. R. WIGGINS:  Your Honor, are we going to |
| 13:57:57 | 15 | get a copy before we argue, so we'll know exactly what |
| 13:58:02 | 16 | -- oh, okay. |
| 13:58:03 | 17 | THE COURT:  All right.  At ease. |
| 13:58:51 | 18 | MR. JOHNSON:  One thing, Your Honor. |
| 13:58:53 | 19 | THE COURT:  Yes. |
| 13:58:54 | 20 | MR. JOHNSON:  I don't know if a ruling was |
| 13:58:55 | 21 | made on Mr. Kallon's slide. |
| 13:58:59 | 22 | THE COURT:  Yeah.  I granted it. |
| 13:59:01 | 23 | MR. JOHNSON:  You granted it?  And you note |
| 13:59:03 | 24 | my objection for the record. |
| 13:59:05 | 25 | THE COURT:  Overruled. |

13:59:07  1              MR. ST. CLAIR:  One question, Your Honor,

13:59:10  2    the verdict form.

13:59:12  3              THE COURT:  I'll use the same one as last

13:59:13  4    time.

13:59:14  5              MR. ST. CLAIR:  Will the jury even know that

13:59:17  6    JMOL has been entered?

13:59:21  7              THE COURT:  Set up separately --

13:59:27  8              MR. ST. CLAIR:  It seems to me that there

13:59:29  9    needs to be -- I know Your Honor -- yeah, I think there

13:59:35  10   has to be two verdicts, at least -- one for the group of

13:59:38  11   1 --

13:59:39  12             THE COURT:  Okay.

13:59:40  13             MR. ST. CLAIR:  -- 62.  There's 162 people

13:59:43  14   for whom judgment as a matter of law is being entered;

13:59:45  15   and then the balance of the group then is not, so don't

13:59:49  16   we have to have at least two different verdicts?

13:59:53  17             THE COURT:  Well, it seems to me that the

13:59:56  18   first question should be:  What damages do you assess

14:00:04  19   for those plaintiffs as to whom the Court -- as for whom

14:00:09  20   the Court has granted judgment as a matter of law?

14:00:18  21             MR. ST. CLAIR:  And shouldn't they be told

14:00:21  22   that they are persons 979 --

14:00:26  23             THE COURT:  Doesn't my charge say that?

14:00:30  24             MR. ST. CLAIR:  I'm sorry?

14:00:32  25             THE COURT:  Doesn't my charge say that?

| | | |
|---|---|---|
| 14:00:36 | 1 | MR. ST. CLAIR:  Judge, I don't think we've |
| 14:00:38 | 2 | seen that -- |
| 14:00:38 | 3 | THE COURT:  Well, let's see.  I meant to say |
| 14:00:41 | 4 | that. |
| 14:00:41 | 5 | MR. ST. CLAIR:  You may have said it on a |
| 14:00:43 | 6 | document that your crack staff is at this moment doing. |
| 14:00:50 | 7 | THE COURT:  Good intentions are like -- |
| 14:01:42 | 8 | yeah.  On Page 8, I say: "In that regard, you're |
| 14:01:47 | 9 | instructed that I have decided as a matter of law that a |
| 14:01:50 | 10 | defendant has not carried its burden of proof on the two |
| 14:01:56 | 11 | FTE requirement for 162 of the plaintiffs.  They are |
| 14:01:59 | 12 | shown on Defendant's Exhibit 1742C.  And for those |
| 14:02:05 | 13 | plaintiffs, you will only decide, one, willfulness; and |
| 14:02:11 | 14 | two, the amount of damages."  I should change that |
| 14:02:14 | 15 | around and say the amount of damages and the issue of |
| 14:02:22 | 16 | willfulness; right? |
| 14:02:23 | 17 | MR. ST. CLAIR:  And will they know that |
| 14:02:24 | 18 | willfulness matters in terms of two years versus three |
| 14:02:28 | 19 | years?  Because the charts -- some of the charts, you |
| 14:02:31 | 20 | know, are -- I just think they need to understand the |
| 14:02:34 | 21 | connection. |
| 14:02:35 | 22 | THE COURT:  Well, I think in the willfulness |
| 14:02:37 | 23 | section, I tell them that willfulness is three years. |
| 14:02:49 | 24 | MR. ST. CLAIR:  Oh, I see. |
| 14:02:53 | 25 | THE COURT:  I'll check it out in just a |

14:02:55  1  minute.

14:02:56  2             MR. ST. CLAIR:  Right.

14:03:46  3             THE COURT:  No.  I think what I told them

14:03:48  4  the last time was wrong.  Look at Page 12.

14:03:58  5             MR. ST. CLAIR:  I agree, Your Honor.

14:03:59  6  There's this confusion between willfulness and good

14:04:03  7  faith.

14:04:03  8             THE COURT:  Yes.

14:04:05  9             MR. ST. CLAIR:  I think the plaintiffs

14:04:07 10  should first prove the Family Dollar first violated and

14:04:13 11  the damages should go back three years of the

14:04:18 12  plaintiffs' claim, instead of two years, or something to

14:04:20 13  that effect.

14:04:21 14             THE COURT:  All right.  So I would -- I

14:06:22 15  would say to the jury:  If the plaintiffs prove that

14:06:26 16  Family Dollar willfully violated the overtime provisions

14:06:29 17  of the FLSA, then the damages would cover three years

14:06:35 18  before the filing of this lawsuit, rather than two years

14:06:38 19  which would otherwise apply.  Suggest to me how I can

14:06:42 20  change that to make it more --

14:06:44 21             MR. JOHNSON:  There's just one, probably,

14:06:46 22  technical change.

14:06:47 23             THE COURT:  Yes.

14:06:48 24             MR. JOHNSON:  Your Honor, three years before

14:06:51 25  the opt-in plaintiffs joined the lawsuit or --

14:06:53   1             THE COURT:  Yes.  Before the --

14:06:57   2             MR. ST. CLAIR:  You might say before each of

14:06:59   3   the plaintiffs.

14:06:59   4             THE COURT:  Okay.  Before each of the

14:07:01   5   plaintiffs joined this lawsuit but -- why don't I say:

14:07:22   6   Before the plaintiffs filed this lawsuit and -- before

14:07:29   7   the named plaintiffs filed this lawsuit and before each

14:07:35   8   of the opt-in plaintiffs joined the lawsuit?

14:07:39   9             MR. JOHNSON:  That's fine.

14:08:04  10             MR. ST. CLAIR:  And once you're finished

14:08:07  11   typing, Your Honor, I have another comment about

14:08:09  12   damages.

14:08:09  13             THE COURT:  Yes, sir.

14:08:10  14             MR. ST. CLAIR:  Are you ready?

14:08:11  15             THE COURT:  Yes, sir.

14:08:12  16             MR. ST. CLAIR:  I still think we need to --

14:08:14  17   I think the last sentence in the calculation of the

14:08:17  18   overtime rate is not correct.  It says the overtime

14:08:22  19   rate, then, would be one and one half of that rate and

14:08:25  20   would be only for each hour in excess of 40 hours during

14:08:28  21   the work week.

14:08:29  22             The problem is, again, for example, let's

14:08:32  23   say that they -- the salary was intended to compensate

14:08:34  24   the 48 hours.  We multiply or divide the salary by 48,

14:08:39  25   we get a regular rate.  That's that person's regular

14:08:43  1   rate on which the overtime is due.

14:08:45  2          But the law says, you've gotten your regular

14:08:47  3   rate for the first 48 hours.  So for the first eight

14:08:51  4   hours, it's only half time that's due, and after that,

14:08:55  5   it's time and a half.  And I'm sure my brothers at the

14:08:58  6   bar will agree that that's the correct calculation.

14:09:01  7          THE COURT:  So how do you suggest I

14:09:03  8   change --

14:09:04  9          MR. ST. CLAIR:  That's going to take a lot

14:09:05  10  of words.

14:09:06  11         THE COURT:  Page 2?

14:09:11  12         MR. ST. CLAIR:  Let me see if I can work on

14:09:14  13  it, Your Honor.

14:09:16  14         THE COURT:  Are you saying that for the each

14:09:19  15  hour over 40 hours, the plaintiff -- plaintiff who

14:09:25  16  prevails will not be entitled to one and a half?

14:09:29  17         MR. ST. CLAIR:  They would be, Your Honor,

14:09:30  18  but the law says they've already been paid the straight

14:09:33  19  time for the hours it was intended to compensate.  So,

14:09:37  20  in other words, somebody says, I knew my salary was

14:09:40  21  meant to be for 48 hours.  So they've, in effect, gotten

14:09:46  22  their straight time through 48 hours.  So they're only

14:09:48  23  due a half of that for those first eight hours.

14:09:50  24         Now, if he actually worked 52 hours, then

14:09:54  25  that's when they are actually entitled to recover time

14:09:56    1    and a half.

14:09:59    2            MR. JOHNSON:  And, Your Honor, I mean, we

14:10:02    3    objected to the language earlier about the intended to

14:10:05    4    compensate.  But if that is going to be the language,

14:10:08    5    then the calculation is the half rate up to the hours

14:10:14    6    intended to compensate; and then time and a half after

14:10:18    7    that.

14:10:18    8            MR. ST. CLAIR:  I don't think there's any

14:10:20    9    disagreement with counsel that this is the correct

14:10:22   10    formula.  That's the way Dr. Bradley did his math.

14:10:35   11            THE COURT:  Overtime rate would then be half

14:10:38   12    their salary up to the number of hours which the salary

14:10:49   13    was intended to compensate.  And then one and a half of

14:10:55   14    that for the remaining hours.

14:10:59   15            MR. ST. CLAIR:  You know, here's just

14:11:02   16    another suggestion, Your Honor, because, the chart's in

14:11:06   17    evidence.  The jury's going to hear argument about that.

14:11:09   18    Let me suggest that one way to do it is just take your

14:11:13   19    current proposed charge, and at that last sentence, just

14:11:16   20    put a period after would be one and one half of that

14:11:20   21    rate, period.

14:11:29   22            MR. JOHNSON:  Right.  And just lop off the

14:11:32   23    last few phrases.

14:11:33   24            THE COURT:  Right.  And would be --

14:11:36   25            MR. ST. CLAIR:  Right.

14:11:39  1                    THE COURT:  So the sentence would read the

14:11:40  2     overtime rate then would be one and a half of that rate.

14:11:44  3     Period?

14:11:45  4                    MR. ST. CLAIR:  That's right.

14:11:45  5                    MR. JOHNSON:  Right, which is the case.

14:11:47  6                    THE COURT:  Fine.  All right.  Anything

14:11:49  7     else?

14:11:49  8                    MR. JOHNSON:  Your Honor, back on Page 8 on

14:11:55  9     that two full-time equivalent language that you have.

14:11:59  10                    THE COURT:  Hold on just a moment.

14:12:01  11                    MR. JOHNSON:  I'm sorry.  Page 9.

14:12:41  12                    THE COURT:  All right.

14:12:42  13                    MR. JOHNSON:  We would just request language

14:12:45  14     there, Your Honor, on Page 9 after you give your

14:12:50  15     instruction that you've already decided as a matter of

14:12:54  16     law -- that sentence at the end there saying that you

14:12:56  17     still have to determine whether the other -- that the

14:13:00  18     defendant carried its burden with respect to the other

14:13:03  19     plaintiffs in this case.

14:13:05  20                    THE COURT:  Well, Mr. Johnson?

14:13:07  21                    MR. JOHNSON:  Yes, Your Honor.

14:13:08  22                    THE COURT:  This jury has got a lot to deal

14:13:13  23     with.  And the longer I make this charge, it seems to

14:13:18  24     me, that the greater the chance of confusion.

14:13:21  25                    It should be clear to the jury that I am

14:13:25  1  only -- that by singling out these 162, or however many

14:13:32  2  plaintiffs, that I'm only saying that as for them the

14:13:37  3  plaintiff hasn't carried its burden -- the defendant

14:13:42  4  hasn't carried its burden of proof, but it's up to the

14:13:44  5  jury to determine whether the defendant has carried its

14:13:48  6  burden of proof for the others.

14:13:51  7          MR. JOHNSON:  Yes, Your Honor.  We were just

14:13:53  8  concerned that the reasons why you granted judgment as a

14:13:59  9  matter of law may carry some undue prejudice on the

14:14:02  10 jurors as making -- or believing that because the Judge

14:14:04  11 has already done it for some of these people, the rest

14:14:07  12 of the people probably don't deserve any consideration

14:14:12  13 on this issue.

14:14:17  14          THE COURT:  I see.  All right.  As to the

14:15:24  15 other plaintiffs, you must decide whether the defendant

14:15:28  16 has carried its burden of proof on the two FTE

14:15:34  17 requirement for each of them.

14:15:37  18          MR. JOHNSON:  Yes, sir.  That's fine.

14:15:41  19          THE COURT:  All right.  Anything else?  All

14:15:47  20 right.  Let's bring in the jury.

14:16:13  21          You know I like to take a break every hour

14:16:16  22 and a half, so will the plaintiff divide their time 30

14:16:21  23 minutes and 30 minutes, to the extent that you can do

14:16:23  24 that?

14:16:24  25          MR. CALAMUSA:  25.  We're going to come

| | | |
|---|---|---|
| 14:16:27 | 1 | close to it. |
| 14:16:28 | 2 | THE COURT:  Yes. |
| 14:16:29 | 3 | (In open court, jury present at 2:10 p.m.) |
| 14:16:44 | 4 | THE COURT:  Ladies and gentlemen, you have |
| 14:16:45 | 5 | now heard all of the testimony in the case and the |
| 14:16:48 | 6 | exhibits which have been received into the record on the |
| 14:16:52 | 7 | record.  You'll have them with you in the jury room.  So |
| 14:16:56 | 8 | we close out the evidentiary phase of the trial. |
| 14:16:59 | 9 | Now you will hear from the lawyers by way of |
| 14:17:01 | 10 | closing arguments and summations.  Since the plaintiff |
| 14:17:05 | 11 | has the -- initial plaintiffs have the initial burden of |
| 14:17:08 | 12 | proof, they have the right to open and close the case, |
| 14:17:10 | 13 | the arguments.  I have given them each side, one hour |
| 14:17:15 | 14 | for arguments. |
| 14:17:16 | 15 | How will you divide your time, Mr. Calamusa? |
| 14:17:19 | 16 | MR. CALAMUSA:  25 minutes first and then the |
| 14:17:21 | 17 | remaining time second. |
| 14:17:22 | 18 | THE COURT:  All right.  You may proceed. |
| 14:17:24 | 19 | MR. CALAMUSA:  Thank you, Your Honor. |
| 14:17:48 | 20 | Good afternoon, ladies and gentlemen.  A |
| 14:17:50 | 21 | week ago, I stood before you and asked y'all a series of |
| 14:17:54 | 22 | questions.  And what I asked you was that I wanted to |
| 14:17:57 | 23 | learn about your life experiences.  And I told you at |
| 14:18:01 | 24 | the time that I wanted to learn about your life |
| 14:18:02 | 25 | experiences to see how they apply within the context of |

14:18:06  1   this case.

14:18:07  2              It's been two weeks now, and each of y'all

14:18:10  3   have had the opportunity to learn about the life

14:18:13  4   experiences of our clients.

14:18:15  5              As you know, we represent over 1,400

14:18:18  6   individuals.  These individuals have worked for Family

14:18:23  7   Dollar, and these individuals have worked 60, 70-plus

14:18:28  8   hours a week, with 80 to 90 percent of their time manual

14:18:33  9   labor.  But they haven't been compensated any overtime

14:18:37  10  for this work.

14:18:40  11             The Judge is going to instruct you shortly

14:18:42  12  on the law -- once all the lawyers have finally finished

14:18:47  13  talking, you're going to hear what the law is.  And it's

14:18:50  14  your responsibility to apply that law to the facts of

14:18:52  15  the case.  And what you will do when applying that is

14:18:56  16  use your common sense and your life experiences.

14:19:00  17             Now, the Judge is the authority on the law,

14:19:03  18  not me, not Family Dollar.  But some of the things the

14:19:06  19  Judge will tell you is just because someone has a job

14:19:10  20  title, that's not determinative of whether or not they

14:19:16  21  get overtime.

14:19:17  22             Just because Family Dollar has labeled the

14:19:19  23  plaintiffs a manager doesn't make them exempt.  Just

14:19:23  24  because Family Dollar has decided to pay them a salary

14:19:27  25  doesn't keep them from getting overtime.  Just because

14:19:31  1    Family Dollar has decided to classify them as executives
14:19:35  2    means nothing.  That's not determinative.  Just because
14:19:40  3    the plaintiffs supervise several individuals does not
14:19:45  4    mean they're not exempt from overtime.
14:19:47  5                The law the Judge will instruct you is what
14:19:50  6    you need to do is look at the duties these store
14:19:55  7    managers perform.  What are the actual duties?  And as
14:20:00  8    Mr. Kallon said, what are the real world duties our
14:20:04  9    plaintiffs performed?
14:20:05  10               You've heard testimony after testimony.
14:20:11  11   You've heard from the plaintiffs.  You've heard from
14:20:12  12   some defendant witnesses.  You've heard from a few
14:20:15  13   company executives.
14:20:16  14               The evidence, ladies and gentlemen, is
14:20:18  15   undisputed that 80 to 90 percent of these people's time
14:20:23  16   is manual labor.  Loading -- unloading the truck,
14:20:30  17   stocking the shelves, cleaning the bathrooms, cleaning
14:20:34  18   the store, running the registers, waiting on customers.
14:20:39  19   80 to 90 percent of their time is doing those duties.
14:20:45  20   That is their primary duty.  And it's the defendant's
14:20:49  21   burden in this case to prove otherwise.  It is the
14:20:52  22   defendant's burden in this case to prove to you that the
14:20:57  23   plaintiffs are actually executives.
14:21:03  24               Each and every plaintiff has come into this
14:21:05  25   courtroom and testified as to what they do.  And each of

14:21:10  1  them have told you 80 to 90 percent is doing these

14:21:15  2  manual -- is doing this manual labor.  Don't just

14:21:19  3  believe the plaintiffs.  I believe you should believe

14:21:22  4  the plaintiffs.  They're very credible individuals.

14:21:25  5  They're hard working.  They work hard for their living.

14:21:28  6  Family Dollar even admits that.

14:21:30  7        But listen to what the defendant's witnesses

14:21:33  8  said.  Bruce Barkus, who was the corporate

14:21:36  9  representative and senior vice-president over

14:21:40  10  operations, that gentleman controlled the operations of

14:21:43  11  the store.  He told you the biggest chunk of time that

14:21:49  12  these employees do is manual labor:  Unloading,

14:21:55  13  stocking, cleaning.  Ladies and gentlemen, waiting on

14:22:00  14  customers, that is their primary duty.  That's what they

14:22:05  15  spend 80 to 90 percent of their time doing.

14:22:08  16        I submit to you, you heard no one -- no one

14:22:13  17  -- get on that witness stand and tell you anything

14:22:15  18  different.  There was not a single witness from the

14:22:18  19  company that came in and said, no, no, that's not how

14:22:22  20  long they spent.  That's not what the bulk of their

14:22:26  21  responsibilities are.  Even the defendant's own

14:22:28  22  witnesses, their corporate representative agrees to it.

14:22:33  23  Not only does the corporate representative, but the

14:22:37  24  store managers and district managers they've brought in

14:22:39  25  said it.

14:22:40   1          Ms. Brisco sat there and said, I'm in the

14:22:42   2     store nine hours a day.  I asked her, what percentage of

14:22:47   3     time -- this is the company's store manager they brought

14:22:50   4     in.  What percentage of the time do you spend doing it?

14:22:53   5     All day.  That, ladies and gentlemen, is these

14:22:57   6     individuals' primary duty.

14:23:02   7          Family Dollar wants you to forget that.

14:23:06   8     Let's not focus.  Let's put blinders on and not focus as

14:23:09   9     to what the primary duty, what they spend 80 to 90

14:23:13  10     percent of their time doing.  They want you to look at

14:23:16  11     the other 20 percent, 10 percent of the time and say

14:23:19  12     that's the primary.  That's not their primary duty,

14:23:22  13     ladies and gentlemen.

14:23:23  14          But let's look for a second -- because they

14:23:27  15     want you to, let's look at it -- 10 to 20 percent of

14:23:31  16     their time, just because for 10 percent of the time they

14:23:36  17     have some supervisory responsibility does not give these

14:23:41  18     store managers the overall authority to be executives.

14:23:47  19     Family Dollar has labeled them executives.

14:23:51  20          What authority do they have that makes them

14:23:53  21     executives?  The testimony that you've heard is that

14:24:00  22     from -- is that the executives in this equation here at

14:24:04  23     Family Dollar for these stores is the district manager.

14:24:09  24     And it's not just what the plaintiffs said.  It's what

14:24:12  25     their policies say.

14:24:16   1        Steve Phillips came yesterday.  Steve
14:24:18   2   Phillips came in here from Charlotte.  He's high
14:24:23   3   ranking, he's vice-president of the company.  He built
14:24:25   4   the Strands.  The Strands are the training modules.
14:24:29   5   Those are the guidelines and policies which train
14:24:31   6   individuals on how Family Dollar does business.  He also
14:24:35   7   developed the policies and procedure manuals.  Those are
14:24:39   8   the policies and procedures -- everyone knows what
14:24:42   9   policies and procedures are, that goes back to your real
14:24:45   10   life experience.
14:24:46   11        You use the policies and procedures to train
14:24:49   12   individuals as to what you want the company to do and
14:24:51   13   how it works.  And Mr. Phillips told each and every one
14:24:56   14   of us that he started this process from the bottom up.
14:25:01   15   He started at the store level.  He used store managers
14:25:05   16   and district managers.  They developed -- they
14:25:08   17   identified the particular tasks within the store.  They
14:25:12   18   identified the tasks and how they were applied in the
14:25:15   19   real world of the Family Dollar store.  And what they
14:25:21   20   came up with were the Strands.
14:25:23   21        This wasn't some magic potion that the
14:25:25   22   people in Charlotte came up with.  This is what they do
14:25:28   23   on a daily basis in the store.  And you know the first
14:25:32   24   thing they came up in those Strands?  That's a Store
14:25:35   25   Team concept.

14:25:36  1          Who is on the store team?  The top of the

14:25:40  2     Store Team is the district manager.  Family Dollar could

14:25:45  3     have made it any way they wanted it.  I understand that,

14:25:48  4     they developed this.  If the person in charge of that

14:25:51  5     team is the store manager, then why isn't he on there?

14:25:55  6     It's the district manager.  And the reason is because

14:25:58  7     he's the one that has the control.  He has the

14:26:01  8     authority.

14:26:04  9          It's not just in the Strands book, ladies

14:26:07  10    and gentlemen, and it's not just from the testimony

14:26:08  11    you've heard from some of the witnesses.  Not disputed

14:26:13  12    whatsoever by the testimony of several individuals that

14:26:17  13    when you go to a Family Dollar store and you look on the

14:26:21  14    wall, it says "district manager, name, phone number.

14:26:27  15    Store manager, name, phone number.  Assistant manager,

14:26:30  16    name and phone number."  If the district manager is not

14:26:33  17    responsible for that store and not built in authority

14:26:38  18    and not in control, not the executive, why is his name

14:26:40  19    on the door and his phone number?  That's the process,

14:26:45  20    ladies and gentlemen.  That's the way Family Dollar in

14:26:49  21    the real world has defined how this process works and

14:26:53  22    who is in charge.

14:26:55  23          What actual authority does someone need to

14:26:59  24    make them an executive?  The evidence in this case is

14:27:10  25    that Family Dollar tries to claim that the store

14:27:11  1  managers are in charge, but they don't give them that

14:27:14  2  authority.

14:27:14  3          What do you need to be an executive?  Let's

14:27:17  4  start with payroll.  It is undisputed -- who has input

14:27:23  5  in the payroll?  Corporate and the district manager.

14:27:26  6  Store managers have absolutely no role in payroll.  And

14:27:31  7  we all understand by now that the payroll controls the

14:27:34  8  store.  The payroll controls who works and how they

14:27:39  9  work.  The payroll controls the number of hours that

14:27:43  10  hourly people have to work; and, therefore, the number

14:27:46  11  of hours that the store manager has to be there.

14:27:49  12  Absolutely no control or input -- not even input, ladies

14:27:54  13  and gentlemen -- by the store manager.

14:27:55  14          Who has the input?  Who has the control?

14:27:58  15  The district manager.  And it's not just in setting it.

14:28:02  16  Those district managers have control in passing it out

14:28:05  17  from one store to the next.  I'm going to take it from

14:28:10  18  this store and give it to this one.  The district

14:28:13  19  managers control that payroll, and tell the store

14:28:17  20  managers what they can and can't do in regards to it.

14:28:20  21  You've heard that time and again from the witnesses,

14:28:23  22  that they cannot go over payroll.

14:28:26  23          You heard time and again that they cannot

14:28:28  24  give overtime without approval.  Don't just take their

14:28:32  25  word, look at the company's documents.  Email after

14:28:36  1   email came in that said, don't go over overtime.  No

14:28:42  2   overtime without approval.

14:28:43  3           This is Exhibit 20.  It's an email from

14:28:46  4   Linda Taylor.  She got on the stand, ladies and

14:28:49  5   gentlemen, and tried to deny what this says.  There's no

14:28:53  6   mistaking what this says:  "Some of you have been

14:28:56  7   working your employees overtime.  This has not been

14:28:58  8   approved!"  Exclamation points.  "Some of you continue

14:29:02  9   to go over payroll.  This will stop or you will be

14:29:05  10  written up.  P.S., overtime, over payroll must stop."

14:29:11  11          She can't deny it.  She can't deny the 13

14:29:16  12  exclamation points, either.  They do not control their

14:29:19  13  payroll.  Without control of their payroll, they cannot

14:29:22  14  be executives.  They cannot control what goes on in the

14:29:26  15  store.

14:29:29  16          Hiring.  Time and again, you have heard to

14:29:35  17  hire an assistant manager, a second assistant, or even

14:29:39  18  let somebody hold the keys, let the cashier hold the

14:29:43  19  keys, must be approved by the district manager.  You

14:29:49  20  heard witness after witness tell you that.  Defendant's

14:29:52  21  own witnesses came and told you that.  Mr. Barkus,

14:29:56  22  senior executive vice-president, came in and said that

14:29:59  23  is the policy.  You cannot give overtime without my

14:30:04  24  approval -- excuse me, without the district manager's

14:30:07  25  approval.

14:30:09   1          Email.  Exhibit 10, you have all these

14:30:12   2    emails.  There's no mistaking what it says.  "I want to

14:30:17   3    remind you of the policy.  This is to restate the

14:30:20   4    policy."  Must be approved in person by the district

14:30:25   5    manager prior to hiring, promoting, or giving the keys.

14:30:29   6    There's no gray area here.

14:30:33   7          They cannot hire, promote, or give keys to

14:30:37   8    employees in their store without prior DM approval.  How

14:30:41   9    are they an executive?  If you can't even hire your own

14:30:45   10   assistant manager, how are you the executive?  If you

14:30:50   11   can't determine, I'm going to give this head cashier

14:30:53   12   who's been with me a long, long time a set of keys so I

14:30:57   13   can please take a day off -- without approval, how are

14:31:00   14   you the executive?

14:31:03   15         It's not just Mr. Barkus.  He makes policy.

14:31:06   16   There's no dispute about it and he sets the policy.  But

14:31:09   17   don't let them tell you it's just someone in Charlotte

14:31:12   18   making these policies that aren't followed.  These

14:31:15   19   policies trickle down.

14:31:17   20         Frank Vogt issues an email.  He's under

14:31:20   21   Barkus.  He's a regional vice-president.  Exhibit 18.

14:31:23   22   There's no mistake there, either, ladies and gentlemen.

14:31:26   23   "No manager can promote anyone to an assistant manager,

14:31:30   24   second assistant, or third key position, only the

14:31:33   25   district manager has the authority."  There's no gray

14:31:37   1    here.   This is the policy.

14:31:41   2           While I'm on -- while I'm on hiring, really

14:31:47   3    fast, listen to the Judge and what he instructs you as

14:31:53   4    the law.   The law is not what Family Dollar believes the

14:31:58   5    law is, or what Family Dollar wants the law to be.

14:32:02   6           Family Dollar put two charts up in the

14:32:04   7    opening statement about the law.   It dealt with hiring.

14:32:10   8    They state:   "The law only requires that managers be

14:32:13   9    able to make hiring and firing recommendations and their

14:32:17  10    recommendations be given particular weight."

14:32:21  11           Ladies and gentlemen, that is not the law.

14:32:24  12    The Judge will instruct you on the law.   This is not the

14:32:26  13    only thing that makes someone an executive.   There are

14:32:30  14    several prongs to the test.   This is only one, and there

14:32:33  15    is one that came in 2004.

14:32:37  16           Family Dollar's been doing this forever.

14:32:39  17    They have told you they've been doing it forever.

14:32:42  18    That's not law.   Don't believe what they want the law to

14:32:45  19    be.   It's what the law is.

14:32:47  20           Other things, fast, you have to be an

14:32:50  21    executive -- set pay, pay raises.   Must be approved by

14:32:54  22    the district manager.   You've heard the testimony.

14:32:57  23    You've seen the policies.   Must be approved by the

14:33:01  24    district manager.   They cannot do it.   Store managers

14:33:05  25    cannot.   Defendant's own store managers came in and said

14:33:07  1    it.

14:33:08  2              Discharge must be approved by the district

14:33:13  3    manager in advance.  In advance.  This is the policy --

14:33:17  4    this is Barkus' testimony where he says, district

14:33:20  5    managers do the hiring -- I'm sorry, do the pay raises.

14:33:24  6    There's a policy, here, ladies and gentlemen, on

14:33:26  7    discharge.  "Before conducting a discharge -- before

14:33:30  8    conducting a final decision making, you must contact."

14:33:33  9              Here's another one:  That all -- that's the

14:33:37  10   pay recommendations.  "You must contact your district

14:33:40  11   manager or regional vice-president before conducting a

14:33:45  12   discharge."  There's no gray there.  That says "must".

14:33:49  13   What's the definition of "must"?  The definition is what

14:33:54  14   these policies say and what our store managers follow.

14:34:01  15             Determine merchandise that can be sold.

14:34:03  16   They have no authority to determine the merchandise.

14:34:05  17   They can't choose what they want sold.  They take the

14:34:09  18   gun and they scan the shelves and they key in how many

14:34:12  19   are missing.  That's not a managerial function.  That's

14:34:17  20   not their primary duty.

14:34:21  21             Family Dollar's witness got on the witness

14:34:23  22   stand and I was talking to him.  And you know what he

14:34:26  23   told me?  Remember what he told me?  He said, that's a

14:34:29  24   simple process.  It's nothing to do the ordering.

14:34:33  25   Anybody can do the ordering, ladies and gentlemen.

14:34:35   1           This fancy merchandising term they want to

14:34:37   2   throw around, that's ordering and stocking.  Anyone can

14:34:41   3   order.  Store managers, assistant managers, cashiers,

14:34:44   4   everybody.  Who's responsible for it?  Look at their

14:34:49   5   Strands.  Who's responsible for merchandising?

14:34:52   6   Associates who are involved in the actual merchandising

14:34:56   7   are very important.  Associates.  These people get paid

14:35:00   8   hourly.  Why doesn't the store manager?  It's not that

14:35:04   9   much more responsibility to take that gun and swipe over

14:35:07   10  that thing.

14:35:09   11          Scheduling.  Oh, my.  We have heard a lot

14:35:12   12  about scheduling.  The store managers can fill in names

14:35:16   13  on a schedule.  That doesn't make them exempt from

14:35:20   14  overtime.  That doesn't make them executives.  They

14:35:23   15  don't have the authority to put people when they want

14:35:26   16  them where they want them.

14:35:27   17          Mr. Broome testified about the Frequently

14:35:31   18  Asked Questions.  Mr. Broome, corporate representative.

14:35:33   19  This is the policy:  Can you change -- "can I move

14:35:38   20  coverage from slower days?  No."  They don't have the

14:35:42   21  authority.  They don't have the authority, ladies and

14:35:45   22  gentlemen.  They can put names in, yes.

14:35:49   23          Somebody calls in sick, I can move it, yes.

14:35:52   24  But that doesn't mean they're executives.  Just because

14:35:56   25  you fill out a schedule doesn't make you executives.

14:35:59   1          They have no freedom from supervision.  The

14:36:02   2   testimony is averages of ten emails a day.  Their

14:36:06   3   witness, not ours -- ten emails.  You've got a book of

14:36:10   4   them, ladies and gentlemen.  These aren't just, hey,

14:36:12   5   how-are-you emails.  These are emails specific to tasks.

14:36:16   6   These are things that they have to do.  They come down

14:36:21   7   from corporate.  They come down from the through the DM.

14:36:26   8          Ladies and gentlemen, we do not dispute that

14:36:29   9   our plaintiffs have some responsibility.  Don't let them

14:36:34  10   tell you we do.  We understand.  They have some

14:36:39  11   responsibility.  They do some supervising.  They handle

14:36:42  12   the money.  They do multitasks.  They watch some

14:36:46  13   employees.  They handle problems with the plaintiffs.

14:36:50  14          Do you know what that's called, ladies and

14:36:51  15   gentlemen?  And the Judge will instruct you on the law.

14:36:53  16   That's a "working foreman", a working supervisor, a lead

14:36:57  17   person; someone who works alongside his or her

14:37:03  18   subordinates, performing the same kind of work as the

14:37:06  19   subordinates, and also carrying out supervisory

14:37:09  20   functions.  That's what the plaintiffs do, ladies and

14:37:12  21   gentlemen.  The question -- that is it.

14:37:15  22          Family Dollar told you and argued in their

14:37:18  23   opening that this only applies to industrial plants or

14:37:23  24   factories.  That's not the law, ladies and gentlemen.

14:37:26  25   That's the law that Family Dollar wants you to believe.

The law's what the Judge says.

The Judge will instruct you that this law applies in this case.  This is what our plaintiffs do.  We don't deny they have some responsibility, ladies and gentlemen.  Of course they do.  But you know who else has the same responsibility?  Assistant managers.  Everything the store manager can do, an assistant manager can do:  Ordering, supervising, bank deposits, handling money.  Who handles all that?  Store manager and hourly.

What's the difference?  The assistant manager's eligible for overtime.  If these tasks were so important that these people -- makes these people executives, why does the assistant manager do the exact same thing and get paid hourly?

Look at the Essential Job Functions.  Their witness testified Mr. Barkus, as well as one other one, testified they're virtually identical what they do.  Ms. Brisco testified, ladies and gentlemen, that when she's in the store with her assistant, they share the responsibilities.  They share the supervisory duties.

What is the degree in which these duties fit on a scale?  What is "primary"?  "Primary", ladies and gentlemen, the Judge will instruct you that a rule of thumb says that primary means that the burden is on the

14:39:01  1   defendant to prove that more than 50 percent of the

14:39:05  2   employees' time is spent performing executive duties.

14:39:09  3            The testimony is undisputed that it's not 50

14:39:13  4   percent or more of executive duties in this case, it's

14:39:17  5   the manual labor.  What's "primary"?  50 is equal.  Is

14:39:23  6   51/49?  How about 60 percent?  How about 70?  80 or more

14:39:28  7   is what you have.  And, ladies and gentlemen, again, it

14:39:32  8   has gone undisputed.  The defendant's witnesses have not

14:39:35  9   disputed 80 to 90 percent.  At this point, the scale has

14:39:39  10  tipped way too far.  You can't claim that's primary just

14:39:45  11  because 10 or 20 percent of your time is something that

14:39:48  12  you let -- that you do and you let an hourly employee do

14:39:51  13  it, too.

14:39:54  14            The plaintiffs are seeking in this case lost

14:39:59  15  wages, back pay.  They are seeking money that they have

14:40:04  16  earned and worked for.  We are not asking for any free

14:40:08  17  money here.  What we're asking for is to be paid the

14:40:13  18  wages that they earned and the way -- for their labor,

14:40:16  19  their hard work, that Family Dollar has been able to

14:40:20  20  utilize to make a profit.

14:40:22  21            We also will ask you, ladies and gentlemen,

14:40:25  22  to find that they were willful or reckless in not

14:40:30  23  looking into this and allowing this scheme and process

14:40:33  24  to continue to take place.

14:40:37  25            Finally, the Judge will tell you the law,

14:40:40  1   and I want to be really quick on something about the

14:40:43  2   law; and that is, make sure you understand the nature of

14:40:46  3   this.  This is a collective action.  Okay?  That's what

14:40:50  4   this is called.

14:40:51  5           And under the collective action, it says,

14:40:55  6   that "it is not necessary that all plaintiffs must

14:40:58  7   testify in order to prove the case.  Rather, the

14:41:01  8   plaintiffs may rely on representative testimony.

14:41:04  9   Representative testimony means the testimony of a

14:41:06  10  relatively few plaintiff witnesses or other credible

14:41:10  11  witnesses in order to establish a pattern of behavior

14:41:14  12  among the larger groups of plaintiffs."

14:41:16  13          We have 1,424 plaintiffs.  Trust me:  You

14:41:20  14  did not want every one of them to come in this

14:41:24  15  courtroom.  You thought two weeks was long.  If you had

14:41:26  16  to have all 1,400 in here, this same thing over and over

14:41:29  17  and over again?  That's what you would have heard.

14:41:32  18  That's what you heard from the plaintiffs.  The same

14:41:35  19  story, the same claims.  And it wasn't just the

14:41:39  20  plaintiffs, ladies and gentlemen.  You heard it from the

14:41:42  21  defendants, too.

14:41:44  22          The defendants have the burden in this case.

14:41:47  23  They must prove that the 1,424 individuals are exempt,

14:41:53  24  that they are executives.  They cannot meet this burden.

14:41:59  25  They have not brought in evidence and sat in this stand

14:42:04  1   or put in through documents to meet their burden that

14:42:08  2   these people are exempt.  Look at the testimony, look at

14:42:13  3   their own policies.

14:42:15  4          Mr. Wiggins is going to speak after the

14:42:20  5   other side.  He will go into some more detail than I

14:42:22  6   have and will cover some of the areas that I have not.

14:42:25  7          I do want to thank you for your time,

14:42:27  8   because y'all have been very attentive and I really

14:42:30  9   appreciate that that you have given us.  So, thank you.

14:42:33  10          THE COURT:  Thank you, sir.  Mr. Kallon?

14:42:40  11          MR. KALLON:  May it please the Court, ladies

14:42:58  12   and gentlemen.  Good afternoon.

14:43:01  13          I am here on behalf of Family Dollar, and I

14:43:04  14   gladly take on the burden of proof.  Mr. Calamusa and I

14:43:10  15   will have to disagree on the law.  But fortunately, as

14:43:13  16   he pointed out, we are not here to tell you about the

14:43:17  17   law.  Your Honor will to do that.

14:43:19  18          He will indeed tell you that in order for an

14:43:22  19   employee to be exempt, their primary duty must be

14:43:28  20   management.  But he will also tell you that time spent

14:43:32  21   on duties alone is not determinative.  Listen to the

14:43:39  22   charge.  Time spent on duties alone is not the

14:43:45  23   determinative factor.  Primary duty is not what you do

14:43:51  24   most.  Primary duty is what is your most important

14:43:56  25   function.

14:43:59   1          Ladies and gentlemen of the jury, you have

14:44:02   2   heard all the evidence, and I will summarize it for you.

14:44:04   3   When I am done, I am confident you'll agree with me that

14:44:10   4   these managers who took the witness stand, based on the

14:44:12   5   summaries that I will present -- not my words, their own

14:44:17   6   actual testimony -- when you add up all of their duties,

14:44:22   7   their primary duty is the management of the store.

14:44:28   8          Now, let me back up.  Again, a little

14:44:33   9   refresher course.  And the reason why I did this is

14:44:36   10  because Mr. Calamusa said in one of our slides that I

14:44:40   11  used in opening that I said that a manager does not need

14:44:46   12  to hire or fire, that he or she needs to recommend; and

14:44:49   13  that is Family Dollar's law, that is not the law.

14:44:52   14         Ladies and gentlemen of the jury, you've

14:44:54   15  seen it and you will hear it from Your Honor again.  In

14:44:57   16  August of 2004, the law changed.  Step 4 was added.

14:45:03   17  Step 1, the manager makes 455 a week.  Step 2, their

14:45:08   18  primary duty is management.  Step 3, they customarily

14:45:14   19  and regularly direct the work of two or more employees.

14:45:17   20         And this is the addition.  Because if, you

14:45:20   21  see, before 2004, Step 4 was not there.  Before 2004,

14:45:27   22  the employer simply had to show primary duty was

14:45:32   23  management.  Hiring and firing were not a requirement.

14:45:35   24  But in August of 2004, it was added.  It says, the

14:45:40   25  manager has the authority to fire hire or fire; or, in

14:45:45  1   the alternative, their recommendations are given

14:45:48  2   particular weight.

14:45:50  3              This is not Family Dollar's law.  This is

14:45:54  4   the actual law, and Your Honor will charge you on it.

14:46:02  5              Ladies and gentlemen of the jury,

14:46:02  6   Mr. Calamusa's correct.  Just because I say these

14:46:09  7   plaintiffs are exempt does not make them so.  But

14:46:14  8   likewise, just because he says they're not exempt does

14:46:18  9   not make them so.  What you must decide instead, is

14:46:22  10  based on all the evidence and all the factors, whether

14:46:28  11  their primary duty is management.  That is your job.

14:46:32  12  And that is why you've listened for two weeks.

14:46:35  13             And on behalf of my colleagues at Family

14:46:38  14  Dollar's legal team, I thank you for your time

14:46:41  15  throughout this trial, and I ask you to bear with me

14:46:44  16  now.  I'm going to go for roughly 45 minutes, and I'm

14:46:47  17  going to hand over to the podium the elder statesman, my

14:46:55  18  colleague, Jay St. Clair.

14:46:57  19             You have heard it a lot and in

14:46:59  20  Mr. Calamusa's closing.  You will hear a lot that what

14:47:02  21  managers cannot do and can, even though you saw policy

14:47:06  22  after policy.  You saw them.  It says before you hire or

14:47:10  23  fire, you need to get approval.

14:47:15  24             And I surmise they're focusing on what

14:47:20  25  managers cannot do to get you away from the real focus

14:47:25   1   in this case, which is what they really do.  That is

14:47:30   2   what this case is about.  It's not about what the

14:47:34   3   policies say.  It's how these policies are interpreted

14:47:38   4   in the field and how they apply.

14:47:40   5            What do the managers do?  I believe that

14:47:44   6   when you've listened to all the evidence -- again, I'll

14:47:48   7   summarize it for you -- a picture will start to emerge.

14:47:52   8   And that picture's a very simple one.  At the end of the

14:47:56   9   day, those managers are ultimately responsible for that

14:48:00  10   store, all operations within the four walls.

14:48:09  11            To hide this fact, my able colleagues and

14:48:12  12   adversaries will gloss over the duties of the managers,

14:48:18  13   primarily focusing on two things.  They will try to

14:48:22  14   diminish the duties of the store manager by saying what

14:48:25  15   they do, 80 percent, 90 percent of it is manual labor.

14:48:30  16   That is what they call "we were nothing more than

14:48:34  17   glorified stock clerks and cashiers."

14:48:36  18            The second thing they will do is that a

14:48:40  19   small 20 percent now will disagree with that number, are

14:48:44  20   using their number.  The small 20 percent of management

14:48:48  21   tasks that they embrace, they will try to diminish those

14:48:52  22   by saying, well, I'm not really a manager because my

14:48:58  23   assistant can do the same things that I can do.

14:49:05  24            In the plaintiffs' world, ladies and

14:49:07  25   gentlemen of the jury, they can come here and complain

14:49:13   1   about working too many hours.  But in the same breath

14:49:16   2   say, my assistant should not be able to do the same

14:49:20   3   things that I do and relieve me of my obligations.

14:49:25   4   Allow me to take time off.  Can't have it both ways,

14:49:30   5   ladies and gentlemen.  That is why I said in the opening

14:49:37   6   that you must ultimately separate plaintiffs' version

14:49:42   7   from the actual real world.

14:49:45   8              Now, let's take their first contention,

14:49:48   9   which is the majority of the duties of manual labor --

14:49:52   10   please give me tab 1.  That's the one Mr. Calamusa

14:49:56   11   referred to.  In their world, if a manager is doing

14:50:03   12   manual tasks, such as running the cash register,

14:50:06   13   stocking, unloading, he or she ceases to be a manager.

14:50:11   14              In the real world, that is not the case.

14:50:16   15   Because in the real world, your life experiences that

14:50:19   16   Mr. Calamusa referred to -- you're familiar with the

14:50:23   17   concept of multitasking.  That manager does not stop

14:50:28   18   being a manager when he or she is running the cash

14:50:31   19   register.  She does not stop being a manager when she is

14:50:38   20   stocking.

14:50:38   21              Don't take it from me.  Hear what they say

14:50:41   22   themselves.  Koni, let me have Rose 12, please.  This is

14:50:46   23   one of the plaintiffs in this case who testified.  "And

14:50:51   24   I think your -- you told your lawyer that you were

14:50:55   25   ultimately accountable" -- go with me to line 16 --

14:50:59   1   "when you were unloading those trucks, running the cash

14:51:02   2   register, doing the manual tasks, you were still

14:51:06   3   supervising employees?"  She said "yes".  She was not

14:51:11   4   alone.

14:51:14   5           This is testimony from a plaintiff who did

14:51:16   6   not testify.  It's Angela Alexander.  Again, she admits,

14:51:23   7   as a store manager, she does more than two things at

14:51:27   8   once.

14:51:29   9           Next one.  Robert Fiore, he is from New

14:51:32   10  Jersey, same thing on multitask.  "Do you consider

14:51:37   11  yourself to still be a manager?  Yes.  Do you take your

14:51:40   12  manager's hats off", on line 16?  "No."  He is always

14:51:46   13  managing the store, regardless of what he's doing.

14:51:53   14          Give me Barbara Richardson 15 -- of what I'm

14:51:56   15  talking about, just to place it for you in context,

14:51:59   16  Ms. Richardson testified yesterday, if you recall, she's

14:52:03   17  the one that testified about stocking with her head up,

14:52:09   18  running the cash register with her head always up,

14:52:11   19  observing and listening.

14:52:14   20          And the real application of that concept is

14:52:18   21  she was in the back of the store doing one thing, she

14:52:22   22  noticed a bag -- a cart -- excuse me, full of

14:52:24   23  merchandise.  Went to the cash register.  She was

14:52:28   24  observing and listening.  Listening to the cash register

14:52:32   25  rings.  She realized that the number of rings did not

14:52:37  1   match up with the merchandise that she saw in the cart.

14:52:44  2          She went to the front, checked the receipts,

14:52:47  3   verified, called the employee in the back and terminated

14:52:51  4   her.  She did not take a manager's hat off.  She

14:52:57  5   observed and listened.  Stocked with her head up.  She

14:53:04  6   was always in charge of that store.

14:53:06  7          80 to 90 percent assumes one thing, which

14:53:10  8   is, when you're doing those things, you're doing nothing

14:53:14  9   else.  That's not true.  They are doing something else.

14:53:23  10  That's not words, you've seen it.  It's evidence from

14:53:26  11  the actual plaintiffs in this case.

14:53:28  12         The fact that managers do manual tasks does

14:53:32  13  not, ladies and gentlemen, make them working foremen.

14:53:39  14         Your Honor's going to charge you on the law.

14:53:41  15  And he will tell you to apply the law so that you can

14:53:48  16  decide for yourselves whether store managers are working

14:53:52  17  foremen.  In determining whether a store manager is an

14:53:58  18  executive, you should consider the nature of the work

14:54:01  19  performed by the store manager.  For example, a working

14:54:06  20  or supervising foreman works alongside his or her

14:54:09  21  subordinates performing the same task.

14:54:13  22         Ladies and gentlemen, store managers are not

14:54:17  23  working foremen.  A foreman, contrary to what

14:54:22  24  Mr. Calamusa told you, is not an individual who is in

14:54:25  25  charge of a free-standing facility.   A foreman is one

14:54:31  1   of many in a place reporting to someone else who is on

14:54:35  2   site.  He or she does not have responsibility for the

14:54:38  3   assets of the franchise; the store managers here at

14:54:44  4   Family Dollar do.  They are responsible for the four

14:54:48  5   corners of their store.  Over a quarter million dollars

14:54:51  6   worth of merchandise, which is their ultimate

14:54:55  7   responsibility.  That is not a working foreman.

14:55:00  8           What they call a working foreman is what the

14:55:02  9   law recognizes as concurrent duties.  And the concurrent

14:55:11  10  duties, as I've mentioned before in my opening, in the

14:55:15  11  retail context, in particular, allows a manager to

14:55:22  12  stock, to clean, and to not lose the exemption.  That's

14:55:29  13  a very simple standard, and I'll read it for you.  It

14:55:32  14  says:  "For example, a manager in a retail" -- I'm

14:55:37  15  reading from part (b) "establishment may perform work

14:55:40  16  such as serving customers, cooking food, stocking

14:55:44  17  shelves and cleaning the establishment, but performance

14:55:47  18  of such non-exempt work does not preclude the exemption

14:55:52  19  if the primary duty is management."  The last part:  "An

14:55:59  20  employee can also simultaneously direct the work and

14:56:03  21  stock shelves."  That is concurrent duties.  That is not

14:56:07  22  a working foreman, ladies and gentlemen.

14:56:13  23          The next thing Mr. Calamusa did, and which

14:56:16  24  his clients did throughout this case, is to diminish the

14:56:21  25  authority by contending that the supervisory functions

14:56:26  1  somehow ceased being manager or being important, excuse

14:56:31  2  me, because an assistant manager can step in in their

14:56:35  3  absence.

14:56:39  4          Ladies and gentlemen, as I mentioned before,

14:56:43  5  you cannot have it both ways.  You cannot come here and

14:56:47  6  complain about your hours worked, but then claim in the

14:56:51  7  very next breath that your assistant manager, who's

14:56:55  8  there to relieve you, cannot do the same things that you

14:56:59  9  do.

14:57:00  10         In the real world, as you know, a manager

14:57:03  11 wants the assistants to be able to do the same things he

14:57:09  12 or she does.  For two reasons:  One, they want that

14:57:13  13 assistant to be promoted one day.  But, two, they want

14:57:16  14 to be able to take time off.  They want to go home

14:57:20  15 without their phone ringing constantly.

14:57:24  16         But don't take my word for it.  Listen to

14:57:31  17 what the plaintiffs themselves say about what a fully

14:57:34  18 trained assistant can do.  This is, I believe, Gretchen

14:57:38  19 Jones.  "So I think you will agree with this, you wanted

14:57:44  20 your assistants to know as much about your job as you

14:57:48  21 do?"  She said, "yes, sir.  Because that would allow you

14:57:50  22 to take time off?  Yes."  And the last part is that

14:57:54  23 "will allow the employee to be promoted one day."

14:57:59  24         In the real world, ladies and gentlemen, a

14:58:04  25 manager can't have a qualified assistant and still be a

14:58:08   1    manager.  In the plaintiffs' world, presumably, they

14:58:12   2    want to be the only ones that opened and closed the

14:58:15   3    store daily.  They want to be the only ones to do the

14:58:18   4    paperwork.  Essentially, they want to be the ones that

14:58:23   5    stay in the store all the time.  Fortunately, in the

14:58:26   6    real world, employers have a system in place that will

14:58:31   7    allow managers to have backup.

14:58:37   8         But don't misconstrue that.  The fact that a

14:58:41   9    manager has an assistant does not diminish what the

14:58:45  10    assistant does.  The assistant may, in fact, do the bulk

14:58:51  11    of the same duties, maybe even do all of them.  But

14:58:55  12    there's one critical difference:  The assistant reports

14:58:59  13    to the store manager.  The store manager oversees the

14:59:05  14    assistant's work.

14:59:06  15         Again, don't take my word for it.  Here's

14:59:09  16    what the plaintiffs themselves have to say:  "People

14:59:13  17    will testify, Mr. Pellegrin, the assistant manager,

14:59:18  18    reported to you as well?  Yes."  Ms. Gretchen Jones:

14:59:25  19    "Did you do that?"  This was the Court.  "Verbally tell

14:59:29  20    them what to do?  Answer:  Yes, at some point."  And my

14:59:33  21    question -- can you go back if you can?  My question:

14:59:40  22    "There's no need for that" -- my question was:  "And, in

14:59:45  23    fact, you told the cashier -- I'm sorry, the assistant

14:59:48  24    manager assistant managers what to do?  I guess you can

14:59:50  25    say that.  A series of each."

14:59:53  1        Please go through them quickly.  You'll see:

14:59:56  2   "As a store manager, you were responsible for making

14:59:58  3   sure the assistant manager did her job?  Answer:  Yes.

15:00:06  4   There's a lot more responsibility to being an assistant

15:00:11  5   manager?  Right."  And that is a point we're trying to

15:00:14  6   convey.

15:00:14  7        Contrary to what you've been told, ladies

15:00:18  8   and gentlemen of the jury, there is a lot more

15:00:20  9   responsibility for the manager's job than for the

15:00:25  10  assistant manager.  And I think the best illustration of

15:00:28  11  this -- again, I'm using this one so that it may be

15:00:33  12  fresh in your mind, from Ms. Richardson yesterday.  She

15:00:37  13  testified that, yes, when she leaves the store, she

15:00:40  14  leaves to-do lists for the employees, including the

15:00:44  15  assistant.  She comes back and checks.  But she says,

15:00:49  16  "the delegation of those duties does not relieve her

15:00:52  17  ultimate responsibility."  Lines 19 through 22.

15:00:57  18       Next slide, please.  "And when she was off

15:01:02  19  and left to-do lists, she came back and checked

15:01:06  20  everything."  And this is a key point.  "Yes, I had to,

15:01:11  21  because when the district manager comes in and

15:01:14  22  everything is not right, then she's going to look at me.

15:01:21  23  She does not look at the assistant manager."  That's

15:01:24  24  because the store manager is the one who was ultimately

15:01:28  25  responsible.

15:01:31   1          Ladies and gentlemen, these are not my

15:01:32   2   words.  These are the words of the actual plaintiffs who

15:01:39   3   testified in this case.  When you get away from the

15:01:40   4   lawyers talking about the policies, and focus instead on

15:01:43   5   what the actual plaintiffs' testimony was on what they

15:01:47   6   did, you will end up concluding with a different

15:01:53   7   picture, a picture of the real world in which a manager

15:01:56   8   multitasks.  He or she assigns work to the assistant

15:02:01   9   manager, so they help on their workload.  But they're

15:02:06  10   still in charge of their store.  Do not lose sight of

15:02:09  11   that.  There's a big difference between the assistant

15:02:11  12   manager and the store manager.

15:02:14  13          Contrary to what the plaintiffs will tell

15:02:16  14   you or have you believe, the store manager is always in

15:02:20  15   charge of that store.  Can I get slides from tab 4,

15:02:24  16   please?  And, again, I'm going to fast forward these

15:02:29  17   quickly, just to convey a point.  I do not want to leave

15:02:33  18   you guys with the impression that I'm making this up.

15:02:36  19          I want to summarize the testimony of the

15:02:37  20   plaintiffs for you.  I believe this is Ms. Richardson.

15:02:40  21   "At the store level, the assistant manager reported to

15:02:43  22   you?  Yes.  And one of the many things that you did was

15:02:46  23   to enforce Family Dollar's policies and procedures?

15:02:50  24   Yes, as I manager."

15:02:51  25          Next slide, please.  And I think this is

15:02:53  1   Mr. Pellegrin.  Your Honor was asking the question:  "If

15:02:57  2   a customer comes in and says, I want to talk to the

15:03:00  3   manager, who were they directed to?"  Mr. Pellegrin

15:03:03  4   ultimately admitted to him, "because he was in charge."

15:03:09  5   Again, there's several more.

15:03:13  6        The key point of all of this is not only is

15:03:17  7   a store manager in charge when he or she is at work, but

15:03:21  8   some of them also testified that they're held

15:03:26  9   accountable even when they are not there.

15:03:29 10        Tab 5.  Ms. Jones.  This is Gretchen Jones,

15:03:39 11   line 2.  "When you were promoted, you were told that you

15:03:42 12   were in charge of the store even you were not there?  I

15:03:46 13   believe so."

15:03:47 14        Robert Fiore, he did not testify.  He is

15:03:49 15   from New Jersey.  "On his off days, when he is near the

15:03:53 16   store, he either stops in or he sends his wife in to go

15:03:57 17   check on the employees and report back to him."

15:04:01 18        Next one.  Mary Valentine from Florida on

15:04:06 19   off days, she does surveillance on the store.  This is

15:04:08 20   the lady that I mentioned in my opening argument who

15:04:11 21   sits at the McDonald's and watches the employees to make

15:04:15 22   sure that everything is okay.  And she's doing that,

15:04:20 23   because, as Ms. Richardson testified in a slide that I

15:04:24 24   showed you previously, when something goes wrong, the

15:04:28 25   store manager is the one that's held accountable, not

15:04:32    1    the assistant manager.

15:04:37    2           Mr. Calamusa will try to belittle the work

15:04:42    3    of the store manager.  In one of the things he

15:04:48    4    mentioned, he mentioned schematics.  I guess Family

15:04:53    5    Dollar's dumbed things down -- they don't think.  Yes,

15:05:00    6    Family Dollar, they use schematics.  The key one, of

15:05:05    7    course, is customer service.

15:05:07    8           You walk in any Family Dollar store or

15:05:11    9    Wal-Mart, wherever you shop, whatever location you're

15:05:15   10    in, you will always know where things are.  Quick,

15:05:19   11    convenient shopping.  But schematics at Family Dollar

15:05:23   12    also serve a purpose.  They're there to make life easy

15:05:27   13    for the store manager; the same store manager who was

15:05:30   14    complaining about working a lot of hours.

15:05:32   15           This is what Bernice Adams, a woman from

15:05:35   16    Kansas, who was a troubleshooter, testified to.  Bernice

15:05:40   17    went from store to store, fixed any problems.  She says

15:05:48   18    when she goes there to make life easier, there's an

15:05:53   19    office schematic that talks about how you set up your

15:05:56   20    desk.  "It would have made life easier if things were

15:06:02   21    where they were supposed to be."  And also because she

15:06:04   22    was going in and cleaning up disasters other managers

15:06:07   23    have created.  It would make her life easier if there

15:06:10   24    was a schematic in place as to where merchandise in the

15:06:14   25    store went.

15:06:15  1          Yes, there are schematics.  And it is the

15:06:20  2   store manager's responsibility, ladies and gentlemen, to

15:06:22  3   enforce those schematics.  That is a management

15:06:28  4   function.

15:06:28  5          Don't let anyone tell you that just because

15:06:30  6   the manager is not the one that decides where things go

15:06:34  7   in the store, that he or she ceases to be a manager.  As

15:06:38  8   a manager, your primary goal is to enforce the rules and

15:06:42  9   regulations.  Following the schematics is, in fact, a

15:06:47 10   management duty.  And the other thing that he said,

15:06:54 11   which is really bizarre, because you've heard Ms. -- I

15:06:59 12   think it was Vada Rose, who I believe was from Missouri,

15:07:06 13   use the term "you cannot sell air."  And she told you

15:07:09 14   guys about how ordering was a very important thing.

15:07:16 15          Mr. Calamusa, on the other hand, will have

15:07:19 16   you believe it's a simple process.  You take a gun and

15:07:25 17   you scan and it tells you how much stuff to order.  Tab

15:07:32 18   9, please.  In telling you that, he ignores the

15:07:36 19   testimony of his own client, Gretchen Jones.  They order

15:07:45 20   merchandise that sells well.  A manager looks at the

15:07:50 21   sales report that they get.  They figure out what their

15:07:55 22   top-selling items are, and that's what they order so

15:07:58 23   that the store can succeed.

15:07:59 24          The next one, Ms. Rose.  I would -- line 3,

15:08:07 25   "would think, boy, this is a good seller.  We're always

15:08:10  1   out of it and I will order -- try to order as much of it

15:08:13  2   as I can get."  I mean, that is what they do.  They're

15:08:20  3   there to order the merchandise, to keep the stocks full,

15:08:28  4   and there's a reason for that.

15:08:29  5         Give me Barbara Richardson's slides, please.

15:08:34  6   There's a reason for that, ladies and gentlemen.

15:08:38  7   Ordering merchandise ensures that you have merchandise

15:08:42  8   to sell to your customers.  When you sell that

15:08:46  9   merchandise, you turn around, make a profit, increases

15:08:50  10  your payroll, increases the potential for a bonus for

15:08:55  11  the manager.  It's not as simple as Mr. Calamusa says

15:08:59  12  it.  Give me tab 11 of Barbara Richardson, please.

15:09:04  13        This is an important task.  "Regardless of

15:09:07  14  how long it took you, it was a pretty important thing

15:09:11  15  that you ordered merchandise every week?  Yes.  You have

15:09:14  16  to order every week.  And you would agree with me" --

15:09:18  17  I'm reading now from line 24 -- "that one of your

15:09:21  18  primary duties as a manager was to make sure the store

15:09:25  19  ordered merchandise every week?"  She said "yes, me and

15:09:30  20  the assistant."

15:09:31  21        And the question:  "Of course, the assistant

15:09:33  22  manager reports to you?"  She says "correct."  In other

15:09:37  23  words, she ultimately has the responsibility to order

15:09:41  24  for that store.  It's not as simple as Mr. Calamusa

15:09:45  25  makes it.  Do not let them belittle the duties of the

15:09:49   1   managers, ladies and gentlemen.

15:09:56   2              Now, I am going to spend the rest of my time

15:09:59   3   and talk about hiring and firing, because that is what

15:10:04   4   they focused on.  And the thing about that is every

15:10:09   5   plaintiff that testified in this case.

15:10:15   6              Give me tab B.  Every plaintiff that

15:10:21   7   testified in this case left Family Dollar long before

15:10:26   8   August 2003.  Janice Morgan, December 2000; Misty Bice,

15:10:34   9   July 2002; Bernice Adams left in February of 2000.  Keep

15:10:41  10   going.  Vada Rose left November of 2000.  Every person

15:10:48  11   who testified.  Do you remember Ms. Richardson

15:10:51  12   yesterday?  She stepped down in 2000.

15:10:56  13              Now, I point that out, because again, if all

15:11:00  14   of them left before August of 2004, this is the law

15:11:04  15   that's in effect.  There is no fourth requirement that

15:11:09  16   they hire or fire or have authority to do so.  But, yet,

15:11:14  17   over and over again, throughout this case, and

15:11:17  18   throughout the closing by Mr. Calamusa, and perhaps by

15:11:20  19   Mr. Wiggins, they will talk about how Family Dollar

15:11:24  20   managers cannot hire or fire.  And incredibly, they will

15:11:29  21   show you policies that say, before you can hire or fire

15:11:35  22   somebody, talk to your manager.

15:11:39  23              And I say incredibly they will show you

15:11:42  24   those, because even if step 4 is in effect, so what that

15:11:51  25   you have to get approval?  That's what the law is.  You

15:11:54   1    hire or fire or you make recommendations.  The law does

15:11:59   2    not say -- this is not Family Dollar's law.  This is the

15:12:02   3    law taken from the Code of Federal Regulations.  The law

15:12:08   4    does not say that you have to have sole authority and

15:12:12   5    you have to hire or fire on your own.  It says you

15:12:17   6    either do that, or your recommendations are given

15:12:21   7    particular weight.

15:12:22   8              Now, they then pull the trick on you -- and

15:12:27   9    I call it a trick, because the entire argument is, you

15:12:32  10    cannot hire or fire assistant managers without approval.

15:12:39  11    The store has other employees besides assistant

15:12:43  12    managers.  They somehow overlook the fact that no policy

15:12:49  13    that they showed you said anything about a manager not

15:12:53  14    having the right to hire cashiers and stockers.  In

15:12:56  15    fact, the evidence shows you never did.  I don't get it.

15:13:04  16              We hire people, but somehow we're going to

15:13:09  17    explain; because when it comes to assistant managers, we

15:13:13  18    need to get approval.  That's what the law says, ladies

15:13:17  19    and gentlemen.  You've got to hire and fire -- which

15:13:20  20    they do, for cashiers and stockers; or, you get approval

15:13:24  21    for your recommendation.

15:13:26  22              Now, I'm going to focus briefly on these

15:13:31  23    emails from Mr. Barkus and the policy that they showed

15:13:35  24    you of hiring and firing.  Mr. Barkus' email, you've

15:13:42  25    seen it throughout this trial, you know it by heart.  I

15:13:45  1   don't need to show it to you.  It says that before you

15:13:51  2   can give anyone a key to the store, you need to have

15:13:56  3   your district manager interview.

15:14:00  4          What they have not talked about is paragraph

15:14:03  5   1 of the email.  Look at it.  The email starts off

15:14:08  6   saying, "we have had a recent upsurge in integrity

15:14:14  7   issues with assistant managers."  What that means,

15:14:19  8   ladies and gentlemen, is there were a lot of assistant

15:14:22  9   managers who were being terminated because of theft.

15:14:27  10          So Mr. Barkus, then, in paragraph 2, which

15:14:31  11  they've showed you, goes on to say, "before you hire an

15:14:36  12  assistant manager, let your DM interview that person."

15:14:39  13          Ladies and gentlemen of the jury, an

15:14:40  14  assistant manager gets a key to the store.  With that

15:14:46  15  key comes access to the entire store, over a quarter of

15:14:50  16  a million dollars of inventory, plus the money that's in

15:14:53  17  the store.  Is there anything wrong with a company

15:14:58  18  saying, before we give somebody a key to the store and

15:15:03  19  the assets, we want a second set of eyes?  Is there

15:15:07  20  anything wrong with the company saying, before you get

15:15:10  21  keys, you need to undergo a background check?  That is

15:15:16  22  the real world.  That is your experience in your lives,

15:15:22  23  ladies and gentlemen.

15:15:22  24          With responsibility comes access.  And

15:15:25  25  before you can be given access, especially when you've

15:15:29  1   dealt, as Mr. Barkus said in paragraph 1, recently with

15:15:34  2   an increase in integrity issues, it makes sense for a

15:15:40  3   company to take those steps.

15:15:41  4          But the other thing that they will not point

15:15:43  5   out to you in Mr. Barkus' email, is -- and you will look

15:15:46  6   at it -- it only deals with key holders.  It does not

15:15:51  7   deal with cashiers and the stockers.  Read it, ladies

15:15:57  8   and gentlemen.  It doesn't say anything about the

15:16:01  9   manager not being able to hire cashiers and stockers.

15:16:09  10  Read it.

15:16:11  11         And the other thing that I want you to keep

15:16:13  12  in mind, too, is they somehow diminish the law.  And

15:16:17  13  somehow have a problem with the recommendation part, and

15:16:21  14  make it seem like if you're recommending, you're not a

15:16:28  15  true manager.  Two responses to that, of course.  One,

15:16:31  16  the law says hire, fire, or recommend.  But, two, go

15:16:36  17  back to Mr. Barkus' email.  Visualize it as you've seen

15:16:40  18  it.  He says, before you give someone the keys, let your

15:16:46  19  DM talk to that individual.

15:16:50  20         What that means, ladies and gentlemen, is

15:16:52  21  the store manager has screened the applicants, done the

15:16:59  22  interviews, selected who she wants, that's the candidate

15:17:06  23  that they present to the district manager.  Mr. Barkus

15:17:11  24  did not say present multiple candidates and let your

15:17:15  25  district manager hire somebody.  He said, present the

15:17:19  1  person that you want.  The store manager is involved in

15:17:24  2  that process.

15:17:26  3         And I will surmise that, to me -- and I hope

15:17:30  4  you agree -- that the most important person in the

15:17:33  5  process is the one that selects the person as the

15:17:39  6  candidate to present for that job; not the one who was

15:17:43  7  rubber stamping.  Read the emails.  And also listen to

15:17:52  8  the evidence in this case.

15:17:53  9         Give me tab 11, please.  Wilma Cutchall, the

15:17:57  10  woman from Texarkana, Arkansas, testified in the course

15:17:59  11  of a career, her district manager pretty much rubber

15:18:04  12  stamped her recommendations.  And that was because,

15:18:06  13  again, ladies and gentlemen, she had done the most

15:18:10  14  important part.  "Normally, he went with my

15:18:14  15  recommendation, because we had screened pretty good."

15:18:20  16         Next one is Vada Rose, promotion to

15:18:24  17  assistant manager, key holder.  She tapped one of her

15:18:29  18  employees at the store.  She did it.  The DM had no

15:18:34  19  problem with it.

15:18:36  20         Ladies and gentlemen of the jury, Family

15:18:40  21  Dollar's store managers actually participate in the

15:18:42  22  hiring process of assistant managers.  They select who

15:18:47  23  they want, and that is the candidate that they present.

15:18:50  24  And when they present that candidate, their

15:18:54  25  recommendations are given particular weight, because in

15:18:57   1    the words of Ms. Cutchall, "they have screened very

15:19:01   2    well."  They do the most important tasks -- interview.

15:19:09   3    Look at the application, decide which candidates have

15:19:12   4    the basic qualifications to bring them in and then do

15:19:15   5    the interviews.

15:19:16   6            Now, again, the email and the policies

15:19:22   7    they've showed you talk about key holders.  It doesn't

15:19:25   8    say anything about cashiers and stockers.  The store

15:19:29   9    managers hire those individuals.  But, again, don't take

15:19:33  10    my word for it.

15:19:34  11            Tab 12, please.  Testimony from two

15:19:37  12    plaintiffs that testified here and then two more from

15:19:42  13    elsewhere -- Janice Morgan.  "And I think you've

15:19:46  14    testified that assuming there was a budget, you had to

15:19:49  15    tell the DM that you needed someone for the cashier?

15:19:53  16    Yes."  Line 5:  "But you didn't have to get that

15:19:56  17    particular candidate approved?  Answer:  Right."  Next,

15:20:02  18    "But you made a determination whether you wanted that

15:20:04  19    person in your store as a stocker or cashier?  Answer:

15:20:09  20    Right."

15:20:10  21            Next one is Bernice Adams, the

15:20:14  22    troubleshooter from Kansas.  "As a store manager, could

15:20:18  23    you independently, on your own, hire an hourly employee

15:20:21  24    other than the assistant manager without the district

15:20:26  25    manager's approval?  Answer:  Yes, sir."  They're not

15:20:31  1   alone.

15:20:32  2            Valerie Stockdale who was not here.  She's a

15:20:35  3   woman from Pell City, that had the email that was shown

15:20:39  4   to Linda Taylor.  And my partner, Jay St. Clair, said,

15:20:43  5   where is Ms. Stockdale?  Pell City, less than two hours

15:20:46  6   away.  But she says in her deposition:  "Do you have to

15:20:49  7   run the decision to hire them by the DM?  Only if it's

15:20:54  8   an assistant manager.  Cashiers, we don't -- or

15:21:00  9   stockers, we don't."

15:21:01  10           Angela Alexander, another plaintiff who did

15:21:04  11  not testify.  "Could your assistant manager hire a new

15:21:07  12  cashier without consulting you, you being the store

15:21:10  13  manager?  Well, no, not without consulting me."  Next

15:21:14  14  slide?  "Okay.  On the other hand, you could hire a new

15:21:18  15  cashier; right?  Yes, I could."

15:21:25  16           They gloss over that.  Instead, they're

15:21:27  17  focusing on assistant managers and trying to argue a

15:21:30  18  standard that does not exist in the law.  The law does

15:21:34  19  not say managers need to hire or fire.  It says they can

15:21:41  20  do that or their recommendations have to be given

15:21:45  21  particular weight.

15:21:47  22           On the assistant manager, ladies and

15:21:49  23  gentlemen, I think you will agree, based on the evidence

15:21:52  24  that's been presented, that their recommendations were,

15:21:54  25  in fact, given particular weight.  But even if you

15:21:58  1    disagree with that, it is undisputed that they fire

15:22:02  2    cashiers and stockers.  No policy has been shown to tell

15:22:06  3    you otherwise.  All the law says in August of 2004 is

15:22:12  4    they have to be involved with the hiring and firing.  It

15:22:16  5    doesn't say you have to be involved in every decision.

15:22:19  6          Ladies and gentlemen, we contend that

15:22:21  7    contrary to what our adversaries have told you, Family

15:22:27  8    Dollar store managers actually hire or fire cashiers and

15:22:30  9    stockers; or as it relates to assistant managers, their

15:22:36  10   recommendations are given particular weight.

15:22:41  11         We've talked about terminations, same

15:22:44  12   concept again.  Somehow, it is not okay, even though the

15:22:49  13   law says it is, that you hire or fire; or, that you

15:22:55  14   recommend.  Somehow, the standard has become -- forget

15:23:01  15   what the law says, it has to be, can they do it on their

15:23:05  16   own?  Can they independently do it?  Ladies and

15:23:09  17   gentlemen, that is not the law.  That's not the law.

15:23:14  18   The law says you either terminate or you make

15:23:17  19   recommendations.

15:23:20  20         Ladies and gentlemen, there's a reason why

15:23:23  21   Family Dollar, or any employer, any business owner will

15:23:28  22   want to have a system of checks and balances in place.

15:23:31  23   When you terminate somebody, you're affecting that

15:23:36  24   person's livelihood.  Whether you believe that person is

15:23:38  25   a terrible employee or not, he or she is the name on

15:23:43  1  that paycheck.  To be fair to that employee, it makes

15:23:46  2  sense to ask for a second set of eyes, to see if there's

15:23:51  3  documentation, to show where that employee has been

15:23:54  4  given an opportunity to correct their behavior.

15:24:00  5          But also, there's a second reason why

15:24:02  6  companies have that extra labor.  That's to protect the

15:24:09  7  company and the manager from wrongful termination

15:24:11  8  lawsuits.  You can't have a renegade manager who flies

15:24:18  9  off the cuff and makes a decision where there's no

15:24:22  10  documentation to back it up.  For risk management

15:24:26  11  purposes, that is why companies have that requirement.

15:24:31  12  There is nothing wrong with that.

15:24:33  13          Ladies and gentlemen, the Judge will charge

15:24:35  14  you on the law.  You don't need to terminate on your

15:24:39  15  own.  That is a standard the plaintiffs' counsel had

15:24:43  16  made up.  If you believe that all the plaintiffs

15:24:48  17  testified left before August of 2004, that the new

15:24:52  18  standard apply, even the new standard says, you either

15:24:56  19  terminate or you make the recommendations; and the

15:25:02  20  recommendations be given particular weight.

15:25:05  21          The evidence has shown, and again, Barbara

15:25:08  22  Richardson because she testified yesterday.  Two

15:25:11  23  employees that she wanted terminated were both

15:25:13  24  terminated.  Bill Detter, the guy who was unable to make

15:25:16  25  it here today -- who testified by deposition -- in the

15:25:21  1   course of his career as a manager, wanted to fire over

15:25:25  2   30 people.  29 of them were approved.

15:25:30  3            Mr. Detter, if you recall, although he was

15:25:33  4   29 or 30, refused to admit that his district managers

15:25:39  5   gave his recommendations particular weight.

15:25:42  6   Fortunately, you folks are more reasonable than

15:25:46  7   Mr. Detter.  And I believe you'll agree that 29 of 30

15:25:50  8   is, indeed, particular weight.

15:25:54  9            Ladies and gentlemen, are these individuals

15:25:57  10  glorified clerks and stockers?  They're not.  Their

15:26:04  11  responsibility is diminished, and they're insulted when

15:26:08  12  they're classified as that.

15:26:10  13            Cashiers and stockers are not involved in

15:26:13  14  the hiring process.  Cashiers and stockers don't

15:26:17  15  supervise.  They don't fire.  They don't give out

15:26:20  16  assignments.  They don't do the paperwork at the store.

15:26:26  17  That is what a clerk does, a cashier does.  The store

15:26:32  18  manager is responsible for the overall operation.

15:26:38  19            Can I get tab 13, please?  As I pointed out

15:26:45  20  in my opening, I come back to this again:  If they are

15:26:49  21  correct that they are stockers and cashiers only, that

15:26:56  22  the stores can fully function without a store manager,

15:27:02  23  Family Dollar could save and get more labor hours as

15:27:08  24  this chart, take the average hours and the salary, not

15:27:13  25  just the plaintiffs in this case, 671, divide it by the

15:27:18  1   average pay for the hourly employees, which is 6.52; you

15:27:21  2   will get from that 671 over 90 labor hours.  Most of the

15:27:27  3   plaintiffs who have testified in this case, ladies and

15:27:30  4   gentlemen, said they worked 60 to 70.

15:27:35  5          Family Dollar could take their salaries --

15:27:36  6   next slide, please -- could take those salaries and hire

15:27:40  7   more labor hours, and save 24-and-a-half million

15:27:45  8   dollars.  And when you add in the sick pay that only

15:27:48  9   store managers get, you get close to $26 million.

15:27:55  10          Ladies and gentlemen of the jury, they are

15:27:56  11  not glorified stock clerks.  They're actual managers.

15:28:01  12  The stores cannot operate on their own.  They need a

15:28:05  13  manager.

15:28:07  14          Tab 16, please.  A manager brings with him

15:28:11  15  or her responsibility and manage skills.  This is Sam

15:28:18  16  Kenneson.  Tab 15, please.  I'm sorry.  Mr. Kenneson

15:28:30  17  will tell you -- while it's coming up -- in his

15:28:33  18  deposition we asked him the same question we posed to

15:28:36  19  the plaintiffs that testified here.  "If you say you're

15:28:41  20  a glorified stocker or cashier, why is Family Dollar

15:28:46  21  paying your salary?  What justifies Family Dollar paying

15:28:49  22  you your salary, as opposed to going out and getting 120

15:28:53  23  hours worth of work from a stocker or cashier?"

15:28:56  24          He says:  "Because my ability to manage the

15:29:01  25  stores, my hard work, my dedication."  And then the

15:29:06  1  question was:  "When you say your ability to manage,

15:29:10  2  what are you talking about?"

15:29:11  3          And this is a key point.  This is the reason

15:29:14  4  why we say they're not glorified stockers or cashiers.

15:29:18  5  "Motivating those employees, getting those employees to

15:29:21  6  do their tasks, ordering, which increases sales.

15:29:26  7  Because if you're out of stock, you might as well shut

15:29:29  8  down -- shut down the store."

15:29:33  9          Ladies and gentlemen of the jury, that is

15:29:33  10  the manager's primary responsibility, is to run the

15:29:39  11  store.  It is not what they do the most.  Family Dollar

15:29:43  12  could save $26 million if all it wanted was somebody who

15:29:48  13  stocked shelves and ran the cash register 80 to 90

15:29:52  14  percent of the time, when it wanted -- the most

15:29:56  15  important thing it wanted, which is the primary duty,

15:30:00  16  the most important duty, is someone to run the store.

15:30:04  17          I will turn over now to my colleague, Jay

15:30:06  18  St. Clair.  Thank you.

15:30:08  19          MR. ST. CLAIR:  Thank you, Abdul.

15:30:11  20      Mr. Kallon spoke with you about this first

15:30:14  21  element and the last element.  Salary, primary duty,

15:30:20  22  hiring and firing.

15:30:21  23          What I want to talk to you about is

15:30:25  24  customarily and regularly directing the work of two or

15:30:28  25  more employees.  Do they manage two people?  And the

15:30:35   1   good news is the Judge has made this easy, of course,

15:30:39   2   because he's got it.  He's cut the group in two -- or

15:30:42   3   rather, separated the people that are suing.

15:30:45   4          And the Judge is going to tell you that 162

15:30:51   5   of the people who are included in the group he has found

15:30:56   6   a technical violation of the law, and so you won't have

15:31:00   7   to decide it as for that group.  And he's going to refer

15:31:05   8   you to Defendant's Exhibit 1742C, 1742C.  That will be

15:31:13   9   in his instructions.  And he'll say to you that this

15:31:16   10  group beginning on number 979, Catherine Elaine Alston,

15:31:21   11  down to the end, there was a technical violation of the

15:31:27   12  law.

15:31:27   13         Because His Honor has concluded that in

15:31:31   14  order to meet this two employee supervising, there had

15:31:38   15  to be at least 80 hours of work in the store, 80 percent

15:31:44   16  of the weeks.  And you'll see when you look at this

15:31:48   17  exhibit that His Honor's going to refer you to, that the

15:31:52   18  line falls right at 80 percent.  And so those below that

15:31:58   19  you will have to assess two things:  Was the company

15:32:04   20  willful in the way that happened; and how much money are

15:32:10   21  they to receive?

15:32:12   22         Now, before I talk about them, let me talk

15:32:14   23  about the people that are above this line, that that's

15:32:18   24  -- that's 162 people.  Everybody else, everybody else

15:32:24   25  meets that test.  There's no question that for everybody

15:32:29    1   else, they were supervising at least two or more

15:32:32    2   employees.

15:32:33    3            You can look at exhibit -- it's Defendant's

15:32:36    4   Exhibit 1742C.  And you'll go through there page after

15:32:40    5   page after page, and there will be people who meet this

15:32:43    6   test.  And that is relevant to this point:  The first

15:32:49    7   thing you'll have to decide on this technical violation

15:32:53    8   with this group of 162, was it willful?  Did Family

15:32:58    9   Dollar mean to violate the law?  And I suggest to you

15:33:02   10   the only answer to that can be "no".  Can be "no".

15:33:07   11            And here's why:  His Honor has said they had

15:33:10   12   to have at least 80 hours of labor in the store 80

15:33:14   13   percent of the time.  Well, the minimum scheduled hour

15:33:19   14   was 135; right?  Remember those schedulers?  The minimum

15:33:23   15   is 135.  52 of those hours are for the store manager.

15:33:31   16   So that leaves a minimum of 83 hours that was scheduled

15:33:37   17   in every store every week.

15:33:39   18            Remember, Dr. Bradley came back in here and

15:33:41   19   had this brand new analysis that he had done, based on

15:33:46   20   the schedule and saying, well, that's the way it is.

15:33:49   21   What's on this schedule is the way it is.  And he got

15:33:53   22   paid a lot of money, I'm sure, to work up this new

15:33:58   23   opinion that says the schedules to how it is in the

15:34:02   24   store.  Well, if that had been the case, there would

15:34:06   25   have been a hundred percent, a hundred percent

15:34:09   1   performance.  But for some people, it just worked out

15:34:13   2   that it didn't happen.

15:34:15   3            You know, why is that?  Well, you can look

15:34:17   4   at some of these folks.  A number of them right here,

15:34:21   5   they only worked four weeks.  And three of those four

15:34:25   6   weeks they had more than 80 hours.  But for one week,

15:34:28   7   somebody was sick and missed a day or two of work.  And

15:34:33   8   so for that one week, they didn't qualify.  They didn't

15:34:35   9   get to 80.  Well, three into four is 75 percent.

15:34:40   10           So the fact that this person -- one person

15:34:43   11   got sick and missed one day of work in a four-week

15:34:47   12   period, puts that person below 80 percent.  And so, the

15:34:52   13   way that the Judge has ruled, then, that person is due

15:34:57   14   money.

15:34:58   15           So how do you decide what money?  Well,

15:35:02   16   again, that's been done for you.  If you'll look at

15:35:07   17   Exhibit 1742C, the last page, there is a number that

15:35:15   18   adds up those people underneath this 80 percent.  And

15:35:19   19   it's $1,160,759.  And you'll see the names of the people

15:35:34   20   there and the individual amounts for them that's

15:35:39   21   calculated by taking their salary; the average was about

15:35:45   22   $700.  Most people said they were meant to be paid for

15:35:49   23   52 hours.  They understood it to be the 52 hours.

15:35:52   24           So take that salary, spreadsheets, it's over

15:35:55   25   52 hours and come up with an hourly rate.  And then

15:35:59    1   they've been paid the spring time from 40 to 52, so

15:36:04    2   that's giving them that other half time on top of that.

15:36:07    3   And if they worked more than 52, that is for that as

15:36:11    4   well.  It's based on their actual hours reported.

15:36:15    5            Now, you don't have to do that for anyone

15:36:19    6   outside this group of 162, because they meet the test.

15:36:24    7   They meet the test.  They customarily and regularly

15:36:27    8   supervised two people.

15:36:29    9            Now, Dr. Bradley came in, again, and said,

15:36:32   10   oh, well, but they're not always in the store when other

15:36:36   11   people are there.  Well, that's absolutely right, but --

15:36:40   12   because the law doesn't require that.  They're the

15:36:43   13   manager.

15:36:43   14            How many times have you heard people argue

15:36:45   15   about, you know, that's my store, I have a

15:36:47   16   responsibility.  And His Honor will tell you in

15:36:51   17   describing the law that a manager doesn't have to be

15:36:57   18   continuously present at the work site in order to be

15:37:01   19   manager.  And we all know that, don't we?

15:37:03   20            I mean, our boss, our boss may not be there

15:37:07   21   at work the same day that I'm there, but that doesn't

15:37:10   22   make her not my boss.  So I suggest to you that you

15:37:15   23   don't have to focus or worry about or make a decision

15:37:20   24   about money for anyone other than this group of 162.  As

15:37:29   25   for that group of 162, that amount is on this Exhibit

1   1742C.

2           Now, Mr. Wiggins, I expect's going to get up

3   next and he may say, well, that's not the right number.

4   In fact, you should look at this number Dr. Bradley came

5   up with.  Let me tell you a few things that's wrong with

6   Dr. Bradley's hours.  He adds the six hours in there.

7   Here's number one.  Number two, he takes the salary and

8   divides it by 40.  He's just spreading it over 40 hours.

9           You remember that chart that we looked at

10  where he had that overtime rate up to $26 an hour?  Do

11  you remember that chart?  That's the way his numbers are

12  calculated.  And that's not the right way to do it.  The

13  Judge is going to tell you the right way to do it.

14  Yeah, don't you remember when we were saying that here's

15  the method used by Dr. Bradley?  He's coming up with $26

16  an hour overtime.

17           How much time do I have left?

18           THE CLERK:  Four minutes.

19           MR. ST. CLAIR:  Thank you.  So, the correct

20  number to use is the number that's on this exhibit.

21           Now, what else will Mr. Wiggins say?  He's

22  going to talk to you about willfulness, I'm sure, and

23  say this is a bad company that's set out to break the

24  law.  This is not a bad company.  You've heard the

25  evidence.  You've seen the witnesses here in the case.

15:39:02  1        I suggest to you this is a good company with

15:39:06  2   -- that provides good jobs for good people -- good jobs

15:39:10  3   for good people.  He's going to, I'm sure, say, oh,

15:39:14  4   well, they're successful.  They've been profitable and

15:39:19  5   so insinuating that just because a company's profitable

15:39:24  6   then we ought to just take some of it and give it to

15:39:27  7   people.  That's not right.  That's not the law.

15:39:31  8        Your Honor will tell you that you shouldn't

15:39:33  9   decide this based on bias against companies or feeling

15:39:39  10  sorry for somebody else.  You should base it on the law.

15:39:44  11  And I just say to you, I don't think that looking at

15:39:47  12  this evidence, there's any way you can decide that they

15:39:51  13  were not managers.  But their primary duty was a

15:39:55  14  manager.  And then it comes down to this:  Did they

15:39:58  15  manage two or more people?  Well, the vast, vast

15:40:02  16  majority of them clearly did.

15:40:04  17       His Honor's carved out this group of 162

15:40:08  18  that he's concluded didn't.  So all you have to do when

15:40:12  19  you go in the jury room is fill out the amount for that

15:40:14  20  group, answer that the rest of them were exempt, and

15:40:18  21  your work is done.

15:40:21  22       I appreciate your attention.  I appreciate

15:40:24  23  your service on this jury.  This has been a very

15:40:26  24  attentive, hard-working jury.  And I know Family Dollar

15:40:29  25  and everyone in this courtroom appreciates that.

15:40:33  1          Thank you.

15:40:35  2          THE COURT:  Ladies and gentlemen, we're

15:40:37  3  going to take a break.  We'll be in recess until 10

15:40:44  4  minutes of 4:00 by the clock on the wall.  Please do not

15:40:48  5  discuss the case or allow the case to be discussed in

15:40:50  6  your presence, and keep an open mind.

15:40:53  7          (Jury out at 3:40 p.m.)

15:41:04  8          THE COURT:  The lawyers will remain.

15:41:07  9          MR. KALLON:  Sir?  The lawyers will remain?

15:41:10 10          THE COURT:  Yes.

15:41:10 11          (In open court, jury not present.)

15:41:10 12          THE COURT:  There is one issue, and that is

15:41:14 13  that of the interrogatories for the jury, the Special

15:41:29 14  Verdict.  Here's what I propose to say:  Question 1:

15:41:35 15  "What overtime do you award for whom the defendant,

15:41:41 16  Family Dollar Stores, Inc., has not met the two

15:41:46 17  full-time equivalent requirement?"

15:41:46 18          Any objection to that formulation?  I

15:41:49 19  understand you object to it.  Any objection to that?

15:41:52 20  Otherwise, the --

15:41:55 21          MR. ST. CLAIR:  Agree.  No objection, Your

15:41:57 22  Honor.

15:41:57 23          MR. R. WIGGINS:  Judge, our only concern is

15:41:59 24  that it still suggests those are the only ones it could

15:42:04 25  be a finding for, and we ask that you -- like you

15:42:06  1    charged in your last jury charge, that they be told

15:42:09  2    they've still got to decide that you're not ruling

15:42:12  3    against the others.

15:42:12  4              THE COURT:  I'll explain that in explaining

15:42:15  5    the jury charge.

15:42:16  6              MR. R. WIGGINS:  Okay.

15:42:17  7              THE COURT:  Thank you.

15:42:18  8              MR. ST. CLAIR:  Then the rest of the form

15:42:22  9    will be the same as last time?

15:42:23  10             THE COURT:  Yes.

16:03:58  11             (In open court, jury present.)

16:03:58  12             THE COURT:  Mr. Wiggins?

16:03:58  13    (Court reporter slowing Mr. R. Wiggins down repeatedly

16:04:00  14                      throughout.)

16:04:00  15             MR. R. WIGGINS:  Thank you, Your Honor.

16:04:03  16    Good afternoon.

16:04:05  17             It's my first chance to talk directly to

16:04:08  18    you, although I've been in front of you.  And I do

16:04:11  19    appreciate -- and on behalf of all the lawyers, I think

16:04:13  20    all of us appreciate your attention.

16:04:15  21             I've heard every lawyer in the case, both

16:04:17  22    sides of the case, talk about how rare it is to see

16:04:22  23    every juror paying so close attention.  And that means a

16:04:26  24    lot to the lawyers.  It means a lot to the people that

16:04:29  25    have had to go through this trial that are parties,

16:04:32  1  witnesses, officials.

16:04:34  2          It always makes people feel like they're

16:04:38  3  getting their day in court.  People are conscientious,

16:04:43  4  listening.  And I think to a person, the lawyers have

16:04:46  5  said -- have made remarks about that.  And I thank you.

16:04:50  6          And I hope that I haven't said anything, and

16:04:52  7  I hope any of the people representing my clients have

16:04:56  8  said anything that would offend you.  Sometimes in the

16:05:00  9  heat of the battle, you can get a little stipend or

16:05:05  10  leave the podium and think, well, I should have cooled

16:05:08  11  it.  But that's just part of trying to represent your

16:05:12  12  client.  And if I have offended anyone, please take it

16:05:16  13  out on me.  My client, they can't help it.  Don't hold

16:05:25  14  it against them.

16:05:27  15          But let me start and get to the point.  The

16:05:30  16  plaintiffs' burden is not disputed.  The Judge told you

16:05:32  17  early on that our burden has been met.  We've used their

16:05:37  18  records and showed that we worked over 40 hours.  We

16:05:40  19  weren't paid for overtime.

16:05:42  20          If the defendant wants to then say that

16:05:44  21  they're exempt, they have to prove that; and that's

16:05:47  22  their burden of proof, and that's what the trial has

16:05:49  23  been mainly about.

16:05:51  24          You've got a lot of evidence in front of

16:05:53  25  you, a lot of documentary evidence.  And I would imagine

16:05:57   1   if I were sitting in your place, it would be going

16:06:00   2   through my mind, well, how do I put it all together?

16:06:03   3   How do I make sense of this mass of testimony and

16:06:06   4   documents and concepts?  And I think the Judge will help

16:06:13   5   you the most on that.

16:06:15   6          As has been said by the defendants and by

16:06:18   7   the plaintiffs' lawyers both, that the lawyers don't

16:06:21   8   tell you what the law is.  They might try, but they

16:06:24   9   really -- that's not their job.  It's the Judge's job to

16:06:28   10  give an instruction on what the law is.  And I want to

16:06:31   11  stick to that.

16:06:33   12          The Judge is going to tell you in his

16:06:35   13  instructions in a few minutes about what the working

16:06:40   14  supervisor means.  The defendant has created a straw

16:06:46   15  man.  We're not claiming our clients are just laborers,

16:06:50   16  or just stockers, or anything else.  But we've said from

16:06:53   17  the beginning that they're lead men.  We concede they're

16:06:56   18  lead men.

16:06:56   19          They're working supervisors.  That's two

16:06:59   20  words:  Working supervisors.  They do both.  That's what

16:07:03   21  multi-tasking means.  The defendant seems to think they

16:07:08   22  can put out the word multi-task and that's the ticket

16:07:12   23  home, don't pay any overtime.  That's not the law.

16:07:14   24          If I could have the "working foreman".

16:07:18   25  That's what the Judge is going to tell you the law is.

16:07:21  1   That's not my words, it's not Mr. Kallon's words or

16:07:25  2   anyone's words, those are the Court's instructions.

16:07:29  3   Working foreman.  "In determining whether a store

16:07:33  4   manager is an executive, you should consider the nature

16:07:36  5   of the work performed by the store manager.  For

16:07:38  6   example, a 'working' or 'supervising' foreman works

16:07:41  7   alongside his or her subordinates, performing the same

16:07:45  8   kind of work as the subordinates, and also carrying out

16:07:49  9   supervisory functions."  They do both.  They multitask.

16:07:54  10          And the defendant says, well, so what if the

16:07:58  11  assistant manager does it?  Well, it is important.  The

16:08:01  12  reason I keep bringing it out is because that's what the

16:08:03  13  law says.  Performing the same kind of work, shoulder to

16:08:08  14  shoulder, they're working as their subordinates.  And

16:08:12  15  that's -- that's what a working supervisor is.  And I

16:08:16  16  think the evidence from both sides has been that's what

16:08:19  17  happens here.

16:08:20  18          These are working supervisors.  They're not

16:08:23  19  bona fide executives.  The exemption is worded that way.

16:08:27  20  Bona fide means real, not superficial; real executives.

16:08:33  21  And if you work shoulder to shoulder, you're a working

16:08:38  22  supervisor and you're entitled to overtime.

16:08:41  23          Now, let me say this, too:  It was suggested

16:08:45  24  that that is just -- I wrote the words down --

16:08:47  25  "applicable to factories or industries, not to free-

16:08:52  1    standing stores".  Well, that's not what that says.  And

16:08:55  2    if that were true, if this didn't apply to Family

16:09:00  3    Dollar, the Judge wouldn't tell you that it does.  The

16:09:04  4    Judge is going to instruct you that this applies to

16:09:07  5    Family Dollar, and the defendant is wrong to say that it

16:09:12  6    doesn't apply to free-standing stores or it applies just

16:09:15  7    to factories.  That's not true.

16:09:19  8           Second thing:  And this is important,

16:09:22  9    because so much emphasis was put on it a few minutes

16:09:27  10   ago.  That if you make recommendations and someone puts

16:09:31  11   weight on your recommendations, does that mean you give

16:09:35  12   up your overtime?  If I just make a recommendation, does

16:09:42  13   that mean they can work me 60 hours a week not paying

16:09:45  14   me?  That's not what the law is.  I don't even

16:09:49  15   understand that argument.

16:09:52  16          The recommendation -- think what it would do

16:09:56  17   to the law.  If every person that makes a recommendation

16:09:59  18   you work them until they drop, you don't pay them

16:10:02  19   overtime.  That's not the law.  That's just one factor.

16:10:06  20   You've got to meet each factor.  And having recommending

16:10:10  21   authority is just one element.  And we'd all be in sad

16:10:15  22   shape if just by making a recommendation we lost our

16:10:19  23   overtime rights.

16:10:20  24          And the Judge is going to tell you that you

16:10:23  25   still have to decide this case, even if you decide they

16:10:28  1  have recommending authority, that's a long way from

16:10:31  2  making them executives.  Because why?  Working

16:10:34  3  supervisors, they make recommendations.  They multitask.

16:10:41  4  That's a working supervisor.  They supervise.  They

16:10:45  5  work.  They do both.  But they're not exempt from

16:10:51  6  overtime.  Let's get that cleared up here at the start.

16:10:55  7        Secondly:  50 percent -- now, it was argued

16:11:01  8  by the company that time is not controlling and they

16:11:06  9  just brush to the side.  That's not the law.  The

16:11:10  10  Court's going to instruct you -- I'm going to put it on

16:11:12  11  the board here as to what the Court's going to tell you

16:11:15  12  what the law is -- if I can get this to work.  Here's

16:11:26  13  part of the instruction as I pulled it out of the typed

16:11:29  14  version the Judge gave us a little while ago.  Now,

16:11:32  15  exactly what the law really is.

16:11:33  16        It says:  "The amount of time spent by an

16:11:35  17  employee in the performance of executive or managerial

16:11:38  18  duties is a useful guide in determining whether such

16:11:44  19  duties are primary.  The rule of thumb is that primary

16:11:49  20  duty means the major part, or more than 50 percent, of

16:11:56  21  the employee's time is spent in performing executive

16:11:59  22  duties.  But time alone is not the only factor."  And we

16:12:05  23  concede that.  But it is an important task.  You don't

16:12:11  24  just brush it aside.  It is a useful guide.

16:12:13  25        And as you get away from 50 percent, here it

16:12:19  1    is undisputed that 80 percent of the time at least is

16:12:25  2    spent in manual labor.  As you move away from 50

16:12:31  3    percent, you go to 60 percent manual labor, 70 percent

16:12:33  4    manual labor, 80 percent manual labor, you are a working

16:12:38  5    foreman obviously.  You don't need much more than that.

16:12:42  6    It's just about that simple.

16:12:46  7             The scale, as Mr. Calamusa said, is just

16:12:49  8    tipped all the way over to the working side.  Sure, they

16:12:53  9    still do supervision.  It's not contested.  So does the

16:12:58  10   assistant manager.  That's what a working supervisor

16:13:00  11   does.  They work and they supervise.  So, I don't want

16:13:03  12   you to think that the time spent is not important.

16:13:07  13            The percentage is important.  It's not the

16:13:09  14   only thing, but it is very important.  To have something

16:13:12  15   to weigh on the other side, you've got to have something

16:13:15  16   very heavy, you've got to have some really critical

16:13:18  17   thing.  Not just recommending authority.  That doesn't

16:13:21  18   balance out all that manual labor at all; or, overtime

16:13:28  19   rights are gone for just about everybody, if mere

16:13:31  20   recommending authority loses your FLSA rights.

16:13:36  21            Now, what is the other 20 percent?  Even if

16:13:40  22   you go further, even if for the fact that they spend so

16:13:44  23   much time just unloading the trucks and everything else

16:13:48  24   you've heard about, if you still say, well, okay, let's

16:13:51  25   look at the other 20 percent.  What are they doing with

16:13:54  1    the other 20 percent?  It's been represented to you that

16:13:56  2    they're in charge of that store.  That, ladies and

16:14:02  3    gentlemen, is not true, according to their own

16:14:04  4    documents.  And I want to go through two of three of

16:14:07  5    them that I think tell you what the real world is at

16:14:10  6    Family Dollar.

16:14:12  7             If we could see their -- well, the one after

16:14:16  8    that -- Store Team, what they define as their store

16:14:20  9    team.  This is what they define in their own training

16:14:23  10   documents, what they train their employees:  The Family

16:14:26  11   Dollar Store Team is the district manager, the store

16:14:30  12   manager, the assistant manager.

16:14:32  13            Let's go to the next one.  No.  Go back.

16:14:37  14   I'm sorry.  Go back two.  This one.  Go up here.  This

16:14:43  15   is the district manager job description that they put

16:14:46  16   out to public.  Let's blow it up.  Let's go to this

16:14:54  17   sentence "success depends".  Blow that up, second

16:14:58  18   sentence.  Yeah.  Blow that whole thing up.

16:15:00  19            This is what -- this is their job

16:15:02  20   description for district manager, and it tells us about

16:15:04  21   that team.  "Success depends on your ability to hire,

16:15:11  22   train, motivate your management team."  They haven't

16:15:22  23   been candid with us.  That district manager is the head

16:15:28  24   of that team.  And it says right there that they hire,

16:15:32  25   they train, they motivate the management team in the

16:15:35  1   store.  And by the way, the district manager doesn't

16:15:37  2   have any other staff, doesn't even have a secretary.

16:15:40  3   His only employees are the store employees.

16:15:45  4          Let's go to the next paragraph on the job

16:15:47  5   description under the word "qualifications".  Go to the

16:15:51  6   last -- yeah.  "Our district manager positions require a

16:15:57  7   minimum of five years."  Now, look at this last

16:16:00  8   sentence, the last two sentences, defining what the

16:16:05  9   district manager's job is:  "You will need to deliver

16:16:08  10  bottom line results through remote management of your

16:16:12  11  team."  We've heard from the beginning of this case:

16:16:21  12  Remote control.  No remote control.  They couldn't

16:16:25  13  possibly have a remote control.  They know better.

16:16:28  14          They -- that's what they tell the public

16:16:29  15  when they recruit district managers is that they're in

16:16:32  16  charge of that team, that store team, they're the head

16:16:36  17  of that store team.  And they run it through remote

16:16:42  18  management.  That's their word, "remote management".

16:16:44  19  How do they do that?  Emails mainly.  They bombard them.

16:16:48  20  Mr. Barkus admitted they bombard these stores with these

16:16:51  21  emails.  200,000 a week.  10 every -- for every store a

16:16:57  22  week -- I mean, a day.

16:17:01  23          We know how the modern world works in terms

16:17:04  24  of electronics.  You don't have to be in the store to

16:17:07  25  run your team.  But let's go beyond the job description.

16:17:14   1   Let's look at their hiring.

16:17:16   2           Let's go to the next document.  Two over.

16:17:25   3   No -- well, yeah, let's look at this real quick.  This

16:17:28   4   is an email that's in evidence.  Exhibit 140A.  Here is

16:17:35   5   the district manager.  He says, why -- "so why am I

16:17:38   6   chastising the entire district when half of you did an

16:17:42   7   outstanding job?  Because we live and breathe as a

16:17:46   8   district."  That's talking to the team.  And he says "we

16:17:54   9   live and breathe as a team."  We operate, we, in the

16:17:57  10   real world, we're not a free-standing world, we're

16:18:00  11   operating as a district.

16:18:02  12           Let's go to the next one.  Before I go to

16:18:10  13   that one, I want to put one up here.  They tell you that

16:18:18  14   the hiring is done by the store manager for the

16:18:25  15   cashiers.  Look at this last line here.  This is in part

16:18:33  16   of their hiring, you see up there at the top, it says

16:18:37  17   "sourcing applicants".  And this is what they train

16:18:40  18   their employees and they're talking about referrals,

16:18:42  19   which is recruitment of new employees.  Let's see if I

16:18:46  20   can get this blown up.

16:18:50  21           Look at that last line there.  This is their

16:18:52  22   policy, this is what they train:  "Decision to hire,

16:18:56  23   based on qualifications, remains with the district

16:18:59  24   manager."  That's not all the district manager does.

16:19:10  25           Let's go to the next slide.  "Payout

16:19:17   1   transactions.   Must have the approval of the district

16:19:22   2   manager of the corporate office."   Payouts, right there

16:19:28   3   in the store.   "Must have approval of the district

16:19:31   4   manager."

16:19:31   5           Let's go to the next one.   "Payout

16:19:34   6   transactions are limited to $50.   Any amount higher than

16:19:38   7   $50 requires district manager approval."

16:19:41   8           Let's go to the next one.   Petty -- "cash

16:19:46   9   accumulation."   Does the manager -- can he decide how

16:19:49   10  much to accumulate cash?   No, the district manager does

16:19:52   11  that.   "The amount of the store's cash accumulation is

16:19:54   12  set by the district manager."

16:19:55   13          Next one.   Keys.   We heard so much about,

16:20:04   14  well, they have the keys.   Well, who really controls the

16:20:07   15  keys?   "At the direction of the district manager,

16:20:09   16  regional vice-president, or an officer of the company,

16:20:11   17  keys may be given to someone other than management in

16:20:16   18  the case of an extreme emergency."   But what's it say?

16:20:20   19  Can the store manager make those kinds of decisions?

16:20:23   20  No.   The store keys, the district manager decides who

16:20:26   21  can get them.

16:20:27   22          Next one.   The store hours.   "These hours

16:20:34   23  may be altered by the company or the district manager."

16:20:38   24          Next one.   This is the break room.   Can the

16:20:42   25  employees or the store manager decide what to do in the

16:20:45  1    break room?  No.  "Appliances, such as coffee pots,

16:20:50  2    microwave ovens, refrigerators, must be approved by the

16:20:53  3    district manager.  No extension cords are allowed."

16:20:58  4         Next one.  This is a four-way rack.  You've

16:21:04  5    been in the stores and they have racks and clothes on

16:21:06  6    them.  They cross each other, clothes on all sides.  Can

16:21:09  7    the store manager decide to remove one because he

16:21:11  8    doesn't need it or it's in the way or needs the -- no,

16:21:16  9    district manager.  "The district manager/store manager

16:21:18  10   should decide which four-way fixture is designated as

16:21:23  11   four-way number one."  Next line.  "Do not remove

16:21:27  12   fixtures from the sales floor without approval from the

16:21:30  13   district manager."

16:21:33  14        Next one.  End caps.  We all know at the end

16:21:39  15   of the aisle they try to catch your eye.  Who decides

16:21:41  16   about the end caps?  The district manager.  "Store

16:21:45  17   manager should decide which end cap is designated,

16:21:49  18   number one, any changes from the company program must,"

16:21:53  19   emphasis on "must" -- "must have district manager

16:21:55  20   approval."

16:21:56  21        Next one.  We heard so much about ordering,

16:22:00  22   merchandising.  Who really does it?  "There is a

16:22:03  23   merchandise buyer in the corporate merchandising

16:22:05  24   department who selects the merchandise for your store,

16:22:09  25   decides the price, assures the merchandise is

delivered."

Next one.  Ordering.  We heard so much about ordering.  Is that a management function?  It says right there.  "Who is responsible?"  Let's blow that up. Yeah, right down here on the bottom.  "Who is responsible?  Associates who are involved in the actual merchandise ordering process are very important." That's what -- the associates are doing that also. That's working foremen.  It's not a management function. They're doing it.  It's important.  We don't say it's not important.  You know, obviously it's important, but it's not management function.

Let's go to the next one.  Tells them how to do with it the PDT gun where you scan the items on the end of the shelves.  This tells them how to do that. But what you do when you get these and you look at them in the jury room, you're going to see this is something everybody's doing.  It's not just the store manager.

Let's go to the next one.  Schematics. "Under no circumstances should schematics be altered without approval of your district manager."  Now, let's talk about that.  They say, well, okay, we just want it standardized.  You go in the store, you want to find the Clorox in the same place.  If you've ever been in a Family Dollar store, the Clorox is never in the same

16:23:44  1    place.  But let's put that aside.

16:23:46  2           What about the office?  The store manager's

16:23:48  3    office.  He can't -- they told Mr. Detter in this

16:23:52  4    morning's deposition he didn't have the right container

16:23:55  5    for his paper clips and his pens.  Took it off.  The

16:23:58  6    district manager said "I don't like that one, I'm going

16:24:00  7    to get you another one.  This is what you're going to

16:24:02  8    have on your paper clips."  Wilma Cutchall had her

16:24:06  9    grandkids' pictures.  Take them home.  Not on the

16:24:09  10   schematic.  There are no customers back there in that

16:24:13  11   office.

16:24:16  12          Let's go to the next one.  "Under no

16:24:21  13   circumstances should schematics be altered without

16:24:23  14   approval of the district manager."

16:24:25  15          Next one.  "Schematics must always be

16:24:30  16   followed."

16:24:32  17          Next one.  We've already been through that

16:24:36  18   one.  That's the one that says the decision to hire and

16:24:40  19   fire is the decision of the district manager.

16:24:41  20          Let's go to the next one.  Pricing.  "There

16:24:44  21   are strict guidelines, explained in the policy manual,

16:24:47  22   as to where pricing tickets are to be put on the

16:24:50  23   merchandise."

16:24:50  24          Let's go to the next one.  I think you're

16:24:57  25   getting the picture.  And I think when you look at the

16:25:02  1    slides -- I mean, the documents, you're going to see

16:25:07  2    what the real world is at Family Dollar and it's in the

16:25:10  3    policies, and those are not top down.  We heard the man

16:25:13  4    that developed them yesterday, Mr. Phillips, came in

16:25:15  5    here and said "we built them from the bottom up, store

16:25:18  6    managers built those, store managers determined these

16:25:20  7    policies.  District manager, store managers, and other

16:25:23  8    parts of the corporation."  Those -- that is what they

16:25:27  9    decided is their world and that's the way they're

16:25:30  10   willing to do things.  They put it in the policy so

16:25:33  11   everybody would know.  We wouldn't all be sitting right

16:25:35  12   here guessing what do they really do?  It's right there

16:25:38  13   in their policy.

16:25:40  14           They say customer service is very important.

16:25:42  15   I agree with them.  But whose responsibility is it?  The

16:25:46  16   associates also have customer service responsibility.

16:25:49  17   That's just common sense.

16:25:50  18           Next one.  Asset protection.  It's

16:25:57  19   important.  We admit that.  But is it management?  No.

16:26:00  20   It's just partly management.  It's what lead men do.

16:26:03  21   It's what the associates do with them, the assistant

16:26:06  22   managers do with them, it's everybody's responsibility

16:26:09  23   to --

16:26:14  24           THE COURT:  You're talking too fast.

16:26:16  25           MR. R. WIGGINS:  Going too fast.  Next one.

16:26:23    1    More asset protection.  Let's stop that for a minute,

16:26:26    2    and let's talk a minute.

16:26:35    3            Ladies and gentlemen, there's an elephant in

16:26:38    4    the room, and no one wants to talk about the elephant on

16:26:44    5    the defense side.  And that's that stack of policies,

16:26:50    6    Strands, the documents in the case, that run the stores

16:26:56    7    every day of the week.

16:26:58    8            Those policy manuals and those Strands are

16:27:01    9    sitting in those stores, operating those stores, that's

16:27:04   10    what the resource is as we speak.  And I hate that

16:27:09   11    people have to dig through them.  But, I mean, if you

16:27:12   12    dig through them, you're going to get a picture that

16:27:14   13    there is a team there.  Yes, there is.  And that team,

16:27:17   14    the district manager's got a lot of functions in the

16:27:19   15    stores.  He's -- the district manager's carved out a lot

16:27:23   16    of the responsibilities for himself.  He's left the

16:27:26   17    store manager, some as a lead man, working supervisor.

16:27:30   18    He's left the assistant managers to do some of the same

16:27:33   19    things when the store manager's off on his off day,

16:27:37   20    vacation, et cetera.  But it is, in fact, a team.  It

16:27:42   21    is, in fact, a division of labor and the number two

16:27:47   22    person is the store manager.  And he's -- that makes him

16:27:52   23    non-exempt.  That makes him do and not get paid

16:27:59   24    overtime.

16:28:00   25            Now, I think it's a critical fact in this

16:28:02  1   case, where is the decision maker?  Where is someone

16:28:07  2   that would tell us, I make these decisions, this is me.

16:28:13  3   I asked Mr. Barkus.  Did you make the decision?  He said

16:28:16  4   no.  I asked Mr. Broome.  Did you make the decision?  He

16:28:19  5   said no.  I asked Mr. Phillips, the third vice-president

16:28:22  6   we had.  Did you make the decisions?  No.  I asked them,

16:28:25  7   all three.  All three of the vice-presidents came.  Who

16:28:27  8   made this decision?  Well -- well, what -- why is this

16:28:34  9   decision made?  We haven't had anyone.  They haven't

16:28:39 10   come.

16:28:42 11        We've been working in this case for several

16:28:44 12   years and we haven't found yet anybody who will take the

16:28:47 13   responsibility for this decision, or explain it or tell

16:28:51 14   us why with these policies, this training and this way

16:28:57 15   of running the store, why are these people not working

16:29:01 16   supervisors?  The district manager is the person on the

16:29:06 17   team who has a major share of responsibility.  He's in

16:29:13 18   charge.

16:29:18 19        I want to talk about the two full-time

16:29:20 20   equivalents.  I don't know -- it looks like I've got a

16:29:24 21   few minutes left.

16:29:34 22        I heard Mr. St. Clair say this, and I'm not

16:29:38 23   sure what he meant, but I want to clear it up.  He said

16:29:41 24   the Judge has ruled for 162 people, everybody else meets

16:29:46 25   the criteria.  If that were true, the Judge would have

16:29:52   1   not given you those other employees to rule on.  The

16:29:57   2   Judge couldn't tell -- the Judge is going to tell you

16:30:00   3   that is not true, he has not ruled against.  He has not

16:30:02   4   found that the others meet the criteria.  The 162 are

16:30:07   5   just the ones that are on the company's own document.

16:30:10   6   Their own exhibits.

16:30:11   7          Ms. Spiesman's documents didn't meet under

16:30:15   8   their own definitions, didn't meet the full-time

16:30:18   9   equivalent.  So the Judge says those, you don't even

16:30:22   10   dispute those.  It's right in your own.

16:30:24   11          You don't have to look at Dr. Bradley.  I'm

16:30:27   12   ruling for those, because you -- you practically

16:30:32   13   admitted those violations.  And believe me, they're not

16:30:33   14   technical violations.  Technical -- in fact, if you have

16:30:39   15   a bright line rule, law, that says you have to supervise

16:30:44   16   two people, and their own record says that they don't

16:30:50   17   mean it and they continue year after year not paying

16:30:54   18   overtime when they know better?  It's right there in

16:30:57   19   their own document.  It's so clear that the Judge

16:30:59   20   doesn't even need a jury to sort out the facts, it's

16:31:02   21   just as a matter of law.  That's willful.  That's

16:31:10   22   reckless.  Not to even look at your own documents?

16:31:18   23          Those 162 deserve all three years.  They

16:31:22   24   really deserve all the years they didn't get paid but

16:31:25   25   can't get it.  But they deserve the three years they

16:31:29  1   didn't get their overtime.  And the only way they won't

16:31:31  2   get it is if you decide Mr. St. Clair, with no evidence,

16:31:37  3   not a decision maker, testified it was a technical

16:31:40  4   violation.  Not a decision maker would come in here and

16:31:43  5   say, I didn't know.  No one.

16:31:45  6        I asked Mr. Barkus, did you do a study?  No.

16:31:48  7   Did the company ever -- ever look at how many -- how

16:31:52  8   many hours they were spending?  What they're doing?  No.

16:31:57  9   Who made the decision?  Don't know.  That's reckless.

16:32:01  10       I mean, the best you can say for this

16:32:02  11  company is they stuck their head in the sand.  But,

16:32:06  12  ladies and gentlemen, that's not what the law requires.

16:32:08  13  You're reckless, willful, if you just take the money,

16:32:12  14  don't pay for the labor.  You're getting the work you're

16:32:16  15  getting, you don't pay for it, but you don't bother to

16:32:19  16  even figure out if they're really exempt, and your own

16:32:23  17  records show they're not under the two full-time

16:32:27  18  equivalent.

16:32:28  19       Now, we say the rest of the employees also

16:32:31  20  do not meet the full-time equivalent, but you have to

16:32:36  21  decide that.  And the reason you have to decide that is

16:32:40  22  because Dr. Bradley says under our -- under what we

16:32:44  23  believe to be the law, that while you don't have to be

16:32:47  24  in the store on your lunch break, or when you're going

16:32:50  25  to the bank, when you're on duty, I agree with that.

16:32:54  1   The Judge will tell you if you're on duty, you can be

16:32:56  2   out of the store.

16:32:57  3           We never said anything -- Dr. Bradley said,

16:32:59  4   I gave them credit for lunch.  I gave them credit for

16:33:03  5   the whole day they were there.  But where we part

16:33:05  6   company is when they're off, when it's their off day, on

16:33:10  7   vacation, in the hospital, might even be in a coma, you

16:33:15  8   cannot say they're supervising two people.  The

16:33:17  9   assistant manager's doing the supervision, or the

16:33:19  10  district manager in combination with the assistant

16:33:22  11  manager.

16:33:22  12          But it's going too far to say, I'm going to

16:33:25  13  take all the supervision time of the assistant manager

16:33:28  14  and I'm going to give it to the store manager and

16:33:31  15  pretend like he was there.  We don't believe that's the

16:33:34  16  way you calculate.

16:33:35  17          If you look at their schedules, we saw and

16:33:38  18  we know there was an issue about whether -- I haven't

16:33:46  19  had time to check if Mr. McCarthy did the math, but it

16:33:51  20  doesn't have been to be half.  He was right.  He got

16:33:55  21  50.5, I'm not sure.  I've got to check it.  He's never

16:33:58  22  going to get to 80.

16:34:00  23          When you look at Dr. Bradley when he came in

16:34:02  24  and took all the schedules -- and you'll have them to

16:34:05  25  look at them, it's just adding.  And 4,172 of the

16:34:10   1   stores, they don't even schedule them for two full-time

16:34:16   2   equivalents.  And we -- so we say the rest of the

16:34:19   3   employees are due to be paid for their three years of

16:34:24   4   time, too, under that bright line rule.

16:34:27   5          If you disagree with us on that, then what

16:34:30   6   you've got to decide is primary duty; are they a working

16:34:34   7   foreman or bona fide executive.  But if you decide that

16:34:38   8   you really have to be there to supervise, then you don't

16:34:41   9   have to get to primary duty.  You don't have to get to

16:34:45   10  lead man, working foreman.  That's the way the law

16:34:47   11  works, and the Judge will explain that.

16:34:50   12         Judge -- quickly, I want to talk a little

16:34:53   13  about the primary duty back pay.  We think it's willful,

16:35:00   14  as we told you.  They say, oh, well, 30 hours.  30 hours

16:35:05   15  full-time.  Judge has rejected that.  He has found 40

16:35:08   16  hours is full-time.  That's out of the case, and they

16:35:11   17  should not have been telling us that.

16:35:14   18         Now, secondly, if you look at those

16:35:17   19  schedules, no one ever gets 30 hours anyway.  You look

16:35:20   20  at that over in that right-hand column.  They never

16:35:22   21  schedule someone 30 hours.  They never let anybody get

16:35:25   22  their benefits, the little bit of benefits they give you

16:35:28   23  at 30 hours.  You don't get them because they don't give

16:35:31   24  you 30 hours.  20 hours, 22, 23, you look at every one.

16:35:37   25         They profited by this practice, $565

16:35:42  1    million.  I asked Mr. Barkus, he didn't disagree with

16:35:45  2    Dr. Bradley on that.  It just couldn't be true that you

16:35:51  3    could get 18 hours of labor and not pay for it for 5,500

16:35:56  4    stores.  18 hours for 5,500 stores a week.  Multiply it

16:36:02  5    times 52.  They say we didn't make any money off this.

16:36:07  6    We didn't make any money off this.  That's just not

16:36:08  7    possible.  They obviously made money by not paying

16:36:12  8    people.

16:36:13  9              I think this case is important for this

16:36:16  10   reason:  As much or more than the money is the future.

16:36:22  11   Is this going to continue?  Are they going to be allowed

16:36:25  12   to continue to do this?  This is the only way we have in

16:36:28  13   our system to stop the practice and make people get

16:36:30  14   their overtime.  To get rid of this idea, just because

16:36:33  15   you recommend somebody you lose your overtime.  I don't

16:36:37  16   care how much weight, particular weight you give them.

16:36:40  17   You don't lose your overtime.

16:36:43  18             How are you going to stop this?  The only

16:36:45  19   way you are going to stop it is to make them pay what

16:36:48  20   they've taken so far, and maybe they'll make a business

16:36:51  21   decision and stop.  We can't -- you can't order them to

16:36:56  22   stop.  All you can do is give back the money they took

16:36:59  23   or didn't pay for the labor they got; that they didn't

16:37:03  24   pay for it.

16:37:04  25             But we think you should give them the three

16:37:06  1   years.  We think -- they had the schedules.  They could

16:37:08  2   have looked at them.  They could have talked to their

16:37:13  3   decision makers.  They could have had the legal

16:37:16  4   department look at this.  They could have had an expert

16:37:18  5   look at this.

16:37:19  6          We haven't had anybody come in here who said

16:37:21  7   I had some expertise and I made a decision and this is

16:37:24  8   my decision, and it was a good time.  Consultants,

16:37:27  9   experts, president, who?  No one.

16:37:31  10          I think you should send a message, hey, what

16:37:36  11  you get, you get the labor to get the truck unloaded,

16:37:41  12  you get your shelves stocked, floors mopped, had the

16:37:45  13  lead man there to make sure you don't pull the assets.

16:37:48  14  They did a good job.  Pay them.

16:37:55  15          Thank you.

16:37:58  16          THE COURT:  Ladies and gentlemen, we'll go

16:38:02  17  home early today.  Don't make up your minds about the

16:38:06  18  case, because I know you've heard the evidence and the

16:38:09  19  closing arguments, I haven't given you the instructions

16:38:11  20  of law.  Now, I'll do that tomorrow morning at 9:00

16:38:15  21  o'clock.

16:38:15  22          Y'all have a good evening.  See you tomorrow

16:38:17  23  morning at 9:00.

16:38:19  24          (Jury out at 4:30 p.m.)

16:38:43  25          THE COURT:  Anything else we need to do here

16:38:45  1  today?

16:38:46  2            MR. ST. CLAIR:  Your Honor, if I may, I want

16:38:47  3  to make certain I have on the record my objection to the

16:38:50  4  proposed instruction on working foreman --

16:38:53  5            THE COURT:  Right.  You do.

16:38:55  6            MR. ST. CLAIR:  -- in its entirety.  I would

16:38:57  7  point out the one you propose to give is the one that's

16:39:01  8  different than the one last time.

16:39:02  9            THE COURT:  It is.

16:39:03  10            MR. ST. CLAIR:  It includes a 20 percent --

16:39:06  11            THE COURT:  Oh, okay.

16:39:07  12            MR. ST. CLAIR:  -- threshold.

16:39:08  13            THE COURT:  I will give the one I gave last

16:39:10  14  time.  Hold on just a minute.

16:39:12  15            MR. ST. CLAIR:  Yeah.

16:39:39  16            THE COURT:  In fact, if you will stick

16:39:41  17  around, I have a rough draft with exactly what I intend

16:39:49  18  to say tomorrow.  I rearranged some of it.  Yes.  You're

16:40:31  19  right.

16:40:34  20            MR. ST. CLAIR:  Do you see what I'm talking

16:40:36  21  about, Your Honor?

16:40:37  22            THE COURT:  Yes.

16:40:38  23            MR. ST. CLAIR:  I just didn't know if that

16:40:40  24  was intentional or not.

16:40:40  25            THE COURT:  It was not intentional.  I will

16:40:44  1   delete that.

16:40:46  2          MR. ST. CLAIR:  And one other deletion from

16:40:48  3   the last time, Your Honor -- and you talked about the

16:40:51  4   job duty alone doesn't prove exemption; and right after

16:40:56  5   that, you said also company policies standing alone

16:41:00  6   don't establish that an employee is or is not an

16:41:03  7   executive, that it's controlled by what really -- what

16:41:06  8   actually happened.

16:41:07  9          THE COURT:  Where is that?  What page is

16:41:08 10   that?

16:41:11 11          MR. ST. CLAIR:  It is on Page 4 of the draft

16:41:15 12   I have, Your Honor.  The current draft says that "you

16:41:19 13   should be mindful that the job title alone, for example,

16:41:24 14   store managers, is insufficient to establish an employee

16:41:26 15   as an executive employee."

16:41:28 16          And then what you said last time was -- you

16:41:35 17   added after that, "company policies standing alone do

16:41:42 18   not establish that an employee is or is not an

16:41:45 19   executive."  And so we would just request that that same

16:41:50 20   part of the charge be included this time.

16:41:53 21          THE COURT:  What page of the transcript?

16:41:59 22          MR. ST. CLAIR:  I'm looking.  It's Page 136.

16:42:02 23          THE COURT:  Okay.

16:42:03 24          MR. ST. CLAIR:  Well, Your Honor, I may have

16:42:04 25   a daily -- I don't know, that may be all that exists.

16:42:11   1   But what -- I'd be happy to give you mine.  I'm looking

16:42:16   2   at is Page 136, beginning on line 5.

16:42:20   3                   THE COURT:  All right.  All right.

16:42:39   4                   MR. ST. CLAIR:  And then I think this is

16:42:41   5   clear, Your Honor.  But just to -- out of an abundance

16:42:47   6   of caution, the -- we don't -- the whole issue of

16:42:52   7   representative has been agreed to fairly well, and I

16:42:54   8   don't think it's necessary for me to object to the

16:42:57   9   charge when we have -- but just so the record's clear,

16:43:02   10  we object to that as well.  And that's all I have, Your

16:43:04   11  Honor.

16:43:04   12                  THE COURT:  All right.

16:43:04   13                  MR. JOHNSON:  And from the plaintiffs'

16:43:06   14  standpoint, when I reviewed this, I don't remember

16:43:08   15  seeing the charge we had last time on shared

16:43:12   16  responsibility for supervising employees.

16:43:16   17                  THE COURT:  You know, I don't think I --

16:43:20   18  that is an oversight from the last time --

16:43:22   19                  MR. JOHNSON:  Sorry?

16:43:24   20                  THE COURT:  That was an oversight from last

16:43:26   21  time.  But I'll give it.  Do you have it?

16:43:32   22                  MR. JOHNSON:  I have another draft of it.

16:43:35   23                  MR. ST. CLAIR:  I have what you gave, Your

16:43:37   24  Honor.  Do you want to have this page?

16:43:53   25                  THE COURT:  No.  I have what I gave.  I have

| | | |
|---|---|---|
| 16:43:55 | 1 | it. |
| 16:43:56 | 2 | MR. JOHNSON:  Oh, you have it? |
| 16:44:01 | 3 | MR. ST. CLAIR:  And, of course, we object to |
| 16:44:03 | 4 | the shared responsibility, Your Honor -- |
| 16:44:04 | 5 | THE COURT:  You may. |
| 16:44:06 | 6 | MR. ST. CLAIR:  -- of the shared |
| 16:44:07 | 7 | responsibility charge. |
| 16:44:13 | 8 | THE COURT:  All right. |
| 16:44:15 | 9 | MR. KALLON:  Judge, I think we filed a |
| 16:44:17 | 10 | motion in limine which you read and denied, of course. |
| 16:44:21 | 11 | I just wanted to point out that as we pointed out, |
| 16:44:25 | 12 | shared responsibility is when two employees in the store |
| 16:44:31 | 13 | from whom the exemption is being claimed. |
| 16:44:35 | 14 | Here it is.  There is only one employee and |
| 16:44:39 | 15 | the concept being an assistant manager and manager who |
| 16:44:42 | 16 | are both exempt, and I claim the same view as the |
| 16:44:46 | 17 | plaintiffs' standard of the same 80 hours of employee |
| 16:44:49 | 18 | time.  Here is only one exempt employee, Your Honor.  So |
| 16:44:54 | 19 | we think the shared responsibility isn't applicable in |
| 16:45:00 | 20 | this case. |
| 16:45:01 | 21 | MR. JOHNSON:  As you know, Your Honor, our |
| 16:45:03 | 22 | position is, with respect to the supervision, under |
| 16:45:08 | 23 | supervision discussion, as held under the shared |
| 16:45:11 | 24 | responsibility, the whole frame work in the group is |
| 16:45:14 | 25 | that you cannot supervise -- two people can't supervise |

| | | |
|---|---|---|
| 16:45:20 | 1 | an employee at the same time. |
| 16:45:21 | 2 | The charge that you gave last year didn't |
| 16:45:23 | 3 | mention anything about anyone being exempt or |
| 16:45:27 | 4 | non-exempt, it just mentioned supervision. |
| 16:45:56 | 5 | MR. ST. CLAIR:  Nothing else from the |
| 16:45:58 | 6 | defendant, Your Honor.  Other than, of course, the |
| 16:46:00 | 7 | objections previously stated. |
| 16:46:02 | 8 | THE COURT:  Right. |
| 16:46:03 | 9 | MR. JOHNSON:  Same here, Your Honor. |
| 16:46:05 | 10 | THE COURT:  Bring me the shared |
| 16:46:06 | 11 | responsibility thing. |
| 16:46:37 | 12 | MR. ST. CLAIR:  Yes.  We have a copy of the |
| 16:46:39 | 13 | regulation, if that's what you want, Your Honor.  It's |
| 16:46:44 | 14 | down there, I think, in 104(c), I believe. |
| 16:47:21 | 15 | Your Honor, while you're doing that -- if |
| 16:47:31 | 16 | just a -- for the record, Your Honor, I also want to |
| 16:47:35 | 17 | state our objection to way the charge reads on |
| 16:47:38 | 18 | representativeness.  It says "if the jury finds that any |
| 16:47:42 | 19 | single representative plaintiff is exempt, then it must |
| 16:47:47 | 20 | find for the whole group of 1,400 and doesn't say that |
| 16:47:53 | 21 | the jury must find all of the representative plaintiffs, |
| 16:47:56 | 22 | or even a majority of them are exempt." |
| 16:47:59 | 23 | And so the way the charge reads, if the jury |
| 16:48:01 | 24 | were to find that seven of them are -- are properly |
| 16:48:07 | 25 | exempt and only one of them is not, they're being |

16:48:10   1   instructed to find for the entire group, and we believe

16:48:12   2   that's improper.

16:48:13   3                    THE COURT:  All right.

16:48:20   4                    MR. JOHNSON:  You asked for the regulation,

16:48:22   5   Your Honor?

16:48:23   6                    THE COURT:  Yes.  Thank you.  See you

16:48:35   7   tomorrow.

16:48:49   8                    (Court adjourned at 4:40 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATE

2

3

4          I certify that the foregoing is a correct

5    transcript from the record of proceedings in the

6    above-entitled matter.

7

8

9

10

11   *Christina K. Decker*                        3-12-06

12   Christina K. Decker, RPR, CRR                   Date

13   Federal Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25