FILED

2007 May-16 AM 10:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION


JANICE MORGAN, et al.,            *
        Plaintiffs,               *   CV-01-C-0303-W
                                  *   June 13, 2005
vs.                               *   Tuscaloosa, Alabama
                                  *   9:00 A.M.
FAMILY DOLLAR STORES, INC.,       *
        Defendants.               *
* * * * * * * * * * * * * * * * * * * * * * * * * *


                    VOLUME 1
          TRANSCRIPT OF JURY TRIAL
        BEFORE THE HON. U. W. CLEMON
        CHIEF UNITED STATES DISTRICT JUDGE


FOR THE PLAINTIFFS:

HON. ROBERT L. WIGGINS, JR., Esq.
HON. ROBERT F. CHILDS, JR., ESQ.
HON. C. MICHAEL QUINN, ESQ.
HON. DENNIS G. PANTAZIS, ESQ.
HON. GREGORY O. WIGGINS, ESQ.
HON. HERMAN N. JOHNSON, JR., ESQ.
HON. ROCCO CALAMUSA, JR., ESQ.
HON. KEVIN W. JENT, ESQ.
WIGGINS, CHILDS, QUINN & PANTAZIS
301 19th Street, North
Birmingham, AL 35203-3204


HON. J. ALLEN SCHREIBER, ESQ.
HON. P. MARK PETRO, ESQ.
SCHREIBER & PETRO
Two Metroplex Drive, Suite 250
Birmingham, AL  35209


FOR THE DEFENDANTS:

J. MARK WHITE, ESQ.
WHITE, ARNOLD ANDREWS & WHITE
2025 3rd Avenue North, Ste. 600
Birmingham, AL 35203

1                  (Continued Appearances)

2    HON. JOSEPH B. MAYS, JR., ESQ.
     HON. ABDUL K. KALLON, ESQ.
3    HON. ARNOLD W. UMBACH, III, ESQ.
     HON. JAMES WALKER MAY, ESQ.
4    HON. RONALD H. KENT, JR., ESQ.
     HON. T. MATTHEW MILLER, ESQ.
5    BRADLEY, ARANT, ROSE & WHITE
     P. O. Box 830709
6    Birmingham, AL   35203

7

8

9

10   Christina K. Decker, RPR, CRR
     Federal Official Court Reporter
11   101 Holmes Avenue, NE, Suite 305
     Huntsville, AL 35801

12

13   Penny L. Enoch, RPR
     Federal Official Court Reporter
14   1729 5th Avenue North, Room 325
     Birmingham, AL   35203

15

16

17

18

19

20

21

22

23

24

25

1               I N D E X

2  Witnesses:           Direct   Cross   Redirect   Recross

3
   Motions                 4
4
   Jurors in              14
5
   Jury ID                14
6
   Jury Voir Dire         14
7
   Jury Selected          70
8
   Prel. Instructions     71
9

10 Opening Statements

11 By Mr. Quinn           78

12 By Mr. Mays            98

13

14
   LARRY REEVERS          119       154       187
15

16

17

18

19

20

21

22

23

24

25

1   June 13, 2005                                    9:30 a.m.

2                          PROCEEDINGS:

08:55:43   3            (In open court, jury not present.)

10:15:36   4            THE COURT:  Good morning, ladies and

10:15:37   5   gentlemen.  Subject to the pending motions, three that I

10:15:51   6   am aware of, are the plaintiffs ready?

10:15:56   7            MR. QUINN:  Plaintiffs are ready, Your

10:15:58   8   Honor.

10:15:58   9            THE COURT:  Is the defendant ready?

10:16:00   10            MR. MAYS:  Defendant's ready, Your Honor.

10:16:04   11            THE COURT:  I alluded to this at the

10:16:25   12   pretrial conference -- actually, I did more than allude

10:16:29   13   to it.  I gave you a document indicating that each side

10:16:37   14   will have 40 hours to present its case, that the expert

10:16:48   15   examination of a witness on direct will take no more

10:16:55   16   than an hour, an hour for cross, 30 minutes for redirect

10:17:03   17   and recross, and 15 minutes for final.  And for

10:17:14   18   non-expert witnesses, 45 minutes on direct, 45 cross, 20

10:17:18   19   for redirect and recross, and ten minutes for final.

10:17:32   20            Family Dollar has a motion to substitute a

10:17:38   21   witness.  I have read the motion, and as I understand

10:17:44   22   it, Family Dollar proposes to substitute Adam Gates to

10:17:57   23   testify in effect of what Del Bristol would have

10:18:02   24   testified to.

10:18:05   25            MR. KENT:  That's correct, Your Honor.

| 10:18:07 | 1 | THE COURT:  All right.  With that |
| 10:18:08 | 2 | understanding, the motion is granted. |
| 10:18:22 | 3 | Plaintiffs have a motion to exclude evidence |
| 10:18:25 | 4 | of prior administrative court rulings and the exempt |
| 10:18:29 | 5 | status of non-parties.  I am going to carry that motion |
| 10:18:34 | 6 | with the case.  Before any such exhibit or reference is |
| 10:18:42 | 7 | made in the presence of the jury, I request that the |
| 10:18:46 | 8 | lawyers take up the matter with me and we will consider |
| 10:18:53 | 9 | it. |
| 10:18:55 | 10 | Plaintiffs have a motion to exclude Karl |
| 10:18:59 | 11 | Haigler, Joan Mason, Kathleen Lundquist and associated |
| 10:19:05 | 12 | exhibits. |
| 10:19:09 | 13 | MR. JOHNSON:  That's correct, Your Honor. |
| 10:19:18 | 14 | THE COURT:  These witnesses would not be |
| 10:19:22 | 15 | called until the defendant's case. |
| 10:19:28 | 16 | MR. MAY:  That's correct, Your Honor. |
| 10:19:29 | 17 | THE COURT:  All right.  I will carry this |
| 10:19:31 | 18 | motion. |
| 10:19:32 | 19 | Are there any other preliminary matters? |
| 10:19:35 | 20 | MR. WHITE:  Your Honor, Mark White for the |
| 10:19:39 | 21 | defendant.  Just one logistical matter to advise the |
| 10:19:42 | 22 | Court. |
| 10:19:43 | 23 | Your Honor, may I introduce to the Court the |
| 10:19:45 | 24 | president of Family Dollar, David Alexander, who is our |
| 10:19:49 | 25 | cooperate representative. |

10:19:51    1                 THE COURT:  All right.

10:19:51    2                 MR. WHITE:  Next week he will be required to

10:20:07    3   be out for a day or two.  But we will have another

10:20:07    4   executive available, but I just wanted to make the Court

10:20:07    5   aware of that.

10:20:07    6                 THE COURT:  All right.

10:20:07    7                 MR. G. WIGGINS:  Your Honor, if I may?

10:20:07    8                 THE COURT:  Yes, sir.

10:20:07    9                 MR. G. WIGGINS:  There is an issue in

10:20:12   10   regards to one of the motions that the defendant filed

10:20:16   11   concerning the letter that was sent to the clients after

10:20:22   12   they opted in.

10:20:22   13                THE COURT:  I have ruled on that,

10:20:25   14   Mr. Wiggins.

10:20:25   15                MR. G. WIGGINS:  Yes, sir.  I would like to

10:20:26   16   ask the Court whether or not there is any room --

10:20:33   17                THE COURT:  No, sir.

10:20:34   18               MR. G. WIGGINS:  -- to discuss that.

10:20:57   19                THE COURT:  No, sir.  No, sir.  No, sir.

10:20:57   20   The lawyers are notified up front:  File a motion or

10:20:57   21   make a motion and I rule on it, that's it.

10:20:57   22                MR. G. WIGGINS:  Yes, sir.

10:20:57   23                THE COURT:  I don't want to hear that motion

10:20:57   24   again.

10:20:57   25                MR. G. WIGGINS:  Yes, sir.

| | | |
|---|---|---|
| 10:20:57 | 1 | THE COURT:  Unless you have got something |
| 10:20:57 | 2 | different to say, and then put it in writing. |
| 10:21:10 | 3 | MR. G. WIGGINS:  Yes, sir. |
| 10:21:10 | 4 | THE COURT:  And I will look at it. |
| 10:21:10 | 5 | MR. G. WIGGINS:  There's one other issue, |
| 10:21:10 | 6 | Your Honor.  In regards to there is an exhibit for a |
| 10:21:10 | 7 | blow up that we anticipate the defendant attempting to |
| 10:21:22 | 8 | use in regards to Karl Haigler and the job description |
| 10:21:22 | 9 | that he allegedly has made up.  And the Court just ruled |
| 10:21:22 | 10 | or asked was the defendant -- was this person going to |
| 10:21:24 | 11 | be not brought up until the defendant's case in chief. |
| 10:21:27 | 12 | And I assumed you are carrying with -- that motion until |
| 10:21:30 | 13 | the defendant's case. |
| 10:21:31 | 14 | THE COURT:  Yes, sir. |
| 10:21:31 | 15 | MR. G. WIGGINS:  We would ask that any |
| 10:21:33 | 16 | reference to any document that Haigler has relied upon |
| 10:21:37 | 17 | or the defendant intends to introduce or rely upon also |
| 10:21:40 | 18 | be withheld until the defendant's case in chief. |
| 10:21:43 | 19 | THE COURT:  Sure. |
| 10:21:44 | 20 | MR. MAY:  Your Honor, the document I think |
| 10:21:47 | 21 | he is talking about is the SHL document.  That's what |
| 10:21:51 | 22 | you are talking about? |
| 10:21:52 | 23 | MR. G. WIGGINS:  Yes, sir. |
| 10:21:53 | 24 | MR. MAY:  It would be part of our case, Your |
| 10:21:55 | 25 | Honor. |

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
| 10:21:55 | 1  | THE COURT:  Now, as I understand the law, |
| 10:22:00 | 2  | the plaintiffs' burden, at least initially, is pretty |
| 10:22:08 | 3  | slight.  The plaintiffs have to show that they were |
| 10:22:22 | 4  | engaged in employment in an industry affecting commerce |
| 10:22:27 | 5  | and that they were not paid overtime.  Of course, they |
| 10:22:32 | 6  | have to show damages as well.  But once the plaintiffs |
| 10:22:41 | 7  | show that they have not been paid overtime, then the |
| 10:22:50 | 8  | defendant has the burden, if it chooses to assert it, of |
| 10:23:01 | 9  | showing that there is an exemption, and the defendant |
| 10:23:13 | 10 | has to prove that more likely than not this exemption |
| 10:23:22 | 11 | applies.  Is that what the law is? |
| 10:23:29 | 12 | MR. QUINN:  That's my understanding. |
| 10:23:31 | 13 | MR. MAY:  Your Honor, that's basically what |
| 10:23:33 | 14 | we agree with on our side. |
| 10:23:34 | 15 | THE COURT:  All right.  Now, how will the |
| 10:23:36 | 16 | plaintiffs proceed in terms of presentation of the |
| 10:23:38 | 17 | evidence? |
| 10:23:42 | 18 | MR. G. WIGGINS:  Your Honor, we plan on |
| 10:23:46 | 19 | calling anywhere from 40 to 75 witnesses -- current and |
| 10:23:57 | 20 | former store managers of Family Dollar -- to testify |
| 10:24:03 | 21 | about the job duties they performed -- |
| 10:24:08 | 22 | THE COURT:  What I am really asking is this: |
| 10:24:10 | 23 | Are you, in your case in chief, up front, going to, in |
| 10:24:18 | 24 | effect, undertake to rebut the defendant's evidence |
| 10:24:23 | 25 | about primary duty? |

10:24:25  1          MR. G. WIGGINS:  Yes, sir, I believe we

10:24:26  2   would.

10:24:26  3          THE COURT:  All right.  I am going to

10:24:29  4   require, starting today, at the end of each day counsel

10:24:41  5   for the side presenting witnesses to list the next 20

10:24:52  6   witnesses and to provide that list to counsel for the

10:24:58  7   other side not later than 5:00 o'clock on the day before

10:25:06  8   those witnesses will be called.

10:25:09  9          MR. G. WIGGINS:  The parties had agreed to

10:25:10  10  basically that agreement, Your Honor.

10:25:12  11         THE COURT:  All right.

10:25:13  12         MR. KENT:  Your Honor, just so I am clear,

10:25:15  13  is that 20 witnesses in order?

10:25:17  14         THE COURT:  In order.

10:25:17  15         MR. MAY:  That was what I was going to say.

10:25:19  16         THE COURT:  Yes.  20 witnesses in order.

10:25:21  17         MR. MAY:  So that we would know that who is

10:25:23  18  likely the next morning.

10:25:24  19         THE COURT:  Exactly.

10:25:25  20         MR. G. WIGGINS:  Judge --

10:25:27  21         MR. MAY:  Your Honor, we -- despite what you

10:25:30  22  may think throughout the four-and-a-half year history of

10:25:33  23  this case, we have a long history of being adversaries

10:25:37  24  with everybody over there almost, and I think we can

10:25:40  25  deal with what I think -- I hate to cut you off,

| | | |
|---|---|---|
| 10:25:45 | 1 | Mr. Wiggins -- but I think what he is about to say is we |
| 10:25:47 | 2 | have people from out of state and we do, too.  And we |
| 10:25:52 | 3 | will work, as counsel is supposed to and you expect them |
| 10:25:56 | 4 | to, to try to deal with any last minute changes, |
| 10:26:00 | 5 | problems, flights, that kind of thing.  But it is |
| 10:26:03 | 6 | critical to us in our operations, especially being out |
| 10:26:07 | 7 | of town, and theirs, too, that we would be able to know |
| 10:26:10 | 8 | who is planned to come the next morning and get |
| 10:26:11 | 9 | immediate notice if there's a change. |
| 10:26:13 | 10 | THE COURT:  Well, if there is an emergency, |
| 10:26:22 | 11 | I would expect the parties would work out the problem. |
| 10:26:27 | 12 | MR. G. WIGGINS:  Yes, sir. |
| 10:26:28 | 13 | THE COURT:  Otherwise bring to it me and I |
| 10:26:30 | 14 | will handle it. |
| 10:26:30 | 15 | MR. G. WIGGINS:  Yes, sir.  That's what I |
| 10:26:32 | 16 | was going to bring up.  And right now, we have got four |
| 10:26:35 | 17 | witnesses hung up in an airport that can't get here. |
| 10:26:38 | 18 | THE COURT:  Sure.  That's an emergency. |
| 10:26:40 | 19 | Sure. |
| 10:26:40 | 20 | MR. G. WIGGINS:  That's an emergency.  But |
| 10:26:41 | 21 | they would be on our list and it would be in a certain |
| 10:26:43 | 22 | order and we would ask for some lenience as far as -- |
| 10:26:47 | 23 | THE COURT:  Of course. |
| 10:26:48 | 24 | MR. MAY:  As long as we get a list and an |
| 10:26:51 | 25 | explanation if somebody's not going to be there and that |

| | | |
|---|---|---|
| 10:26:53 | 1 | moves the next person in the slot. |
| 10:26:56 | 2 | MR. R. WIGGINS:  Your Honor, I was involved |
| 10:26:58 | 3 | in the discussions with the other side on this issue and |
| 10:27:01 | 4 | we had agreed to 30 minutes after the last witness |
| 10:27:05 | 5 | instead of 5:00 o'clock.  Is that permissible? |
| 10:27:08 | 6 | MR. MAY:  We don't have any objection, Your |
| 10:27:11 | 7 | Honor, because I think it makes more sense for them to |
| 10:27:13 | 8 | put their heads together and know what they can really |
| 10:27:13 | 9 | do. |
| 10:27:14 | 10 | THE COURT:  Right. |
| 10:27:14 | 11 | MR. WHITE:  Judge, why don't you make these |
| 10:27:14 | 12 | three swap the numbers when they start calling each |
| 10:27:20 | 13 | other at 2:00, 3:00 o'clock in the morning so -- |
| 10:27:22 | 14 | THE COURT:  Are there any other preliminary |
| 10:27:25 | 15 | matters we need to take up? |
| 10:27:28 | 16 | MR. QUINN:  One, Judge.  I am going to be |
| 10:27:30 | 17 | using some demonstrative evidence in the opening. |
| 10:27:33 | 18 | THE COURT:  Yes, sir. |
| 10:27:34 | 19 | MR. QUINN:  It is going to be evidence that |
| 10:27:36 | 20 | is going to be introduced.  And I know that you don't |
| 10:27:39 | 21 | like to be surprised with things like that. |
| 10:27:41 | 22 | Would you like to see in advance what I will |
| 10:27:44 | 23 | be using or just take my assurance -- |
| 10:27:48 | 24 | THE COURT:  Have you shared it with -- |
| 10:27:49 | 25 | MR. QUINN:  I will share it with them.  It's |

10:27:51   1   just 10 or 15 that are part of their policies and

10:27:57   2   procedures.

10:27:57   3            THE COURT:  All right.

10:27:58   4            MR. QUINN:  As well as some of the law.

10:28:00   5            MR. MAYS:  Likewise, Judge, I will be using

10:28:03   6   three or four charts.  They will not be introduced into

10:28:06   7   evidence.  They are just demonstrative.  And I will

10:28:09   8   share those with the other side also.

10:28:11   9            MR. QUINN:  Yeah.  Nor will these.

10:28:13  10            THE COURT:  Fine.  I gave you, as I recall,

10:28:17  11   30 minutes per side for opening statement?

10:28:21  12            MR. MAY:  Your Honor, precisely what you

10:28:23  13   said in the pretrial conference in response to my

10:28:25  14   question was that I could use my whole 40 hours to open

10:28:28  15   if I wanted to.  We obviously are not going do that.

10:28:32  16   And I think that we will be using about 30 minutes.

10:28:35  17            MR. QUINN:  And that's about what we will be

10:28:37  18   using, give or take.

10:28:39  19            MR. MAYS: I hope to use a little less,

10:28:41  20   Judge.

10:28:41  21            THE COURT:  All right.  We have excused the

10:28:47  22   following jurors:  James Michael Anderson, Monza

10:28:59  23   Burnett, Louise Cayson, Tiffany Chandler, Edward J. Fox,

10:29:09  24   Andrew Harshman, James Thomas Hill, Perry Jones, Martha

10:29:19  25   Kimbrell, Steven McGrew, David Morgan, Virginia Quinn,

10:29:31  1  Robert P. Reynolds, Brittany Rutherford.  There's a

10:29:40  2  juror Sanford whose first name I don't have.

10:29:45  3                   MR. WHITE:  Kenneth.

10:29:46  4                   THE COURT:  All right.  And Dean Walters.

10:29:49  5  These excuses were granted at the request of the jurors

10:29:55  6  for good reason.

10:29:58  7                   MR. WHITE:  It is our understanding Juror

10:30:00  8  Moore did not appear, Your Honor.

10:30:01  9                   MR. QUINN:  Right.

10:30:03  10                  MR. WHITE:  Sandra Fox Moore.

10:30:05  11  Mr. Smitherman advised both sides --

10:30:07  12                  THE COURT:  All right.  Well, if he advised

10:30:09  13  you she hasn't appeared, but I don't have that

10:30:12  14  information.

10:30:13  15                  MR. WHITE:  Yes, sir.

10:30:13  16                  THE COURT:  I am not always the first one to

10:30:15  17  get it.

10:30:23  18                  We will be in recess subject to the call of

10:30:26  19  the jury.  And as soon as we can get them seated, we

10:30:31  20  will proceed to strike a jury.

10:30:33  21                  MR. WHITE:  Your Honor, on the individual

10:30:35  22  voir dire, are you going to put a time limit?

10:30:38  23                  THE COURT:  Oh, usually, I plan to do that.

10:30:41  24  I plan to ask general questions, basically, whether the

10:30:48  25  answers that they gave to the questionnaires are true

| | | |
|---|---|---|
| 10:30:51 | 1 | and correct.  I'll ask maybe five or six other |
| 10:30:58 | 2 | questions, and then give each side 30 minutes to ask |
| 10:31:03 | 3 | whatever questions you want to ask and we will strike a |
| 10:31:05 | 4 | jury. |
| 10:31:06 | 5 | MR. WHITE:  Okay.  That's what we wanted to |
| 10:31:07 | 6 | know. |
| 10:31:08 | 7 | MR. MAYS:  Thank you, Judge. |
| 10:31:09 | 8 | MR. QUINN:  How many strikes are we going to |
| 10:31:11 | 9 | get, Your Honor? |
| 10:31:12 | 10 | THE COURT:  I don't know. |
| 10:31:13 | 11 | MR. MAY:  Your Honor, are we going to sit |
| 10:31:15 | 12 | them in the box or back here? |
| 10:31:16 | 13 | THE COURT:  He will sit some in the box and |
| 10:31:19 | 14 | some others back here. |
| 10:31:21 | 15 | MR. WHITE:  That's not what he said. |
| 10:31:23 | 16 | THE COURT:  All right.  Well, he is going to |
| 10:31:24 | 17 | do what he said. |
| 10:31:26 | 18 | (Laughter.) |
| 10:31:28 | 19 | MR. WHITE:  Subject to change. |
| 10:31:32 | 20 | (Recess at 10:20 a.m. until 10:46 a.m.) |
| 10:54:58 | 21 | (In open court, prospective jurors present.) |
| 10:54:58 | 22 | THE COURT:  Ladies and gentlemen, we are here |
| 10:55:12 | 23 | To select the jury for the trial of Case Number |
| 10:55:23 | 24 | 01-CV-0303-UWC, Janice Morgan, and others, versus Family |
| 10:55:35 | 25 | Dollar Stores. |

10:55:35   1          I will first ask each one of you to stand as

10:55:40   2   your name is called by the courtroom deputy.   Then

10:55:44   3   repeat your name, and tell us where you live and just a

10:55:50   4   little about yourself.

10:56:03   5                THE CLERK:  Ms. Adcox?

10:56:05   6                JUROR ADCOX:  Melissa Adcox.

10:56:12   7                THE COURT:  Where do you live, Ms. Adcox?

10:56:14   8                JUROR ADCOX:  I am a decorator.

10:56:16   9                THE COURT:  Where do you live?

10:56:17  10                JUROR ADCOX:  In Indian Hills, Tuscaloosa.

10:56:21  11                THE COURT:  All right.   Thank you.

10:56:28  12                THE CLERK:  Ms. Alberque.

10:56:29  13                JUROR ALBERQUE:  My name is Melissa

10:56:33  14   Alberque.  I am a violin performance major at the

10:56:42  15   University of Alabama.  I'm finishing up my degree.  I

10:56:46  16   am a resident.

10:56:49  17                THE CLERK:  Mr. Amick.

10:56:50  18                JUROR AMICK:  My name is Kevin Amick.  I am

10:56:54  19   from Winston County, live in Addison, Alabama.  Retired

10:56:57  20   out of the military.  And currently, I can't work.

10:57:01  21                THE CLERK:  Mr. Bates.

10:57:03  22                JUROR BATES:  Ernestine Bates from Sumpter

10:57:07  23   County.  And I work at AIB Logistics.

10:57:15  24                THE CLERK:  Mrs. Bevelle?

10:57:16  25                JUROR BEVELLE:  My name is Karla Bevelle.  I

10:57:19  1   live in Tuscaloosa County, and I work at CVS Pharmacy.

10:57:23  2                  THE CLERK:  Ms. Bishop?

10:57:25  3                  JUROR BISHOP:  Ladena Bishop from

10:57:28  4   Haleyville, Alabama.  I work for Citifinancial Corp.

10:57:34  5                  THE CLERK:  Ms. Bryant?

10:57:35  6                  JUROR BRYANT:  My name is Kim Bryant.  I

10:57:38  7   live in Tuscaloosa County.  I work with Tech-Eye Care

10:57:43  8   Associates.

10:57:43  9                  THE CLERK:  Ms. Burleson?

10:57:44  10                  JUROR BURLESON:  My name is Lottie Burleson.

10:57:46  11   I live in Northport.  And I work at the University of

10:57:49  12   Alabama.

10:57:50  13                  THE CLERK:  Ms. Caples?

10:57:53  14                  JUROR CAPLES:  I am Marie Caples.  I live in

10:57:56  15   Tuscaloosa.  I work part-time for the Alabama Book Store

10:57:59  16   as a bookkeeper.

10:58:00  17                  THE CLERK:  Mrs. Cleveland?

10:58:03  18                  JUROR CLEVELAND:  My name is Katie

10:58:06  19   Cleveland.  I reside in Duncanville.  I work at the VA

10:58:12  20   Medical Center.

10:58:14  21                  THE CLERK:  Ms. Culp.

10:58:17  22                  JUROR CULP:  My name is Shirley Culp.  I

10:58:20  23   live in Tuscaloosa.  And I work at the University of

10:58:23  24   Alabama.

10:58:24  25                  THE CLERK:  Mr. Curry?

10:58:27  1           JUROR CURRY:  My name is James Curry.  I

10:58:30  2   live in Winfield, Alabama.  I am a youth pastor and

10:58:34  3   Christian school principal.

10:58:36  4           THE CLERK:  Mr. Dubose?

10:58:38  5           JUROR DUBOSE:  My name is Mark Dubose.  And

10:58:41  6   I live down here.  And I work at Phifer Wire.

10:58:45  7           THE CLERK:  Ms. Duckworth?

10:58:49  8           JUROR DUCKWORTH:  My name is Pat Duckworth.

10:58:52  9   I live in Northport.  I am an elementary school teacher,

10:58:56 10   Tuscaloosa Board of Education.

10:58:58 11           THE CLERK:  Mr. Findlay?

10:59:00 12           JUROR FINDLAY:  I am Francis Findlay.  I

10:59:04 13   live in Cottondale, Alabama.  And I am a retired school

10:59:07 14   teacher, but I run a tutoring program for dyslexic and

10:59:11 15   ADD children.

10:59:13 16           THE CLERK:  Ms. Foster?

10:59:15 17           JUROR FOSTER:  My name is Christy Foster.  I

10:59:19 18   live in Kennedy, Alabama.  And I am employed by Hospice

10:59:22 19   Medical Center.

10:59:24 20           THE CLERK:  Mr. Harkins?

10:59:26 21           JUROR HARKINS:  My name is Marvin Harkins.

10:59:30 22   I work at Pickens County, Alabama.  I work at Nucor

10:59:35 23   Steel in Tuscaloosa.

10:59:36 24           THE CLERK:  Mr. Hollingsworth?

10:59:38 25           JUROR HOLLINGSWORTH:  My name is William

10:59:40  1    Wayne Hollingsworth.  I am a retired purchasing agent,

10:59:45  2    40 years in the oil field.

10:59:48  3              THE CLERK:  Ms. Hood?

10:59:49  4              JUROR HOOD:  Felicia Hood.  I live in Double

10:59:53  5    Springs, Alabama.  And I am accounts payable for Rick's,

10:59:57  6    Inc.

10:59:57  7              THE CLERK:  Mr. Kinard?

10:59:59  8              JUROR KINARD:  Susan Kinard.  I work for the

11:00:03  9    University of Alabama.  And I live out in Fosters.

11:00:06  10             THE CLERK:  Mr. Larkin?

11:00:07  11             JUROR LARKIN:  Wendell Larkin.  I live in

11:00:10  12   Livingston.  And I am self-employed, Larkin & Minor

11:00:13  13   Corporation.

11:00:13  14             THE CLERK:  Mr. Lawley?

11:00:16  15             JUROR LAWLEY:  Wade Lawley.  I in Fayette.

11:00:20  16   I'm a design engineer with Marathon Equipment Company.

11:00:23  17             THE CLERK:  Ms. McDaniel?

11:00:28  18             JUROR Mc DANIEL:  Michelle McDaniel.  I live

11:00:31  19   in Vernon, Alabama.  And I help my mother run our

11:00:35  20   restaurant.

11:00:35  21             THE CLERK:  Ms. Mills?

11:00:37  22             JUROR MILLS:  My name is Betty Joyce Mills.

11:00:41  23   I live in Tuscaloosa, Alabama.  I am employed at BF

11:00:47  24   Goodrich Tire.

11:00:48  25             THE CLERK:  Mr. Northington?

11:00:49   1                JUROR NORTHINGTON:  I am Harry Northington.
11:00:52   2   I live in Detroit, Alabama.  I work for the Golden Flake
11:00:55   3   Snack Foods.
11:00:56   4                THE CLERK:  Ms. Pratt?
11:00:58   5                JUROR PRATT:  My name is Sherry Pratt.  I
11:01:01   6   live in Winston County.  I live in Addison.  I work at
11:01:05   7   Addison Chevron.
11:01:07   8                THE CLERK:  Ms. Randolph?
11:01:09   9                JUROR RANDOLPH:  My name is Karen Randolph.
11:01:11  10   I work at the University of Alabama.  I live in
11:01:13  11   Duncanville, Alabama.
11:01:14  12                THE CLERK:  Mr. Ray?
11:01:18  13                JUROR RAY:  I am John Ray.  I live in
11:01:21  14   Northport.  I work for McAbee Construction.
11:01:25  15                THE CLERK:  Ms. Rushing?
11:01:29  16                JUROR RUSHING:  My name is Jerri Rushing.
11:01:31  17   And we have a family-owned business, Rushing Floors.
11:01:33  18   And I live in Northport.
11:01:35  19                THE CLERK:  Ms. Sadberry?
11:01:38  20                JUROR SADBERRY:  Terri Sadberry from Walker
11:01:43  21   County.  I'm a paralegal for Bradley Arant.
11:01:46  22                THE CLERK:  Ms. Smelser?
11:01:48  23                JUROR SMELSER:  Janice Smelser.  I live in
11:01:50  24   Tuscaloosa.  And I am retired.
11:01:52  25                THE CLERK:  Ms. Smith?

| | | |
|---|---|---|
| 11:01:54 | 1 | JUROR SMITH:  My name Delois Smith.  And I |
| 11:01:58 | 2 | live in Eutaw, Alabama.  I work at Greene County |
| 11:02:02 | 3 | Hospital. |
| 11:02:02 | 4 | THE CLERK:  Ms. Stamps? |
| 11:02:04 | 5 | JUROR STAMPS:  My name is Debra stamps.  And |
| 11:02:06 | 6 | I live in Tuscaloosa.  And I work at *Tuscaloosa News*. |
| 11:02:09 | 7 | THE CLERK:  Mr. Sutton? |
| 11:02:11 | 8 | JUROR SUTTON:  My name is Gene Sutton.  I |
| 11:02:15 | 9 | live in Gordo.  And I work at BF Goodrich Tire plant, |
| 11:02:19 | 10 | Tuscaloosa. |
| 11:02:19 | 11 | THE CLERK:  Mr. Taylor? |
| 11:02:23 | 12 | JUROR TAYLOR:  My name is Kevin Taylor.  I |
| 11:02:26 | 13 | live in Reform, Alabama.  I'm a pastor and Christian |
| 11:02:29 | 14 | school teacher at Union Hill Free Will Baptist Church. |
| 11:02:30 | 15 | THE CLERK:  Ms. Uptain? |
| 11:02:31 | 16 | JUROR UPTAIN:  My name is Martha Uptain.  I |
| 11:02:33 | 17 | live in Walker County.  I am a homemaker. |
| 11:02:36 | 18 | THE CLERK:  Ms. Vickery? |
| 11:02:39 | 19 | JUROR VICKERY:  My name's Teena Vickery.  I |
| 11:02:43 | 20 | live in Hamilton.  I work for the Alabama Cooperative |
| 11:02:45 | 21 | Systems.  And I also work at Burger King. |
| 11:02:48 | 22 | THE CLERK:  Ms. Watkins? |
| 11:02:51 | 23 | JUROR WATKINS:  Patricia Watkins.  Jasper, |
| 11:02:55 | 24 | Alabama.  I am a homemaker. |
| 11:02:56 | 25 | THE CLERK:  Ms. Wymer? |

| | | |
|---|---|---|
| 11:02:58 | 1 | JUROR WYMER:  I am Mary Wymer.  I work at |
| 11:03:01 | 2 | Media Relations at the University of Alabama.  And I |
| 11:03:03 | 3 | live in Tuscaloosa. |
| 11:03:06 | 4 | THE COURT:  The plaintiffs in this case are |
| 11:03:19 | 5 | Janice Morgan.  Is Ms. Morgan present?  Barbara |
| 11:03:30 | 6 | Richardson, Cora Canon, Wilma Catchall, Laura Trout, and |
| 11:03:45 | 7 | Gloria Childs are the named plaintiffs -- I'm sorry |
| 11:03:50 | 8 | Gloria Charles. |
| 11:03:52 | 9 | Are any of you related by blood or marriage |
| 11:03:56 | 10 | to either of these plaintiffs?  Do any of you know any |
| 11:04:01 | 11 | of them?  The -- |
| 11:04:09 | 12 | MR. MAYS:  Ms. -- |
| 11:04:11 | 13 | JUROR SMITH:  I know Barbara Richardson. |
| 11:04:16 | 14 | THE COURT:  Ms. Smith, you know Barbara |
| 11:04:21 | 15 | Richardson?  And how well do you know her? |
| 11:04:24 | 16 | JUROR SMITH:  From going to the store -- |
| 11:04:26 | 17 | THE COURT:  Pardon me? |
| 11:04:27 | 18 | JUROR SMITH:  I know her from when she used |
| 11:04:29 | 19 | to work at the store and when she come out to hospice |
| 11:04:33 | 20 | where I work at. |
| 11:04:34 | 21 | THE COURT:  What store does she work at? |
| 11:04:37 | 22 | JUROR SMITH:  Family Dollar Store. |
| 11:04:37 | 23 | THE COURT:  Family Health Stores? |
| 11:04:38 | 24 | JUROR SMITH:  Family Dollar Store. |
| 11:04:38 | 25 | THE COURT:  Family Dollar Store.  Do you |

| | | |
|---|---|---|
| 11:04:41 | 1 | shop at the Family Dollar Store? |
| 11:04:43 | 2 | MR. SMITH:  Yes, sir, I do. |
| 11:04:44 | 3 | THE COURT:  All right.  And would the fact |
| 11:04:46 | 4 | that you know her have an affect on your ability to be a |
| 11:04:52 | 5 | fair and impartial juror if you were selected for the |
| 11:04:54 | 6 | trial of this case? |
| 11:04:55 | 7 | JUROR SMITH:  I don't know.  I'll try. |
| 11:04:58 | 8 | THE COURT:  All right.  Thank you, ma'am. |
| 11:05:02 | 9 | Anyone else who knows any of the plaintiffs? |
| 11:05:11 | 10 | The plaintiffs are represented by the |
| 11:05:16 | 11 | Wiggins Childs law firm.  And I will ask Mr. Gregory |
| 11:05:31 | 12 | Williams or Mr. Quinn to read -- well, let me just say |
| 11:05:36 | 13 | this:  How many lawyers are there in your firm? |
| 11:05:40 | 14 | MR. QUINN:  40. |
| 11:05:41 | 15 | THE COURT:  40.  Have any of you ever been |
| 11:05:48 | 16 | represented by a lawyer at the Wiggins Childs law firm |
| 11:05:56 | 17 | in Birmingham? |
| 11:05:59 | 18 | Any of you related to any of those lawyers? |
| 11:06:04 | 19 | Do any of you know any of those lawyers? |
| 11:06:12 | 20 | All right.  The defendant in the case is |
| 11:06:27 | 21 | Family Dollar Stores, Incorporated.  Have any of you, |
| 11:06:33 | 22 | any member of your family or friends, ever held any |
| 11:06:41 | 23 | stock or other ownership interest in Family Dollar |
| 11:06:48 | 24 | Stores? |
| 11:06:49 | 25 | Mr. Harkins? |

| | | |
|---|---|---|
| 11:06:50 | 1 | JUROR HARKINS:  Yes.  My wife, she used to |
| 11:06:54 | 2 | work at Family Dollar.  She used to be a manager and |
| 11:06:57 | 3 | assistant. |
| 11:06:58 | 4 | THE COURT:  All right.  Was she a manager |
| 11:07:02 | 5 | and an assistant manager at the Family Dollar Stores? |
| 11:07:07 | 6 | MR. HARKINS:  She was. |
| 11:07:08 | 7 | THE COURT:  All right.  When was this? |
| 11:07:09 | 8 | MR. HARKINS:  Just last year. |
| 11:07:11 | 9 | THE COURT:  All right.  Thank you, sir. |
| 11:07:14 | 10 | Anyone else? |
| 11:07:19 | 11 | Now, that is a separate question from |
| 11:07:22 | 12 | whether you have ever owned any stock in Family Dollar |
| 11:07:29 | 13 | Stores.  Now, are there any of you others, like |
| 11:07:34 | 14 | Mr. Harkins, whose family members, close friends, or |
| 11:07:44 | 15 | yourself have been employed by Family Dollar Stores? |
| 11:07:54 | 16 | Who is the cooperate representative for |
| 11:07:58 | 17 | Family Dollar Stores? |
| 11:07:59 | 18 | MR. WHITE:  Your Honor, Mr. David Alexander, |
| 11:08:02 | 19 | the president of Family Dollar Stores. |
| 11:08:05 | 20 | THE COURT:  Mr. Alexander, ladies and |
| 11:08:10 | 21 | gentlemen, do any of you know him?  Thank you, sir, you |
| 11:08:12 | 22 | may be seated. |
| 11:08:15 | 23 | Family Dollar Stores is represented by two |
| 11:08:28 | 24 | law firms:  The Bradley Arant Rose and White law firm. |
| 11:08:33 | 25 | It has a lot of lawyers.  And Mr. Kallon is not about to |

11:08:41 1    read the names.

11:08:42 2              MR. KALLON:  No, Your Honor.  Your Honor, I

11:08:45 3    also want to point out that you left out the Schreiber &

11:08:52 4    Petro firm.

11:08:53 5              THE COURT:  Oh, I'm sorry.  Thank you so

11:08:53 6    much.  Gentlemen, will one of you tell us the names of

11:08:56 7    the members of your law firm?

11:08:57 8              MR. PETRO:  The name of the law firm is

11:09:01 9    Schreiber and Petro.  It's just two lawyers.  Allen

11:09:04 10   Schreiber and Mark Petro.

11:09:05 11             THE COURT:  Do any of you know either of

11:09:07 12   those lawyers, have you ever been represented by either

11:09:08 13   one of them, or are you kin to them?  Thank you.

11:09:11 14             Now, the Bradley Arant Rose and White law

11:09:14 15   firm represents Family Dollar Stores.  They have got a

11:09:20 16   lot of lawyers.  And I understand one of you may -- one

11:09:26 17   of you jurors may be presently employed or may have been

11:09:31 18   employed by Bradley Arant.  That will be Ms. --

11:09:37 19             MR. MAYS:  Ms. Sadberry.

11:09:38 20             THE COURT:  Ms. Sadberry, are you presently

11:09:41 21   employed by Bradley Arant?

11:09:42 22             JUROR SADBERRY:  Yes.

11:09:43 23             THE COURT:  All right.  Are there any of the

11:09:48 24   others of you, members of your family or friends, who

11:09:53 25   have ever been employed by Bradley Arant Rose and White?

11:10:00   1          Have any of you, any members of your family

11:10:02   2   or friends ever been represented by that law firm?  Do

11:10:10   3   any of you know any of the lawyers in that law firm

11:10:13   4   besides Ms. Sadberry?

11:10:21   5          Family Dollar is also represented by

11:10:32   6   Mr. Mark White and his law firm.  Mr. White, how many

11:10:36   7   lawyers are there in your firm?

11:10:37   8          MR. WHITE:  Should be ten, Judge.

11:10:40   9          THE COURT:  All right.  It's a Birmingham

11:10:42  10   firm.  Do any of you know Mr. White?  Have any of you,

11:10:47  11   any members of your family or friends ever been

11:10:51  12   represented by him or any of the lawyers in his firm?

11:10:56  13          Any of you, any members of your family or

11:10:58  14   friends ever worked for Mr. White or any of the lawyers

11:11:01  15   in his firm?  Thank you, sir.  Have I covered them all?

11:11:09  16          MR. KALLON:  Yes, Your Honor.

11:11:11  17          THE COURT:  All right.  Now, ladies and

11:11:14  18   gentlemen, we asked you to complete questionnaires and

11:11:18  19   all of you have.

11:11:21  20          Do you swear that the answers that you gave

11:11:24  21   on your questionnaires are true and correct?  Is there

11:11:31  22   anyone who doesn't?

11:11:31  23          (No responses.)

11:11:36  24          THE COURT:  This is a case, ladies and

11:11:40  25   gentlemen, in which the plaintiffs on behalf of

11:11:45 1   themselves and others claim that the defendant, Family

11:11:55 2   Dollar Stores, violated the Fair Labor Standards Act by

11:12:03 3   failing to pay them overtime.  Each of the plaintiffs

11:12:12 4   was at some point or another a store manager at Family

11:12:15 5   Dollar.

11:12:18 6              I give you this background information so

11:12:22 7   that I may now ask whether any of you know anything at

11:12:24 8   all about this case?  Have you heard anything about it?

11:12:45 9              Have any of you ever worked at -- any

11:12:50 10  members of your family and friends, ever worked as a

11:12:55 11  manager at Fred's, Dollar Tree, Bill's Dollar Tree,

11:13:02 12  Dollar General, Rite Aide, CVS, Bill's Variety Store, or

11:13:07 13  any similar discount store?

11:13:11 14             Is that Ms. Wymer?

11:13:16 15             JUROR SUTTON:  Gene Sutton.

11:13:17 16             THE COURT:  All right, Mr. Sutton.

11:13:19 17             JUROR SUTTON:  My daughter, she manages a

11:13:21 18  warehouse.

11:13:22 19             THE COURT:  All right.  Thank you.  Anyone

11:13:25 20  else?

11:13:25 21             Yes?  Is that Ms. Hood?

11:13:28 22             JUROR HOOD:  Yes.  To be honest, I am not

11:13:30 23  sure.  I know my sister worked at Bill's Dollar Store.

11:13:33 24  And I believe she was an assistant manager, but I am not

11:13:36 25  positive of that.  It's been a few years.

| | | |
|---|---|---|
| 11:13:39 | 1 | THE COURT:  All right.  Mrs. Bryant? |
| 11:13:42 | 2 | JUROR BRYANT:  Several years ago, I worked |
| 11:13:45 | 3 | with Rite Aide Pharmacy. |
| 11:13:47 | 4 | THE COURT:  And what was your position? |
| 11:13:51 | 5 | JUROR BRYANT:  Pharmacy technician. |
| 11:13:52 | 6 | THE COURT:  All right.  Anybody else? |
| 11:14:00 | 7 | MR. MAY:  Got another hand, Your Honor. |
| 11:14:01 | 8 | THE COURT:  I'm sorry.  Ms. Bates? |
| 11:14:05 | 9 | JUROR BEVELLE:  Bevelle. |
| 11:14:06 | 10 | THE COURT:  Ms. Bevelle, I'm sorry. |
| 11:14:08 | 11 | JUROR BEVELLE:  I currently work at CVS |
| 11:14:11 | 12 | Pharmacy in the pharmacy department. |
| 11:14:13 | 13 | THE COURT:  All right.  Anyone else? |
| 11:14:19 | 14 | Are any of you, or members of your immediate |
| 11:14:26 | 15 | family, members of a union or other labor organization? |
| 11:14:33 | 16 | Yes, sir, Mr. Ray? |
| 11:14:35 | 17 | JUROR RAY:  John Ray.  I am a member of |
| 11:14:39 | 18 | Local 472, Plumbers and Steamfitters. |
| 11:14:42 | 19 | THE COURT:  All right.  Anyone else?  Would |
| 11:14:44 | 20 | you just stand and tell us who you are and what union |
| 11:14:46 | 21 | you belong to? |
| 11:14:48 | 22 | A JUROR:  I am a member of Local 361. |
| 11:14:56 | 23 | THE COURT:  Any other? |
| 11:14:57 | 24 | JUROR STAMPS:  My husband is a member of the |
| 11:14:59 | 25 | union, Local 351. |

```
11:15:01   1              THE COURT:  What is your name, ma'am?

11:15:03   2              JUROR STAMPS:  My name?  His name?

11:15:05   3              THE COURT:  Yes, ma'am.

11:15:06   4              JUROR STAMPS:  My name is Debra Stamps.

11:15:08   5              THE COURT:  All right.

11:15:10   6              JUROR SUTTON:  I am Gene Sutton.  I am a

11:15:12   7    member of local -- the Union 351.

11:15:23   8              THE COURT:  All right.  Anyone else?

11:40:49   9         Are there any of you who, for any reason,

11:40:49   10   feel that you could not fair and impartially try this

11:40:49   11   case if you were selected as a juror?

11:40:49   12         Mr. Harkins?  We were going to excuse you,

11:40:49   13   anyway.

11:40:49   14         Anyone else?

11:40:49   15         All right.  Additional questions by the

11:40:49   16   plaintiffs?

11:40:49   17              MR. QUINN:  Thank you, Your Honor.

11:40:49   18         First, I would like to introduce other

11:40:49   19   plaintiffs that are present in the courtroom at this

11:40:49   20   time.  Larry Reevers; Michael Papp -- if you would just

11:40:49   21   stay standing, please.  John West; Wilma Catchall; Ruby

11:40:49   22   Brady; Bill Detter; David Majeski; and Doris Moody.

11:40:49   23         These are all plaintiffs who will be

11:40:49   24   testifying.  This is not all of them, but those are the

11:40:49   25   ones that are present here today.  And I would ask if
```

11:40:49  1   any of you know any of them?  Thank you.

11:40:49  2              JUROR SUTTON:  Excuse me.  Oh, I'm sorry.

11:40:49  3              MR. QUINN:  Yes?

11:40:49  4              JUROR SUTTON:  I thought I knew somebody,

11:40:49  5   but I didn't.

11:40:49  6              MR. QUINN:  Okay.  All right.

11:40:49  7              You answered a questionnaire that was quite

11:40:50  8   lengthy and contained a lot of information, and so

11:40:50  9   really there isn't that much more that needs to be

11:40:50  10  asked.

11:40:50  11             There are a couple of things, though, that

11:40:50  12  weren't covered on the questionnaire that I would just

11:40:50  13  briefly like to ask.  And one of them is -- and it is

11:40:50  14  covered, but it doesn't go back far enough.

11:40:50  15             How many of you have ever owned your own

11:40:50  16  business?  Just raise your hand.  And keep your hands

11:40:50  17  up, please.  And those that own that company now and put

11:40:50  18  it on your questionnaire, you can put your hand down.

11:40:50  19             If you didn't put it on the questionnaire

11:40:51  20  and you owned a business, we would like to know what it

11:40:51  21  was.  So we will start here on the front.

11:40:51  22             Oh, I'm sorry.  Ms. Adcox?

11:40:51  23             JUROR ADCOX:  I owned a clothing store for

11:40:51  24  25 years.

11:40:51  25             MR. QUINN:  You owned a clothing store?

| | | |
|---|---|---|
| 11:40:51 | 1 | JUROR ADCOX:  Uh-huh. |
| 11:40:51 | 2 | MR. QUINN:  Here in Tuscaloosa? |
| 11:40:51 | 3 | JUROR ADCOX:  Yes, sir.  And in Jackson, |
| 11:40:51 | 4 | Mississippi. |
| 11:40:51 | 5 | MR. QUINN:  Okay.  Thank you.  And then, |
| 11:40:51 | 6 | Ms. Bevelle? |
| 11:40:51 | 7 | JUROR BEVELLE:  Floral arrangement.  Been in |
| 11:40:51 | 8 | business for about a year. |
| 11:40:51 | 9 | MR. QUINN:  Okay.  All right.  And on the |
| 11:40:51 | 10 | back row -- unfortunately, I don't have them lined up. |
| 11:40:51 | 11 | Your name, please, ma'am? |
| 11:40:51 | 12 | JUROR CULP:  Shirley Culp.  We owned a |
| 11:40:51 | 13 | travel agency. |
| 11:40:51 | 14 | MR. QUINN:  You did own a travel agency? |
| 11:40:51 | 15 | JUROR CULP:  We did. |
| 11:40:51 | 16 | MR. QUINN:  Okay.  How long did you own it? |
| 11:40:51 | 17 | JUROR CULP:  Oh, gosh.  Ten, twelve years. |
| 11:40:51 | 18 | MR. QUINN:  Okay.  Thank you. |
| 11:40:51 | 19 | On that next row, anybody else?  Yes, sir? |
| 11:40:51 | 20 | Your name, please? |
| 11:40:51 | 21 | JUROR HOLLINGSWORTH:  William Hollingsworth. |
| 11:40:51 | 22 | I owned my own -- |
| 11:40:51 | 23 | MR. QUINN:  I am afraid she couldn't hear |
| 11:40:51 | 24 | you. |
| 11:40:51 | 25 | JUROR HOLLINGSWORTH: I owned an oil field |

11:40:51   1   supply firm in Houston, Texas years ago.

11:40:51   2           MR. QUINN:  And so you will understand:

11:40:51   3   When we ask you to repeat something, it's not because we

11:40:51   4   may not have heard you, but the lady up here is taking

11:40:52   5   everything down that is said.  And so we have got to be

11:40:52   6   sure that we speak up so that she can hear you.

11:40:52   7           Thank you very much, Mr. Hollingsworth.  On

11:40:52   8   the third row.  Yes, ma'am?

11:40:52   9           JUROR HOOD:  My name is Felicia Hood.  We

11:40:52   10  owned a mobile home and fitting store.

11:40:52   11          MR. QUINN:  Okay.  Thank you.  Anybody else

11:40:52   12  on that row?  Yes, sir?

11:40:52   13          JUROR LARKIN:  We own a grocery store.

11:40:52   14          MR. QUINN:  You do own or did own?

11:40:52   15          JUROR LARKIN:  Did own.  Wendell Larkin.

11:40:52   16          MR. QUINN:  Mr. Larkin, while you are

11:40:52   17  standing up, I'll ask you a question -- I will ask you

11:40:52   18  now.  Can you tell us what Larkin & Minor Corporation

11:40:53   19  does?

11:40:53   20          JUROR LARKIN:  Larkin & Minor Corporation

11:40:53   21  owns Larkin -- it's a shopping center plaza that my

11:40:53   22  sister and I own.

11:40:53   23          MR. QUINN:  Thank you very much.  Where is

11:40:53   24  that?

11:40:53   25          JUROR LARKIN:  It's in York, Alabama.  We

11:40:53  1  have a Dollar General in the plaza.

11:40:53  2          MR. QUINN:  You do have a Dollar General;

11:40:53  3  not a Family Dollar, a Dollar General?

11:40:53  4          JUROR LARKIN:  No, sir.

11:40:53  5          MR. QUINN:  Thank you.  Was there anybody

11:40:53  6  else on that row?

11:40:53  7          JUROR MILLS:  Betty Mills.  My husband and I

11:40:53  8  once owned Mills Janitorial Service.

11:40:53  9          MR. QUINN:  And where was it located?

11:40:53  10          JUROR MILLS:  Out of our home in Tuscaloosa.

11:40:53  11          MR. QUINN:  How long?

11:40:53  12          JUROR MILLS:  About five years.

11:40:53  13          MR. QUINN:  Okay.  Thanks.  Anybody else on

11:40:53  14  that row?  Okay.

11:40:53  15          The next row.  Yes, sir?

11:40:53  16          JUROR RAY:  John Ray.  I had an air

11:40:53  17  conditioning service business in the early '70s.

11:40:53  18          MR. QUINN:  Okay.  Thank you.  Anyone else

11:40:53  19  on that row?  Yes, ma'am?

11:40:53  20          JUROR STAMPS:  We owned a plumbing and

11:40:53  21  electrical service about five years.

11:40:53  22          MR. QUINN:  Okay.  Thank you.  Anyone else

11:40:53  23  on the back row?  Okay.  Thank you very much.

11:40:53  24          How many of you, in the positions that you

11:40:53  25  have held, had the authority to hire, fire, discipline,

| | | |
|---|---|---|
| 11:40:53 | 1 | or promote employees that work for you?  Just raise your |
| 11:40:53 | 2 | hand. |
| 11:40:53 | 3 | Okay.  And I just very quickly need to get |
| 11:40:54 | 4 | your name is all. |
| 11:40:54 | 5 | JUROR ADCOX:  Melissa Adcox. |
| 11:40:54 | 6 | MR. QUINN:  Okay.  Ms. Adcox. |
| 11:40:54 | 7 | JUROR CULP:  Shirley Culp. |
| 11:40:54 | 8 | MR. QUINN:  Culp.  Anybody on that second |
| 11:40:54 | 9 | row?  First row here? |
| 11:40:54 | 10 | JUROR CAPLES:  Marie Caples. |
| 11:40:54 | 11 | MR. QUINN:  Ms. Caples.  Second row?  Yes, |
| 11:40:54 | 12 | sir, Mr. Hollingsworth? |
| 11:40:54 | 13 | JUROR HOLLINGSWORTH:  (Nodded head.) |
| 11:40:54 | 14 | MR. QUINN:  Third row? |
| 11:40:54 | 15 | JUROR LAWLEY:  Wade Lawley. |
| 11:40:54 | 16 | MR. QUINN:  Lawley. |
| 11:40:54 | 17 | JUROR LARKIN:  Wendell Larkin. |
| 11:40:54 | 18 | MR. QUINN:  Larkin.  Yes, ma'am? |
| 11:40:54 | 19 | JUROR HOOD:  Own a company?  Felicia Hood. |
| 11:40:54 | 20 | MR. QUINN:  Okay.  Next row?  And the back |
| 11:40:54 | 21 | row?  Yes, ma'am? |
| 11:40:54 | 22 | JUROR VICKERY:  Teena Vickery. |
| 11:40:54 | 23 | MR. QUINN:  And what -- what position did |
| 11:40:56 | 24 | you hold? |
| 11:40:56 | 25 | JUROR VICKERY:  Manager. |

| | | |
|---|---|---|
| 11:40:56 | 1 | MR. QUINN:  Anybody ever been paid overtime? |
| 11:40:56 | 2 | Just raise your hand.  You have been paid overtime? |
| 11:40:56 | 3 | Any of you ever had to work for a job more |
| 11:40:56 | 4 | than 40 hours a week that you didn't get paid overtime? |
| 11:40:56 | 5 | And while that hand is up, if you -- if in |
| 11:40:56 | 6 | working that job you understood exactly how many hours |
| 11:40:56 | 7 | you were going to have to work overtime, keep your hand |
| 11:40:56 | 8 | up. |
| 11:40:56 | 9 | If you were a supervisor working alongside |
| 11:40:56 | 10 | other people doing the same thing as they were doing, |
| 11:40:56 | 11 | keep your hand up. |
| 11:40:56 | 12 | You've got your hand up, but you didn't have |
| 11:40:56 | 13 | it up before.  Were you paid hourly or salary? |
| 11:40:57 | 14 | JUROR AMICK:  I -- |
| 11:40:57 | 15 | THE COURT:  Ladies and gentlemen.  Ladies |
| 11:40:57 | 16 | and gentlemen, it's going to help us immeasurably if, |
| 11:40:57 | 17 | when you give an answer, you will stand up and speak |
| 11:40:57 | 18 | loudly so that the court reporters can hear exactly what |
| 11:40:57 | 19 | you are saying. |
| 11:40:57 | 20 | MR. QUINN:  I apologize, that's my fault, |
| 11:40:57 | 21 | Your Honor.  If you would please stand. |
| 11:40:57 | 22 | And your name, please? |
| 11:40:57 | 23 | JUROR AMICK:  Kevin Amick. |
| 11:40:57 | 24 | MR. QUINN:  The question to you was, you had |
| 11:40:57 | 25 | your hand up, were you hourly or salary? |

11:40:57  1          JUROR AMICK:  Salary.

11:40:57  2          MR. QUINN:  Thank you.  I have got a couple

11:40:57  3  of individual questions.  Excuse me.

11:40:57  4          Ms. Sadberry, if you would stand, please,

11:40:58  5  ma'am.  You presently work for Bradley Arant?

11:40:58  6          JUROR SADBERRY:  Yes.

11:40:58  7          THE COURT:  I intend to excuse Ms. Sadberry,

11:40:58  8  Mr. Harkins, and Ms. Smith for cause.

11:40:58  9          MR. QUINN:  I have no questions for her.

11:40:58  10         I think that's all.  Thank you, ladies and

11:40:58  11 gentlemen.

11:40:58  12         THE COURT:  Additional questions by

11:40:58  13 defendant?

11:40:58  14         MR. WHITE:  May it please the Court.

11:40:58  15         THE COURT:  Mr. White?

11:40:58  16         MR. WHITE:  Ladies and gentlemen, as you

11:40:58  17 know, my name is Mark White, and we earlier also

11:40:58  18 introduced our corporate representative, David

11:40:58  19 Alexander.  It is our privilege as lawyers to represent

11:40:58  20 this client.  And David is the president of that client.

11:40:58  21         Now, I need to disclose to you and make you

11:40:58  22 aware, and out of an abundance of caution that you

11:40:58  23 aren't aware of David from some other source.  Because

11:40:58  24 the Judge will instruct you at some course, if you are

11:40:58  25 fortunate enough to be selected to this jury, that you

11:40:58  1    shouldn't --

11:40:58  2            David Alexander has appeared in some recent

11:40:58  3    publications as recently as April of 2005.  This year,

11:40:58  4    there was an article in Reader's Digest about David and

11:40:58  5    his family; has nothing to do with this case, but it had

11:40:58  6    to do with he and his wife adopting some -- six

11:40:58  7    children; right, David -- from Liberia; and also

11:40:59  8    appeared in a publication recently in Woman's Day and in

11:40:59  9    a publication by the 700 Club.

11:40:59  10           So I make that disclosure to you and I ask

11:40:59  11   you, out of an abundance of caution, whether any of you

11:40:59  12   may have seen that article, read that article, in any of

11:40:59  13   those publications?

11:40:59  14           Yes?  If you will stand and give your name?

11:40:59  15           JUROR WATKINS:  My name is Patricia Watkins.

11:40:59  16   It was an interest to me because my son and

11:40:59  17   daughter-in-law adopted two children, one from Russia,

11:40:59  18   when it --

11:40:59  19           MR. WHITE:  Do you remember which

11:40:59  20   publication you read?

11:40:59  21           JUROR WATKINS:  Woman's Day.

11:40:59  22           MR. WHITE:  Woman's Day?  Let me ask you

11:40:59  23   this out of an abundance of caution.  Mr. Quinn, who I

11:40:59  24   have known for a long time, we both are trying to get a

11:40:59  25   fair and impartial jury.  And I want to make sure that

11:40:59  1    -- so everybody has a level playing field:  Do you think

11:40:59  2    the fact that you read about David and the fact that it

11:40:59  3    interested you and intrigued you about his family, do

11:40:59  4    you think that would cause you to be less than a fair

11:40:59  5    and impartial juror in this case?

11:40:59  6              JUROR WATKINS:  No, because I didn't know

11:40:59  7    anything about him.

11:40:59  8              MR. WHITE:  Okay.  Thank you very much.

11:40:59  9    Anyone else?

11:40:59  10             And if, during the course of this

11:40:59  11   discussion, if you think of something that either Mike

11:41:00  12   Quinn asked you about or that I asked you about, would

11:41:00  13   you say, "whoops, maybe I should have said something,"

11:41:00  14   both of us would appreciate you saying, "hey, I remember

11:41:00  15   something."

11:41:00  16             Now, this is a case in which a group of

11:41:00  17   employees are suing their employer, my client.  Would

11:41:00  18   just that, knowing that and nothing else, does that

11:41:00  19   cause you, just knowing that, to be more sympathetic and

11:41:00  20   more in favor of the employees versus the employer?

11:41:00  21   Anybody that says just any given situation, or I would

11:41:00  22   probably favor them for it?

11:41:00  23             My client is a publicly-traded corporation.

11:41:00  24   And there are a lot of people right now that don't

11:41:01  25   really think much of big corporations or publicly-traded

11:41:01  1    corporations.  And I will ask you just to search your

11:41:01  2    heart and search your soul and answer candidly to us and

11:41:01  3    the Court -- if you say, you know, "it's a corporation,

11:41:01  4    I'm probably going to come into this already being

11:41:01  5    suspicious and suspect because of that," or, "I am going

11:41:01  6    to favor an individual over a publicly-traded company."

11:41:01  7            Anybody here that when you search your heart

11:41:01  8    and search your soul, it comes to your mind that that

11:41:01  9    might be something that affects you?  Doesn't mean

11:41:01  10   anything's wrong, because both sides just want to know

11:41:02  11   your candid opinion.  It's not a test.  You don't get it

11:41:02  12   right or wrong, but we are entitled to inquire into

11:41:02  13   that.

11:41:02  14           Anybody?  Thank you very much.  Ma'am?

11:41:02  15   Thank you very much.

11:41:02  16           A JUROR:  You said something about the

11:41:02  17   article?  And I believe I read that article when I was

11:41:02  18   sitting in a dentist's office.

11:41:02  19           MR. WHITE:  I don't know if that would make

11:41:02  20   me feel better or worse.  Okay.

11:41:02  21           A JUROR:  I thought I would tell you.

11:41:02  22           MR. WHITE:  Your name, for the court

11:41:02  23   reporter.

11:41:02  24           A JUROR:  Felicia --

11:41:02  25           MR. WHITE:  Thank you so much.  That's

11:41:02  1  exactly -- I just never remembered names.  I am glad

11:41:02  2  somebody got -- let me ask you also -- you were asked

11:41:02  3  whether or not, I think anyone ever represented you, any

11:41:02  4  of these lawyers.

11:41:02  5          Do any of you have any knowledge or know at

11:41:02  6  all or think you might know any of the lawyers in the

11:41:02  7  Wiggins firm or in Allen Schreiber and Petro's firm?

11:41:02  8  Anybody who think you might know them socially or

11:41:02  9  professionally?

11:41:02  10         And that firm is Gordon Silberman -- I'm

11:41:02  11  sorry, they changed it.  It's no longer Gordon.  It's

11:41:02  12  Wiggins Childs Quinn and Pantazis.  Is that what it is

11:41:02  13  as of today?  Or for that matter, any of the other two

11:41:02  14  law firms?  Anybody that has come to mind there that you

11:41:03  15  might know somebody that has been represented by any of

11:41:03  16  the firms?

11:41:03  17         Now, I took a quick count -- and some of

11:41:03  18  these names may actually be people that have already

11:41:03  19  been excused -- but leads me to go into the

11:41:03  20  questionnaires.

11:41:03  21         It looked to me like some jurors have had

11:41:03  22  some retail experience, working retail in the past.  And

11:41:03  23  that would be Mr. Walters, Mr. Taylor, Ms. Rutherford,

11:41:03  24  Mr. Reynolds, Ms. Quinn, Mr. Jones, Ms. Hood,

11:41:03  25  Ms. Chandler, Ms. Caples --

11:41:03   1              JUROR CAPLES:  Caples.

11:41:03   2              MR. WHITE:  Caples.  Thank you.

11:41:03   3              Ms. Burnett, Ms. Burleson and Mr. Bryant.

11:41:03   4    Other than those names I have called out -- Ms. Adcox,

11:41:03   5    we just got to you this morning.  And your husband, I

11:41:03   6    think is a lawyer here, Tuscaloosa, is that right?

11:41:03   7              JUROR CAPLES:  Uh-huh.

11:41:03   8              MR. WHITE:  Okay.  Anyone else we didn't

11:41:03   9    call?

11:41:03  10              JUROR BISHOP:  My father owned a Yamaha

11:41:03  11    franchise, Yamaha Motorcycles.

11:41:03  12              MR. WHITE:  Okay.

11:41:03  13              JUROR BISHOP:  Worked for them.

11:41:03  14              MR. WHITE:  Any of you, as a result of that

11:41:03  15    retail experience that you have had in the past, come

11:41:03  16    away from that with some feeling that you might have

11:41:03  17    some sort of advantage, or maybe some sort of feeling

11:41:03  18    that you are not real fond of retail establishments?

11:41:04  19    Anything that affected you about working there?

11:41:04  20              Ms. Adcox, I forgot to ask you:  Did you

11:41:04  21    sell a line of clothing or did you have an actual retail

11:41:04  22    store?

11:41:04  23              JUROR ADCOX:  Retail store.

11:41:04  24              MR. WHITE:  And what was the name of that

11:41:04  25    store?

11:41:04    1          JUROR ADCOX:  Popaguillo.  And I changed the

11:41:04    2    name to Part Two.  And I also had a children's store,

11:41:04    3    Purple Turtle.

11:41:04    4          MR. WHITE:  Purple Turtle?

11:41:04    5          JUROR ADCOX:  (Nodded head.)

11:41:04    6          MR. WHITE:  I think some of you are

11:41:04    7    currently working in retail.  It's either full, or

11:41:04    8    part-time, or something like that.  Think think what I

11:41:05    9    show is Ms. Vickery, Mr. Larkin, Fox, Ms. Bevelle,

11:41:05   10    Ms. Stamps, and Mr. Dubose.

11:41:05   11          Any of you -- anyone else that I didn't call

11:41:05   12    that's currently working full or part-time in retail?

11:41:05   13          THE COURT:  Mr. White, step back and speak

11:41:05   14    louder so that both the court reporters and the jurors

11:41:05   15    can hear you.

11:41:05   16          MR. WHITE:  I am just going to have to get

11:41:05   17    all the way to the front of the pew.

11:41:05   18          THE COURT:  All right.

11:41:05   19          MR. WHITE:  Thank you, Judge.  Or anyone --

11:41:05   20    yes, ma'am?

11:41:05   21          JUROR CAPLES:  I work in a retail store, but

11:41:05   22    I work in the accounting department.

11:41:05   23          MR. WHITE:  And that's Ms. Caples?

11:41:06   24          JUROR CAPLES:  Yes.

11:41:06   25          MR. WHITE:  And which particular retailer do

11:41:06   1   you work in?

11:41:06   2           JUROR CAPLES:  I work in the Alabama Book

11:41:06   3   Store, which really is about four companies.  It's a

11:41:06   4   college book store down the strip.

11:41:06   5           MR. WHITE:  Is that owned by the University?

11:41:06   6           JUROR CAPLES:  No.  It's privately owned.

11:41:06   7           MR. WHITE:  Thank you.  Anyone that is

11:41:06   8   currently working in retail that has an employee, other

11:41:06   9   than what you may have responded, or what -- or the

11:41:06   10  particular persons who the Judge has indicated he is

11:41:06   11  already going to excuse; anything about that current

11:41:06   12  experience in retail that would cause you to have some

11:41:06   13  attitude or some opinion that you think might keep you

11:41:06   14  from being a completely fair and impartial juror?

11:41:06   15          Thank you.  Okay.  Let me look at my

11:41:06   16  individual notes.

11:41:06   17          Ms. Bates, I had a note that you had

11:41:06   18  recently started your new job.  What were you doing

11:41:06   19  before your current employment?

11:41:06   20          JUROR BATES:  I worked for the Sumpter

11:41:06   21  County Sheriff's Department.

11:41:06   22          MR. WHITE:  What did you do for Sumpter

11:41:06   23  County Sheriff's Department?

11:41:06   24          JUROR BATES:  I was a cook and matron.

11:41:06   25          MR. WHITE:  A cook and what?

| | | |
|---|---|---|
| 11:41:06 | 1 | JUROR BATES:  A matron. |
| 11:41:06 | 2 | MR. WHITE:  So you worked in the jail? |
| 11:41:06 | 3 | JUROR BATES:  Yes. |
| 11:41:06 | 4 | MR. WHITE:  Were you a sworn law enforcement |
| 11:41:06 | 5 | officer? |
| 11:41:06 | 6 | JUROR BATES:  No, sir. |
| 11:41:06 | 7 | MR. WHITE:  Mr. Amick? |
| 11:41:06 | 8 | JUROR AMICK:  Yes. |
| 11:41:06 | 9 | MR. WHITE:  I think there was an indication |
| 11:41:07 | 10 | that you maybe had some experience in human resources. |
| 11:41:07 | 11 | And I heard your answers earlier -- employee relations. |
| 11:41:07 | 12 | Tell me exactly what experience you had in your |
| 11:41:07 | 13 | employment in those areas. |
| 11:41:07 | 14 | JUROR AMICK:  Just been in the military |
| 11:41:07 | 15 | working with people.  And the job that I am in now -- |
| 11:41:07 | 16 | MR. WHITE:  Okay.  And you've currently been |
| 11:41:07 | 17 | in the current job how long? |
| 11:41:07 | 18 | JUROR AMICK:  I have just been in it since |
| 11:41:07 | 19 | August of last year. |
| 11:41:07 | 20 | MR. WHITE:  You retired from the military |
| 11:41:07 | 21 | when? |
| 11:41:07 | 22 | JUROR AMICK:  December of '94. |
| 11:41:07 | 23 | MR. WHITE:  What was your rate or rank when |
| 11:41:07 | 24 | you retired? |
| 11:41:07 | 25 | JUROR AMICK:  E6. |

11:41:07  1            MR. WHITE:  You indicated that you went to

11:41:07  2    Family Dollar several times a month?

11:41:08  3            JUROR AMICK:  My wife and I, yeah.

11:41:08  4            MR. WHITE:  Anything -- what -- have you had

11:41:08  5    any either good or bad experiences that would cause you

11:41:08  6    to feel one way or the other about Family Dollar?

11:41:08  7            JUROR AMICK:  No.

11:41:08  8            MR. WHITE:  And Ms. Alberque?

11:41:08  9            JUROR ALBERQUE:  Alberque.

11:41:08  10           MR. WHITE:  I know you are a musician.  Do

11:41:08  11   you currently -- I know you are a violin student at

11:41:08  12   Alabama.  Do you have any employment or work anywhere as

11:41:08  13   a musician, like symphony?

11:41:08  14           JUROR ALBERQUE:  Yes, I am with the Tupelo,

11:41:08  15   I do work with them, yes.  But I don't have to put it on

11:41:08  16   taxes because I don't get enough money.

11:41:08  17           MR. WHITE:  Those of us who have family

11:41:08  18   members, I don't think we ever get enough money.  When

11:41:08  19   will you finish?

11:41:08  20           JUROR ALBERQUE:  I hope to by next spring.

11:41:08  21   I have a few weeks to fill in and I have nine hours of

11:41:08  22   core classes.

11:41:08  23           MR. WHITE:  Are you -- I can't remember the

11:41:08  24   title.  Are you on an annual contract or something with

11:41:08  25   Tupelo Symphony?

11:41:08  1          JUROR ALBERQUE:  Well, I fill a form out

11:41:08  2   every -- you know, contract every summer.  I haven't got

11:41:08  3   my contract yet for this coming season, but I am

11:41:08  4   assuming it's coming.

11:41:08  5          MR. WHITE:  Okay.

11:41:08  6          JUROR ALBERQUE:  I also play weights.  If I

11:41:08  7   get a phone call, or something, someone wants a weight,

11:41:08  8   I play for them, too.

11:41:08  9          MR. WHITE:  Okay.

11:41:09  10         And, Ms. Bevelle, you work at CVS?

11:41:09  11         JUROR BEVELLE:  Yes, sir.

11:41:09  12         MR. WHITE:  And I think you indicated maybe

11:41:09  13  you had some training or experience in human resources

11:41:09  14  or employee relations.  Is that at CVS?

11:41:09  15         JUROR BEVELLE:  Northport Health Services.

11:41:09  16         MR. WHITE:  Tell me exactly what that was.

11:41:09  17         JUROR BEVELLE:  I was a nursing home field

11:41:09  18  associate.

11:41:09  19         MR. WHITE:  I am stepping back so both of us

11:41:09  20  need to speak louder.  If you will stand, it will make

11:41:09  21  it easier on the court reporter.

11:41:09  22         JUROR BEVELLE:  Okay.  It's a nursing home;

11:41:09  23  departmental mental rehab.  And there my job was

11:41:09  24  clerical and also a payroll department.

11:41:10  25         MR. WHITE:  Were you salaried or hourly

11:41:10   1   there?

11:41:10   2                   JUROR BEVELLE:  Hourly.

11:41:10   3                   MR. WHITE:  At CVS you are hourly?

11:41:10   4                   JUROR BEVELLE:  Hourly.

11:41:10   5                   MR. WHITE:  Do you have any, as a result of

11:41:10   6   working there at CVS -- I asked the whole group -- but

11:41:10   7   is there anything negative or positive about that work

11:41:10   8   experience that you can think of?

11:41:10   9                   JUROR BEVELLE:  No.

11:41:10   10                  MR. WHITE:  And exactly how long have you

11:41:10   11  been at CVS?

11:41:10   12                  JUROR BEVELLE:  Two years.

11:41:10   13                  MR. WHITE:  Okay.  And your current position

11:41:10   14  is?

11:41:10   15                  JUROR BEVELLE:  Cashier at the pharmacy

11:41:10   16  department -- in the pharmacy department.

11:41:10   17                  MR. WHITE:  Thank you very much.

11:41:10   18                  And Ms. Burleson, you worked at --

11:41:10   19                  JUROR BURLESON:  Piggly Wiggly.

11:41:10   20                  MR. WHITE:  You worked at Piggly Wiggly or

11:41:11   21  you currently work there?  And how long have you been

11:41:11   22  there?

11:41:11   23                  JUROR BURLESON:  I worked there from '96 to

11:41:11   24  2000, before I down here -- to go to school.

11:41:11   25                  MR. WHITE:  Anything negative or positive

11:41:11  1   about that experience?

11:41:11  2          JUROR BURLESON:  I hope that I don't ever

11:41:11  3   have to go back there again.

11:41:11  4          MR. WHITE:  Okay.  Do you --

11:41:11  5          JUROR BURLESON:  So -- unless I have to.

11:41:11  6          MR. WHITE:  I am not going to ask you to

11:41:11  7   name anybody's names, but was it that particular

11:41:11  8   location, or you just found out that --

11:41:11  9          JUROR BURLESON:  People.  The public is

11:41:11  10  rude.  So --

11:41:11  11         MR. WHITE:  Out of all the answers you could

11:41:11  12  have given to put me in a tough spot, that was one of

11:41:11  13  them, because I think the public is sitting right behind

11:41:11  14  you.

11:41:11  15         Okay.  But that part of the experience, the

11:41:11  16  way that you deal with people?

11:41:11  17         JUROR BURLESON:  Yes.

11:41:11  18         MR. WHITE:  Okay.  Thank you.

11:41:11  19         Ms. Cleveland?

11:41:11  20         JUROR CLEVELAND:  Yes, sir.

11:41:11  21         MR. WHITE:  You need to stand so they can

11:41:11  22  hear you.  21 years a member of the American Dietary

11:41:11  23  Association; right?

11:41:11  24         JUROR CLEVELAND:  That's right.

11:41:11  25         MR. WHITE:  That has been a long-standing

11:41:11  1    professional organization for people in your profession;

11:41:11  2    is that correct?

11:41:11  3              JUROR CLEVELAND:  It has.

11:41:11  4              MR. WHITE:  Have you been actually active in

11:41:11  5    the association?

11:41:11  6              JUROR CLEVELAND:  Yes, sir.

11:41:11  7              MR. WHITE:  And have you served on any

11:41:11  8    committees or any of the various things that ADA has?

11:41:11  9              JUROR CLEVELAND:  Not with the National ADA,

11:41:11  10   but I have served as president for the Tuscaloosa

11:41:11  11   District Dietary Association.  And I have served on

11:41:13  12   committees with the Alabama Dietary Association.

11:41:18  13             MR. WHITE:  And you are currently -- you've

11:41:20  14   been in the VA the whole time; correct?

11:41:22  15             JUROR CLEVELAND:  No, sir.

11:41:23  16             MR. WHITE:  Where else have you been?

11:41:24  17             JUROR CLEVELAND:  For 21 years, I have been

11:41:26  18   at the Tuscaloosa VA, but I have worked in other states

11:41:31  19   prior to that.

11:41:32  20             MR. WHITE:  What, in the hospital

11:41:33  21   environment?

11:41:34  22             JUROR CLEVELAND:  I have worked in the

11:41:36  23   hospitals, nursing homes, schools.  And I have done

11:41:42  24   consulting.

11:41:42  25             MR. WHITE:  Any other food service entities

11:41:46  1   in Alabama, or were they all out of state?

11:41:50  2   JUROR CLEVELAND:  I worked at Bryce

11:41:53  3   Hospital, and I also worked as a consultant in Pickens

11:41:59  4   County.

11:42:03  5   MR. WHITE:  My mother, Zora White, was a

11:42:06  6   dietician at the Norman B. Cobb Hospital in Phenix City.

11:42:09  7   And my sister-in-law, Laurie, was a dietician.

11:42:12  8   I just want to make sure that if your paths

11:42:14  9   have crossed, that you know that they're related to me.

11:42:18  10  Do any of those names ring a bell?

11:42:20  11  JUROR CLEVELAND:  Give me the names again.

11:42:24  12  MR. WHITE:  Zora, Z-O-R-A, White was my

11:42:27  13  mother.  She was there for 30-something years.  And then

11:42:30  14  Laurie White, my sister-in-law, worked at UAB as a

11:42:32  15  dietician.

11:42:33  16  JUROR CLEVELAND:  I don't remember them, no.

11:42:36  17  MR. WHITE:  Okay.  Now, do you have any sort

11:42:42  18  of view about big corporations, either good or bad?

11:42:47  19  Any experiences in your life where you

11:42:50  20  have -- you have any sort of opinion at all about big

11:42:54  21  corporations?

11:42:54  22  JUROR CLEVELAND:  No, sir.

11:42:55  23  MR. WHITE:  Thank you very much.

11:43:02  24  Ms. Culp?

11:43:04  25  JUROR CULP:  Yes, sir.

11:43:05  1          MR. WHITE:  Good morning.

11:43:06  2          JUROR CULP:  Good morning.

11:43:07  3          MR. WHITE:  You indicated your husband's

11:43:09  4  retired.  What did he do prior to retirement?

11:43:12  5          JUROR CULP:  He had a travel agency.

11:43:14  6          MR. WHITE:  The name of that travel agency

11:43:15  7  was what?

11:43:16  8          JUROR CULP:  All Seasons Travel.

11:43:19  9          MR. WHITE:  Located where?

11:43:20  10          JUROR CULP:  Well, we -- okay.  Located over

11:43:25  11  in -- I don't know the name of the -- it's near Indian

11:43:30  12  Hills, the location where you had your store.

11:43:35  13          MR. WHITE:  Here in Tuscaloosa?

11:43:37  14          JUROR CULP:  Yes.

11:43:40  15          MR. WHITE:  Isn't there one in Birmingham,

11:43:42  16  too?

11:43:43  17          JUROR CULP:  There is one in Birmingham, and

11:43:45  18  we sold it back to the All Seasons in Birmingham.

11:43:47  19          MR. WHITE:  Okay.  So that at one time was

11:43:49  20  owned by you and your husband, you sold it to --

11:43:52  21          JUROR CULP:  Well, they had a branch in

11:43:55  22  Grant.  And the owner there came and we set up a branch

11:43:58  23  here in Tuscaloosa.  And we operated it ourselves.

11:44:04  24          MR. WHITE:  Okay.  Thank you so much.

11:44:08  25          Reverand Curry?

11:44:09   1          JUROR CURRY:  Good morning.  First time I

11:44:14   2    have been called "reverand."

11:44:16   3              MR. WHITE:  Did I get it right?

11:44:18   4          JUROR CURRY:  Yes, sir, James Curry.

11:44:20   5              MR. WHITE:  Do you use the title?

11:44:21   6          JUROR CURRY:  No.

11:44:23   7              MR. WHITE:  You don't?  And is that because

11:44:24   8    the particular denomination?

11:44:27   9          JUROR CURRY:  Yes, sir.

11:44:28   10             MR. WHITE:  You are typically referred to

11:44:30   11   with any title or just first name?

11:44:33   12         JUROR CURRY:  A lot of times, just first

11:44:35   13   name or Brother Curry.

11:44:37   14             MR. WHITE:  I was looking at the

11:44:39   15   questionnaire, and apparently you moved here.

11:44:42   16         JUROR CURRY:  Yes, sir.

11:44:43   17             MR. WHITE:  From -- I can't remember where

11:44:44   18   you moved from.

11:44:45   19         JUROR CURRY:  I had been living in Gary,

11:44:47   20   Indiana while I was going to college at Hiles Anderson

11:44:51   21   in Indiana.

11:44:52   22             MR. WHITE:  When did you come here and what

11:44:54   23   was the reason that you moved to Alabama?

11:44:56   24         JUROR CURRY:  I moved here four days before

11:45:00   25   9/11.  And I took over as the assistant pastor and

11:45:07  1   principal at the Christian Academy.

11:45:10  2           MR. WHITE:  Okay.  So you were offered that

11:45:13  3   position in June?

11:45:17  4           JUROR CURRY:  Yes, sir.

11:45:17  5           MR. WHITE:  And was there anything in your

11:45:22  6   particular life that made you decide that you wanted to

11:45:25  7   be engaged in full-time ministry?

11:45:28  8           JUROR CURRY:  I was called to preach at a

11:45:30  9   pastor's school about 1992, while I was still in the

11:45:37  10  Navy.

11:45:38  11          MR. WHITE:  You were in the Navy and you

11:45:40  12  were also attending pastor's school?

11:45:42  13          JUROR CURRY:  Yes, sir.

11:45:42  14          MR. WHITE:  That's when you got called into

11:45:46  15  full-time service?

11:45:47  16          JUROR CURRY:  Yes, sir.

11:45:49  17          MR. WHITE:  Thank you, sir.

11:45:51  18          Ms. Findlay?

11:45:53  19          JUROR FINDLAY:  Yes.

11:45:55  20          MR. WHITE:  I saw a notation here that you

11:45:59  21  had -- there was some litigation you were involved in.

11:46:01  22  And there was one involving Alfa Insurance?

11:46:05  23          JUROR FINDLAY:  Right.

11:46:06  24          MR. WHITE:  Can you tell me briefly what

11:46:07  25  that litigation was about?

11:46:10    1          JUROR FINDLAY:  Our daughter had a wreck in

11:46:12    2    a car that was new to us.  And we have been with Alfa

11:46:18    3    for a number of years and hadn't had any claims.  And

11:46:22    4    there was some -- we had only had the car about a week.

11:46:26    5          My husband handled all the procedures of

11:46:30    6    getting it insured over the telephone.  And the

11:46:34    7    secretary made the mistake, which made us not have the

11:46:41    8    coverage that we thought we had.

11:46:42    9          Our daughter had a wreck, and it didn't

11:46:47   10    cover the wreck because of the -- from the mistake.  And

11:46:52   11    yet because it was a large corporation, they didn't look

11:47:00   12    at the fact that we had never had any claims against the

11:47:04   13    company.  And we had been with them for 20-something

11:47:07   14    years.  And so we lost the claim and totaled the car.

11:47:13   15          MR. WHITE:  I wouldn't feel too good about

11:47:15   16    Alfa if I were you.  Is that a fair way that you feel?

11:47:20   17          JUROR FINDLAY:  Well, we changed companies.

11:47:22   18          MR. WHITE:  I can appreciate and understand

11:47:23   19    that.

11:47:25   20          And you heard my earlier questions and you

11:47:31   21    pretty much guessed what -- did that experience, which

11:47:34   22    obviously is a terrible negative experience with a big

11:47:39   23    corporation in this case, but did that cause you to feel

11:47:44   24    any sort of negative feelings toward just big

11:47:48   25    corporations in general?

11:47:49  1          JUROR FINDLAY:  Not in general, but against

11:47:51  2  them, yes.

11:47:52  3          MR. WHITE:  Okay.  Any other corporation on

11:47:54  4  your hit list?

11:47:56  5          JUROR FINDLAY:  No.  No.  We have been very

11:47:59  6  pleased with the company that we use now.

11:48:02  7          MR. WHITE:  Thank you so much.  Usually

11:48:05  8  there is an insurance agent who would want you to plug

11:48:10  9  their company.

11:48:11  10          Ms. Foster, you indicated you go to Family

11:48:19  11  Dollar several times a week?  Is there a particlar store

11:48:22  12  you go to?  And where is it located?

11:48:24  13          JUROR FOSTER:  Vernon, north Fayette.

11:48:30  14          MR. WHITE:  Vernon?  Okay.  And do you know

11:48:33  15  any of the employees or the people that work in that

11:48:35  16  store?

11:48:35  17          JUROR FOSTER:  Just common, you know, just

11:48:37  18  everyday.  Not personally.

11:48:41  19          MR. WHITE:  Knowing what I have told you

11:48:42  20  already, that there's an employee involved in this

11:48:45  21  litigation against Family Dollar, do you think there's a

11:48:51  22  chance that your experiences in this might somehow be

11:48:54  23  influenced by those relationships or contacts you have

11:48:59  24  developed with the people?

11:49:00  25          JUROR FOSTER:  No.

11:49:01  1          MR. WHITE:  You are confident, which I

11:49:03  2  appreciate, that you can be a fair and impartial juror

11:49:05  3  in this case?

11:49:09  4          JUROR FOSTER:  Yes.

11:49:15  5          MR. WHITE:  Thank you so much.

11:49:16  6          Mr. Hollingsworth?

11:49:19  7          JUROR HOLLINGSWORTH:  Michael Hollingsworth.

11:49:22  8          MR. WHITE:  You indicated you had previously

11:49:25  9  been a purchasing agent.  Was that a salary position or

11:49:28  10  hourly?

11:49:28  11         JUROR HOLLINGSWORTH:  They were all salary.

11:49:32  12         MR. WHITE:  And tell me exactly what your

11:49:35  13  job entailed when you were working as a purchasing agent

11:49:38  14  before you retired.

11:49:40  15         JUROR HOLLINGSWORTH:  Purchasing old field

11:49:41  16  supplies and shipped them around the world.  Excuse me.

11:49:44  17         MR. WHITE:  So it was a global market you

11:49:49  18  were purchasing for?

11:49:50  19         JUROR HOLLINGSWORTH:  Basically.

11:49:51  20         MR. WHITE:  Now, I am trying to get in my

11:49:53  21  mind -- I am not sure -- were you purchasing them for

11:49:56  22  use by the company you worked for, or was it a brokerage

11:50:01  23  arrangement?

11:50:02  24         JUROR HOLLINGSWORTH:  I have done both.

11:50:03  25         MR. WHITE:  Okay.

| | | |
|---|---|---|
| 11:50:04 | 1 | JUROR HOLLINGSWORTH:  The first company I |
| 11:50:05 | 2 | worked for was strictly for the -- when I went in |
| 11:50:08 | 3 | business for myself, it was for other people. |
| 11:50:12 | 4 | MR. WHITE:  Okay.  And when did you retire? |
| 11:50:14 | 5 | JUROR HOLLINGSWORTH:  In 2000. |
| 11:50:16 | 6 | MR. WHITE:  And you indicated you had some |
| 11:50:25 | 7 | HR management; obviously, owning your own business you |
| 11:50:29 | 8 | had that.  How many employees did you have when you |
| 11:50:31 | 9 | owned your own business? |
| 11:50:32 | 10 | JUROR HOLLINGSWORTH:  I basically supervised |
| 11:50:34 | 11 | only one at that point in time. |
| 11:50:37 | 12 | MR. WHITE:  In your other position you held |
| 11:50:39 | 13 | as a purchasing agent, did you supervise other |
| 11:50:43 | 14 | employees? |
| 11:50:43 | 15 | JUROR HOLLINGSWORTH:  Yes, I did. |
| 11:50:44 | 16 | MR. WHITE:  What's the most? |
| 11:50:46 | 17 | JUROR HOLLINGSWORTH:  I believe it would be |
| 11:50:47 | 18 | seven. |
| 11:50:47 | 19 | MR. WHITE:  That was when the oil business |
| 11:50:49 | 20 | was good? |
| 11:50:50 | 21 | JUROR HOLLINGSWORTH:  I'm sorry? |
| 11:50:52 | 22 | MR. WHITE:  That must have been when the oil |
| 11:50:54 | 23 | business was good. |
| 11:50:54 | 24 | JUROR HOLLINGSWORTH:  That is correct. |
| 11:50:56 | 25 | MR. WHITE:  Were those seven employees, were |

11:50:57  1   they salaried or commission or hourly?

11:51:02  2           JUROR HOLLINGSWORTH:  They were salaried and

11:51:06  3   and on -- hourly, salary and hourly.  I had some that

11:51:12  4   were both.

11:51:13  5           MR. WHITE:  Okay.  Thank you very much.

11:51:16  6           Ms. Hood?  Ms. Hood, you indicated you had

11:51:24  7   previously given a deposition in a case.  And there will

11:51:27  8   be some -- probably some depositions that will be used,

11:51:30  9   or you may hear that word in this case.

11:51:33 10           What was the case in which you gave the

11:51:35 11   deposition, briefly?

11:51:37 12           JUROR HOOD:  In the past, I had worked for

11:51:39 13   the same transportation company I am working for now.

11:51:41 14   And one of the drivers was involved in an accident,

11:51:47 15   where the escort driver was killed.  And I was one that

11:51:50 16   answered the phone call and took her statements from the

11:51:54 17   drivers.  So I had to give -- excuse me -- the

11:51:56 18   deposition on what was told to me, and what I needed, as

11:51:59 19   far as phone calls, needed to learn.

11:52:01 20           MR. WHITE:  No deposition other than that

11:52:02 21   one; correct?

11:52:03 22           JUROR HOOD:  No, sir.

11:52:06 23           MR. WHITE:  And you had been involved in

11:52:08 24   some litigation, I think.  Do you -- you had been in a

11:52:11 25   lawsuit?  Is my note right on that?

11:52:14  1                    JUROR HOOD:  Well, there was some papers

11:52:16  2   filed on the balance of a loan that was owed, but we

11:52:18  3   settled it without ever going into court.

11:52:21  4                    MR. WHITE:  Okay.  And was that against a

11:52:23  5   bank or finance company?

11:52:24  6                    JUROR HOOD:  Yes, sir, loan company.  I

11:52:27  7   didn't file it.  They filed it.

11:52:29  8                    MR. WHITE:  I understand.  Did you come away

11:52:33  9   from that with any sort of negative feeling toward

11:52:36  10  financial companies or big corporations at all?

11:52:38  11                   JUROR HOOD:  No, I don't think so.

11:52:41  12                   MR. WHITE:  Okay.  You don't think any of

11:52:45  13  those things will keep you from being a fair and

11:52:48  14  impartial juror?

11:52:50  15                   JUROR HOOD:  No, sir, I don't think it

11:52:52  16  would.

11:52:52  17                   MR. WHITE:  Okay.  Well, do you have

11:52:55  18  anything that is bothering you that you think it might

11:52:58  19  affect you a little bit?

11:52:59  20                   JUROR HOOD:  No.

11:53:00  21                   MR. WHITE:  Okay.  Thank you.

11:53:10  22                   THE COURT:  Two minutes, Mr. White.

11:53:12  23                   MR. WHITE:  Thank you, Your Honor.

11:53:14  24                   Mr. Larkin?  Mr. Larkin, could you just

11:53:18  25  briefly give me some details about your business that

11:53:23  1   you currently have, what it does, what kind of business?

11:53:26  2              JUROR LARKIN:  We own a shopping center and

11:53:30  3   we operate a gas station and a grocery store and a

11:53:36  4   laundromat.  So we have two tenants in the plaza; Dollar

11:53:39  5   General and another office space.

11:53:42  6              MR. WHITE:  And what -- how long have you

11:53:44  7   been on the Sumpter Board of Education?

11:53:46  8              JUROR LARKIN:  18 years.

11:53:48  9              MR. WHITE:  And that's an elected position,

11:53:52  10  isn't it?

11:53:52  11             JUROR LARKIN:  Yes, sir.

11:53:53  12             MR. WHITE:  All right.  Thank you,

11:53:55  13  Mr. Larkin.

11:53:55  14             And quickly, Mr. Lawley?  You indicate you

11:54:01  15  are a design engineer.  Do you have an engineering

11:54:04  16  degree?

11:54:05  17             JUROR LAWLEY:  No.

11:54:06  18             MR. WHITE:  Okay.  What is your educational

11:54:08  19  background?

11:54:11  20             JUROR LAWLEY:  Two associate degrees.

11:54:13  21             MR. WHITE:  Okay.

11:54:13  22             JUROR LAWLEY:  About 20 years in

11:54:15  23  construction.

11:54:15  24             MR. WHITE:  Where was that, who did you

11:54:16  25  principally work for in construction?  Was that

11:54:19  1    commercial or residential?

11:54:20  2                    JUROR LAWLEY:  Commercial.

11:54:21  3                    MR. WHITE:  All right, sir.  Thank you.

11:54:32  4                    And one final question:  How many of you

11:54:35  5    folks have ever heard a guy on the radio by the name of

11:54:40  6    Paul Harvey?

11:54:43  7                    Okay.  That's all, Judge.

11:54:46  8                    MR. QUINN:  Judge, I have two follow-ups

11:54:47  9    from his earlier questions that he asked.

11:54:50  10                   THE COURT:  No.

11:54:51  11                   MR. QUINN:  Okay.

11:54:55  12                   THE COURT:  Aside from the challenges to

11:55:02  13   Mr. Hankins, Ms. Smith and Ms. Sadberry, are there any

11:55:07  14   other challenges for cause?

11:55:12  15                   MR. WHITE:  You had -- I think those three.

11:55:15  16                   THE COURT:  All right.

11:55:17  17                   MR. WHITE:  I haven't heard from Mike.

11:55:18  18                   THE COURT:  All right.  You will have ten

11:55:20  19   minutes --

11:55:21  20                   MR. QUINN:  No, none from the plaintiff.

11:55:23  21                   THE COURT:  You will have ten minutes to

11:55:26  22   execute your peremptory challenges.  Five challenges per

11:55:31  23   side.

11:55:31  24                   MR. WHITE:  Five.  May we be excused?

11:55:33  25                   THE COURT:  Sure.

| | | |
|---|---|---|
| 11:55:35 | 1 | MR. WHITE:  If we run late, will you have |
| 11:55:40 | 2 | David knock on your door? |
| 11:55:42 | 3 | THE COURT:  No.  We will just go on without |
| 11:55:44 | 4 | you. |
| 11:55:45 | 5 | (Laughter.) |
| 11:55:47 | 6 | THE COURT:  Ladies and gentlemen, we are in |
| 11:56:41 | 7 | Informal recess.  We are in informal recess.  I am going |
| 11:56:45 | 8 | to ask the jurors not to leave the room. |
| 12:09:30 | 9 | (In open court, prospective jurors present.) |
| 12:09:30 | 10 | THE COURT:  We are now distributing the list |
| 12:09:32 | 11 | of challenges to the adverse counsel to determine |
| 12:09:35 | 12 | whether there are any Batson-type challenges. |
| 12:09:43 | 13 | MR. QUINN:  Judge? |
| 12:10:11 | 14 | THE COURT:  Yes. |
| 12:10:11 | 15 | MR. QUINN:  May we approach? |
| 12:10:13 | 16 | THE COURT:  Sure. |
| 12:23:48 | 17 | (At bench:) |
| 12:23:48 | 18 | THE COURT:  Let me see the list. |
| 12:23:48 | 19 | MR. QUINN:  Four of the five strikes are |
| 12:23:48 | 20 | African-American.  We make a Batson challenge. |
| 12:23:48 | 21 | THE COURT:  All right.  Let me see the list. |
| 12:23:48 | 22 | Are there any Batson challenges from the |
| 12:23:48 | 23 | defendant? |
| 12:23:48 | 24 | MR. WHITE:  No, sir. |
| 12:23:48 | 25 | THE COURT:  All right.  What is the non- |

12:23:48  1   racial reason for the --

12:23:48  2                  MR. WHITE:  Okay, Your Honor, I will take

12:23:48  3   the --

12:23:48  4                  THE COURT:  -- striking of Ms. Bates?

12:23:48  5                  MR. WHITE:  Your Honor, she is a -- she is

12:23:48  6   in litigation right now, a very recent bankruptcy,

12:23:48  7   within the past 30 days.

12:23:48  8                  Her experience in the Sumpter County prison

12:23:49  9   system and law enforcement orientation, I would

12:23:49  10  represent to Your Honor that we have done, as you might

12:23:49  11  anticipate, researched focus groups, those kinds of

12:23:49  12  things.  I would represent that there was no racial

12:23:49  13  indicator in any of that research that would cause us to

12:23:49  14  strike for racial reasons.

12:23:49  15                  THE COURT:  Is she the only -- are there no

12:23:49  16  whites who are --

12:23:49  17                  MR. WHITE:  No, not that I have seen.  They

12:23:49  18  have got a 30-day case, and I don't see any law

12:23:49  19  enforcement --

12:23:49  20                  THE COURT:  The first question is:  Are

12:23:49  21  there any whites who have indicated bankruptcy?

12:23:49  22                  MR. CALAMUSA:  Yes, sir.  Yes, Your Honor.

12:23:49  23  There were some that had bankruptcy, not in 30 days.

12:23:50  24                  THE COURT:  I am not asking 30 days.  I am

12:23:50  25  just asking bankruptcy.

| | | |
|---|---|---|
| 12:23:50 | 1 | MR. QUINN: Yes, there were. |
| 12:23:50 | 2 | THE COURT: Let me see the names. |
| 12:23:50 | 3 | MR. WHITE: You want me to hold up before I |
| 12:23:50 | 4 | finish? |
| 12:23:50 | 5 | THE COURT: Yes. |
| 12:23:50 | 6 | MR. WHITE: Okay. |
| 12:23:50 | 7 | MR. QUINN: Okay. We have another black who |
| 12:23:50 | 8 | was in bankruptcy that they did not strike. |
| 12:23:50 | 9 | THE COURT: No, that is not the question. |
| 12:23:50 | 10 | The question is, is there any white who is in |
| 12:23:50 | 11 | bankruptcy? |
| 12:23:50 | 12 | MR. WHITE: Down to the -- |
| 12:23:50 | 13 | THE COURT: Well, I need that question |
| 12:23:50 | 14 | answered. |
| 12:23:50 | 15 | MR. QUINN: I could have swore I had one in |
| 12:23:50 | 16 | my hand. |
| 12:23:50 | 17 | MR. CALAMUSA: Ms. Pratt, Your Honor. |
| 12:23:51 | 18 | MR. QUINN: Here's a -- yeah, here's a |
| 12:23:51 | 19 | husband who was in bankruptcy. |
| 12:23:51 | 20 | THE COURT: All right. Anything else on the |
| 12:23:51 | 21 | bankruptcy issue, Mr. White? |
| 12:23:51 | 22 | MR. WHITE: No, sir, except that if that's |
| 12:23:51 | 23 | Pratt, we wouldn't get down that far. |
| 12:23:51 | 24 | THE COURT: The objection is sustained. Any |
| 12:23:51 | 25 | other non-racial basis for striking Ms. Bates? |

| | | |
|---|---|---|
| 12:23:51 | 1 | MR. WHITE:  Yes, sir, Your Honor.  She |
| 12:23:51 | 2 | indicated that she worked a lot of hours where she was |
| 12:23:51 | 3 | not paid overtime in her employment. |
| 12:23:51 | 4 | MR. KALLON:  She was paid overtime. |
| 12:23:51 | 5 | MR. WHITE:  She was paid overtime. |
| 12:23:51 | 6 | MR. QUINN:  Right.  She was paid overtime. |
| 12:23:51 | 7 | MR. WHITE:  Instead of not being paid |
| 12:23:51 | 8 | overtime. |
| 12:23:51 | 9 | THE COURT:  Yeah.  Anything else? |
| 12:23:51 | 10 | MR. WHITE:  On that issue? |
| 12:23:51 | 11 | THE COURT:  On this juror. |
| 12:23:51 | 12 | MR. WHITE:  Yes, sir, the law enforcement |
| 12:23:51 | 13 | paragraph and working Sumpter County as the matron. |
| 12:23:51 | 14 | THE COURT:  What would her -- |
| 12:23:51 | 15 | MR. WHITE:  Our research shows that law |
| 12:23:51 | 16 | enforcement jurors -- but strictly based on that, not |
| 12:23:51 | 17 | based on any racial reason, Your Honor. |
| 12:23:51 | 18 | THE COURT:  How is a cook -- |
| 12:23:51 | 19 | MR. WHITE:  Matron. |
| 12:23:51 | 20 | THE COURT:  She said she was a matron? |
| 12:23:51 | 21 | MR. QUINN:  She was not a certified -- |
| 12:23:51 | 22 | THE COURT:  Are there any whites in this |
| 12:23:51 | 23 | pool with a law enforcement background? |
| 12:23:51 | 24 | MR. CALAMUSA:  I am going to have to go back |
| 12:23:51 | 25 | and look through them, but, yes, sir, there was one who |

12:23:52  1    was a military police in the army.

12:23:52  2              MR. WHITE:  We didn't get to him, Judge.

12:23:52  3              THE COURT:  There was a white with a

12:23:52  4    military?

12:23:52  5              MR. WHITE:  No, sir.

12:23:52  6              THE COURT:  Military police.

12:23:52  7              Ladies and gentlemen of the jury, do any of

12:23:52  8    you recall whether you indicated on your questionnaire

12:23:52  9    that you had any law enforcement or military police

12:23:52  10   background?

12:23:52  11             All right.  That would be Mr. Ray.  Thank

12:23:52  12   you.  Anything else?

12:23:52  13             MR. MAYS:  He is union.

12:23:52  14             MR. WHITE:  That wasn't it, Judge.  But,

12:23:52  15   Your Honor, may I put on the record the fact that

12:23:52  16   because of the number of strikes the Court has, Mr. Ray

12:23:52  17   wouldn't be in the pool?

12:23:53  18             THE COURT:  Yes, sir.  Ms. Bates is on this

12:23:53  19   jury.  Ms. Bevelle, non-racial reason?

12:23:53  20             MR. WHITE:  She is a current employee at a

12:23:53  21   CVS retailer and is a direct competitor of ours.  And

12:23:53  22   she works there as a cashier today right now currently.

12:23:53  23             And she would come into this -- our

12:23:53  24   analysis, our research is that she would come into it

12:23:53  25   with impressions from working in that environment that

12:23:53  1   would make her adverse to management.

12:23:53  2   MR. QUINN:  Did they strike Ms. Burleson?

12:23:53  3   THE CLERK:  No.

12:23:53  4   MR. QUINN:  Well, Ms. Burleson had a really

12:23:53  5   bad experience against Piggly Wiggly, but she's white.

12:23:54  6   MR. WHITE:  She had a bad experience with

12:23:54  7   the customers that came in there.

12:23:54  8   MR. QUINN:  She said she would never work

12:23:54  9   there again.  She said she would never work there again.

12:23:54  10  That's just as much as retail as what he's talking

12:23:54  11  about.

12:23:54  12  MR. WHITE:  They're not a direct competitor

12:23:54  13  of ours.

12:23:54  14  THE COURT:  All right.  Any other reason?

12:23:54  15  MR. WHITE:  That's it.

12:23:54  16  THE COURT:  Your challenge is sustained.

12:23:54  17  Ms. Bevelle remains on this jury.

12:23:54  18  Ms. Cleveland?

12:23:54  19  MR. WHITE:  Your Honor, Ms. Cleveland also

12:23:54  20  indicated that she had worked a lot of hours.  One thing

12:23:54  21  I -- I took her off, because I was born and raised and

12:23:54  22  lived with a dietician and I know the kind of

12:23:54  23  environment that that is.

12:23:54  24  There is no other dietician, white or black,

12:23:54  25  with this kind of service on this jury; and that the

12:23:54  1  type of work that she does, Your Honor, is such that

12:23:54  2  our -- our research shows -- strictly a race-neutral

12:23:54  3  basis on peremptory challenge -- there are better

12:23:54  4  jurors.

12:23:54  5           THE COURT:  So she is a dietician?

12:23:54  6           MR. WHITE:  Because of the nature of that

12:23:54  7  work, Judge, it is long, long hours.  It is a lot of

12:23:54  8  long hours, on a salary basis.  And we also think

12:23:54  9  that --

12:23:54  10           MR. QUINN:  Her jury questionnaire says she

12:23:54  11  works 40 hours a week.

12:23:55  12           MR. WHITE:  There was an indication from

12:23:55  13  Abdul -- didn't she have the long hours?

12:23:55  14           MR. KALLON:  She was the one --

12:23:55  15           MR. QUINN:  She's off on Saturday and

12:23:55  16  Sunday.  She works from 8:00 a.m. to 4:30 p.m.

12:23:55  17           MR. KALLON:  She gave the bad answers to the

12:23:55  18  corporation jury.  She was on the corporation questions.

12:23:55  19  She is the one that was real tenuous about how she would

12:23:55  20  feel toward the corporation.

12:23:55  21           MR. QUINN:  She said very emphatically that

12:23:55  22  she held no grudge against any --

12:23:55  23           MR. WHITE:  She did not say it emphatically.

12:23:55  24  She was the corporation person.

12:23:55  25           Sorry, Judge.  I had her mixed up with

12:23:55  1    Bates.

12:23:55  2            But she -- the responses she gave to the

12:23:55  3    cooperation questions.

12:23:55  4            MR. QUINN:  We don't have anything on ours

12:23:56  5    about that.

12:23:56  6            THE COURT:  Listen, can we pull up her

12:23:56  7    testimony?

12:23:56  8            MR. KALLON:  She answered the question.

12:23:56  9            MR. WHITE:  She lost eye contact, all of

12:23:56  10   that.  And she's a pretty strong person.  And she's a

12:23:56  11   pretty accomplished person.  And that was the area where

12:23:56  12   she lost eye contact.  And there was something there --

12:23:56  13   I couldn't get that.

12:23:56  14           MR. QUINN:  I see no basis for striking

12:23:56  15   because they that have been a dietician in a hospital

12:23:56  16   working for a salary.

12:23:56  17           MR. WHITE:  It has just got to be the reason

12:23:56  18   that it's race-neutral.  And I am representing to you

12:23:56  19   that's the reason.

12:23:56  20           THE COURT:  Well, we have got on this

12:23:56  21   remaining jury --

12:23:56  22           MR. WHITE:  I wouldn't have kept a white

12:23:56  23   dietician.  I wouldn't have kept my mother.

12:23:56  24           MR. QUINN:  I don't feel that way.  My

12:23:56  25   daughter's going to be a dietician.  She's --

| 12:23:56 | 1 | MR. WHITE:  That's the best evidence right |
| 12:23:56 | 2 | there. |
| 12:23:56 | 3 | MR. QUINN:  She's going to be -- |
| 12:23:56 | 4 | MR. CALAMUSA:  You would keep your mom. |
| 12:23:56 | 5 | THE COURT:  We've got 36 venire persons.  Of |
| 12:23:56 | 6 | those 36, seven of those are black, and Family Dollar |
| 12:23:56 | 7 | has stricken four of them. |
| 12:23:56 | 8 | MR. WHITE:  I didn't realize that until I |
| 12:23:56 | 9 | had my list. |
| 12:23:56 | 10 | THE COURT:  Ms. Cleveland remains on this |
| 12:23:56 | 11 | jury. |
| 12:23:56 | 12 | MR. WHITE:  Your Honor, do I -- |
| 12:23:56 | 13 | THE COURT:  Findlay. |
| 12:23:57 | 14 | MR. WHITE:  Findlay -- |
| 12:23:57 | 15 | THE COURT:  Ms. Duckworth. |
| 12:23:57 | 16 | MR. WHITE:  Ms. Duckworth. |
| 12:23:57 | 17 | MR. KALLON:  You are not going to get to |
| 12:23:57 | 18 | that.  There's only ten jurors. |
| 12:23:57 | 19 | THE CLERK:  Yes, there's going to be ten. |
| 12:23:57 | 20 | MR. KALLON:  Yeah, ten. |
| 12:23:57 | 21 | MR. WHITE:  You don't even get to Duckworth? |
| 12:23:57 | 22 | THE CLERK:  Huh-uh. |
| 12:23:57 | 23 | MR. WHITE:  You don't get to Duckworth.  You |
| 12:23:57 | 24 | have already got ten in the box.  She is not one of |
| 12:23:57 | 25 | them? |

12:23:57  1           THE CLERK:  Duckworth?  No.  You struck her.

12:23:57  2           MR. KALLON:  There's no need to argue.

12:23:57  3           MR. WHITE:  David has already got ten in the

12:23:57  4  box, so we don't get to Duckworth.

12:23:57  5           But, Your Honor, can I show them, on behalf

12:23:57  6  of the defendants, that the particular defendants have

12:23:57  7  spent a significant amount of money in jury research on

12:23:57  8  many occasions, that none of these three were based upon

12:23:57  9  race, but for other race-neutral reasons, and we object

12:23:58  10  to the Court's sustaining the objection.

12:23:58  11           THE COURT:  All right.

12:23:58  12           MR. WHITE:  Thank you, Judge.

12:23:58  13           (End of bench conference.)

12:23:58  14           THE CLERK:  The following people have been

12:23:58  15  selected to serve in this case; when I call your name,

12:23:58  16  will you please come forward and have a seat in the jury

12:23:59  17  box:  Ms. Foster; Mr. Dubose; Ms. Cleveland;

12:25:00  18  Ms. Burleson; Ms. Bryant; Ms. Bishop; Ms. Bevelle;

12:26:02  19  Ms. Bates; Mr. Amick; Ms. Alberque.

12:26:39  20           (Complying.)

12:26:52  21           THE CLERK:  Will all of you please stand and

12:26:59  22  raise your right hand?

12:27:00  23           (Jury sworn.)

12:27:10  24           THE COURT:  Those of you not selected for

12:27:15  25  service on this jury, thank you so very much for your

12:27:19  1   willingness to serve.  You are now excused.

12:27:56  2             Ladies and gentlemen, it's time for lunch.

12:28:12  3   You have now been sworn as a jury to try this case.

12:28:15  4   When we return from lunch, I will give you the opening

12:28:18  5   instructions and will then get into the meat of the

12:28:20  6   case.  But in the meantime, do not discuss the case

12:28:25  7   among yourselves or with anyone else.  Do not allow it

12:28:28  8   to be discussed in your presence.  Keep an open mind.

12:28:34  9   Don't go to a Family Dollar store.  And return back here

12:28:38  10  at 2:00 o'clock.

12:28:41  11            Thank you.  See you then.

12:28:43  12            (Jury out at 12:20 p.m.)

12:29:15  13            THE COURT:  We will be in recess until 2:00

12:29:19  14  o'clock.

12:29:20  15            MR. KALLON:  Your Honor, we have some

12:29:35  16  preliminary instructions that we would like you to

12:29:40  17  consider.

12:29:50  18            MR. MILLER:  May I approach, Your Honor?

12:29:50  19      (Lunch recess from 12:21 p.m. until 2:00 p.m.)

14:06:39  20            (In open court, jury present.)

14:08:42  21            THE COURT:  Ladies and gentlemen, as I

14:08:56  22  indicated before you left for lunch, you have now been

14:09:05  23  sworn as a jury to try this case.  And by your verdict,

14:09:20  24  you will decide the disputed issues of fact in the case.

14:09:25  25  I will decide all questions of law and procedure as they

14:09:28  1    arise during the trial.  And before you go to the jury

14:09:35  2    room to deliberate, I will give you the rules of law

14:09:40  3    that you must apply in making your decision.

14:09:46  4            You will base your decision on two things:

14:09:53  5    First, the evidence, which you will hear here in the

14:09:58  6    courtroom; and secondly, the law, as I shall give it to

14:10:01  7    you.

14:10:03  8            Evidence consists of two things:  Testimony

14:10:10  9    and the exhibits.  You should pay close attention to the

14:10:16  10   testimony as it is given here on the witness stand,

14:10:19  11   because even though, as you can see we have two court

14:10:24  12   reporters taking down everything that is being said,

14:10:30  13   their transcript of the testimony will not be available

14:10:34  14   for your use during your deliberations.  So you will

14:10:38  15   have to rely on your memories concerning what a witness

14:10:45  16   had to say.

14:10:48  17           On the other hand, if you don't have a

14:10:50  18   chance to closely scrutinize each exhibit as it comes

14:10:54  19   into evidence, don't be too concerned about it, because

14:10:58  20   you will have all the exhibits with you in the jury room

14:11:01  21   as you deliberate.

14:11:07  22           If you would like to take notes during the

14:11:12  23   trial, you may do so.  On the other hand, you are not

14:11:17  24   required to take notes if you don't want to do that;

14:11:20  25   that is left up to each one of you individually.

14:11:24  1          If you decide to take notes, don't try to

14:11:28  2  write down everything that's being said, because you

14:11:32  3  will get so involved in your note taking that you may

14:11:35  4  become distracted from the ongoing proceedings.  Just

14:11:42  5  try to make a note of the things that -- names, dates,

14:11:46  6  places -- things that might be difficult to remember.

14:11:49  7          Also, your notes should only be used as aids

14:11:52  8  to your memory.  And if your memory should later differ

14:11:57  9  from your notes, rely on your memory and not your notes.

14:12:05 10          If you decide that you don't want to take

14:12:07 11  notes, again, rely on your own independent recollection

14:12:16 12  or memory of what was said by a witness; and you

14:12:21 13  shouldn't be unduly influenced by the notes of other

14:12:25 14  jurors.

14:12:27 15          Notes are not entitled to any greater weight

14:12:30 16  than the recollection of each juror concerning what the

14:12:38 17  testimony was.

14:12:42 18          During the trial, you should keep an open

14:12:46 19  mind and avoid reaching any hasty impressions or

14:12:52 20  conclusions.  Reserve your judgment until you have heard

14:12:55 21  all of the testimony and evidence, the closing

14:13:01 22  arguments, the instructions of law, until you have begun

14:13:10 23  your deliberations and considered the evidence.

14:13:15 24          Because of your obligation to keep an open

14:13:18 25  mind during the trial, coupled with your obligation to

14:13:22  1   decide the case only on the basis of the evidence, you

14:13:28  2   should not discuss the case during the trial in any

14:13:33  3   manner among yourselves or with anyone else, and you

14:13:37  4   should not allow the case to be discussed in your

14:13:40  5   presence.

14:13:44  6        You should avoid any newspaper article or

14:13:47  7   any public broadcast concerning this case.  You should

14:13:53  8   not visit any Family Dollar Store during the time that

14:13:59  9   you are serving as a juror in the case.

14:14:06  10       Now, from time to time, you will notice that

14:14:09  11  the lawyers are going to make objections.  And they will

14:14:17  12  make motions.  And it's my duty to rule on those

14:14:21  13  objections and motions.  You should not conclude or

14:14:27  14  infer from any ruling I make on an objection or motion

14:14:33  15  that I have any opinion in this case.

14:14:39  16       If I should sustain an objection, you should

14:14:43  17  not guess or speculate what the answer would have been

14:14:48  18  if the witness had been allowed to answer the question

14:14:50  19  or what the document would have shown had it been

14:14:55  20  received in evidence.

14:14:59  21       Also, during the trial, it will be necessary

14:15:01  22  for me, from time to time, to discuss matters with the

14:15:07  23  lawyers outside your presence, called bench conferences,

14:15:12  24  we will have up here sometimes.  There will be other

14:15:16  25  times when matters may require more extended discussion

14:15:20  1   and we may have to excuse you to the jury room while we

14:15:23  2   take up those matters outside your presence.

14:15:27  3            We will try to limit those interruptions as

14:15:33  4   much as possible.  And when we are required to have

14:15:39  5   those bench conferences, please be patient with us and

14:15:43  6   understand that we are trying to get this case tried as

14:15:48  7   quickly as possible.

14:15:51  8            Now, during the course of the trial, you

14:15:55  9   will also note that from time to time I will ask

14:15:59  10  questions of witnesses.  You are not permitted to ask

14:16:04  11  questions of witnesses.  You shouldn't give any special

14:16:08  12  weight to any question I put to a witness or the

14:16:13  13  witness' answer to that question.  The lawyers know that

14:16:19  14  they may object to any question I put to a witness, and

14:16:23  15  I will have to rule on that objection.

14:16:26  16            I simply want to point out to you that you

14:16:29  17  should not be influenced in any way that a question was

14:16:34  18  put to a witness by the Judge.  Because it's your duty

14:16:40  19  to be the judges of the facts in the case.

14:16:44  20            Also, you may observe that from time to time

14:16:52  21  I may make some unkind statements to the lawyers.  Don't

14:17:00  22  infer from anything I have said to a lawyer that I have

14:17:07  23  any opinion as to how this case ought to be decided or

14:17:11  24  which party should win, or any bias or prejudice against

14:17:15  25  anyone.  You should put all of those kinds of things out

14:17:20   1    of your mind when you go into the jury room and base

14:17:23   2    your decision only on the evidence and the law as I

14:17:28   3    shall have given it to you.

14:17:31   4           Now, the case -- I said to you that this

14:17:33   5    case is going to last at least two weeks.  The order of

14:17:41   6    the proceeding will be as follows:  As soon as I finish

14:17:46   7    these opening instructions, the lawyers will make

14:17:53   8    opening statements.

14:17:56   9           Now, they can take as much time as they

14:18:00  10    want, because whatever they say in opening statements is

14:18:03  11    going to come out of their 40 hours.  The opening

14:18:08  12    statements are not evidence.  They are statements of

14:18:11  13    what the lawyers expect the evidence is going to be.

14:18:18  14           Following the opening statements, then we

14:18:21  15    will turn to the evidentiary phase of the trial.  It is

14:18:25  16    at this point that the plaintiffs will be required to

14:18:30  17    prove the specific things necessary to show that the

14:18:38  18    Fair Labor Standards Act was violated and that they

14:18:42  19    suffered damages.

14:18:44  20           At the end of the plaintiffs' evidence, the

14:18:48  21    defendant will then come forward with what they call

14:18:53  22    affirmative defense.  You remember I indicated to you

14:18:58  23    earlier that the defendant has the burden of proving

14:19:03  24    that the plaintiffs' work was exempt, that it was

14:19:15  25    administrative work that was not subject to the overtime

14:19:20  1    provisions of the Fair Labor Standards Act; and the

14:19:24  2    defendant has the burden of proof on that issue.  So

14:19:26  3    after the plaintiffs' evidence, the defendant will then

14:19:29  4    offer evidence.

14:19:31  5         At the end of the defendant's evidence, then

14:19:34  6    the plaintiff will have the right to introduce rebuttal

14:19:37  7    evidence, which will close out the evidentiary phase of

14:19:40  8    the trial.

14:19:40  9         After you have heard the evidence, then you

14:19:42  10   will hear from the lawyers again in their summations, or

14:19:46  11   closing arguments.  At this point, the lawyers will

14:19:48  12   argue to you what they think the evidence has shown and

14:19:53  13   what inferences they want you to draw from the facts.

14:20:02  14        After the summations, I will then give you

14:20:05  15   the oral charge.  These are the rules of law that you

14:20:09  16   must follow and apply in deciding the case, whether you

14:20:14  17   agree with them or not.

14:20:17  18        After you've heard these instructions, you

14:20:20  19   will then go to the jury room and begin your

14:20:22  20   deliberations, or discussions, concerning the evidence.

14:20:26  21   You will consider all of the evidence, and you will base

14:20:29  22   your verdict on the evidence and the law.

14:20:35  23        When you reach unanimous decisions as to the

14:20:39  24   answers to various questions -- because you will have a

14:20:41  25   Special Verdict, you will have to answer several

14:20:44  1  questions -- when you reach unanimous decision as to the

14:20:47  2  answers to those questions, the foreperson will date and

14:20:51  3  sign the Special Verdict Form, and you will return to

14:20:56  4  the courtroom and announce your verdict here in open

14:21:00  5  court.

14:21:03  6          Ordinarily, I expect that we will begin the

14:21:06  7  trial at 9:00 o'clock each morning; have a 15, 20-minute

14:21:13  8  break in the morning, a lunch break of an hour to an

14:21:17  9  hour 15 minutes, an afternoon break; and generally, we

14:21:22  10  will adjourn at 6:00 o'clock each day.

14:21:27  11         Of course, during each one of the breaks,

14:21:31  12  you are admonished that you should not discuss the case.

14:21:34  13  You shouldn't discuss the case even with your family

14:21:37  14  members and friends when you go home this evening, or in

14:21:40  15  a hotel, or anything.  You shouldn't discuss the case

14:21:43  16  with anyone until you retire to the jury room to

14:21:46  17  deliberate.

14:21:50  18         We will now have the opening statement of

14:21:53  19  the plaintiffs.

14:21:54  20         MR. QUINN:  Thank you, Your Honor.

14:21:56  21         THE COURT:  Mr. Quinn.

14:21:58  22         MR. QUINN:  Good afternoon.  Can you hear me

14:22:04  23  okay?  My name is Mike Quinn.  I am one of the lawyers

14:22:10  24  that is representing the plaintiffs in this action.    I

14:22:13  25  am part of the law firm of Wiggins, Childs, Quinn and

14:22:18  1   Pantazis.

14:22:19  2              And I have the privilege of giving this

14:22:22  3   opening statement to you as to what we expect the

14:22:27  4   evidence to show.

14:22:30  5              But I want to start, first, by thanking you

14:22:34  6   for what you are about to do.  I consider -- and I am

14:22:38  7   sure all the rest of the lawyers themselves consider

14:22:41  8   that this is the most -- you are the most important part

14:22:46  9   of this trial.  You are the ones to hear all of the

14:22:51  10  evidence.  You are the ones that make the decisions.

14:22:54  11             And I know that there are probably some of

14:22:56  12  you sitting there that would rather be somewhere else

14:23:00  13  for the next two weeks.  And so I want to thank you in

14:23:03  14  advance for being one of those that gets to listen to

14:23:08  15  the evidence and make the decision.

14:23:11  16             This is not a criminal case.  This isn't

14:23:15  17  like the Scrushy trial that's going on, or the McWane

14:23:19  18  trial that's going on, or even the Michael Jackson trial

14:23:22  19  that's going on.  This is a civil case.  But that

14:23:26  20  doesn't make it any less important.

14:23:29  21             In fact, this is a very important case.

14:23:33  22  This is a case that is going to have ramifications

14:23:37  23  throughout the country.  The reason for that is because

14:23:41  24  Family Dollar is a nationwide company.  They have over

14:23:47  25  5,400 stores throughout the United States.  And in those

14:23:52   1   stores are managers.

14:23:56   2            And in this particular case, we represent

14:24:02   3   1,424 of those managers who either work there now or did

14:24:09   4   work there, and work there as managers.  And so the

14:24:14   5   decision here is very, very important.

14:24:21   6            The plaintiffs were store managers who,

14:24:25   7   when -- and they were either hired or they were

14:24:30   8   promoted.  They were told that they would be the

14:24:33   9   managers of a particular store; that for a salary and a

14:24:38   10  bonus they would receive -- they would work 48 hours,

14:24:43   11  some of them; 52 hours, some others.  And even some of

14:24:48   12  those who started out at 48, later were told 52 hours.

14:24:52   13  And they were told that they would be the managers of

14:24:57   14  the store.

14:25:00   15           What they weren't told, and what we expect

14:25:03   16  the evidence to show, is that they received that manager

14:25:10   17  title in name only.  And that, in fact, when they

14:25:16   18  started their job as manager, they found that they were

14:25:21   19  working 55, 60, 65, 70, 75 upwards to 90 hours a week --

14:25:33   20  not what they had been told -- and that 90 percent of

14:25:40   21  that work was nothing more than manual labor.

14:25:45   22           What they did 90 percent of that time was

14:25:51   23  unload a truck, stock the shelves, run the cash

14:25:59   24  register, mop the floors, clean the bathrooms.  The

14:26:09   25  evidence will be that they did not have any of the

14:26:15  1   managerial duties that they thought that they would

14:26:19  2   have.

14:26:20  3          It became quite clear to them early on that

14:26:24  4   they could not hire or fire their own assistants.  They

14:26:30  5   could not set or change the store's budget.  They could

14:26:34  6   not set or change the number of employees needed to run

14:26:37  7   the store.  They could not set the hours that the store

14:26:41  8   would be open or closed.  They could not set or increase

14:26:46  9   their own assistants' pay.  They could not decide who

14:26:51  10  should have keys to the store.  They could not deal with

14:26:54  11  the store's vendors or contractors.

14:26:57  12         So when they wanted the floors waxed, or

14:27:01  13  they wanted an exterminator, or they wanted to contract

14:27:05  14  for outside trash control, they couldn't do that.  They

14:27:08  15  had to call their district manager.  They could not set

14:27:12  16  the store's payroll or add a new employee, even if they

14:27:16  17  needed it.

14:27:18  18         They couldn't even determine the everyday

14:27:21  19  store policies used to run that particular store; like

14:27:25  20  hiring, firing, promotions, increases, bank deposits,

14:27:30  21  inventories, all of those things that you would think

14:27:34  22  that a store manager could do.

14:27:36  23         They couldn't decide when to close the

14:27:38  24  store, if there was an emergency, inclimate weather, a

14:27:44  25  tornado.  They couldn't even decide how the store was to

14:27:49  1  be decorated.

14:27:51  2         They couldn't order supplies, except what

14:27:54  3  was basic.  They couldn't change the locks on the doors.

14:27:59  4  They couldn't change the schematics in the store where

14:28:02  5  the shelves were going to be, where the items were going

14:28:06  6  to be.  They couldn't keep petty cash without asking the

14:28:10  7  district manager.

14:28:12  8         And if a shortage came up on the cash

14:28:15  9  register, the cashier had to call the district manager.

14:28:20  10  The manager, store manager, wasn't even involved in

14:28:24  11  that.

14:28:27  12         So you ask yourselves, how in the world did

14:28:32  13  this happen?  Why in the world did the store manager

14:28:37  14  allow it to happen?

14:28:39  15         Well, the evidence will show you that not

14:28:43  16  only did the store not keep its promise, but that it did

14:28:49  17  it intentionally and willingly and knowingly.  And it

14:28:55  18  did it by creating a scheme -- a scheme that was run by

14:29:01  19  a store payroll budget, and you will see it.

14:29:06  20         You will see what the store manager is sent

14:29:09  21  by the district manager and the corporate office.  And

14:29:14  22  this scheme, set up by the corporate office, established

14:29:18  23  exactly how many hours the hourly employees could work.

14:29:26  24         You see, the plan was that the hourly

14:29:30  25  employees wouldn't work overtime.  The store manager

14:29:37   1   could not work them overtime.  You will hear that time

14:29:40   2   and again.  And after determining how many hours they

14:29:44   3   were allowed to work through this budget on paying their

14:29:48   4   salary, every other hour that this store had to be kept

14:29:54   5   open, had to be done by the store manager.

14:29:59   6            You see, the store manager was told, "you

14:30:02   7   are on salary.  You don't get overtime."  And so all of

14:30:09   8   the other hours that were needed, that store manager was

14:30:12   9   not allowed to work the hourly employee, because they

14:30:16   10  would get overtime.  They had to work it, which is why

14:30:22   11  90 percent of their work was doing just what the

14:30:26   12  associates and the assistant manager were doing:

14:30:32   13  Unloading the truck, stocking the shelves, mopping the

14:30:35   14  floors, cleaning the bathrooms, running the cash

14:30:41   15  registers.  That's what the store manager ended up

14:30:45   16  doing.

14:30:47   17           And so you ask yourself -- and the evidence

14:30:49   18  will show you, well, ask -- well, then, who did the

14:30:53   19  store?  Who did run the store?  Well, the district

14:30:57   20  manager is the one that ran the store.  And the evidence

14:31:02   21  will show that it was the district manager that ran the

14:31:05   22  store.  And that this scheme that was developed by the

14:31:10   23  corporate office, in fact, obtained free labor from the

14:31:18   24  store manager that they didn't have to pay for.

14:31:25   25           The reason we are here and the reason this

14:31:27  1    lawsuit has been bought is because, ladies and

14:31:30  2    gentlemen, we submit to you, and the evidence will

14:31:33  3    submit to you, and the Judge will tell you, that is

14:31:35  4    against the law.

14:31:38  5              The Fair Labor Standards Act was passed over

14:31:42  6    60 years ago; and it said, "a fair day's work for a fair

14:31:51  7    day's pay."

14:31:54  8              It developed what you and I know as

14:31:57  9    overtime.  And it basically says if you are going to

14:32:01  10   work someone over 40 hours, you must pay time and a half

14:32:05  11   overtime.  That's the general rule.

14:32:11  12             Now, there are some exemptions that were

14:32:16  13   created to this particular rule.  There is an exemption

14:32:21  14   if you are an administrative employee, working in

14:32:25  15   administration, as some of the jurors were, some of you

14:32:29  16   may be.  There is what we call a professional exemption:

14:32:36  17   Lawyers, doctors, others in professionals.

14:32:40  18             And then there is a third one.  There is one

14:32:43  19   that is called the executive exemption.  Now, one thing

14:32:47  20   that you do need to understand before I get into that

14:32:49  21   executive exemption is this:  The law is clear, and it

14:32:56  22   says that just because you are told that you are a

14:33:03  23   manager does not mean that you are a manager.

14:33:07  24             In fact, the law will establish that if you

14:33:19  25   have the name manager, that does not mean that you are

14:33:24   1   manager.  The title of the job does not control.  This

14:33:33   2   is the regulation that you will see, the law that

14:33:35   3   applies:  "A job title alone is insufficient to

14:33:39   4   establish the exempt status of an employee."

14:33:44   5         And something else that you will be told;

14:33:47   6   that is, that leadmen, foremen, people that work

14:33:54   7   alongside other employees and do the same things that

14:34:00   8   others do and at the same time they may supervise, what

14:34:05   9   we call multitasking.  Well, the law is clear that most

14:34:08  10   times, if not all, they, too, are not exempt from this

14:34:16  11   law.

14:34:16  12         No, the exemption and the only exemption

14:34:19  13   that could possibly apply in this case is the exemption

14:34:22  14   that we call the bona fide executive exemption.  And

14:34:28  15   what this company, Family Dollar, did, is that they

14:34:33  16   declared for themselves was that these store managers

14:34:37  17   were executives, so that they could work all of this

14:34:43  18   time that needed to be worked; that they weren't going

14:34:47  19   to allow the hourly employees to work and not have to

14:34:51  20   pay them overtime.

14:34:53  21         Now, the Judge is going to tell you that the

14:34:56  22   burden of proof in this case, once it is established

14:35:01  23   that they worked over 40 hours, and that they were, in

14:35:05  24   fact, working in interstate commerce -- which, by the

14:35:08  25   way, the defendants admit -- the burden is on the

14:35:13  1  defendants to prove to you that, in fact, this exemption

14:35:19  2  should have been used.

14:35:21  3          Now, let's look at that exemption.  The law

14:35:25  4  tells you that a *bona fide* executive for a company is

14:35:32  5  someone who has a salary of 250 under the old, 450 under

14:35:39  6  the new regulations.  That is undisputed.  That is not

14:35:43  7  an issue in this case.  But the defendants cannot meet

14:35:47  8  any of the other requirements that they have to meet.

14:35:51  9          And you need to keep in mind, ladies and

14:35:54  10 gentlemen, they have got to meet all things, not just

14:35:56  11 one, not just two, not just three, but all of them.  And

14:36:01  12 we expect the evidence to show that they cannot meet

14:36:05  13 number 2, number 3, or number 4.

14:36:09  14         Number 2 says "regularly and customarily

14:36:14  15 direct the work of two or more other employees."  The

14:36:17  16 evidence will be that many, many times, these store

14:36:21  17 managers were in these stores by themselves, because

14:36:28  18 everybody else's time was used up.  Those don't even

14:36:32  19 have to go to elements 3 and 4.  Their case is proven by

14:36:40  20 that evidence alone.

14:36:42  21         As for the rest of those who didn't work in

14:36:46  22 the store by themselves or meet this requirement, 3 and

14:36:50  23 4 must also be met by the defendants.  3 says, "have as

14:36:55  24 their primary duty -- primary duty -- the management of

14:37:01  25 a store."

14:37:02   1          Ladies and gentlemen, I submit to you

14:37:04   2   without anything else, that when 90 percent of your time

14:37:07   3   is spent on the manual labor I told you about, there is

14:37:12   4   no way that your primary duty can be in management.  The

14:37:19   5   evidence will be clear, we believe, that they cannot

14:37:22   6   meet number 3.

14:37:25   7          Number 4 says, "authority to hire or fire

14:37:28   8   other employees or make recommendations to hire or fire

14:37:32   9   that are given particular weight."  Now, what I want you

14:37:35   10  to keep in mind as you are hearing the evidence is that

14:37:40   11  last little part there:  "given particular weight."  See

14:37:45   12  if you hear whether these store managers thought that

14:37:51   13  their recommendations did any good.  See if even some of

14:37:56   14  them were allowed to give recommendations.

14:38:00   15         Listen to the evidence.  I believe the

14:38:02   16  evidence will show you many of them couldn't even

14:38:06   17  recommend.  Those that could, there wasn't much weight

14:38:11   18  put in them.  And so we do not believe that they will

14:38:14   19  have the evidence to prove number 4.

14:38:17   20         Now, I want to go into just a minute primary

14:38:19   21  duty again.  I want to go a little farther.  So I want

14:38:22   22  to show you what we expect the law to show a primary

14:38:28   23  duty to be.  And I highlighted three things that I want

14:38:31   24  you to keep in mind as you hear the evidence:  The

14:38:35   25  "importance of the managerial duties" being done by this

14:38:40    1   management, not by any other manager, not by the

14:38:43    2   district manager, but the importance of the management

14:38:46    3   duties that this manager was given.  The "frequency"

14:38:50    4   with which he or she did them.  And let's stop right

14:38:53    5   there and then we will get to the third one.

14:38:55    6          Right there, we expect the evidence to show

14:38:58    7   that with 90 percent of their time being spent on the

14:39:02    8   manual labor, that left them 10.  Even at most, 15 to 20

14:39:09    9   percent of their time to do the other things that they

14:39:13   10   were allowed to do, such as do some paperwork, open the

14:39:19   11   store, close the store.  And maybe while unloading and

14:39:25   12   doing all of the other things, a little bit of seeing

14:39:28   13   that the work's being done.  That, ladies and gentlemen,

14:39:33   14   is not what we call important and frequency.  And the

14:39:41   15   evidence will be clear.

14:39:42   16          The third one is really important.  The

14:39:45   17   third one says "freedom from supervision".  Now, what

14:39:50   18   does that mean?  That means that the store manager, his

14:39:53   19   or herself, is free from supervision.  The evidence in

14:39:58   20   this case, ladies and gentlemen, is going to be -- it's

14:40:03   21   going to be the opposite.

14:40:05   22          And here's where I want to stop and I want

14:40:08   23   to tell you that -- and I think that maybe one of the

14:40:13   24   reasons that the last question that Mr. White asked you

14:40:15   25   is whether you ever heard of Paul Harvey.  And I think

14:40:18  1   the reason he asked you that is because he is going to

14:40:21  2   or someone is going to say, "we have the other side of

14:40:24  3   the story", which is what Paul Harvey says.

14:40:27  4              Well, here's the other side of the story:

14:40:29  5   Well, they're going to give the other side of the story,

14:40:32  6   but what I want you to keep in mind as they give the

14:40:35  7   other side of the story, is that their own documents are

14:40:39  8   going to belie what they say.

14:40:41  9              Their own documents, their own policies are

14:40:44  10  not going to support what they're going to tell you.

14:40:47  11  And they're going to tell you that these store managers

14:40:52  12  were, in fact, managers.

14:40:54  13             But keep in mind, their documents won't show

14:40:57  14  it.  Keep in mind, too, that in order for them to say

14:41:03  15  that, they have to have the evidence.

14:41:07  16             Now, what will the evidence, through their

14:41:10  17  own documents, show us?  Well, it's going to show us a

14:41:14  18  lot of things that the district managers do, that the

14:41:17  19  store managers can't do.

14:41:22  20             "Store Policy Manual on Housekeeping".

14:41:26  21  Outside weekly, monthly floor maintenance is going to be

14:41:30  22  done per district manager directions.

14:41:36  23             Floor care:  The district manager sets up

14:41:39  24  the floor care contractor.  The district manager also

14:41:42  25  sets up the schedule for floor cleaning and periodic

14:41:45  1    stripping and waxing.  District manager again.

14:41:53  2         Need an exterminator, you have rats in your

14:41:55  3    store, the evidence is going to show you only the

14:41:58  4    district manager can contract the exterminator, not the

14:42:02  5    store manager.

14:42:05  6         Trash pick-up service is established by the

14:42:08  7    district manager, not by the manager.  No one at store

14:42:12  8    level has the authority to sign trash agreements and

14:42:16  9    contracts.  I am telling you this, as you keep in mind

14:42:19  10   freedom from supervision, that this store manager is

14:42:23  11   supposed to have.

14:42:26  12        District manager, if you want extra chairs

14:42:29  13   for your break room, if you want a microwave, if you

14:42:33  14   want a coffee pot, if you want ovens or refrigerators,

14:42:40  15   you can't get them as the store manager, you must call

14:42:43  16   the district manager.

14:42:45  17        Remember, I will show you in a minute -- the

14:42:47  18   evidence will show they can't even keep petty cash that

14:42:50  19   you can use for something like that.

14:42:52  20        Oh, and one other down there:  No extension

14:42:55  21   cords.  Now, this is a store manager that's not supposed

14:43:00  22   to be supervising, being told he can't have extension

14:43:02  23   cords.

14:43:03  24        If a lock needs to be replaced -- I'm sorry,

14:43:06  25   go back one -- if a lock needs to be replaced or

14:43:10  1  rekeyed, contact your district manager.

14:43:15  2          Request for any supply items above

14:43:18  3  quantities stated in the basic reference ordering guide.

14:43:22  4  They get a guide, they use the guide that anything other

14:43:26  5  than the guide, they got to call the district manager.

14:43:32  6          Don't remove fixtures from the sales floor

14:43:35  7  without district management approval.

14:43:41  8          They're going to tell you, the defendants

14:43:43  9  are, that the store managers got to interview their

14:43:47  10  assistant managers.  Some of them will tell you that's

14:43:51  11  true, but some of them are going to tell you that was

14:43:53  12  not true.  But even those that tell you it's true are

14:43:57  13  going to tell you had to go to the district manager.

14:44:02  14  District manager had to interview the assistant manager

14:44:05  15  before the assistant manager could ever be hired.

14:44:08  16  Store -- the evidence will be that the store manager

14:44:10  17  didn't hire the assistant manager, the district manager

14:44:14  18  did.

14:44:18  19          A store manager was not allowed to make a

14:44:22  20  job offer without going through management, the district

14:44:28  21  manager and above.

14:44:33  22          Couldn't rehire an employee who had even

14:44:35  23  been a good employee, had to go to corporate, get

14:44:39  24  permission from corporate to do that -- someone who had

14:44:42  25  even worked for that store.

14:44:47   1            Pay changes.  Any pay changes, and this is

14:44:51   2 where, again, you are going to hear about

14:44:55   3 recommendations made by store managers.  Many of these

14:44:57   4 store managers are going to testify and tell you that

14:45:00   5 they went to the district manager in an effort to get a

14:45:04   6 store -- to get a pay increase for one of their

14:45:07   7 employees who was threatening to leave, and they

14:45:12   8 couldn't do it.  The district manager said no.

14:45:17   9            The evidence will be that not a single pay

14:45:21 10 increase could be given by a store manager.  It had to

14:45:25 11 come through the district manager.

14:45:29 12            Every single one of them will tell you that

14:45:33 13 you didn't discharge an employee without calling the

14:45:36 14 district manager.  The district manager would tell you

14:45:40 15 when, where, and how to discharge that employee.

14:45:48 16            Store hours of operation are set when the

14:45:52 17 store opens.  This is important, ladies and gentlemen.

14:45:55 18 This is part of the scheme.  This is part of that

14:45:58 19 corporate scheme.  You see, the store was open seven

14:46:01 20 days a week.  And there weren't enough hours for the

14:46:06 21 hourly employees to do the work to keep the store open.

14:46:10 22 The store manager did it.  The store manager did it,

14:46:14 23 working all those extra hours that he or she did not get

14:46:18 24 paid for.  They weren't going to let them control the

14:46:20 25 store hours, because then they could control their

14:46:26  1    hours.

14:46:30  2              They have a task scheduler.  Now, that is

14:46:34  3    important here.  We all think of store managers and we

14:46:38  4    think of things that they ought to be, and one of those

14:46:41  5    is to figure out what happens on a daily basis in a

14:46:45  6    store.  And the evidence is going to be they got a

14:46:48  7    document that told them what was going to be done on a

14:46:51  8    daily basis in their store.

14:46:54  9              Again, I told you earlier, keys.  The keys

14:46:59  10   are not -- who can have keys is not established by the

14:47:02  11   store manager.  It's established by the district

14:47:05  12   manager.

14:47:09  13             The store managers were even told when to

14:47:14  14   make deposits through this cash accumulation policy.

14:47:24  15             No pay outs without district manager

14:47:27  16   approval.  This is pay outs for anything.  And if you

14:47:30  17   look down at the bottom, it says, "pay outs for casual

14:47:33  18   labor are strictly forbidden".  So if they needed any

14:47:37  19   cash work done, they could not do it.  No pay outs.

14:47:44  20             Petty cash may be increased only through the

14:47:47  21   district manager's approval.

14:47:52  22             And this is the one I told you before:  "If

14:47:54  23   the register is short, the cashier is to describe the

14:47:58  24   person suspected of the theft and notify the district

14:48:02  25   manager," not the store manager.

14:48:11  1         The company's going to try to tell you that

14:48:13  2    the manager, store managers, had something to do with

14:48:17  3    ordering of merchandise.  Well, you are going to see

14:48:20  4    this document.  And I am not going to go over the whole

14:48:22  5    thing with you now.  But what that document is going to

14:48:25  6    establish for you is they had no control.  There was a

14:48:28  7    buyer at the home office; and through an automated

14:48:33  8    program on the computer, it determined what the

14:48:38  9    merchandise in the store would be, not the store

14:48:41  10   manager.

14:48:46  11        The schematics in the store, where the

14:48:48  12   shelves are, those kinds of things, the store manager

14:48:52  13   has absolutely no control on how it's going to be, nor

14:48:55  14   can they move them in any way.

14:49:01  15        End caps -- I don't know if you know what

14:49:03  16   end caps are, that's when you go into the grocery store

14:49:05  17   or go into a Family Dollar store, at the end of each

14:49:08  18   aisle what is going to be displayed?  The store manager

14:49:11  19   doesn't have anything to do with that.  That's done by

14:49:14  20   the home office, or by the district manager.

14:49:19  21        Even down to what they're allowed to put on

14:49:24  22   their desk, the evidence is going to show you is

14:49:27  23   controlled by the district manager and headquarters.

14:49:33  24   The paper clips, the rubber band box -- they tell them.

14:49:41  25        And I put this up here for another reason,

14:49:43   1    just to give you the example of the control that Family

14:49:48   2    Dollar had over the store managers.  Control, so that

14:49:56   3    they knew that they could not deviate from the budget;

14:50:02   4    and that the only way to keep the store open was for

14:50:06   5    them to stay there and unload the trucks, mop the

14:50:12   6    floors, clean the bathrooms, run the cash register.  And

14:50:17   7    some of them are even going to testify that in order --

14:50:22   8    that they couldn't even leave to go to the bathroom,

14:50:26   9    because they were the only ones there.

14:50:30   10             But Family Dollar wants you to believe that

14:50:34   11   they were executives, so that they don't have to pay

14:50:38   12   them overtime.

14:50:42   13             Now, let me sum up.  The company is going

14:50:51   14   to -- in order to try and meet its burden, to show you

14:50:57   15   that these store managers were, in fact, managers.  They

14:51:02   16   have to.  If they don't, they lose.

14:51:07   17             They're going to show you a job description,

14:51:10   18   probably from 2003, that shows that these store managers

14:51:15   19   can do a whole lot of things that I haven't told you

14:51:17   20   about.  Well, you need to keep in mind that that was two

14:51:20   21   years after the lawsuit was filed.  And that if you look

14:51:25   22   at the store manager job description before the lawsuit

14:51:28   23   was filed and up to 2003, you will see that it proves

14:51:34   24   our point:  They were not store managers, except in

14:51:40   25   name.

14:51:41  1          Remember three things as the evidence is

14:51:45  2   presented in this case:  Remember, number one, what the

14:51:50  3   documents say.  You can't fool with documents.

14:51:56  4   Policies -- their own -- are going to show you that the

14:52:03  5   district manager ran that store.

14:52:05  6          And that brings up another point.  They are

14:52:07  7   going to show you a document and they are going to

14:52:09  8   attempt to show you all of these stores that the

14:52:12  9   district manager is in charge of.  And they are going to

14:52:15  10  say the district manager has got 15 stores that he is in

14:52:19  11  charge of.

14:52:21  12         After seeing how much control the company

14:52:26  13  has, and how little control the store manager has, and

14:52:33  14  how everything is controlled by a rule, it's not real

14:52:39  15  hard for that district manager to run those 15 stores

14:52:42  16  and to leave that store manager to do the manual labor

14:52:47  17  that is needed to keep the store open.

14:52:52  18         Second, you will hear evidence that the

14:52:55  19  little managerial duties that they were allowed to do

14:52:59  20  that I told you about, such as open and close; maybe

14:53:02  21  interview somebody, but then send it on; maybe supervise

14:53:08  22  while they're stocking or other things; the evidence

14:53:11  23  will be that there is an assistant manager in that

14:53:14  24  store, someone that Family Dollar has said is not

14:53:17  25  exempt, who is an hourly employee, who the evidence will

be does the same thing as the store manager; those same
little managerial duties that they have, the assistant
manager has, too.

And then last, only 10 percent to 15 percent
of what these managers were doing was management, while
the other 80 to 90 percent was spent unloading the
truck, mopping the floor, running the cash register,
cleaning up the bathrooms.  That was their primary,
number one responsibility.

What does "primary" mean?  "Primary" means
it is the number one, most important thing that you are
supposed to do.  And if 80 to 90 percent of your time is
being spent doing that, that's your primary duty; not
the 10 to 15 to 20 percent that's left over, wherein you
can try and perform some managerial functions.  That's
not what "primary" means.

At the conclusion of this case, after you
hear all the evidence, and after we believe you are
convinced that they cannot prove their case, we are
going to ask you to tell Family Dollar to pay back to
these 1,424 plaintiffs the free labor that they gave
you.  And we are convinced that after all of this
evidence, you will do that.

Thank you.

THE COURT:  Mr. Mays?

14:55:26   1          MR. MAYS:  Thank you, Your Honor.

14:55:39   2          May it please the Court.  Ladies and

14:55:41   3   gentlemen, my name is Joe Mays.  You have already met

14:55:47   4   the president of Family Dollar.  These are my law

14:55:50   5   partners and other members of our team who you will meet

14:55:53   6   directly.  And it is our privilege to represent Family

14:55:56   7   Dollar in this very important lawsuit.

14:55:58   8          As Mr. Quinn said, it's important.  It's

14:56:00   9   important to us.  It's important to Family Dollar.

14:56:02  10   Because Family Dollar, throughout its history, has

14:56:06  11   followed the law the way it's treated its managers and

14:56:10  12   employees.  And it follows the law today.

14:56:12  13          Now, Mr. Quinn said I would invite you to

14:56:16  14   hear the rest of the story, as Paul Harvey says, and

14:56:19  15   that's exactly right.  I want you to hear the rest of

14:56:22  16   the story, not just from me -- although I am happy to

14:56:24  17   tell it to you -- but from the evidence that is going to

14:56:27  18   be presented in this courtroom.

14:56:28  19          And that evidence includes store managers,

14:56:32  20   district managers and executives at all levels of our

14:56:37  21   company who will testify, including our store managers

14:56:40  22   who are executives of our company.

14:56:42  23          And it also includes our documents.  And

14:56:45  24   when Mr. Quinn says "pay attention to the documents,"

14:56:49  25   that's right.  Pay attention to all of the documents,

14:56:51  1  not just excerpts of documents taken out of context, but

14:56:55  2  to all the documents that, when seen in their totality,

14:56:59  3  do, in fact, tell the rest of the story.

14:57:04  4        Our store managers are managers.  They are

14:57:09  5  executives.  They are the people who operate as the

14:57:14  6  person in charge of our 5,600 stand-alone stores.  Most

14:57:20  7  of those stores on average have five or six employees

14:57:25  8  and store managers.  On average, our stores have annual

14:57:30  9  sales, not profits, now, but sales of a million dollars.

14:57:34  10        At any given time, you will find on the

14:57:37  11  shelves of our stores inventory worth a quarter of a

14:57:41  12  million dollars.  We have cash on hand of great value.

14:57:46  13  We have safety issues, appearance issues, security

14:57:50  14  issues, supervision of employees, customer satisfaction

14:57:56  15  issues.  And on all of those issues, the person in

14:58:01  16  charge, the person with responsibility for what happens

14:58:05  17  is our store manager.  Those people are managers.  They

14:58:11  18  are executives.  In fact, in their store, they're the

14:58:14  19  chief executive.

14:58:16  20        And to say that those people don't have that

14:58:19  21  kind of responsibility, is demeaning and insulting to

14:58:24  22  them.  Family Dollar doesn't feel that way about them,

14:58:27  23  no matter what these lawyers say in trying to win their

14:58:32  24  case.

14:58:32  25        Let me tell you a little bit about Family

14:58:34   1   Dollar.  You will hear more of this from the evidence.

14:58:36   2           Family Dollar was founded in 1958 in

14:58:41   3   Charlotte, North Carolina.  That's 47 years ago.  At

14:58:45   4   that time, it was started with one store.

14:58:48   5           And the idea of Family Dollar in 1958 and

14:58:51   6   the idea of Family Dollar today -- and we have 5,600

14:58:55   7   stores, operating in 44 states throughout the United

14:58:58   8   States -- is to provide a convenient and attractive

14:59:02   9   place to shop, where we offer low-price merchandise in

14:59:08   10  the neighborhoods where people live.

14:59:11   11          We are kind of like the small Wal-Mart or

14:59:14   12  Kmart.  We're a lot smaller, but we offer the same kinds

14:59:19   13  of low-price merchandise that people want to buy and

14:59:22   14  need for their families.

14:59:25   15          We try to put it in the neighborhood so you

14:59:27   16  don't have to go as far.  And we make our stores smaller

14:59:32   17  so you don't have to stand in line for a long time and

14:59:34   18  deal with all the problems you have when you go to a big

14:59:37   19  store like Wal-Mart.

14:59:42   20          In order for us to succeed as Family Dollar,

14:59:46   21  we operate in a very competitive environment.  We

14:59:50   22  compete with Wal-Mart.  We compete with Kmart.  We

14:59:54   23  compete with the drug stores like CVS and Eckerds and

14:59:57   24  Rite Aid.  Although their prices are higher, they offer

15:00:00   25  a lot of the same product.

15:00:02  1          In order for us to compete in that

15:00:05  2   environment, we have to do several things:  Number one,

15:00:08  3   we have got to offer a superb customer service; because

15:00:13  4   our customers can go to those other stores and buy the

15:00:16  5   same things we sell.  We've got to offer convenience,

15:00:18  6   and we've got to offer low prices.  But we won't succeed

15:00:24  7   unless we make shopping at our store a pleasant

15:00:27  8   experience, a good experience for our customers.

15:00:31  9          And the person who has control over that,

15:00:34  10  the person who makes shopping at our store a good

15:00:37  11  experience or a bad experience is our store manager.

15:00:42  12  That responsibility lies with the store manager.

15:00:45  13  Because if the store manager wants his or her store well

15:00:50  14  and offers good customer satisfaction, our customers

15:00:53  15  will come back and we will succeed.

15:00:56  16          And the store manager, of course, as you

15:00:58  17  know from your own experience in lots of businesses, the

15:01:01  18  store manager is the person who sets the tone for every

15:01:05  19  employee in that store.  If the store manager insists on

15:01:11  20  good customer service, everybody will offer good

15:01:15  21  service.

15:01:15  22          If the store manager is not that kind of

15:01:18  23  person, our store won't offer good service and our

15:01:21  24  customers won't come back.  They will cease to be our

15:01:24  25  customers.

15:01:25  1            All right.  That's a little bit about Family

15:01:28  2    Dollar and about what we do.

15:01:31  3            The plaintiffs have told you that our store

15:01:35  4    managers are not in charge or not executives, because

15:01:39  5    our policies tell you what goods we are going to sell in

15:01:43  6    our stores.  And we have policies, which you've seen

15:01:46  7    some of, about how we deal with issues like terminating

15:01:50  8    employees; and how we deal with issues about where

15:01:54  9    products are placed in our stores; and how we deal with

15:01:57  10   issues about how our stores are set up; and even

15:02:01  11   employing outside contractors, like exterminators and

15:02:05  12   floor cleaners.  Ladies and gentlemen, that is nothing

15:02:07  13   but a policy of uniformity, which I freely admit we

15:02:12  14   have.

15:02:12  15           When you go in to the Family Dollar store

15:02:15  16   here in Tuscaloosa out by Stillman College, you want to

15:02:21  17   have there much the same experience as you go in Family

15:02:23  18   Dollar in Birmingham, or in Fayette, or Reform, or

15:02:26  19   wherever you go.  And you will find that experience the

15:02:29  20   same.

15:02:29  21           When I go to a Family Dollar store to buy

15:02:33  22   laundry detergent, which I do, I know that I can walk

15:02:36  23   straight to the back wall, and that's where the laundry

15:02:39  24   detergent is.  And that's whether I go into the one in

15:02:42  25   Stillman College here in Tuscaloosa, or the one where I

15:02:45  1   usually shop in Birmingham on Crestwood Boulevard.

15:02:48  2          Our stores are set up to offer that kind of

15:02:51  3   uniformity to our customers.  And our policies are set

15:02:54  4   up so that one Family Dollar store is run a lot like

15:02:59  5   another Family Dollar store.

15:03:01  6          And by the way, because of that uniformity,

15:03:04  7   we get much better buying power when we buy toothpaste,

15:03:08  8   or floor cleaner services, or exterminator services.  So

15:03:12  9   we do have uniformity.  And it gives us great benefit

15:03:16  10  and value, including the ability to offer our customers

15:03:21  11  a uniform and familiar shopping experience, as well as

15:03:25  12  to keep our prices down; because that's what our

15:03:29  13  customers want and what our customers expect.

15:03:31  14         Now, does that mean that our managers are

15:03:34  15  not managers?  No.

15:03:36  16         And by the way, that's the same thing as

15:03:38  17  true if you buy at CVS, or Rite Aid, or Wal-Mart, or

15:03:42  18  even our competitor Dollar General, Fred's Dollar

15:03:46  19  Store -- all of these companies do the same thing.  That

15:03:48  20  doesn't mean that our managers are not managers.

15:03:52  21         Our managers are managers because they

15:03:56  22  participate all the time in important decisions,

15:04:01  23  including hiring and firing and disciplining employees,

15:04:06  24  and making recommendations about those things.  They

15:04:09  25  don't have to have -- the law doesn't require them to

15:04:11    1    have sole authority to fire and hire.

15:04:14    2              In some instances, they do have meaningful

15:04:18    3    input, and make recommendations which are given weight;

15:04:22    4    which, as you have seen from the slide, is what the law

15:04:22    5    requires.  But they also have responsibility and

15:04:25    6    accountablity.  That means Family Dollar is looking to

15:04:28    7    them for the success of that store:  The security of

15:04:32    8    this store, the appearance of the store, the

15:04:35    9    profitability of the store.  And they are judged on

15:04:40   10    those factors and they are rewarded, paid, compensated,

15:04:45   11    bonus, according to those factors.  Because they're true

15:04:49   12    managers.  They're true executives.

15:04:52   13              May I have the first slide, please?  You've

15:05:00   14    already seen some of this, but I want to go over it with

15:05:03   15    you again.  When we say -- when we talk about the

15:05:06   16    executive exemption, or the bona fide executive

15:05:11   17    exemption -- and that's what this case is about -- it's

15:05:14   18    undisputed that we don't pay our store managers

15:05:18   19    overtime.  There's no question about that.  But we come

15:05:21   20    under what is called the executive exemption in the law.

15:05:25   21              Now, "executive" is a little bit of a

15:05:28   22    misleading word.  It doesn't mean -- we're not required

15:05:32   23    to have somebody who sits on the 40th floor of a

15:05:35   24    building with his feet on the desk drinking coffee.

15:05:38   25    That's not what's meant by it.  An executive in this

15:05:42  1   context is a manager.  And the law defines what an

15:05:45  2   executive is.

15:05:47  3           Under the law, an executive is somebody that

15:05:50  4   receives a salary of at least $250 a week.  And it was

15:05:55  5   changed last year in August, August 23rd of last year,

15:05:59  6   to $455 a week.  That's not an issue in this case,

15:06:03  7   ladies and gentlemen.

15:06:04  8           All of our store managers make more money

15:06:06  9   than that.  The average salary for one of our store

15:06:11  10  managers is over $600 a week.  In fact, the average

15:06:15  11  salary now for one of our store managers is $36,000 a

15:06:19  12  year.

15:06:19  13          And by the way, most of these store managers

15:06:22  14  are people with a high school education or less.  And

15:06:28  15  they're making pretty good money -- $36,000 a year for

15:06:31  16  that level of education.  And that's one of the things

15:06:34  17  that I think is important to think about, and something

15:06:36  18  that's attractive about Family Dollar.

15:06:38  19          Family Dollar affords opportunity to

15:06:43  20  employees.  If they're honest and have integrity and are

15:06:47  21  willing to work, and have some drive and ambition and

15:06:50  22  managerial ability, they can be store managers with a

15:06:54  23  high school education or less.  And, in fact, they can

15:06:57  24  and often do, rise through our company to become

15:07:01  25  district managers, regional vice-presidents, even

15:07:04  1   divisional vice-presidents, very high in our company; if

15:07:09  2   they will show their ability, through working hard and

15:07:12  3   having integrity and good organizational skills and good

15:07:17  4   managerial skills.  So the first one's not an issue.

15:07:21  5          The second is, do they regularly and

15:07:24  6   customarily direct the work of two or more other

15:07:27  7   employees?  Now, you will find that the average Family

15:07:31  8   Dollar store has five or six employees; some have more

15:07:35  9   than that.

15:07:36  10          Now, Mr. Quinn said sometimes the store

15:07:38  11   manager may be there by herself.  And that's true.  To

15:07:42  12   open or close the store or for other times, but that's a

15:07:46  13   choice that the store manager makes.  Because the store

15:07:49  14   manager is the person that schedules the work of the

15:07:53  15   other employees.

15:07:54  16          Now, you heard that we send out -- Family

15:07:57  17   Dollar sends out scheduler guides and we do.  That's a

15:08:01  18   tool that the store manager can use to assist in

15:08:04  19   scheduling the work of the employees and in scheduling

15:08:06  20   the work of the store manager.  By the way, that

15:08:09  21   scheduling guide suggests that the store manager

15:08:13  22   schedule herself not for 80 or 90 hours, which you heard

15:08:19  23   about -- not what the evidence is going to show -- that

15:08:21  24   scheduling guide suggestions that the store manager

15:08:24  25   schedule herself 52 hours a week; and then put in slots

15:08:33  1    for the other employees.

15:08:34  2            So the scheduling is in the control of the

15:08:37  3    store manager.  If the store manager works more than 52

15:08:40  4    hours a week, it's because he or she chose to do that,

15:08:44  5    except for emergency.

15:08:45  6            Now, there are times when there are

15:08:47  7    emergencies; when an employee's out sick, or an

15:08:49  8    employee's child is graduating from high school, or have

15:08:52  9    some other medical emergency; when people have to work

15:08:55  10   longer to cover for each other.  And by the way, at

15:08:59  11   Christmas, people have to work longer.  This is retail.

15:09:02  12   Stores are -- customers want more service, stores are

15:09:06  13   open longer hours.  And everybody has to pitch in and

15:09:09  14   work longer for the holiday season.  But that's the

15:09:13  15   exception, not the rule.

15:09:13  16           And last, the requirement of the law is that

15:09:16  17   they have as their primary duty the management of the

15:09:20  18   store.  "Primary duty," as Mr. Quinn said, means their

15:09:26  19   most important duty.  And for our store managers,

15:09:29  20   management of the store is their primary duty.

15:09:34  21           They say they spend 90 percent of their time

15:09:37  22   doing manual labor.  We dispute that.  I don't think the

15:09:41  23   evidence will show that at all here with these

15:09:43  24   witnesses.  But it's true that, from time to time as

15:09:46  25   part of their job, our store managers have to do some

15:09:50  1   manual tasks.  They spend time loading shelves, stocking

15:09:55  2   shelves.  They spend time making sure the store's clean.

15:09:58  3   If there's a spill on the floor, the store manager --

15:10:02  4   and the store manager sees it, the store manager may

15:10:05  5   choose to deal with that immediately so that somebody

15:10:07  6   won't fall and get hurt.  Rather than calling somebody

15:10:11  7   off the cash register to clean up a spill, the store

15:10:14  8   manager's there and the store manager can clean up the

15:10:17  9   spill.

15:10:17  10          If there are two lines of customers or long

15:10:19  11  line of customers, the store manager, who is responsible

15:10:21  12  for customer satisfaction, may choose to step in and

15:10:26  13  open another cash register and run that cash register.

15:10:29  14          That's because the store manager is in

15:10:31  15  charge.  The store manager knows that he is accountable

15:10:35  16  for customer satisfaction; and for the safety and

15:10:39  17  appearance of the store.  And the store manager is going

15:10:41  18  to do what needs to be done to make that store work

15:10:45  19  right; and to make it a good experience for our shopper.

15:10:50  20          And another thing, that store manager is

15:10:52  21  going to lead by example.  Many of our store managers

15:10:56  22  will tell you, "I am not going to do anything I wouldn't

15:11:00  23  ask my employees to do."  That's leadership.  And it's

15:11:05  24  leadership by example.

15:11:06  25          Now, does that mean that when that store

15:11:09　1　manager runs a cash register, or is stocking a shelf,

15:11:13　2　that that store manager ceases to be the store manager?

15:11:16　3　Of course not.

15:11:17　4　　　　You will hear store managers tell you, "I

15:11:20　5　manage my store 100 percent of the time.  When I'm

15:11:25　6　stocking a shelf, I am stocking that shelf with my head

15:11:28　7　up.  I am looking around.  I am making sure customers

15:11:31　8　are being waited on.  I am making sure the other cash

15:11:34　9　register doesn't need to be open.  I am making sure the

15:11:37　10　store has a good appearance.  I am making sure an

15:11:40　11　aisle's not blocked, so if there were an emergency or

15:11:43　12　fire somebody could get out.  I am managing the store

15:11:47　13　all the time, even as I am doing these other tasks."

15:11:51　14　　　　And that's what we expect our store managers

15:11:54　15　to do, because they're the managers.  They're the people

15:11:57　16　in charge.  And they're the people who are accountable

15:11:59　17　for the safety, appearance, cleanliness, security, and

15:12:03　18　success of the store.

15:12:14　19　　　　Let me see the next slide, please.  Here are

15:12:20　20　some of the duties of our store managers, and these are

15:12:23　21　the duties that we expect our store managers to do:

15:12:27　22　They hire employees.  They interview employees for hire.

15:12:32　23　They train employees.  They evaluate and appraise

15:12:36　24　performance of employees.  They discipline employees.

15:12:40　25　When an employee is not performing up adequately, they

15:12:44  1    will write them up, give them a warning.  Sometimes they

15:12:47  2    have to terminate employees.  It's not pleasant, but it

15:12:51  3    happens.

15:12:51  4             They supervise and direct the work of

15:12:53  5    employees in their stores.  And they have all kinds of

15:12:58  6    responsibilities for store operations, including

15:13:01  7    scheduling, ordering, doing paperwork, taking control of

15:13:06  8    the money and the bank deposits, making sure the

15:13:09  9    merchandise is correctly displayed, and complying with

15:13:14  10   Family Dollar's policy.  All of these are management

15:13:18  11   duties.

15:13:19  12            Now, they will tell you that some of these

15:13:23  13   require some input from our district managers.  And some

15:13:27  14   of them do input or partnering.  For example, it's a

15:13:32  15   serious matter to terminate an employee.  We understand

15:13:35  16   that that impacts people's lives.  So when we terminate

15:13:39  17   employees, we want to be sure that we do it in

15:13:42  18   accordance with company policy; in other words, that we

15:13:45  19   follow our own policies and that we follow the law.  And

15:13:49  20   that's why we ask that the district manager be consulted

15:13:53  21   about a termination.

15:13:56  22            When we hire an employee, we require certain

15:13:59  23   things there, too.  I am not going to tell you that the

15:14:02  24   store manager has absolute discretion about hiring,

15:14:06  25   because they don't.  Again, it has to do with uniform

company policy.  For example, everybody that we hire, we ask to take a test, called a Stanton.  You will hear about it.  And that's a test that shows that the people we hire have the skills that we expect to deal with our customers, and to give good customer service and to do what's expected in our store.

I will tell you something else:  Every employee we hire takes a drug test.  We are not going to put an employee in our store that does not pass a drug test.  Now, it's company policy.  And so we ask that before you hire somebody -- at least an assistant manager level -- you get the district manager to sign on to the fact that these steps have been complied with.

That doesn't mean that the store manager doesn't have a meaningful voice in that.  It just requires that our company policy has been uniformly complied with.

All of these operations are done by the store manager, and they're all management functions, but they're all done, when necessary, with the partnering or cooperation from time to time of the district manager.

Now, does that mean that the store manager's not a manager?  No.  Let me tell you something:  The district manager has a manager, too.  Every district manager answers to regional vice presidents.  Does that

15:15:39  1  mean because the district manager has to report to a

15:15:41  2  regional vice-president that the district manager is not

15:15:44  3  an executive?  It does not.  Even the plaintiffs don't

15:15:47  4  claim that.

15:15:49  5          Guess what?  The regional vice-president has

15:15:52  6  a boss, and that's the divisional vice-president.  Does

15:15:55  7  that mean that the regional vice-president is not really

15:15:58  8  an executive?  Of course not.

15:16:00  9          That divisional vice-president answers to a

15:16:03  10  senior vice-president, and that person answers to David

15:16:06  11  Alexander, the president of our company.  Does that mean

15:16:10  12  the regional vice-president or the divisional

15:16:12  13  vice-president is not an executive?  Everybody has a

15:16:14  14  boss.

15:16:16  15          David Alexander, our president, answers to

15:16:18  16  our chairman; and our chairman answers to the Board of

15:16:21  17  Directors.  That's the way business works.  And by the

15:16:26  18  way, all of us answer, in one form or another, to the

15:16:30  19  Government, don't we?

15:16:31  20          So the fact that people have a boss does not

15:16:35  21  mean that they're not a true manager.  The real question

15:16:38  22  is:  Do they work under direct supervision?

15:16:43  23          Now, I want to tell you something:  These

15:16:47  24  district managers that the plaintiffs' lawyer claims run

15:16:51  25  these stores, have responsibility for 15, some of them

15:16:54   1   20 stores.  And those stores are scattered.  They may be

15:16:58   2   scattered over more than one or two states, depending on

15:17:02   3   the territory.  They're long distances apart.

15:17:06   4        A store manager may see the district manager

15:17:09   5   in the store once every two weeks.  The store manager

15:17:13   6   may see his district manager or her district manager

15:17:17   7   maybe once a month.  That's all.  And then for a period

15:17:20   8   of an hour or two.

15:17:22   9        Now, ladies and gentlemen, you cannot run a

15:17:25  10   Family Dollar store by remote control.  And you know

15:17:29  11   that from your own experience.  You cannot run any kind

15:17:34  12   of store by remote control.  You've got to have a

15:17:38  13   manager, a true manager who is on the spot who can make

15:17:43  14   decisions about what goes on in that store every day:

15:17:48  15   Customer service, employee relations, the cleanliness of

15:17:54  16   the store, the security of the store, returns of

15:17:58  17   merchandise, the stocking of the shelves, ordering

15:18:01  18   merchandise for the store.  The district manager can't

15:18:04  19   do that, because the district manager is just not there.

15:18:08  20        You can't run one of these stores by showing

15:18:11  21   up every two weeks for an hour.  And you can't run a

15:18:15  22   Family Dollar store by remote control.  And that fact

15:18:19  23   alone tells you that the district manager is not the

15:18:24  24   real manager of our store.  The store manager is.

15:18:28  25        So all of the factors that we have seen,

15:18:32  1   that the store manager hire, interview, train, evaluate,

15:18:35  2   discipline, terminate -- do all these things -- show

15:18:39  3   that they're true managers under the facts and under the

15:18:44  4   law.

15:18:53  5           Store managers are evaluated at Family

15:18:57  6   Dollar, just like vice-presidents, regional

15:19:00  7   vice-presidents, and district managers.  They're all

15:19:04  8   evaluated.  And here's what the store managers are

15:19:07  9   evaluated on -- and I am showing you this because it

15:19:09  10  tells you what Family Dollar values.

15:19:12  11          We don't -- we don't evaluate our store

15:19:15  12  managers on how well they clean the stores, or stock the

15:19:19  13  shelves, or unload the trucks -- although they have to

15:19:21  14  do that from time to time.  But what you evaluate shows

15:19:25  15  what you value.  And we evaluate our store manager on

15:19:29  16  their management duties, their business results; that

15:19:32  17  means the profitability of the store.

15:19:35  18          And you will hear from the testimony that

15:19:38  19  our store managers judged on the profits of the store.

15:19:42  20  That's a management function.  And they're rewarded and

15:19:45  21  given a bonus based on the, quote, control of the

15:19:49  22  profits.  That's the things they can control, by their

15:19:52  23  actions; not things they can't control like the rent, or

15:19:55  24  overhead, or distribution costs that are out of their

15:19:58  25  control.  But they're bonused on the controllable

15:20:01  1   profits of the store.

15:20:03  2          So they're evaluated on the business

15:20:06  3   results.  They're evaluated on whether their stores meet

15:20:09  4   company standards -- whether they're clean, whether

15:20:11  5   they're well stocked, whether they're well run.  They're

15:20:15  6   evaluated on their HR programs; that is, how they do in

15:20:19  7   hiring and firing and terminating employees and bringing

15:20:22  8   them along.

15:20:23  9          And they're evaluated on self-development.

15:20:25  10  And that is how they grow in management and how they

15:20:30  11  bring other employees along; because we ask all our

15:20:33  12  assistant managers when we hire them, with the idea that

15:20:36  13  they will be managers and we are trying to train to be

15:20:40  14  managers.

15:20:47  15         This slide -- you know, I told you a minute

15:20:50  16  ago how you evaluate somebody shows what your values

15:20:53  17  are.  Well, let me tell you, how you compensate somebody

15:20:56  18  shows you what you really believe about their work and

15:21:00  19  their value.

15:21:02  20         If you look, our associates -- which means

15:21:04  21  our employees, our cashiers, our stock personnel, the

15:21:08  22  people in our stores who are not assistant managers and

15:21:10  23  not managers -- are not eligible for a bonus.  They

15:21:15  24  don't have a guaranteed salary, and they don't have

15:21:17  25  guaranteed sick leave.

1    Our assistant managers don't have a cash

2    bonus, a guaranteed salary, or sick leave.  But our

3    store managers, just like our district managers, have a

4    guaranteed salary; they're eligible for a cash bonus,

5    based on controllable profit; and they do have sick

6    leave.

7    What that shows is our whole compensation

8    scheme at Family Dollar shows that we treat our store

9    managers as true managers, and compensate them and

10   reward them, just like we do our district managers.

11   They will tell you our district managers do

12   the same thing as store managers, but that's not true.

13   They are learning the same job, and we hope that they

14   will become store managers.  They are performing the

15   same -- some of the same tasks, not all of the same

16   tasks -- but the difference is the difference in

17   responsibility.  Because it's the store manager, and

18   only the store manager, who's responsible for the

19   performance of the store, the security, the appearance,

20   all of the things we talked about.  As one store manager

21   said, "the difference is my decision is final, because I

22   am the manager."

23   If you believe, as the plaintiffs are asking

24   you to believe, that our managers, our store managers

25   are not really managers, they're just glorified

15:22:54  1    stickmen, which is what the plaintiffs are saying,

15:22:56  2    you've got to believe that the person who is in charge

15:23:00  3    of a stand-alone store with a million dollars in annual

15:23:05  4    sales -- not profits, but sales -- with $250,000 of

15:23:09  5    inventory on the shelf; five or six employees working

15:23:13  6    under their supervision; a person who works without

15:23:17  7    direct supervision is the head person in that store; a

15:23:23  8    person who is responsible and accountable to our

15:23:26  9    company, for our profits for that store, for customer

15:23:30  10   satisfaction, for the security of that store, for the

15:23:34  11   safety of the store, for the security of our assets in

15:23:37  12   that store -- you have to believe that that person's

15:23:39  13   really not a manager; and that can't be.

15:23:43  14           Family Dollar does not entrust that kind of

15:23:46  15   responsibility to people who are not managers and

15:23:50  16   executives under the law and under the facts, and in

15:23:55  17   every sense of the word.

15:23:59  18           You are going to hear a lot of evidence.

15:24:00  19   And like Mike Quinn, I thank you for being here.  And I

15:24:03  20   thank you for your patience in listening to me for this

15:24:06  21   long, and listening to the evidence for the next two

15:24:09  22   weeks.

15:24:09  23           But at the end of that time, you are going

15:24:11  24   to come to the conclusion that our managers are managers

15:24:18  25   in fact and managers in law.  They are the people with

15:24:22  1   the responsibility for the success of our stores.

15:24:26  2          And although we ask them to follow uniform

15:24:29  3   company standards, we hold them accountable for

15:24:33  4   following those standards and for using their

15:24:36  5   intelligence and their organizational skills and their

15:24:39  6   integrity and their people skills, to make that store a

15:24:44  7   success and to make it a good place to shop and a good

15:24:49  8   place to work.

15:24:49  9          These people are executives and they're

15:24:52  10  management.  And that's what this case is about.  At the

15:24:55  11  conclusion of the case, we will ask you to find in favor

15:24:59  12  of Family Dollar, because our managers are managers.

15:25:04  13         Thank you.

15:25:05  14         THE COURT:  Is the rule invoked?

15:25:09  15         MR. MAYS:  We would request the rule being

15:25:12  16  invoked, Your Honor.

15:25:13  17         THE COURT:  Aside from the plaintiffs, the

15:25:17  18  opt-ins and representative for the defendants, all

15:25:21  19  persons who expect to testify as witnesses will remain

15:25:25  20  outside the courtroom unless and until you're called to

15:25:28  21  testify.

15:25:31  22         Plaintiffs will call their first witness.

15:25:34  23         MR. G. WIGGINS:  Judge, before we call the

15:25:36  24  first witness, did you also mean to exclude experts,

15:25:39  25  also may remain in the courtroom?

15:25:44  1          MR. MAYS:   We object to that, Your Honor.

15:25:46  2   We think the experts should be subject to the rule.

15:25:48  3          THE COURT:  Well, the experts have already

15:25:50  4   given their opinions, haven't they?

15:25:52  5          MR. MAYS:   I'm sorry, I didn't hear Your

15:25:55  6   Honor.

15:25:55  7          THE COURT:  The experts have already given

15:25:58  8   their opinions.  The objection is sustained.

15:26:01  9          MR. G. WIGGINS:  Plaintiffs calls Larry

15:26:04  10  Reevers.

15:26:18  11          **LARRY REEVERS, A PLAINTIFF, SWORN,**

15:26:19  12          THE CLERK:  State your name for the record,

15:26:23  13  please.

15:26:24  14          THE WITNESS:  My name is Larry Reevers.

15:26:26  15          THE CLERK:  Spell your last name for the

15:26:28  16  record, please.

15:26:28  17          THE WITNESS:  R-E-E-V-E-R-S.

15:26:36  18          MR. G. WIGGINS:  May I proceed, Your Honor?

15:26:37  19          THE COURT:  Surely.

15:26:37  20              **DIRECT EXAMINATION**

15:26:38  21  **BY MR. G. WIGGINS:**

15:26:38  22   Q.  Mr. Reevers, where are you currently employed?

15:26:40  23   A.  I am self-employed.  I am a general contractor

15:26:43  24  building my own house right now.

15:26:45  25   Q.  Where were you formerly employed before you

15:26:47   1   undertook this venture?

15:26:48   2       A.   I was employed at Family Dollar.

15:26:50   3       Q.   How long were you employed with Family Dollar?

15:26:52   4       A.   Let's see.  I was employed for about 12 years.

15:26:55   5       Q.   And can you tell us briefly what positions you

15:26:58   6   held with Family Dollar?

15:26:59   7       A.   Yes.  I was came aboard as an assistant manager

15:27:04   8   in training -- excuse me, as a manager in training, and

15:27:08   9   promoted to manager.

15:27:09  10       Q.   From how long did you hold the position of store

15:27:15  11   manager?

15:27:16  12       A.   A little less than 12 years.

15:27:20  13       Q.   I want you to concentrate, if you will, with the

15:27:23  14   time period from July 1999 to the present, okay?

15:27:32  15       A.   Okay.

15:27:32  16       Q.   Tell the ladies and gentlemen of the jury how

15:27:33  17   many stores you worked in during that time period

15:27:36  18   holding the title store manager.

15:27:38  19       A.   I worked in two stores.

15:27:40  20       Q.   And what were those store numbers, if you recall?

15:27:43  21       A.   Store Number 865, which is in East Lake, Alabama

15:27:46  22   and Store Number 4150, which is Center Point, Alabama.

15:27:50  23       Q.   And just so everybody's clear, East Lake and

15:27:54  24   Center Point, those are suburbs of Birmingham, Alabama?

15:27:58  25       A.   Correct.

15:27:58  1    Q.  Do you recall what the square footage of Store

15:28:03  2  865 was?

15:28:03  3    A.  Yes.  It was 9,000 square feet.

15:28:06  4    Q.  Do you recall what the square footage of your

15:28:10  5  other store was?

15:28:11  6    A.  Store Number 4150 was 10,200 square feet.

15:28:16  7    Q.  Were your stores assigned a risk classification?

15:28:19  8    A.  Yes, they were.

15:28:20  9    Q.  Explain to the ladies and gentlemen of the jury

15:28:23  10  briefly what a risk classification is.

15:28:25  11    A.  Well, if your store's in a high theft or high

15:28:29  12  crime area, there's a bigger risk.  So I was a Risk 3,

15:28:35  13  Store 865.  And I am not too sure of my classification

15:28:39  14  at 4150, but I believe it was lower.

15:28:42  15    Q.  Do you recall the average number of employees

15:28:44  16  that worked in the Store Number 865?

15:28:48  17    A.  Yes.  I was allowed to have, I believe, five or

15:28:53  18  six employees; and in Store Number 4150, I believe I was

15:28:57  19  allowed to have four.

15:28:58  20    Q.  And do you recall what district both of those

15:29:03  21  stores were in?

15:29:03  22    A.  Yes.  District Number 53.

15:29:07  23    Q.  And do you recall what region both of those

15:29:09  24  stores were in?

15:29:10  25    A.  I believe it was Region Number 4.

15:29:12  1    Q.   Now, did you have a district manager while you

15:29:17  2    were holding the position of store manager?

15:29:19  3    A.   Yes, I did.

15:29:20  4    Q.   During your employment of 12 years, do you recall

15:29:22  5    approximately how many district managers you had?

15:29:24  6    A.   We went through a whole bunch of district

15:29:27  7    managers.  I believe 11, to be exact.  I believe it was

15:29:31  8    11, yes.

15:29:32  9    Q.   And did your district managers visit your stores?

15:29:37  10   A.   Yes, they did.

15:29:38  11   Q.   And do you recall how often your district

15:29:41  12   managers would visit your stores?

15:29:43  13   A.   On an average?  About twice a week, I guess,

15:29:49  14   maybe once or twice a week.

15:29:50  15   Q.   Did you have any other forms of communication

15:29:53  16   with your district manager, other than a physical visit

15:29:55  17   to the store?

15:29:56  18   A.   Oh, most definitely, yes.

15:29:58  19   Q.   Can you tell us about those communications were?

15:30:00  20   A.   They could be emails to the store on a daily

15:30:03  21   basis, or telephone calls to the store on a daily basis.

15:30:06  22   Q.   And were those -- did those emails and phone

15:30:10  23   calls, did they come strictly from the district manager,

15:30:14  24   or did it come from higher-ups in the company?

15:30:17  25   A.   They came from just -- from the district manager

15:30:21  1   and higher-ups.

15:30:22  2       Q.   Now, what were the store hours of Store 865?

15:30:28  3       A.   I believe the store hours were 9:00 to 8:00

15:30:33  4   o'clock, or 9:00 to 7:00, one of the two.

15:30:36  5       Q.   That was six days a week?

15:30:38  6       A.   Six days a week.  And on Sunday, I believe it was

15:30:41  7   10:00 to 6:00.

15:30:42  8       Q.   And were the store hours at the other store the

15:30:47  9   same?

15:30:47  10      A.   Yes, they were.

15:30:48  11      Q.   All right.  Now, who determined when your store

15:30:51  12  or when the store was going to be opened and when it was

15:30:54  13  going to be closed?

15:30:55  14      A.   My district manager basically decided what the

15:30:59  15  store hours would be.

15:31:01  16      Q.   Did those store hours -- did they ever change?

15:31:04  17      A.   Most definitely, yes.

15:31:06  18      Q.   Tell us why they would change.

15:31:08  19      A.   Going into the holiday season, they would want us

15:31:12  20  to stay open a few hours later, one or two hours later.

15:31:16  21      Q.   Did you have any input into the number of hours

15:31:18  22  the store would be open or closed?

15:31:20  23      A.   No, I didn't.

15:31:21  24      Q.   When the store hours were expanded -- well,

15:31:30  25  strike that.

15:31:31  1        Did you have a payroll budget?

15:31:32  2    A.  Oh, yes.

15:31:32  3    Q.  Tell us who determined the payroll budget of your

15:31:36  4  store.

15:31:36  5    A.  The payroll budget was determined by the district

15:31:38  6  manager and corporate office, I believe.

15:31:40  7    Q.  And do you recall what your store payroll budgets

15:31:42  8  were?

15:31:42  9    A.  Not off the top of my head, no, I don't.

15:31:45  10   Q.  Do you recall whether or not your salary was

15:31:50  11  deducted from the payroll budget before, and then the

15:31:54  12  rest of the time was allocated to other employees?

15:31:55  13   A.  Correct.  My pay would be deducted and the rest

15:31:58  14  would go to the employees.

15:31:59  15   Q.  Now, when your store hours were expanded during

15:32:07  16  the holiday season, did they increase the store's budget

15:32:10  17  to accommodate those hours?

15:32:12  18   A.  No, they didn't.

15:32:15  19   Q.  Well, if the store was opened more hours, who was

15:32:19  20  going to be working those extra hours?

15:32:21  21   A.  Me.  I would.

15:32:24  22   Q.  They did not give you more payroll budget to hire

15:32:27  23  for employees, or pay the employees more time?

15:32:31  24        MR. KENT:  Object to leading, Your Honor.

15:32:32  25        THE COURT:  The objection to leading is

15:32:34  1   sustained.

15:32:38  2       Q.   Did your job duties, did they vary between Store

15:32:43  3   865 and Store 4251?

15:32:45  4       A.   No, they did not.

15:32:48  5       Q.   Were you ever sent to work at other stores on a

15:32:56  6   temporary basis?

15:32:58  7       A.   Oh, yeah, many times, yes.

15:32:59  8       Q.   When you say "many times," tell the ladies and

15:33:02  9   gentlemen how often.

15:33:02  10      A.   There was always something going on in the store.

15:33:06  11   I would say at least once every other week -- excuse me,

15:33:11  12   about maybe twice a month.

15:33:12  13      Q.   Okay.  Twice a month?

15:33:13  14      A.   Once or twice a month.

15:33:17  15          THE COURT:  Well, what would happen to your

15:33:19  16   store, the store that you managed when you were sent to

15:33:21  17   work at another store?

15:33:22  18          THE WITNESS:  Good question.  I would have

15:33:27  19   to come back to my store and work, or my assistant

15:33:30  20   manager would handle it, or the assistant managers would

15:33:35  21   handle the stores.

15:33:35  22      Q.   When you were sent to other stores to work on a

15:33:38  23   temporary basis, what job duties were you performing?

15:33:41  24      A.   Unloading trucks, putting merchandise on the

15:33:44  25   counter, setting schematics, cleaning, things of this

15:33:49  1   nature.

15:33:50  2      Q.   Was there a store manager in that store that you

15:33:52  3   were sent to?

15:33:52  4      A.   Yes, there was.  Yes.

15:33:54  5      Q.   Were you supervising any of the employees that

15:33:56  6   were in that store?

15:33:57  7      A.   No.  Absolutely not, no.

15:34:00  8      Q.   Did you have any supervisory authority at all

15:34:03  9   over any employees at those stores where you were sent

15:34:06  10  to on a temporary basis?

15:34:07  11     A.   No.  I had no control over that, no.

15:34:09  12     Q.   Did you ever observe cashiers, or stockers, or

15:34:24  13  hourly employees being sent to other stores on a

15:34:30  14  temporary basis?

15:34:30  15     A.   No, I didn't.  No, I don't.

15:34:32  16     Q.   Did you observe or did you learn that other store

15:34:35  17  managers other than yourself were also sent to other

15:34:38  18  stores to work on a temporary basis?

15:34:40  19     A.   Yes.  They definitely were sent to other stores.

15:34:43  20     Q.   Were you ever sent to a store to work on a

15:34:45  21  temporary basis and there was another store manager that

15:34:48  22  also had been sent there?

15:34:49  23     A.   Oh, yes.

15:34:50  24     Q.   And what were both of y'all doing at that store

15:34:53  25  that were there on a temporary basis?

15:34:55  1   A.   Cleaning it up, stocking, sweeping, setting

15:34:58  2   schematics, setting up ends.

15:35:11  3   Q.   Now, when you started to work for Family Dollar,

15:35:17  4   did you have an agreement with Family Dollar as to the

15:35:19  5   number of hours you would work per week?

15:35:21  6   A.   Yes, I did.

15:35:22  7   Q.   And what was that agreement?

15:35:24  8   A.   My agreement was that I would work 48 hours a

15:35:27  9   week.

15:35:27  10  Q.   And for that 48 hours, what would you get?

15:35:31  11  A.   I was told for the 48 hours a week I would get

15:35:34  12  paid a weekly salary, plus a bonus at the end of the

15:35:39  13  year.

15:35:39  14  Q.   Now, did that agreement subsequently change?

15:35:43  15  A.   Yes, it did.

15:35:45  16  Q.   And what was it changed to?

15:35:46  17  A.   Shortly thereafter, I was told that I had to work

15:35:51  18  52 hours a week.

15:35:52  19  Q.   When they bumped you from 48 to 52 hours a week,

15:35:56  20  did they also bump your salary?

15:35:58  21  A.   No, they did not.

15:35:59  22  Q.   It just required you to work more hours at the

15:36:02  23  same salary?

15:36:03  24  A.   That's correct.

15:36:03  25  Q.   Was your agreement with Family Dollar in regards

15:36:10   1   to 48 hours and later to 52 hours, was that agreement

15:36:13   2   ever breached?

15:36:14   3       A.   Was that agreement breached?

15:36:18   4       Q.   Was it ever broken?

15:36:19   5       A.   Yeah.  I say yes.

15:36:21   6       Q.   Can you tell us the average number of hours that

15:36:27   7   you believe you averaged working as a store manager for

15:36:30   8   Family Dollar?

15:36:30   9       A.   The average hours?  I would say definitely above

15:36:35   10   70 hours a week.

15:36:36   11      Q.   Did the amount -- well, strike that.  If you had

15:36:53   12   an agreement to work 48 or 52 hours, why did you work in

15:36:59   13   excess of 70 hours a week?

15:37:01   14      A.   Well, the budget wouldn't allow for me to have

15:37:06   15   more help, so I had to absorb the extra duties of

15:37:09   16   stocking, sweeping, cleaning, sidewalk, register

15:37:15   17   operations and unloading the truck.

15:37:17   18      Q.   Well, you were the manager; you held the title?

15:37:20   19      A.   I held the title, yes.

15:37:21   20      Q.   Why didn't you just simply hire more employees to

15:37:23   21   do that manual labor?

15:37:25   22      A.   I just didn't have the authority to.

15:37:28   23      Q.   Did you have the budget to?

15:37:29   24      A.   No, I didn't have the budget either.

15:37:32   25      Q.   Did your budget directly affect the number of

15:37:35  1    employees that you could work on a weekly basis?

15:37:37  2         A.   Most definitely, yes.

15:37:38  3         Q.   Well, why didn't you work the employees overtime?

15:37:41  4         A.   Once again, I am not allowed to.  I wasn't

15:37:44  5    allowed to.

15:37:44  6         Q.   When you say you are not allowed to, what do you

15:37:47  7    mean by that?

15:37:48  8         A.   I mean that I didn't have the authority to tell

15:37:50  9    my employees to work extra hours.  It wasn't -- I just

15:37:54  10   didn't -- wasn't granted that authority.  If I did,

15:37:57  11   repercussions would definitely happen.

15:37:59  12        Q.   What would happen?

15:38:00  13        A.   Well, if I told Sally to work extra hours or

15:38:05  14   overtime hours, I would probably be written up or

15:38:07  15   possibly even terminated.

15:38:08  16        Q.   Did you ever exceed the budget?

15:38:11  17        A.   Yes, I have.

15:38:12  18        Q.   And what happened?

15:38:12  19        A.   One time I was definitely -- a written

15:38:17  20   disciplinary action taken.

15:38:22  21             THE COURT:  What was the occasion -- what

15:38:25  22   caused you to exceed the budget on that occasion?

15:38:27  23             THE WITNESS:  Well, if I am not mistaken, I

15:38:31  24   believe I ordered a truck of about maybe 500 pieces, and

15:38:35  25   through the back door came 2,000 pieces of merchandise

15:38:38   1    that I didn't even order, and I had to get it out.

15:38:42   2            They wanted it out in so many days, and

15:38:44   3    there was no way possible I could do it.  So I asked my

15:38:47   4    employees to help; and the result, I got myself in

15:38:50   5    trouble over it.

15:38:51   6            THE COURT:  Do you recall the approximate

15:38:53   7    year in which this incident happened?

15:38:56   8            THE WITNESS:  No.  I would have to look at

15:38:58   9    my records or my write-up, I guess.

15:39:01   10           THE COURT:  All right.

15:39:03   11           MR. G. WIGGINS:  Well, let's -- may I?

15:39:05   12           THE COURT:  Yes.

15:39:06   13   Q.  Let's talk about ordering a little bit.  What was

15:39:11   14   your normal -- did you have any normal standard order

15:39:15   15   that was placed in your stores?

15:39:17   16   A.  Yes, we had --

15:39:18   17   Q.  I'm sorry.

15:39:20   18   A.  Yes, we did have a standard.

15:39:21   19   Q.  And what was that standard or normal order?

15:39:23   20   A.  We would order somewhere between 3 and 400 lines,

15:39:31   21   500 lines of merchandise.

15:39:32   22   Q.  Is that all you would ever receive is the 3 or

15:39:35   23   400?

15:39:35   24   A.  It would be nice if that was true, but, no.

15:39:39   25   Everyone sort of ordered.

15:39:40   1        By that, I mean the buyers ordered the

15:39:43   2   merchandise, automatic system was ordering merchandise.

15:39:48   3   The district manager ordered merchandise.  Everybody was

15:39:51   4   ordering, but I was the one that was held accountable.

15:39:54   5   Q.   When you say "held accountable," held accountable

15:39:58   6   for getting it out in the store?

15:39:59   7   A.   Correct.

15:39:59   8   Q.   Did you ever, in your 12 plus years, do you ever

15:40:05   9   recall receiving the exact order that you, the store

15:40:08  10   manager, placed for the store?

15:40:10  11   A.   I can say absolutely never did I get exactly what

15:40:14  12   I ordered.

15:40:14  13   Q.   Was it always in excess?

15:40:16  14   A.   Always in excess; much, much higher than I

15:40:20  15   ordered.

15:40:20  16            THE COURT:  Keep your voice -- keep your

15:40:22  17   voice up, Mr. Reevers, so all the jury can hear what you

15:40:25  18   are saying.

15:40:25  19            THE WITNESS:  Oh, I'm sorry.

15:40:27  20   Q.   Did the amount of freight that came into the

15:40:29  21   store, did that affect the amount of physical labor that

15:40:32  22   you would have to exert?

15:40:33  23   A.   Yes, it did.

15:40:33  24   Q.   How so?

15:40:34  25   A.   Well, the more merchandise came in -- and I was

15:40:37  1   only allowed to have my employees work so many hours.

15:40:41  2   If that freight was not put up in that short amount of

15:40:43  3   time, I would have to put it up.  It required me to work

15:40:47  4   many hours.

15:40:48  5       Q.   Now, you testified earlier that you believe you

15:40:53  6   worked around 70 hours a week?

15:40:56  7       A.   Correct.

15:40:56  8       Q.   Did you always report all of your hours?

15:40:59  9       A.   No, I did not.

15:41:00  10      Q.   Tell me why not.

15:41:01  11      A.   Well, sometimes I would key in my hours,

15:41:04  12  sometimes the assistant manager would key in my hours,

15:41:07  13  and sometimes the supervisor would key in the hours.

15:41:09  14       Depending on who keyed in the hours -- we had a

15:41:13  15  staff schedule, and they would look at my schedule and

15:41:16  16  they would key in what they saw or what was written down

15:41:19  17  on the schedule that the company wanted me to work.

15:41:22  18      Q.   What would cause the assistant or the supervisor

15:41:24  19  to key in your hours, as opposed to you keying them in?

15:41:26  20      A.   Many factors could be.  I could be unloading a

15:41:31  21  truck, or possibly I may be off that evening, or I could

15:41:35  22  be at the magistrate's office filling out a warrant for

15:41:39  23  an arrest.  Sometimes the store would close and we're

15:41:42  24  still working, and the computer was closed, so we

15:41:44  25  couldn't key in the hour, so the next day the assistant

15:41:46  1   manager would key this those hours; things of this

15:41:49  2   nature.

15:41:51  3       Q.   Staff schedule.  What is a staff schedule?

15:41:54  4       A.   A staff schedule is basically a schedule that

15:41:57  5   says when I work, when the assistant manager works.  It

15:42:02  6   tells us when to work.  It tells us that I will be

15:42:05  7   working so many days, it will say when my assistant

15:42:09  8   manager was working.  It told me when to work my

15:42:12  9   employees or the stock clerk.

15:42:16  10      Q.   Did you -- did you develop that staff schedule,

15:42:19  11  since you were the manager?

15:42:19  12      A.   No, I did not.

15:42:20  13      Q.   Did you have any input into it?

15:42:22  14      A.   I had no input whatsoever, no.

15:42:25  15      Q.   Where did that staff schedule come from, if you

15:42:27  16  know?

15:42:28  17      A.   I believe it came from my district manager and

15:42:30  18  the corporate office.

15:42:33  19      Q.   Well, briefly describe what this staff schedule

15:42:38  20  looked like, for the ladies and gentlemen.  They don't

15:42:40  21  work at Family Dollar.  They might need a better

15:42:42  22  description.

15:42:43  23      A.   Sure.  The staff schedule is basically just a

15:42:45  24  schedule, and it'd have the employees written down.

15:42:49  25  It'd have the manager, the assistant manager, the stock

15:42:53  1   clerk, the cashiers.  And it would tell us when we had

15:42:56  2   to work.  It told me when that the stock clerks have to

15:43:00  3   work, and it told me when the employees, or the cashiers

15:43:03  4   had to work for each day.

15:43:06  5       Q.   Did it have a total at the end of the -- like

15:43:10  6   Associate A, did it have -- did it determine the number

15:43:13  7   of hours that that employee could work that week?

15:43:15  8       A.   Correct.  If it say Associate A, Sally, could

15:43:18  9   work 20 hours.

15:43:19  10      Q.   And then it would have the same for all the

15:43:22  11  associates?

15:43:22  12      A.   Correct.

15:43:23  13      Q.   And you had no input into setting that?

15:43:27  14      A.   I had no input at all in setting it, no.

15:43:31  15      Q.   The -- tell us -- well, let me show you an

15:43:45  16  exhibit.  Mr. Roberts, would you put up Exhibit 10,

15:43:50  17  please?

15:43:53  18           Now, Larry, I know your eyes are bad --

15:43:55  19           MR. G. WIGGINS:  Judge, he has bad eyes.

15:43:58  20  Would it be okay if he --

15:43:59  21           THE COURT:  Sure.

15:44:00  22      Q.   Can you see that okay?

15:44:00  23      A.   Yeah.  It says, "Store Manager, Essential Job

15:44:02  24  Functions."

15:44:02  25      Q.   Okay.  Have you ever seen this document before?

| | | |
|---|---|---|
| 15:44:05 | 1 | A.   Yes, I have. |
| 15:44:10 | 2 | THE COURT:  Mr. Reevers, would it be more |
| 15:44:12 | 3 | convenient for you to walk over there? |
| 15:44:13 | 4 | THE WITNESS:  If I need to, could I go over |
| 15:44:16 | 5 | there? |
| 15:44:16 | 6 | THE COURT:  Sure. |
| 15:44:17 | 7 | THE WITNESS:  I'm okay for now.  If it gets |
| 15:44:19 | 8 | any smaller, heaven help me. |
| 15:44:24 | 9 | Q.   (By Mr. G. Wiggins)  Now -- |
| 15:44:26 | 10 | MR. KENT:  Your Honor, would it be more |
| 15:44:27 | 11 | appropriate if Mr. Reevers was questioned on this |
| 15:44:30 | 12 | document without it being published to the jury until |
| 15:44:32 | 13 | it's actually into evidence? |
| 15:44:34 | 14 | THE COURT:  Of course it's more appropriate. |
| 15:44:37 | 15 | I thought y'all had an agreement about exhibits. |
| 15:44:40 | 16 | MR. G. WIGGINS:  I thought we did, too, Your |
| 15:44:42 | 17 | Honor.  And I thought we had an agreement that -- |
| 15:44:44 | 18 | THE COURT:  Well, offer the document into |
| 15:44:46 | 19 | evidence. |
| 15:44:46 | 20 | MR. G. WIGGINS:  We offer Exhibit 10, Your |
| 15:44:48 | 21 | Honor. |
| 15:44:48 | 22 | THE COURT:  Any objection? |
| 15:44:50 | 23 | MR. KENT:  No objection, Your Honor. |
| 15:44:52 | 24 | THE COURT:  It's received in evidence. |
| 15:44:52 | 25 | Now, do you have an agreement about |

15:44:54    1   exhibits?

15:44:56    2                  MR. KENT:  There's multiple objections, Your

15:44:59    3   Honor.  There's multiple objections to a lot of

15:45:02    4   exhibits.

15:45:02    5                  THE COURT:  Do you exhibit to this one?

15:45:06    6                  MR. UMBACH:  No, Your Honor.

15:45:07    7                  THE COURT:  Well, if you didn't object to

15:45:09    8   it, it comes in when offered.

15:45:11    9                  MR. KENT:  Yes, sir.

15:45:12   10                  THE COURT:  All right.

15:45:16   11   Q.   (By Mr. G. Wiggins)  Mr. Reevers, I want to show

15:45:19   12   you -- I want you to take a look at it.  I want you to

15:45:23   13   read page 1 of this exhibit, if you can read it.  If

15:45:26   14   not, you can step down here, as the Judge said.  Just

15:45:28   15   take a minute to read that.

15:45:32   16   A.   Okay.  I better step on down.

15:45:39   17   Q.   You better come on down.

15:45:44   18   A.   Okay.

15:45:45   19   Q.   All right.  Take just a second to read it.

15:46:02   20   A.   Okay.

15:46:03   21   Q.   Mr. Roberts, would you show us page 2 of this

15:46:09   22   exhibit?

15:46:13   23        Take your time and read that.

15:46:19   24                  MR. G. WIGGINS:  Judge, would it be

15:46:20   25   appropriate to inform the jury that if they're having a

15:46:23  1   problem seeing it, they are going to get a copy of this

15:46:26  2   document?

15:46:26  3            THE COURT:  It would be nice if you gave

15:46:29  4   them a copy of it now so that they can see it as you

15:46:32  5   examine the witness.  Give them all to one and let them

15:46:51  6   pass them out.

15:46:52  7            MR. G. WIGGINS:  I only have three, Judge.

15:46:54  8   I apologize.

15:46:55  9            THE COURT:  I don't expect to have this

15:46:57  10  problem again in this trial.

15:46:59  11            MR. G. WIGGINS:  Will not.  You will not.

15:47:02  12            THE WITNESS:  Okay.

15:47:03  13  Q.   (By Mr. G. Wiggins)  Turn to page 3, Mr. Roberts.

15:47:18  14  Okay.  Page 4, Mr. Roberts.

15:47:34  15  A.   Okay.

15:47:35  16  Q.   Now, have you seen that document before?

15:47:38  17  A.   Yes, I have.

15:47:39  18  Q.   Does that document accurately reflect the job --

15:47:43  19  essential job functions --

15:47:44  20  A.   Yes, it does.

15:47:45  21  Q.   -- of the store manager?

15:47:46  22  A.   Yes, it does.

15:47:47  23  Q.   In fact -- go back to page 1, if you will,

15:47:50  24  Mr. Roberts.

15:47:50  25            You can have a seat, Mr. Reevers.

15:47:50  1      A.   (Taking stand.)

15:47:56  2      Q.   The title of this document is "store manager,

15:47:59  3  essential job functions;" correct?

15:48:01  4      A.   Correct.

15:48:02  5              MR. KENT:   Object.   He's leading the

15:48:03  6  witness.

15:48:04  7              THE COURT:   Overruled.

15:48:05  8              MR. G. WIGGINS:   Judge, may I ask --

15:48:07  9              THE COURT:   Next question.

15:48:09  10             MR. G. WIGGINS:   May I ask if Mr. May or

15:48:12  11  Mr. Kent is going to object?

15:48:13  12             THE COURT:   Mr. Kent is going to take this

15:48:18  13  witness.

15:48:21  14     Q.   (By Mr. G. Wiggins)  Does that document in your

15:48:23  15  opinion, Mr. Reevers, reflect the primary duties of a

15:48:28  16  store manager?

15:48:29  17             MR. KENT:   Objection, Your Honor.   He's

15:48:32  18  leading again.

15:48:33  19             THE COURT:   Objection is sustained.

15:48:36  20     Q.   Does that document, Mr. Reevers, say anything

15:48:39  21  about your ability to hire?

15:48:44  22     A.   No, it does not.

15:48:46  23     Q.   Fire?

15:48:48  24     A.   No, it does not.

15:48:49  25     Q.   Give pay raises?

| | | |
|---|---|---|
| 15:48:51 | 1 | THE COURT:  This is leading. |
| 15:48:53 | 2 | MR. G. WIGGINS:  I'm sorry? |
| 15:48:54 | 3 | THE COURT:  Leading. |
| 15:48:56 | 4 | MR. G. WIGGINS:  Yes, sir. |
| 15:48:59 | 5 | Q.  Well, let me ask you this question, Mr. Reevers: |
| 15:49:01 | 6 | Did you have the authority to hire? |
| 15:49:05 | 7 | A.  No, I had no authority to hire. |
| 15:49:06 | 8 | Q.  Did you have the authority to fire? |
| 15:49:09 | 9 | A.  No, I didn't have the authority to fire. |
| 15:49:12 | 10 | Q.  Did you have the authority to give pay raises? |
| 15:49:17 | 11 | A.  No, I did not. |
| 15:49:18 | 12 | Q.  Did you have the authority to set the starting |
| 15:49:22 | 13 | pay? |
| 15:49:22 | 14 | A.  No, I couldn't. |
| 15:49:23 | 15 | Q.  Did you have the authority to promote someone? |
| 15:49:25 | 16 | A.  No. |
| 15:49:27 | 17 | Q.  Are any of those five categories that I just |
| 15:49:32 | 18 | mentioned to you, are they listed on that document |
| 15:49:34 | 19 | anywhere? |
| 15:49:35 | 20 | A.  On the store manager, essential job functions? |
| 15:49:37 | 21 | Q.  Yes. |
| 15:49:38 | 22 | A.  It is not located anywhere on that document. |
| 15:49:41 | 23 | Q.  Mr. Reevers, what does the term "truck day" mean? |
| 15:50:09 | 24 | A.  Truck day, that's the day that they tell us when |
| 15:50:15 | 25 | the truck will arrive at our store.  And that day we |

15:50:18  1    unload the truck and put up the merchandise on the shelf

15:50:22  2    floor.  That's the day we start beginning to unload it

15:50:26  3    on the sales floor.

15:50:28  4      Q.  I am going to show you a document that's been

15:50:32  5    marked as Plaintiffs' Exhibit 36.

15:50:36  6              MR. G. WIGGINS:  Judge, we would offer

15:50:38  7    Exhibit 36.

15:50:38  8              THE COURT:  Any objection?

15:50:40  9              MR. KENT:  We don't know what it is, Your

15:50:43  10   Honor.

15:50:55  11             THE COURT:  Have you listed your exhibits?

15:50:57  12             MR. G. WIGGINS:  I'm sorry?

15:50:59  13             THE COURT:  Have you listed your exhibits?

15:51:01  14             MR. G. WIGGINS:  Yes, sir.

15:51:02  15             THE COURT:  You've given it a number?

15:51:02  16             MR. G. WIGGINS:  Yes, sir.

15:51:04  17             THE COURT:  Plaintiffs' Exhibit 36 is

15:51:06  18   received in evidence.

15:51:08  19             MR. G. WIGGINS:  Thank you, Your Honor.  May

15:51:16  20   I publish?

15:51:16  21             THE COURT:  Yes, you may publish.

15:51:18  22     Q.  (By Mr. G. Wiggins)  Mr. Reevers, I am going to

15:51:19  23   ask you to step down here again.

15:51:21  24             THE COURT:  We are going to take a break at

15:51:23  25   3:45.  You want to do it now?

15:51:26  1           MR. G. WIGGINS:  Yes, sir.

15:51:26  2           THE COURT:  All right.  Ladies and

15:51:27  3  gentlemen, let's take our afternoon break.  We will be

15:51:33  4  in recess until 4:00 o'clock.

15:51:33  5           Please do not discuss the case among

15:51:34  6  yourselves or with anyone else.  Do not allow the case

15:51:36  7  to be discussed in your presence, and keep an open mind.

15:51:39  8           (Recess from 3:42 p.m. until 4:00 p.m.)

16:08:29  9           (In open court, jury present.)

16:08:37  10           MR. G. WIGGINS:  May I approach the witness,

16:08:39  11  Your Honor?

16:08:40  12           THE COURT:  Yes, sir.

16:08:43  13  Q.  (By Mr. G. Wiggins)  Rather than having you walk

16:08:45  14  up there, I am going to hand you that, Mr. Reevers.

16:09:11  15           Take just a minute or so and look through

16:09:14  16  what's been marked as Plaintiffs' Exhibit 36, and I am

16:09:18  17  going to ask you a question about it.

16:09:59  18       Have you had a chance to look at that document,

16:10:01  19  Mr. Reevers?

16:10:02  20  A.  Yes, I have.

16:10:03  21  Q.  Do you recognize that document?

16:10:05  22  A.  Yes.

16:10:05  23  Q.  Can you tell us what that document is?

16:10:07  24  A.  It's the essential job functions of assistant

16:10:11  25  manager/floor supervisor/supplemental manager.

16:10:15   1    Q.   Does that document accurately reflect the job

16:10:18   2   duties of the assistant store manager?

16:10:21   3    A.   Yes, it does.

16:10:22   4         THE COURT:   What's the number of the

16:10:25   5   exhibit?

16:10:25   6         MR. G. WIGGINS:   36.

16:10:26   7    Q.   Mr. Roberts, if you would, if you would put

16:10:29   8   Exhibit 10 and Exhibit 36 on the screen, side by side,

16:10:33   9   please, sir.

16:10:37  10       I am going to hand you --

16:10:39  11         MR. G. WIGGINS:   May I approach, Your Honor?

16:10:40  12         THE COURT:   Yes.

16:10:42  13    Q.   In lieu of you walking back up there, I am going

16:10:45  14   to hand you a copy of Exhibit 10.

16:10:48  15       Would you briefly compare those two exhibits and

16:10:50  16   identify any major distinctions between the two

16:10:53  17   exhibits, please, sir?

16:10:54  18    A.   Page 1 is virtually the same.

16:11:12  19    Q.   Okay.   Have you had a chance to look at page 2,

16:11:44  20   Mr. Reevers?

16:11:44  21    A.   Yes, I have.

16:11:45  22    Q.   And it's pretty much --

16:11:47  23    A.   Both documents are pretty much the same.

16:11:50  24    Q.   All the way through?

16:11:51  25    A.   Yes, sir.   Pretty much all the way through.

16:12:01    1    Q.   One document -- Exhibit 10 is for the store

16:12:03    2    manager and Exhibit 36 is for the assistant store

16:12:06    3    manager?

16:12:06    4    A.   Correct.

16:12:07    5    Q.   Now, in paragraph 1 of Exhibit 10, it states

16:12:13    6    "supervise all store personnel".  Do you have an

16:12:16    7    approximate -- or do you have an answer to the amount of

16:12:23    8    time that you would guess you spent supervising store

16:12:29    9    personnel?

16:12:31   10    A.   I would say somewhere between 5 and 10 percent.

16:12:39   11    Q.   And on Exhibit 36, it says paragraph 1 for the

16:12:45   12    assistant manager:  "Supervise personnel in the absence

16:12:48   13    of the store manager"; is that a correct statement?

16:12:51   14    A.   Yes, it is.

16:12:53   15    Q.   Did the assistant manager ever supervise while

16:13:00   16    you were there?

16:13:02   17    A.   Sometimes, yes.

16:13:03   18    Q.   Now, I want to back up for one second, if you

16:13:13   19    will.  We were talking about your transfers to other

16:13:16   20    stores a while ago, your temporary transfers?

16:13:19   21    A.   Yes.

16:13:19   22    Q.   When you were temporarily transferred to these

16:13:24   23    other stores, did that increase the number of hours that

16:13:26   24    you were required to work per week?

16:13:28   25    A.   Yes, it did, because I had to work at these other

16:13:32    1   stores.  And that's basically free labor there.  And I

16:13:36    2   still had to come back to the store and unload trucks,

16:13:39    3   my store -- or the store, and unload the trucks, sweep,

16:13:43    4   clean, run the register, so, yes.  Yes, I worked more

16:13:49    5   hours.

16:13:50    6       Q.  Did you ever work in your store alone?

16:13:53    7       A.  Yes.  Many times, yes.

16:13:55    8       Q.  How often would that occur?

16:13:57    9       A.  Well, a lot.  Sometimes I would -- in the

16:14:04   10   morning, I would work in my store for two, three hours.

16:14:07   11           THE COURT:  Did you ever work in your store

16:14:10   12   alone during the time when the store was open?

16:14:13   13           THE WITNESS:  Yes, I did.

16:14:15   14       Q.  Were you supervising anybody during that time

16:14:18   15   period?

16:14:19   16       A.  There was nobody to supervise.

16:14:22   17       Q.  Did -- was your job performance ever evaluated,

16:14:41   18   Mr. Reevers?

16:14:41   19       A.  Yes, it was.

16:14:42   20       Q.  And who evaluated your job performance?

16:14:48   21       A.  My district manager.

16:14:49   22       Q.  And I am going to show you what has been marked

16:14:54   23   as Exhibit 11, store manager evaluation.

16:15:01   24           MR. G. WIGGINS:  We would offer it, Your

16:15:03   25   Honor.

16:15:03  1        MR. KENT:  No objection, Your Honor.

16:15:05  2        THE COURT:  It's received in evidence.

16:15:07  3        MR. G. WIGGINS:  May I publish, Your Honor?

16:15:09  4        THE COURT:  Yes.  It may be published to the

16:15:11  5   jury.

16:15:25  6   Q.   (By Mr. G. Wiggins)  Mr. Reevers, do you

16:15:27  7   recognize that document?

16:15:28  8   A.   Yes, I do.

16:15:29  9   Q.   Can you tell us what that document is?

16:15:31  10  A.   That's the performance review of a store manager.

16:15:35  11  Q.   Is the performance review that you were reviewed

16:15:37  12  with by your district manager?

16:15:39  13  A.   Yes, it was.

16:15:40  14  Q.   Can you tell me what the title of Section 1 is?

16:15:45  15  A.   I better get up there.

16:15:48  16  Q.   Okay.

16:15:49  17        MR. G. WIGGINS:  May I approach, Your Honor?

16:15:51  18        THE COURT:  Yes.

16:15:52  19        MR. G. WIGGINS:  Okay.

16:15:54  20  A.   Yes.  The title of Section 1 is "Business

16:16:01  21  Results".

16:16:03  22  Q.   All right.  Could you turn to page 2?

16:16:07  23  A.   Okay.

16:16:08  24  Q.   And Section 2 of your of the evaluation, what is

16:16:13  25  it entitled?

16:16:13  1      A.   Sections 2 is "Store Standards".

16:16:16  2      Q.   Section 3?

16:16:18  3      A.   "HR programs".

16:16:21  4      Q.   Turn the page, if you will, please, sir.

16:16:24  5      A.   Okay.

16:16:25  6      Q.   Go to Section 4.

16:16:30  7      A.   "Self-development".

16:16:41  8      Q.   And turn to page -- turn on over to the next

16:16:46  9  page.

16:16:46  10     A.   Okay.

16:16:47  11     Q.   The top of the next page, what is the category?

16:16:57  12     A.   "Overall appraisal".

16:16:59  13     Q.   And then the last category that you were

16:17:03  14  evaluated on was what?

16:17:05  15     A.   "Merit timing and percent guidelines and merit

16:17:10  16  recommendations".

16:17:11  17     Q.   Okay.  And who did you say completed this

16:17:16  18  evaluation?

16:17:17  19     A.   The district manager.

16:17:18  20     Q.   I want to show you what's been marked as Exhibit

16:17:29  21  12, assistant store manager evaluation.

16:17:35  22              MR. G. WIGGINS:  We offer it, Your Honor.

16:17:36  23              MR. KENT:  No objection, Your Honor.

16:17:38  24              THE COURT:  Without objection, it's received

16:17:40  25  in evidence.

16:17:41  1      Q.   (By Mr. G. Wiggins)   Mr. Reevers, take a minute,

16:17:59  2  if you will, and look at that document.   I ask you if

16:18:01  3  you recognize that document?

16:18:05  4      A.   Yes, I do.

16:18:13  5      Q.   What is that document?

16:18:14  6      A.   That's the performance review for the assistant

16:18:18  7  store manager.

16:18:19  8      Q.   Whose signature was it - was required in order

16:18:22  9  for this assistant store manager's review to be

16:18:26  10 finalized?

16:18:26  11     A.   The district manager.

16:18:31  12          THE COURT:  But you evaluated the -- I mean,

16:18:34  13 the store manager initially evaluated the assistant

16:18:38  14 store manager; right?

16:18:39  15          THE WITNESS:  I filled out the document,

16:18:41  16 yes, and my input was in this, yes.

16:18:43  17          THE COURT:  Okay.

16:18:45  18     Q.   (By Mr. G. Wiggins)  Did your district manager

16:18:46  19 ever change your evaluation of your assistant store

16:18:49  20 manager?

16:18:49  21     A.   Oh, yes.

16:18:50  22     Q.   How many times did he change it?

16:18:52  23     A.   I couldn't tell you exactly, but --

16:18:54  24     Q.   More than once?

16:18:55  25     A.   Definitely more than once, yes.

16:18:57  1    Q.   The -- look at Exhibits 11 and 12, if you will

16:19:04  2  put them side by side.  And Section 1 is entitled what

16:19:08  3  on both exhibits?

16:19:11  4    A.   Section 1?  "Business Results".

16:19:15  5    Q.   Section 2 on both exhibits?

16:19:17  6    A.   On the store manager, it says "Store Standards"

16:19:29  7  and on the assistant, it says "Anytime Five Standards",

16:19:33  8  but they're exactly the same.

16:19:34  9    Q.   They're the same standards listed within both

16:19:36  10  sections?

16:19:37  11    A.   Yes, they are.

16:19:38  12    Q.   The Section 3 for the manager, how is it listed?

16:19:42  13    A.   For the manager, it's listed as "Hr Programs".

16:19:45  14    Q.   And for the assistant manager?

16:19:47  15    A.   "Performance Measures".

16:19:50  16    Q.   And then in Section 4, look at the different

16:19:52  17  categories where the manager and the assistant manager

16:19:55  18  are evaluated, are they both evaluated under the same

16:19:59  19  categories?

16:20:01  20    A.   Yes, they are, exactly.

16:20:05  21    Q.   There's no difference whatsoever --

16:20:08  22    A.   Absolutely none.

16:20:09  23    Q.   -- in Section 4 between the manager and the

16:20:12  24  assistant manager, as far as what they're evaluated on

16:20:14  25  in their job performance?

| 16:20:17 | 1 | MR. KENT:  Objection, Your Honor. |
| 16:20:18 | 2 | THE COURT:  The objection to leading is |
| 16:20:20 | 3 | sustained. |
| 16:20:20 | 4 | Q.  Is there a difference? |
| 16:20:21 | 5 | A.  There is absolutely no different between the two. |
| 16:20:23 | 6 | Q.  Thank you.  Mr. Reevers, are you familiar with -- |
| 16:20:29 | 7 | strike that. |
| 16:20:29 | 8 | Did your stores have a store policy manual in |
| 16:20:33 | 9 | them? |
| 16:20:33 | 10 | A.  Yes, they did. |
| 16:20:38 | 11 | MR. G. WIGGINS:  Your Honor, we offer |
| 16:20:39 | 12 | Exhibit 2. |
| 16:20:40 | 13 | THE COURT:  All right. |
| 16:20:42 | 14 | MR. G. WIGGINS:  Store Policy Manual. |
| 16:20:45 | 15 | MR. KENT:  No objection. |
| 16:20:47 | 16 | THE COURT:  No objection, they're received |
| 16:20:49 | 17 | in evidence. |
| 16:20:50 | 18 | MR. G. WIGGINS:  May I  publish, Your Honor? |
| 16:20:52 | 19 | THE COURT:  You may publish. |
| 16:20:54 | 20 | Mr. Reevers, are you an opt-in plaintiff? |
| 16:20:59 | 21 | THE WITNESS:  Yes, I am. |
| 16:21:01 | 22 | MR. G. WIGGINS:  Yes, sir. |
| 16:21:18 | 23 | Q.  (By Mr. G. Wiggins)  Mr. Reevers, do you |
| 16:21:24 | 24 | recognize that document as being the store policy manual |
| 16:21:27 | 25 | that was in your store? |

16:21:28  1    A.  Yes, it is.

16:21:29  2    Q.  If you will, Mr. Reevers, turn to what is Bates

16:21:36  3  stamped at the bottom -- you see those numbers at the

16:21:39  4  bottom of the page?

16:21:40  5    A.  Yes.

16:21:41  6    Q.  D, then four or five numbers out beside it?

16:21:44  7    A.  Yes, I see the numbers.

16:21:46  8    Q.  Turn to what's Bates stamped as 00050.

16:21:55  9    A.  Okay.

16:21:55  10   Q.  Paragraph 3 of that exhibit states what -- of

16:22:03  11  that Bates number page?

16:22:05  12   A.  "The district manager is to be notified

16:22:08  13  immediately by a ranking member of store management that

16:22:11  14  a lock change is necessary".

16:22:12  15   Q.  Paragraph 6 of that document of that page states

16:22:16  16  what?

16:22:16  17   A.  "Members of the management team are store

16:22:22  18  manager, associate manager, assistant manager, floor

16:22:26  19  supervisor, and in some cases, a third key person".

16:22:30  20   Q.  And this is the company store policy manual that

16:22:33  21  was in your store?

16:22:34  22   A.  Correct.

16:22:40  23   Q.  Turn, if you will, to what's Bates stamped 055.

16:22:53  24   A.  Okay.

16:22:54  25   Q.  If you will read the third paragraph, first

16:22:57  1   sentence for me, please, sir.

16:22:59  2       A.   My copy is not too good.

16:23:01  3       Q.   All right.   Let me --

16:23:03  4            THE COURT:   You've got five minutes with

16:23:04  5   this witness.

16:23:09  6            MR. G. WIGGINS:   May I approach, Your Honor?

16:23:11  7            THE COURT:   No.   Approach me?

16:23:15  8            MR. G. WIGGINS:   No, no.

16:23:17  9            THE COURT:   All right.   You don't need my

16:23:19  10  permission to approach the witness.

16:23:21  11            MR. G. WIGGINS:   Okay.

16:23:22  12       Q.   Third paragraph, if you will.

16:23:24  13       A.   Sure.   "When faced with making a decision to

16:23:26  14  close a store for snow or ice, store management is to

16:23:29  15  contact the district manager, making him or her a

16:23:33  16  partner in the decision."

16:23:35  17       Q.   Did you have the authority on your own to close

16:23:37  18  the store in case of an emergency, Mr. Reevers?

16:23:40  19       A.   Not at all.

16:23:41  20       Q.   Did you ever have an emergency situation when you

16:23:43  21  needed to close a store?

16:23:45  22       A.   Oh, yes, a couple of times.

16:23:47  23            One time in particular, I remember there was a

16:23:50  24  tornado coming through our area, down 1st Avenue.   The

16:23:56  25  weather was really, really bad.   And I wanted to close

16:24:00   1   my store, but I couldn't.  I had to contact the district

16:24:01   2   manager.

16:24:05   3               THE COURT:  When was this?

16:24:06   4               THE WITNESS:  This was in 2002, I believe.

16:24:14   5       Q.   Turn, if you will, to Bates stamp 00105.

16:24:23   6       A.   Okay.

16:24:24   7       Q.   See the -- see the section entitled "floor care"?

16:24:27   8       A.   Yes, I do.

16:24:28   9       Q.   Did you have any authority to set up the people

16:24:33  10   that were being charged the floor care for the store?

16:24:35  11       A.   I had no control over that.

16:24:37  12       Q.   And why do you say that?

16:24:38  13       A.   Because I had no control over it.  There was --

16:24:43  14       Q.   What does the store policy manual say on

16:24:46  15   paragraph 3 there, in regards to floor care?

16:24:49  16       A.   "The floor care contractors set up by the

16:24:51  17   district manager.  The schedule for floor cleaning and

16:24:55  18   waxing is also set up by the district manager".

16:24:59  19       Q.   Did you ever have any rodent problems or bug

16:25:04  20   problems in your stores, Mr. Reevers?

16:25:06  21       A.   Yes, I definitely did.

16:25:07  22       Q.   What type of problems did you have?

16:25:09  23       A.   In one store, I had major rat problems.

16:25:11  24       Q.   What did you do to take care of that problem in

16:25:16  25   your store?

16:25:17  1    A.   I couldn't do anything.  I had to contact my

16:25:20  2    district manager.

16:25:21  3    Q.   You're the store manager, Mr. Reevers.  You have

16:25:24  4    employees there, you have customers there; correct?

16:25:25  5    A.   Yes, I do.

16:25:27  6    Q.   Did you call an exterminator?

16:25:29  7    A.   I couldn't.

16:25:30  8    Q.   Why not?

16:25:30  9    A.   Because I wasn't authorized to.  I didn't have

16:25:34  10   the authority to.

16:25:35  11   Q.   00107.

16:25:45  12   A.   Okay.

16:25:45  13   Q.   Section entitled "trash control".  Would you read

16:25:48  14   that for me please, sir?

16:25:49  15   A.   "Store services will contract trash pick-up

16:25:53  16   service at the time a new store is opened.  No one at

16:25:57  17   store level has the authority to sign trash agreements

16:26:00  18   or contracts."

16:26:01  19   Q.   Mr. Reevers, tell the ladies and gentlemen of the

16:26:04  20   jury the amount of time, percentage of time, you spent

16:26:08  21   unloading trucks, running the cash register, cleaning

16:26:12  22   the store, stocking the shelves and cleaning the

16:26:14  23   bathroom.

16:26:15  24   A.   I would say about 90 percent of the time.

16:26:22  25   Q.   Did you feel like -- based on the job duties that

| | | |
|---|---|---|
| 16:26:27 | 1 | you performed, holding the title store manager -- did |
| 16:26:31 | 2 | you feel like that you were a chief executive? |
| 16:26:36 | 3 | A.   No, I did not. |
| 16:26:37 | 4 | MR. KENT:  Objection. |
| 16:26:38 | 5 | THE COURT:  Your objection to leading is |
| 16:26:41 | 6 | sustained.  Last question.  Cross-examination. |
| 16:26:41 | 7 | MR. G. WIGGINS:  Thank you, Your Honor. |
| 16:26:46 | 8 | **CROSS-EXAMINATION** |
| 16:26:46 | 9 | **BY MR. KENT:** |
| 16:26:48 | 10 | Q.   Mr. Reevers, good afternoon. |
| 16:27:17 | 11 | A.   Good afternoon. |
| 16:27:18 | 12 | Q.   I would like to follow up on a few questions, if |
| 16:27:21 | 13 | I could.  Let's begin with your experience. |
| 16:27:23 | 14 | Prior to starting at Family Dollar, you had |
| 16:27:26 | 15 | extensive experience at Kmart, didn't you? |
| 16:27:28 | 16 | A.   Yes, I did. |
| 16:27:29 | 17 | Q.   You had worked at Kmart from 1976 to 1992; |
| 16:27:33 | 18 | correct? |
| 16:27:33 | 19 | A.   Correct. |
| 16:27:34 | 20 | Q.   And you held salaried positions there; correct? |
| 16:27:38 | 21 | A.   Correct. |
| 16:27:38 | 22 | Q.   And then when you went to Family Dollar, you came |
| 16:27:41 | 23 | in as a manager trainee; right? |
| 16:27:43 | 24 | A.   Correct. |
| 16:27:44 | 25 | Q.   To be trained to be a store manager; correct? |

16:27:48   1      A.   Correct.

16:27:48   2      Q.   And then you held the store manager position from

16:27:52   3   roughly 1992 to 2004; correct?

16:27:56   4      A.   Correct.

16:27:57   5      Q.   You were a store manager with Family Dollar for

16:27:59   6   12 years; correct?

16:28:01   7      A.   Correct.

16:28:01   8      Q.   Now, I want to focus on the time from 2002 to

16:28:07   9   2004 when Mr. Malcom Cannon was your district manager,

16:28:14  10   okay?

16:28:14  11      A.   Okay.

16:28:15  12      Q.   And that would have been primarily when you were

16:28:17  13   at Store 865 and then the Store 4150; correct?

16:28:23  14      A.   Correct.

16:28:23  15      Q.   Do you remember approximately when Mr. Cannon

16:28:25  16   became your district manager?

16:28:27  17      A.   I don't, no.

16:28:28  18      Q.   Okay.   It was sometime in 2002; correct?

16:28:32  19      A.   Correct.

16:28:32  20      Q.   Your ending pay with Family Dollar was $700 per

16:28:40  21   week; correct?

16:28:41  22      A.   Correct.

16:28:42  23      Q.   If I do the math, that's 36,000, approximately

16:28:47  24   per year; correct?

16:28:48  25      A.   Correct.

16:28:49   1    Q.   And the clerks, hourly clerks at the store, would

16:28:58   2    receive anywhere from minimum wage to 6 or $7 per hour;

16:29:02   3    correct?

16:29:02   4    A.   Correct.

16:29:03   5    Q.   In fact, Debra Anderson -- do you remember her?

16:29:08   6    A.   Debra Anderson?

16:29:09   7    Q.   Yes, sir.

16:29:10   8    A.   I do believe so, yes.

16:29:12   9    Q.   She was making 5.50 an hour when you left;

16:29:15   10   correct?

16:29:16   11   A.   Without checking my records, I --

16:29:18   12   Q.   You don't dispute that?

16:29:19   13   A.   No, I don't.

16:29:20   14   Q.   And you received a bonus as a store manager;

16:29:24   15   correct?

16:29:24   16   A.   Yes, I was entitled to a bonus.

16:29:26   17   Q.   And, in fact, you received one bonus of $2,300;

16:29:30   18   correct?

16:29:30   19   A.   Correct.

16:29:31   20   Q.   And you also received benefits that other

16:29:35   21   employees of the store didn't receive; correct?

16:29:37   22   A.   Correct.

16:29:38   23   Q.   Vacation pay, sick pay, medical; correct?

16:29:44   24   A.   Well, you don't receive vacation pay.  You are

16:29:47   25   entitled a vacation, but if you don't take vacation, you

16:29:50  1   don't get paid for it.

16:29:51  2       Q.   And that's different than the hourly employees;

16:29:54  3   correct?

16:29:54  4       A.   Yeah, they would definitely get a vacation.

16:29:57  5       Q.   Would they get the same benefits that you got?

16:30:00  6   Did they get the same health insurance that you

16:30:02  7   received?

16:30:02  8       A.   No, I don't think so.

16:30:04  9       Q.   And taking one step back, you were the only

16:30:08  10  employee at the store that would receive a bonus;

16:30:11  11  correct?

16:30:14  12      A.   According to my original agreement, yes, I was

16:30:15  13  supposed to get weekly pay, plus a bonus.

16:30:18  14      Q.   I am not talking about just your agreement.  I am

16:30:20  15  talk about Family Dollar company wide.  As far as you

16:30:23  16  know, the only employee at the store that's entitled to

16:30:28  17  a bonus is the store manager; correct?

16:30:30  18      A.   Yes, correct.

16:30:31  19      Q.   Assistant manager is not entitled a bonus;

16:30:34  20  correct?

16:30:35  21      A.   Correct.

16:30:35  22      Q.   And all the other hourly employees are not

16:30:37  23  entitled to a bonus; correct?

16:30:39  24      A.   Correct.

16:30:40  25      Q.   Now, you knew when you started that you were

16:30:48   1   going to receive a salary; correct?

16:30:49   2      A.   Yes.

16:30:50   3      Q.   You knew you were going to receive that same

16:30:53   4   salary whether you worked 48 hours, 49 hours, 52 hours,

16:30:58   5   or 55 hours; correct?

16:30:59   6      A.   I thought it would be 48 hours.

16:31:02   7      Q.   But that's not my question.

16:31:03   8      A.   I'm sorry.

16:31:04   9      Q.   My question is:  You knew that your salary was

16:31:07   10   going to remain the same, whether you worked 48 hours or

16:31:11   11   52 hours?

16:31:12   12      A.   Correct.

16:31:12   13      Q.   In other words, you knew you were not going to

16:31:15   14   receive any overtime; correct?

16:31:17   15      A.   Correct.

16:31:18   16      Q.   It was a salaried position; right?

16:31:21   17      A.   Correct.

16:31:21   18      Q.   So if you worked 46 hours one week, you still

16:31:25   19   were going to get the same salary; right?

16:31:28   20      A.   If I worked 46 hours?

16:31:29   21      Q.   Right.

16:31:30   22      A.   Well, I -- I never worked 46 hours, so I couldn't

16:31:33   23   tell you.

16:31:33   24      Q.   But that's the deal, though, if you did, you

16:31:36   25   would get the same amount of pay; correct?

16:31:38    1       A.   Oh, it wasn't made to my knowledge, so I really

16:31:43    2   couldn't tell you.  I am assuming --

16:31:44    3       Q.   I thought you were describing to Mr. Wiggins the

16:31:47    4   deal --

16:31:47    5            THE COURT:   No.  I think this may be getting

16:31:50    6   argumentative.  What this witness is saying, I believe

16:31:52    7   is what he was told when he was initially hired --

16:31:55    8            MR. KENT:   I'm sorry, Your Honor.  There is

16:31:57    9   a little bit of a buzz going on, on this machine.

16:32:00   10            THE COURT:   I said it may be getting a bit

16:32:02   11   argumentative.  It is.

16:32:04   12            MR. KENT:   Yes, Your Honor.

16:32:05   13            THE COURT:   All right.

16:32:07   14       Q.   (By Mr. Kent)  We will take it one step further.

16:32:09   15   Part of the benefit of having that salary is you knew

16:32:12   16   you were going to get the same paycheck every week;

16:32:15   17   correct?

16:32:15   18       A.   Correct.

16:32:15   19       Q.   You knew you were going to get $700 every week,

16:32:20   20   whereas somebody like Debra Anderson, her paycheck is

16:32:23   21   going to fluctuate, depending on how many hours she's

16:32:28   22   scheduled to work that week; correct?

16:32:30   23       A.   Correct.

16:32:30   24       Q.   And in addition, you knew that Family Dollar is

16:32:32   25   going to keep you full-time at $700 per week; correct?

16:32:37  1     A.   Full-time?

16:32:39  2     Q.   Yes, sir.  You know -- in other words, they're

16:32:41  3   not going to say, "one week you will just work half the

16:32:45  4   hours and you will get half the pay."  You knew that

16:32:48  5   every week you could count on that paycheck of $700;

16:32:50  6   correct?

16:32:51  7     A.   Correct.

16:32:51  8     Q.   And you also know that the way that the schedule

16:32:54  9   works is that if you're just a clerk, your average hours

16:32:58  10  may be anywhere from 20 to 30 hours a week; correct?

16:33:01  11    A.   Correct.

16:33:02  12    Q.   So if you are making 5.50 an hour, and you're

16:33:05  13  working 20 hours a week, your annual salary is $10,000;

16:33:10  14  correct?

16:33:11  15    A.   Correct.

16:33:11  16    Q.   And you're making 36,000?

16:33:15  17    A.   Correct.

16:33:16  18    Q.   Now, let's talk about how often Mr. Cannon would

16:33:22  19  come to your store.  How often did he come?

16:33:25  20    A.   Sometimes once a week, sometimes two times, three

16:33:31  21  times.

16:33:32  22    Q.   How infrequently would he come?  Would he come

16:33:35  23  less than once a week?  Would he come once every two

16:33:39  24  weeks?

16:33:40  25         MR. G. WIGGINS:  Your Honor --

16:33:41   1              THE COURT:  Your objection is sustained.

16:33:43   2    Q.  Would he come every two weeks?

16:33:45   3              MR. G. WIGGINS:  Same objection.

16:33:46   4              THE COURT:  Your objection is sustained.

16:33:48   5    Asked and answered.

16:33:49   6    Q.  What is the greatest amount of time in between

16:33:52   7    visits that Mr. Cannon came to your store?

16:33:54   8    A.  Could you repeat the question one more time?

16:33:57   9    Q.  Sure.  How long was, it or what was the greatest

16:34:01  10    span of time between visits that Mr. Cannon came to your

16:34:05  11    store?

16:34:06  12    A.  What is the greatest amount of time that he did

16:34:08  13    not show up?

16:34:09  14    Q.  Yes.

16:34:11  15    A.  Maybe once every two weeks, or once every -- I

16:34:16  16    would say about once every two to three weeks.

16:34:18  17    Q.  The sales at 865 were approximately, while you

16:34:22  18    were there, were approximately 1.6 million per year;

16:34:25  19    correct?

16:34:25  20    A.  Approximately, yes.

16:34:25  21    Q.  That's the sales.

16:34:25  22    A.  Yes, sir.

16:34:27  23    Q.  And your average inventory was around $250,000;

16:34:30  24    correct?

16:34:30  25    A.  That seems a little high, but correct.

16:34:34  1    Q.   Do you remember giving your deposition in the

16:34:45  2    case --

16:34:46  3              THE COURT:   I thought the witness just said

16:34:48  4    "it seems a little high, but correct".

16:34:51  5              MR. KENT:   Okay.

16:34:55  6    Q.   Let's turn now to your duties.  You would agree

16:34:59  7    with me that hiring is an important duty to Family

16:35:04  8    Dollar?

16:35:04  9    A.   Yes, I do.  I agree.

16:35:06  10   Q.   And you would agree with me that you were

16:35:11  11   responsible for interviewing applicants at the store?

16:35:16  12   A.   That I was responsible for interviewing?

16:35:18  13   Q.   Yes, sir.

16:35:19  14   A.   I would agree, yes.

16:35:20  15   Q.   And I -- and just so that we're clear, I am

16:35:23  16   specifically talking about the time period when Malcom

16:35:27  17   Cannon was your district manager.

16:35:28  18   A.   Okay.

16:35:29  19   Q.   Do you agree that you were responsible for

16:35:33  20   interviewing; correct.

16:35:33  21   A.   Yes.  Me and my management staff would be, yes.

16:35:35  22   Q.   And you were responsible for making the hiring

16:35:37  23   decisions; correct?

16:35:38  24   A.   Responsible?

16:35:40  25   Q.   Yes, sir.

16:35:41   1    A.   I couldn't say I was responsible.  If my district

16:35:45   2  manager told me to hire somebody, I would hire them.

16:35:48   3    Q.   You hired Barbara Cierra, didn't you?

16:35:51   4    A.   Barbara who?

16:35:53   5    Q.   Cierra.

16:35:56   6    A.   We have been through so many employees, I really

16:35:59   7  couldn't tell you.  The name sounds familiar, but I just

16:36:03   8  don't remember.

16:36:03   9    Q.   Do you remember hiring Latiesha Felder?

16:36:07  10    A.   Oh, yes, I remember Latiesha.

16:36:09  11    Q.   And you hired her; correct?

16:36:10  12    A.   My district manager approved that, yes.

16:36:12  13    Q.   Did he approve that before or after you hired

16:36:15  14  her?

16:36:15  15    A.   Well, let's see.  If I am not mistaken, first I

16:36:20  16  had to get approval from Loss Prevention; and of course,

16:36:24  17  she had to pass the company's Stanton test.  And, of

16:36:30  18  course, my district manager had to look at the

16:36:32  19  background, so he was aware.  I don't know if he gave me

16:36:35  20  the approval, yes, I hired her.

16:36:37  21          THE COURT:  Are you saying that you hired

16:36:41  22  these people after you got the approval of the district

16:36:45  23  manager?

16:36:46  24          THE WITNESS:  Yeah.  There's a certain test

16:36:47  25  that you have to give.  And after everything has come

16:36:52  1    back okay, then and only then am I actually authorized

16:36:56  2    to hire.

16:36:56  3        Q.   And I think the point here that needs

16:36:58  4    clarification is:  Are you seeking the district

16:37:01  5    manager's personal input, or are there certain

16:37:05  6    background checks that have to be done that he is simply

16:37:07  7    telling you the results of?

16:37:09  8        A.   I have to get the approval of -- if I did

16:37:14  9    something on my own -- if you are asking if I just hired

16:37:18  10   them on my own --

16:37:19  11       Q.   Yes, sir.

16:37:19  12       A.   -- I couldn't do that.  I would have to have

16:37:21  13   input.  I had your authority to hire them on my own.  I

16:37:25  14   can -- possibly get terminated if I didn't do certain

16:37:29  15   tests or something.

16:37:30  16       Q.   Okay.  Do you remember having your deposition

16:37:40  17   taken in the case?  I am going to page 101.

16:37:48  18            THE COURT:  Well, let's see where we're

16:37:52  19   going here.

16:37:54  20            Is there some -- at one place or point in

16:37:58  21   the deposition where he says he hired a particular

16:38:01  22   person, and then another point in the deposition where

16:38:04  23   he says he had to have the district manager's approval

16:38:12  24   to hire?

16:38:17  25            MR. KENT:  Yes, Your Honor.

16:38:19   1          THE COURT:  And that's -- yeah.  That's

16:38:20   2   pretty much what he said here, so go on to your next

16:38:24   3   question.

16:38:25   4          MR. KENT:  Yes, Your Honor.

16:38:26   5      Q.  As long as the district -- as long as the

16:38:29   6   background check came back okay, that was the only thing

16:38:33   7   you were waiting for from your district manager;

16:38:35   8   correct?

16:38:35   9      A.  No.  Also, there was a payroll issue, too, if --

16:38:38  10      Q.  Was there ever a time when Mr. Cannon said to

16:38:42  11   you, "you cannot hire this individual, because even

16:38:45  12   though he's passed all the background checks, I don't

16:38:48  13   like him"?

16:38:49  14      A.  I believe he has, yes.

16:38:51  15      Q.  Do you recall who that individual is?

16:38:53  16      A.  Well, one young man passed all his tests, and the

16:39:00  17   second time he came in -- and one young man passed all

16:39:04  18   his tests and he left the company.

16:39:05  19      Q.  I'm sorry, he what?

16:39:07  20      A.  One young man passed all his tests and he left

16:39:10  21   the company.  He came back and asked for his job back.

16:39:13  22   And he passed all his tests.  And I gave him his job

16:39:17  23   back.  And later on he left the company because he was

16:39:19  24   going to school.

16:39:20  25          The third time he came back, he passed all of his

16:39:24    1    tests, but I believe he left his glasses at home and he

16:39:27    2    messed up on one test.  And I wanted to hire him, but

16:39:30    3    Mr. Cannon said absolutely not, I could not.  He told me

16:39:34    4    no, basically.

16:39:35    5        Q.   Is Mr. Cannon saying that because he failed one

16:39:38    6    of his tests?

16:39:40    7        A.   I don't know.  He didn't really correspond to me.

16:39:43    8    All I know is he told me that there was no way I could

16:39:45    9    hire him, even though he was probably the best employee

16:39:50   10    I had ever seen work.  I mean, this guy could work.

16:39:52   11        Q.   Do you remember his name?

16:39:54   12        A.   Yes.  Cedric Brown.  Outstanding young man.

16:39:57   13        Q.   But you are stating that Mr. Brown did fail one

16:40:01   14    of the required tests when coming back a third time;

16:40:05   15    correct?

16:40:05   16        A.   Yeah.  I believe he did, yes, sir.

16:40:08   17        Q.   Okay.  What about Dewayne Ward?  Did you hire

16:40:11   18    Dewayne Ward?

16:40:14   19        A.   That name sounds familiar.  I believe he was -- I

16:40:17   20    may have him mixed up with somebody else, but I remember

16:40:19   21    the name, yes.

16:40:20   22        Q.   Okay.  How about Calvin Stewart?  Did you hire

16:40:24   23    Calvin Stewart?

16:40:25   24        A.   I believe my district manager sent him to me,

16:40:28   25    yes.

16:40:28   1   Q.   Is it fair to sum up your testimony by saying

16:40:32   2   that there is one person that you wanted to hire who had

16:40:37   3   passed all the tests except for one, Calvin Brown, and

16:40:41   4   otherwise, Mr. Cannon agreed with everybody you wanted

16:40:46   5   to hire?

16:40:47   6   A.   I wish that was the case, but no, I can't say

16:40:50   7   that.

16:40:50   8   Q.   Okay.  What can you say?

16:40:51   9   A.   I can say that I recommended some, and he, once

16:40:54   10   in a while, went with my recommendations and sometimes

16:40:57   11   he definitely did not go with my recommendations.

16:41:00   12   Q.   Finished?  I didn't mean to cut you off.

16:41:02   13   A.   He had control of it.

16:41:03   14   Q.   And these -- we're talking about during the time

16:41:07   15   you had an open position; correct?

16:41:10   16   A.   Correct.

16:41:13   17   Q.   Did he agree with your recommendations more often

16:41:14   18   than not?

16:41:16   19   A.   Well, I can say -- within the budget?  If I

16:41:24   20   wanted somebody extra, or I needed some help getting the

16:41:28   21   merchandise up, and I wanted to hire somebody, he would

16:41:30   22   not.  He would definitely say no.  So I would say more

16:41:34   23   times than not.  In that instance, yes.

16:41:36   24   Q.   Let's exclude situations where it would go beyond

16:41:39   25   the allowable budget.  Let's stick within the confines

16:41:43   1   of saying that there's payroll budget to be able to hire

16:41:46   2   somebody, okay?

16:41:47   3       So in other situations where we would have an

16:41:50   4   opening where there's payroll dollars to pay for that

16:41:52   5   opening, did Mr. Cannon agree with your recommendations

16:41:55   6   more often than not?

16:41:57   7       A.   I would say it's about 50/50.

16:42:02   8       Q.   Now, in terms of being the store manager, you're

16:42:12   9   also responsible for discipline and firing of employees;

16:42:16   10  correct?

16:42:16   11      A.   Am I held responsible for it?

16:42:20   12      Q.   Yes, sir.

16:42:20   13      A.   I have disciplined; but as far as terminations or

16:42:29   14  anything like that, no, I don't have that kind of

16:42:32   15  written authority.

16:42:32   16      Q.   You've never terminated anybody for theft?

16:42:34   17      A.   Oh, one time in particular, I remember there was

16:42:38   18  a -- my assistant manager that was assigned to me was

16:42:43   19  stealing, stealing employees' paychecks, stealing cash,

16:42:50   20  stealing merchandise, and I caught the person stealing.

16:42:55   21  And I wanted to terminate this person immediately

16:42:57   22  because, you know, that's a big no-no with the company.

16:43:00   23      I brought it to my district manager's attention.

16:43:03   24  And he told me specifically that I could not fire this

16:43:06   25  employee, that I had to wait there three weeks for Loss

16:43:11  1    Prevention.  And he told me just to watch her.

16:43:14  2         So that meant I had to be there from opening to

16:43:17  3    closing, and then some -- almost every day while that

16:43:20  4    employee was working, to make sure the store was secure.

16:43:23  5         I didn't understand why I couldn't --

16:43:25  6              THE COURT:  When was this?

16:43:27  7              THE WITNESS:  This was in 2002, I believe,

16:43:31  8    Your Honor.

16:43:32  9    Q.   While Mr. Cannon was your district manager?

16:43:34  10   A.   Yes.

16:43:35  11   Q.   And what was the employee's name?

16:43:38  12   A.   Well, there has been a couple of them.  I think

16:43:42  13   it was Cleary, I believe.  I think her last name was

16:43:47  14   Cleary.

16:43:48  15   Q.   Cleary.

16:43:51  16              MR. KENT:  Your Honor, how much time do I

16:43:53  17   have left?

16:43:53  18              THE COURT:  You have about 25 minutes.

16:43:56  19              MR. KENT:  25?

16:43:59  20              THE COURT:  Yes.

16:44:01  21   Q.   (By Mr. Kent)  How about Snequa Heard?  Did you

16:44:06  22   terminate her?

16:44:08  23   A.   I remember that name, yes.

16:44:09  24   Q.   Did you terminate her without any involvement

16:44:13  25   from Mr. Cannon?

16:44:14　1　　A.　No, I had to contact him.  I talked to him over

16:44:17　2　the phone.

16:44:17　3　　Q.　Did you contact him before or after you

16:44:21　4　terminated her?

16:44:23　5　　A.　I believe before.  I think I --

16:44:28　6　　Q.　Could have been after?

16:44:30　7　　A.　No, I -- I wouldn't be that bold.  But then

16:44:34　8　again, there's a possibility, but I just don't think I

16:44:37　9　did.

16:44:37　10　　Q.　And would that have been --

16:44:39　11　　　　　THE COURT:  Well, let me ask this:  Is there

16:44:46　12　a written company policy on this issue, as to whether a

16:44:52　13　store employee, a store manager can discharge an

16:44:58　14　employee without the approval of the district manager?

16:45:03　15　Is there a written company policy on it?

16:45:07　16　　　　　MR. G. WIGGINS:  Yes, sir, there is.

16:45:08　17　　　　　THE COURT:  Where is the company policy?

16:45:35　18　　　　　Let me put it to the company:  Is there a

16:45:38　19　written company policy on this issue?

16:45:43　20　　　　　MR. KENT:  Your Honor, there's no policy

16:45:45　21　that prohibits a store manager from either hiring an

16:45:51　22　hourly employee or terminating the hourly employee.

16:45:55　23　　　　　THE COURT:  You didn't answer my question.

16:45:57　24　　　　　MR. KENT:  Okay.  I'm sorry.

16:45:58　25　　　　　THE COURT:  So I take it the answer to the

16:46:01  1   question that I put to you is no, there is no -- I take

16:46:06  2   it the answer is, yes, there is a written policy that

16:46:10  3   says that an employee, a store manager, may not

16:46:15  4   discharge an employee without the approval of the

16:46:18  5   district manager.

16:46:19  6            MR. KENT:  I think, if I am following your

16:46:21  7   question, let me make sure --

16:46:22  8            THE COURT:  And if that is so, then I am

16:46:25  9   going to -- I am not going to allow this line of

16:46:28  10  testimony, unless you are prepared to show that this

16:46:33  11  witness has been, or any other witness, has been

16:46:37  12  violating company policy.

16:46:43  13            MR. CALAMUSA:  Right there, Your Honor.

16:46:46  14            MR. KENT:  Your Honor --

16:46:47  15            THE COURT:  Is this document in evidence?

16:46:51  16            MR. G. WIGGINS:  It can be made, Your Honor.

16:46:52  17            THE COURT:  What's the number of the

16:46:54  18  document?

16:46:55  19            MR. G. WIGGINS:  Exhibit 25, Bates stamped

16:46:57  20  D-14467.

16:47:00  21            THE COURT:  Any objection to Plaintiffs'

16:47:02  22  Exhibit 25?

16:47:04  23            MR. UMBACH:  No, Your Honor.

16:47:06  24            MR. KENT:  No, Your Honor.

16:47:07  25            THE COURT:  That's Family Dollar's policy;

16:47:13  1   is that correct, Mr. Kent?

16:47:14  2              MR. KENT:  Policy at the time.  I don't know

16:47:16  3   when that policy would have applied.

16:47:18  4              THE COURT:  Mr. Reevers, as far as you know,

16:47:21  5   was this the policy -- the one that's on this board

16:47:24  6   here -- was this the policy at the time you are

16:47:26  7   testifying about?

16:47:27  8              THE WITNESS:  Yes, Your Honor, that is the

16:47:28  9   policy.

16:47:29  10             MR. KENT:  Your Honor, of course, for the

16:47:31  11  record, I have to object, because under the law, what

16:47:36  12  we're seeking here is not what Family Dollar's policy is

16:47:39  13  or was at any time, it's what each plaintiff did, in

16:47:46  14  terms of their management duties.

16:47:49  15             If, in fact, Mr. Reevers was terminating

16:47:54  16  employees on his own, and Mr. Cannon knew it, then

16:47:56  17  that's his management duty.

16:47:57  18             THE COURT:  All right.  Under Rule 403 of

16:48:01  19  the Federal Rules of Evidence, a Judge may exclude

16:48:16  20  evidence if the probative value is substantially

16:48:21  21  outweighed by the danger of confusion of the issues,

16:48:24  22  misleading the jury, and that kind of thing.

16:48:27  23             Now, the issue is whether the district

16:48:33  24  manager has the authority, under Family Dollar policy,

16:48:40  25  to discharge an employee -- I'm sorry, whether the store

16:48:44  1   manager has the authority to discharge an employee

16:48:47  2   without contacting the district manager.

16:48:55  3              Under the written policy, if the store

16:48:59  4   manager discharges an employee without contacting the

16:49:07  5   district manager, he violates the policy.  And so this

16:49:11  6   line of inquiry definitely has the potential for

16:49:17  7   confusing the jury -- misleading the jury and confusing

16:49:22  8   the issues.

16:49:22  9              And I have noted your objection, I have

16:49:25  10  overruled it.  Go on to your next line of questioning.

16:49:27  11             MR. KENT:  And just so I am clear, Your

16:49:29  12  Honor, you will still allow questioning on -- number

16:49:32  13  one, the only limit here is on discharge, not on hiring

16:49:35  14  or anything else, we are talking about discharge.

16:49:38  15             THE COURT:  If there is a similar policy for

16:49:40  16  hiring, the same rule applies.

16:49:42  17             MR. KENT:  In terms of that rule --

16:49:43  18             THE COURT:  When the jury goes home this

16:49:45  19  afternoon, you can make your offer of proof for the

16:49:48  20  record.

16:49:49  21             MR. WHITE:  Thank you.

16:49:50  22             MR. KENT:  And for the record, we are still

16:49:52  23  allowed to inquire in terms of whether his

16:49:54  24  recommendations, consistent with the policy, were given

16:49:58  25  weight.

16:49:58  1        THE COURT:  You asked that question, and I

16:50:01  2  am now directing you to go on to another line of

16:50:04  3  questioning.

16:50:08  4        MR. KENT:  Okay.  Can we have that taken

16:50:11  5  down?

16:50:11  6        THE COURT:  Yes.

16:50:18  7  Q.  (By Mr. Kent)  Mr. Reevers, is it true that, as a

16:50:22  8  store manager, you are in charge of the store?

16:50:28  9  A.  In charge of the store?

16:50:29 10  Q.  Yes, sir.

16:50:30 11  A.  I am held responsible or accountable for the

16:50:34 12  store, but I wouldn't say I was in charge of the store.

16:50:36 13  Q.  And here I would like to refer to your

16:50:39 14  deposition.

16:50:39 15        MR. KENT:  Is that okay, Your Honor?

16:50:41 16        THE COURT:  Yes, sir.

16:50:42 17  Q.  And I am going to refer you to page 59 of your

16:50:49 18  deposition at lines 7 through 17.  I will give you --

16:50:58 19  well, can you read that?

16:50:59 20  A.  That's pretty big.  I can read that.

16:51:01 21  Q.  Okay.  Well, let me know.

16:51:09 22        The question is:  "Can you modify that

16:51:12 23  schedule" -- we are clearly talking about the --

16:51:16 24        MR. G. WIGGINS:  Your Honor --

16:51:16 25        THE COURT:  Your objection is sustained.

16:51:18   1     Q.   Okay.  Let me continue.  Can you modify --

16:51:21   2              THE COURT:  No.  You won't continue the

16:51:23   3     question.  I sustained the objection.

16:51:25   4     Q.   Well, Mr. Reevers, do you remember saying --

16:51:28   5              THE COURT:  Did you understand what I --

16:51:30   6              MR. KENT:  I'm sorry, Your Honor.  I don't

16:51:32   7     know what the objection is based on.

16:51:34   8              MR. G. WIGGINS:  Your Honor, we would also

16:51:35   9     like to stop the screen.

16:51:36   10              THE COURT:  Turn off that.

16:51:38   11              You are attempting to impeach this

16:51:41   12     witness --

16:51:42   13              MR. KENT:  Yes, Your Honor.

16:51:43   14              THE COURT:  -- by showing that in the

16:51:44   15     deposition he testified that he was in charge of the

16:51:47   16     store.

16:51:47   17              MR. KENT:  Yes, Your Honor.

16:51:48   18              THE COURT:  If you will flick on the light

16:51:50   19     that shows in his deposition he testified that he was in

16:51:55   20     charge of the store, yes, you may do that.  But you may

16:51:59   21     not put something up on the screen where he says

16:52:03   22     something else and then said, yes, that that's an

16:52:07   23     impeachment.

16:52:09   24              MR. KENT:  Well, I believe, if we pull it up

16:52:12   25     and go to line 16 and highlight that line --

16:52:18  1          MR. G. WIGGINS:  Your Honor, before he pulls

16:52:19  2   it up, I would ask them to show you a copy of the

16:52:22  3   deposition, because it's misleading.

16:52:24  4          THE COURT:  Let me see it.  The question is:

16:52:49  5   "So you may have to modify to account for the

16:52:51  6   unexpected?"  And the answer is:  "Yeah, we're in

16:52:54  7   charge."

16:52:54  8          Objection sustained.

16:52:56  9          MR. G. WIGGINS:  Thank you, Your Honor.

16:53:00  10   Q.  (By Mr. Kent)  Mr. Reevers, you did say that you

16:53:03  11   are held accountable for what goes on in the store;

16:53:06  12   correct?

16:53:06  13   A.  When they need someone to blame, or something

16:53:09  14   like that, I would be the one they would talk to.

16:53:13  15   Q.  In fact, you are responsible for everything in

16:53:17  16   the store, aren't you?

16:53:18  17   A.  Res- -- I would say I'm held accountable for a

16:53:25  18   majority of things.  If I am responsible --

16:53:28  19   Q.  Yes.

16:53:30  20   A.  -- I don't know if I would agree with that.

16:53:31  21   Q.  Okay.

16:53:37  22          MR. KENT:  Your Honor, I will let you see

16:53:39  23   this first before I -- I am looking at page 124, lines 5

16:53:45  24   and 6.  Can I show the witness, or would you like to see

16:53:53  25   it?

16:53:54  1          THE COURT:  Yes, sir.

16:54:06  2          MR. KENT:  May I publish that to the jury?

16:54:09  3          THE COURT:  You may ask the question.

16:54:11  4     Q.  (By Mr. Kent)  Do you remember being asked in

16:54:16  5  your deposition:  "Can you delegate that duty?  your

16:54:21  6  assistant manager can do it, however it can get done,

16:54:24  7  but you are responsible for it?"

16:54:26  8          And your answer was:  "I am held responsible for

16:54:30  9  everything in the store, yes."

16:54:33 10     A.  Are you asking me if I remember me saying that?

16:54:35 11     Q.  Yes.

16:54:36 12     A.  And if it's in my deposition, I am pretty sure I

16:54:40 13  said it.

16:54:40 14     Q.  I want to turn now to the essential job functions

16:54:54 15  that you testified about earlier for the store manager.

16:54:56 16  Do you remember that testimony?

16:54:57 17     A.  Yes, I do.

16:55:00 18     Q.  And it's correct, isn't it, that there are 11

16:55:04 19  categories in this document -- do you have a copy up

16:55:08 20  there that you can look at?  Mr. Wiggins says you have a

16:55:20 21  copy.

16:55:21 22     A.  I believe I do.

16:55:22 23     Q.  Okay.

16:55:23 24     A.  Yes.  The essential job functions of a store

16:55:27 25  manager.

16:55:27   1   Q.   Yes, sir.  If you will flip through that, you

16:55:30   2   will notice that there are 11 categories; correct?  on

16:55:35   3   the first two pages?

16:55:37   4   A.   Correct.

16:55:37   5   Q.   And the first nine of them are all management

16:55:41   6   functions; correct?

16:55:43   7            MR. G. WIGGINS:  Your Honor, we would object

16:55:45   8   to the characterization of them being management

16:55:47   9   functions.  Read, plan and stock schematics, I don't

16:55:52  10   believe would be characterized as a manager's functions.

16:55:54  11            THE COURT:  Your objection is sustained.

16:55:56  12   Q.   Let's go over them.  Number one is -- the first

16:56:00  13   thing that's listed on the essential job functions is to

16:56:04  14   supervise all store personnel; correct?

16:56:08  15   A.   Correct.  That's what we do.

16:56:10  16   Q.   Okay.  That's the number one job of the essential

16:56:13  17   job function; correct?

16:56:15  18            MR. G. WIGGINS:  Your Honor, we object to

16:56:16  19   mischaracterization.  Listed as number one --

16:56:20  20            THE COURT:  Overruled.

16:56:21  21   Q.   Second, is to complete the required paperwork for

16:56:25  22   the store; correct?

16:56:26  23   A.   Correct.

16:56:29  24   Q.   Third is to count the money and prepare the bank

16:56:35  25   deposits; correct?

16:56:36  1     A.   Correct.

16:56:36  2     Q.   And that is a critical task for store manager, to

16:56:40  3  protect the company assets; isn't it?

16:56:43  4     A.   Yes.   For the store manager, assistant manager,

16:56:45  5  floor supervisor, yes, it is our responsibility.

16:56:48  6     Q.   Next, it's to count the petty cash; again talking

16:56:54  7  about protecting the company assets; correct?

16:56:56  8     A.   Correct.

16:56:58  9     Q.   Next is to post the net sales; in other words, to

16:57:03  10  look at the profitability of the sales of the store;

16:57:05  11  correct?

16:57:06  12     A.   You are talking about number 5?

16:57:12  13     Q.   Yes, sir.

16:57:13  14     A.   Okay.   The net sales has nothing to do with the

16:57:16  15  profit.

16:57:16  16     Q.   I meant sales.   I apologize.   To see how well the

16:57:19  17  store's doing?

16:57:19  18     A.   Well, that says "sales", what we did in sales for

16:57:24  19  that day.

16:57:24  20     Q.   And that gives you an idea of how the store's

16:57:26  21  doing; correct?

16:57:27  22     A.   It tells us what we did for that day.

16:57:29  23     Q.   The next number, number 6, is to train the

16:57:33  24  employees; correct?

16:57:35  25     A.   Correct.

16:57:36  1    Q.   And that's critical, isn't it?

16:57:39  2    A.   Yes, it is.

16:57:41  3    Q.   And it's critical because the better you train

16:57:46  4    them, the easier your job is; correct?

16:57:49  5    A.   Correct.

16:57:51  6    Q.   If they're really well trained and you get a big

16:57:55  7    truck in one day, you could knock it out without having

16:57:57  8    to spend a lot of time on it; correct?

16:58:01  9    A.   Well, I wouldn't say that on that one.

16:58:04  10        You get a big truck in, it's still going to take

16:58:07  11   you a lot of time to put it out, whether -- you could be

16:58:10  12   the world's greatest trained employee, it's still going

16:58:14  13   to take days.  You're going to be unloading trucks -- I

16:58:17  14   mean, I don't know if you know what a Family Dollar

16:58:19  15   truck looks like, but it's huge.

16:58:22  16        And there was this -- I don't care how well

16:58:24  17   trained you are, unless you can move and do this manual

16:58:27  18   labor, that's the only way you are going to get this

16:58:30  19   much merchandise out.

16:58:31  20   Q.   My question is:  The better trained the employees

16:58:33  21   are, the more you can motivate them, the faster the

16:58:36  22   job's going to go; correct?

16:58:38  23   A.   Of unloading a truck?

16:58:39  24   Q.   Yes.  Well, really, any function at the store.

16:58:42  25   A.   Some functions, yes, some functions, no.

16:58:45  1    Q.   Number 7 is to monitor the stock, the inventory
16:58:50  2    of the store; correct?
16:58:51  3    A.   Monitor the stock?
16:58:54  4    Q.   It says "count stock".
16:58:57  5    A.   Well, I don't know about -- yes.  You count the
16:59:02  6    stock, calculate the amount to order.
16:59:05  7         They tell us what to order, you know.  So -- I
16:59:09  8    will say yes on that.
16:59:10  9    Q.   All right.  Well, let's briefly talk about that.
16:59:13  10   Family Dollar does not send to you goods that you have
16:59:21  11   not requested in total; correct?  They may get a good
16:59:25  12   deal on something and send them down to the store to
16:59:28  13   sell, but they are also asking you to weekly order
16:59:33  14   goods; correct?
16:59:34  15   A.   Yes.  They are wanting us to order goods, yes.
16:59:37  16   Q.   And they want you to look at what's selling well
16:59:41  17   and what's not selling well and request more of the
16:59:45  18   good-selling items and request less of the
16:59:49  19   not-good-selling items; correct?
16:59:50  20   A.   Well, we would like to order the good-selling
16:59:56  21   items, yes, it doesn't always happen that way.
17:00:00  22   Q.   My question was:  They want you to order, they
17:00:03  23   want you to request more, they want you to tell them,
17:00:05  24   "hey, the Tide is selling well, give us more Tide";
17:00:09  25   correct?

17:00:10   1    A.   Well, it's not brain -- it's not brain surgery.
17:00:15   2    They know what's selling.  They would send it
17:00:17   3    automatically to you.
17:00:19   4    Q.   I am not saying it's brain surgery, Mr. Reevers.
17:00:22   5    A.   I'm sorry.
17:00:23   6    Q.   But what I am saying is, they're counting on you
17:00:25   7    to monitor what's selling well and what's not, so that
17:00:28   8    they can have the inventory there to meet the demand?
17:00:33   9    A.   Yes.
17:00:38   10   Q.   Number -- I believe we're down to number 8, which
17:00:41   11   is read, plan and stock schematics.
17:00:45   12        And, again, this -- part of what this is talking
17:00:49   13   about is saying to you, Mr. Reevers, store manager, we
17:00:53   14   want the store to look a certain way and we're counting
17:00:56   15   on you to make sure it's done; correct?
17:00:59   16            MR. G. WIGGINS:  Your Honor --
17:01:00   17            THE COURT:  Objection is sustained.
17:01:02   18   Q.   You're responsible for making sure that the store
17:01:06   19   layout is the way that Family Dollar would like it,
17:01:08   20   aren't you?
17:01:09   21   A.   Yes.  They tell us what they want up and we put
17:01:12   22   it up exactly the way they want it, yes.
17:01:14   23   Q.   Right.  Right.  So that all the stores can look
17:01:16   24   the same?
17:01:17   25            MR. G. WIGGINS:  Your Honor --

17:01:18  1              THE COURT:  Your objection is sustained.

17:01:20  2      Q.  When you go -- when you're at Family Dollar,

17:01:23  3  they're not saying, "hey, do it any way you want it",

17:01:27  4  they want it a specific way; correct?

17:01:28  5      A.  Yeah, regardless of whatever I feel is -- would

17:01:32  6  be better, yes, they want it their way.

17:01:33  7      Q.  I understand.  And your job is to make sure that

17:01:37  8  the store is complying with that policy; correct?

17:01:41  9      A.  Correct.

17:01:43  10     Q.  Okay.  Go on to number 9.  Practice cash control

17:01:50  11 policies.  And this, again, gets to -- bigger sense,

17:01:59  12 protecting the company assets?

17:02:02  13             MR. G. WIGGINS:  Your Honor --

17:02:03  14             THE COURT:  Your objection is sustained.

17:02:04  15     Q.  When it says "practice cash control policies";

17:02:10  16 including check approvals, part of what that's talking

17:02:15  17 about is the purchase --

17:02:16  18             MR. G. WIGGINS:  Objection.

17:02:17  19             THE COURT:  Your objection is sustained.

17:02:19  20             MR. G. WIGGINS:  You're testifying.

17:02:21  21             MR. KENT:  I'm allowed to lead, aren't I?

17:02:25  22             THE COURT:  This is not this witness'

17:02:26  23 document, as I understand it.  This is Family Dollar's

17:02:30  24 document?

17:02:30  25             MR. KENT:  Yes, Your Honor.

17:02:32  1                 THE COURT:  All right.  I sustain the

17:02:33  2  objection.

17:02:34  3                 MR. KENT:  Okay.

17:02:35  4    Q.  (By Mr. Kent)  Do you, at your store, or did you

17:02:38  5  when you were with Family Dollar, have certain cash

17:02:42  6  control policies, policies that would apply to a cashier

17:02:45  7  when they're checking somebody out?

17:02:47  8    A.  Yes.  They sent us policies, yes.

17:02:49  9    Q.  Okay.  And part of the reason they would do that

17:02:52  10  is so that cashiers --

17:02:54  11                THE COURT:  Your objection is sustained, as

17:02:57  12  to why Family Dollar did what it did.

17:03:02  13                MR. KENT:  I understand.

17:03:03  14    Q.  Is a good reason for that --

17:03:04  15                THE COURT:  The objection is sustained.

17:03:08  16    Q.  Could you have a problem with a cashier sliding

17:03:12  17  merchandise?

17:03:13  18    A.  Could I have a problem?

17:03:14  19    Q.  Yeah, as a Family Dollar store manager.

17:03:17  20    A.  Could I have a problem?  Are you asking, "could

17:03:20  21  an employee slide merchandise"?  Yes, an employee could

17:03:23  22  slide merchandise.

17:03:23  23    Q.  It's a potential problem?

17:03:25  24    A.  Yes, sir.  It would be a potential problem if an

17:03:29  25  employee slid merchandise.

17:03:41  1      Q.   Do you know who the current store manager is at

17:03:45  2  865?

17:03:46  3      A.   I'm sorry, but I don't, sir.

17:03:48  4      Q.   Shawn Lassiter?

17:03:51  5      A.   Oh, yes.  I know Shawn, yes.

17:03:53  6      Q.   Do you know what has happened to sales at the

17:03:56  7  store since you have left 865?

17:03:58  8      A.   Well, considering the community's basically going

17:04:02  9  down, there's only one store left in the neighborhood

17:04:05  10  which would be the Family Dollar.  It better be going

17:04:08  11  up.

17:04:08  12      Q.   So it wouldn't surprise you if sales were up 48

17:04:11  13  percent?

17:04:12  14      A.   I am surprised it's not a little higher than

17:04:16  15  that --

17:04:16  16      Q.   And Mr. Lassiter's reporting more than 50 or 60

17:04:20  17  hours?

17:04:20  18            THE COURT:  The objection is sustained.

17:04:22  19            MR. G. WIGGINS:  Your Honor, I don't

17:04:23  20  understand the relevance.

17:04:24  21            THE COURT:  And the objection is sustained.

17:04:26  22      Q.   (By Mr. Kent)  I would like to talk about your

17:04:29  23  performance review that Mr. Wiggins asked you about.

17:04:32  24      A.   Sure.

17:04:33  25      Q.   There are four sections on the review, that

17:04:38    1    Family Dollar's reviewing you; correct?

17:04:39    2        A.   Correct.

17:04:40    3        Q.   I believe it's number 11, if you have one there

17:04:43    4    in front of you.

17:04:46    5            Now --

17:04:51    6                MR. G. WIGGINS:  May we have a side bar?

17:04:53    7                THE COURT:  No, because after he answers

17:04:56    8    this question, his time is up.

17:05:01    9                MR. KENT:  Am I out of time?

17:05:03   10                THE COURT:  Yes, sir.

17:05:07   11        Q.   (By Mr. Kent)  Are any of the sections of

17:05:09   12    Plaintiffs' Exhibit Number 11 evaluating you on how you

17:05:15   13    do as a stock clerk, as a cashier, or any other manual

17:05:20   14    duty?

17:05:21   15        A.   Well, I would say yeah.

17:05:24   16        Q.   Okay.  And where would you say --

17:05:26   17        A.   Well, sales.  There's only one way to get sales

17:05:30   18    is to put the merchandise up on the counter.  If you

17:05:32   19    don't have it up on that counter, you are not going to

17:05:35   20    get those sales.  That directly reflects those to stock.

17:05:39   21        Q.   Okay.  Anything else?

17:05:41   22        A.   And that's only one category.

17:05:44   23                THE COURT:  Thank you, sir.  Redirect?

17:05:47   24                MR. G. WIGGINS:  Yes, sir, Your Honor.

17:05:48   25                THE COURT:  While he is coming, Mr. Reevers,

| | | |
|---|---|---|
| 17:05:50 | 1 | what is your educational background? |
| 17:05:52 | 2 | THE WITNESS:  I went to, total, three years |
| 17:05:54 | 3 | college. |
| 17:05:56 | 4 | THE COURT:  Three years of college? |
| 17:05:57 | 5 | THE WITNESS:  Yes, sir. |
| 17:05:58 | 6 | THE COURT:  All right. |
| 17:06:00 | 7 | MR. G. WIGGINS:  Your Honor, did I |
| 17:06:06 | 8 | understand we had ten minutes? |
| 17:06:07 | 9 | THE COURT:  Yes. |
| 17:06:07 | 10 | **REDIRECT EXAMINATION** |
| 17:06:08 | 11 | **BY MR. G. WIGGINS:** |
| 17:06:08 | 12 | Q.  Mr. Reevers, your prior experience at Kmart that |
| 17:06:12 | 13 | Mr. Kent was talking about, you could hire at Kmart? |
| 17:06:16 | 14 | A.  Yes, sir. |
| 17:06:17 | 15 | Q.  Could you fire -- |
| 17:06:19 | 16 | MR. KENT:  Objection, Your Honor.  That's |
| 17:06:23 | 17 | leading. |
| 17:06:23 | 18 | THE COURT:  Sustained. |
| 17:06:23 | 19 | Q.  Could you fire? |
| 17:06:25 | 20 | A.  Yes, I had the authority to fire. |
| 17:06:25 | 21 | Q.  Could you hire? |
| 17:06:26 | 22 | A.  Yes, I had the authority, and I could also |
| 17:06:29 | 23 | delegate that authority, yes. |
| 17:06:30 | 24 | Q.  Could you set pay? |
| 17:06:31 | 25 | A.  Yes, sir, I could set the pay. |

17:06:33  1          MR. KENT:  Your Honor, I object on relevancy

17:06:35  2   here.

17:06:35  3          THE COURT:  It is relevant, but it is

17:06:38  4   leading, Mr. Wiggins.

17:06:40  5          You may ask the witness to tell the jury

17:06:44  6   what authority he had at Kmart.

17:06:48  7          MR. G. WIGGINS:  I will move on, Your Honor.

17:06:50  8      Q.  (By Mr. G. Wiggins)  Mr. Reevers, you testified

17:06:53  9   you were entitled to a vacation?

17:06:54 10      A.  Yes, I was entitled to it.

17:06:57 11      Q.  Were you ever refused that vacation?

17:06:59 12      A.  Oh, yeah, many times.

17:07:01 13      Q.  Were you ever paid for that vacation after it was

17:07:04 14   refused?

17:07:04 15      A.  Paid?  Never paid.  We wouldn't receive a pay, we

17:07:09 16   just lost that time.  They wouldn't say, "take it next

17:07:12 17   year", you would just lose that time, that vacation

17:07:15 18   time.

17:07:15 19      Q.  Do you still have the store policy manual in

17:07:17 20   front of you, Mr. Reevers?

17:07:19 21      A.  Yes, I do.

17:07:20 22      Q.  Turn to 00325, if you will.

17:07:25 23          And Mr. Kent was asking you some questions about

17:07:27 24   petty cash.

17:07:39 25      A.  Okay.  I have got it.

17:07:40  1    Q.   You there?  Read the first sentence under the

17:07:43  2    store management accountablity section.

17:07:46  3    A.   "The store manager, assistant manager, and/or

17:07:50  4    floor supervisor are accountable for petty cash.  If two

17:07:54  5    or more members of management are present at the same

17:07:57  6    time, the ranking management person is accountable for

17:08:00  7    the petty cash."

17:08:01  8    Q.   So according to the store policy manual, you were

17:08:04  9    not responsible alone --

17:08:06  10            THE COURT:  The objection to leading is

17:08:08  11   sustained.

17:08:09  12            MR. KENT:  Objection.

17:08:10  13   Q.   Look at the exhibit, I believe it was the store

17:08:16  14   manager, essential job functions.

17:08:22  15   A.   Yes, I have it.

17:08:23  16   Q.   Number 10.  Now, Mr. Kent went through the first

17:08:27  17   nine with you; correct?

17:08:27  18   A.   Correct.

17:08:28  19   Q.   I want you to take a second and look at number 10

17:08:34  20   and number 11.  And I want you to count how many job

17:08:38  21   duties and responsibilities are under that section, the

17:08:43  22   non-managerial job sections.

17:08:45  23            MR. KENT:  Your Honor, I object.  This is

17:08:47  24   outside the scope of my questions.

17:08:49  25            THE COURT:  Doesn't matter.  Objection is

17:08:51  1    overruled.

17:08:52  2        A.   Okay.   I have counted them.

17:08:54  3        Q.   You counted through 10 and 11?

17:08:57  4        A.   10 and 11?

17:08:59  5        Q.   Yes.

17:09:01  6        A.   There's a lot.

17:09:04  7        Q.   I want you to tell me how many there are.

17:09:06  8        A.   20 -- or 21, I believe.

17:09:11  9        Q.   So there are far more on the essential job

17:09:13  10   functions document --

17:09:16  11              THE COURT:   Objection to leading is

17:09:18  12   sustained.

17:09:18  13       Q.   Are there more?

17:09:20  14       A.   Yes.   There are more non-managerial functions of

17:09:24  15   the store manager.

17:09:25  16       Q.   Mr. Reevers, Mr. Kent was asking you about your

17:09:34  17   bonus.

17:09:35  18       A.   Correct.

17:09:36  19       Q.   I want to talk to you for just a second.

17:09:38  20            Did you receive a bonus from 1999 to 2004?

17:09:42  21       A.   Yes, I did.

17:09:43  22       Q.   And do you recall what the total of those bonuses

17:09:47  23   were?

17:09:47  24       A.   I believe it's somewhere around $12,000, maybe.

17:09:54  25       Q.   $12,900?

| | | |
|---|---|---|
| 17:09:57 | 1 | A.   Correct. |
| 17:09:57 | 2 | Q.   That was for five years? |
| 17:09:58 | 3 | A.   Yes, that is for five years. |
| 17:10:00 | 4 | Q.   Mr. Reevers, you said it's $12,900? |
| 17:10:24 | 5 | A.   Yes. |
| 17:10:25 | 6 | Q.   If you would, that's for a five-year period? |
| 17:10:28 | 7 | A.   Yes, that is for a five-year period. |
| 17:10:31 | 8 | Q.   Would you divide 5 into 12,900, please? |
| 17:10:36 | 9 |      So for your average bonus per year was $2,580, |
| 17:10:42 | 10 | according to the calculation; right? |
| 17:10:44 | 11 | A.   Correct. |
| 17:10:45 | 12 | Q.   That's for 52 weeks a year; correct? |
| 17:10:47 | 13 | A.   52 weeks. |
| 17:10:49 | 14 | Q.   Would you divide 52 into 2,580?  $49.61 a week; |
| 17:10:58 | 15 | correct? |
| 17:10:58 | 16 | A.   Correct. |
| 17:10:58 | 17 | Q.   Would you divide -- you said you worked how many |
| 17:11:00 | 18 | hours? |
| 17:11:00 | 19 | A.   70 hours. |
| 17:11:01 | 20 | Q.   Would you divide 70 into that number? |
| 17:11:05 | 21 |      So your bonus that Mr. Kent was referring to, you |
| 17:11:10 | 22 | were making about 70 cents an hour? |
| 17:11:15 | 23 | A.   Wow.  Yeah.  That's what I was making, 70 cents |
| 17:11:20 | 24 | an hour. |
| 17:11:39 | 25 |            MR. G. WIGGINS:  No further questions at |

17:11:42  1   this time.

17:11:42  2              THE COURT:  Okay.  Ladies and gentlemen,

17:11:44  3   enough for the day.

17:11:46  4              Remember when you go home, tell the members

17:11:48  5   of your family and friends that you can't discuss the

17:11:51  6   case.  Don't discuss it.  Don't allow anyone to discuss

17:11:54  7   it in your presence.

17:11:56  8              And if anyone tries to contact you about the

17:11:58  9   case after you have made it known that you are a juror,

17:12:03  10  please bring that matter to my attention tomorrow

17:12:06  11  morning when you return here.

17:12:08  12             Yes, sir?

17:12:09  13             MR. WHITE:  Your Honor, it shows my age, but

17:12:11  14  are you going to expand that admonition to the Internet

17:12:15  15  as well?  You know, about not reading; like not surfing

17:12:19  16  the Internet?

17:12:20  17             THE COURT:  Yes.  Well, don't gather any

17:12:25  18  information about Family Dollar Stores from the

17:12:29  19  Internet, library, or from visiting the stores, anything

17:12:33  20  like that, all right?

17:12:34  21             And keep an open mind.  Have a good evening.

17:12:37  22  See you tomorrow morning at 9:00 o'clock.

17:12:39  23             Thank you.

17:12:40  24             (Jury out at 5:03 p.m.)

17:12:45  25             THE COURT:  If everyone will remain until

17:12:47  1    the jury has left.

17:13:07  2              (In open court, jury not present.)

17:13:07  3              THE COURT:  Were there some matters you

17:13:09  4    wanted to take up?

17:13:11  5              MR. KENT:  First question I have, Your

17:13:13  6    Honor, is, are we going -- I thought it was 45 minutes

17:13:18  7    direct and cross, and then 30 minutes, and 10 rebuttal.

17:13:19  8              Are we finished with the examination?

17:13:21  9              THE COURT:  Of this witness?

17:13:22  10             MR. KENT:  Yes, Your Honor.

17:13:24  11             THE COURT:  Yes, sir.

17:13:24  12             MR. KENT:  The question for the witnesses is

17:13:26  13   going to be direct, cross, and 10 minutes?

17:13:28  14             THE COURT:  Right.

17:13:29  15             MR. MAY:  Your Honor, if I might, I have got

17:13:31  16   the sheet of paper that you handed out.  That's not what

17:13:33  17   it says on there.

17:13:34  18             THE COURT:  Yeah.  Well, that's what I said

17:13:37  19   today, I believe.

17:13:39  20             MR. KENT:  That will hold for all witnesses?

17:13:42  21             THE COURT:  Yes, it holds for all witnesses.

17:13:43  22             MR. MAY:  What was handed out -- is

17:13:45  23   changed -- at the pretrial conference?

17:13:47  24             THE COURT:  Next question?

17:13:55  25             MR. CHILDS:  Your Honor, we have one.  I was

17:13:57  1    trying to see clarification on sequestration of experts.

17:14:04  2    You have always allowed them in.

17:14:06  3              Are the defendants going to take a position

17:14:08  4    we have taken with regard to our expert Mr. Belt, that

17:14:11  5    he hadn't adequately reviewed; and I would like him to

17:14:13  6    be able to sit in and listen to the witnesses testify?

17:14:15  7    And I was just trying to seek clarification to what you

17:14:18  8    said.

17:14:18  9              THE COURT:  Well, I am sustaining the

17:14:22  10   objection to the presence of expert witnesses before

17:14:27  11   they testify.

17:14:29  12             MR. CHILDS:  Thank you, sir.

17:14:30  13             THE COURT:  Anything else?

17:14:31  14             MR. WHITE:  No, sir.

17:14:32  15             THE COURT:  Have you got the list for

17:14:34  16   tomorrow?

17:14:36  17             MR. G. WIGGINS:  We will have it to them in

17:14:39  18   30 minutes.

17:14:39  19             THE COURT:  All right.  See you tomorrow

17:14:52  20   morning at 9:00 o'clock.

17:14:54  21

17:14:56  22             (Adjourned at 5:06 p.m.)

          23

          24

          25

CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


_Christina K Decker_                           07-27-05

Christina K. Decker, RPR, CRR                    Date

Federal Official Court Reporter