FILED

2007 May-17 AM 10:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

```
                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ALABAMA
                        WESTERN DIVISION



JANICE MORGAN, et al.,          *
          Plaintiffs,           *    CV-01-C-0303-W
                                *    June 16, 2005
vs.                             *    Tuscaloosa, Alabama
                                *    9:00 A.M.
FAMILY DOLLAR STORES, INC.,     *
          Defendants.           *
* * * * * * * * * * * * * * * * * * * * * * * * * *


                            VOLUME 4
                  TRANSCRIPT OF JURY TRIAL
                 BEFORE THE HON. U.W. CLEMON
               CHIEF UNITED STATES DISTRICT JUDGE


FOR THE PLAINTIFFS:

HON. ROBERT L. WIGGINS, JR., Esq.
HON. C. MICHAEL QUINN, ESQ.
HON. DENNIS G. PANTAZIS, ESQ.
HON. GREGORY O. WIGGINS, ESQ.
HON. HERMAN N. JOHNSON, JR.,ESQ.
HON. KEVIN W. JENT, ESQ.
HON. ROBERT F. CHILDS, JR., ESQ.
HON. ROCCO CALAMUSA, ESQ.
WIGGINS, CHILDS, QUINN & PANTAZIS
301 19th Street, North
Birmingham, AL 35203-3204


HON. J. ALLEN SCHREIBER, ESQ.
HON. P. MARK PETRO, ESQ.
SCHREIBER & PETRO
Two Metroplex Drive, Suite 250
Birmingham, AL  35209


FOR THE DEFENDANTS:

J. MARK WHITE, ESQ.
WHITE, ARNOLD ANDREWS & WHITE
2025 3rd Avenue North, Ste. 600
Birmingham, AL 35203
```

1              (Continued Appearances)

2    HON. JOSEPH B. MAYS, JR., ESQ.
     HON. ABDUL K. KALLON, ESQ.
3    HON. ARNOLD W. UMBACH, III, ESQ.
     HON. JAMES WALKER MAY, ESQ.
4    HON. RONALD H. KENT, JR., ESQ.
     HON. T. MATTHEW MILLER, ESQ.
5    BRADLEY, ARANT, ROSE & WHITE
     P. O. Box 830709
6    Birmingham, AL  35203

7

8

9

10   Christina K. Decker, RPR, CRR
     Federal Official Court Reporter
11   101 Holmes Avenue, NE, Suite 305
     Huntsville, AL 35801

12

13   Penny L. Enoch, RPR
     Federal Official Court Reporter
14   1729 5th Avenue North, Room 325
     Birmingham, AL  35203

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2    Witnesses:           Direct   Cross  Redirect Recross

3    BRUCE BARKUS            4        35      56

4    Motions                66

5    BRENDA RUSSELL         77        95     104

6    SUE ECKLES            106       113     117

7    PENNY BRAKE           118       131     138

8    WM. B. McCARTHY       144       172     199

9    LETICIA BRISCO        203       235     258

10

11   Motions               261

12   Findings              270

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| | 1 | June 16, 2005                                          9:00 a.m. |
| | 2 | PROCEEDINGS: |
| | 3 | (In open court, jury present.) |
| 08:57:49 | 4 | THE COURT:  Good morning, ladies and |
| 09:11:35 | 5 | gentlemen.  I hope you had a good evening.  The |
| 09:11:39 | 6 | defendant will call its next witness. |
| 09:11:41 | 7 | MR. WHITE:  Mr. Barkus is in the box, Your |
| 09:11:41 | 8 | Honor. |
| 09:11:44 | 9 | **BRUCE EDWIN BARKUS, DEFENDANT'S WITNESS, SWORN** |
| 09:11:49 | 10 | THE CLERK:  State your name for the record, |
| 09:11:53 | 11 | please. |
| 09:11:56 | 12 | THE WITNESS:  Bruce Edwin Barkus. |
| 09:11:56 | 13 | THE CLERK:  And spell your last name for the |
| 09:11:56 | 14 | record, please. |
| 09:11:58 | 15 | THE WITNESS:  B-A-R-K-U-S. |
| 09:11:58 | 16 | **DIRECT EXAMINATION** |
| 09:12:02 | 17 | **BY MR. WHITE:** |
| 09:12:02 | 18 | Q.  Mr. Barkus, will you slide up just a little bit? |
| 09:12:05 | 19 | That might improve the volume.  Thank you. |
| 09:12:36 | 20 | Where do you currently live, Mr. Barkus? |
| 09:12:36 | 21 | A.  Currently live in Charlotte, North Carolina. |
| 09:12:36 | 22 | Q.  What is your current employment? |
| 09:12:36 | 23 | A.  I am the president and CEO of GNC Stores. |
| 09:12:36 | 24 | Q.  What is GNC Stores? |
| 09:12:36 | 25 | A.  General Nutrition Centers.  And there's about |

09:12:36  1   5,000 stores throughout the United States.

09:12:36  2       Q.   How long have you been the chief executive

09:12:36  3   officer and president of General Nutrition Stores?

09:12:37  4       A.   Monday was my first day.

09:12:40  5       Q.   So your career is now in its fourth day, and we

09:12:46  6   have had you here two of the four days; is that correct?

09:12:48  7       A.   Yes, sir.

09:12:49  8       Q.   Okay.  Prior to that, where were you employed?

09:12:53  9       A.   I was with Family Dollar since 1999; and prior to

09:12:59  10  Family Dollar, I was with Eckerd Drug Company for 21

09:13:03  11  years; and then prior to Edkerd Drugs, I was with

09:13:07  12  falling Falling Stores for a couple of years.  And then

09:13:09  13  I have worked in retail since I was 16 years old.  I

09:13:14  14  started as a stock boy.

09:13:15  15      Q.   And your current age is what?

09:13:16  16      A.   52.

09:13:19  17      Q.   What were the various positions that you held at

09:13:22  18  the retail establishments where you worked full-time?

09:13:25  19      A.   I started as a stock boy, delivery boy.  I have

09:13:29  20  been a cashier and intern.  I am a pharmacist by trade.

09:13:35  21           I have been a pharmacist, a pharmacist store

09:13:38  22  manager, a district manager, a pharmacy operations

09:13:41  23  manager, a pharmacy professional services manager, a

09:13:47  24  regional vice-president, a vice-president of operations,

09:13:50  25  a senior vice-president, and executive vice-president.

09:13:54   1     Q.   What was the last position you held with Family

09:13:59   2   Dollar?

09:13:59   3     A.   I was executive vice-president of store

09:14:02   4   operations.

09:14:04   5     Q.   And you came with Family Dollar in 19 when?

09:14:07   6     A.   1999, July.

09:14:09   7     Q.   And were you in that position the entire time

09:14:43   8   from 1999 until very recently?

09:14:43   9     A.   No, sir.  I was V.P. of operations for the first

09:14:43  10   year, and then I was soon to be M.V.P. for the next

09:14:43  11   couple of years, and now have been an M.V.P. for about

09:14:43  12   18 months.

09:14:43  13     Q.   What were your duties and responsibilities at

09:14:43  14   Family Dollar?

09:14:43  15     A.   Most recently, as executive vice-president, I had

09:14:43  16   five divisional vice-presidents that worked for me.   And

09:14:43  17   essentially, they had each about 1,000 stores on

09:14:47  18   average.

09:14:47  19          I had a V.P. of operations.  And part of V.P. of

09:14:53  20   operations would be payroll planning analysis,

09:14:57  21   interphasing with human resources, I.T., merchandising

09:15:03  22   interphasing.  And then in addition to that, as senior

09:15:06  23   V.P., I also have construction.

09:15:10  24          We open about 500 stores a year.  So I had

09:15:13  25   construction, store development, store design,

09:15:18  1   utilities, maintenance procurement, so...

09:15:24  2      Q.  Would you put up, please, the organizational

09:15:26  3   chart that Mr. Mays previously used?

09:15:34  4      Do you recognize what's on the screen as part of

09:15:41  5   the organizational chart for Family Dollar?

09:15:43  6      A.  Yes, sir.

09:15:44  7      Q.  And what -- where would you be in that chart at

09:15:47  8   your last senior position?

09:15:48  9      A.  The -- in between the CEO and the divisional

09:15:52  10  vice-president would be the president and chief

09:15:56  11  operating officer, David Alexander.  And then I reported

09:15:59  12  to Mr. Alexander as the E.V.P., and then the divisional

09:16:03  13  vice-presidents reported to me.

09:16:04  14     Q.  So you were between the division vice-president

09:16:07  15  and CEO?

09:16:08  16     A.  Yes.

09:16:08  17     Q.  And you reported to Mr. Alexander, who is seated

09:16:11  18  here at the table?

09:16:12  19     A.  Yes.

09:16:12  20     Q.  Who reported to you?

09:16:17  21     A.  Reporting to me was the divisional

09:16:21  22  vice-presidents; there are five of them.  And then also

09:16:25  23  off to the side would be another vice-president of

09:16:28  24  operations.

09:16:30  25     And all those interfaces that we talked about:

09:16:34  1    interphasing with HR and merchandising and IT and

09:16:40  2    systems, that's not on the chart.

09:16:42  3        Q.  We're principally talking about store managers in

09:16:48  4    this particular case.  Are you aware of that?

09:16:51  5        A.  I understand.

09:16:51  6        Q.  Tell us the reporting order, how the chain of

09:16:55  7    command went from you down, or from the store manager

09:16:58  8    up, whatever one you're comfortable with, so we

09:17:02  9    understand how that reporting went.

09:17:05  10       A.  Yes.  The divisional vice-presidents, there's

09:17:08  11   five of them.  And the way we separate the company right

09:17:10  12   now, we have two divisional vice-presidents that are in

09:17:14  13   the urban structures, so they have more city stores, so

09:17:18  14   they have fewer stores.

09:17:19  15       And then we have three divisional vice-presidents

09:17:21  16   that have more rural or suburban stores.  And they have

09:17:26  17   close to 1,500 stores each.

09:17:30  18       We divide the regional vice-presidents pretty

09:17:33  19   much the same way; some have city stores and some have

09:17:36  20   urban and rural.  But there is about, I think it's 22

09:17:43  21   regional vice-presidents right now.

09:17:46  22       The district managers report in to the regional

09:17:50  23   vice-presidents.  There's about 380 district managers.

09:17:56  24   The number changes, but there's about 380 district

09:18:00  25   managers for 5,700 stores.  And then the store managers

09:18:05  1   report to the district manager.

09:18:07  2        On average, we try to have 16 or 17 stores per

09:18:12  3   district manager.  But sometimes, if it's in a rural

09:18:16  4   market, there's a lot more; and sometimes, if it's a

09:18:19  5   city market, there may be less.

09:18:21  6        In the urban structure, we do have more of a

09:18:24  7   support staff, so we increase the number of stores.

09:18:27  8        Q.   How many states does Family Dollar operate in?

09:18:29  9        A.   Family Dollar is in 44 states.

09:18:33 10        Q.   And if I had a block for every store, how many

09:18:36 11   blocks would I have to have here where it says "store

09:18:41 12   manager level"?

09:18:41 13        A.   We have 5,700, and open about 500 extra every --

09:18:47 14   just about every year.

09:18:50 15        Q.   And those are placed throughout the 44 states;

09:18:53 16   correct?

09:18:53 17        A.   Yes, sir.  Yes.

09:18:56 18        Q.   Correct?

09:18:57 19        A.   Yes, sir.

09:18:58 20        Q.   How many blocks would I have to have to reflect

09:19:00 21   all of the district managers?

09:19:01 22        A.   About 380.

09:19:04 23        Q.   And where are they generally located?

09:19:07 24        A.   They're located throughout the United States.

09:19:10 25   They are in the markets, so if you -- you're in Atlanta,

09:19:15    1    there will be three or four district managers.  And, you
09:19:19    2    know, the number of stores would vary from market.
09:19:22    3        Q.   And regional vice-presidents, I think you said
09:19:25    4    there were 20 or 21?
09:19:27    5        A.   About 22.
09:19:28    6        Q.   Okay.  Where are they located?
09:19:30    7        A.   They're located generally in the largest city
09:19:35    8    closest to the geographic area that they might be in.
09:19:39    9        Q.   And typically, how many districts would report to
09:19:42   10    a regional vice-president?
09:19:44   11        A.   Generally, about 12 to 18.  Some even have gone
09:19:51   12    up to 22 districts.
09:19:53   13        Q.   How many division vice-presidents did you say
09:19:58   14    Family Dollar has?
09:19:58   15        A.   There's five divisions.
09:19:59   16        Q.   Where are they located?
09:20:01   17        A.   The divisional vice-presidents are in Charlotte,
09:20:03   18    and basically travel out to the field in their
09:20:10   19    geographic areas on Tuesdays, Wednesdays, and Thursdays.
09:20:14   20        Q.   I take it, Mr. Alexander and you, while you were
09:20:18   21    at Family Dollar and CEO are all located in Charlotte?
09:20:22   22        A.   Yes, sir.
09:20:22   23        Q.   And is Charlotte where the corporate offices are
09:20:26   24    located?
09:20:26   25        A.   It is.  Yes.

09:20:27  1     Q.   And I understand you are currently in the process

09:20:30  2   of relocating to the corporate offices of GNC, which is

09:20:34  3   in Pittsburgh; correct?

09:20:36  4     A.   Yes; living in a hotel.

09:20:39  5     Q.   Mr. Barkus, do you know what the average sales

09:20:51  6   volume is for individual Family Dollar Stores?

09:20:55  7     A.   The average sales volume is just a little bit

09:21:01  8   over a million dollars a year.

09:21:02  9     Q.   And if the sales are a million dollars, do you

09:21:07  10  know of your knowledge basically on some sort of

09:21:10  11  percentage on an average basis what kind of profit

09:21:14  12  Family Dollar would get on a profit on a million dollar

09:21:18  13  sales store?

09:21:19  14    A.   The profit percent would be about 5 to 7 percent.

09:21:25  15    Q.   So that would be -- profit would be between 50

09:21:28  16  and $70,000, roughly, on an average of a million?

09:21:32  17    A.   Yes, roughly.

09:21:33  18    Q.   What is the average size of the stores?

09:21:38  19    A.   The size of a store is about 8,000 square feet.

09:21:45  20  But there is a range, you know; some goes down to 5,000,

09:21:49  21  some are 11,000, but about 7 to 8 to 9,000 square feet,

09:21:56  22  probably an older size drug store.

09:22:01  23    Q.   And how many employees does Family Dollar employ?

09:22:05  24    A.   I think it's 42,000, 40 or 42,000, of which I

09:22:11  25  think about 38,000 is in the field of organization.

09:22:20  1      Q.   When you say that, are you -- from what level on

09:22:23  2   that chart are you talking down?

09:22:25  3      A.   That would be store associates, you know:

09:22:29  4   management, district managers, R.V.P.s, V.P.s.

09:22:36  5      Q.   What areas of responsibility did you have while

09:22:55  6   you were at Family Dollar that related directly to store

09:22:58  7   operations?

09:22:59  8      A.   All of us at Family Dollar, all the store

09:23:02  9   functions essentially reported to me and that would be

09:23:05  10  through the divisional vice-presidents.

09:23:09  11       And as I mentioned before, a lot of the expense

09:23:14  12  of repairs and maintenance, some of the construction --

09:23:19  13  we're growing quickly, so construction was a big part of

09:23:23  14  it as a senior V.P. -- but then all the interfaces

09:23:27  15  between merchandising and marketing and, you know, IT

09:23:32  16  and technology and support systems.

09:23:36  17      Q.   Did Family Dollar, while you were there, have

09:23:40  18  policy and procedure manuals?

09:23:42  19      A.   Yes.

09:23:43  20      Q.   Did Family Dollar, while you were there, have

09:23:45  21  training materials?

09:23:47  22      A.   Yes.

09:23:47  23      Q.   Did Family Dollar, while you were there, have

09:23:52  24  employee handbooks?

09:23:53  25      A.   Yes.

09:23:54  1          MR. WHITE:  Your Honor, we are going to try

09:23:56  2   to put in relatively quickly these documents --

09:23:59  3          THE COURT:  All right.

09:24:00  4          MR. WHITE:  -- that are here.  And if I may

09:24:02  5   use Mr. Kent as the go-between, it might expedite

09:24:06  6   things.

09:24:06  7          THE COURT:  Sure.

09:24:09  8          MR. WHITE:  Counsel for the plaintiffs is

09:24:10  9   aware and has been gracious in the process so far.

09:24:13  10          THE COURT:  All right.

09:24:15  11   Q.  (By Mr. White)  Let me show you first what is

09:24:21  12   marked as Defendant's Exhibit Number 1922 and ask you if

09:24:29  13   you can identify that?

09:24:30  14   A.  It says Store Policy Manual Revision, January

09:24:40  15   1997.

09:24:43  16          MR. WHITE:  We would move the admission of

09:24:45  17   the '97 manual.

09:24:46  18          THE COURT:  It's received in evidence.

09:24:48  19          MR. R. WIGGINS:  No objection, Your Honor.

09:24:51  20   Q.  (By Mr. White)  Let me show you Exhibit 1927, the

09:25:02  21   Family Dollar Stores Personnel Training Manual.

09:25:11  22          MR. WHITE:  We would move it into evidence,

09:25:14  23   Your Honor.

09:25:14  24          MR. R. WIGGINS:  No objection, Your Honor.

09:25:16  25          THE COURT:  It's received in evidence.

09:25:22   1        Q.   (By Mr. White)   And let me show you --

09:25:26   2             MR. WHITE:   Your Honor, I would advise you

09:25:27   3   that Exhibit 1925, which is already in evidence, is

09:25:32   4   what's been referred to, I think, as the Professional

09:25:36   5   Development Training Reference book.   That's also what

09:25:39   6   the word is strand that is used.

09:25:42   7             THE WITNESS:   The strands.

09:25:43   8             MR. WHITE:   Your Honor, I would advise that

09:25:46   9   we have copies of Exhibit 1925 for all the jurors, but I

09:25:51   10   don't intend to publish it right at this time, since

09:25:54   11   it's kind of heavy.

09:25:56   12             THE COURT:   Good.

09:25:59   13        Q.   (By Mr. White)   All right.   Let me show you

09:26:03   14   Defendant's Exhibit 1923 -- wait a minute, I forgot to

09:26:11   15   show it -- I show you what is the Store Policy Manual

09:26:26   16   for 2002, Exhibit 1923; and ask you if you -- for

09:26:32   17   identification purposes, do you recognize that?

09:26:37   18        A.   Yeah, I recognize it as a Family Dollar document.

09:26:44   19             MR. WHITE:   We would offer that exhibit into

09:26:45   20   evidence, Your Honor.

09:26:46   21             THE COURT:   It's received in evidence.

09:26:48   22             MR. R. WIGGINS:   I don't need to see it.

09:26:51   23   I've seen it many times.

09:26:52   24        Q.   (By Mr. White)   Let me show you Exhibit 1924,

09:26:54   25   Store Operations Policy Manual.

09:26:59   1    A.   Yes.

09:27:01   2         MR. WHITE:   We would move 1924 in.

09:27:03   3         THE COURT:   Without objection, it's received

09:27:07   4    in evidence.

09:27:08   5    Q.   Exhibit 1928, the Associates Handbook.   Identify

09:27:30   6    that for identification purposes.

09:27:32   7    A.   It is.

09:27:33   8    Q.   And Exhibit 1929, Associates Handbook?

09:27:38   9    A.   It is.

09:27:39   10   Q.   Now, Mr. Barkus, is it fair to say that you don't

09:27:44   11   know everything that's in those books?

09:27:46   12   A.   Yes.

09:27:47   13   Q.   I am not going to ask you to summarize.   But

09:27:54   14   basically, tell us what your understanding of what those

09:27:59   15   manuals are and who prepared them for the company.

09:28:02   16   A.   The strands are training materials, and they were

09:28:08   17   prepared through the HR team and operations team to

09:28:13   18   reflect and train new associates on the best practices

09:28:18   19   of the stores.

09:28:20   20        The Associate Handbooks are for new associates

09:28:27   21   coming on to the team, just getting them oriented to the

09:28:31   22   business.

09:28:32   23        The Policies and Procedures are basically, you

09:28:37   24   know, best practices, business practices that we have in

09:28:40   25   the organization to use as reference materials at

09:28:44  1   stores, and as the managers' and assistant managers'

09:28:49  2   guide in the store office.

09:28:50  3      Q.   When you came in 1999, I take it the 1997 Policy

09:28:56  4   and Procedure Manual already existed?

09:28:58  5      A.   Yes, it did.

09:28:59  6      Q.   What reason, if any, do you know for the reason

09:29:04  7   for the creation of the 2002 or 2003 Policy and

09:29:09  8   Procedures Manual?

09:29:09  9      A.   Well, I had talked with Steve Phillips, who is

09:29:15  10  one of my V.P. of operations, and he is the interface of

09:29:19  11  our HR team.   And basically, the '97 policy manual was

09:29:24  12  very much out of date and disorganized.

09:29:28  13         When I had come on board, really focused on

09:29:31  14  business practices, how to get the stores operational,

09:29:35  15  and we focused on that activity.   And then from there, I

09:29:42  16  had gotten a call from Mr. Alexander, and he had read

09:29:46  17  through the policy manual and he said -- you know, he's

09:29:50  18  seeing a lot of mistakes in this thing.

09:29:53  19         And from that point on, we pulled the team

09:29:55  20  together to build the new policy manual, pulling the

09:29:59  21  training material out of the policy manual and keeping

09:30:01  22  the policy manual current to the current practices that

09:30:05  23  we were building.

09:30:07  24     Q.   And I take it, as I understand your testimony,

09:30:15  25  people that reported to you were actually the people

09:30:18   1    from your organization that participated in that

09:30:21   2    process?

09:30:21   3        A.   Yes.   There was others, other departments

09:30:24   4    involved -- HR department; and then I think there was a

09:30:28   5    team of district managers and store managers that were

09:30:31   6    also involved, but I can't say for a fact.   I think

09:30:35   7    that's how it worked.

09:30:36   8        Q.   "HR" would be Human Resources?

09:30:38   9        A.   Human Resources.

09:30:39  10        Q.   Personnel?

09:30:41  11        A.   Yes.

09:30:42  12        Q.   Okay.   During the period of time that you were at

09:30:45  13    Family Dollar from 1999 until last week, was there an

09:30:50  14    increase or decrease in the number of stores?

09:30:53  15        A.   Oh, when I came on board, roughly we had about

09:30:58  16    3,000 stores.   And since '99, we have opened -- we now

09:31:05  17    have 5,700 stores.   So we increased 2,700 stores in a

09:31:10  18    couple of years.

09:31:11  19        Q.   Have you reviewed those documents at my request

09:31:20  20    in order to determine if any of those documents had a

09:31:24  21    mission statement for a store manager?

09:31:26  22        A.   This morning, I saw a page that had a mission

09:31:31  23    statement for a store manager.   But I have not gone

09:31:33  24    through and reviewed these documents, no.

09:31:35  25        Q.   Okay.   Tell us, then, what you understand, while

09:31:40  1  you were at Family Dollar, what was the duty and

09:31:43  2  responsibility of the store manager.

09:31:45  3     A.   The store manager's responsible and accountable

09:31:54  4  for the profitable and sales operation of the business

09:31:59  5  in the neighborhood.

09:32:00  6        So their responsibility lies in hiring a team,

09:32:04  7  motivating a team, taking care of customer service, the

09:32:09  8  safe operation of the store, the control of shrink and

09:32:13  9  profit of the store, the protection of company assets,

09:32:18  10  money, and just making sure that the store is overall

09:32:24  11  run very well.

09:32:26  12     Q.   Let me ask you to call up number DX1927-110 from

09:32:41  13  the Family Dollar Personnel Training Manual, please.

09:32:55  14        And is that one of the mission statements you

09:32:57  15  reviewed at my request?

09:32:59  16     A.   Yes, sir.

09:33:00  17     Q.   Is there anything in that mission statement which

09:33:05  18  is from Exhibit 1927 that is inconsistent with what you

09:33:11  19  understood and have just described as the duties and

09:33:14  20  responsibilities of the store manager?

09:33:17  21     A.   No, sir.

09:33:31  22     Q.   Will you pull up page DX1925-430 from the

09:33:36  23  Customer Service Strand One, Defendant's Trial Exhibit

09:33:42  24  1925?

09:33:46  25        Did you also examine the other place where there

09:33:51   1   is at least one other place where the store manager

09:33:53   2   mission statement is contained?

09:33:55   3       A.   Yes.

09:33:56   4       Q.   And was that in a later publication than the

09:33:59   5   first one that we referred to?

09:34:01   6       A.   Yes, I believe so.

09:34:02   7       Q.   Is it the same as the prior statement?

09:34:05   8       A.   Yes.

09:34:06   9       Q.   And at the time you left, would you consider that

09:34:10   10  still to be a fair statement of what the store manager's

09:34:14   11  mission statement was?

09:34:15   12      A.   Yes, it was.

09:34:16   13      Q.   That statement mentions hiring honest, reliable

09:34:24   14  personnel.  What is the role of the store manager,

09:34:30   15  first, in hiring clerks, cashiers, stock personnel?

09:34:35   16      A.   They want to hire associates that are motivated

09:34:40   17  to do the work and are honest in doing the job, to

09:34:45   18  prevent theft, internal theft.

09:34:48   19      Q.   What specific role does the store manager have in

09:34:51   20  hiring those personnel in the store?

09:34:54   21      A.   The store manager interviews them, goes through

09:34:58   22  the paperwork, and hires the associates.

09:35:03   23      Q.   For assistant managers, is the process the same

09:35:07   24  or different?

09:35:08   25      A.   The process is a little different.  The manager

09:35:12  1   still hires the assistant managers.  We do ask that they
09:35:16  2   make sure that the district manager also interviews the
09:35:26  3   assistant manager candidates.
09:35:29  4      Q.  What role does the district manager, as you
09:35:31  5   understood it, have in the hiring of an assistant
09:35:34  6   manager?
09:35:34  7      A.  The district manager oversees and makes sure
09:35:39  8   that, you know, we're in compliance with all the
09:35:42  9   paperwork that comes through.  And they interview the
09:35:47  10  candidates just to make sure that the manager is well
09:35:51  11  trained in the selection of the managers and assistant
09:35:57  12  managers.
09:35:57  13          THE COURT:  Does the district manager have
09:36:03  14  veto power over a store manager's choice of an assistant
09:36:11  15  manager?
09:36:11  16          THE WITNESS:  Yes, sir.
09:36:14  17     Q.  Do you know how often veto is exercised by
09:36:19  18  district managers?
09:36:19  19     A.  I don't, no.
09:36:21  20     Q.  In the case of all, whether it's assistant
09:36:30  21  manager or whatever, what is your understanding as to
09:36:33  22  who does the initial interview?
09:36:35  23     A.  The -- I think that it has changed over time.  I
09:36:45  24  think the interview has always been the store manager.
09:36:49  25          We do get applications over the Internet, and so

09:36:53   1   it's not really an interview, but the district manager

09:36:56   2   will review some of the applications.

09:37:01   3       Q.   Does the district manager, when he gets them over

09:37:03   4   the Internet, keep them or send them to the store

09:37:06   5   manager?

09:37:06   6       A.   Sends them to the store manager.

09:37:08   7       Q.   What -- who administers the drug test and the

09:37:12   8   other tests that are administered to applicants?

09:37:15   9       A.   The store manager -- and the Stanton test.

09:37:18   10      Q.   And you mentioned earlier the store manager's

09:37:27   11  responsibility for safety.  Explain to us what you

09:37:33   12  understood, while you were at Family Dollar, the store

09:37:36   13  manager had related to safety in their individual store.

09:37:39   14      A.   There's a couple of things on safety.  One thing

09:37:43   15  is associate's safety.  Worker's compensation is a very

09:37:47   16  big issue in our type of business.  I think worker's

09:37:51   17  compensation costs the company about $60 million.

09:37:54   18           So the store manager on a monthly basis goes

09:37:58   19  through what we call a care calendar.  And that is

09:38:02   20  checking three times a day that there's no slip-and-fall

09:38:05   21  hazards, and that they train the associates on how to

09:38:09   22  lift a box and how to use a cutter so no one gets cut.

09:38:17   23           And then just walking the store to make sure

09:38:19   24  there's nothing on the ledges or risers, or any of the

09:38:22   25  U-boats are overpacked that might fall over in the

09:38:25  1   store; and that includes ladders leaning against the

09:38:28  2   ledges.  And so there's -- sometimes is a lot of freight

09:38:31  3   in the stores.

09:38:32  4       Q.  What is a U-boat?

09:38:33  5       A.  The U-boat is like a hand truck for moving boxes

09:38:38  6   around efficiently.

09:38:40  7       Q.  Have you been able to determine what the cost is

09:38:43  8   to Family Dollar whenever they need to replace a store

09:38:46  9   manager?

09:38:46  10      A.  We did a number of years ago.  We were looking at

09:38:51  11  turnover.  And the hard costs of losing a manager was

09:38:56  12  either 6 or $8,000.  That was, you know, the training,

09:39:02  13  the administrative costs.

09:39:04  14      We didn't measure the opportunity costs of what

09:39:08  15  happens to sales or shrink, which is really the bigger

09:39:11  16  loss to the company.  We don't want to lose managers.

09:39:14  17      Q.  How are store managers paid at Family Dollar?

09:39:18  18      A.  Managers are paid a weekly salary.  I think right

09:39:23  19  now the average salary is $657 a week on average.  And

09:39:28  20  then they also get a bonus on the controllable profit,

09:39:32  21  so they would get 1 percent.

09:39:35  22      Q.  Now, when you say "controllable profits", tell us

09:39:40  23  either what that includes or excludes when I am a store

09:39:45  24  manager and I want to calculate my bonus.

09:39:48  25      A.  Controllable profit, if you take the total

09:39:51   1   sales -- and maybe would be best to bring it just to a

09:39:54   2   dollar.

09:39:54   3       Q.   Okay.

09:39:55   4       A.   If you have 1 dollar in sales, that costs you 70

09:39:59   5   cents, the cost of goods.  Well, out of the remaining 30

09:40:06   6   cents, you have to pay for payroll, you have utilities,

09:40:09   7   maintenance, any other expenses in the store.  Those are

09:40:13   8   variable expenses.

09:40:14   9       So the controllable profit is about 20 cents on a

09:40:18  10   dollar, or 20 percent of the total store sales.  And

09:40:21  11   then the manager gets 1 percent of that in their bonus.

09:40:26  12       Q.   And the items that you consider the store manager

09:40:31  13   to be able to control are what?

09:40:34  14       A.   Managers would control the payroll, the

09:40:38  15   utilities, the expense items, even some of the

09:40:42  16   maintenance in the store.  So that -- there's a number

09:40:46  17   of things that they can control.

09:40:48  18       Q.   Is the calculation done -- does it include, for

09:40:55  19   purposes of calculating store manager's bonus, the

09:41:00  20   compensation paid to higher executives in the company?

09:41:06  21       A.   I don't follow the question.  I'm sorry.

09:41:08  22       Q.   In other words, when you calculate controllable

09:41:10  23   profit, does something get allocated to that store

09:41:15  24   because of the executive compensation?

09:41:17  25       A.   Under controllable profit, there are other

09:41:21  1   expenses.  So there would be corporate allocation

09:41:24  2   expenses, rent, taxes, those items come out after the

09:41:28  3   controllable profit.  And then you would get net profit

09:41:31  4   on the bottom.

09:41:31  5       Q.   Okay.  So they're not included?

09:41:34  6       A.   No.  No, that overhead wouldn't be included.

09:41:37  7       Q.   Now, you indicated that you had worked for a

09:41:48  8   number of other retailers?

09:41:50  9       A.   Yes.

09:41:51 10       Q.   And based on your knowledge and experience, do

09:41:56 11   other retailers that compete with Family Dollar

09:41:58 12   compensate store managers in a similar fashion as Family

09:42:03 13   Dollar?

09:42:03 14       A.   Yes, they do.  It's a salary-based -- salary and

09:42:07 15   bonus-based.

09:42:08 16       Q.   While you were at Family Dollar, who did you

09:42:10 17   consider to be the competitors of Family Dollar Stores?

09:42:15 18       A.   We sell a lot of commodity goods.  We sell Tide

09:42:19 19   and Clorox and Snicker bars at what we call extreme

09:42:25 20   value retail.  So, overall, I would consider anyone

09:42:28 21   that's selling these type of items to be competitors.

09:42:32 22            The big competitors would be, you know, obviously

09:42:34 23   Wal-Mart, which almost everyone competes against for the

09:42:37 24   same items.  Stores like Dollar General, which are

09:42:41 25   smaller, small-sized dollar stores; Big Lots; even drug

09:42:48  1    stores:  CVS, Rite Aid, Eckerds, Walgreen's.

09:42:53  2         So anyone that really sells those type of

09:42:56  3    items -- and we do carry apparel items, clothing.  And

09:43:01  4    so people that sell the clothing.

09:43:03  5              MR. WHITE:  Mr. Smitherman, could I have a

09:43:06  6    time check?

09:43:07  7              THE COURT:  You have 15 minutes.

09:43:09  8              MR. WHITE:  Thank you, Your Honor.

09:43:10  9    Q.  (By Mr. White)  What is the role of district

09:43:12  10   managers while you were at Family Dollar?

09:43:14  11   A.  The district manager is responsible for the

09:43:19  12   hiring of store managers, the leadership in the

09:43:23  13   district, the motivation of the team, the performance

09:43:28  14   counseling, the appraisals.

09:43:30  15        They visit stores and try to make sure that the

09:43:34  16   standards are maintained throughout the districts.

09:43:36  17   Q.  How often does Family Dollar expect the district

09:43:41  18   manager to be in a store?

09:43:42  19   A.  District managers, depending on the store, could

09:43:46  20   vary a lot.  And on average, I would say they would see

09:43:51  21   a store every four to six weeks.

09:43:54  22        Sometimes if a store needed more attention, it

09:43:57  23   could be much more frequently; if the store was in great

09:44:00  24   shape, it might be every couple of months.

09:44:03  25   Q.  Did Family Dollar have a number range of stores

09:44:07  1    that on average that district managers typically would

09:44:12  2    have responsibility of?

09:44:14  3        A.   On average, 15 to 17 stores is a good average.

09:44:19  4    We have shifted a little bit.  Sometimes the rural

09:44:22  5    stores will have more stores.  They usually have less

09:44:26  6    problems.

09:44:27  7        Sometimes the city stores are a little higher

09:44:29  8    volume, so the district manager might have less stores.

09:44:35  9        Q.   In the time I have left, I want to go through

09:44:38  10   some terms with you, Mr. Barkus, and see if you can help

09:44:41  11   us understand the language of your business.

09:44:47  12       What is a schematic?

09:44:48  13       A.   A schematic is just a diagram of a purchasing

09:44:54  14   set, so when the customer comes in the store, that the

09:44:57  15   merchandise is consistent and presented in an

09:45:00  16   appropriate way.

09:45:01  17       It's -- if you go into a grocery store and you

09:45:05  18   look at the milk, you always want to find the milk here

09:45:08  19   in this location.  So it's a schematic to keep you

09:45:12  20   consistent.

09:45:12  21       Q.   And in a Family Dollar store that we go into, how

09:45:17  22   much of the merchandise that is either there or that is

09:45:21  23   received in the store is subject to being placed

09:45:25  24   according to that schematic?

09:45:27  25       A.   Don't know the exact number.  I would guess about

09:45:31  1  50 percent of the stores is in some sort of formalized

09:45:35  2  schematic.  There are some more items on the seasonal

09:45:38  3  items and end caps.  But they would vary by the size of

09:45:41  4  the store.

09:45:42  5      Q.  You mentioned "seasonal items".  Does the volume

09:45:46  6  of sales change at Family Dollar during certain seasons

09:45:50  7  of the year?

09:45:51  8      A.  Yes.  In December, the volume of the store could

09:45:57  9  double.  And so any of the peak holidays, like most

09:46:02  10  retailers, like around Thanksgiving, you will get a jump

09:46:06  11  up.  So it does vary.

09:46:08  12      Q.  How many hours are store managers expected to

09:46:11  13  work while you were at Family Dollar?

09:46:12  14      A.  That has been around 48 to 52 hours.

09:46:18  15  Essentially, though, it's been whatever it takes to get

09:46:21  16  the job done.

09:46:22  17          So if someone comes into a new store, they are

09:46:27  18  going to have to work a lot of hours.  If it's

09:46:28  19  Christmastime, they have to work a lot of hours.  If the

09:46:30  20  store is running well, you know, and they take off,

09:46:33  21  that's fine also.

09:46:35  22          We like to see the managers get a five-day work

09:46:37  23  week, if possible.

09:46:38  24      Q.  We have heard the term "shrink".  Would you

09:46:46  25  explain to us what Family Dollar means when you use the

09:46:49  1    term "shrink"?

09:46:49  2        A.   Shrink is, you have an inventory and you expect

09:46:55  3    $230,000 to be on the shelf in the store.  When you

09:47:00  4    actually go in and count it and you find that there is

09:47:05  5    $180,000 of inventory, you have had a 50-thousand-dollar

09:47:09  6    shrink.

09:47:09  7        So it's basically, you know, the difference of

09:47:11  8    what's on the books and what's on hand.  And just a

09:47:16  9    ballpark, right now, the company has close, probably,

09:47:21  10   over $150 million in shrink.

09:47:24  11       Q.   What causes shrink?

09:47:26  12       A.   Shrink, a good part of it is internal theft.

09:47:32  13   Generally, industry numbers will say, you know, 60

09:47:36  14   percent of shrink is from internal theft.  And a lot of

09:47:40  15   that is through back door or sliding at the checkout --

09:47:47  16   checkout.

09:47:47  17       You know, customers in and say, "do you hook up?"

09:47:51  18   And that's a phrase, "do you hook up", so someone will

09:47:54  19   slide something with no charge on the hook up.  And then

09:47:57  20   the associate could go over to the other retail store

09:48:01  21   and get the same hook up.

09:48:03  22       Q.   Who is the main person that works for Family

09:48:06  23   Dollar that can reduce shrink?

09:48:08  24       A.   The manager controlled the shrink.

09:48:10  25       Q.   The store manager?

09:48:11 1    A.   The store manager.

09:48:12 2    Q.   We have heard the term "truck" or "truck day".

09:48:17 3  Would you tell us what Family Dollar means when they use

09:48:20 4  the term "truck"?

09:48:20 5    A.   Truck is a big deal.   We sell, like I mentioned,

09:48:26 6  a lot of commodity items.   So a store might get 1,000

09:48:31 7  cases on the truck.   But the key thing is, how do you

09:48:34 8  efficiently manage the truck?

09:48:36 9         And that is a process we call "door to shelf";

09:48:39 10  and it's how do you sort the truck?   how do you use the

09:48:43 11  U-boats?   how do you use your staffing?   how do you

09:48:46 12  increase the productivity?   where does the merchandise

09:48:49 13  go on the end caps?   how quickly can you get it done?

09:48:53 14  how can you safely get it done and keep it off the

09:48:56 15  floor?   So you don't want people tripping over boxes.

09:48:59 16         And part of truck is, you know, the ordering of

09:49:03 17  goods, making sure they have data integrity, that the

09:49:06 18  product on shelf is what is supposed to be there.   And

09:49:09 19  those are all associated with the truck.

09:49:11 20    Q.   And I -- who is the person at the store level

09:49:16 21  that has the most control over the truck process?

09:49:19 22    A.   The store manager.

09:49:21 23    Q.   And during the time that you were at Family

09:49:24 24  Dollar, did the efficiency of that process improve or

09:49:29 25  get worse?

09:49:30    1      A.   It improved dramatically.

09:49:33    2      Q.   And why?

09:49:34    3      A.   We put a lot of focus on it.  We put a lot of

09:49:38    4   work into making sure people were trained, that they

09:49:41    5   knew how to schedule their folks, that they were

09:49:45    6   organizing the shifts appropriately.

09:49:48    7          We worked with the distribution center to make

09:49:51    8   sure the trucks were on time; and when the truck hit the

09:49:54    9   store, the people were there and available.  So there

09:49:56   10   was a lot of focus on it.

09:49:58   11          We handle 250 million cases a year.  I think

09:50:02   12   that's a rough number, but it's a lot of cases.

09:50:05   13      Q.   Does Family Dollar have any national contracts

09:50:10   14   with certain -- with vendors or certain services that

09:50:14   15   are delivered at the store level?

09:50:15   16      A.   Yes.  And some are national, some are regional.

09:50:21   17   But it has to do with, you know, extermination or floor

09:50:26   18   cleaning, which are regional contracts, utilities on

09:50:30   19   lights.  There are a number.

09:50:32   20      Q.   In front of you is Exhibit Number 1743 that's

09:50:47   21   already in evidence.  Let me just ask you -- which is

09:50:52   22   the weekly work schedule.  See that?

09:50:55   23      A.   Yes, sir.

09:50:55   24      Q.   Is that also sometimes called the staff

09:50:58   25   scheduler?

09:50:59   1      A.   Yes, it is.

09:51:00   2      Q.   And who is the person at Family Dollar that would

09:51:02   3  know the most about the staff scheduler?

09:51:04   4      A.   Well, the store -- store manager would know the

09:51:07   5  most about the staff scheduler.

09:51:10   6      Q.   Who is the person at Family Dollar that would

09:51:12   7  know the most about the creation of the store schedules?

09:51:14   8      A.   Bill McCarthy.

09:51:16   9           MR. WHITE:   I'm sorry, Your Honor, that's

09:51:22  10  actually Exhibit 2216.   Excuse me.

09:51:33  11      Q.   Now, I want you to look in front of you and see

09:51:35  12  if you see Plaintiffs' Exhibit -- I think it's 136, an

09:51:42  13  email?

09:51:45  14      A.   Yes, sir.

09:51:46  15      Q.   At my request, have you reviewed Plaintiffs' 136?

09:51:51  16      A.   Yes, I saw it yesterday.

09:51:53  17      Q.   And I think it's been published to the jury --

09:51:56  18  hasn't it, Bob -- so the jury should have a copy of

09:52:00  19  that.

09:52:01  20           What was the occasion for your -- did you write

09:52:04  21  that email?

09:52:05  22      A.   I don't think so.   A lot of emails go out.   I

09:52:11  23  don't write most of them.   I --

09:52:13  24      Q.   Do you know how many emails go out a week or a

09:52:16  25  month at Family Dollar?

09:52:17  1      A.   I think there is 200,000 emails a week in the

09:52:23  2  company.

09:52:24  3      Q.   Were you aware -- having now seen that email,

09:52:29  4  were you aware that it went out?

09:52:29  5      A.   Yes.  Yes, sir.

09:52:30  6      Q.   And are you able to recall today, what was the

09:52:33  7  occasion for that email going out?

09:52:35  8      A.   Vaguely, I remember the Loss Prevention

09:52:39  9  Department had come to me and said that they're seeing

09:52:43  10  the amount of shrink in the stores increase because the

09:52:47  11  theft of -- internal theft from store assistant

09:52:51  12  managers.

09:52:52  13          And so that was the occasion that we saw that

09:52:57  14  most of the internal theft were -- and when I say

09:53:00  15  "most", I think it was over 60 percent was coming from

09:53:03  16  assistant managers and key carriers.

09:53:06  17      Q.   And was the purpose -- was the purpose of --

09:53:12  18  well, let me ask you -- when the email was sent out --

09:53:18  19  after the email was sent out, do you have knowledge of

09:53:23  20  anyone who was terminated by Family Dollar for not

09:53:27  21  complying with the email?

09:53:28  22      A.   No, I don't.

09:53:29  23      Q.   Did the email address just new hires or did it

09:53:32  24  address employees who had already --

09:53:35  25              THE COURT:  The objection to leading is

09:53:38  1   sustained.

09:53:39  2       Q.   I'm sorry.  What employees, if any, were covered

09:53:43  3   by the email?

09:53:44  4       A.   This was -- what it said was new hires, internal

09:53:51  5   promotion candidates, and future hires.

09:53:55  6       Q.   Who is the person at the store level that has the

09:54:02  7   responsibility for ensuring that when the inventory

09:54:06  8   comes in that it's displayed properly on the shelf?

09:54:10  9       A.   The store manager has to follow the display

09:54:14  10  guidelines.

09:54:15  11      Q.   Who is the person that is principally responsible

09:54:22  12  for managing customer service at the store level?

09:54:25  13      A.   The store manager is principally -- sets the tone

09:54:28  14  for customer service.

09:54:30  15      Q.   What importance, if any, is customer service in

09:54:33  16  the success or failure of Family Dollar?

09:54:36  17      A.   Oh, customer service is everything.  I mean, the

09:54:39  18  stores are in the neighborhood, so the manager sees the

09:54:44  19  customers all the time, develops a relationship with the

09:54:47  20  customers, creates a dialogue.

09:54:50  21           If there's a special buyer, or a customer needs

09:54:53  22  something special like a quantity, if the kids are at

09:54:56  23  camp and they need 50 swim caps, the manager will try to

09:55:02  24  get them for them.  So that's their responsibility.

09:55:06  25      Q.   What resources are provided by the corporate

09:55:09   1   office to help the store manager carry out that mission

09:55:13   2   statement?

09:55:14   3       A.   Resources are items like the scheduler.  We have

09:55:19   4   training materials, training booklets.  You know, we

09:55:25   5   give -- we do have with the district managers, we have

09:55:28   6   meetings with the store managers.

09:55:31   7           And, you know, a lot of times they build their

09:55:34   8   own programs with the district managers.

09:55:36   9       Q.   What is the responsibility of the store manager

09:55:40   10  as it relates to the cash control in the store?

09:55:43   11      A.   Well, the store manager is responsible for the

09:55:47   12  petty cash and the cash handling in the store; making

09:55:51   13  sure that it gets to the bank safely and appropriately;

09:55:55   14  that the bad debt is not abused; that -- one of the big

09:56:00   15  things now stores is making sure the till or the amount

09:56:03   16  of money in the register doesn't get too high.  Because

09:56:06   17  if you have a robbery and there's $2,000 in the safe or

09:56:10   18  in the register, then a robber will come back because

09:56:14   19  that's a big haul.

09:56:18   20      Q.   In the Family Dollar organization, who is the

09:56:20   21  person that is in charge of loading into the Family

09:56:25   22  Dollar system payroll changes?

09:56:27   23      A.   The district manager puts in the payroll changes

09:56:31   24  through what they call a PAF.

09:56:32   25      Q.   And where does the district manager get that

09:56:36   1   information?

09:56:36   2       A.   From the store manager.

09:56:37   3       Q.   And the payroll is all handled in Charlotte; is

09:56:43   4   that correct?

09:56:43   5       A.   Yes, sir.

09:56:44   6       Q.   You used -- I've heard the term two terms and you

09:56:51   7   used one of them -- store floor and store to shelf.  Is

09:56:58   8   there a difference in those terms?

09:57:00   9       A.   Yes.  Door to floor.

09:57:01   10      Q.   Door to floor?

09:57:03   11      A.   Door to floor was the original program of getting

09:57:07   12  freight from the truck to the shelves.  What was

09:57:09   13  happening the freight was really going to the floor and

09:57:12   14  we had all these cases on the floor.

09:57:14   15          We changed the process and made it door to shelf

09:57:17   16  so the product gets from the back door of the truck to

09:57:21   17  the shelf in the stores very quickly and efficiently.

09:57:24   18      Q.   Is that part of the engineering of the truck

09:57:27   19  process you described earlier?

09:57:29   20      A.   Yes.

09:57:30   21              THE COURT:  Your time is up, Mr. White.

09:57:32   22              MR. WHITE:  Thank you, Your Honor.

09:57:33   23              THE COURT:  Cross-examination?

09:57:34   24                      **CROSS-EXAMINATION**

09:57:34   25  **BY MR. R. WIGGINS:**

09:57:36  1       Q.   Good morning, Mr. Barkus.

09:57:51  2       A.   Good morning, Mr. Wiggins.

09:57:53  3       Q.   You said that you -- at least twice -- I think,

09:58:01  4   you started as a stock boy.  You didn't mention your

09:58:06  5   college training.  What was it?

09:58:08  6       A.   I started -- I was a math major and then I went

09:58:14  7   to pharmacy school.  So I have a pharmacist degree.

09:58:18  8   Then I got a master's degree in business.

09:58:21  9            And last year, I finished up a doctorate degree

09:58:25  10  in business.

09:58:26  11      Q.   So when you were telling us you were a stock boy,

09:58:29  12  that was when you were in high school, summer job or

09:58:31  13  something?

09:58:31  14      A.   After high school, yes.  And even through college

09:58:35  15  I had worked as an intern.

09:58:37  16      Q.   Okay.  But you're a professional; you are a

09:58:42  17  professional?

09:58:43  18      A.   Yes, sir.

09:58:45  19      Q.   Druggist or pharmacist; correct?

09:58:48  20      A.   Yes, sir.

09:58:48  21      Q.   Now, you said that the average store manager pay

09:58:53  22  currently is $657; is that correct?

09:58:58  23      A.   Yes, sir.

09:58:58  24      Q.   And if you -- what is the average hourly rate for

09:59:05  25  an assistant manager?

09:59:07   1      A.   The hourly rate for an assistant store manager, I

09:59:09   2   think, is $7.84.

09:59:13   3      Q.   84 cents?

09:59:14   4      A.   And I might the wrong.  It might be a little

09:59:17   5   lower, a little higher.

09:59:18   6      Q.   If you take $657 for the store manager and divide

09:59:22   7   it by 90 -- I'm sorry, divide it by 70 hours, that's

09:59:28   8   $7.93; correct?  You want a calculator?  Let's do it by

09:59:39   9   the calculator.

09:59:47   10      Did you -- the lawyers are debating whether your

09:59:50   11   testimony was that the average salary is 657 or 5 -- I

09:59:56   12   wrote down 657.

09:59:58   13      A.   657.  And I saw that this morning.

10:00:01   14      Q.   Okay.  Well, let's just do it here on the board.

10:00:06   15   Let's put in $657, divide by 70.  That's $9.38; correct?

10:00:19   16      A.   Yes.

10:00:20   17      Q.   Okay.  So the assistant manager, who is eligible

10:00:25   18   for overtime, gets -- what did you say, 7.84?

10:00:30   19      A.   I believe it's 7.84.

10:00:32   20      Q.   And the store manager, who doesn't get overtime,

10:00:37   21   he gets 9.38; just about a dollar and a half more;

10:00:42   22   correct?

10:00:42   23      A.   If they work 70 hours.

10:00:44   24      Q.   All right.  And you don't know the hours of work

10:00:49   25   that your store managers are putting in, do you?

10:00:53  1      A.   No, I don't.

10:00:53  2      Q.   And the company has done no study of what the

10:01:00  3  store managers are doing or how much time they're doing

10:01:04  4  it, as between management duties or non-management

10:01:09  5  duties?

10:01:09  6      A.   That's correct.

10:01:10  7      Q.   And, in fact, the company has not done any study

10:01:18  8  to determine the tasks or the duties actually being

10:01:25  9  performed in the stores, has it?

10:01:28 10      A.   That's correct.

10:01:29 11      Q.   And the company has not done a study to determine

10:01:35 12  whether those duties, which themselves haven't been

10:01:41 13  studied, constitute a bona fide executive under the Fair

10:01:46 14  Labor Standards Act, has it?

10:01:48 15           MR. WHITE:  Object to that, Your Honor.

10:01:50 16           THE COURT:  Overruled.

10:01:52 17           MR. WHITE:  Question of law.

10:01:55 18           THE COURT:  You may answer.

10:01:56 19           THE WITNESS:  Not that I'm aware of.

10:01:58 20      Q.   (By Mr. R. Wiggins)  And, in fact, the company

10:02:03 21  doesn't even have a policy addressing Fair Labor

10:02:08 22  Standards Act compliance, does it?

10:02:12 23      A.   Not that I'm aware of.

10:02:14 24      Q.   And --

10:02:20 25           THE COURT:  Not even with respect to hourly

10:02:22   1   employees?

10:02:23   2        THE WITNESS:  Not that I'm aware of, Judge.

10:02:29   3   Q.  The -- you said the average profit of the stores

10:02:43   4   is a million dollars, but what's the range?

10:02:46   5   A.  No, sir.  I said the sales.

10:02:47   6   Q.  The sales?

10:02:48   7   A.  Average sales was a million dollars.

10:02:50   8   Q.  I apologize.  I misspoke.  The average sales was

10:02:53   9   a million dollars?

10:02:54   10  A.  Yes.

10:02:55   11  Q.  What's the range, high to low?

10:02:57   12  A.  We have some stores that are doing 3, $400,000 in

10:03:05   13  sales -- and this is off the top of my head -- and I

10:03:09   14  think our top volume store may be about a little bit

10:03:12   15  over $5 million stores.

10:03:17   16  Q.  Now, you said that when you came in, in 1999, you

10:03:28   17  put a team together to study the Store Policy Manual,

10:03:35   18  which you've got there in front of you; correct?

10:03:38   19  A.  Not to study it.  We were working first on

10:03:41   20  getting the practices in place.

10:03:43   21       And then when Mr. Alexander had said, you know,

10:03:48   22  let's look at the policy manuals, that's when we started

10:03:51   23  to put the team together and started then.  I don't know

10:03:54   24  the year.

10:03:55   25  Q.  Okay.  So let's look at Exhibit 3, which I

10:03:59  1   believe in the defendant's -- that's Plaintiffs' Exhibit

10:04:02  2   3, which is the same thing -- the reason I'm doing

10:04:07  3   this -- I am not as familiar with the Defendant's

10:04:09  4   Exhibit Number.

10:04:18  5        I think the Defendant's Number that was read out

10:04:20  6   by Mr. White was Defendant's Exhibit 1923.  And that's

10:04:31  7   the 2002 Store Policy Manual; correct?

10:04:35  8        A.   I can't see it from here.  I'm sorry.

10:04:40  9        Q.   Well, pull your Exhibit 1923 that was given to

10:04:44  10  you.

10:04:44  11       A.   Okay.  Yes.

10:04:45  12       Q.   Okay.  That's the 2002 Store Policy Manual?

10:04:50  13       A.   Yes, April 2002.

10:04:54  14       Q.   Okay.  And using our version of that, the same

10:05:00  15  Bates number and everything, it says "to all store

10:05:05  16  managers from store operations"; correct?

10:05:08  17       A.   Yes.

10:05:08  18       Q.   You're the head of store operations?

10:05:11  19       A.   Yes.

10:05:12  20       Q.   And this is a revision of the Store Policy

10:05:17  21  Manual.

10:05:17  22       Now, I want you to take that -- okay.  Let's look

10:05:21  23  at the third paragraph.  Says "exceptions to any of

10:05:29  24  these policies would require upper level management

10:05:34  25  authorization (i.e. vice-president level or above)";

10:05:39  1   correct?

10:05:40  2       A.   Yes.

10:05:44  3       Q.   And that policy was put in by -- under your

10:05:51  4   tenure or your term as executive vice-president?

10:05:55  5       A.   It was.

10:05:56  6       Q.   Okay.  And let's look at Exhibit 1924, which is

10:06:02  7   the 2003, which is our Exhibit 4.  August 2003 is what

10:06:19  8   ours says there.  Do you have it?

10:06:24  9       A.   Yes.

10:06:25 10       Q.   Okay.  And this, too, the Store Policy Manual,

10:06:33 11   was revised again a year later under your tenure as

10:06:37 12   executive vice-president of store operations?

10:06:41 13       A.   Yes.

10:06:41 14       Q.   And once again, you stated in the first page of

10:06:46 15   the policy manual, in the third paragraph:  "Exceptions

10:06:53 16   to any of these policies would require upper level

10:06:57 17   management authorization (i.e., vice-president level or

10:07:00 18   above)"; correct?

10:07:02 19       A.   Yes.

10:07:02 20       Q.   And that's referring to you as the

10:07:07 21   vice-president; correct?

10:07:08 22       A.   That was referring to a vice-president.  I was

10:07:12 23   senior vice-president.  So a V.P. of a division could

10:07:16 24   make an approval.

10:07:17 25       Q.   Okay.  And a division vice-president reports

| | | |
|---|---|---|
| 10:07:20 | 1 | directly to you; correct? |
| 10:07:22 | 2 | A.   Yes. |
| 10:07:22 | 3 | Q.   And they're in charge of a large number of |
| 10:07:28 | 4 | stores; correct? |
| 10:07:28 | 5 | A.   Yes. |
| 10:07:32 | 6 | THE COURT:   Let me ask you this:   Who sets |
| 10:07:39 | 7 | the policy or policies for Family Dollar? |
| 10:07:46 | 8 | THE WITNESS:   The policy setting is usually |
| 10:07:49 | 9 | a number of people, depending -- if it has to do with, |
| 10:07:54 | 10 | say, Loss Prevention, the Loss Prevention adds to it. |
| 10:07:58 | 11 | If it's an HR policy, the HR participates. |
| 10:08:01 | 12 | THE COURT:   And where are these policies |
| 10:08:03 | 13 | set? |
| 10:08:04 | 14 | THE WITNESS:   They would be based from Best |
| 10:08:06 | 15 | Practices, and set in the corporate office. |
| 10:08:08 | 16 | THE COURT:   So the policies are actually |
| 10:08:10 | 17 | formulated and set in the corporate office? |
| 10:08:12 | 18 | THE WITNESS:   Yes, sir. |
| 10:08:13 | 19 | THE COURT:   And I take it, once the policies |
| 10:08:17 | 20 | are set, they're embodied in written form, they're put |
| 10:08:24 | 21 | in writing? |
| 10:08:25 | 22 | THE WITNESS:   Yes.   There's a lot of |
| 10:08:27 | 23 | adjustments that may go on.   Sometimes there's changes |
| 10:08:32 | 24 | in the emails or memos that go out, so they might -- we |
| 10:08:35 | 25 | don't have, like, an updated page where you send pages |

| | | |
|---|---|---|
| 10:08:39 | 1 | into this document.  So we will send out an email that |
| 10:08:43 | 2 | says -- |
| 10:08:43 | 3 | THE COURT:  Yes, sir.  Yes, sir.  But in any |
| 10:08:45 | 4 | event, if there is a change in policy, it will be in |
| 10:08:48 | 5 | some written form somewhere? |
| 10:08:50 | 6 | THE WITNESS:  Yes. |
| 10:08:50 | 7 | THE COURT:  All right.  To the best of your |
| 10:08:53 | 8 | knowledge, does the company have a written policy |
| 10:08:59 | 9 | stating that the hiring, firing, or other store manager |
| 10:09:05 | 10 | recommendations concerning changes of employee status, |
| 10:09:11 | 11 | be given particular weight? |
| 10:09:14 | 12 | THE WITNESS:  I think -- I'm just going from |
| 10:09:19 | 13 | memory -- I think it says get a partner in something |
| 10:09:22 | 14 | that you do. |
| 10:09:26 | 15 | THE COURT:  Well, do you understand my |
| 10:09:27 | 16 | question? |
| 10:09:28 | 17 | THE WITNESS:  Is the -- |
| 10:09:29 | 18 | THE COURT:  Is there any written policy that |
| 10:09:31 | 19 | you know of, any written Family Dollar policy, that says |
| 10:09:39 | 20 | that the recommendations of store managers concerning |
| 10:09:43 | 21 | the hiring, firing, promotions of employees, of all |
| 10:09:51 | 22 | their employees, be given particular weight? |
| 10:09:57 | 23 | THE WITNESS:  I don't think it's written |
| 10:09:58 | 24 | that way, no, sir. |
| 10:09:59 | 25 | THE COURT:  All right. |

10:10:03  1    Q.  (By Mr. R. Wiggins)  Okay.  Now, I want to show

10:10:10  2  you Exhibit 5 -- I'm sorry, 13A.  Excuse me.  It's 5 in

10:10:22  3  your deposition.

10:10:30  4    A.  Thank you.

10:10:31  5    Q.  This is the district manager job description;

10:10:36  6  correct?

10:10:36  7    A.  Yes, it is.

10:10:38  8    Q.  And --

10:10:45  9        MR. R. WIGGINS:  We would offer that, Your

10:10:46  10  Honor.

10:10:46  11        THE COURT:  What's the number?

10:10:49  12        MR. R. WIGGINS:  Exhibit 13A.

10:10:51  13        THE COURT:  It's received in evidence.

10:10:54  14        MR. WHITE:  Do you have a date on that, Bob?

10:10:56  15        MR. R. WIGGINS:  We're going to establish

10:10:59  16  that.  This is produced by the defendant as D17484 in

10:11:03  17  the documents produced.  Did I end up having enough?

10:11:30  18        MR. WHITE:  Do you have an extra one?

10:11:33  19        MR. R. WIGGINS:  You're missing one?

10:11:35  20  Unfortunately, I'm short two.  Two of them got marked up

10:11:40  21  with yellow highlighter.

10:12:09  22    Q.  (By Mr. R. Wiggins)  Now, this job description

10:12:19  23  that's in that for district manager says basic

10:12:23  24  responsibilities of the district manager is, quote, "to

10:12:29  25  serve as the corporate representative in charge of all

10:12:33  1   store activities within their assigned district";

10:12:36  2   correct?

10:12:37  3       A.   That's what it says.

10:12:38  4       Q.   Second sentence under basic responsibility says

10:12:45  5   "specifically, to achieve the desired profit result for

10:12:48  6   that district using corporate approved policies, plans

10:12:52  7   and objectives"; correct?

10:12:55  8       A.   Yes, sir.

10:12:55  9       Q.   We saw a minute ago the Store Policy Manual -- in

10:13:01  10  order to have the approval of the vice-president for any

10:13:04  11  change; correct?

10:13:05  12      A.   Yes.

10:13:05  13      Q.   And this is saying the district manager has the

10:13:08  14  responsibility for enforcing those policies; correct?

10:13:12  15      A.   Yes.

10:13:13  16      Q.   And, in fact, you understand specific duties,

10:13:17  17  Number 1, it says "administer company policy".  I'm

10:13:26  18  sorry.

10:13:26  19          Did I pass out one more copy that I had?  Are we

10:13:31  20  still short?  I only have one.  I'm sorry.

10:13:37  21              THE COURT:  And he won't be sorry next time,

10:13:42  22  because he will make at least 10 copies -- 11 -- one for

10:13:47  23  the Judge.

10:13:48  24              MR. R. WIGGINS:  I will make 20 next time,

10:13:50  25  just to be sure.  I'm very bad about losing documents.

| | | |
|---|---|---|
| 10:13:55 | 1 | Q.   Number 1 under specific duties for the district |
| 10:13:59 | 2 | manager says, quote, "administer company policy in their |
| 10:14:03 | 3 | district by directing store manager" -- |
| 10:14:06 | 4 | MR. WHITE:  Your Honor, may I look at what |
| 10:14:09 | 5 | he published to the jury? |
| 10:14:10 | 6 | THE COURT:  Sure. |
| 10:14:17 | 7 | MR. WHITE:  Your Honor, the copies he's |
| 10:14:19 | 8 | publishing are highlighted. |
| 10:14:22 | 9 | MR. R. WIGGINS:  I just asked you that. |
| 10:14:24 | 10 | THE COURT:  Disregard the highlight. |
| 10:14:26 | 11 | MR. R. WIGGINS:  I apologize. |
| 10:14:27 | 12 | THE COURT:  Next question. |
| 10:14:29 | 13 | Mr. Wiggins, do you have another question of |
| 10:14:31 | 14 | the witness? |
| 10:14:32 | 15 | MR. R. WIGGINS:  Yes.  I'm not sure I got an |
| 10:14:34 | 16 | answer. |
| 10:14:35 | 17 | Q.   (By Mr. R. Wiggins)  "Administer company policy |
| 10:14:39 | 18 | in the district by intersecting store managers in |
| 10:14:42 | 19 | implementation of policies at store level".  That's the |
| 10:14:43 | 20 | district manager's duty; correct? |
| 10:14:45 | 21 | A.   That's what it says. |
| 10:14:46 | 22 | Q.   You talk about shrinkage in your direct.  Look |
| 10:14:54 | 23 | down under number 3, the fifth bullet point.  It says |
| 10:15:02 | 24 | that the district manager, quote, "conducts shrinkage |
| 10:15:05 | 25 | meetings as needed on a store-by-store basis, as well as |

10:15:09  1   ensure the execution of all mandatory corporate

10:15:14  2   shrinkage meetings"; correct?

10:15:17  3       A.  Yes, sir.

10:15:17  4       Q.  Now, Exhibit 136, you said, was drafted because

10:15:25  5   you thought there was some problem in 2003 that was

10:15:31  6   brought to your attention about assistant managers'

10:15:40  7   shrinkage or sliding of merchandise; correct?

10:15:42  8       A.  Yes, that's correct.

10:15:43  9       Q.  But let's look at what you actually said.  Look

10:15:48  10  to the first paragraph.

10:15:54  11      It says:  "I want to remind you that it is the

10:16:01  12  policy of Family Dollar that district managers interview

10:16:09  13  all assistant manager candidates, whether newly hired or

10:16:13  14  internal promotional candidates"; correct?

10:16:15  15      A.  That's what it says.

10:16:16  16      Q.  That's telling that's always been the policy, you

10:16:21  17  were just reminding them of it?

10:16:23  18      A.  No.  I don't know that it was always the policy.

10:16:25  19      Q.  Those were the words you chose to send out to

10:16:27  20  every store manager in the company; correct?

10:16:30  21      A.  That went out, yes.

10:16:32  22      Q.  All right.  And next paragraph, you said, "the

10:16:51  23  purpose of this memo is to restate this policy".  It had

10:16:57  24  always been the policy; correct?  You were simply

10:17:01  25  restating it?

10:17:01    1        A.   I don't know that it was always the policy.

10:17:03    2        Q.   But you said you were restating --

10:17:05    3               THE COURT:   Well, actually, you didn't write

10:17:07    4     this memo?

10:17:08    5               THE WITNESS:   I don't think so, Judge.

10:17:09    6               THE COURT:   Well, do you recall a time when

10:17:11    7     it was not the policy?

10:17:13    8               THE WITNESS:   What started to happen is we

10:17:15    9     asked for a partnership in interviewing just to make

10:17:20   10     sure that the amount of turnover would go down.

10:17:24   11               And so we really started to emphasize it.   I

10:17:27   12     don't recall when it was or wasn't a policy.

10:17:30   13               THE COURT:   All right.   So you don't recall

10:17:32   14     a time when it was not the policy?

10:17:34   15               THE WITNESS:   No, sir.

10:17:35   16               THE COURT:   All right.

10:17:36   17        Q.   (By Mr. R. Wiggins)   And the - what you're

10:17:39   18     restating in Exhibit 136 as the company policy is that

10:17:44   19     the district manager must interview each and every

10:17:47   20     assistant manager; and you will be subject to discharge

10:17:51   21     or discipline if you don't follow that policy; correct?

10:17:54   22        A.   That's what it says.

10:17:56   23        Q.   And you said the reason for that interview was

10:18:00   24     for shrinkage or theft issues, honesty issues, that type

10:18:09   25     of thing?

10:18:10    1      A.   To make sure the manager was following good

10:18:13    2   practices in interviewing and hiring the right people.

10:18:15    3      Q.   Well, you didn't say the district manager must

10:18:18    4   sit in; you said the district manager must interview?

10:18:22    5      A.   That's right.

10:18:23    6      Q.   And you wanted the interview to -- for the

10:18:27    7   district manager to assess the person and make a

10:18:29    8   judgment as to whether they were trustworthy?

10:18:31    9      A.   So they could go back and talk with the manager.

10:18:34   10      Q.   And so it was the district manager who was having

10:18:37   11   to actually interview and assess and make a judgment

10:18:40   12   about the selection of the assistant manager candidates?

10:18:44   13      A.   Not in the selection of.

10:18:47   14      Q.   District managers routinely check behind store

10:18:54   15   managers on paperwork issues; correct?

10:18:57   16      A.   Yes, sir.

10:18:57   17      Q.   They don't have to interview the actual applicant

10:19:01   18   to check behind the store manager on paperwork issues?

10:19:06   19      A.   No, sir.

10:19:06   20      Q.   Okay.  Now, did you testify that -- I wrote it

10:19:27   21   down quickly, I might have gotten it wrong -- that the

10:19:32   22   district manager is the one that grants the pay

10:19:34   23   increases of the assistant managers, or -- I think you

10:19:39   24   testified to that, didn't you?

10:19:40   25      A.   What I said is the district manager inputs the

10:19:42  1   salary into --

10:19:43  2       Q.  Well, they actually have to approve the pay

10:19:46  3   increase; correct?

10:19:47  4       A.  No.  I think -- I don't think I talked about a

10:19:52  5   pay increase.

10:19:54  6       Q.  Let's have F1.  The Store Policy Manual that you

10:20:00  7   said you revised when you became vice-president in 2002,

10:20:07  8   that we looked at a little earlier, says on pay

10:20:15  9   increases -- if technology doesn't fail us -- that "all

10:20:31  10  pay change recommendations by the store manager should

10:20:34  11  be approved by the district manager prior to

10:20:37  12  implementation"; correct?

10:20:39  13      A.  That's what it says.

10:20:40  14      Q.  Then it says "the district manager will review

10:20:43  15  wage increase recommendations with the regional

10:20:47  16  vice-president"; correct?

10:20:48  17      A.  Yes.

10:20:49  18      Q.  And then the policy that was put in, in 2002

10:20:54  19  under you, says this:  "Store managers will be informed

10:20:57  20  whether or not" --

10:20:59  21              MR. WHITE:  Your Honor, I object to the

10:21:00  22  representation.

10:21:02  23              THE COURT:  The representation of what?

10:21:05  24              MR. WHITE:  That this is from 2002.  I

10:21:08  25  believe this is from 1997.

10:21:10  1          MR. R. WIGGINS:  No, sir.  Absolutely not.

10:21:11  2          THE COURT:  The objection is overruled.

10:21:14  3     Q.  (By Mr. R. Wiggins)  You want to check that --

10:21:16  4  you want to check to see if I'm right, Mr. Barkus, if

10:21:19  5  this is 2002?

10:21:22  6     A.  I don't know where it would be, Mr. Wiggins.

10:21:25  7     Q.  Look at your 2002, which is 1923, Defendant

10:21:30  8  Exhibit 1923.  Do you have it?  Do you have --

10:21:45  9          THE COURT:  Well, let me just see if you can

10:21:48 10  just get right down to the core.

10:21:52 11          The fact of the matter is that a store

10:21:56 12  manager's recommendation for any change in pay of a

10:22:01 13  store employee must be approved by the district manager

10:22:07 14  before it's implemented; is that a correct statement of

10:22:11 15  the policy?

10:22:12 16          THE WITNESS:  I believe it is.

10:22:13 17          THE COURT:  All right.

10:22:15 18     Q.  (By Mr. R. Wiggins)  And that was the statement

10:22:18 19  under the policy under you during your years as

10:22:21 20  executive vice-president of store operations; correct?

10:22:24 21     A.  I don't know how far that goes back, Bob.

10:22:26 22     Q.  Okay.  Well, I'm -- the exhibits are in evidence.

10:22:34 23  They speak for themselves.

10:22:41 24          Now, you said that you liked to see a five-day

10:23:02 25  work week, if possible, for your store managers;

10:23:05  1  correct?

10:23:05  2      A.  Yes.

10:23:06  3      Q.  But you also told us that you do nothing to check

10:23:08  4  how many hours are actually being required?

10:23:10  5      A.  That's correct.

10:23:11  6      Q.  The company selected you as their official

10:23:23  7  spokesman under a rule called Rule 30(b)(6), so that it

10:23:30  8  would be bound by what you say; correct?

10:23:33  9      A.  Yes, sir.

10:23:33  10      Q.  And Mr. Broome, who we heard from yesterday, was

10:23:37  11  also the other official spokesman the company agreed to

10:23:41  12  be bound by; correct?

10:23:43  13      A.  Yes, sir.

10:23:44  14      Q.  Does the company take the position that just

10:24:03  15  because you have the title of manager, you're not

10:24:09  16  entitled to overtime?

10:24:11  17      A.  The manager gets paid on a salary basis and gets

10:24:17  18  a bonus for compensation, so it would be a salary basis.

10:24:21  19  It wouldn't be overtime.

10:24:23  20      Q.  So you're saying the only thing the company looks

10:24:27  21  at in not paying overtime for all these hours that are

10:24:32  22  worked over 40, is that you put the label "salary" and

10:24:38  23  pay them a salary; that's the only thing you consider?

10:24:40  24      A.  No, I didn't say that.  I said we pay them

10:24:45  25  salary, and we pay them a bonus.  I don't know the

10:24:50  1    considerations.

10:24:50  2        Q.   You are the designated spokesman for the company

10:24:53  3    on this issue.  Do you consider anything besides the

10:24:57  4    fact that you've got the title of manager --

10:25:01  5        A.   They also have the responsibility and

10:25:03  6    accountability.  I mean, they have the responsibility to

10:25:06  7    build the business and build the profit, build the

10:25:11  8    sales, hire the team.

10:25:12  9        Q.   So you would agree, then, that just because you

10:25:16  10   have a title of manager -- like the assistant store

10:25:21  11   manager has -- that doesn't make you exempt from

10:25:23  12   overtime, does it?

10:25:24  13       A.   I don't know what all the legal ramifications

10:25:27  14   are, exempt from overtime.

10:25:29  15       Q.   The company made a determination that even though

10:25:33  16   assistant managers are called managers, they're not

10:25:35  17   really managers, they're not going to get overtime;

10:25:39  18   correct?

10:25:39  19       A.   The assistant managers do get overtime.

10:25:42  20       Q.   The assistant managers get overtime -- did I say

10:25:46  21   that?

10:25:46  22       A.   Yes, sir.

10:25:47  23       Q.   I said it backwards.

10:25:51  24       A.   The assistant managers get paid an hourly raise,

10:25:54  25   and then anything over 40 hours would be time and a

10:25:57   1   half.

10:25:57   2       Q.   Yeah.   I don't know how I phrased that.   I must

10:26:00   3   have badly misphrased it.

10:26:02   4       The -- and the company, you said, expects 48

10:26:16   5   hours from the store managers; and then at some point it

10:26:20   6   became 52; correct?

10:26:22   7       A.   48 to 52, yes.

10:26:24   8       Q.   And the bonuses for that work?

10:26:27   9       A.   The bonus is off of controllable profit that the

10:26:31  10   manager generates in the store.

10:26:33  11       Q.   The bonus, you're entitled to the bonus if you

10:26:36  12   work 48 to 52 hours; correct?

10:26:38  13       A.   Yes, sir.

10:26:38  14       Q.   That was the deal?

10:26:39  15       A.   Yes, sir.

10:26:40  16       Q.   The deal wasn't work 70, 80, 90 hours, was it?

10:26:49  17       A.   The job is whatever it requires to get the job

10:26:53  18   done.

10:26:54  19       And so, there are many times in retail, like at

10:26:57  20   Christmastime you work a lot of hours, yes, sir.   But at

10:27:02  21   the same time, there's time in the summertime when the

10:27:05  22   business is slow, a lot of people can take time off.

10:27:08  23       Q.   But you told us that you don't know -- and you

10:27:11  24   have never looked into it, you have no reports of --

10:27:15  25   whether these managers are working many more hours than

10:27:20   1   that; you don't know what hours they're working, do you?

10:27:24   2       A.   That's correct.

10:27:25   3            THE COURT:   But it is certainly not the

10:27:27   4   contemplation of the company that a store manager will

10:27:31   5   work week after week after week 70 or more hours per

10:27:39   6   week?

10:27:39   7            THE WITNESS:   No, sir.   And we will ask

10:27:41   8   people, "how many hours are you working?"   "what are you

10:27:44   9   doing?"   and, "how can we help you reduce those hours?"

10:27:47   10           I mean, no one can work that many hours week

10:27:49   11   after week in this type of work.

10:27:52   12      Q.   You don't want them to work those many hours.

10:27:54   13   But we had a witness yesterday who had received the

10:27:58   14   company records, Dr. Bradley, and he had printed out

10:28:03   15   what the records showed; and your own records are

10:28:06   16   showing people are working long hours?

10:28:10   17      A.   They do work long hours.

10:28:12   18           MR. WHITE:   Judge, I'm going to object to

10:28:14   19   the characterization of that testimony.

10:28:16   20           THE COURT:   I overrule.

10:28:20   21      Q.   The exhibit showed someone working of 52 weeks,

10:28:24   22   working 50 of them long hours, that's not just

10:28:29   23   Christmas, is it?

10:28:30   24      A.   It wouldn't be if it was 52 weeks.

10:28:33   25      Q.   And even though Dr. Bradley doesn't work for the

| | | |
|---|---|---|
| 10:28:38 | 1 | company could figure it out, looking at your records, |
| 10:28:43 | 2 | you never bothered to look at your records to see if |
| 10:28:48 | 3 | these folks were having to do what you said they |
| 10:28:52 | 4 | shouldn't have to do -- work these terrible hours? |
| 10:28:54 | 5 | A.  No, I haven't. |
| 10:28:58 | 6 | MR. R. WIGGINS:  No other questions. |
| 10:29:01 | 7 | THE COURT:  Redirect? |
| 10:29:02 | 8 | MR. WHITE:  Yes, sir. |
| 10:29:03 | 9 | **REDIRECT EXAMINATION** |
| 10:29:03 | 10 | **BY MR. WHITE:** |
| 10:29:06 | 11 | Q.  Would you please pull up from Defendant's Exhibit |
| 10:29:11 | 12 | 124, page DX1924-202? |
| 10:29:22 | 13 | I think you -- I'm referring you to the Store |
| 10:29:27 | 14 | Operations Policy Manual.  And I believe you said |
| 10:29:30 | 15 | earlier in your direct you have not read nor are you |
| 10:29:33 | 16 | familiar? |
| 10:29:33 | 17 | A.  No, I am not. |
| 10:29:34 | 18 | Q.  And you were asked a question about wage and hour |
| 10:29:38 | 19 | compliance. |
| 10:29:39 | 20 | Would you highlight that?  Thank you. |
| 10:29:43 | 21 | MR. R. WIGGINS:  Your Honor, we object. |
| 10:29:45 | 22 | This is three years after this lawsuit was filed. |
| 10:29:47 | 23 | MR. WHITE:  Your Honor, I object to his |
| 10:29:49 | 24 | speaking objection. |
| 10:29:51 | 25 | THE COURT:  The objection to the objection |

10:29:53    1    is overruled.

10:29:55    2              Now, what's your point, Mr. Wiggins?

10:29:59    3              MR. R. WIGGINS:  He is trying to put up on

10:30:01    4    the board something that this witness said he didn't

10:30:03    5    know anything about, first of all, and it is three years

10:30:06    6    after the lawsuit.

10:30:07    7              THE COURT:  Do you know anything about this

10:30:08    8    document?

10:30:10    9              THE WITNESS:  If it's in this book, I would

10:30:12   10    say it's there, sir.  That's what I would know.

10:30:14   11              THE COURT:  The objection is sustained.

10:30:17   12    Q.  (By Mr. White)  Are store managers required,

10:30:21   13    Mr. Barkus, to report their store -- their hours they

10:30:25   14    work?

10:30:25   15    A.  They are required to report hours.

10:30:28   16    Q.  And do you know what the average number of hours

10:30:31   17    that the store managers report?

10:30:33   18    A.  I think what they reported is 56 hours.

10:30:40   19    Q.  Let me show you -- you were asked a question

10:30:43   20    about a job description.  Let me show you Defendant's

10:30:48   21    Exhibit 2111, please, sir.  I think that's also your

10:30:59   22    Exhibit 31.  I think you were using 31A.

10:31:17   23              MR. R. WIGGINS:  Same objection, Your Honor.

10:31:20   24    This is a job description revision three years after the

10:31:22   25    lawsuit was filed.

10:31:24  1          MR. WHITE:  Your Honor, it is in -- never

10:31:27  2   mind.  Excuse me.

10:31:29  3          THE COURT:  Are you familiar with this job

10:31:31  4   description?

10:31:31  5          THE WITNESS:  Yes, sir.

10:31:32  6          THE COURT:  All right.  Overruled.

10:31:33  7          MR. WHITE:  We'll offer that, Your Honor.

10:31:35  8          THE COURT:  It's received in evidence.

10:31:37  9   Q.  (By Mr. White)  And is that a job description

10:31:39  10  that ultimately resulted from the process that you've

10:31:42  11  described today?

10:31:44  12          MR. R. WIGGINS:  Object to leading.

10:31:45  13          THE COURT:  Sustained.

10:31:46  14  Q.  What was the occasion for that job description

10:31:48  15  being created?

10:31:49  16  A.  We had the HR team and the Operations team

10:31:53  17  working together with, I think it was the HSL -- HL --

10:31:59  18  SHL Group -- sorry -- working on job descriptions.

10:32:03  19  Q.  And as you have previously identified and

10:32:07  20  admitted into evidence -- or it may have already been

10:32:09  21  in, I think, Defendant's Exhibit 1925 -- please look at

10:32:14  22  page 557.

10:32:17  23          Mr. Barkus, do store managers get trained with

10:32:21  24  these manuals, such as the exhibit I have talked about

10:32:25  25  with candidates --

10:32:27   1                MR. R. WIGGINS:  Object to leading with

10:32:30   2     these policies he is throwing up on the board.

10:32:32   3                THE COURT:  The objection to leading is

10:32:34   4     sustained.

10:32:34   5                MR. R. WIGGINS:  He's leading these

10:32:35   6     documents to lead him on things he said he didn't know

10:32:38   7     in my examination.

10:32:39   8                MR. WHITE:  Your Honor, can I ask counsel

10:32:42   9     not to --

10:32:42  10                THE COURT:  I have sustained -- I'm sorry.

10:32:45  11     I have sustained the objection to leading.

10:32:47  12                Now, what's the next question, Mr. White?

10:32:50  13                MR. R. WIGGINS:  We ask the leading page to

10:32:53  14     be taken down, Your Honor.

10:32:55  15                MR. WHITE:  It's in evidence, Your Honor.

10:32:57  16                THE COURT:  What's in evidence -- Mr. White,

10:32:59  17     do you have another question?

10:33:00  18                MR. WHITE:  Yes, sir.

10:33:01  19                THE COURT:  Ask it.

10:33:03  20        Q.  (By Mr. White)  Are Family Dollar store manager

10:33:09  21     trainees trained with materials, such as Exhibit Number

10:33:12  22     25, in selecting candidates for employees?

10:33:14  23                THE COURT:  The objection to leading is

10:33:17  24     sustained.  Don't answer it.

10:33:20  25                THE WITNESS:  Oh, I'm sorry.

10:33:23   1     Q.   What, if any, training is given to Family Dollar

10:33:28   2   trainees in hiring employees?

10:33:31   3     A.   The -- we have training store managers that use

10:33:35   4   the training strands.  And so manager candidates will

10:33:40   5   use these strands that have what we call selection for

10:33:44   6   success on the proper hiring and training of the new

10:33:49   7   management candidates.

10:33:51   8     Q.   Look at Exhibit 25.

10:33:55   9               MR. WHITE:  May I approach, Your Honor?

10:33:56   10               THE COURT:  Yes, sir.

10:33:57   11               MR. WHITE:  And may I show him page 557?

10:34:05   12   And ask him to look at that.  Do not put it up.

10:34:12   13               THE COURT:  What's the number of the

10:34:15   14   exhibit?

10:34:15   15               MR. WHITE:  It's Exhibit 25, page 557, Your

10:34:21   16   Honor.  I'm sorry.  Exhibit 1925, Your Honor.

10:34:27   17               THE COURT:  All right.

10:34:28   18     Q.   (By Mr. White)  Have you had a chance to examine

10:34:35   19   that page?  Let me give you a minute.

10:34:42   20               MR. R. WIGGINS:  Your Honor, we object again

10:34:44   21   to not asking the witness what he knows before he has

10:34:47   22   given an answer by one of those pages in that big stack

10:34:51   23   of documents.

10:34:52   24               THE COURT:  Hold on just a moment from

10:34:53   25   reading the document.  What is going to be your question

| | | |
|---|---|---|
| 10:34:59 | 1 | to the exhibit? |
| 10:34:59 | 2 | MR. WHITE:  Does that page, to his |
| 10:35:01 | 3 | knowledge, reflect the Family Dollar practice in |
| 10:35:03 | 4 | training on store managers for selecting candidates? |
| 10:35:07 | 5 | MR. R. WIGGINS:  It's leading.  He's picking |
| 10:35:09 | 6 | a single page out of that huge stack of documents, |
| 10:35:12 | 7 | showing it to the witness, and then asking him that |
| 10:35:15 | 8 | leading question. |
| 10:35:15 | 9 | THE COURT:  Is that the policy manual? |
| 10:35:18 | 10 | MR. WHITE:  Yes, sir.  It's in the training |
| 10:35:20 | 11 | materials that are in evidence.  Yes, sir. |
| 10:35:21 | 12 | THE COURT:  So that's the policy.  The |
| 10:35:23 | 13 | objection is sustained. |
| 10:35:25 | 14 | MR. WHITE:  Your Honor, may it please the |
| 10:35:28 | 15 | Court? |
| 10:35:28 | 16 | THE COURT:  Yes, sir. |
| 10:35:29 | 17 | MR. WHITE:  Counsel has pulled out portions |
| 10:35:31 | 18 | for demonstrative purposes, and I don't have copies |
| 10:35:35 | 19 | until tomorrow to distribute.  May I publish it on the |
| 10:35:45 | 20 | screen without asking him a question? |
| 10:35:45 | 21 | THE COURT:  Yes. |
| 10:35:45 | 22 | MR. WHITE:  Thank you.  Please put it on the |
| 10:35:45 | 23 | screen. |
| 10:35:51 | 24 | May I ask it to be enlarged, please? |
| 10:35:55 | 25 | THE COURT:  Yes, sir. |

| | | |
|---|---|---|
| 10:35:56 | 1 | MR. WHITE:  Thank you.  That's all I have, |
| 10:36:10 | 2 | Your Honor. |
| 10:36:11 | 3 | THE COURT:  All right. |
| 10:36:12 | 4 | MR. WHITE:  Thank you, Mr. Barkus.  May he |
| 10:36:16 | 5 | be excused to make his flight? |
| 10:36:18 | 6 | THE COURT:  He is excused. |
| 10:36:20 | 7 | Ladies and gentlemen, we will take our |
| 10:36:22 | 8 | morning recess.  We will be in recess until 10:45 by the |
| 10:36:27 | 9 | clock on the wall.  Please do not discuss the case among |
| 10:36:30 | 10 | yourselves or allow it to be discussed in your presence. |
| 10:36:33 | 11 | Keep an open mind. |
| 10:36:34 | 12 | (Jury out at 10:27 a.m.) |
| 10:43:14 | 13 | (In open court, jury not present.) |
| 10:43:14 | 14 | MR. R. WIGGINS:  We have attempted to serve |
| 10:43:14 | 15 | a subpoena on the last witness so that he would be |
| 10:43:14 | 16 | available for our case.  He ran down the hall, would not |
| 10:43:14 | 17 | take the subpoena. |
| 10:43:14 | 18 | He is the 30(b)(6) spokesman designated by |
| 10:43:14 | 19 | the company.  And we have the right to call him, as much |
| 10:43:14 | 20 | as they do, for our case. |
| 10:43:14 | 21 | THE COURT:  Yes.  You can call him when it |
| 10:43:14 | 22 | comes your time, and he will be here when it comes your |
| 10:43:14 | 23 | time to put on additional evidence. |
| 10:43:14 | 24 | MR. WHITE:  Well, our problem is, Your |
| 10:43:14 | 25 | Honor, once we asked if he's excused -- this man lives |

| | | |
|---|---|---|
| 10:43:15 | 1 | in Pittsburgh, and, as you know, is working at GNC. |
| 10:43:15 | 2 | THE COURT:  This was -- well, why didn't you |
| 10:43:15 | 3 | alert me -- this is the witness that just left the |
| 10:43:15 | 4 | stand? |
| 10:43:15 | 5 | MR. WHITE:  Yeah.  He served him in the |
| 10:43:15 | 6 | hall, almost in front -- |
| 10:43:15 | 7 | MR. R. WIGGINS:  There are -- |
| 10:43:15 | 8 | MR. WHITE:  -- of the jury after he had -- |
| 10:43:15 | 9 | THE COURT REPORTER:  One at a time. |
| 10:43:15 | 10 | MR. R. WIGGINS:  There are matters -- |
| 10:43:15 | 11 | MR. WHITE:  Not previously. |
| 10:43:15 | 12 | MR. R. WIGGINS:  -- for our case that can't |
| 10:43:15 | 13 | be brought out -- |
| | 14 | THE COURT REPORTER:  Mr. White, one at a |
| | 15 | time. |
| | 16 | MR. R. WIGGINS:  -- as a 30(b)(6) spokesman |
| | 17 | that they designated.  There are things that we want to |
| | 18 | bring out from him from our case that can't be brought |
| 10:43:15 | 19 | out in the time that they chose -- |
| 10:43:15 | 20 | THE COURT:  Mr. Wiggins? |
| 10:43:15 | 21 | MR. R. WIGGINS:  Yes. |
| 10:43:15 | 22 | THE COURT:  I think we did it on the record. |
| 10:43:15 | 23 | This witness was excused. |
| 10:43:15 | 24 | MR. WHITE:  Yes, sir. |
| 10:43:15 | 25 | THE COURT:  Without objection from you -- |

10:43:16   1          MR. R. WIGGINS:  I did not even hear the

10:43:16   2   comment being made, Your Honor.

10:43:16   3          MR. WHITE:  Your Honor --

10:43:16   4          THE COURT:  Well, I think we can pull it up

10:43:16   5   on Livenote.

10:43:16   6          MR. R. WIGGINS:  I don't deny it, but I

10:43:16   7   didn't hear the word said.

10:43:16   8          THE COURT:  Well, that's too bad.  That's

10:43:16   9   too bad.  It was requested that the witness be excused.

10:43:16   10          Now, maybe you need to get a better hearing

10:43:16   11   aid.

10:43:16   12          MR. R. WIGGINS:  I think I listened pretty

10:43:16   13   close, Your Honor.  And if it was said, it was said in

10:43:16   14   passing where I didn't hear it.

10:43:16   15          THE COURT:  Well, let me -- can you pull it

10:43:16   16   up?  Mr. Wiggins?

10:43:16   17          (The court reporter read the last comments.)

10:43:16   18          MR. R. WIGGINS:  I apologize, Your Honor.  I

10:43:16   19   did not hear that.  But I think it's an important issue

10:43:16   20   that we be able to call the witness on equal terms.

10:43:16   21          I would not do this for any other witness

10:43:16   22   other than their official --

10:43:16   23          MR. WHITE:  Excuse me, Your Honor.  They put

10:43:16   24   a subpoena on Bill Broome, when he walked off the stand

10:43:16   25   yesterday; the man with the wife who is ill up there.

10:43:16  1          MR. R. WIGGINS:  He is the second --

10:43:16  2          MR. WHITE:  But --

10:43:16  3          THE COURT REPORTER:  One at a time.

10:43:17  4          MR. WIGGINS:  -- the two people in this

10:43:19  5  whole case to speak for them, and our case is built

10:43:22  6  around the people that he gave us -- those two people.

10:43:26  7  And we should be able to bring out the points that we

10:43:29  8  want to bring out for our case, just like they are able

10:43:31  9  to do that.

10:43:34  10         THE COURT:  Yes, sir.  I agree with you.

10:43:36  11  And if you had -- if you had objected to my excusing

10:43:41  12  him, I would not have excused him.

10:43:44  13         MR. R. WIGGINS:  Well, I hope that I have

10:43:46  14  excusable neglect on that, Your Honor, because I just

10:43:48  15  didn't hear it.

10:43:49  16         THE COURT:  No, you don't.  No.  There

10:43:52  17  were -- other plaintiffs' lawyers were in the room when

10:43:54  18  it happened.

10:43:59  19         MR. R. WIGGINS:  Apparently --

10:44:00  20         THE COURT:  Now, of course, when it comes

10:44:02  21  your turn to put on evidence -- you have taken his

10:44:06  22  deposition, haven't you?

10:44:07  23         MR. R. WIGGINS:  We did take his deposition

10:44:09  24  three years ago.

10:44:10  25         THE COURT:  You can put on anything in the

10:44:12   1   deposition.

10:44:12   2              MR. R. WIGGINS:  We took his deposition,

10:44:13   3   Your Honor, in 2002.

10:44:20   4              MR. WHITE:  I think they took it on more

10:44:22   5   than one occasion.  I think it was taken one time by

10:44:25   6   Mr. Childs and another time by Mr. Wiggins.

10:44:27   7              MR. R. WIGGINS:  Not in this case.

10:44:28   8              MR. MAYS:  Not in this case.

10:44:30   9              MR. WHITE:  Okay.

10:44:31   10             MR. R. WIGGINS:  Totally different case.

10:44:34   11             MR. WHITE:  He is excused, Your Honor?

10:44:36   12             THE COURT:  Well, Mr. White --

           13             MR. WHITE:  Yes, sir.

           14             THE COURT:  You know I excused him.  I would

           15   have to unexcuse him.

           16             MR. WHITE:  Thank you, Your Honor.

           17             (Recess from 10:44 a.m. until 10:45 a.m.)

10:56:02   18             MR. R. WIGGINS:  Your Honor, the plaintiff

10:56:03   19   would make a motion to preclude the next witness and

10:56:07   20   witnesses like her that are not plaintiffs that are

10:56:12   21   store managers from stores not at issue in this case,

10:56:16   22   whose testimony will be that they were store managers in

10:56:20   23   spite of the policies and the threat of discharge or

10:56:25   24   discipline if they violated those policies.  Those type

10:56:28   25   of witnesses are simply not relevant to the 1,400

10:56:34   1   plaintiffs in this case.

10:56:35   2         We believe the defendant should be

10:56:36   3   putting on witnesses addressed to the stores the

10:56:39   4   plaintiffs worked in, not other stores.

10:56:44   5         As the witness last night, the last

10:56:46   6   witness yesterday, Ms. Coleman, the fact that she -- or

10:56:52   7   this witness, was not misclassified does not tell us

10:56:58   8   anything about whether these 1,400 representative

10:57:01   9   plaintiffs are -- the representative plaintiffs and the

10:57:03  10   1,400 are mis-classified.  And there's a risk of

10:57:08  11   confusion to bring in stores that aren't at issue in the

10:57:14  12   case.

10:57:16  13         MR. MAY:  The risk of confusion is at the

10:57:19  14   podium, Your Honor.  I have heard nothing other than but

10:57:22  15   that all plaintiffs in this case, and all nationwide

10:57:27  16   store managers of Family Dollar were similarly situated

10:57:31  17   over and over again.  Plus, this witness will tell you

10:57:34  18   that she got notice of this lawsuit.

10:57:37  19         So there has been an abundance of argument

10:57:44  20   that all the store managers of Family Dollar are

10:57:48  21   similarly situated and have the same duties.  And she

10:57:51  22   wants to tell you how things are and what the policy --

10:57:53  23   how the policies apply to her.

10:57:55  24         MR. R. WIGGINS:  It's only the 1,400 --

10:57:58  25         THE COURT:  Just a moment.

| | | |
|---|---|---|
| 10:57:59 | 1 | MR. MAY:  No, the -- |
| 10:58:00 | 2 | THE COURT:  It would probably be useful for |
| 10:58:06 | 3 | me to pull up the notice that was sent to the Class. |
| 10:58:10 | 4 | As I understood the plaintiffs' position -- |
| 10:58:14 | 5 | and I stand to be corrected -- as I understood the |
| 10:58:17 | 6 | plaintiffs' position, it wasn't that all store managers |
| 10:58:22 | 7 | are similarly situated, it was that there were other |
| 10:58:26 | 8 | store managers who were similarly situated. |
| 10:58:29 | 9 | Now, if I'm wrong in that, point out the |
| 10:58:40 | 10 | error of my ways.  Just -- I mean, by a document. |
| 10:58:44 | 11 | MR. MAY:  Well, I was -- |
| 10:58:46 | 12 | THE COURT:  -- or by an order -- |
| 10:58:47 | 13 | MR. MAY:  I would think that the initial |
| 10:58:50 | 14 | opinion. |
| 10:58:50 | 15 | THE COURT:  Well, before speculating.  Just |
| 10:58:54 | 16 | see if you can find any order that I have signed, |
| 10:58:57 | 17 | Mr. May, any order that I have signed in which I say |
| 10:59:01 | 18 | that the plaintiffs' contention is that all store |
| 10:59:07 | 19 | managers are similarly situated to these plaintiffs. |
| 10:59:10 | 20 | MR. MAY:  Yes, sir. |
| 10:59:12 | 21 | THE COURT:  You -- |
| 10:59:14 | 22 | MR. MAY:  We are going to pull that up.  But |
| 10:59:16 | 23 | I just point out that notice went to about 13, 14,000 |
| 10:59:20 | 24 | people at the Court's -- |
| 10:59:23 | 25 | THE COURT:  I don't need argument at this |

| | | |
|---|---|---|
| 10:59:24 | 1 | point, Mr. May. |
| 10:59:25 | 2 | MR. MAY:  All right. |
| 10:59:27 | 3 | MR. KALLON:  Your Honor, can I say one thing |
| 10:59:29 | 4 | along these lines in response to Mr. Wiggins' point? |
| 10:59:29 | 5 | THE COURT:  Yes, sir. |
| 10:59:33 | 6 | MR. KALLON:  I think essentially what |
| 10:59:35 | 7 | Mr. Wiggins is arguing is, any individuals may not be |
| 10:59:38 | 8 | exempt if they do not follow Family Dollar's policies. |
| 10:59:42 | 9 | If you take that argument to an extreme, essentially |
| 10:59:45 | 10 | what he is arguing is that you, Your Honor, should be |
| 10:59:47 | 11 | able to find if the entire collective that no evidence |
| 10:59:52 | 12 | has been presented on is similarly situated to these |
| 10:59:56 | 13 | individuals.  Whereas, in fact, some of those folks, if |
| 11:00:01 | 14 | we were able to depose them, may very well have been |
| 11:00:06 | 15 | like Felicia Coleman that said, "I was able to hire or |
| 11:00:09 | 16 | fire or make recommendations, and I ran my stores". |
| 11:00:12 | 17 | THE COURT:  Well, the difference is that, |
| 11:00:13 | 18 | unlike the next witness, the opt-ins all said that they |
| 11:00:25 | 19 | were similarly situated to the named plaintiffs and that |
| 11:00:31 | 20 | they agreed to be bound by the fate of the named |
| 11:00:40 | 21 | plaintiffs. |
| 11:00:40 | 22 | MR. KALLON:  Your Honor, the lawyers have |
| 11:00:42 | 23 | said that and the representatives have said that. |
| 11:00:44 | 24 | THE COURT:  Well, the law says that. |
| 11:00:46 | 25 | MR. KALLON:  But we have not -- |

11:00:47  1          THE COURT:  But the law says that.

11:00:49  2          MR. KALLON:  That's true, Your Honor.  But I

11:00:51  3   think our argument here is to truly determine if an

11:00:53  4   individual is exempt, Your Honor, the arguments put

11:00:57  5   forth in open --

11:00:57  6          THE COURT:  Mr. Kallon, under the Fair Labor

11:01:02  7   Standards Act, as I understand it, each plaintiff -- or

11:01:08  8   the defendant has a burden of proving that each

11:01:12  9   plaintiff is exempt.

11:01:17  10          MR. KALLON:  And the only way to prove that

11:01:19  11   exemption, Your Honor, is to see what that plaintiff

11:01:22  12   actually does at the store.

11:01:23  13          THE COURT:  What that plaintiff actually

11:01:25  14   does.  You're exactly right.

11:01:26  15          MR. KALLON:  Well, that's our point.  We

11:01:28  16   cannot do that if we were not allowed discovery if

11:01:31  17   while -- there's no evidence whatsoever, Your Honor --

11:01:34  18          THE COURT:  Mr. Kallon, look, I did not

11:01:36  19   write this law.  I did not write the law of collective

11:01:40  20   actions under the Fair Labor Standards Act.

11:01:45  21          Congress could have left Fair Labor

11:01:52  22   Standards Act cases under Rule 23, in which all of the

11:01:59  23   members of the defined class would have been bound.  And

11:02:04  24   they would have -- they would have had an opportunity to

11:02:09  25   opt out.

11:02:11   1            But Congress decided that it would turn Rule

11:02:15   2   23 on its head and say that if a similarly situated

11:02:21   3   person wants to opt in, then that individual may do so.

11:02:32   4   And the effect of his opting in is that he is, as I

11:02:40   5   understand it, as I understand the law, by opting in, he

11:02:41   6   doesn't have to prove his own case.

11:02:45   7            You don't have to try every single opt-in's

11:02:51   8   case.  The opt-in swims or sinks with the named

11:03:02   9   plaintiff.

11:03:03   10            MR. MAY:  Yes, sir.

11:03:04   11            THE COURT:  Now, we're back to the point

11:03:06   12   where you're going to show me, if you can, that I have

11:03:10   13   said that all -- that all store managers are similarly

11:03:17   14   situated to these plaintiffs.

11:03:19   15            MR. MAY:  May I just -- I'm not arguing.  I

11:03:23   16   just want to correct one statement made on the record by

11:03:25   17   our side.

11:03:26   18            THE COURT:  All right.

11:03:27   19            MR. MAY:  We do not agree that the opt-in

11:03:32   20   plaintiffs, any plaintiff in this action, binds another,

11:03:35   21   or that that's the cause of action that's working here.

11:03:40   22            I wanted to make sure that's clear on the

11:03:42   23   record.  That's all I wanted to say.

11:03:44   24            THE COURT:  All right.

11:03:46   25            MR. MAY:  Have we pulled it up?

11:03:49    1              Still at it, Your Honor.

11:03:50    2              THE COURT:  Okay.  How many of these other

11:03:53    3    store managers do you plan to call?

11:03:57    4              MR. MAY:  Well, we have at the courthouse

11:04:02    5    now --

11:04:05    6              THE COURT:  That's not the question I'm

11:04:07    7    asking.

11:04:07    8              MR. MAY:  I know.  I'm having to count them.

11:04:09    9              THE COURT:  So you just take whatever time

11:04:11   10    you need so you can answer my question.

11:05:50   11              MR. MAY:  Yes, sir.

11:06:20   12              THE COURT:  Have you been able to find it?

11:06:29   13              Well, until the defendant shows me that

11:06:33   14    material, I am going to let you call this witness over

11:06:40   15    the objection of the plaintiff.  I am going to give a

11:06:44   16    cautionary instruction to the jury that the defendant

11:06:54   17    has the burden of proving that each of the named

11:07:00   18    plaintiffs is an exempt employee; and that this evidence

11:07:17   19    about other store managers who are not opt-ins in this

11:07:23   20    case is being allowed on a limited basis to provide a

11:07:27   21    full picture of the general duties of store managers.

11:07:41   22              Bring in the jury.

11:07:43   23              MR. R. WIGGINS:  Could we request that the

11:07:44   24    cautionary instruction also add that merely because one

11:07:49   25    store manager is exempt doesn't mean that another one is

11:07:53  1   exempt?

11:07:53  2            THE COURT:  Yes.  And I am going to let you

11:08:05  3   put on a total of five store managers who are not

11:08:12  4   opt-ins in this case.

11:08:14  5            MR. SCHREIBER:  Judge, one other thing.

11:08:16  6            Yesterday the letter, or there was testimony

11:08:21  7   elicited from the witness about a letter.  And I think

11:08:24  8   they gave notice.  But could the Court, on its own, just

11:08:29  9   instruct the jury that this witness is -- because the

11:08:31  10  letter didn't go to anybody but our named plaintiffs.

11:08:34  11            The letter --

11:08:36  12            MR. MAY:  We are not talking about your

11:08:38  13  lawyer letter.

11:08:39  14            MR. SCHREIBER:  She said "letter".  And then

11:08:40  15  when you bring it out, it's confusing.

11:08:42  16            MR. MAY:  We are not talking about the

11:08:45  17  lawyer letter.  It's not in evidence, hasn't been

11:08:45  18  offered yet --

11:08:45  19            MR. SCHREIBER:  The only --

11:08:47  20            THE COURT REPORTER:  One at a time.

11:08:47  21            MR. SCHREIBER:  The only notice came from

11:08:49  22  the Court, with respect to plaintiff action.

11:08:51  23            MR. MAY:  Oh, no.  Well, the notice was

11:08:52  24  allowed, and then y'all mailed it.

11:08:55  25            THE COURT:  Well -- well, if you are going

| | | |
|---|---|---|
| 11:08:56 | 1 | to make that point -- |
| 11:08:58 | 2 | MR. MAY:  I am not going to worry about it. |
| 11:09:00 | 3 | THE COURT:  If you're going to make this |
| 11:09:02 | 4 | point, I'm going to tell this jury that I said that I |
| 11:09:03 | 5 | approved the notice of the settlement. |
| 11:09:05 | 6 | MR. SCHREIBER:  That's right. |
| 11:09:05 | 7 | MR. MAY:  The fact that she got notice, I am |
| 11:09:07 | 8 | going to ask her that, unless you tell me I can't. |
| 11:09:10 | 9 | THE COURT:  Well, actually, I was of the |
| 11:09:18 | 10 | impression yesterday afternoon that the plaintiffs' |
| 11:09:20 | 11 | counsel had sent a letter to Ms. Coleman asking her to |
| 11:09:28 | 12 | join the lawsuit. |
| 11:09:29 | 13 | MR. MAY:  That's not -- |
| 11:09:29 | 14 | MR. SCHREIBER:  She said "a letter and phone |
| 11:09:31 | 15 | calls".  The phone calls would have come from managers. |
| 11:09:34 | 16 | She didn't ever get a letter from any of us. |
| 11:09:37 | 17 | She got notice from the Court.  And it was |
| 11:09:39 | 18 | very confusing.  We couldn't fix it. |
| 11:09:41 | 19 | THE COURT:  It wasn't confusing in my mind. |
| 11:09:43 | 20 | In my mind, her testimony was that she got a letter from |
| 11:09:46 | 21 | the plaintiffs' law firm asking her to join the lawsuit. |
| 11:09:49 | 22 | MR. MAY:  Well, I'm sure if I got something |
| 11:09:53 | 23 | in the mail, I might call it a letter. |
| 11:09:55 | 24 | THE COURT:  All right.  Well, that was |
| 11:09:57 | 25 | misleading for the jury. |

11:09:58    1            MR. SCHREIBER:  That's why I wanted to avoid

11:10:00    2   it in this witness.

11:10:01    3            THE COURT:  All right.

11:10:02    4            MR. CHILDS:  Well, Your Honor, is it

11:10:03    5   possible that we can get a clarifying instruction, since

11:10:06    6   you drew that conclusion from that witness yesterday --

11:10:08    7            MR. MAY:  I will ask the question that way,

11:10:09    8   if you want me to.

11:10:12    9            MR. CHILDS:  -- in regard to Ms. Felicia

11:10:13   10   that testified.  I think a clarifying instruction from

11:10:17   11   the Court, to the extent you got the impression that it

11:10:19   12   was a court order, not from the plaintiffs' counsel.  I

11:10:22   13   mean, you drew it, they could have, too.

11:10:24   14            MR. KALLON:  She also received phone calls.

11:10:26   15   And we know for a fact the Court did not call them.

11:10:28   16            MR. SCHREIBER:  Well, neither did any law

11:10:30   17   firm.  They would have come from friends or other store

11:10:32   18   managers.

11:10:33   19            MR. KALLON:  You can say that you two firms

11:10:34   20   didn't call her, but, you know, how can you say to the

11:10:38   21   Court that no law firm called?

11:10:39   22            THE COURT:  All right.  Let's bring in the

11:10:41   23   jury.

11:10:51   24            And I am instructing the court reporters

11:10:53   25   that they don't have to take down any exchange that you

11:10:56  1   lawyers have between each other.

11:11:12  2                   (Jury in at 11:05 a.m.)

11:11:27  3                   (In open court, jury present.)

11:11:27  4        THE COURT:  Ladies and gentlemen, before the

11:11:28  5   next witness comes on, I want to give you a limited

11:11:39  6   instruction.

11:11:39  7        The defendant has the burden of proving that

11:11:45  8   each of the named plaintiffs is an executive employee,

11:11:54  9   managerial employee.  And the fact that some managers,

11:12:05 10   some store managers, are executive employees, doesn't

11:12:15 11   mean that all store managers are executive employees.

11:12:18 12   The proof has to be made on an individual basis.

11:12:26 13        So that you will get a total picture of the

11:12:29 14   duties of store managers of Family Dollar generally, I

11:12:39 15   am allowing the company to call five store managers who

11:12:48 16   are not plaintiffs in this case and who are not opt-ins

11:12:55 17   in this case.  But the fact that they may or may not be

11:13:01 18   executive and therefore exempt employees, doesn't mean

11:13:06 19   that others are also executive or exempt employees.

11:13:14 20        MR. MAY:  May we approach for one statement

11:13:16 21   for the record, please, sir?

11:13:18 22        THE COURT:  No, sir.  Call the witness.

11:13:20 23        You can make the statement when the jury

11:13:21 24   goes out.

11:13:22 25        MR. MAY:  All right.  Defendant calls Brenda

| | | |
|---|---|---|
| 11:13:29 | 1 | Russell. |
| 11:13:30 | 2 | **BRENDA K. RUSSELL, DEFENDANT'S WITNESS, SWORN** |
| 11:13:32 | 3 | THE CLERK:  State your name for the record, |
| 11:13:34 | 4 | employees. |
| 11:13:35 | 5 | THE WITNESS:  Brenda K. Russell. |
| 11:14:00 | 6 | THE CLERK:  Spell your last name for the |
| 11:14:02 | 7 | record, please. |
| 11:14:03 | 8 | THE WITNESS:  R-U-S-S-E-L-L. |
| 11:14:03 | 9 | **DIRECT EXAMINATION** |
| 11:14:06 | 10 | **BY MR. MAY:** |
| 11:14:06 | 11 | Q.  Good morning, Ms. Russell. |
| 11:14:11 | 12 | A.  Good morning. |
| 11:14:12 | 13 | Q.  Where are you from? |
| 11:14:13 | 14 | A.  Sandy Creek, Michigan. |
| 11:14:15 | 15 | Q.  And where do you work? |
| 11:14:16 | 16 | A.  For Family Dollar. |
| 11:14:17 | 17 | Q.  Welcome to Alabama. |
| 11:14:19 | 18 | A.  Thank you. |
| 11:14:20 | 19 | Q.  What position do you hold with Family Dollar? |
| 11:14:23 | 20 | A.  I am a district manager. |
| 11:14:24 | 21 | Q.  How long have you worked for Family Dollar? |
| 11:14:28 | 22 | A.  Eight years. |
| 11:14:30 | 23 | Q.  Have you held any other positions? |
| 11:14:32 | 24 | A.  I was a store manager for six years. |
| 11:14:35 | 25 | Q.  Did you start out as a store manager? |

11:14:37    1        A.   Yes, sir, I did.

11:14:38    2        Q.   What store did you have?

11:14:40    3        A.   I started at Store 433 in Toledo, Ohio.

11:14:47    4        Q.   As a district manager, how many stores do you

11:14:50    5   have under your district?

11:14:52    6        A.   I have 16.

11:14:53    7        Q.   Where are they located?

11:14:55    8        A.   Most of them are in the Toledo area.  I have

11:15:00    9   three in Michigan and one in Indiana.

11:15:03   10        Q.   So you have three states?

11:15:04   11        A.   Yes.

11:15:05   12        Q.   Where is your office?

11:15:07   13        A.   In Toledo.

11:15:10   14        Q.   Where in Toledo?

11:15:12   15        A.   At Store 14 -- excuse me.  Store 1450.

11:15:17   16        Q.   Where is that?

11:15:18   17        A.   In Toledo on Sylvania Avenue in Toledo.

11:15:23   18        Q.   What building is it in?  It's in a store?

11:15:27   19        A.   Yes.  Yes.

11:15:28   20        Q.   Where?

11:15:28   21        A.   I'm sorry?

11:15:29   22        Q.   Where in the store?

11:15:30   23        A.   It's in the stockroom.

11:15:31   24        Q.   Is there a different office in the store for the

11:15:33   25   store manager?

11:15:34   1      A.   Yes.

11:15:35   2      Q.   How often do you visit your stores?

11:15:40   3      A.   At least once a month.

11:15:42   4      Q.   Does it vary from store to store?

11:15:45   5      A.   It does.

11:15:45   6      Q.   Tell us about that.   Why does it vary?

11:15:48   7      A.   If you have a new manager, you might have to

11:15:51   8   visit them a little more often.   You give them -- you

11:15:54   9   know, give them a little hand if they need it.   If you

11:15:59  10   have a manager that is struggling, you will want to

11:16:01  11   visit a little more often.

11:16:03  12      Q.   What is "a little more often"?

11:16:04  13      A.   Well, other than once a month, you may go there

11:16:08  14   twice a month, you may go there three times a month.

11:16:10  15      Q.   You spend all of your time visiting stores?

11:16:13  16      A.   Yes, pretty much.

11:16:16  17      Q.   When you get there, how long do you stay?

11:16:20  18      A.   It really depends on the store and the length of

11:16:26  19   time the manager has been there, how much time you

11:16:28  20   really need to spend.   It can be anywhere from an hour

11:16:31  21   to two to three hours, four hours.

11:16:34  22      Q.   When you were a store manager, did your district

11:16:37  23   manager visit your store?

11:16:38  24      A.   Yes, sir.

11:16:38  25      Q.   When you were in your last store before you got

11:16:43  1  promoted -- you did get promoted to district manager, I

11:16:46  2  suppose?

11:16:46  3     A.   Yes.   Uh-huh.

11:16:47  4     Q.   Before you got promoted, who was your district

11:16:49  5  manager?

11:16:49  6     A.   Mark Sanner.

11:16:51  7     Q.   How often did he visit?

11:16:53  8     A.   Quite often.   I was just down the street from

11:16:57  9  where he lived, so he was there quite a bit.

11:16:59  10     Q.   Okay.   Do you have contact with your store

11:17:03  11  manager in other ways other than visits?

11:17:05  12     A.   Yes.

11:17:06  13     Q.   How do you do that?

11:17:07  14     A.   Phone calls, emails.

11:17:10  15     Q.   Tell us about that, and the frequency, and how

11:17:13  16  that works.

11:17:14  17     A.   If I need to ask a question or whatever,

11:17:21  18  something, I might get an email that I might have to

11:17:25  19  reply to.   And I will call and get an answer from all

11:17:28  20  managers, or just one or two.

11:17:31  21          Emails are sent out every Monday.   We send them

11:17:36  22  out; good emails on how well they did for the week, and

11:17:40  23  what we are trying to accomplish this week.

11:17:43  24     Q.   When you say "we", who are you talking about?

11:17:46  25     A.   All the store managers and all the associates.

11:17:49   1       There's things that every store needs to focus on

11:17:54   2   each week, different projects, different tasks.  And we

11:18:01   3   send out emails to help them -- to remind them of things

11:18:05   4   that we would like to see completed by the end of the

11:18:08   5   week.

11:18:08   6       Q.   Do you send emails to individual stores or to all

11:18:15   7   your stores, or part, or how do you do that?

11:18:18   8       A.   Most of the time, it's to the entire district,

11:18:22   9   all 16 stores at one time.  On occasion, you might send

11:18:26   10   out an email to a specific store if you have received

11:18:29   11   some information that pertains, you know, like a

11:18:32   12   background check or something like that, you would only

11:18:35   13   send that to one store.

11:18:36   14       Q.   What do you mean "a background check"?

11:18:41   15       A.   Well, when we're promoting someone, we find an

11:18:44   16   assistant manager, we'll do a background; and that

11:18:48   17   usually comes back to us.

11:18:50   18       Q.   And then what do you do with it?

11:18:52   19       A.   And then I forward that on to the store; usually

11:18:55   20   with a phone call and with an email just so they have

11:18:59   21   that document to the file.

11:19:00   22       Q.   You keep saying "us" and "we".  Is that you or

11:19:02   23   are you just talking about somebody else?

11:19:05   24       A.   No.  That's me.

11:19:06   25       Q.   Now, as a store manager, before you got promoted

11:19:16  1   to district manager, did you ever see a document or book

11:19:24  2   called the "strands"?

11:19:28  3        A.   When I first came as a manager, we didn't have

11:19:31  4   those, no.

11:19:32  5        Q.   All right.  But I'm talking about during your

11:19:34  6   tenure as a store manager, did you get some strands?

11:19:38  7        A.   Yes.

11:19:38  8        Q.   Well, tell the jury about those and what the

11:19:41  9   strands are, at least as far as you know from a store

11:19:43  10  level when you were a store manager.

11:19:46  11       A.   It's four training books we use to train managers

11:19:50  12  and assistant managers.  It's everyday processes.

11:19:58  13            It's a four-week program.  And we encourage them

11:20:04  14  to take one book per week.  But it's our way of training

11:20:09  15  them to do a good job.

11:20:12  16            We don't want anybody to fail.  So it's a good

11:20:15  17  training tool.

11:20:15  18       Q.   Are they used for positions other than store

11:20:19  19  manager?

11:20:19  20       A.   Assistant managers, yes.

11:20:21  21       Q.   Now, are you familiar with the term Store Policy

11:20:28  22  Manual?

11:20:28  23       A.   Yes.

11:20:29  24       Q.   And is that different from the strands?

11:20:32  25       A.   Yes.

11:20:32  1      Q.   Is it used differently than the strands?

11:20:35  2      A.   Yes.

11:20:36  3      Q.   All right.  Tell us that -- what that difference

11:20:39  4  is.

11:20:40  5      A.   Well, the policy manual is -- I'm not sure that

11:20:44  6  everybody actually reads that entire policy manual.

11:20:47  7           It's a book that we can go to if we have a

11:20:50  8  question and the managers can go to if they aren't clear

11:20:55  9  about what something means, or clear about what the

11:21:01  10  company wants from them, they can go to that manual, the

11:21:06  11  policy manual, and look that up.  We have one in every

11:21:09  12  store.

11:21:10  13      Q.   As a store manager, did you play any role in

11:21:19  14  placing orders for new merchandise or replenishing

11:21:23  15  inventory?

11:21:25  16      A.   As a store manager, you do place an order every

11:21:28  17  week.

11:21:29  18      Q.   How was that handled in the store -- were you the

11:21:32  19  store manager in more than one store?

11:21:33  20      A.   Yes.

11:21:33  21      Q.   How many?

11:21:34  22      A.   Three.

11:21:35  23      Q.   All right.  Tell us about -- a little bit about

11:21:39  24  how you conducted ordering as a store manager in the

11:21:42  25  three stores you were in, as a store manager.

11:21:45   1       A.   For the most part, managers like to do it

11:21:49   2    themselves, and I like to do it myself at first until I

11:21:53   3    was -- I was trying to groom assistants.   Then we would

11:21:57   4    share a little bit of that responsibility just so that

11:22:00   5    they knew the products and they knew the line.

11:22:04   6            You also -- in the same sense of ordering

11:22:09   7    merchandise, other than ordering with your PVT gun, you

11:22:13   8    could also just call the buyer if you wanted extra

11:22:16   9    merchandise.   So in a way, that's still part of our

11:22:19   10   ordering process, because you could call and get other

11:22:22   11   things, other than what you were ordering.

11:22:24   12      Q.   Now, we've heard the term "schematics", and I

11:22:28   13   don't want to spend a lot of time on that because we

11:22:31   14   have talked about it a good bit.

11:22:32   15           But I want you to tell us from your view -- and

11:22:36   16   you were in an Ohio store, generally?

11:22:37   17      A.   Yes.

11:22:38   18      Q.   In your stores in Ohio, how did the schematics

11:22:43   19   work and what was your role as a store manager with

11:22:48   20   them?

11:22:49   21      A.   Schematics are a monthly department change.   It

11:22:56   22   could be several departments.   And we do this once a

11:22:59   23   month each year and you get something different.   And it

11:23:03   24   just adds new merchandise, or it takes away merchandise

11:23:07   25   that doesn't sell well, clearance merchandise.

11:23:11  1        The schematic is -- comes in first of the month,

11:23:15  2   supposed to be completed, you know, by the 21st.  So

11:23:18  3   sometimes you get behind, you delegate.

11:23:21  4        Schematics come in, and they're basically a

11:23:24  5   fairly simple process, unless you have a store that it

11:23:28  6   doesn't fit, you know --

11:23:29  7   Q.   Did that happen to you?

11:23:30  8   A.   Yes.  With 5,000 stores, you can't make one

11:23:34  9   specific to every store.  So sometimes you have to

11:23:39  10  maneuver, and you have to expand, or you have to shrink

11:23:42  11  down.  You might have a 3-foot section instead of a

11:23:45  12  4-foot section.  So you have to use your best judgment

11:23:48  13  as a store manager and make it fit.

11:23:51  14  Q.   Well, in addition to expanding or shrinking down

11:23:54  15  to fit the shelves, is there any ability, at least in

11:23:59  16  your experience, upon a store manager to change how the

11:24:05  17  products fit on the schematic?

11:24:07  18       And I may not be saying it right, because I've

11:24:09  19  never done a schematic.  But can you change the product

11:24:14  20  mix or arrangement in any way?  Do you have any leeway

11:24:18  21  there?

11:24:18  22  A.   As a store manager, you do make that decision.

11:24:20  23  You might not sell red towels and they gave you two

11:24:25  24  sections for it; but you might sell that blue towel

11:24:29  25  really good.  So you might want to eliminate that one

11:24:40  1    row of red towels and do an extra one of blue towels.

11:24:40  2          That's just an example.  But we -- as a store

11:24:40  3    manager, you can make that decision.

11:24:42  4          Q.  Are there different kinds of schematics, or are

11:24:45  5    they all -- I mean, is there a different way -- they

11:24:48  6    come at different times, or is it just only a monthly

11:24:51  7    schematic?

11:24:52  8          A.  We have a monthly schematic, if you're going to

11:24:55  9    talk specifically schematic, yes.

11:24:57  10         Q.  Okay.  How is seasonal merchandise handled?

11:25:00  11         A.  Seasonal merchandise comes in weekly.  And we

11:25:03  12    also get what we call a seasonal planner, which is a

11:25:07  13    little bit different than schematic, if a schematic is

11:25:12  14    merchandise that we carry all the time.

11:25:14  15         Seasonal is merchandise that we carry at, you

11:25:17  16    know, specific times of the year.

11:25:19  17         Q.  All right.  Well, if you can, elaborate on that.

11:25:22  18    But first, tell us about seasonal merchandise.  I --

11:25:26  19    Christmas, is that one kind of seasonal merchandise?

11:25:29  20         A.  Right.

11:25:29  21         Q.  Give us some other examples of seasonal

11:25:34  22    merchandise you might have in a store.

11:25:36  23         A.  Summer, like right now, our stores -- our drive

11:25:40  24    aisles are all set to our summer merchandise.  That

11:25:43  25    comes in, you have a planner that comes well ahead of

11:25:45  1   when you have to set that.  So you read your planner,

11:25:50  2   you look at it.

11:25:51  3        And all we -- all Family Dollar likes us to do is

11:25:54  4   have some kind of flow.  So the manager has to

11:26:00  5   creatively make that flow work down that drive aisle.

11:26:06  6        Q.  Would Easter or Halloween, or those kind of

11:26:10  7   things, also have seasonal planners?

11:26:13  8        A.  Valentine.

11:26:14  9        Q.  And at the same time you have the seasonal

11:26:16  10  planner, do you also have a monthly schematic?

11:26:20  11       A.  Yes.

11:26:21  12       Q.  Are you allowed to, as a store manager -- or were

11:26:25  13  you allowed to decorate your store, or make it appear

11:26:30  14  seasonal, whatever that season might be?

11:26:33  15       A.  Oh, yes.  Yes.  They -- we -- we -- the company

11:26:38  16  encourages us to do nice displays and get creative.

11:26:42  17  Because it's a good feeling when you create this -- a

11:26:47  18  nice display that your customers appreciate.

11:26:50  19       Q.  Now, are you being told exactly how to do that or

11:26:53  20  what to do, or are you given leeway in that?

11:26:56  21       A.  Most of the time, you know, there are suggestions

11:26:58  22  in the planner that you -- you know, they suggest that

11:27:02  23  you could do it this way.  But most managers kind of do

11:27:05  24  their own thing, that I have come in contact with.  And

11:27:08  25  I always did my own sets and decorations and displays.

11:27:14  1      Q.   How about as a store manager?  What are your

11:27:17  2   store managers that report to you do in that regard --

11:27:21  3   decorating, getting ready for the season?

11:27:24  4      A.   Well, I encourage that.  I think that's -- it's

11:27:28  5   real eye appealing to have good, pretty displays when

11:27:35  6   your customers come in.

11:27:37  7      Q.   Do you do, as a district manager, evaluations of

11:27:42  8   your store managers that report to you?

11:27:46  9      A.   Yes.  I do.

11:27:47  10      Q.   Tell us briefly how that works.

11:27:49  11      A.   Once a year, we have an inventory.  And at that

11:27:55  12   time I, as a district manager, evaluate the store

11:28:00  13   manager.  And at the same time, the store manager

11:28:04  14   evaluates their staff.

11:28:06  15      Q.   And so your store manager is evaluating

11:28:09  16   associates?

11:28:10  17      A.   Associates and assistant managers.

11:28:12  18      Q.   And what's your involvement in that process,

11:28:17  19   doing the employees that are below the store manager?

11:28:21  20   what is your involvement as a district manager in that

11:28:24  21   process of getting the evaluations done?

11:28:26  22      A.   The manager actually does them all.  We look them

11:28:31  23   over.  The manager requests a specific pay raise, or if

11:28:42  24   the evaluation isn't great, then it might be nothing.

11:28:46  25           But it's up to the discretion of the manager what

11:28:50  1    they feel their associates and assistant managers should

11:28:53  2    have at that yearly evaluation time.

11:28:58  3        Q.   Are you familiar with the term "staff scheduler"?

11:29:02  4        A.   Yes, sir.

11:29:03  5        Q.   Did you have that type of scheduler at your

11:29:08  6    stores when you were a store manager?

11:29:09  7        A.   Yes, I did.

11:29:10  8        Q.   Tell the ladies and gentlemen of the jury briefly

11:29:17  9    what a staff scheduler is and how it operated when you

11:29:21  10   were a store manager.

11:29:21  11       A.   The staff scheduler is a schedule that is sent to

11:29:26  12   each store, delivered to each store by the district

11:29:29  13   manager.  And it's a guideline, is what we were always

11:29:33  14   told to go by, in scheduling.

11:29:36  15            It -- it's really a great tool, because it

11:29:39  16   tells -- it tells you where you, as a store manager,

11:29:45  17   will need the most hours.  Because if you're a new store

11:29:48  18   manager and you are coming into a store, you might not

11:29:50  19   know those things.

11:29:52  20            And it designates the hours on your truck day,

11:29:55  21   which is the day that you need, and the hours on the

11:29:58  22   next day for processing the freight.

11:30:03  23       Q.   Could you change the staff scheduler if you

11:30:07  24   wanted to or needed to?

11:30:08  25       A.   Oh, yes.  Yes.

11:30:09  1    Q.   Did that happen when you were store manager?

11:30:12  2    A.   Oh, yes.

11:30:13  3    Q.   How often?

11:30:14  4    A.   Every week.  I mean, there was no way to go by

11:30:18  5    that staff scheduler 100 percent, because you always had

11:30:23  6    changes.  Someone needed a different day off, someone

11:30:28  7    was on vacation, the truck came late, or came the next

11:30:34  8    day.  There's always -- there was always a change in

11:30:36  9    that staff scheduler.

11:30:38  10   Q.   Who made those decisions about changing the staff

11:30:42  11   scheduler when you were store manager in your store?

11:30:45  12   A.   I did.

11:30:46  13   Q.   Now that you're a district manager, do you allow

11:30:50  14   your store managers to make changes in the staff

11:30:53  15   scheduler?

11:30:54  16   A.   Yes.

11:30:54  17   Q.   Did the store manager, in your experience, have

11:31:01  18   any role in safety at the store?

11:31:03  19   A.   Yes.

11:31:04  20   Q.   Tell us about that.

11:31:06  21   A.   We have a, what we call a care calendar.  And

11:31:13  22   three times a day it's to be initialed -- your store,

11:31:16  23   for safety issues; and that it also has hints.  It has

11:31:22  24   things that we should be checking.  And that's shared

11:31:24  25   with your whole staff, and the manager will do that.

11:31:29   1          The manager or assistant manager normally will

11:31:33   2    initial that calendar three times a day to check their

11:31:36   3    store for those safety issues.

11:31:38   4        Q.   As a district manager, do you get involved in the

11:31:48   5    hiring or promotion of assistant managers of the stores

11:31:57   6    that report to you, the store managers and stores that

11:32:00   7    are in your district -- now as a district manager, now,

11:32:06   8    not when you were store manager?

11:32:08   9        A.   And we're talking about assistant manager?

11:32:10   10       Q.   Assistant manager only.

11:32:12   11       A.   We do interviewing in my area at least one day a

11:32:17   12   week.  And we try to do interviewing for manager

11:32:22   13   positions.  But sometimes the people who come to us that

11:32:25   14   we interview are not what we want for a manager but they

11:32:30   15   have, you know, enough background that they could be an

11:32:35   16   assistant manager.

11:32:35   17          We go through part of the process with this

11:32:38   18   person -- the Stanton, the drug test, the background

11:32:41   19   check.  When the background comes back, you then in turn

11:32:44   20   send that person to a store that has a need for an

11:32:48   21   assistant manager.

11:32:49   22          And if that assistant manager wants to hire that

11:32:52   23   assistant manager, that person or assistant; if not we

11:32:55   24   send them on to the next one.

11:32:57   25       Q.   You keep saying "we" --

11:32:58  1    A.   Oh, I guess because I work pretty close with the

11:33:01  2    other district manager that has half of Toledo.  We work

11:33:05  3    close, as far as interviews.

11:33:07  4    Q.   Okay.  Have you personally become involved in --

11:33:12  5    well, let's take this example, and see if this has

11:33:16  6    happened, maybe.

11:33:17  7         Has a store manager ever asked you to get

11:33:20  8    involved in an assistant they've identified, not

11:33:25  9    somebody you have identified in some interviewing and

11:33:27  10   sent to the store, but it came from one of your store

11:33:29  11   managers while you were a district manager?

11:33:30  12   A.   Yes.  I have had a couple -- I just had one the

11:33:34  13   other day that had asked me to sit in on an interview

11:33:37  14   with an assistant manager.

11:33:39  15   Q.   Okay.  Tell us about that, how it came to be,

11:33:43  16   what you did.

11:33:45  17   A.   Yeah.  She was -- the girl was actually working

11:33:49  18   in the store and she wanted to be promoted.  The manager

11:33:52  19   had her own ideas about whether she should or not, and

11:33:57  20   was just looking to see what I thought.  And sometimes

11:34:00  21   they will ask.

11:34:01  22        And so, I went there to share the day with them

11:34:06  23   and gave her my opinion, but she made the decision

11:34:10  24   herself.

11:34:11  25   Q.   Did you interview this person?

11:34:13  1      A.   I did not actually sit in on the interview with

11:34:16  2   her.  I decided not to do that, because she -- I had

11:34:20  3   watched her work during the day, so I had already formed

11:34:24  4   my opinion of this person, working closely with her that

11:34:29  5   day.

11:34:30  6      Q.   When you were the store manager, did you -- a

11:34:34  7   store manager; now I've switched gears on you back two

11:34:38  8   years or so.  During the six years you were a store

11:34:42  9   manager, did you consider yourself to have the authority

11:34:45  10  to hire individuals in your store?

11:34:46  11     A.   Yes.  I always did.

11:34:48  12     Q.   Terminated individuals in your store?

11:34:50  13     A.   Yes.

11:34:51  14     Q.   Disciplined the individuals in your store?

11:34:53  15     A.   Yes.

11:34:54  16     Q.   Is there a difference, in your view, either as a

11:35:04  17  store manager or district manager, or both, between

11:35:07  18  store manager and assistant manager?

11:35:09  19     A.   There's a big difference between a manager and an

11:35:14  20  assistant manager.  The manager is 100 percent

11:35:18  21  responsible for what goes on in their store.

11:35:26  22     Q.   Is the assistant manager 100 percent responsible?

11:35:29  23     A.   They are responsible when they are there and

11:35:31  24  they're in charge, but they are not responsible for the

11:35:35  25  100 percent running of that store, no.

11:35:38  1      Q.   How many hours do you think you work, as a

11:35:46  2   district manager, a week?

11:35:48  3      A.   Probably about 50 hours a week.

11:35:54  4      Q.   How many hours a week do you think you worked as

11:35:58  5   a store manager?

11:35:59  6      A.   Roughly about 50 hours a week, normally.

11:36:06  7      Q.   Were your stores successful?

11:36:10  8      A.   Yes.

11:36:10  9      Q.   Did you receive notice of this lawsuit from the

11:36:21  10  Court or from wherever?

11:36:24  11     A.   Yes, I did.

11:36:25  12          THE COURT:   Well, the notice, ladies and

11:36:27  13  gentlemen, was sent -- was approved by the Court.   Then

11:36:34  14  it went to all store managers of Family Dollar.

11:36:37  15          MR. MAY:   Your Honor, former and -- present

11:36:39  16  and former.

11:36:39  17          THE COURT:   Yes, sir.

11:36:40  18          MR. MAY:   Within a defined period; right,

11:36:43  19  Your Honor?

11:36:43  20          THE COURT:   Yes.

11:36:44  21     Q.   (By Mr. May)   All right.   Back to my question:

11:36:46  22  Did you receive that notice?

11:36:48  23     A.   Yes, I did.

11:36:48  24     Q.   What did you do with it?

11:36:50  25     A.   I read it, and I had no idea what was coming.   So

| | | |
|---|---|---|
| 11:36:55 | 1 | I read it and it didn't seem like it pertained to me and |
| 11:37:03 | 2 | I threw it away.  I don't -- I didn't pursue it, because |
| 11:37:09 | 3 | it didn't pertain to me. |
| 11:37:11 | 4 | Q.  Have you had an enjoyable employment experience |
| 11:37:15 | 5 | at Family Dollar? |
| 11:37:15 | 6 | A.  Yes, I have. |
| 11:37:18 | 7 | MR. SCHREIBER:  Object, Your Honor. |
| 11:37:20 | 8 | THE COURT:  Sustained. |
| 11:37:22 | 9 | MR. MAY:  Answer his questions. |
| 11:37:23 | 10 | THE COURT:  Cross-examination.  You have 23 |
| 11:37:26 | 11 | minutes. |
| 11:37:27 | 12 | MR. SCHREIBER:  How much? |
| 11:37:28 | 13 | THE COURT:  23. |
| 11:37:28 | 14 | **CROSS-EXAMINATION** |
| 11:37:30 | 15 | **BY MR. SCHREIBER:** |
| 11:37:30 | 16 | Q.  Good morning, Ms. Russell. |
| 11:37:31 | 17 | A.  Good morning. |
| 11:37:32 | 18 | Q.  How are you doing? |
| 11:37:34 | 19 | A.  Good. |
| 11:37:34 | 20 | Q.  I didn't hear you say when you became district |
| 11:37:39 | 21 | manager.  Can you tell the jury when you became district |
| 11:37:42 | 22 | manager? |
| 11:37:42 | 23 | A.  June, two years ago, 2003. |
| 11:37:47 | 24 | Q.  Well, when were you asked to be a witness in this |
| 11:37:51 | 25 | case?  Do you know that?  Was it before or after they |

| | | |
|---|---|---|
| 11:37:58 | 1 | promoted you to district manager? |
| 11:38:00 | 2 | A. I believe it was before. |
| 11:38:01 | 3 | Q. Okay. |
| 11:38:02 | 4 | A. It was before. |
| 11:38:03 | 5 | Q. Okay. So before you were promoted, you had been |
| 11:38:06 | 6 | identified as a witness on behalf of managers; is that |
| 11:38:13 | 7 | right? |
| 11:38:13 | 8 | A. I had talked to them at that time, but I was not |
| 11:38:16 | 9 | asked to actually be a witness at that time. |
| 11:38:18 | 10 | Q. Well, at one point, you agreed, because it came |
| 11:38:22 | 11 | to us; correct? |
| 11:38:23 | 12 | A. Two years ago. |
| 11:38:26 | 13 | Q. And then after that, you were promoted to |
| 11:38:30 | 14 | district manager; is that correct? |
| 11:38:31 | 15 | A. Correct. |
| 11:38:31 | 16 | Q. All right. And you're still employed by Family |
| 11:38:34 | 17 | Dollar? |
| 11:38:34 | 18 | A. Yes, sir. |
| 11:38:34 | 19 | Q. All right. If the district manager -- if your |
| 11:38:42 | 20 | district manager -- I'm talking about when you were a |
| 11:38:44 | 21 | manager, not when you were promoted to district |
| 11:38:48 | 22 | manager -- but if your district manager had told you |
| 11:38:51 | 23 | that you cannot hire anyone without his permission, |
| 11:38:56 | 24 | would you have done it anyway? |
| 11:38:59 | 25 | A. No. |

11:39:00  1    Q.  Of course you wouldn't.  And if your district

11:39:07  2    manager had told you that you could not promote anyone

11:39:11  3    without his permission, would you have done it anyway?

11:39:14  4    A.  No.

11:39:15  5    Q.  If your district manager told you that you could

11:39:19  6    not fire anyone without his permission or her

11:39:25  7    permission, would you have done it anyway?

11:39:27  8    A.  No.

11:39:28  9    Q.  And in violating those requests from your

11:39:32  10   district manager, you wouldn't take that lightly, would

11:39:34  11   you?  If you just decided on your own just to fire

11:39:37  12   somebody when he told you you couldn't, that's pretty

11:39:41  13   serious, isn't it?

11:39:42  14   A.  Yes.

11:39:42  15   Q.  You could be fired for that, couldn't you?

11:39:45  16   A.  I don't know that you would be fired, but you

11:39:50  17   would be counseled, I'm sure.

11:39:51  18   Q.  You would be counseled, wouldn't you?  Because

11:39:55  19   you're supposed to do, aren't you, what your district

11:39:58  20   manager says; correct?  Isn't that correct, ma'am?

11:40:07  21   A.  I'm not sure that you're --

11:40:10  22   Q.  Well, let's do --

11:40:12  23   A.  I'm not sure that you -- everything your district

11:40:15  24   manager tells you to do might not be correct.  I mean,

11:40:20  25   as far as your policy --

11:40:22   1            THE COURT:  Insofar as what the district

11:40:26   2   manager tells you to do is not illegal.

11:40:30   3            THE WITNESS:  Exactly.

11:40:31   4            THE COURT:  And you don't know -- you have

11:40:33   5   no reason to believe that it violates company policy.

11:40:38   6   You would expect, as a store manager, to do what your

11:40:41   7   district manager directed you to do?

11:40:43   8            THE WITNESS:  Yes, sir.  Thank you.

11:40:45   9   Q.   (By Mr. Schreiber)  All right.  We've heard

11:40:47   10  testimony in this case that managers are responsible for

11:40:53   11  safety.  Do you agree with that, in their store?

11:40:58   12  A.   Yes.

11:40:59   13  Q.   All right.  Can they, on their own, hire

11:41:04   14  security?

11:41:07   15  A.   No.

11:41:07   16  Q.   Can they put cameras in their store?

11:41:11   17  A.   No.

11:41:11   18  Q.   Can they just on their own decide that at

11:41:14   19  nighttime they want more employees so people can be

11:41:16   20  safe, without consulting district managers?

11:41:21   21  A.   They can maneuver the schedule somewhat to have

11:41:25   22  extra coverage in the evenings, yes.

11:41:27   23  Q.   But isn't it true that to get the extra employees

11:41:30   24  to go over budget, they have to get the district manager

11:41:32   25  approval, don't they?

11:41:33   1    A.   But it can be done without going over the budget.

11:41:36   2   You can maneuver the scheduling around to have a little

11:41:39   3   bit of different coverage on different days.

11:41:42   4    Q.   If -- do you believe a store manager is

11:41:57   5   responsible for shrinkage, which I think -- you know, is

11:42:02   6   stealing, people stealing from your store?

11:42:06   7    A.   Shrinkage comes in a lot of different -- a lot of

11:42:09   8   different things.

11:42:10   9    Q.   Let's say that you have a cashier that you know

11:42:13   10   or suspect is taking merchandise from your store, and

11:42:16   11   you catch that person doing that.

11:42:19   12    A.   Uh-huh.

11:42:20   13    Q.   What if you could not fire that person on your

11:42:24   14   own?  would that affect your ability to control

11:42:27   15   shrinkage in your store, Ms. Russell?

11:42:29   16    A.   We have Loss Prevention who will guide our

11:42:33   17   managers through that.  We don't want to do anything

11:42:36   18   that is going to get us in trouble with the law.  So,

11:42:39   19   therefore, Loss Prevention is there to help us as a

11:42:43   20   manager through that time when we have a suspicion.

11:42:47   21    Q.   Well, isn't it true and isn't it important that

11:42:49   22   if a manager -- if a district manager tells you that you

11:42:52   23   cannot terminate an employee that you think is stealing,

11:42:56   24   that takes away your ability to effectively manage that

11:42:59   25   store, doesn't it?

11:43:00   1    A.   I don't think a district manager would ever

11:43:04   2    tell --

11:43:04   3    Q.   I didn't say that.   But if a district manager

11:43:08   4    told you "don't fire that person", wouldn't that have

11:43:11   5    affected your ability to manage that store?

11:43:16   6    A.   No, because I would have called Loss Prevention.

11:43:20   7    Q.   So you would have gone over the district manager?

11:43:22   8    A.   Yes, sir.

11:43:23   9    Q.   You mentioned earlier about the Store Policy

11:43:31  10    Manual.   Have you read it, the Store Policy Manual?

11:43:36  11    A.   Probably most of it, off and on.   I never sat

11:43:39  12    down and read the whole thing from --

11:43:42  13    Q.   All right.

11:43:42  14    A.   Front to back.

11:43:48  15    Q.   Did you know that this was a policy of your

11:43:51  16    company?

11:43:51  17    A.   Yes.

11:43:52  18    Q.   All right.   And, in fact, in training for new

11:43:55  19    people, don't you request them to read the Store Policy

11:43:59  20    Manual?

11:43:59  21    A.   We do ask them to read it at their leisure, yes.

11:44:05  22    Q.   Pull up L1, please.

11:44:10  23         On direct, Mr. May was asking about schematics.

11:44:16  24    Are you familiar with this policy of Family Dollar?

11:44:19  25    A.   I have seen it, yes.

11:44:20  1    Q.   And it says the "schematics are to be set as

11:44:23  2    pictured.  Under no circumstances should schematics be

11:44:28  3    altered without approval from your district manager"; is

11:44:32  4    that right?

11:44:32  5    A.   That's what it says, sir.

11:44:33  6    Q.   And that was in effect when you were a manager,

11:44:38  7    wasn't it, ma'am?

11:44:39  8    A.   Yes, it was.

11:44:40  9    Q.   Do you remember your direct examination about pay

11:44:55  10   increases?

11:44:55  11   A.   Yes.

11:44:56  12   Q.   And doesn't it say there that "the district

11:44:58  13   manager will review wage increase recommendations with

11:45:02  14   the regional vice-president"?  Is that what it says?

11:45:06  15   A.   Uh-huh.

11:45:06  16   Q.   And "store managers will be informed whether or

11:45:08  17   not recommendations are granted"?

11:45:10  18   A.   Yes.

11:45:11  19   Q.   Is that right?  Let me -- let me ask you just

11:45:15  20   about your budget.  The budget's a key part of your

11:45:19  21   store, isn't it?

11:45:20  22   A.   Yes.

11:45:20  23   Q.   And I think Family Dollar takes your total sales

11:45:23  24   and figures out of how much money you're going to be

11:45:26  25   able to spend per week at your store; right, or at a

11:45:30  1   store?

11:45:30  2       A.   Yeah.   There's different things that they take

11:45:33  3   into consideration, but, yeah.

11:45:35  4       Q.   And the first thing that's taken out, I guess, is

11:45:40  5   your salary; correct?

11:45:41  6       A.   Correct.

11:45:42  7       Q.   And then after that, you only have so many hours

11:45:46  8   left to staff that store for that week; correct?

11:45:51  9       A.   Right.

11:45:51  10      Q.   All right.   And so, for a seven-week period,

11:45:56  11  you're open how many days?   You're open every day,

11:46:03  12  aren't you?

11:46:03  13      A.   Oh, yeah, seven days.

11:46:04  14      Q.   Every day you've got to staff that day, and they

11:46:07  15  prefer at night for you to have two people in the store;

11:46:10  16  correct?

11:46:10  17      A.   Yes.

11:46:11  18      Q.   And based on the amount of budget that Family

11:46:14  19  Dollar gives you directly determines how many hours you

11:46:20  20  have for people to be in that store; correct?

11:46:22  21      A.   Yes.

11:46:22  22      Q.   And if you don't have enough hours to get the job

11:46:28  23  done, and they won't let you pay anybody overtime, who

11:46:33  24  has got to do the extra work?

11:46:37  25      A.   In my time, there are enough hours on those

11:46:42  1  schedules.

11:46:43  2  Q.  If there aren't, the manager has to do it, don't

11:46:47  3  they?

11:46:48  4  A.  I wouldn't say that, no.

11:46:49  5  Q.  Well, who else is going to do it, if your

11:46:52  6  district manager doesn't give you more money and more

11:46:55  7  budget and you can't pay anybody overtime, who else is

11:46:58  8  going to do it?

11:47:00  9  A.  Well, the majority of the stores are run on the

11:47:03  10  budget that they have.  So if you have a store that

11:47:05  11  doesn't, there are other issues, it's not just they're

11:47:08  12  not getting enough payroll.  Anybody can spend payroll

11:47:12  13  and want extra money, but you have to be able to run

11:47:17  14  your store and get it done on those -- the budget that

11:47:22  15  you're given.

11:47:22  16  Q.  And that's my point, there's a lot of

11:47:25  17  requirements from home office about how long you have to

11:47:27  18  get that merchandise even on the shelves; correct?

11:47:32  19  A.  Yes.

11:47:33  20  Q.  All right.  When you testified -- I wasn't paying

11:47:46  21  good attention -- how many assistants do you have, when

11:47:51  22  you were manager?

11:47:51  23  A.  When I was a manager?

11:47:53  24  Q.  Yeah.

11:47:53  25  A.  Two or three.

11:47:54  1    Q.   You had two or three assistants?

11:47:57  2    A.   Uh-huh.

11:47:57  3    Q.   And those assistants worked 30 or 40 hours a

11:48:02  4    week; right?

11:48:02  5    A.   Most of the time, depending on which store I had.

11:48:05  6    Q.   And for those stores that don't have two or three

11:48:09  7    employees that can work 30 to 40 hours, that makes it a

11:48:14  8    little harder to get that freight out of that truck,

11:48:16  9    doesn't it?

11:48:17  10   A.   Not necessarily, because they don't get as much.

11:48:20  11   And some of the stores aren't open as long, they don't

11:48:23  12   do the volume, so they're not waiting on as many

11:48:27  13   customers.  So there's a lot of other factors that's

11:48:30  14   not --

11:48:31  15   Q.   Oh, thank you.  And you did not join the lawsuit,

11:48:33  16   you are not a plaintiff in this case, are you?

11:48:35  17   A.   No, I did not join the lawsuit.

11:48:37  18        THE COURT:  Redirect?

11:48:38  19              **REDIRECT EXAMINATION**

11:48:39  20   **BY MR. MAY:**

11:48:41  21   Q.   Ms. Russell, back to this issue of catching an

11:48:49  22   employee thinking -- that you are thinking an employee

11:48:52  23   is stealing or thinking that's how it's set up.  Let's

11:48:56  24   just get you to tell the jury what you want your store

11:49:00  25   managers to do as a district manager if that

11:49:06  1   circumstance arises.  Will you explain what you would

11:49:09  2   like your assistant managers to do?  How many do you

11:49:12  3   have?

11:49:12  4       A.   16.

11:49:13  5       Q.   16 stores in three states.  What do you expect

11:49:17  6   those 16 store managers reporting to you to do if they

11:49:21  7   suspect theft in the store?

11:49:23  8       A.   Well, I would like them to always be observant,

11:49:27  9   because this is what drives our business, is to keep our

11:49:31 10   honest people there and dishonest people gone.

11:49:34 11       But they would normally call and let me know, and

11:49:40 12   then I would, myself or them, can call Loss Prevention.

11:49:44 13   And we would rather get Loss Prevention involved so that

11:49:48 14   we don't do anything that gets us into trouble legally,

11:49:57 15   you know.

11:49:57 16       We don't want to terminate somebody based on what

11:49:57 17   one person says, because that's not fair either.

11:49:59 18              THE COURT:  Well, what about a situation

11:50:01 19   where the store manager actually sees an employee

11:50:09 20   stealing?

11:50:10 21              THE WITNESS:  Okay.  I'm sorry.

11:50:11 22              THE COURT:  Would you -- when the store

11:50:18 23   manager called to report to you that he has just seen an

11:50:22 24   employee stealing, would you, in the ordinary course of

11:50:26 25   things, give the store manager the authority to at least

| | | |
|---|---|---|
| 11:50:32 | 1 | remove that person from the premises? |
| 11:50:34 | 2 | THE WITNESS:  Suspend them.  That's what we |
| 11:50:36 | 3 | do is suspend them until Loss Prevention comes in. |
| 11:50:39 | 4 | THE COURT:  All right. |
| 11:50:39 | 5 | THE WITNESS:  Thank you. |
| 11:50:40 | 6 | MR. MAY:  That's all I have, Your Honor. |
| 11:50:42 | 7 | THE COURT:  Thank you, ma'am. |
| 11:50:45 | 8 | MR. MAY:  May the witness be excused to go |
| 11:50:46 | 9 | back home? |
| 11:50:48 | 10 | THE COURT:  Yes. |
| 11:50:49 | 11 | Defendant will call its next witness. |
| 11:51:07 | 12 | MR. MAY:  May we approach before the witness |
| 11:51:10 | 13 | comes in? |
| 11:51:11 | 14 | THE COURT:  Yes. |
| 11:51:11 | 15 | (At bench:) |
| 11:51:57 | 16 | MR. MAY:  For the record.  I want to object |
| 11:51:57 | 17 | to the instruction you gave to the jury.  I didn't have |
| 11:51:57 | 18 | a chance to do it. |
| 11:51:57 | 19 | And the only other thing is, does the five |
| 11:51:57 | 20 | witnesses that you have given us -- because for planning |
| 11:51:57 | 21 | purposes, we have people scrambling around -- does that |
| 11:51:57 | 22 | include Ms. Coleman? |
| 11:51:57 | 23 | THE COURT:  Yes, it does.  Yes. |
| 11:51:57 | 24 | MR. MAY:  Okay.  Thank you. |
| 11:51:57 | 25 | (End of bench conference.) |

|          |    |                                                             |
|----------|----|-------------------------------------------------------------|
| 11:52:21 | 1  | **SUE ECKLES, DEFENDANT'S WITNESS, SWORN**                  |
| 11:52:22 | 2  | THE CLERK:  State your name for the record,                 |
| 11:52:24 | 3  | please.                                                     |
| 11:52:25 | 4  | THE WITNESS:  Sue Eckles.                                   |
| 11:52:25 | 5  | THE CLERK:  And spell your last name.                       |
| 11:52:26 | 6  | THE WITNESS:  E-C-K-L-E-S.                                  |
| 11:52:30 | 7  | **DIRECT EXAMINATION**                                      |
| 11:52:31 | 8  | **BY MR. MAYS:**                                            |
| 11:52:32 | 9  | Q.  Mrs. Eckles, where do you live, please, ma'am?          |
| 11:52:35 | 10 | A.  Mesquite, Texas.                                         |
| 11:52:37 | 11 | Q.  How are you employed?                                   |
| 11:52:39 | 12 | A.  I don't understand.                                     |
| 11:52:41 | 13 | Q.  What's your job?                                         |
| 11:52:42 | 14 | A.  Manager.                                                 |
| 11:52:42 | 15 | Q.  And are you -- do you work for Family Dollar?            |
| 11:52:44 | 16 | A.  Yes, sir.                                                |
| 11:52:45 | 17 | Q.  Are you a manager of a Family Dollar store in           |
| 11:52:48 | 18 | Mesquite, Texas?                                             |
| 11:52:49 | 19 | A.  Yes, sir.                                                |
| 11:52:49 | 20 | Q.  What is the store number, please, ma'am?                |
| 11:52:51 | 21 | A.  3067.                                                    |
| 11:52:53 | 22 | Q.  How long have you been employed as a store              |
| 11:52:58 | 23 | manager by Family Dollar?                                    |
| 11:52:59 | 24 | A.  Almost five years.                                       |
| 11:53:01 | 25 | Q.  And what was your -- let me ask you a little bit         |

11:53:06   1   about what you did before then.

11:53:07   2          How far did you go in school?

11:53:09   3   A.   I have an associate's degree.

11:53:10   4   Q.   And what work experience did you have before you

11:53:14   5   went to work at Family Dollar?

11:53:16   6   A.   I have roughly seven years retail in men's

11:53:21   7   apparel.

11:53:22   8   Q.   Okay.   I want to ask you now some questions about

11:53:24   9   some of the things that a manager does at Family Dollar,

11:53:28   10  based on your experience.

11:53:32   11         What are some of the job duties of a store

11:53:36   12  manager at Family Dollar?

11:53:36   13  A.   Opening and closing the store, making sure the

11:53:41   14  store's fully staffed, ordering, cycle counts, managing

11:53:47   15  my associates.

11:53:48   16  Q.   Okay.   Let's talk about cycle counts.   What are

11:53:51   17  cycle counts?   Tell the ladies and gentlemen.

11:53:53   18  A.   Cycle counts are something you want to make sure

11:53:57   19  your own hands are right with the distribution center or

11:54:01   20  corporate office.   If I have an abundance of something,

11:54:04   21  I need to cycle count to make sure I don't get more of

11:54:07   22  it sent back to me.

11:54:08   23  Q.   Are we talking about merchandise on the shelves?

11:54:11   24  A.   Yes, sir.   Sorry.   If I have outs on my shelf

11:54:20   25  that we need to cycle count so that way we make sure we

11:54:23  1  get it.

11:54:24  2      Q.   Is it important that your shelves be stocked?

11:54:27  3      A.   Yes, sir.

11:54:28  4      Q.   Why is that?

11:54:28  5      A.   Increase my sales, bring the business in.

11:54:31  6      Q.   And is cycle counting a way that you make sure

11:54:35  7  you have stock on your shelves?

11:54:37  8      A.   Yes, sir.

11:54:38  9      Q.   Is that a management function?

11:54:40  10      A.   Yes, sir.

11:54:41  11      Q.   You mentioned supervising of employees.  What are

11:54:46  12  some of the things that you do, in terms of supervising

11:54:49  13  employees in a Family Dollar store manager?

11:54:52  14      A.   I delegate tasks out to my associates.  Make sure

11:54:57  15  they're there on time, make sure they're doing their

11:55:01  16  jobs.

11:55:03  17      Q.   What is your role in hiring of associates?

11:55:09  18      A.   I interview them.  I will go through like a first

11:55:15  19  interview, then I will bring them in for a second

11:55:17  20  interview.  If I like them, then I hire them.

11:55:20  21      Q.   Do you have to give them a Stanton test?

11:55:23  22      A.   With us, we have -- I'm union crew, so they take

11:55:27  23  the test and their application at the same time.

11:55:29  24      Q.   Okay.  What about in training employees, what's

11:55:33  25  your role with that?

11:55:35  1      A.   I'm a certified manager trainer, so I train for

11:55:38  2   them to advance up in the company.

11:55:40  3      Q.   Do you, from time to time, have to discipline

11:55:44  4   employees?

11:55:45  5      A.   Yes, sir.

11:55:45  6      Q.   What's your role in that?

11:55:47  7      A.   Normally, I like to just verbally warn them.

11:55:52  8   There are some associates you may have to give a written

11:55:53  9   warning to, sometimes termination.

11:55:55  10     Q.   Now, you have talked about hiring associates.

11:56:01  11  Does the district manager have any role in that process?

11:56:04  12     A.   No, sir.

11:56:05  13     Q.   You have talked about training associates.  Does

11:56:08  14  your district manager have any role in that process?

11:56:11  15     A.   If they are a trainee being sent to me, then,

11:56:14  16  yes, I consult with him on issues with them, but if

11:56:18  17  they're -- sorry.

11:56:19  18     Q.   If they're not a trainee being sent to you, the

11:56:26  19  district manager doesn't have any role there?

11:56:29  20     A.   No.

11:56:29  21     Q.   What about in terminating employees?  does the

11:56:33  22  district manager have a role there?

11:56:34  23     A.   No.

11:56:35  24     Q.   Have you ever had to consult with a district

11:56:39  25  manager, or have you ever consulted with your district

11:56:44  1    manager about terminating employees?

11:56:44  2        A.   Yes, I have.

11:56:44  3        Q.   And what was the occasion for that?

11:56:46  4        A.   The girl was under 18, and a parent had involved

11:56:53  5    herself in it, so I consulted with him to see what steps

11:56:57  6    to take.

11:56:58  7        Q.   How often do you see your district manager?

11:57:00  8        A.   Maybe once every two weeks.

11:57:03  9        Q.   And does -- would you agree with the statement

11:57:10  10   that the district manager really is in charge of your

11:57:13  11   store?

11:57:13  12       A.   No, sir.

11:57:14  13       Q.   Who is in charge of your store?

11:57:16  14       A.   I am in charge.  I'm the boss of it.

11:57:19  15       Q.   How many assistant managers do you have?

11:57:21  16       A.   Right now, I have three.

11:57:23  17       Q.   What's the role of the assistant manager?

11:57:28  18       A.   To delegate the tasks that I have given her.

11:57:33  19       Q.   And would you agree that the assistant manager

11:57:37  20   performs all of the same functions as the store manager?

11:57:40  21       A.   Could you repeat that?

11:57:42  22       Q.   Would you agree with the statement that an

11:57:45  23   assistant manager performs all the same functions as a

11:57:47  24   store manager?

11:57:48  25       A.   No, sir.

| | | |
|---|---|---|
| 11:57:48 | 1 | Q.   What's the difference? |
| 11:57:50 | 2 | A.   She doesn't run my store.   She's not the boss.   I |
| 11:57:57 | 3 | am. |
| 11:57:57 | 4 |         THE COURT:   When you're away, who runs the |
| 11:57:59 | 5 | store? |
| 11:57:59 | 6 |         THE WITNESS:   My assistant manager is in |
| 11:58:01 | 7 | charge. |
| 11:58:01 | 8 | Q.   (By Mr. Mays)   When you're away, you sometimes |
| 11:58:04 | 9 | get sent to other stores for various tasks? |
| 11:58:06 | 10 | A.   Yes, sir. |
| 11:58:07 | 11 | Q.   Explain to the ladies and gentlemen when that |
| 11:58:10 | 12 | happens and what you do. |
| 11:58:11 | 13 | A.   If we have managers that's on vacation and they |
| 11:58:16 | 14 | don't have enough coverage, I'll fill in.   There's been |
| 11:58:19 | 15 | instances where a manager has been terminated and I have |
| 11:58:22 | 16 | had to go and run their store or my store. |
| 11:58:26 | 17 |    I basically do the -- I'm running that store and |
| 11:58:28 | 18 | then my assistant managers will step up and fill in my |
| 11:58:31 | 19 | position in my store. |
| 11:58:32 | 20 | Q.   When you're running another store, or at another |
| 11:58:36 | 21 | store, your assistant managers "step up", as you said, |
| 11:58:39 | 22 | do you still have any responsibility for your own store? |
| 11:58:41 | 23 | A.   Oh, yes. |
| 11:58:42 | 24 | Q.   Explain to the ladies and gentlemen how that |
| 11:58:44 | 25 | happens. |

11:58:45   1       A.   I'm running my store and the store I'm in.   I'll

11:58:48   2   give them the schedule to run my store.   And, plus, I'm

11:58:51   3   doing the schedule for the other store.

11:58:53   4       I'm giving them tasks to make sure they're

11:58:55   5   following in my store, plus the store that I'm at.

11:58:59   6       Q.   Do you ever stop managing your store?

11:59:00   7       A.   No, sir.

11:59:01   8       Q.   You like your job?

11:59:03   9       A.   Yes, sir.

11:59:03   10      Q.   Why?

11:59:04   11      A.   I love my boss.   I'm a boss.

11:59:09   12           MR. CALAMUSA:   Objection, Your Honor.

11:59:12   13           THE COURT:   Your objection is sustained.

11:59:14   14   Cross-examination, seven minutes.

11:59:20   15                    **CROSS-EXAMINATION**

11:59:20   16   **BY MR. CALAMUSA:**

11:59:22   17      Q.   Ms. Eckles, if your district manager told you

11:59:30   18   that you could not hire without his permission, would

11:59:34   19   you do it anyway?

11:59:35   20      A.   No, sir.

11:59:37   21      Q.   And if your district manager said you couldn't

11:59:39   22   fire anybody without his permission, would you go ahead

11:59:42   23   and do it anyway?

11:59:43   24      A.   Yes, sir.

11:59:43   25      Q.   You would fire without his permission?

11:59:45  1      A.  Yes, sir.

11:59:46  2      Q.  Even though it violates policy?

11:59:48  3      A.  Yes, sir.

11:59:48  4      Q.  And even if it subjects you to termination?

11:59:52  5      A.  Yes, sir.

11:59:53  6      Q.  Do you believe that the company's policies and

11:59:57  7  procedures should be followed?

11:59:58  8      A.  In some instances, yes.

12:00:00  9      Q.  So --

12:00:01  10          THE COURT:  Do you feel free to disregard

12:00:03  11  company policy?

12:00:04  12          THE WITNESS:  No, sir.  But there's certain

12:00:06  13  situations that I have to go with me running the store.

12:00:12  14  I'm the manager.

12:00:13  15          THE COURT:  Yes, ma'am.  So if the company

12:00:14  16  policy says "don't fire anyone unless the district

12:00:22  17  manager has approved it", and you felt that someone

12:00:28  18  should be fired immediately, would you feel free to go

12:00:31  19  ahead and fire them without consulting the district

12:00:34  20  manager?

12:00:34  21          THE WITNESS:  Yes, sir.

12:00:36  22          THE COURT:  You would?

12:00:37  23          THE WITNESS:  Yes, sir.

12:00:40  24          THE COURT:  All right.

12:00:42  25      Q.  (By Mr. Calamusa)  You just said there are

12:00:43  1    certain things you have to do --

12:00:44  2            THE COURT:  Incidentally, do you understand

12:00:46  3    that it is the policy of Family Dollar that you can't

12:00:50  4    fire without the prior approval of the district manager?

12:00:53  5            THE WITNESS:  I have never read that in a

12:00:55  6    book.

12:00:59  7            MR. CALAMUSA:  Can we have H1, please?

12:01:02  8            THE COURT:  But you thought that -- you

12:01:03  9    assumed all the time that you had the power to fire any

12:01:07  10   of your employees without the approval of the district

12:01:10  11   manager?

12:01:10  12           THE WITNESS:  Yes, sir.

12:01:11  13           THE COURT:  All right.

12:01:13  14   Q.  (By Mr. Calamusa)  Do you understand the store

12:01:15  15   policy says that you must contact your district manager

12:01:17  16   or regional vice-president before conducting a

12:01:20  17   discharge?

12:01:20  18   A.  Yes, I understand.

12:01:22  19   Q.  You knew that to be the policy?

12:01:23  20   A.  No, I didn't.  I'm saying I understand what

12:01:26  21   that's saying.

12:01:27  22   Q.  When you were hired, did you see the manual and

12:01:30  23   get the manual?

12:01:30  24   A.  We have a policy book, but mine's missing pages.

12:01:37  25   Q.  Do you know what pages yours happens to be

12:01:39   1   missing?

12:01:40   2        A.   No, sir.   To be honest, I haven't opened it.

12:01:44   3        Q.   Let me show you A7, please.   Was this page

12:02:01   4   missing from your policy book, Ms. Eckles?

12:02:04   5        A.   I wouldn't have any idea, sir.

12:02:06   6        Q.   Have you read this page in the policy book which

12:02:09   7   says:   "Store managers, assistant managers, and floor

12:02:12   8   supervisors must read and understand the principles,

12:02:15   9   procedures and responsibilities set forth in the Store

12:02:18   10  Policy Manual"?

12:02:18   11       A.   I have read something similar to that in our

12:02:22   12  handbook that we get when we're hired.

12:02:24   13       Q.   But you choose to ignore certain parts of it on

12:02:27   14  your own?

12:02:27   15       A.   I have to run my store the way I see fit.

12:02:30   16       Q.   And in order to run your store the way you see

12:02:33   17  fit, you have to be able to make those decisions to fire

12:02:36   18  on the spot, don't you?

12:02:37   19       A.   Yes, sir.

12:02:38   20       Q.   And to be able to run your store as you see fit,

12:02:43   21  make you the manager of the store, you have to be able

12:02:45   22  to hire when you want to, don't you?

12:02:47   23       A.   Yes, sir.

12:02:47   24       Q.   And to be able to run your store as you see fit,

12:02:50   25  as store manager, you have got to be able to hire people

| | | |
|---|---|---|
| 12:02:56 | 1 | without ever having to deal with your district manager, |
| 12:02:58 | 2 | don't you? |
| 12:02:59 | 3 | A.  Yes, sir. |
| 12:02:59 | 4 | Q.  And if you couldn't hire and you couldn't fire |
| 12:03:06 | 5 | without your district manager's approval, you would not |
| 12:03:09 | 6 | be a store manager, would you? |
| 12:03:11 | 7 | MR. MAYS:  Object to that, Your Honor. |
| 12:03:12 | 8 | THE COURT:  Overruled. |
| 12:03:16 | 9 | THE WITNESS:  True. |
| 12:03:20 | 10 | MR. CALAMUSA:  Nothing further, Your Honor. |
| 12:03:21 | 11 | THE COURT:  Redirect? |
| 12:03:22 | 12 | REDIRECT EXAMINATION |
| 12:03:23 | 13 | BY MR. MAYS: |
| 12:03:24 | 14 | Q.  Have you ever been disciplined by Family Dollar, |
| 12:03:34 | 15 | ma'am? |
| 12:03:34 | 16 | A.  No, sir. |
| 12:03:34 | 17 | Q.  And have you been recognized as a certified |
| 12:03:38 | 18 | training manager? |
| 12:03:39 | 19 | A.  Yes, sir. |
| 12:03:40 | 20 | MR. MAYS:  That's all.  Thank you. |
| 12:03:42 | 21 | THE COURT:  Thank you, ma'am. |
| 12:03:43 | 22 | The defendant will call its next witness. |
| 12:04:16 | 23 | MR. MAYS:  The witness is coming, Your |
| 12:04:18 | 24 | Honor. |
| 12:04:22 | 25 | THE COURT:  But your time is running. |

**PENNY BRAKE, DEFENDANT'S WITNESS, SWORN**

12:04:22  1

12:04:54  2          THE CLERK:  State your name for the record,

12:04:57  3  Please.

12:05:08  4          THE WITNESS:  Penny Brake.

12:05:11  5          THE CLERK:  Spell your last name.

12:05:11  6          THE WITNESS:  B-R-A-K-E.

12:05:14  7                  **DIRECT EXAMINATION**

12:05:14  8  **BY MR. MAY:**

12:05:17  9   Q.  Good morning, Ms. Brake.

12:05:19  10   A.  Good morning.

12:05:20  11   Q.  Where are you from?

12:05:21  12   A.  Mount Gilead, Ohio.  Galion is my home town.

12:05:26  13   Q.  And where do you work?

12:05:28  14   A.  Mount Gilead.

12:05:30  15   Q.  And for whom do you work?

12:05:31  16   A.  Family Dollar Stores.

12:05:33  17   Q.  How long have you worked for Family Dollar?

12:05:35  18   A.  Just about 20 years; 19 years, seven months.

12:05:40  19   Q.  What do you do for them?

12:05:41  20   A.  I'm a manager.

12:05:42  21   Q.  Store manager?

12:05:44  22   A.  Yes.

12:05:45  23   Q.  What's your store?

12:05:47  24   A.  3740.

12:05:50  25   Q.  Have you had more than one store during your

12:05:53  1   tenure with Family Dollar?

12:05:54  2       A.   Yes.

12:05:55  3       Q.   How long have you been at your present store?

12:05:57  4       A.   Eight years.

12:05:59  5       Q.   Would you say that's a rural store or urban

12:06:05  6   store?

12:06:05  7       A.   It's a rural store.

12:06:07  8       Q.   Where is your office in that store?

12:06:12  9       A.   In the backroom, right in the center of my store.

12:06:20  10      Q.   Who is your district manager?

12:06:21  11      A.   Karen Zoesch.

12:06:25  12      Q.   How many -- you want to spell that?  Do you know

12:06:27  13  how?

12:06:27  14      A.   Z-O-E-S-C-H.

12:06:30  15      Q.   Do you know how many stores Ms. Zoesch has?

12:06:33  16      A.   I'm pretty sure she has 20.  She's got two more

12:06:38  17  opening, so I'm not sure.

12:06:41  18      Q.   How often do you see her face-to-face in your

12:06:45  19  store?

12:06:46  20      A.   I can see her two times a week.  I can see her

12:06:52  21  once a month.  She's pretty regular.

12:06:55  22           She comes to my store a lot just to stop through

12:06:57  23  on her way.  She's got a lot of stores to go by my store

12:07:01  24  to get to.

12:07:02  25      Q.   How many employees do you have in your store?

12:07:05  1      A.   Seven, plus myself.

12:07:06  2      Q.   How many assistants do you have?

12:07:10  3      A.   Three.

12:07:10  4      Q.   Who hires at your store?

12:07:16  5      A.   I do.

12:07:17  6      Q.   Tell us generally how that works.

12:07:20  7      A.   I just go through my applications.  And it

12:07:25  8   depends on what -- what I'm hiring for, and I interview

12:07:31  9   them.  I ask one of my assistants to interview them.

12:07:34  10          They do all the basic.  They take the Stanton,

12:07:36  11  they do all the normal things when they're interviewed.

12:07:40  12  I do the drug testing.  And I usually interview more

12:07:43  13  than one or two people at a time.  And I go from there.

12:07:47  14          If they passed everything, if I'm comfortable

12:07:50  15  with them, my other employees are comfortable with them,

12:07:53  16  we -- usually it's a go.

12:07:55  17     Q.   What does your district manager do, with respect

12:07:58  18  to that process?

12:07:59  19     A.   As far as hiring?

12:08:02  20     Q.   Yes.  Yes, ma'am.

12:08:03  21     A.   Nothing.  I might call her if -- if I think I

12:08:09  22  might want to offer this person more money or they might

12:08:11  23  want to be with the company and I want to start them at

12:08:14  24  my level and, you know, I might call her for guidance,

12:08:17  25  but she -- I do the hiring.

12:08:19   1    Q.   When you say "guidance", what kind of guidance

12:08:23   2    are you talking about?

12:08:24   3    A.   Like if I think that she might want them to move

12:08:28   4    up farther in the company, but they need a good place to

12:08:31   5    start, I'll call her and I will let her know, "you know,

12:08:35   6    I've got somebody that I would really like to hire, but

12:08:39   7    I think they're going to be promotable in a few years".

12:08:42   8         And if they're going to be promotable, I am going

12:08:45   9    to let her know, because we work together, but I manage

12:08:48   10   my store and I do the hiring.

12:08:49   11        THE COURT:   So if you hire someone who you

12:08:51   12   think is not going to be promotable, you don't get the

12:08:56   13   advance approval of the district manager?

12:08:59   14        THE WITNESS:   No.   No, sir.   I do the hiring

12:09:01   15   on my own.

12:09:02   16        THE COURT:   Is that also true of firing?

12:09:05   17        THE WITNESS:   Yes.

12:09:05   18        THE COURT:   You fire without getting the

12:09:07   19   approval of the district manager?

12:09:08   20        THE WITNESS:   Yes.

12:09:09   21   Q.   (By Mr. May)   To follow up on the Judge's

12:09:11   22   question, do you get the advance approval for hiring

12:09:15   23   somebody who you think's going to be promoted?

12:09:17   24   A.   Do I ask my DM?   No.   I just -- it's all done by

12:09:24   25   me.

12:09:24  1    Q.  Okay.  Do you have a Store Policy Manual?

12:09:26  2    A.  Yes.

12:09:27  3    Q.  Do you use it?

12:09:28  4    A.  Yes.  Not - it's not on an everyday basis.  I

12:09:33  5    don't pull it off the shelf every day and look at it

12:09:35  6    and -- but it's there, yes.

12:09:37  7    Q.  Do you have strands in your store?

12:09:40  8    A.  Yes.

12:09:40  9    Q.  What are they?

12:09:43  10   A.  They are to help us to train people, to help

12:09:46  11   train ourselves further.  Because companies are always

12:09:50  12   changing, so when the companies are changing, we have to

12:09:55  13   go with the company.

12:09:56  14        It's there for guidance, there for a learning

12:09:59  15   tool.

12:09:59  16   Q.  Has it changed in the last two or three years

12:10:02  17   since you've been there, the store?

12:10:05  18   A.  The store policy?

12:10:06  19   Q.  Yeah.  The Family Dollar, as you see it from your

12:10:10  20   end as store manager, has it changed over time?

12:10:14  21   A.  Oh, yes, it changes all the time.  There's daily

12:10:17  22   changes, but -- as with any company, I do believe.

12:10:20  23   Q.  Do you interview anyone for positions elsewhere?

12:10:26  24   A.  Meaning?

12:10:29  25   Q.  For -- elsewhere in Family Dollar?

12:10:31   1      A.   Oh, sometimes my DM will ask me to do an

12:10:35   2   interview for her, you know, to help -- kind of see if I

12:10:42   3   think that person might be a good manager for another

12:10:44   4   store or for another district if they're low.  And say,

12:10:49   5   I have a lot of people come through and -- I -- I do

12:10:54   6   interviewing for other stores as a second opinion.

12:10:58   7      Q.   What's your responsibility for the money in the

12:11:05   8   store; petty cash, and the money that customers give in

12:11:10   9   return for the products that you're selling?

12:11:14  10      A.   I'm responsible for all the money in the store,

12:11:17  11   the deposits; or my assistant's responsible for the

12:11:21  12   deposits, if it's her day to work.  I do all the

12:11:25  13   banking, all the -- all the banking.

12:11:30  14           We do the registers now and the girls count their

12:11:33  15   tills down.  I -- once their tills are counted down,

12:11:36  16   it's my responsible or my assistant's to get that money

12:11:40  17   secured into the bank.

12:11:41  18      Q.   Does your district manager play any role in that?

12:11:46  19      A.   No, not unless we need to up the dollar amount in

12:11:51  20   our petty cash.  Say you don't feel you're running on

12:11:54  21   enough money and you're doing a higher volume, so you

12:11:59  22   can get more money from them.

12:12:00  23      Q.   Do you play any role in safety at your store?

12:12:06  24      A.   Yes.

12:12:07  25      Q.   Tell us about that.

12:12:08  1    A.  All the safety issues are done on a computer.  If

12:12:12  2  someone falls, gets hurt, if it's a workman's comp, if a

12:12:16  3  customer gets hurt, we do it on the computer.  We send

12:12:19  4  it right to the corporate office.  I --

12:12:24  5    Q.  Do you have any process or systems, or any kind

12:12:28  6  of plans, to ensure that your store's a safe place to

12:12:34  7  work and shop?

12:12:34  8    A.  Yes.  We follow the A.D.A. rules.  We don't let

12:12:39  9  anyone climb the ladders without somebody else being

12:12:41  10  there.  We just --

12:12:46  11    Q.  Do you have anything to do with when people work

12:12:51  12  in your store?  Scheduling?

12:12:55  13    A.  I do all the scheduling.  I do -- I go -- I use

12:13:02  14  the staff scheduler as a guide, but I do all the

12:13:05  15  scheduling.  I make sure I've got coverage on Sunday, on

12:13:10  16  holidays.  I pretty much rotate my girls.  But I do all

12:13:14  17  the scheduling.

12:13:16  18    Q.  Is there any paperwork that you're responsible

12:13:20  19  for as a store manager?

12:13:21  20    A.  Yes.  Every morning --

12:13:24  21    Q.  I'm sorry?

12:13:25  22    A.  Okay.

12:13:26  23    Q.  If you'll take us, not in the excruciating

12:13:31  24  detail, but just give us an idea of the types of things

12:13:35  25  that you do regularly as store manager, for paperwork,

12:13:40   1   in your role as store manager.

12:13:42   2       A.   Okay.   We do cash-in sales in the morning.   We do

12:13:49   3   billing summaries.   We do all your daily reports, all

12:13:54   4   your incident reports, all the banking.   I mean, we have

12:14:03   5   paperwork every day that we do.

12:14:04   6       Q.   When you say "we", who are you talking about?

12:14:07   7       A.   Myself and an assistant.

12:14:08   8       Q.   Is there a difference between you and your

12:14:10   9   assistant?

12:14:10   10      A.   Yes.

12:14:11   11      Q.   What's that difference?

12:14:12   12      A.   The store -- the store is mine to run.   I have an

12:14:17   13   assistant that can help me; or if I have to step out of

12:14:20   14   the store, she can basically run my store, but not

12:14:23   15   without guidance by me -- I mean, to call me.   There are

12:14:28   16   certain jobs that each person in my store do, and they

12:14:31   17   can do them all, but they don't do it on a daily basis.

12:14:35   18          They don't do a billing summary every day or

12:14:39   19   every month, or they don't, you know, go to the bank

12:14:41   20   every day, or do the pick-ups or --

12:14:47   21      Q.   Have you had more than one district manager?

12:14:51   22      A.   Yes.

12:14:52   23      Q.   Have there been differences in the way they do

12:14:57   24   things?

12:14:59   25      A.   There's always a little bit difference in all

12:15:02  1   your managers and your district managers.

12:15:04  2        But, no, I don't -- I don't feel I have to call

12:15:08  3   them and get every little thing I do approved.  I mean,

12:15:11  4   that's why I am there to do is run my store.  That's why

12:15:14  5   I'm the manager.

12:15:15  6     Q.  What's the door-to-shelf program?

12:15:17  7     A.  That is where we -- when we unload our trucks,

12:15:21  8   the trucks back up to the door and you have a recovery

12:15:23  9   area and you unload your truck, you stay at your truck.

12:15:35  10        It's basically worked in 48 hours.  Your main

12:15:35  11   freight is always up off the floor within 48 hours.

12:15:35  12     Q.  Now, is it just simply -- and it sounds like it's

12:15:38  13   just simply picking up the box off the truck, putting it

12:15:41  14   in the store room, then taking it and getting it to the

12:15:44  15   shelf.  Is there any kind of plan or system --

12:15:47  16     A.  No.  There's a system.  You have a place for

12:15:50  17   every cart.  Every cart is labeled.

12:15:52  18        You make sure that whoever's helping you, you're

12:15:56  19   delegating that that be put on a certain cart and be

12:15:59  20   taken out at a certain time during the day.  We do

12:16:02  21   special areas each day.  We do special carts.

12:16:06  22        And so it's all got to be, you know, delegated

12:16:09  23   and managed, and --

12:16:12  24     Q.  Well, are you telling us you manage when you're

12:16:18  25   moving boxes?

12:16:19   1      A.   Yes.

12:16:20   2      Q.   Why do you say that?

12:16:21   3      A.   Because I might be having any number of the

12:16:26   4  girls -- I try to get all my girls involved in unloading

12:16:29   5  the trucks and putting -- if they don't do it every day,

12:16:33   6  then I need to be telling them, "wait, no, that doesn't

12:16:35   7  go on that cart.  We need to make sure that we work this

12:16:38   8  cart first.  So I'm going to do the section, you're

12:16:41   9  going to do that section, so --"

12:16:43  10      Q.   Is there any training involved, or can you just

12:16:46  11  take a new employee and put them in the backroom and run

12:16:51  12  the door to shelf?

12:16:51  13      A.   No --

12:16:52  14           MR. QUINN:   Object to leading, Your Honor.

12:16:57  15           THE COURT:   Sustained.

12:16:57  16      Q.   Have you ever trained anybody at your store?

12:16:59  17      A.   Yes.

12:17:00  18      Q.   Tell us about that.

12:17:01  19      A.   I -- when I train a person, I start them on one

12:17:05  20  particular job, cash register, for instance.  And then

12:17:08  21  when they've learned that, I take them to the next level

12:17:13  22  where they may unload the truck with me.  That may be

12:17:17  23  all they do that day.

12:17:18  24           Then the next week, they will learn how to stage

12:17:21  25  the truck, put the truck away.  There's all the labels,

12:17:25  1   you have to learn how to do all the labels, so they have

12:17:27  2   to be taught that.

12:17:28  3        What comes in a carton, how many it's, you

12:17:31  4   know -- how many cartons a week we get, what batch it's

12:17:35  5   out of.

12:17:37  6   Q.   What does the term in retail mean "merchandising"

12:17:43  7   mean?

12:17:44  8   A.   Merchandising is putting an end -- end cap on.

12:17:53  9   Merchandising new tables, as far as knowing what -- how

12:17:56  10  to merchandise them, you know.

12:17:58  11       Nobody wants to go in a store and see toothpaste,

12:18:03  12  for instance, and Tampons on the same shelf, or food

12:18:06  13  with Tampons.  You have to know.

12:18:08  14       So you have to teach people that's never been in

12:18:10  15  retail how to -- you don't put dog food with ketchup.

12:18:15  16  See it's merchandising.

12:18:17  17       You just -- you have to teach someone, if they

12:18:20  18  don't know how to merchandise, you definitely have to

12:18:23  19  train them and teach them how to do that.

12:18:26  20  Q.   And who does that training?

12:18:27  21  A.   I do.

12:18:28  22  Q.   Have you ever had theft in your store?

12:18:36  23  A.   Yes.

12:18:37  24  Q.   How is that handled?

12:18:39  25  A.   I call the police.  I have them arrested.  We go

12:18:44   1   through that procedure.

12:18:45   2       You know, we -- we fill out a complaint on the

12:18:49   3   computer, it's called an incident report.  We basically

12:18:53   4   just fill it out on the computer and you go from there.

12:18:56   5       Q.  Have you ever had Loss Prevention in your store?

12:18:59   6       A.  Yes.  Yes.  Loss Prevention comes in, and if it's

12:19:03   7   an integrity issue with an employee, there's steps to be

12:19:06   8   taken, write-ups to give.

12:19:08   9       If it's internal theft, it's usually handled by

12:19:11  10   Loss Prevention, unless it's a right out-and-out, "I saw

12:19:15  11   you give that to the customer free, if I see that

12:19:18  12   happen, you're out of there.  You're done."  I know it's

12:19:21  13   not going to be a legal situation, because they know

12:19:24  14   they did it.

12:19:24  15       If it's a suspicion I have, then I call the DM or

12:19:27  16   the Loss Prevention and get them involved.  But on a

12:19:31  17   daily basis, no.

12:19:33  18       Q.  Do you have displays in your store?

12:19:38  19       A.  Yes, we do.  We have Frito displays, we have

12:19:43  20   Little Debbie displays.  We display all kinds of

12:19:48  21   different products.  Some have several areas, some

12:19:53  22   don't.

12:19:53  23       If we have a seasonal display, I can do it

12:19:56  24   however I want to, I can be creative.  And then there's

12:19:58  25   other ones if you have room, you find the room for it.

12:20:01   1      Q.   You think you could run your store without a

12:20:04   2   Store Policy Manual?

12:20:05   3      A.   No.   I think I would have to have a policy

12:20:09   4   manual, because nobody knows everything.   You have to

12:20:12   5   have something to reference back to.

12:20:20   6               MR. MAY:   One minute, Your Honor -- one

12:20:22   7   second.

12:20:23   8               THE COURT:   Okay.

12:20:42   9      Q.   My partners have said you used the word

12:20:46   10   "staging", and that might not be readily apparent to

12:20:49   11   everybody what that means.

12:20:50   12        So why don't you explain to us what you mean by

12:20:53   13   that term.

12:20:55   14      A.   What, staging?   When we unload the truck, you

12:20:58   15   have certain departments in your store that you have to

12:21:01   16   stage right away to be able to unload the rest of your

12:21:05   17   truck.

12:21:06   18        But it's like -- staging is when you take it out

12:21:09   19   and set it right in front of where it goes.   And then

12:21:11   20   someone else is coming along putting it up right away,

12:21:14   21   so you can have that cart right back to the backroom.

12:21:16   22        And then after your truck is unloading, you do

12:21:19   23   your repacks, which are big totes that a lot of

12:21:22   24   different items are put in, not just one box of the same

12:21:25   25   item.   And we work those.

And then we go back and in the evening, about an hour, half hour, 45 minutes before we close, we start what we call staging.  And that's when you take the U-boats out and you line them up in the aisle that they belong in front of the product.  And then at 6:00 o'clock the next morning, one, two, three, depends on your store volume, how many people come in, and pull that freight up and get it up on the shelves so it's not sitting in the aisle.  It's ADD approved.

You get it done before we open between 6:00 and 9:00.  About a quarter until 9:00, I go back and unstage my floor, as I say it to the girls.

Anything that's on the floor that will not be put on the shelf needs to be put back on the U-boat and in the stockroom.

Q.  ADA, you mean the Americans with Disabilities Act?

A.  Yes.

MR. MAY:  Thank you, Ms. Brake.

THE COURT:  Cross-examination, 18 minutes.

**CROSS-EXAMINATION**

BY MR. QUINN:

Q.  Hello.

A.  Hi.

Q.  Did I hear you say that you have three assistant

12:22:33   1    managers?

12:22:34   2        A.   Correct.

12:22:35   3        Q.   And I also heard you say that you are allowed to

12:22:40   4    manipulate your schedule?

12:22:44   5        A.   We are allowed to use it for a guide, yeah.

12:22:46   6        Q.   But the schedule is based on your budget;

12:22:49   7    correct?

12:22:49   8        A.   Correct.

12:22:49   9        Q.   And the budget, you cannot manipulate without

12:22:54  10    permission of the district manager; correct?

12:22:56  11        A.   Well, you don't just overspend payroll, no.

12:23:01  12        Q.   And with those three assistant managers, what do

12:23:10  13    you average working a week?

12:23:12  14        A.   Myself?

12:23:13  15        Q.   Yes.

12:23:14  16        A.   I could work anywhere between 52 and 70.

12:23:17  17        Q.   What do you normally work?

12:23:19  18        A.   I normally work around 60 to 63 to 65.

12:23:24  19        Q.   Okay.

12:23:24  20        A.   But that's of my own choice.

12:23:27  21        Q.   Okay.  And you were talking about the safety of

12:23:32  22    your store.  Does -- do you have the authority to hire a

12:23:38  23    security guard?

12:23:39  24        A.   No.

12:23:39  25        Q.   Or put up cameras?

12:23:41  1      A.   I have cameras in my store.   They -- they're some

12:23:47  2  that they sell.   They're not the surveillance cameras.

12:23:53  3      Q.   If your district manager told you that you could

12:23:58  4  not hire without his permission, would you do it anyway?

12:24:02  5      A.   Yes.

12:24:05  6      Q.   You would break policy?

12:24:07  7      A.   That's not a policy.

12:24:09  8      Q.   But that's not what I asked you.   You don't

12:24:13  9  understand that to be a policy?

12:24:14  10     A.   No.

12:24:15  11     Q.   And nobody's ever told you that was a policy?

12:24:17  12     A.   That I couldn't hire someone?

12:24:18  13     Q.   Yes.

12:24:19  14     A.   No.

12:24:21  15              THE COURT:   You couldn't hire anyone without

12:24:22  16  the prior approval of the district manager?

12:24:24  17              THE WITNESS:   No, sir.   No one's ever told

12:24:26  18  me that.

12:24:26  19              THE COURT:   No one's ever told you, you

12:24:28  20  couldn't fire someone without the approval of the

12:24:32  21  district manager?

12:24:32  22              THE WITNESS:   No.

12:24:33  23     Q.   (By Mr. Quinn) Were you never told that, in

12:24:47  24  fact, your hiring procedure was a "recommendation" that

12:24:53  25  had to go to the district manager or the home office?

12:24:58    1    Have you ever seen that policy?

12:25:00    2        A.   From an old store policy, I'm sure, but I

12:25:04    3    don't --

12:25:04    4        Q.   You don't follow that, do you?

12:25:05    5        A.   I have never been told I could not hire someone.

12:25:08    6        Q.   But you do admit that that is in the policy and

12:25:10    7    training manual, do you not?

12:25:12    8        A.   Correct.

12:25:13    9        Q.   And is it your testimony that you don't have to

12:25:20   10    get district manager approval to terminate or discharge

12:25:27   11    an employee?

12:25:28   12        A.   No, I don't have to get that district manager's

12:25:30   13    approval.   The only way we have to do that is if we feel

12:25:37   14    that it's going to be like a logistic problem.

12:25:42   15        Q.   Uh-huh.   Again, you're familiar with the policy

12:25:57   16    and training manual?

12:25:59   17        A.   No, that's not our policy.

12:26:02   18              MR. MAY:   That's --

12:26:03   19              THE COURT:   Just a moment.   What's the basis

12:26:06   20    of the objection?

12:26:07   21              MR. MAY:   It's not the policy manual.   You

12:26:09   22    can see on the bottom line, it's not.

12:26:11   23        Q.   (By Mr. Quinn)   It's the strands that you train

12:26:13   24    with; correct?

12:26:14   25        A.   No.   Those we use for a guideline to help train.

12:26:16  1      Q.   Okay.

12:26:17  2      A.   But it's not a store policy.

12:26:19  3      Q.   But you are not going to train them to do

12:26:21  4   something that is not a policy, are you?

12:26:24  5           Why are you going to train, ma'am -- let me ask

12:26:27  6   you this:  Why are you going to train them that they

12:26:30  7   must contact the district manager before they can

12:26:33  8   discharge, if that's not a policy?

12:26:39  9      A.   Because that is a training tool.  If you have a

12:26:42  10  problem and you're training someone how to hire or fire

12:26:47  11  someone, that's a tool to let you know, okay, if you

12:26:52  12  really feel that this person did something wrong, if,

12:26:55  13  you know -- you gave them a drug test and they failed

12:26:59  14  the drug test, it's policy that they have to pass that

12:27:02  15  drug test.  They didn't -- you can fire them.  It

12:27:07  16  doesn't say I have to call my DM, though.

12:27:09  17           THE COURT:  You can fire them on the spot?

12:27:11  18           THE WITNESS:  Yes, for doing drugs.

12:27:12  19      Q.   Do you suspend them or do you fire them?  Do you

12:27:15  20  suspend them --

12:27:16  21      A.   It depends on the situation --

12:27:18  22      Q.   -- and then fire them?

12:27:19  23      A.   -- it depends on the situation of what -- how --

12:27:22  24  how deep it is, how deep the reason that you're firing

12:27:25  25  them is.

12:27:26  1    If I saw a cashier ring up -- which this has

12:27:29  2 happened to me -- I saw the cashier ring up a pack of

12:27:32  3 gum and charged her 26 cents, but she walked out with

12:27:37  4 two gallons of antifreeze and a pack of gum.  I

12:27:40  5 immediately fired that cashier.

12:27:41  6         THE COURT:  And it wasn't a suspension, you

12:27:44  7 were firing her right there on the spot?

12:27:45  8         THE WITNESS:  I fired her on the spot.  I

12:27:48  9 didn't give her a warning, nothing.

12:27:49 10    Q.   Okay.  If you --

12:27:50 11    A.   That's my assets, you know.

12:27:52 12    Q.   If your district manager told you that you could

12:27:57 13 not fire on the spot like that, even if you saw them

12:28:01 14 stealing without calling that district manager, would

12:28:06 15 you do it anyway?

12:28:08 16    A.   Yes, sir, I would.

12:28:09 17    Q.   You would violate his directions?

12:28:11 18    A.   Yes.

12:28:11 19    Q.   And if he told you that -- he or she told you

12:28:14 20 that you could not promote without involving him or her,

12:28:19 21 would you still do that anyway?

12:28:21 22    A.   I would consult her, but I don't have to consult

12:28:25 23 her, because I would have to go through her for the

12:28:29 24 raises -- they're all done through the DMs at our

12:28:33 25 request after our inventories.

| | | |
|---|---|---|
| 12:28:38 | 1 | Q.   And if you didn't have that power that you have |
| 12:28:42 | 2 | to hire and to fire, and to make all of the decisions |
| 12:28:47 | 3 | that you've talked about here, would you still consider |
| 12:28:50 | 4 | yourself to be a store manager? |
| 12:28:52 | 5 | A.   Yes. |
| 12:28:52 | 6 | Q.   You would? |
| 12:28:53 | 7 | A.   Yes. |
| 12:28:53 | 8 | Q.   If you couldn't hire or you couldn't fire or do |
| 12:28:57 | 9 | those other things, you would still consider yourself to |
| 12:28:59 | 10 | be a store manager? |
| 12:29:00 | 11 | A.   There's still other aspects that I do that would |
| 12:29:02 | 12 | be managing that store. |
| 12:29:05 | 13 | Q.   Okay.   And would you consider yourself a store |
| 12:29:10 | 14 | manager because that's the title that you have? |
| 12:29:12 | 15 | A.   No. |
| 12:29:13 | 16 | Q.   And let me ask you:   Your assistant managers -- |
| 12:29:19 | 17 | you said you had three of them -- those assistant |
| 12:29:25 | 18 | managers, do they do a lot of the same things that you |
| 12:29:28 | 19 | do? |
| 12:29:28 | 20 | A.   Yes. |
| 12:29:29 | 21 | Q.   Have you ever seen the job description for the |
| 12:29:34 | 22 | store manager and the assistant store manager? |
| 12:29:37 | 23 | A.   I have never seen one for the assistant manager, |
| 12:29:39 | 24 | but -- |
| 12:29:39 | 25 | Q.   Would it surprise you if those were almost |

12:29:42   1   identical?

12:29:43   2       A.   No.

12:29:45   3       Q.   And you are not a plaintiff in this action, are

12:29:49   4   you?

12:29:49   5       A.   No.

12:29:52   6           MR. QUINN:   Thank you.   That's all.

12:29:54   7           THE COURT:   Redirect?

12:29:55   8                        **REDIRECT EXAMINATION**

12:29:56   9   **BY MR. MAY:**

12:29:57  10       Q.   Ms. Brake, you said you -- I think you said you

12:30:03  11   worked 65 hours, and I think you used "that's my own

12:30:08  12   choice"?

12:30:09  13       A.   Correct.

12:30:09  14       Q.   What does that mean?

12:30:11  15       A.   I take pride in my store.   I could run my

12:30:14  16   store -- I could leave my store at 48 hours.   I have

12:30:18  17   left my store at 48 hours before.   But I take pride in

12:30:21  18   my store.   And I'm a people person.

12:30:23  19           I want people to come back.   I want people to

12:30:25  20   know that -- I want a clean store.

12:30:30  21       Q.   And you were talking with Mr. Quinn about

12:30:32  22   promotions and saying that you would do it anyway.   But

12:30:39  23   you would have to inform your district manager

12:30:41  24   ultimately, because the district manager has to enter it

12:30:45  25   or key it in, or something like that?

12:30:47   1      A.   Correct.

12:30:47   2      Q.   Would you tell us about that, what that means?

12:30:50   3      A.   If I give a raise to someone, that has to be -- I

12:30:54   4  can't just key it in at my store level.  It has to go

12:30:56   5  through the DM.  She does it on her laptop computer so

12:31:00   6  it goes directly to payroll.

12:31:05   7           As far as firing, we did it the same thing.  We

12:31:08   8  have to key it in on our computers and it then gets

12:31:12   9  forwarded on to the DM, but I don't have to call her

12:31:14  10  to --

12:31:15  11      Q.   Have you ever had discussions with your district

12:31:18  12  manager about how much a raise ought to be or might be

12:31:23  13  or would be appropriate?

12:31:24  14      A.   I always do.

12:31:26  15      Q.   Okay.

12:31:26  16      A.   Except my own.

12:31:27  17      Q.   Except your own?

12:31:28  18      A.   Yeah.

12:31:29  19      Q.   And so, do you consider yourself, given the

12:31:34  20  recommendation to your district manager --

12:31:36  21           THE COURT:  The objection to leading is

12:31:38  22  sustained.

12:31:40  23           MR. MAY:  Thank you, Your Honor.

12:31:41  24      Q.   Did -- do you -- do you make recommendations to

12:31:45  25  your --

12:31:45  1    A.  Yes, I do.

12:31:46  2    Q.  -- district manager?

12:31:47  3    A.  As a matter of fact, my district manager just

12:31:50  4  called me.  I have been off on medical leave and she

12:31:52  5  just called me with my inventory and she asked me what I

12:31:58  6  thought I should give my girls.

12:31:59  7        She doesn't set -- she doesn't say, "I'm going to

12:32:02  8  give so and so 20 cents, or I'm going to give so and so

12:32:06  9  50 cents.  Penny, what do you think they're worth?  What

12:32:09 10  do you think you need for them to keep them here?"

12:32:11 11    Q.  And would you say that your recommendations are

12:32:14 12  given particular weight --

12:32:15 13        THE COURT:  Objection to leading is

12:32:17 14  sustained.

12:32:18 15        MR. QUINN:  Objection.  Leading.

12:32:19 16    Q.  Has your district manager, in your experience,

12:32:25 17  listened to your recommendation?

12:32:27 18    A.  Yes.

12:32:28 19        MR. QUINN:  Objection.  I don't know how he

12:32:30 20  can answer to what the district manager --

12:32:36 21        MR. MAY:  I asked her what her boss --

12:32:36 22        THE COURT:  The objection is sustained.

12:32:39 23    Q.  (By Mr. May)  Have you made recommendations to

12:32:44 24  your district manager about raises?

12:32:46 25    A.  Yes, I have.

12:32:47  1       Q.   What has occurred?

12:32:48  2       A.   I ask her to give them such and such an amount

12:32:53  3   and she gives it.  She takes my recommendation and goes

12:32:58  4   with it.

12:32:59  5                  MR. MAY:  Thank you.

12:33:01  6                  THE COURT:  Thank you, ma'am.

12:33:03  7                  THE WITNESS:  You're welcome.

12:33:05  8                  THE COURT:  Ladies and gentlemen, we will

12:33:07  9   take our lunch recess at this time -- incidentally, this

12:33:09 10   witness is excused.

12:33:11 11                  MR. R. WIGGINS:  Yes, sir.

12:33:12 12                  THE WITNESS:  Pardon me?

12:33:12 13                  THE COURT:  You're excused.

12:33:14 14                  Please do not discuss the case among

12:33:16 15   yourselves or with anyone else.  Do not allow it to be

12:33:19 16   discussed in your presence, and keep an open mind.

12:33:22 17                  We'll resume at 1:30.

12:33:25 18                  (Jury out at 12:24 p.m. until 1:30 p.m.)

13:33:08 19                     (In open court, jury not present.)

13:42:26 20                  THE COURT:  Mr. White?

13:42:27 21                  MR. WHITE:  Yes, sir?

13:42:31 22                  THE COURT:  You're at the podium.  I take it

13:42:34 23   you have something to say.

13:42:37 24                  MR. WHITE:  No, sir.  I'm waiting for you to

13:42:39 25   say "call the next witness" -- oh, somebody has

13:42:42  1   something to say.

13:42:44  2                  MR. UMBACH:  I --

13:42:46  3                  MR. MAY:  I'll do it.  Your Honor, you had

13:42:49  4   held a motion in limine, I believe, in the plaintiffs'

13:42:54  5   case -- dealing with administrative rulings and those

13:43:00  6   sorts of things.

13:43:01  7                  And there are two court opinions they may be

13:43:03  8   trying to cover by that.  And we're going to call Mr. --

13:43:06  9   due to the truncated schedule we now have, we're going

13:43:11  10  to be getting to Mr. Clifford sooner than we thought.

13:43:14  11  And you told the lawyers not to mention that until it

13:43:18  12  was brought back up.

13:43:19  13                 THE COURT:  All right.  Any other argument

13:43:22  14  on it?

13:43:24  15                 MR. JOHNSON:  Well, Your Honor, initially,

13:43:26  16  we just want to reiterate what we said in our motion.

13:43:30  17  We believe this evidence will be unduly prejudicial

13:43:34  18  because it comes from the Government.  These are

13:43:35  19  agencies and two Court decisions from South Carolina, as

13:43:39  20  well as a couple of letters --

13:43:41  21                 THE COURT:  The South Carolina court

13:43:44  22  decisions, when were they handed down?

13:43:48  23                 MR. JOHNSON:  I'm sorry, sir?

13:43:50  24                 THE COURT:  When were they -- I remember

13:43:52  25  looking at them, but I don't remember the date of the

| | | |
|---|---|---|
| 13:43:54 | 1 | decision. |
| 13:43:55 | 2 | MR. JOHNSON:  2000 -- I've got them right |
| 13:43:58 | 3 | here -- September 28th and 29th of 2004, respectively. |
| 13:44:09 | 4 | THE COURT:  2004. |
| 13:44:11 | 5 | All right.  The Court decisions are out. |
| 13:44:18 | 6 | The regulations, interpretations, or whatever are in |
| 13:44:26 | 7 | with a limiting instruction. |
| 13:44:28 | 8 | MR. UMBACH:  Your Honor, may I respond |
| 13:44:30 | 9 | quickly? |
| 13:44:31 | 10 | THE COURT:  No. |
| 13:44:32 | 11 | MR. UMBACH:  Your Honor, this is the same |
| 13:44:33 | 12 | issue as the Haigler testimony.  It goes to willfulness. |
| 13:44:37 | 13 | It's the very same issue. |
| 13:44:39 | 14 | THE COURT:  Yes.  But you've got a court |
| 13:44:42 | 15 | decision of 2004. |
| 13:44:46 | 16 | MR. MAY:  Are the damages limited to before |
| 13:44:49 | 17 | that time? |
| 13:44:52 | 18 | THE COURT:  You got another witness? |
| 13:44:55 | 19 | MR. UMBACH:  Yes, we do, Your Honor. |
| 13:44:58 | 20 | MR. WHITE:  That's why I'm here.  Bill |
| 13:45:01 | 21 | McCarthy.  I'll put him in the box, Judge. |
| 13:45:38 | 22 | (Jury in at 1:36 p.m.) |
| 13:45:38 | 23 | (In open court, jury present.) |
| 13:45:55 | 24 | THE COURT:  Defendant will call its next |
| 13:45:56 | 25 | witness. |

13:45:57  1             MR. WHITE:  Bill McCarthy.

13:45:59  2      **WILLIAM B. McCARTHY, DEFENDANT'S WITNESS, SWORN**

13:46:01  3             THE CLERK:  State your name for the record,

13:46:04  4  please.

13:46:05  5             THE WITNESS:  William B. McCarthy.

13:46:09  6             THE CLERK:  Spell your last name.

13:46:11  7             THE WITNESS:  M-c-C-A-R-T-H-Y.

13:46:11  8                    **DIRECT EXAMINATION**

13:46:17  9  **BY MR. WHITE:**

13:46:17 10      Q.  Where do you live, Mr. McCarthy?

13:46:18 11      A.  I live in Charlotte, North Carolina.

13:46:21 12      Q.  By whom are you employed?

13:46:22 13      A.  I'm employed by Family Dollar.

13:46:23 14      Q.  What position?

13:46:24 15      A.  I am a director of financial analysis and

13:46:27 16  planning for store operations.

13:46:28 17      Q.  What does the director of financial planning and

13:46:31 18  analysis for store operations do for Family Dollar?

13:46:36 19      A.  Several things; amongst them, I do sales apparel

13:46:40 20  budgets for all the stores.  I also do the budgets for

13:46:43 21  the store operations department, as well as the stores

13:46:45 22  for the fiscal year.

13:46:46 23          I do analysis of reports from other departments

13:46:49 24  and distribute that information to the senior vice

13:46:53 25  presidents, vice-presidents, regional vice-presidents

13:46:55    1    for the store operations department.

13:46:57    2        I also control some of the head count for our

13:47:02    3    department, as far as district managers, regional

13:47:04    4    vice-presidents, to make sure we're on track as far as

13:47:08    5    budgets are concerned, as well as any other various and

13:47:11    6    sundry reports that come up.

13:47:12    7    Q.   Mr. McCarthy, these young ladies are good, but if

13:47:20    8    you would slow your speech down a little, you will have

13:47:23    9    friends for life.

13:47:23   10    A.   Absolutely.

13:47:25   11    Q.   Thank you.  Now, how long have you been employed

13:47:28   12    at Family Dollar?

13:47:29   13    A.   I've been employed since February 20th of 2002, a

13:47:33   14    little bit under three-and-a-half years.

13:47:35   15    Q.   What is your age?

13:47:36   16    A.   I am 31 years old.

13:47:38   17    Q.   Prior to being employed in your current position

13:47:43   18    at Family Dollar, would you just give us a brief summary

13:47:47   19    of your previous work experience?

13:47:48   20    A.   I owned my own taxi cab company for three years

13:47:56   21    in Gainesville, Florida.

13:47:58   22        After that, I entered into the equipment rental

13:48:00   23    industry as a financial analyst for a company at Pompano

13:48:04   24    Beach, Florida.  And then was recruited by a company in

13:48:08   25    Charlotte, North Carolina to do similar work in the

13:48:10   1    equipment rental industry.

13:48:12   2        After that, I transferred to a company in Miami,

13:48:16   3    also in the equipment rental industry; and was put on a

13:48:20   4    six-month project for California; and then relocated

13:48:23   5    back to Charlotte, North Carolina, where I started with

13:48:26   6    Family Dollar.

13:48:26   7    Q.   Were those last two or three, or most of that

13:48:29   8    employment in the financial analyst area?

13:48:31   9    A.   That is correct.

13:48:32  10    Q.   What is your educational background?

13:48:34  11    A.   I graduated from high school in 1991 from Cooper

13:48:38  12    City High School in Cooper City, Florida.  I attended a

13:48:42  13    year and a half at the University of Florida, and then

13:48:47  14    had to leave for family reasons.

13:48:49  15        Since then, I have taken various college courses

13:48:52  16    at community colleges, ranging from Breyer Community

13:48:58  17    College to Piedmont College in Charlotte, North

13:49:02  18    Carolina.  I have no current degree.

13:49:03  19    Q.   In your present position at Family Dollar, are

13:49:05  20    you frequently called upon to provide statistical

13:49:09  21    information about certain of the operations of Family

13:49:11  22    Dollar?

13:49:11  23    A.   Yes, I am, on a daily, weekly and monthly basis.

13:49:16  24    Q.   Are you familiar with -- look in front of you in

13:49:20  25    the -- what is already in evidence as Exhibit 2216.

13:49:26  1          Do you see that in front of you?

13:49:28  2     A.  Yes, I do.

13:49:29  3     Q.  And do you recognize that document?

13:49:31  4     A.  Yes.

13:49:33  5     Q.  What is that?

13:49:33  6     A.  This is a staff scheduler for a store.

13:49:39  7          MR. WHITE:  Your Honor, I have copies of

13:49:41  8  that.  May I publish to the jury?

13:49:43  9          THE COURT:  Yes.

13:50:07 10          MR. WHITE:  Would the Court like a copy?

13:50:09 11          THE COURT:  Yes.  Thank you.

13:50:19 12     Q.  (By Mr. White)  We have heard a term in this case

13:50:31 13  called "payroll schedule" or "scheduler".  Have you ever

13:50:37 14  heard that term?

13:50:37 15     A.  The staff scheduler is generally what the term

13:50:40 16  is, but payroll schedule wouldn't be a correct term for

13:50:46 17  this.

13:50:46 18     Q.  But when we hear those terms, whether it's

13:50:49 19  payroll schedule, staff schedule, or weekly work

13:50:54 20  schedule, what do these terms mean in relationship to

13:50:57 21  Exhibit 2216?

13:50:58 22     A.  This would be what they're referring to, a staff

13:51:01 23  schedule that's issued to the store each work.

13:51:03 24     Q.  And how long, to your knowledge, has this

13:51:05 25  document been -- is it created at Family Dollar?

13:51:08  1     A.  Absolutely is created at Family Dollar by me.

13:51:11  2     Q.  By you?

13:51:12  3     A.  Yes, by me.

13:51:13  4     Q.  How long has this document been utilized at

13:51:18  5  Family Dollar, to your knowledge?

13:51:19  6     A.  This document, or a document similar to it, has

13:51:22  7  been in use since December of 2001.

13:51:26  8     Q.  What is the purpose of the document 2216?

13:51:30  9     A.  This document is basically a guideline or

13:51:36  10  template to assist stores in scheduling their employees,

13:51:39  11  to handle the store needs; to manage their stores.

13:51:44  12     Q.  And Exhibit 2216, we've been using as an example.

13:51:50  13  Yours is actually laminated in plastic; correct?

13:51:53  14     A.  That is correct.

13:51:54  15     Q.  And it has -- yours has on it magic marker or

13:52:00  16  felt-tip sort of drawing marks.  Do you see those?

13:52:03  17     A.  Yes, that is correct.  This is the staff schedule

13:52:06  18  that appears to have been used.

13:52:07  19     Q.  Been used?

13:52:08  20     A.  Yes.  It's a staff schedule that's been used.

13:52:11  21     Q.  When -- do you actually mail these documents out

13:52:13  22  to the stores?

13:52:14  23     A.  Yes, I do.

13:52:15  24     Q.  Do they go directly to the stores?

13:52:17  25     A.  No, sir, they don't.

13:52:19  1    Q.   Who -- where do they go from you?

13:52:22  2    A.   From me, originally, I send a list to the print

13:52:27  3    shop -- at our print shop.   And they print the staff

13:52:30  4    schedules on the paper.

13:52:32  5         From there, they take the staff schedules, they

13:52:34  6    send them to another print shop that laminates them.

13:52:37  7         They return the laminated staff schedules, about

13:52:41  8    5,600 of them, to me.   And myself and a few workers, we

13:52:48  9    get together in a room, and we collate them, and break

13:52:51  10   them out by district.

13:52:53  11        We take the district, the complete district's

13:52:55  12   work of staff schedules, have a list attached to it that

13:52:58  13   shows which store was picked for each schedule; and then

13:53:00  14   we send that to the district manager for them to

13:53:04  15   distribute and review with their store managers.

13:53:07  16   Q.   What is the purpose of this document?

13:53:11  17   A.   The purpose of the document is to assist store

13:53:17  18   managers and to give them a template or a guideline --

13:53:19  19   specifically, newer store managers -- as to how to best

13:53:23  20   schedule their employees.

13:53:24  21        It's supposed to be a guideline or a basis from

13:53:27  22   which to start from, and for the stores to make

13:53:30  23   adjustments to.

13:53:31  24   Q.   We have heard the term "payroll budget" in this

13:53:36  25   case.   Tell me what correlation, if any, this document,

13:53:41   1   this exhibit has to the term "payroll budget".

13:53:44   2       A.   In the process of my assigning which stores get

13:53:48   3   which staff schedules, I start off with first what their

13:53:51   4   payroll budget is.  And I perform a series of

13:53:55   5   calculations that will determine how many labor hours

13:53:57   6   each store has for their staff schedule.

13:54:00   7       The combination of that store's labor hours, as

13:54:05   8   indicated by their budget, with the day that the truck

13:54:10   9   comes to that store, and the hours that that store

13:54:13   10  closes from Monday through Saturday, is what determines

13:54:17   11  which staff schedule they get.

13:54:18   12      So directly, the store's payroll budget that they

13:54:22   13  have for that quarter will influence directly which

13:54:25   14  staff schedule they will get for that quarter.

13:54:28   15      Q.   Okay.  Prior to 2001, December of 2001, how were

13:54:36   16  payroll budgets done in the Family Dollar Stores?

13:54:40   17      A.   The payroll budgets were done similar to the way

13:54:44   18  they are today:  A payroll budget dollar was issued to

13:54:50   19  the store, and the store was responsible for handling

13:54:54   20  their payroll budget to the dollars.

13:54:56   21      Q.   And who at the store was responsible for

13:54:58   22  scheduling the labor under the payroll budget prior to

13:55:03   23  2001?

13:55:04   24      A.   The store managers, as it is today.

13:55:08   25      Q.   Why was the weekly work schedule, as it's titled,

13:55:15   1   this exhibit -- why was it created at Family Dollar?

13:55:18   2       A.   It was created in December of 2001, mostly

13:55:23   3   August, and to support our door-to-shelf process, as

13:55:27   4   well as to give new managers a good guideline to start

13:55:30   5   with for scheduling their stores in accordance with

13:55:33   6   their budgets.

13:55:34   7       Q.   Tell the ladies and gentlemen of the jury what

13:55:37   8   process you used and how you go about -- you said, I

13:55:41   9   think, on every quarter this is created for every store;

13:55:45  10   correct?

13:55:45  11       A.   That is correct.

13:55:46  12       Q.   And how does -- how do you go about the process

13:55:49  13   every quarter of creating for the 5,600 stores this

13:55:55  14   exhibit or --

13:55:58  15       A.   I start with the budget process.  And initially

13:56:02  16   with the budget process, the first thing I do is I pull

13:56:05  17   historical information for each individual store, as far

13:56:08  18   as how much sales they have had this year for the most

13:56:10  19   recent period, as well as how that store did last year.

13:56:14  20            Then I will have a comparison of how that store's

13:56:17  21   doing year over year, see if it's increasing or

13:56:21  22   decreasing in sales.

13:56:22  23            From that, I will send a projection -- sales

13:56:24  24   projection to the district managers for each store

13:56:28  25   within their district.  I will ask them to review those

13:56:31   1   projections, make any adjustments either up or down or

13:56:34   2   flat on a store-by-store basis, roll it all up, and then

13:56:37   3   send it to me.

13:56:39   4       From those sales projections, what I do is I take

13:56:42   5   the sales projection in what's called a risk class, and

13:56:46   6   that determines what coverage the store has.  Coverage

13:56:50   7   ranges anywhere from 2.00 coverage up to a 10.0 average,

13:56:55   8   or even higher if we have --

13:56:58   9   Q.  Let me stop you there and ask you to define

13:57:00   10  coverage.

13:57:01   11  A.  Coverage is a number which basically corresponds

13:57:05   12  to the average number of bodies that is in a store and

13:57:09   13  the hours the store's open.  So 2.0 coverage would say

13:57:13   14  they average two employees an hour the store is open.

13:57:16   15  Q.  Would it be fair to use "employees" instead of

13:57:19   16  "bodies"?

13:57:19   17  A.  Yes, that would be fair.

13:57:20   18  Q.  Okay.  And you said the coverage would go

13:57:22   19  anywhere from a minimum of what?

13:57:24   20  A.  2.0 is the minimum coverage that I allocate, and

13:57:29   21  that stores are allowed to have as a budget.  And it

13:57:31   22  would go anywhere as high as -- we have a store that has

13:57:33   23  over 10.0 coverage, because it's a 6.7 million dollar

13:57:37   24  store that's open many hours a week.

13:57:40   25  Q.  Okay.  I interrupted you.  But once you determine

13:57:44    1    that coverage, take us through the process from there.

13:57:47    2        A.   I take that coverage, that average number of

13:57:50    3    people that are supposed to be in the store every hour

13:57:52    4    the store's open, and I multiply times the number of

13:57:55    5    hours the store is open and their operating hours.

13:57:58    6             For example, if a store's open from 9:00 a.m.

13:58:00    7    until 8:00 p.m. Monday through Saturday, and 10:00 to

13:58:03    8    6:00 on Sunday, they're open for 74 hours a week.  So I

13:58:06    9    take that 2.0 coverage times 74 hours a week, and I come

13:58:09   10    up with 148 labor hours.

13:58:13   11             From that labor hours number, what I did is

13:58:16   12    subtract out 52 hours, which is the manager's schedule,

13:58:19   13    which would leave me in that store with 96 hours of

13:58:23   14    hourly labor.  I take that 96 hours, and I multiply it

13:58:27   15    times the store's average hourly wage, the most recent

13:58:31   16    average hourly wage that I pulled for that store, and

13:58:33   17    that comes up with an hourly payroll budget for that

13:58:35   18    store.

13:58:36   19             I add the manager's weekly salary back into it.

13:58:39   20    And that store's weekly payroll budget is determined.

13:58:41   21        Q.   Does every schedule that you prepare have, as an

13:58:48   22    assumption, that the manager works 52 hours?

13:58:51   23        A.   Absolutely.  That's one of the, I guess, laws

13:58:54   24    that every manager has 52 hours.

13:58:57   25        Q.   Now, this exhibit at the bottom right-hand corner

13:59:03   1   says 48B on one side and 48A on the other side.

13:59:07   2       A.   Uh-huh.

13:59:08   3       Q.   What is the difference between the A side and the

13:59:11   4   B side?

13:59:11   5       A.   What we did is we created an A and a B side that

13:59:17   6   gives the manager and assistant manager alternating

13:59:21   7   weekends off.

13:59:21   8            If you will notice that on the side A, the

13:59:23   9   manager is off on Sundays and the assistant manager

13:59:26   10  works from 9:30 to 6:30 on Sunday morning.

13:59:30   11           And on the B side, the manager's working 9:30 to

13:59:34   12  6:30 on Sunday, while the assistant manager's off on

13:59:37   13  that Sunday.

13:59:38   14      Q.   Now, how can you tell who is off by looking at

13:59:42   15  that?

13:59:42   16      A.   Well, basically, just by the schedule template.

13:59:45   17  This gives them something to work with.  But if you look

13:59:47   18  on the left-hand side here, where it says the positions,

13:59:50   19  the managers, and at this store would have one to two

13:59:54   20  assistants.

13:59:55   21      Q.   Yeah.

13:59:56   22      A.   And you see here where it says Suzy?  Suzy is

14:00:00   23  showing on Sunday shows she's off on the B side.  And

14:00:03   24  that Kell would be the manager is working from 9:30 a.m.

14:00:06   25  to 6:30 p.m. on Sunday.

14:00:08   1    Q.   Who is the person on these schedules when they

14:00:12   2    receive them that puts in the handwritten number?

14:00:14   3    A.   That's the store manager.   They're sent out from

14:00:17   4    me.   They're sent out blank.

14:00:19   5    Q.   When you say "blank", is anything, any number

14:00:22   6    that's printed on here on it when it goes to the store?

14:00:25   7    A.   That is correct.

14:00:25   8    Q.   So that when you say "blank", anything that's

14:00:28   9    handwritten is added by the store?

14:00:30   10   A.   Correct.   And we actually did some research when

14:00:34   11   we went to -- first, we were laminating these -- as to

14:00:36   12   which grease pencil would write best on the store on the

14:00:40   13   staff's schedules.   That way, they could erase it

14:00:42   14   without leaving permanent marks.   And we added that.

14:00:46   15        That way, store managers can order that

14:00:48   16   specifically for making adjustments to their staff

14:00:50   17   schedules.

14:00:50   18   Q.   Well, how does this work for 13 weeks, when it

14:00:54   19   only has one week on one side and one week on the other

14:00:57   20   side?

14:00:57   21   A.   Well, what will happen is at the top of the staff

14:01:00   22   schedule it says "week ending".   What they'll do is the

14:01:03   23   store manager will sit down and make adjustments to this

14:01:06   24   schedule for, let's say, the week ending June 14th.   And

14:01:09   25   they post this up in the back room in the store for all

1   the associates to work with.

2        If they're using the alternating version of this

3   schedule, which is one week A and one week B.  So that

4   way, the assistant manager and the store manager

5   alternate Sundays off, they would make changes; that way

6   it could be flipped to the following week.

7        And each week they sit down with the assistant

8   and have to make adjustments for the following week so

9   the associates can know what the schedules are.

10   Q.   So the third week, you would flip back to the A

11   side and either keep what you have handwritten over

12   there or make changes for that week?

13   A.   That's correct.  That's actually one option to

14   this.

15        Some stores, the store managers and assistant

16   managers have an agreement that the store managers will

17   work every Sunday and the assistant manager is off every

18   Sunday.  And for those stores, they would just have the

19   48B up and never go back to a 48A.

20        Other stores decide that the assistant manager

21   will work every Sunday.  That way, they can have

22   Saturday night off.  And that store would then work with

23   an A, and they would just have an A and they would never

24   flip over to the B.

25        The choice is theirs.

14:02:12  1    Q.  Does every single store receive the same printed

14:02:18  2  information on the staff scheduler they get?

14:02:20  3    A.  That is not correct.  We have 258 versions of A,

14:02:25  4  258 versions of B, for staff schedules.  And each store

14:02:29  5  will get a staff schedule that's calculated based on

14:02:33  6  what their payroll budget is, what their truck day is,

14:02:36  7  and the store hours of operation.

14:02:37  8    Q.  What is the -- what effect does truck day have on

14:02:42  9  the schedule?

14:02:44  10    A.  It actually has a pretty good effect, because the

14:02:49  11  staff schedule's originally designed to support our

14:02:52  12  door-to-shelf process, which is our truck proceeding in

14:02:55  13  and stocking process.

14:02:58  14        So if you'll notice here on this schedule here on

14:03:01  15  the 48A side, this store is a Tuesday truck.  You will

14:03:06  16  notice that, when you look at the bottom where it says

14:03:08  17  the total number of hours each day, you will notice that

14:03:12  18  29 has the most hours.  And that's to give them some

14:03:14  19  additional template and additional guidelines as to

14:03:18  20  working on their truck day so they have enough labor to

14:03:20  21  process the freight and get it out on the sales floor.

14:03:23  22  That way customers can shop.

14:03:24  23        Also, on Wednesday, which is the day after truck,

14:03:27  24  we have the early morning stocking day, which is they

14:03:30  25  come in before the store opens, that way they're not

14:03:32   1   disturbing the customers -- they come in before the

14:03:34   2   store opens and they stock the store prior to opening.

14:03:38   3        And you'll see here that they have two

14:03:40   4   associates -- the manager on this case -- and the first

14:03:43   5   full-time associate coming in at 6:00 a.m. on that

14:03:47   6   Wednesday.  That is for the trucks.

14:03:52   7        So that store would have a Thursday truck,

14:03:53   8   wouldn't have these hours on Tuesday or Wednesday.

14:03:55   9   Those hours would probably be on Thursday, Friday.

14:03:57  10   Q.   Are there work schedules for times other

14:04:02  11   different than 160 hours?

14:04:04  12   A.   Absolutely.  We have ranges in staff schedules

14:04:07  13   from -- the smallest range is 135 labor hours is the

14:04:11  14   smallest staff schedule that we have.  A new store has

14:04:14  15   allocated or budgeted less than 135 labor hours.  And

14:04:18  16   that would ramp all the way up to a 370-hour staff

14:04:21  17   schedule.  And actually -- there are actually some

14:04:25  18   stores that have -- fall higher than 370 labor hours in

14:04:28  19   their budget.

14:04:29  20        But because we only have 258 staff schedules, we

14:04:32  21   issue them a 370-hour staff schedule.  And their job is

14:04:36  22   to make adjustments, actually additions, to cover what

14:04:40  23   is their payroll budgets.

14:04:41  24   Q.   When you get involved in the process, though, do

14:04:44  25   you create the actual payroll budget, or is that given

14:04:47  1  you?

14:04:47  2      A.   That's given to me, the payroll budget.  What I

14:04:50  3  do -- get back to the process I was talking about

14:04:53  4  before.

14:04:53  5      Q.   Right.

14:04:53  6      A.   Where I add back in the manager's salary that

14:05:05  7  comes up to the weekly payroll budgets.  That's the

14:05:05  8  payroll allocation process.

14:05:05  9          Once again, I take this allocated payroll on a

14:05:05  10  store-by-store basis, and I send it to the district

14:05:06  11  manager and say -- present it to the regional

14:05:09  12  vice-president, Robert -- and say that this is the

14:05:11  13  amount of allocated payroll for this store, this store

14:05:14  14  and this store, and within this district, and all these

14:05:17  15  districts within this region.

14:05:18  16          The RVP turns around and gives that to the

14:05:21  17  district manager.  And the district manager, once again,

14:05:23  18  has the ability to change a payroll budget, move some

14:05:29  19  dollars from this store to this store, because maybe

14:05:31  20  this store has a basement or attic and takes more time

14:05:34  21  to unload the truck; or this store over here is a store

14:05:37  22  that has two entrances, so they require a little bit

14:05:40  23  more coverage to be able to --

14:05:44  24      Q.   Slow down, Bill.

14:05:46  25      A.   I apologize.  Maybe another store has two

14:05:52  1   entrances and the store manager may need additional

14:05:58  2   coverage, or additional people to man both entrances.

14:06:01  3   They can assist customers as they come in the door.  And

14:06:03  4   so they may move dollars from one store to another, or

14:06:06  5   they may add dollars to all stores, or subtract dollars

14:06:09  6   to all stores.

14:06:10  7        And then when they've done making adjustments to

14:06:14  8   the payroll budgets, they take that information, they

14:06:16  9   send it back to me, so the district manager sends that

14:06:19  10  information back to me.

14:06:21  11       I compile all of that information.  And from

14:06:23  12  that, payroll that's given back to me from the district

14:06:26  13  manager, that's where I start the staff schedule process

14:06:29  14  of assigning the schedule to each store to match what

14:06:33  15  their payroll budget is.  That's what the district

14:06:35  16  manager has given to me.

14:06:37  17  Q.  Well, don't you have to know to create this --

14:06:39  18  how much, in this example Suzy and Kim and J.J. and

14:06:44  19  Fran, are making?

14:06:45  20  A.  Well, what I do know when I create this

14:06:47  21  example -- and also when I do the budgeting process, I

14:06:51  22  do know how much the manager Kel makes, because I pull

14:06:54  23  into our payroll system how much the manager makes at

14:06:57  24  the time I'm doing the budget.  I try to get it as close

14:07:00  25  to as possible.

14:07:01  1          Also, if the district manager knows that they're
14:07:04  2   making a change in that store, they can send me an email
14:07:07  3   and I will make sure that when I do their budget, I take
14:07:09  4   that updated information and do a count.
14:07:12  5          With regards to Suzy and Kim and J.J. and Cindi
14:07:17  6   and Fran, what I have is I take an average hourly wage
14:07:20  7   for that store for all the hourly associates.  And
14:07:23  8   frankly, I do that by pulling all the paychecks for all
14:07:27  9   the associates six weeks prior to my budget process.
14:07:32  10  And I take the total dollars that were paid to those
14:07:34  11  hourly associates in that store for the six weeks, and I
14:07:39  12  divide it by the total number of hours that those
14:07:42  13  associates work.  And that comes up -- would be an
14:07:46  14  average hourly wage specific to that store for their
14:07:48  15  associates.
14:07:49  16         That's how I come up with the labor hours.
14:07:51  17  Q.   And after you -- let me ask you this:  From
14:07:59  18  quarter to quarter, do these -- for a particular store,
14:08:02  19  do these schedules change?
14:08:04  20  A.   Absolutely.  They may -- they may change quarter
14:08:07  21  to quarter for a store, or they may stay fairly the
14:08:11  22  same.  A number of different factors change.
14:08:13  23  Q.   What are the factors that can cause a payroll
14:08:18  24  budget to change from this quarter to the next quarter?
14:08:21  25  A.   Oh, my.  What would change from a payroll budget

standpoint is a lot of things.  The first and foremost is sales.

     If a store is performing well, their sales are increasing dramatically, what's going to happen is their coverage will go up as well, the number of employees that they need to run their business goes up as well.  That's going to increase their payroll budget.

     If the store's manager changes, and their payroll goes up, or if they have a good inventory and do good performance, they may get a raise of $25 a week.  And that $25 will increase their payroll budget for the next quarter.  Same thing with the hourly associates.

     We may change the hours of the store.  It may go from being a 9:00 to 7:00 Monday through Saturday store and 10:00 to 6:00 on Sunday.  It may go to a 9:00 to 8:00, Monday through Saturday, 10:00 to 6:00 on Sunday.

     And if we ask them to stay open additional hours, we give them additional payroll to handle the hourly associates to handle that.  That would -- if their hours went down, it would decrease.

     Q.  Excuse me.  You've got on your printed part that you send out --

     A.  Yes.

     Q.  -- you actually have hours down for certain days and certain people?

14:09:32   1    A.   Correct.

14:09:32   2    Q.   Is the manager required to follow that?

14:09:34   3    A.   No, they're not.  They're -- the manager is

14:09:42   4    responsible for meeting their payroll budget on a dollar

14:09:47   5    basis, not an hour basis.

14:09:47   6    Q.   Okay.  So, as long as -- if I'm a manager and if

14:09:52   7    I stay within the dollar budget, that's what you're

14:09:55   8    trying to achieve?

14:09:56   9    A.   That is correct.  And this was given as a

14:09:59   10   template to help managers who may not be familiar with

14:10:02   11   how to properly schedule.  This is something for them to

14:10:06   12   start with.

14:10:06   13   Q.   Do all managers use this?

14:10:08   14   A.   All managers receive this.  As to the amount of

14:10:16   15   the amount of actual -- input that they put into this

14:10:19   16   and dependency on this.  In the stores that I visited,

14:10:22   17   the managers that I have spoken to, it varies greatly.

14:10:26   18        Some stores -- when you go into the store --

14:10:30   19        MR. R. WIGGINS:  Your Honor, I'm going to

14:10:31   20   object.  This man works in Charlotte in an office.  He

14:10:34   21   is not in the stores.

14:10:35   22        When we took his deposition, he told us he

14:10:37   23   didn't know how they used these in the stores.  Now all

14:10:39   24   of a sudden he's got all this knowledge.

14:10:41   25        It must be hearsay, because he didn't do it

14:10:44  1    himself.

14:10:44  2                    MR. WHITE:  Your Honor --

14:10:45  3                    THE COURT:  What's your position with the

14:10:47  4    company?

14:10:48  5                    THE WITNESS:  Director of financial analysis

14:10:52  6    and planning for Store Operations.

14:10:53  7                    THE COURT:  The objection is sustained.

14:10:54  8        Q.   (By Mr. White)  Have you actually gone in the

14:10:55  9    store?

14:10:56  10       A.   Absolutely.

14:10:57  11       Q.   Has your deposition been taken in this case?

14:11:00  12       A.   No, it has not.

14:11:01  13       Q.   Was it taken in another case?

14:11:02  14       A.   That is correct.

14:11:02  15       Q.   Okay.  Have you been in the stores and actually

14:11:07  16    seen schedules on the wall?

14:11:09  17       A.   Absolutely.  I feel it's important for people in

14:11:14  18    the corporate office to go visit stores and talk to

14:11:16  19    store managers and district managers and assistant

14:11:19  20    managers and clerks.

14:11:20  21            It helps -- it personally helps me do a better

14:11:23  22    job.  Some of the changes that I have made to this

14:11:25  23    process -- the budgeting process as a whole, the payroll

14:11:29  24    credit process -- have come from input from store

14:11:31  25    managers and store associates.

14:11:33    1      Q.   If I'm a store manager, what, if anything, that I

14:11:37    2   do in the operation of my store can result in you, the

14:11:41    3   next quarter, giving me a higher payroll budget?

14:11:45    4      A.   The myriad thing to do to increase your sales at

14:11:50    5   your store will directly impact your sales budget, and

14:11:53    6   therefore, impact your payroll.

14:11:55    7           If you do more impactful merchandising, if you

14:11:59    8   practice better customer service, if your store's

14:12:03    9   cleaner and neater and you encourage your customers to

14:12:05   10   come back and shop with you, that's going to increase

14:12:07   11   your sales, and increase the sales and increase payroll

14:12:11   12   budget.

14:12:11   13      Q.   Is -- is this a budget for the next 13 weeks,

14:12:21   14   based on the previous 13 weeks?  Is that --

14:12:25   15      A.   Not necessarily, because sometimes you will have,

14:12:30   16   for example, our second quarter -- our fiscal quarter

14:12:34   17   runs December, January, February.  That's Christmas.

14:12:36   18   And we tend to have our busiest time of the year is at

14:12:40   19   Christmas.

14:12:41   20           Because of that, the staff scheduler for second

14:12:45   21   quarter tends to have more hours on it than you would

14:12:47   22   have had for first quarter.  Because you're anticipating

14:12:50   23   higher sales in the second quarter than you did the

14:12:54   24   first quarter in September, October, November.

14:12:56   25           So it really is tied to what your projection's

14:12:59  1   going to be, not just your past 13 weeks.  But your

14:13:03  2   performance is going to be -- is going to impact what

14:13:06  3   your projection is.

14:13:07  4        If you're trending up 10 percent in your area,

14:13:11  5   you're probably going to be doing 10 percent next

14:13:14  6   quarter as this quarter.

14:13:15  7        Q.  In the templates you create, the versions, the

14:13:17  8   200 whatever number versions, is there any overtime

14:13:20  9   factored into your computation?

14:13:22  10       A.  Overtime is factored in, in a lot of the

14:13:27  11   calculations.  But on the schedules themselves, no, we

14:13:31  12   don't plan for overtime, because we don't want to force

14:13:35  13   stores, if they're using their staff schedules, to use

14:13:38  14   overtime.  It's not efficient use of their dollars

14:13:41  15       Q.  Does Family Dollar pay overtime?

14:13:43  16       A.  We pay quite a bit of overtime, actually.

14:13:46  17       Q.  Do you know how much they paid in the last year?

14:13:48  18       A.  In the last year, we paid roughly 18 --

14:13:52  19            MR. R. WIGGINS:  Your Honor, I'm going to

14:13:54  20   object --

14:13:54  21            THE COURT:  What's the basis for your

14:13:56  22   objection?

14:13:56  23            MR. R. WIGGINS:  This man did not disclose

14:14:00  24   as a witness on that subject.  It's far beyond anything

14:14:03  25   he's disclosed.  He's disclosed the scheduler and the

14:14:06   1   payroll budget.  Now, he's off into something else.

14:14:09   2              MR. WHITE:  Your Honor, he's on their

14:14:10   3   witness list.

14:14:12   4              MR. R. WIGGINS:  Yes, sir.  For the topics

14:14:13   5   we listed him for.  He wasn't listed for that topic.

14:14:16   6              MR. WHITE:  He's not --

14:14:17   7              THE COURT:  Overruled.

14:14:19   8              MR. WHITE:  Thank you.

14:14:20   9   Q.  (By Mr. White)  How much payroll did Family

14:14:22   10   Dollar pay last year?

14:14:25   11   A.  Last year, we paid just under $18,900,000 in

14:14:31   12   overtime to associates in the stores alone.

14:14:36   13   Q.  Do you create any reports to show when -- for

14:14:45   14   anybody to show that people have not met their payroll

14:14:49   15   budget?

14:14:49   16   A.  No.  There is no report that I or anyone else

14:14:55   17   creates that says "this is the store's staff schedule

14:14:58   18   and this is the number of hours that that store actually

14:15:01   19   used".  The stores are held to the dollars, not the

14:15:03   20   hours.

14:15:05   21   Q.  The -- you mentioned that one of the criteria or

14:15:09   22   one of the things that could affect this was truck day.

14:15:12   23   How does truck day affect this?

14:15:13   24   A.  Truck is probably one of the busiest days at our

14:15:19   25   stores.

14:15:20  1          Roughly, 30 percent of all of our stores' hours
14:15:25  2   in a given week is spent handling freight from the time
14:15:28  3   it comes off the truck to putting it on the carts in an
14:15:31  4   orderly fashion, so that way you can properly stock the
14:15:34  5   store, to actually getting it out onto the sales floor
14:15:37  6   and some of the products you can put directly on the
14:15:40  7   shelf.  Some of the seasonal product you may not have
14:15:42  8   the space for it, so you have to put it on a ledge or a
14:15:45  9   riser.
14:15:46  10         Some of the products are promotional, and you
14:15:48  11  want to get into a special place, a special stack out or
14:15:51  12  display, or something to drive your sales.  That roughly
14:15:54  13  accounts for 30 percent of that store's labor on a
14:15:58  14  weekly basis.
14:15:59  15         Where that falls within the week has a dramatic
14:16:03  16  affect on the store's staff schedule and the store's
14:16:07  17  payroll for a week.
14:16:08  18  Q.   You mentioned the labor hours and the truck
14:16:11  19  process.  Is there any other criteria that affects the
14:16:14  20  schedule of the budgeting process?
14:16:17  21  A.   The last one would be the time the store closes.
14:16:21  22         The schedules, such as this schedule right here,
14:16:24  23  factors an 8:00 p.m. close for this store and that's
14:16:27  24  where we would have associates staying until 8:30 every
14:16:30  25  night; whereas a store that would close at 7:00 o'clock

14:16:33  1   Monday through Saturday, they will stay until 7:30

14:16:36  2   allows them to service the customers still in the

14:16:38  3   building after the store closes, as well as to finish

14:16:41  4   the final paperwork for the end of the day process, so

14:16:43  5   that we would have at least two associates in the

14:16:45  6   building, so that way the manager doesn't leave alone at

14:16:49  7   night.

14:16:49  8       Q.   Where -- who gives you the dollar amount to

14:17:12  9   budget what you use?  You said you receive the payroll

14:17:16  10  budget.  Who did you receive it from?

14:17:18  11      A.   I receive it directly from the district manager.

14:17:19  12      Q.   And I gather you -- this is an ongoing process

14:17:23  13  for you every quarter you are at some point in this

14:17:26  14  process?

14:17:26  15      A.   Yes.  This -- every 13 weeks we have a new

14:17:31  16  quarterly payroll budget.  We just finished the first --

14:17:35  17  I'm sorry, the fourth quarter's payroll budget, which

14:17:38  18  began on May 28th.

14:17:40  19           And I will be beginning the sales portion of the

14:17:43  20  first quarter payroll budget when I get back to

14:17:46  21  Charlotte next week.

14:17:47  22      Q.   You indicated that you -- one of the components

14:17:50  23  is the store manager's salary.  At my request, did you

14:17:54  24  get the average store manager's salary?

14:17:56  25      A.   Yes, I did.

14:17:57   1       Q.   And what is that number?

14:17:58   2       A.   The average store manager's salary, as of last

14:18:01   3   week, was $657 per week.

14:18:03   4       Q.   And did you indicate that when someone is hired,

14:18:11   5   that additional information comes to you is part of this

14:18:14   6   process?

14:18:15   7       A.   Yes.   If a district manager knows that they've

14:18:19   8   got either a vacancy, or they have a manager that's

14:18:22   9   retiring, they can replace them with another manager.

14:18:25  10            If that district manager sent me an email and

14:18:27  11   lets me know that Store 1234's manager now maes 650, and

14:18:35  12   the new one 675, I will take the information into

14:18:39  13   account when I do that store's payroll budget for the

14:18:41  14   next quarter.

14:18:42  15            I openly solicit that information from district

14:18:46  16   managers, because I feel it's the best way to get an

14:18:48  17   accurate payroll budget.

14:18:49  18       Q.   Are you also aware of what the annual -- average

14:18:52  19   inventory is for a store?

14:18:54  20       A.   As of last week, our average inventory for the

14:18:58  21   store was $236,326.

14:19:04  22       Q.   I guess that's close enough.

14:19:07  23            Are you aware of the average sales per store?

14:19:10  24       A.   A little bit over $1,023,000 per store.

14:19:14  25       Q.   And do you know how many clerks were hired by

14:19:19  1   Family Dollar in the last year?

14:19:20  2       A.   In the last year, we hired somewhere in the

14:19:25  3   neighborhood of 39,600 clerks.  That's for clerks that

14:19:30  4   may have left, for whatever reason, as well as for new

14:19:33  5   stores.

14:19:33  6       Q.   What about assistant managers?

14:19:35  7       A.   Assistant managers was just a little bit under

14:19:39  8   7,700.

14:19:41  9            MR. WHITE:   How much time do I have left?

14:19:43  10            THE COURT:   You have 12 minutes.

14:20:22  11       Q.   At the bottom of the exhibit, it says "hourly

14:20:29  12   associates must be paid for all time actually worked".

14:20:33  13   Is that on every one of these schedules when it goes

14:20:36  14   out?

14:20:36  15       A.   Yes, sir.

14:20:36  16       Q.   And in the top right-hand corner, there is some

14:20:41  17   writing.  Can you read that?

14:20:42  18       A.   It says, "it is the store manager's

14:20:47  19   responsibility to properly schedule and manage their

14:20:50  20   employees to meet the workload and budget on a weekly

14:20:54  21   basis".

14:20:54  22       Q.   And is that on every one of these when they go

14:20:57  23   out?

14:20:57  24       A.   Yes, it is.

14:20:58  25       Q.   And --

14:21:09  1            MR. WHITE:  That's all.

14:21:10  2            THE COURT:  Cross-examination?  34 minutes.

14:21:11  3                    **CROSS-EXAMINATION**

14:21:11  4  **BY MR. R. WIGGINS**

14:21:15  5      Q.  Good afternoon, Mr. McCarthy.

14:21:20  6      A.  Good afternoon.

14:21:21  7      Q.  Good to see you again.  You went a little fast

14:21:28  8  for me, I want to get an understanding of how this

14:21:31  9  works.

14:21:32  10           As I understand it -- you correct me if I'm wrong

14:21:34  11  and then I may still have to write it on the board.

14:21:40  12           Did you get a total payroll set of dollars from

14:21:45  13  the corporate headquarters to allocate across the whole

14:21:49  14  company; that's where you started?

14:21:51  15      A.  I start off each year with a payroll budget for

14:21:54  16  stores based on the number of stores that we have.

14:21:58  17      Q.  That's for all stores lumped together.  I think

14:22:01  18  when I talked to you last, you said like 77 million, or

14:22:05  19  something like that -- don't hold me to that -- but you

14:22:08  20  have got a big number you start with.  And you have it

14:22:11  21  allocated across the stores; is that correct?

14:22:13  22      A.  That is correct.

14:22:14  23      Q.  Okay.  And what you do first with that big number

14:22:16  24  that covers the whole company is you allocate it to the

14:22:20  25  districts and send it down to the district managers;

14:22:23   1    correct?

14:22:23   2        A.   No.   Actually, I allocate the stores on a

14:22:26   3    store-by-store basis, based on each store's payroll --

14:22:30   4    I'm sorry, sales -- each store's risk class which

14:22:33   5    determines coverage, the manager's salary, and average

14:22:36   6    hourly wage for the stores.   Then, I take that

14:22:38   7    information and I actually send it to the regional

14:22:40   8    vice-president, who then gives that to the district

14:22:45   9    managers at that region's budget meeting.

14:22:48  10        So it goes -- the big number comes to a little

14:22:51  11    smaller number that goes to the regional vice-president,

14:22:53  12    and then he sends it to his district managers.

14:22:56  13        Q.   That is correct.

14:22:57  14        A.   And it's closer to about 460 million.

14:23:00  15        Q.   Okay.   And the big number that goes -- that's

14:23:07  16    chopped up and goes to the regional vice-presidents, is

14:23:10  17    it going just as a single number for them to split up?

14:23:13  18        A.   No.   It's broken down into the individual stores

14:23:16  19    I allocate based on an individual store, which, in turn,

14:23:19  20    rolls up into a district.   And those roll up into

14:23:22  21    regions.

14:23:22  22        Q.   Okay.   And then when it gets to the district

14:23:24  23    manager, I think you told me last time that the district

14:23:30  24    managers allocate the budget to the stores; correct?

14:23:33  25        A.   That is correct.

14:23:35  1    Q.  And they're able -- the district managers are

14:23:41  2    able to decide, "well, this store needs a little more

14:23:44  3    budget than this other store", and then the dollars are

14:23:47  4    at their discretion; correct?

14:23:49  5    A.  That is correct.

14:23:49  6    Q.  And once they have moved the dollars that you

14:23:55  7    calculated under your formula for each store, from one

14:23:59  8    store to the other, and they get -- the district manager

14:24:01  9    gets it about right where he thinks it's best, he'll

14:24:06  10   send it back to you?

14:24:08  11   A.  That is correct.  After the district manager has

14:24:10  12   made adjustments, they'll take that -- and number on a

14:24:15  13   per store basis and roll it back to me.

14:24:17  14   Q.  And that process there with the district

14:24:23  15   managers, you don't participate in that?

14:24:25  16   A.  That is correct.

14:24:25  17   Q.  You just get whatever they do, it comes back to

14:24:28  18   you in an email or something, in some report or

14:24:30  19   something; correct?

14:24:31  20   A.  That is correct.

14:24:32  21   Q.  And that's when you go to work to try to get to

14:24:34  22   your final payroll budget after your district managers

14:24:37  23   have moved the numbers around; correct?

14:24:40  24   A.  That's where I get my final payroll budget and

14:24:42  25   the staff schedules.

14:24:44   1      Q.   Okay.   And because you don't participate in that

14:24:47   2   process at the district manager level where they're

14:24:50   3   allocated, to use your word, dollars, taking it from

14:24:56   4   this store, giving it to that store, in their

14:25:00   5   discretion, you don't know how they do that, you're not

14:25:04   6   there?

14:25:04   7      A.   That is correct.

14:25:05   8      Q.   There's 300-and-some-odd districts; correct?

14:25:09   9      A.   That is correct.

14:25:10  10      Q.   And we've seen situations -- for example,

14:25:15  11   yesterday afternoon where we had one witness,

14:25:18  12   Ms. Coleman, then we had some more this morning, who

14:25:23  13   seem to think they had enough budget and they weren't

14:25:26  14   having any real problem.

14:25:29  15          We've seen other witnesses that have said they

14:25:32  16   had tremendous problems.

14:25:34  17          And that's all coming from how that district

14:25:36  18   manager moves that money around; giving it to one,

14:25:41  19   taking it from another, in their discretion; correct?

14:25:44  20      A.   Within certain limitations.

14:25:47  21      Q.   Well, you're not there, though?

14:25:48  22      A.   No.   But when the budgets are rolled back to me,

14:25:53  23   there is a certain minimum allowable payroll for each

14:25:56  24   store, that 2.0 coverage that I spoke of, and the 135

14:26:01  25   labor hours I spoke of.   And when the district manager

14:26:03  1  rolls that information back to me every quarter at the

14:26:05  2  end of the -- prior to the budgets being issued to the

14:26:08  3  stores, I compare each store's budget to that minimum.

14:26:11  4  And if the stores has been -- has been changed by the

14:26:15  5  district manager to less than that minimum, I add to

14:26:18  6  that store's payroll budget to make sure it's brought up

14:26:22  7  to at least that minimum.

14:26:23  8      Q.  Okay.  So if the district manager took too much

14:26:25  9  away from one store, you will give back out to that

14:26:29  10  limited degree; correct?

14:26:31  11      A.  Yes.

14:26:32  12      Q.  But other than that, the district managers are

14:26:35  13  robbing Peter to pay Paul; correct?

14:26:39  14      A.  They are moving dollars from one store to

14:26:41  15  another, or to all stores.

14:26:45  16      Q.  You don't know if there's favoritism, do you,

14:26:48  17  because you're not there?

14:26:49  18      A.  No, I don't.

14:26:49  19      Q.  You don't know if some folks, maybe Ms. Coleman,

14:26:53  20  maybe not, are favorites and they get the best

14:26:56  21  treatment; another store manager might not be as

14:27:08  22  popular, he doesn't get quite treated the same way;

14:27:08  23  you're not involved in that, are you?

14:27:08  24      A.  I'm not involved with how the district managers

14:27:11  25  make their budgeting decisions.

14:27:13   1    Q.   Well, let's talk about --

14:27:14   2    A.   On --

14:27:16   3              MR. WHITE:   Let him finish.

14:27:16   4    Q.   (Mr. R. Wiggins)  I'm sorry.

14:27:18   5    A.   I'm not involved with the district managers'

14:27:20   6    decision on a store-by-store basis as to how they budget

14:27:24   7    their store's payroll.

14:27:25   8    Q.   Now, when the -- I'm going to use the board here

14:27:29   9    in a second after this question.

14:27:30   10              When the dollars come back to you, that's when

14:27:33   11   you use your formula that you were telling us about with

14:27:36   12   your 2.0 times your 74 that gets your 148 -- that was

14:27:40   13   your example you used -- minus your 52; correct?

14:27:43   14   A.   That is correct.   Once the budgets come back to

14:27:47   15   me, I calculate the staff schedules.

14:27:49   16   Q.   I want to make sure we all understand how your

14:27:52   17   formula works, because this is all new to us.

14:28:04   18              As I understand your formula -- can you see that?

14:28:11   19   A.   Yes, I can.

14:28:12   20   Q.   Once those district managers send you back those

14:28:18   21   numbers, you take your 2.0 coverage ratio -- is that

14:28:31   22   what you call that?

14:28:32   23              What do you call that?   Coverage what?

14:28:34   24   A.   That would be a 2.0 coverage.

14:28:36   25   Q.   Just call it coverage?   You say that's human

14:28:40  1   beings -- "bodies", you called it; correct?

14:28:42  2     A.  Employees that are in the store; the hours the

14:28:45  3   store's open.

14:28:46  4     Q.  That's two employees at every hour the store's

14:28:48  5   open; correct?

14:28:49  6     A.  That is correct.

14:28:51  7     Q.  All right.  Now, the next thing you do is you

14:29:01  8   take -- you said -- your example, you used 74, you said

14:29:05  9   2.0 times 74.

14:29:07  10          What was the 74, again?

14:29:08  11    A.  I think you're confusing the way I allocate the

14:29:12  12  payroll budget with the way that I calculate the stores

14:29:15  13  are issued their staff schedules.

14:29:16  14    Q.  Okay.  Well, whatever --

14:29:18  15    A.  What you are explaining right now is the way I

14:29:20  16  allocate payroll to a store prior to the budget meetings

14:29:24  17  that I give to the regional vice-presidents.

14:29:26  18    Q.  Okay.  Well, whatever -- whatever you call it,

14:29:28  19  I'm not sure what we call it, I just want to get the

14:29:33  20  formula down.  What is the next step?

14:29:35  21    A.  The next step the number of operating hours the

14:29:37  22  store is open.

14:29:38  23    Q.  Operating hours?

14:29:39  24    A.  That's correct.  The example I used was a store

14:29:40  25  that's open from 9:00 a.m. until 8:00 p.m. Monday

14:29:44  1   through Saturday; and open from 10:00 a.m. until 6:00

14:29:47  2   p.m. on Sunday.   That would be 74 hours per week

14:29:50  3   operating.

14:29:51  4       Q.   10:00 to 6:00 you said on Sunday?

14:29:54  5       A.   That is correct.

14:29:54  6       Q.   That's 74?

14:29:55  7       A.   Yes.   74 hours per week.

14:29:58  8       Q.   All right.   And that gives you your number -- I

14:30:02  9   think you said 148?

14:30:04  10      A.   Correct.

14:30:04  11      Q.   All right.   That's your 148 hours that you have

14:30:11  12  got to cover your store with employees every hour the

14:30:16  13  store is open; correct?

14:30:17  14      A.   That's how many labor hours -- 2.0 coverage --

14:30:22  15  each store would have for 74 hours per week.

14:30:24  16      Q.   Now, is that number what we see at the top of

14:30:27  17  this Exhibit 2216 when it says 160 hours?

14:30:31  18      A.   No.

14:30:32  19      Q.   Okay.   We're not there yet?   All right.

14:30:35  20          Now, I think the next -- you said you subtracted

14:30:40  21  52 hours; is that the next step?

14:30:41  22      A.   In the budgeting process as opposed to the staff

14:30:44  23  schedule process, I would subtract out 52 hours, which

14:30:47  24  is the store manager's schedule.

14:30:49  25      Q.   That's the store manager hours; correct?

14:30:53  1        A.   That is correct.

14:30:53  2        Q.   And that's the hours that his salary and bonus is

14:30:59  3   paying him for; correct?

14:31:00  4        A.   That is correct.

14:31:01  5        Q.   So then, because we're subtracting out the store

14:31:14  6   manager hours from the 2.0 coverage -- the store manager

14:31:19  7   is part of the 2.0 coverage; right?

14:31:22  8        A.   That is correct.

14:31:23  9        Q.   All right.  And that produces, what?  It gives

14:31:28  10  you another number?

14:31:29  11       A.   That would give you 96 hours of hourly labor in

14:31:32  12  that store.

14:31:34  13       Q.   That's the remainder that goes to the hours?

14:31:39  14       A.   And that's for hourly associates; correct.

14:31:45  15       Q.   Okay.  And then what's the next step?

14:31:50  16       A.   Then I would take that 96.  And I would multiply

14:31:53  17  it times that store's average hourly wage to determine

14:31:59  18  how many dollars that store has in an hourly payroll

14:32:04  19  hours on a weekly basis.

14:32:08  20       Q.   Okay.  You want to -- you want to give us a

14:32:13  21  number there just so we can fill the blank in?

14:32:15  22       A.   Let's go ahead and go with $7 per hour.

14:32:20  23       Q.   All right.  Is that about what the average is,

14:32:23  24  $7?

14:32:24  25       A.   I would say the average -- assistant managers'

14:32:27   1   currently average 8.07 an hour, and clerks currently

14:32:31   2   average 6.37 per hour.

14:32:34   3       Q.   Okay.  And that gives you a number.  Are -- can

14:32:41   4   you do it?

14:32:42   5       A.   In my head?

14:32:43   6       Q.   I'm not pressing you.  I'm not that good at it,

14:32:46   7   either.

14:32:46   8       A.   It's somewhere in the neighborhood of $680, I

14:32:51   9   would say.

14:32:51   10      Q.   All right.  And that's your dollars, that's --

14:32:56   11  that's your store payroll budget before you add back the

14:33:00   12  store manager?

14:33:00   13      A.   That's correct.

14:33:01   14      Q.   All right.  So this is your store payroll budget?

14:33:05   15      A.   That's your hourly payroll budget --

14:33:09   16      Q.   That's hourly payroll budget.

14:33:09   17      A.   -- that you are paying the associates.

14:33:12   18      Q.   Okay.  Then you add back your store manager

14:33:18   19  because you subtracted right here; you put it back?

14:33:22   20      A.   That's correct.  The average store manager

14:33:24   21  currently makes $657 per week.

14:33:27   22      Q.   657 average.  Do you use an average or an actual

14:33:31   23  rate?

14:33:31   24      A.   Oh, no.  I use the actual rate for the manager

14:33:34   25  that's assigned to that store for that period of time.

14:33:36  1        Q.   Okay.   We're going to assume this particular
14:33:39  2    person is right square in the middle.
14:33:44  3            All right.   Then what have we got?   Is that our
14:33:47  4    store payroll budget now?
14:33:48  5        A.   That would be the store's weekly allocated
14:33:50  6    payroll of $1,337 a week.
14:33:54  7        Q.   1,337 is our store what?
14:33:57  8        A.   Store's weekly allocated payroll.
14:34:01  9        Q.   Allocated payroll.   And what happens then?
14:34:07 10        A.   I take that $1,337, and I multiply by 13 for the
14:34:14 11    13 weeks in a quarter.
14:34:16 12        Q.   And that equips us to get that one?
14:34:20 13        A.   Roughly somewhere in the neighborhood of
14:34:22 14    16,000 -- right at $17,000.
14:34:25 15        Q.   17 roughly.   And that's just -- is that our store
14:34:31 16    payroll budget?
14:34:31 17        A.   That would be the quarterly payroll that would be
14:34:34 18    sent, along with all the other stores in the district,
14:34:36 19    would be sent to the regional vice-president.
14:34:39 20        Q.   Okay.   I think I've got it now.
14:34:49 21            The -- at some point, you get what's called, I
14:34:52 22    think, a coverage ratio?
14:34:53 23        A.   Yes.   There's a piece that you are missing, which
14:34:56 24    is what goes into that store's coverage ratio.
14:34:59 25        Q.   Okay.   What piece are we missing?

14:35:01  1    A.   You're missing the sales budget, which is given

14:35:03  2  to me by the district manager.

14:35:04  3    Q.   Okay.  So this is before the district manager

14:35:08  4  allocates that money from store to store?

14:35:10  5    A.   No.  No.  This is at the very beginning of the

14:35:13  6  process, which is what the district manager tells me,

14:35:15  7  that this is how much sales this store is expecting to

14:35:19  8  have during this 13-week period.

14:35:21  9    Q.   Okay.  So I guess I messed up.  I'm going to have

14:35:25  10  a page 2.  We will have our first step here where I left

14:35:30  11  out.

14:35:31  12         The district manager gives you a projected sales;

14:35:36  13  correct?

14:35:36  14    A.   That is correct.

14:35:37  15    Q.   And what's that used for?

14:35:40  16    A.   That's going to be their sales budget for the

14:35:43  17  next 13 weeks.

14:35:47  18    Q.   Does that produce somehow a coverage ratio?

14:35:54  19    A.   That, along with the store's risk class, would

14:35:57  20  produce a coverage ratio.

14:36:00  21         This example on 2.0 coverage store probably has

14:36:03  22  somewhere in the neighborhood of about $500,000 in sales

14:36:05  23  a year, about half the company average.

14:36:08  24    Q.   Okay.  So it -- where you used the 2.0, someone

14:36:13  25  -- this is a store in our example that didn't get above

14:36:16  1   minimum, but sometimes they get at the minimum; it might

14:36:18  2   be 2.1, 2.2 or 3?

14:36:21  3       A.  The average in a company is 2.43 as of 2005.  But

14:36:29  4   we have stores that are all the way up to 10.5 coverage,

14:36:32  5   which is the --

14:36:38  6              THE COURT:  We can't hear you.

14:36:41  7              THE WITNESS:  I'm sorry.

14:36:43  8       Q.  Give me that number.  I missed it.  The average

14:36:48  9   coverage ratio that's for people in the store on the

14:36:48  10  average every hour on the day it's open.  What is that?

14:36:51  11      A.  That is 2.43.

14:36:53  12      Q.  2.43 average coverage every hour the store's

14:37:02  13  open; correct?

14:37:02  14      A.  That is correct.

14:37:04  15      Q.  And as you showed us, we always subtract the

14:37:16  16  store managers; correct?

14:37:19  17      A.  The 2.43 includes the store manager, but the

14:37:23  18  store manager would not equate to a 1.0 coverage.

14:37:27  19      Q.  Well --

14:37:28  20      A.  -- the store manager would only equate to 1.0

14:37:31  21  coverage if they --

14:37:32  22      Q.  You told us that you were using a 2.0 example.

14:37:35  23      A.  That is correct.

14:37:36  24      Q.  And you subtract the store manager?

14:37:38  25      A.  2.0 doesn't mean two employees work in the store.

14:37:42  1   2.0 means that there are an average of two employees in

14:37:45  2   the store every hour the store's open.

14:37:48  3        Sometimes there would be one employee in the

14:37:50  4   store and sometimes there would be three, but it would

14:37:52  5   average to 2.0.

14:37:54  6        2.0 would only mean two employees in the store or

14:37:57  7   two employees working at the store, if each employee

14:37:59  8   works 74 hours per week.  And we don't have any

14:38:02  9   scenarios like that.

14:38:03  10  Q.   Right.  But 2.0 is -- it could be two part-time

14:38:06  11  employees, which would be one full-time equivalent; and

14:38:11  12  then the store manager, that would be one person and

14:38:13  13  then that would be two?

14:38:13  14  A.   No.

14:38:14  15  Q.   But you really have three people, but you have

14:38:16  16  two full-time equivalent?

14:38:18  17  A.   No.  Actually, you have a 2.0 coverage for that

14:38:20  18  store, would be 148 hours divided by 40, which would

14:38:27  19  give you a equivalent of employees.

14:38:30  20       For example, at the 148 minus the 52 for the

14:38:32  21  manager, that would give us the 96 hours left over for

14:38:35  22  hourly labor.  If you were to divide that by 40, you

14:38:39  23  would come up with 2.25, 2.3 full-time associates, in

14:38:46  24  addition to the manager.

14:38:47  25  Q.   Okay.

14:38:48  1      A.   Because today we have currently an average of 5.6

14:38:52  2   hourly associates per store, plus a manager.

14:38:54  3      Q.   That's because you have part-time employees?

14:38:56  4      A.   That's correct.

14:38:57  5      Q.   All right.  I'm talking about people, not hours.

14:39:00  6   I'm talking about human beings.  That's what you said,

14:39:02  7   these are bodies, human beings, employees.  And you said

14:39:07  8   2.0; correct?

14:39:07  9      A.   Correct.

14:39:07  10     Q.   Real people, 2.0; correct?

14:39:10  11     A.   No, 2.0 --

14:39:12  12     Q.   On a coverage ratio, you talked about people in

14:39:14  13  the store.

14:39:15  14     A.   That is correct.  For every hour that the store

14:39:18  15  is open.

14:39:18  16     Q.   Okay.  And when you subtract 52 hours from that,

14:39:23  17  that's one person, that's the store manager; correct?

14:39:26  18     A.   That is correct.

14:39:27  19     Q.   All right.  So when we subtract one from two,

14:39:31  20  that leaves one employee in the store besides the store

14:39:35  21  manager, although it might be split?

14:39:37  22     A.   You're -- I think you may be confusing the

14:39:40  23  calculation.  If you subtract out 52 for the store

14:39:45  24  manager of the 148 labor hours, that leaves you with 96

14:39:49  25  labor hours left over.

14:39:50    1        Now, if you only had one associate working those

14:39:53    2   96 hours, then you can have two people.

14:39:55    3        Q.   Okay.   Well, let's assume that.   Let's just

14:39:58    4   assume that the store has a full-time assistant manager

14:40:02    5   and a store manager, and that's it.

14:40:04    6        A.   And that that manager -- that assistant manager

14:40:06    7   works 96 hours per week?

14:40:08    8        Q.   Well -- and that would give you your two;

14:40:13    9   correct?

14:40:13   10        A.   That is correct.

14:40:14   11        Q.   All right.   That's two minus one is one.   That's

14:40:19   12   not a store manager; correct?   covering the store every

14:40:24   13   hour of the day.

14:40:26   14        A.   Using the example, the 96 hours assistant

14:40:29   15   manager, yes, that would be one associate.

14:40:32   16        Q.   And that's what that 96 hours you're going to let

14:40:34   17   them have is going to give them; it's going to give them

14:40:37   18   two people every hour of the day; correct?   Is that

14:40:47   19   right?

14:40:47   20        A.   Using those numbers, I think that you could

14:40:50   21   achieve two associates in the store.

14:40:53   22        Q.   Now, let's -- now, once you do all of that,

14:41:13   23   you -- what's your next step?

14:41:16   24        A.   Well, as this is the payroll budgeting process,

14:41:21   25   after I determine that that store's going to have a

14:41:25  1    $17,000 payroll budget for the quarter allocated, I

14:41:29  2    would then send that out to the regional vice-president

14:41:31  3    who would distribute that.  It's -- it's actually broken

14:41:36  4    out into pages:  One page for each district manager.

14:41:39  5    They would give that to each district manager at the

14:41:42  6    budget meeting.

14:41:43  7        The district managers would take those payroll

14:41:45  8    budgets and they would move dollars from store to store,

14:41:48  9    if necessary, or they would not make any changes

14:41:50  10   whatsoever.  Then they would take the numbers and would

14:41:53  11   send them back to me.  That would be the store's payroll

14:41:56  12   budget for the next quarter.

14:41:58  13       From that payroll budget, then I would go to

14:42:00  14   start making staff schedules.

14:42:01  15   Q.   Okay.  And the purpose of the store payroll

14:42:04  16   budget and the staff schedule is to give the stores the

14:42:09  17   resources, in terms of people, to accomplish its task or

14:42:15  18   its mission?

14:42:15  19   A.   The purpose for the store's payroll budget is to

14:42:18  20   meet the needs for the sales that that store has

14:42:21  21   projected for that quarter.

14:42:23  22       The purpose of the staff schedule is to give them

14:42:25  23   a template or a guideline to work from so that they can

14:42:29  24   achieve their payroll budgets.

14:42:31  25   Q.   But this is all the payroll they're going to get

14:42:34  1   to run the store and keep it open those hours of the

14:42:37  2   day; correct?

14:42:38  3       A.   Their payroll budget is what the budget is for

14:42:42  4   that quarter.  Each quarter they get a new payroll

14:42:45  5   budget.

14:42:45  6       Q.   All right.  Now, you said the next step was you

14:42:51  7   do the staff scheduler.  And you said that's sent out

14:42:54  8   from your office to the district managers; is that

14:42:56  9   correct?

14:42:56  10      A.   That is correct.  I print out the staff

14:43:00  11  schedules, or I send them to our print shop at the

14:43:02  12  corporate office and they print the staff schedules.

14:43:05  13  They send them to an outside source that laminates all

14:43:09  14  5,600 staff schedules.

14:43:11  15      They bring them back to me.  And then myself and

14:43:14  16  several other co-workers then collate them into the

14:43:18  17  stacks for each district and send them to the district

14:43:20  18  managers, along with the list of which store gets which

14:43:24  19  staff scheduler.

14:43:24  20      Q.   And once the schedule is sent down to the

14:43:26  21  district managers, you don't know how they're used in

14:43:30  22  the district or in the stores?

14:43:32  23      A.   The instruction is that the district managers are

14:43:34  24  then to take these staff schedules and distribute them

14:43:37  25  out to each individual store and review them at -- store

14:43:40  1   managers make changes as necessary.

14:43:42  2       Q.  And so when I took your deposition, I asked you

14:43:47  3   the question:  "Once the schedule is sent down, do you

14:43:51  4   ever review how it's used or complies with the schedule,

14:43:55  5   anything of that sort?"

14:43:57  6       "Answer:  No, I don't.

14:44:00  7       "Question:  Do you get any feedback at all as to

14:44:03  8   how the schedule is used, in terms of who worked when

14:44:07  9   and who was off when, and that type of thing?

14:44:11  10      "Answer:  No."

14:44:12  11      That's what you told me; correct?

14:44:15  12      A.  I haven't been deposed in this case.  However, in

14:44:19  13  depositions for other cases, no, I did not get

14:44:22  14  individual feedback, individual employees on 5,000

14:44:27  15  stores.  Individual employees are -- they conform to

14:44:30  16  individual schedules.

14:44:31  17      We have currently close to 40,000 associates in

14:44:37  18  our stores.  I don't have feedback on each individual's

14:44:42  19  associates to the staff schedules.

14:44:47  20      And I actually don't have any feedback, other

14:44:47  21  than from district managers that I spoken to that says,

14:44:50  22  "the staff schedules really worked good this quarter";

14:44:52  23  or, I'm getting comments from my store managers that

14:44:56  24  says, "you know, we're tired of having every Sunday off

14:44:59  25  and our assistant managers are tired of working every

14:45:02  1   Sunday".

14:45:02  2       From those feedback from district managers is

14:45:04  3   where I came up with the idea A and a B side.   And

14:45:09  4   that's when we made the change to the staff schedules.

14:45:11  5   Q.   Okay.   So you are getting feedback from the

14:45:14  6   district managers?

14:45:14  7   A.   That is correct.

14:45:15  8   Q.   All right.   My question, though, using the store:

14:45:20  9   You are not there, you don't know how it's used in each

14:45:24  10  of the stores, particularly the stores of the plaintiffs

14:45:27  11  in this case?

14:45:28  12  A.   That is correct.

14:45:29  13  Q.   And you don't know if particular district

14:45:36  14  managers allow deviation from the staff scheduler or

14:45:40  15  not, do you?

14:45:41  16  A.   That is correct.   I don't know if district

14:45:45  17  managers or store managers choose to utilize this staff

14:45:48  18  schedule or not.

14:45:50  19  Q.   Let me show you the door-to-shelf program.   This

14:45:59  20  is Exhibit 560.

14:46:03  21       You said this whole process we've been going

14:46:06  22  over, the store payroll budget and staff schedule, is

14:46:08  23  part of the door-to-shelf program; correct?

14:46:10  24  A.   What I said was the staff scheduler is created to

14:46:13  25  support the door-to-shelf process.

14:46:16  1      Q.  Well, I want to show you Plaintiff's Exhibit 560

14:46:20  2  which is out of the company training book, training

14:46:23  3  reference book, sometimes called the strands.  This is

14:46:26  4  from the door-to-shelf strands --

14:46:29  5              MR. WHITE:  Judge, I don't know that we have

14:46:30  6  a 560 on their list.  It's a new exhibit.

14:46:34  7              THE COURT:  All right.

14:46:37  8              MR. WHITE:  May I ask if this is a new

14:46:39  9  exhibit, Your Honor?

14:46:40 10              THE COURT:  Is this a new exhibit?

14:46:42 11              MR. R. WIGGINS:  Yes, sir.  This is from the

14:46:44 12  strands.  The strands are already in evidence.

14:46:46 13              THE COURT:  All right.

14:46:47 14              MR. R. WIGGINS:  Just two pages.

14:46:48 15              MR. WHITE:  May we request, Your Honor, when

14:46:51 16  he uses an exhibit not on the list that he give us a

14:46:53 17  copy?

14:46:54 18              MR. R. WIGGINS:  The strands are like this

14:46:55 19  thick.  I'm trying to use this --

14:46:58 20              THE COURT:  Give him a copy --

14:47:01 21              MR. R. WIGGINS:  I just gave him one.

14:47:03 22      Q.  (By Mr. R. Wiggins)  I am going to try to get

14:47:05 23  this up on the board, on this Elmo here.  And I don't

14:47:08 24  think I have given you one yet.  Did I give you one?

14:47:11 25      A.  Yes, you did.

14:47:12   1     Q.   Okay.   You see in there where it says

14:47:16   2  door-to-shelf and it says staff scheduler?   And we have

14:47:20   3  got it up on the board here.

14:47:24   4     A.   Yes.

14:47:25   5     Q.   Okay.   And this is called Step 2 to the

14:47:29   6  door-to-shelf program; correct?

14:47:30   7     A.   Says, "Step 2, Staff Schedulers".

14:47:37   8     Q.   And this is from the company training reference

14:47:39   9  book; correct?

14:47:40  10     A.   This appears to be from the skill book on

14:47:43  11  door-to-shelf, which is a part of the strands.

14:47:45  12     Q.   Okay.

14:47:45  13             MR. R. WIGGINS:   We offer 560.

14:47:50  14             THE COURT:   It's received in evidence.

14:47:52  15     Q.   And read that -- let's let it get passed out

14:48:01  16  first.

14:48:04  17         Read -- you told us you didn't know how the

14:48:20  18  stores used these things.   I want to try to establish

14:48:22  19  that.   And you said you didn't know how the district

14:48:25  20  managers work with their particular stores in their

14:48:27  21  particular districts?

14:48:28  22         So to try to get to that issue, read number one.

14:48:31  23     A.   "A series of standardized weekly staff scheduler

14:48:37  24  templates have been developed based on different store's

14:48:40  25  volumes, payroll hours, and delivery day scenarios.

14:48:44  1   Your district manager will provide your store with a

14:48:46  2   staff schedule that best matches your store's needs."

14:48:51  3      Q.   So the district managers are the ones that are

14:48:58  4   determining these matters; correct?   after you've given

14:49:06  5   your input in your proposals?

14:49:07  6      A.   In December of 2001, when we first came up with

14:49:11  7   the staff schedulers, we did not print them at the

14:49:13  8   corporate office and send them to the district managers.

14:49:15  9        What we did is we sent a compact disk to the

14:49:19  10  district managers for them to choose which staff

14:49:21  11  scheduler best fit their store's needs, and print staff

14:49:25  12  schedulers for that store.

14:49:27  13        Since then, and as part of financial process that

14:49:31  14  I have brought, is to actually print and deliver the

14:49:35  15  staff schedulers to the stores and laminated the

14:49:38  16  function that allows them to better utilize it.

14:49:41  17     Q.   But then this says your "district manager will

14:49:45  18  provide your store with the staff schedulers that best

14:49:50  19  matches your store's needs", end quote.   At that point,

14:49:53  20  the store manager's never been consulted at all, has it?

14:49:57  21     A.   When we first initially began this?

14:50:04  22     Q.   Anytime.   The store manager hasn't been mentioned

14:50:08  23  by you yet today as being involved in anything doing

14:50:12  24  with that budget or that schedule.

14:50:14  25             MR. WHITE:   Objection.

14:50:15  1      Q.   Until after it's finalized and sent to him by his

14:50:20  2  district manager; correct?

14:50:21  3               MR. WHITE:   Objection.

14:50:22  4               THE COURT:   Objection overruled.

14:50:22  5               THE WITNESS:   The store manager is

14:50:24  6  responsible for the management of their stores, which

14:50:26  7  drives their sales.   And the sales is the beginning part

14:50:28  8  of this entire process, as we mentioned.

14:50:30  9      Q.   (By Mr. R. Wiggins)   The district manager does

14:50:31  10  the projected sales.   That was your testimony; correct?

14:50:37  11      A.   The district manager sends the sales projections

14:50:38  12  to me.

14:50:39  13      Q.   Okay.   You didn't mention the store manager that

14:50:42  14  step.   You didn't mention the store manager in this

14:50:53  15  formula on the board.   You didn't mention the store

14:50:53  16  manager in the staff scheduler.   But at the point it's

14:50:53  17  printed, laminated, and sent to the district manager,

14:50:54  18  and now here, in Exhibit 560, district manager is still

14:50:59  19  not mentioned -- when it says your district manager will

14:51:03  20  provide your store with the staff scheduler that best

14:51:08  21  matches your store's needs.

14:51:12  22        The store manager is out of the picture in the

14:51:14  23  whole process for the budget of the store, the payroll

14:51:18  24  of the store, the coverage of the store, and the

14:51:21  25  schedule of the store, aren't they?

14:51:25   1       A.   Up until this part of the process, which is the

14:51:28   2   part that's handled by the corporate office and by the

14:51:30   3   district manager, the store manager is not involved in.

14:51:34   4   The implementation and the customization of the staff

14:51:37   5   scheduler is the part that the store manager has to use

14:51:40   6   to meet their store's needs.

14:51:42   7       Q.   And all the store manager gets to do is to

14:51:45   8   convert -- do you have yours there?   All the store

14:51:51   9   manager gets to do is to convert the anonymous full-time

14:51:54   10   associate A and write in the name John Doe, Sally Jones,

14:52:00   11   whomever; that's what we've heard so much about the

14:52:06   12   store manager's role, is to convert Associate A to the

14:52:10   13   name of whoever that might be; correct?

14:52:12   14       A.   No.   That's not correct.

14:52:14   15       Q.   Well, let's look what we have here.   Do you

14:52:18   16   see -- look at a full-time associate A.   Let's take just

14:52:22   17   the first day, Sunday.

14:52:25   18       A.   Are you on side A or side B?

14:52:28   19       Q.   I'm on side -- I don't know how to tell that,

14:52:34   20   but --

14:52:34   21       A.   If we look at the lower right-hand --

14:52:38   22       Q.   I'm on A.   I'm on A.   This is schedule 48A.

14:52:42   23       You see full-time associate A, 11:30 to 6:30;

14:52:47   24   correct?

14:52:47   25       A.   No.   I see part-time associate B, 11:30 to 6:30

14:52:54  1   on a Sunday.

14:52:55  2      Q.   I'm misreading.   I've got my lines wrong.

14:52:58  3   Part-time associate B, 11:30 to 6:30, Sunday.   And then

14:53:03  4   we have J.J., 11:30 to 6:30 Sunday; correct?

14:53:06  5      A.   Correct.

14:53:07  6      Q.   And so that's who B is?   J.J.?

14:53:11  7      A.   It appears that J.J. is probably the part-time

14:53:13  8   associate B.

14:53:14  9      Q.   Okay.   And all these changes on here, when I

14:53:20  10  added them up, you still just come up to 160 hours; the

14:53:24  11  store manager hasn't been able to do anything, except

14:53:27  12  write the names down; and maybe if someone's sick, to

14:53:32  13  change a name once in a while.   That's their input;

14:53:36  14  correct?

14:53:37  15             MR. WHITE:   Your Honor, the screen is not

14:53:40  16  what the exhibit is.   I would ask if he's not showing

14:53:44  17  the exhibit, he's referring to --

14:53:46  18             THE COURT:   You've got two minutes.

14:53:51  19             MR. R. WIGGINS:   That's fine, Your Honor.

14:53:52  20             THE WITNESS:   What it would appear to me,

14:53:54  21  looking at this staff scheduler, is actually the store

14:53:57  22  manager has made several changes.

14:53:59  23             The first thing they've done is taken on

14:54:01  24  Monday, they've changed it so that the assistant manager

14:54:04  25  Kim is going to be working 10:00 to 6:00.

14:54:07  1        And first off, this store, 160 hours was

14:54:10  2   only showing one assistant manager and another full-time

14:54:14  3   associate, which they made the assistant manager to make

14:54:17  4   two assistant managers of the store and two part-time

14:54:20  5   associates.

14:54:22  6        They've made changes so that the first

14:54:24  7   assistant manager, Suzy, instead of working from 8:30

14:54:27  8   a.m. until -- let's see underneath this, 8:30 a.m. to

14:54:34  9   8:00 p.m. on Monday, that Suzy will now work from 8:30

14:54:38  10  a.m. until 2:00, probably to meet Suzy's needs, although

14:54:42  11  that's a supposition.

14:54:43  12     Q.   (By Mr. R. Wiggins)  Now, is all that handwriting

14:54:46  13  on there yours?

14:54:46  14     A.   No.  This looks like it was pulled from an actual

14:54:49  15  store.

14:54:50  16     Q.   You don't know where it came from?

14:54:51  17     A.   It was not done at the corporate office.

14:54:55  18     Q.   Okay.  You don't know if that's a real example or

14:54:58  19  just made up for this case --

14:55:00  20          MR. WHITE:  Your Honor, I am going to object

14:55:02  21  to that.

14:55:02  22          THE COURT:  Overruled.

14:55:04  23     Q.   Do you know?

14:55:05  24     A.   From this specific example?  I wouldn't surmise,

14:55:08  25  I would guess, that what we collected for staff

14:55:11   1   schedules for stores --

14:55:12   2       Q.   Don't guess, sir.  Do you know?

14:55:14   3       A.   I don't know for a fact that this was used at a

14:55:16   4   store.

14:55:16   5       Q.   But we have 5,800 stores that have these things

14:55:20   6   supposedly; correct?

14:55:20   7       A.   We have 5,600 and some odd stores that were

14:55:25   8   issued staff schedulers.

14:55:26   9       Q.   And we have no idea yet if that came from a real

14:55:29   10   store, do we?

14:55:29   11       A.   I don't know what store this came from.

14:55:33   12       Q.   Okay.

14:55:33   13           MR. R. WIGGINS:   Thank you.  No other

14:55:35   14   questions.

14:55:35   15           THE COURT:   Redirect?

14:55:36   16                   **REDIRECT EXAMINATION**

14:55:37   17   **BY MR. WHITE:**

14:55:38   18       Q.   The example or the hypothetical that Mr. Wiggins

14:55:50   19   used, are you aware of any stores of Family Dollar that

14:56:03   20   are open 74 hours, have a 2.0 coverage, that have an

14:56:10   21   assistant manager working 96 hours?

14:56:12   22       A.   No.

14:56:12   23       Q.   Does Mr. Wiggins' example there match any store

14:56:16   24   that you are aware of in Family Dollar?

14:56:18   25       A.   I don't know of any store at Family Dollar that

14:56:21  1   has a total of two associates, or one associate and one

14:56:25  2   store manager.

14:56:25  3       Q.   Are you aware that store managers occasionally

14:56:30  4   exceed their weekly payroll budgets?

14:56:33  5       A.   Yes, quite often.

14:56:35  6       Q.   And is that information transmitted to you as

14:56:39  7   part of the information you use in preparing the next

14:56:43  8   quarter's budgets?

14:56:43  9       A.   The information for preparing the budget is based

14:56:47  10  on the store's individual sales budget and risk classes,

14:56:50  11  their performance over and under their payroll budgets

14:56:54  12  from the prior quarter doesn't enter into it.

14:56:58  13      Q.   And do you have an opinion of how often you see

14:57:08  14  information where stores have exceeded payroll budget?

14:57:11  15      A.   I did an analysis a few months ago, with regards

14:57:16  16  to how often stores exceeded their sales or their

14:57:20  17  payroll budgets; and some were at 30 percent of the

14:57:25  18  time.

14:57:25  19      Q.   About 30 percent of the time?

14:57:26  20      A.   About 30 percent of the time.

14:57:28  21      Q.   And is the process that you used, when you see

14:57:31  22  that they've exceeded the prior quarter's payroll

14:57:36  23  budget, does that then cause you -- going forward to

14:57:39  24  assuming you have the other factors, correct -- to

14:57:42  25  adjust their payroll budget?

14:57:45  1      A.   If they're -- if they're exceeding their payroll

14:57:48  2  budget because they're exceeding their sales, which is a

14:57:51  3  valid reason for exceeding your sales through payroll

14:57:54  4  budget.   If you exceed your sales budget, you are

14:57:56  5  allowed certain dollars over your payroll budget.

14:57:59  6      What that's going to translate into is that there

14:58:01  7  are sales projections for next quarter are going to be

14:58:04  8  higher.   And as the sales projections go higher, they'll

14:58:07  9  have increased amount of freight coming in the back

14:58:10  10 door.   That means they'lll have increased amount of

14:58:11  11 customers coming in the front door, increased cashier

14:58:14  12 transactions.   They're going to need additional time for

14:58:16  13 recovery, which is kind of the cleaning up of the store.

14:58:19  14     And those additional needs, caused by that

14:58:22  15 additional sales, is going to mean that they're going to

14:58:25  16 get more payroll budget.

14:58:26  17     Q.   Once these schedulers go out, they don't come

14:58:31  18 back to you, do they?

14:58:33  19     A.   No.

14:58:34  20     Q.   And did you, at my request, in addition to the

14:58:38  21 one you have testified about as an example today, look

14:58:42  22 at a stack of payroll schedulers in the last couple of

14:58:45  23 days?

14:58:45  24     A.   Yes.

14:58:45  25     Q.   And has it been represented to you that those,

| | | |
|---|---|---|
| 14:58:49 | 1 | including the one in front of you -- |
| 14:58:51 | 2 | MR. R. WIGGINS:  Objection to hearsay, Your |
| 14:58:53 | 3 | Honor. |
| 14:58:53 | 4 | THE COURT:  Your objection is sustained. |
| 14:58:55 | 5 | Q.  Do you have any reason to believe that the |
| 14:58:57 | 6 | exhibit that is used has been made up? |
| 14:58:59 | 7 | MR. R. WIGGINS:  Objection. |
| 14:59:00 | 8 | THE COURT:  Objection to leading is |
| 14:59:03 | 9 | sustained. |
| 14:59:03 | 10 | MR. WHITE:  That's all.  Thank you. |
| 14:59:05 | 11 | THE COURT:  Thank you, sir. |
| 14:59:07 | 12 | MR. WHITE:  May he be excused? |
| 14:59:08 | 13 | THE COURT:  Yes, sir.  He may be excused. |
| 14:59:10 | 14 | Defendant will call his next witness. |
| 14:59:12 | 15 | MR. UMBACH:  Leticia Brisco. |
| 14:59:59 | 16 | **LETICIA BRISCO, DEFENDANT'S WITNESS, SWORN** |
| 15:00:03 | 17 | MR. CALAMUSA:  Your Honor, may we approach |
| 15:00:04 | 18 | before we start this witness? |
| 15:00:51 | 19 | (At bench:) |
| 15:00:51 | 20 | MR. CALAMUSA:  Two witnesses and three this |
| 15:00:51 | 21 | morning.  That's five. |
| 15:00:51 | 22 | MR. UMBACH:  You talking about store |
| 15:00:51 | 23 | managers? |
| 15:00:51 | 24 | MR. CALAMUSA:  Store managers. |
| 15:00:51 | 25 | MR. UMBACH:  I think we have only called |

15:00:51  1    yesterday Mr. --

15:00:51  2              MR. CALAMUSA:  Mr. Haney is a store manager,

15:00:51  3    and he testified --

15:00:51  4              (Discussion between attorneys off the

15:00:51  5    record.)

15:01:03  6              (End of bench conference.)

15:01:03  7              (In open court, jury present.)

          8              THE CLERK:  State your name for the record.

          9              THE WITNESS:  Leticia Brisco.

         10              THE CLERK:  Spell your name for the record,

         11    please.

         12              THE WITNESS:  Brisco.

         13              THE COURT REPORTER:  Your first name?

         14              THE WITNESS:  Leticia; L-E-T-I-C-I-A.

         15                     **DIRECT EXAMINATION**

15:01:16 16    **BY MR. UMBACH:**

15:01:16 17    Q.  Ms. Brisco, tell us where you work, please.

15:01:19 18    A.  I work for Family Dollar store in Houston, Texas.

15:01:22 19    Q.  And how long have you worked for Family Dollar?

15:01:24 20    A.  Eight years.

15:01:26 21    Q.  You started in 1996?

15:01:29 22    A.  Uh-huh.

15:01:29 23    Q.  What positions have you held at Family Dollar?

15:01:32 24    A.  I was hired in as a store manager, and later

15:01:37 25    promoted to Human Resource manager.

15:01:40  1    Q.   And Human Resources manager is your current

15:01:43  2    position?

15:01:43  3    A.   Yes, sir, it is.

15:01:44  4    Q.   When were you promoted to Human Resource manager?

15:01:48  5    A.   October 5th, 2004.

15:01:53  6    Q.   Tell us about your education, Ms. Brisco.  How

15:01:57  7    far did you go in school?

15:01:58  8    A.   I have a high school diploma.

15:02:01  9    Q.   Let's talk about when you were hired at Family

15:02:07  10   Dollar.  Who hired you?

15:02:09  11   A.   Lonnie McCafferty was the district manager at the

15:02:14  12   time.

15:02:14  13   Q.   Tell us about your discussions with

15:02:17  14   Mr. McCafferty concerning your opportunities at Family

15:02:23  15   Dollar?

15:02:23  16   A.   Well, I remember him speaking to me about

15:02:27  17   employment at Family Dollar and told me there was

15:02:29  18   opportunity for me to advance, that it all lied within

15:02:32  19   me pursuing that avenue.

15:02:33  20   Q.   Do you recall any discussion that you had with

15:02:41  21   Mr. McCafferty concerning what would be expected of you

15:02:46  22   as a store manager?

15:02:48  23   A.   I don't recall exact -- an exact conversation

15:02:53  24   about what was required of me.

15:02:54  25        I knew pretty much the requirements of a store

15:02:56  1   manager.  I had several years of management experience

15:02:59  2   prior to coming to Family Dollar.  So I pretty much knew

15:03:02  3   what was required of me.

15:03:03  4       Q.  Did you receive any training when you first

15:03:08  5   became employed at Family Dollar?

15:03:09  6       A.  Yes, I did.

15:03:10  7       Q.  Okay.  Can you describe to us over what period of

15:03:15  8   time you were in training?

15:03:16  9       A.  I was in training for five weeks; about two of

15:03:21  10  those weeks was teaching me Family Dollar's methods of

15:03:24  11  doing things -- the skill of management I already had.

15:03:27  12  They were just teaching me Family Dollar's way.

15:03:31  13       And after four or five days, I could run my own

15:03:35  14  store; open, close, and do the day-to-day tasks of

15:03:37  15  managing the store.

15:03:38  16       Q.  Who was responsible for the training that you

15:03:40  17  received?

15:03:40  18       A.  Leo Gomez was the one that trained me.

15:03:44  19       Q.  Store manager?

15:03:45  20       A.  Store manager, yes.

15:03:47  21       Q.  Same position?

15:03:47  22       A.  Same position.

15:03:48  23       Q.  Held at Family Dollar?

15:03:54  24       A.  Yes, sir.

15:03:56  25       Q.  Did you advance in the company after being hired

15:03:59   1   at Family Dollar?

15:04:00   2       A.   Yes, sir, I did.   I made five lateral moves as a

15:04:05   3   store manager.   I managed five different stores with

15:04:07   4   Family Dollar.   Each store that I progressed -- that I

15:04:10   5   moved to was an advance.

15:04:12   6       I moved from one store to another -- another

15:04:15   7   level, meaning that the store did more sales, which they

15:04:18   8   were more management tasks rather the amount of work.

15:04:24   9   The amount -- yes, I did.

15:04:26   10      Q.   Okay.   Was there a difference in the sales volume

15:04:31   11  of the stores that you worked in?

15:04:32   12      A.   Yes, sir, it was.   That's what I was trying to

15:04:34   13  say.

15:04:35   14      Q.   Tell us how they were different.

15:04:36   15      A.   I think the first store I started out was Store

15:04:40   16  3530, and it probably did about 700,000 or 700 something

15:04:44   17  a year.   And then I went up to a store that did a

15:04:46   18  million and up to a million and a half.

15:04:48   19      Each time there was a store that was available in

15:04:50   20  a store, I wanted something more challenging.   So the

15:04:53   21  move basically was my own decision.   And if I knew of a

15:04:56   22  store that was opening and it was projected to do more,

15:04:58   23  I opted in to that store.   And that's what I -- that's

15:05:03   24  what I did.

15:05:04   25      And if I didn't feel that it was challenging

15:05:05  1   enough to me, I always wanted to move, because I had a

15:05:08  2   goal in mind and that goal was to progress in Family

15:05:11  3   Dollar.

15:05:11  4        And I wanted to be where I could -- you know,

15:05:15  5   where I can do a job that I can -- someone could see me

15:05:18  6   doing my job, that I could move up the corporate ladder

15:05:21  7   that way -- you know, in the challenges, one that was

15:05:25  8   more challenging.

15:05:26  9    Q.   Were there any benefits or rewards to you in

15:05:28  10  taking on a higher volume store?

15:05:31  11   A.   Yes.  You mean, monetary wise?

15:05:33  12   Q.   Well, any --

15:05:34  13   A.   Yes.

15:05:34  14   Q.   -- kind.

15:05:35  15   A.   Yeah.  Each time I moved up to a different store,

15:05:39  16  the rate of pay was increased, as well as meeting the

15:05:43  17  new people in training, in coaching and teaching.

15:05:46  18        I mean, when I left that store, I felt like I

15:05:48  19  left a legacy.  I left people developed and people

15:05:51  20  trained.  And some of those individuals today have moved

15:05:53  21  on to be managers and assistant managers and performance

15:05:57  22  managers, even; we have one that I trained.

15:05:59  23        So yeah, that was a great benefit.

15:06:01  24   Q.   Do you recall specifically how your salary

15:06:04  25  progressed through the different stores?

15:06:06    1      A.   Vaguely, yes.   I think when I first came to

15:06:12    2   Family Dollar was the November 5th of 1996.   I think

15:06:16    3   maybe I was hired in around 600 and some change and went

15:06:20    4   to another store.   And I probably went up to about 720.

15:06:23    5          I think at last when I stopped, I was up at about

15:06:26    6   830, 850 a week at that time.

15:06:29    7      Q.   And the job that you have now, was that a

15:06:36    8   promotion from the position of store manager?

15:06:38    9      A.   Yes, it was.

15:06:39   10      Q.   Okay.   Promotion in the sense of the higher

15:06:41   11   salary?

15:06:42   12      A.   Yes, it was -- it is.

15:06:43   13      Q.   Did being a store manager for what, seven and a

15:06:47   14   half, eight years --

15:06:48   15      A.   Yes.

15:06:48   16      Q.   -- did that help prepare you for the job that

15:06:51   17   you're in now?

15:06:51   18      A.   Yes, it did.

15:06:52   19      Q.   Let me ask you a little bit different subject,

15:07:06   20   Ms. Brisco.

15:07:08   21          We have heard some testimony about something

15:07:11   22   called "strands"?

15:07:13   23      A.   Yes, sir.

15:07:14   24      Q.   Okay?   We've seen the volumes.   You're familiar

15:07:18   25   with those?

15:07:18   1      A.   Yes, sir, I am.

15:07:19   2      Q.   Did you have those volumes in your stores at

15:07:24   3   Family Dollar?

15:07:24   4      A.   Yes.   In the last store I ran, I believe I had

15:07:30   5   strands.   Prior to that, they wasn't in existence.

15:07:32   6      Q.   Okay.   Do you know what they are and how they're

15:07:37   7   used?

15:07:37   8      A.   Yes, I know what they are.

15:07:39   9      Q.   Can you tell us your understanding of what they

15:07:41  10   are and how they're used?

15:07:42  11      A.   My understanding of the strands is that that is a

15:07:44  12   training tool for a new manager or perhaps an assistant

15:07:49  13   manager to help them to progress along.

15:07:53  14           I myself never really used the strands, because I

15:07:56  15   was a veteran manager, and I had -- I had those skills

15:08:01  16   and know those skills.   I use those for new manager

15:08:04  17   training, you know.

15:08:05  18           If I had a specific problem, I may go to the

15:08:08  19   strands to look, but other than that, that's the only

15:08:11  20   knowledge or use I have for them.

15:08:12  21      Q.   Did you find the strands to be more helpful to a

15:08:16  22   new store manager versus a more seasoned manager?

15:08:19  23      A.   Yes, sir.

15:08:20  24      Q.   You're familiar with the store policy manual,

15:08:26  25   aren't you?

15:08:26  1      A.   Vaguely, yes.

15:08:27  2      Q.   Okay.   Are there any differences in the use of

15:08:32  3  the strands and the use of a policy manual?

15:08:34  4      A.   Yes, sir, it is.

15:08:42  5      Q.   If there is, tell us what that is.

15:08:44  6      A.   A strand is a tool set in place to help a new

15:08:49  7  manager progress or help them; I will say a person

15:08:54  8  that's green, that don't really know, you know, what to

15:08:57  9  do or how to do it, they can refer to those books to

15:09:00  10  help them, the strands; help them in different facets of

15:09:03  11  Family Dollar or Basic Retail 101, is what it is.

15:09:07  12      And the policies are the things set in place to

15:09:09  13  help guide and navigate us in different aspects of

15:09:12  14  Family Dollar pertaining to -- I would use the policy

15:09:15  15  manual if I had to terminate an associate.

15:09:18  16      I wanted to look -- if I had a question about

15:09:19  17  something, I can look and read up on it.  I can find a

15:09:22  18  code I need to use to discharge them.  That's the only

15:09:25  19  thing I use the policy manual for.  That's the best way

15:09:28  20  I can separate them for you.

15:09:29  21      Q.   How many employees did you have in the stores

15:09:35  22  that you managed at Family Dollar?

15:09:37  23      A.   Between five -- and the greatest amount being

15:09:42  24  ten, I want to say.

15:09:42  25      Q.   Did you supervise those employees?

15:09:50   1        A.   Yes, I did.

15:09:51   2        Q.   What portion of your time, when you were store

15:09:55   3   manager, did you spend supervising employees?

15:09:57   4        A.   All of my time.

15:10:01   5        Q.   Did you spend any time stocking a shelf or

15:10:06   6   unloading a truck?

15:10:07   7        A.   Yes, I did.

15:10:08   8        Q.   Okay.  How is it that you say that you spent all

15:10:11   9   of your time supervising?

15:10:13   10        A.   Excuse me.  Because if I was unloading a truck, I

15:10:17   11   was unloading with the assistants or a worker or two,

15:10:20   12   and I use that time to train and coach and develop them,

15:10:24   13   you know, training them on the stage to freight, giving

15:10:27   14   them direction what I want to put where.  So I consider

15:10:30   15   that as me training, coaching, and doing the all of that

15:10:33   16   I'm still being the manager.

15:10:35   17        Q.   Do you have to be a multi-tasker to be --

15:10:39   18             THE COURT:  Objection to leading is

15:10:42   19   sustained.

15:10:42   20             MR. R. WIGGINS:  Objection.

15:10:45   21        Q.   Ms. Brisco, did you tell your employees what to

15:10:50   22   do?  Did you give them direction?

15:10:54   23             MR. CALAMUSA:  Objection.

15:10:55   24             THE COURT:  Objection to leading is

15:10:56   25   sustained.

15:10:56    1        Q.   Did you use to-do lists, Ms. Brisco?

15:11:00    2        A.   Yes, I did.

15:11:01    3        Q.   How did you use those?

15:11:02    4        A.   I would come into the store probably an hour,

15:11:04    5    hour and a half before the store opened most mornings,

15:11:06    6    and I would take that time to walk the store.

15:11:08    7             And I would put things -- I would make notes for

15:11:12    8    myself.  And as I make the notes for myself, I would put

15:11:15    9    names of associates that I knew was coming in that day

15:11:18   10    and I would write their name by their task, as well as

15:11:20   11    tasks that was for me to complete that day.  And then I

15:11:23   12    would execute them.

15:11:24   13             When that associate came in, I would discuss with

15:11:26   14    them what I wanted to accomplish that day, give them

15:11:29   15    their task in writing.  But I also would check with them

15:11:32   16    to make sure they understood the task.  I would repeat

15:11:35   17    it to them and have them repeat to me what I explained

15:11:38   18    for them to do, and we would execute it that way.

15:11:41   19        Q.   Was that a necessary thing to do?

15:11:45   20             THE COURT:  Your objection to leading is

15:11:48   21    sustained.

15:11:50   22        Q.   Did you consider that to be important part --

15:11:52   23             THE COURT:  The objection to leading is

15:11:54   24    sustained.

15:11:56   25        Q.   Let's talk about a different subject, Ms. Brisco.

15:12:03    1   Ordering.  As a store manager, did you order product for

15:12:07    2   the store?

15:12:07    3       A.  Yes, I did.

15:12:08    4       Q.  Describe to us the process that you would use to

15:12:11    5   order products for the store.

15:12:16    6       A.  Well, I would use the PVT gun, and I would

15:12:19    7   order -- I would order all the schematic items --

15:12:22    8   schematic are items that the store carry on a regular

15:12:24    9   basis that we keep in our in-house so we can replenish

15:12:29   10   at the meeting.

15:12:30   11       I would order those on a weekly basis, and it

15:12:34   12   would generally come the next week.

15:12:36   13       Q.  What decisions, if any, did you have to make in

15:12:40   14   the process of ordering for the store?

15:12:41   15       A.  Okay.  The decisions that I have to make was the

15:12:43   16   quantity that I needed.  I had to be -- I always

15:12:48   17   thinking, thinking forward.  I had to anticipate the

15:12:51   18   sales, anticipate what I was going to need for the

15:12:54   19   following week.  So, as a manager, I could make the

15:12:56   20   decision:  "Do I buy three cases or do I buy five

15:13:00   21   cases?"  So this is what I had to do.

15:13:11   22       Q.  What factors would you use in deciding whether to

15:13:11   23   buy three or buy five?  what would it depend on?

15:13:15   24       A.  It would depend on the sales volume, the time of

15:13:17   25   the month it is, some things sell more at the first of

15:13:20   1   the month than we do in the middle of the month.  So all

15:13:22   2   of that took in -- into consideration of what I ordered.

15:13:33   3        The need that the customers asked for, all of

15:13:33   4   that played a vital role in what we would order and what

15:13:33   5   I ordered.

15:13:33   6   Q.   Okay.  Were there any limitations on how much of

15:13:36   7   something that you could order?

15:13:37   8   A.   No.  No.  I mean, there were no limitations.  If

15:13:42   9   it was an item that was a seasonal item and I wanted it,

15:13:48  10   I couldn't scan it and order it with the gun, but I have

15:13:52  11   had opportunities and times when I called the buyer

15:13:54  12   directly for a particular item and we got 20 coolers --

15:13:57  13   and that's a seasonal item -- and that's all I received.

15:14:00  14        But I have a customer that wants 30 coolers, if I

15:14:02  15   call the buyer and the buyer can have those items sent

15:14:07  16   to us, we have them available in the warehouse.  I have

15:14:10  17   did that also.

15:14:11  18   Q.   Did your district manager have to approve your

15:14:14  19   orders for the store?

15:14:14  20   A.   No, sir.

15:14:15  21   Q.   Did you have to get your district manager's

15:14:19  22   approval to call the buyer?

15:14:20  23   A.   No, sir.

15:14:21  24   Q.   Ms. Brisco, once you have -- let me ask this

15:14:35  25   first:  Who did the ordering?

15:14:46  1    A.  I did.

15:14:46  2    Q.  In your store, you did?

15:14:46  3    A.  Uh-huh.

15:14:46  4    Q.  Why did you do it?

15:14:46  5    A.  Because I was ultimately responsible for making

15:14:46  6  sure that the store's in-stock position was at the

15:14:49  7  company goal.  I wanted to make sure that I had

15:14:51  8  everything that the customer needed.  And I just wanted

15:14:55  9  to make sure that I was doing an effective job to bring

15:14:58  10 the customers in.

15:14:59  11      I only get two opportunities to get a customer --

15:15:01  12 that's to greet when they come in, to smile and greet

15:15:04  13 them and be happy, then have the product that they're

15:15:07  14 coming in to buy.

15:15:08  15      So as a manager it was my responsibility to make

15:15:10  16 sure that I did a quality detailed order and have what

15:15:12  17 my customers was looking for.

15:15:14  18    Q.  What effect does ordering have on the sales of

15:15:20  19 your store?

15:15:21  20    A.  It has a great effect.  Because if you don't have

15:15:23  21 the merchandise, the customer's not going to come back

15:15:25  22 two or three times to a store that don't have the

15:15:28  23 product.

15:15:28  24      It all works together.  Got to have the

15:15:30  25 merchandise for the customer to come back for the

15:15:32   1   customer to buy it, so --

15:15:33   2      Q.  As a store manager, did you feel like it was your

15:15:38   3   responsibility --

15:15:39   4           THE COURT:  Your objection is sustained.

15:15:41   5           MR. CALAMUSA:  Object.

15:15:45   6           MR. R. WIGGINS:  Object to leading.

15:15:47   7      Q.  (By Mr. Umbbach)  Were you evaluated based on

15:15:49   8   dollars, on the sales of the store, Ms. Brisco?

15:15:51   9      A.  I think all of it played a part in my evaluation.

15:15:55  10   I think sales was a part of my evaluation.

15:15:58  11      Q.  All right.  Mrs. Brisco, merchandising, is that

15:16:10  12   something that you did as a store manager?

15:16:11  13      A.  Yes, sir.

15:16:12  14      Q.  And we have heard the term "schematic"?

15:16:14  15      A.  Yes, sir.

15:16:15  16      Q.  And it's my understanding that there may be more

15:16:17  17   than one type of schematic; is that correct?

15:16:20  18      A.  For each department, yeah, department wise, yes.

15:16:24  19      Q.  Okay.  Tell us -- now, in merchandising, is that

15:16:29  20   putting the stuff on the shelves?

15:16:31  21      A.  Yes, it is.

15:16:31  22      Q.  Okay.  What decisions, if any, did you make as a

15:16:36  23   store manager relating to the merchandising in your

15:16:39  24   store?

15:16:40  25      A.  Excuse me.  Ask me the question again.  I'm

15:16:46   1   sorry.

15:16:46   2      Q.   Were there any decisions that you had to make

15:16:49   3   concerning where the product went in your store?

15:16:52   4      A.   Yes, there was.

15:16:53   5      Q.   Okay.   What decisions?

15:16:54   6      A.   Well, I made several decisions.   It depended on

15:16:58   7   if it was a schematic -- schematic items being Family

15:17:02   8   Dollar has identified as key items we sell every day.

15:17:05   9         And one particular store I was in was a

15:17:09   10   high-volume store that I had ran that I was the manager

15:17:12   11   of.   And when the schematic came out, it may have given

15:17:16   12   two phases to a different item; however, I realized that

15:17:19   13   that item was -- excuse me, a good selling item in that

15:17:22   14   store.

15:17:22   15         So I made the decision as the store manager to

15:17:24   16   allocate four phases for this one item and cut down on

15:17:29   17   the item that didn't do so well.   So I can do it in that

15:17:31   18   aspect.

15:17:32   19      Q.   Am I correct that there are monthly planners and

15:17:45   20   seasonal planners?

15:17:46   21      A.   Uh-huh.

15:17:46   22      Q.   Okay.   What are the differences between those?

15:17:48   23      A.   A monthly planner is each 12 months of the year

15:17:54   24   we get a monthly planner in.   The planner typically give

15:17:58   25   us guidance on future or feature items that the company

15:18:03  1   wants us to put on end caps.

15:18:05  2         However, as the store manager, you have to

15:18:06  3   navigate that, because if they put Hawaiian Punch on end

15:18:11  4   one, and you only have two cases, I don't put it on end

15:18:16  5   one, I will put something else with it.

15:18:17  6         So as the manager, I have to, you know, come up

15:18:20  7   with some adjacent or put something together with it

15:18:24  8   that make sense, or don't put it on the end at all.

15:18:27  9   That is a guide to help us to impact for merchandise.

15:18:30  10      Q.   You worked in several different stores?

15:18:32  11      A.   Yes, sir, I did.

15:18:33  12      Q.   Did the schematics always fit your store to the

15:18:36  13   tee?

15:18:36  14      A.   No, sir, they did not.

15:18:38  15      Q.   Then, how would you deal with that?

15:18:41  16      A.   You would have to make it fit; in other words,

15:18:44  17   you would take and you would make the schematic work

15:18:47  18   with what you had to work with.

15:18:49  19         If it calls for eight feet of stationary and you

15:18:52  20   only had four feet or four and a half, you would, you

15:18:55  21   know, put the best selling -- the best way I would do

15:18:58  22   was to put the number -- the items that sold best, I

15:19:02  23   would give them the right, you know, two phases and cut

15:19:05  24   down on something that we didn't really need.

15:19:07  25         But the manager have to work with the schematic

15:19:09  1   and work with it based on the sales for that department

15:19:13  2   in that store, based on each item to make it work.

15:19:15  3       Q.  When you realized that it didn't fit, did you

15:19:18  4   pick up the phone and call the district manager and say,

15:19:21  5   "hey, what do I do"?

15:19:23  6       A.  No.

15:19:27  7               MR. CALAMUSA:  Object to leading, Your

15:19:29  8   Honor.

15:19:29  9               THE COURT:  Sustained.

15:19:30  10      Q.  You're familiar with the term "pay outs"?

15:19:32  11      A.  Yes, sir.

15:19:32  12      Q.  Tell us what a "pay out" is.

15:19:34  13      A.  Okay.  A pay out is -- if I would have someone

15:19:40  14  come by the store and I would allow them to clean the

15:19:43  15  windows in the store, I could do a pay out in the store

15:19:46  16  to pay them to clean the windows.  So you go to the

15:19:49  17  register, you key in the amount you are paying them.

15:19:52  18  You have that person sign the receipt for the pay out.

15:19:57  19          Because when you're paying someone at store level

15:20:00  20  for a service they did at the store, or if you bought

15:20:02  21  lunch, or whatever you've done, you just write it on the

15:20:06  22  pay out and have that particular person sign it; or if

15:20:08  23  you bought lunch, you take a receipt from Domino's, if

15:20:11  24  that's what you bought, pizza, and put it with the pay

15:20:15  25  out and just make a note of what you used it for.

15:20:17  1      Q.   Did you have the authority to make pay outs?

15:20:20  2      A.   Yes, sir.

15:20:21  3      Q.   And give us examples of why you would make the

15:20:25  4  pay out.

15:20:26  5      A.   Okay.  The first one was, like I said, I had a

15:20:28  6  guy that would come by first of the month to clean the

15:20:30  7  windows at the store.  I asked him to come on the first

15:20:32  8  of the month, because that's time of the month that I

15:20:35  9  changed the signs in the front.  So he come on the first

15:20:37  10  of the month.

15:20:38  11      He would clean my windows inside and out.  And I

15:20:40  12  think at the time I was paying him 20 or $25.  So I

15:20:44  13  would do a pay out every month for the window cleaning.

15:20:47  14      There was times when I recall having two

15:20:50  15  associates in the store because someone called in and

15:20:53  16  something happened to another associate, but we were

15:20:55  17  really busy and like the day before a holiday.  And I

15:20:58  18  decided instead of having staff go out to lunch, we was

15:21:02  19  working with limited staff this particular day, so I

15:21:04  20  ordered pizza for the staff and had it in the breakroom

15:21:08  21  so that they can have lunch.  I did pay out for that;

15:21:11  22  didn't call anyone, did it and put the receipts in

15:21:13  23  order.

15:21:13  24      Q.   Ms. Brisco, when you would have somebody come do

15:21:17  25  the windows, did you make the decision of when the

15:21:22   1   windows needed to be cleaned?

15:21:23   2       A.  Yes, sir, I did.

15:21:24   3       Q.  Did you make the decision about who to hire to do

15:21:26   4   that?

15:21:26   5       A.  Yes, sir, I did.

15:21:27   6       Q.  What about floors?  Did you decide when the

15:21:35   7   floors needed cleaning?

15:21:36   8       A.  Yes, sir, I did.

15:21:37   9       Q.  Did you decide who to hire to do it?

15:21:39  10       A.  Yes, sir.

15:21:39  11       Q.  Did you have to get your district manager's

15:21:42  12   approval to do that?

15:21:43  13       A.  No, I didn't.

15:21:44  14       Q.  Am I correct that, at some point in your career

15:21:53  15   as a store manager, things changed; so instead of

15:21:59  16   getting a pay out, you had to do a what's called a

15:22:02  17   direct billing?

15:22:03  18       A.  Yes.

15:22:03  19       Q.  Is that right?

15:22:04  20       A.  Yes.  Actually, it changed since after I was --

15:22:07  21   since I have been HR manager, it really changed

15:22:10  22   recently.

15:22:10  23       Q.  Okay.

15:22:11  24       A.  Where they go to direct billing.  I'm aware that

15:22:13  25   it's direct billing now.

15:22:14  1     Q.   Okay.

15:22:15  2     A.   Yeah.

15:22:15  3     Q.   Under the current direct billing system, does the

15:22:22  4  store manager still decide who to hire to do the

15:22:26  5  windows?

15:22:26  6             MR. CALAMUSA:   Object, Your Honor.   It

15:22:29  7  changed after she was HR manager.

15:22:31  8             THE COURT:   Sustained.

15:22:32  9     Q.   Ms. Brisco, who made the hiring and firing

15:22:41  10  decisions in your store?

15:22:42  11     A.   I did.

15:22:43  12     Q.   And on hiring, would that be for all employees?

15:22:47  13     A.   All employees.

15:22:48  14     Q.   Including assistant managers?

15:22:51  15     A.   Yes, sir.

15:22:51  16     Q.   Was the district manager involved to any extent

15:22:56  17  in your hiring decisions?

15:22:57  18     A.   No.

15:22:58  19     Q.   Did you partner with the district manager --

15:23:02  20             MR. CALAMUSA:   Object to leading, Your

15:23:05  21  Honor.

15:23:05  22             THE COURT:   Your objection is sustained.

15:23:07  23     Q.   Ms. Brisco, if your district manager told you

15:23:18  24  that you could not hire and fire without his approval,

15:23:22  25  would you still consider yourself a manager?

15:23:24   1      A.   Yes, sir, I would.

15:23:26   2      Q.   Why do you say that?

15:23:27   3      A.   Because it's many facets to being a store

15:23:30   4   manager.  I would still be the person in charge of

15:23:32   5   ordering the store, taking care of the customers,

15:23:35   6   training and culture my associates, and just overall

15:23:39   7   day-to-day aspects of running a Family Dollar store; I

15:23:42   8   would still be the store manager.

15:23:44   9      Q.   Let's talk about scheduling for a minute,

15:23:52  10   Ms. Brisco.  Was the staff scheduler in place when you

15:23:58  11   were a store manager?

15:24:00  12      A.   Yes, sir, it was.

15:24:00  13      Q.   Do you recall what they looked like?

15:24:03  14      A.   (Nodded head.)

15:24:05  15      Q.   Let me see if I can get you an example.

15:24:17  16           MR. CALAMUSA:  Is this a new one, Tripp, or

15:24:20  17   one that's already in evidence?

15:24:23  18           THE COURT:  Let's take the break.

15:24:25  19           Ladies and gentlemen, we will take our

15:24:27  20   afternoon break at this time.  We will be in recess

15:24:29  21   until 3:35 by the clock on the wall.

15:24:40  22           Please do not discuss the case among

15:24:42  23   yourselves or with anyone else.  Do not allow the case

15:24:44  24   to be discussed in your presence and keep an open mind.

15:24:44  25           (Jury out at 3:20 p.m.)

| | | |
|---|---|---|
| 15:24:49 | 1 | THE COURT:  You have an additional 20 |
| 15:24:51 | 2 | minutes with this witness. |
| 15:24:54 | 3 | MR. UMBACH:  20? |
| 15:24:56 | 4 | THE COURT:  Yes, sir. |
| 15:24:57 | 5 | THE WITNESS:  Thank you. |
| 15:25:22 | 6 | MR. WHITE:  Your Honor? |
| 15:25:22 | 7 | THE COURT:  Yes, sir? |
| 15:25:22 | 8 | MR. WHITE:  I have one matter -- we can do |
| 15:25:23 | 9 | it now or when we come back. |
| 15:25:24 | 10 | THE COURT:  We can do it now. |
| 15:25:26 | 11 | MR. WHITE:  Your Honor, I would move to |
| 15:25:27 | 12 | strike Plaintiffs' Exhibit Number 560, which came in |
| 15:25:32 | 13 | during the last witness. |
| 15:25:33 | 14 | I went back and checked the realtime |
| 15:25:36 | 15 | transcript -- with assistance, as you might imagine -- |
| 15:25:40 | 16 | and the representation that Mr. Wiggins made, I think |
| 15:25:43 | 17 | what caused you to put it in was that this was part of |
| 15:25:47 | 18 | an exhibit that I had already put in. |
| 15:25:49 | 19 | THE COURT:  Yeah.  He said it was part of |
| 15:25:52 | 20 | the Strands. |
| 15:25:55 | 21 | MR. WHITE:  We have looked at that exhibit |
| 15:25:55 | 22 | and I do not find this.  If Mr. Wiggins has the entire |
| 15:25:57 | 23 | document, or something, and would like me to look at |
| 15:25:59 | 24 | it -- but I do not see that these two -- |
| 15:26:01 | 25 | THE COURT:  All right.  I will give him a |

15:26:03   1   chance to check that.

15:26:05   2              MR. WHITE:  I appreciate that, Your Honor.

15:26:07   3              The other thing I would request, it relates

15:26:09   4   to Exhibit 2216, the scheduler that has been used.  It

15:26:13   5   is my recollection that when that was offered, it came

15:26:16   6   in without objection.  And counsel has, on two occasions

15:26:19   7   now, made suggestions to witnesses that it was, quote,

15:26:23   8   "just made up", closed quote.

15:26:25   9              I think, Your Honor, that, frankly, lacks

15:26:29   10  civility at a minimum, and more at worst.  But I would

15:26:32   11  say that permitting them to preface any sort of

15:26:35   12  reference to an exhibit, which they have not objected

15:26:38   13  to, as being "just made up" is frankly demeaning to the

15:26:46   14  process.

15:26:46   15             I would represent to you, as an officer of

15:26:49   16  the Court, that those staff schedules are collected from

15:26:52   17  a number of stores.  If there had been an authentication

15:26:57   18  issue, they should have raised it when it was -- rather

15:27:00   19  than making inflammatory comments.

15:27:02   20             I would ask the Court to instruct the

15:27:04   21  plaintiff not to make that suggestion in reference to

15:27:06   22  that exhibit.

15:27:08   23             MR. R. WIGGINS:  Your Honor, that exhibit

15:27:09   24  has not been authenticated for any particular store.  I

15:27:13   25  have asked several witnesses and haven't got an answer

15:27:17    1    yet.

15:27:17    2                 I did not say it was "just made up", I said

15:27:20    3    "was it made up for this case" or "was it from a real

15:27:24    4    store".

15:27:24    5                 I think the valid distinction is --

15:27:26    6                 THE COURT:  Well, since there's been an

15:27:28    7    objection to it, Mr. Wiggins, don't do it again.

15:27:36    8                 All right.

15:27:37    9                 MR. WHITE:  Thank you, Your Honor.

15:27:39   10                 (Recess at 3:20 p.m. until 3:40 p.m.)

15:27:39   11                 (In open court, jury not present.)

15:49:57   12                 MR. CHILDS:  Your Honor, I have one quick

15:49:58   13    matter I would like to bring up with you.

15:50:01   14                 We, assuming that you allow Haigler and

15:50:04   15    Lundquist to take the stand, we have a rebuttal expert,

15:50:08   16    Dr. John Veres, who we will be using in our rebuttal

15:50:11   17    phase of the case.

15:50:12   18                 I would like to renew our request that he be

15:50:15   19    able to sit in to listen to the testimony of Haigler and

15:50:19   20    Lundquist.  I think under Rule --

15:50:21   21                 THE COURT:  He will be able to do that.

15:50:23   22                 MR. CHILDS:  Thank you, Your Honor.

15:50:25   23                 MR. MAY:  Mr. Haigler is not being offered

15:50:28   24    as an expert, but you are still going to let him sit in?

15:50:32   25                 THE COURT:  Yes, sir.

| | | |
|---|---|---|
| 15:50:40 | 1 | MR. WHITE:  Your Honor, do you want an |
| 15:50:43 | 2 | update on the exhibit? |
| 15:50:45 | 3 | THE COURT:  Yes, sir. |
| 15:50:46 | 4 | MR. WHITE:  Mr. Wiggins has a Strand 3 |
| 15:50:56 | 5 | notebook that was not produced by us from which he |
| 15:50:59 | 6 | obtained the document.  The Strand 3 that we put into |
| 15:51:03 | 7 | evidence -- I will cover it later. |
| 15:51:09 | 8 | THE COURT:  All right. |
| 15:51:10 | 9 | (Jury in at 3:42 p.m.) |
| 15:51:30 | 10 | THE COURT:  Resume direct examination. |
| 15:51:34 | 11 | MR. UMBACH:  Thank you, Your Honor. |
| 15:51:34 | 12 | **DIRECT EXAMINATION (Resumed)** |
| 15:51:36 | 13 | **BY MR. UMBACH:** |
| 15:51:36 | 14 | Q.  Ms. Brisco, we were talking about scheduling when |
| 15:51:41 | 15 | we took a break. |
| 15:51:42 | 16 | A.  Yes, sir. |
| 15:51:42 | 17 | Q.  Let me show you what's in evidence as Defendant's |
| 15:51:46 | 18 | Exhibit 2216. |
| 15:51:48 | 19 | A.  Okay. |
| 15:51:48 | 20 | Q.  And, Ms. Brisco, is that an example of the type |
| 15:52:03 | 21 | of schedule that you received when you were a store |
| 15:52:06 | 22 | manager? |
| 15:52:06 | 23 | A.  Yes, it is. |
| 15:52:09 | 24 | Q.  Okay.  It's not necessarily one, an actual |
| 15:52:13 | 25 | schedule per your store, is it? |

15:52:15  1      A.   No.

15:52:16  2      Q.   But you received ones like that?

15:52:18  3      A.   Yes, sir.

15:52:19  4      Q.   Okay.  How did you use those, Ms. Brisco?

15:52:25  5      A.   I used them based on the hours.  I used the total

15:52:31  6   hours that I would -- I would use the hours -- I would

15:52:36  7   use -- excuse me.  Let me start over.

15:52:38  8           I would use the total hours, but I would navigate

15:52:41  9   them however I needed to in the store to get the

15:52:44  10  coverage that I needed and to get the things executed

15:52:46  11  that I needed to do.

15:52:47  12     Q.   Okay.  Let's see if I understand what you're

15:52:51  13  saying.

15:52:57  14          Does the schedule show hours for each day?

15:53:03  15     A.   Yes, it does.

15:53:04  16     Q.   And then a total for the whole week?

15:53:06  17     A.   Week.  On the side, yeah.

15:53:08  18     Q.   Okay.

15:53:08  19     A.   Yeah.

15:53:09  20     Q.   Did you just fill in the names that went here on

15:53:16  21  the left-hand side for the employees?  Is that how you

15:53:20  22  used this?

15:53:20  23     A.   Not completely.  I would put the names on, but I

15:53:24  24  would also put the schedule that I needed them to work.

15:53:28  25  I would make the changes, but I had to make them -- I

15:53:31  1    made them on the schedule, uh-huh.

15:53:33  2        Q.   Okay.   What did you use to make the change?

15:53:36  3        A.   I used the erasable marker.

15:53:39  4        Q.   Okay.   And can you tell us why you might make a

15:53:43  5    change to the schedule that came to you?

15:53:46  6        A.   Well, if I had associate A working 10:00 to 6:00

15:53:52  7    on Sunday, and associate A had requested -- requested

15:53:55  8    Sunday off, then I would take associate B and C maybe,

15:53:58  9    and divide those hours between them.

15:54:01  10            However, it depended on the circumstances, the

15:54:03  11   time of the week, different things took in place -- I

15:54:06  12   had to take in consideration when making the schedule.

15:54:09  13       Q.   Okay.   When you made changes like that, did you

15:54:15  14   have to involve the district manager?

15:54:16  15       A.   No, sir, I did not.

15:54:17  16       Q.   Did you also make changes to the hours that were

15:54:23  17   allocated --

15:54:25  18                 MR. CALAMUSA:   Object to leading, Your

15:54:27  19   Honor.

15:54:27  20                 THE COURT:   The objection is sustained.

15:54:30  21       Q.   Did you make any other types of changes to the

15:54:32  22   schedule, Ms. Brisco?

15:54:34  23       A.   Yes, sir, I did.

15:54:35  24       Q.   Okay.   Tell us what other changes you made.

15:54:38  25       A.   Well, I would make the changes according to -- if

15:54:41  1   I got a truck on Wednesday, and I didn't get the call on

15:54:44  2   Tuesday or Monday for the truck on Wednesday, I would

15:54:47  3   move those hours all around.

15:54:48  4        Again, like I said, it would depend on what was

15:54:51  5   going on that week, how I had to navigate the schedule.

15:54:54  6   I did maneuver the hours, I mailed in the schedule 30

15:54:58  7   for that day, and may have only used 15, depends on what

15:55:02  8   happened that week and --

15:55:04  9   Q.   Okay.  And when you made that kind of change, did

15:55:07  10  you have to involve the district manager?

15:55:08  11  A.   No, sir, I did not.

15:55:10  12  Q.   Ms. Brisco, when you were a store manager, who

15:55:20  13  was the leader of the store?

15:55:22  14  A.   I was.

15:55:23  15  Q.   And how did you go about leading in the store?

15:55:27  16  A.   By example, first of all.

15:55:29  17  Q.   Tell us what you mean by leading by example.

15:55:31  18  A.   Okay.  Well, I'll give you an example.

15:55:35  19       If I needed the restrooms cleaned -- well, the

15:55:38  20  last store I took over was a store -- the store that I

15:55:43  21  took over was not where I wanted to be at the time.

15:55:48  22       So I went in and if the restrooms were not

15:55:51  23  clean -- this situation pops up in my mind -- I went in

15:55:55  24  and I cleaned the restrooms because I am the manager and

15:55:57  25  I made a decision to raise the bar, raise the standards.

15:56:01   1   I cleaned the restrooms.

15:56:04   2        And in cleaning the restrooms, my associates saw

15:56:05   3   I did coaching and training.  I cleaned the restrooms.

15:56:08   4        They saw me doing it.  They now know my

15:56:11   5   standards, which means I accomplished two things:  I let

15:56:13   6   them know this is the way it's going to be, and I

15:56:16   7   trained them how to do it.  So that's the best example I

15:56:20   8   could give you.

15:56:21   9   Q.  Was motivating employees part of --

15:56:28   10             MR. CALAMUSA:  Object.

15:56:29   11             THE COURT:  Objection to the leading is

15:56:32   12   sustained.

15:56:32   13   Q.  Ms. Brisco, did you do anything to motivate your

15:56:39   14   employees in the store?

15:56:40   15   A.  Yes, I did.

15:56:41   16   Q.  What did you do?

15:56:43   17   A.  Well, some of the things that would motivate

15:56:46   18   employees, first of all, is to see their manager, like I

15:56:49   19   said, leading by example.

15:56:51   20        Then when I got the associates to buy in on

15:56:54   21   programs that I wanted to implement, you know, doing

15:56:57   22   things, you know, like cleaning the restroom, and

15:57:00   23   processing our freight, and just staying on top of

15:57:02   24   everything we needed to do.

15:57:03   25        I would buy lunch for the employees.  I would,

15:57:06  1  you know, buy breakfast.

15:57:08  2      If I went to the bank on day 2 of the truck on

15:57:11  3  day 2 of the truck -- that's the second day of the

15:57:14  4  truck, we went in to put the freight out.  On my way to

15:57:17  5  the bank, when I come, I stop at McDonald's and buy them

15:57:20  6  breakfast.  This motivated the employees, picked the

15:57:22  7  morale up in the store, and let the employees, I think,

15:57:25  8  feel that they were more than just an employee.

15:57:27  9      They were part of the team and that I appreciated

15:57:30  10  them.

15:57:30  11  Q.  Why did you want to motivate your employees?

15:57:34  12  A.  Why?  Because the customers feed off of what we

15:57:39  13  put out, if you can understand what I'm saying.

15:57:43  14      If a -- if a customer came into the store and the

15:57:46  15  morale was down -- if I was in shopping, I go in the

15:57:48  16  store and there's no team work, I know immediately when

15:57:51  17  I walk in because nobody's saying "good morning", no one

15:57:54  18  is saying "hello".

15:57:56  19      So if I pick the morale up and got everybody to

15:57:59  20  buy into giving excellent customer service, you know,

15:58:02  21  keeping our in-stock in front facing the shelves, then

15:58:05  22  the morale in the store went up.  Because we had a sense

15:58:08  23  of pride about our store.  And so the morale went up and

15:58:12  24  everybody was motivated.

15:58:14  25  Q.  We talked about to-do lists, Ms. Brisco.  Why did

| | | |
|---|---|---|
| 15:58:21 | 1 | you to do this? |
| 15:58:25 | 2 | A.   Why?  I made them, first of all, so that I, |
| 15:58:28 | 3 | myself, would walk the store and it would make me aware |
| 15:58:31 | 4 | of the things that I needed to get done.  It helped me |
| 15:58:36 | 5 | to be a good manager.  It helped me to be able to be |
| 15:58:39 | 6 | ready. |
| 15:58:40 | 7 | I wanted to say when my associates come in to |
| 15:58:42 | 8 | delegate and give them their assignments and tasks for |
| 15:58:46 | 9 | the day.  So it helped me. |
| 15:58:47 | 10 | Q.   Was your to-do list the same each day? |
| 15:58:49 | 11 | A.   No. |
| 15:58:50 | 12 | Q.   Is there paperwork reports involved in being a |
| 15:58:56 | 13 | store manager? |
| 15:58:57 | 14 | A.   Yes, sir. |
| 15:58:57 | 15 | Q.   What type of paperwork? |
| 15:58:59 | 16 | A.   Well, we had the cashier sales, paperwork, we do |
| 15:59:05 | 17 | in the morning.  That's when we reconcile the business |
| 15:59:08 | 18 | for the previous day.  We reconcile that and log that, |
| 15:59:11 | 19 | along with direct shipments which is when vendors, |
| 15:59:14 | 20 | vendors bring in Frito Lay, Coca-cola, the greeting |
| 15:59:18 | 21 | cards, where we come -- you have to log them in on the |
| 15:59:21 | 22 | logbook, make a record of them coming, what they brought |
| 15:59:25 | 23 | in, total it up, that's paperwork. |
| 15:59:27 | 24 | And then we have a billing summary -- |
| 15:59:28 | 25 | THE COURT:  You did all of that? |

15:59:29  1          THE WITNESS:  Yes, sir, I did.  Okay.  And

15:59:31  2   then the billing summary would come in.  We would --

15:59:34  3   billing summary is like a bank statement.

15:59:36  4          You would -- all monies your store made for

15:59:40  5   the month would be listed on there.

15:59:41  6          You would balance what they -- what the

15:59:43  7   corporate office say you have versus what you have on

15:59:47  8   your books, to make sure that nothing is missing.  And

15:59:49  9   then you would reconcile all the drop shipments that

15:59:52  10  Frito Lay and the Coca-cola I'm speaking about, they

15:59:57  11  would show up.

15:59:58  12          So that was a very important part of my job,

16:00:00  13  that paperwork, because all that worked for, you know,

16:00:03  14  it would help us with shrink and know what was in the

16:00:06  15  store.  So it would help in that aspect.

16:00:09  16     Q.  If the paperwork didn't get done, who was held

16:00:12  17  accountable for it?

16:00:13  18     A.  Me, the store manager.

16:00:14  19     Q.  Did you ever delegate any paperwork to other

16:00:19  20  employees in the store?

16:00:20  21     A.  I would have an assistant manager would be able

16:00:23  22  to sign any drop shipment, if the drop shipment came.  I

16:00:27  23  was not there all hours of the day.

16:00:29  24          The vendors don't have a certain time to come.

16:00:32  25  So if they came when I was not there, the assistant

16:00:34  1   manager was expected to check in the vendors.

16:00:37  2          And I would -- I wanted my assistant manager to

16:00:41  3   be trained in doing the billing summary.  I would bring

16:00:45  4   them in, assist and see training, coach them on doing a

16:00:48  5   billing summary, so, yes, I did.

16:00:50  6      Q.  Ms. Brisco, what do you consider to be the most

16:01:01  7   important duty of the store manager at Family Dollar?

16:01:04  8      A.  The most important duty of the store manager,

16:01:17  9   most important duty -- I think all of my duties are very

16:01:20  10  important -- but the one that sticks out most in my head

16:01:23  11  is taking care of the customer.  Because without a

16:01:26  12  customer, they don't have a need for me to manage the

16:01:28  13  stores.

16:01:29  14         So I would say customer service and taking care

16:01:31  15  of the service would be number one.

16:01:33  16     Q.  Is that your responsibility as a store manager?

16:01:35  17     A.  Yes, sir.

16:01:36  18              MR. UMBACH:  Thank you, Ms. Brisco.

16:01:38  19              THE WITNESS:  Thank you.

16:01:39  20              THE COURT:  Cross-examination?

16:01:44  21              MR. CALAMUSA:  Yes, Your Honor.

16:01:44  22                    **CROSS-EXAMINATION**

16:01:45  23  **BY MR. CALAMUSA:**

16:01:45  24     Q.  Good afternoon, Ms. Brisco.

16:01:50  25     A.  Good afternoon.  How are you?

16:01:53  1    Q.  I'm great.  You're not a plaintiff in this case,

16:01:56  2  are you?

16:01:56  3    A.  No, sir, I'm not.

16:01:57  4    Q.  And at the time you were designated as a witness

16:02:00  5  in this case; and in fact, the time you were deposed,

16:02:04  6  you held the position of store manager, didn't you?

16:02:06  7    A.  Yes, sir, I did.

16:02:07  8    Q.  And isn't it true that one month before you were

16:02:11  9  designated as a witness and you were deposed, you

16:02:14  10  inquired the first time about being a district manager?

16:02:17  11    A.  I don't recall that to be true, no.

16:02:19  12    Q.  Do you recall having your deposition taken?

16:02:21  13    A.  Yes, I do.

16:02:22  14    Q.  Do you recall being asked:  "You've been with the

16:02:53  15  company six years and you have a total of almost 30

16:02:56  16  years' experience in management at retail; is that

16:02:59  17  approximately right?"

16:03:00  18       And you answered:  "About 20 something, yeah.

16:03:04  19       "Are you interested in being a district manager

16:03:06  20  with Family Dollar?  Yes, ma'am.  Have you ever applied

16:03:10  21  for it?  I just started making mention of it."

16:03:13  22    A.  I was talking to my DM, in fact, about it.

16:03:16  23    Q.  When did you mention it to your DM, about a month

16:03:19  24  or so ago?  Do you recall that?

16:03:23  25    A.  It may be true.  I mean, I don't recall -- I

16:03:26  1    didn't recall saying it when you asked me.  I don't --

16:03:27  2              THE COURT:  You're not saying that you

16:03:28  3    didn't say it, you're just saying you don't have any

16:03:31  4    independent recollection?

16:03:32  5              THE WITNESS:  No, I don't have a

16:03:33  6    recollection of it.

16:03:33  7    Q.   That's fine.  But it is true when your deposition

16:03:36  8    was taken, you were designated by Family Dollar to be a

16:03:39  9    witness, you were a store manager; and about a month or

16:03:42  10   so before that, you asked for the first time to be a

16:03:46  11   district manager?

16:03:46  12   A.   I don't recall.

16:03:48  13   Q.   And approximately six to seven months after your

16:03:51  14   deposition was taken, and you had been designated by

16:03:53  15   Family Dollar to be a store manager to testify in this

16:03:58  16   case, you were promoted to Human Resource manager?

16:04:02  17             MR. UMBACH:  Object to the term "designated"

16:04:07  18   by us.

16:04:08  19             MR. CALAMUSA:  She has been designated by

16:04:10  20   you --

16:04:10  21             MR. UMBACH:  The timing of that, Your Honor.

16:04:12  22             THE COURT:  The objection is overruled.

16:04:14  23   Q.   (By Mr. Calamusa)  Six to seven months after your

16:04:15  24   deposition.  I'll help you.

16:04:17  25             I'm not trying to trick you at all, Ms. Brisco,

16:04:20   1   I'm really not.  April 14th, 2005.

16:04:24   2        A.   Okay.

16:04:24   3        Q.   My math -- I'm not as good as Mr. McCarthy.  I

16:04:28   4   can't do it in my head.

16:04:29   5             My math, that's six or seven months before you

16:04:32   6   were promoted to Human Resource manager; right?

16:04:35   7        A.   Yes.

16:04:36   8        Q.   Am I correct the last store you were in was 4775?

16:04:44   9        A.   That's correct.

16:04:45   10       Q.   Okay.  And when you were in that store, you had

16:04:52   11  two full-time assistant managers?

16:04:54   12       A.   Yes, I did.

16:04:55   13       Q.   And you had, in fact, four full-time employees

16:04:59   14  and four part-time employees?

16:05:02   15       A.   I don't recall if they were all full-time.  I

16:05:04   16  can't -- I can't recall that.  I'm sorry.

16:05:06   17       Q.   You're not denying it?

16:05:07   18       A.   I'm not denying it.  I just don't recall.

16:05:11   19       Q.   When you -- let me ask you something else for a

16:05:19   20  second.

16:05:20   21       A.   Sure.

16:05:20   22       Q.   Customer service?

16:05:22   23       A.   Uh-huh.

16:05:23   24       Q.   You were asked by Mr. Umbach what's the most

16:05:26   25  important function as a store manager, and you thought

16:05:32  1   for a moment; correct?

16:05:33  2       A.  Uh-huh.

16:05:34  3       Q.  And you came up with customer service; right?

16:05:36  4       A.  Uh-huh.

16:05:37  5       Q.  First, you paused before you answered that.  You

16:05:40  6   thought for a minute?

16:05:41  7       A.  Uh-huh.

16:05:41  8       Q.  That's not the first time you heard that

16:05:43  9   question.  In fact, when you were deposed -- I think

16:05:46  10  when I deposed you, I asked you the same question.

16:05:48  11      A.  Sir, I really don't remember nothing you asked me

16:05:51  12  in my deposition.

16:05:52  13      Q.  Customer service satisfaction is the most

16:05:54  14  important function; right?

16:05:56  15      A.  Yes.

16:05:56  16      Q.  Isn't customer service a function for your

16:06:00  17  cashiers?

16:06:01  18      A.  Yes, it is.

16:06:02  19      Q.  And your stockers?

16:06:03  20      A.  Yes, it is, but I train them on that, to make

16:06:06  21  sure they give excellent customer service.

16:06:09  22      Q.  They are trained not only by you, but by your

16:06:12  23  assistants and other cashiers, too?

16:06:15  24      A.  That could be true, yes.

16:06:16  25      Q.  In fact, customer service is being friendly with

16:06:18  1   somebody; so that person could have been trained in how

16:06:20  2   to be friendly by their mom and dad; right?

16:06:22  3       A.   They could have been.

16:06:25  4       Q.   People that oversee customer service -- cashiers,

16:06:30  5   stockers, associates, assistant managers, and yourself;

16:06:36  6   right?

16:06:37  7       A.   Correct.

16:06:38  8       Q.   Let's go back to 4775, your last store.

16:06:45  9       A.   Uh-huh.

16:06:46 10       Q.   Two assistant managers, four full-time, and four

16:06:48 11   part-time employees, plus yourself?

16:06:52 12       A.   I'm not sure that I had four full-time employees

16:06:56 13   and four assistants.  I can't recall, sir.

16:06:58 14       Q.   Well, let's just make sure.  I don't want you to

16:07:05 15   think I'm up here saying something that's not right.

16:07:14 16            I asked you:  "And how many full-time employees

16:07:20 17   have you had at 4775 at one time?"

16:07:24 18            And let me stop for a second.  April of 2004, you

16:07:31 19   were in 4775?

16:07:31 20       A.   I was in 4775, yes.

16:07:33 21       Q.   "And how many full-time employees have you had at

16:07:36 22   4775 at one time?  Answer:   Three.  And how many

16:07:41 23   part-time?  Answer:  Four.  I'm sorry, sir, add one.  I

16:07:46 24   have four full-time associates and four part-time

16:07:49 25   associates"?

16:07:49  1    A.  Okay.  I must --

16:07:50  2    Q.  That help you remember?

16:07:54  3    A.  (Nodded head.)

16:07:54  4    Q.  Unloading trucks.  Unloading trucks is actually

16:07:58  5  the physical job of taking something off the truck,

16:08:02  6  carrying it into the store, stacking it in the back room

16:08:04  7  or on a U-boat, or out on the floor; right?

16:08:08  8    A.  On the U-boat.

16:08:09  9    Q.  U-boat?

16:08:10  10    A.  Uh-huh.

16:08:11  11    Q.  Wheeling the U-boat out on to the floor; am I

16:08:15  12  right?  Help me understand.

16:08:16  13    A.  Unloading it off the rollers and putting it on

16:08:20  14  the U-boat.

16:08:21  15    Q.  And what happens to the U-boat?

16:08:23  16    A.  It's rolled out on the floor.

16:08:25  17    Q.  All right.  So the U-boat can be rolled out.

16:08:29  18  That's the stocking phase?

16:08:31  19    A.  Yes.

16:08:31  20    Q.  All right.  You train your people while they're

16:08:36  21  doing it?

16:08:37  22    A.  Yes.

16:08:37  23    Q.  You train how to pick something up off a truck,

16:08:44  24  carry it over and set it on the U-boat?

16:08:47  25    A.  Yeah, if they're doing it improperly.  Hopefully,

16:08:50   1   after one or two times, they will have it correctly and

16:08:53   2   do it.  But I train every day.

16:08:55   3       Q.   How to pick up a box and move it is what we're

16:08:59   4   talking about training; right?

16:09:01   5       A.   Yes.

16:09:02   6       Q.   All right.  Let's talk about 4775.  Unloading.

16:09:08   7            Isn't it true that 4775, when you had all those

16:09:12   8   employees we're talking about, you also had what's known

16:09:15   9   as a mobile stock team?

16:09:18   10      A.   Yes, I did.

16:09:19   11      Q.   Explain to us what a mobile stock team is.

16:09:22   12      A.   Well, a mobile stocking team is a group of

16:09:26   13   individuals that go around and help stores -- I think

16:09:29   14   it's stores that was identified as high-volume stores

16:09:32   15   that really need to get the freight out and get out of

16:09:35   16   the way.

16:09:36   17           They would come around and help -- they would

16:09:38   18   help in my store -- I think I got one -- if my truck was

16:09:41   19   at 6:00, I got one in at 6:00 and one may be in at 7:00.

16:09:45   20           However, I think if you read in my deposition, a

16:09:48   21   couple of those people I included as full-time employees

16:09:51   22   were based out of my store, which made them full-time in

16:09:54   23   my store.

16:09:54   24      Q.   Okay.

16:09:55   25      A.   Okay.

16:09:55  1     Q.   So you have read your deposition before today?

16:09:57  2     A.   Well, I know that would have to be where the

16:10:00  3   eight come from, or those four come from.

16:10:02  4     Q.   All right.  But what I'm getting at is with this

16:10:04  5   unloading, you had a group of employees that would come

16:10:07  6   on truck day and unload the truck, or assist your

16:10:13  7   employees in unloading the truck?

16:10:15  8     A.   Not a group, I would have two.  One and me.  The

16:10:18  9   second person is on the floor.  That's the person that's

16:10:20  10  rolling out the chemicals and starting to stage the

16:10:22  11  chemicals.  So there would be two of us unloading the

16:10:25  12  truck -- me and one.

16:10:26  13    Q.   And, in fact, you were physically moving those

16:10:30  14  boxes?

16:10:30  15    A.   Yes.

16:10:30  16    Q.   Okay.  So someone would come from outside your

16:10:33  17  store to assist on truck day; this mobile stocking team?

16:10:38  18    A.   Yes.

16:10:38  19    Q.   And, in fact, the next day, the mobile stocking

16:10:42  20  team would show back up to help take that freight off

16:10:45  21  the U-boats and put it on the shelves?

16:10:48  22    A.   The freight would be staged on the floor when it

16:10:52  23  got there the next day.  You wouldn't have to take it

16:10:54  24  off the U-boat.

16:10:54  25    Q.   Sorry.

16:10:55    1       A.   Thank you.

16:10:55    2       Q.   They would pick it up off the floor?

16:10:58    3       A.   It would be staged.

16:10:58    4       Q.   And put it on the shelf?

16:10:59    5       A.   Yeah.

16:11:00    6       Q.   Again, someone from outside your store would come

16:11:03    7   and assist you?

16:11:05    8       A.   One of them would have been from outside of my

16:11:07    9   store, and the other one would have been an associate

16:11:09   10   that was assigned to my store.

16:11:10   11       Q.   You also, in one of these full-time employees,

16:11:15   12   had a full-time stock boy?

16:11:19   13       A.   Say it again.

16:11:19   14       Q.   You had a full-time stocker, as well, one of your

16:11:23   15   full-time?

16:11:24   16       A.   That would be one of the mobile stocking persons

16:11:27   17   would be.

16:11:27   18       Q.   Despite having this help and all these employees,

16:11:33   19   you would agree with me, wouldn't you, that unloading

16:11:36   20   the truck, running the cash register, cleaning the

16:11:42   21   store, stocking, organizing the shelves, cleaning the

16:11:46   22   bathrooms, that's an all-day job for you?

16:11:51   23       A.   Being the manager of the store is an all-day job.

16:11:53   24       Q.   Yes, ma'am.

16:11:54   25       A.   All of that goes into that.

16:11:56  1     Q.  But actually doing the unloading, the stocking,

16:11:59  2  the organizing the shelves, the cleaning the floors, the

16:12:01  3  bathrooms, the recovery, that's what you do all day?

16:12:07  4  Because I asked you --

16:12:07  5     A.  Along with many other tasks, yeah.  Along with

16:12:11  6  multi-tasking, yes.

16:12:12  7     Q.  In fact, I asked you:  "How long did it take you,

16:12:15  8  what percentage of your time was spent unloading,

16:12:18  9  stocking, organizing, cleaning?"  And you said:  "Out of

16:12:27  10  nine hours, all day"; correct?

16:12:29  11     A.  Yeah.  I'm the manager all day.

16:12:31  12     Q.  Reports.  You come in, in the morning and do your

16:12:36  13  reports.  Isn't it true that those reports you just

16:12:40  14  explained to us take you about 15 -- 10, 15, 20 minutes

16:12:45  15  in the morning?

16:12:47  16     A.  It could take at least as 15 minutes, but

16:12:51  17  depending on if there was a problem, it could take up to

16:12:55  18  30 minutes.

16:12:55  19     Q.  Depending on if it's a problem.  But on average,

16:12:58  20  what it usually takes is 15 -- about 10 to 15 minutes?

16:13:07  21     A.  Yeah.

16:13:08  22     Q.  All right.  So all those reports, that big

16:13:11  23  explanation of in the morning, what you do in your

16:13:15  24  reports, 10 to 15 minutes.

16:13:18  25         And let me ask this:  Your assistant manager,

16:13:21  1    whoever does the opening, does this 10 to 15, even 20

16:13:25  2    minutes' worth of reports in the morning; right?

16:13:27  3    whoever does the opening?

16:13:28  4         A.   Yes.   That's strictly the cash and sales.   It's

16:13:31  5    not the other reports that we're talking about.   It's

16:13:33  6    strictly the cash and sales.

16:13:35  7         Q.   The other reports is when vendors come in the

16:13:37  8    day?

16:13:37  9         A.   Yeah.

16:13:37  10        Q.   Okay.   Your assistants also do those same reports

16:13:45  11   in the morning if they're opening?

16:13:47  12        A.   Yes.

16:13:47  13        Q.   And their assistants are paid hourly?

16:13:51  14        A.   Yes, they are.

16:13:52  15        Q.   They move the freight like you do?

16:13:53  16        A.   Yes.

16:13:54  17        Q.   They clean the bathroom just like you do?

16:13:56  18        A.   Yes.

16:13:57  19        Q.   Now, let me ask you this:   Closing, am I right

16:14:02  20   that closing process, from the time the lights go off at

16:14:07  21   8:00 o'clock, everything that you do, including all your

16:14:12  22   reports, takes you 30 minutes -- your cashiers count

16:14:17  23   down the tills, that takes them 10 to 15 minutes.   While

16:14:21  24   they're counting down the tills, you're straightening up

16:14:24  25   for the next day.   And when they finish, you reconcile

16:14:28   1   their tills, and that total process takes you 30

16:14:32   2   minutes.  You're out of there by 8:30; right?

16:14:36   3       A.   It depends.  It could vary.

16:14:37   4       Q.   On average, you told me, didn't you, 30 minutes?

16:14:41   5       A.   I don't know what I -- I can't recall.  But,

16:14:42   6   okay, yeah.

16:14:43   7       Q.   So, yeah -- or do you want me to find it?  You

16:14:47   8   were the store manager.  I wasn't, ma'am.  I'm trying to

16:14:50   9   figure out what happened; how long it takes you to do

16:14:52  10   these closing reports.

16:14:54  11       A.   To reconcile the -- because I'm confused because

16:14:58  12   you said closing the stores after you turn the lights

16:15:00  13   off.  First of all, I don't cut the lights off while the

16:15:03  14   employees are still in the store.

16:15:04  15       Q.   Let me correct.  Locking the doors.

16:15:06  16       A.   You confused me.

16:15:08  17       Q.   Locking the doors.

16:15:09  18       A.   Talking of just counting down the tills, that

16:15:12  19   could take 15 to 20 minutes counting the tills.

16:15:15  20       Q.   What do you do after you count down the tills?

16:15:17  21       A.   Hopefully, we've already started the recovery

16:15:20  22   process, meaning straightening the store, phasing it,

16:15:25  23   and that winds into 8:30.

16:15:27  24       Q.   All right.  Recovery is straightening up?

16:15:29  25       A.   Uh-huh.

16:15:29    1      Q.   Picking up things off the floor, fixing the

16:15:33    2   merchandise?

16:15:33    3      A.   Uh-huh.

16:15:33    4      Q.   Okay.   Cleaning.

16:15:33    5      A.   Uh-huh.

16:15:36    6      Q.   Cleaning and fixing merchandise, straightening

16:15:40    7   up, that's the recovery?

16:15:41    8      A.   Uh-huh.

16:15:42    9      Q.   You and whoever's in the store with you, if there

16:15:45   10   is someone there, helps you out.   All right.   Then at

16:15:48   11   8:00 o'clock, the cashier counts down the till?

16:15:53   12      A.   Uh-huh.

16:15:54   13      Q.   15, 20 minutes for her to do that?

16:15:58   14      A.   Uh-huh.

16:15:59   15      Q.   And what do you do next to get you out by 8:30 --

16:16:03   16   because I asked what time on average are you locking the

16:16:06   17   store and walking out; you said 8:30?

16:16:08   18      A.   Yeah.

16:16:09   19      Q.   "So the whole closing process may take

16:16:12   20   approximately 30 minutes at most?   Answer:   Well, you

16:16:15   21   can start closing prior to that.   If the store's not

16:16:17   22   busy, we can go ahead and close down one till.   So that

16:16:20   23   leaves us until 8:00 o'clock, one to count down.   So it

16:16:23   24   could take no longer than 30 minutes"?

16:16:25   25      A.   If we're not busy; that's what I said.

16:16:28   1      Q.   Yeah, okay.

16:16:29   2      A.   Okay.

16:16:30   3      Q.   The reports at the end of the night take you 15,

16:16:34   4    20 minutes?

16:16:35   5      A.   The reports do, yes, that's correct.

16:16:38   6      Q.   Ordering.  Mr. Umbach asked you about ordering.

16:16:46   7    Let me go back one more point.

16:16:49   8      A.   Sure.

16:16:49   9      Q.   Closing.  Your assistants also do that?

16:16:52  10      A.   Yes, they do.

16:16:53  11      Q.   Responsible for those same reports?

16:16:55  12      A.   Yes, when they're closing.

16:16:57  13      Q.   Ordering.  Ordering is taking a gun, a handheld

16:17:06  14    gun, going beep, beep, beep, row by row and ordering,

16:17:11  15    figuring out what you have on your shelves, or is that

16:17:14  16    cycle counts?

16:17:15  17      A.   Well, you do a little for both.  But in ordering,

16:17:18  18    it's more than scanning the item and letting it go beep,

16:17:21  19    beep.  You have to know what you have on hand, know if

16:17:24  20    you have it in the back room, anticipate the sales, have

16:17:26  21    an idea of what you are going to need so you --

16:17:28  22      Q.   Don't you -- isn't most of your ordering auto

16:17:33  23    replenishing?

16:17:34  24      A.   No, sir.

16:17:35  25      Q.   Are you sure?

16:17:36  1      A.   I'm sure.

16:17:38  2      Q.   Can I have M1, please?

16:17:42  3           Isn't it true that even as a store manager or as

16:17:47  4   a store manager, you don't order clothes?

16:17:52  5      A.   No.

16:17:52  6      Q.   You don't order seasonal goods, you don't order

16:17:55  7   ads, and you don't order -- automatically replenish;

16:17:59  8   right?

16:18:00  9      A.   That's not absolutely true.

16:18:01  10     Q.   Is that what you told me?

16:18:02  11     A.   I don't recall, but --

16:18:04  12          THE COURT:  Well, is there an extra copy of

16:18:06  13  this witness' deposition?

16:18:07  14          THE WITNESS:  Please.  Thank you.

16:18:09  15          MR. CALAMUSA:  No, sir.  I will show it to

16:18:11  16  her.

16:18:11  17          THE COURT:  Well, let's get an extra copy of

16:18:14  18  the witness' deposition so that she will have it before

16:18:16  19  you.  You can direct her to a page.  You read the

16:18:19  20  question put to her and she can read the answer.

16:18:22  21          MR. CALAMUSA:  Yes, sir.

16:18:23  22          THE COURT:  And I'm giving notice to counsel

16:18:26  23  that they should be prepared to seek to impeach a

16:18:32  24  witness using his or her own deposition in that manner

16:18:38  25  for the rest of this trial.

| | | |
|---|---|---|
| 16:18:40 | 1 | Put another way:  When you're going to |
| 16:18:43 | 2 | cross-examine the witness, make sure you have two copies |
| 16:18:47 | 3 | of the witness' deposition; one for your use and one for |
| 16:18:52 | 4 | the witness' use. |
| 16:18:53 | 5 | MR. CALAMUSA:  Yes, sir. |
| 16:18:55 | 6 | Q.  (By Mr. Calamusa)  Let me show you this, |
| 16:18:56 | 7 | Ms. Brisco. |
| 16:19:03 | 8 | MR. WHITE:  Can we have the page and line? |
| 16:19:05 | 9 | MR. CALAMUSA:  Yes.  Page 60, starting at |
| 16:19:07 | 10 | line 24. |
| 16:19:10 | 11 | Q.  The question is:  "So, you don't order the |
| 16:19:14 | 12 | clothes, you don't order the seasonal, you don't order |
| 16:19:17 | 13 | the ads, and you don't order the automatic |
| 16:19:22 | 14 | replenishment; isn't that right?"  And your answer? |
| 16:19:25 | 15 | A.  "Yes." |
| 16:19:26 | 16 | Q.  And I asked:  "What else appears on that truck |
| 16:19:28 | 17 | that you order?"  And your answer? |
| 16:19:34 | 18 | A.  Oh, you mean read it?  "I can't think of anything |
| 16:19:37 | 19 | else, sir." |
| 16:19:37 | 20 | Q.  "Okay.  Let's look at the training manual on |
| 16:19:49 | 21 | ordering.  There's a merchandise buyer; right?" |
| 16:19:53 | 22 | A.  "Yes." |
| 16:19:54 | 23 | Q.  "It's in the corporate office.  And according to |
| 16:19:58 | 24 | this, there's a merchandise buyer in the corporate |
| 16:20:01 | 25 | merchandising department who selects the merchandise for |

16:20:03    1   your store, decides the price, and assures that the

16:20:07    2   merchandise is delivered to the distribution centers";

16:20:15    3   is that right?

16:20:15    4       A.  Yes.

16:20:18    5       Q.  The next is:  "How is merchandise ordered?  To

16:20:26    6   assist with the merchandise ordering process, there is a

16:20:30    7   computer system calls C.A.R.S.", are you familiar with

16:20:32    8   that?

16:20:33    9       A.  "Yes, I am."

16:20:36   10       Q.  "That gathers sales information from each store

16:20:39   11   on a daily basis.  Based on the information received

16:20:42   12   from the store, basic merchandise is reordered weekly.

16:20:46   13   The automated replenishment system analyzes the sales

16:20:50   14   history of items sold in the store and creates an on-

16:20:53   15   hand inventory.  It then places an automatic order to

16:20:56   16   replenish the sold merchandise."

16:20:57   17       That pretty much describes the auto

16:21:01   18   replenishment, doesn't it?  Doesn't it?  Does that

16:21:07   19   accurately describe what auto replenishment is?

16:21:10   20       A.  Not totally.

16:21:11   21       Q.  And the ordering takes you -- you do that once a

16:21:25   22   week?

16:21:25   23       A.  Yes.

16:21:26   24       Q.  And it takes you three hours?

16:21:28   25       A.  Some more.  I would -- I came into my store early

16:21:33  1    and I ordered, you know, I took my time, it would take

16:21:36  2    me five or six hours to do a detailed quality order.  Do

16:21:41  3    a little bit each day.

16:21:42  4        Q.  The -- are there occasions when you get items

16:22:15  5    that you, in fact, don't order?

16:22:17  6        A.  Yes, there are.

16:22:20  7        Q.  And things that you do order, you don't get, do

16:22:27  8    you?

16:22:27  9        A.  Excuse me?  Ask me that question again.

16:22:33  10       Q.  I'm sorry.  Things that you do order, there are

16:22:36  11   occasions where you don't get it?

16:22:41  12       A.  That could happen, not often.

16:22:45  13       Q.  Here we go.  I'm sorry.

16:22:48  14               MR. CALAMUSA:  Page 59, please, Tripp.

16:22:52  15       Q.  And I asked you:  "And how long does it take you

16:22:55  16   to do your scanning for store ordering?"  And your

16:22:59  17   answer?

16:23:00  18       A.  "It usually takes about three hours to get a

16:23:04  19   really good order, that's why I do it in increments.  I

16:23:07  20   told you things have changed because C.A.R.S. we don't

16:23:11  21   use anymore, it added time to it."

16:23:14  22       Q.  So since April 14th of 2004, it has added time?

16:23:18  23       A.  Yes.

16:23:19  24       Q.  But as of April 14th, 2004, it took you about

16:23:23  25   three hours?

16:23:24  1      A.   Three hours.

16:23:25  2      Q.   Monthly schematics, did I understand you to say

16:23:28  3  you can change monthly schematics on your own?

16:23:31  4      A.   Yes.

16:23:32  5      Q.   Are you aware that company policy states that

16:23:37  6  monthly schematics differ from store to store depending

16:23:50  7  on the layout?  That last line says:  "Under no

16:23:55  8  circumstances should schematics be altered without

16:23:58  9  approval from the district manager."  Are you aware of

16:24:01  10  that?

16:24:01  11      A.   Yes, I am.

16:24:02  12      Q.   You make pay outs, you say?

16:24:09  13      A.   Yes, I did.

16:24:11  14      Q.   Isn't it true, Ms. Brisco, that you cannot

16:24:20  15  perform a pay out without district manager approval?

16:24:24  16      A.   No, sir, that was not true in my case.

16:24:26  17              THE COURT:  You need to keep your voice up.

16:24:28  18              THE WITNESS:  No, sir, that was not true in

16:24:30  19  my case in my store.  I didn't have that problem.

16:24:32  20      Q.   Are you familiar with this part of the policy

16:24:41  21  manual that says:  "Store management cannot perform any

16:24:44  22  pay out without district manager approval unless it's

16:24:47  23  been pre-approved by policy manual or the corporate

16:24:52  24  office"?

16:24:52  25      A.   No.

16:24:53   1   Q.   Am I correct, Ms. Brisco, that there is nothing

16:25:13   2   in which your assistants can do -- let me fix that one.

16:25:21   3   There was nothing that you did as a store manager that

16:25:26   4   your assistant managers could also not do, also do?  I

16:25:32   5   messed up the second time.

16:25:34   6        Isn't it true you performed the same functions;

16:25:37   7   y'all could perform the same functions; same job duties

16:25:40   8   that you performed, your assistant managers could also

16:25:42   9   perform?

16:25:42   10   A.   Not totally.

16:25:44   11   Q.   What's missing?

16:25:45   12   A.   My assistant managers could not hire associates

16:25:48   13   and they did not terminate associates.  They needed me,

16:25:51   14   the store manager, to do that.  However, I did involve

16:25:55   15   them in the interview process.

16:25:57   16   Q.   Are you aware of company policy that requires you

16:26:02   17   to get district manager approval before hiring?

16:26:05   18   A.   No.

16:26:07   19   Q.   Are you aware of company policy that requires you

16:26:09   20   to get district manager approval before firing?

16:26:12   21   A.   No, sir.

16:26:13   22   Q.   The -- if your manager told you -- the district

16:26:25   23   manager told you you were not allowed to hire, would you

16:26:29   24   do it anyway?

16:26:31   25   A.   Say the question again.

16:26:32   1        Q.   If your district manager told you that you could
16:26:35   2   not hire, would you do it anyway?
16:26:38   3        A.   That I could not hire?
16:26:40   4        Q.   Uh-huh.
16:26:41   5        A.   If they told me I could not hire, would I hire
16:26:47   6   anyway?
16:26:48   7        Q.   Yes, ma'am.
16:26:49   8        A.   If they told me I could not?
16:26:51   9        Q.   Yes, ma'am.
16:26:52  10        A.   I've never had that happen, so I really don't
16:26:57  11   know.   I mean, I would have a problem with that; no.
16:27:00  12        Q.   What would you do if your district manager, in
16:27:03  13   fact, told you, "sorry, Ms. Brisco, that you cannot hire
16:27:09  14   anybody unless I approve --"
16:27:11  15             THE COURT:   Well, the question should be:
16:27:13  16   "What would you do if your district manager told you you
16:27:16  17   cannot hire anybody without first getting my consent?"
16:27:22  18        Q.   Would you do it anyway?
16:27:24  19        A.   Would I hire the person anyway?   I probably would
16:27:27  20   have a conversation with my district manager for us to
16:27:30  21   try to come together first of all.
16:27:34  22             THE COURT:   Yeah.   You would try to do what
16:27:37  23   your district manager asked you to do.
16:27:39  24             THE WITNESS:   Asked me to do.   And I would
16:27:40  25   have a conversation with him and hope that we could come

16:27:43  1   to an understanding --

16:27:44  2           THE COURT:  If you didn't come to an

16:27:46  3   understanding, you would not hire someone --

16:27:47  4           THE WITNESS:  -- unless we got --

16:27:49  5           THE COURT:  -- unless the district manager

16:27:51  6   gave his prior approval, if you knew that that was a

16:27:53  7   policy of the company.

16:27:54  8           THE WITNESS:  Yeah.  Yeah.  If it was a

16:27:56  9   policy and he point blank told me, "don't hire anybody

16:27:59  10  unless I say so".  But like I said, I haven't had that

16:28:02  11  happen.

16:28:02  12          THE COURT:  No one has ever told you?

16:28:04  13          THE WITNESS:  No, sir, Your Honor.

16:28:05  14          THE COURT:  All right.

16:28:06  15          THE WITNESS:  Thank you.

16:28:08  16  Q.  (By Mr. Calamusa)  Would you agree, Ms. Brisco,

16:28:10  17  that you and your employees were responsible for profit

16:28:16  18  and loss in your store?

16:28:18  19  A.  Yeah.  I was responsible for profit and loss.

16:28:23  20  However, as a team, everybody's involved in and should

16:28:29  21  take a part in helping to control loss to the store.

16:28:34  22  But I'm ultimately responsible for it.

16:28:37  23  Q.  And everyone from cashier, stock, assistant and

16:28:45  24  you are also responsible for control and shrink?

16:28:48  25  A.  Yes.  Everyone should play a part, but I'm still

16:28:52  1    ultimately responsible for controlling the shrink in my

16:28:56  2    store.

16:28:56  3        Q.   When you're not in the store, does your assistant

16:28:59  4    manager perform the same functions that you would

16:29:03  5    perform if you weren't there?

16:29:06  6        A.   When I'm not in the store?  Yes.  But, again,

16:29:10  7    selected not hire and fire.

16:29:11  8           The only problem I was not in the store as a

16:29:15  9    store manager, I have trained my managers to keep me in

16:29:18  10   the loop so I could make the decisions, but the

16:29:21  11   day-to-day functions, I would look for them to do them.

16:29:23  12       Q.   And you have been trained as a store manager to

16:29:27  13   keep your district manager in the loop of what's going

16:29:29  14   on in your stores?

16:29:30  15       A.   No.  But as a courtesy, I have been and I will do

16:29:34  16   it as a courtesy, because I don't want it to fall on me

16:29:38  17   if I made a decision that was not good judgment.  I made

16:29:44  18   good to them for to make sure that I'm on the right

16:29:48  19   page.  But never had I had them tell me that I had to,

16:29:51  20   no.

16:29:53  21              MR. CALAMUSA:  Thank you, Ms. Brisco.

16:29:55  22              THE WITNESS:  Thank you.

16:29:56  23              THE COURT:  Redirect?

16:29:57  24                     **REDIRECT EXAMINATION**

16:29:57  25   **BY MR. UMBACH:**

16:29:59  1   Q.   Just a few questions, Ms. Brisco.

16:30:02  2   A.   Sure.

16:30:03  3   Q.   All these tasks that Mr. Calamusa asked you about

16:30:08  4   that assistant managers do, who assigns those tasks to

16:30:11  5   them?

16:30:12  6   A.   I did, the store manager.

16:30:13  7   Q.   And who did the assistant managers report to?

16:30:15  8   A.   Me.

16:30:16  9   Q.   And who's responsible for training them?

16:30:19  10  A.   I am.

16:30:20  11  Q.   Could you discipline your assistants?

16:30:22  12  A.   Yes, sir.

16:30:23  13  Q.   Could they discipline you?

16:30:24  14  A.   No, sir.

16:30:25  15  Q.   The mobile stocking team that Mr. Calamusa asked

16:30:29  16  you about, who supervised them?

16:30:32  17  A.   I did.

16:30:33  18  Q.   And whose authority did they come under?

16:30:35  19  A.   Mine.

16:30:55  20  Q.   Are you able to see that, Ms. Brisco?

16:30:57  21  A.   Yes, sir.

16:30:57  22  Q.   Can you read the last paragraph, please?

16:31:00  23  A.   First sentence.  At the bottom?

16:31:04  24  Q.   Yes.

16:31:05  25  A.   "Associates who are involved in the actual

16:31:07   1    merchandise ordering process are very important."

16:31:11   2        Q.  And then what does it say after that?

16:31:13   3        A.  "If incorrect data is entered into the system or

16:31:16   4    on-hand quantities are not available, the wrong

16:31:20   5    merchandise will be ordered for the store."

16:31:21   6        Q.  Ms. Brisco, what would happen if you or someone

16:31:29   7    else in the store doing your ordering -- if you or

16:31:33   8    whoever was doing the ordering just relied on the

16:31:36   9    computer to do it?

16:31:38  10        A.  We would be out of stock on a lot of items.

16:31:41  11             THE COURT:  Will you keep your voice up?

16:31:43  12             THE WITNESS:  I'm sorry.  We would be out of

16:31:45  13    stock on a lot of items, and the sales would reflect

16:31:48  14    that.

16:31:49  15        Q.  You were asked about unloading trucks?

16:31:55  16        A.  Yes, sir.

16:31:55  17        Q.  Is there a right way and a wrong way to pick up a

16:31:58  18    box --

16:31:59  19             THE COURT:  Your objection to leading is

16:32:02  20    sustained.

16:32:04  21        Q.  Are you responsible for safety --

16:32:06  22        A.  Yes, sir, I am.

16:32:07  23        Q.  -- Ms. Brisco?

16:32:08  24        A.  Yes, I am.

16:32:09  25        Q.  Do you train employees on how to handle boxes?

16:32:12  1      A.  Yes.  I train them on lifting, stooping, bending,
16:32:15  2   the proper way to pack a box.  Yes, we do.
16:32:18  3      Q.  Ms. Brisco, did you come here today to testify so
16:32:30  4   that you could become a district manager?
16:32:32  5                 THE COURT:  The objection to leading is
16:32:34  6   sustained.
16:32:35  7                 THE WITNESS:  No.
16:32:35  8                 THE COURT:  The jury will disregard the last
16:32:39  9   question asked.
16:32:40 10                 MR. UMBACH:  Thank you, Ms. Brisco.
16:32:42 11                 THE COURT:  Thank you, ma'am.
16:32:42 12                 THE WITNESS:  Thank you, Your Honor.
16:32:43 13                 THE COURT:  Defendant will call its next
16:32:45 14   witness.
16:32:46 15                 MR. MAY:  Defendant calls John Clifford.
16:32:50 16       **JOHN CLIFFORD, DEFENDANT'S WITNESS, SWORN**
16:33:38 17                 THE CLERK:  State your name for the record,
16:33:40 18   please.
16:33:42 19                 THE WITNESS:  John Clifford.
16:33:44 20                 THE CLERK:  Spell your last name for the
16:33:46 21   record, please.
16:33:46 22                 THE WITNESS:  C-L-I-F-F-O-R-D.
16:33:55 23                 THE COURT:  On the issue of agency
16:33:59 24   interpretations, I have looked at some authority; and
16:34:04 25   before getting into that issue, we need to have a

16:34:08   1    conference outside the presence of the jury.

16:34:11   2              MR. MAY:  Well --

16:34:13   3              MR. R. WIGGINS:  Based on the documents we

16:34:16   4    have just received, we would request that right now.

16:34:18   5              THE COURT:  Are these the agency

16:34:20   6    interpretations?

16:34:21   7              MR. MAY:  I think we ought to do it --

16:34:24   8              THE COURT:  Ladies and gentlemen, if you

16:34:26   9    would retire to the jury room.

16:34:27   10                    (Jury out at 4:25 p.m.)

16:34:52   11             (In open court, jury not present.)

16:34:52   12             THE COURT:  Now, as I understand it, on the

16:34:56   13   willfulness issue, the plaintiff has the burden of proof

16:35:03   14   that the defendant knew or showed reckless disregard for

16:35:13   15   the matter of whether it was covered by the Act.

16:35:19   16             Is that the --

16:35:22   17             MR. JOHNSON:  Well, the standard for

16:35:24   18   willfulness, as we know it, Your Honor, is that --

16:35:26   19             MR. MILLER:  You correctly stated it.

16:35:28   20             THE COURT:  Pardon?

16:35:30   21             MR. MILLER:  You correctly stated it, Your

16:35:32   22   Honor.

16:35:32   23             THE COURT:  All right.  Now, there is, in

16:35:36   24   effect, an affirmative defense of good-faith defense.

16:35:42   25   Even though a jury may find willfulness, a defendant

16:35:55   1   nonetheless may prove to the Court that it in good

16:36:03   2   faith -- in good faith relied on agency interpretation.

16:36:08   3            MR. MAY:  Yes, sir, Judge.  There's actually

16:36:11   4   two good-faith defenses.

16:36:13   5            THE COURT:  What's the other good faith?

16:36:17   6            MR. MAY:  I will let my colleague,

16:36:19   7   partner --

16:36:19   8            MR. MILLER:  Your Honor, two good-faith

16:36:21   9   defenses, both is whether -- the first is a complete

16:36:25  10   defense to liability, which we believe to be an issue

16:36:29  11   for the jury.  It's whether Family Dollar in good faith

16:36:33  12   relied upon interpretations, rulings or opinions from

16:36:37  13   the Department of Labor.

16:36:37  14            THE COURT:  All right.  And what's the

16:36:38  15   second one?

16:36:39  16            MR. MILLER:  The second one is whether or

16:36:41  17   not Family Dollar acted in good faith -- is more of a

16:36:46  18   general good faith -- acted in good faith.

16:36:49  19            THE COURT:  But both of those defenses are

16:36:50  20   tried to the Court, aren't they?

16:36:52  21            MR. MILLER:  Sir, I believe that the first

16:36:54  22   would be tried to the jury.

16:36:55  23            MR. MAY:  Yes, sir.  I believe the first one

16:36:56  24   is to the jury, because I believe it bars liability.

16:36:59  25            MR. MILLER:  That's correct.

16:37:00  1          THE COURT:  I don't think so.  I'm looking

16:37:04  2   at a book by Kerns, the treatise, Fair Labor Standards

16:37:13  3   Act.

16:37:13  4          MR. MILLER:  Yes, sir.  And there is a

16:37:15  5   section in the back on willfulness, and it breaks it

16:37:18  6   down into two different sections.

16:37:20  7          THE COURT:  All right.  I'm looking at in

16:37:23  8   the bound volume at page 1224, which says that the

16:37:48  9   good-faith defense is tried to the Court.  I'll just

16:38:20  10  read it.

16:38:22  11         "To prove a defense to liability under

16:38:24  12  Section 10, an employer must establish that his

16:38:27  13  conformance with the administrative ruling on

16:38:30  14  interpretation was in good faith.  The statute does not

16:38:32  15  require -- does not define the meaning of good faith",

16:38:41  16  et cetera, et cetera.

16:39:16  17         I've lost my place, but let me back up.

16:39:41  18         MR. MILLER:  Your Honor, are you looking at

16:39:43  19  the section that breaks it down into two parts?

16:39:46  20         THE COURT:  I'm looking at Section --

16:39:48  21         MR. MILLER:  I don't have my book with me.

16:39:49  22         THE COURT:  -- 18.VI.D.1.a, Section 10 at

16:39:57  23  page 224, "actions taken in good faith, in conformity

16:40:02  24  with, and in reliance on written rulings or enforcement

16:40:05  25  policies of the administrator" --

| 16:40:06 | 1 |
|---|---|

                    MR. MILLER:  Right.  That's the defense as

to liability.  Correct.

                    THE COURT:  All right.  "If the employer" --

I am now at page 1228, "if an employer successfully

pleads and proves such a good-faith defense under

Section 10 of the Portal-To-Portal Act, a Court is,

without discretion to assess any liability or punishment

'on account of the failure of the employer to pay

minimum wages or overtime compensation'."

                    Well, it's getting late, but I have -- I

have seen that citation in this book, this treatise this

afternoon, and --

                    MR. MAY:  Mr. Johnson has volunteered to

stay up and brief it.

                    THE COURT:  No.  We're going to settle it

before we leave here today.  I'm going to let the jury

go home.

                    (Jury in at 4:37 p.m.)

                    THE COURT:  Ladies and gentlemen, leave.

                    We're going to let you go home today.  Be

back tomorrow morning at 9:00 o'clock.  Please do not

discuss the case among yourself.  Don't allow the case

to be discussed in your presence and keep an open mind.

                    (Jury out at 4:38 p.m.)

                    (In open court, jury not present.)

16:47:46  1          THE COURT:  As I understand it, Family

16:48:04  2  Dollar takes or has asserted the defense that its action

16:48:11  3  was taken in good faith and with reasonable grounds for

16:48:15  4  believing that they were not in violation of the Act.

16:48:17  5          MR. MILLER:  We asserted both.

16:48:18  6          MR. MAY:  We asserted both that and the lack

16:48:21  7  of willfulness, which I assume plaintiffs --

16:48:22  8          THE COURT:  All right.  Hang on just a

16:48:24  9  minute.

16:48:25 10          MR. MAY:  -- takes the position --

16:48:26 11          THE COURT:  Just a minute.  Under Section

16:48:29 12  11, under Section 11, the defendant bears the plain and

16:48:40 13  substantial burden of proving to the Court that it acted

16:48:44 14  reasonably and in good faith, in order to obtain a

16:48:48 15  reduction or elimination of liquidated damages --

16:48:52 16          MR. MILLER:  Your Honor, we have no --

16:48:53 17          THE COURT:  -- under the Act.

16:48:54 18          MR. MILLER:  We have no dispute that the

16:48:57 19  good faith, as to the liquidated damages portion, goes

16:49:00 20  to the Court.

16:49:01 21          MR. MAY:  We have no dispute with that.

16:49:03 22          THE COURT:  All right.  The question is

16:49:04 23  whether the defense under good faith, the Section 10,

16:49:10 24  was a question --

16:49:11 25          MR. MILLER:  And as to liability.

| 16:49:13 | 1 | THE COURT:  Pardon me? |

16:49:13    1              THE COURT:  Pardon me?

16:49:14    2              MR. MAY:  The defense is as to liability.

16:49:17    3    And the defense you just read was liquidated damages.

16:49:19    4    We have no dispute that that was for the Court.  But

16:49:22    5    there is another defense as to liability.

16:49:24    6              THE COURT:  Yeah.  That's a Section 10

16:49:26    7    defense.

16:49:27    8              MR. MAY:  Is good faith.

16:49:29    9              THE COURT:  Yes.

16:49:40   10              MR. MAY:  And, of course --

16:49:41   11              THE COURT:  Just a moment.

16:50:39   12              All right.  Under Section 10, "Departmental

16:50:50   13    regulations may serve as a basis of good faith.  A

16:51:23   14    particularized showing of conformity with an

16:51:26   15    interpretation that specifically addresses the

16:51:29   16    employer's situation is required."  Says, "this

16:51:37   17    treatise, citing a Ninth Circuit case."

16:51:56   18              All right, what I've got to decide -- and it

16:52:00   19    may take 10 or 15 minutes for me to look up a few cases

16:52:06   20    on WESTLAW -- is whether the Section 10 good-faith

16:52:11   21    defense is triable to the Court or to the jury.  So we

16:52:15   22    will be in recess until 5:00 o'clock.

16:52:19   23              MR. MAY:  Have you ruled on willfulness?

16:52:23   24              THE COURT:  Pardon me?

16:52:25   25              MR. MAY:  Are we leaving out willfulness?

| | | |
|---|---|---|
| 16:52:28 | 1 | THE COURT:  No.  Willfulness goes to the |
| 16:52:30 | 2 | jury. |
| 16:52:31 | 3 | MR. MAY:  Right. |
| 16:52:31 | 4 | THE COURT:  Yeah. |
| 16:52:34 | 5 | MR. MAY:  Well, Mr. Clifford is being |
| 16:52:36 | 6 | offered for that, too, you know. |
| 16:52:39 | 7 | THE COURT:  Well, I'm asking about the |
| 16:52:41 | 8 | agency regulations -- |
| 16:52:45 | 9 | MR. MAY:  Yes, sir. |
| 16:52:45 | 10 | THE COURT:  -- that you seek to offer into |
| 16:52:47 | 11 | evidence.  If the agency -- if good faith -- if Section |
| 16:52:53 | 12 | 10, good faith, is triable only to the Court, then the |
| 16:52:57 | 13 | regulations don't go to the jury. |
| 16:52:59 | 14 | MR. MAY:  I see. |
| 16:53:01 | 15 | THE COURT:  They come to the Court, but they |
| 16:53:03 | 16 | don't go to the jury. |
| 16:53:04 | 17 | MR. MAY:  We're just fighting about the |
| 16:53:06 | 18 | documents then? |
| 16:53:07 | 19 | THE COURT:  Yes. |
| 16:53:08 | 20 | MR. MAY:  Okay.  I misunderstood what the |
| 16:53:09 | 21 | Court was saying. |
| 16:53:10 | 22 | THE COURT:  Yes.  All right.  Thank you. |
| 16:53:12 | 23 | See you in 15 minutes. |
| 16:53:14 | 24 | MR. MAY:  We're also, you know, asserting |
| 16:53:18 | 25 | prior findings by the Department of Labor. |

| | | |
|---|---|---|
| 16:53:22 | 1 | MR. MILLER:  Which go to willfulness. |
| 16:53:24 | 2 | MR. MAY:  Which goes to willfulness as well. |
| 16:53:27 | 3 | So, I mean, we think those issues are not that, and |
| 16:53:31 | 4 | obviously they are legally -- |
| 16:53:33 | 5 | THE COURT:  All right.  Get -- well, over |
| 16:53:36 | 6 | this recess, will somebody, for my ready reference, just |
| 16:53:42 | 7 | give me the regulation you're relying on?  I've got them |
| 16:53:45 | 8 | somewhere, but I have to go through a whole lot of |
| 16:53:48 | 9 | papers to come up with them. |
| 16:53:51 | 10 | MR. JOHNSON:  If I may, Your Honor? |
| 16:53:53 | 11 | MR. MAY:  It's broader than regulations, |
| 16:53:56 | 12 | Your Honor.  We would like to see what you're doing. |
| 16:54:20 | 13 | THE COURT:  Well, if I can't get you to give |
| 16:54:23 | 14 | me the regulations -- if I can't -- I will just have to |
| 16:54:29 | 15 | have you come back here at 6:00 o'clock, and I will go |
| 16:54:32 | 16 | through the papers and find it. |
| 16:54:34 | 17 | MR. JOHNSON:  It's circled on there, Your |
| 16:54:38 | 18 | Honor. |
| 16:54:38 | 19 | MR. MAY:  That's a page out of the treatise. |
| 16:54:42 | 20 | THE COURT:  No.  I'm asking for the |
| 16:54:44 | 21 | regulations that you are objecting to. |
| 16:54:46 | 22 | MR. JOHNSON:  To Section 10?  It's -- |
| 16:54:50 | 23 | THE COURT:  No. |
| 16:54:52 | 24 | MR. JOHNSON:  The actual DOL. |
| 16:54:53 | 25 | MR. MILLER:  The regulations that we're |

16:54:55  1   relying on and interpretations are set out 29 CFR,

16:54:59  2   Section 521 and the interpretations.

16:55:02  3           We're also relying on the good-faith

16:55:06  4   decisions, findings by the United States Department of

16:55:08  5   Labor and federal courts, which would go both to

16:55:12  6   willfulness and good faith.

16:55:13  7           THE COURT:  All right.  All right.  Thank

16:55:14  8   you.

16:55:14  9           MR. MILLER:  Thank you.

16:55:19  10          THE COURT:  See you in 15 minutes.

16:55:21  11          MR. MAY:  We're in recess?

16:55:23  12          THE COURT:  Yes.

17:17:27  13          (Recess at 4:47 p.m. until 6:00 p.m.)

18:04:33  14          THE COURT:  We're now back on the record.

18:04:40  15          The Court has considered the plaintiffs'

18:04:43  16  objection to Defendant's Exhibit 1952.

18:04:54  17          It finds that in the multi-page exhibit

18:05:02  18  there are two documents which may be arguably relevant

18:05:10  19  to the defense set forth set in 29 U.S.C. Section 259.

18:05:24  20          They are, number one, a preliminary wage

18:05:29  21  determination order of the Texas Work Force Commission,

18:05:32  22  dated July 19th, 2001, involving a claim of Gary N. Bean

18:05:41  23  against Family Dollar Store.  And in that preliminary

18:05:50  24  wage determination order, the Texas Work Force

18:05:54  25  Commission finds that Mr. Bean, a Family Dollar Store

manager, was not entitled to overtime pay because he,

quote, "holds the position or works in an industry that

is exempt from the overtime provisions of the Fair Labor

Standards Act", end quote.

          The other document that may arguably be

relevant to Section 259 of Title 29 is an email from Van

Mills to Monte Polly, dated October 22nd, 2003, in which

it is disclosed that in 4 of 33 weeks, a Ms. Victoria

Zanders, presumably a store manager of Family Dollar,

supervised employees that worked a combined total of

less than 80 hours.  And that notwithstanding that

factual finding, the Department of Labor did not intend

to conduct an investigation of Family Dollar's pay

practices.

          With respect to the first document, the

Court concludes that it does not qualify under Title 29,

Section 259, that is Section 10, because the preliminary

wage determination was not made by an agency of the

United States.

          With respect to the second document, the

Court finds that if there was a violation of the

overtime provisions of the Fair Labor Standards Act,

this defendant did not rely on the 2003 decision of the

Department of Labor, that it was not going to file a

lawsuit against Family Dollar, notwithstanding the fact

18:09:38  1    that Family Dollar -- that for some period of time, the

18:09:46  2    complainant apparently did not supervise two full-time

18:09:55  3    employees, or the equivalent.

18:10:01  4              And for those reasons, the Court concludes

18:10:05  5    that the documents are inadmissable, generally;

18:10:25  6    specifically, the Court finds that even if there is some

18:10:33  7    probative value in them, and there isn't, but even if

18:10:38  8    there were some probative value, it's substantially

18:10:42  9    outweighed by the other considerations specifically set

18:10:45  10   forth in Rule 403.

18:10:50  11             The Court further finds that the defense --

18:10:58  12   let me rephrase that.  The Court concludes that the

18:11:09  13   defense, allowed by Title 29, Section 259, is one to be

18:11:19  14   determined by a court rather than a jury.

18:11:28  15             And that is the ruling of the Court.

18:11:32  16             Of course, the defendant --

18:11:34  17             MR. MAY:  Your Honor, just because -- just

18:11:39  18   because the court reporters were -- I'm sure we were on

18:11:42  19   the record, I want to make sure -- to make one sentence

18:11:46  20   the record reflects that we had offered them for

18:11:48  21   willfulness as well, not just good faith.

18:11:50  22             THE COURT:  All right.

18:11:52  23             MR. MAY:  Those, coupled with Mr. Clifford's

18:11:55  24   testimony, we believe would satisfy that.

18:11:57  25             THE COURT:  All right.  Thank you all.

18:12:01    1            MR. WHITE:  Judge, could we take up a quick

18:12:04    2    logistical issue, too?

18:12:06    3            THE COURT:  Yes.

18:12:07    4            MR. WHITE:  We are trying to get our list of

18:12:09    5    witnesses ready for tomorrow.  And you have reduced our

18:12:12    6    list of witnesses, with the ruling today, on the store

18:12:16    7    managers, and those things.

18:12:18    8            We were going to include on that list, or

18:12:21    9    intended to include on that list, the four named

18:12:24   10    plaintiffs.  I have not seen them today and I wanted to

18:12:26   11    make sure that they were available tomorrow, that they

18:12:33   12    will be on the list.  We will try to keep advised, but I

18:12:38   13    didn't know -- I wanted plenty of notice for them to be

18:12:41   14    here.  I didn't see them.

18:12:42   15            I don't know -- one of two of them may have

18:12:44   16    been here today, but I didn't see them.  But I assume we

18:12:48   17    will be in a position with the Court to call named

18:12:51   18    plaintiffs.

18:13:05   19            MR. CALAMUSA:  One's in New York, will be

18:13:07   20    back Tuesday per the Court's order.  Two can be

18:13:11   21    available, the two that are here, the local ones, Janice

18:13:14   22    and Barbara.

18:13:17   23            MR. WHITE:  Barbara Richardson and Janice

18:13:20   24    Morgan can be here tomorrow; correct?  Judge?

18:13:25   25            THE COURT:  Yes.

18:13:26  1          MR. WHITE:  Let me make a suggestion.  We

18:13:28  2  are approaching the end of our case, which I know

18:13:32  3  disturbs the Court greatly, but its excitement may soon

18:13:37  4  come to an end.

18:13:38  5          One thing we can do and like to do and like

18:13:41  6  to argue.  Mr. Alexander, as I advised the Court

18:13:47  7  earlier, Tuesday is the day that he has to participate

18:13:49  8  in the investiture conference call.

18:13:52  9          I would like Joe to speak to the prospect of

18:13:55  10  putting David on tomorrow.

18:13:58  11          MR. MAYS:  Your Honor has already ruled

18:14:00  12  Mr. Alexander cannot testify, when I said I wanted to

18:14:03  13  put him on as a rebuttal witness.  And I certainly

18:14:06  14  respect that.

18:14:06  15          But I would ask the Court to reconsider,

18:14:09  16  based on two or three things:  Number one, Mr. Alexander

18:14:16  17  cannot be here on Tuesday, and we need to --

18:14:18  18          MR. WHITE:  Excuse me.  I misstated.  Joe

18:14:21  19  and I thought it was Thursday.  Half a day Wednesday and

18:14:25  20  Thursday.  I'm sorry, Your Honor.

18:14:29  21          MR. MAYS:  Shall I just wait then to see

18:14:31  22  what's --

18:14:32  23          MR. WHITE:  No.  We still, in order to fill

18:14:34  24  up tomorrow -- and because of the Wednesday, Thursday

18:14:38  25  thing -- and the other point Joe raises, I would still

| | | |
|---|---|---|
| 18:14:42 | 1 | like to put him on tomorrow. |
| 18:14:44 | 2 | MR. QUINN:  I thought the Court has already |
| 18:14:46 | 3 | ruled that he couldn't testify. |
| 18:14:48 | 4 | MR. MAYS:  The Court has decided that. |
| 18:14:52 | 5 | I am asking the Court to reconsider that on |
| 18:14:54 | 6 | two grounds:  One is that there have been several points |
| 18:14:57 | 7 | raised by cross-examination -- by lawyers on |
| 18:14:59 | 8 | cross-examination of witnesses in the last day or two, |
| 18:15:02 | 9 | that Mr. Alexander can provide rebuttal testimony with |
| 18:15:05 | 10 | respect to -- and he's here and prepared to do that, |
| 18:15:10 | 11 | particularly, Your Honor -- |
| 18:15:11 | 12 | THE COURT:  Wait.  Now, are these issues |
| 18:15:17 | 13 | that have been raised during the defendant's case? |
| 18:15:27 | 14 | MR. MAYS:  They're questions that have been |
| 18:15:29 | 15 | raised by questions from the plaintiffs, Your Honor, |
| 18:15:32 | 16 | particularly with respect to the policy manuals and |
| 18:15:35 | 17 | different pages from different policy manuals, and |
| 18:15:38 | 18 | policy manuals that have been revised that Mr. Alexander |
| 18:15:41 | 19 | can speak to. |
| 18:15:42 | 20 | THE COURT:  Well, didn't you designate a |
| 18:15:45 | 21 | 30(b)(6) witness for all of those kinds of questions? |
| 18:15:50 | 22 | MR. MAYS:  The 30(b)(6) witness, Your Honor, |
| 18:15:52 | 23 | was designated for purposes of deposition. |
| 18:16:02 | 24 | THE COURT:  All right. |
| 18:16:04 | 25 | MR. MAYS:  Your Honor, the other ground is |

18:16:06   1    this:  The Court will recall that when the case began,

18:16:12   2    the Court asked counsel for plaintiffs this:  "What I am

18:16:16   3    really asking is this:  Are you in your case in chief up

18:16:20   4    front going to, in effect, undertake to rebut the

18:16:23   5    defendant's evidence about primary duty?"  And Mr. Greg

18:16:27   6    Wiggins said:  "Yes, sir, I believe we would."

18:16:30   7         And, in fact, we started that way, with two

18:16:33   8    witnesses:  Mr. Reevers and Mr. Detter, who testified at

18:16:38   9    some length about those matters.  Then as the Court's

18:16:41  10    aware, we changed the direction of the trial.

18:16:44  11         Mr. Alexander has rebuttal testimony -- and

18:16:49  12    it's rebuttal testimony -- to the testimony that

18:16:51  13    Mr. Reevers and Mr. Detter offered.

18:16:54  14         THE COURT:  What is he going to rebutt?

18:16:58  15         MR. MAYS:  One of the things he's going to

18:16:59  16    rebutt, Your Honor, is the suggestion that these

18:17:02  17    plaintiffs, or any people in the Family Dollar system,

18:17:05  18    are required to work 80 hours or long hours.  That

18:17:13  19    that's a matter of Family Dollar policy and Family

18:17:16  20    Dollar practice, that they're somehow required to do

18:17:19  21    this by Family Dollar.  And he is prepared to rebutt

18:17:22  22    that, Your Honor.

18:17:23  23         And, Your Honor, as I understand the Court's

18:17:26  24    plan for the remainder of the trial, the Court does not

18:17:30  25    intend to give the defendants an opportunity to present

18:17:35   1   rebuttal evidence after the plaintiffs have put on their

18:17:40   2   evidence again.  And, if I'm mistaken about that, I

18:17:43   3   would be willing to stand corrected, of course.

18:17:46   4          Of course, the defendants have the burden of

18:17:49   5   proof, as the Court has acknowledged, with respect to

18:17:52   6   the issue of exemption.  And we would suggest that the

18:17:57   7   defendants be allowed to present a rebuttal case on the

18:18:01   8   exemption issue only, after the plaintiffs have

18:18:05   9   presented their rebuttal evidence on that.

18:18:08   10         But if the Court chooses not to do that, we

18:18:11   11   would like to present Mr. Alexander as a rebuttal

18:18:14   12   witness tomorrow.

18:18:14   13         THE COURT:  Do you have any authority for

18:18:18   14   that proposition?

18:18:20   15         MR. MAYS:  If you mean --

18:18:21   16         THE COURT:  That you're entitled, in a Fair

18:18:29   17   Labor Standards Act case, that you are entitled after

18:18:31   18   you put on evidence of your affirmative defense to

18:18:37   19   rebut the plaintiffs' response?

18:18:43   20         MR. MAYS:  Your Honor, I don't at the

18:18:45   21   moment; and I honestly think that's in the discretion of

18:18:48   22   the Court.

18:18:48   23         It does, however, I would say, make sense.

18:18:51   24   Because it is our burden, which would suggest that after

18:18:55   25   we put on the evidence -- which is our burden -- the

18:18:58  1    defendants then put on their evidence and we have the

18:19:00  2    opportunity to rebutt.

18:19:01  3            THE COURT:  Well, Mr. Mays, if this were

18:19:05  4    evidence by Mr. Alexander that no other person who was

18:19:17  5    listed as a -- who was disclosed initially as one having

18:19:26  6    knowledge of the factual disputes in the case could

18:19:32  7    provide, that would put the exemption in a completely

18:19:41  8    different posture.

18:19:42  9            But I rather suspect that all Mr. Alexander

18:19:47  10   is going to say is what most of the other defendant

18:19:52  11   witnesses have said.  Put another way, in any event, it

18:19:59  12   would probably be cumulative.

18:20:05  13           Mr. Wiggins?

18:20:06  14           MR. R. WIGGINS:  Your Honor, if he's the

18:20:08  15   only witness that could address these matters, and these

18:20:11  16   are matters that go to their case in chief, and they go

18:20:14  17   to the 30(b)(6) documents; and if he is the only person,

18:20:17  18   he should have been produced under 30(b)(6).

18:20:22  19           They shouldn't have given us someone that

18:20:24  20   doesn't address a matter that we asked for.  And the

18:20:27  21   purpose -- I disagree with Joe about it's just 30(b)(6)

18:20:31  22   just for depositions.  30(b)(6) is so you can't switch

18:20:35  23   from a united position to your trial witness; is to

18:20:38  24   flush out who's got to knowledge.  And by their own

18:20:42  25   statement, this man -- I'm sorry, not his statement, the

18:20:46  1   Court's hypothetical -- if this were the only man that
18:20:50  2   could address these matters, he certainly should have
18:20:53  3   been produced under the 30(b)(6).  He certainly should
18:20:56  4   have been under the pretrial discloses and supplemental
18:21:00  5   disclosures.
18:21:01  6         Now, the matters that we described when they
18:21:04  7   proffered him, Joe calls rebuttal, but they are in their
18:21:08  8   case in chief.  Pure and simple their case in chief.
18:21:11  9         Rebuttal goes to matters that aren't a part
18:21:14  10  of your burden and a part of your case in chief.  And I
18:21:18  11  don't -- I did not hear any proffer the other day, and
18:21:21  12  haven't heard one today, that is a true rebuttal.
18:21:25  13        THE COURT:  Does Mr. Alexander have some
18:21:31  14  personal knowledge as to any of the matters testified to
18:21:33  15  by these two witnesses here --
18:21:36  16        MR. R. WIGGINS:  No, sir.
18:21:38  17        THE COURT:  -- plaintiffs' witnesses?
18:21:40  18        MR. MAYS:  He has -- let me respond to two
18:21:42  19  things, Your Honor, if I might.
18:21:43  20        THE COURT:  All right.
18:21:44  21        MR. MAYS:  With respect to the policy
18:21:46  22  manuals and the change from the '97 to the 2002 policy
18:21:52  23  manual, Mr. Alexander was the instrument of that change;
18:21:55  24  and he can testify about why he instituted that change
18:21:59  25  and what that change involved.

18:22:01  1          With respect to the testimony given by

18:22:03  2   Mr. Reevers and Mr. Detter, he can testify about the

18:22:09  3   policy of Family Dollar, with respect to the -- whether

18:22:14  4   they were, in fact, as they use the words, "required to

18:22:17  5   work those hours".

18:22:20  6          MR. R. WIGGINS:  Mr. Barkus this morning

18:22:22  7   testified to why those changes were made in 2002.

18:22:26  8          That policy manual is the manual of the

18:22:29  9   Store Operations Department.  Mr. Barkus is the head of

18:22:33  10  that department.

18:22:34  11         Mr. Alexander comes from the distribution

18:22:37  12  center -- the warehouse.  He never worked in the store

18:22:38  13  operations department.  He came up a different route in

18:22:40  14  this company.  And he's, at some point in time recently,

18:22:46  15  became president.  But he was never in the store

18:22:48  16  operations department, to my knowledge.  And that's why,

18:22:52  17  more than likely, he was never listed as a witness and

18:22:55  18  he was never disclosed under 30(b)(6).

18:22:57  19         MR. MAYS:  Your Honor, Mr. Barkus reported

18:22:59  20  to Mr. Alexander.  And Mr. Alexander was the person who

18:23:04  21  initiated the change and requested the change in the

18:23:06  22  operating manuals, and was involved in the changes.  And

18:23:09  23  he was head of all store operations.

18:23:12  24         THE COURT:  And then this was -- was he in

18:23:14  25  that position at the time when you should have made the

18:23:17  1    initial disclosure?

18:23:19  2              MR. MAYS:  I'm not certain of that, Your

18:23:21  3    Honor.

18:23:21  4              THE COURT:  Well, he was certainly in that

18:23:23  5    position prior to the time that the discovery ended,

18:23:28  6    wasn't he?

18:23:28  7              MR. MAYS:  He was, Your Honor.

18:23:30  8              THE COURT:  I overrule the motion for

18:23:33  9    reconsideration.

18:23:35  10             MR. MAYS:  Thank you, Your Honor.

18:23:37  11             THE COURT:  9:00 o'clock.

18:23:39  12

18:23:41  13             (Court adjourned at 6:14 p.m.)

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

CERTIFICATE

1

2

3

4      I certify that the foregoing is a correct

5   transcript from the record of proceedings in the

6   above-entitled matter.

7

8

9

10

11                                              07-31-05

12   Christina K. Decker, RPR, CRR                Date

13   Federal Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25