FILED

2007 May-21 PM 12:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

1        IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF ALABAMA

2              WESTERN DIVISION

3

4  JANICE MORGAN, et al.,     *
       Plaintiffs,     *   CV-01-C-0303-W

5                    *   June 15, 2005
  vs.                *   Tuscaloosa, Alabama

6                    *   9:00 A.M.
  FAMILY DOLLAR STORES, INC.,  *

7       Defendants.     *
  * * * * * * * * * * * * * * * * * * * * * * * * * *

8

9                  VOLUME 3
           TRANSCRIPT OF JURY TRIAL

          BEFORE THE HON. U.W. CLEMON

10      CHIEF UNITED STATES DISTRICT JUDGE

11

FOR THE PLAINTIFFS:

12

HON. ROBERT L. WIGGINS, JR., Esq.

13  HON. C. MICHAEL QUINN, ESQ.
  HON. DENNIS G. PANTAZIS, ESQ.

14  HON. GREGORY O. WIGGINS, ESQ.
  HON. HERMAN N. JOHNSON, JR.,ESQ.

15  HON. KEVIN W. JENT, ESQ.
  HON. ROBERT F. CHILDS, JR., ESQ.

16  HON. ROCCO CALAMUSA, ESQ.
  WIGGINS, CHILDS, QUINN & PANTAZIS

17  301 19th Street, North
  Birmingham, AL 35203-3204

18

19  HON. J. ALLEN SCHREIBER, ESQ.
  HON. P. MARK PETRO, ESQ.

20  SCHREIBER & PETRO
  Two Metroplex Drive, Suite 250

21  Birmingham, AL  35209

22

23  FOR THE DEFENDANTS:

24  J. MARK WHITE, ESQ.
  WHITE, ARNOLD ANDREWS & WHITE

25  2025 3rd Avenue North, Ste. 600
  Birmingham, AL 35203

```
 1              (Continued Appearances)

 2    HON. JOSEPH B. MAYS, JR., ESQ.
      HON. ABDUL K. KALLON, ESQ.
 3    HON. ARNOLD W. UMBACH, III, ESQ.
      HON. JAMES WALKER MAY, ESQ.
 4    HON. RONALD H. KENT, JR., ESQ.
      HON. T. MATTHEW MILLER, ESQ.
 5    BRADLEY, ARANT, ROSE & WHITE
      P. O. Box 830709
 6    Birmingham, AL  35203

 7

 8

 9

10    Christina K. Decker, RPR, CRR
      Federal Official Court Reporter
11    101 Holmes Avenue, NE, Suite 305
      Huntsville, AL 35801
12

13    Penny L. Enoch, RPR
      Federal Official Court Reporter
14    1729 5th Avenue North, Room 325
      Birmingham, AL  35203
15

16

17

18

19

20

21

22

23

24

25
```

```
1                           I N D E X

2    Witnesses:              Direct   Cross   Redirect   Recross

3    LAURIE WILSON              9       11

4    EDWIN BRADLEY             13       38        60

5    Motions(proffer)         63

6    Plaintiffs rest          68

7    Motions                  68

8    MALCOLM RAOUL CANNON      82      109       140

9    WILLIAM BROOME          142      167       194

10   GREG HANEY              201      221       246

11   FELICIA COLEMAN         247      266       285

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    June 15, 2005                                    9:00 a.m.

2                          PROCEEDINGS:

3                (In open court, jury not present.)

09:10:49   4          THE COURT:  Good morning, ladies and

09:10:50   5    gentlemen.  It's my understanding that the plaintiffs

09:10:57   6    wanted to raise an issue?

09:10:59   7          MR. CHILDS:  Yes, Your Honor.  We had one

09:11:02   8    issue with regard to an exhibit that's going to be

09:11:05   9    forthcoming for Dr. Bradley.  It's Exhibit 46A, Your

09:11:12  10    Honor.

09:11:12  11          THE COURT:  Yes.

09:11:13  12          MR. CHILDS:  Says Supplemental Expert

09:11:15  13    Report.  Part of the calculations that are attached to

09:11:18  14    that include the back page calculations for the class,

09:11:24  15    but it also breaks it out on the two full-time employee

09:11:27  16    tests to show which group of these plaintiffs do not

09:11:30  17    meet that two full-time employee test.  And the

09:11:33  18    defendant takes a position that that's not part of what

09:11:37  19    Dr. Bradley should be testifying to this morning.  We

09:11:40  20    were going to ask the Court for clarification.

09:11:43  21          MR. KENT:  Your Honor, I believe we talked

09:11:44  22    to you yesterday, you explained that it is our burden to

09:11:47  23    establish the two employee part of the test; and,

09:11:51  24    therefore, the plaintiff would not be presenting

09:11:54  25    evidence on that issue since it's part of our burden,

| | | |
|---|---|---|
| 09:11:57 | 1 | but that the plaintiff was allowed to present evidence |
| 09:12:00 | 2 | on damages. |
| 09:12:03 | 3 | MR. CHILDS:  Our position would be that's |
| 09:12:04 | 4 | part of damages, Your Honor.  It just breaks out the |
| 09:12:06 | 5 | group that are contained in the total damages by the |
| 09:12:08 | 6 | failing to meet the two full-time equivalent. |
| 09:12:12 | 7 | MR. KENT:  Your Honor, I expect that the |
| 09:12:14 | 8 | plaintiff is going to list out damages for every |
| 09:12:16 | 9 | plaintiff.  So the only part that we're asking |
| 09:12:20 | 10 | Dr. Bradley to not testify to is the individuals that |
| 09:12:24 | 11 | are on that list who they would claim would be a part of |
| 09:12:28 | 12 | that two FTE group. |
| 09:12:31 | 13 | THE COURT:  Your objection is overruled. |
| 09:12:34 | 14 | MR. KENT:  Okay. |
| 09:12:35 | 15 | MR. CHILDS:  Any other part you want to |
| 09:12:36 | 16 | raise? |
| 09:12:37 | 17 | MR. KENT:  Yes.  Yes.  We would also like to |
| 09:12:40 | 18 | raise that Mr. Childs said that he expects to introduce |
| 09:12:44 | 19 | Dr. Bradley's report.  We would like to object to the |
| 09:12:49 | 20 | actual report itself because, number one, it addresses |
| 09:12:54 | 21 | the two FTE issue; and two, because it's going to |
| 09:12:58 | 22 | be hearsay. |
| 09:12:58 | 23 | THE COURT:  The objection is overruled. |
| 09:13:01 | 24 | MR. CHILDS:  Thank you. |
| 09:13:06 | 25 | MR. KENT:  Well, Your Honor, there's a third |

09:13:08  1  objection, and that is on the damage calculation itself.

09:13:13  2          Mr. Childs, we expect, will introduce

09:13:15  3  evidence that there are -- there is an additional amount

09:13:18  4  of time of unreported hours.

09:13:20  5          THE COURT:  Yes.

09:13:21  6          MR. KENT:  And we object for all the reasons

09:13:23  7  that we put in our motion, that the calculations'

09:13:28  8  inaccurate, unreliable, misleading, not based on sound

09:13:32  9  scientific evidence, everything we put in our motion.

09:13:35  10         MR. CHILDS:  I think that's already in the

09:13:37  11 motion that you have overruled.

09:13:38  12         THE COURT:  And so there is no reason for me

09:13:41  13 to address it now.  Mr. Wiggins?

09:13:42  14         MR. G. WIGGINS:  One other issue.  You asked

09:13:44  15 us about Cora Cannon yesterday.

09:13:46  16         THE COURT:  Yes.

09:13:47  17         MR. G. WIGGINS:  It's my understanding, at

09:13:49  18 this point, Ms. Cannon will not be here this morning.

09:13:54  19 We thought we would bring that up outside the presence

09:13:58  20 of the jury.

09:13:59  21         THE COURT:  Let's bring in the jury.

09:14:01  22         MR. KALLON:  Your Honor, one more thing.  We

09:14:03  23 move to dismiss Mrs. Cannon.

09:14:08  24         MR. CHILDS:  Your Honor, you didn't indicate

09:14:09  25 she would be dismissed yesterday.  I believe your

09:14:11    1    indication was that she would not be a representative

09:14:14    2    plaintiff, and not that she would be dismissed.

09:14:16    3              THE COURT:  That's correct.  Well, even so,

09:14:25    4    Ms. Cannon has to put on her case.  She is not an

09:14:33    5    opt-in, is she?

09:14:35    6              MR. KALLON:  No, sir.

09:14:35    7              MR. CHILDS:  But we've already established

09:14:37    8    that she meets the criteria.  Wouldn't that be a

09:14:40    9    rebuttal issue that would have to be taken up on the

09:14:43   10    rebuttal phase of the case, when we have to go back and

09:14:46   11    disprove what they're putting up?  So she could

09:14:48   12    testify --

09:14:49   13              THE COURT:  Well, the evidence indicates

09:14:52   14    that Ms. Cannon worked for Family Dollar, doesn't it?

09:14:59   15              MR. KALLON:  We don't dispute that, Your

09:15:01   16    Honor.

09:15:01   17              THE COURT:  And that she was not paid

09:15:03   18    overtime.

09:15:03   19              MR. KALLON:  We only dispute that she was

09:15:06   20    paid a salary.

09:15:07   21              THE COURT:  All right.  The motion to

09:15:08   22    dismiss will be overruled.

09:15:10   23              MR. KALLON:  She is a named party, who has

09:15:13   24    sued the company in this case that has been called to

09:15:14   25    trial, and is not here to testify, Your Honor.

09:15:17  1          MR. G. WIGGINS:  Your Honor, I would say

09:15:18  2   this:  When the complaint was filed, plaintiffs filed

09:15:21  3   under Janice Morgan and Barbara Richardson.  Mrs. Cannon

09:15:27  4   filed an opt-in form.

09:15:28  5          THE COURT:  She is an opt-in?  I thought I

09:15:30  6   had asked that question.  Did she opt-in?

09:15:31  7          MR. G. WIGGINS:  Yes, sir, she did.

09:15:32  8          MR. KALLON:  I thought she was a named

09:15:35  9   plaintiff.

09:15:35 10          MR. G. WIGGINS:  She was -- we amended the

09:15:37 11   complaint to make her a named plaintiff, but she filed a

09:15:41 12   consent form to join the case.

09:15:44 13          THE COURT:  So she's both?

09:15:44 14          MR. G. WIGGINS:  Yes, sir.

09:15:45 15          THE COURT:  Motion to dismiss is overruled.

09:15:47 16          MR. KENT:  Your Honor, there's one other

09:15:49 17   thing.  Mr. Childs, just this morning, has given me

09:15:52 18   another exhibit that they are going to use with

09:15:55 19   Dr. Bradley.

09:15:56 20          I would just like to get on the record that

09:15:58 21   my agreement with Mr. Childs is that he is able to

09:16:00 22   introduce this exhibit, as long as we are allowed to

09:16:03 23   introduce an exhibit that shows the average number of

09:16:07 24   reported hours per plaintiff.

09:16:10 25          MR. CHILDS:  Your Honor, we talked about

09:16:11   1   that.  I told Mr. Kent that I would have to look at the

09:16:15   2   report.

09:16:15   3          If he wants to object to this exhibit coming

09:16:17   4   in, he can take that position.  I don't think we will

09:16:20   5   have one, but I don't know until I see it or get

09:16:23   6   Dr. Bradley to look at it.

09:16:24   7          THE COURT:  All right.  We will take up the

09:16:25   8   objection when the exhibit is offered.

09:16:28   9          Bring in the jury.

09:16:52   10              (Jury in at 9:8 a.m.)

09:16:52   11          (In open court, jury present.)

09:17:21   12          THE COURT:  Good morning, ladies and

09:17:22   13   gentlemen.  I trust you had a good evening.

09:17:25   14          The plaintiffs will now call their next

09:17:27   15   witness.

09:17:28   16          MR. QUINN:  We call Laurie Wilson.

09:17:31   17      **LAURIE WILSON, PLAINTIFFS' WITNESS, SWORN**

09:17:41   18          THE CLERK:  State your name for the record,

09:17:42   19   please.

09:17:47   20          THE WITNESS:  Laurie Wilson.

09:17:56   21          THE CLERK:  And spell your last name for the

09:17:58   22   record, please.

09:17:58   23          THE WITNESS:  W-I-L-S-O-N.

09:17:58   24              **DIRECT EXAMINATION**

09:18:01   25   **BY MR. QUINN:**

09:18:01  1      Q.   Ms. Wilson, where do you live?

09:18:03  2      A.   Waterloo, New York.

09:18:06  3      Q.   And did you ever work for Family Dollar?

09:18:10  4      A.   Yes, sir, I did.

09:18:10  5      Q.   How long did you work for Family Dollar?

09:18:12  6      A.   Two years, two months.

09:18:15  7      Q.   When did you work for Family Dollar?

09:18:17  8      A.   Started in Geneva, New York, and then I went to

09:18:22  9   Sodus and Albany, New York.

09:18:24 10      Q.   Were you ever a store manager?

09:18:25 11      A.   Yes.

09:18:26 12      Q.   How long were you a store manager?

09:18:28 13      A.   A year.

09:18:28 14      Q.   When you were a store manager, was there ever a

09:18:33 15   week that you didn't work over 40 hours?

09:18:35 16      A.   No.

09:18:36 17      Q.   Was there ever a week that you didn't work over

09:18:38 18   48 hours?

09:18:38 19      A.   No.

09:18:39 20      Q.   Was there ever a week that you didn't work over

09:18:42 21   52 hours?

09:18:43 22      A.   No.

09:18:43 23      Q.   During any of those weeks that you worked over

09:18:48 24   40, 48 or 52 hours, were you ever paid any overtime?

09:18:52 25      A.   No.

| | | |
|---|---|---|
| 09:18:52 | 1 | Q.   What number of hours did you average a week? |
| 09:18:58 | 2 | A.   I would say from 65 to 70 hours a week. |
| 09:19:02 | 3 | MR. QUINN:  Thank you, Ms. Wilson. |
| 09:19:04 | 4 | THE WITNESS:  You're welcome. |
| 09:19:04 | 5 | THE COURT:  Cross-examination? |
| 09:19:04 | 6 | MR. MAYS:  Thank you, Judge. |
| 09:19:06 | 7 | **CROSS-EXAMINATION** |
| 09:19:06 | 8 | **BY MR. MAYS:** |
| 09:19:08 | 9 | Q.   Good morning, Ms. Wilson.  My name is Joe Mays, |
| 09:19:19 | 10 | and I am one of the lawyers for Family Dollar.  I have |
| 09:19:20 | 11 | just a few questions I would like to ask you. |
| 09:19:23 | 12 | A.   Okay. |
| 09:19:23 | 13 | Q.   When you were a store manager for Family Dollar, |
| 09:19:27 | 14 | you were paid a salary, were you not? |
| 09:19:29 | 15 | A.   Yes, I was. |
| 09:19:29 | 16 | Q.   What was your salary at the time you left Family |
| 09:19:31 | 17 | Dollar? |
| 09:19:31 | 18 | A.   Well, I believe it was $485 a week. |
| 09:19:37 | 19 | Q.   Okay.  And when you accepted the job as store |
| 09:19:39 | 20 | manager, you knew it was a salaried position, did you |
| 09:19:41 | 21 | not? |
| 09:19:42 | 22 | MR. QUINN:  Objection, relevance.  What does |
| 09:19:44 | 23 | it have to do with -- |
| 09:19:45 | 24 | THE COURT:  What is the relevance of it? |
| 09:19:46 | 25 | MR. MAYS:  I'm sorry, Your Honor? |

09:19:48  1                THE COURT:  What is the relevance of it?

09:19:50  2                MR. MAYS:  The relevance is to show that she

09:19:52  3    knew when she accepted the job, she was accepting a

09:19:55  4    salaried position.

09:19:56  5                THE COURT:  Your objection is sustained.

09:19:59  6        Q.  (By Mr. Mays)  You testified as to the number of

09:20:01  7    hours you worked.  You were the store manager; is that

09:20:04  8    right?

09:20:04  9        A.  Yes.

09:20:04  10       Q.  You were the person that set the schedule for the

09:20:08  11   store?

09:20:08  12               MR. QUINN:  Objection.

09:20:09  13               THE COURT:  Your objection is sustained.

09:20:11  14               MR. QUINN:  Relevance.

09:20:15  15               MR. MAYS:  That's all I have.  Thank you.

09:20:17  16               THE COURT:  Thank you, ma'am.

09:20:18  17               Plaintiffs will call their next witness.

09:20:28  18               MR. CHILDS:  Plaintiffs will call

09:20:30  19   Dr. Bradley, Dr. Edwin Bradley.

09:20:36  20       **EDWIN LUTHER BRADLEY, JR., PLAINTIFFS' WITNESS, SWORN**

09:21:12  21               THE CLERK:  State your name for the record,

09:21:14  22   please.

09:21:15  23               THE WITNESS:  Edwin Luther Bradley, Jr.

09:21:36  24               THE CLERK:  Spell your last name for the

09:21:37  25   record, please.

09:21:38  1              THE WITNESS:   B-R-A-D-L-E-Y.

09:21:41  2                    **DIRECT EXAMINATION**

09:21:41  3  **BY MR. CHILDS:**

09:21:42  4      Q.   Dr. Bradley, by whom are you presently employed?

09:21:45  5      A.   I have my own consulting business, Quantitative

09:21:49  6  Research Associates.

09:21:49  7      Q.   And in what capacity are you at that company?

09:21:52  8      A.   I am the chief executive officer.

09:21:56  9      Q.   I am going to show you a document that has been

09:22:01 10  marked as Plaintiffs' Exhibit 550 in this case, and ask

09:22:07 11  if you can identify that document for the record,

09:22:10 12  please?

09:22:10 13      A.   Yes.  That's a copy of my curriculum vitae.

09:22:15 14      Q.   Is it your current curriculum vitae?

09:22:17 15      A.   Yes, sir, it is.

09:22:18 16              MR. CHILDS:   Your Honor, we would offer

09:22:20 17  Plaintiffs' Exhibit 550.

09:22:23 18              MR. KENT:   No objection.

09:22:24 19              THE COURT:   Without objection, it's received

09:22:27 20  in evidence.

09:22:28 21      Q.   (By Mr. Childs)  Would you tell the jury what a

09:22:31 22  CV is?  That's a term I am not real familiar with.

09:22:36 23      A.   Well, it's probably sort of a fancy word in

09:22:39 24  academia that's like a resume, and it describes your

09:22:44 25  educational history, your employment history.  But in

09:22:47  1   addition to that, it describes publications that you

09:22:52  2   have been involved with and other academic procedures.

09:22:56  3       Q.   Dr. Bradley, do you consider yourself to have

09:22:59  4   expertise in any particular area?

09:23:00  5       A.   Yes, sir, I do.

09:23:01  6       Q.   What area?

09:23:04  7       A.   Mathematics, statistics, certain areas of

09:23:09  8   computing.

09:23:09  9       Q.   What is your educational background?

09:23:10  10      A.   I have a bachelor's degree in mathematics with

09:23:15  11  honors from the University of Florida in 1964.  I have a

09:23:20  12  master's statistics degree from the University of

09:23:23  13  Florida in 1967, and I received a Ph.D. degree in

09:23:27  14  statistics from the University of Florida in 1969.

09:23:30  15      Q.   All right.  And is that educational background

09:23:34  16  reflected in your resume up there that you have with you

09:23:38  17  as Exhibit 550?

09:23:39  18      A.   Yes, sir, on page 1.

09:23:41  19      Q.   All right.  Prior to starting your company QRA,

09:23:45  20  did you teach?

09:23:45  21      A.   Yes, sir, I did.

09:23:46  22      Q.   And where did you teach?

09:23:47  23      A.   I taught at the University of Alabama at

09:23:50  24  Birmingham.

09:23:51  25      Q.   When?

| | | |
|---|---|---|
| 09:23:51 | 1 | A.   I started in 1970 until I retired in 1997. |
| 09:23:57 | 2 | Q.   And what courses did you teach? |
| 09:23:58 | 3 | A.   I taught a wide variety of courses that dealt |
| 09:24:02 | 4 | with statistical theories, statistical methodologies and |
| 09:24:09 | 5 | application statistics. |
| 09:24:12 | 6 | Q.   Did you have any research duties at UAB? |
| 09:24:15 | 7 | A.   Yes.  For the -- well, two main areas of |
| 09:24:17 | 8 | research:  One was collaborative research, where I |
| 09:24:20 | 9 | consulted with a scientist and researchers on various |
| 09:24:26 | 10 | projects or studies that were to be conducted, where I |
| 09:24:29 | 11 | helped design the studies, analyze the data, and |
| 09:24:33 | 12 | interpret the results. |
| 09:24:35 | 13 | I also worked with graduate students.  And, in |
| 09:24:39 | 14 | fact, from '89 until I retired in '97, I was director of |
| 09:24:43 | 15 | the graduate program in biostatistics at the University |
| 09:24:47 | 16 | of Alabama at Birmingham. |
| 09:24:49 | 17 | Q.   All right.  Do you have any present appointments |
| 09:24:52 | 18 | at UAB? |
| 09:24:53 | 19 | A.   Yes, I do. |
| 09:24:54 | 20 | Q.   What is that appointment? |
| 09:24:55 | 21 | A.   I have an appointment of professor emeritus of |
| 09:24:59 | 22 | biostatistics. |
| 09:25:01 | 23 | Q.   Do you have any other academic performance or |
| 09:25:06 | 24 | activities, other than those you just named, that you |
| 09:25:08 | 25 | undertook while at UAB? |

09:25:10  1    A.  Well, I was -- there's various other secondary

09:25:13  2    appointments I had that are listed in my curriculum

09:25:16  3    vitae.

09:25:17  4        For example, I was vice-chairman of the

09:25:18  5    department from '78 to '82.

09:25:21  6    Q.  Are you a member of any associations or society?

09:25:25  7    A.  Yes, sir.

09:25:25  8    Q.  Which ones?

09:25:26  9    A.  American Statistical Association and the

09:25:31  10   Biometric Society.

09:25:32  11   Q.  Do you serve as a -- well, first of all, what is

09:25:36  12   a review referee?

09:25:38  13   A.  All right.  When you are in academia and you do

09:25:40  14   research and publish results, they are published in

09:25:44  15   generally what are called peer-reviewed journals.  And a

09:25:47  16   peer-reviewed journal, you submit your results; your

09:25:50  17   peers, or people in the same area that you are, will

09:25:53  18   review these articles for their accuracy and

09:25:57  19   completeness.

09:25:57  20       And so besides submitting articles, I also served

09:26:01  21   as a review referee for a number of years.

09:26:04  22   Q.  Have you made presentations in the area of

09:26:07  23   statistics, biostatistics?

09:26:08  24   A.  Yes, I have.

09:26:09  25   Q.  What presentations have you made?  are they

| | | |
|---|---|---|
| 09:26:11 | 1 | listed on your vitae? |
| 09:26:13 | 2 | A.  Yes, they are. |
| 09:26:14 | 3 | Q.  What page? |
| 09:26:15 | 4 | A.  I believe that's pages 5 and 6. |
| 09:26:25 | 5 | Q.  Any of these publications dealing with the areas |
| 09:26:28 | 6 | of statistics? |
| 09:26:29 | 7 | A.  They all deal with statistics. |
| 09:26:32 | 8 | Q.  Okay.  Have you also written publications or |
| 09:26:36 | 9 | research papers? |
| 09:26:38 | 10 | A.  Yes, sir, I have. |
| 09:26:38 | 11 | Q.  And how many have you written in that work? |
| 09:26:42 | 12 | A.  Over 200. |
| 09:26:43 | 13 | Q.  Have you been recognized as an expert in the |
| 09:26:47 | 14 | field of statistics by any state or federal court? |
| 09:26:50 | 15 | A.  Yes, sir, I have. |
| 09:26:50 | 16 | Q.  Which ones -- first of all, on how many |
| 09:26:52 | 17 | occasions? |
| 09:26:54 | 18 | A.  Probably more than 50 times. |
| 09:26:55 | 19 | Q.  And what states? |
| 09:26:57 | 20 | A.  Alabama, Mississippi, Georgia, South Carolina, |
| 09:27:02 | 21 | New York, Ohio, Pennsylvania -- |
| 09:27:05 | 22 | Q.  Have you ever -- |
| 09:27:07 | 23 | A.  -- Florida. |
| 09:27:08 | 24 | Q.  -- not been held to be qualified as an expert in |
| 09:27:11 | 25 | statistics by any court? |

09:27:12   1    A.   No, sir, I have not.

09:27:13   2    Q.   How long have you worked as a statistical expert

09:27:17   3    in litigation cases as a consultant?

09:27:19   4    A.   Probably close to 25 years.

09:27:21   5    Q.   And how many cases do you think you have been

09:27:23   6    involved in as an expert?

09:27:25   7    A.   Well over a hundred.

09:27:26   8    Q.   And do you do work for just plaintiffs or

09:27:30   9    defendants, or both?

09:27:31  10    A.   I do work for both plaintiffs and defendants.

09:27:34  11    Q.   In your judgment, what is the split between doing

09:27:37  12    plaintiffs' and defendants' work?

09:27:39  13    A.   Historically, it's probably two-thirds for

09:27:43  14    plaintiffs and one-third for defendants.

09:27:45  15    Q.   How many cases are -- are the cases that you have

09:27:49  16    worked on listed in your vitae also?

09:27:52  17    A.   Those that I have testified in for the last four

09:27:55  18    years.

09:27:56  19    Q.   And what part of your vitae are those cases

09:27:59  20    reflected?

09:27:59  21    A.   That would be the last two pages, which would be,

09:28:02  22    I believe -- let's see.  Last two pages, pages 31 and

09:28:10  23    32.

09:28:10  24    Q.   Are those all the cases that you have testified

09:28:13  25    in?

09:28:13    1        A.   No, sir.

09:28:13    2        Q.   How many total have you testified in?

09:28:15    3        A.   Well, I have probably testified -- and this is

09:28:18    4   rough, probably over 50 times.

09:28:22    5             MR. CHILDS:   Your Honor, we would offer

09:28:24    6   Dr. Bradley as a statistical expert in this case.

09:28:26    7             MR. KENT:   Your Honor, we object on the

09:28:28    8   ground previously stated.

09:28:30    9             THE COURT:   Overruled.

09:28:31   10        Q.   (By Mr. Childs)   Dr. Bradley, how are you being

09:28:35   11   paid in this case?

09:28:36   12        A.   Hourly.

09:28:38   13        Q.   And is your pay in any way based on the results

09:28:46   14   that are attained in this case?

09:28:46   15        A.   No, sir.

09:28:46   16        Q.   As part of your work in this case, Dr. Bradley,

09:28:51   17   what were you asked to do?

09:28:51   18        A.   Well, I have been asked to do basically three

09:28:54   19   broad things:   One was to provide a damage list;

09:29:00   20   secondly, during the course of this litigation, I have

09:29:03   21   been asked to provide various statistical reports that

09:29:08   22   outline various damage calculations; and thirdly,

09:29:14   23   yesterday I was asked to provide for each of the opt-in

09:29:23   24   store manager plaintiffs a list of the number of weeks

09:29:25   25   they worked and the number of those where they worked

09:29:29  1  more than 40 hours, more than 48 hours, and more than 52

09:29:33  2  hours.

09:29:33  3      Q.  And did you do these various areas of work for

09:29:36  4  plaintiffs?

09:29:37  5      A.  Yes, sir, I did.

09:29:38  6      Q.  Okay.  I show you a document Plaintiffs' Exhibit

09:29:58  7  42 that's been marked for identification.  Can you

09:30:00  8  identify this document for the Court?

09:30:02  9      A.  Yes.  This is the pretrial damage list that I

09:30:06  10  provided to the plaintiffs' attorneys.

09:30:09  11          MR. CHILDS:  Plaintiffs would offer Exhibit

09:30:12  12  42, Your Honor.

09:30:12  13          MR. KENT:  Your Honor, we object.

09:30:14  14          THE COURT:  All right. Over the defendant's

09:30:15  15  objection, Plaintiffs' Exhibit 42 is received in

09:30:20  16  evidence.

09:30:20  17      Q.  (By Mr. Childs)  All right.  Looking at

09:30:55  18  Plaintiffs' Exhibit 42, Dr. Bradley, would you explain

09:30:58  19  each of the columns that appear on this document?

09:31:01  20      A.  Yes.  The first column lists the social security

09:31:04  21  identification number for the opt-in store manager

09:31:09  22  plaintiff.  The second column gives that opt-in store

09:31:15  23  manager plaintiffs' name.  The third column shows the

09:31:18  24  last the store number -- or this is a Family Dollar

09:31:21  25  identification number for the last store that they

09:31:25  1    worked.  And the fourth column shows the state in which

09:31:29  2    that store is located.  The last column is an estimate

09:31:33  3    of the damages for that particular opt-in store manager

09:31:39  4    plaintiff.

09:31:40  5       Q.  Would you explain to the jury and the Court how

09:31:44  6    you arrived at the calculations contained in the last

09:31:48  7    column for each plaintiff?

09:31:49  8       A.  Yes.  What I did was as follows:  Let's take the

09:31:54  9    first one, I think it's Albert Abbott.  You take a week

09:32:00  10   that the store manager worked, and you have a data file

09:32:07  11   supplied by the defendants the number of hours they

09:32:09  12   reported they work.

09:32:10  13       So, for example, let's suppose that just

09:32:13  14   hypothetically that he reported for a particular week 60

09:32:16  15   hours that he had worked.

09:32:18  16       All right.  I added to that 6 additional hours,

09:32:21  17   which was an estimate that I arrived at to account for

09:32:25  18   unreported hours -- hours that these store managers have

09:32:28  19   not reported.  So I would have a figure, say, for him of

09:32:33  20   66.  I then took -- I have got 66 hours I am working

09:32:39  21   with.

09:32:39  22       Then I take his salary for that week and divide

09:32:42  23   that by 40 hours to get an hourly rate of pay.  So, for

09:32:45  24   example, let's suppose he made $400 a week, divided by

09:32:49  25   40 hours would be $10 an hour.

09:32:52    1        I then computed an overtime rate of pay, which is

09:32:56    2    one and a half times that figure.  In this case, if it's

09:32:59    3    $10 an hour, it would be $15 an hour would be the

09:33:03    4    overtime rate of pay.  I then multiplied the 15 times

09:33:07    5    the additional hours over 40, which in this case would

09:33:10    6    be 26.  You have 66 hours minus 40 leaves 26, come up

09:33:15    7    with a number.

09:33:15    8        I did that for every week.  I had data for that

09:33:18    9    individual that occurred within the liability period,

09:33:21   10    which was three years prior to his opt-in date was when

09:33:26   11    it started, or the date in which he started with the

09:33:30   12    company, whichever was later, up until the time he

09:33:36   13    either terminated or the present, or the last date that

09:33:38   14    we had data.

09:33:39   15        So I would do that for each week, add up all the

09:33:43   16    weeks of that individual and I would put a number down

09:33:46   17    here, and I would repeat that for every store manager.

09:33:48   18    Q.   Dr. Bradley, how did you determine to use six

09:33:52   19    hours for the unreported?

09:33:53   20    A.   The six hours was determined from the depositions

09:33:59   21    that were taken of over 200 opt-in store manager

09:34:05   22    plaintiffs.  And in those many of those depositions,

09:34:08   23    they quantified the number of hours they say they

09:34:12   24    reported, and then the number of hours they say they

09:34:15   25    actually worked.

09:34:16  1          And from that, you would get an estimate -- using
09:34:18  2   statistical averages, you would get an estimate of what
09:34:22  3   the average number of hours they didn't report was.  And
09:34:24  4   so that's how I -- I actually came up with over seven
09:34:27  5   hours, but I used only six, to compensate for the fact
09:34:30  6   that this might be an overstatement of the results.
09:34:34  7      Q.   And what if a particular individual -- in doing
09:34:37  8   this analysis for a particular individual -- in their
09:34:39  9   depo indicated they worked no overtime?
09:34:42 10      A.   That got a zero.
09:34:43 11      Q.   So you added the zeroes in, plus those, and came
09:34:46 12   up with an average close to seven, but decided to use
09:34:49 13   six?
09:34:50 14      A.   Right.  Little over seven, so I had to use six.
09:34:53 15      Q.   So what data did you use doing this analysis?
09:34:56 16      A.   Well, of course, I described in the depo --
09:34:58 17   deposition data to get the estimate for six hours.  But
09:35:09 18   for all the hours of the -- number of hours worked and
09:35:09 19   the salary, I used the data base provided by the
09:35:10 20   defendants.
09:35:10 21      Q.   All right.  And turn to the last page of that
09:35:12 22   document, Dr. Bradley.  What is the total back pay that
09:35:17 23   you have calculated in this damage list for the
09:35:19 24   plaintiffs?
09:35:19 25      A.   All right.  For the 1,418 opt-in plaintiffs --

09:35:24  1   and I believe that's still remaining in the case -- I

09:35:27  2   came up with a figure of $49,354,3 -- I believe -- 96

09:35:37  3   dollars and 73 cents.

09:35:38  4       Q.  Is that liquidated number?

09:35:39  5       A.  No.  Liquidated number would be twice that

09:35:43  6   figure.

09:35:43  7       Q.  So what would the total amount be if it was a

09:35:46  8   liquidated number?

09:35:47  9       A.  The total amount of liquidated would be over

09:35:51  10  $98.7 million.

09:35:57  11      Q.  Thank you, Dr. Bradley.

09:36:07  12          I now show you what's been marked as Plaintiffs'

09:36:14  13  Exhibit 46A.

09:36:15  14      A.  Yes.

09:36:17  15      Q.  Can you identify that document for the record,

09:36:20  16  please, sir?

09:36:20  17      A.  Yes.  This is the last expert report that I

09:36:25  18  submitted that summarized back pay damages for the

09:36:32  19  individual opt-in plaintiffs.  And it has data that goes

09:36:35  20  through April 9th of 2005.

09:36:38  21      Q.  What is the date of this report?

09:36:39  22      A.  May -- May 24th, 2005.

09:36:43  23          MR. CHILDS:  Plaintiffs will offer 46A, Your

09:36:46  24  Honor.

09:36:46  25          MR. KENT:  Your Honor, we renew our

09:36:49  1    objections.

09:36:49  2              THE COURT:  All right.  The objection is

09:36:51  3    overruled.  46A is received in evidence.

09:36:53  4    Q.  (By Mr. Childs)  Dr. Bradley, would you explain

09:36:55  5    to the jury again what you did -- give you too much

09:37:11  6    volume there, looks like.

09:37:44  7         And in preparing this report, Dr. Bradley, what

09:37:46  8    were you asked to do by the plaintiffs?

09:37:48  9    A.  I was asked to prepare a chart that listed for

09:37:54  10   each individual opt-in store manager plaintiffs various

09:38:01  11   damage calculations under four different scenarios.

09:38:04  12   Q.  And what were those four scenarios?

09:38:07  13   A.  One scenario was back pay, assuming a contract of

09:38:15  14   48 hours a week, set contract of working 48 hours a

09:38:19  15   week, without adding any value for unreported hours.

09:38:24  16        Another calculation was computing a back pay

09:38:28  17   damages based on 48 hours set contract, which I added my

09:38:34  18   estimate of unreported hours of six hours.

09:38:38  19        I was also asked to do a back pay calculation

09:38:42  20   assuming a contract of 40 hours, without adding any

09:38:45  21   unreported damages.

09:38:47  22        And then lastly, I was asked to do one for 40

09:38:51  23   hours, adding the estimate of the unreported hours.  And

09:38:57  24   that column is the same as the one we have already

09:39:00  25   discussed dealing with the damage calculation I gave

09:39:04  1   earlier.  That column would be identical.

09:39:08  2       Q.  In doing those analyses that you just talked

09:39:11  3   about, did you do them the same way you did in your

09:39:13  4   damage calculation?

09:39:14  5       A.  Yes, I did.  There's only one difference when you

09:39:19  6   do the 48-hour calculation.

09:39:21  7       Q.  What's the difference?

09:39:22  8       A.  Well, when you do the 48-hour calculation, you

09:39:25  9   take the salary for the week and divide by 48 to get an

09:39:29  10  hourly rate.  But when you're computing an overtime

09:39:32  11  rate, all hours between 40 and 48 are only computed at

09:39:37  12  one half the hourly rate.

09:39:39  13      So, for example, if the hourly rate dividing --

09:39:42  14  supposedly to make it easy again -- made $480 a week, so

09:39:47  15  you divide by 48 is $10, and for all hours between 40

09:39:51  16  and 48 you multiply those by $5, half the rate.  And

09:39:55  17  then for all hours over 48, you multiply times one and

09:39:59  18  half the rate for overtime, which would be 15.  So that

09:40:02  19  would be the only difference in the calculations;

09:40:04  20  otherwise they're the same.

09:40:05  21      Q.  And these calculations are in Exhibit 3A of your

09:40:10  22  report?  The first tab on the side of Exhibit 3A starts?

09:40:15  23      A.  Right.  Exhibit 3A is the calculation for all

09:40:20  24  1,418 opt-in store managers.

09:40:22  25      Q.  Did you do an additional calculation as part of

09:40:25   1    this report?

09:40:25   2        A.   Yes, sir, I did.  Exhibit 4A is a subset of the

09:40:32   3    1,418 consisting of 200 opt-in store managers, which I

09:40:38   4    have determined the calculations have failed what's

09:40:41   5    called the two full-time equivalent requirement.

09:40:45   6        Q.   And that's reflected in Exhibit 4A?

09:40:48   7        A.   And that's 4A, yes, sir.

09:40:49   8        Q.   That's the second tab in the document that you

09:40:52   9    have in front of you there.

09:40:54  10             Is 4A a subset of 3A?

09:40:58  11        A.   Yes, sir, it is.

09:40:59  12        Q.   Explain exactly what that group is.

09:41:01  13        A.   All right.  The 4A deals with -- and I don't

09:41:06  14    really know how much the --

09:41:09  15        Q.   Explain it as best you can.

09:41:11  16        A.   -- the -- in determining whether a manager meets

09:41:17  17    the exempt requirement of the FLSA laws, there's what's

09:41:22  18    called a short test.  And a short test has three major

09:41:26  19    prongs to it:  One is, they have to make over $250 a

09:41:30  20    week.  I think that's been raised --

09:41:33  21             MR. KENT:  Your Honor, we object to

09:41:34  22    Mr. Bradley testifying to any regulations or statutes

09:41:37  23    under the FLSA.  He is not qualified in that area.

09:41:41  24             MR. CHILDS:  Your Honor, I think he is

09:41:43  25    qualified.  He is just expressing how he did his

09:41:48   1   calculations and the basis he did it all as explained to

09:41:51   2   him by Mr. Belzar's expert --

09:41:53   3            THE COURT:   The jury is instructed that the

09:41:56   4   you are receiving witness' testimony only as his

09:42:00   5   explanation of the means by which he arrived at his

09:42:03   6   conclusions.

09:42:04   7            MR. CHILDS:   Okay.

09:42:05   8       Q.   (By Mr. Childs)  Go ahead, Dr. Bradley.

09:42:06   9       A.   So they all meet that requirement.   Then the

09:42:08   10  other requirement is that their duties have to be

09:42:12   11  managerial in nature; they have to manage the

09:42:16   12  enterprise.   This doesn't address that.

09:42:17   13           But the third test they have to make is they have

09:42:19   14  to regularly and customarily supervise two or more

09:42:25   15  full-time employees.   Now -- so we define that as a two

09:42:31   16  full-time equivalent.

09:42:33   17           So, for example, if you supervise two employees

09:42:37   18  both working 40 hours a week, that meets the criteria;

09:42:39   19  or you can say supervised four employees that all worked

09:42:42   20  half time, 20 hours a week, that would satisfy 480

09:42:46   21  hours.   For two employees in -- total number of hours

09:42:49   22  they work in a week must equal 80 or more.

09:42:52   23           Now, if they do not meet that criteria for a

09:42:55   24  week, then they fail -- that what's called the 2 FTE --

09:43:00   25           MR. KENT:   Your Honor, we object to this,

09:43:02  1    because it's a misstatement of the law.

09:43:04  2              THE COURT:  Overruled.

09:43:05  3    Q.  Go ahead.  So --

09:43:07  4    A.  Okay.  So what I did was compute, for the list of

09:43:10  5    200, is consist of all individuals who failed the 2 FTE

09:43:20  6    requirement, 20 or more percent of the time.  And so

09:43:23  7    that's the criteria I used to create that list.

09:43:26  8    Q.  So Exhibit 4A consists of 200 people; is that

09:43:30  9    correct?

09:43:30  10   A.  That's correct.

09:43:31  11   Q.  And those are the 200 people that, based on what

09:43:34  12   you have been told and based on your calculations, don't

09:43:36  13   meet the two full-time equivalent?

09:43:39  14             MR. KENT:  Your Honor, objection leading.

09:43:41  15             THE COURT:  Sustained.

09:43:42  16   Q.  Tell me what, in your knowledge, then, going back

09:43:46  17   over it, the 200 that are in Exhibit 4A --

09:43:49  18   A.  The 200 represent simply 200 individuals who 20

09:43:54  19   or more percent of the time did not supervise two or

09:43:58  20   more full-time equivalent employees for 80 hours a week.

09:44:01  21   Q.  And you break this out by employee; is that

09:44:03  22   correct?

09:44:03  23   A.  Yes.

09:44:03  24             MR. KENT:  Objection.  Leading, Your Honor.

09:44:05  25             THE COURT:  Overruled.

09:44:06  1        Q.   Is that correct, Dr. Bradley?

09:44:08  2        A.   Yes, sir.

09:44:09  3        Q.   And then you have a total at the back?

09:44:11  4        A.   Yes, sir, I do.

09:44:12  5        Q.   Would you tell the jury -- go column by column

09:44:15  6    and explain the amounts to any of them, the dollar

09:44:18  7    amounts.

09:44:18  8        A.   Exhibit 3A or 4A?

09:44:20  9        Q.   4A first.  We have been talking about it.

09:44:25  10       A.   All right.  For the -- I don't believe I have

09:44:31  11   Exhibit 4A in mine.

09:44:34  12       Q.   It's not on yours?

09:44:35  13       A.   No.  Mine ends at 3A.

09:44:38  14       Q.   Do y'all have one?  Okay.  Good.  I didn't mess

09:44:40  15   that up for everybody.

09:44:52  16       A.   Okay.  So if we go to the page 6 of Exhibit 4A,

09:44:58  17   there are several columns there.  And I think I have

09:45:03  18   already explained, when I talked about the damage

09:45:07  19   calculations, about the social security number, the

09:45:13  20   name, last store worked and state worked -- those are

09:45:16  21   similar here, same definition.

09:45:19  22            First column, you will see says "back pay for all

09:45:22  23   hours worked 48-hour week reported hours only".  That is

09:45:27  24   my damage calculation, assuming a set contract of 48

09:45:30  25   hours per week, but without adding any estimate for

09:45:34  1  unreported hours.

09:45:36  2       And for those 200 individuals, the total damages

09:45:41  3  sum up to be $2,124,993.71.

09:45:48  4       The second column is the same 48-hour contract,

09:45:51  5  but in this case each individual had added to their

09:45:55  6  hours each week an additional six to compensate for

09:45:59  7  unreported hours.  That, for these 200 individuals is a

09:46:04  8  total of $3,093,744.83.

09:46:13  9       The third column is back pay for all hours

09:46:16  10  worked, assuming a 48-hour -- I'm sorry, assuming a

09:46:19  11  40-hour contract, no unreported hours, just what was on

09:46:23  12  the data filed; using a 40-hour contract without

09:46:27  13  unreported hours, $3,570,614.86.

09:46:36  14       And lastly, we have back pay, assuming a 40-hour

09:46:41  15  contract with --

09:46:41  16            MR. KENT:  Your Honor, we object to the term

09:46:43  17  "contract", because there's no evidence of any contract

09:46:46  18  in the case.

09:46:47  19            THE COURT:  Overruled.

09:46:49  20   Q.  Go ahead.

09:46:49  21   A.  Assuming a 40-hour contract, adding in six

09:46:55  22  unreported hours, giving a total of $4,772,756.83.

09:47:02  23   Q.  And that's specifically for these 200 employees

09:47:05  24  that are listed on this chart?

09:47:06  25   A.  Yes, sir.

09:47:07  1                MR. KENT:  Object to the --

09:47:11  2       Q.  All right.  Let's now look at Exhibit 3A.  And

09:47:19  3  it's the first tab in your packet.

09:47:22  4            Would you explain -- well, before I leave 3, the

09:47:27  5  calculations you did in 3A and the -- is just like you

09:47:31  6  have previously explained about your damage calculation?

09:47:34  7       A.  That's correct.

09:47:35  8                MR. KENT:  Objection, leading.

09:47:36  9                THE COURT:  Overruled.

09:47:39  10      Q.  What is the time frame?

09:47:39  11      A.  The time frame, once again, starts, for any

09:47:43  12  opt-in plaintiff, no more than three years prior to the

09:47:49  13  date of which he opted in, signed his opt-in form; or it

09:47:53  14  could be later than that if it was -- if he was hired

09:47:56  15  later than that date; and then ends on the date he

09:47:59  16  terminates; or April 9th, which is the last day of the

09:48:03  17  data they gave.

09:48:04  18      Q.  And again, this is data that you were provided

09:48:07  19  from the defendant?

09:48:07  20                MR. KENT:  Objection.  Leading, Your Honor.

09:48:09  21                THE COURT:  Overruled.

09:48:11  22                THE WITNESS:  That's correct.

09:48:11  23      Q.  Now, let's go to 3A, Exhibit 3A to your report.

09:48:16  24            Explain to the jury each and every column in that

09:48:20  25  one as we have been doing, please, sir.

09:48:22  1      A.   All right.   Once again, we have a column that

09:48:25  2   gives the social security number of the opt-in store

09:48:28  3   manager plaintiff, column that gives the name, last

09:48:32  4   store worked, and the state in which that store is

09:48:37  5   located.

09:48:37  6         And then the first column of back pay is, once

09:48:42  7   again, for assuming a 48-hour contract, but not adding

09:48:46  8   any unreported hours, leaves a total of $23,573,369.49.

09:48:58  9         The next column also assumes a 48-hour set

09:49:03  10  contract, but adding six additional hours each week for

09:49:11  11  under reporting of hours; summing that up yields a total

09:49:16  12  of 32 million, 9 -- excuse me -- yeah, 902 million --

09:49:21  13  $32,902,734.52.

09:49:28  14        The next column is back pay for all hours worked,

09:49:31  15  no unreported hours added in, assuming a 40-hour set

09:49:35  16  contract.   That total is $37,929,021.97.

09:49:45  17        Then, finally, we have the same computation we

09:49:48  18  had for damages, which is the 40-hour set contract,

09:49:52  19  adding in six hours per week for unreported hours,

09:49:56  20  getting a total of $49,354,396.73 cents.

09:50:03  21     Q.   And these are straight overtime pay and not any

09:50:07  22  liquidated amounts?

09:50:09  23              MR. KENT:   Objection.   Leading, Your Honor.

09:50:11  24              THE COURT:   Overruled.

09:50:12  25              THE WITNESS:   That's correct.   They are not

09:50:13  1    liquidated.

09:50:14  2        Q.  If they were liquidated, what would the amounts

09:50:16  3    reflect?

09:50:16  4        A.  Well, that they would all be double.

09:50:18  5        Q.  All right.  The time period that you used here,

09:50:22  6    the same as in your previous analyses?

09:50:24  7        A.  Yes, sir, it's all the same.

09:50:26  8        Q.  And this is all opt-in plaintiffs in this case;

09:50:29  9    correct?

09:50:29  10       A.  That's my understanding, yes.

09:50:31  11       Q.  Okay.  And you indicated earlier that you were

09:50:50  12   asked to do something recently by plaintiffs' counsel;

09:50:54  13   is that correct?

09:50:54  14       A.  Yes, sir.

09:50:54  15       Q.  And what was that, again, just --

09:50:57  16       A.  That was for each of these opt-in store manager

09:51:00  17   plaintiffs, I was asked to compute the number of weeks

09:51:06  18   that they worked in the liability period; and for those

09:51:10  19   number of weeks, the number that were over 40 hours per

09:51:15  20   week that they worked, those where they worked over 48

09:51:19  21   hours per week, and those where they worked over 52

09:51:22  22   hours per week.

09:51:24  23       Q.  I show you what has been marked as Plaintiffs'

09:51:28  24   Exhibit 551, and ask you to identify that document for

09:51:31  25   the record.

| | | |
|---|---|---|
| 09:51:31 | 1 | A.   Yes, sir, it is. |
| 09:51:34 | 2 | Q.   What is that document? |
| 09:51:35 | 3 | A.   That document is the document that shows the |
| 09:51:38 | 4 | number of weeks store manager opt-in plaintiffs worked |
| 09:51:42 | 5 | throughout the liability period, also broken down by |
| 09:51:44 | 6 | whether it was over 40, over 48, or over 52 hours per |
| 09:51:48 | 7 | week. |
| 09:51:49 | 8 | MR. CHILDS:  We would offer Plaintiffs' 551. |
| 09:51:52 | 9 | MR. KENT:  Your Honor, we renew our |
| 09:51:54 | 10 | objections. |
| 09:51:55 | 11 | THE COURT:  Over the objection, it is |
| 09:51:58 | 12 | received in evidence. |
| 09:51:59 | 13 | Q.   (By Mr. Childs)  Got extra ones?  I will get it |
| 09:52:31 | 14 | back from you, ma'am. |
| 09:52:32 | 15 | MR. CHILDS:  Is it all right if I get it, |
| 09:52:34 | 16 | Your Honor? |
| 09:52:35 | 17 | THE COURT:  Yes. |
| 09:52:41 | 18 | Q.   Would you take this Exhibit 551 and go over each |
| 09:52:48 | 19 | column like we have been doing, please, sir? |
| 09:52:51 | 20 | A.   Sure.  Once again, the first column is the social |
| 09:52:53 | 21 | security number, identification number for that opt-in |
| 09:52:56 | 22 | store manager plaintiff. |
| 09:52:58 | 23 | The second column gives their name. |
| 09:53:00 | 24 | Third column shows the total number of weeks that |
| 09:53:04 | 25 | they worked during their particular liability period, |

09:53:06  1   which was in three years of the date they signed the

09:53:11  2   opt-in form.  That's the first one that says total

09:53:13  3   number of weeks worked, first numerical column.

09:53:16  4        The second one is a number of those weeks where

09:53:19  5   they worked more than 40 hours a week.  So you can see,

09:53:22  6   for example, for Alfred Abbott, he worked a total of 42

09:53:26  7   hours in the liability period.

09:53:28  8        Q.  42 hours?

09:53:29  9        A.  Excuse me.  42 weeks.  I'm sorry.  And all 42 of

09:53:32 10   those weeks he worked more than 40 hours a week.

09:53:35 11        Now, the next column shows the number he worked

09:53:38 12   more than 48 hours a week, and of the 42 weeks, 41 of

09:53:42 13   those he worked more than 48 hours a week.

09:53:47 14        The last column shows the number of weeks that he

09:53:49 15   worked more than 52 hours a week; and of the 42, 40 of

09:53:54 16   those weeks he worked more than 52 hours a week.

09:53:58 17        And that's repeated for each of these opt-in

09:54:01 18   store manager plaintiffs.

09:54:01 19        Q.  So in each instance, you have gone through each

09:54:03 20   opt-in plaintiff and broken it down by name, showing

09:54:06 21   what you have just indicated; is that correct?

09:54:07 22             MR. KENT:  Objection, Your Honor.

09:54:08 23             THE COURT:  Sustained.

09:54:11 24        Q.  This calculation was for just one plaintiff or

09:54:13 25   all?

09:54:14  1      A.   It's for all plaintiffs I gave an example by

09:54:17  2   talking about.

09:54:21  3             MR. CHILDS:   That's all I have -- hold on

09:54:23  4   just a minute, Your Honor.

09:54:34  5      Q.   Just for clarification, is there -- did you add

09:54:37  6   six hours to any of these weeks?

09:54:38  7      A.   Oh, no, sir.   These are just reported hours.

09:54:41  8      Q.   And this, again, comes from the data that was

09:54:43  9   given to you by the defendant?

09:54:44 10      A.   Yes, sir.

09:54:45 11      Q.   And it's broken down by week?

09:54:47 12      A.   It's broken down by plaintiff, and it's broken

09:54:50 13   down by the total number of weeks that they worked, and

09:54:52 14   the number of those that were either over 40, over 48,

09:54:56 15   or over 52.

09:54:58 16             MR. CHILDS:   All right.   Answer the

09:54:59 17   questions by the defendant.

09:55:01 18             THE COURT:   All right.   Cross-examination,

09:55:02 19   34 minutes.

09:55:04 20             MR. KENT:   Your Honor?

09:55:05 21             THE COURT:   Yes.

09:55:06 22             MR. KENT:   Your Honor, we object and to

09:55:08 23   strike the testimony and the reports.   There's no

09:55:11 24   basis --

09:55:12 25             THE COURT:   The objection is overruled.   Are

| | | |
|---|---|---|
| 09:55:14 | 1 | you going to cross-examine this witness? |
| 09:55:16 | 2 | MR. KENT:  Yes, sir. |
| 09:55:16 | 3 | THE COURT:  Please do so. |
| 09:55:21 | 4 | **CROSS-EXAMINATION** |
| 09:55:21 | 5 | **BY MR. KENT:** |
| 09:55:21 | 6 | Q.  Dr. Bradley, good morning. |
| 09:55:23 | 7 | A.  Good morning. |
| 09:55:24 | 8 | Q.  Now, I took your deposition awhile ago; correct? |
| 09:55:26 | 9 | A.  About a year ago, as a matter of fact, yes. |
| 09:55:28 | 10 | Q.  And is it the case that you are still getting |
| 09:55:30 | 11 | paid $600 an hour to testify at trial? |
| 09:55:32 | 12 | A.  That's correct. |
| 09:55:33 | 13 | Q.  Okay.  Well, I will try to go slow. |
| 09:55:37 | 14 | I first want to start with what your area of |
| 09:55:44 | 15 | expertise is, okay? |
| 09:55:46 | 16 | A.  Okay. |
| 09:55:47 | 17 | Q.  You are not an expert in the Fair Labor Standards |
| 09:55:52 | 18 | Act; correct? |
| 09:55:52 | 19 | A.  That's correct. |
| 09:55:53 | 20 | Q.  Your expertise is in mathematics, statistics; |
| 09:55:57 | 21 | correct? |
| 09:55:57 | 22 | A.  Statistics, mathematics and computing, yes. |
| 09:56:00 | 23 | Q.  So you have no opinion on what the law or the |
| 09:56:05 | 24 | regulations are under the FLSA; correct? |
| 09:56:08 | 25 | A.  That is correct. |

09:56:09    1      Q.   Therefore, you have no opinion on what the
09:56:13    2  correct assumptions are when making a damage calculation
09:56:17    3  in this case; correct?
09:56:19    4      A.   Well, I don't know about that.  I know that -- I
09:56:26    5  don't know to which assumptions you are talking about,
09:56:28    6  in particular.
09:56:29    7      Q.   Well, we will go through them.  But is it fair to
09:56:31    8  say that all of the assumptions that you made, in terms
09:56:34    9  of calculations in this case, were assumptions that were
09:56:39   10  given to you by the plaintiffs' attorneys?
09:56:42   11      A.   I just hate to be that broad about it.  I
09:56:46   12  certainly would agree that the criterion for determining
09:56:50   13  the 2 FTE was given by the plaintiffs' attorney; and I
09:56:55   14  agree that the criteria for what the back pay rates
09:56:59   15  would be were given by the attorney.
09:57:03   16      Q.   Okay.  So I think we're on the same page.  All
09:57:08   17  the sums include the damages calculations, and the
09:57:10   18  assumptions to come up with who was on the two employee
09:57:13   19  lists were assumptions given to you by plaintiffs'
09:57:16   20  counsel?
09:57:16   21      A.   Right.  Those assumptions for who was on the two
09:57:20   22  employee FTE list were given to me by plaintiffs'
09:57:23   23  counsel.  Some of the assumptions for computing the
09:57:26   24  damage calculations were given to me by plaintiffs'
09:57:29   25  counsel, and I enumerated those.  Those were what the

09:57:31    1    overtime rates were.  For example, between 40 and 48

09:57:36    2    hours, or over 48 hours.

09:57:38    3        Q.  Okay.  And taking it one step further, you have

09:57:43    4    no opinion as to whether Family Dollar was in compliance

09:57:48    5    with the Fair Labor Standards Act or not; correct?

09:57:50    6        A.  Oh, I agree with that, yes, sir.  I do not have

09:57:53    7    an opinion on that.

09:57:55    8        Q.  Okay.  Let's talk about your damage calculation.

09:57:57    9    Your damage calculation was performed based upon data

09:58:02   10    you said was provided by Family Dollar; correct?

09:58:05   11        A.  Yes, sir.

09:58:06   12        Q.  And the data, as you understood it, was the hours

09:58:10   13    that the store manager reported, that's one; correct?

09:58:14   14        A.  Correct.

09:58:15   15        Q.  And then their salary that they were paid;

09:58:19   16    correct?

09:58:20   17        A.  That, plus -- okay, that's correct.

09:58:23   18        Q.  Okay.  Those two things were components of your

09:58:27   19    damage calculations?

09:58:28   20        A.  That's correct.

09:58:28   21        Q.  Okay.  Now, for each plaintiff that you did this

09:58:35   22    damage calculation, it is a simple, straightforward

09:58:39   23    calculation; correct?

09:58:40   24        A.  I would say it's a straightforward calculation,

09:58:47   25    given you have perfect numbers, yes.

09:58:49  1      Q.   Okay.   Assuming that the numbers are correct, the
09:58:52  2  math is simple?
09:58:53  3      A.   The math is straightforward.   I hate to use the
09:58:57  4  word "simple", but it's certainly straightforward.
09:58:59  5      Q.   Thank you.
09:58:59  6          Now, I want to briefly go over some of the
09:59:03  7  calculations that Mr. Childs asked you about.
09:59:05  8      A.   Okay.
09:59:06  9      Q.   The first assumption you had to make was to
09:59:10 10  figure out the overtime rates; correct?
09:59:13 11      A.   That's correct.
09:59:14 12      Q.   And to do that, you took a salary -- Family
09:59:19 13  Dollar's information what the salary was; correct?
09:59:20 14      A.   That's correct.
09:59:21 15      Q.   And you divided it by a number.   Now, you called
09:59:25 16  that the contract number; correct?
09:59:27 17      A.   That's correct.
09:59:27 18      Q.   There's no contract between Family Dollar and --
09:59:39 19  no written contract between Family Dollar and any of its
09:59:39 20  employees; correct?
09:59:39 21      A.   I have no opinion on that.
09:59:39 22      Q.   You are using that term just as a term of art;
09:59:40 23  correct?
09:59:41 24      A.   That's correct.
09:59:42 25      Q.   Okay.   And if it turns out that there's an

09:59:48   1   agreement between Family Dollar and any plaintiff, you

09:59:52   2   don't know about that; correct?

09:59:54   3       A.   That's correct.

09:59:55   4       Q.   And it could be that every employee of Family

10:00:01   5   Dollar has a different agreement; correct?

10:00:03   6       A.   That's conceivable, yes.

10:00:05   7       Q.   But what you did, is you just uniformly applied

10:00:09   8   the same number for all the plaintiffs in each of your

10:00:12   9   calculations?

10:00:13   10      A.   And I stated I made that assumption.

10:00:15   11      Q.   Excuse me?

10:00:16   12      A.   I stated I made that assumption for the various

10:00:19   13   scenarios, I did.

10:00:20   14      Q.   So using the term and let's -- instead of using

10:00:24   15   the term "contract", let's use the term "compensated

10:00:28   16   hours".

10:00:29   17           Assuming that you were going to use 40 as the

10:00:33   18   number for compensated hours, you would apply that

10:00:36   19   number to all of the plaintiffs; correct?

10:00:39   20      A.   For that calculation, yes, I would.

10:00:41   21      Q.   Okay.  And then for 48 hours, you would do the

10:00:44   22   same thing?

10:00:45   23      A.   Yes.

10:00:46   24      Q.   Correct?

10:00:47   25      A.   That's correct.

10:00:47  1      Q.   Okay.  You have no opinion as to which is the

10:00:56  2   correct; is that correct?

10:00:56  3      A.   That's correct.  I do not have an opinion on

10:00:58  4   that.

10:00:58  5      Q.   Like you said, it could be that for one it's 48;

10:01:01  6   and it could be that for somebody else, it's not either

10:01:06  7   40 or 48, but another number; correct?

10:01:09  8      A.   That's conceivable, yes.

10:01:11  9      Q.   Could be 52?

10:01:12 10      A.   Could be.

10:01:13 11      Q.   Or it could be a fourth alternative -- it could

10:01:17 12   be all of the hours that they worked each week?

10:01:21 13      A.   That is an option, yes, sir.

10:01:22 14      Q.   Okay.  Again, you were just given two assumptions

10:01:28 15   to calculate?

10:01:31 16      A.   I was asked to compute under two assumptions.

10:01:33 17      Q.   And not any others?

10:01:34 18      A.   That's correct.

10:01:35 19      Q.   Okay.  Now, the big difference in the calculation

10:01:43 20   is that it drives -- in the determination of the number,

10:01:47 21   is that it drives how big the damage calculations's

10:01:50 22   going to be; correct?

10:01:51 23      A.   Wait, now, what was that again?  I'm sorry.

10:01:54 24      Q.   What I am saying to you is, the big difference or

10:01:57 25   the significance of this number -- whether it's 40, 48,

10:02:01  1   or 52 -- is it's driving the level of damages; correct?

10:02:07  2       A.   Yes, sir, that's correct.

10:02:08  3       Q.   Okay.  And you testified to -- but just to go

10:02:11  4   over part of it, if you pick 40 hours, all the hours

10:02:15  5   that the person works over 40, they're going to get paid

10:02:18  6   time and a half that?

10:02:18  7       A.   That's correct.

10:02:19  8       Q.   Even if their compensated hours were for 48 or

10:02:24  9   52, under your math, they still get overtime for all

10:02:27  10  hours over 40?

10:02:28  11      A.   Right.  Under the assumption that they're only

10:02:31  12  really compensated for 40 hours, they get time and a

10:02:33  13  half for all hours over 40.

10:02:35  14      Q.   Exactly.  Now, let's go on to, then, the part

10:02:48  15  about how far back you went.

10:02:53  16      A.   Okay.

10:02:54  17      Q.   And I'm looking for the term that -- here it is.

10:02:59  18  You testified that you did it, quote, "occurred within

10:03:03  19  the liability period", closed quote.

10:03:06  20      A.   Correct.

10:03:06  21      Q.   Now, you don't have an opinion as to what is the

10:03:11  22  proper liability period in this case, do you?

10:03:14  23      A.   No, sir, I do not.

10:03:15  24      Q.   Okay.  It could be six months; correct?

10:03:19  25      A.   Right.  Like I said, I don't have an opinion.

| | | |
|---|---|---|
| 10:03:21 | 1 | Q.  You don't know.  You were just told to go back |
| 10:03:26 | 2 | three years from when the individual became a plaintiff |
| 10:03:29 | 3 | in this case, and then go forward from there; correct? |
| 10:03:33 | 4 | A.  That's correct. |
| 10:03:34 | 5 | Q.  You could have gone back two years? |
| 10:03:36 | 6 | A.  I could have, but I was asked to do three years. |
| 10:03:39 | 7 | Q.  And at $600 an hour, it's reasonable you would be |
| 10:03:44 | 8 | asked to do certain things -- |
| 10:03:46 | 9 | MR. CHILDS:  Object. |
| 10:03:47 | 10 | THE COURT:  Sustained.  The jury will |
| 10:03:49 | 11 | disregard the lawyer's remarks. |
| 10:03:53 | 12 | Q.  To summarize, you were given two assumptions: |
| 10:03:58 | 13 | Number one, the compensated hour number -- 40, 48, some |
| 10:04:04 | 14 | other number? |
| 10:04:05 | 15 | A.  That's correct. |
| 10:04:05 | 16 | Q.  And number two, how far back to go, the liability |
| 10:04:10 | 17 | period? |
| 10:04:10 | 18 | A.  Yes, sir, that's correct. |
| 10:04:11 | 19 | Q.  And once you know those two numbers, as you said |
| 10:04:16 | 20 | it's straightforward math to do the calculation? |
| 10:04:19 | 21 | A.  That's correct. |
| 10:04:19 | 22 | Q.  Okay.  I'll have you look at Plaintiffs' Exhibit |
| 10:04:37 | 23 | 46A.  I guess you need to go to tab where -- it's the |
| 10:04:43 | 24 | 3A -- |
| 10:04:44 | 25 | A.  Okay. |

10:04:44  1       Q.   -- part of that.  Your damage calculation of
10:04:46  2   Exhibit 46A.  And I just want to bring up two -- just
10:04:51  3   two examples to make sure that we're reading the report
10:04:55  4   correctly.
10:04:56  5          Turn, first, if you would, to Lawrence Reevers.
10:05:01  6       A.   Do you have a page number?
10:05:03  7       Q.   Well, I believe it's alphabetically, but I will
10:05:06  8   tell you what I turned to.
10:05:08  9       A.   I found it.  I found it.
10:05:12 10       Q.   Okay.  What page do you have -- did you find
10:05:27 11   Mr. Reevers?
10:05:28 12       A.   Yes, I did.
10:05:29 13       Q.   Can you just tell the jury and me, for the
10:05:31 14   record, what you have calculated Mr. Reevers' damages to
10:05:37 15   be, and do it for 40 and 48 without the six hours.
10:05:40 16       A.   Okay.  For 48 without the six hours, it's
10:05:46 17   $86,482.52.  And for the 40 without six hours, it's
10:05:52 18   $130,161.57.
10:05:55 19       Q.   Okay.  So Mr. Reevers, assuming he worked three
10:06:00 20   years -- the full three years of the period, and he was
10:06:03 21   claiming damages of 130,000, that would be over $40,000
10:06:09 22   a year in damages; correct?
10:06:12 23       A.   That's correct.
10:06:13 24       Q.   Okay.  So the salary was 36,000, and he would be
10:06:17 25   over doubling his salary?

10:06:20   1      A.   That's correct.

10:06:20   2      Q.   Okay.   In this report, I believe -- and the

10:06:32   3   documents speak for themselves, we don't need to look

10:06:35   4   through it to confirm -- but there is about 20

10:06:39   5   individuals that you have a zero for, and that would

10:06:41   6   mean for those individuals, based upon the information

10:06:44   7   you have, they have zero damages?

10:06:46   8      A.   I don't know if the 20 is right, but I think it's

10:06:49   9   somewhere in that ballpark.

10:06:51  10          That could be one of two reasons:   It could be

10:06:55  11   they have no damages, that is, they worked, say, less

10:06:58  12   than 40 hours a week and they worked a short period of

10:07:02  13   time; or for some individuals, we didn't have data

10:07:05  14   available to do a calculation.

10:07:06  15      Q.   Okay.   And in any event, you have no data that

10:07:11  16   would show they were entitled to any damages; is that

10:07:14  17   correct?

10:07:14  18      A.   That's correct.

10:07:15  19      Q.   If you would turn to the additional six hours

10:07:24  20   that you did, and there's two issues here.

10:07:28  21          There's, first, the calculation to get to the

10:07:32  22   number, the six; and then there is the application, who

10:07:36  23   gets the six; correct?

10:07:38  24      A.   That's correct.

10:07:38  25      Q.   All right.   And just so that we can tie back to

10:07:43  1    the damages, if an individual had a zero -- one of these

10:07:53  2    20 or so people -- if they had a zero, you wouldn't give

10:07:56  3    them any additional damages because they would have

10:08:02  4    theoretically worked six more hours; correct?

10:08:05  5         A.   Well, that's very true.   If the six hours put

10:08:07  6    them over the 40 hours, then they would get some

10:08:10  7    damages.

10:08:10  8         Q.   Well, I'm saying for this 20 that had the zero.

10:08:12  9         A.   All the way across?

10:08:13  10        Q.   Yes, sir.

10:08:14  11        A.   Well, they had to work less than 34 hours a week.

10:08:20  12        Q.   Let's turn, for example, to Michael Davis.

10:08:28  13             I believe you have --

10:08:29  14        A.   Pardon me, what is that last name?

10:08:31  15        Q.   Davis.   You have for him across the board a zero.

10:08:49  16        A.   That's correct.

10:08:50  17        Q.   And my only point there is that -- I'm making

10:08:53  18   sure I'm correct saying that if you calculated zero

10:08:57  19   damages for him without the six hours, you are not going

10:09:00  20   to give him any damages under the six hour -- additional

10:09:05  21   six-hour theory?

10:09:06  22        A.   And I am saying it's possible.   It didn't happen

10:09:08  23   in his case, but that's possible.

10:09:10  24             For example, let's suppose he worked 38 hours.

10:09:13  25        Q.   Okay.

10:09:13   1      A.   Two weeks only in the liability period, and each

10:09:16   2    time is 38 hours.

10:09:17   3           All right, under the 40-hour scenario, he would

10:09:20   4    get no back pay.  But if I added six hours to it, he

10:09:23   5    would get 44, and he would get back pay for four

10:09:26   6    additional hours.

10:09:27   7      Q.   Okay.  Well, let's talk about the calculation of

10:09:33   8    the six hours.

10:09:34   9      A.   Okay.

10:09:35  10      Q.   Okay?  To calculate, to come up with that number,

10:09:41  11    what you did is you had to compare two things; correct?

10:09:46  12    you had to compare the actual hours that were reported,

10:09:52  13    compared to what they said they worked; what these

10:09:56  14    plaintiffs said that they worked?

10:09:57  15      A.   Well, I actually compared two figures from the

10:10:02  16    depo.  One was the actual hours they said they reported,

10:10:06  17    compared to what they said in the deposition that they

10:10:11  18    worked.

10:10:11  19      Q.   Okay.  And so what you actually did, was you

10:10:13  20    actually looked at -- you actually looked at summaries

10:10:18  21    of depositions that somebody else did?

10:10:20  22      A.   That's correct.

10:10:21  23      Q.   And one thing you looked at in those deposition

10:10:27  24    summaries was what each plaintiff in their deposition

10:10:30  25    said that they worked; for example, they could have

10:10:33  1    said, "each week I worked 90 hours"?

10:10:35  2        A.   That's correct.

10:10:36  3        Q.   And then what you have to do is you have to

10:10:38  4    compare time they actually did work?

10:10:41  5        A.   Correct.

10:10:42  6        Q.   Now, the most accurate way to find out that

10:10:45  7    second number would be to go back and look at the data

10:10:50  8    that you were given that shows what they actually

10:10:54  9    reported; correct?

10:10:56  10       A.   Well, I don't know if that's the most accurate,

10:10:58  11   but that's certainly one way to do it.

10:11:00  12            These people are recalling from memory both

10:11:02  13   figures.  And they're liable to bias -- if they're

10:11:06  14   liable to bias those figures by subtracting that bias

10:11:10  15   would be removed.

10:11:11  16            So I don't necessarily agree that the difference

10:11:13  17   I would be getting would be more accurate by going back

10:11:16  18   and using the depo figure, the depo statement for one

10:11:19  19   figure and then the numerical figure for another.

10:11:21  20       Q.   Isn't it the case that the ones we looked at the

10:11:29  21   deposition, there was a person who said in their

10:11:32  22   deposition, "I reported 52 hours every week"; and yet

10:11:36  23   when we looked at the actual reported hours, they're

10:11:40  24   reporting 60, 70 and 80 hours every week?

10:11:43  25       A.   Well, we looked at three.

10:11:44    1      Q.   Yes.

10:11:46    2      A.   And since then, I have looked at four others and

10:11:50    3   they were right on target.  So I don't know that that

10:11:51    4   always happened, that they were over-reporting as to

10:11:56    5   what was reported.

10:11:57    6      Q.   Well, doesn't it take out an unknown if you just

10:12:05    7   went and looked at the actual reported hours, as

10:12:08    8   compared to what somebody is testifying occurred several

10:12:12    9   years ago?

10:12:13   10      A.   I say that's one way you could do it.  But you

10:12:16   11   have also got to keep in mind, as I tried to explain to

10:12:20   12   you, there could be bias in what people recall and they

10:12:23   13   may bias both numbers the same.

10:12:23   14           Secondly, you also recall my average was actually

10:12:27   15   over seven hours, and to allow for the possibility there

10:12:29   16   might be some overstatement, I only added six hours.

10:12:34   17      Q.   Okay.  And let me just jump back for one second.

10:12:38   18   The actual damage calculation that you did, that was --

10:12:41   19   the program was written by somebody in your office; is

10:12:44   20   that correct, sir?

10:12:44   21      A.   That's correct.

10:12:45   22      Q.   Okay.  And these deposition summaries were done

10:12:49   23   by somebody else in your office?

10:12:50   24      A.   That's correct.

10:12:51   25      Q.   Let's talk about -- now, you've come up with this

10:12:56   1    number of six.  And you know from the depositions some

10:13:02   2    people are saying, "I reported my time accurately"?

10:13:06   3        A.   That's correct.

10:13:07   4        Q.   And you looked at approximately 214 depositions;

10:13:12   5    correct?

10:13:12   6        A.   I think that is the correct number, yes.

10:13:15   7        Q.   And that's less than one-fifth of all the

10:13:17   8    plaintiffs in the case?

10:13:19   9        A.   That's right.

10:13:22  10        Q.   So you have two groups of people, at least:  You

10:13:29  11    have one group of people who have said, I reported my

10:13:32  12    time accurately; you have another group of people, huge

10:13:36  13    group of people, you have no information on.

10:13:42  14             And the way that you applied the six hours was to

10:13:46  15    apply it to everybody uniformly?

10:13:49  16        A.   Right.  But my purpose of adding these hours in

10:13:52  17    was to come up with a bottom line estimate of what the

10:13:55  18    compensation would be if we could measure unreported

10:13:58  19    hours.

10:13:59  20             I mean, the ideal situation is every plaintiff

10:14:04  21    would have reported every week the number of hours he

10:14:07  22    didn't report and we would have that figure.  We don't

10:14:09  23    have that.  So we're forced to estimate, in some sense,

10:14:12  24    what the effect of not reporting hours are.

10:14:15  25             So when I come up with the bottom line summary,

10:14:19  1   that estimate gives me an idea of what the unreported

10:14:22  2   time would represent.

10:14:23  3       Q.   In other words, to do it accurately, we need to

10:14:27  4   hear from each plaintiff?

10:14:28  5       A.   Well, actually to do it accurately, we need more

10:14:31  6   than to hear from each plaintiff, we need each plaintiff

10:14:34  7   to be shot back in time and write down the number of

10:14:38  8   hours he didn't report at the time he reported them.

10:14:40  9       Q.   Well, given that we can't do that --

10:14:42  10      A.   Given we can't do that, we have to use a

10:14:45  11  reasonable method of estimation, which I believe I have

10:14:47  12  done.

10:14:48  13      Q.   Unless we could hear from each plaintiff?

10:14:52  14      A.   I am saying, hearing from each plaintiff may not

10:14:55  15  solve that problem.  I mean, I don't know that the

10:15:00  16  estimate would change.  We don't know that.  I mean,

10:15:02  17  statistics tell us it won't change that much.

10:15:05  18      Q.   Let's change gears and talk about your two

10:15:10  19  employee calculation.  There, you needed to have two

10:15:16  20  assumptions given to you; correct?

10:15:20  21           We first needed to know what the definition of

10:15:23  22  "two employees" is.

10:15:25  23      A.   That's correct.

10:15:26  24      Q.   And it could be that two employees means two

10:15:31  25  employees?

10:15:32   1      A.   Well, it was two full-time equivalent employees.

10:15:35   2      Q.   That's the terminology you were given; correct?

10:15:39   3      A.   Well, that's a fairly standard terminology.

10:15:42   4      Q.   I understand.   That's the terminology you were

10:15:45   5   given?

10:15:45   6      A.   I think two full-time equivalents is a fairly

10:15:48   7   standard terminology.   It was given.   I am just saying

10:15:51   8   two full-time equivalent is fairly standard.

10:15:54   9      Q.   You don't know what the regulations say,

10:15:56  10   Dr. Bradley, do you?

10:15:57  11      A.   Well, I have read parts of the regulations.   To

10:16:01  12   say I don't know they say, it's sort of a misnomer.   I

10:16:06  13   said I was not an expert in regulations.

10:16:07  14      Q.   One of the ways you could have done the test is

10:16:10  15   you could have looked at how many employees were at the

10:16:13  16   store each week.   You had that information; correct?

10:16:15  17      A.   Yes.

10:16:16  18      Q.   Okay.   And if you had looked it that way, you

10:16:19  19   would have found that almost every week, if not every

10:16:22  20   week, every store had two or more employees working at

10:16:25  21   it; correct?

10:16:27  22      A.   You are talking about just --

10:16:28  23           THE COURT:   Are you asking him what he would

10:16:30  24   have found had he looked when he did not look?

10:16:33  25           MR. KENT:   Well, I think he already said he

```
10:16:34   1   has not looked.
10:16:35   2                THE COURT:  All right.
10:16:36   3                THE WITNESS:  Well, I mean, I did not look
10:16:37   4   at it that way.  I did not look just to see how many
10:16:39   5   employees were there each week.  I looked to see how
10:16:43   6   many employee hours there were each week.
10:16:45   7        Q.   (By Mr. Kent)  But you did look at the data;
10:16:48   8   correct?  You had that data?
10:16:50   9        A.   Yes.  I mean, I had the data.  That's correct.
10:16:53  10        Q.   And so you had the information that would show
10:16:55  11   you how many employees were at the store each week?
10:16:58  12        A.   That's correct.
10:16:59  13        Q.   Did you look at how many employees worked at the
10:17:02  14   store each week?
10:17:03  15        A.   Well, I had to do that.  It's part of computing
10:17:06  16   the 2 FTE.  I had two more employees working 80 more
10:17:11  17   hours a week.
10:17:12  18        Q.   I'm not talking about terms of how many hours, I
10:17:14  19   am asking did you look at how many employees worked at
10:17:16  20   the store each week?
10:17:18  21        A.   Well, I mean, did you say did I physically sit
10:17:21  22   down and look at everybody's week?  No.  I mean, is that
10:17:24  23   data available in the database?  Yes.
10:17:27  24        Q.   Okay.  So you don't know what that calculation
10:17:32  25   is, or that statistic is?
```

10:17:33   1      A.   No, I don't know what that calculation is, no.

10:17:35   2      Q.   Well, in this case, you were told to assume that

10:17:41   3   two employees equals 80 hours.

10:17:44   4      A.   I was told to assume two full-time equivalent

10:17:45   5   employees equals two or more employees working 80 or

10:17:48   6   more hours a week.

10:17:49   7      Q.   And that number, under the law, could be 80, or

10:17:53   8   it could be 70, or it could be 60 or it could be another

10:17:57   9   number; correct?

10:17:58   10     A.   That's correct.

10:17:59   11     Q.   If, under your analysis, full-time equaled 30

10:18:04   12   hours, then two full-time would be 60 hours; correct?

10:18:08   13     A.   Pardon?

10:18:11   14     Q.   If full-time --

10:18:13   15     A.   If full-time were 30 hours?

10:18:15   16     Q.   Yes, sir.

10:18:15   17     A.   Then two full-time equivalent would be 60 hours,

10:18:19   18   that's correct.

10:18:19   19     Q.   And so then the second part of what you had to do

10:18:22   20   was that, once you know what two full-time is, you had

10:18:26   21   to know what is regular and customary, you had to

10:18:30   22   know -- how often did they have to meet this goal;

10:18:33   23   correct?

10:18:34   24     A.   That's correct.

10:18:34   25     Q.   And, again, that number was given to you by

10:18:37   1    plaintiffs' attorneys; correct?

10:18:39   2        A.   Plaintiffs' attorneys and their expert, that's

10:18:42   3    correct.

10:18:42   4        Q.   You have no opinion of what is the correct

10:18:45   5    definition of "regular and customary"?

10:18:47   6        A.   That's correct.

10:18:48   7        Q.   Could be 50 percent?

10:18:52   8        A.   Could be.

10:18:53   9        Q.   Could be 60, could be 70, you just don't have an

10:18:56  10    opinion; correct?

10:18:56  11        A.   That's correct.

10:18:57  12        Q.   You were told 80 percent?

10:18:59  13        A.   I was told they had to do it more than 80 percent

10:19:01  14    of the time.

10:19:02  15        Q.   Actually, you were told over 80 percent?

10:19:05  16        A.   That's correct.

10:19:05  17        Q.   So then there were, in fact, people who were

10:19:07  18    right at 80 percent?

10:19:08  19        A.   I think there were two people at 80 percent.

10:19:10  20        Q.   Ten, thirteen people?

10:19:12  21        A.   You know, I don't recall the exact number.

10:19:14  22        Q.   In your calculation, they fell below the line?

10:19:19  23        A.   That's correct.

10:19:20  24        Q.   You treated the same as somebody who was at 10

10:19:22  25    percent?

10:19:22  1    A.   That's correct.  For determining whether they

10:19:29  2    failed or not the two full-time equivalent criteria.

10:19:34  3    Q.   The third time you had to do was to determine

10:19:37  4    what period of time I am looking at.  Am I going to go

10:19:40  5    back one year, am I going to go back two years; you had

10:19:43  6    to determine the time period to look at; correct?

10:19:45  7    A.   That's correct.

10:19:46  8    Q.   And you were told to look over a three-year time

10:19:48  9    period?

10:19:49  10   A.   That is correct.

10:19:49  11   Q.   You have no opinion on whether that's the right

10:19:53  12   time period or not, do you?

10:19:54  13   A.   You are correct, I do not know that.

10:19:56  14   Q.   Did you look at it over any other time period?

10:19:59  15   A.   No, sir.

10:19:59  16   Q.   In terms of looking at it, you could have looked

10:20:24  17   at what the overall average was for the group, couldn't

10:20:28  18   you?

10:20:28  19   A.   I don't understand how you're defining "overall

10:20:35  20   average".

10:20:35  21   Q.   We have got these 1,400 plaintiffs.  On average,

10:20:39  22   how are they doing, on average do they as a group

10:20:42  23   supervise more than 80 hours worth of hourly work or

10:20:46  24   not; could have done that?

10:20:47  25   A.   We could have, yes.

10:20:48  1      Q.   Did you?

10:20:48  2      A.   No.

10:20:49  3      Q.   Tell me, did you look at the average salary for a

10:20:57  4   store manager?

10:20:58  5      A.   I might have computed that at one time.

10:21:02  6      Q.   Do you remember?

10:21:04  7      A.   It's under $10 hour.  I don't remember exactly

10:21:07  8   what it is.

10:21:07  9      Q.   That's current?

10:21:11  10     A.   Pardon?

10:21:11  11     Q.   Currently.  I'm talking the salary, their annual

10:21:11  12  salary?

10:21:12  13     A.   Oh, annual salary.  I'm talking about their

10:21:15  14  hourly rate.

10:21:15  15     Q.   Well, depending on how many hours --

10:21:17  16     A.   Right.  Right.  I don't remember -- be honest

10:21:20  17  with you, I do not remember a weekly salary.  I just

10:21:23  18  don't recall that.

10:21:24  19     Q.   Did you look at the average number of reported

10:21:29  20  hours of a store manager?

10:21:31  21     A.   I probably looked at that one time.

10:21:37  22     Q.   Do you remember if it was around 58, 59?

10:21:41  23     A.   You know, I don't remember, but that -- I'm not

10:21:43  24  saying that's incorrect.  60, or something along those

10:21:46  25  lines, rings a bell to me.

10:21:48  1      Q.   So some people who have their average would be

10:21:53  2   below 58 and some people would be above it?

10:21:56  3      A.   Right.   There were some people worked a short

10:21:59  4   period of time, some people worked less than 40 hours a

10:22:01  5   week, and a lot of people worked 80 and 90 hours a week,

10:22:05  6   too.

10:22:05  7      Q.   Did you find people, store managers, who averaged

10:22:08  8   under 40 hours a week?

10:22:09  9      A.   Who averaged what?

10:22:11 10      Q.   Under 40 hours a week.

10:22:12 11      A.   There probably were some that worked a very brief

10:22:15 12   period of time as a store manager.

10:22:18 13           MR. KENT:   Nothing else, Your Honor.   Except

10:22:22 14   we renew all of our motions to --

10:22:25 15           THE COURT:   Redirect?

10:22:26 16                    **REDIRECT EXAMINATION**

10:22:27 17   **BY MR. CHILDS:**

10:22:29 18      Q.   I have just a couple of questions, Dr. Bradley.

10:22:35 19           Every one of the depos that you reviewed in

10:22:37 20   arriving at your unreported hours calculation, those

10:22:42 21   witnesses testified under oath; is that correct?

10:22:45 22      A.   That's correct.

10:22:46 23           MR. KENT:   Objection, Your Honor, leading.

10:22:49 24           THE WITNESS:   That's my understanding, yes.

10:22:51 25           THE COURT:   Overruled.

10:22:53  1    Q.   Every one of the analysis that you did in this

10:22:57  2  case --

10:22:57  3             THE COURT:  Don't lead your witness,

10:22:59  4  Mr. Childs.

10:23:00  5             MR. CHILDS:   I won't, Your Honor.

10:23:03  6    Q.   What data was used in doing each and every one of

10:23:08  7  your analysis?

10:23:09  8    A.   Well, other than the depositions I used to

10:23:14  9  compute the six-hour estimate, all the data was supplied

10:23:18  10  by Family Dollar.

10:23:19  11    Q.   And can you do unreported hours analysis when

10:23:24  12  there is no data on it, other than the way you did it?

10:23:26  13    A.   Well, you have to have some estimates, because

10:23:29  14  there are no electronic files or records of unreported

10:23:33  15  hours.

10:23:33  16    Q.   And the assumptions that you used in arriving at

10:23:43  17  your six-hour calculation, those assumptions were yours;

10:23:46  18  is that correct?

10:23:46  19             THE COURT:  Mr. Childs, don't lead your

10:23:47  20  witness.

10:23:48  21    Q.   Would you tell the Court what assumptions and

10:23:50  22  where they came from in doing the unreported analysis?

10:23:53  23    A.   Well, I used standard statistical methodology to

10:23:58  24  estimate the number of hours.

10:23:59  25    Q.   Were you told how many hours to use?

10:24:01   1       A.   No, sir.

10:24:02   2       Q.   You arrived at that on your own?

10:24:04   3       A.   Yes, sir.

10:24:05   4       Q.   Without input from plaintiffs' counsel?

10:24:06   5            THE COURT:   Mr. Childs --

10:24:08   6            MR. CHILDS:   Sorry, Your Honor.

10:24:09   7            THE COURT:   That's the end of this

10:24:11   8  examination.   Thank you, sir.   You may come down.

10:24:13   9            Plaintiff will call --

10:24:15  10            MR. KENT:   Your Honor, we renew all of your

10:24:17  11  motions.

10:24:17  12            THE COURT:   I make the same ruling I made

10:24:19  13  before.   Plaintiffs will call their next witness.

10:24:25  14            MR. R. WIGGINS:   Your Honor, the plaintiffs

10:24:26  15  have a proffer of proof outside the presence of the

10:24:28  16  jury, a matter the Court's already excluded.

10:24:31  17            THE COURT:   Ladies and gentlemen, let's take

10:24:33  18  a break.

10:24:35  19            We will be in recess because there are some

10:24:37  20  matters we have to take up outside your presence.   We

10:24:40  21  will be in recess until 10:20.

10:24:43  22            Please do not discuss the case among

10:24:45  23  yourselves or with anyone else.   Don't allow the case to

10:24:48  24  be discussed in your presence.   Keep an open mind.

10:24:58  25            I'm sorry.   I can't see, ladies and

| | |
|---|---|
| 10:25:03 | 1 |
| 10:25:52 | 2 |
| 10:25:52 | 3 |
| 10:25:55 | 4 |
| 10:25:57 | 5 |
| 10:26:12 | 6 |
| 10:26:12 | 7 |
| 10:26:12 | 8 |
| 10:26:12 | 9 |
| 10:26:15 | 10 |
| 10:26:18 | 11 |
| 10:26:20 | 12 |
| 10:26:21 | 13 |
| 10:26:24 | 14 |
| 10:26:27 | 15 |
| 10:26:29 | 16 |
| 10:26:29 | 17 |
| 10:26:32 | 18 |
| 10:26:38 | 19 |
| 10:26:44 | 20 |
| 10:26:47 | 21 |
| 10:26:49 | 22 |
| 10:26:50 | 23 |
| 10:26:52 | 24 |
| 10:26:57 | 25 |

gentlemen.  Let's make that 10:50.

(In open court, jury not present.)

THE COURT:  Is there something we need to take up now?

MR. R. WIGGINS:  Yes, sir.

THE COURT:  We are going to take it up in open court.

MR. R. WIGGINS:  Your Honor, as a formal matter, we would like to proffer the items that the Court has excluded in a motion in limine so that we can satisfy the Circuit's rule on that.

THE COURT:  What items?

MR. R. WIGGINS:  Specifically, first, the plaintiffs' depositions to those that are beyond a hundred miles from the courthouse.

THE COURT:  All right.

MR. R. WIGGINS:  Secondly, the witnesses that we intend to put on live as a part of our case that Mr. -- my brother, Greg Wiggins, brought out yesterday. And they have told me they have a list.

THE COURT:  The witnesses that you intend to put on live?

MR. R. WIGGINS:  Yes, sir.  The witnesses that the Court has told us wait until rebuttal.

THE COURT:  Oh, all right.

| | | |
|---|---|---|
| 10:26:59 | 1 | MR. R. WIGGINS:  Right. |
| 10:27:00 | 2 | THE COURT:  Yeah. |
| 10:27:01 | 3 | MR. R. WIGGINS:  And do you have a list? |
| 10:27:26 | 4 | We also have an affidavit of Sheila Pippin |
| 10:27:30 | 5 | that shows that she is unable to attend because of her |
| 10:27:36 | 6 | health.  We don't offer it for the purpose of the jury, |
| 10:27:39 | 7 | obviously, but just to satisfy Rule 32 for medical |
| 10:27:43 | 8 | unavailability of the witness. |
| 10:27:45 | 9 | THE COURT:  All right.  Well, didn't I, in |
| 10:27:47 | 10 | my order, didn't I indicate that a witness who was |
| 10:27:51 | 11 | unavailable to attend because of illness or disability, |
| 10:27:57 | 12 | that the deposition of that witness would be allowed? |
| 10:28:00 | 13 | MR. R. WIGGINS:  Well, we would offer the |
| 10:28:02 | 14 | deposition of Sheila Pippin, then. |
| 10:28:04 | 15 | MR. MAY:  Our only objection is this is the |
| 10:28:06 | 16 | first time we have heard about any affidavit, Your |
| 10:28:09 | 17 | Honor.  So we don't really know what that's about, |
| 10:28:11 | 18 | but -- |
| 10:28:12 | 19 | MR. R. WIGGINS:  It's simply attests to her |
| 10:28:15 | 20 | medical condition. |
| 10:28:16 | 21 | THE COURT:  Let me see the evidence.  And |
| 10:28:18 | 22 | why didn't you show defendant's counsel the affidavit? |
| 10:28:21 | 23 | MR. R. WIGGINS:  That's a good question. |
| 10:28:23 | 24 | THE COURT:  Well, I need an answer.  Let me |
| 10:28:28 | 25 | get an answer as to why plaintiffs' counsel didn't share |

| | | |
|---|---|---|
| 10:28:33 | 1 | with defendant's counsel the affidavit knowing that you |
| 10:28:36 | 2 | were going to offer it. |
| 10:28:39 | 3 | MR. R. WIGGINS:  Because it goes to just the |
| 10:28:42 | 4 | issue of the proffer, not to any evidence in front of |
| 10:28:46 | 5 | the jury.  And we didn't -- I didn't really know the |
| 10:28:48 | 6 | affidavit existed until a moment ago. |
| 10:28:50 | 7 | THE COURT:  All right.  Well, henceforth, |
| 10:28:54 | 8 | before you present something to the Court -- |
| 10:28:58 | 9 | MR. R. WIGGINS:  Yes, sir. |
| 10:28:59 | 10 | THE COURT:  -- give the other side a chance |
| 10:29:03 | 11 | to look at it. |
| 10:29:04 | 12 | MR. R. WIGGINS:  I agree with that.  I did |
| 10:29:05 | 13 | not know we had not. |
| 10:29:07 | 14 | THE COURT:  All right.  Let me see it. |
| 10:29:15 | 15 | MR. MAY:  I just wanted to clarify:  You are |
| 10:29:18 | 16 | just offering it in the record; you are not offering to |
| 10:29:21 | 17 | read the depositions, are you?  Just to have it in the |
| 10:29:24 | 18 | record for any appeal? |
| 10:29:26 | 19 | MR. R. WIGGINS:  Right. |
| 10:29:46 | 20 | THE COURT:  All right. |
| 10:29:47 | 21 | MR. MAY:  As I understand it, Your Honor, |
| 10:29:49 | 22 | this is being offered only for any record that might be |
| 10:29:54 | 23 | an appellate record, and not for any evidence in front |
| 10:29:58 | 24 | of the jury. |
| 10:29:58 | 25 | THE COURT:  No, your understanding is |

10:30:00   1   incorrect.  It is being offered -- her deposition is

10:30:03   2   being offered in evidence.

10:30:06   3               MR. MAYS:  May I inquire whether they plan

10:30:10   4   to read it or just make it an exhibit?

10:30:12   5               THE COURT:  It is going to be an exhibit.

10:30:15   6               MR. MAYS:  In that case, Your Honor, we

10:30:17   7   object to it on hearsay grounds; on the grounds that it

10:30:20   8   is not proper making a deposition an exhibit; and on the

10:30:24   9   grounds that there are numerous things that are

10:30:26   10  objectionable under the rules of evidence in the

10:30:28   11  deposition, and we reserved those objections for trial.

10:30:31   12  And if it's put into the evidence wholesale, we lose the

10:30:34   13  ability to make the objections.

10:30:37   14              THE COURT:  All right.  I will give until

10:30:39   15  tomorrow morning to point out the sections of the

10:30:41   16  deposition which you object to, and I will rule on

10:30:45   17  those.  And then the depositions will be redacted in

10:30:53   18  accordance with my ruling, and what's left will go to

10:30:57   19  the jury.

10:30:57   20              MR. MAY:  And, Your Honor, we -- this

10:31:01   21  affidavit, as I now read it for the first time, is more

10:31:04   22  than an affidavit justifying her absence from trial or

10:31:10   23  inability and her medical condition.  It discusses

10:31:13   24  substantive hearsay evidence about --

10:31:16   25              THE COURT:  The affidavit is not going to be

10:31:18  1   received in evidence.

10:31:19  2             MR. MAY:  Your Honor, that satisfies my

10:31:22  3   concern.

10:31:22  4             THE COURT:  All right.  Give the affidavit a

10:31:25  5   number, though, an Exhibit Number.  It is not received

10:31:30  6   in evidence.  It is being presented to the Court as a

10:31:34  7   basis for receiving this witness' deposition into

10:31:40  8   evidence, because of her unavailability.

10:31:44  9             MR. KENT:  Your Honor, does your ruling on

10:31:46  10  the admission of a deposition as an exhibit only apply

10:31:50  11  to witnesses who are sick; or is the reading of any

10:31:54  12  deposition that we might want to do something that we

10:31:59  13  can submit to the jury as an exhibit?

10:32:00  14            THE COURT:  Well, I am going to deal with

10:32:03  15  that issue as it is presented to me.

10:32:06  16            MR. MAY:  Yes, sir.

10:32:13  17            MR. CHILDS:  Your Honor, there's one other

10:32:15  18  thing.  You've got two motions in limine.  I know in

10:32:19  19  regard to Haigler, Mason and Lundquist, you indicated

10:32:22  20  you were going to hold over until the defendant's case.

10:32:28  21            THE COURT:  Well, what else do you have to

10:32:31  22  present in your case?

10:32:32  23            MR. R. WIGGINS:  In our case, Your Honor, we

10:32:35  24  would make a proffer of the evidence excluded on the

10:32:38  25  motion in limine that you granted regarding

10:32:41  1    voluntariness, whether the plaintiffs were there working

10:32:46  2    voluntarily or they had to do it because of the nature

10:32:50  3    of the job; and the hardship that the -- all these long

10:32:54  4    hours had on their families.

10:32:58  5                 THE COURT:  All right.  Anything else?

10:32:59  6                 MR. R. WIGGINS:  And with that, we rest.

10:33:01  7                 THE COURT:  All right.

10:33:04  8                 MR. UMBACH:  We have a motion, Your Honor.

10:33:05  9                 THE COURT:  Yes, sir.  Why is everybody

10:33:10  10   standing?

10:33:30  11                MR. UMBACH:  Your Honor, this is a Rule 50

10:33:33  12   motion --

10:33:34  13                THE COURT:  All right.  I have it.  I am

10:33:38  14   going to read it.

10:33:59  15                The motion is totally lacking in merit, and

10:34:02  16   it is accordingly denied.

10:34:07  17                We will resume at 10:50 with the defendant's

10:34:12  18   evidence.

10:34:12  19                MR. R. WIGGINS:  Your Honor, we have one

10:34:14  20   motion on the defendant's evidence that we would like to

10:34:17  21   take up outside the presence of the jury when we

10:34:21  22   reconvene before the jury comes back.

10:34:23  23                THE COURT:  What is that?

10:34:24  24                MR. R. WIGGINS:  The first witness they

10:34:26  25   listed is a witness that was not disclosed in their

10:34:28   1   initial discloses, not disclosed in their supplemental

10:34:32   2   disclosures.  We tried to -- therefore, we couldn't

10:34:37   3   depose him.

10:34:38   4            THE COURT:  Who is it?

10:34:39   5            MR. R. WIGGINS:  Mr. Alexander, sitting

10:34:43   6   behind me.

10:34:45   7            We tried to flush out the fact of witnesses

10:34:48   8   that might be lurking somewhere that they didn't

10:34:52   9   disclose through a 30(b)(6) designation covering every

10:34:57  10   topic in this case.  They did not produce him then.

10:35:01  11            It was only once that magazine article came

10:35:03  12   up last fall that we heard about in voir dire that all

10:35:08  13   of a sudden they are going to run him in here and

10:35:10  14   substitute him instead of their 30(b)(6) spokesman.

10:35:14  15            And we object strenuously to surprise like

10:35:18  16   this, a witness that had nothing to do with these

10:35:20  17   decisions at the time; was never disclosed, never

10:35:24  18   allowed to be deposed, was not designated as their

10:35:29  19   official spokesperson, as coming in on this basis.

10:35:32  20            MR. MAYS:  Your Honor, he was disclosed on

10:35:34  21   our witness list.

10:35:35  22            THE COURT:  Was he disclosed under the

10:35:38  23   admission of disclosures?

10:35:39  24            MR. MAYS:  No, sir, he was not.

10:35:40  25            THE COURT:  And did you supplement the

10:35:42   1   disclosures to indicate that he had knowledge of the

10:35:47   2   disputed issues for trial?

10:35:48   3              MR. MAYS:  No, sir, we did not.  But, Your

10:35:50   4   Honor, he is a rebuttal witness.  As I understand the

10:35:53   5   Court's ruling, that is not necessary, with respect

10:35:55   6   to --

10:35:55   7              THE COURT:  And so -- and what is he going

10:35:57   8   to rebut?

10:35:58   9              MR. MAYS:  He is going to rebut almost every

10:36:01   10  case that -- almost every contention that the plaintiffs

10:36:03   11  have made:  That there's a scheme that the store

10:36:06   12  managers are not managers of the store, that the

10:36:08   13  district managers manage the store.

10:36:11   14             This is the contention they have made.  He

10:36:13   15  is prepared to rebut that.

10:36:14   16             He is prepared to rebut the contention that

10:36:17   17  the store managers spend 90 percent of their time in

10:36:20   18  doing menial tasks.  All of these contentions, Your

10:36:24   19  Honor, which the plaintiffs have made, both through

10:36:26   20  their opening statement and witnesses, he is prepared to

10:36:29   21  rebut.

10:36:29   22             THE COURT:  The only thing he would be able

10:36:31   23  to rebut at this point is the evidence that plaintiffs

10:36:35   24  have put on up to this point, and that would be the

10:36:39   25  testimony of the individual plaintiffs, that they worked

10:36:44  1   more than 40 hours a week and were not paid overtime;

10:36:52  2   and the testimony of Dr. Bradley concerning the back

10:36:59  3   pay.

10:36:59  4              Is he prepared to rebut any of that

10:37:02  5   testimony?

10:37:04  6              MR. MAYS:  No, Your Honor.  But there have

10:37:05  7   been two plaintiffs that have testified at great length

10:37:08  8   that they, as store managers, were not allowed to manage

10:37:11  9   the store; that the district managers managed the store;

10:37:14  10  that the store managers had no freedom to make decisions

10:37:16  11  about scheduling, ordering and other matters.

10:37:18  12             Your Honor heard that --

10:37:19  13             THE COURT:  What they are saying is that

10:37:21  14  they, as store managers, were not allowed to do these

10:37:25  15  things.

10:37:27  16             MR. MAYS:  They're also claiming to be

10:37:27  17  representatives of all the store managers, Your Honor.

10:37:31  18  And Mr. Alexander is prepared to rebut that testimony.

10:37:33  19  We tender him as a rebuttal witness.

10:37:36  20             I would say it's not our intention to say

10:37:38  21  anything at all about the magazine articles or his

10:37:41  22  adoption of children.  That's not what we're here for.

10:37:44  23             And I would also say, Your Honor, that the

10:37:45  24  plaintiffs have made no effort to depose Mr. Alexander,

10:37:48  25  even after he was listed on the witness list, which we

| | |
|---|---|
| 10:37:51 | 1 |
| 10:37:57 | 2 |
| 10:38:00 | 3 |
| 10:38:02 | 4 |
| 10:38:05 | 5 |
| 10:38:06 | 6 |
| 10:38:13 | 7 |
| 10:38:14 | 8 |
| 10:38:15 | 9 |
| 10:38:19 | 10 |
| 10:38:26 | 11 |
| 10:38:32 | 12 |
| 10:38:35 | 13 |
| 10:38:38 | 14 |
| 10:38:42 | 15 |
| 10:38:45 | 16 |
| 10:38:49 | 17 |
| 10:38:53 | 18 |
| 10:38:57 | 19 |
| 10:39:08 | 20 |
| 10:39:14 | 21 |
| 10:39:23 | 22 |
| 10:39:24 | 23 |
| 10:39:26 | 24 |
| 10:39:29 | 25 |

1    would have been glad to have them do.

2         THE COURT:  Had discovery closed when he was

3    listed on the witness list?

4         MR. MAYS:  Yes, sir, it had.  We would have

5    allowed that voluntarily.

6         THE COURT:  The objection is sustained.

7         MR. G. WIGGINS:  There is one other --

8         THE COURT:  Yes, sir.

9         MR. G. WIGGINS:  Your Honor, the defendant

10   has listed several store managers they intend to call in

11   their case.  We have asked on at least two occasions for

12   the defendant to produce these people's time records in

13   interrogatories, and request of production.

14        We filed a motion to enforce the Court's

15   June 24th order requiring them to produce this

16   information.  The Court granted that motion, gave them

17   ten days to comply in July of '03.  They have failed to

18   produce any time records for any of these witnesses.

19        THE COURT:  Well, of course, under the Fair

20   Labor Standards Act, the fact that a plaintiff can't

21   produce time records does not bar that plaintiff's

22   recovery.

23        MR. G. WIGGINS:  Maybe I misstated it, Your

24   Honor.  It's their store managers that are going to get

25   up here and testify, I believe, "well, I only worked 52

10:39:30  1    hours.  This was an easy job.  I get my job done in 52

10:39:35  2    hours".

10:39:35  3              We have no way of challenging that if they

10:39:38  4    reported more than 52 hours, because they didn't produce

10:39:39  5    the time records.

10:39:40  6              THE COURT:  Well, I assume that Family

10:39:42  7    Dollar has produced all of the records which the Court

10:39:47  8    has ordered it to produce, by way of orders compelling

10:39:53  9    production.

10:39:54  10             MR. G. WIGGINS:  They have not, Your Honor.

10:39:55  11             THE COURT:  Well, let me hear from Family

10:39:58  12   Dollar.

10:39:58  13             MR. KALLON:  Your Honor, these are

10:40:00  14   individuals who were listed and whose plaintiffs'

10:40:02  15   counsel actually deposed, deposed some of them, and they

10:40:05  16   chose to stop the depositions.

10:40:06  17             THE COURT:  Well, did you produce the time

10:40:08  18   records?

10:40:08  19             MR. KALLON:  We produced personnel files.

10:40:10  20             I am not sure if the discovery requests that

10:40:13  21   Mr. Wiggins is alluding to applies to these individuals.

10:40:17  22   Are you talking about your --

10:40:19  23             THE COURT:  Did you produce the time

10:40:21  24   records, Mr. Kallon?

10:40:22  25             MR. KALLON:  We have produced time records

10:40:25　1　that they have requested.  I don't know if they have

10:40:26　2　requested them.

10:40:27　3　　　　　　　　THE COURT:  Well, it should be a fairly easy

10:40:33　4　entry to determine, first, whether the time records of

10:40:37　5　these store managers were requested --

10:40:37　6　　　　　　　　MR. MAY:  Yes, sir.

10:40:41　7　　　　　　　　THE COURT:  -- and second, if they were

10:40:45　8　produced.

10:40:46　9　　　　　　　　MR. MAY:  And, Your Honor, whether there was

10:40:48　10　any subject of a motion to compel, which I don't believe

10:40:50　11　there was, which Your Honor has said to us repeatedly

10:40:54　12　that that was what disclosed.

10:40:58　13　　　　　　　　There was no motion to compel it -- there

10:41:01　14　were time records, of course --

10:41:03　15　　　　　　　　THE COURT:  Hold on just one minute.

10:41:05　16　　　　　　　　MR. MAY:  Yes, sir.  I'm sorry.

10:41:07　17　　　　　　　　THE COURT:  We are going to start off with

10:41:09　18　Mr. Wiggins showing to me that I ordered the production

10:41:19　19　of these documents.

10:41:23　20　　　　　　　　MR. G. WIGGINS:  Judge, I will give you our

10:41:27　21　motion to enforce, the Court's granting it, and our two

10:41:31　22　requests asking for the time records.  They were the

10:41:33　23　basis of that.

10:41:35　24　　　　　　　　MR. KALLON:  Your Honor, may I see that to

10:41:37　25　respond when you have a chance, please?

10:42:21   1              THE COURT:  Plaintiffs' 6 request for
10:42:25   2   production.
10:42:26   3              MR. KALLON:  I'm sorry, Your Honor?
10:42:28   4              THE COURT:  Plaintiffs' 6 request for
10:42:32   5   production.
10:42:32   6              On the document that I have, it indicates
10:42:36   7   there's an indicated service date of March 14th, 2003;
10:42:45   8   contains, as the first item, "any and all payroll
10:42:51   9   records, files, charts, time cards, computer-generated
10:43:00  10   sheets, time sheets, for each and every store manager
10:43:04  11   and hourly employee for all Family Dollar Stores from
10:43:08  12   June 1, 1999, to the present".
10:43:12  13              So, it is, in my judgment, clearly
10:43:17  14   established that the plaintiffs have requested the time
10:43:22  15   records of every store manager from June 1st, 1999, to
10:43:29  16   present.
10:43:31  17              Do you disagree with that, Mr. Kallon?
10:43:32  18              MR. KALLON:  Your Honor, we do not disagree
10:43:35  19   with that.
10:43:35  20              THE COURT:  All right.  Let's move on.
10:43:38  21              MR. KALLON:  Can I --
10:43:40  22              THE COURT:  No.  No.
10:43:41  23              Now, the question is:  Has the Court ordered
10:43:48  24   the production of those documents?
10:43:52  25              Mr. Wiggins has shown me a document that was

10:43:58  1   filed July the 16th, 2003, captioned "Plaintiffs' Motion

10:44:06  2   to Enforce the Court's June 24th, 2003, Order."  And at

10:44:14  3   this point, let me pull up the order.

10:45:51  4           MR. G. WIGGINS:  Judge, I have a copy of it.

10:45:53  5           THE COURT:  Oh, do you?

10:45:57  6           MR. G. WIGGINS:  Yes, sir.

10:47:40  7           MR. KALLON:  Hey, Greg, what order of the

10:47:41  8   Court are you referring to?

10:48:44  9           THE COURT:  Well, the June 24th order deals

10:49:01 10   with the questionnaires.

10:49:07 11           MR. G. WIGGINS:  It also goes down, Your

10:49:09 12   Honor -- I believe it's in the third, fourth paragraph.

10:49:12 13           THE COURT:  All right.

10:49:15 14           MR. G. WIGGINS:  There is also a July order,

10:49:18 15   I believe.

10:49:26 16           THE COURT:  The June 24th order -- June

10:49:30 17   24th, 2003, order says this:  "Defendant's motion for

10:49:36 18   reconsideration of order allowing plaintiffs to submit

10:49:39 19   evidence under seal and motion to compel production of

10:49:42 20   questionnaires is hereby granted.  Within ten days of

10:49:47 21   this order, plaintiff shall provide to the defendants,

10:49:50 22   copies of the 25 questionnaires reviewed in preparation

10:49:53 23   of the affidavit of Mr. Wiggins.

10:49:55 24           "Plaintiffs' motion to compel, Document 74

10:49:57 25   is hereby granted.  Within ten days of the order,

10:50:02  1   defendant shall produce the names, address and telephone

10:50:04  2   numbers of all former Family Dollar Stores district

10:50:10  3   managers since June 1999."

10:50:17  4            MR. KALLON:  Which we did, Your Honor.

10:50:18  5            THE COURT:  All right.  Let me go back to

10:50:21  6   Document 74.

10:50:52  7            Document 74 seeks to compel production of a

10:51:08  8   listing of all former Family Dollar district managers,

10:51:14  9   including their social security number.

10:51:16  10           Mr. Wiggins, you haven't shown me that I

10:51:19  11  have entered an order requiring that this information be

10:51:24  12  produced.

10:51:25  13           MR. G. WIGGINS:  Judge, if you look at the

10:51:27  14  bottom of that June 24th order.

10:51:29  15           THE COURT:  Yes, sir.  You -- I'll look at

10:51:35  16  it here on the --

10:51:37  17           MR. G. WIGGINS:  Okay.

10:51:40  18           THE COURT:  Hold on just a minute.  Let me

10:51:43  19  look at it on the computer which you read to me

10:51:47  20  something which apparently I haven't seen that's

10:51:49  21  apparent to you --

10:51:51  22           MR. G. WIGGINS:  The last sentence of the --

10:51:57  23  last page, Your Honor.  You have -- say, "This Court

10:51:59  24  shall enforce the scheduling order and shall treat each

10:52:03  25  opt-in plaintiff as a separate party for purposes of

| | | |
|---|---|---|
| 10:52:06 | 1 | enforcing the scheduling order." |
| 10:52:07 | 2 | We then filed a motion, based on this |
| 10:52:10 | 3 | order -- |
| 10:52:10 | 4 | THE COURT:  All right.  Well, now, but this |
| 10:52:12 | 5 | order does not require them to produce -- |
| 10:52:15 | 6 | MR. G. WIGGINS:  No, not this order. |
| 10:52:17 | 7 | THE COURT:  All right.  Well, give me the -- |
| 10:52:19 | 8 | point me to the -- give me the date of the order that I |
| 10:52:25 | 9 | required the defendant -- |
| 10:52:26 | 10 | MR. G. WIGGINS:  You have it, Judge.  I gave |
| 10:52:29 | 11 | it to you. |
| 10:52:30 | 12 | MR. KALLON:  Greg, what day is that? |
| 10:52:32 | 13 | THE COURT:  Yeah.  Let me give you back what |
| 10:52:35 | 14 | you've given to me and you give me the date. |
| 10:52:44 | 15 | We know you made the request.  What's the |
| 10:52:46 | 16 | date of the order? |
| 10:52:51 | 17 | MR. KALLON:  Your Honor, what's the date? |
| 10:52:53 | 18 | THE COURT:  July 16th.  And, again, I |
| 10:53:00 | 19 | believe Mr. Wiggins is just dead wrong.  But let me just |
| 10:53:04 | 20 | check it out. |
| 10:53:13 | 21 | MR. G. WIGGINS:  Judge, if you will look at |
| 10:53:15 | 22 | your motion, which is what that was granted on, you will |
| 10:53:17 | 23 | look at what we asked for in our motion, Document 88, |
| 10:53:21 | 24 | the last page, where we say, "the plaintiffs |
| 10:53:24 | 25 | respectfully requests this Honorable Court to enforce |

| | | |
|---|---|---|
| 10:53:27 | 1 | the June 24th order requiring the defendant to respond |
| 10:53:30 | 2 | to all the plaintiffs' discovery requests by August |
| 10:53:33 | 3 | 1st."  And that's what you granted. |
| 10:53:36 | 4 | MR. KALLON:  Which we did respond.  And we |
| 10:53:39 | 5 | objected, of course, in our responses.  So we did;we |
| 10:53:43 | 6 | granted you some, and some we -- |
| 10:53:45 | 7 | THE COURT:  Mr. Wiggins, you have had me go |
| 10:53:47 | 8 | through all this exercise for naught. |
| 10:53:51 | 9 | MR. G. WIGGINS:  Well, Your Honor, I believe |
| 10:53:53 | 10 | that your order making them compel, based on this |
| 10:53:58 | 11 | motion, was dealing with time records. |
| 10:53:59 | 12 | THE COURT:  No.  No.  No, it doesn't.  Show |
| 10:54:02 | 13 | it to me. |
| 10:54:04 | 14 | MR. G. WIGGINS:  Well, again, Your Honor -- |
| 10:54:06 | 15 | THE COURT:  And if all you are going to show |
| 10:54:07 | 16 | me is what you have shown me, you haven't shown me |
| 10:54:10 | 17 | anything. |
| 10:54:10 | 18 | MR. G. WIGGINS:  I would ask the Court, |
| 10:54:12 | 19 | then, to look at this -- our "wherefore there" is what I |
| 10:54:15 | 20 | am relying on, Your Honor. |
| 10:54:17 | 21 | MR. KALLON:  Greg, what are you showing the |
| 10:54:20 | 22 | Court? |
| 10:54:21 | 23 | MR. G. WIGGINS:  Our motion to enforce -- |
| 10:54:23 | 24 | THE COURT:  The June 24th order. |
| 10:54:48 | 25 | Apparently, there's something here which I |

10:54:52  1    am not seeing.  But let me just read into the record

10:54:54  2    what the order says.

10:54:55  3                    MR. G. WIGGINS:  May I?  May I?

10:54:57  4                    THE COURT:  No.  The order says:

10:55:00  5         "Defendant's Motion for Reconsideration of Order

10:55:03  6    Allowing Plaintiffs to Submit Evidence 'Under Seal' and

10:55:05  7    Motion to Compel Production of Questionnaires is hereby

10:55:08  8    GRANTED.  Within ten days of the date of this Order,

10:55:11  9    plaintiffs shall provide to defendant copies of the 25

10:55:14  10   questionnaires reviewed in preparation of the affidavit

10:55:18  11   of Mr. Wiggins.

10:55:19  12                    "Plaintiffs' Motion to Compel (Document 74)

10:55:21  13   is hereby GRANTED.  Within ten days of the date of this

10:55:23  14   Order, defendant shall produce the names, addresses and

10:55:25  15   telephone numbers of all former Family Dollar Stores

10:55:29  16   district managers since June, 1999.

10:55:32  17                    "Defendants' Motion for Entry of a

10:55:33  18   Protective Order (Document 79) is hereby GRANTED.

10:55:37  19   Plaintiffs' counsel shall be prohibited from engaging in

10:55:39  20   ex parte communications with former Family Dollar Stores

10:55:42  21   district managers.

10:55:42  22                    "Defendant's Motion to Enforce the

10:55:44  23   Scheduling Order is hereby GRANTED.  The Court shall

10:55:48  24   enforce the Scheduling Order, and shall treat each

10:55:49  25   opt-in plaintiff as a separate party for purposes of

10:55:49  1  enforcement of the Scheduling Order."

10:55:50  2              That's all that order says.

10:55:53  3              Now, Mr. Wiggins, you make another baseless

10:55:56  4  motion like this, it's going to cost you some money.

10:55:59  5  Your motion is overruled.

10:56:01  6              We are adding 30 more minutes to your --

10:56:09  7  taking away 30 more minutes of your time allotted for

10:56:13  8  this groundless motion.

10:56:15  9              All right.  Now, we will start up at 10

10:56:28  10  after 11:00.

10:56:31  11              (Recess at 10:47 a.m. until 11:10 a.m.)

         12              (In open court, jury present.)

         13              THE COURT:  Ladies and gentlemen, the

         14  plaintiffs have rested their case and we will now turn

         15  to the defendant's case.

         16              Defendant will call their first witness.

         17              MR. UMBACH:  Your Honor, we call Malcolm

         18  Cannon.

         19              MR. R. WIGGINS:  Your Honor, I object.  He

         20  is not the next person on the witness list.

         21              THE COURT:  Is he on the list?

         22              MR. R. WIGGINS:  He is the third witness on

         23  the witness list, and we are not prepared that far down

         24  until after lunch.

         25              MR. UMBACH:  Your Honor, I provided a list

1    to the other side last night.

2                THE COURT:  Who is the second name on the

3    witness list?

4                MR. UMBACH:  Bill Broome, who is not here

5    yet because of the speed in which we have gone this

6    morning.

7                MR. KALLON:  And we expected Mr. Alexander

8    to be first, Your Honor.  Mr. Broome will probably be

9    ready within the half hour.

10               THE COURT:  All right.  The objection is

11   overruled.

12       **MALCOLM RAOUL CANNON, DEFENDANT'S WITNESS, SWORN**

13               THE CLERK:  State your name for the record,

14   please.

15               THE WITNESS:  Malcolm Raoul Cannon.

16   C-A-N-N-O-N.

17                       **DIRECT EXAMINATION**

18   **BY MR. UMBACH:**

19       Q.  Mr. Cannon, tell us where you live, sir.

20       A.  Hoover, Alabama.

21       Q.  Are you from Alabama?

22       A.  Yes.

23       Q.  Are you employed by Family Dollar?

24       A.  Yes.

25       Q.  When did you first become employed by Family

```
 1   Dollar?
 2       A.   June 2002.
 3       Q.   And what positions have you held since 2002?
 4       A.   District manager and area operations manager.
 5       Q.   And what is your current position?
 6       A.   Area operations manager.
 7       Q.   How long were you -- what period of time were you
 8   a district manager at Family Dollar?
 9       A.   A little bit over three-and-a-half years.
10       Q.   Mr. Cannon, tell the ladies and gentlemen of the
11   jury what a district manager at Family Dollar does.
12       A.   A district manager at Family Dollar will have a
13   certain number of stores, which he or she will be
14   supervising and making sure that the store is following
15   all the compliance issues, that they're following
16   standards issues, that their stores are shoppable, and
17   that we're hiring good people.
18       Q.   Did you have a boss as a district manager?
19       A.   Yes.
20       Q.   Who was your boss?
21       A.   My first regional vice-president was Marilyn
22   Malone.
23       Q.   How were you paid as a district manager?
24       A.   Biweekly.
25       Q.   Okay.  Were you paid hourly or salary?
```

 1    A.   Salary.

 2    Q.   Were you responsible for a district, as a

 3  district manager?

 4    A.   Yes.

 5    Q.   Okay.  Can you describe to us what district you

 6  had?

 7    A.   District 53, which consisted of metro Birmingham

 8  and some outlying stores.

 9    Q.   Mr. Cannon, how many stores did you have in your

10  district?

11    A.   When I started, 18.

12    Q.   Did that number change at any point?

13    A.   Yes.

14    Q.   Okay.  How did it change?

15    A.   The district was divided east and west, and the

16  store count dropped from 18 to 13.

17    Q.   So when you first started as a district manager,

18  you had 18 stores and then later 13?

19    A.   Yes.

20    Q.   Do you recall what the area of your district was,

21  in terms of square miles?

22    A.   Not in square miles.

23    Q.   Okay.  As a district manager, how did you spend

24  your time day-to-day?

25    A.   Day-to-day, I would manage the stores that really

1    had a red flag or an exception, and we would manage by

2    exception.  There would be a problem in a particular

3    store, and the store that had the most problems, you

4    would go to first and more often.

5        Q.  Okay.  Do you have an estimate of how much time

6    or how often you went to each store in your district?

7        A.  If it was a good store, three to four weeks; if

8    it was a store where a new store manager was placed or

9    you were having multitude of issues, two weeks or less.

10       Q.  Has the district manager, did you have keys to

11   every store in your district?

12       A.  I had keys to none; no store.

13       Q.  If you needed to get into a store, how would you

14   do that?

15       A.  Contact the store manager.

16       Q.  Now, as the district manager, who reported to

17   you?

18       A.  The store manager.

19       Q.  And would there have been a store manager at each

20   store?

21       A.  Yes.

22       Q.  Okay.  In terms of the chain of command, who, if

23   anyone, reported to the store manager?

24       A.  The assistant manager and the associates in that

25   store.

1    Q.   Okay.  When you say "associates", does that refer

2    to different positions in the store?

3    A.   Yes.  You could have somebody just be a stocker

4    or a cashier.  Normally, the cashier would do the

5    stocking and running the register, but some store

6    managers divided up the labor.

7    Q.   Are you familiar with the way in which Family

8    Dollar compensates its store managers?

9    A.   Oh, yes.

10   Q.   Okay.  How were they paid?

11   A.   Salary.

12   Q.   Did they receive any other form of compensation,

13   Mr. Cannon?

14   A.   Depending on the performance of the store, if the

15   store does well, they get a bonus.

16   Q.   All right.  We'll come back to that.

17        In the Family Dollar system, who is the highest

18   paid employee at the store?

19   A.   Store manager.

20   Q.   Back to your district.  We have heard testimony

21   from a gentleman named Larry or Lawrence Reevers.  Was

22   Mr. Reevers in your district?

23   A.   Yes.

24   Q.   As the district manager, are you responsible for

25   hiring store managers?

1    A.   Yes.

2    Q.   Do you interview individuals to be a store

3    manager?

4    A.   Yes.

5    Q.   When you are deciding who to hire as a store

6    manager, what are you looking for?

7    A.   Depending on the store, if it's a high-volume

8    store, somebody with a lot of previous management

9    experience, somebody who's familiar with retail; when I

10   am looking at a store manager, somebody who has been

11   successful at hiring people, because when you run your

12   own store, a successful store manager has to be able to

13   hire their staff.

14   Q.   How many hours do you expect a store manager to

15   work?

16   A.   My expectation is for the store manager to work

17   the hours required to run the store effectively.

18   Q.   Do you tell them anything about how many hours

19   you expect them to work?

20   A.   No.

21   Q.   Do you show them anything that would indicate to

22   them how many hours they might be expected to work?

23   A.   I show them a staff scheduler, or if I am

24   interviewing them, I will ask them:  Are you able to

25   work 52 hours?

1    Q.   And for the ladies and gentlemen of the jury, we

2  have heard a little bit about a staff scheduler, but

3  what is that?

4    A.   A staff scheduler is a guide in which Family

5  Dollar has designed for store managers to use to set and

6  make schedules.  It shows you how to cover all the

7  processes, how many hours that we necessitate that

8  certain processes should take:  Recovery, keeping the

9  store clean, how long we do a truck, coverage, if you

10  have a high risk store you need to have two people or

11  more open the store and two people close.

12        And the staff scheduler is a guideline in which

13  store managers use to make their schedules.

14    Q.   As the district manager, do you monitor how many

15  hours the store managers actually work?

16    A.   No.

17    Q.   Can you recall --

18            THE COURT:  So you really don't even know

19  how many hours the store managers work?

20            THE WITNESS:  No.

21    Q.   Do you recall any examples of any store manager

22  who worked less than what the staff scheduler showed?

23    A.   Oh, yeah.

24    Q.   Can you tell us those examples, please?

25    A.   I have a store manager, and she has a little boy,

1    and during the springtime football season she picks up.

2    And she goes to the game, she takes her son to

3    practice --

4                MR. R. WIGGINS:  Your Honor, I would

5    object --

6                THE COURT:  The objection is sustained.

7       Q.   What is the person's name, Mr. Cannon?

8                MR. R. WIGGINS:  I object.  He is not a

9    plaintiff, has nothing to do with this lawsuit.

10               THE COURT:  Sustained.

11               MR. UMBACH:  Your Honor, he -- I believe he

12   is a plaintiff, if he could answer that question, just

13   the question "who is it".

14               THE COURT:  All right.  All right.

15               THE WITNESS:  Shellah Brown.

16      Q.   (By Mr. Umbach)  Mr. Cannon, did Ms. Brown have a

17   situation with her son, which she needed to take some

18   time off or leave early?

19      A.   Oh, yeah.

20      Q.   Did you allow her to do that?

21      A.   Yes.

22      Q.   Did you discipline her --

23               MR. R. WIGGINS:  Your Honor --

24               THE WITNESS:  No.

25               MR. R. WIGGINS:  I object and move to

exclude this type of evidence itself.  They prevented us
from putting this type of evidence on.

THE COURT:  Well, was the question of
whether you allowed her to take time off?

THE WITNESS:  I think that was the question.

THE COURT:  Well, was that even an issue for
you?

THE WITNESS:  No.

THE COURT:  Because, as store manager, she
pretty much controlled her own time?

THE WITNESS:  Yeah.  She could make her own
time.

THE COURT:  All right.  The objection is
sustained.

Q.  (By Mr. Umbach)  Mr. Cannon, what is the most
important duty of a store manager?

A.  The most important duty is hiring; hiring and
training of an associate.

Q.  Why is that?

A.  For a store manager to be successful, they are
depending upon the people who work for them.  And the
better the people you have as a group of associates, the
easier it is your job is going to be, and you have a
pool to promote from.

Q.  Let's talk a minute about hiring, hiring within

1    the store, Mr. Cannon.

2              As the district manager, what role did you play

3    in hiring, and what role did the store manager play?

4        A.   In the hiring process, there is -- the store

5    manager would hire an associate.  And the only time I

6    would become involved, if they were hiring somebody who

7    was an assistant manager.

8        Q.   Okay.  If they were hiring an assistant manager,

9    how would you become involved?

10       A.   The store manager would complete the hiring

11   process.  They would give them a Stanton, a drug test,

12   interview them, do the reference checks, then they would

13   call me and say, "hey, you know, this is the person that

14   I want for my assistant manager.  I need you to talk to

15   them."

16             And when I talk to them, my conversation would be

17   career path:  "Has the store manager explained to you

18   what you will be responsible for?  Do you have any

19   questions about what you are going to be responsible

20   for?  And are you aware that you can be promoted from

21   assistant to store manager?  And is that something you

22   want to do?"

23       Q.   You mentioned something called the Stanton.  What

24   is that?

25       A.   The Stanton is a questionnaire that is basically

a loss prevention question exam.  A new applicant would take the Stanton.  And what we are trying to find out is integrity; what kind of integrity can we look forward to having with this associate?

Q.  And who gives the Stanton test?

A.  The store manager.

Q.  Who gives the drug test?

A.  Store manager.

Q.  Who checks the references?

A.  Store manager.

Q.  Now, how is the starting pay for someone hired into the store --

THE COURT:  Before you get into that, can the store manager hire an employee for her store without your approval?

THE WITNESS:  Oh, yeah.

Q.  How is --

THE COURT:  And you are sure of that?

THE WITNESS:  Positive.

THE COURT:  So the store manager could hire an employee for his or her store without even contacting you?

THE WITNESS:  Yeah.  That's what I look for.

THE COURT:  And that's your understanding of the company policy?

```
 1                 THE WITNESS:  Yes.
 2                 MR. R. WIGGINS:  Your Honor, we move to
 3    exclude, because that is not the company policy.  The
 4    company policy is in evidence.  It says the district
 5    manager must make the hiring interview selection.
 6                 THE COURT:  You look as though that
 7    surprises you.
 8                 THE WITNESS:  That would be impossible for a
 9    district manager to keep up with the turnover that we
10    have.  Clerks at -- the store manager must be able to
11    hire.  The store manager is the person who works in that
12    environment.  If I am a store manager, I know who is
13    coming in.
14                 THE COURT:  Yes, sir.
15                 THE WITNESS:  And I need to interview that
16    individual and let them know this is my demographic,
17    that is who we serve.  As a district manager, I cannot.
18    There's no way I can make it to all 16 stores.
19                 THE COURT:  You don't have any input
20    whatsoever in the hiring?
21                 THE WITNESS:  Not in the hiring process of
22    an associate.  I mean, you can't get there.  If somebody
23    quits, I can't leave one store to hire somebody else if
24    I am doing a store visit.  That store can be 50 miles
25    away.  They need somebody tomorrow.
```

1           THE COURT:  I see.

2           THE WITNESS:  The store manager needs to be

3  able to make that decision.  You can't call a DM for

4  that kind of stuff.

5           THE COURT:  The store manager couldn't call

6  the district manager for that kind of question?

7           THE WITNESS:  Why would I hire somebody that

8  can't run the building?  To run the building, you have

9  to be able to hire the people working for you.

10          THE COURT:  Yes, sir.

11          THE WITNESS:  They have to be responsible to

12  the store manager.  I don't write associates up.  If I

13  am hired by this store manager, I got to look to them to

14  set my pay.  I am not going to set the pay for an

15  associate.

16          THE COURT:  I take it that would also be

17  true, with respect to promotions?

18          THE WITNESS:  Correct.

19          THE COURT:  You don't have any input, or the

20  store manager doesn't have to get your approval to

21  promote anyone?

22          THE WITNESS:  No.  The only thing the store

23  manager has to do, I have to interview them to let them

24  know, "hey, did they explain to you, you are going to be

25  holding keys, you are going to be counting money?  I am

1    the district manager.  I want you to be able to

2    understand if I come in and I ask you certain things,

3    you should be able to answer questions about the store,

4    you and the assistant manager, how much money we got,

5    did the money go to the bank?  did the store manager

6    tell you that you have to sign the logbook?"

7              And once that person says yes, the store

8    manager makes the decision to promote that individual.

9    They work with the cashier.

10             I can't -- I don't do the truck with the

11   cashier.  I don't know how good they are.  I don't see

12   them run the register.  I don't know what they can do.

13   The store manager knows that.

14             The store manager also knows if they are

15   compatible with that person.

16             THE COURT:  Yeah.  And I take it --

17             THE WITNESS:  We're sending you somebody you

18   might not like.

19             THE COURT:  I take it that's also true with

20   respect to firing?

21             THE WITNESS:  Yeah.  They're the ones --

22   there's no reason the store manager should call me.

23             If you have been late five times and they

24   know you are not showing up -- that he made the

25   schedule, she made it, and you knew what the schedule

1    was, I didn't make the schedule, the store manager makes

2    it.  He knows when you are late.

3             THE COURT:  The store manager then has the

4    authority to fire an employee on the spot?

5             THE WITNESS:  Yeah, on the spot.

6             THE COURT:  Without consulting you?

7             THE WITNESS:  Without consulting me.

8             THE COURT:  All right.

9             MR. R. WIGGINS:  Your Honor --

10            THE COURT:  There will be ample time for

11   cross-examination.

12            You may continue.

13   Q.   (By Mr. Umbach)  Mr. Cannon, do store managers

14   sometimes consult you on the various decisions that you

15   have just testified about?

16   A.   Oh, yeah.  If it's a new store manager, they got

17   an associate and they don't realize, say, the associate

18   has done something and they want to know, "Malcom, I

19   feel I should terminate this person, they have been

20   late.  This is the first time they were late, but it was

21   for inventory, it was a serious offense.  They knew

22   inventory was scheduled.  I went through the process to

23   make sure they had off time and they still showed up

24   late."  New store managers will call --

25            THE COURT:  But you wouldn't expect that of

```
 1    any store manager to, say, who has been there in that
 2    position for six or eight months or so?
 3                   THE WITNESS:  No.
 4                   THE COURT:  All right.
 5       Q.  (By Mr. Umbach)  Mr. Cannon, who supervises the
 6    employees in the store?
 7       A.  Store manager.
 8       Q.  Who does -- are evaluations done on the employees
 9    in the store?
10       A.  Oh, yes.  By the store manager.
11       Q.  How are those evaluations used, if you know?
12       A.  The store manager at inventory receives a
13    package, and it will contain normally five to eight
14    evaluation forms and it will go through certain
15    criteria, one through three, three being the best, one
16    being the worst.
17            Store manager will evaluate that circumstance,
18    and will number which is applicable to that individual
19    and then suggest a raise.
20       Q.  Mr. Cannon, when you are talking about
21    scheduling -- you mentioned staff scheduleers?
22       A.  Uh-huh.
23       Q.  We may have one of those here later, but can you
24    describe to us what it is and how a store manager --
25       A.  A staff scheduler is a laminated schedule, and it
```

1   will break down, based upon hours:  What time you open,

2   what time you close, how much coverage you need.

3          In a high-risk store, you will need 2.0 coverage,

4   so it will always show you need two people:  A manager

5   and/or an associate.  The staff scheduler will

6   concentrate and focus hours around busy times for our

7   store, which is normally the truck.

8          The staff scheduler will show weekend hours and

9   rotate the assistant and store managers on the weekends.

10  Q.  Can store managers make changes to a staff

11  scheduler?

12  A.  Yes.

13  Q.  You mentioned that it's laminated.  What -- why

14  is that?

15  A.  So you can use a dry erase marker so you can make

16  changes to it.

17  Q.  Mr. Cannon, let me show you an exhibit.

18         I am going to get the exhibit number in just a

19  minute, Your Honor?

20         Is that a staff scheduler?

21  A.  Yes.

22  Q.  Does it have writing on it?

23  A.  Yes.

24         MR. UMBACH:  Okay.  For the record, it's

25  Defendant's Exhibit 2216.  Your Honor, we move to admit

1    this exhibit.

2           THE COURT:  Without objection, it is

3    received in evidence.

4           MR. UMBACH:  Your Honor, may I publish this

5    exhibit to the jury?

6           THE COURT:  Yes, you may publish it to the

7    jury.

8    Q.  (By Mr. Umbach)  Mr. Cannon, what is used to make

9    changes to that; in other words, do you write on it, how

10   do you do it?

11   A.  Any grease marker or dry erase marker, you can

12   write on there with it.

13   Q.  Mr. Cannon, we have heard some testimony about

14   store managers going to work in another store.  Do you

15   sometimes send -- or did you sometimes send a store

16   manager, take them from their store and ask them to go

17   help out in another store?

18   A.  Yes.

19   Q.  Tell us under what circumstances you might do

20   that.

21   A.  You place a new store manager -- the new store

22   manager might be going to a store that's a little rough

23   around the edges.  The new store manager -- normally to

24   keep them from being overwhelmed, you will send two

25   training managers or one of your training managers.  The

```
1    training manager will go into the store and show this --
2              THE COURT:  Is the training manager a store
3    manager at another store?
4              THE WITNESS:  Yes.
5              THE COURT:  So he -- in effect, the store
6    manager -- the other store assumes a new job
7    classification; that is, that training manager for
8    purposes of this new store manager?
9              THE WITNESS:  We have certified training
10   managers, and that's part of their role.
11             THE COURT:  So some of the store managers
12   are also certified training managers?
13             THE WITNESS:  Yes.
14             THE COURT:  I see.  Is the certified
15   training managers, do they get a certificate or
16   something showing they were certified training managers?
17             THE WITNESS:  They are given a certificate.
18             THE COURT:  All right.
19   Q.  (By Mr. Umbach)  All right.  Mr. Cannon, how do
20   you decide which store manager in your district to send
21   to another store when there's a need to do that?
22   A.  The best.  You would take the best store manager.
23   And normally the best store manager always will be your
24   CTM.  You want to train somebody with the best manager
25   you have in your field.
```

1          And a certified training manager will go into the
2     new store.  And the new store managers are normally
3     overwhelmed, they will look around and say, "wow, got a
4     lot to do".
5          The certified training manager will show them how
6     to organize themselves to run this store.  They will
7     show them how to get a schematic done, lay it out for
8     them.  They will train an associate for them.
9          The new store managers normally have so much on
10     their plate that when they get there, they're
11     overwhelmed.  The certified training manager can help
12     them relax and show them how to organize it, show them
13     how Family Dollar is run, and how we can run that
14     particular store there.
15               THE COURT:  Now, are you testifying based on
16     your personal observation, or are you there when the
17     certified training manager is working with this new
18     store manager?
19               THE WITNESS:  A lot of times, yes.
20               THE COURT:  All right.
21     Q.   (By Mr. Umbach)  Mr. Cannon, these assignments to
22     another store to help out, how long do these typically
23     last?
24     A.   No longer than two days.
25     Q.   Now, when a store manager is away from his or her

1   store helping out in another store, okay, who is

2   responsible for the store that the certified training

3   manager has left and gone to another one?

4     A.   That certified training manager, the CTM.

5             THE COURT:  I'm sorry.  I didn't understand

6   that.

7             THE WITNESS:  Certified training manager.

8             THE COURT:  Is responsible for --

9             THE WITNESS:  -- his store, after he's left.

10            THE COURT:  While he's away, he is

11  responsible for his store?

12            THE WITNESS:  Yeah.

13            THE COURT:  All right.

14    Q.  (By Mr. Umbach)  Mr. Cannon, what effect, if any,

15  does a store manager have on the success of the store?

16    A.  Store manager determines if that store will be

17  successful.  They're the most impactful person in the

18  building.

19    Q.  Anything in particular that a store manager might

20  do that would affect the ultimate success of the store?

21    A.  If a store manager does not effectively hire

22  well, the store will potentially shrink out, lose a lot

23  of inventory.  If they can't hire well, it will look

24  like a bomb hit the store.  Every time you walk in,

25  there's stuff everywhere.

1      If a store manager doesn't review the paperwork

2 or the payroll numbers that come out, it won't be

3 profitable; if they abuse the labor hours, the store

4 can't make a profit.

5      Q.   Mr. Cannon, are there any differences in the

6 duties and responsibilities of a store manager, as

7 compared to an assistant manager?

8      A.   Oh, yeah.

9      Q.   What would those be?

10     A.   Store manager sets the direction.  The store

11 manager is the person you hold accountable and

12 responsible for the performance of that particular

13 store.  The store manager is also responsible for hiring

14 all the associates in the building, terminating the

15 associates, promoting the associates.

16      The store manager will also be the person in

17 which you look for to discipline, if necessary, the

18 assistant manager, or to recommend that store -- I mean,

19 assistant manager for store manager.

20      The store manager is the only person who can

21 evaluate the associates in the building, give raises.

22     Q.   Can an assistant manager discipline a store

23 manager?

24     A.   No.

25     Q.   Let's talk a minute, Mr. Cannon, about evaluating

1    store managers.  Do you do evaluations on store

2    managers?

3        A.   Yes.

4        Q.   Mr. Cannon, let me show you what is already in

5    evidence as Plaintiffs' Exhibit 11.

6        Q.   I believe the jury has already been provided a

7    copy of this.

8            Mr. Cannon, is Plaintiff's Exhibit 11 a copy of

9    the form that you use to evaluate store managers?

10       A.   Yes.

11       Q.   What is the first section?  What is the heading,

12   Section 1?

13       A.   Sales and business results.

14       Q.   And are those categories in which you evaluate

15   store managers?

16       A.   Yes.

17       Q.   Okay.  Look down where it says "controllable

18   expense".  Are you with me?

19       A.   Yes.

20       Q.   Can you explain to the jury what that is,

21   controllable expense?

22       A.   Controllable expense, the first one, Section A is

23   payroll.  Each store is given a budget.  And in that

24   budget, you use the money to really accomplish all the

25   tasks in a store, in making sure the store standards are

1    in place.

2         If a store manager goes over budget, you will

3    directly affect all profitability in that particular

4    location.

5    Q.  All right.  The next item is slippage.  Can you

6    explain to us briefly what "slippage" is?

7    A.  Slippage, A, is shrink:  How much inventory was

8    lost in that particular building?  Which is directly

9    impactable into the profitability and sales of that

10   store.  The more inventory you lose, the less amount of

11   merchandise you can sell.  The less merchandise you

12   sell, the less profits you generate.

13        The second one is markdowns.  Markdowns are

14   anything that the store manager has decided to mark

15   down, as according to damages.  We have merchandise that

16   is damaged, we will mark down to zero and throw away.

17   We also have merchandise that has to be marked down

18   because it's open or for various reasons.  The store

19   manager doesn't control his or her markdown budget, it

20   will directly impact profitability.

21        Slippage is a combination of shrink and markdown;

22   total dollars lost in that particular location from

23   theft or from loss, and from markdowns.

24   Q.  All right.  If you would, turn to the second

25   page.  Section 2, Store Standards.  Can you tell us just

generally what that covers?

A.   Number 1 covers recovery.  How does the store look to customers when they come in?  Is it clean, inviting, a nice place to shop?

Two is monthly planning.  Are your ads matching up with what you have in the store?  When we have an ad come out, we will take certain merchandise in that ad and highlight it.

The effectiveness of the store manager can really be evaluated here.  That merchandise is time bound, like Christmas merchandise.  If you bring it out December 27, it's really not going to help you.  You have to have a great plan, and the store manager has to be organized. Following the plan will also increase your store standards.  Customers will enjoy shopping there.

Three is door to shelf.  Do you get the freight out?  Is the freight on the shelves when customers are coming in your building?

Number four is shrink control.  Shrink control; how well does that store manager hire successful people? And under shrink control is selection for success.  How well can that store manager hire?

Logbook; do they keep track of merchandise and money?

Task management; how well do they organize

1    themselves and how do they assign tasks to their team?

2         Number five is in-stock position.  Do they have

3    the merchandise necessary to run the business?  Are they

4    in stock?

5    Q.  All right.  Section 3, HR programs, we have

6    talked about hiring terminations, that sort of thing.

7    Go to the last page -- or, rather, pages 3 and 4,

8    Section 4 is self development.

9         Can you evaluate the store managers in each of

10   the items that are mentioned A through E on this form?

11   A.  Yes.  In A, priority setting; what I am looking

12   for when you come into the store -- give you an example,

13   if the store has a stockroom that's filled and you can't

14   even get back there, it's a safety hazard.  The store

15   manager has the sense of urgency to clean it up, make

16   sure the store's safe for people to shop in.

17        One other thing you are looking for in priority

18   setting, does the store manager evaluate the team?  And

19   when I say "evaluate the team", what kind of associates

20   do they have?  If they don't have great associates, the

21   number one priority in that store should be they hire

22   great people.  Number two, staffing and hiring --

23   Q.  Mr. Cannon, just in the interest of time, let's

24   not go through each and every one of these.  The jury

25   will be able to read those.

1          Let's go to the last page.  Is this where the

2     store manager's raise is calculated?

3        A.   Yes.

4        Q.   Okay.  Now, we talked about bonuses, but we

5     haven't talked about what goes into that.  How is a

6     bonus for a store manager determined?

7        A.   1 percent of net profit.

8        Q.   And that is the net profit of the store?

9        A.   Yes.

10       Q.   Do any other employees in the store get a bonus?

11       A.   No.

12       Q.   Are they eligible for a bonus?

13       A.   No.

14               MR. UMBACH:  Mr. Cannon, answer the

15     plaintiffs' attorneys questions, please.

16               THE COURT:  35 minutes for

17     cross-examination.

18               MR. R. WIGGINS:  Your Honor, may we

19     approach?

20               THE COURT:  Yes.

21                    (At bench.)

22               MR. R. WIGGINS:  Because they put the

23     witness on out of order, can we have lunch before we

24     cross?  Can we go to lunch early?

25               THE COURT:  All right.

```
 1                    (End of bench conference.)

 2              THE COURT:  Ladies and gentlemen, we will

 3    take our lunch break.  We will be in recess until 1:00

 4    o'clock.

 5              Please do not discuss the case among

 6    yourselves or allow it to be discussed in your presence

 7    and keep an open mind.

 8                  (Jury out at 11:46 a.m.)

 9              THE COURT:  See you at 1:00.

10        (Lunch recess from 11:46 a.m. until 1:00 p.m.)

11              (In open court, jury present.)

12              THE COURT:  Please be seated.

13    Cross-examination?

14                      CROSS-EXAMINATION

15    BY MR. R. WIGGINS:

16      Q.  Good afternoon, Mr. Cannon.

17      A.  Good afternoon.

18      Q.  I'm Bob Wiggins.  I understood you to testify

19    that to be a true manager, you must be able to hire,

20    fire, promote, set the pay of the people in your store?

21      A.  Correct.

22      Q.  One that doesn't have that power is not a true

23    executive, are they?

24      A.  Someone that had that power wouldn't be a store

25    manager; correct.
```

13:13:37   1    Q.   Right.   And, in fact, you said, why would I hire

13:13:42   2   someone to be the manager of a store if they didn't have

13:13:45   3   the power, the authority to hire, fire, promote, set the

13:13:49   4   pay on their own?

13:13:51   5    A.   Correct.

13:13:51   6    Q.   So this company that you work for, Family Dollar,

13:14:07   7   has policy books that are kept in the store; correct?

13:14:11   8    A.   Yes.

13:14:11   9    Q.   And the policy book, you don't have the authority

13:14:14  10   to change it?

13:14:16  11    A.   Correct.

13:14:16  12    Q.   Only the executive vice-president in the

13:14:20  13   Charlotte headquarters has the authority to change the

13:14:23  14   policy manuals?

13:14:24  15    A.   Yes.

13:14:25  16    Q.   And this is the policy on discharging, you must

13:14:28  17   contact your district manager or regional vice-president

13:14:33  18   before conducting a discharge; correct?

13:14:38  19    A.   That is the policy, yes.

13:14:40  20    Q.   So for this company under this policy, these

13:14:47  21   store managers are not true managers; they can't fire?

13:14:53  22    A.   That's not true.   My store managers have the

13:14:55  23   capability to fire.

13:14:56  24    Q.   You just violate the company policy?

13:14:59  25    A.   I did violate the company policy.   The store

13:15:02  1    manager has the capability to hire and fire.

13:15:04  2        Q.  You just told me you don't have that authority?

13:15:06  3        A.  Correct.  They still terminate associates.

13:15:09  4        Q.  I'm sorry.  You don't have that authority to

13:15:13  5    violate company policy; only the executive

13:15:15  6    vice-president can change the policy, you told us that.

13:15:17  7        A.  I can violate the policy -- you are saying, could

13:15:20  8    I change the policy?  No, I don't have the ability to

13:15:22  9    change it.  I do have the ability to violate it.

13:15:25  10            THE COURT:  Well, what's the consequence for

13:15:27  11   your knowingly violating company policy?

13:15:30  12            THE WITNESS:  That consequence would have to

13:15:32  13   come from the regional vice-president.  There's been no

13:15:35  14   consequence laid upon me for doing that.

13:15:39  15            THE COURT:  Did you know you were violating

13:15:41  16   company policy?

13:15:42  17            THE WITNESS:  Actually, at the time, no.

13:15:44  18       Q.  (By Mr. R. Wiggins)  And you're not saying that

13:15:47  19   any other district manager is violating company policy,

13:15:53  20   are you?

13:15:53  21       A.  Do I know of any other?

13:15:55  22       Q.  Yeah.  You just have the 13 stores that you run;

13:15:58  23   correct?

13:15:59  24       A.  Correct.  But, yes, I know of some other district

13:16:05  25   managers who allow store managers to hire and fire.

13:16:07   1       Q.   Just hearsay?

13:16:10   2       A.   No, it's not hearsay.

13:16:11   3       Q.   You weren't there?

13:16:12   4       A.   I wasn't there; correct.

13:16:13   5       Q.   Okay.  Now, you said that to be a true store

13:16:16   6   manager, a true executive, you would have to have the

13:16:19   7   authority to hire your assistant on your own?

13:16:22   8       A.   Yes.

13:16:23   9       Q.   Correct?  Is that right?

13:16:25  10       A.   Yes, that's what I said.

13:16:26  11       Q.   All right.  Well, let's see D1 from the policy

13:16:30  12   manual of this company.

13:16:49  13            "The district manager is required to interview

13:16:52  14   all assistant manager candidates"; correct?

13:16:55  15       A.   Yes.

13:16:56  16       Q.   You don't violate that policy, do you?

13:16:59  17       A.   No, I interview them.

13:17:00  18       Q.   Right.

13:17:01  19       A.   But I don't make the decision to hire them.

13:17:03  20       Q.   You are just -- just because you don't have

13:17:06  21   enough to do?

13:17:07  22       A.   What?  Enough to do what?

13:17:10  23       Q.   Why are you interviewing someone?

13:17:12  24       A.   That's part of our policy, sir.  I can identify

13:17:15  25   who they are and make sure who they are, what they look

13:17:19   1   like, career path, they understand the responsibility

13:17:22   2   being bequeathed to them.

13:17:24   3       Q.   Those are things you do after someone's hired,

13:17:26   4   aren't they?

13:17:26   5       A.   Yes.   The store manager would hire them first;

13:17:28   6   correct.

13:17:29   7       Q.   Well, this interview is talked about in policy

13:17:32   8   manual -- and we all have it here, the whole manual?

13:17:35   9       A.   Uh-huh.

13:17:35   10      Q.   Is talking about applicants before hired?

13:17:39   11      A.   No.   The store manager would have had to hire

13:17:41   12   them first.   The store manager has to select them.   The

13:17:44   13   store manager would then Stanton them.   The store

13:17:47   14   manager would give them a drug test.   The store manager

13:17:49   15   would do the reference checks.   And the store manager

13:17:52   16   has already made the decision to make this person the

13:17:54   17   assistant.

13:17:54   18          I am involved in the last part of the process; to

13:17:56   19   make sure the assistant understands what is expected of

13:18:00   20   them, and what's their career path, and do they

13:18:02   21   understand the implications of violation when they don't

13:18:05   22   sign the logbook, or they lose money.

13:18:07   23      Q.   So is it your testimony that you're not

13:18:09   24   interviewing assistant store managers before they're

13:18:13   25   hired?

13:18:13   1      A.   That's the store manager's responsibility.

13:18:16   2      Q.   So --

13:18:17   3      A.   I just told you that earlier.

13:18:18   4      Q.   Your answer is you don't interview assistant

13:18:21   5   store manager applicants before they're hired?

13:18:25   6      A.   I have in some instances, but not when the store

13:18:27   7   manager has selected their own.  If there is no store

13:18:30   8   manager in a particular store, and there's no assistant

13:18:32   9   because we have had a bad inventory, yes, I will do the

13:18:36  10   process from beginning to end.

13:18:37  11        If there's a store manager in the store, the

13:18:40  12   store manager will select their assistants based upon

13:18:43  13   who's applying.  If you have somebody from Wal-Mart

13:18:46  14   applying with the skill set you are looking for, you

13:18:49  15   would interview them, you would do the reference check,

13:18:51  16   you would make sure that this person is compatible and

13:18:55  17   understand what you want.

13:18:55  18        I mean, at the last time, after they've gone

13:18:57  19   through all the questionnaire, the drug test, you would

13:18:59  20   call your district manager and say "this is my

13:19:02  21   assistant, I need you to interview them and make sure

13:19:04  22   that he understands what's going to take place", and

13:19:06  23   that's when I become involved.

13:19:08  24        I don't make the decision to hire that assistant.

13:19:11  25   I don't know what you need in your store.  I don't know

13:19:13    1    what you're looking for.

13:19:14    2        Q.   So if the policy is that the district manager is

13:19:18    3    to interview and select the assistant --

13:19:19    4        A.   Not select.

13:19:21    5        Q.   Hold on.  You have got to wait.  Let me finish.

13:19:27    6             It's your testimony that if the company policy is

13:19:30    7    that you must interview the assistant store manager

13:19:35    8    before they're hired, you're violating that policy, too,

13:19:38    9    in you're district?

13:19:39   10        A.   It doesn't say before they're hired.

13:19:41   11             THE COURT:  Just assume that it does.

13:19:47   12             THE WITNESS:  I interview them, yes.

13:19:48   13        Q.   Before hire?

13:19:50   14        A.   Not in all cases, no.

13:19:51   15        Q.   So in some cases, you are violating the company

13:19:53   16    policy; in other cases, you're not?

13:19:56   17        A.   Well, no, they could be hired as a cashier.

13:19:58   18        Q.   I'm talking about assistants, sir.

13:20:01   19        A.   You can hire an assistant as a cashier, based

13:20:03   20    upon the evaluation in which that person worked for two

13:20:06   21    weeks, you can decide, "hey, this is somebody I want to

13:20:09   22    pursue".

13:20:09   23        Q.   I am talking about not associates but I'm talking

13:20:11   24    about --

13:20:11   25        A.   That is an assistant.

13:20:12  1      Q.   Assistant store manager, that's what you're

13:20:14  2   talking about?

13:20:15  3      A.   You can hire them on as a cashier.

13:20:17  4      Q.   Oh.

13:20:17  5      A.   And evaluate them to make sure they can be

13:20:20  6   promoted.

13:20:20  7      Q.   Okay.  Let's talk about when you have an

13:20:22  8   applicant to be an assistant manager, and you are

13:20:25  9   interviewing them to be an assistant manager, not a

13:20:29  10  cashier.

13:20:29  11     A.   Uh-huh.

13:20:30  12     Q.   You have to interview them before they're hired,

13:20:33  13  don't you?

13:20:33  14     A.   I have to interview them, yes.

13:20:35  15     Q.   Okay.  And you know Mr. Barkus, the

13:20:43  16  vice-president of the company; correct?

13:20:44  17     A.   Yes.

13:20:44  18     Q.   Is he your boss?

13:20:46  19     A.   He was.

13:20:47  20     Q.   And he was the executive vice-president in charge

13:20:51  21  of the whole store operations for every store in the

13:20:54  22  company; correct?

13:20:55  23     A.   Yes.

13:20:55  24     Q.   Let's have Exhibit 136.

13:21:43  25          While we're trying to find it there, let me

1   just --

2               MR. R. WIGGINS:  May I approach, Your Honor?

3               THE COURT:  Yeah, sure.

4       Q.  Let me show you Exhibit 136.  The jury already

5   has it.

6           Mr. Barkus' email says it's going to all store

7   managers, "please read, make sure --" I'm sorry, that's

8   the district manager.

9           Mr. -- Mr. Barkus' email says, "to all store

10  managers and associates"

11          And we have it on the board now.  I'm not sure

12  that you can read it.  We will just stay here and read

13  it here.

14          It says:  "Re:  Assistant manager/store key

15  carriers.  February 20, 2003"; correct?

16      A.  Correct.

17      Q.  Now, let's look at that last sentence of the

18  first paragraph.

19          It says, "I want to remind you that it is the

20  policy of Family Dollar that district managers interview

21  all assistant manager candidates, whether newly hired or

22  internal promotion candidates"; correct?

23      A.  Yes.

24      Q.  And that is the company policy?

25      A.  The policy is that I interview them; correct.

13:22:52  1    Q.  So the store manager, under your testimony, is
13:22:58  2  not a true store manager --
13:22:59  3    A.  That's not true.
13:23:00  4    Q.  -- because they don't have this authority on
13:23:02  5  their own to hire their assistants?
13:23:04  6    A.  That's not true.  The store manager must first
13:23:07  7  select the person.
13:23:08  8         The store manager, you're forgetting, is
13:23:10  9  selecting this assistant.  Before you call me, I can't
13:23:13  10  walk up and just interview a customer.  You have to
13:23:14  11  select and say "this is the person I want, this is the
13:23:16  12  person I believe can run in my system and run the
13:23:19  13  building".
13:23:20  14         They're not calling me for every interview or I
13:23:23  15  will never breathe.
13:23:24  16    Q.  We are talking about assistant store managers.
13:23:26  17    A.  That's what I'm saying, assistant store managers.
13:23:29  18    Q.  You have got 13 stores?
13:23:30  19    A.  13 stores.
13:23:31  20    Q.  They're not quitting every day, are they?
13:23:34  21    A.  Depending on the store manager.
13:23:37  22         THE COURT:  Are there instances where
13:23:39  23  assistant store managers, in your district, have quit on
13:23:42  24  a daily basis?
13:23:44  25         THE WITNESS:  Quite frequently.  Not every

13:23:47  1    day for seven days consecutive, no.

13:23:49  2        Q.   You say you can't possibly interview the

13:23:52  3    assistant store manager candidates.  You work 365 days a

13:23:55  4    year or thereabouts, don't you?

13:23:57  5        A.   Correct.  I didn't say I couldn't interview the

13:24:00  6    assistant managers.

13:24:00  7        Q.   Yeah.  You have got time to interview them, like

13:24:02  8    the policy requires, don't you?

13:24:04  9        A.   I can interview assistant managers; correct.

13:24:07  10       Q.   And Mr. Barkus said in the second paragraph,

13:24:14  11   quote, "The purpose of this memo is to restate this

13:24:18  12   policy so everyone fully understands.  Any store

13:24:23  13   manager, assistant manager, or any other associate whom

13:24:27  14   the store manager has recommended carry keys to a Family

13:24:30  15   Dollar store must be approved in person by the district

13:24:35  16   manager prior to being hired, promoted, and/or given

13:24:40  17   store keys"; correct?

13:24:42  18       A.   Yes.  We are to interview assistant manager

13:24:49  19   candidates.

13:24:50  20            THE COURT:  But that's -- that policy is not

13:24:55  21   what you testified on direct examination, is it?

13:24:59  22            THE WITNESS:  I testified that store manager

13:25:01  23   appoints their assistants.  I have never denied a store

13:25:05  24   manager who say you select an assistant --

13:25:07  25            THE COURT:  Just a moment.

13:25:08  1          THE WITNESS:  All right.  All right.

13:25:10  2          THE COURT:  I thought I asked you on direct

13:25:14  3  examination whether the store manager could hire,

13:25:18  4  promote, or fire without having to get your prior

13:25:25  5  approval.

13:25:27  6          THE WITNESS:  They can promote.

13:25:28  7          THE COURT:  Do you remember my asking you

13:25:30  8  that question?

13:25:30  9          THE WITNESS:  Yes.

13:25:31  10          THE COURT:  And do you remember what your

13:25:32  11  answer was?

13:25:33  12          THE WITNESS:  I said "yes, they may".

13:25:34  13          THE COURT:  All right.  But this policy says

13:25:39  14  that they can't do it without prior approval of the

13:25:43  15  district manager, doesn't it?

13:25:45  16          THE WITNESS:  That policy states that.  And

13:25:48  17  I always approved what my store managers recommended.

13:25:51  18          THE COURT:  Without prior approval?

13:25:54  19          THE WITNESS:  Yeah --

13:25:55  20          THE COURT:  Isn't that what the policy says,

13:25:58  21  "without prior approval"?

13:25:59  22          THE WITNESS:  Yeah, if they recommended or

13:26:00  23  said this is going to be their assistant, I approved it,

13:26:04  24  even before I saw the assistant manager.

13:26:06  25     Q.  (By Mr. R. Wiggins)  So now you're using the word

13:26:08   1    "recommend", a minute ago you used the word "select".

13:26:11   2       A.   It's still -- I used them interchangeably.   I

13:26:14   3    mean the same thing.

13:26:15   4       Q.   Okay.   Well, that's fair.   So what you have been

13:26:18   5    telling us all along is that the store managers can't

13:26:21   6    hire anybody, even their own assistant on their own,

13:26:25   7    they just recommend?

13:26:26   8       A.   No, that's not true.   They can hire, select, and

13:26:31   9    assign their own assistant manager.   When I interview

13:26:35   10   them is not an interview to deny or to reverse a

13:26:39   11   decision; the interview is basically to explain the job

13:26:42   12   at hand; what they will be doing as an assistant

13:26:46   13   manager, what they will be responsible for as an

13:26:48   14   assistant manager.

13:26:50   15      Q.   Okay.   So you're saying that you could -- a store

13:26:55   16   manager in your 13 stores could hire an assistant store

13:26:58   17   manager on their own without you being involved, and

13:27:03   18   that would be okay, and not violate company policy?

13:27:05   19      A.   I would be involved.   I would interview them,

13:27:08   20   because they're holding keys.

13:27:10   21           All key holders, I will interview.   I will not

13:27:13   22   decide if that person is going to be an assistant.

13:27:16   23           When I interview them, I want them to understand

13:27:18   24   if the --

13:27:19   25                   THE COURT:   Wait a minute.   You've answered

13:27:21  1    that question.

13:27:23  2        Q.   The next sentence says, last sentence of second

13:27:28  3    paragraph:  "Violation of this policy is a serious

13:27:31  4    infraction and may result in disciplinary action, up to

13:27:36  5    and including possible termination"; correct?

13:27:39  6        A.   Correct.

13:27:40  7        Q.   So a store manager would be subject to discharge

13:27:45  8    if they were to hire someone on their own, wouldn't

13:27:48  9    they?

13:27:49  10       A.   They could be, yes.

13:27:52  11       Q.   And for that reason, these plaintiffs just don't

13:27:57  12   do it, do they?

13:27:59  13       A.   They do, do it.  In my district, they do, do it.

13:28:03  14   I can't testify to other districts.  But in my district,

13:28:06  15   they have hired an assistant.

13:28:08  16            THE COURT:  Without your prior approval?

13:28:11  17            THE WITNESS:  I am not approving.  I am

13:28:13  18   explaining -- and that -- let me explain, sir --

13:28:15  19            THE COURT:  No, sir.  No, sir.  Do you

13:28:17  20   understand what "prior approval" means?  what that

13:28:21  21   phrase means?

13:28:23  22            THE WITNESS:  From what I understand it to

13:28:25  23   mean, is that I have to say yes, this person can be an

13:28:28  24   assistant.

13:28:29  25            THE COURT:  That's correct.  Before the

13:28:30    1    person is hired, that's what "prior approval" means;

13:28:33    2    right?

13:28:33    3                    THE WITNESS:  Correct.

13:28:34    4                    THE COURT:  All right.  Now, is it your

13:28:37    5    testimony that store managers in your district have

13:28:44    6    hired assistant store managers, other store employees

13:28:50    7    without your prior approval?

13:28:52    8                    THE WITNESS:  That's my testimony, yes, sir.

13:28:55    9    Q.  (By Mr. R. Wiggins)  And were they discharged?

13:28:56   10    A.  No, I did not terminate them.

13:28:58   11                    THE COURT:  And could you tell us the names

13:29:02   12    of any assistant managers or other employees who were

13:29:07   13    hired by store managers in your district without your

13:29:12   14    prior approval?

13:29:14   15                    THE WITNESS:  Yes.  Christopher Ray.  He

13:29:17   16    works at Store 622.

13:29:19   17    Q.  When was he hired?

13:29:21   18    A.  When?

13:29:21   19    Q.  Yes.

13:29:22   20    A.  I want to say about four weeks ago.

13:29:24   21    Q.  Four weeks ago.  Okay.  What about at the time

13:29:28   22    this memo, February 20th, 2003?  had there ever been an

13:29:32   23    occasion that an assistant manager had been hired in one

13:29:35   24    of your stores by someone other than you hiring them?

13:29:38   25    A.  Yes.

13:29:39  1    Q.   Who?

13:29:40  2    A.   I'm trying to think of the young lady.  Patsy

13:29:48  3  Haynes.  She was hired as an assistant manager and then

13:29:50  4  later promoted to store manager.  She was hired --

13:29:52  5         THE COURT:  She was hired as an assistant

13:29:54  6  manager without your prior approval?

13:29:57  7         THE WITNESS:  Correct.

13:29:58  8    Q.   And what was her name?

13:29:59  9    A.   Patsy L. Haynes, Store 4053.

13:30:03  10   Q.   And who is the store manager of that store?

13:30:05  11   A.   She's now the -- was the store manager.  We

13:30:09  12  closed it.

13:30:09  13   Q.   Who was the store manager that she was the

13:30:11  14  assistant for?

13:30:12  15   A.   Oh, Kelly Estes.

13:30:14  16   Q.   All right.  So, now, did you then email that to

13:30:18  17  Mr. Barkus like he asked you to do?

13:30:20  18   A.   Email what to him?

13:30:22  19   Q.   Did you email Patsy Haynes to Mr. Barkus so he

13:30:29  20  would know about it, like he says in the third paragraph

13:30:32  21  of the email?

13:30:33  22   A.   No, I did not email it.

13:30:35  23   Q.   Let's look at the third paragraph -- let's bring

13:30:39  24  it all up.

13:30:46  25         "Please notify your district manager immediately

| | |
|---|---|
| 13:30:49 | 1 |
| 13:30:52 | 2 |
| 13:30:55 | 3 |
| 13:30:58 | 4 |
| 13:31:01 | 5 |
| 13:31:03 | 6 |
| 13:31:07 | 7 |
| 13:31:08 | 8 |
| 13:31:11 | 9 |
| 13:31:14 | 10 |
| 13:31:15 | 11 |
| 13:31:15 | 12 |
| 13:31:19 | 13 |
| 13:31:20 | 14 |
| 13:31:21 | 15 |
| 13:31:26 | 16 |
| 13:31:28 | 17 |
| 13:31:31 | 18 |
| 13:31:37 | 19 |
| 13:31:38 | 20 |
| 13:31:39 | 21 |
| 13:31:46 | 22 |
| 13:31:49 | 23 |
| 13:31:55 | 24 |
| 13:32:02 | 25 |

by email if you believe any key carrier in your store has not been interviewed and approved by the district manager.  Any management person or key carrier currently on staff who has not been interviewed personally and approved by the district manager must receive such interview by April 1, 2003."

Did you comply with that?

A.  Yes.  I did go back and talk to her, yes.

Q.  So you went back and you interviewed Patsy Haynes?

A.  Yes.

Q.  Because policy hadn't been followed on her; correct?

A.  Yes.

Q.  And the next sentence says:  "Once this grace period has ended, the district manager will be held personally responsible for the final approval of the associates in his/her district who carry keys to our stores"; correct?

A.  Correct.

Q.  Have you complied with that since then?

A.  For the most part.

Q.  And any store manager since February 20, 2003, who would have hired an assistant in their own store was subject to discharge under this policy that we have in

| | |
|---|---|
| 13:32:05 | 1 |
| 13:32:07 | 2 |
| 13:32:09 | 3 |
| 13:32:14 | 4 |
| 13:32:18 | 5 |
| 13:32:21 | 6 |
| 13:32:25 | 7 |
| 13:32:27 | 8 |
| 13:32:29 | 9 |
| 13:32:31 | 10 |
| 13:32:33 | 11 |
| 13:32:40 | 12 |
| 13:32:41 | 13 |
| 13:32:44 | 14 |
| 13:32:45 | 15 |
| 13:32:46 | 16 |
| 13:32:49 | 17 |
| 13:32:52 | 18 |
| 13:32:52 | 19 |
| 13:32:55 | 20 |
| 13:32:58 | 21 |
| 13:33:04 | 22 |
| 13:33:07 | 23 |
| 13:33:11 | 24 |
| 13:33:12 | 25 |

Exhibit 136; correct?

        THE COURT:  Well, the question is whether the store manager hired an assistant store manager without his prior approval.

Q.  That's never happened since then, has it?

A.  I think so on Janell Myers, Store 3985.

Q.  Janell Myers was hired?

A.  No.  He hired an assistant.

Q.  Who did she hire?

A.  I don't remember her name.

Q.  So Janell Myers, you say, violated this policy?

A.  Yes.

Q.  And who did she hire?

A.  He.

Q.  Who is it?

A.  Janell Myers.  I don't know her name.  I can't remember her name.  I can see her face, I just can't remember her name.

Q.  You don't remember the assistant that she hired?

A.  I don't remember the assistant he hired.

Q.  Now, you said on direct exam that to be a true store manager, you would have to be able to set the pay of your own employees in your store; correct?

A.  Yes.

Q.  And in this company, these store managers don't

13:33:18    1    have that authority to set their own employees' pay,

13:33:22    2    give them a pay raise, without your approval, do they?

13:33:25    3        A.    That's not correct.

13:33:28    4        Q.    Well, let's look at Exhibit F1.

13:33:40    5            This is in the policy manual of the company that

13:33:43    6    you said is kept in the store.  It says:  "All pay

13:33:46    7    change recommendations by the store manager should be

13:33:49    8    approved by the district manager prior to

13:33:51    9    implementation"; correct?

13:33:54   10        A.    Correct.

13:33:55   11        Q.    Now, you have complied with that one, haven't

13:33:59   12    you?

13:33:59   13        A.    The store manager would send me what they want to

13:34:04   14    pay the associate and I would key it in.

13:34:05   15        Q.    So they would recommend something, but it cannot

13:34:09   16    be approved or put into effect until you have given your

13:34:12   17    approval of the pay raise; correct?

13:34:14   18        A.    I didn't act as an approving agent.  I acted as a

13:34:18   19    conduit to key it in.

13:34:19   20            THE COURT:  So you did not approve pay raise

13:34:23   21    recommendations of the store managers in your district?

13:34:27   22            THE WITNESS:  I reviewed, correct, I did not

13:34:29   23    approve.

13:34:30   24            THE COURT:  You did not approve them.

13:34:33   25        Q.    (By Mr. R. Wiggins)  So you violated this policy,

13:34:34   1    too, for your 13 stores; correct?

13:34:36   2        A.   Correct.

13:34:38   3        Q.   And to be a true store manager, would you have

13:34:51   4    to, in running your store, be able to determine how many

13:34:55   5    employees you need to cover the store?

13:34:57   6        A.   Store managers do.

13:35:01   7        Q.   So you agree to be a true store manager, you

13:35:03   8    would have to be able to allow overtime, in order to get

13:35:05   9    your job done; correct?

13:35:07  10        A.   They can.

13:35:08  11        Q.   So you're saying here today that store managers

13:35:13  12    have the authority to approve overtime as much as they

13:35:17  13    need to run the store?

13:35:19  14             THE COURT:   Without the prior approval of

13:35:22  15    the district manager.

13:35:22  16        Q.   Without the prior approval of the district

13:35:24  17    manager.

13:35:24  18        A.   They did not call me for prior approval --

13:35:27  19             THE COURT:   Did you hear the question?  Did

13:35:29  20    you hear the question?

13:35:30  21             THE WITNESS:   Yes.

13:35:31  22             THE COURT:   And would you answer it?

13:35:32  23             THE WITNESS:   Without prior approval.

13:35:34  24             THE COURT:   They could not do it without the

13:35:36  25    prior approval of the district manager?

13:35:38  1          THE WITNESS:  They could do it without my
13:35:39  2  prior approval.
13:35:41  3          THE COURT:  All right.
13:35:41  4     Q.  (By Mr. R. Wiggins)  And would they violate a
13:35:43  5  policy if they did that?
13:35:45  6     A.  I am not sure if there's a policy for that.
13:35:49  7     Q.  What about the store payroll budget?  doesn't it
13:35:51  8  set the number of hours and the payroll that's allowed
13:35:56  9  in your store?
13:35:56 10     A.  It says the payroll budget for the store, yes.
13:35:58 11     Q.  And employees, store managers, assistant store
13:36:02 12  manager who exceed that payroll amount are subject to
13:36:06 13  discipline, aren't they?
13:36:06 14     A.  Correct.
13:36:07 15     Q.  And so they don't have the authority to decide
13:36:12 16  how much or how many employees are needed to run the
13:36:15 17  store, because you would only give them so much payroll?
13:36:18 18     A.  That's not true.  If you had somebody working
13:36:21 19  five hours -- you could have ten people, as long as you
13:36:25 20  didn't fail within the payroll guidelines.  The number
13:36:28 21  of people is not determined by the payroll dollars, it's
13:36:30 22  by the hours and labor used.  So the store manager could
13:36:34 23  control that.
13:36:35 24     Q.  Well, the example you gave us was this one,
13:36:37 25  Exhibit 2216, and it says at the top "160 hours";

13:36:42  1    correct?

13:36:42  2        A.   Correct.

13:36:43  3        Q.   And that's how many that store's allowed, 160

13:36:46  4    hours; correct?

13:36:47  5        A.   That's how many we recommend the store to use,

13:36:49  6    correct.

13:36:50  7        Q.   And, in fact, when you add up all your

13:36:53  8    pencilled-in marks, that's how much you used for that

13:36:56  9    store is 160 hours; correct?

13:36:58  10       A.   That's how much they should use.  That's not --

13:37:02  11       Q.   Well, I added it up at lunch.  And when I added

13:37:05  12   up all your handwritten and all your typed marks, it

13:37:08  13   came up to 160 hours.

13:37:12  14       A.   If they followed the guideline.

13:37:13  15       Q.   So this person -- this store manager, if this is

13:37:17  16   a real example, I'm not sure it is -- was within its

13:37:22  17   budget for his -- for running that store; correct?

13:37:27  18       A.   Five hours, I would assume so.

13:37:30  19       Q.   Let's say that store manager was working in

13:37:35  20   reality 80 hours a week.  Could he add another employee,

13:37:41  21   go up to 200?  He's allowed 160.  He says, "I really

13:37:49  22   need 200" and just do it?

13:37:50  23       A.   Yeah.  He could do it, yes.

13:37:52  24                  THE COURT:  Without your prior approval?

13:37:55  25                  THE WITNESS:  They have done it without my

13:37:57  1    prior approval.

13:37:58  2        Q.  I have no doubt many people in the world do

13:38:00  3    things they're not supposed to do, but are they allowed

13:38:02  4    to do that without violating company policy?

13:38:05  5        A.  Without going over payroll?

13:38:09  6        Q.  Yes.

13:38:10  7        A.  I mean, it depends on what rate you hired them in

13:38:13  8    at.  If you hired them in at 5.15 or minimum wage, you

13:38:17  9    could spend more hours than someone else.

13:38:18  10       Q.  If a store manager on that exhibit we have

13:38:22  11   decided, "I need 200 hours to properly run this store,"

13:38:25  12   he was only given 160 hours by the company on the

13:38:29  13   payroll budget and the staff scheduling, would he

13:38:32  14   violate company policy by going over his budget by 40

13:38:36  15   hours?

13:38:37  16       A.  He would have a chance for repercussions,

13:38:42  17   depending on the time.  Because you are asking something

13:38:45  18   in the absolute.

13:38:46  19       Q.  He could be fired; correct?

13:38:47  20       A.  I have fired no one for payroll.

13:38:49  21       Q.  But, you know that in this company store managers

13:38:52  22   and assistant store managers are disciplined all the

13:38:55  23   time for going even one dollar over that payroll budget,

13:38:59  24   aren't they?

13:38:59  25       A.  I don't know that personally, but I have written

13:39:02  1   somebody up for payroll; correct.

13:39:03  2      Q.  You have.  And you told us on your direct that

13:39:06  3   when you evaluate their performance, a key element on

13:39:09  4   page 1, you pointed out to us, was compliance with the

13:39:11  5   store payroll budget, didn't you?

13:39:13  6      A.  Yeah, but you also have to --

13:39:15  7            THE COURT:  Wait a minute --

13:39:17  8            THE WITNESS:  Payroll budget, it goes

13:39:19  9   into -- yes.

13:39:20  10     Q.  Okay.  And that evaluation, in which you said the

13:39:23  11  store payroll budget compliance was so important, that

13:39:26  12  affects your pay raise, doesn't it?

13:39:28  13     A.  It would be a component, depending on some other

13:39:34  14  issues, yes.

13:39:34  15     Q.  So a store manager that would do like you would

13:39:37  16  suggest, that make a decision, a decision that if they

13:39:42  17  need more employees in a store to properly run it, would

13:39:44  18  be subject to having no pay raise for doing his

13:39:47  19  managerial duties; correct?

13:39:49  20     A.  Incorrect.  Depending on the situation.  I

13:39:52  21  have -- and let me give an example --

13:39:54  22     Q.  Well, don't depend on the situation.  Respond to

13:39:56  23  my question, sir.  If they did not comply with their

13:40:00  24  store payroll budget, that would cause them to receive

13:40:03  25  less or perhaps no pay raise; correct?

13:40:06  1    A.   Could impact a raise, yes.

13:40:07  2    Q.   Okay.  Now, that scheduler that you have there in

13:40:16  3  front of you -- and we don't have copies yet that I know

13:40:18  4  of -- is this a real example, or is this just something

13:40:24  5  done for this case, for your testimony?

13:40:28  6    A.   Appears to be real.  I don't know any of those

13:40:30  7  individuals.

13:40:31  8    Q.   This is not from your district, is it?

13:40:33  9    A.   No.

13:40:33  10   Q.   You've never seen this before today?

13:40:37  11   A.   No, I have not.

13:40:38  12   Q.   So you don't know if this is -- really how this

13:40:40  13  works in any district out in the world, do you?

13:40:43  14   A.   I have never seen that particular one.

13:40:46  15   Q.   How many districts are there in this company?

13:40:47  16   A.   Probably close to 350 to 400.

13:40:57  17   Q.   And you run one of those?

13:40:59  18   A.   Yes.

13:41:00  19   Q.   Correct?

13:41:02  20        Now, you've been telling us that to be a true

13:41:06  21  manager, you've got to be an executive and have the

13:41:09  22  power to run your store.  But, in fact, the company

13:41:16  23  policy makes the district manager the head of the store

13:41:17  24  team, doesn't it?

13:41:19  25   A.   Supervisor.  I'm not the head of the store team,

13:41:25  1   no.

13:41:25  2       Q.   You're familiar with the company strands and

13:41:31  3   policy statements and training manuals; correct?

13:41:34  4       A.   Yes.

13:41:34  5       Q.   And they're binding; they run -- they control how

13:41:38  6   the stores are run, and they're kept in the stores;

13:41:40  7   correct?

13:41:41  8       A.   Correct.

13:41:41  9       Q.   And I want to show you a page in that policy,

13:41:48  10  this page right here (indicating), which defines the

13:41:50  11  store -- the Family Dollar store team.  Right here

13:42:04  12  (indicating) let's get this figure.  Right here, the

13:42:09  13  Family Dollar store team, the company policy.  Who is

13:42:11  14  the head of that team for that store?

13:42:13  15      A.   In that illustration, shows the district manager.

13:42:17  16      Q.   Sir, that's the company policy manual that says

13:42:22  17  the district manager is the head of the store team,

13:42:25  18  doesn't it?

13:42:26  19      A.   It doesn't say it's the head.  It just lists the

13:42:31  20  members of the team.

13:42:32  21      Q.   Right.  And you can discipline the store manager,

13:42:36  22  can't you?

13:42:37  23      A.   Yes.

13:42:37  24      Q.   He can't discipline you?

13:42:39  25      A.   Correct.

13:42:40  1    Q.   You're his boss?

13:42:42  2    A.   Yes, I am.

13:42:42  3              THE COURT:   Well, as between those four

13:42:45  4    positions, which do you consider to be the most

13:42:48  5    important?

13:42:51  6              THE WITNESS:   Most important in what aspect?

13:42:55  7              THE COURT:   In the general, common, everyday

13:42:58  8    English understanding of the word "important".

13:43:05  9              THE WITNESS:   In authority, the district

13:43:17  10   manager.

13:43:17  11   Q.   (By Mr. R. Wiggins)  So the most important member

13:43:20  12   of that store team is the district manager; was that

13:43:23  13   what I heard you say?

13:43:24  14   A.   I said most authoritative out of that list would

13:43:27  15   be the district manager.

13:43:28  16   Q.   I apologize.  I was trying to find out how much

13:43:31  17   time I had left.

13:43:31  18             THE COURT:   You've got about ten minutes.

13:43:36  19             MR. R. WIGGINS:   Yes, sir.

13:43:37  20   Q.   Now, you told us that you will send employees in

13:43:45  21   a store over to another store; correct?

13:43:49  22   A.   I told you that we'll send training managers into

13:43:52  23   another store.

13:43:53  24   Q.   But that's just an example.  You said in your --

13:43:57  25   this morning you said, "for example, we'll send training

13:44:01  1    managers to other stores"?

13:44:02  2        A.  Correct.

13:44:03  3        Q.  Larry Reevers was not a certified training

13:44:07  4    manager, was he?

13:44:08  5        A.  And I didn't use Larry Reevers to do that --

13:44:10  6            THE COURT:  But if you would just simply

13:44:14  7    answer his questions.  Was Larry Reevers a certified

13:44:20  8    training manager?

13:44:20  9            THE WITNESS:  No, Larry Reevers was not.

13:44:23  10       Q.  So you were exercising your authority over that

13:44:26  11   store to send its store manager over to another store of

13:44:30  12   the company as the head of that store team; correct?

13:44:34  13       A.  Yes.  I've sent training managers over to another

13:44:41  14   store; correct.

13:44:48  15           THE COURT:  As far as you know, Larry

13:44:51  16   Reevers has not been sent over to work at another store?

13:44:55  17           THE WITNESS:  I don't have an example of

13:44:56  18   where Larry was, no.

13:44:57  19       Q.  Well, you've sent Larry Reevers to other stores

13:45:00  20   to work with some frequency, haven't you?

13:45:02  21       A.  No.

13:45:03  22       Q.  You don't think the other stores are going to

13:45:05  23   remember?

13:45:06  24           THE COURT:  No, he has says -- this witness

13:45:07  25   says, no, he has not sent Mr. Reevers to other stores.

13:45:13   1   Q.   Okay.   You email the stores when you have

13:45:22   2   instructions for them on what to do; correct?

13:45:25   3   A.   Yes.

13:45:26   4   Q.   You called them on the phone when you have

13:45:28   5   instructions to tell them how to run the store; correct?

13:45:33   6   A.   Not how to run the store, no.

13:45:34   7   Q.   But you call them up and you tell them various

13:45:39   8   things you want done, the deadline you want it done by,

13:45:42   9   don't you?

13:45:42  10   A.   Yes, I will manage the exception report.

13:45:45  11   Q.   You mentioned those exception reports this

13:45:48  12   morning.   That's a system, a computerized system that's

13:45:51  13   checking everything in the store and spitting out

13:45:55  14   warnings to you of something that you might need to look

13:45:58  15   into in the store; correct?

13:46:00  16   A.   Correct.

13:46:01  17   Q.   And it's your job to enforce the company policies

13:46:05  18   in each store in your district; correct?

13:46:08  19   A.   Correct.

13:46:09  20   Q.   And you're responsible to make sure those stores

13:46:13  21   meet their store payroll budget, turn a profit, and

13:46:18  22   comply with company policy and goals; right?

13:46:25  23   A.   Correct.

13:46:26  24   Q.   That's why you're head of the store team, because

13:46:29  25   you are responsible for managing the store profit,

13:46:32  1   getting the job done in the stores; correct?

13:46:36  2       A.   I'm responsible for supervising.

13:46:39  3       Q.   And you visit the stores, you told us this

13:46:42  4   morning, also, in addition to emails, in addition to

13:46:45  5   phone calls; correct?

13:46:46  6       A.   Correct.

13:46:47  7       Q.   And these stores are getting instructions in the

13:46:51  8   form of bulletins and emails from corporate

13:46:55  9   headquarters, too, on how to run the store?

13:46:59  10      A.   They're getting bulletins for various different

13:47:04  11  reasons, not really how to run the store; ads,

13:47:08  12  compliance issues.  You can't run a store from

13:47:13  13  Charlotte.

13:47:14  14      Q.   You can sure issue a lot of instructions in very

13:47:18  15  much detail on how to run that store.  And that is, in

13:47:21  16  fact, what happens with those bulletins; correct?

13:47:23  17      A.   Bulletins talk about our ads, talk about new

13:47:26  18  initiatives.  They don't tell you what time to open,

13:47:29  19  when to do the truck, when the truck is coming, who to

13:47:32  20  hire, what you are looking for, when you are hiring.

13:47:35  21  Bulletins can't do that, only the store manager can.

13:47:37  22      Q.   Well, the corporate does set when the truck is

13:47:40  23  coming to the store; correct?

13:47:43  24      A.   They give you a broad guideline.

13:47:45  25      Q.   But the corporate tells them what their truck day

13:47:47  1   is?

13:47:47  2       A.   Tell them what the day is.

13:47:49  3       Q.   Okay.   And the corporate sends fairly detailed

13:47:56  4   bulletins to each store on a regular basis and requires

13:47:59  5   that each member of the store team read them and comply

13:48:03  6   with them; correct?

13:48:04  7       A.   We ask that they read them.

13:48:08  8       Q.   And the regional vice-presidents -- that's your

13:48:12  9   boss; correct?

13:48:12  10      A.   Yes.

13:48:13  11      Q.   They send emails, they send bulletins, they send

13:48:17  12  instructions to the store on what to do and when to do

13:48:19  13  it in running that store, don't they?

13:48:22  14      A.   Not running the store.   They send bulletins;

13:48:24  15  correct.

13:48:27  16                  THE COURT:   What do the bulletins tell them?

13:48:28  17                  THE WITNESS:   Bulletins will tell you

13:48:30  18  various things:   When we're going to get coolers, when

13:48:33  19  you are going to get something into your store, to be on

13:48:36  20  the lookout; if we have a recall or unsafe item.

13:48:40  21              It doesn't tell you how to manage the

13:48:41  22  business, it's just telling you what to look for in your

13:48:44  23  particular store.

13:48:45  24      Q.   All right.   We are going to have some of those in

13:48:48  25  evidence later.

13:48:49   1          MR. R. WIGGINS:  I have no other questions.
13:48:50   2   Thank you.
13:48:51   3          THE COURT:  Redirect?
13:48:51   4          MR. UMBACH:  Yes, Your Honor.
13:48:52   5                  REDIRECT EXAMINATION
13:48:52   6   BY MR. UMBACH:
13:49:01   7   Q.  Mr. Cannon, you were shown a list of team at the
13:49:06   8   store with the district manager at the top.  And you
13:49:11   9   were asked who was the most in terms of authority.
13:49:16  10          Who do you say is most important in that list, in
13:49:19  11   terms of the individual's success of the stores?
13:49:23  12   A.  Store manager.
13:49:24  13   Q.  And who do you say is most important, in terms of
13:49:29  14   the customer service that's provided by Family Dollar?
13:49:31  15   A.  The store manager.
13:49:32  16   Q.  Mr. Cannon, counsel asked you about something
13:49:40  17   called the strands.  Are you familiar with the strands?
13:49:44  18   A.  Yes.
13:49:44  19   Q.  And is that -- are those training materials for
13:49:47  20   store managers?
13:49:48  21   A.  Yes.
13:49:49  22   Q.  Let me show you a volume of the strands, and
13:50:00  23   direct your attention to the tabbed page.
13:50:05  24          And for the Court, this is Defendant's Exhibit
13:50:09  25   1925 and it has Bates number D14394.

13:50:26   1         Look with me at the box, Mr. Cannon, where it

13:50:30   2    says "note".  If you will highlight "note" there in the

13:50:39   3    middle.

13:50:45   4              THE COURT:  Do you offer the document in

13:50:48   5    evidence?

13:50:48   6              MR. UMBACH:  Yes, I do, Your Honor.  I

13:50:50   7    thought it may have been in.  This volume -- a page out

13:50:54   8    of it, it has been shown.  But if not, I do offer it.

13:50:56   9              THE COURT:  All right.  It's in evidence.

13:50:58  10              MR. UMBACH:  Thank you.

13:50:59  11    Q.  (By Mr. Umbach)  What does it say by the note,

13:51:01  12    Mr. Cannon?

13:51:01  13    A.  "You are the hiring authority of Family Dollar

13:51:06  14    Stores."

13:51:06  15    Q.  Now, who is this manual directed to?

13:51:08  16    A.  Store manager.

13:51:12  17              MR. UMBACH:  No further questions.

13:51:14  18              MR. R. WIGGINS:  Now, sir --

13:51:15  19              THE COURT:  Thank you, sir.  You may come

13:51:18  20    down.

13:51:19  21              MR. R. WIGGINS:  Your Honor, I didn't hear

13:51:20  22    you.

13:51:21  23              THE COURT:  Pardon me?

13:51:22  24              MR. R. WIGGINS:  I couldn't hear you.

13:51:24  25              THE COURT:  He said store managers.

| | | |
|---|---|---|
| 13:51:29 | 1 | Thank you, sir. |
| 13:51:30 | 2 | The defendant will call the next witness. |
| 13:51:33 | 3 | MR. UMBACH:  Your Honor, I have the original |
| 13:51:35 | 4 | exhibits here. |
| 13:51:54 | 5 | MR. MAYS:  May it please the Court, we call |
| 13:51:57 | 6 | Mr. Bill Broome.  Mr. White is bringing him in from the |
| 13:52:02 | 7 | witness room, Your Honor. |
| 13:52:19 | 8 | **CHARLES WILLIAM BROOME, DEFENDANTS' WITNESS, SWORN** |
| 13:52:19 | 9 | THE CLERK:  State your name for the record, |
| 13:53:00 | 10 | Please. |
| 13:53:00 | 11 | THE WITNESS:  Charles William Broome. |
| 13:53:11 | 12 | THE CLERK:  Spell your last name for the |
| 13:53:13 | 13 | record, please. |
| 13:53:14 | 14 | THE WITNESS:  B-R-O-O-M-E. |
| 13:53:16 | 15 | **DIRECT EXAMINATION** |
| 13:53:16 | 16 | **BY MR. MAYS:** |
| 13:53:17 | 17 | Q.  Mr. Broome, do you go by Bill Broome? |
| 13:53:20 | 18 | A.  I do. |
| 13:53:21 | 19 | Q.  Where do you live, sir? |
| 13:53:22 | 20 | A.  Iva, South Carolina. |
| 13:53:24 | 21 | Q.  How old are you, sir? |
| 13:53:25 | 22 | A.  56. |
| 13:53:28 | 23 | Q.  How are you currently employed? |
| 13:53:30 | 24 | A.  I work for Family Dollar Operations, |
| 13:53:34 | 25 | Incorporated. |

13:53:34   1        Q.   How long have you been employed by Family Dollar,

13:53:37   2   Mr. Broome?

13:53:38   3        A.   February past was 28 years.

13:53:41   4        Q.   Mr. Broome, have you been a store manager at

13:53:45   5   Family Dollar?

13:53:46   6        A.   Yes, I have.

13:53:47   7        Q.   How long were you a store manager?

13:53:49   8        A.   Seven or eight months, as I recall.

13:53:53   9        Q.   And when was that?

13:53:54  10        A.   1977.

13:53:56  11        Q.   Have you been a district manager?

13:53:57  12        A.   Yes, I have.

13:53:58  13        Q.   And for how long were you a district manager?

13:54:01  14        A.   Approximately nine years.

13:54:03  15        Q.   And when was that, sir?

13:54:05  16        A.   When?

13:54:06  17        Q.   Yes.

13:54:07  18        A.   From '78 through '87, I guess, I believe,

13:54:14  19   roughly.

13:54:14  20        Q.   Have you been a regional vice-president at Family

13:54:18  21   Dollar?

13:54:18  22        A.   I am presently, and I was once previously as

13:54:22  23   well.

13:54:22  24        Q.   And when were you a regional vice-president first

13:54:25  25   time?

13:54:25    1        A.   '87 to '96, I believe.   I don't remember exactly.

13:54:30    2        Q.   So that's eight or nine years?

13:54:32    3        A.   Yes.

13:54:33    4        Q.   And have you been a divisional vice-president?

13:54:35    5        A.   I was a vice-president store operations in charge

13:54:39    6    of a division, yes.

13:54:40    7        Q.   And when was that?

13:54:41    8        A.   From '96 through August of last year.

13:54:46    9        Q.   Are you currently serving as a regional

13:54:49   10    vice-president again?

13:54:50   11        A.   Yes, I am.

13:54:51   12        Q.   And tell the ladies and gentlemen why you stepped

13:54:54   13    down from vice-president divisional to regional

13:54:59   14    vice-president.

13:54:59   15        A.   I requested to step back.   My wife has some

13:55:02   16    health issues.   And the region that I currently have

13:55:05   17    allowed us to move close to our hometown where there are

13:55:08   18    some family support, and so forth.

13:55:09   19        Q.   And did Family Dollar allow you to make that

13:55:12   20    change at your request?

13:55:13   21        A.   They did.

13:55:15   22        Q.   May I have the slide, please, Terry?   The one

13:55:30   23    that shows the structure of Family Dollar.

13:55:38   24             MR. MAYS:   Your Honor, this is not an

13:55:40   25    exhibit I am going to introduce into evidence.   It's a

13:55:43  1    demonstrative exhibit that I would like to use just to

13:55:45  2    show the chain of command at Family Dollar, if that's

13:55:48  3    acceptable.

13:55:49  4                    THE COURT:  Any objection?

13:55:54  5                    MR. R. WIGGINS:  No, sir.

13:55:55  6                    THE COURT:  All right.

13:55:56  7    Q.   Mr. Broome, I show you this demonstrative

13:56:01  8    exhibit.  Does this show the structure or organizational

13:56:04  9    chart of Family Dollar?

13:56:05  10   A.   Yes, it does.

13:56:09  11   Q.   All right.  Now, we see the store associates, are

13:56:12  12   those people like cashiers and stockers and assistant

13:56:16  13   managers in the store?

13:56:16  14   A.   Yes, they would be.

13:56:17  15   Q.   And then do they report to store managers?

13:56:20  16   A.   That is correct.

13:56:20  17   Q.   And is there one store manager for every store?

13:56:23  18   A.   That's our desire, yes.

13:56:25  19   Q.   Then do the store managers answer to a district

13:56:30  20   manager?

13:56:30  21   A.   They do.

13:56:30  22   Q.   How many district managers are there at Family

13:56:33  23   Dollar, if you know, sir?

13:56:34  24   A.   I don't know the exact number, probably 325 or

13:56:39  25   so, 325.

13:56:41  1      Q.    And by the way, how many stores does Family
13:56:43  2   Dollar have now?
13:56:44  3      A.    Approximately 5,700, 56 and change.
13:56:49  4      Q.    Okay.  So it would be 5600, 5700 store managers
13:56:52  5   then; is that right?
13:56:53  6      A.    Well, we do have some stores without, but it is
13:56:56  7   our desire to have a store manager at each store.
13:56:59  8      Q.    Typically, how many stores does a district
13:57:02  9   manager have in his jurisdiction or her jurisdiction?
13:57:05  10     A.    In my present region, we have about 17-and-a-half
13:57:08  11  stores per district manager.
13:57:11  12     Q.    Okay.  Now, when you say 17-and-a-half, that's an
13:57:14  13  average, isn't it?
13:57:15  14     A.    Yes, it is.
13:57:16  15     Q.    Nobody has a half store, do they?
13:57:18  16     A.    I hope not.
13:57:19  17     Q.    And then the district managers answer to regional
13:57:23  18  vice-presidents?
13:57:23  19     A.    That's correct.
13:57:24  20     Q.    And how many regions do we have at Family Dollar?
13:57:27  21     A.    We just had a quarter change and a realignment.
13:57:33  22  I believe there are 20 today.
13:57:35  23     Q.    And you are a regional vice-president?
13:57:37  24     A.    I am.
13:57:37  25     Q.    How many districts do you have in your region?

13:57:39 1      A.   21.

13:57:40 2      Q.   And each one of those 21 districts would have

13:57:46 3   17-and-a-half stores?

13:57:47 4      A.   Yeah.   I go from a low of 10 stores in a district

13:57:51 5   to a high of probably 23 or 24.

13:57:53 6      Q.   Okay.   And then the regional vice-president

13:57:58 7   answers to a divisional vice-president?

13:58:00 8      A.   I think the official title is vice-president of

13:58:02 9   store operations; and they supervise a division, yes.

13:58:06 10     Q.   And you were one of those for several years?

13:58:08 11     A.   Yes, I was.

13:58:09 12     Q.   How many divisional vice-presidents are there?

13:58:11 13     A.   There are currently five.

13:58:12 14     Q.   And then it's not shown on the chart, but does

13:58:16 15   each of those five division vice-presidents answer to a

13:58:20 16   senior vice-president who is over all the stores?

13:58:23 17     A.   That's correct.

13:58:23 18     Q.   I mean, does that person answer to the president

13:58:26 19   of the company, Mr. David Alexander?

13:58:28 20     A.   That is correct.

13:58:29 21     Q.   And Mr. Alexander answers to the chairman and

13:58:32 22   CEO?

13:58:32 23     A.   Yes.

13:58:33 24     Q.   Based on your experience with Family Dollar for

13:58:43 25   27 years, are you familiar with the duties of a store

13:58:48  1    manager?

13:58:48  2        A.   Yes.

13:58:50  3        Q.   Are you familiar with the duties of a district

13:58:56  4    manager?

13:58:56  5        A.   I -- pretty much so, yes.

13:58:58  6        Q.   And are you familiar with the duties of a

13:59:00  7    regional vice-president?

13:59:02  8        A.   I am relearning them as we speak.

13:59:06  9        Q.   What is the average volume of sales of the store

13:59:10  10   of Family Dollar store?

13:59:12  11       A.   It's just about a million dollars a year.

13:59:14  12       Q.   Now, when we say "a million dollars", is that

13:59:17  13   gross sales?

13:59:17  14       A.   Yes.

13:59:18  15       Q.   That's not profit, is it?

13:59:19  16       A.   No.

13:59:20  17       Q.   And approximately, how much inventory would a

13:59:24  18   Family Dollar store have on the shelf at any given time?

13:59:27  19       A.   It varies greatly by season, but approximately

13:59:33  20   202 to 220 -- 200,000 to 220,000.

13:59:39  21       Q.   Dollars?

13:59:39  22       A.   Yes.

13:59:40  23       Q.   Okay.  How many employees would one expect to

13:59:44  24   find in a Family Dollar store?

13:59:46  25       A.   Again, that varies greatly.  I think the average

13:59:50  1   is probably six to seven, somewhere in that range.

13:59:52  2       Q.  And who -- whom do all of those six or seven

13:59:56  3   employees answer to in that store?

13:59:58  4       A.  The store manager.

14:00:00  5       Q.  Tell the ladies and gentlemen of the jury what

14:00:04  6   are the duties of the store manager in Family Dollar.

14:00:08  7       A.  They're responsible and accountable for

14:00:11  8   everything that takes place in that store; from asset

14:00:16  9   protection or shrinkage control, cash control, hiring of

14:00:20  10  associates, training of associates, retaining

14:00:24  11  associates; unfortunately on occasion, termination of

14:00:28  12  associates, ensuring that the store stays in stock,

14:00:32  13  ordering of merchandise, or making sure that the

14:00:34  14  presentation of the merchandise is good, that it's

14:00:37  15  properly presented for sale.

14:00:39  16       They're the link to the customers in the

14:00:42  17  neighborhood.  They're responsible to the customer

14:00:44  18  service of that particular store.  They're that link to

14:00:48  19  that neighborhood, that store.

14:00:50  20       Q.  All right.  I am going to ask you about several

14:00:52  21  of the things you mentioned.  You mentioned "asset

14:00:55  22  protection".  Tell the ladies and gentlemen what's

14:00:57  23  involved in asset protection in a store.

14:01:00  24       A.  Basically, we're talking about protecting the

14:01:05  25  assets of the building, whether it be physical assets,

14:01:08  1   inventory of the store, any cash that is taken in on a

14:01:11  2   daily basis, the human assets, if you will, their

14:01:14  3   employees, safety of the employees, and the customers in

14:01:19  4   the store.

14:01:20  5       Q.   What can the district manager -- I'm sorry, the

14:01:27  6   store manager do to promote or effect asset protection,

14:01:28  7   the store manager?  What can the store manager do about

14:01:31  8   that?

14:01:31  9       A.   Really run a tight ship, make sure that they're

14:01:37  10  cognizant of what's going on around them, make sure that

14:01:41  11  they hire the right associates, that they train those

14:01:44  12  associates, that they're careful with any paperwork that

14:01:49  13  has to do with whether it has to do with inventory

14:01:51  14  control or cash control.

14:01:53  15      Really, anything that goes on in that building,

14:01:56  16  they're responsible for and could directly or indirectly

14:02:01  17  affect the loss of assets.

14:02:02  18      Q.   Can the district manager perform those functions

14:02:04  19  in the store?

14:02:05  20      A.   The district manager has 16 to 18 stores,

14:02:10  21  17-and-a-half in my case; he's there maybe once a month.

14:02:14  22  And while he can certainly work with the store managers,

14:02:18  23  he or she can work with the store managers that work

14:02:21  24  with them, they cannot do that on a daily basis, no.

14:02:24  25  They have to do that through training.

14:02:26   1        Q.   All those functions that you mentioned, asset
14:02:29   2   protection, is that a management function?
14:02:31   3        A.   Yes, I would say so.
14:02:32   4        Q.   You mentioned control and shrinkage.   What does
14:02:34   5   that mean?
14:02:35   6        A.   Shrinkage is the difference in what is actually
14:02:39   7   in the store -- if you could go in and count it
14:02:41   8   physically -- and what the books show that you have in
14:02:43   9   that store.
14:02:44  10        So if you have a brand new store and you ship it
14:02:46  11   $150,000 worth of merchandise, you sell 10, you come in
14:02:51  12   count it a couple of weeks later, you only have 135,
14:02:54  13   that difference -- you have had 150 to start, you sold
14:02:58  14   10, you have got $5,000 worth of shrinkage.
14:03:01  15        The difference between what's physically there
14:03:04  16   and what the books shows as being there.
14:03:06  17        Q.   What can the store manager do to control store
14:03:11  18   shrinkage?
14:03:12  19        A.   Again, it's kind of like the asset protection
14:03:15  20   piece; it's make sure we are following policies in
14:03:19  21   regards to the merchandise control and cash control,
14:03:22  22   watching for the external piece of shrinkage, which is
14:03:28  23   shoplifting, making sure that they have got honest,
14:03:30  24   well-trained associates to help them in the store and
14:03:33  25   then monitor paperwork.

14:03:35  1        You can have shrinkage through paperwork errors.

14:03:37  2    Q.   Is that -- are all of those management functions?

14:03:39  3    A.   I would say, yes.

14:03:40  4    Q.   Can the district manager control shrinkage?

14:03:44  5    A.   Their input on shrinkage control is through

14:03:50  6  training the store managers and following up if they

14:03:52  7  notice something that might be an issue, I'm sure they

14:03:56  8  would bring it to that store manager's attention.

14:03:59  9        Again, they're not there but, on average, every

14:04:01 10  second, third week; once a month in some stores.

14:04:03 11    Q.   Do you have to be there to effectively control

14:04:06 12  shrinkage?

14:04:06 13    A.   You really do.

14:04:07 14    Q.   You mentioned customer service.  What can the

14:04:10 15  store manager do to control customer service?

14:04:12 16    A.   Well, they're there interacting with the

14:04:16 17  customers that come in and shop.

14:04:19 18        I am amazed at how many -- in my traveling stores

14:04:22 19  and visiting the store managers -- how many know the

14:04:25 20  customers by name and how many customers know the

14:04:28 21  manager by name.  And their Family Dollars link to that.

14:04:35 22    Q.   Are those management functions?

14:04:37 23    A.   Very important ones, yes, sir.

14:04:38 24    Q.   And can the district manager control or effect

14:04:43 25  good customer relations?

14:04:45    1        A.   Again, he's not there every day, so his customer

14:04:48    2    contact is limited greatly compared to our store

14:04:53    3    managers.

14:04:53    4        Q.   You mentioned safety in the store.   What can the

14:04:56    5    store manager do to control safety?

14:05:00    6        A.   Make sure that the store is safe for our

14:05:04    7    customers to shop; make sure the aisles are clear, that

14:05:06    8    if there's anything that's knocked off the shelf or left

14:05:09    9    in the floor, that it's immediately picked up; make sure

14:05:12   10    that if there are spills that they're immediately

14:05:15   11    cleaned up; and any -- any obstacles that might be

14:05:19   12    there, just make sure that we have a clean, safe

14:05:21   13    environment for our customers to shop.

14:05:24   14        Q.   Are those management functions?

14:05:26   15        A.   Yes.

14:05:26   16        Q.   Can the district manager control store safety?

14:05:31   17        A.   Not directly, no.

14:05:34   18        Q.   And why is that?

14:05:35   19        A.   Again, they're not there.   They're there on a

14:05:37   20    very limited basis.

14:05:38   21        Q.   You said on several occasions in response to my

14:05:44   22    questions that the district manager cannot do these

14:05:47   23    things because they're not there.   Can you run a Family

14:05:51   24    Dollar store by remote control?

14:05:53   25               THE COURT:   The objection to leading is

14:05:55   1    sustained.

14:05:59   2        Q.   How are Family Dollar store managers compensated?

14:06:07   3        A.   They're salary.

14:06:10   4        Q.   Is any other employee in the store salaried?

14:06:15   5        A.   No, they're not.

14:06:16   6        Q.   Is the assistant manager salaried?

14:06:19   7        A.   No, they're hourly.

14:06:20   8        Q.   And is that true with the cashiers and the

14:06:23   9    stockers and everyone else?

14:06:24  10        A.   Yes, that is correct.

14:06:25  11        Q.   Why is the store manager salary, while the others

14:06:30  12    are not?

14:06:31  13        A.   They're the manager of the building.  They're

14:06:34  14    responsible and accountable for everything that goes on

14:06:37  15    in that store.  They're the executive in charge, if you

14:06:41  16    will.

14:06:41  17        Q.   There's been testimony in this case about store

14:06:49  18    managers performing physical tasks, such as unloading

14:06:53  19    trucks, stocking shelves, running the cash register.

14:06:55  20            In your experience, do store managers run the

14:07:00  21    cash register from time to time?

14:07:02  22        A.   Yes.  From time to time, they would have to do

14:07:04  23    that.

14:07:04  24        Q.   And why would they do that?

14:07:06  25        A.   Well, store manager's responsible for everything

14:07:09  1   in the building.  They certainly would have to know how

14:07:11  2   to run the cash register, to be able to do it if the

14:07:15  3   need arose.  They have to be able to train their

14:07:17  4   associates.  And there are times when they're the backup

14:07:22  5   cash register operator that they would have to take that

14:07:24  6   other register if there's a line, and they're the only

14:07:27  7   other employee in the store.

14:07:28  8           So there are occasions when they would have to do

14:07:30  9   that.

14:07:31  10      Q.   Does the store manager stock the shelves from

14:07:35  11  time to time?

14:07:35  12      A.   Yes, they do.

14:07:37  13      Q.   And why would the store manager be engaged in

14:07:40  14  stocking the shelves?

14:07:41  15      A.   Well, for the same reason.  They're - they have

14:07:44  16  to know how to do that to train other associates to do

14:07:47  17  it.  And they're -- even though they're stocking

14:07:51  18  shelves, they're still -- that's a -- they don't do that

14:07:54  19  all of the time, and yet they manage all of the time.

14:07:57  20  They're managing even while they're stocking shelves.

14:08:00  21          They're looking at how well their store is in

14:08:02  22  stock, what's selling off the shelves; and getting a

14:08:05  23  better idea of how they could better merchandise that

14:08:07  24  particular area to increase their sales.

14:08:09  25      Q.   Is the store manager involved in unloading trucks

14:08:14    1    from time to time?

14:08:15    2                    MR. R. WIGGINS:  Object.

14:08:16    3                    THE COURT:  Objection to leading.

14:08:18    4                    MR. R. WIGGINS:  He's leading him every

14:08:20    5    time, Your Honor.  We object.

14:08:22    6                    THE COURT:  It's sustained.

14:08:23    7    Q.   (By Mr. Mays)  Explain to the ladies and

14:08:25    8    gentlemen what the door-to-shelf program is.

14:08:27    9    A.   Door to shelf is a process, or a best practice,

14:08:31   10    as we call it, in the company of how to best utilize the

14:08:36   11    store's resources to take the freight from the truck

14:08:39   12    that delivers it once a week to the sales floor and to

14:08:42   13    the shelf for sale to the customers.

14:08:44   14          It basically resolves around what is the most

14:08:47   15    efficient use of the labor assets that you have in the

14:08:50   16    store.  You -- typically, we have two people off-loading

14:08:55   17    the trucks.  We try to do that at about a

14:08:59   18    500-carton-per-hour pace.

14:09:00   19          It's sorted onto carts to take that to the sales

14:09:03   20    floor and to the general vicinity of where it goes.  And

14:09:07   21    then the manager directs making sure that that

14:09:10   22    merchandise is placed on the shelves.

14:09:13   23          Our goal is to have the bulk of the freight

14:09:16   24    processed been 24 to 48 hours of receipt.

14:09:20   25    Q.   Is directing that process a management function?

14:09:24    1       A.   Yes, it is.

14:09:25    2       Q.   Are there decisions that have to be made as that

14:09:28    3    process goes forward?

14:09:29    4       A.   Yeah, there is.   We -- we have two types of

14:09:33    5    merchandise in our stores.   We have what we call

14:09:35    6    schematic or basic merchandise, which is items that we

14:09:37    7    carry every day of the year.   They have a home, they

14:09:40    8    have a shelf label and a price.   And that basic

14:09:43    9    merchandise has a home.

14:09:45   10           We also have probably somewhere in the vicinity

14:09:47   11    of 40 to 50 of the goods that come in on any given truck

14:09:50   12    that is either promotional or seasonal or special-buy

14:09:53   13    merchandise.   That is merchandise that the manager has

14:09:55   14    to make a merchandising decision about where it should

14:09:58   15    be placed in their store.

14:10:00   16           We give them guidance.   We give them tools to

14:10:03   17    help them make those decisions, but it's ultimately up

14:10:07   18    to them to place that merchandise in their store.   And

14:10:09   19    how well they do so is reflected in how well their store

14:10:14   20    does from a sales standpoint.

14:10:15   21       Q.   You mentioned that these decisions impact on how

14:10:19   22    well the store does from a sales standpoint?

14:10:23   23               MR. R. WIGGINS:   Object to leading.

14:10:25   24               THE COURT:   I'm sorry.   It's a preliminary

14:10:29   25    question.

14:10:30    1              MR. MAYS:   Thank you, Judge.

14:10:32    2        Q.   Is the store manager eligible for a bonus?

14:10:37    3        A.   Yes, they are.

14:10:38    4        Q.   Is any other employee in the store eligible for a

14:10:42    5   bonus?

14:10:43    6        A.   No, they're not.

14:10:44    7        Q.   For example, is the assistant manager eligible

14:10:47    8   for a bonus?

14:10:48    9        A.   No, sir.

14:10:48   10        Q.   What is the store manager's bonus based on?

14:10:52   11        A.   Controllable profit of their particular store.

14:10:55   12        Q.   Explain to the ladies and gentlemen what

14:10:57   13   controllable profit means.

14:10:59   14        A.   Controllable profit is basically things that that

14:11:04   15   manager has control over to some degree.   The manager

14:11:08   16   can't influence how much the rent is on their building,

14:11:11   17   so rent is taken away from controllable profit.   It's

14:11:15   18   not reflected.

14:11:18   19              Advertising is directed by the corporate office,

14:11:20   20   so they have no direct control over that.   It's anything

14:11:23   21   that they have no direct control over doesn't influence

14:11:25   22   the controllable profit number for that store.

14:11:29   23        Q.   Is the controllable profit, in your experience,

14:11:33   24   influenced by the decisions that the store manager

14:11:37   25   makes?

14:11:37  1      A.   Oh, absolutely.

14:11:39  2      Q.   Explain how that works.

14:11:40  3      A.   Well, if a store manager runs a good store and

14:11:45  4  they keep it in good stock, well merchandised, and they

14:11:48  5  offer and give good customer service, their sales

14:11:51  6  increase.  If your sales increase and all other things

14:11:54  7  are equal, then the controllable profit increases.

14:11:57  8      So how well they manage their store is a direct

14:12:00  9  contributor to their controllable profit.

14:12:02  10     Q.   Sir, it's already been introduced into evidence

14:12:11  11 what's been admitted as Exhibit 2216, which is the staff

14:12:18  12 scheduler.

14:12:19  13          MR. MAYS:  May I approach, Your Honor?

14:12:20  14          THE COURT:  Yes.

14:12:21  15     Q.   I want to show you this exhibit, which is already

14:12:24  16 in evidence.  Do you recognize that as a Family Dollar

14:12:36  17 staff scheduler?

14:12:38  18     A.   Yes.

14:12:40  19     Q.   Why is it issued in a plastic laminate form like

14:12:47  20 this?

14:12:48  21     A.   I guess that goes to kind of what it is.  What

14:12:54  22 this is, is a model schedule that is furnished to the

14:12:57  23 store, if you will, that reflects good utilization of

14:13:01  24 the payroll dollars or the coverage that is allocated to

14:13:04  25 that store.

14:13:05  1        I think the reason that it is in laminate is just

14:13:08  2   like the one you showed me here, is there are numerous

14:13:12  3   changes to the hours; and that's the manager's

14:13:15  4   responsibility to make changes, as necessary, to have

14:13:18  5   that fit either the number of associates or the

14:13:21  6   availability of associates on any given day on this

14:13:23  7   schedule.

14:13:24  8        Q.   In your experience, do store managers change the

14:13:28  9   staff schedule?

14:13:29  10       A.   Very much so.

14:13:30  11       Q.   Do they require the approval of the district

14:13:33  12  manager to make such changes?

14:13:35  13       A.   They do not.

14:13:37  14       Q.   And the -- is the same staff schedule issued for

14:13:44  15  every store?

14:13:45  16       A.   No.   It is -- it's based on the coverage by

14:13:51  17  store.   It's driven by several factors, primary of which

14:13:54  18  is sales.   Based on the sales volume of the unit, that

14:13:57  19  starts the process.   The hours that the store is open,

14:14:01  20  the coverage for that given store, risk class is a

14:14:05  21  factor of -- there are numerous factors that go into the

14:14:09  22  development of the schedule.   It's also based on the day

14:14:12  23  they receive their delivery truck.

14:14:14  24       Q.   We have heard some testimony about overtime.

14:14:19  25  Does Family Dollar like to have overtime in their

14:14:23   1   stores?

14:14:24   2       A.   It's not the best utilization of your payroll

14:14:30   3   resources.

14:14:30   4       Q.   Does Family Dollar, in fact, have overtime in

14:14:33   5   their stores, when necessary?

14:14:35   6       A.   Yes, we do.

14:14:36   7       Q.   Do you know what -- how much overtime Family

14:14:39   8   Dollar has on a weekly or monthly basis?

14:14:41   9       A.   I don't know how much Family Dollar has.  I try

14:14:44   10  to monitor what I have in my region.

14:14:46   11      Q.   And how much does that run in your region?

14:14:48   12      A.   It varies greatly.  It -- sometimes biweekly pay

14:14:54   13  period is about 14 to 1,500 hours.

14:14:57   14      Q.   What does that translate to in dollars?

14:14:59   15      A.   I don't know.  It would -- I don't know exactly

14:15:02   16  who is using it, it's just a recapped number, so I don't

14:15:06   17  have the dollar amount.

14:15:06   18      Q.   Is a store manager disciplined for utilizing

14:15:12   19  overtime?

14:15:13   20      A.   I'm not -- I'm not aware of any disciplining

14:15:20   21  taking place.  It's not necessarily the best utilization

14:15:23   22  of resources.

14:15:23   23               THE COURT:  Well, does the use of overtime

14:15:27   24  by the store manager affect that store manager's profit?

14:15:38   25               THE WITNESS:  To the degree of -- if it

14:15:41   1   causes that store to exceed their payroll budget, it

14:15:44   2   would.  Yes, sir.

14:15:45   3            THE COURT:  All right.

14:15:46   4     Q.  And is that a management function of the store

14:15:49   5   manager to control it?

14:15:50   6            THE COURT:  The objection to leading is

14:15:53   7   sustained.

14:15:54   8     Q.  The judge has sustained the objection, please

14:15:57   9   don't answer.

14:15:58   10    A.  Don't answer?

14:15:59   11    Q.  Yes, sir.  I want to ask you a little bit about

14:16:07   12   the hiring process at Family Dollar.  What is the role

14:16:11   13   of the store manager in hiring of associates?

14:16:17   14    A.  They're responsible for assembling a staff to

14:16:26   15   help them run and manage their particular store.  They

14:16:29   16   take applications on a daily basis.  They review those

14:16:33   17   applications.  They try to keep an active file, if you

14:16:38   18   will, of applications they interview when they have a

14:16:41   19   need, or when they anticipate having a need.

14:16:45   20         They're responsible for conducting a survey that

14:16:49   21   we do with the applicant, if they decide to move forward

14:16:52   22   with that applicant.

14:16:53   23    Q.  What is that survey called?

14:16:55   24    A.  A Stanton survey.

14:16:57   25    Q.  Explain what that consists of.

14:17:00  1       A.   It's a series of questions that kind of gives you

14:17:06  2   a profile of that individual and whether or not they

14:17:09  3   would be a good candidate for a particular store.

14:17:12  4       Q.   I interrupted you.  What else does a store

14:17:15  5   manager do in connection with a hiring?

14:17:17  6       A.   If it's a management or a store designated, they

14:17:21  7   submit a background check on that individual.  You do a

14:17:23  8   drug test.  And we also have a third party that provides

14:17:28  9   another quick check, if you will, it's called Esteem.

14:17:31 10   And it's simply a consortium of retailers that report

14:17:35 11   dishonest activity by former associates.  And we run

14:17:39 12   anyone we hire through that process as well.

14:17:41 13       Q.   Are all of these functions performed by the store

14:17:44 14   manager?

14:17:44 15       A.   Yes, they are.

14:17:45 16       Q.   What is the role of the district manager in

14:17:48 17   hiring of associates?

14:17:50 18       A.   It's very limited.  I guess the primary one would

14:17:57 19   be if we are doing a new store hiring where we are going

14:17:59 20   to open a new store, we pass that -- print up fliers,

14:18:04 21   pass them out in the area of the stores or in the area

14:18:06 22   of the new store.

14:18:07 23            And the turnout is such that the district

14:18:10 24   manager, along with the store manager of that store, and

14:18:12 25   sometimes the neighboring district manager go through

14:18:14    1   that.

14:18:16    2        If a district manager had a situation where a

14:18:19    3   manager was having trouble hiring, I'm sure they would

14:18:24    4   assist in that situation as well.

14:18:26    5   Q.   With respect to assistant managers or key holders

14:18:29    6   to the store, is the district manager's role any

14:18:33    7   different?

14:18:33    8   A.   Store managers are the hiring authority for

14:18:40    9   assistants.  District managers look at the assistant

14:18:45   10   manager level as their bench strength, if you will,

14:18:49   11   their next wave of managers.

14:18:52   12        So they try to talk to assistant manager

14:18:55   13   applicants during the hiring process, but the ultimate

14:18:58   14   decision comes down to the store manager.

14:18:59   15   Q.   What about with respect to evaluating employees?

14:19:03   16   Are employees, associates, evaluated at Family Dollar?

14:19:07   17   A.   Yes, they are.

14:19:08   18   Q.   And who performs those evaluations?

14:19:10   19   A.   The store manager evaluates the associates and

14:19:13   20   the assistant manager; the district manager evaluates

14:19:16   21   the store manager.

14:19:17   22   Q.   And with respect to promotions, are associates

14:19:23   23   and store managers sometimes promoted at Family Dollar?

14:19:27   24   A.   Yes, they are.

14:19:27   25   Q.   And explain the role of the store manager with

14:19:30  1    respect to promotions.

14:19:31  2        A.   Store managers typically will recommend the

14:19:38  3    promotion that they'll select from their associates --

14:19:42  4    if, say, they have an assistant manager need, they know

14:19:45  5    who, if they have anyone in their organization that they

14:19:48  6    think could take that role, they'll sit and have that

14:19:51  7    interview or that discussion with that associate.  And

14:19:54  8    they might or might not, depending on their agreement or

14:19:56  9    their working relationship with their district manager,

14:19:59  10   get the district manager involvement.  But most partner

14:20:03  11   with their district manager in promoting assistants.

14:20:06  12       Q.   What about with respect to disciplining employees

14:20:11  13   when there's an employee performance problem?  what is

14:20:14  14   the role of the store manager with regard to

14:20:18  15   disciplining the employee?

14:20:19  16       A.   The store manager is responsible for that

14:20:21  17   process.

14:20:21  18       Q.   What role does the district manager have with

14:20:24  19   respect to disciplining employees?

14:20:28  20       A.   Typically, the district manager isn't involved in

14:20:32  21   that process.  Should the discipline process lead to

14:20:37  22   termination, most store managers pick up the phone and

14:20:40  23   cover with the district manager what they're going to do

14:20:43  24   or what they think needs to happen to a particular

14:20:46  25   associate, just from a - get a partner standpoint, if

14:20:49  1  you will, or consistency.  But the store manager has the

14:20:52  2  ability to discipline the associates.

14:20:55  3     Q.   Does Family Dollar -- is it Family Dollar's

14:20:58  4  policy that a district manager become involved in a

14:21:01  5  termination?

14:21:02  6     A.   I think the policy suggests that they speak with

14:21:09  7  their district manager regarding a termination.

14:21:10  8     Q.   And why do you understand that to be the policy?

14:21:12  9     A.   I'm sorry?

14:21:15  10    Q.   Why is that the policy?

14:21:16  11    A.   Well, again, from the consistency --

14:21:18  12           THE COURT:  Well, you say you think the

14:21:20  13  policy suggests.  Are you saying that the policy does

14:21:26  14  require them to consult --

14:21:29  15           THE WITNESS:  I think "should" is the word

14:21:32  16  in the sentence that causes me to state it that way.

14:21:34  17           THE COURT:  All right.

14:21:35  18           THE WITNESS:  But from a consistency or

14:21:38  19  termination standpoint, or simply to protect yourself,

14:21:40  20  most of the store managers pick up the phone and have

14:21:44  21  the conversation with the district manager.  Doesn't

14:21:45  22  happen all the time.

14:21:47  23    Q.   (By Mr. Mays)  With respect to pay raises for

14:21:52  24  employees, what is the role of the store manager there?

14:21:56  25    A.   The store manager evaluates the associate and

14:22:04   1    recommends the pay increase.  The way our computer

14:22:08   2    system is set today, the -- a pay raise cannot be

14:22:13   3    entered on a store computer.  They have to partner with

14:22:15   4    a district manager to physically get that pay raise put

14:22:19   5    into the system.

14:22:20   6         In that respect, they have to discuss that with

14:22:22   7    the district manager to have them input that pay raise.

14:22:25   8    Q.  Is it fair to say.  With respect to all these

14:22:31   9    issues we're talking about -- hiring, promotion,

14:22:36   10   evaluation, discipline, termination -- that the process

14:22:44   11   is initiated by the store manager?

14:22:47   12              MR. R. WIGGINS:  Object to leading.

14:22:49   13              THE COURT:  The objection is sustained.

14:22:51   14              MR. MAYS:  Thank you, Your Honor.

14:23:03   15   Q.  Mr. Broome, in your experience at Family Dollar,

14:23:09   16   who is the most important person, with respect to the

14:23:13   17   success of a Family Dollar store?

14:23:17   18   A.  The store manager, without question.

14:23:19   19              MR. MAYS:  Thank you, sir.  That's all I

14:23:21   20   have.

14:23:21   21              THE COURT:  Cross-examination, 33 minutes.

14:23:27   22                   **CROSS-EXAMINATION**

14:23:27   23   **BY MR. R. WIGGINS:**

14:23:31   24   Q.  Good afternoon, Mr. Broome.

14:23:34   25   A.  Good afternoon.

14:23:35  1    Q.   You said that on pay raises, the district manager
14:23:59  2  merely inputs on a computer the pay raise of the store
14:24:06  3  associate; correct?
14:24:07  4    A.   I am not sure I said "merely", I said district
14:24:11  5  managers with our system today has to input it, yes.
14:24:14  6    Q.   Okay.  So are you saying that the district
14:24:16  7  manager's role is only as a clerical inputter into a
14:24:21  8  computer, or is he an approver and a decision maker?
14:24:25  9    A.   I can't speak for all district managers.  I am
14:24:31 10  sure there are some that are part of the approval
14:24:33 11  process.  I know for a fact that others are not.
14:24:36 12    Q.   You know that the company policy -- let's get
14:24:41 13  F1 -- says specifically that the district manager
14:24:48 14  approves, doesn't say input, says approves pay changes
14:24:57 15  that are recommended, not decided by the store manager;
14:25:03 16  correct?
14:25:04 17    A.   Yes, sir.  I'm simply stating what happens in the
14:25:08 18  stores today.
14:25:09 19    Q.   And you expect the stores to comply with the
14:25:14 20  store policy manuals and the company policies; correct?
14:25:20 21    A.   We would like them to do that, yes.
14:25:22 22    Q.   And that is one item that they're evaluated on in
14:25:25 23  their annual performance review that affects their pay
14:25:29 24  raise; correct?
14:25:32 25    A.   I'm not sure to what degree policy compliance per

14:25:37   1   say is a piece of that evaluation, but their overall

14:25:42   2   operation of their store is certainly part of that

14:25:44   3   evaluation.

14:25:45   4      Q.   Employees that violate the company policy on such

14:25:49   5   things as hiring, without district manager approval, or

14:25:53   6   pay raising without district manager approval, are

14:25:58   7   subject to discipline, aren't they?

14:25:59   8      A.   They could be, yes, sir.

14:26:01   9      Q.   Let's look at Exhibit 201.  As an example, this

14:26:15  10   is a written warning, written counseling for -- I'll

14:26:28  11   have to let you look on with me until they get it on the

14:26:31  12   board -- for hiring an assistant manager without

14:26:34  13   district manager approval.

14:26:38  14              MR. UMBACH:  What exhibit is this?

14:26:41  15              MR. R. WIGGINS:  201.

14:26:42  16              MR. UMBACH:  May we have just a second to

14:26:44  17   see if there is an objection?

14:26:46  18              THE COURT:  Yes, sir.

14:26:47  19              MR. MAYS:  Is that already in evidence, Your

14:26:50  20   Honor?

14:26:50  21              THE COURT:  No.

14:26:53  22              MR. MAYS:  We will need to look at it.

14:26:55  23      Q.   (By Mr. R. Wiggins)  Go ahead, sir.

14:27:00  24         This is April 2003 that this man was disciplined

14:27:06  25   for hiring an assistant manager for his store without

14:27:11  1    the district manager's approval; correct?

14:27:30  2              MR. MAYS:  Your Honor, we have objected to

14:27:31  3    this --

14:27:31  4              THE COURT:  Is it a company document?

14:27:35  5              MR. MAYS:  It is, Your Honor.

14:27:37  6              THE COURT:  Objection is overruled.

14:27:39  7        Q.  (By Mr. R. Wiggins)  You want me to state it

14:27:41  8    again?

14:27:41  9        A.  No.

14:27:42  10       Q.  We have it on the board now.  Let's try to get it

14:27:45  11   up bigger.

14:27:46  12             MR. R. WIGGINS:  I offer Exhibit 201, Your

14:27:49  13   Honor.

14:27:49  14             THE COURT:  It's received in evidence over

14:27:53  15   objection.

14:27:53  16       Q.  Now, I correctly described it as a discipline of

14:27:56  17   a store employee or a district manager for hiring an

14:28:01  18   assistant, a store manager hiring an assistant without

14:28:04  19   district manager approval; correct?

14:28:05  20       A.  It states that; and then the next paragraph could

14:28:08  21   be what's driving the deal.  It says "giving her 200

14:28:11  22   code", which gives her access to the register changes

14:28:15  23   before background check was done.

14:28:16  24             We require a background check on all management

14:28:19  25   employees before that they can be coded or given those

14:28:24   1   titles.

14:28:24   2        Q.   It says right here at the top "Infraction:

14:28:27   3   Hiring an assistant without district manager approval";

14:28:30   4   correct?

14:28:31   5        A.   Yes.  Followed by "giving her the 200 code" or

14:28:35   6   making her that assistant before the background check

14:28:38   7   comes in.

14:28:39   8        Q.   It doesn't say -- at the infraction.  Right there

14:28:41   9   at the top where it says "Infraction", doesn't say

14:28:43  10   anything about background check, does it?

14:28:46  11             MR. MAYS:  Object, Your Honor, the document

14:28:49  12   speaks for itself.

14:28:50  13             THE COURT:  Overruled.

14:28:50  14             THE WITNESS:  Means I answer; right?

14:28:53  15             THE COURT:  Yes, you answer.

14:28:55  16             THE WITNESS:  It states that followed by

14:28:56  17   what I read.  Yes, sir.

14:28:57  18        Q.   (By Mr. R. Wiggins)  And that's the company

14:28:58  19   policy that you will be disciplined if you -- if a store

14:29:03  20   manager hires an assistant -- his own assistant or her

14:29:09  21   own assistant without district manager approval;

14:29:11  22   correct?

14:29:12  23        A.   I'm not sure if there's a policy written that

14:29:16  24   states it just that way.

14:29:17  25        Q.   Plaintiffs' Exhibit 136.  Do you know Bruce

14:29:20  1   Barkus?

14:29:21  2       A.  I do.

14:29:21  3       Q.  He's your boss?

14:29:23  4       A.  Not any longer, but was.

14:29:25  5       Q.  How long was he your boss?

14:29:26  6       A.  About four years.

14:29:28  7       Q.  He was executive vice-president?

14:29:29  8       A.  Correct.

14:29:30  9       Q.  He was head of store operations department?

14:29:33  10      A.  Correct.

14:29:34  11      Q.  That department controls every store in the

14:29:37  12  company?

14:29:37  13      A.  We attempt to, yes, sir.

14:29:40  14      Q.  He's responsible; he's in charge of every store

14:29:43  15  in the company, Mr. Barkus; correct?

14:29:46  16      A.  He heads the organization that is in charge of

14:29:52  17  the stores, yes.

14:29:52  18      Q.  Now, let's get this a little larger, second

14:29:55  19  paragraph.  You have seen this before today, sir.  I

14:30:00  20  want to remind you of it.  And see, it says:  "Violation

14:30:03  21  of this policy is a serious infraction and may result in

14:30:07  22  disciplinary action, up to and including possible

14:30:13  23  termination"; correct?

14:30:20  24          MR. MAYS:  I object, unless he's shown the

14:30:22  25  full document and had an opportunity to review it in the

14:30:25  1    context of the entire document, Your Honor.

14:30:28  2                THE COURT:  Overruled.

14:30:35  3        Q.  Sir?

14:30:38  4        A.  Well, that's what that paragraph states.  I am

14:30:41  5    not sure what the paragraph above or below says.

14:30:44  6        Q.  Do you know company policy --

14:30:45  7                THE COURT:  Give him the entire document.

14:30:48  8        Q.  Are you familiar with company policy?

14:30:50  9        A.  I'm familiar.  I do not know every policy in the

14:30:53 10    company verbatim.

14:30:56 11        Q.  Let's look at Mr. Barkus' 2003 email to everyone.

14:31:28 12        A.  It does state that.  Yes, it does.

14:31:31 13        Q.  Yes.  It says, "don't hire an assistant in your

14:31:35 14    store without the district manager doing the hiring; and

14:31:38 15    if you do, you might be fired"?

14:31:41 16        A.  That was the policy at that time, yes, sir.

14:31:43 17        Q.  All right.  And you don't have any other policy

14:31:48 18    here today to show us, do you?

14:31:54 19        A.  No, I do not.

14:31:56 20        Q.  In fact, let me show you a series of emails from

14:32:00 21    regional vice-presidents and district managers telling

14:32:02 22    their employees "do not hire without my approval".

14:32:07 23            Let's look at Exhibit 115, 48, 203, 90 --

14:32:21 24                MR. WHITE:  They're not in evidence, Your

14:32:23 25    Honor.

14:32:23   1           MR. MAYS:  We object.  They're not in.

14:32:26   2           THE COURT:  Are these company documents?

14:32:29   3           MR. R. WIGGINS:  Yes.

14:32:30   4           THE COURT:  The objection is overruled.

14:32:34   5      Q.  (By Mr. R. Wiggins)  Exhibit 140, Exhibit --

14:32:36   6           THE COURT:  One at a time, please.

14:32:39   7           MR. R. WIGGINS:  All right.

14:32:45   8      Q.  Let's identify it first, sir.  What's the date on

14:32:49   9  it?

14:32:49  10      A.  January of 12th of '04 --

14:32:54  11           MR. MAYS:  Could we be given a copy of

14:32:57  12  these, Your Honor?  We have not been shown --

14:32:59  13           THE COURT:  Aren't these the documents that

14:33:01  14  you objected to and I made a ruling on?

14:33:03  15           MR. MAYS:  Yes, Your Honor.

14:33:04  16           THE COURT:  How could you not have been

14:33:06  17  provided them when youre using them as a basis for

14:33:09  18  filing a motion in limine?  And besides that, they're

14:33:13  19  your documents.

14:33:14  20           MR. KALLON:  They're general emails that

14:33:16  21  were produced to us.  I think Mr. Mays was --

14:33:19  22           THE COURT:  Yes, sir.  The company's

14:33:20  23  documents.

14:33:21  24           MR. KALLON:  We don't know which specific

14:33:24  25  ones are being shown the witness.

14:33:26  1              THE COURT:  Aren't these company documents?

14:33:29  2              MR. KALLON:  We don't know which specific

14:33:31  3  ones --

14:33:31  4              THE COURT:  Sir?

14:33:33  5              MR. KALLON:  Yes, sir, they are.

14:33:35  6              THE COURT:  Objection is overruled.

14:33:37  7  Q.   (By Mr. R. Wiggins)  That email we have on the

14:33:38  8  board, Exhibit 115 is from one district manager,

14:33:43  9  Mr. Faulkner, and the second district manager who says

14:33:47  10  "a great note" by another district manager and then read

14:33:51  11  this paragraph right here.  I'm sorry, come down, right

14:33:56  12  here (indicating).

14:33:57  13              MR. MAYS:  Your Honor, we object to the

14:34:00  14  handwriting on the top of this, because that's not a

14:34:02  15  company document, as far as we know.

14:34:04  16              MR. R. WIGGINS:  That's the way the exhibit

14:34:06  17  came in.

14:34:07  18              MR. MAYS:  We don't know whose handwriting

14:34:10  19  that is; and we certainly don't know that that's a

14:34:13  20  company employee or company official that did that.  And

14:34:17  21  it's an editorial comment that comments on the content

14:34:20  22  of the email and we object to it.

14:34:22  23              THE COURT:  Where did you get these emails?

14:34:26  24              MR. R. WIGGINS:  These came from the clients

14:34:28  25  who received them from the company at their management

14:34:32   1   positions.  The company's --

14:34:34   2                MR. WHITE:  That doesn't necessarily make

14:34:37   3   them a corporate document.

14:34:38   4                THE WITNESS:  Your Honor, if I could --

14:34:39   5                THE COURT:  No, sir.  Delete the handwritten

14:34:48   6   comment at the top of the page.

14:34:50   7                MR. R. WIGGINS:  Yes, sir.

14:34:51   8     Q.  (By Mr. R. Wiggins)  Let's just use the

14:34:54   9   original --

14:34:54  10                MR. WHITE:  Your Honor, the problem is that

14:34:57  11   he has --

14:34:57  12                THE COURT:  Just a moment.  Now, the jury

14:35:02  13   already has them?  Just a moment.

14:35:06  14                Mr. Calamusa, stay right where you are.

14:35:08  15                Mr. White?

14:35:11  16                MR. WHITE:  The confusion came because I

14:35:14  17   understood counsel to originally represent that these

14:35:17  18   were received from us.  His respresentation to you now

14:35:20  19   is that he gotten them from the clients.

14:35:23  20                I would at least like the courtesy -- in

14:35:25  21   view of that, and the fact that there's confusion, that

14:35:29  22   we be given courtesy copies.

14:35:31  23                He's obviously got 14 or more copies.

14:35:34  24   Before he starts -- he is telling the witness what they

14:35:37  25   are in his words, Your Honor.

14:35:40   1            THE COURT:  I recall looking at some emails
14:35:44   2   over the weekend.  Are these the same emails?
14:35:47   3            MR. R. WIGGINS:  Yes, sir, same ones on the
14:35:49   4   motion in limine you denied.
14:35:52   5            MR. WHITE:  I don't know.
14:35:52   6            THE COURT:  All right.
14:35:54   7            MR. WHITE:  I'm merely asking --
14:35:57   8            THE COURT:  One of you - I take it one of
14:36:00   9   you lawyers filed a motion in limine.
14:36:02  10            MR. WHITE:  Sure.
14:36:03  11            THE COURT:  Did you have these exhibits?
14:36:04  12            MR. WHITE:  Judge, I'm not saying we didn't.
14:36:07  13            THE COURT:  The lawyer who filed the motion
14:36:09  14   in limine.  Who filed it?
14:36:10  15            MR. UMBACH:  I filed it.
14:36:11  16            THE COURT:  Did you have these emails when
14:36:13  17   you filed the motion in limine?
14:36:15  18            MR. UMBACH:  Yes, Your Honor.  All we'd
14:36:17  19   like --
14:36:18  20            THE COURT:  The objection is overruled on
14:36:21  21   reconsideration.  Pass the exhibits back out to the
14:36:24  22   jury.
14:36:24  23     Q.  (By Mr. R. Wiggins)  All right.  We have it on
14:36:25  24   the board without the handwriting on the top.
14:36:28  25            And look at the part that I have marked on that

14:36:31  1  exhibit in front of you, or look here on the board,

14:36:34  2  either one.  What does this district manager say right

14:36:37  3  here (indicating)?  "Never hire or terminate anyone or

14:36:44  4  do the new hire or terminate PPF until you call a DM";

14:36:52  5  correct?

14:36:52  6     A.   That states that.  There's nothing on this

14:36:57  7  document that tells me who sent that information or who

14:37:01  8  typed that information.

14:37:02  9         This is a note from Bill Faulkner to, I presume,

14:37:05  10  one of their stores -- that's been blacked out -- but a

14:37:09  11  store and that signed by Bill Faulkner, DM.  There's no

14:37:14  12  indication here where the paragraphs actually came from.

14:37:17  13         He did say a note from another DM.  I have no way

14:37:21  14  of knowing who that was or where it came from

14:37:23  15     Q.   BF is a district manager; correct?

14:37:25  16     A.   I don't know.

14:37:25  17     Q.   It says "DM 281"; correct?

14:37:28  18     A.   Yes, sir.

14:37:28  19     Q.   Is that District 281?

14:37:30  20     A.   I would assume so, yes, sir.  I don't have that

14:37:33  21  part of the country, so I really don't know the

14:37:36  22  individuals.

14:37:36  23     Q.   Let's look at Exhibit 140.  Here's another

14:37:40  24  district manager saying basically the same thing:

14:37:45  25  "Don't hire anyone without my approval as the district

14:37:49   1   manager"?

14:38:03   2       A.  Yes, sir.

14:38:04   3       Q.  Okay.

14:38:06   4              MR. R. WIGGINS:  We offer that, Your Honor.

14:38:07   5              THE COURT:  It's received in evidence over

14:38:09   6   objection.

14:38:10   7       Q.  Exhibit 203, district manager tells his folks

14:38:13   8   under him, his store managers and assistant store

14:38:15   9   managers, quote, "before anyone, anyone, anyone punches

14:38:21  10   in for the first time, you must call me so we can talk

14:38:23  11   about this person and tell me what is done, not done in

14:38:26  12   their file or not in their file."  And it's talking

14:38:29  13   there about the same thing:  "don't hire these people

14:38:32  14   without getting in touch with me"; correct?

14:38:34  15              MR. WHITE:  Object to counsel's

14:38:36  16   characterization.

14:38:36  17              THE COURT:  Mr. White, you don't make any

14:38:38  18   objections with respect to this witness.

14:38:40  19              MR. WHITE:  Yes, sir.

14:38:44  20              THE WITNESS:  I think what you have here is

14:38:45  21   a district manager's interpretation or how their

14:38:50  22   particular district and supervising their store

14:38:53  23   managers.  Yes, that's what it states.

14:38:53  24       Q.  (By Mr. R. Wiggins)  Isn't this in the same month

14:38:55  25   that Mr. Barkus sent that memo that we had, Exhibit 136,

14:38:59  1    where Mr. Barkus said, "don't hire without district

14:39:04  2    manager interview and approval"?

14:39:06  3        A.  Yes.

14:39:06  4        Q.  Same month, this -- that Mr. Barkus' exhibit went

14:39:11  5    out to the whole company, this district manager is

14:39:14  6    sending this to his store manager saying "don't anyone,

14:39:18  7    anyone, anyone ever do it"; correct?

14:39:21  8                THE COURT:  Go back to the podium.

14:39:27  9                MR. R. WIGGINS:  We offer that in evidence,

14:39:30 10    Your Honor.

14:39:30 11                THE COURT:  203 is received in evidence over

14:39:33 12    objection.

14:39:35 13        Q.  (By Mr. R. Wiggins)   Exhibit 179, this is

14:39:40 14    regional vice-president Frank Vogt.  Are you familiar

14:39:44 15    with him?

14:39:45 16        A.  Yes.

14:39:46 17        Q.  Same job you hold; correct?

14:39:50 18                THE COURT:  What's the number of the about?

14:39:53 19                MR. R. WIGGINS:  This is Exhibit 179.

14:39:57 20        Q.  Do you see here Mr. Vogt --

14:40:00 21                MR. MAYS:  Your Honor, I object to counsel

14:40:03 22    leaning over the witness and crowding the witness.

14:40:05 23                THE COURT:  Do you have copies?  Get

14:40:08 24    copies --

14:40:08 25                MR. R. WIGGINS:  The jury has the copies.

14:40:10  1   We may have some extras.

14:40:12  2          THE COURT:  We only need one extra one.

14:40:14  3   Give it to the witness so you can stand at the podium

14:40:16  4   while the witness is seated.

14:40:19  5      Q.  (By Mr. R. Wiggins)  Right here, Mr. Vogt --

14:40:25  6   can't see this very good -- right down in here

14:40:30  7   somewhere, says, quote, "no manager is allowed to key a

14:40:48  8   PDF promoting someone to assistant manager or manager.

14:40:54  9   This can only be done by the district manager"; correct?

14:41:00  10     A.  That's what it says.  I am not sure what he is

14:41:02  11  referencing.

14:41:03  12         As we said earlier, district managers have to key

14:41:05  13  in the pay change for anyone in the store, so it could

14:41:08  14  be referencing the pay change PAF.

14:41:11  15     Q.  Isn't he referencing that same companywide policy

14:41:14  16  that Mr. Barkus had earlier in Exhibit 136?

14:41:18  17     A.  This was prior to that, so --

14:41:21  18     Q.  Two months earlier, November, 2002; correct?

14:41:25  19     A.  Yes.

14:41:27  20         MR. R. WIGGINS:  We offer 179.

14:41:29  21         THE COURT:  It's received in evidence over

14:41:30  22  objection.

14:41:32  23     Q.  Do you recall testifying in your deposition about

14:41:34  24  another email from which is Exhibit 47 from Mr. Vogt

14:41:41  25  where he said "no manager can promote anyone to

14:41:45  1    assistant manager, second position, or third key

14:41:48  2    position"?

14:41:48  3        A.   I remember there being a memo.  I don't remember

14:41:51  4    if this one -- which one it was.

14:41:53  5        Q.   Okay.

14:41:54  6        A.   I do remember a memo, yes, sir.

14:41:56  7        Q.   I apologize.  It's a little cut off since your

14:41:59  8    deposition.  But the sentence I was reading from,

14:42:03  9    Mr. Vogt -- what month is that, December 2002?

14:42:07  10            MR. MAYS:  Your Honor, again, I object to

14:42:10  11   counsel crowding the witness and going over to the

14:42:12  12   witness stand.

14:42:24  13       Q.   You see there where it says, quote, "only the

14:42:27  14   district manager has the authority to do this and have

14:42:31  15   the key, the PDF in promoting someone to this position";

14:42:36  16   correct?

14:42:37  17       A.   Well, I think we're guessing at the words to the

14:42:43  18   left.  It's manager.  And it looks to be maybe a half an

14:42:46  19   O in front of it, so I am not sure what that word is.

14:42:48  20       Q.   But you read it in your deposition out loud.  I

14:42:52  21   can get it for you, if you need to be refreshed.

14:42:55  22       A.   It very well could be "no".  This is a note to a

14:42:57  23   store that Frank sent.  I don't know the circumstances.

14:43:00  24            MR. R. WIGGINS:  We offer Exhibit 47.

14:43:02  25            THE COURT:  47?

14:43:03   1           MR. R. WIGGINS:  Yes, sir.

14:43:03   2           THE COURT:  Over objection, it's received in

14:43:06   3    evidence.

14:43:06   4      Q.  (By Mr. R. Wiggins)  Now, I think I identified

14:43:12   5    Mr. Vogt, but he is a regional vice-president; correct?

14:43:16   6      A.  He is.

14:43:17   7      Q.  And the district managers have control over

14:43:29   8    discharges of store employees, too, under company

14:43:33   9    policy; correct?

14:43:34  10      A.  I think, again, the policy states they should

14:43:38  11    consult with their district manager, yes, sir.

14:43:40  12      Q.  And you testified about the store payroll budget

14:43:51  13    earlier -- well, I think I covered that.

14:44:06  14           You're not testifying, are you, that just because

14:44:11  15    someone receives a salary that they're exempt from

14:44:15  16    overtime?

14:44:19  17      A.  No.  They receive a salary because they manage

14:44:23  18    the building.  They're accountable for management of

14:44:25  19    that building.

14:44:26  20      Q.  Some people can receive a salary and still be

14:44:29  21    entitled to overtime, because just getting a salary is

14:44:32  22    not the only thing that controls; correct?

14:44:34  23      A.  I don't know.

14:44:38  24      Q.  And are you testifying that the company just

14:44:45  25    declines to pay overtime just because someone's on

14:44:49   1   salary, and nothing more?

14:44:52   2       A.   I didn't testify to that, no.

14:44:55   3       Q.   You don't believe that either, do you?

14:44:57   4       A.   I said our managers are salaried, and I believe

14:45:03   5   they are exempt.   They manage the building to which they

14:45:06   6   are -- they are assigned.   They supervise the employees

14:45:09   7   in the store; they take care of merchandising in the

14:45:12   8   store; they create either good or bad customer

14:45:14   9   service --

14:45:15   10      Q.   Customer service --

14:45:15   11      A.   -- they manage that building.

14:45:17   12      Q.   Customer service is also the responsibility of

14:45:19   13   all the store associates, including the assistant

14:45:22   14   manager; correct?

14:45:23   15      A.   You would hope so, yes.

14:45:24   16      Q.   And customer service is also the responsibility

14:45:27   17   of the district manager?

14:45:29   18      A.   True.   But they're not accountable for making

14:45:32   19   sure that it happens in that store.   Only the store

14:45:34   20   manager is accountable for what goes on in their store.

14:45:37   21      Q.   The district manager evaluation, performance

14:45:40   22   evaluation, makes him accountable and conditions his pay

14:45:44   23   raise on the customer relations, producing a profit,

14:45:47   24   control of a profit; on the very same items that are

14:45:51   25   under the store manager's evaluation; correct?

14:45:53   1     A.   To the extent that he gets it done through

14:45:56   2   supervising his store managers, yes.

14:45:58   3     Q.   All right.   And so when you say that the store

14:46:03   4   manager is responsible for such things as profit and

14:46:06   5   controllable profit, and inventory and shrinkage, and

14:46:10   6   customer relations, all those are items that the

14:46:13   7   district manager's job description and performance

14:46:15   8   evaluation makes him accountable for, and conditions his

14:46:19   9   pay raise upon; correct?

14:46:21   10    A.   For the district.   But only the store manager is

14:46:25   11   responsible for their particular store.

14:46:26   12    Q.   And the assistant store manager is also held

14:46:29   13   accountable for those very same items on his performance

14:46:32   14   evaluation; correct?

14:46:33   15    A.   If given that responsibility by the store

14:46:36   16   manager, yes.

14:46:36   17    Q.   No, sir.   The performance evaluation itself is in

14:46:39   18   writing; correct?

14:46:40   19    A.   Yes, it is.

14:46:41   20    Q.   It's the same for every assistant store manager?

14:46:43   21    A.   They are evaluated on the same topics.

14:46:45   22    Q.   Same --

14:46:46   23    A.   They are not totally responsible for those topics

14:46:49   24   like the store manager is.

14:46:50   25    Q.   Same standardized form; every assistant store

14:46:54   1   manager has it for his performance evaluation; correct?

14:46:56   2       A.   Yes.

14:46:56   3       Q.   And that form for assistant store manager says

14:46:59   4   they're evaluated on controllable profit, business

14:47:02   5   results; same exact items as the store manager is

14:47:05   6   evaluated on; correct?

14:47:06   7       A.   And the store manager is doing that evaluation

14:47:08   8   and they're evaluating them as to how much they

14:47:11   9   contribute towards his or her store's performance.  But

14:47:15  10   the manager is the one that is held accountable for that

14:47:17  11   store.

14:47:17  12       Q.   But is that a yes -- are they?

14:47:21  13       A.   They are the same subjects, yes.

14:47:22  14       Q.   Same topics they're evaluated on, assistants

14:47:25  15   evaluated on same topics as the store manager?

14:47:28  16       A.   Yes, they are.

14:47:29  17       Q.   Okay.  Now, you are not saying that just because

14:47:32  18   you have the title of manager that that makes you exempt

14:47:34  19   from overtime, are you?

14:47:35  20       A.   No.

14:47:41  21       Q.   Assistant store managers, they have manager in

14:47:44  22   their title, don't they?

14:47:46  23       A.   Yes, it's part of their title.

14:47:50  24       Q.   But you admit that the company has determined

14:47:52  25   that for those same duties that the assistant manager

14:47:57  1    does that the store -- as the store manager, that the

14:48:01  2    assistant manager is entitled to overtime on those same

14:48:05  3    duties; correct?

14:48:07  4        A.   All hourly associates are entitled to overtime if

14:48:12  5    they work more than 40 hours a week.

14:48:14  6        Q.   So the assistant store manager does the same

14:48:16  7    thing as the store manager, has "manager" in his title,

14:48:19  8    but he gets overtime?

14:48:21  9        A.   That's where we're breaking down, okay.

14:48:23  10       Q.   Is that true?

14:48:24  11       A.   I'm sorry?

14:48:25  12            THE COURT:  Let me put it this way:  In

14:48:28  13   those occasions where the manager is away from the

14:48:32  14   store, and the assistant manager, in effect, becomes

14:48:39  15   responsible for operating the store, can -- or does the

14:48:47  16   assistant manager in that situation become entitled to

14:48:53  17   overtime pay?

14:48:56  18            THE WITNESS:  Your Honor, maybe I misheard

14:48:59  19   what you said.  They're entitled to overtime pay anytime

14:49:03  20   they work more than 40 hours per week.

14:49:05  21            THE COURT:  All right.  Fine.  So the answer

14:49:07  22   to the question is, yes, if they work more than 40 hours

14:49:09  23   a week.

14:49:10  24            THE WITNESS:  Yes, sir.

14:49:11  25            THE COURT:  All right.

14:49:11    1      Q.   (By Mr. R. Wiggins)   My last two questions to

14:49:13    2   you, sir:   You don't know how much time the store

14:49:17    3   manager spends unloading the trucks, stocking the

14:49:20    4   shelves, mopping the floors, running the cash register,

14:49:24    5   do you?

14:49:25    6      A.   Not specifically, but I do know that they

14:49:28    7   spend --

14:49:28    8      Q.   You have answered my questions.

14:49:30    9      A.   -- all hours there --

14:49:31   10      Q.   You have answered my question.

14:49:34   11           You testified in your deposition that you don't

14:49:36   12   know how much time they spend on manual labor, didn't

14:49:39   13   you?

14:49:39   14      A.   I do not.

14:49:40   15      Q.   Okay.   And the company has not studied or made

14:49:43   16   any determination that the store managers are spending

14:49:48   17   less than the 75 to 90 percent of their time on manual

14:49:53   18   labor that these plaintiffs have testified to, have

14:49:56   19   they?

14:49:58   20      A.   I'm not aware of any, any studies, other than

14:50:02   21   those that were used in developing Best Practices where

14:50:05   22   activities were studied.

14:50:07   23      Q.   And you testified in your deposition that you

14:50:09   24   can't testify that these store managers in this case

14:50:12   25   don't, in fact, spend 75 to 90 percent of their time on

14:50:16  1    manual labor, didn't you?

14:50:18  2       A.   I can't say that one way or the other.  I can

14:50:21  3    tell you they spend 100 percent of their time managing.

14:50:28  4       Q.   You can tell me what?

14:50:28  5       A.   That they spend 100 percent of the time there at

14:50:30  6    the store managing that store.

14:50:31  7       Q.   But you just testified, sir, that you can't say

14:50:34  8    that you dispute that they're spending 75 to 90 percent

14:50:38  9    of their time on manual labor; so they can't be spending

14:50:41 10    a hundred percent of their time, in addition to the 75

14:50:44 11    to 90 percent of their time?

14:50:46 12       A.   Well, but I have personally been putting out

14:50:49 13    freight and giving good customer service.  I have

14:50:52 14    personally taken boxes off a truck and made

14:50:54 15    merchandising decisions as to where I was going to

14:50:56 16    merchandise that when I take it to the sales floor.  So

14:50:58 17    the things aren't mutually exclusive, I don't think.

14:51:01 18       Q.   Would you agree a manager should do that from

14:51:04 19    time to time, and normally should be supervising others

14:51:10 20    that are doing the manual labor?

14:51:12 21       A.   Would you repeat that for me?

14:51:16 22       Q.   Would you agree that a true manager, a true

14:51:18 23    executive, should only be doing manual labor from time

14:51:22 24    to time occasionally; and that most of this time, if not

14:51:26 25    virtually all of this time, should be spent supervising

14:51:29   1   other people doing the manual labor?

14:51:32   2      A.   In a great majority of our stores, that is the

14:51:36   3   case.

14:51:37   4      Q.   You have already told us you can't tell us how

14:51:39   5   many hours these managers are spending on manual labor

14:51:43   6   doing it, haven't you?

14:51:44   7      A.   But I also stated that they spend a hundred

14:51:47   8   percent of their time managing, which includes

14:51:50   9   supervising others in their store.

14:51:51   10          No two stores are the same.  We've got stores

14:51:54   11   that have ten, 15, 20 employees.  That manager spends a

14:51:57   12   tremendous amount of time supervising those other

14:52:00   13   associates.

14:52:00   14      Q.   You're not in those stores yourself, are you?

14:52:03   15      A.   Three days a week.

14:52:04   16      Q.   Three days a week.  And you have got 1500 stores

14:52:07   17   under you, don't you?

14:52:08   18      A.   No, sir.  I have about 400 today.

14:52:10   19      Q.   Today.  But when your deposition was taken when

14:52:13   20   you were the division vice-president, your division had

14:52:18   21   1,500 stores in it?

14:52:20   22      A.   At one point, yes.

14:52:21   23      Q.   Today, you have 300 stores approximately;

14:52:24   24   correct?

14:52:24   25      A.   400.

14:52:25    1    Q.   Now, you're regional vice-president?

14:52:26    2    A.   Yes.

14:52:27    3    Q.   You testified in your deposition that the person

14:52:31    4    that knows the most about what's -- how many hours are

14:52:36    5    being spent on manual labor in the stores would be the

14:52:39    6    store managers; correct?

14:52:41    7    A.   I don't recall that.

14:52:44    8    Q.   You don't dispute, though, the testimony that --

14:52:49    9    A.   I don't recall that statement.

14:52:50   10    Q.   All right.

14:52:51   11    A.   I'm sure the store manager knows their store

14:52:54   12    better than anyone else, because they're there daily

14:52:57   13    managing that business.

14:52:58   14    Q.   And, sir, I have been reminded of one thing I was

14:53:01   15    supposed to ask you.  What is the sales of the company

14:53:08   16    for the past year?

14:53:10   17            MR. MAYS:  Object, Your Honor.  First of

14:53:12   18    all, it's beyond the scope of direct examination; and

14:53:15   19    secondly, it is prejudicial under Rule 403.

14:53:21   20            THE COURT:  Well, as I recall this witness'

14:53:24   21    testimony on direct, it dealt with the number of stores

14:53:29   22    and various other things.

14:53:31   23            MR. R. WIGGINS:  Yes, sir.

14:53:32   24            THE COURT:  Objection is overruled.

14:53:35   25    Q.   (By Mr. R. Wiggins)  The company had 1.3 billion

14:53:37    1    in sales, didn't it?

14:53:40    2        A.   What period are you talking about?

14:53:41    3        Q.   The last year.

14:53:43    4        A.   Last year was -- I don't have the exact number,

14:53:45    5    but around 5 billion in sales.

14:53:47    6        Q.   5 billion?

14:53:48    7        A.   Yes.

14:53:48    8        Q.   Okay.  And what was the profit after expenses?

14:53:53    9             MR. MAYS:  Objection, Your Honor.  I object

14:53:56   10    on 403, and also on the grounds of relevancy, and going

14:53:59   11    beyond the scope of direct examination.

14:54:01   12             THE COURT:  Same ruling.

14:54:06   13             THE WITNESS:  I don't know the profit

14:54:08   14    dollars.

14:54:10   15             THE COURT:  His answer is he doesn't know.

14:54:12   16        Q.   (By Mr. R. Wiggins)  All right.  Let me refresh

14:54:14   17    your recollection --

14:54:14   18             THE COURT:  He didn't say he had some

14:54:16   19    recollection to refresh.

14:54:18   20        Q.   You're familiar with the company report, annual

14:54:20   21    report, aren't you?

14:54:21   22        A.   Yes.

14:54:23   23        Q.   And the annual report shows that the net sales --

14:54:27   24    I mean, the net profits; correct?

14:54:30   25        A.   Yes.

14:54:31  1      Q.   Let me show you Exhibit 33 --

14:54:34  2                MR. MAYS:  Your Honor, I object.  I renew

14:54:36  3      our motion in limine we filed on all this; the ground of

14:54:39  4      Rule 403; relevancy --

14:54:41  5                THE COURT:  All right --

14:54:42  6                MR. MAYS:  -- wealth of the defendant.

14:54:44  7                THE COURT:  I am making my last ruling on

14:54:46  8      that motion.  Any other motion along those lines with

14:54:51  9      respect to that specific -- this specific inquiry, put

14:54:57  10     it in writing as an offer of proof.

14:55:02  11               MR. MAYS:  Thank you.

14:55:05  12     Q.   (By Mr. R. Wiggins)  Look in the company annual

14:55:07  13     report of stockholders.  And --

14:55:12  14               MR. R. WIGGINS:  Your Honor, we offer

14:55:12  15     Exhibit 33.

14:55:14  16               MR. MAYS:  We object to it, Your Honor, on

14:55:16  17     the grounds previously stated.

14:55:19  18               MR. R. WIGGINS:  Annual report of the

14:55:20  19     company.

14:55:23  20               THE COURT:  It's received in evidence.

14:55:31  21     Q.   (By Mr. R. Wiggins)  Find for us the profit the

14:55:34  22     company has made.

14:55:43  23     A.   263 million.

14:55:46  24     Q.   All right.  And what year was that?

14:55:49  25     A.   2004.

14:55:52  1       Q.   And what page was that?

14:55:54  2       A.   They're not numbered, but it's the third in

14:55:57  3   sequence.

14:55:58  4       Q.   Third in sequence.

14:56:00  5                THE COURT:   Your time is up.

14:56:02  6                MR. R. WIGGINS:   Okay.

14:56:03  7                THE COURT:   Redirect?

14:56:04  8                  **REDIRECT EXAMINATION**

14:56:05  9   **BY MR. MAYS:**

14:56:06  10      Q.   Mr. Broome, you were asked about the amount of

14:56:23  11  time that store managers spent engaged in manual tasks.

14:56:30  12  Do you recall that?

14:56:30  13      A.   Yes.

14:56:31  14      Q.   And you attempted to say, and I think you were

14:56:35  15  cut off, about how much time the store manager spends in

14:56:43  16  doing management tasks.   What's your response about

14:56:45  17  that, sir?

14:56:45  18                THE COURT:   About doing management?

14:56:47  19                MR. MAYS:   Management tasks, Your Honor.

14:56:49  20                MR. R. WIGGINS:   That was not asked, Your

14:56:51  21  Honor.

14:56:51  22                THE COURT:   It may not have been asked, but

14:56:53  23  it was answered at least twice.

14:56:55  24                Next question?

14:56:58  25      Q.   (By Mr. Mays)  You were asked about certain

14:57:01   1   emails you were given.  Had you seen these emails

14:57:05   2   before?

14:57:05   3       A.  I saw one from Frank Vogt.  I don't recall the

14:57:12   4   specifics, but I am assuming it was one of these.  I had

14:57:15   5   not seen the others.

14:57:16   6       Q.  Do you know how many emails are generated in the

14:57:19   7   Family Dollar system every year?

14:57:20   8       A.  I do not, but millions would be a safe bet.

14:57:26   9       Q.  And -- okay.  You were asked whether or not

14:57:31   10  Mr. Barkus was in charge of every store in the company.

14:57:34   11  Do you recall that?

14:57:35   12      A.  Yes.

14:57:35   13      Q.  At the store level, who is in charge of the store

14:57:40   14  in this company?

14:57:40   15      A.  The store manager is in charge of the store.

14:57:43   16  District managers supervise store managers who run

14:57:45   17  stores.

14:57:45   18          I supervise district managers; VP's supervise

14:57:50   19  RVP's; and seniors supervise the ones under them.

14:57:54   20      Q.  And are the tasks that you described that these

14:57:59   21  store managers perform, are they management tasks?

14:58:03   22              THE COURT:  The objection to leading is

14:58:06   23  sustained.

14:58:06   24      Q.  How would you describe the tasks that store

14:58:10   25  managers perform in their stores?

14:58:12  1      A.   Again, I think they manage their store all the
14:58:18  2  time they're there.
14:58:20  3           In certain stores, there are managers that -- in
14:58:23  4  all stores, managers are subject to do some of the tasks
14:58:27  5  and functions that we have discussed here today.  Most
14:58:30  6  stores are different.
14:58:30  7           If you are in a high volume store with lots of
14:58:33  8  associates, the manager is spending virtually all their
14:58:36  9  time supervising the activities of others.
14:58:38 10              THE COURT:  Are there times when a store
14:58:41 11  manager is reassigned by the district manager to a
14:58:48 12  different store on a temporary basis?
14:58:52 13              THE WITNESS:  Yes, Your Honor.
14:58:53 14              THE COURT:  Is that store manager managing
14:58:57 15  when he is at the other store?
14:59:00 16              THE WITNESS:  Typically, those
14:59:02 17  reassignments -- well, I guess depending on what type of
14:59:05 18  assignment it is, if they are to replace or if there is
14:59:09 19  no store manager there, which is one of the
14:59:11 20  circumstances where that manager is temporarily
14:59:13 21  reassigned, they're managing the associates in that
14:59:15 22  building.
14:59:16 23              If it's a temporary, go help a new manager,
14:59:23 24  they're sharing, I guess, the management of the
14:59:25 25  associates and the assets in that building with that

14:59:27  1    other manager while they're there, yes, sir.

14:59:31  2        Q.  (By Mr. Mays)  The lawyer asked you about whether

14:59:33  3    assistant managers had the same duties as store

14:59:38  4    managers.  What's the difference in an assistant manager

14:59:41  5    and a store manager, with respect to responsibility?

14:59:44  6        A.  The assistant manager's responsibilities are

14:59:48  7    given by the store manager.  The store manager can

14:59:51  8    authorize the assistant on any number of things.  We

14:59:54  9    have some assistants that order, just like the manager

14:59:57  10   does.  We have others that do not.

14:59:58  11       The difference is the store manager is

14:59:59  12   accountable for the store.  The assistant manager is

15:00:02  13   accountable for whatever responsibility that manager

15:00:05  14   directs them to take.

15:00:07  15       Q.  As between assistant and store manager, who is in

15:00:10  16   charge?

15:00:10  17       A.  The store manager, without question.

15:00:13  18            MR. MAYS:  Thank you, sir.  That's all I

15:00:15  19   have.

15:00:15  20            THE COURT:  Thank you, sir.  Ladies and

15:00:19  21   gentlemen, we will take our recess.  We will be in

15:00:21  22   recess until 3:15 by the clock on the wall.

15:00:24  23            Please do not discuss the case among

15:00:26  24   yourselves or with anyone else.  Do not allow the case

15:00:28  25   to be discussed in your presence and keep an open mind.

| | | |
|---|---|---|
| 15:00:38 | 1 | (Jury out at 2:51 p.m.) |
| 15:00:47 | 2 | (In open court, jury not present.) |
| 15:27:07 | 3 | THE COURT:  Gentlemen? |
| 15:27:11 | 4 | MR. G. WIGGINS:  Judge, we had spoke |
| 15:27:13 | 5 | yesterday about some of the problems we would be |
| 15:27:17 | 6 | encountering on keeping the plaintiffs here or letting |
| 15:27:20 | 7 | them go. |
| 15:27:22 | 8 | We had said we would talk about it today and |
| 15:27:24 | 9 | some of our clients have flights that are coming up. |
| 15:27:28 | 10 | And I was wondering could we address that now so we can |
| 15:27:31 | 11 | give them an answer? |
| 15:27:32 | 12 | THE COURT:  They will be the next witnesses |
| 15:27:33 | 13 | called.  I had just assumed that the defendant was -- |
| 15:27:39 | 14 | had decided not to call the plaintiffs when they didn't |
| 15:27:45 | 15 | call them first.  I am not making the plaintiffs stay |
| 15:27:51 | 16 | over another day. |
| 15:27:52 | 17 | MR. WHITE:  Our understanding is they were |
| 15:27:54 | 18 | here today only. |
| 15:27:54 | 19 | THE COURT:  Yes. |
| 15:27:56 | 20 | MR. KALLON:  Your Honor, you also made it |
| 15:27:59 | 21 | clear yesterday, I believe, that we were not restricted |
| 15:28:03 | 22 | to just calling those plaintiffs who are in court |
| 15:28:05 | 23 | yesterday or today. |
| 15:28:06 | 24 | THE COURT:  No, you are not. |
| 15:28:08 | 25 | MR. KALLON:  Thank you, sir. |

15:28:10   1          MR. R. WIGGINS:  Your Honor, in order for us
15:28:12   2   to move smoothly back from their case to our case, if we
15:28:16   3   could get some sort of notice of when they're getting
15:28:19   4   close to resting so we can begin to get people to come
15:28:23   5   back?
15:28:23   6          THE COURT:  Well, I don't think -- you're
15:28:26   7   not planning on resting this week, are you?
15:28:29   8          MR. KALLON:  Judge, probably not.
15:28:32   9          We wanted to raise something with you.  One
15:28:34  10   of the people that I wanted to testify who is from
15:28:39  11   Wisconsin is on vacation this week.  And when we called
15:28:42  12   her to try to get her to come, she pointed out to me I
15:28:48  13   promised I wouldn't interrupt her vacation.  But she
15:28:51  14   also pointed out to me the reason she took a vacation is
15:28:55  15   because she is meeting her daughter for the first time
15:28:58  16   that she gave up for adoption years ago.  And we would
15:29:01  17   like to carry over to next week, if for no other reason
15:29:04  18   then to put her up as well.
15:29:06  19          THE COURT:  Well, I had learned today that
15:29:11  20   Judge Pryor's investiture is next Monday in Atlanta and
15:29:17  21   I've got to be there.
15:29:17  22          MR. WHITE:  Was I invited?
15:29:19  23          THE COURT:  I don't know.
15:29:22  24          (Laughter.)
15:29:27  25          THE COURT:  The Chief Judge of the Circuit.

15:29:31  1   That's the word in my office, to only call back if I

15:29:34  2   wasn't coming, is what -- so we won't have court next

15:29:40  3   Monday.

15:29:41  4                MR. WHITE:  Okay.

15:29:42  5                THE COURT:  And the witness could be called

15:29:46  6   Tuesday.

15:29:48  7                MR. KALLON:  Thank you.

15:29:50  8                MR. G. WIGGINS:  Would it be safe, Your

15:29:52  9   Honor, I guess I'm asking you and the defendant, if we

15:29:55  10  planned on having the people back next Wednesday?

15:30:00  11               THE COURT:  No.  Plan on having them back

15:30:03  12  next Tuesday.

15:30:04  13               MR. G. WIGGINS:  Next Tuesday?

15:30:05  14               THE COURT:  Yes.

15:30:06  15               MR. G. WIGGINS:  Do y'all -- do y'all see

15:30:09  16  y'all resting on Tuesday, or before?

15:30:11  17               MR. WHITE:  We didn't see y'all resting

15:30:14  18  yesterday.

15:30:16  19               MR. CHILDS:  We didn't, either.

15:30:20  20               MR. G. WIGGINS:  We didn't either.  That's

15:30:23  21  why I had these people --

15:30:27  22               THE COURT:  All right.  Let's bring in the

15:30:29  23  jury.

15:30:30  24                    (Jury in at 3:21 p.m.)

15:30:40  25                  (In open court, jury present.)

15:31:22  1              THE COURT:  The defendant will call its next

15:31:25  2    witness.

15:31:26  3              MR. MILLER:  Your Honor, we call Greg Haney.

15:31:36  4         **GREG HANEY, DEFENDANT'S WITNESS, SWORN**

15:31:39  5              THE CLERK:  State your name for the record,

15:31:43  6    please.

15:31:51  7              THE WITNESS:  Greg Haney.

15:32:35  8              THE CLERK:  And spell your last name for the

15:32:37  9    record.

15:32:37  10             THE WITNESS:  H-A-N-E-Y.

15:32:39  11                  **DIRECT EXAMINATION**

15:32:40  12   **BY MR. MILLER:**

15:32:41  13        Q.  Good afternoon, Mr. Haney.

15:32:44  14        A.  Hello.

15:32:45  15        Q.  Where do you live?

15:32:46  16        A.  Harrisonburg, Virginia.

15:32:49  17        Q.  And what part of Virginia is that in?

15:32:51  18        A.  It's in central Virginia, pretty much directly in

15:32:55  19   the middle.

15:32:56  20        Q.  Where do you work?

15:32:57  21        A.  I work for Family Dollar Stores.

15:32:59  22        Q.  What positions have you held during the time of

15:33:04  23   your employment with Family Dollar Stores?

15:33:06  24        A.  Currently a district manager, and I started as a

15:33:12  25   store manager with Family Dollar.  I did that -- I was

15:33:14  1   in that position for 9 years, and have been a district

15:33:18  2   manager for 16 years.

15:33:20  3       Q.   And what is your educational background, sir?

15:33:23  4       A.   I have a high school degree.

15:33:25  5       Q.   Okay.   And is that in Virginia?

15:33:28  6       A.   Yes, sir.

15:33:29  7       Q.   And you have been a district manager for how

15:33:32  8   long?

15:33:32  9       A.   16 years.

15:33:34  10      Q.   What does a district manager do at Family Dollar?

15:33:42  11      A.   I -- in my district, I have 18 stores, so I

15:33:47  12  oversee that group of -- I'm sorry, 18 stores.   Excuse

15:33:51  13  me.   I oversee those 18 stores, work with the store

15:33:57  14  managers within my district.

15:34:00  15      Q.   And as a district manager, who do you report to?

15:34:03  16      A.   I report to a regional vice-president.   His name

15:34:09  17  is George Lysic.

15:34:13  18      Q.   Are you assigned to a specific territory?

15:34:17  19      A.   Yes, I am.

15:34:18  20      Q.   Okay.   And is that territory in the Harrisonburg,

15:34:24  21  Virginia area?

15:34:24  22      A.   I am based out of Harrisonburg, and the stores

15:34:28  23  that I supervise are about an hour and a half radius of

15:34:32  24  Harrisonburg.

15:34:33  25      Q.   I would like to show you a map.   Is that map an

15:34:47  1    accurate depiction of the area in which you cover in
15:34:51  2    your district?
15:34:51  3        A.  Yes, it is.
15:34:52  4        Q.  And are those blue dots an accurate depiction of
15:34:56  5    the locations where your stores would be within the
15:34:59  6    district?
15:34:59  7        A.  Yes, it is.
15:35:00  8        Q.  Okay.  And what is the greatest distance between
15:35:06  9    the stores in your district?
15:35:08 10        A.  The furtherest stores are about an hour and a
15:35:12 11    half.
15:35:12 12        Q.  From where?
15:35:13 13        A.  From Harrisonburg, where I live.
15:35:15 14        Q.  Okay.  Between -- what is the furtherest distance
15:35:20 15    between the two furtherest apart, the two that are
15:35:26 16    furtherest apart in your district?
15:35:29 17        A.  It's about a three-hour drive from one to the
15:35:32 18    another.
15:35:32 19        Q.  And you have how many stores?
15:35:34 20        A.  18.
15:35:34 21        Q.  How often, as a district manager, do you visit
15:35:37 22    the individual stores in your district?
15:35:40 23        A.  I attempt to visit each store -- each of my
15:35:45 24    stores monthly.  Most of the time that does happen, but
15:35:50 25    there are some occasions that some of the newer

15:35:54  1    managers, I may try to get to their stores twice within

15:35:59  2    that month; and some of the more experienced managers,

15:36:04  3    they may go a period of six weeks or so.

15:36:07  4        Q.  And what do you do when you go to a store?

15:36:13  5        A.  Well, during a typical visit, I usually try to

15:36:18  6    visit two stores a day, and I spend approximately three

15:36:22  7    to four hours within a store.  And the first part of the

15:36:28  8    visit is just visiting with whichever associates are --

15:36:32  9    happen to be present that day at that particular store.

15:36:36 10        Then I usually meet with the manager and, you know,

15:36:41 11    inquire whether there are any issues that they're having

15:36:43 12    and that they need assistance with; whether, you know,

15:36:47 13    it be personnel, whether it be with some of the

15:36:50 14    merchandise that they received, if they need some

15:36:52 15    direction on -- or some suggestions on where to go with

15:36:55 16    some of that.  So that when we start to walk through the

15:36:58 17    store, that I have a little insight as to, you know,

15:37:02 18    what type of issues are there, if there are any.

15:37:05 19    Sometimes there's not.

15:37:06 20        And then the manager and myself, we walk through

15:37:09 21    the store and, you know, walk through each department

15:37:13 22    and looking at the different areas of the store trying

15:37:16 23    to resolve any of those issues that they have discussed

15:37:19 24    with me.  I offer suggestions in different areas of

15:37:25 25    things that, you know, could perhaps improve their

15:37:28  1   stores somewhat.

15:37:30  2        Then we have a grading system which the store

15:37:33  3   manager is given the opportunity to grade their store;

15:37:36  4   and then I will grade their store myself.  And then

15:37:41  5   we -- usually, we're very close on that grading.  We may

15:37:44  6   be off a point or so sometimes.  And we will discuss

15:37:49  7   those -- the differences and those comparisons.

15:37:55  8        And that's -- there is some of the cash handling

15:37:59  9   reports and things, and I do review those, just to be

15:38:01  10  sure that everything is being logged as it should be.

15:38:06  11  And that's pretty much all that's involved in a regular

15:38:10  12  visit.

15:38:10  13     Q.  You said that there was some type of an

15:38:13  14  assessment of the store that was done?

15:38:15  15     A.  Yes.  It's called an Any Time 5 report.  And it's

15:38:21  16  just a report where we identify the priorities of the

15:38:26  17  store and the things that we feel that are, you know,

15:38:28  18  most important to the operation of the store and to our

15:38:32  19  customers and the areas that we want the staff of the

15:38:36  20  store to focus on.  And that is the format that we use

15:38:41  21  for evaluating a store.

15:38:43  22     Q.  And do store managers know what is on Any Time 5?

15:38:50  23     A.  Yes, they do.

15:38:51  24     Q.  And how do they know that?

15:38:53  25     A.  Well, they've been given that information in my

15:38:57  1   particular area of responsibility.  They have -- there's

15:39:00  2   a form that we complete.  They have copies of that form.

15:39:06  3   And I ask them whether I visit their store or not, I ask

15:39:10  4   them to evaluate their store weekly so they have a good

15:39:14  5   sense of, you know, where they are with that rating.

15:39:18  6       Q.  How long do your visits usually last?

15:39:21  7       A.  Usually three to four hours, maybe, sometimes a

15:39:25  8   little more brief than that.

15:39:27  9       Q.  So as a general matter, you visit stores in your

15:39:33  10  district once a month, and for a period of three to four

15:39:38  11  hours?

15:39:39  12      A.  That's correct.

15:39:39  13      Q.  You have other contact with the store other than

15:39:43  14  personal visits?

15:39:44  15      A.  We have the ability to communicate by email.  And

15:39:49  16  also, you know, they certainly have numbers that they

15:39:54  17  can contact me if they have any questions or issues that

15:39:58  18  they need some assistance on.

15:39:59  19      Q.  What type of emails might be sent back and forth?

15:40:02  20      A.  I do have -- each week they are providing me with

15:40:08  21  sales information from their particular store.  I take

15:40:11  22  that -- for the district, I take each one of those

15:40:15  23  letters.  And I compile that and I send that back out to

15:40:20  24  the districts; so trying to create a competitive

15:40:22  25  environment so each of the stores they know what their

15:40:25   1   neighboring stores are doing.  So I receive that

15:40:29   2   communication and in turn send that back out to the

15:40:32   3   stores weekly.

15:40:34   4        The other emails are usually maybe where they're

15:40:37   5   inquiring about a question about something, or a

15:40:41   6   particular task, or just things of that nature.

15:40:46   7        Q.   Who hires store level employees?

15:40:50   8        A.   The store manager does.

15:40:51   9        Q.   Tell us how that process works.

15:40:54  10        A.   The -- well, there is a process where, you know,

15:41:02  11   without going through all the details that they do to

15:41:05  12   hire someone.  And the store manager just goes through

15:41:09  13   those particular steps --

15:41:12  14             MR. G. WIGGINS:  Your Honor, unless

15:41:15  15   Mr. Haney or Mr. Miller can establish that we have

15:41:20  16   particular plaintiffs that he's talking about or

15:41:22  17   referring to that are doing this hiring and working this

15:41:25  18   district, I don't see how what his managers are doing is

15:41:27  19   relevant to the issues in this case.

15:41:31  20             MR. MILLER:  Your Honor, I disagree for

15:41:33  21   several reasons.

15:41:34  22             First, the plaintiff -- first, the plaintiff

15:41:40  23   said this case is proceeding on a representative basis.

15:41:44  24   Second, I do believe that there are stores within

15:41:46  25   Mr. Haney's district that has store managers who have

15:41:51  1    received notice of this lawsuit, and this Court has

15:41:53  2    found that those individuals are similarly situated to

15:41:56  3    the individuals who have opted in.  As such, I believe

15:41:58  4    that his testimony would be relevant.

15:42:01  5            MR. G. WIGGINS:  Your Honor, I have no

15:42:04  6    knowledge of any plaintiff -- not saying they're not --

15:42:07  7    but I don't have personal knowledge whether or not

15:42:09  8    these -- we have any store managers -- whether or not

15:42:11  9    any of them received notice.

15:42:15  10           I think it's incumbent upon him to

15:42:19  11   establish, or Mr. Miller to establish that fact.  It

15:42:22  12   doesn't go to the similarly situated issue if, in fact,

15:42:25  13   he might be a rogue district somewhere.  I don't know.

15:42:29  14           THE COURT:  All right.  I overrule your

15:42:32  15   objection.

15:42:37  16      Q.   (By Mr. Miller)  I believe before Mr. Wiggins

15:42:41  17   stood up, you were telling us about the hiring process.

15:42:45  18      A.   That the store manager goes through?

15:42:47  19      Q.   Yes.

15:42:50  20      A.   The store manager's responsible for selecting all

15:42:54  21   of the persons that work within their store.  And, of

15:42:58  22   course, you know, we have applications and different

15:43:00  23   forms that each associate needs to fill out.  So the

15:43:05  24   store managers are posting their openings that they

15:43:10  25   have.  They're reviewing the applicants that they

15:43:13   1   receive.  And, you know, based on those interviews,

15:43:17   2   they're making a selection and they're hiring those

15:43:21   3   persons for their stores.

15:43:22   4       Q.  Now, what about the hiring of assistant managers?

15:43:27   5   How does that process work?

15:43:29   6       A.  The process is very similar, with the exception

15:43:35   7   that I like to speak to the particular candidates that

15:43:45   8   they're considering.  And that happens most of the time.

15:43:47   9   There have been some occasions where they have went

15:43:50  10   ahead and hired those persons.

15:43:52  11       But what I ask is that I am able to speak to

15:43:56  12   those people prior to them giving keys to our store.

15:44:02  13   When I do -- when I do conduct the interviews, the

15:44:07  14   reason that I'm doing that is to assist the managers.

15:44:12  15       A lot of those are -- a lot of the store

15:44:15  16   managers, it's their first supervisory position.  It's

15:44:18  17   something that they're new at.  And until they develop

15:44:22  18   some of the interviewing skills, I have just found it

15:44:25  19   helpful to do that.  And a lot of times there are

15:44:29  20   certain things that come out in the interview that

15:44:31  21   perhaps they don't pick up on.

15:44:33  22       So I will, after having an interview with the

15:44:35  23   person they're considering, I will just take and share

15:44:39  24   what my findings are; and then the store manager makes

15:44:44  25   the decision on whether they're going to hire that

15:44:46   1   particular person or not.

15:44:47   2       Q.   Who sets the pay level for store level employees

15:44:52   3   in a district?

15:44:53   4       A.   The store managers are the ones that are setting

15:44:56   5   those pays for their particular store.  You know,

15:45:00   6   usually, there is a particular pay scale that's been in

15:45:04   7   place and they're familiar with that and that, you know,

15:45:08   8   they usually go by that.

15:45:09   9       Q.   Okay.  Do you have a role in the process of

15:45:11  10   setting pay for store level employees?

15:45:14  11       A.   No.  I don't get involved in that unless, you

15:45:17  12   know, there may be an occasion where one of the

15:45:20  13   applicants has an excessive amount of experience and

15:45:26  14   maybe -- you know, maybe there's a need to pay that

15:45:29  15   person a little more than what we had been paying.  We

15:45:31  16   may confer about that.

15:45:35  17       But whenever that issue has came out, I have

15:45:38  18   always, you know, approved whatever the manager wanted

15:45:42  19   to offer that particular person.

15:45:44  20       Q.   And what's the process for disciplining

15:45:48  21   employees, employees in your district?

15:45:49  22       A.   It is up to -- it's up to the store manager.

15:45:55  23   They're responsible for all of the disciplinary actions.

15:45:59  24       And, you know, as a company, we do offer our

15:46:01  25   guidelines to the store managers of that process.  You

15:46:05  1   know, where the first step is they're coaching those

15:46:10  2   associates, then they're counseling them if it gets to

15:46:12  3   that level verbally.

15:46:14  4        If the problem isn't corrected, then there's --

15:46:17  5   they get to a point of a written warning.  And then the

15:46:21  6   last point is where they're actually giving that person

15:46:25  7   several days off to make a decision whether, you know,

15:46:28  8   they want to, you know, abide by whatever policy or

15:46:32  9   procedure they're not following or whatever issue it is;

15:46:36  10  and correct that and come to work for us or not.

15:46:40  11       And once they go through the process, the store

15:46:42  12  manager makes that decision ultimately whether that

15:46:46  13  person will stay or not.

15:46:47  14  Q.  And if an employee has to be terminated, what is

15:46:51  15  the process for that in the store?

15:46:53  16  A.  Well, it's back to this same process.  You know,

15:46:58  17  where the store manager is going through all these steps

15:47:01  18  because, you know, obviously, the outcome we would like

15:47:04  19  to salvage all those associates and we would like to

15:47:07  20  resolve all of those issues.  But, you know,

15:47:10  21  unfortunately, that doesn't always happen.

15:47:13  22       And if it gets to that point and that person

15:47:17  23  is -- they're not going to comply, or the issues are not

15:47:20  24  going to be resolved, then the store manager makes the

15:47:23  25  decision to terminate them.

15:47:26   1          I certainly have had, you know, store managers --

15:47:28   2    especially newer managers -- going through those types

15:47:33   3    of steps for the first time to, you know, call me and

15:47:36   4    want to confer about the steps.  And I certainly offer

15:47:41   5    my assistance, you know, in those situations.

15:47:43   6          But it is their responsibility, and I expect them

15:47:46   7    to do that.

15:47:48   8      Q.   As a general matter as a district manager, is

15:47:51   9    there any difference in how you interact between new

15:47:55  10    managers, newly hired/promoted managers, and those who

15:47:58  11    have been managers for a longer period of time?

15:48:01  12      A.   Certainly it is.  I mean, when they're new to the

15:48:06  13    position, as I said -- we do a lot of promoting our

15:48:11  14    people from within.  So it's very frequent that's their

15:48:18  15    first time being in a supervisory role.  So those

15:48:24  16    persons that are new at that, they certainly need some

15:48:27  17    assistance, and they certainly require some direction

15:48:32  18    more so than the more experienced people.

15:48:34  19          After they have gone through some of those

15:48:36  20    different issues that they're faced with, then, you

15:48:39  21    know, they build a level of confidence, and then the

15:48:42  22    communication between us on those issues just dissipates

15:48:46  23    over time.

15:48:48  24      Q.   Who does the scheduling of the store in your

15:48:51  25    district?

15:48:51  1      A.   The store manager does that.

15:48:52  2      Q.   And if a change needs to be made to the schedule,

15:48:58  3  who does that?

15:48:59  4      A.   The store manager does that.

15:49:01  5      Q.   Who makes promotion decisions in a Family Dollar

15:49:05  6  store in your district?

15:49:06  7      A.   The store manager does that.

15:49:07  8      Q.   Do you play a role in that process?

15:49:09  9      A.   If it is a -- if it is a cashiering position that

15:49:13  10  they're considering to going into an assistant position,

15:49:17  11  then that, you know, falls into, as what I mentioned

15:49:20  12  earlier, whereas I would like to speak with that person

15:49:25  13  before they're actually handed the keys.

15:49:27  14      But the thing that's different in that situation

15:49:29  15  is I have usually always, you know, met those people

15:49:34  16  because they work for us in another position.

15:49:37  17      So it's not a matter of me interviewing them to

15:49:40  18  get to know them or to find out, you know, things about

15:49:43  19  that person.  It's just a matter of me talking to them

15:49:47  20  before they're actually handed the keys to the building.

15:49:50  21      Q.   Do you recall having overridden a manager's

15:49:55  22  promotion decision?

15:49:56  23      A.   I do not recall ever doing that in 16 years.

15:50:00  24      Q.   Who in the stores is eligible for a cash bonus?

15:50:05  25      A.   The store manager.

15:50:06   1      Q.   Anyone else?

15:50:08   2      A.   That's all.

15:50:09   3      Q.   And what are the bonuses based upon?

15:50:11   4      A.   It is based on the store's controllable profit,

15:50:16   5   and it is calculated on an annual time period based on

15:50:21   6   that store's inventory.  And they are paid 1 percent of

15:50:28   7   that store's controllable profit.

15:50:33   8      Q.   How are employees evaluated in the store?

15:50:35   9      A.   I do the evaluation on the store manager, and the

15:50:42  10   store manager evaluates all their associates.

15:50:46  11      Q.   Now, I've shown you what has already been

15:51:03  12   introduced into evidence as Plaintiffs' Exhibit 11.  Do

15:51:07  13   you recognize that document?

15:51:08  14      A.   Yes, I do.

15:51:09  15      Q.   Okay.  And is that the form that you would use

15:51:12  16   for evaluating a store manager?

15:51:13  17      A.   Yes, it is.

15:51:13  18      Q.   And you evaluate the managers on each of the

15:51:16  19   categories contained in that form?

15:51:18  20      A.   Yes, I do.

15:51:19  21      Q.   Who evaluates assistant managers?

15:51:23  22      A.   The store manager does that.

15:51:25  23      Q.   Okay.  Are they evaluated on some of the same

15:51:28  24   things that a store manager is evaluated on?

15:51:30  25      A.   They're -- there are some of the categories which

15:51:35    1    are on the assistant manager's evaluations as well, yes.

15:51:39    2        Q.   And why is that?

15:51:40    3        A.   Well, the portions that are on both the assistant

15:51:44    4    and the store manager, they are the business portions of

15:51:49    5    the store, which is evaluating the business performance

15:51:55    6    of the store.  And, you know, operating a store, it's a

15:51:59    7    team effort and -- you know, among that management

15:52:02    8    group.

15:52:02    9        So they -- the assistant manager is certainly,

15:52:06   10    you know, have a role in that as well.  So that's why

15:52:09   11    they're included in that portion of it.

15:52:11   12        Q.   As a district manager, what is your role in the

15:52:16   13    budget process, the store's payroll budget?

15:52:20   14        A.   The budgeting, it starts by me receiving figures

15:52:31   15    from our corporate office, and they're based on sales

15:52:35   16    trends for each of the stores within the district.

15:52:39   17        Prior to the budgeting, most of this -- just from

15:52:44   18    the visits that I have knowledge of, but, you know, the

15:52:47   19    store manager and myself, we do confer about different

15:52:50   20    changes, perhaps in the setting of that particular

15:52:56   21    store.  For example, maybe there's another retailer

15:52:58   22    that's either moved into the area or perhaps there's one

15:53:03   23    that's closed, which may be affecting their budgets.

15:53:06   24        So we will usually confer on those, you know, not

15:53:09   25    necessarily the day I get the budget, there's things

15:53:12  1   that, you know, the visits that we are conferring on.

15:53:15  2       And if there are some of those issues that are

15:53:18  3   going to impact the sales of that store, then on these

15:53:22  4   figures that I receive, I will make adjustments to

15:53:26  5   those, according to those discussions that we've had.

15:53:29  6   And then I resubmit that to our corporate office.

15:53:32  7       Q.   Can a store manager impact the budget for his or

15:53:38  8   her store?

15:53:38  9       A.   They most certainly can, by, you know, increasing

15:53:42  10  the sales in their store.  You know, they are a very

15:53:46  11  important part of that.

15:53:47  12      Q.   Who hires store managers in your district?

15:53:51  13      A.   I do.

15:53:51  14      Q.   What percentage of store managers in your

15:54:01  15  district are hired from the outside versus promoted

15:54:05  16  internally?

15:54:06  17      A.   I am not sure exactly what the percentage is, but

15:54:11  18  I can tell you currently that there are 18 stores in my

15:54:14  19  district; and 16 of my store managers started as a

15:54:19  20  cashier and have moved into the position of store

15:54:25  21  manager.

15:54:25  22      Q.   16 out of 18?

15:54:28  23      A.   16 out of 18, yes, sir.

15:54:30  24      Q.   When you hire or promote a new store manager in

15:54:35  25  your district, do you mention to them the hours that

15:54:39   1    they are going to be expected to work?

15:54:41   2        A.   I most certainly do.  And it's, as I said,

15:54:44   3    because of, you know, having 16 people that have moved

15:54:48   4    up through the ranks, all of these people have certainly

15:54:50   5    been exposed to, you know, the store.  And they have

15:54:53   6    seen what an assistant manager does, what a store

15:54:56   7    manager does.  So they, you know, certainly have

15:54:58   8    knowledge of the position and what's required of them.

15:55:02   9        Of the few people that I do hire from the

15:55:05  10    outside, I certainly go out of my way to explain the

15:55:08  11    job, explain the position, explain everything that is

15:55:11  12    expected of them.  I try to be very fair about that, and

15:55:15  13    I don't -- I don't want anyone accepting a position that

15:55:19  14    is, you know, in their mind something that it's not.

15:55:22  15        So just as it is important to me to try to select

15:55:26  16    the correct person, I feel that I owe them as well --

15:55:33  17    the ability to make a decision on whether they want to

15:55:36  18    come to work for us, you know, based on what the job

15:55:39  19    truly is.

15:55:40  20        Q.   Is there a minimum number of hours?

15:55:42  21        A.   The minimum amount of hours are 48 hours.

15:55:46  22        Q.   And what happens in your district if a store

15:55:49  23    manager works less than the minimum?

15:55:50  24        A.   As long as their store is current and it is

15:55:57  25    presented the way that it is supposed to be, I have no

1    issue with that whatsoever.

2         I actually -- I mean, I encourage that, because I

3    certainly understand as a manager there's going to be

4    some weeks where, you know, you have an associate that's

5    out sick, or something like that.  That's going to cause

6    them, you know, to perhaps have to work some extra

7    hours.

8         So, you know, in the same regards, you know, when

9    everything is right, they need to get out of there when

10   they can.  So I have no issue with that at all.

11   Q.   And when you hire or promote a store manager, do

12   you discuss with that person what their job duties are

13   going to be?

14   A.   Yes, I do.

15   Q.   Okay.  Do you tell them that they're going to

16   have to stock shelves or move freight?

17   A.   I most certainly do.

18   Q.   Do hourly employees in the stores also stock

19   shelves and move freight?

20   A.   They certainly do, but it's -- you know, what

21   they do and what the managers are doing, they're both

22   moving boxes.  There's no question about that.  But

23   there's a different process going on.

24        For instance, when they're receiving a truck,

25   most of the store managers are in the back room taking

15:57:09  1   the product off of the conveyor belt.  But they're also,

15:57:13  2   you know, they're making decisions on that product, as

15:57:15  3   far as, you know, if they receive eight cases of a

15:57:18  4   particular item and they only want to send three of

15:57:21  5   those to the sales floor, and they want to, you know,

15:57:23  6   put another group of that on one of these U-bay freight

15:57:27  7   carts, whether they're going to have to bulk stock it in

15:57:30  8   the back room.

15:57:30  9        So, yes, they are physically, you know, unloading

15:57:34  10  a truck, moving boxes.  But there's also a lot of

15:57:38  11  directing going on and planning going on in that

15:57:41  12  process, which is different than, you know, what a

15:57:44  13  regular associate is doing; they're opening a box and

15:57:47  14  putting product on the shelf.  And there's not a lot of

15:57:51  15  thought process involved in what they're doing.

15:57:54  16       Q.   Is the assistant manager reviewed by you on

15:58:00  17  hiring?

15:58:02  18       A.   I'm sorry, could you repeat that?

15:58:05  19       Q.   Do you review assistant managers on hiring?

15:58:08  20       A.   Do I review them?

15:58:09  21       Q.   Yes.

15:58:10  22       A.   Interview them, you mean?

15:58:12  23       Q.   Review, evaluate?

15:58:14  24       A.   No, do not.

15:58:15  25       Q.   Do you know if anyone does?

15:58:18    1        A.   The store manager does.

15:58:19    2        Q.   Do you have keys to the store in your district?

15:58:25    3        A.   Absolutely not.

15:58:27    4        Q.   Do you have keys to the store manager's office in

15:58:32    5    the store?

15:58:32    6        A.   Absolutely not.

15:58:33    7        Q.   Who has those keys?

15:58:35    8        A.   The store manager and the approved assistant

15:58:39    9    managers.

15:58:40   10        Q.   What is full-time at Family Dollar?

15:58:45   11        A.   Any associate that works 30 hours or more per

15:58:48   12    week.

15:58:49   13        Q.   And, in your opinion, what is the most important

15:58:54   14    thing that Family Dollar store manager does?

15:58:56   15        A.   Well, most importantly, I feel there's -- and

15:59:04   16    they go hand in hand -- but it's the leadership role of

15:59:08   17    the manager, and it's managing the task and organizing

15:59:11   18    and prioritizing.

15:59:14   19             But, you know, the leadership part of it, it

15:59:19   20    takes a team effort.  It takes someone there to plan the

15:59:23   21    workload, to motivate the staff.  And they can't be

15:59:27   22    successful if they're not doing those things.

15:59:30   23        Q.   Who runs the 18 individual stores in your

15:59:34   24    district?

15:59:34   25        A.   The store managers do.

| | |
|---|---|
| 15:59:37 | 1 |
| 15:59:39 | 2 |
| 15:59:40 | 3 |
| 15:59:41 | 4 |
| 15:59:42 | 5 |
| 15:59:44 | 6 |
| 15:59:50 | 7 |
| 15:59:52 | 8 |
| 15:59:55 | 9 |
| 15:59:56 | 10 |
| 15:59:56 | 11 |
| 15:59:58 | 12 |
| 15:59:59 | 13 |
| 16:00:02 | 14 |
| 16:00:05 | 15 |
| 16:00:07 | 16 |
| 16:00:07 | 17 |
| 16:00:12 | 18 |
| 16:00:16 | 19 |
| 16:00:19 | 20 |
| 16:00:22 | 21 |
| 16:00:26 | 22 |
| 16:00:28 | 23 |
| 16:00:29 | 24 |
| 16:00:29 | 25 |

MR. MILLER:  Thank you, Mr. Haney.

THE WITNESS:  You're welcome.

THE COURT:  Cross-examination?

**CROSS-EXAMINATION**

BY MR. G. WIGGINS:

Q.  Good afternoon, Mr. Haney.

A.  Hello, sir.

Q.  I want to touch on a couple of points you just testified to.

A.  Okay.

Q.  When you were talking about unloading freight --

A.  Yes, sir.

Q.  -- and were saying that the store managers are back there making decisions, as opposed to just unloading boxes?  Did I understand you right?

A.  Yes, sir.

Q.  Isn't it a fact, Mr. Haney, that the strands, the store policy manual, the managers are told what freight goes on what dolly, where that dolly is to be placed, the number of cartons to be placed on, and the number of cartons to be unloaded on the shelves; isn't that part of strands, the policy manual?

MR. MILLER: Object to the form of the question, Your Honor.

THE COURT:  Overruled.

16:00:31  1        THE WITNESS:  Certainly, in the training
16:00:33  2   materials that we provide to the stores, there is
16:00:36  3   direction about that.  But every store is different and
16:00:41  4   there has to be adjustments made which, you know, it
16:00:45  5   depends on how much business that store does, which
16:00:48  6   is --
16:00:48  7      Q.  Mr. Haney, I don't mean to cut you off, but my
16:00:51  8   question was:  Isn't it a fact that in the stands, in
16:00:54  9   the store policy manual, there's specific diagrams on
16:00:58  10  where to put freight here on this dolly, park this dolly
16:01:03  11  here, unload this freight here; isn't that in the
16:01:05  12  strands?  the training guide for the store managers?
16:01:07  13  Yes or no.
16:01:08  14     A.  It is in the training guides.  However, I think
16:01:10  15  it's important to know --
16:01:12  16     Q.  Thank you.  Well --
16:01:14  17        MR. MILLER: Your Honor, we would ask that he
16:01:16  18  be allowed to finish his answer.  Mr. Wiggins has cut
16:01:19  19  him off on several occasions.
16:01:22  20        THE COURT:  All right.
16:01:22  21        MR. MILLER:  This is a matter of trial
16:01:25  22  courtesy.
16:01:25  23        THE COURT:  Let him finish his response.
16:01:29  24     Q.  (By Mr. G. Wiggins)  Yes, sir?
16:01:30  25     A.  Thank you, Your Honor.

16:01:31    1            THE COURT:  Well, that is, I mean, not going

16:01:34    2    to just let him say anything he wants to say.  He may

16:01:37    3    answer the question preferably yes or no, if he can.

16:01:43    4        Q.  Yes, sir.  You said it was a store manager's

16:01:47    5    responsibility to increase the profits of the store.

16:01:49    6    Did I understand you correct there?

16:01:51    7        A.  I think what I had stated was to, you know, that

16:01:55    8    they could aid in increasing their sales, which

16:01:57    9    certainly has a direct impact on the profitability of

16:01:59   10    their store.

16:02:00   11        Q.  Isn't it a fact that in the store policy manual

16:02:02   12    that it states that it's the responsibility of all store

16:02:05   13    employees -- the manager and the assistant manager and

16:02:08   14    the associate -- to increase the sales and profit, and

16:02:10   15    to greet and meet customers; isn't that a fact?

16:02:14   16        A.  It is a fact.  But the manager is, you know, the

16:02:18   17    leader of that group.  And they're the one that are --

16:02:20   18            THE COURT:  Well, is it a fact --

16:02:22   19            THE WITNESS:  Yes --

16:02:23   20            THE COURT:  The answer is yes.  All right.

16:02:25   21            MR. G. WIGGINS:  Thank you, Your Honor.

16:02:26   22        Q.  (By Mr. G. Wiggins)  You talked a little bit

16:02:31   23    about promotions.

16:02:33   24        A.  Yes, sir.

16:02:34   25        Q.  And you used the analogy that when it came to

16:02:38  1   promotions dealing with assistant managers in the

16:02:41  2   stores, you liked to be involved?

16:02:44  3        A.   I liked to -- I liked to -- my involvement in any

16:02:50  4   person that is going to an assistant position is to

16:02:52  5   speak --

16:02:53  6             THE COURT:  No, sir, Mr. Haney.

16:02:55  7             THE WITNESS:  Yes, sir.

16:02:56  8             THE COURT:  I want you to listen to his

16:02:58  9   question.

16:02:58 10             THE WITNESS:  Yes, sir.

16:02:59 11             THE COURT:  And if you can answer the

16:03:00 12   question yes or no, please do that.

16:03:02 13             THE WITNESS:  Okay.

16:03:03 14             THE COURT:  All right.

16:03:05 15             MR. G. WIGGINS:  Thank you, Your Honor.

16:03:06 16        Q.   (By Mr. G. Wiggins)  Do I understand your

16:03:07 17   testimony to be that when dealing with promotions to

16:03:10 18   assistant manager, you wanted to be involved?

16:03:12 19        A.   Yes.

16:03:12 20        Q.   Now, can you tell me are there any other

16:03:16 21   positions in the store a person can be promoted to,

16:03:18 22   other than to assistant manager or manager?

16:03:20 23        A.   I'm sorry, could you repeat that?

16:03:24 24        Q.   Are there any other positions a person can be

16:03:27 25   promoted to in the store other than assistant manager

16:03:30   1   and/or manager?

16:03:31   2       A.   No, there's not.

16:03:32   3       Q.   So you're involved in all the promotions in the

16:03:36   4   store because you make the decision on the managers, and

16:03:38   5   you interview on the promotions to assistant manager; is

16:03:42   6   that correct?

16:03:42   7               MR. MILLER: Object, Your Honor.

16:03:43   8               THE COURT:   Overruled.

16:03:45   9               THE WITNESS:   Yes, I do.

16:03:45   10       Q.   (By Mr. G. Wiggins)   So on all promotional

16:03:48   11   decisions, you are involved?

16:03:49   12       A.   Yes.

16:03:51   13       Q.   Now, you talked a little bit about discipline

16:04:02   14   also; correct?   Do you remember that testimony?

16:04:04   15       A.   Yes, sir.

16:04:04   16       Q.   And you talked about the store manager was

16:04:07   17   responsible for the discipline?

16:04:09   18       A.   Yes, sir, that's correct.

16:04:10   19       Q.   Isn't it a fact that the assistant manager also

16:04:13   20   has the authority to discipline employees?

16:04:14   21       A.   In my area of responsibility, no.

16:04:17   22       Q.   Your assistant managers are not given authority

16:04:22   23   to discipline employees?

16:04:24   24       A.   They discuss those issues with the store manager,

16:04:28   25   and the store manager is the one that does that.

16:04:30    1      Q.   Do you know if that is true in any other district

16:04:35    2   other than yours?

16:04:35    3      A.   No, sir, I do not.

16:04:37    4      Q.   Now, you were talking a little bit about the fact

16:04:45    5   that store managers hire.  Do you recall that testimony?

16:04:48    6      A.   Yes, I do.

16:04:49    7      Q.   And I wrote down what you said.  You said what I

16:04:53    8   ask for and what you like to see accomplished in the

16:05:02    9   hiring process.

16:05:04   10           And it's not really what you want to see

16:05:09   11   accomplished in the hiring process; you're told, as a

16:05:12   12   district manager, as part of the policy for the company,

16:05:16   13   that you are to be involved in the hiring of store

16:05:19   14   manager or assistant managers and others; and failure to

16:05:22   15   do so could cause disciplinary action to the manager or

16:05:25   16   to yourself; isn't that correct?

16:05:26   17      A.   Could you repeat that?  I'm not sure about the

16:05:32   18   latter part.

16:05:33   19      Q.   Well, I understood your testimony, I wrote it

16:05:35   20   down --

16:05:36   21      A.   Okay.

16:05:36   22      Q.   -- when you are talking about store manager

16:05:39   23   hired, you paraphrased it from the standpoint what you

16:05:41   24   asked for.

16:05:42   25      A.   Okay.

16:05:42  1    Q.   And my question to you is:   It's not what you are

16:05:46  2  asking for, it's what you are required to do, pursuant

16:05:49  3  to policy; and that is to be involved in the hiring of

16:05:52  4  individuals in the store; isn't that correct?

16:05:54  5    A.   I'm to be involved in the hiring of store

16:05:58  6  managers and a discussion with the assistant managers.

16:06:02  7    Q.   And is that policy only to be a discussion with

16:06:05  8  them?  Is it before they're hired you have the

16:06:08  9  discussion?

16:06:08  10    A.   It is prior to them receiving the keys.  So in

16:06:11  11  some cases it's prior, sometimes it's afterwards.

16:06:14  12    Q.   Well, isn't it a fact, Mr. Haney, that the policy

16:06:17  13  is that you are to be involved and have these

16:06:20  14  discussions prior to the individual being hired, not

16:06:22  15  after they're hired; isn't that policy?

16:06:25  16    A.   I -- I understand it to be prior to them being

16:06:29  17  given the keys to the building.

16:06:31  18    Q.   Well, we'll come back to that.

16:06:41  19         Mr. Roberts, could you put up Exhibit 136,

16:06:44  20  please, sir?

16:06:45  21         Mr. Haney, you're familiar with a gentleman by

16:06:47  22  the name of Bruce Barkus?

16:06:50  23    A.   Yes, I am.

16:06:50  24    Q.   Who is Mr. Barkus?

16:06:52  25    A.   Our senior vice-president of Operations.

16:06:55   1     Q.   Is he one of your supervisors, indirectly, but

16:07:00   2   one of your supervisors at the store operations?

16:07:02   3     A.   Yes, he was, I guess would be --

16:07:05   4     Q.   Was.  I apologize.  He's no longer there?

16:07:08   5     A.   Correct.

16:07:09   6     Q.   I want to show you what's been previously marked

16:07:12   7   as Exhibit 136.  Take a look at it, if you will, at the

16:07:23   8   second paragraph.  It states here that:  "The purpose of

16:07:33   9   this memo is to restate this policy so everyone fully

16:07:38  10   understands.  Any store manager, assistant manager or

16:07:41  11   any other associate whom the store manager has

16:07:44  12   recommended carry keys to a Family Dollar Store must be

16:07:47  13   approved in person by the district manager prior to

16:07:51  14   being hired, promoted and/or given the store keys."

16:07:55  15   That's the policy; correct?

16:07:57  16             MR. MILLER:  Your Honor, I would just like

16:07:59  17   to ask simply, was he given a copy of that?

16:08:03  18             MR. G. WIGGINS:  I will certainly give him

16:08:05  19   one.

16:08:05  20             MR. MILLER:  The defendant would like the

16:08:07  21   witness to have a copy.

16:08:08  22             THE COURT:  It's not required under the

16:08:10  23   rules, of course, but give him a copy.

16:08:14  24             MR. G. WIGGINS:  Yes, sir.

16:08:16  25     Q.   (By Mr. G. Wiggins)  There you go, Mr. Haney.

16:08:23  1          Is that what that memo says, Mr. Haney?

16:08:25  2      A.  I take it to read exactly as I stated; in that

16:08:47  3  prior to that person being given keys to the building,

16:08:52  4  that I am to have a conversation with those people.

16:08:57  5      Q.  Well, doesn't it say "prior to being hired" --

16:08:59  6              THE COURT:  Well --

16:09:01  7      Q.  -- or promoted.

16:09:02  8              THE COURT:  Read the section of the document

16:09:04  9  that you relied on for the statement he just made.

16:09:09 10              THE WITNESS:  Where it says prior to being

16:09:11 11  hired?

16:09:11 12              THE COURT:  Read the statement that starts

16:09:12 13  with "the purpose of this".

16:09:16 14              THE WITNESS:  "The purpose of this memo is

16:09:17 15  to" -- excuse me -- "is to restate the policy so

16:09:23 16  everyone fully understands any store manager, assistant

16:09:27 17  manager and any other associate whom the store manager

16:09:31 18  has recommended to carry keys to a Family Dollar Store

16:09:37 19  must be approved in person by the district manager prior

16:09:41 20  to being hired, promoted, and/or given the store keys.

16:09:47 21  Violation of this policy is a serious infraction and may

16:09:50 22  result in disciplinary action up to and including

16:09:53 23  possible termination."

16:10:00 24              THE COURT:  So the store manager is required

16:10:13 25  to obtain the approval of the district manager prior to

16:10:20   1   being hired, promoted, and/or given store keys,

16:10:28   2   according to that?

16:10:29   3              THE WITNESS:  Yes.  Yes, sir.

16:10:30   4              THE COURT:  All right.

16:10:32   5       Q.  (By Mr. G. Wiggins)  Now, you were talking a

16:10:34   6   little bit also -- or you were asked some questions,

16:10:36   7   rather, about pay levels.

16:10:38   8       A.  Yes, sir.

16:10:39   9       Q.  And if I have heard the testimony right, your

16:10:44  10   first thing was you didn't get involved in pay raises;

16:10:49  11   was that your testimony?

16:10:50  12       A.  I thought we were discussing whether we were

16:10:54  13   hiring a new associate, whether I was involved in that.

16:10:59  14       Q.  Okay.  Okay.  Maybe I'm mistaken.

16:11:02  15          Let's talk about hiring.  Are you involved at all

16:11:05  16   in the starting salary of new hires?

16:11:07  17       A.  Not unless it is something that is uncustomary to

16:11:13  18   that particular store.  No, I'm not.

16:11:15  19       Q.  What would be uncustomary?

16:11:17  20       A.  If they -- if -- as I stated earlier, if they

16:11:24  21   have an applicant that has an excessive amount of

16:11:29  22   experience, more so than, you know, prior people in

16:11:33  23   those positions, and that that person is going to have

16:11:36  24   to be compensated at a higher level than what we have

16:11:40  25   customarily paid for that position, the store managers

16:11:45  1   would normally talk to me about that.  And, you know,

16:11:52  2   and we will make a decision on what that particular pay

16:11:56  3   rate will be.

16:11:57  4       Q.  Okay.  Now, earlier in your testimony you said

16:12:01  5   you would like to hire people with prior experience,

16:12:04  6   retail experience, and another qualification; is that

16:12:10  7   right?

16:12:10  8       A.  I don't recall saying that, no, sir.

16:12:12  9       Q.  Now, your store managers, you testified, were

16:12:20 10   promoted from within.  They were cashiers -- 16 to 18

16:12:24 11   would be cashiers?

16:12:24 12       A.  Yes, sir.

16:12:25 13       Q.  You know these people pretty well?

16:12:27 14       A.  Yes, I do.

16:12:28 15       Q.  And they're holding the title of store manager?

16:12:32 16       A.  They are the store managers, yes, sir.

16:12:33 17       Q.  And you trust their judgment?

16:12:34 18       A.  Yes, I do.

16:12:35 19       Q.  And you -- you trust them to be there to run that

16:12:38 20   store?

16:12:39 21       A.  Yes, I do.

16:12:39 22       Q.  And you put all your faith in them?

16:12:41 23       A.  Yes, I do.

16:12:42 24       Q.  And why don't you give them the authority to make

16:12:45 25   that decision to give that person more money without

16:12:47   1    having to talk to you?

16:12:48   2        A.    Because they're going to, you know -- so it

16:12:53   3    doesn't negatively impact their budget, if they're going

16:12:56   4    to pay that person more, then they need assistance to

16:13:01   5    cover that extra pay.  So they're coming to me for that.

16:13:05   6        Q.    What type of assistance do they need?

16:13:07   7        A.    Well, if they're -- if they're paying a person a

16:13:10   8    dollar more an hour than their budget is based on, then

16:13:14   9    they need the funds to cover that so that it doesn't

16:13:17  10    negatively impact their store.

16:13:19  11        Q.    So are they coming to you for additional funds

16:13:21  12    for their payroll budget?

16:13:23  13        A.    Yes, sir.

16:13:23  14        Q.    That's all they're coming to you for?

16:13:26  15        A.    Yes, sir.

16:13:26  16        Q.    They're not coming to you for approval to give

16:13:29  17    that money, they just want more funds, if they give that

16:13:33  18    money?

16:13:33  19        A.    Yes, sir.

16:13:34  20        Q.    That's your testimony?

16:13:35  21        A.    Yes, sir.

16:13:35  22        Q.    And do you give them that money?

16:13:37  23        A.    Yes, sir.

16:13:38  24        Q.    Every time?

16:13:39  25        A.    To this date, I have.

16:13:39 1    Q.  You, as a district manager, control what the

16:13:41 2  payroll budget for a store is; you could increase it?

16:13:47 3    A.  I don't change the store budget.  What I am doing

16:13:52 4  is allowing them to spend that amount over that budget.

16:13:55 5  That budget lasts for a period of 13 weeks.  And once it

16:13:59 6  is set, there is no revisions to the budget.

16:14:02 7    Q.  Well, you just testified, I thought -- maybe I

16:14:05 8  misunderstood you -- but I thought you just testified

16:14:07 9  you made a revision when the manager came to you and

16:14:10 10  wanted to get more money.  That's making a revision,

16:14:13 11  isn't it?

16:14:13 12    A.  I am giving them funds in addition to that and to

16:14:16 13  the budget that they have.

16:14:17 14    Q.  So that would be a revision?

16:14:18 15    A.  I guess -- I look at that -- I mean, it's a

16:14:23 16  printed piece of paper.  I don't make any changes on

16:14:26 17  that piece of paper.

16:14:27 18        So in my testimony, what I am referring to is,

16:14:29 19  you know, I don't go and change that document.  I am

16:14:33 20  just giving that manager those extra funds to cover

16:14:36 21  that.

16:14:36 22    Q.  So you are giving him extra payroll?

16:14:40 23    A.  Correct.

16:14:40 24    Q.  So you are making adjustments to the payroll

16:14:43 25  budget?

16:14:44   1        A.   According to your terminology, yes, I am.

16:14:46   2        Q.   You, as a district manager, can increase the

16:14:49   3    store manager's budget; correct?

16:14:51   4        A.   I do that with the authorization from my

16:14:55   5    regional.

16:14:56   6        Q.   Once you get that authorization, you can increase

16:15:00   7    the store budget?

16:15:01   8        A.   Yes.

16:15:01   9        Q.   And you can decrease the store budget?

16:15:04  10        A.   I have never done that.

16:15:07  11        Q.   Do you have the authority to do that?

16:15:10  12        A.   I'm not sure.  I have never, you know -- as I

16:15:20  13    have went to my regional to make requests for additional

16:15:23  14    funds, I have never went to my regional to request a

16:15:26  15    reduction in a budget.  So I'm not sure what the

16:15:30  16    response to that would be.

16:15:31  17        Q.   What effect does the store's payroll budget have

16:15:35  18    on the number of hours that are allotted to a store?

16:15:39  19        A.   What effect does the -- let me get you to repeat

16:15:47  20    that, if you could, please.

16:15:48  21        Q.   What effect does the payroll budget have on the

16:15:51  22    number of hours that are allotted to the store for

16:15:54  23    employees to work?

16:15:55  24        A.   Well, there's a direct correlation, but the

16:16:03  25    process actually works opposite of that in that, you

16:16:06  1   know, based upon a particular store's -- the hours that

16:16:09  2   they're working and the business that they're doing,

16:16:13  3   they were allocated an amount of hours to cover that.

16:16:16  4   And then whatever the pay rates are for that particular

16:16:19  5   store, they are allocated the funds to fund that number

16:16:24  6   of hours.

16:16:24  7       Q.  Well, let me see if I can simplify this.

16:16:27  8       A.  Okay.

16:16:27  9       Q.  Would you agree with this statement:  That the

16:16:29  10  payroll budget directly affects the number of hours the

16:16:33  11  employees can work?

16:16:34  12      A.  Yes, it does.

16:16:35  13      Q.  And the store manager has no input into the

16:16:40  14  store's payroll budget at all, does he or does she?

16:16:43  15      A.  The payroll budget?

16:16:46  16      Q.  Right.

16:16:47  17      A.  No.

16:16:47  18      Q.  You were talking also in your direct about

16:16:56  19  communications with the store.  And I thought you said

16:16:59  20  you had 18 -- you said you had 18 stores?

16:17:03  21      A.  Yes.

16:17:03  22      Q.  The furtherest drive is three hours?

16:17:06  23      A.  It's actually an hour and a half from my home,

16:17:09  24  but if I'm going tip to tip, it's three hours.

16:17:11  25      Q.  You only visit them once a month?

16:17:13   1        A.   That's what they average; correct.

16:17:15   2        Q.   Well, that's 18 days a month.   What are you doing

16:17:19   3    the rest of the time?

16:17:19   4        A.   Well, there's -- you know, there's inventories.

16:17:23   5    I spend one day a week just analyzing reports, taking

16:17:29   6    the messages that the store sends and compiling the

16:17:32   7    sales letter that I send to them.   So, essentially, I am

16:17:37   8    visiting the stores four days a week.

16:17:39   9            I typically average two to three inventories a

16:17:43  10    month, which, you know, take two to three days during a

16:17:47  11    week whenever they're scheduled, to get everything

16:17:51  12    prepared for that particular store's inventory.

16:17:54  13        Q.   Well, isn't it a fact, Mr. Haney, that you're in

16:17:57  14    daily contact with most of your stores, either through a

16:18:00  15    phone call and/or through an email, or through a visit;

16:18:04  16    isn't that a fact?

16:18:05  17        A.   No, that's not correct at all.

16:18:09  18        Q.   Okay.   The evaluations that you were talking

16:18:21  19    about, Mr. Miller was asking you about the Any Time 5.

16:18:26  20    Do you recall that?

16:18:26  21        A.   Yes.

16:18:26  22        Q.   And you said managers are evaluated based on the

16:18:29  23    Any Time 5 program; is that correct?

16:18:31  24        A.   That's a portion of their evaluation, yes, sir.

16:18:33  25        Q.   And the assistant manager is also evaluated on

| | | |
|---|---|---|
| 16:18:36 | 1 | the Any Time 5 program; right? |
| 16:18:38 | 2 | A.  That's correct. |
| 16:18:39 | 3 | Q.  Same category, same job duty, same assignments; |
| 16:18:43 | 4 | is that correct? |
| 16:18:43 | 5 | MR. MILLER:  Object to the form, Your Honor. |
| 16:18:45 | 6 | Compound question. |
| 16:18:46 | 7 | THE COURT:  Pardon me? |
| 16:18:46 | 8 | MR. MILLER:  It's a compound question. |
| 16:18:51 | 9 | THE COURT:  I didn't understand you. |
| 16:18:51 | 10 | MR. MILLER:  Oh, I'm sorry.  It's a compound |
| 16:18:54 | 11 | question, Your Honor.  That's the basis for my |
| 16:18:57 | 12 | objection. |
| 16:18:59 | 13 | THE COURT:  Overruled. |
| 16:19:04 | 14 | Q.  (By Mr. G. Wiggins)  Is that correct, Mr. Haney? |
| 16:19:05 | 15 | A.  I'm sorry.  If I could get you to repeat that. |
| 16:19:10 | 16 | Q.  Let me see if I can simplify it.  Are store |
| 16:19:13 | 17 | managers and assistant managers evaluated based on Any |
| 16:19:18 | 18 | Time 5? |
| 16:19:18 | 19 | A.  That is a portion of both of their evaluations. |
| 16:19:21 | 20 | Q.  And Any Time 5 deals with the presentation of |
| 16:19:26 | 21 | merchandise? |
| 16:19:27 | 22 | A.  Yes, it does. |
| 16:19:28 | 23 | Q.  The merchandising of the material? |
| 16:19:31 | 24 | A.  Yes, it does. |
| 16:19:32 | 25 | Q.  The recovery of the store? |

16:19:35  1      A.   Yes, sir.

16:19:35  2      Q.   The price changes?

16:19:37  3      A.   Yes, sir.

16:19:38  4      Q.   The schematics?

16:19:39  5      A.   That's correct.

16:19:40  6      Q.   And the assistant manager is being evaluated on

16:19:44  7   those job duties?

16:19:48  8      A.   Yes.  Some of those, they are.

16:19:49  9      Q.   Okay.  Well, is it -- would you agree that in

16:19:53 10   order to be evaluated on those job duties, he at least

16:19:55 11   has to be performing those job duties?

16:19:58 12      A.   The assistant managers, they are involved in

16:20:00 13   those.  They're -- you know --

16:20:02 14      Q.   They're involved enough to be evaluated on?

16:20:05 15      A.   Yes.  They're a part of that team.

16:20:07 16      Q.   Well, let's talk about team.

16:20:09 17      A.   Okay.

16:20:10 18      Q.   Have you ever heard of the Family Dollar Store

16:20:14 19   Team?

16:20:14 20      A.   I can't say that I have, no, sir.

16:20:17 21      Q.   You've never heard that terminology?  You're

16:20:26 22   familiar with the policies and procedures in the

16:20:29 23   strands, are you not?

16:20:30 24      A.   Yes, I am.  I'm not going to sit here and say I

16:20:34 25   know every one page by page, but --

16:20:36   1      Q.   Okay.

16:20:37   2      A.   -- I am familiar.

16:20:38   3      Q.   I want you to take a look over here, if you will,

16:20:40   4   sir.  And this is an exhibit that was marked earlier.

16:20:46   5   This is a Family Dollar document.  It says "Family

16:20:49   6   Dollar Store Team".

16:20:50   7           Who makes up the Family Dollar Store Team, based

16:20:52   8   on the policies of Family Dollar?

16:20:55   9      A.   My interpretation of that --

16:21:00  10      Q.   No.  That's not what I asked.

16:21:02  11      A.   Okay.  I'm sorry.

16:21:04  12      Q.   I asked you what that document says.

16:21:05  13                  MR. MILLER:  Your Honor --

16:21:06  14                  THE COURT:  That may not have been the

16:21:08  15   question that you asked him, but in your view, is the

16:21:12  16   district manager a part of each store's management team?

16:21:18  17                  THE WITNESS:  No, I'm not.

16:21:20  18      Q.   You're not?

16:21:21  19                  THE COURT:  That's not your viewing?

16:21:22  20                  THE WITNESS:  No, sir.

16:21:23  21                  THE COURT:  All right.

16:21:24  22      Q.   (By Mr. G. Wiggins)  So you would disagree with

16:21:27  23   Family Dollar's policy that says you are part of the

16:21:32  24   Family Dollar Store Team?

16:21:33  25      A.   Not of that store's team.

16:21:36   1      Q.   Okay.  And that's despite what the policy says?

16:21:41   2      A.   I guess -- I view, you know, my district and the

16:21:46   3   managers as my team.  And then each individual store is

16:21:54   4   their own team.  And that is that group of associates.

16:21:58   5   They work together every day.  I'm not there.  So I

16:22:03   6   don't feel that, you know, I am a part of their

16:22:05   7   particular team.

16:22:06   8              THE COURT:  Well, do you understand that

16:22:08   9   this is what Family Dollar says?

16:22:10   10             THE WITNESS:  Yes, sir, I do.

16:22:12   11             THE COURT:  That you are part of the team?

16:22:13   12             THE WITNESS:  Yes, sir, I do.

16:22:15   13     Q.   (By Mr. G. Wiggins)  Mr. Haney, isn't it a fact

16:22:20   14   that one of your jobs is to serve as a corporate

16:22:22   15   representative in charge of all store activities within

16:22:26   16   your assigned district; isn't that your job?

16:22:29   17     A.   Yes, it is.

16:22:30   18     Q.   And, that's, in fact, that's what your job

16:22:34   19   description says, doesn't it?

16:22:35   20     A.   Yes, it does.

16:22:36   21     Q.   So you are to serve as the corporate

16:22:39   22   representative in charge of all store activities for all

16:22:42   23   your stores; do you agree with that statement?

16:22:47   24     A.   I feel -- I am responsible for all of the stores

16:22:51   25   within my area of responsibility.  However, you know,

16:22:55   1    the stores -- the store manager is responsible for what

16:22:59   2    happens within their particular store.

16:23:02   3        Q.   The store manager's responsible for the

16:23:07   4    particular store, and you're responsible for the store

16:23:10   5    manager?

16:23:10   6        A.   Correct.

16:23:10   7        Q.   And you are part of the Dollar Team, the Dollar

16:23:14   8    Store Team; right?

16:23:15   9        A.   Yes.

16:23:16   10       Q.   Do you know whether or not -- well, let me ask

16:23:26   11   you this:   How many hours a week would you say the

16:23:31   12   average -- your managers in your district average

16:23:35   13   working?

16:23:38   14       A.   Probably 50 couple hours.   The more experienced

16:23:45   15   ones, less; the less experienced ones, they work more

16:23:50   16   hours.

16:23:51   17       Q.   So you would say that your store managers work 50

16:23:55   18   to 52, 53?

16:23:58   19       A.   Somewhere in that range; correct.

16:24:00   20       Q.   You don't have any store managers that are

16:24:01   21   working 55, 60, 70, 80, 90 hours a week?

16:24:07   22       A.   I'm sure there has been occasions where, you

16:24:10   23   know, any one of those store managers have had to work

16:24:12   24   more than 52 hours.   I am not aware of anyone working 90

16:24:18   25   hours.

16:24:19  1          I'm not saying that that couldn't have never

16:24:21  2   happened, but I'm certainly not aware of that.

16:24:24  3      Q.  Do you know -- you only visit the stores on once

16:24:31  4   a month, that is your testimony; right?

16:24:34  5      A.  On average.

16:24:36  6      Q.  So if a store is open 30 days a month --

16:24:41  7      A.  Yes, sir.

16:24:41  8      Q.  -- you will see, based on your testimony, what

16:24:44  9   actually goes on in that store one day a month?

16:24:47  10     A.  That's correct.

16:24:48  11     Q.  Okay.  And you have no idea what's going on the

16:24:51  12  other 29 days, do you?

16:24:52  13     A.  That's not exactly correct.  There's a lot of,

16:24:56  14  you know, reporting that I get that is generated, you

16:25:00  15  know, from the -- their cash registers and different

16:25:06  16  materials that the store managers are inputting that

16:25:06  17  certainly gives me some insight as to, you know, things

16:25:10  18  that are going on within that store.

16:25:12  19     Q.  As far as the physical activities, the physical

16:25:15  20  duties, you don't know for 29 or 30 days what's going

16:25:18  21  on, do you?

16:25:19  22     A.  Not on a daily basis.  No, I don't.

16:25:22  23     Q.  Well, do you know the percentage of time that

16:25:26  24  your managers spend unloading trucks, stocking shelves,

16:25:30  25  running cash registers, sweeping the floors?  Do you

16:25:36    1    know the percentage of time they spend doing those job

16:25:40    2    duties?

16:25:40    3        A.   Not exactly, no.

16:25:41    4        Q.   Would it surprise you that it was as high as 85,

16:25:45    5    90 percent of the time store managers are telling us

16:25:48    6    that they're unloading the trucks, stocking shelves,

16:25:52    7    sweeping floors, cleaning the bathroom; would that

16:25:55    8    surprise you?

16:25:55    9        A.   That would startle me.

16:25:56   10        Q.   Startle you?

16:25:57   11        A.   Yes, sir.

16:25:58   12        Q.   Why would it startle you, if you have no basis to

16:26:02   13    know what's going on for 29 or 30 days?  Why would it

16:26:05   14    startle you?

16:26:06   15        A.   Because those particular tasks do not take that

16:26:09   16    much time.  And it would be impossible for a store to be

16:26:15   17    successful and to be current, you know, on the

16:26:19   18    particular presentation that we have for that time

16:26:21   19    period, and be spending that much time doing those

16:26:25   20    particular tasks.

16:26:26   21        Q.   Well, setting schematics would be a labor task;

16:26:30   22    right?  They've got to go out and set the merchandise

16:26:32   23    where it's going to go?

16:26:33   24        A.   It's certainly some labor involved.  It's not a

16:26:37   25    high intensity type of task, no.

16:26:39  1    Q.   The schematics are set by the corporate office?

16:26:42  2    A.   Yes, they are.

16:26:42  3    Q.   And they're unloading trucks -- some stores get

16:26:45  4    as many as two trucks a week; correct?

16:26:48  5    A.   I'm not aware of that.  That happens very rarely.

16:26:52  6    And that's just when there's a spill-over shipment.

16:26:55  7    That may happen in my area of responsibility maybe once

16:26:59  8    a month in one store.

16:27:01  9    Q.   So they get at least one truck a week?

16:27:03  10   A.   Yes, sir, they do.

16:27:04  11   Q.   And would you agree that the average shipment

16:27:08  12   count is around 1,500, 2,000?

16:27:11  13   A.   No.  It's probably more about -- more like 8 to

16:27:14  14   900 apiece.

16:27:15  15   Q.   8 to 900?

16:27:17  16   A.   Yes, sir.

16:27:17  17   Q.   You have a bunch of small stores?

16:27:20  18   A.   It's an average group of stores.

16:27:21  19   Q.   Tell me what the highest volume store you have

16:27:25  20   is.

16:27:25  21   A.   2.8 million.

16:27:26  22   Q.   What's your lowest?

16:27:28  23   A.   About 650,000.

16:27:30  24   Q.   Is there a day designated for the freight to be

16:27:34  25   unloaded from the trucks?

| | | |
|---|---|---|
| 16:27:36 | 1 | A.  Yes, it is. |
| 16:27:37 | 2 | Q.  Aren't managers to have that freight unloaded |
| 16:27:38 | 3 | from that truck within 24 hours? |
| 16:27:41 | 4 | A.  Yes, they are. |
| 16:27:42 | 5 | Q.  And then they have to stock all that freight; |
| 16:27:44 | 6 | right? |
| 16:27:45 | 7 | A.  Yes, they do. |
| 16:27:46 | 8 | THE COURT:  One minute, Mr. Wiggins. |
| 16:27:47 | 9 | Q.  And they have to make sure the merchandise is on |
| 16:27:50 | 10 | the shelves, schematics are set; but you would be |
| 16:27:53 | 11 | shocked, despite not being in the store, that managers |
| 16:27:55 | 12 | spend 85 to 90 percent of their time performing other |
| 16:27:59 | 13 | jobs? |
| 16:27:59 | 14 | A.  Yes, I would.  I do not see that when I visit the |
| 16:28:02 | 15 | stores. |
| 16:28:02 | 16 | THE COURT:  Actually, do you spend a whole |
| 16:28:05 | 17 | day at a store when you visit it? |
| 16:28:08 | 18 | THE WITNESS:  Some of them I do, but most of |
| 16:28:10 | 19 | the time, half the day. |
| 16:28:11 | 20 | THE COURT:  All right.  Thank you.  Thank |
| 16:28:14 | 21 | you. |
| 16:28:15 | 22 | MR. G. WIGGINS:  Judge, may I ask him one |
| 16:28:17 | 23 | more question on this? |
| 16:28:18 | 24 | THE COURT:  No.  Redirect? |
| 16:28:18 | 25 | **REDIRECT EXAMINATION** |

| 16:28:28 | 1 | **BY MR. MILLER:** |
|---|---|---|

16:28:28   1   **BY MR. MILLER:**

16:28:29   2       Q.   Mr. Haney, I have one question for you.

16:28:40   3       A.   Okay.

16:28:40   4       Q.   Mr. Wiggins asked you about the store team.   In

16:28:45   5   each store, who is the captain of the store team?

16:28:48   6       A.   The store manager.

16:28:51   7               MR. MILLER:   Thank you.

16:28:54   8               MR. G. WIGGINS:   Judge --

16:28:55   9               THE COURT:   Thank you, sir.

16:28:57  10               MR. G. WIGGINS:   I would like to --

16:28:59  11               MR. MILLER:   Thank you, Mr. Haney.

16:29:04  12               THE COURT:   The defendant will call its next

16:29:05  13   witness.

16:29:06  14               Mr. Wiggins, while that witness is coming,

16:29:09  15   do you want to say something?

16:29:10  16               MR. G. WIGGINS:   Not at this time, Your

16:29:11  17   Honor.

16:29:12  18               THE COURT:   Good.

16:29:15  19               MR. KALLON:   Your Honor, can we approach

16:29:17  20   briefly?   I just want to ask a question.

16:29:19  21               THE COURT:   All right.

16:29:20  22               MR. KALLON:   Thank you.

16:29:20  23                   (At bench:)

16:30:06  24               MR. KALLON:   How late do you plan to go

16:30:06  25   today, sir?

| | | |
|---|---|---|
| 16:30:06 | 1 | THE COURT:  Not past 6:00. |
| 16:30:06 | 2 | MR. KALLON:  Okay.  The next witness is |
| 16:30:06 | 3 | mine, and I would like to finish her today so I can do |
| 16:30:06 | 4 | something else at 9:00 o'clock tomorrow.  It's a short |
| 16:30:06 | 5 | presentation. |
| 16:30:06 | 6 | THE COURT:  Okay. |
| 16:30:06 | 7 | (End of bench conference.) |
| 16:30:06 | 8 | (In open court, jury present.) |
| 16:30:51 | 9 | **FELICIA COLEMAN, DEFENDANT'S WITNESS, SWORN** |
| 16:30:58 | 10 | THE CLERK:  State your name for the record. |
| 16:31:00 | 11 | THE WITNESS:  Felicia Coleman, |
| 16:31:19 | 12 | C-O-L-E-M-A-N. |
| 16:31:20 | 13 | **DIRECT EXAMINATION** |
| 16:31:20 | 14 | **BY MR. KALLON:** |
| 16:31:22 | 15 | Q.  Ms. Coleman, good afternoon, please, ma'am. |
| 16:31:23 | 16 | A.  Good afternoon. |
| 16:31:24 | 17 | Q.  How are you today? |
| 16:31:25 | 18 | A.  Nervous. |
| 16:31:26 | 19 | (Laughter.) |
| 16:31:29 | 20 | A.  Very nervous. |
| 16:31:30 | 21 | Q.  I want to make sure we get you on and off very |
| 16:31:33 | 22 | quickly, ma'am.  I appreciate you being here. |
| 16:31:35 | 23 | Tell me, where do you live? |
| 16:31:36 | 24 | A.  Tuscaloosa. |
| 16:31:37 | 25 | Q.  Are you a native of Tuscaloosa? |

16:31:40  1   A.   Yes.

16:31:41  2   Q.   And how long have you lived here?

16:31:43  3   A.   Well, I was born in Greene County.  And I grew up

16:31:47  4   and went to school in Tuscaloosa.

16:31:49  5   Q.   And where do you currently work, ma'am?

16:31:51  6   A.   Family Dollar.

16:31:56  7   Q.   And how long have you worked with Family Dollar?

16:31:57  8   A.   Well, I have been back at Family Dollar for eight

16:31:59  9   years.  I had a break in service; add it all up, it's

16:32:02  10  almost 14 years.

16:32:03  11  Q.   Well, for the last eight years when you have been

16:32:06  12  back, what position have you held?

16:32:08  13  A.   Store manager.

16:32:08  14  Q.   And currently, I guess you're store manager of

16:32:12  15  which store?

16:32:13  16  A.   The one -- excuse me.  I'm nervous.  The one on

16:32:19  17  Culver Road near Stillman College.

16:32:21  18  Q.   How long have you been a manager at that store,

16:32:23  19  ma'am?

16:32:24  20  A.   We opened it in 1999.

16:32:25  21  Q.   And how many employees do you have working for

16:32:27  22  you at that store?

16:32:27  23  A.   About eight.

16:32:30  24  Q.   And who hired those employees, ma'am?

16:32:32  25  A.   I did.

16:32:33  1      Q.   Walk the jury through the process that you

16:32:37  2   utilized at your store for hiring.

16:32:42  3           Well, first, you get your applications in?

16:32:45  4      A.   Yes.

16:32:45  5      Q.   And what happens after that?

16:32:47  6      A.   I review the applications, because I look for

16:32:51  7   certain people.  I am real particular.  I forever

16:32:55  8   recruit all the time.

16:32:56  9           I look at applications, and everywhere I shop, I

16:33:00 10   look for employees.  And --

16:33:04 11      Q.   What are you looking for, with respect to

16:33:07 12   employees or prospective employees?

16:33:09 13      A.   Someone sort of like me.

16:33:11 14      Q.   Which is -- what do you mean by that?

16:33:14 15      A.   Someone that's not afraid of hard work.  And I

16:33:18 16   never lie to them.  I let them know that it's going to

16:33:21 17   be hard work.

16:33:23 18           And when I find a good candidate, I check their

16:33:28 19   references.  I want to find out what they've done, where

16:33:32 20   they've worked before, where they went to school, things

16:33:36 21   like that.

16:33:36 22           I interview them.  I let them talk to me.  You

16:33:40 23   learn a lot more when they talk to you.  And when I hire

16:33:45 24   them, I initiate a Stanton survey -- I'm sorry, I'm

16:33:51 25   nervous.

16:33:51  1     Q.   That's okay, ma'am.

16:33:53  2     A.   And background check, drug test, things like

16:33:56  3   that.

16:33:57  4     Q.   You have never testified in court, have you?

16:33:59  5     A.   Never.

16:33:59  6     Q.   This is foreign territory?

16:34:01  7     A.   I hope it's the last time.

16:34:03  8            (Laughter throughout.)

16:34:04  9     Q.   After you review the application, you said you

16:34:07 10   decide to bring them in for interviews?

16:34:09 11     A.   Yes.

16:34:10 12     Q.   Are you the only person at your store that

16:34:13 13   interviews the candidates?

16:34:15 14     A.   Probably I should be, but I have a cashier that I

16:34:18 15   let talk to them and one of my stock guys talk to them.

16:34:22 16     Q.   Why do you do that, ma'am?

16:34:24 17     A.   People -- people are a little more at ease with

16:34:27 18   people they're going to work with, and sometimes they

16:34:30 19   find out things from them that I wouldn't find out.

16:34:33 20     Q.   And once, I guess, the person's been interviewed,

16:34:38 21   I assume -- I guess you have multiple candidates?

16:34:40 22     A.   Oh, yes.

16:34:41 23     Q.   And you interview multiple people; what system do

16:34:45 24   you use to know which one to give the job to?

16:34:50 25     A.   What system do I use?

16:34:52  1      Q.   Or what are you looking for when you interview

16:34:55  2   people?  What sets somebody apart from somebody else?

16:34:58  3      A.   I want to find out about their work experience.

16:35:01  4   I have hired employees who had no work experience and

16:35:06  5   they worked out really well.  Sometimes they go to

16:35:09  6   school, things like that.

16:35:11  7           But I really want someone that's not afraid of

16:35:14  8   work, that's going to be good to the customers, things

16:35:18  9   like that.

16:35:18 10      Q.   Why do you prefer an employee who is going to be

16:35:23 11   good to the customers?

16:35:25 12      A.   Customers is my business.  That's what keeps us

16:35:28 13   in business.

16:35:28 14      Q.   And once you have made a determination to hire --

16:35:32 15   I'm sorry, let me back up.  Is your district manager

16:35:37 16   involved in the hiring process at all in your store?

16:35:40 17      A.   What do you mean "involved" in it?

16:35:42 18      Q.   Well, does the district manager interview any of

16:35:45 19   the prospective candidates?

16:35:47 20      A.   I think I have only had one that was interviewed

16:35:51 21   by my district manager.

16:35:54 22      Q.   And how many people have you hired in the eight

16:35:55 23   years since you have been back to Family Dollar, just

16:35:58 24   ballpark figure?

16:35:59 25      A.   Probably about 20.  Not all of them work for me.

16:36:06  1   I have given them to other stores.

16:36:09  2       Q.  Have you ever been disciplined for hiring

16:36:13  3   anybody, I guess, the other 19 -- from the 20 that you

16:36:18  4   have mentioned, ma'am?

16:36:18  5             THE COURT:  Well, I am not sure,

16:36:21  6   Ms. Coleman, whether you fully answered the question of

16:36:24  7   the involvement, if any, of the district manager in your

16:36:29  8   decision to hire.  Do you have any?

16:36:33  9             THE WITNESS:  The district manager had no

16:36:35  10  decision in my hiring.  Sometimes they work there two or

16:36:40  11  three months before the district manager meets them.

16:36:42  12            THE COURT:  I see.

16:36:43  13      Q.  (By Mr. Kallon)  Now, who is your current

16:36:45  14  district manager?

16:36:46  15      A.  That's hard to say.  Well, Peggy Pettigoe was.

16:36:54  16      Q.  When Ms. Pettigoe was your district manager, how

16:36:57  17  often did she stop by the store, ma'am?

16:37:00  18      A.  How often?  It could be a couple of months,

16:37:06  19  sometimes.

16:37:08  20      Q.  I take it during an interview you would see

16:37:12  21  Ms. Pettigoe at some other locations?

16:37:15  22      A.  Yes.  Because I do training and sometimes I go to

16:37:17  23  other stores to help out.  I see her in those locations.

16:37:21  24      Q.  Do you know Ms. Barbara Richardson, who is

16:37:24  25  sitting here behind you, ma'am?

16:37:28   1       A.  Yes.

16:37:29   2       Q.  All right.  I apologize for blocking your view.

16:37:33   3   You say from time to time your district managers ask you

16:37:37   4   to go to other stores?

16:37:39   5       A.  Yes.

16:37:41   6       Q.  What are you asked to do when you go to those

16:37:43   7   stores?

16:37:43   8       A.  Well, it's always to assist the other store for

16:37:46   9   whatever they need.  Sometimes it's to help clean up the

16:37:49   10  store, to stock, to help -- to interview, things like --

16:37:54   11  whatever they need.

16:37:55   12      Q.  And when you go to these places, is there a

16:37:59   13  district -- I'm sorry, is there a store manager at these

16:38:02   14  stores that you go to?

16:38:04   15      A.  Sometimes.

16:38:05   16      Q.  The ones that the store manager is not there, are

16:38:07   17  you sent there by yourself to go manage the store?

16:38:09   18      A.  Well, sometimes -- rarely am I there just to

16:38:16   19  manage them.  I'm usually there to help do whatever's

16:38:20   20  needed, but I do manage while I'm there.

16:38:23   21      Q.  Who are you managing, ma'am?

16:38:25   22      A.  Whatever employees are there.

16:38:26   23      Q.  Let's focus on the training part when we're

16:38:31   24  saying to go help other managers.  Has one of those

16:38:35   25  managers been Ms. Richardson?

16:38:38   1      A.   Yes.   I have -- I was sent to her store when she

16:38:43   2   was manager to assist with training, with hiring,

16:38:46   3   interviewing.

16:38:47   4      Q.   How long had Ms. Richardson been in management

16:38:51   5   when you were sent to go assist and to train and to help

16:38:54   6   with her?

16:38:56   7      A.   I think probably a year, or a little better than

16:38:59   8   a year.

16:39:00   9      Q.   And when you were there interacting with

16:39:03   10   Ms. Richardson and with the employees of that store, did

16:39:06   11   you identify any potential problem or issues of that

16:39:11   12   store?

16:39:11   13      A.   Usually training issues.

16:39:14   14      Q.   What do you mean by that?

16:39:16   15      A.   Oh, Barbara's an outstanding worker.   But

16:39:20   16   sometimes managers have a problem when they're promoted

16:39:23   17   with the transition from being a clerk to a manager, and

16:39:27   18   they don't always do a lot of training of their

16:39:31   19   employees.

16:39:32   20      Q.   What's the benefit, I guess, of training the

16:39:37   21   employees?

16:39:37   22      A.   What's -- I'm sorry?

16:39:39   23      Q.   Why is it important to train employees?

16:39:41   24      A.   For performance, for the store to run easier.

16:39:49   25           All of my employees are thoroughly trained and it

16:39:53  1   makes it a lot easier for me.

16:39:55  2       Q.  Who is responsible at your store for making sure

16:39:59  3   that the employees are trained?

16:40:01  4       A.  Well, I -- I'm responsible for them being

16:40:06  5   trained, but I don't do all the training.  Sometimes my

16:40:09  6   assistant trains.

16:40:09  7       Q.  And for the times when you're not the one doing

16:40:14  8   the training specifically, do you at all follow up to

16:40:18  9   see if the employees's being trained properly?

16:40:21  10      A.  Absolutely.

16:40:22  11      Q.  Let's fast forward.  You have hired a person, the

16:40:26  12   person's been trained and a person has started working

16:40:29  13   for you.  Is that the end of that person's training?

16:40:32  14      A.  No.

16:40:35  15      Q.  Do you ever stop training your employees?

16:40:38  16      A.  I never stop training my employees.  I never stop

16:40:42  17   learning.

16:40:43  18      Q.  And what are you training your employees for,

16:40:46  19   ultimately?

16:40:46  20      A.  Promotions.

16:40:49  21      Q.  And how many of your employees have been promoted

16:40:53  22   to store management positions, for example?

16:40:57  23      A.  Probably four or five, to store managers.

16:41:02  24      Q.  For the employees that are working at your store,

16:41:05  25   take the jury throughout your daily routine, how you go

16:41:09  1    about setting the work for the day.

16:41:12  2         A.   I usually go into my store about an hour early in

16:41:16  3    the morning before we open, walk the store, and set my

16:41:23  4    priorities for the day, make a to-do list.

16:41:27  5         Q.   And who was that to-do list directed to?

16:41:30  6         A.   Different employees, as well as myself.

16:41:33  7         Q.   And once you have listed the items on the to-do

16:41:36  8    list, what do you do with it?

16:41:38  9         A.   Well, I have a clipboard; I hang it.  They know

16:41:43  10   where to go and look for it once they finish whatever it

16:41:46  11   is I have assigned them to do, they have to sign it.

16:41:48  12        Q.   So the to-do list, does each item have a name

16:41:53  13   associated with it?

16:41:54  14        A.   Yes, it does.

16:41:55  15        Q.   Now, I take it from time to time you have had

16:42:02  16   employees who have not done what you have told them to

16:42:06  17   do, or employees who have had performance issues.  How

16:42:11  18   do you deal with those employees?

16:42:13  19        A.   Once in a while, I have something that wasn't

16:42:19  20   completed, and I always find out why it wasn't done.

16:42:22  21   Sometimes there's a good reason for it.

16:42:25  22        If I gave something to my stock guy do and he end

16:42:27  23   up assisting with the running the cash register, or

16:42:31  24   something like that, that's fine.  I don't have a

16:42:34  25   problem.

16:42:35   1    Q.   Assuming there's not a good reason why a person

16:42:38   2    didn't do what you have told them to do, what do you do

16:42:41   3    with that individual?

16:42:41   4    A.   We would -- I would give them a coaching or a

16:42:47   5    counseling session.

16:42:48   6    Q.   And if they don't improve, what's the next step

16:42:51   7    after a coaching or counseling?

16:42:52   8    A.   Then they would be -- they would be -- I would

16:42:57   9    write them up.

16:42:57  10    Q.   And if they don't improve after you write them

16:43:04  11    up, what's the next phase?

16:43:06  12    A.   Usually they do.  But if they didn't -- you know,

16:43:11  13    but if they didn't -- they didn't improve when we sat

16:43:16  14    down and talked about it, and the coaching and conduct,

16:43:19  15    they just -- if they just didn't do it, and I did the

16:43:23  16    write-up -- which I can't remember any times when I had

16:43:28  17    to go any further with it.  Most of my employees --

16:43:32  18             THE COURT:  You really don't remember ever

16:43:34  19    having to fire anybody?

16:43:36  20             THE WITNESS:  Not lately.  But yes, I do

16:43:38  21    remember having to fire someone a while back.

16:43:41  22             THE COURT:  All right.

16:43:44  23    Q.   (By Mr. Kallon)  Ms. Coleman, when you counsel or

16:43:46  24    write up employees, is -- are you required to notify

16:43:50  25    your district manager before you do that?

16:43:52  1    A.  Well, I've never notified.

16:43:57  2    Q.  Have you ever been written up --

16:43:59  3            THE COURT:  In the instances you actually

16:44:02  4  fired someone way back, did you get the approval of your

16:44:05  5  district manager before you fired them?

16:44:07  6            THE WITNESS:  No, sir.  But I let the

16:44:09  7  district manager know they were fired.

16:44:11  8            THE COURT:  Were they gone at the time you

16:44:14  9  let the district manager know?

16:44:15 10            THE WITNESS:  Yes, sir, they were very gone.

16:44:17 11            (Laughter.)

16:44:23 12    Q.  (By Mr. Kallon)  Ms. Coleman, you have not been

16:44:26 13  in here, but there has been some other testimony about

16:44:30 14  what they call "truck day".  For those of us who don't

16:44:33 15  work at Family Dollar, tell us what truck day is.

16:44:36 16    A.  Truck day, for a lot of managers, is a pain in

16:44:41 17  the you know where.

16:44:43 18            No disrespect, Your Honor, but it is.

16:44:46 19            Truck day at our store, I try to make it a little

16:44:49 20  more pleasurable.

16:44:51 21            We get an invoice the day before, sometimes two

16:44:54 22  days before the truck, and I review it to see what we're

16:44:59 23  getting.  And --

16:45:01 24    Q.  Why are you reviewing it?  Why do you do that,

16:45:05 25  ma'am?

16:45:05  1    A.   Sometimes we get a lot of merchandise that we
16:45:08  2  didn't order.   They choose to send it to us.
16:45:10  3       And I have made such an exciting thing out of it
16:45:12  4  that we can hardly wait to get it anymore.
16:45:16  5    Q.   All right.   Tell the jury, I guess, you have at
16:45:22  6  your store, I guess, basic items, things that you order;
16:45:26  7  correct?
16:45:26  8    A.   Yes, sir.
16:45:27  9    Q.   And are you saying in addition to that, the
16:45:29 10  company from time to time will send you some other
16:45:32 11  things?
16:45:32 12    A.   Almost weekly.
16:45:33 13    Q.   And what do you mean that you have made it an
16:45:36 14  "exciting" thing?   Please explain what you mean by that.
16:45:38 15    A.   Well, my employees, especially the cashiers that
16:45:43 16  interact with the customers daily, always let the
16:45:48 17  customers know when we get something new.
16:45:50 18       So when we -- when I review the invoice, find out
16:45:54 19  we're getting something new, maybe some different kinds
16:45:57 20  of mirrors, or candles, or vases, or what have you, I
16:46:01 21  always let the cashiers know so they can let the
16:46:05 22  customers know.   And we watch for it when it comes off
16:46:08 23  the truck so we can take it to the floor and let the
16:46:11 24  cashiers promote it, sell it.
16:46:13 25    Q.   And what are some of the tools, I guess, that you

16:46:16　1　would use at the store to promote items that you get

16:46:19　2　that you didn't order?

16:46:20　3　　A.　Well, I have a little contest between associates.

16:46:27　4　We -- it all started when the Dollar General store

16:46:31　5　opened up in my area and they were sort of kicking my

16:46:34　6　butt a little bit with sales, and I had to do

16:46:36　7　something -- since I don't take food stamps.  And I had

16:46:40　8　to try to level the playing field, so to speak.

16:46:43　9　　Q.　And when you say the Dollar General opened near

16:46:46　10　you?

16:46:46　11　　A.　Yes, sir.

16:46:47　12　　Q.　And I guess what you're telling the jury is when

16:46:51　13　that store opened, that impacted your sales?

16:46:53　14　　A.　Absolutely.

16:46:54　15　　Q.　What, if anything, did you do to, I guess, get

16:47:00　16　your sales back up?

16:47:01　17　　A.　Well, one of the things, I went to visit the

16:47:07　18　store because -- took off my Family Dollar uniform, went

16:47:11　19　in like a customer, and checked them out.

16:47:14　20　　　　　　THE COURT:  Spying?

16:47:19　21　　　　　　THE WITNESS:  Yes, sir.  I needed to see

16:47:21　22　what weakness they had.

16:47:24　23　　　　　　They had all sorts of merchandise we didn't

16:47:25　24　have.  So -- but I found out that they were not good in

16:47:29　25　customer service.

16:47:30  1          And so I go back to my store and we start
16:47:33  2   doing curb service.  We take the bags to the car and let
16:47:37  3   them drive up to the door, let them take it out, just
16:47:41  4   things like that.
16:47:41  5      Q.   Did your district manager tell you to do that?
16:47:43  6      A.   My district manager didn't know it.
16:47:45  7      Q.   That was -- my next question was:  Did you tell
16:47:47  8   your district manager you were going to do that?
16:47:49  9      A.   No, sir.
16:47:49  10     Q.   All right.  The truck comes in.  Let me back up
16:47:57  11  for a minute.
16:47:58  12          You say as a result of a Dollar General opening,
16:48:01  13  you created a competition among your employees?
16:48:05  14     A.   Yes.
16:48:05  15     Q.   Tell us about that competition, please.
16:48:08  16     A.   Well, it generated more sales, which is what we
16:48:11  17  needed to do, to try to get my sales up.  I was losing
16:48:16  18  business.  And we tried to make the store as pleasant as
16:48:21  19  possible for people to shop.  And --
16:48:25  20     Q.   What's the prize for the employees?  What's the
16:48:30  21  reward?
16:48:30  22     A.   Lunch.  Everybody eats lunch.
16:48:33  23     Q.   Who pays for that lunch?
16:48:35  24     A.   I did.
16:48:35  25     Q.   And how how often --

16:48:37  1    A.   -- McDonald's.

16:48:38  2    Q.   How often would you provide that lunch, please,

16:48:41  3  ma'am?

16:48:41  4    A.   It was sometimes a weekly thing; and depending on

16:48:44  5  my money, sometimes monthly.

16:48:47  6    Q.   Ms. Coleman, for those of who have not worked at

16:48:50  7  Family Dollar, a truck comes in?

16:48:52  8    A.   Okay.

16:48:53  9    Q.   Is it just an easy thing of taking boxes and

16:48:56  10  putting them somewhere?

16:48:57  11    A.   No.  We have a system.  We have a system for

16:49:02  12  unloading the truck that --

16:49:08  13    Q.   I guess take us through the freight.  As I have

16:49:12  14  learned, you guys use the company what is called

16:49:15  15  "process" freight?

16:49:16  16    A.   That's correct.

16:49:17  17    Q.   Take us through, I guess, what you do.  First,

16:49:20  18  you get that invoice, I guess, you said; correct?

16:49:23  19    A.   Yes.

16:49:23  20    Q.   And you review it to see what you are getting.

16:49:28  21         All right.  Once the truck comes in, what do you

16:49:28  22  do, with respect to that invoice, if anything?

16:49:30  23    A.   Well, I already decided the day before the truck

16:49:37  24  where everything's going to go, who's going to work,

16:49:40  25  who's going to, you know, how we're going to do it.

16:49:43   1          The whole idea is to get the freight to the floor
16:49:46   2   as fast as possible.
16:49:50   3      Q.   Do your customers know when your truck is coming?
16:49:53   4      A.   I think the whole neighborhood knows, yes, sir.
16:49:57   5      Q.   Does that mean that you see an increase of
16:50:00   6   traffic on truck day?
16:50:02   7      A.   Yes, sir.
16:50:02   8      Q.   So your priority, then, is what, once a truck
16:50:08   9   comes in?
16:50:08  10      A.   To get the freight off the truck and get it to
16:50:11  11   the floor so we can sell it.
16:50:13  12      Q.   And I guess to help you do that, you're telling
16:50:16  13   the jury that you start planning the day before?
16:50:19  14      A.   Oh, yes.
16:50:20  15      Q.   And what does that planning involve, again?
16:50:24  16      A.   Reviewing the invoice, because it tells you what
16:50:27  17   you're getting.
16:50:27  18      Q.   And once you know what you're getting, then what?
16:50:32  19      A.   Then they plan -- then I plan for the truck.  And
16:50:36  20   usually I try to be there myself.
16:50:41  21          We separate the new stuff that we didn't order,
16:50:46  22   the new merchandise from the regular schematic
16:50:50  23   merchandise.
16:50:51  24      Q.   All right.  Now, that's another phrase that's
16:50:53  25   been used by prior witnesses.

16:50:56  1     A.   Schematic?

16:50:58  2     Q.   Yes, ma'am.

16:50:58  3     A.   It's just a layout of the store that tells you

16:51:02  4  where all the merchandise goes.

16:51:03  5     Q.   All right.  From a given truck, what percentage

16:51:06  6  of your truck is schematic items?

16:51:09  7     A.   What percentage?

16:51:12  8     Q.   Yeah.  Break it down for us.  You said they are

16:51:17  9  schematic items, and then there are items that you have

16:51:19  10 ordered?

16:51:19  11    A.   Right.

16:51:20  12    Q.   Schematic items generally make up how much of

16:51:23  13 what you get?

16:51:24  14    A.   Probably about 95 percent.

16:51:26  15    Q.   All right.  And the other 5 percent?

16:51:28  16    A.   Depending on the season.

16:51:29  17    Q.   All right.  And the other 5 percent is what?

16:51:31  18    A.   What we call the good stuff; the stuff that we

16:51:36  19 want to sell to the customers right away.

16:51:38  20    Q.   And where do you normally put that stuff, what

16:51:43  21 part of the store?

16:51:44  22    A.   I usually send it to the front so that my

16:51:49  23 cashiers can start right away letting the customers know

16:51:52  24 we got it.

16:51:53  25    Q.   Does Family Dollar tell you where to place that

16:51:57   1   item in your store?

16:51:58   2       A.   Sometimes it's an item that they want put on an

16:52:02   3   end cap, or weekly planner type thing.   Most generally

16:52:06   4   it's not.   And so we can have a lot of fun with it, and

16:52:11   5   we do.

16:52:12   6       Q.   Ms. Coleman, the eight employees who work for

16:52:17   7   you, who is their boss?

16:52:18   8       A.   Could you repeat that?

16:52:20   9       Q.   Yes, ma'am.   The eight people of that store, who

16:52:24   10   is the boss?

16:52:25   11       A.   Who is the boss of the eight people that work for

16:52:28   12   me?

16:52:28   13       Q.   Yes, ma'am.

16:52:29   14       A.   I am.

16:52:29   15       Q.   You got an assistant manager; correct?

16:52:32   16       A.   Yes, sir.

16:52:32   17       Q.   And that assistant manager --

16:52:34   18       A.   Works for me, too.

16:52:36   19       Q.   Okay.   That assistant manager does some of the

16:52:38   20   same things that you do at times; correct?

16:52:41   21       A.   Absolutely.

16:52:42   22       Q.   They open?

16:52:42   23       A.   Sure.

16:52:43   24       Q.   They close?

16:52:43   25       A.   Yes, sir.

16:52:44  1      Q.   And some of the paperwork that you do, they do?

16:52:46  2      A.   Yes, sir.

16:52:47  3      Q.   Do you still claim that you are in charge of your

16:52:50  4  store?

16:52:50  5      A.   Always.

16:52:50  6      Q.   Why do you say that, ma'am?

16:52:52  7      A.   Because I run the store.  I'm the store manager.

16:52:59  8           If you have a problem with that, when y'all take

16:53:02  9  a break, go over to my store and ask them who's in

16:53:06  10  charge.

16:53:07  11     Q.   Thank you, Mrs. Coleman.

16:53:08  12     A.   You're welcome.

16:53:09  13           THE COURT:  Cross-examination?

16:53:11  14           MR. QUINN:  Thank you, Your Honor.

16:53:12  15                    **CROSS-EXAMINATION**

16:53:12  16  **BY MR. QUINN:**

16:53:13  17     Q.   Ms. Coleman, my name is Mike Quinn.  I am going

16:53:16  18  to ask you some questions.

16:53:21  19           You say you have got eight employees in your

16:53:25  20  store?

16:53:25  21     A.   And a trainee.

16:53:29  22     Q.   I'm sorry?

16:53:30  23     A.   I also have a manager trainee.  But I have eight

16:53:33  24  employees of my very own, yes, sir.

16:53:35  25     Q.   How long has that manager trainee been in your

16:53:39   1   store with you?

16:53:39   2       A.   About a month.

16:53:40   3       Q.   And of the eight employees, you have yourself,

16:53:43   4   the store manager; correct?

16:53:45   5       A.   Yeah.

16:53:46   6       Q.   The assistant manager?

16:53:48   7       A.   (Nodded head.)

16:53:49   8       Q.   Do you have more than one assistant manager, or

16:53:51   9   just one?

16:53:52  10       A.   Yes, sir.  I have two.

16:53:53  11       Q.   You have two assistant managers?

16:53:54  12       A.   Yes, sir.

16:53:55  13       Q.   And then how many associates do you have?

16:53:57  14       A.   Four or five.

16:54:01  15       Q.   Okay.

16:54:02  16       A.   If you counted me.  You counting me?

16:54:04  17       Q.   Excuse me?

16:54:05  18       A.   I'm sorry.  I didn't know if you were counting

16:54:08  19   me.  I'm sorry.

16:54:10  20       Q.   No.  No.  So are both of your assistant managers

16:54:12  21   full-time employees?

16:54:13  22       A.   Yes, sir.

16:54:14  23       Q.   So you have three full-time employees in your

16:54:17  24   store?

16:54:18  25       A.   Four.

16:54:19  1   Q.   Four?

16:54:20  2   A.   Yes, sir.

16:54:21  3   Q.   Who is the fourth?

16:54:21  4   A.   One of my stock guys.

16:54:23  5   Q.   I see.  So you have four full-time employees?

16:54:25  6   A.   Yes, sir.

16:54:26  7   Q.   And then the others are part-time employees?

16:54:29  8   A.   Yes, sir.

16:54:29  9   Q.   Okay.  Would it surprise you to know that the --

16:54:35  10  let me ask you:  Have you ever seen the job description

16:54:39  11  for the store manager?

16:54:40  12  A.   I have seen it.

16:54:41  13  Q.   Have you ever seen the job description?

16:54:47  14  A.   Which one?  Because they've got a new one.

16:54:47  15  Q.   They've got a new one.  I'm talking about the old

16:54:49  16  one and the new one.  Have you seen them both?

16:54:51  17  A.   Yes, sir.  I may not remember, but, yes, sir, I

16:54:54  18  have seen them.

16:54:55  19  Q.   Have you ever seen the job description for the

16:54:58  20  assistant store manager?

16:54:59  21  A.   Yes, sir.

16:54:59  22  Q.   Have you noticed that they are the same?

16:55:02  23  A.   Almost.

16:55:03  24  Q.   And isn't it true that the assistant manager does

16:55:10  25  the same things that you do in the store?

16:55:19    1      A.   Almost.   Almost all the same things that I do,
16:55:24    2   yes, sir.
16:55:24    3      Q.   Right.   And when you were not at the store --
16:55:29    4   because you don't work everyday; correct?
16:55:31    5      A.   Correct.
16:55:31    6      Q.   The assistant -- do you have an assistant manager
16:55:35    7   who is full-time who is running that store?
16:55:38    8      A.   I have two of them.
16:55:40    9      Q.   And are they running the store when you're off?
16:55:43   10      A.   They're running it today.
16:55:44   11      Q.   Okay.
16:55:50   12               THE COURT:   What did you earn last year?
16:55:54   13               THE WITNESS:   What did I earn personally?
16:55:55   14               THE COURT:   Yes, sir.   From Family Dollar.
16:55:57   15               THE WITNESS:   Roughly about 48.
16:55:59   16               THE COURT:   About $48,000?
16:56:01   17               THE WITNESS:   Yes, sir.
16:56:01   18               THE COURT:   That included the bonus?
16:56:03   19               THE WITNESS:   No, sir.
16:56:03   20               THE COURT:   What was the bonus?
16:56:04   21               THE WITNESS:   Probably about 3.
16:56:06   22               THE COURT:   About $3,000?
16:56:07   23               THE WITNESS:   Yes, sir.
16:56:09   24      Q.   (By Mr. Quinn)  Ms. Coleman, did -- before you
16:56:15   25   came back to Family Dollar -- did you leave Family

16:56:19  1   Dollar and go to work for Service Merchandise?

16:56:23  2       A.  Yes, sir.

16:56:24  3       Q.  And did you leave -- did you tell your district

16:56:30  4   manager that the reason that you were leaving Family

16:56:32  5   Dollar was for a better job and because of the stress?

16:56:36  6       A.  I never mentioned the word "stress".  I did say

16:56:39  7   it was a better job.

16:56:40  8       Q.  Okay.  If the word "stress" appears in your

16:56:45  9   personnel files as the reason, would you agree or

16:56:48  10  disagree with that?

16:56:50  11      A.  That it was stressful?

16:56:51  12      Q.  Yes.

16:56:52  13      A.  It -- I would agree that it was stressful, but I

16:56:58  14  don't remember saying that I was leaving because of the

16:57:01  15  stress, no, sir.

16:57:01  16      Q.  And when you went to Service Merchandise, did you

16:57:07  17  go there as an assistant store manager?

16:57:10  18      A.  As a co-manager, yes, sir.

16:57:15  19              THE COURT:  Did you go as an assistant or as

16:57:17  20  a store manager?

16:57:19  21              THE WITNESS:  Not -- they only had one store

16:57:21  22  manager and three co-managers.  I went as a co-manager.

16:57:25  23              THE COURT:  A co-manager?

16:57:27  24              THE WITNESS:  Yes, sir.

16:57:28  25              THE COURT:  Is that the same thing as an

16:57:29   1   assistant manager?

16:57:30   2            THE WITNESS:  It paid more money than an

16:57:34   3   assistant.  They -- they used -- they say "co-managers",

16:57:37   4   in that they had like four people running the store, and

16:57:40   5   I was one of them.

16:57:41   6            THE COURT:  I see.

16:57:42   7            THE WITNESS:  A general manager and then

16:57:43   8   three other co-managers.

16:57:45   9            THE COURT:  All right.  There was a general

16:57:47   10  manager and then there were co-managers?

16:57:50   11           THE WITNESS:  Yes, sir.

16:57:50   12           THE COURT:  I see.

16:57:51   13  Q.  (By Mr. Quinn)  And I think you indicated that,

16:57:54   14  in fact, your assistant manager could interview for

16:58:00   15  positions in your store; either one of your assistant

16:58:03   16  managers could do that; correct?

16:58:05   17  A.  I didn't -- did I say that?

16:58:06   18  Q.  Well, did they have the authority to interview?

16:58:08   19  A.  Well, one of my assistants has the authority to

16:58:12   20  interview, yes, sir.

16:58:13   21  Q.  Okay.  Now, I'm going to show you some policies

16:58:19   22  up here on this screen that I want to ask you some

16:58:24   23  questions about.  D6, please.

16:58:38   24           Is it true, Ms. Coleman, that you were required

16:58:44   25  to do a pre-employment check that you have to send to

16:58:49  1   the home office before you can offer someone a job?

16:58:52  2       A.   I wouldn't want to offer somebody a job until I

16:58:56  3   checked the background and did a drug test and the

16:59:00  4   Stanton.

16:59:00  5       Q.   And isn't it also true that management -- that

16:59:03  6   you have to receive authorization to hire before you can

16:59:07  7   hire that person after you send that information in;

16:59:11  8   isn't that true?

16:59:12  9       A.   I didn't know that.

16:59:16  10      Q.   That's their policy.  Did you not know that?

16:59:19  11      A.   Let me see.  I think -- I think I read it

16:59:25  12  probably.

16:59:25  13      Q.   Okay.  All right.  You would agree that that is

16:59:28  14  the policy, wouldn't you?

16:59:30  15      A.   I --

16:59:30  16           THE COURT:  Well, you agree that's --

16:59:33  17           THE WITNESS:  I agree that's the policy.

16:59:35  18           THE COURT:  Just a moment.  You agree that

16:59:39  19  that is what you see on the board there; but is it also

16:59:47  20  true that you didn't follow this policy?

16:59:51  21           THE WITNESS:  I did the -- I did all the

16:59:54  22  things necessary --

16:59:54  23           THE COURT:  But in terms of getting --

16:59:56  24           THE WITNESS:  -- approval.

16:59:57  25           THE COURT:  -- approval before you hired a

| | | |
|---|---|---|
| 17:00:00 | 1 | person, you didn't do that, did you? |
| 17:00:01 | 2 | THE WITNESS:  No, sir, I didn't. |
| 17:00:02 | 3 | Q.  (By Mr. Quinn)  You didn't get approval? |
| 17:00:04 | 4 | A.  No, sir. |
| 17:00:04 | 5 | Q.  Okay.  But did you know that that was the policy; |
| 17:00:08 | 6 | that you were supposed to get approval? |
| 17:00:09 | 7 | A.  I guess probably it didn't register with me, but |
| 17:00:14 | 8 | yes, sir, it is the policy. |
| 17:00:15 | 9 | Q.  Okay.  Would you go -- |
| 17:00:17 | 10 | A.  And -- |
| 17:00:17 | 11 | Q.  -- would you go to D5? |
| 17:00:21 | 12 | Did you know that -- isn't it true that, in fact, |
| 17:00:26 | 13 | what you were supposed to do is make recommendations for |
| 17:00:32 | 14 | hire? |
| 17:00:33 | 15 | A.  Recommendations to who? |
| 17:00:34 | 16 | Q.  Recommendations to your district manager? |
| 17:00:39 | 17 | A.  I -- |
| 17:00:40 | 18 | Q.  Did you know that? |
| 17:00:41 | 19 | A.  That's what it says, yes, sir. |
| 17:00:42 | 20 | Q.  Did you know that? |
| 17:00:44 | 21 | A.  I probably knew it, somewhere in the back of my |
| 17:00:47 | 22 | head. |
| 17:00:47 | 23 | Q.  And you don't disagree that that is, in fact, the |
| 17:00:50 | 24 | policy? |
| 17:00:50 | 25 | A.  I don't disagree that's the policy. |

17:00:52  1    Q.   Okay.

17:00:54  2              THE COURT:  But you didn't do it?

17:00:55  3              THE WITNESS:  No, sir.

17:00:56  4    Q.   But you didn't do it?

17:01:01  5    A.   Can I explain?

17:01:02  6              THE COURT:  Yes, ma'am.

17:01:07  7              THE WITNESS:  Okay.  I'm very good at that,

17:01:10  8    and I do good hiring.  And my district manager took

17:01:13  9    candidates that I hired, so did other stores.

17:01:16  10             And so I guess I just knew that I was doing

17:01:20  11   a good job, and I call it common sense.

17:01:24  12   Q.   (By Mr. Quinn)   D1.  Did you -- isn't it true

17:01:27  13   that you could not hire an assistant manager before the

17:01:31  14   district manager interviewed that assistant manager?

17:01:34  15   A.   It's true that that's what that says, yes, sir.

17:01:36  16   Q.   And it's true that that was the policy; correct?

17:01:39  17   A.   It's true that that is the policy.

17:01:41  18   Q.   Okay.

17:01:42  19             THE COURT:  And it's true that you didn't do

17:01:44  20   it?

17:01:44  21             THE WITNESS:  It's also true that I didn't

17:01:46  22   do it.

17:01:46  23             (Laughter.)

17:01:49  24   Q.   E1.  After the store employees had been there for

17:01:56  25   90 days, is it true that you and the district manager

17:01:59  1    would sit down and review that employee and see whether

17:02:04  2    they would become entitled employee benefits?

17:02:07  3        A.   It's true that I sat down with that employee and

17:02:09  4    did an evaluation, and I sent a recommendation to my

17:02:13  5    district manager if they should get a raise.   That's

17:02:16  6    true.

17:02:16  7        Q.   Okay.   G4.

17:02:36  8        A.   Wouldn't happen to have a glass of water, would

17:02:38  9    you?

17:02:39  10             THE COURT:   Yes, ma'am.   We'll get one for

17:02:41  11   you.

17:02:42  12             THE WITNESS:   Thank you.

17:03:06  13       Q.   While he's doing that, let me go on.   Isn't it

17:03:09  14   true that you and the assistant manager were the ones

17:03:13  15   that were responsible to keep the associates working at

17:03:16  16   an expected performance level; that was both yours and

17:03:22  17   the associate and your assistant manager's job?

17:03:25  18       A.   Is that in the policy manual, too?

17:03:29  19       Q.   It is.

17:03:30  20       A.   You can slip -- put it up there, let me see it.

17:03:33  21       Q.   He's having problems slipping it.

17:03:37  22       A.   I told you I'm ever learning.

17:03:40  23       Q.   I know.   There it is.

17:03:46  24       A.   Well, I be darn.

17:03:50  25       Q.   Let me ask you this --

17:03:52   1      A.   Yes, sir.

17:03:52   2      Q.   -- did you have a store policy manual in your

17:03:57   3   store?

17:03:57   4      A.   I've got two of them, sir.

17:03:59   5      Q.   Okay.  So there it is.  So you agree with that,

17:04:02   6   that that was the policy?

17:04:03   7      A.   Yes, sir.

17:04:05   8      Q.   Okay.  F1.  Let me just ask you:  I bet you know

17:04:26   9   this one:  Didn't you -- isn't it true, and didn't you

17:04:29   10   know that before you could give anybody a pay increase,

17:04:31   11   you had to ask your district manager?

17:04:33   12      A.   District manager has to key it in.

17:04:36   13      Q.   Well, the district manager has to approve it,

17:04:39   14   according to the policy.  Did you know that?

17:04:41   15      A.   I recommended the raises that my employees got.

17:04:44   16   She knew -- my district manager wasn't there to know

17:04:46   17   what they did, but I have never been turned down.  She

17:04:49   18   always keyed in what I recommended, yes, sir.

17:04:51   19      Q.   But you did have to recommend to the district

17:04:53   20   manager --

17:04:53   21      A.   Oh, absolutely.  You're right, I knew that one.

17:04:58   22      Q.   H1.  Did you know that you could not recommend

17:05:19   23   discharge without going through your district manager?

17:05:22   24      A.   No.

17:05:23   25      Q.   You didn't?  He never told you that, or she never

17:05:29  1    told you that?

17:05:30  2        A.   I've worked for lots of district managers, I've

17:05:33  3    never had anybody tell me I couldn't fire anybody.

17:05:36  4        Q.   Do you see that's the policy?

17:05:38  5        A.   I see it now.

17:05:39  6        Q.   Okay.  J1.  You didn't set the hours that your

17:06:02  7    store could be opened and closed, did you?

17:06:04  8        A.   Oh, no, sir.

17:06:05  9        Q.   That came from home office?

17:06:07  10       A.   Yes, sir.

17:06:08  11       Q.   You didn't make the decision -- you didn't make

17:06:14  12   the decision who could hold keys in your store, did you?

17:06:20  13   Didn't that also come from the district manager?

17:06:22  14       A.   What do you mean who could hold keys?

17:06:25  15       Q.   Who was entitled to a key to your store?

17:06:27  16       A.   My assistant and me.

17:06:29  17       Q.   And that's -- and you knew that because that was

17:06:32  18   the rule that came from the district manager; correct?

17:06:34  19       A.   Yes, sir.

17:06:34  20       Q.   Did you know that?

17:06:35  21       A.   Came from the district manager?

17:06:37  22       Q.   That was a rule that came -- or from the home

17:06:40  23   office?

17:06:40  24       A.   From the home office, yes, sir.

17:06:42  25       Q.   Okay.  And did you know that you couldn't close

17:06:51   1   your store if you had a tornado, or hurricane, or

17:06:56   2   flooding without calling your district manager?  Did you

17:06:59   3   know that?

17:07:00   4       A.   I heard something like that.  But you know what,

17:07:07   5   we had a tornado a couple of years ago, and I heard that

17:07:10   6   it was coming through Fosters.

17:07:13   7           If you're not from here, Fosters is just right

17:07:17   8   down the road.

17:07:18   9       Q.   Yeah.

17:07:18   10      A.   I wasn't about to go ask my district manager

17:07:20   11  anything when the tornado's on the ground.

17:07:23   12          I took my two customers that were in the store

17:07:25   13  and my employees to the back room, after I locked that

17:07:27   14  door, and I asked the only person that could stop the

17:07:30   15  tornado.

17:07:31   16      Q.   To stop it?

17:07:32   17      A.   That's who I called.

17:07:34   18              (Laughter.)

17:07:35   19      Q.   That's who you called?

17:07:36   20      A.   That's who I called.

17:07:44   21      A.   Now --

17:07:44   22      Q.   But let me ask you:  Did you know, though, that

17:07:48   23  there was a policy on the books that said you couldn't

17:07:50   24  do that?

17:07:50   25      A.   Yeah.  Yeah, I know that.

17:07:52   1      Q.   Okay.

17:07:52   2      A.   I'm not stupid.

17:07:54   3           If the tornado's coming through this courthouse,

17:07:57   4   me and the judge going to get behind this desk.  I'm not

17:08:02   5   asking about rules.

17:08:04   6           (Laughter.)

17:08:04   7      Q.   Okay.  Did you know that -- did you ever hire the

17:08:08   8   contractors that cleaned your floors?

17:08:11   9      A.   Did I hire them?  No, sir.

17:08:11  10      Q.   You weren't allowed to do that, did you?

17:08:13  11      A.   Years ago, we did.

17:08:14  12      Q.   But you weren't allowed to do that, were you?

17:08:17  13      A.   Years ago.

17:08:18  14      Q.   You had to call the district manager?

17:08:19  15      A.   Years ago.  We can now.  They've gotten better.

17:08:22  16   All we have to do -- home office takes care of all that

17:08:25  17   stuff.

17:08:25  18      Q.   The exterminator?

17:08:26  19      A.   The exterminator, the trash, everything.

17:08:28  20      Q.   That's all taken care of?

17:08:30  21      A.   Uh-huh.

17:08:31  22      Q.   Does the district manager establish how much cash

17:08:42  23   accumulation you can have in your store?

17:08:45  24      A.   The district manager?  The home office.

17:08:49  25      Q.   Uh-huh.

17:08:49  1    A.   The home office does.

17:08:50  2    Q.   He does that?

17:08:51  3    A.   How much --

17:08:52  4    Q.   How much cash you can keep at one time in the

17:08:55  5    store, he establishes; and that determines when you're

17:08:58  6    going to make a bank deposit, doesn't it?

17:09:01  7    A.   Yes, sir.  Would it surprise you to know when we

17:09:04  8    were in banking we had the same policy at the bank?

17:09:06  9    Q.   Would not.  Would not.  And when you were in

17:09:08 10    banking, I suspect they had a couple of rules that were

17:09:11 11    a lot like these.

17:09:12 12         Petty cash, you couldn't increase petty cash

17:09:16 13    without the district manager's approval, could you?

17:09:18 14    A.   Tell the truth, I don't know who increased petty

17:09:20 15    cash.

17:09:21 16    Q.   Okay.

17:09:21 17    A.   I think it was loss prevention.

17:09:23 18    Q.   And if the register came up short, did you know

17:09:26 19    that it was a rule for the cashier to call the district

17:09:30 20    manager and not you to report the theft?

17:09:33 21    A.   Need to show me that one.

17:09:35 22    Q.   I will.  K8.

17:09:38 23    A.   The cashier calls the district manager.  Wow.

17:09:46 24    "If the register is short, the cashier is to describe

17:09:49 25    the person suspected of the theft and notify the

```
17:09:51   1   district manager and local police."
17:09:56   2       Q.   Okay.   There's that one.
17:09:57   3            THE COURT:   You were not -- you were not
17:09:59   4   aware of this policy, were you?
17:10:01   5            THE WITNESS:   When they talking about theft.
17:10:04   6   They want the cashier to remember everything so that we
17:10:06   7   can --
17:10:06   8            THE COURT:   Yes, ma'am.   But did you know
17:10:08   9   that the cashier was supposed to call the district
17:10:11  10   manager rather than you?
17:10:12  11            THE WITNESS:   I honestly didn't know that
17:10:14  12   one.
17:10:15  13       Q.   (By Mr. Quinn)   Let me ask you this, Ms. Coleman:
17:10:21  14   It sounds like that there were a lot of things that you
17:10:27  15   didn't do that your -- that you didn't know that you
17:10:34  16   were supposed to get approval from the district manager;
17:10:37  17   isn't that right?
17:10:38  18       A.   I don't know what it sounds like to you.   You
17:10:42  19   need to rephrase that question.   That don't sound too
17:10:45  20   good.   I'm not going to say that's right.
17:10:46  21       Q.   Well, we've already gone through quite a few
17:10:49  22   things that you didn't know about; right?   that you
17:10:52  23   didn't know you couldn't do?
17:10:53  24       A.   Either I didn't know or I just didn't do it, yes,
17:10:56  25   sir.
```

17:10:56   1    Q.   Or you didn't do it?

17:10:58   2    A.   Yes, sir.

17:10:58   3    Q.   And by doing those things that you didn't check

17:11:03   4    with the district manager about, such as the hiring and

17:11:06   5    the firing, such as the other things that you talked

17:11:09   6    about, that made you feel like the store manager of that

17:11:14   7    store, didn't it?

17:11:16   8    A.   That's not going to make me feel like store

17:11:19   9    manager.  I am the store manager, number one.

17:11:22   10         Number two, those are guidelines that they give

17:11:25   11   us to go by.  It's not the Bible.  And I do follow, you

17:11:29   12   know, policy -- except for the hiring and the firing and

17:11:34   13   stuff like that -- if they tell me don't do it, I have

17:11:37   14   never been disciplined for anything for any reason.  If

17:11:39   15   they flat out tell me don't do it, I wouldn't do it.

17:11:42   16   Q.   And if -- and you have never been told not to do

17:11:46   17   it, have you?

17:11:47   18   A.   No, sir.

17:11:48   19   Q.   And so -- and so, because you have been able to

17:11:50   20   do those things, you are actually really the manager of

17:11:55   21   that store, aren't you?

17:11:58   22   A.   I am actually the manager of that store, no

17:12:01   23   matter what.

17:12:02   24   Q.   And you are not a plaintiff in this lawsuit, are

17:12:06   25   you?

17:12:06   1       A.   No, sir.

17:12:07   2       Q.   And you talked about training.  There was not any

17:12:19   3   formalized training that you were given by home office

17:12:23   4   or by the district manager to train the employees, was

17:12:26   5   there?

17:12:26   6       A.   What do you mean?  I don't get you.

17:12:32   7       Q.   Well, you were talking about you had a way of

17:12:34   8   training and that's the way you trained.

17:12:35   9       A.   I am a certified trainer for Family Dollar.

17:12:39  10       Q.   You are a certified trainer?

17:12:40  11       A.   Yes, sir.

17:12:41  12       Q.   Did you ever go work at other stores?

17:12:43  13       A.   Yes, sir.

17:12:43  14       Q.   And when you worked at those other stores, did

17:12:48  15   you do manual labor at those stores?

17:12:53  16       A.   What do you mean "manual"?  What's that mean?

17:12:56  17       Q.   Like, did you stock the shelves?

17:12:58  18       A.   Yes, sir.  I do the same thing in my stores.

17:13:00  19       Q.   Did you help unload the truck?

17:13:01  20       A.   Yes, sir; do it at my store, too.

17:13:03  21       Q.   Did you mop the floors?

17:13:05  22       A.   Yes, sir, when they need it.  I either mop it or

17:13:07  23   I can delegate it.

17:13:08  24            Being the store manager, you can delegate it if

17:13:11  25   you wish.

```
17:13:11   1      Q.   And other things, you did that at the other
17:13:14   2   store, and you also did those things at your store?
17:13:17   3      A.   Absolutely.  If the store -- if the floor needs
17:13:21   4   mopping, I can either mop it myself or I can get someone
17:13:25   5   else to do it.  And a lot of times I choose to do it,
17:13:28   6   because I want my employees to think -- I don't want
17:13:30   7   them thinking that I think I'm too good to do these
17:13:34   8   things.  And I don't do -- I don't ask them to do
17:13:36   9   anything I don't do.
17:13:37  10      Q.   Okay.
17:13:41  11                THE COURT:  You've got two minutes.
17:13:43  12                MR. QUINN:  Thank you.
17:13:45  13                THE WITNESS:  Thank you.
17:13:47  14      Q.   (By Mr. Quinn)  If you couldn't have hired, and
17:13:52  15   you couldn't have fired, and if you couldn't have set
17:13:59  16   pay for your employees and the other things, would you
17:14:04  17   still have felt like you were a store manager, if you
17:14:09  18   couldn't do those things?
17:14:10  19      A.   If I couldn't --
17:14:11  20      Q.   Yeah.
17:14:12  21      A.   If I couldn't hire --
17:14:13  22      Q.   If you couldn't hire and you couldn't fire?
17:14:15  23      A.   And I couldn't fire.
17:14:16  24      Q.   -- and you couldn't make pay changes, would you
17:14:20  25   have still felt like that you were a store manager, a
```

17:14:23  1    true store manager?

17:14:24  2        A.   If I couldn't hire and I couldn't fire and I

17:14:29  3    couldn't make pay changes, would I still feel like a

17:14:33  4    store manager?

17:14:34  5        Q.   Yeah.

17:14:34  6        A.   If I do the same things that I do now, yes, I

17:14:37  7    would --

17:14:38  8        Q.   But now you do hire and you do fire, don't you?

17:14:42  9        A.   Yes, sir, I do.

17:14:43  10       Q.   You do.  And you told us that --

17:14:45  11            THE COURT:  Well, I think that's enough.

17:14:48  12            MR. QUINN:  Okay.

17:14:48  13            THE COURT:  All right.  Redirect?

17:14:50  14                     **REDIRECT EXAMINATION**

17:14:50  15   **BY MR. KALLON:**

17:14:54  16       Q.   Ms. Coleman, you were asked to join this lawsuit;

17:15:00  17   correct?

17:15:00  18       A.   Yes, sir.

17:15:00  19       Q.   You received a letter in the mail?

17:15:04  20       A.   Yes, sir.

17:15:04  21       Q.   And you received phone calls at home?

17:15:07  22       A.   Yes, sir.

17:15:07  23       Q.   How many phone calls did you get?

17:15:09  24       A.   A couple of phone calls.

17:15:10  25       Q.   Do you know how many?

17:15:11  1      A.   Two or three phone calls.

17:15:12  2      Q.   Do you know who those phone calls from?

17:15:14  3            THE COURT:   Where is this leading us?

17:15:15  4            MR. KALLON:   Your HOnor, Mr. Quinn asked

17:15:18  5  Ms. Coleman --

17:15:21  6            THE COURT:   I heard what he asked her, and I

17:15:24  7  heard her say --

17:15:27  8            MR. KALLON:   I was going to ask her, Your

17:15:28  9  Honor, why she did not join this lawsuit, if you will

17:15:30  10  allow me.

17:15:31  11            THE COURT:   All right.   You can answer.

17:15:34  12      Q.   (By Mr. Kallon)   Ms. Coleman, answer the

17:15:35  13  question.

17:15:36  14      A.   Why I didn't join it?

17:15:37  15      Q.   Yes, ma'am.

17:15:38  16      A.   Two reasons:   One, if I want to sue Family

17:15:42  17  Dollar, I will take the initiative myself.   I am not a

17:15:45  18  joiner.

17:15:46  19            Two, because when I read the letter, and I read

17:15:48  20  it over and over again, it said that -- if I can

17:15:51  21  remember correctly -- these store managers were saying

17:15:55  22  that they were misclassified as store managers; and that

17:16:05  23  left me out.   I'm not misclassified as a store manager.

17:16:08  24  I am a store manager.

17:16:09  25            One time I took a job as a secretary.   I was mis-

17:16:13   1    classified.  I am not a secretary, but I am very much a

17:16:16   2    very good store manager, that I am.  And that's why I

17:16:21   3    didn't join it.

17:16:22   4         I am not misclassified as a store manager.

17:16:24   5    Q.  Mrs. Coleman, from the moment you walk into your

17:16:27   6    store until you leave, do you stop being in charge of

17:16:30   7    that store?

17:16:31   8              THE COURT:  The objection to leading is

17:16:33   9    sustained.

17:16:33   10              MR. QUINN:  Thank you.

17:16:34   11    Q.  Mrs. Coleman, do you ever stop being in charge of

17:16:39   12    your store?

17:16:40   13    A.  Never.

17:16:42   14              THE COURT:  The objection to leading is

17:16:44   15    sustained.

17:16:44   16    Q.  Mrs. Coleman, who is in charge of your store?

17:16:47   17    A.  I am.

17:16:47   18    Q.  Are you held accountable for what goes on in your

17:16:50   19    store?

17:16:50   20    A.  Yes, sir.

17:16:50   21    Q.  Does that accountablity ever stop?

17:16:53   22              THE COURT:  The objection to leading is

17:16:56   23    sustained.

17:16:56   24              MR. KALLON:  Thank you, Your Honor.

17:16:58   25              THE COURT:  Ms. Coleman, come back to see us

| | | |
|---|---|---|
| 17:17:01 | 1 | sometime. |
| 17:17:01 | 2 | THE WITNESS:  No, sir. |
| 17:17:05 | 3 | (Laughter.) |
| 17:17:06 | 4 | THE WITNESS:  I can go home now? |
| 17:17:08 | 5 | THE COURT:  Yes, ma'am. |
| 17:17:16 | 6 | Ladies and gentlemen, we will take our |
| 17:17:18 | 7 | evening recess at this time.  We will be in recess until |
| 17:17:20 | 8 | 9:00 o'clock in the morning. |
| 17:17:22 | 9 | Please do not discuss the case among |
| 17:17:24 | 10 | yourselves or with anyone else.  Do not allow the case |
| 17:17:26 | 11 | to be discussed in your presence.  And keep an open |
| 17:17:31 | 12 | mind. |
| 17:17:31 | 13 | I want the lawyers to remain. |
| 17:17:34 | 14 | (Jury out at 5:08 p.m.) |
| 17:17:45 | 15 | (In open court, jury not present.) |
| 17:18:02 | 16 | THE COURT:  Tomorrow I take it we will |
| 17:18:24 | 17 | continue with several other witnesses? |
| 17:18:28 | 18 | MR. WHITE:  Yes, sir. |
| 17:18:29 | 19 | THE COURT:  And will they be district |
| 17:18:33 | 20 | managers and store managers? |
| 17:18:36 | 21 | MR. WHITE:  Some will be district and some |
| 17:18:37 | 22 | will be store, and some will be higher. |
| 17:18:40 | 23 | And I am not going to -- I am not trying to |
| 17:18:44 | 24 | push you to the point of where the accumulative |
| 17:18:47 | 25 | effort -- in fact, I was going to suggest we have the |

17:18:50  1   same meeting that you have called.

17:18:52  2            THE COURT:  Yes.  Right.

17:18:54  3            MR. WHITE:  My thought, Judge, we're not

17:18:56  4   trying to replow over and over again.  And perhaps to

17:19:01  5   the extent we have somebody that we can either eliminate

17:19:05  6   that, or do it in summary fashion, we will work on that

17:19:09  7   tonight.

17:19:09  8            THE COURT:  All right.

17:19:12  9            MR. WHITE:  If you want us to.

17:19:13  10           THE COURT:  All right.  I need some help and

17:19:15  11  I understand I am not the trier of the facts, but I do,

17:19:19  12  at the end of the evidence have to make a determination

17:19:26  13  of whether certain -- whether a reasonable jury could

17:19:31  14  reach certain facts.

17:19:36  15           What do I make of the testimony of this very

17:19:42  16  credible witness who just left the stand?  What would a

17:19:51  17  reasonable jury infer from it?  And -- yes, sir?

17:19:57  18           MR. WHITE:  I will be happy to tell you.  I

17:20:00  19  think you're asking them.

17:20:02  20           THE COURT:  Well, actually, I'm asking you.

17:20:04  21  Because you called the witness, and what this witness

17:20:06  22  basically said was, yes, she's a store manager, but

17:20:11  23  she's a store manager because she doesn't follow your

17:20:16  24  policies.

17:20:18  25           MR. WHITE:  Guidelines.

17:20:22   1            MR. MAY:  No, sir.

17:20:24   2            THE COURT:  All right.  If you can get me

17:20:25   3    some authority on the findings.  If you can't --

17:20:28   4            MR. MAY:  Your Honor, Your Honor --

17:20:30   5            MR. MILLER:  Your Honor, if I may, there's

17:20:32   6    one issue --

17:20:33   7            MR. MAY:  There's a factual issue here.

17:20:36   8            THE COURT:  At this point, it's really not

17:20:38   9    an issue, because at the end of all the evidence -- at

17:20:42  10    the end of all the evidence is when I have to make a

17:20:45  11    decision.

17:20:45  12            But I just am telling you that at this

17:20:49  13    point, I don't -- I don't see that this last witness'

17:20:55  14    testimony is helpful, in terms of the plaintiffs' claims

17:21:06  15    that they didn't have these authorities, or these

17:21:16  16    accouterment of managerial duties, which this last

17:21:21  17    witness says she exercised all the time.

17:21:25  18            MR. KALLON:  Your Honor, at least one of the

17:21:27  19    witnesses testified yesterday that he did.

17:21:28  20            If you recall in opening statement,

17:21:30  21    Mr. Quinn had four elements on the board.  And if the

17:21:36  22    Court's theories are midstreamed, it's now, do you hire,

17:21:37  23    do you fire.  But the last element was, do your

17:21:41  24    recommendations -- are they given particular weight?

17:21:44  25            And I think we will be able to show through

17:21:47  1  their testimony, their clients, once we're allowed to
17:21:50  2  cross-examine them again, Your Honor, that there are
17:21:53  3  some -- as to their Mr. Detter -- 29 or 30 people that
17:21:59  4  he wanted terminated, were terminated.  That's
17:22:01  5  particular weight.  95 or 110 that he wanted to hire
17:22:06  6  were hired.  That's particular weight.  That's the
17:22:08  7  law --
17:22:10  8           MR. R. WIGGINS:  Your Honor, that's not the
17:22:12  9  law.  There's four tests.  That's one of the four.  Even
17:22:15  10  if we have stipulated that --
17:22:17  11           THE COURT:  That's one of the factors.
17:22:18  12           MR. R. WIGGINS:  That's one of the four
17:22:20  13  factors.  You have to satisfy all four.
17:22:21  14           THE COURT:  Yes.  You have to satisfy all
17:22:23  15  four.
17:22:24  16           MR. KALLON:  I don't know how you can hire
17:22:26  17  and fire --
17:22:27  18           THE COURT:  Listen --
17:22:33  19           MR. KALLON:  Sorry about that.
17:22:35  20           THE COURT:  Let's end this.  See you
17:22:36  21  tomorrow at 9:00 o'clock.
17:22:38  22           MR. CHILDS:  Your Honor, can I ask one
17:22:40  23  thing?
17:22:40  24           You had held over a ruling on Haigler,
17:22:43  25  Lundquist and Mason until the defendant's case --

17:22:46  1                THE COURT:  Yes.  Let's take up the issue of

17:22:51  2   the -- who are the witnesses?

17:22:57  3                MR. CHILDS:  Lundquist, and Haigler and

17:22:57  4   Mason.

17:23:02  5                Haigler and Mason did the study for the

17:23:05  6   assistant store managers that Lundquist is now trying to

17:23:08  7   generalize to that area.

17:23:10  8                We think it was improper because it was

17:23:12  9   never designed to show the tasks of the store manager.

17:23:16  10  Mr. Haigler said that.  He said it was not a job

17:23:19  11  analysis.  He also says -- one of the main things that

17:23:23  12  bothers him is the analysis that was done gave the store

17:23:27  13  managers the task they had to choose from.

17:23:28  14               It didn't start from the clean slate.  They

17:23:31  15  had to pick what was given to them.  They didn't have

17:23:33  16  the luxury of deciding whether they wanted to mark

17:23:36  17  stocking, or shelving, or the manual labor.  They

17:23:40  18  weren't given that choice.

17:23:41  19               And they didn't do it in a consent -- they

17:23:43  20  allowed it to be done in a consensus manner.  So a

17:23:47  21  strong manager could dominate what was put down there.

17:23:50  22               And Dr. Verres very strongly said that, and

17:23:53  23  we provided the testimony, that it was improper.

17:23:56  24               MR. JOHNSON:  It wasn't a job analysis.  It

17:23:58  25  was a profile study.  And Mr. Haigler actually testified

17:24:02  1  it was actually the first step for the job analysis.  It

17:24:05  2  wasn't a completed job analysis at all.

17:24:08  3           MR. MAY:  They continue to misunderstand the

17:24:10  4  testimony and the purpose for offering the testimony.

17:24:13  5  They misunderstood it all along.  They continue to

17:24:15  6  misunderstand it.

17:24:16  7           There are only two witnesses we intend to

17:24:18  8  call -- haven't really decided, we may end up not

17:24:23  9  calling -- but they're both out of town.  One is Karl

17:24:26  10 Haigler.

17:24:26  11          THE COURT:  What is he going to testify to?

17:24:28  12          MR. MAY:  What he is going to testify to

17:24:30  13 is -- they fairly accurately characterized his

17:24:35  14 testimony.  He testified it was not a complete job

17:24:36  15 analysis of all the duties of all nationwide -- all

17:24:39  16 store managers nationwide.  We're not offering it for

17:24:42  17 that.

17:24:43  18          As our response said, Mr. Haigler was --

17:24:47  19          THE COURT:  This was a study of the job

17:24:50  20 duties of store managers?

17:24:52  21          MR. MAY:  It was.  But it's got to be taken

17:24:54  22 in context as to why this was done.  If you will allow

17:24:58  23 me?

17:24:58  24          THE COURT:  Yes.

17:24:59  25          MR. MAY:  I will try to be belief.

| | | |
|---|---|---|
| 17:25:01 | 1 | Before anybody knew this lawsuit had been |
| 17:25:05 | 2 | filed, well before it was ever served on Family Dollar, |
| 17:25:08 | 3 | Family Dollar initiated an effort to reduce turnover. |
| 17:25:13 | 4 | As a result of that, without going through |
| 17:25:15 | 5 | all the machinations, Mr. Haigler was hired as a |
| 17:25:19 | 6 | consultant to help them design a training program -- not |
| 17:25:23 | 7 | for store manager. |
| 17:25:24 | 8 | One of the things that happened that he will |
| 17:25:26 | 9 | testify -- he did testify was -- if we're going to |
| 17:25:30 | 10 | hire -- if we're going to reduce turnover by hiring |
| 17:25:33 | 11 | assistant managers or promoting into assistant managers |
| 17:25:37 | 12 | so we come for a job and stay for a career -- that was a |
| 17:25:39 | 13 | term of art they used; that was the lingo they were |
| 17:25:42 | 14 | using -- then you had to know what a store manager was |
| 17:25:45 | 15 | going to do because that was part of the career. |
| 17:25:50 | 16 | So what they did was did a study to look at |
| 17:25:56 | 17 | three markets.  Nobody -- we're not offering it at all |
| 17:25:59 | 18 | for it to be a valid nationwide job study.  But we have |
| 17:26:03 | 19 | the burden of meeting the willfulness test or not. |
| 17:26:08 | 20 | We also have a burden of being -- |
| 17:26:10 | 21 | MR. MILLER:  No, I would interrupt you. |
| 17:26:13 | 22 | MR. MAY:  It's their burden to show |
| 17:26:15 | 23 | willfulness. |
| 17:26:16 | 24 | MR. MILLER:  Good faith. |
| 17:26:18 | 25 | MR. MAY:  We also -- I mean, if there's no |

17:26:20  1   willfulness in this, then --

17:26:21  2          THE COURT:  No liquidated damages.

17:26:23  3          MR. MAY:  No Mr. Haigler, and no need for

17:26:25  4   Dr. Lundquist.  They're both brief.

17:26:28  5          Dr. Haigler would tell what he did -- or

17:26:30  6   Mr. Haigler.  Dr. Lundquist would say "I looked at this.

17:26:35  7   It's not snake oil.  It's not a job analysis like they

17:26:40  8   say and like Haigler said".

17:26:42  9          Complete and utter -- if I was going to do a

17:26:44  10  selection procedure, but it's certainly professionally

17:26:46  11  done.  And it didn't go buy a pig in a poke.

17:26:50  12         That's the reason for offering those two

17:26:52  13  witnesses, Your Honor, on willfulness and good faith.

17:26:55  14         MR. JOHNSON:  Your Honor, Mr. Haigler

17:26:57  15  actually testified and was asked, "were you trying to

17:27:00  16  determine all the duties and responsibilities of the

17:27:01  17  store managers?"  And he said no.

17:27:03  18         MR. MAY:  We admit that.  We admit that.

17:27:05  19         THE COURT:  Okay.

17:27:08  20         THE COURT:  Well, I will put it to you like

17:27:15  21  this:  If you abandon the claim for willfulness, I will

17:27:21  22  exclude the testimony.

17:27:24  23         If that claim remains in the case, I am

17:27:29  24  going to allow the testimony with a limited instruction

17:27:34  25  that the jury may only consider it on the issue of

17:27:37  1  willfulness.

17:27:44  2          MR. MAYS:  Thank you, Judge.

17:27:45  3          MR. MAY:  Thank you, Your Honor.

17:27:49  4          THE COURT:  Good night.

17:27:49  5

17:27:52  6          (Court adjourned at 5:18 p.m.)

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

CERTIFICATE

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


*Christina K. Decker*                           07-30-05

Christina K. Decker, RPR, CRR                    Date

Federal Official Court Reporter