FILED

2007 May-21  PM 12:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

08:57:07

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION


JANICE MORGAN, et al.,          *
        Plaintiffs,             *   CV-01-C-0303-W
                                *   June 14, 2005
vs.                             *   Tuscaloosa, Alabama
                                *   9:00 A.M.
FAMILY DOLLAR STORES, INC.,     *
        Defendants.             *
* * * * * * * * * * * * * * * * * * * * * * * * * *


VOLUME 2
TRANSCRIPT OF JURY TRIAL
BEFORE THE HON. U.W. CLEMON
CHIEF UNITED STATES DISTRICT JUDGE


FOR THE PLAINTIFFS:

HON. ROBERT L. WIGGINS, JR., Esq.
HON. C. MICHAEL QUINN, ESQ.
HON. GREGORY O. WIGGINS, ESQ.
HON. HERMAN N. JOHNSON, JR.,ESQ.
HON. KEVIN W. JENT, ESQ.
HON. ROBERT F. CHILDS, JR., ESQ.
HON. ROCCO CALAMUSA, ESQ.
WIGGINS, CHILDS, QUINN & PANTAZIS
301 19th Street, North
Birmingham, AL 35203-3204


HON. J. ALLEN SCHREIBER, ESQ.
HON. P. MARK PETRO, ESQ.
SCHREIBER & PETRO
Two Metroplex Drive, Suite 250
Birmingham, AL  35209



FOR THE DEFENDANTS:

J. MARK WHITE, ESQ.
WHITE, ARNOLD ANDREWS & WHITE
2025 3rd Avenue North, Ste. 600
Birmingham, AL 35203

```
 1              (Continued Appearances)

 2    HON. JOSEPH B. MAYS, JR., ESQ.
      HON. ABDUL K. KALLON, ESQ.
 3    HON. ARNOLD W. UMBACH, III, ESQ.
      HON. JAMES WALKER MAY, ESQ.
 4    HON. RONALD H. KENT, JR., ESQ.
      HON. T. MATTHEW MILLER, ESQ.
 5    BRADLEY, ARANT, ROSE & WHITE
      P. O. Box 830709
 6    Birmingham, AL  35203

 7

 8

 9

10    Christina K. Decker, RPR, CRR
      Federal Official Court Reporter
11    101 Holmes Avenue, NE, Suite 305
      Huntsville, AL 35801

12

13    Penny L. Enoch, RPR
      Federal Official Court Reporter
14    1729 5th Avenue North, Room 325
      Birmingham, AL  35203

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

| Witnesses: | Direct | Cross | Redirect | Recross |
|------------|--------|-------|----------|---------|
| BILL DETTER | 4 | 34 | 57 | |
| DAVID MAJESKI | 74 | 75 | | |
| WILMA CUTCHALL | 77 | 79 | | |
| JOHN WEST, SR. | 81 | 82 | | |
| JANICE MORGAN | 84 | 86 | | |
| BARBARA RICHARDSON | 87 | 90 | | |
| RUBY BRADY | 91 | 93 | | |
| JAMES POWELL | 95 | 97 | 98 | 98 |
| DORIS MOODY | 101 | 103 | | |
| MICHAEL PAPP | 105 | 107 | 110 | |
| SAM KENERSON | 111 | 113 | | |
| LANA RADOSH | 115 | 117 | | |
| DAVID HOOD | 120 | 121 | | |
| JULIE BLY | 123 | 125 | | |
| THOMAS BROWN | 135 | 138 | | |
| ELDEN HEIM | 139 | 143 | | |
| ALICE DUESSLER | 144 | 146 | 147 | 147 |
| VADA ROSE | 148 | 150 | 155 | |
| Motions | 157 | | | |

1  June 14, 2005                              9:00 a.m.

2                        PROCEEDINGS:

3                  THE COURT:  Good morning, ladies and
gentlemen.  I trust you had a good evening.  The

4  plaintiffs will now call their next witness.

5                  MR. CALAMUSA:  Plaintiffs call Bill Detter,

6  Your Honor.

7            **BILL DETTER, PLAINTIFFS' WITNESS, SWORN**

8                  THE CLERK:  State your name for the record,

9  please.

10                 THE WITNESS:  Bill Detter.

11                 THE CLERK:  Spell you last name for the

12  record, please.

13                 THE WITNESS:  D, as in David, E-T-T-E-R.

14                      **DIRECT EXAMINATION**

15  **BY MR. CALAMUSA:**

16     Q.  Good morning, Mr. Detter.

17     A.  Good morning.

18     Q.  Are you formerly employed with Family Dollar?

19     A.  Yes, sir.

20     Q.  And what was the last position you held?

21     A.  Store manager.

22     Q.  How long were you employed as a store manager?

23     A.  Twelve years.

24     Q.  Do you know the dates of that employment?

25     A.  1991 to 2003.

09:11:46  1     Q.   I want to focus this morning on your employment

09:11:51  2   with Family Dollar as a store manager from July 1999

09:11:57  3   until you left in 2003; okay?

09:11:59  4     A.   Okay.

09:11:59  5     Q.   During that period of time, July '99 to 2003, how

09:12:04  6   many stores did you work in as a store manager?

09:12:06  7     A.   Two.

09:12:07  8     Q.   And where were those stores located?

09:12:10  9     A.   Both in Little Rock, Arkansas.

09:12:12  10    Q.   Do you recall the approximate square footage of

09:12:16  11  those stores?

09:12:16  12    A.   Both of them were approximately 9,000 square

09:12:19  13  feet.

09:12:20  14    Q.   And do you recall the risk classification?

09:12:22  15    A.   At one point, they would be 3; at another, 4.

09:12:26  16    Q.   And would you describe to us what that means?

09:12:29  17    A.   Risk factor was based on several factors:  Crime

09:12:35  18  area, whether or not we had bars on the window, number

09:12:39  19  of liquor stores in the area, conditions of the

09:12:41  20  neighborhood.

09:12:42  21    Q.   Is a 3 or 4 risk class high?

09:12:46  22    A.   4 is the highest, 3 is next.

09:12:48  23    Q.   Do you recall the average number of employees you

09:12:52  24  had in those two stores?

09:12:53  25    A.   Probably seven.

09:12:55   1       Q.   And the number of district managers during that

09:12:59   2   time period?

09:13:00   3       A.   Five or six during that time frame.

09:13:03   4       Q.   Did your job duties --

09:13:06   5            THE COURT:  Just a moment.  You say you had

09:13:09   6   seven employees.  An average of seven employees?

09:13:13   7            THE WITNESS:  Yes, sir.

09:13:14   8            THE COURT:  In each store?

09:13:15   9            THE WITNESS:  Yes, sir.

09:13:16   10           THE COURT:  All right.

09:13:17   11      Q.   (By Mr. Calamusa)  Were those employees full-time

09:13:18   12   or part-time?

09:13:20   13      A.   Some were full-time, some were part-time.

09:13:23   14      Q.   What job classification were the full-time?

09:13:25   15      A.   I would have assistant managers, floor

09:13:29   16   supervisors, cashiers.

09:13:33   17      Q.   Did your job duties vary, depending on which

09:13:37   18   store you worked at?

09:13:39   19      A.   No, sir.

09:13:40   20      Q.   Did your job duties vary, based on the different

09:13:44   21   district managers you had?

09:13:45   22      A.   No, sir.

09:13:47   23      Q.   Did your job duties vary at all, depending on the

09:13:50   24   size of the store?

09:13:51   25      A.   No.

09:13:59  1     Q.  Did your job duties vary depending on the number

09:14:02  2   of employees?  You said an average of seven.  When it

09:14:06  3   fluctuated, did your job duties vary?

09:14:08  4     A.  No.

09:14:08  5     Q.  Mr. Detter, were you ever sent temporarily to

09:14:12  6   another store?

09:14:12  7     A.  Yes, sir.

09:14:13  8     Q.  On how many occasions do you think you were sent

09:14:16  9   temporarily to another store?

09:14:17  10    A.  During that time frame, ten, twelve.

09:14:22  11    Q.  And when you would go to these stores, what were

09:14:26  12  you doing?

09:14:27  13    A.  Throwing freight, cleaning up the store,

09:14:31  14  resetting schematics.

09:14:32  15    Q.  Was there a store manager in the store when you

09:14:35  16  were there doing that work?

09:14:36  17    A.  Yes, sir.

09:14:36  18    Q.  While you were there throwing freight, cleaning

09:14:40  19  up, setting schematics, were there other store managers

09:14:46  20  also doing those same duties?

09:14:48  21    A.  Yes, sir.

09:14:48  22         THE COURT:  Why did you go to these other

09:14:51  23  stores?

09:14:51  24         THE WITNESS:  It was the district manager's

09:14:54  25  request.

09:14:56   1          THE COURT:  And could you have declined the
09:14:58   2   request?
09:15:01   3          THE WITNESS:  I probably could have
09:15:04   4   declined, but I don't think it would have been in the
09:15:06   5   interest of my job.
09:15:09   6          THE COURT:  When you were hired -- or when
09:15:11   7   you were promoted to the position of store manager, was
09:15:17   8   it your understanding that from time to time,
09:15:21   9   notwithstanding your official position as store manager,
09:15:24   10   you would be called on, or asked to volunteer to work in
09:15:33   11   other stores essentially as a laborer?
09:15:39   12          THE WITNESS:  No.
09:15:40   13   Q.  (By Mr. Calamusa)  When you were off being a
09:15:42   14   laborer in these other stores, were you supervising
09:15:46   15   anybody?
09:15:46   16   A.  No, sir.
09:15:47   17   Q.  And who was running the store that you were
09:15:53   18   assigned to permanently while you were off doing this?
09:15:56   19   A.  My assistant managers.
09:16:01   20   Q.  Do you know why you and the other store managers
09:16:03   21   were sent to do this laborer job, instead of sending
09:16:06   22   assistant managers or clerks or cashiers?
09:16:09   23   A.  Because we were free labor.
09:16:15   24   Q.  When you were placed or -- excuse me -- hired as
09:16:20   25   a store manager, what was your agreement with Family

09:16:23   1   Dollar as to the number of hours you would work?

09:16:25   2       A.   When I first hired, it was to be 48 hours a week.

09:16:30   3       Q.   And who told you that?

09:16:32   4       A.   My district manager.

09:16:33   5       Q.   Did that change during your employment as to --

09:16:36   6   were you ever told that that would change, the number of

09:16:39   7   hours would be something different?

09:16:41   8       A.   At one point, I was told it changed to 52.

09:16:44   9       Q.   And who informed you of that?

09:16:45  10       A.   District manager.

09:16:46  11       Q.   Did your salary increase at all when the

09:16:51  12   agreement of Family Dollar changed from 48 to 52 hours?

09:16:55  13       A.   No, sir.

09:16:58  14       Q.   What was your understanding as to your

09:16:58  15   compensation for these 48 hours, and then later 52?

09:17:01  16       A.   I would receive a weekly salary and potential

09:17:05  17   bonuses.

09:17:06  18       Q.   Does your store have a payroll budget?

09:17:12  19       A.   Yes, sir.

09:17:12  20       Q.   And who set the payroll budget?

09:17:14  21       A.   The corporate office.

09:17:16  22       Q.   Did you, as an individual holding the title of

09:17:20  23   store manager, have any input into setting the payroll

09:17:25  24   budget?

09:17:25  25       A.   No, sir.

09:17:26  1     Q.   There was a little talk yesterday about the

09:17:27  2    budget.  Will you explain to me what a payroll budget is

09:17:31  3    and what it controls?

09:17:32  4     A.   The corporate office gave us a number of dollars

09:17:36  5    to spend on the store.  Once we subtracted what the

09:17:40  6    store manager was paid, then we subtracted what the

09:17:44  7    assistant managers were paid.  The remaining dollars

09:17:48  8    were divided among the salary of the hourly employees.

09:17:53  9     Q.   Did the amount of your payroll budget affect the

09:17:55  10   number of hours you had to work?

09:17:58  11    A.   Yes.

09:17:58  12    Q.   How was that?

09:17:59  13    A.   There wasn't enough payroll dollars to man the

09:18:03  14   store properly.

09:18:04  15    Q.   If you didn't have enough hours left over to man

09:18:09  16   the store, could you, as store manager, put other hourly

09:18:13  17   employees in the store to help you?

09:18:16  18    A.   No, sir.

09:18:16  19    Q.   Who had to man the store and do the work if you

09:18:22  20   didn't have the payroll?

09:18:23  21    A.   Myself.

09:18:25  22    Q.   From 1999 until you left in 2003, what would you

09:18:33  23   say is the average number of hours you worked a week?

09:18:36  24    A.   Between 65 and 70.

09:18:39  25    Q.   Why, Mr. Detter, did you work those extra hours

09:18:45  1   if you were told by your DM when you got the job that

09:18:49  2   you only had to work 48, and he later told you you were

09:18:52  3   required to work 52, why did you work the rest of the

09:18:55  4   hours?

09:18:56  5           MR. KALLON:  Objection.  It's leading.

09:18:58  6           THE COURT:  Overruled.

09:19:00  7   A.   Needed to maintain store standards and I needed

09:19:03  8   to keep my job.

09:19:05  9   Q.   Did you have anything else that you could have

09:19:17  10  been doing, other than working that store, those extra

09:19:21  11  hours?

09:19:22  12  A.   Could have spent a lot more time with my family.

09:19:26  13          MR. KALLON:  Your Honor?

09:19:27  14          THE COURT:  Yes, sir?

09:19:28  15          MR. KALLON:  This was covered in my motion

09:19:34  16  in limine.

09:19:36  17          THE COURT:  I think you're right.  The jury

09:19:38  18  will disregard the last question and answer.

09:19:42  19  Q.   (By Mr. Calamusa)  Let me show you an exhibit

09:19:44  20  that was entered yesterday.  Exhibit 10, entitled

09:19:59  21  "Essential Job Functions of the Store Manager".

09:20:03  22      There was some discussion of this yesterday.  I

09:20:09  23  want to talk about a couple of things on the page --

09:20:12  24          MR. KALLON:  Your Honor, before Mr. Calamusa

09:20:15  25  goes forward, I think it would be proper for him to

09:20:20  1    first ask the witness to establish it.

09:20:22  2              THE COURT:  Pardon me?

09:20:23  3              MR. KALLON:  It's not been established that

09:20:25  4    this witness is familiar with this document.

09:20:27  5              THE COURT:  Sustained.

09:20:27  6       Q.  (By Mr. Calamusa)  Have you seen this document,

09:20:29  7    Mr. Detter?

09:20:29  8       A.  Yes.

09:20:32  9              MR. KALLON:  When, Your Honor?

09:20:33  10             THE COURT:  Sir?

09:20:34  11             MR. KALLON:  When?

09:20:35  12             THE COURT:  You can ask him that on

09:20:38  13   cross-examination, Mr. Kallon.

09:20:42  14             MR. KALLON:  Okay.

09:20:42  15      Q.  (By Mr. Calamusa)  Let's look at number 8, if you

09:20:48  16   would.

09:20:49  17        "Read, plan and stock schematics for proper

09:20:54  18   merchandising."  Can you tell me what that entailed?

09:20:57  19      A.  The corporate office sent schematics for the

09:21:02  20   store.  We had to be able to read that schematic and put

09:21:11  21   it into place in the store.

09:21:18  22      Q.  Mr. Kallon wanted me to ask, so I will:  When?

09:21:23  23   Do you recall when you saw this?

09:21:24  24      A.  I don't recall the first time, no.

09:21:27  25      Q.  Look at -- there was some talk about some of the

09:21:32  1    ones yesterday, but I don't think we really discussed

09:21:35  2    the essential job functions listed number 10 and the

09:21:41  3    subpoints under that.

09:21:46  4         Were the essential job functions of a store

09:21:49  5    manager to "ring up sales on cash register"?

09:21:55  6         A.  Yes, sir.

09:21:55  7         Q.  Were your essential job functions of the store

09:21:59  8    manager to "scan merchandise labels and place

09:22:01  9    merchandise in bags"?

09:22:02  10        A.  Yes, sir.

09:22:03  11             MR. KALLON:  Your Honor, the document speaks

09:22:05  12   for itself, I believe.

09:22:06  13             THE COURT:  The objection to leading is

09:22:09  14   sustained.

09:22:11  15        Q.  Look at these six bullet points here, Mr. Detter.

09:22:20  16   Were these bullet points, and the things identified as

09:22:23  17   an essential job function, in fact, an essential job

09:22:27  18   function for the store manager?

09:22:29  19             MR. KALLON:  Same objection, Your Honor.

09:22:33  20             MR. CALAMUSA:  Was these -- I am not going

09:22:34  21   through them individually.

09:22:35  22             THE COURT:  The objection is sustained to

09:22:37  23   the question as phrased.

09:22:41  24        Q.  (By Mr. Calamusa)  Do the bullet points in this

09:22:46  25   document, defendant's document, entitled Essential Job

09:22:50  1    Functions, set forth the job duties?

09:22:55  2        A.  Yes, sir.

09:22:56  3        Q.  Look over on page 2.  The bullet points at the

09:23:07  4    top of the page.  Are those essential job functions of

09:23:21  5    the store manager?

09:23:22  6        A.  Yes, sir.

09:23:23  7        Q.  The section on page 2, under number 11, where it

09:23:34  8    says "work as a stock clerk".  The eight bullet points

09:23:48  9    on this essential job function, are those, in fact, the

09:23:52  10   essential job functions of the store manager?

09:23:54  11       A.  Yes, sir.

09:23:57  12       Q.  If you would, turn over to page 4.  In the

09:24:08  13   section "physical activity", did the job of store

09:24:17  14   manager require climbing frequently?

09:24:22  15       A.  Yes.

09:24:23  16       Q.  Stooping frequently?

09:24:27  17       A.  Yes.

09:24:29  18            MR. KALLON:  Your Honor, Mr. Calamusa is

09:24:33  19   essentially reading the document.

09:24:35  20            THE COURT:  The objection is sustained.

09:24:35  21       Q.  Take a minute, Mr. Detter, and look at these

09:24:37  22   where it says "climbing, stooping, kneeling, reaching".

09:24:45  23            MR. KALLON:  Your Honor, same objection.

09:24:47  24            THE COURT:  Well, this is a preliminary

09:24:49  25   question, he hasn't finished it yet.

| | | |
|---|---|---|
| 09:24:52 | 1 | MR. KALLON:  Okay. |
| 09:24:53 | 2 | Q.  (By Mr. Calamusa)  "Walking and lifting", |
| 09:24:55 | 3 | Mr. Detter.  Are those essential job functions of a |
| 09:25:04 | 4 | store manager? |
| 09:25:04 | 5 | MR. KALLON:  Same objection, Your Honor. |
| 09:25:06 | 6 | THE COURT:  Overruled. |
| 09:25:08 | 7 | A.  Yes, sir. |
| 09:25:08 | 8 | Q.  The defendant's document of Essential Job |
| 09:25:14 | 9 | Functions identifies the amount of time these physical |
| 09:25:18 | 10 | activities and physical demands would take by a store |
| 09:25:26 | 11 | manager.  Do you believe that those are accurate, the |
| 09:25:32 | 12 | ones we are talking about? |
| 09:25:33 | 13 | MR. KALLON:  Your Honor, I object again. |
| 09:25:36 | 14 | Mr. Calamusa is still testifying for the witness. |
| 09:25:38 | 15 | THE COURT:  Well, rephrase your question.  I |
| 09:25:41 | 16 | sustain the objection.  Are they accurate? |
| 09:25:44 | 17 | Q.  Are they accurate? |
| 09:25:45 | 18 | A.  Yes. |
| 09:25:46 | 19 | Q.  Tell me, if you would, Mr. Detter, what your |
| 09:25:56 | 20 | actual job duties were as a store manager. |
| 09:25:58 | 21 | A.  I unloaded trucks.  I stocked shelves.  I ran |
| 09:26:06 | 22 | registers.  I swept floors.  I cleaned bathrooms.  I set |
| 09:26:12 | 23 | schematics.  Changed light bulbs. |
| 09:26:20 | 24 | Q.  How often would your district manager visit your |
| 09:26:24 | 25 | store? |

09:26:24  1      A.   About once every two weeks.

09:26:28  2      Q.   And how often did you speak, communicate, with

09:26:33  3  your district manager, either over the phone or email?

09:26:35  4      A.   Basically, daily basis.

09:26:40  5      Q.   Did you receive assignments from the DM or even

09:26:47  6  corporate via these emails?

09:26:50  7      A.   Yes, sir.

09:26:50  8      Q.   And I guess I asked how often you communicated

09:26:54  9  with -- well, strike that.

09:26:56  10         Did you receive emails from the corporate office?

09:26:58  11     A.   Yes, sir.

09:26:59  12     Q.   Tell me what the emails from the -- that you

09:27:03  13  would receive from the DM or the corporate office would

09:27:06  14  entail.

09:27:07  15     A.   They normally dealt with company policies,

09:27:11  16  procedures, upcoming events, projects they wanted

09:27:17  17  accomplished in the stores.

09:27:31  18              MR. CALAMUSA:  Your Honor, may we approach?

09:27:34  19              THE COURT:  Yes.

09:27:34  20                   (At the bench:)

09:29:22  21              MR. CALAMUSA:  I am going to introduce this

09:29:22  22  to this witness.

09:29:22  23              THE COURT:  What's the objection?

09:29:22  24              MR. UMBACH:  Your Honor, there are several

09:29:22  25  objections.  One is, this has not been produced.  This

09:29:22  1    is one of them that was covered in the motion in limine

09:29:22  2    that we raised.

09:29:22  3                THE COURT:  Uh-huh.

09:29:22  4                MR. UMBACH:  Number two, Your Honor, we

09:29:22  5    object to the authenticity, and they should have to

09:29:22  6    establish that.

09:29:22  7                THE COURT:  Uh-huh.

09:29:22  8                MR. UMBACH:  And, Your Honor, should it come

09:29:22  9    in, we would ask that you give an instruction to the

09:29:22  10   jury that it has a limited application of only to anyone

09:29:22  11   who may have received it.

09:29:22  12               MR. KALLON:  Judge, I am going to pay you

09:29:22  13   back on that point.  If you look at the two-line email,

09:29:23  14   according to this, it was sent to Store 231.

09:29:23  15               MR. CALAMUSA:  If you look at the next line,

09:29:23  16   it says to all store managers from Bruce Barkus.  Bruce

09:29:23  17   Barkus is the senior vice-president of the store

09:29:23  18   operations.

09:29:23  19               MR. KALLON:  He is --

09:29:23  20               MR. CALAMUSA:  I will establish through

09:29:23  21   him --

09:29:23  22               THE COURT:  The objection is overruled.

09:29:23  23               MR. KALLON:  Judge, just so we don't come up

09:29:23  24   here, we will object along the same ground on emails

09:29:23  25   that they introduce.

09:29:23   1              THE COURT:  They're overruled.

09:29:23   2              MR. CALAMUSA:  Overruled on all of them?

09:29:23   3              THE COURT:  Yes.

09:29:29   4                   (End of bench conference.)

09:29:31   5                 (In open court, jury present.)

09:29:31   6     Q.  (By Mr. Calamusa)  If you would, Mr. Detter, look

09:29:33   7   at the document I was giving you, which is Plaintiff's

09:29:36   8   Number 136.

09:29:38   9        Did you receive this document while you were

09:29:43  10   store manager?

09:29:43  11     A.  Yes, sir.

09:29:44  12              MR. CALAMUSA:  Plaintiffs would offer 136,

09:29:47  13   Your Honor.

09:29:47  14              THE COURT:  And from whom did you -- how did

09:29:51  15   you receive it?

09:29:53  16              THE WITNESS:  This came down as over the PC.

09:29:55  17              THE COURT:  What's the "PC"?

09:29:56  18              THE WITNESS:  The personal computer in the

09:29:58  19   offices in email.

09:30:00  20              THE COURT:  You got it while you were in the

09:30:01  21   office as a store manager?

09:30:03  22              THE WITNESS:  Yes, sir.

09:30:04  23              THE COURT:  All right.  It's received in

09:30:06  24   evidence, and it may be published to the jury.

09:30:15  25     Q.  (By Mr. Calamusa)  Mr. Detter, who is this email

09:30:17  1  from?

09:30:21  2     A.   Came from a Ben Spratlin forwarded from Bruce

09:30:26  3  Barkus.

09:30:26  4     Q.   Who is Bruce Barkus?

09:30:29  5     A.   He was senior vice-president of store operations.

09:30:34  6     Q.   I want you to look at the first paragraph, third

09:30:47  7  line starts with "I", way over here (indicating).  And

09:30:55  8  if you would, would you read that?

09:30:57  9     A.   "I want to remind you that it is the policy of

09:31:02 10  Family Dollar that district managers interview all

09:31:05 11  assistant manager candidates, whether newly hired or

09:31:09 12  internal promotion candidates."

09:31:12 13     Q.   The next paragraph, the next sentence.

09:31:16 14     A.   "The purpose of this memo is to restate this

09:31:19 15  policy so everyone fully understands."

09:31:24 16     Q.   And if you would read one more sentence.

09:31:28 17     A.   "Any store manager, assistant manager, or any

09:31:31 18  other associate whom the store manager has recommended

09:31:34 19  to carry keys to a Family Dollar store must be approved

09:31:37 20  in person by the district manager prior to being hired,

09:31:42 21  promoted and/or given store keys."

09:31:47 22     Q.   And what does Mr. Barkus say will happen, if not?

09:31:52 23  The next sentence, I am sorry.

09:31:53 24     A.   "Violation of this policy is a serious infraction

09:31:56 25  and may result in disciplinary action, up to and

09:32:01   1   including possible termination."

09:32:01   2      Q.  And the time you were store manager and held that

09:32:06   3   title, did you understand this to be the company policy?

09:32:09   4      A.  Yes, sir.

09:32:10   5      Q.  And did you -- did you understand that a

09:32:13   6   violation of this policy could result in disciplinary

09:32:17   7   action up to and including termination?

09:32:19   8                  MR. KALLON:  Objection, Your Honor.

09:32:21   9                  THE COURT:  Overruled.

09:32:23  10      A.  Yes, sir.

09:32:24  11      Q.  Did you, Mr. Detter, have the authority to hire

09:32:36  12   employees on your own?

09:32:37  13      A.  No, sir.

09:32:39  14      Q.  Did you interview employees?

09:32:44  15      A.  Yes, sir.

09:32:46  16                  THE COURT:  Well, actually, you had the

09:32:52  17   authority to interview employees and to tentatively hire

09:33:01  18   them, but you had to get the approval of the district

09:33:07  19   manager before the hiring could be complete; is that

09:33:10  20   correct?

09:33:10  21                  THE WITNESS:  Correct.

09:33:11  22                  THE COURT:  All right.  Put another way:

09:33:16  23   You couldn't simply interview a candidate, make sure

09:33:20  24   that the candidate's application papers were all in

09:33:24  25   order, and then give the job to that candidate before

09:33:31  1    you talked to the district manager?

09:33:33  2         THE WITNESS:  No, sir, I could not.

09:33:34  3         THE COURT:  All right.

09:33:36  4    Q.  (By Mr. Calamusa)  Did you have to get the

09:33:37  5    district manager's -- did any candidate in which you

09:33:41  6    interviewed have to be preapproved in person by the

09:33:45  7    district manager, as this document states?

09:33:47  8    A.  Yes, sir.

09:33:48  9         THE COURT:  The candidate -- you couldn't

09:33:51  10   interview the candidate before you got the approval of

09:33:56  11   the district manager?

09:33:57  12        THE WITNESS:  For an assistant manager

09:34:00  13   position.

09:34:01  14        THE COURT:  You could not interview an

09:34:03  15   assistant manager candidate without the prior approval

09:34:06  16   of the district manager?

09:34:07  17        THE WITNESS:  Correct.

09:34:08  18        THE COURT:  All right.

09:34:10  19   Q.  (By Mr. Calamusa)  Let's talk about cashiers for

09:34:12  20   a minute.  You did interview cashiers?

09:34:18  21   A.  Yes, sir.

09:34:19  22   Q.  Who, other than yourself in your store, would

09:34:23  23   interview and make recommendations on cashiers?

09:34:26  24   A.  The assistant managers.

09:34:27  25   Q.  When assistant managers would interview and make

09:34:33   1   these recommendations, were you always present in those

09:34:36   2   interviews and involved in those recommendations?

09:34:39   3       A.   No, sir.

09:34:39   4       Q.   Were there occasions in which you interviewed

09:34:50   5   candidates and recommended to the DM and the DM did not

09:34:53   6   accept your recommendation?

09:34:54   7       A.   Yes, sir.

09:34:55   8       Q.   Did you have any authority to promote anyone?

09:35:05   9       A.   No, sir.

09:35:10   10          THE COURT:   Well, again, you did have the

09:35:12   11   authority to recommend that the employee be promoted,

09:35:19   12   but before the promotion could be effective, go into

09:35:24   13   effect, you had to get the approval of the district

09:35:27   14   manager; is that correct?

09:35:27   15          THE WITNESS:   Correct.

09:35:28   16       Q.   Were there instances in which you made

09:35:30   17   recommendations, either for or against someone being

09:35:33   18   promoted, and the DM didn't follow it?

09:35:35   19       A.   Yes, sir.

09:35:36   20       Q.   Terminating somebody, could you, as the

09:35:44   21   individual holding the title of the store manager,

09:35:47   22   terminate an employee in your store without getting the

09:35:50   23   DM's approval?

09:35:51   24       A.   No, sir.

09:35:52   25       Q.   Was there an occasion in which you wanted to

09:35:54  1    terminate someone?

09:35:55  2       A.   Several.

09:35:56  3       Q.   Tell me about one of those.

09:35:58  4       A.   One of those involved an assistant manager that I

09:36:06  5    caught stealing.  I notified the district manager and

09:36:13  6    requested that I be allowed to terminate that associate.

09:36:17  7    He informed me that I needed to put them back to work,

09:36:21  8    so I did.

09:36:22  9              THE COURT:  When was this?

09:36:24  10             THE WITNESS:  2000, I believe.  Sometime

09:36:27  11   during the year 2000.

09:36:28  12             THE COURT:  And what was the name of the

09:36:30  13   assistant manager?

09:36:31  14             THE WITNESS:  I can't recall the last name,

09:36:33  15   first name was Chris.

09:36:34  16             THE COURT:  And do you recall the name of

09:36:36  17   your district manager at the time?

09:36:37  18             THE WITNESS:  Bob Russell.

09:36:40  19             THE COURT:  All right.

09:36:40  20       Q.   (By Mr. Calamusa)  And did you put that gentleman

09:36:42  21   back to work?

09:36:42  22       A.   Yes, sir.

09:36:43  23       Q.   And were you asked, or did you give an opinion as

09:36:51  24   to whether or not that person should be promoted later

09:36:53  25   on?

09:36:54   1          MR. KALLON:   Object to leading.

09:36:56   2          THE COURT:   Overruled.

09:36:57   3     A.   Yes.  I asked if they were ready for promotion

09:37:00   4   and I informed the district manager, no.

09:37:04   5     Q.   Was that individual promoted, despite your

09:37:07   6   objection?

09:37:08   7     A.   Yes, sir.

09:37:09   8     Q.   Do you know what happened to that individual?

09:37:10   9     A.   They were promoted to store manager, and three

09:37:12   10  months later terminated for theft.

09:37:15   11    Q.   Did you have any authority to give anybody -- or

09:37:23   12  excuse me -- did you have any authority to decide

09:37:25   13  starting salary?

09:37:26   14    A.   No, sir.

09:37:26   15    Q.   Could you give employees within the store that

09:37:39   16  you worked written warnings for discipline without

09:37:42   17  seeking DM approval?

09:37:44   18    A.   Not without DM approval.

09:37:47   19    Q.   Was there an occasion when you wanted to give one

09:37:50   20  of your employees in your store a written reprimand and

09:37:53   21  you had to go to the DM and he denied it?

09:37:56   22    A.   Several.

09:37:57   23    Q.   Who determined the number of hours in which your

09:38:02   24  hourly employees worked?

09:38:03   25    A.   That came from corporate.

09:38:09   1      Q.   And how did it come down from corporate?

09:38:11   2      A.   Via the staff schedule order.

09:38:19   3      Q.   I think it was discussed a little bit yesterday,

09:38:22   4  but I want to make sure --

09:38:23   5              THE COURT:  Can we hold on just one minute?

09:38:26   6              Ladies and gentlemen, let's take a

09:38:27   7  five-minute recess.

09:38:28   8              Do not discuss the case among yourselves or

09:38:31   9  anyone else.  Do not allow it to be discussed in your

09:38:34  10  presence, and keep an open mind.

09:38:40  11              (Jury out at 9:27 a.m. until 9:35 a.m.)

09:44:02  12              (In open court, jury present.)

09:44:02  13              THE COURT:  Continue direct examination of

09:44:13  14  the witness.

09:44:14  15      Q.   (By Mr. Calamusa)  I believe you were going to

09:44:22  16  tell us about the staff scheduler.  Will you describe

09:44:26  17  for us what that is and what that term means?

09:44:30  18      A.   It's a computer-generated schedule that came down

09:44:33  19  from the corporate office instructing the manager how to

09:44:36  20  schedule the employees in the store.

09:44:40  21      Q.   Help us understand.  You have lived with it.

09:44:43  22  What do you mean instructed you how to schedule your

09:44:47  23  employees in the store?

09:44:48  24      A.   It came down with a listing of manager, assistant

09:44:54  25  manager, A and B, cashiers, A, B, C, listed total number

09:45:01  1   of hours for each of those employees and how many hours

09:45:04  2   each day they would work.

09:45:05  3       Q.   After you took out your hours and had the

09:45:16  4   assistant managers, did it identify the day in which the

09:45:21  5   hourly employees could work and the number of hours for

09:45:24  6   that day?

09:45:25  7       A.   Yes, sir.

09:45:25  8       Q.   Did you have any input into setting the days in

09:45:33  9   which your employees would work and the number of hours?

09:45:36  10      A.   No, sir.

09:45:37  11      Q.   If the staff scheduler came down and gave you a

09:45:42  12  cashier on Monday, and somebody else at a different time

09:45:45  13  on Monday, and you thought it would be better to have

09:45:47  14  them on Friday, could you make that change?

09:45:51  15          MR. KALLON:   Objection, leading, Your Honor.

09:45:54  16          THE COURT:   Overruled.

09:45:55  17      A.   Not without district manager approval.

09:45:57  18      Q.   Did you have a copy of the store policy manuals?

09:46:04  19      A.   Yes, sir.

09:46:04  20      Q.   And I want you to look at Exhibit 2, page number

09:46:18  21  50.   If you would look at page entitled "Store

09:47:01  22  Standards, General Operating Policies", which at the

09:47:03  23  bottom has that D-00050.   Do you see that page?

09:47:08  24      A.   Yes, sir.

09:47:08  25      Q.   If you would --

| | | |
|---|---|---|
| 09:47:11 | 1 | THE COURT:  Does the jury have a copy of |
| 09:47:15 | 2 | this? |
| 09:47:17 | 3 | MR. CALAMUSA:  I believe so. |
| 09:47:18 | 4 | MR. G. WIGGINS:  Yes, sir. |
| 09:47:19 | 5 | THE COURT:  All right. |
| 09:47:21 | 6 | Q.  (By Mr. Calamusa)  If you would, look at the |
| 09:47:25 | 7 | fifth paragraph down.  And read that for me, please. |
| 09:47:32 | 8 | A.  Where it's "members of the management team"? |
| 09:47:37 | 9 | Q.  Yes, sir. |
| 09:47:38 | 10 | A.  "Members of the management team are:  Store |
| 09:47:40 | 11 | manager, associate manager, assistant manager, floor |
| 09:47:44 | 12 | supervisor, and in some cases, a 'third key' person." |
| 09:47:48 | 13 | Q.  Did you understand that this was Family Dollar's |
| 09:47:52 | 14 | definition of the members of management? |
| 09:47:55 | 15 | A.  Yes, sir. |
| 09:47:57 | 16 | Q.  You held the title store manager; correct? |
| 09:48:00 | 17 | A.  Correct. |
| 09:48:01 | 18 | Q.  You were paid salary; correct? |
| 09:48:03 | 19 | A.  Correct. |
| 09:48:03 | 20 | Q.  Did you ever have an associate manager? |
| 09:48:08 | 21 | A.  No, sir. |
| 09:48:09 | 22 | Q.  Assistant managers, how were they paid? |
| 09:48:12 | 23 | A.  Hourly. |
| 09:48:13 | 24 | Q.  Floor supervisors, how were they paid? |
| 09:48:16 | 25 | A.  Hourly. |

09:48:18    1      Q.   And "third key" person, how were they paid?

09:48:20    2      A.   Hourly.

09:48:21    3      Q.   If you would, Mr. Detter, turn to page 95, the

09:48:35    4   bottom will say D-95.  At the top, "Store Recovery".

09:48:45    5      If you would under "Store Recovery", would you

09:48:48    6   read that first paragraph?

09:48:49    7      A.   "It is every employee's responsibility to assist

09:48:54    8   in maintaining a clean and inviting shopping environment

09:48:57    9   for the customer."

09:48:59   10      Q.   That's your understanding, as the store manager,

09:49:02   11   of what Family Dollar's policy was as to whose

09:49:05   12   responsibility it was to maintain a clean and inviting

09:49:08   13   shopping environment?

09:49:09   14      A.   Yes, sir.

09:49:10   15      Q.   Look at another page in the policy manual.  311.

09:49:27   16   Actually, before 311, let's go to 325 first.  Under

09:49:40   17   "Petty Cash", that will be the fourth paragraph.

09:49:48   18      In order to increase the petty cash in the store,

09:49:51   19   what did that require, Mr. Detter?

09:49:53   20      A.   It required the district manager's approval,

09:49:58   21   regional vice-president's approval, and notification to

09:50:02   22   the cash and sales department.

09:50:03   23      Q.   And the next paragraph, "Store Management's

09:50:07   24   Accountability", we heard some talk of accountability

09:50:11   25   yesterday.

09:50:12  1      What is the first sentence under in the store

09:50:16  2  policy manual regarding Accountability say?

09:50:19  3      A.   "The store manager, assistant manager and/or

09:50:22  4  floor supervisor are accountable for petty cash."

09:50:25  5      Q.   Was that your understanding as to Family Dollar's

09:50:28  6  policy as to who was accountable?

09:50:30  7      A.   Yes, sir.

09:50:31  8      Q.   Go to 311, please.   Document entitled "Office

09:50:45  9  Procedures, Office Schematic."

09:50:49  10      First, let me ask you this:   There have been

09:50:51  11  talks of schematics.   What is a schematic?

09:50:55  12      A.   A schematic is a layout of a section of the store

09:51:01  13  that has shelf tags, location of product, spacing of the

09:51:06  14  product, and a description of the product itself.

09:51:10  15      Q.   Could you, as the individual holding this title

09:51:12  16  of store manager, decide where you wanted to put product

09:51:16  17  in your store?

09:51:17  18      A.   No, sir.

09:51:18  19      Q.   Who made that decision?

09:51:19  20      A.   That came from the corporate office.

09:51:22  21      Q.   Could you, as store manager, decide what items to

09:51:27  22  display and where?

09:51:28  23      A.   No, sir.

09:51:28  24      Q.   It's summertime, Mr. Detter.   As store manager,

09:51:34  25  could you decide, "hey, I think I am going to sell more

09:51:37  1  suntan lotion and put a display of suntan lotion right

09:51:42  2  when the people walk in the store" --

09:51:44  3          MR. KALLON:  Objection, Your Honor.

09:51:46  4          THE COURT:  Overruled.

09:51:47  5    A.  No, sir.

09:51:47  6    Q.  This is an office schematic.  Explain to me what

09:51:53  7  that is.

09:51:54  8    A.  Again, it's a schematic much as on the sales

09:52:00  9  floor, but this pertained to the office of the store;

09:52:01  10  told us how to set up the file cabinets, where different

09:52:04  11  books went, different manuals went, different papers;

09:52:08  12  went so far as to tell us where to put the supplies that

09:52:11  13  we used in our office.

09:52:14  14    Q.  The last sentence under "Desk Top".  Would you

09:52:20  15  read that for me?

09:52:21  16    A.  "Under no circumstances should store supplies,

09:52:25  17  merchandise, food and drink, or any other non-office

09:52:30  18  related items be placed on the desktop."

09:52:32  19    Q.  Could you, as the individual holding this title

09:52:36  20  of the store manager, deviate in any way from this

09:52:40  21  office schematics?

09:52:41  22    A.  No, sir.

09:52:41  23    Q.  Did you, as the individual holding the title of

09:52:44  24  store manager, ever get reprimanded or counseled

09:52:51  25  regarding the office schematic?

09:52:53   1        A.   Not actually reprimand, but I was informed that I
09:52:56   2   had the wrong type of container on top of the desk for
09:53:00   3   my paper clips, rubber bands and ballpoint pens.
09:53:04   4        Q.   The container -- tell us what you mean
09:53:06   5   "container".
09:53:07   6        A.   I just had a little plastic tub had several that
09:53:11   7   were lined up on the desk that held my supplies.
09:53:14   8        Q.   And who came in and told you you had the wrong
09:53:16   9   type of containers to hold your pens and paper clips?
09:53:19  10        A.   The district manager.
09:53:20  11        Q.   Did you have to change it?
09:53:22  12        A.   He threw the old ones away, and went to the shelf
09:53:27  13   in the store and brought back some new containers, and
09:53:29  14   placed them on the desk.
09:53:31  15        Q.   How much -- what percentage of time would you
09:53:37  16   say, Mr. Detter, that you spent unloading the trucks,
09:53:42  17   stocking the shelves, running the cash register,
09:53:46  18   cleaning the floors, cleaning the bathrooms in the
09:53:54  19   store?
09:53:55  20        A.   90 percent.
09:53:56  21        Q.   If you held the title of store manager, why did
09:54:03  22   you not simply hire more employees, or place more
09:54:09  23   employees in the store to help you do some of this
09:54:12  24   manual labor?
09:54:13  25        A.   I didn't have the authority to hire them and I

09:54:16  1   didn't have the payroll to hire them.

09:54:18  2       Q.   Did you do evaluations?  Did you fill out

09:54:33  3   evaluations on employees in your store?

09:54:34  4       A.   I assisted with those evaluations.

09:54:36  5       Q.   Who also assisted you with the evaluations?

09:54:39  6       A.   For the cashiers, my assistant managers.

09:54:43  7       Q.   Did you have final approval as to those

09:54:47  8   evaluations?

09:54:48  9       A.   No, sir.

09:54:48  10      Q.   Who did?

09:54:49  11      A.   The district manager.

09:54:50  12      Q.   Were there any occasions in which you handed

09:54:54  13  evaluations on the employees that were within your store

09:54:57  14  to the district manager, and he or she changed those

09:55:01  15  evaluations?

09:55:01  16      A.   Yes, sir.

09:55:02  17      Q.   How often did that happen?

09:55:04  18      A.   During the time frame we're talking, no more than

09:55:10  19  two or four times.

09:55:12  20      Q.   You said that when you were hired, you were told

09:55:23  21  that you would get a salary, plus be eligible for bonus;

09:55:27  22  correct?

09:55:28  23      A.   Correct.

09:55:29  24      Q.   In the years in which we're talking about, '99

09:55:32  25  until you left in 2003, were there times where you got

09:55:36    1    no bonus?

09:55:37    2         A.   Yes, sir.

09:55:37    3         Q.   And were there other times when you did?

09:55:41    4         A.   Other times that I did.

09:55:43    5         Q.   You had assistants in your store?

09:55:55    6         A.   Yes, sir.

09:55:56    7         Q.   Did the job duties of the assistants vary in any

09:56:00    8    way from your job duties?

09:56:01    9         A.   No, sir.

09:56:02   10         Q.   Were you responsible -- or let me ask this:  Your

09:56:16   11    store, was it also known as a training store for a

09:56:20   12    period of time?

09:56:20   13         A.   Yes, sir.

09:56:22   14         Q.   And tell me what that is.

09:56:24   15         A.   The district manager would send me potential

09:56:29   16    store managers that were to train, learn how to do

09:56:35   17    Family Dollar operations in my store.

09:56:39   18         Q.   When the new potential store managers would come

09:56:45   19    to your store, what was the first thing that you would

09:56:49   20    train them on?

09:56:50   21         A.   How to unload a truck.

09:56:56   22         Q.   What was the next thing that you trained them on?

09:57:00   23         A.   How to put the freight on the shelf.

09:57:02   24         Q.   So the first two things that you would train

09:57:05   25    these soon-to-be store managers was unloading the truck

| | | |
|---|---|---|
| 09:57:08 | 1 | and stocking shelves? |
| 09:57:10 | 2 | A.  Yes, sir. |
| 09:57:11 | 3 | MR. CALAMUSA:  Thank you, Mr. Detter. |
| 09:57:13 | 4 | That's all I have. |
| 09:57:14 | 5 | THE COURT:  All right.  Cross-examination. |
| 09:57:15 | 6 | 40 minutes. |
| 09:57:16 | 7 | **CROSS-EXAMINATION** |
| 09:57:16 | 8 | **BY MR. KALLON:** |
| 09:57:18 | 9 | Q.  Mr. Detter, good morning, sir. |
| 09:57:24 | 10 | A.  Good morning. |
| 09:57:25 | 11 | Q.  My name is Abdul Kallon.  I am one of the lawyers |
| 09:57:28 | 12 | of Family Dollar in this case. |
| 09:57:30 | 13 | Just following up what Mr. Calamusa just recently |
| 09:57:33 | 14 | asked you, you would agree with me that there's a |
| 09:57:37 | 15 | process involved in unloading a truck; correct? |
| 09:57:40 | 16 | A.  Correct. |
| 09:57:41 | 17 | Q.  And that is, in fact, a management function; |
| 09:57:45 | 18 | correct? |
| 09:57:45 | 19 | A.  Correct. |
| 09:57:46 | 20 | Q.  Because one of the things you are doing is, one, |
| 09:57:50 | 21 | verifying that you did, in fact, receive what Family |
| 09:57:54 | 22 | Dollar corporate is alleging you received; correct? |
| 09:57:56 | 23 | A.  No, sir. |
| 09:57:56 | 24 | Q.  All right.  Now, the other thing you would look |
| 09:57:58 | 25 | at as you unload, you're planning, you're deciding what |

09:58:04  1   goes on the floor and what goes in the bathroom;

09:58:06  2   correct?

09:58:07  3        A.   No, sir.

09:58:07  4        Q.   You don't do anything when you unload the truck,

09:58:10  5   then?

09:58:11  6        A.   I handle the boxes.

09:58:14  7        Q.   All right.   Now, do you also agree with me, then,

09:58:18  8   sir, that stocking, keeping the shelves full, that that

09:58:24  9   is a management function?

09:58:25  10        A.   Correct.

09:58:26  11        Q.   When you left Family Dollar was in 2001, I

09:58:34  12   believe?

09:58:34  13        A.   No.   I left in 2003.

09:58:39  14        Q.   I apologize for that.   You were making

09:58:39  15   approximately $900 a week; correct?

09:58:41  16        A.   Correct.

09:58:42  17        Q.   And that's roughly $46,000 a year?

09:58:45  18        A.   Correct.

09:58:46  19        Q.   And you also were eligible for bonus; correct?

09:58:50  20        A.   Correct.

09:58:51  21        Q.   And that bonus was based on performance, meeting

09:58:54  22   certain performance standards; correct?

09:58:57  23        A.   I am not really sure what it was based on.   I

09:59:00  24   know how they have calculated it.

09:59:02  25        Q.   It was based on 1 percent of the controllable

09:59:05  1   profit at the store?

09:59:06  2       A.   Correct.

09:59:07  3       Q.   So there were years when you received it, as you

09:59:09  4   pointed it out to Mr. Calamusa, and years when you did

09:59:11  5   not?

09:59:12  6       A.   Correct.

09:59:12  7       Q.   You were asked --

09:59:15  8                 THE COURT:   What's your educational

09:59:20  9   background?

09:59:21  10                THE WITNESS:   College graduate.

09:59:22  11                THE COURT:   College graduate?

09:59:23  12                THE WITNESS:   Yes.

09:59:24  13      Q.   (By Mr. Kallon)  You were asked about the staff

09:59:27  14  schedule; correct?

09:59:27  15      A.   Correct.

09:59:27  16      Q.   When you first received that, it came with some

09:59:29  17  grease pencils?

09:59:29  18      A.   Yes.

09:59:30  19      Q.   And that was so you could make changes to it;

09:59:32  20  correct?

09:59:33  21      A.   With the district manager approval.

09:59:34  22      Q.   And just so the jury is clear, I think you

09:59:37  23  testified on direct that you could not decide which

09:59:42  24  employees worked what hours.  Do you recall that

09:59:44  25  testimony?

09:59:44    1    A.  No.

09:59:49    2    Q.  In fact, you can't -- you could decide what your

09:59:54    3    employees worked which hours; correct?

09:59:55    4    A.  You had to assign a name to the hours that were

09:59:58    5    scheduled.

09:59:58    6    Q.  And you were the one as the manager who made that

10:00:01    7    determination?

10:00:02    8    A.  Combination of myself and my assistant.

10:00:04    9    Q.  And when it came to scheduling at the store, also

10:00:09    10    the buck stopped with you; correct?

10:00:12    11    A.  No.

10:00:12    12    Q.  Let me -- at the store level, when it came to

10:00:19    13    scheduling, your testimony is the buck did not stop with

10:00:21    14    you; correct?

10:00:22    15    A.  Correct.

10:00:22    16    Q.  Let me -- you gave a deposition in this case;

10:00:27    17    correct, sir?

10:00:28    18    A.  Correct.

10:00:28    19    Q.  And you were under oath?

10:00:32    20    A.  Yes, sir.

10:00:32    21    Q.  Just like you are today; correct?

10:00:35    22    A.  Yes, sir.

10:00:37    23        MR. KALLON:  Judge, may I approach the

10:00:38    24    witness, sir?

10:00:40    25        THE COURT:  Yes, sir.

| | | |
|---|---|---|
| 10:00:42 | 1 | MR. CALAMUSA:  What page, Abdul? |
| 10:00:46 | 2 | MR. KALLON:  Page 167. |
| 10:00:48 | 3 | Q.  (By Mr. Kallon)  Here you go, sir.  Are you on |
| 10:00:58 | 4 | page 167, sir? |
| 10:01:00 | 5 | A.  Yes, sir. |
| 10:01:00 | 6 | Q.  If you go to line 15, question -- I will read the |
| 10:01:05 | 7 | question and then the answer, you will read.  These -- |
| 10:01:09 | 8 | MR. CALAMUSA:  Your Honor, this doesn't |
| 10:01:12 | 9 | contradict what he said. |
| 10:01:13 | 10 | THE COURT:  Well, I would expect, |
| 10:01:16 | 11 | Mr. Kallon, that at some point he's going to say in the |
| 10:01:19 | 12 | deposition "the buck stopped with me". |
| 10:01:24 | 13 | MR. KALLON:  Your Honor, the question was at |
| 10:01:26 | 14 | the store level when it came to scheduling, the buck |
| 10:01:29 | 15 | stopped with him. |
| 10:01:30 | 16 | THE COURT:  The question you put to him was, |
| 10:01:33 | 17 | as I recall, "did the buck stop with you"? |
| 10:01:39 | 18 | MR. KALLON:  Yes, sir. |
| 10:01:40 | 19 | THE COURT:  And I can pull it up, if I need |
| 10:01:42 | 20 | to, but I think I remember it fairly well. |
| 10:01:45 | 21 | MR. KALLON:  That's correct, Your Honor. |
| 10:01:47 | 22 | THE COURT:  And so, in order to impeach him, |
| 10:01:48 | 23 | you are going to have to show that in his deposition he |
| 10:01:50 | 24 | says "the buck stopped with me". |
| 10:01:53 | 25 | MR. KALLON:  I apologize. |

| | | |
|---|---|---|
| 10:01:55 | 1 | THE COURT:  All right. |
| 10:01:56 | 2 | Q.  (By Mr. Kallon)  Mr. Detter -- |
| 10:01:58 | 3 | MR. CALAMUSA:  Can we shut this off? |
| 10:01:59 | 4 | THE COURT:  Sure. |
| 10:01:59 | 5 | Q.  -- as it comes to schedule of the store, between |
| 10:02:02 | 6 | you and the assistants, you had the final say; correct? |
| 10:02:04 | 7 | A.  Correct. |
| 10:02:06 | 8 | Q.  The buck stopped with you at the store level on |
| 10:02:10 | 9 | the scheduling? |
| 10:02:11 | 10 | A.  No, sir. |
| 10:02:12 | 11 | Q.  You had seven employees; correct? |
| 10:02:23 | 12 | A.  I averaged seven. |
| 10:02:25 | 13 | Q.  And both stores you worked them? |
| 10:02:28 | 14 | A.  Correct. |
| 10:02:28 | 15 | Q.  And those seven employees were full-timers? |
| 10:02:33 | 16 | A.  Some were full-time, some were part-time. |
| 10:02:35 | 17 | Q.  In your deposition, you testified all seven of |
| 10:02:38 | 18 | them were full-timers; correct? |
| 10:02:40 | 19 | A.  Not at all times, no. |
| 10:02:42 | 20 | Q.  But generally, for those seven that you had, you |
| 10:02:46 | 21 | would agree with me that you had over 200 hours, of |
| 10:02:49 | 22 | labor hours, from those seven at both stores? |
| 10:02:52 | 23 | A.  Correct. |
| 10:02:53 | 24 | Q.  And your store was open for how many hours? |
| 10:02:56 | 25 | A.  It varied from 9:00 to 7:00 during the week to -- |

| | | |
|---|---|---|
| 10:03:03 | 1 | Q.  I'm sorry.  Collectively, roughly 67 or 70 hours? |
| 10:03:10 | 2 | A.  Roughly 77 hours a week. |
| 10:03:12 | 3 | Q.  And you had 200 man hours of -- not -- excluding |
| 10:03:17 | 4 | you, you had 200-plus hours of help at the store; |
| 10:03:20 | 5 | correct? |
| 10:03:21 | 6 | A.  Correct. |
| 10:03:21 | 7 | Q.  So technically, if you wanted to, you had man |
| 10:03:26 | 8 | hours available to have an employee, two employees at |
| 10:03:29 | 9 | the store, at least two employees at the store every |
| 10:03:32 | 10 | time that store was opened? |
| 10:03:33 | 11 | A.  Correct. |
| 10:03:33 | 12 | Q.  And then, of course, you would also, at some |
| 10:03:36 | 13 | point, overlap with those two; correct? |
| 10:03:38 | 14 | A.  Correct. |
| 10:03:39 | 15 | Q.  So, in other words, you were not the only one |
| 10:03:41 | 16 | working at the store? |
| 10:03:42 | 17 | A.  No, sir. |
| 10:03:43 | 18 | Q.  And you had 200-plus hours worth of help? |
| 10:03:48 | 19 | A.  The store had that much labor, yes. |
| 10:03:50 | 20 | Q.  You testified earlier that you were sent from |
| 10:03:53 | 21 | store to store to help out.  Do you recall that |
| 10:03:58 | 22 | testimony? |
| 10:03:58 | 23 | A.  Yes. |
| 10:03:58 | 24 | Q.  And generally, when you were pulled from your |
| 10:04:01 | 25 | store to go elsewhere, it was because the other store |

| | | |
|---|---|---|
| 10:04:04 | 1 | was in a mess; correct? |
| 10:04:05 | 2 | A.   Correct. |
| 10:04:05 | 3 | Q.   That manager of that store was not performing his |
| 10:04:09 | 4 | duties; correct? |
| 10:04:10 | 5 | MR. CALAMUSA:  Objection, Your Honor. |
| 10:04:11 | 6 | THE COURT:  Your objection is sustained. |
| 10:04:14 | 7 | Q.   The store was a mess when you were sent to it; |
| 10:04:18 | 8 | correct? |
| 10:04:19 | 9 | A.   Correct. |
| 10:04:19 | 10 | Q.   You were sent over there to fix the problem? |
| 10:04:22 | 11 | MR. CALAMUSA:  Object, Your Honor. |
| 10:04:23 | 12 | THE COURT:  The objection is sustained. |
| 10:04:26 | 13 | Q.   Mr. Detter, were you asked by your district |
| 10:04:30 | 14 | managers to go to those stores and to help fix a problem |
| 10:04:32 | 15 | with those stores? |
| 10:04:34 | 16 | MR. CALAMUSA:  Object, Your Honor. |
| 10:04:39 | 17 | THE COURT:  I will let him answer that |
| 10:04:40 | 18 | question. |
| 10:04:42 | 19 | A.   I was asked to assist, yes. |
| 10:04:43 | 20 | Q.   And sometimes, in the course of doing that |
| 10:04:47 | 21 | fixing, you were working side by side with that store's |
| 10:04:50 | 22 | manager; correct? |
| 10:04:52 | 23 | A.   Correct. |
| 10:04:53 | 24 | Q.   And you would show him how to do certain things? |
| 10:04:58 | 25 | A.   No. |

10:05:00   1    Q.   But when you left that store, whatever issue

10:05:05   2  existed before you arrived, that issue was eliminated?

10:05:11   3    A.   That, I don't know.

10:05:12   4    Q.   Well, when you left the store and returned to

10:05:15   5  your store, was the store a mess, the one that you had

10:05:19   6  just been sent to?

10:05:22   7    A.   The one that we had been at wasn't as messy as it

10:05:25   8  was when we got there.

10:05:26   9         THE COURT:  Well, when you say the store's a

10:05:28  10  mess, are you saying that at times you had to go to

10:05:31  11  another store because the merchandise hadn't been

10:05:38  12  unloaded from trucks and you had to unload the

10:05:42  13  merchandise?  Is that the kind of thing you did?

10:05:44  14         THE WITNESS:  That's part of what we did.

10:05:46  15         THE COURT:  And so when unloaded merchandise

10:05:51  16  was on the truck at another store, you would consider

10:05:56  17  that store, then, being in a mess?

10:05:58  18         THE WITNESS:  Correct.

10:05:59  19         THE COURT:  All right.  And what you did was

10:06:02  20  go over, basically, and perform the manual labor of

10:06:07  21  removing the merchandise from the truck into the store?

10:06:12  22         THE WITNESS:  And put it on the shelves.

10:06:14  23         THE COURT:  And put it on the shelves.

10:06:16  24         THE WITNESS:  Correct.

10:06:16  25    Q.   (By Mr. Kallon)  And that was not the only thing

10:06:18   1   that you did, Mr. Detter?

10:06:20   2      A.   Correct.

10:06:20   3      Q.   There were other things that you did?

10:06:21   4      A.   We also set schematics.

10:06:24   5      Q.   All right.  And setting schematics, making sure

10:06:28   6   you follow company policy, you would agree that is a

10:06:30   7   management function; correct?

10:06:32   8      A.   I did not make sure that the management followed

10:06:35   9   policy, no.

10:06:36  10      Q.   That's not my question.  I apologize for not

10:06:38  11   being clear.

10:06:39  12          I said setting schematics, making sure a store

10:06:43  13   follows company policy with respect to schematics, you

10:06:46  14   would agree with me, that is a management function?

10:06:49  15      A.   That's a function of every associate in the

10:06:53  16   store.

10:06:54  17      Q.   But, again, the associates of the store at the

10:06:57  18   store level, report to the store manager?

10:07:01  19      A.   Some reported to the assistant, some report

10:07:05  20   reported to the manager.

10:07:06  21      Q.   Thank you, sir.

10:07:07  22          You were shown an email earlier, which I believe

10:07:09  23   is Plaintiffs' Exhibit 136.  That's the email that you

10:07:15  24   told the Court that you received in your store; correct?

10:07:19  25      A.   Correct.

10:07:20  1    Q.   Ben Spratlin was never your district manager, was

10:07:24  2    he?

10:07:24  3    A.   I don't recognize the name, no.

10:07:26  4    Q.   Correct.  In fact, you never worked at Store 231

10:07:29  5    that is listed there, have you?

10:07:30  6    A.   No.

10:07:31  7    Q.   Let's look at that email you have in front of

10:07:33  8    you.

10:07:34  9    A.   Yes.

10:07:34  10   Q.   The first line of that email deals with an

10:07:39  11   increase of a number of assistant managers who were

10:07:43  12   discharged on integrity issues?

10:07:47  13   A.   Yes, sir.

10:07:47  14   Q.   Integrity issues would include assistant managers

10:07:50  15   stealing; correct?

10:07:50  16   A.   Correct.

10:07:51  17   Q.   And Mr. Barkus goes on to say "before you hire

10:07:57  18   any person as a key holder, please contact your district

10:08:01  19   manager"; correct?

10:08:02  20   A.   Correct.

10:08:06  21   Q.   And the district managers -- based on your

10:08:10  22   experience, as it relates to key holders -- they

10:08:13  23   conducted background checks?

10:08:17  24   A.   I am not sure who performed the background

10:08:21  25   checks.

10:08:21  1    Q.   But one of the things you asked the district

10:08:23  2    manager for, the district manager gave you as it related

10:08:27  3    to assistant managers, related to background checks?

10:08:31  4    A.   Correct.

10:08:31  5    Q.   And the background check will tell you if the

10:08:34  6    person has a criminal record?

10:08:36  7    A.   I am not sure what all it tells you.

10:08:38  8    Q.   Mr. Detter, you were the store manager for twelve

10:08:42  9    years; correct?

10:08:43  10   A.   Correct.

10:08:43  11   Q.   And in the course of that time period, you

10:08:46  12   received background -- information on background checks?

10:08:50  13   A.   The only information we received as managers was

10:08:53  14   whether or not we could hire a potential associate.

10:08:56  15   Q.   After a background check has been run?

10:08:58  16   A.   Correct.

10:08:58  17   Q.   And as you sit here today, you are saying that

10:09:01  18   you don't know if a background check deals with a

10:09:04  19   person's criminal history or not?

10:09:05  20   A.   Because we did not get the results of the

10:09:07  21   background check.

10:09:09  22   Q.   But in any event, Mr. Barkus goes on to say that

10:09:15  23   "before anyone is hired and is given a key to the store,

10:09:20  24   contact the district manager"; correct?

10:09:22  25   A.   It says they have to be approved by the district

10:09:32  1   manager.

10:09:32  2       Q.   And, Mr. Detter, you wouldn't want anybody at

10:09:35  3   your store with a key who, for example, might have had a

10:09:39  4   criminal history that you didn't know about, would you?

10:09:41  5       A.   No, sir.

10:09:42  6       Q.   Because the person with the keys has access to

10:09:47  7   everything that's in the store; correct?

10:09:49  8       A.   If they were the key-carrying assistant manager.

10:09:58  9       Q.   Keeping the store clean is a management function;

10:10:07  10  isn't that correct?

10:10:07  11      A.   Correct.

10:10:08  12      Q.   In fact, you ranked that pretty high, as far as

10:10:13  13  management function that you performed, right behind

10:10:18  14  customer service; correct?

10:10:19  15      A.   Yes, sir.

10:10:19  16      Q.   Customer service was your number one management

10:10:22  17  function that you did; correct?

10:10:23  18      A.   Correct.

10:10:32  19      Q.   And the second management function you did was

10:10:32  20  keeping the store clean; isn't that correct?  This is

10:10:32  21  your ranking them.

10:10:32  22      A.   Correct.

10:10:33  23      Q.   All right.  And then the third thing on your list

10:10:37  24  of management functions is making sure the shelves are

10:10:40  25  stocked.

| | | |
|---|---|---|
| 10:10:41 | 1 | A.   Correct. |
| 10:10:42 | 2 | Q.   And these two -- keeping the store clean and |
| 10:10:45 | 3 | making sure the shelves are stocked -- tie back into |
| 10:10:49 | 4 | number one, providing effective customer service; |
| 10:10:52 | 5 | correct? |
| 10:10:52 | 6 | A.   Yes, sir. |
| 10:10:53 | 7 | Q.   You want your customers to come in and shop in a |
| 10:10:56 | 8 | clean store? |
| 10:10:57 | 9 | A.   Yes, sir. |
| 10:10:58 | 10 | Q.   Correct?   And you want them to be able to find |
| 10:11:00 | 11 | the merchandise they are looking for; correct? |
| 10:11:02 | 12 | A.   Yes, sir. |
| 10:11:03 | 13 | Q.   And so customer service this is something that |
| 10:11:06 | 14 | you preached and practiced over and over again; isn't |
| 10:11:08 | 15 | that true? |
| 10:11:09 | 16 | A.   Something I practiced frequently. |
| 10:11:12 | 17 | Q.   And then the next thing on your list of important |
| 10:11:15 | 18 | management functions was making sure the employees do |
| 10:11:21 | 19 | their job; correct? |
| 10:11:24 | 20 | A.   I don't understand.   What, now? |
| 10:11:28 | 21 | Q.   In your deposition, you were asked to rank the |
| 10:11:31 | 22 | management functions that you performed. |
| 10:11:33 | 23 | Number 1 on your list was customer service. |
| 10:11:36 | 24 | Number 2 was keeping the store clean.   Number 3 was |
| 10:11:40 | 25 | keeping the stocks on the shelves.   And your fourth item |

10:11:44  1   was making sure the employees did their jobs; isn't that

10:11:50  2   correct, sir?

10:11:50  3       A.   I don't remember exactly, but if that's what the

10:11:56  4   deposition shows, yes.

10:11:58  5       Q.   You can check it if you want.  It's on page 176,

10:12:01  6   if you want to.

10:12:10  7            If you look on page 176, beginning at 175, line

10:12:19  8   number 18 on 175.  My question to you on line number

10:12:30  9   18 -- are you there, sir?

10:12:34  10      A.   175?

10:12:35  11      Q.   175, yes, sir, line number 18.  My question to

10:12:41  12  you was:  "What would be number 3?"  And what did you

10:12:45  13  say?

10:12:45  14      A.   "Number 3 would probably be keeping stock on the

10:12:48  15  shelves."

10:12:49  16      Q.   All right.  And if you flip now to 176, line

10:12:53  17  number 2, "What would be number 4?"  And what was your

10:12:59  18  answer, sir?

10:13:00  19      A.   My answer was "ordering" in number four.

10:13:06  20      Q.   Keep going.  Next question from me was:  "How

10:13:09  21  about making sure that the employees did their job to

10:13:12  22  the best of their ability?"  And you said "you could put

10:13:14  23  that ahead of ordering"; correct?

10:13:16  24      A.   Correct.

10:13:16  25      Q.   So it would be after making sure the shelves were

10:13:19   1    stocked?

10:13:19   2        A.   Correct.

10:13:20   3        Q.   And one way to make sure the employees did their

10:13:26   4    job was to make sure they were effectively trained;

10:13:30   5    correct?

10:13:30   6        A.   That would be part of it.

10:13:31   7        Q.   And you considered training -- you felt training

10:13:34   8    of employees was a very important thing; correct?

10:13:36   9        A.   Correct.

10:13:38   10       Q.   And in that regard, to make sure the employees --

10:13:44   11            MR. CALAMUSA:   Are we finished with this?

10:13:48   12            MR. KALLON:   I'm sorry.   We are.   Thank you.

10:13:50   13       Q.   To make sure the employees did their jobs, as a

10:13:54   14   manager, you gave them directions, you instructed them,

10:13:58   15   you told them what to do; correct?

10:14:01   16       A.   Myself and my assistants.

10:14:04   17       Q.   And in the course of the day, after you,

10:14:07   18   Mr. Detter, have given them instructions and

10:14:10   19   assignments, you would go behind them and follow up to

10:14:12   20   see if they did what you told them to do; isn't that

10:14:16   21   true, sir?

10:14:16   22       A.   Myself and my assistants.

10:14:19   23       Q.   And if they didn't do what you told them to do,

10:14:22   24   you verbally warned them; correct?

10:14:25   25       A.   I wouldn't say warned.

10:14:27  1      Q.   You talked to them?

10:14:28  2      A.   Correct.

10:14:29  3      Q.   In fact, you said in your deposition you gave

10:14:32  4  verbal warnings over 50 times in the course of your

10:14:38  5  career as a manager.

10:14:39  6      A.   Correct.

10:14:40  7      Q.   And this is something you didn't have to go to

10:14:42  8  the DM for; correct?

10:14:43  9      A.   Correct.

10:14:43  10      Q.   You just did it on your own?

10:14:45  11      A.   Myself and the assistants.

10:14:48  12      Q.   And, of course, unfortunately, some employees

10:14:52  13  just don't get it.   And at some point you reached a

10:14:55  14  point where you want to terminate them; correct?

10:14:58  15      A.   Correct.

10:14:59  16      Q.   And when Mr. Calamusa was up here, you talked

10:15:03  17  about the one time when you wanted to terminate somebody

10:15:07  18  and your DM told you not to do so.   Do you recall that

10:15:09  19  testimony?

10:15:10  20      A.   That one instance, yes.

10:15:12  21      Q.   Now, what you didn't tell the Court was that

10:15:16  22  since 2000 you had 30 employees that you wanted to be

10:15:25  23  terminated, that you made a recommendation to the

10:15:29  24  district manager; and he agreed with you 29 of the 30

10:15:33  25  times; correct?

| | | |
|---|---|---|
| 10:15:34 | 1 | A.   Correct. |
| 10:15:35 | 2 | Q.   So you would agree with me that when it comes to |
| 10:15:39 | 3 | terminations, your district manager gave your |
| 10:15:42 | 4 | recommendations particular weight; in other words, he |
| 10:15:47 | 5 | took your recommendations seriously? |
| 10:15:51 | 6 | A.   I would not say that, no. |
| 10:15:53 | 7 | Q.   29 out of 30 were terminated? |
| 10:16:01 | 8 | A.   But that doesn't mean he took my recommendations |
| 10:16:04 | 9 | with any weight. |
| 10:16:05 | 10 | Q.   These are people that you went to the manager, |
| 10:16:07 | 11 | district manager, you said, "this person is a goof off", |
| 10:16:10 | 12 | or whatever phrase you used, "and I want them |
| 10:16:12 | 13 | terminated"; correct? |
| 10:16:14 | 14 | A.   No, sir. |
| 10:16:15 | 15 | Q.   And 29 out of 30 were terminated.  That's what's |
| 10:16:18 | 16 | in your deposition.  We can go to it if you want. |
| 10:16:21 | 17 | MR. CALAMUSA:  I believe he has |
| 10:16:22 | 18 | established -- |
| 10:16:23 | 19 | THE COURT:  It's established and your |
| 10:16:25 | 20 | objection is sustained. |
| 10:16:27 | 21 | Q.   Now, you consider terminations to be a serious |
| 10:16:30 | 22 | matter, of course? |
| 10:16:31 | 23 | A.   Correct. |
| 10:16:32 | 24 | Q.   And before you terminate anybody, you want to |
| 10:16:34 | 25 | make sure you did it right; that you had all your |

| | | |
|---|---|---|
| 10:16:39 | 1 | documentation together; correct? |
| 10:16:39 | 2 | A.   Yes, sir. |
| 10:16:40 | 3 | Q.   And when you went to the district manager to |
| 10:16:44 | 4 | terminate somebody, it was only after you had tried |
| 10:16:48 | 5 | everything and you felt that you had no choice but to |
| 10:16:51 | 6 | terminate? |
| 10:16:52 | 7 | A.   Yes, sir. |
| 10:16:53 | 8 | Q.   Now, let's talk about hiring for a minute.  The |
| 10:17:02 | 9 | store gets applications; correct? |
| 10:17:04 | 10 | A.   Correct. |
| 10:17:05 | 11 | Q.   And you guys reviewed them to determine who you |
| 10:17:07 | 12 | wanted to bring in for an interview; correct? |
| 10:17:10 | 13 | A.   Correct. |
| 10:17:10 | 14 | Q.   And then you interview those people.  At the |
| 10:17:15 | 15 | store level, you guys decided collectively who you |
| 10:17:19 | 16 | wanted to hire; correct? |
| 10:17:20 | 17 | A.   Correct. |
| 10:17:21 | 18 | Q.   And, in fact, you had a system where you did it |
| 10:17:25 | 19 | by majority rule; correct? |
| 10:17:27 | 20 | A.   Yes. |
| 10:17:27 | 21 | Q.   In other words, you took into account what your |
| 10:17:34 | 22 | assistant managers had to say; correct? |
| 10:17:36 | 23 | A.   Yes. |
| 10:17:36 | 24 | Q.   And, in fact, you had a policy that if it was |
| 10:17:39 | 25 | just one assistant, and the two of you could not agree, |

10:17:42   1   you wouldn't hire that person; correct?

10:17:44   2       A.   I don't know if I would call it a policy, but

10:17:49   3   that was the way it worked.

10:17:50   4       Q.   That was your practice?

10:17:51   5       A.   That was the practice in that store.

10:17:53   6       Q.   Okay.   And once you and the assistant decided who

10:17:59   7   you wanted, you then presented that candidate to the

10:18:02   8   district manager; correct?

10:18:03   9       A.   Correct.

10:18:03  10       Q.   And you said you had -- focusing the last couple

10:18:07  11   of years of your employment -- you had two district

10:18:10  12   managers, one was a guy named Kevin.   Do you remember

10:18:14  13   Mr. Kevin's last name?

10:18:16  14       A.   The last two years of my employment?

10:18:19  15       Q.   The last two stores you worked at.   You had a

10:18:23  16   district manager named Kevin, and you had another one

10:18:26  17   named Kibolski; correct?

10:18:28  18       A.   Last name Kibolski doesn't ring a bell.

10:18:32  19       Q.   It may not be Kibolski.   I will spell it for you.

10:18:36  20   My pronunciation is not that good.   I think it's

10:18:39  21   K-I-B-O-L-S-K-I.

10:18:43  22       A.   That name does not ring a bell.

10:18:48  23       Q.   I'm sorry.   I was thinking about somebody else.

10:18:51  24            You had Bob Russell; correct?

10:18:53  25       A.   Correct.

10:18:53  1       Q.   And then you had a guy named Kevin, before?

10:18:57  2       A.   Kevin was when I first started.

10:19:00  3       Q.   During -- when Kevin was your district manager,

10:19:05  4   you went to him and presented a candidate; and on 35 to

10:19:11  5   40 times, he approved that candidate; correct?

10:19:14  6       A.   I believe that's accurate.

10:19:18  7       Q.   And the only time he said no was on six

10:19:21  8   occasions?

10:19:25  9       A.   Correct.

10:19:25  10      Q.   And he only said no because you didn't have the

10:19:31  11  payroll at your store to pay that employee; correct?

10:19:36  12      A.   No.  He turned down some, even though they --

10:19:41  13      Q.   Well, again, you gave a deposition in this case;

10:19:45  14  correct?

10:19:45  15      A.   Correct.

10:19:46  16      Q.   Give me a minute to find it myself, and I will

10:19:50  17  lead you to the page.  If you flip to page 53 for a

10:20:01  18  minute, sir.  All right.  Start with line 4 on page 53.

10:20:31  19          "Question:  Okay.  I want to exclude a potential

10:20:34  20  hiring that would affect your payroll level.  Assume

10:20:38  21  that this is an opening and you can fill it within your

10:20:40  22  payroll budget, okay?"  Next question:  "Did Kevin ever

10:20:45  23  say you couldn't hire an applicant you recommended under

10:20:48  24  that situation?"  What was your answer?

10:20:49  25      A.   My answer was "no".

10:20:50  1      Q.   Thank you.  So for Kevin, you went to him

10:20:55  2   anywhere from 35 -- I'm sorry, anywhere from 41 to 46

10:21:00  3   times to hire somebody; correct?

10:21:01  4      A.   Correct.

10:21:02  5      Q.   And on 35 or 40 times, he said yes.

10:21:06  6      A.   Yes, sir.

10:21:07  7      Q.   And you would agree with me that he considered

10:21:10  8   your recommendations and gave them weight; correct?

10:21:13  9      A.   Mine and the assistants.

10:21:18  10     Q.   Now, for Bob Russell, he was the last district

10:21:21  11  manager you had; correct?

10:21:22  12     A.   No, he wasn't the last one.

10:21:26  13     Q.   All right.  Let's talk about Mr. Russell, anyway.

10:21:30  14          You went to Mr. Russell on approximately 75 times

10:21:36  15  to hire someone when you were at Store 708; correct?

10:21:41  16     A.   Correct.

10:21:41  17     Q.   And 60 times he said "yes", approved a candidate

10:21:48  18  that you presented to him; correct?

10:21:50  19     A.   That myself and my assistants presented, yes.

10:21:54  20     Q.   And on the 15 times when he said no, like

10:21:57  21  Mr. Kevin, it was because you didn't have the dollars at

10:22:00  22  your store to pay that employee; correct?

10:22:01  23     A.   Correct.

10:22:02  24     Q.   And then when you were at Store Number 1314 --

10:22:06  25  you were sent over there because that store was a mess;

10:22:09  1    correct?

10:22:10  2        A.   Correct.

10:22:11  3        Q.   You were transferred there because the manager

10:22:13  4    who was there was not getting the job done.

10:22:16  5                    MR. CALAMUSA:   Object.

10:22:17  6        Q.   That's what you were told.

10:22:19  7        A.   Correct.

10:22:19  8        Q.   And when you went over there, you had the

10:22:23  9    opportunity to hire four people; correct?

10:22:26  10       A.   During the time frame that I was there.

10:22:30  11       Q.   And on all four of those, your district manager,

10:22:33  12   Bob Russell, said yes.

10:22:37  13       A.   Correct.

10:22:38  14       Q.   All right.  Based on my math, Kevin said 35 to 40

10:22:44  15   times yes; Bob Russell, at your two stores, said yes 64

10:22:51  16   times.  That's 105 times, if my math is correct.  I may

10:22:57  17   be off a couple of numbers -- but that's 105 times when

10:23:00  18   a candidate was presented that you, at your store level

10:23:04  19   wanted to hire, and that candidate was, in fact, hired;

10:23:08  20   correct?

10:23:08  21       A.   That myself and my assistants recommended, yes.

10:23:13  22       Q.   And the two of them, Kevin and Mr. Russell,

10:23:15  23   collectively only said "no" on 21 times; 15 for Bob and

10:23:21  24   then 6 for Kevin?

10:23:24  25       A.   Correct.

| | | |
|---|---|---|
| 10:23:24 | 1 | Q.   You would agree with me that both of your |
| 10:23:27 | 2 | managers gave your recommendations for hiring particular |
| 10:23:32 | 3 | weight? |
| 10:23:34 | 4 | A.   It gave weight to myself and my assistants' |
| 10:23:38 | 5 | recommendations, yes. |
| 10:23:40 | 6 | MR. KALLON:   Thank you, sir. |
| 10:23:40 | 7 | THE COURT:   Redirect? |
| 10:23:42 | 8 | **REDIRECT EXAMINATION** |
| 10:23:42 | 9 | **BY MR. CALAMUSA:** |
| 10:23:49 | 10 | Q.   Let's start with this hiring.  Mr. Kallon did |
| 10:23:57 | 11 | some numbers. |
| 10:23:58 | 12 | Why, if you're store manager, did you even have |
| 10:24:01 | 13 | to go to the DM on however many times he added up? |
| 10:24:04 | 14 | A.   That was company policy. |
| 10:24:07 | 15 | Q.   Could you have done it on your own? |
| 10:24:09 | 16 | A.   No, sir. |
| 10:24:09 | 17 | Q.   If the person passed all the background checks, |
| 10:24:13 | 18 | the Stanton test, the drug test -- so they passed the |
| 10:24:17 | 19 | company policies what they required -- could you on your |
| 10:24:21 | 20 | own hire people for the store in which you were working |
| 10:24:25 | 21 | in? |
| 10:24:25 | 22 | A.   No, sir. |
| 10:24:25 | 23 | Q.   He asked you about scheduling.  You put names on |
| 10:24:35 | 24 | a schedule; is that right? |
| 10:24:36 | 25 | A.   Correct. |

10:24:37   1       Q.   Is that the extent of what you did, in regards to

10:24:41   2   scheduling employees in your stores?

10:24:43   3       A.   Yes, sir.

10:24:44   4       Q.   Could you put people on certain days if you

10:24:48   5   wanted to?

10:24:49   6       A.   No.

10:24:50   7       Q.   Could you add or subtract hours on days?

10:24:53   8       A.   No, sir.

10:24:54   9       Q.   Could you increase somebody on -- or move

10:24:56   10   somebody from a Monday to a Friday?

10:24:58   11       A.   No, sir.

10:24:59   12       Q.   There was some talk about stocking, stocking and

10:25:09   13   unloading.  And it's listed on the essential job

10:25:13   14   functions.

10:25:15   15       Tell me what you, as store manager did, in

10:25:18   16   regards to stocking.

10:25:19   17       A.   I carried a lot of boxes from the back of the

10:25:25   18   truck to the shelf.

10:25:26   19       Q.   And your stores, the two stores you worked in, on

10:25:32   20   a truck day, give me an approximate number of boxes that

10:25:37   21   would arrive.

10:25:39   22       A.   We received a full trailer, anywhere from 1700 to

10:25:44   23   2,100 parts.

10:25:47   24       Q.   And this management function was to pick those

10:25:56   25   boxes up and move them to the shelves?

10:25:59   1              MR. KALLON:   Object, Your Honor.   He's

10:26:01   2   leading.

10:26:01   3              THE COURT:   Sustained.

10:26:02   4       Q.   What was the management function, as part of

10:26:04   5   stocking?

10:26:05   6       A.   Take the boxes from the truck to the shelf.

10:26:08   7       Q.   Schematics, setting schematics was mentioned on

10:26:12   8   the essential job functions.  Help us understand what

10:26:16   9   that means, as far as you, as a manager.  What did you

10:26:19   10  do?

10:26:20   11      A.   I took the information that was sent to the store

10:26:24   12  from the corporate office, shelf strip, shelf tags, and

10:26:29   13  put them on the shelves that the corporate office

10:26:32   14  designated to put them on.

10:26:34   15      Q.   Do you consider that to be manual labor?

10:26:38   16      A.   Yes, sir.

10:26:39   17      Q.   Customer service.  Mr. Kallon asked you a little

10:26:46   18  bit about customer service.  Who is responsible for

10:26:48   19  customer service in your store?

10:26:49   20      A.   Every employee we've got.

10:26:51   21      Q.   And is that Family Dollar policy, that all

10:26:54   22  employees are responsible for customer service?

10:26:56   23      A.   Yes, sir.

10:26:57   24      Q.   Part of customer service -- and I think Mr.

10:27:04   25  Kallon talked about cleanliness of the store.  Number

10:27:10  1    95, Exhibit 2.   Page 95 on Exhibit 2, Store Recovery.

10:27:23  2         That's cleaning; is that right, Mr. Detter?

10:27:26  3    A.   Yes, sir.

10:27:27  4    Q.   And what does Family Dollar's policy state in

10:27:30  5    regards to who is responsible for cleaning?

10:27:36  6    A.   Every employee.

10:27:41  7    Q.   Tell me this:  What did you do, as store manager,

10:27:45  8    in regards to cleaning?  What was this big manager

10:27:47  9    function you did?

10:27:48  10   A.   I straightened shelves, I swept floors, and I

10:27:54  11   cleaned bathrooms.

10:27:56  12   Q.   Do you consider that to be manual labor or

10:27:59  13   supervisory?

10:28:00  14   A.   Manual labor.

10:28:01  15   Q.   Keys.  Keys to the store.  Mr. Kallon talked

10:28:09  16   about how important it was that the people that had keys

10:28:12  17   to your store passed those background checks and go

10:28:15  18   through all the company procedures.  You agree with

10:28:17  19   that; right?

10:28:18  20   A.   Yes, sir.

10:28:19  21   Q.   You wanted people that were honest to have keys

10:28:24  22   to your store; right?

10:28:26  23   A.   Yes.

10:28:26  24   Q.   That had integrity; right?

10:28:28  25   A.   Yes.

10:28:29  1      Q.   Did you want an assistant manager to have keys to
10:28:34  2   your store whom you caught stealing?
10:28:38  3      A.   No, sir.
10:28:39  4               MR. KALLON:   Your Honor?
10:28:41  5               THE COURT:   Yes, sir?
10:28:42  6               MR. KALLON:   Leading at this point.  He's
10:28:44  7   also covering something from this morning as well.
10:28:46  8               THE COURT:   Overruled.
10:28:48  9      Q.   (By Mr. Calamusa)   Could you fire the individual
10:28:50  10  whom you caught stealing?
10:28:52  11     A.   No, sir.
10:28:53  12     Q.   Did you seek to fire the individual who was
10:28:57  13  caught stealing, who had a set of keys?
10:28:59  14     A.   Yes, sir.
10:29:00  15     Q.   Training.  Who trained your cashiers?
10:29:05  16     A.   I had a lead cashier that did that.
10:29:10  17     Q.   There was some talk about your bonus.  And I
10:29:17  18  believe Mr. Kallon said your bonus was based on 1
10:29:20  19  percent of controllable profit.  Do you agree with that?
10:29:23  20     A.   That was my understanding, yes.
10:29:24  21     Q.   During the five years in question here, '99 until
10:29:28  22  you left in 2003, do you recall receiving $10,737 in
10:29:38  23  bonus?
10:29:39  24     A.   Not at one time.
10:29:42  25     Q.   Over those five years?

10:29:46   1      A.   Probably fairly close.

10:29:51   2      Q.   Do you recall a year in which you received $4,000

10:29:58   3   in bonus?

10:30:01   4      A.   I know I received that much in -- I believe it

10:30:06   5   was 2001.

10:30:10   6      Q.   Calculator.   And there was a year in which you

10:30:15   7   received zero, I think you testified.

10:30:17   8      A.   Yes, sir.

10:30:18   9      Q.   And if you received a bonus of 4,000 --

10:30:22  10           MR. KALLON:   Your Honor, this is redirect.

10:30:25  11   And also, bonuses are based on performance and store

10:30:31  12   sales.   This is not the way bonuses were calculated.

10:30:39  13   It's not based on how many hours you worked, sir.

10:30:40  14           THE COURT:   The objection is overruled.

10:30:43  15      Q.   Would you put in 4,000?   If you received $4,000

10:30:51  16   in bonus, and it's based on 1 percent of controllable

10:30:55  17   profit, what would be the profit that Family Dollar made

10:30:59  18   for the store that you worked on?   400 -- can you read

10:31:29  19   that?

10:31:29  20      A.   $400,000.

10:31:30  21      Q.   And as a result of that, you got a 1 percent

10:31:33  22   profit?

10:31:33  23           MR. KALLON:   Your Honor, I am going to

10:31:35  24   object.   Again, I think the bonus is based on

10:31:38  25   controllable profit.

| | | |
|---|---|---|
| 10:31:39 | 1 | THE COURT:  You have made that objection, |
| 10:31:41 | 2 | Mr. Kallon, and I have -- |
| 10:31:42 | 3 | MR. KALLON:  And also, Your Honor, this is |
| 10:31:44 | 4 | going way beyond the scope of Mr. Calamusa's direct. |
| 10:31:47 | 5 | THE COURT:  You made that one, too.  And |
| 10:31:49 | 6 | they're overruled. |
| 10:31:50 | 7 | Q.  (By Mr. Calamusa)  If in the five years you |
| 10:31:52 | 8 | worked, Mr. Detter, you made $10,737 in bonus.  $10,737 |
| 10:32:12 | 9 | divided by five years; Mr. Detter, can you read that for |
| 10:32:16 | 10 | me?  Can you see that far? |
| 10:32:18 | 11 | A.  $2,147.40. |
| 10:32:22 | 12 | Q.  That's per year.  And if you divide that by 52 |
| 10:32:25 | 13 | weeks, can you read that? |
| 10:32:29 | 14 | A.  Roughly $41.30. |
| 10:32:32 | 15 | Q.  And I believe it's your testimony that's |
| 10:32:37 | 16 | undisputed that you worked between 65 and 70 hours? |
| 10:32:43 | 17 | A.  Correct. |
| 10:32:43 | 18 | Q.  Let's do it by 65.  Divide that $41 by 65 hours, |
| 10:32:48 | 19 | please.  Can you read that? |
| 10:32:52 | 20 | A.  A little over 63 cents. |
| 10:32:54 | 21 | Q.  63 cents per hour? |
| 10:32:57 | 22 | A.  Per hour. |
| 10:33:03 | 23 | MR. CALAMUSA:  That's all I have, Your |
| 10:33:05 | 24 | Honor. |
| 10:33:05 | 25 | THE COURT:  All right.  Thank you, sir. |

10:33:09   1          Ladies and gentlemen, we will take our

10:33:12   2   morning recess.  We will be in recess until 10:45 by the

10:33:16   3   clock on the wall.

10:33:17   4          Please do not discuss the case among

10:33:19   5   yourselves or with anyone else.  Do not allow the case

10:33:22   6   to be discussed in your presence, and keep an open mind.

10:33:25   7              (Jury out at 10:24 a.m.)

10:37:56   8       (In open court, jury not present at 10:45 a.m.)

10:51:45   9          THE COURT:  In looking over the jury

10:51:48   10   instructions, it seems to me pretty clear that there is

10:51:57   11   no dispute over whether the plaintiffs have carried

10:52:04   12   their burden of proof, is there?

10:52:15   13          MR. WHITE:  You mean as to all members?

10:52:17   14          THE COURT:  As to all members on the three

10:52:19   15   issues:  Number 1, whether they were employed by Family

10:52:30   16   Dollar; number 2, whether at the time of their

10:52:37   17   employment with Family Dollar, Family Dollar was engaged

10:52:40   18   in interstate commerce; and number 3, whether Family

10:52:47   19   Dollar paid them overtime wages.  That's all they have

10:52:53   20   to show.

10:52:55   21          MR. MAY:  Your Honor, I don't know where the

10:52:57   22   proof is on the ladder for the collective.

10:53:00   23          THE COURT:  Well, that Family Dollar --

10:53:02   24          MR. MAY:  I mean, as a technical matter, I

10:53:04   25   don't think there's any proof in the record about the

| | | |
|---|---|---|
| 10:53:07 | 1 | collective on that.  And it's more than a technical |
| 10:53:10 | 2 | matter, it's an evidentiary -- |
| 10:53:11 | 3 | THE COURT:  I'm sorry.  Is there some |
| 10:53:14 | 4 | dispute as to whether Family Dollar has paid these |
| 10:53:17 | 5 | plaintiffs overtime wages? |
| 10:53:18 | 6 | MR. MAY:  No, sir. |
| 10:53:19 | 7 | THE COURT:  That's what I am saying. |
| 10:53:20 | 8 | MR. MAY:  Okay. |
| 10:53:21 | 9 | THE COURT:  As I understand the three |
| 10:53:23 | 10 | elements that the plaintiffs have to prove:  First, they |
| 10:53:27 | 11 | have to prove that they were employed by Family Dollar |
| 10:53:30 | 12 | Stores.  There's no question as to whether they were |
| 10:53:34 | 13 | employed by Family Dollar Stores; right? |
| 10:53:35 | 14 | MR. MAY:  Yes, sir.  There's one other |
| 10:53:38 | 15 | element. |
| 10:53:38 | 16 | THE COURT:  Well, let's take mine first. |
| 10:53:40 | 17 | MR. MAY:  Yes, sir. |
| 10:53:41 | 18 | THE COURT:  All right.  No question that |
| 10:53:45 | 19 | they were employed by Family Dollar Stores. |
| 10:53:46 | 20 | Number 2, they have to prove that at the |
| 10:53:48 | 21 | time of their employment, Family Dollar was engaged in |
| 10:53:51 | 22 | interstate commerce. |
| 10:53:53 | 23 | MR. MAY:  No dispute about that. |
| 10:53:55 | 24 | THE COURT:  And number 3, they have to prove |
| 10:53:57 | 25 | that Family Dollar failed to pay them overtime pay. |

10:53:59  1          MR. MAY:  If they worked over 40 hours.

10:54:02  2   That's the first part that I left out.  There's no proof

10:54:06  3   that the collective is over 40 hours.  I think there is

10:54:10  4   proof in their quiver, but I haven't heard it.

10:54:22  5          THE COURT:  All right.

10:54:23  6          MR. MAY:  It's not just not paying overtime.

10:54:26  7          THE COURT:  Well, but overtime only becomes

10:54:30  8   applicable if they worked 40 hours or more.

10:54:33  9          MR. MAY:  Yes, sir.  In a week.

10:54:36  10          THE COURT:  And are you suggesting that some

10:54:39  11   of these plaintiffs didn't work 40 hours?

10:54:42  12          MR. MAY:  Well, there's certainly going to

10:54:44  13   be some weeks where they didn't report it.

10:54:49  14          THE COURT:  All right.  Well, how many other

10:54:55  15   witnesses were the plaintiffs planning to call who are

10:54:58  16   going to testify substantially to the same thing that

10:55:01  17   the first two?

10:55:02  18          MR. G. WIGGINS:  Judge, we have set up right

10:55:04  19   now approximately 60 to 65 witnesses.

10:55:07  20          THE COURT:  Nope.  Will not happen.

10:55:09  21          Here's what I am going to require you to

10:55:14  22   do --

10:55:15  23          MR. G. WIGGINS:  Yes, sir.

10:55:16  24          THE COURT:  -- all of the plaintiffs who are

10:55:20  25   going to testify have been in the courtroom, haven't

10:55:23  1    they?

10:55:23  2                MR. G. WIGGINS:  So far.  There's some

10:55:25  3    people still coming in.

10:55:27  4                THE COURT:  All right.  Well, in groups of

10:55:30  5    20, let one testify -- one person testify and the other

10:55:39  6    19 adopt that person's testimony, in terms of whether

10:55:48  7    they worked -- basically, whether they worked 40 hours a

10:55:52  8    week.

10:55:54  9                MR. G. WIGGINS:  We can do that, Your Honor.

10:55:55  10               THE COURT:  And then if the defendant wishes

10:55:57  11   to question any one of them as to whether they worked 40

10:56:01  12   hours a week, they may do so.

10:56:04  13               And what I am really saying is that it seems

10:56:09  14   to me that in the best interest of everybody's time, the

10:56:14  15   way to proceed is to require the plaintiffs to put on

10:56:20  16   their case in chief, not their rebuttal evidence.

10:56:26  17   Primary duty is rebuttal evidence.

10:56:30  18               Require the plaintiffs to put on their case

10:56:33  19   in chief, namely, that they were employed in interstate

10:56:37  20   commerce and worked over 40 hours a week; then

10:56:40  21   plaintiffs put on their experts; and then get to the

10:56:45  22   defendant's exemption.

10:56:49  23               MR. G. WIGGINS:  Your Honor, the only

10:56:50  24   problem I see with that is that we have 15 private

10:56:56  25   plaintiffs here now, and we have plaintiffs coming in

| | | |
|---|---|---|
| 10:56:59 | 1 | later this afternoon, tomorrow, and Friday.  I am not |
| 10:57:01 | 2 | sure how logistically I could -- |
| 10:57:04 | 3 | THE COURT:  Well, this -- I know that the |
| 10:57:07 | 4 | defendant disagrees with it, but it's my ruling. |
| 10:57:09 | 5 | We are trying this case by representative |
| 10:57:13 | 6 | evidence. |
| 10:57:13 | 7 | MR. G. WIGGINS:  Yes, sir. |
| 10:57:14 | 8 | THE COURT:  That it's only necessary, |
| 10:57:18 | 9 | really, that the named plaintiffs testify.  So are the |
| 10:57:25 | 10 | named plaintiffs here? |
| 10:57:26 | 11 | MR. G. WIGGINS:  Two of them are here, yes, |
| 10:57:30 | 12 | sir. |
| 10:57:30 | 13 | THE COURT:  Get the other two here by |
| 10:57:33 | 14 | tomorrow. |
| 10:57:33 | 15 | MR. G. WIGGINS:  Okay. |
| 10:57:34 | 16 | THE COURT:  Now, Mr. White? |
| 10:57:35 | 17 | MR. WHITE:  Your Honor. |
| 10:57:36 | 18 | THE COURT:  Yes, sir? |
| 10:57:37 | 19 | MR. WHITE:  The logistical problem that |
| 10:57:41 | 20 | Mr. Wiggins points out is sort of multiple, in that I |
| 10:57:45 | 21 | understood Mr. Wiggins yesterday saying that he was |
| 10:57:47 | 22 | going to accept the burden of going forward with |
| 10:57:50 | 23 | rebutting the exemption, which is what a lot of this |
| 10:57:54 | 24 | testimony has been about. |
| 10:57:57 | 25 | My problem with trying to do some sort of |

10:58:03  1   incorporation there, I still think it's possible, but I

10:58:07  2   think there's got to be an instruction such that this

10:58:09  3   jury doesn't think when they adopt on those three

10:58:13  4   elements that they adopt everything that these two

10:58:15  5   witnesses have said about the various aspects of their

10:58:18  6   supervision, and things like that.

10:58:21  7              So I am scratching my head, frankly, about

10:58:25  8   how we handle that.  I understand where you're headed.

10:58:28  9   But when --

10:58:31  10             THE COURT:  Well, let's mull over it.  I

10:58:33  11  will let plaintiffs call their next witness, and we can

10:58:34  12  talk about it again after we come back from lunch.  But

10:58:38  13  that's the direction in which I am headed.

10:58:41  14             MR. KALLON:  Judge, can I get one

10:58:42  15  clarification?

10:58:43  16             THE COURT:  Yes.

10:58:44  17             MR. KALLON:  You are saying that after they

10:58:46  18  present the evidence on the 40 hours' issue and the

10:58:51  19  expert, they rest?

10:58:52  20             THE COURT:  Yes.

10:58:53  21             MR. KALLON:  Then we put on our case?

10:58:54  22             THE COURT:  Yes.

10:58:55  23             MR. KALLON:  And then when we are done --

10:58:57  24             THE COURT:  Then they put on their rebuttal

10:58:59  25  case, which is their defense to your primary duty.

10:59:02  1          MR. MAY:  And then we would have an

10:59:04  2   opportunity to come back, since it's our burden to carry

10:59:06  3   the exemption.

10:59:07  4          THE COURT:  I don't think so.

10:59:11  5          MR. MAY:  Well, the burden of proof lies

10:59:14  6   largely with the defendant, so --

10:59:21  7          THE COURT:  Well --

10:59:22  8          MR. MAY:  I think we suggested to Your Honor

10:59:24  9   that we might be the ones that go first, and you

10:59:28  10  rejected that earlier somewhere along the way.

10:59:31  11          MR. KALLON:  On the logistical issue on our

10:59:33  12  part --

10:59:33  13          THE COURT:  You could have -- I would have

10:59:35  14  allowed you to go first if you had stipulated that the

10:59:39  15  plaintiffs met the burden of these three things that I

10:59:43  16  have asked you about.  You have not stipulated to that,

10:59:45  17  even now.

10:59:46  18          So the plaintiff has to -- the plaintiffs

10:59:47  19  have to prove that they worked 40 hours.  So they were

10:59:51  20  entitled to go first, which is what they're doing.

10:59:57  21          MR. G. WIGGINS:  Judge, you said you wanted

10:59:58  22  to put one more witness up there?

11:00:00  23          THE COURT:  Yes, sir.

11:00:00  24          MR. G. WIGGINS:  Am I understanding you to

11:00:02  25  tell me that you want me to establish through him that

| | | |
|---|---|---|
| 11:00:07 | 1 | he worked more than 40 hours? |
| 11:00:07 | 2 | THE COURT:  Yes. |
| 11:00:09 | 3 | MR. G. WIGGINS:  Okay. |
| 11:00:09 | 4 | MR. KALLON:  Why don't we get the list of |
| 11:00:12 | 5 | these 20 or so people this witness represents? |
| 11:00:16 | 6 | THE COURT:  Well, don't you have a list |
| 11:00:17 | 7 | showing which opt-ins will be represented by which |
| 11:00:21 | 8 | witness? |
| 11:00:24 | 9 | MR. KALLON:  We raised this problem.  The |
| 11:00:26 | 10 | list we received -- I think nine different lists -- each |
| 11:00:30 | 11 | one had 35 representatives or so, and they all represent |
| 11:00:33 | 12 | anywhere from 200 plus people -- |
| 11:00:35 | 13 | MR. MAY:  -- which overlap.  The underneath |
| 11:00:38 | 14 | overlap. |
| 11:00:43 | 15 | There's a -- I understand this is a legal |
| 11:00:47 | 16 | issue we are all wrangling with, but there is a |
| 11:00:50 | 17 | logistical issue that is the mirror image of |
| 11:00:55 | 18 | Mr. Wiggins', in the sense that we need some notice, |
| 11:01:00 | 19 | like you gave -- you ordered the parties yesterday, |
| 11:01:04 | 20 | which I assumed was going to go both ways, and give 20 |
| 11:01:07 | 21 | witnesses in advance, 30 minutes after the close of |
| 11:01:10 | 22 | testimony. |
| 11:01:10 | 23 | THE COURT:  Right. |
| 11:01:11 | 24 | MR. MAY:  We are prepared for whatever comes |
| 11:01:13 | 25 | today. |

11:01:13    1              THE COURT:  Right.

11:01:14    2              MR. MAY:  But, you know, most of our

11:01:16    3    witnesses would not be within immediate call, because we

11:01:20    4    thought we were going to have that lead time.

11:01:22    5              THE COURT:  Well, you could -- you could get

11:01:24    6    them here by Thursday.

11:01:25    7              MR. MAY:  Yes, sir.

11:01:27    8              THE COURT:  Or Friday.

11:01:28    9              MR. WHITE:  You are sort of dropping the

11:01:30   10    pigeon on both of us at the same time.

11:01:32   11              THE COURT:  Yes, sir.

11:01:33   12              MR. WHITE:  Okay.  I got it.

11:01:38   13              MR. G. WIGGINS:  Your Honor -- never mind,

11:01:41   14    Your Honor.

11:01:42   15              THE COURT:  All right.

11:01:43   16              MR. MAY:  One other thing that could happen

11:01:44   17    is we could stipulate to the payroll data that shows the

11:01:49   18    hours worked, but I don't think they're willing to do

11:01:51   19    that.

11:01:52   20              MR. G. WIGGINS:  Judge, could we ask the

11:01:55   21    Court for a ten-minute recess so all of us can talk to

11:01:59   22    make sure that we are all on the same page here?

11:02:01   23              THE COURT:  Well, no.  Let's go on to the

11:02:04   24    next witness and y'all can talk over lunch.

11:02:08   25                   (Jury in at 10:53 a.m.)

| | | |
|---|---|---|
| 11:02:56 | 1 | (In open court, jury present.) |
| 11:02:56 | 2 | THE COURT:  Ladies and gentlemen, I didn't |
| 11:02:57 | 3 | say this to you in the outset, but I should have:  In |
| 11:03:00 | 4 | this case, many of the plaintiffs will present their |
| 11:03:09 | 5 | evidence by representative.  That is to say, a |
| 11:03:17 | 6 | considerable number of plaintiffs will not actually |
| 11:03:20 | 7 | testify because they will be relying on the ones who |
| 11:03:23 | 8 | have testified to prove their case. |
| 11:03:29 | 9 | This case is being proved, if it is being |
| 11:03:31 | 10 | proved, by representative evidence.  And there will |
| 11:03:35 | 11 | probably be a different procedure after you come back |
| 11:03:39 | 12 | from lunch. |
| 11:03:40 | 13 | But I am trying to get down to the meat of |
| 11:03:44 | 14 | the coconut as quickly as possible so that we can |
| 11:03:48 | 15 | resolve this matter. |
| 11:03:50 | 16 | Thank you.  The plaintiffs will call their |
| 11:03:52 | 17 | next witness. |
| 11:03:54 | 18 | MR. G. WIGGINS:  The plaintiffs call David |
| 11:03:56 | 19 | Majeski. |
| 11:03:58 | 20 | **DAVID MAJESKI, PLAINTIFFS' WITNESS, SWORN** |
| 11:04:06 | 21 | THE CLERK:  State your name for the record, |
| 11:04:13 | 22 | please. |
| 11:04:13 | 23 | THE WITNESS:  David Majeski. |
| 11:04:13 | 24 | THE CLERK:  And spell your last name. |
| 11:04:15 | 25 | THE WITNESS:  M-A-J-E-S-K-I. |

**DIRECT EXAMINATION**

BY MR. G. WIGGINS:

Q.   Mr. Majeski, were you formerly employed with Family Dollar?

A.   Yes, sir.

Q.   What position were you employed in?

A.   Store manager.

Q.   Did you work -- as a store manager, did you work more than 40 hours a week?

A.   Yes, I did.

Q.   Did you work more than 48 hours a week?

A.   Yes, sir, I have.

Q.   Was there ever a week that you were employed with Family Dollar as a store manager that you did not work more than 40 hours a week?

A.   Absolutely not.

Q.   Did you ever receive any overtime compensation for those hours?

A.   No, I have not, sir.

          MR. G. WIGGINS:   One minute.

Q.   Did you ever -- was there ever a week that you didn't work 48 hours?

A.   No, sir, not to my knowledge.

Q.   Did you receive any compensation for those hours over 48?

11:05:14   1      A.   No, sir.

11:05:15   2      Q.   Was there a week you didn't work at least 52

11:05:20   3   hours?

11:05:20   4      A.   No.

11:05:20   5      Q.   Did you ever receive any compensation for those

11:05:22   6   hours?

11:05:22   7      A.   No.

11:05:27   8           MR. G. WIGGINS:   No further questions, Your

11:05:29   9   Honor.

11:05:29   10          THE COURT:   Cross-examination?

11:05:30   11                    **CROSS-EXAMINATION**

11:05:30   12   **BY MR. UMBACH:**

11:05:32   13     Q.   Mr. Majeski, you were paid a salary, were you

11:05:38   14   not?

11:05:39   15     A.   Yes, I was.

11:05:40   16     Q.   760 a week, I think, at the time you left?

11:05:44   17     A.   Probably something like that.   It's been a couple

11:05:47   18   of years ago.   That's probably right.

11:05:48   19     Q.   It's been about four years, almost five, hasn't

11:05:53   20   it?

11:05:53   21     A.   Yeah.

11:05:54   22     Q.   Okay.   And so 760 a week is about $39,500; is

11:06:01   23   that correct?

11:06:01   24     A.   I don't have a calculator, but if you say so.

11:06:04   25     Q.   Okay.   And that was four years ago; correct?

11:06:08  1      A.   Yes.

11:06:08  2      Q.   And you got that salary every week?

11:06:13  3      A.   Yeah.  And that was based on 48 hours a week,

11:06:17  4   though, that salary was.

11:06:19  5      Q.   Mr. Majeski, isn't it true -- you unloaded

11:06:33  6   trucks, didn't you?

11:06:34  7               THE COURT:  Your objection is sustained.

11:06:39  8               MR. UMBACH:  Your Honor, is the Court not

11:06:41  9   going to let me go beyond the scope?

11:06:43  10              THE COURT:  That's right.

11:06:45  11              MR. UMBACH:  All right.

11:06:49  12              MR. G. WIGGINS:  We have nothing further,

11:06:51  13  Your Honor.

11:06:51  14              THE COURT:  Okay.  Thank you, sir, you may

11:06:54  15  come down.  Plaintiffs call the next witness.

11:06:57  16              MR. UMBACH:  Your Honor, may I ask a

11:06:59  17  follow-up question?

11:06:59  18              THE COURT:  Sir?

11:07:00  19              MR. UMBACH:  I have another question.  May I

11:07:02  20  ask him another question?

11:07:03  21              THE COURT:  All right.  What is the

11:07:50  22  question?

11:07:55  23              You may come down.

11:07:56  24              MR. UMBACH:  No further questions, Your

11:07:58  25  Honor.

| | | |
|---|---|---|
| 11:07:58 | 1 | THE COURT:  Plaintiffs will call their next |
| 11:08:00 | 2 | witness. |
| 11:08:02 | 3 | MR. CALAMUSA:  Plaintiffs call Wilma |
| 11:08:05 | 4 | Cutchall, Your Honor. |
| 11:08:11 | 5 | **WILMA CUTCHALL, PLAINTIFFS' WITNESS, SWORN** |
| 11:08:18 | 6 | THE CLERK:  State your name for the record, |
| 11:08:20 | 7 | please. |
| 11:08:23 | 8 | THE WITNESS:  Wilma Cutchall. |
| 11:08:29 | 9 | THE CLERK:  And spell your last name for the |
| 11:08:32 | 10 | record, please. |
| 11:08:33 | 11 | THE WITNESS:  C-U-T-C-H-A-L-L. |
| 11:08:39 | 12 | **DIRECT EXAMINATION** |
| 11:08:39 | 13 | **BY MR. CALAMUSA:** |
| 11:08:39 | 14 | Q.  Ms. Cutchall, were you employed with Family |
| 11:08:42 | 15 | Dollar as a store manager? |
| 11:08:43 | 16 | A.  Yes, sir. |
| 11:08:44 | 17 | Q.  Do you recall what period of time you were |
| 11:08:47 | 18 | employed as a store manager? |
| 11:08:48 | 19 | A.  From February the 7th of 2000, to August 28th of |
| 11:08:53 | 20 | 2003. |
| 11:08:54 | 21 | Q.  And where was your store located? |
| 11:09:00 | 22 | A.  The first one was located in Hooks, Texas.  The |
| 11:09:03 | 23 | other two were located in Texarkana, Arkansas. |
| 11:09:07 | 24 | Q.  During the time that you were employed as a store |
| 11:09:09 | 25 | manager as Family Dollar, did you work more than 40 |

11:09:12  1    hours a week?

11:09:13  2        A.  Yes, sir.

11:09:13  3        Q.  During the time you were employed with Family

11:09:15  4    Dollar, did you work more than 48 hours a week?

11:09:17  5        A.  Yes, sir.

11:09:18  6        Q.  During the time you were employed with Family

11:09:21  7    Dollar as store manager, did you work more than 52 hours

11:09:23  8    a week?

11:09:24  9        A.  Yes, sir.

11:09:24  10        Q.  Ms. Cutchall, was there ever a week in which you

11:09:27  11    were employed as a store manager where you worked less

11:09:29  12    than 40?

11:09:30  13        A.  No, sir.

11:09:31  14        Q.  Less than 48?

11:09:32  15        A.  No, sir.

11:09:32  16        Q.  Or less than 52?

11:09:34  17        A.  No, sir.

11:09:34  18        Q.  Did you receive overtime compensation for any

11:09:37  19    hours you worked over 40?

11:09:39  20        A.  No, sir.

11:09:39  21        Q.  Over 48?

11:09:41  22        A.  No, sir.

11:09:41  23        Q.  Or over 52?

11:09:43  24        A.  No, sir.

11:09:47  25            MR. CALAMUSA:  That's all I have,

| | | |
|---|---|---|
| 11:09:49 | 1 | Ms. Cutchall.  Thank you. |
| 11:09:50 | 2 | THE COURT:  Cross-examination? |
| 11:09:51 | 3 | **CROSS-EXAMINATION** |
| 11:09:51 | 4 | **BY MR. WHITE:** |
| 11:09:52 | 5 | Q.  Good morning, Ms. Cutchall. |
| 11:10:01 | 6 | A.  Good morning. |
| 11:10:03 | 7 | Q.  It's my understanding that at the time you left |
| 11:10:06 | 8 | the employment of Family Dollar, you were making about |
| 11:10:09 | 9 | 700 -- |
| 11:10:10 | 10 | MR. CALAMUSA:  Object to relevancy, as to |
| 11:10:12 | 11 | what she was making as salary. |
| 11:10:16 | 12 | THE COURT:  What is the relevance of it, |
| 11:10:18 | 13 | Mr. White? |
| 11:10:19 | 14 | MR. WHITE:  The relevance of it is the fact |
| 11:10:21 | 15 | that she was being compensated, Your Honor. |
| 11:10:24 | 16 | MR. CALAMUSA:  We would stipulate she was |
| 11:10:26 | 17 | being compensated. |
| 11:10:27 | 18 | THE COURT:  In view of the stipulation, what |
| 11:10:29 | 19 | is the relevance of it, Mr. White? |
| 11:10:31 | 20 | MR. WHITE:  The amount, Your Honor, if they |
| 11:10:32 | 21 | will stipulate to the amount. |
| 11:10:34 | 22 | MR. CALAMUSA:  It's a salary, Your Honor. |
| 11:10:36 | 23 | We will stipulate she was compensated a salary. |
| 11:10:39 | 24 | MR. WHITE:  The amount. |
| 11:10:40 | 25 | THE COURT:  What was the amount? |

| | | |
|---|---|---|
| 11:10:42 | 1 | MR. WHITE:  795 a week when she left. |
| 11:10:45 | 2 | THE COURT:  That's what you were making? |
| 11:10:46 | 3 | THE WITNESS:  No, sir. |
| 11:10:48 | 4 | MR. WHITE:  What were you making? |
| 11:10:50 | 5 | THE WITNESS:  800. |
| 11:10:51 | 6 | THE COURT:  All right.  He stipulates to it. |
| 11:10:55 | 7 | Q.  (By Mr. White)  And you are, are you not, a |
| 11:10:57 | 8 | representative in this case, Ms. Cutchall? |
| 11:10:59 | 9 | A.  I am a representative of all the clients in this |
| 11:11:02 | 10 | case. |
| 11:11:03 | 11 | Q.  So you represent how many people? |
| 11:11:04 | 12 | A.  1,424 people. |
| 11:11:07 | 13 | Q.  All of them? |
| 11:11:08 | 14 | A.  Yes, sir. |
| 11:11:09 | 15 | Q.  And other than knowing that they were Family |
| 11:11:14 | 16 | Dollar managers, do you know anything else about the |
| 11:11:17 | 17 | people that you propose to represent? |
| 11:11:20 | 18 | MR. CALAMUSA:  Objection, Your Honor |
| 11:11:21 | 19 | THE COURT:  Your objection is sustained. |
| 11:11:25 | 20 | Q.  And who selected you to be a representative? |
| 11:11:37 | 21 | THE COURT:  Your objection is sustained. |
| 11:11:39 | 22 | MR. CALAMUSA:  Objection, Your Honor. |
| 11:11:40 | 23 | MR. WHITE:  That's all, Judge. |
| 11:11:42 | 24 | MR. CALAMUSA:  Nothing further. |
| 11:11:43 | 25 | THE COURT:  Thank you, ma'am.  You may come |

| | | |
|---|---|---|
| 11:11:45 | 1 | down. |
| 11:11:46 | 2 | Plaintiffs will call their next witness. |
| 11:11:50 | 3 | MR. G. WIGGINS:  Plaintiffs call John West. |
| 11:11:53 | 4 | **JOHN WEST, SR., PLAINTIFFS' WITNESS, SWORN** |
| 11:11:56 | 5 | THE CLERK:  State your name for the record, |
| 11:11:58 | 6 | please. |
| 11:12:08 | 7 | THE WITNESS:  John West, Sr., W-E-S-T. |
| 11:12:20 | 8 | **DIRECT EXAMINATION** |
| 11:12:21 | 9 | **BY MR. G. WIGGINS:** |
| 11:12:22 | 10 | Q.  Mr. West, were you employed with Family Dollar as |
| 11:12:24 | 11 | a store manager? |
| 11:12:25 | 12 | A.  Yes. |
| 11:12:26 | 13 | Q.  Did you work more than 40 hours a week? |
| 11:12:30 | 14 | A.  Yes. |
| 11:12:30 | 15 | Q.  Did you work more than 48 hours a week? |
| 11:12:32 | 16 | A.  Yes. |
| 11:12:32 | 17 | Q.  Did you work more than 52 hours a week? |
| 11:12:34 | 18 | A.  Yes. |
| 11:12:35 | 19 | Q.  Did you receive any overtime compensation for |
| 11:12:38 | 20 | those hours? |
| 11:12:38 | 21 | A.  No. |
| 11:12:39 | 22 | Q.  Do you have a guesstimate as to the number of |
| 11:12:41 | 23 | hours you averaged working each week? |
| 11:12:44 | 24 | A.  70. |
| 11:12:51 | 25 | Q.  Did you ever receive any overtime compensation |

| | | |
|---|---|---|
| 11:12:54 | 1 | for any hours that you worked over 40 hours? |
| 11:12:56 | 2 | A.  Not a cent. |
| 11:13:02 | 3 | MR. G. WIGGINS:  Nothing further, Your |
| 11:13:04 | 4 | Honor. |
| 11:13:04 | 5 | THE COURT:  Cross-examination? |
| 11:13:05 | 6 | **CROSS-EXAMINATION** |
| 11:13:05 | 7 | **BY MR. WHITE:** |
| 11:13:08 | 8 | Q.  Mr. West, did you report your hours as a store |
| 11:13:13 | 9 | manager to Family Dollar? |
| 11:13:16 | 10 | MR. G. WIGGINS:  Objection. |
| 11:13:18 | 11 | THE COURT:  On what basis? |
| 11:13:19 | 12 | MR. G. WIGGINS:  It's beyond the scope, for |
| 11:13:21 | 13 | one thing, of the direct, whether or not he reported it. |
| 11:13:26 | 14 | THE COURT:  I overrule it. |
| 11:13:28 | 15 | Q.  (By Mr. White)  You may answer, sir.  Did you |
| 11:13:30 | 16 | report your hours you worked to Family Dollar? |
| 11:13:32 | 17 | A.  Yes. |
| 11:13:33 | 18 | Q.  Did you accurately report on a weekly basis the |
| 11:13:37 | 19 | hours you worked? |
| 11:13:38 | 20 | A.  Yes. |
| 11:13:39 | 21 | Q.  On each and every week, would it be correct for |
| 11:13:43 | 22 | me to assume that the hours you reported to Family |
| 11:13:46 | 23 | Dollar were, in fact, the hours you worked? |
| 11:13:48 | 24 | A.  The hours I reported -- I worked all the hours I |
| 11:13:52 | 25 | reported, yes. |

11:13:53  1     Q.  All right, sir.  And at the time you left, what
11:13:56  2  was your salary?
11:13:58  3     A.  $708 a week.
11:14:02  4     Q.  And I don't know if Mr. Wiggins asked you -- he
11:14:05  5  may have -- but what was your store number and your
11:14:07  6  location?
11:14:07  7     A.  When I left?
11:14:09  8     Q.  Yes, sir.
11:14:10  9     A.  1295 was the store number, and the location was
11:14:14  10  Texarkana, Arkansas.
11:14:17  11            MR. WHITE:  Okay.  Thank you.
11:14:19  12            MR. G. WIGGINS:  Nothing further.
11:14:20  13            THE COURT:  Thank you, sir.
11:14:23  14            MR. QUINN:  Call Janice Morgan.
11:14:26  15            MR. WHITE:  That's out of order.  It's not
11:14:30  16  the order you gave us.
11:14:30  17            MR. MAY:  Your Honor, that's not the
11:14:32  18  order --
11:14:32  19            MR. QUINN:  I would assume that, based on
11:14:34  20  what you have done earlier, that that order is kind
11:14:37  21  of --
11:14:38  22            THE COURT:  Is her name on the list for
11:14:41  23  today?
11:14:41  24            MR. QUINN:  Yes, sir.
11:14:42  25            MR. CALAMUSA:  Yes, sir.

| | | |
|---|---|---|
| 11:14:43 | 1 | MR. MAY:  Yes, sir. |
| 11:14:44 | 2 | THE COURT:  All right. |
| 11:14:49 | 3 | **JANICE MORGAN, A PLAINTIFF, SWORN** |
| 11:14:52 | 4 | THE CLERK:  State your name for the record, |
| 11:14:56 | 5 | please. |
| 11:14:57 | 6 | THE WITNESS:  Janice Morgan. |
| 11:15:10 | 7 | THE CLERK:  Spell your last name for the |
| 11:15:12 | 8 | record, please. |
| 11:15:13 | 9 | THE WITNESS:  M-O-R-G-A-N. |
| 11:15:13 | 10 | **DIRECT EXAMINATION** |
| 11:15:14 | 11 | **BY MR. QUINN:** |
| 11:15:15 | 12 | Q.  Were you employed by Family Dollar? |
| 11:15:16 | 13 | A.  Yes, sir. |
| 11:15:17 | 14 | Q.  When? |
| 11:15:17 | 15 | A.  January the 1st, 2000, through December 31st, |
| 11:15:22 | 16 | 2000. |
| 11:15:23 | 17 | Q.  Where? |
| 11:15:23 | 18 | A.  In first in Dalton, Georgia; Granell, Georgia; |
| 11:15:29 | 19 | and Decatur, Alabama -- Somerville, Alabama. |
| 11:15:34 | 20 | Q.  And what was your position? |
| 11:15:35 | 21 | A.  I started as assistant manager, and then I became |
| 11:15:38 | 22 | manager. |
| 11:15:39 | 23 | Q.  When did you become manager? |
| 11:15:41 | 24 | A.  It was about March of 2000. |
| 11:15:43 | 25 | Q.  And was that store manager? |

11:15:44  1       A.   Yes, sir.

11:15:44  2       Q.   And how many hours did you average working a

11:15:51  3   week?

11:15:51  4       A.   Between 70 and 80 hours every week.

11:15:54  5       Q.   Was there ever a week that you did not work 40

11:16:00  6   hours?

11:16:00  7       A.   There was one week I just worked 40, but could I

11:16:04  8   tell you what happened --

11:16:05  9       Q.   Sure.

11:16:06  10      A.   -- when I did?  I only worked only 42, or

11:16:09  11  something, and the home office called me and told me

11:16:12  12  they weren't going to pay me for all week because I did

11:16:14  13  not work 48 hours.

11:16:17  14      Q.   So they told you they weren't going to pay you?

11:16:20  15      A.   For the whole week.

11:16:21  16      Q.   Okay.  Every other week, did you work more than

11:16:25  17  40 hours?

11:16:26  18      A.   Yes, sir.

11:16:26  19      Q.   Every other week, did you work more than 48

11:16:29  20  hours?

11:16:29  21      A.   Yes, sir.

11:16:30  22      Q.   Every other week, did you work more than 52

11:16:34  23  hours?

11:16:34  24      A.   Yes, sir.

11:16:34  25      Q.   What was your salary?

11:16:36    1    A.   In Georgia, I was making 525 a week, but when I

11:16:43    2    moved to Alabama, I had to take a drop in pay to 500 a

11:16:49    3    week to cover my payroll.

11:16:50    4              THE COURT:   Where did you work in Alabama?

11:16:52    5              THE WITNESS:   In Somerville, Alabama, next

11:16:54    6    to Decatur.   It's a suburb of Decatur.

11:16:58    7              THE COURT:   Somerton?

11:17:00    8              THE WITNESS:   Somerville, yes, sir.

11:17:02    9    Q.   (By Mr. Quinn)  And for any of those weeks that

11:17:04   10    you worked over 48 or 52 hours, did you ever receive any

11:17:10   11    overtime?

11:17:10   12    A.   No, sir.

11:17:12   13              MR. QUINN:   That's all.

11:17:14   14              THE COURT:   Cross-examination?

11:17:15   15                      **CROSS-EXAMINATION**

11:17:15   16    **BY MR. UMBACH:**

11:17:17   17    Q.   Ms. Morgan, the time that you said that you

11:17:23   18    called the home office about not getting your full pay,

11:17:28   19    you, in fact, did ultimately get your full pay for that

11:17:32   20    week, didn't you?

11:17:33   21    A.   I did not call them.   Payroll called me and

11:17:36   22    stipulated they were not going to pay me.   And when I

11:17:38   23    threatened with a lawyer, they did pay me.

11:17:41   24    Q.   Did you accurately report all of the hours that

11:17:46   25    you worked at Family Dollar?

| | | |
|---|---|---|
| 11:17:47 | 1 | A.  Yes, sir. |
| 11:17:50 | 2 | MR. UMBACH:  Thank you, Ms. Morgan. |
| 11:17:52 | 3 | MR. QUINN:  No further questions. |
| 11:17:54 | 4 | THE COURT:  Thank you, ma'am.  You may come |
| 11:17:56 | 5 | down. |
| 11:17:56 | 6 | Plaintiffs will call their next witness. |
| 11:17:58 | 7 | MR. QUINN:  Barbara Richardson. |
| 11:18:08 | 8 | **BARBARA RICHARDSON, A PLAINTIFF, SWORN** |
| 11:18:09 | 9 | THE CLERK:  State your name for the record, |
| 11:18:12 | 10 | please. |
| 11:18:13 | 11 | THE WITNESS:  Barbara Richardson.  Barbara |
| 11:18:13 | 12 | Richardson. |
| 11:18:13 | 13 | THE CLERK:  And spell your last name for the |
| 11:18:26 | 14 | record, please. |
| 11:18:26 | 15 | THE WITNESS:  R-I-C-H-A-R-D-S-O-N. |
| 11:18:30 | 16 | **DIRECT EXAMINATION** |
| 11:18:30 | 17 | **BY MR. QUINN:** |
| 11:18:31 | 18 | Q.  Ms. Richardson, were you ever employed by Family |
| 11:18:34 | 19 | Dollar? |
| 11:18:34 | 20 | A.  Yes, sir. |
| 11:18:34 | 21 | Q.  When? |
| 11:18:35 | 22 | A.  From April of '94 -- still employed; still |
| 11:18:40 | 23 | employed there. |
| 11:18:40 | 24 | Q.  You are still there? |
| 11:18:41 | 25 | A.  Yes, sir. |

11:18:42   1      Q.   And what was your position with Family Dollar?

11:18:44   2      A.   Started as cashier, then up to assistant manager,

11:18:49   3   and up to manager.

11:18:50   4      Q.   When did you become a store manager?

11:18:52   5      A.   In '94.

11:19:03   6      Q.   So you have been a store manager since 1994?

11:19:03   7      A.   No, sir.  I started in '94.

11:19:03   8      Q.   Okay.

11:19:03   9           THE COURT:  When did you become a store

11:19:03   10   manager?

11:19:03   11           THE WITNESS:  In '94 -- I mean, '97.

11:19:05   12      Q.   Okay.  And have you been a store manager since

11:19:08   13   1997?

11:19:09   14      A.   No, sir.  It stopped in 2000.  2000.

11:19:12   15      Q.   And what did you become in 2000?

11:19:15   16      A.   Dropped back down to cashier.

11:19:17   17      Q.   Why did you drop back down to cashier?

11:19:20   18      A.   Just was too much -- it was too much work.

11:19:23   19      Q.   While you were a store manager, did you work over

11:19:30   20   40 hours a week?

11:19:31   21      A.   Yes, sir.

11:19:31   22      Q.   While you were a store manager, did you work over

11:19:35   23   48 hours a week?

11:19:35   24      A.   Yes, sir.

11:19:36   25      Q.   While you were a store manager, did you work over

11:19:39  1  52 hours a week?

11:19:40  2      A.  Yes, sir.

11:19:41  3      Q.  Was there ever a week that you worked that you

11:19:44  4  did not work 40 hours?

11:19:46  5      A.  No, sir.

11:19:47  6      Q.  Was there ever a week that you did not work more

11:19:50  7  than 48 hours?

11:19:51  8      A.  No, sir.

11:19:52  9      Q.  How about 52?

11:19:53  10     A.  No, sir.

11:19:55  11     Q.  Were you ever paid any overtime for any of those

11:20:00  12  hours that you did not work -- that you worked over 48

11:20:03  13  or 52?

11:20:04  14     A.  No, sir.

11:20:04  15     Q.  What was your salary while you were a manager?

11:20:07  16     A.  $435 a week.

11:20:09  17     Q.  Did it ever increase?

11:20:10  18     A.  No, sir.

11:20:12  19             MR. QUINN:  Thank you, that's all.

11:20:13  20             THE COURT:  What is your position now?

11:20:15  21             THE WITNESS:  I am a cashier now.

11:20:16  22             THE COURT:  What is your salary now?

11:20:18  23             THE WITNESS:  It's 7.95 an hour.

11:20:23  24     Q.  (By Mr. Quinn)  How many hours do you work now?

11:20:24  25     A.  From about -- it's about 35, 35 a week.

| 11:20:29 | 1 | MR. QUINN:  Thank you. |
| 11:20:31 | 2 | Q.  Oh, do you ever work over 40? |
| 11:20:33 | 3 | A.  No, sir. |
| 11:20:35 | 4 | THE COURT:  Cross-examination? |
| 11:20:35 | 5 | **CROSS-EXAMINATION** |
| 11:20:35 | 6 | **BY MR. MAYS:** |
| 11:20:39 | 7 | Q.  Ms. Richardson, my name is Joe Mays.  I am one of |
| 11:20:50 | 8 | the lawyers for Family Dollar. |
| 11:20:52 | 9 | What store were you employed at as store manager? |
| 11:20:56 | 10 | A.  1064. |
| 11:20:57 | 11 | Q.  Where is that please, ma'am? |
| 11:20:58 | 12 | A.  Eutaw, Alabama. |
| 11:20:59 | 13 | Q.  Is that down in Greene County? |
| 11:21:01 | 14 | A.  Yes, sir. |
| 11:21:02 | 15 | Q.  Who was your district manager during that time? |
| 11:21:05 | 16 | A.  Peggy -- |
| 11:21:07 | 17 | MR. QUINN:  Objection, Your Honor, |
| 11:21:08 | 18 | relevance. |
| 11:21:09 | 19 | THE COURT:  Sustained. |
| 11:21:09 | 20 | Q.  During the time you were a store manager, did you |
| 11:21:12 | 21 | accurately report your hours to Family Dollar? |
| 11:21:15 | 22 | A.  Yes, sir. |
| 11:21:16 | 23 | Q.  And who is the store manager of the store you are |
| 11:21:21 | 24 | at now? |
| 11:21:22 | 25 | MR. QUINN:  Objection, relevance. |

| | | |
|---|---|---|
| 11:21:28 | 1 | THE COURT:  What is the relevance of it, |
| 11:21:29 | 2 | Mr. Mays? |
| 11:21:30 | 3 | MR. MAYS:  I may want to contact that |
| 11:21:32 | 4 | person, Your Honor, to inquire about conditions in the |
| 11:21:35 | 5 | store today. |
| 11:21:36 | 6 | MR. QUINN:  I object. |
| 11:21:37 | 7 | THE COURT:  Your objection is sustained. |
| 11:21:39 | 8 | MR. MAYS:  Thank you.  That's all. |
| 11:21:41 | 9 | THE COURT:  Thank you, ma'am. |
| 11:21:42 | 10 | MR. QUINN:  No further questions. |
| 11:21:51 | 11 | MR. CALAMUSA:  Plaintiffs call Ruby Brady. |
| 11:22:01 | 12 | **RUBY BRADY, PLAINTIFFS' WITNESS, SWORN** |
| 11:22:03 | 13 | THE CLERK:  State your name for the record, |
| 11:22:05 | 14 | please. |
| 11:22:06 | 15 | THE WITNESS:  Ruby Brady. |
| 11:22:17 | 16 | THE CLERK:  Spell your last name for the |
| 11:22:19 | 17 | record. |
| 11:22:19 | 18 | THE WITNESS:  B-R-A-D-Y. |
| 11:22:23 | 19 | **DIRECT EXAMINATION** |
| 11:22:23 | 20 | **BY MR. CALAMUSA:** |
| 11:22:23 | 21 | Q.  Ms. Brady, where are you currently employed? |
| 11:22:26 | 22 | A.  At this time, I work in Lakeland, Florida. |
| 11:22:28 | 23 | Q.  For which company? |
| 11:22:30 | 24 | A.  Family Dollar. |
| 11:22:31 | 25 | Q.  And what is your position? |

| | | |
|---|---|---|
| 11:22:32 | 1 | A.   Manager. |
| 11:22:33 | 2 | Q.   And how long have you been a store manager with |
| 11:22:36 | 3 | Family Dollar? |
| 11:22:36 | 4 | A.   Since 1999. |
| 11:22:39 | 5 | Q.   Since '99, how many stores are you worked at? |
| 11:22:45 | 6 | A.   Three. |
| 11:22:46 | 7 | Q.   And where are those stores located? |
| 11:22:49 | 8 | A.   One was in Sneffer, Florida; one was in Tampa, |
| 11:22:53 | 9 | Florida; the last one was in Lakeland, Florida. |
| 11:22:55 | 10 | Q.   Since 1999, and during the time that you worked |
| 11:22:58 | 11 | as a store manager, did you work more than 40 hours a |
| 11:23:03 | 12 | week? |
| 11:23:03 | 13 | A.   Yes. |
| 11:23:03 | 14 | Q.   Did you work more than 48 hours a week? |
| 11:23:06 | 15 | A.   Yes. |
| 11:23:07 | 16 | Q.   Did you work more than 52 hours a week? |
| 11:23:09 | 17 | A.   Yes. |
| 11:23:10 | 18 | Q.   Was there ever a time since you have been store |
| 11:23:14 | 19 | manager when you have worked less than 40? |
| 11:23:17 | 20 | A.   No. |
| 11:23:18 | 21 | Q.   Less than 48? |
| 11:23:19 | 22 | A.   No. |
| 11:23:19 | 23 | Q.   Less than 52? |
| 11:23:21 | 24 | A.   No. |
| 11:23:22 | 25 | Q.   As a store manager, were you ever compensated |

11:23:29  1    overtime for any hour you worked over 40?

11:23:31  2        A.   No, sir.

11:23:32  3        Q.   What about over 48?

11:23:34  4        A.   No, sir.

11:23:34  5        Q.   Or over 52?

11:23:36  6        A.   No, sir.

11:23:39  7             MR. CALAMUSA:   That's all -- hang on a

11:23:41  8    second.

11:23:42  9        Q.   How many hours do you believe you work on average

11:23:48  10   in a week?

11:23:48  11       A.   55 to 70.

11:23:56  12            MR. CALAMUSA:   Thank you.

11:23:58  13            THE COURT:   Cross-examination?

11:23:59  14                   **CROSS-EXAMINATION**

11:23:59  15   **BY MR. MILLER:**

11:24:01  16       Q.   Ms. Brady, my name's Matt Miller.  I am one of

11:24:06  17   the attorneys for Family Dollar.

11:24:07  18            While you worked at Family Dollar as a store

11:24:09  19   manager since 1999, you have been paid a salary above

11:24:13  20   $250 every week?

11:24:15  21       A.   Correct.

11:24:15  22       Q.   And, in fact, in 2003, your salary was $900 a

11:24:21  23   week?

11:24:25  24       A.   I don't think so.

11:24:27  25       Q.   No, ma'am, it's not true?  Your salary wasn't

| | | |
|---|---|---|
| 11:24:30 | 1 | about $47,000 a year? |
| 11:24:32 | 2 | A.  If you calculate it out.  I don't have a |
| 11:24:35 | 3 | calculator here with me. |
| 11:24:37 | 4 | Q.  What is your current salary? |
| 11:24:38 | 5 | A.  929. |
| 11:24:39 | 6 | Q.  Okay.  That's about $48,000 a year? |
| 11:24:42 | 7 | A.  Yes. |
| 11:24:42 | 8 | Q.  And you have also received bonuses each year |
| 11:24:46 | 9 | since 2001? |
| 11:24:48 | 10 | MR. CALAMUSA:  Object, Your Honor. |
| 11:24:50 | 11 | THE COURT:  Sustained. |
| 11:24:53 | 12 | Q.  Did you report your hours accurately to Family |
| 11:24:59 | 13 | Dollar? |
| 11:24:59 | 14 | A.  I would call in to my assistant when I was out of |
| 11:25:05 | 15 | the store, and she would only report 52, because we |
| 11:25:09 | 16 | didn't get paid for anything above it. |
| 11:25:10 | 17 | Q.  So, ma'am, is your answer, no, that you did not |
| 11:25:13 | 18 | accurately report your hours to Family Dollar? |
| 11:25:16 | 19 | A.  If I was in the store, I accurately put them in. |
| 11:25:19 | 20 | If I was not in the store, the assistant would put them |
| 11:25:22 | 21 | in. |
| 11:25:22 | 22 | Q.  So your answer is that sometimes you accurately |
| 11:25:24 | 23 | reported and sometimes you did not? |
| 11:25:25 | 24 | A.  Correct. |
| 11:25:26 | 25 | Q.  Do you know Emry Chesterfield? |

11:25:31  1          MR. CALAMUSA:  Object, Your Honor.

11:25:32  2          THE COURT:  Sustained.

11:25:35  3          MR. MILLER:  No further questions, Your

11:25:37  4   Honor.

11:25:37  5          THE COURT:  Thank you, ma'am.  Plaintiffs

11:25:40  6   will call their next witness.

11:25:42  7          MR. QUINN:  James Powell.

11:25:46  8   **JAMES POWELL, PLAINTIFFS' WITNESS, SWORN**

11:25:49  9          THE CLERK:  State your name for the record.

11:25:58  10          THE WITNESS:  James Powell.

11:26:11  11          THE CLERK:  Spell your last name for the

11:26:16  12   record.

11:26:16  13          THE WITNESS:  P-O-W-E-L-L.

11:26:16  14                   **DIRECT EXAMINATION**

11:26:17  15   **BY MR. QUINN:**

11:26:17  16   Q.  Mr. Powell, where do you live?

11:26:18  17   A.  Phoenix, Arizona.

11:26:19  18   Q.  And did you ever work for Family Dollar?

11:26:22  19   A.  Yes.

11:26:22  20   Q.  When did you work for Family Dollar?

11:26:24  21   A.  October '99 through 2 -- April 2003.

11:26:31  22   Q.  Where did you work for Family Dollar?

11:26:32  23   A.  Two locations:  One in Mesa, Arizona and one in

11:26:38  24   Phoenix, Arizona.

11:26:39  25   Q.  And what was your position at both of those

11:26:41  1   stores?

11:26:41  2       A.   Store manager.

11:26:43  3       Q.   And as store manager, how many hours did you

11:26:48  4   average working a week?

11:26:50  5       A.   60 to 70.

11:26:52  6       Q.   How many hours were you told that you were to

11:26:57  7   work for your salary?

11:26:59  8       A.   40 to 45.

11:27:03  9       Q.   Did that ever change?

11:27:06  10      A.   Yes.

11:27:07  11      Q.   What did it change to?

11:27:09  12      A.   Went up to 52.

11:27:12  13      Q.   Did you ever work less than 40 hours in either

11:27:17  14  one of those stores during the week?

11:27:19  15      A.   No.

11:27:20  16      Q.   Did you -- did you work over 40 hours every week

11:27:27  17  that you worked there?

11:27:28  18      A.   Yes.

11:27:29  19      Q.   Did you work over 45 hours every week that you

11:27:34  20  worked there?

11:27:34  21      A.   Yes.

11:27:35  22      Q.   Did you work over 52 hours?

11:27:38  23      A.   Yes.

11:27:39  24      Q.   Did you work over 52 hours from the time you were

11:27:43  25  a store manager on?

| | | |
|---|---|---|
| 11:27:44 | 1 | A.  Yes. |
| 11:27:45 | 2 | Q.  Did you receive any overtime for any of the time |
| 11:27:50 | 3 | that you worked over 40, 45, or 52? |
| 11:27:54 | 4 | A.  No. |
| 11:27:56 | 5 | MR. QUINN:  No further questions. |
| 11:27:58 | 6 | THE COURT:  Cross-examination? |
| 11:27:59 | 7 | **CROSS-EXAMINATION** |
| 11:27:59 | 8 | **BY MR. WHITE:** |
| 11:28:00 | 9 | Q.  Mr. Powell, I am Mark White. |
| 11:28:10 | 10 | It's my understanding that you resigned in April |
| 11:28:12 | 11 | of 2003 and left Family Dollar; correct? |
| 11:28:16 | 12 | A.  Yes. |
| 11:28:16 | 13 | Q.  And at that time, what was your salary? |
| 11:28:19 | 14 | A.  32,000. |
| 11:28:21 | 15 | Q.  And what was the assistant manager making that |
| 11:28:25 | 16 | worked with you at that store? |
| 11:28:27 | 17 | MR. QUINN:  Objection.  Relevance. |
| 11:28:29 | 18 | THE COURT:  Objection sustained. |
| 11:28:31 | 19 | Q.  You did not accurately report your hours to |
| 11:28:34 | 20 | Family Dollar, did you, Mr. Powell? |
| 11:28:36 | 21 | A.  Correct. |
| 11:28:37 | 22 | Q.  And -- but when you answered it, do you have any |
| 11:28:41 | 23 | records of your own that would establish what hours you |
| 11:28:44 | 24 | worked at Family Dollar? |
| 11:28:45 | 25 | A.  No.  They would all be in the store. |

11:28:54   1       Q.   The only records to show your hours was what you

11:28:58   2   sent in to Family Dollar every week, wasn't it,

11:29:01   3   Mr. Powell?

11:29:01   4       A.   Yes.

11:29:02   5       Q.   And when you answered your sworn interrogatories

11:29:05   6   in this case, and you were asked for any records that

11:29:09   7   would show the hours you worked, you referred us to the

11:29:13   8   records of Family Dollar, didn't you?

11:29:15   9       A.   Yes.

11:29:19  10            MR. WHITE:   That's all.

11:29:20  11            MR. QUINN:   Just one question.

11:29:20  12                    **REDIRECT EXAMINATION**

11:29:21  13   **BY MR. QUINN:**

11:29:21  14       Q.   Why didn't you report your hours accurately?

11:29:24  15       A.   We were instructed, when we were trained

11:29:26  16   originally by the training manager, we were instructed

11:29:28  17   not to put any more than 45 hours, no matter what time

11:29:32  18   you worked in the store.

11:29:33  19            MR. QUINN:   Thank you.

11:29:33  20                    **RECROSS EXAMINATION**

11:29:34  21   **BY MR. WHITE:**

11:29:34  22       Q.   And that never changed?

11:29:36  23       A.   It didn't change until, I think, 2003.

11:29:41  24       Q.   Were you still there when you say it changed?

11:29:44  25       A.   Yes.

11:29:45  1    Q.   Did you report accurate hours at any time?

11:29:48  2              THE COURT:   What was the change?

11:29:51  3              THE WITNESS:   What was the change?

11:29:52  4              THE COURT:   Yes.

11:29:53  5              THE WITNESS:   It was actually to put in

11:29:55  6    exactly the time we were actually there, because it was

11:29:59  7    always days.   They never said you worked nights, or you

11:30:02  8    had a day off, or if you ever got one in it -- you

11:30:05  9    actually put in the time it was in there.

11:30:07  10             THE COURT:   Okay.

11:30:11  11   Q.   (By Mr. White)  Do you remember testifying that

11:30:13  12   it was in June of 2001 when you began reporting, at your

11:30:19  13   deposition, when you said you began reporting your

11:30:21  14   actual hours?

11:30:23  15   A.   I will go -- if that's what I said.

11:30:27  16   Q.   You don't deny you said that?

11:30:28  17   A.   No.

11:30:29  18   Q.   But today, you were giving me 2003?

11:30:33  19   A.   It's been a few years.

11:30:35  20   Q.   All right, Mr. Powell.  Well, when -- is it 2001

11:30:40  21   or 2003 that I can go to the records of my client,

11:30:44  22   Family Dollar, and find out when you say you reported

11:30:49  23   your hours?

11:30:50  24   A.   I guess I am going to go with 2001 would be real.

11:30:55  25   That would be the right date.

| | | |
|---|---|---|
| 11:31:00 | 1 | MR. WHITE:  That's all. |
| 11:31:01 | 2 | THE COURT:  Anything further? |
| 11:31:02 | 3 | MR. QUINN:  No further questions. |
| 11:31:04 | 4 | THE COURT:  Thank you, Mr. Powell. |
| 11:31:07 | 5 | Plaintiffs will call their next witness. |
| 11:31:10 | 6 | MR. CALAMUSA:  Plaintiffs call Doris Moody, |
| 11:31:15 | 7 | Your Honor. |
| 11:31:15 | 8 | MR. WHITE:  Judge, there is one document |
| 11:31:17 | 9 | that I might want to use on Mr. Powell and I want |
| 11:31:20 | 10 | authenticity.  I don't want to have to have him come |
| 11:31:24 | 11 | back or something. |
| 11:31:25 | 12 | THE COURT:  All right.  And what is the |
| 11:31:26 | 13 | document? |
| 11:31:27 | 14 | MR. WHITE:  It would be his resume, current |
| 11:31:30 | 15 | resume. |
| 11:31:31 | 16 | THE COURT:  For what -- |
| 11:31:33 | 17 | MR. WHITE:  Produced -- maybe later, Your |
| 11:31:35 | 18 | Honor. |
| 11:31:35 | 19 | THE COURT:  You are not offering it now? |
| 11:31:37 | 20 | MR. WHITE:  I am prepared to offer it now, |
| 11:31:39 | 21 | but I don't know if you are going to accept it now. |
| 11:31:41 | 22 | THE COURT:  I'm probably not, but he can |
| 11:31:44 | 23 | identify it.  He can authenticate it now. |
| 11:31:48 | 24 | MR. QUINN:  We don't take issue with whether |
| 11:31:54 | 25 | it's -- I have seen it. |

11:31:55   1          THE COURT:  They will stipulate to it.

11:31:59   2          MR. WHITE:  Stipulation that the resume of

11:32:01   3   J. Powell is authentic.

11:32:05   4          Thank you, Your Honor.  Thank you,

11:32:07   5   Mr. Quinn.

11:32:08   6   **DORIS MOODY, PLAINTIFFS' WITNESS, SWORN**

11:32:11   7          THE CLERK:  State your name for the record.

11:32:13   8          THE WITNESS:  Doris Moody, M-O-O-D-Y.

11:32:30   9                  **DIRECT EXAMINATION**

11:32:31  10   **BY MR. CALAMUSA:**

11:32:33  11      Q.  Ms. Moody, were you employed as a store manager

11:32:36  12   of Family Dollar?

11:32:37  13      A.  Yes, sir.

11:32:38  14      Q.  And what period of time?

11:32:40  15      A.  May 19th, 1980, until the present.

11:32:43  16      Q.  And since 1999, where have you been employed by

11:32:49  17   Family Dollar?

11:32:49  18      A.  Most of the time was in Pinswakin, New Jersey and

11:32:56  19   the other Sarasota, Florida.

11:32:59  20      Q.  Where are you currently employed; Sarasota?

11:33:02  21      A.  Yes, sir.

11:33:02  22      Q.  Since 1999, and the time that you have been store

11:33:05  23   manager, have you been required to work more than 40

11:33:08  24   hours a week?

11:33:09  25      A.  Have I been required?

| | | |
|---|---|---|
| 11:33:10 | 1 | Q.  Yes. |
| 11:33:11 | 2 | A.  Yes, sir. |
| 11:33:11 | 3 | Q.  And have you worked more than 48 hours a week? |
| 11:33:16 | 4 | A.  Yes, sir. |
| 11:33:17 | 5 | Q.  Have you worked more than 52? |
| 11:33:19 | 6 | A.  Yes, sir. |
| 11:33:20 | 7 | Q.  Were there any weeks since 1999 in which you have |
| 11:33:24 | 8 | worked less than 48 hours? |
| 11:33:25 | 9 | A.  No, sir. |
| 11:33:26 | 10 | Q.  Have there been any weeks in which you have |
| 11:33:28 | 11 | worked less than 48? |
| 11:33:30 | 12 | A.  No. |
| 11:33:31 | 13 | Q.  Less than 52? |
| 11:33:33 | 14 | A.  No. |
| 11:33:34 | 15 | Q.  Do you receive overtime compensation from Family |
| 11:33:38 | 16 | Dollar for any of the hours that you worked over 40? |
| 11:33:41 | 17 | A.  No. |
| 11:33:41 | 18 | Q.  Over 48? |
| 11:33:42 | 19 | A.  No. |
| 11:33:43 | 20 | Q.  Or over 52? |
| 11:33:44 | 21 | A.  No. |
| 11:33:45 | 22 | Q.  What would you say the average number of hours |
| 11:33:48 | 23 | you have worked -- you work at Family Dollar? |
| 11:33:51 | 24 | A.  Sir, between 90 and a hundred hours a week, |
| 11:33:53 | 25 | sometimes more. |

11:33:54   1      Q.   They're going to ask, so I will go ahead:   Did

11:34:00   2   you accurately turn in every hour that you worked with

11:34:03   3   Family Dollar?

11:34:03   4      A.   No.

11:34:04   5      Q.   Why not?

11:34:05   6      A.   Because I just put in that I started at 8:00

11:34:11   7   o'clock.   Most of the time -- I'm not going to say most

11:34:13   8   of the time, all the time I was there either between --

11:34:16   9   from 7:00 to quarter to 8:00.   But, I guess, to make it

11:34:21   10  easier for me, I just punched in 8:00 o'clock across the

11:34:24   11  board.

11:34:24   12          And then at night when I would leave, sometimes I

11:34:30   13  would stay.   I would punch out, and then I would wind up

11:34:32   14  staying and doing more work.

11:34:36   15     Q.   Were you required -- excuse me.   Did you get paid

11:34:41   16  by Family Dollar based on the number of hours you

11:34:45   17  reported?

11:34:45   18     A.   No, sir.

11:34:50   19              MR. CALAMUSA:   Nothing further, Your Honor.

11:34:51   20              THE COURT:   Cross-examination?

11:34:52   21                        **CROSS-EXAMINATION**

11:34:52   22  **BY MR. UMBACH:**

11:35:01   23     Q.   Ms. Moody, if you said it, I missed it.   What is

11:35:04   24  your salary now?

11:35:05   25     A.   My salary is $1,027.

11:35:09   1       Q.   And that's per week?

11:35:11   2       A.   Yes, sir.

11:35:11   3       Q.   Now, you said you worked 90 to a hundred hours?

11:35:21   4       A.   Yes, sir.

11:35:22   5       Q.   A week?

11:35:22   6       A.   Yes.

11:35:23   7       Q.   That's more hours than your store is open, isn't

11:35:27   8   it?

11:35:27   9       A.   Absolutely.

11:35:28   10      Q.   And you don't have any independent records of

11:35:34   11   those hours that you worked, do you?

11:35:36   12      A.   Sir, I never saved the payroll sheets, no.

11:35:39   13      Q.   Okay.  So the only record you're aware of, of

11:35:43   14   hours that you worked at Family Dollar, would be the

11:35:45   15   hours that you reported to Family Dollar; is that right?

11:35:48   16      A.   Yes.

11:35:49   17      Q.   Does your store have an alarm system?

11:35:58   18      A.   Yes, sir.

11:35:59   19      Q.   Do you turn it on when you get into the store?

11:36:03   20      A.   Do I turn it on when I get into the store?

11:36:06   21      Q.   When you open the store, do you turn on the

11:36:09   22   alarm?

11:36:09   23      A.   No, I turn it off.

11:36:10   24      Q.   Okay.  You turn it off.  That would make more

11:36:14   25   sense.

| | | |
|---|---|---|
| 11:36:17 | 1 | But then when you leave the store -- |
| 11:36:19 | 2 | A.  Yes. |
| 11:36:20 | 3 | Q.  -- you would then turn it on? |
| 11:36:23 | 4 | A.  Absolutely. |
| 11:36:24 | 5 | Q.  Okay.  And so when you turn it on, Ms. Moody, |
| 11:36:31 | 6 | that means no one else is in your store; is that right? |
| 11:36:34 | 7 | A.  No, sir.  No, sir. |
| 11:36:35 | 8 | Q.  Isn't that what that means? |
| 11:36:37 | 9 | A.  When I turn the alarm on? |
| 11:36:39 | 10 | Q.  Right. |
| 11:36:39 | 11 | A.  No, sir.  There's no one else in the store. |
| 11:36:41 | 12 | Q.  Okay.  That's what I was asking.  Thank you. |
| 11:36:45 | 13 | THE COURT:  Redirect? |
| 11:36:46 | 14 | MR. CALAMUSA:  No, Your Honor. |
| 11:36:47 | 15 | THE COURT:  Thank you, ma'am.  Plaintiffs |
| 11:36:49 | 16 | will call their next witness. |
| 11:36:51 | 17 | MR. CALAMUSA:  Michael Papp, Your Honor. |
| 11:36:54 | 18 | **MICHAEL PAPP, PLAINTIFFS' WITNESS, SWORN** |
| 11:37:00 | 19 | THE CLERK:  State your name for the record, |
| 11:37:02 | 20 | please. |
| 11:37:03 | 21 | THE WITNESS:  Michael Stephen Papp, P-A-P-P. |
| 11:37:16 | 22 | **DIRECT EXAMINATION** |
| 11:37:16 | 23 | **BY MR. CALAMUSA:** |
| 11:37:18 | 24 | Q.  Mr. Papp, are you employed as a store manager for |
| 11:37:23 | 25 | Family Dollar? |

11:37:23  1      A.   Yes, I was.

11:37:24  2      Q.   And what was your last employment dates with

11:37:28  3  Family Dollar?

11:37:28  4      A.   It was 2001 to 2002.

11:37:32  5      Q.   And what position were you employed during that

11:37:34  6  time?

11:37:34  7      A.   Manager.

11:37:34  8      Q.   Had you previously been employed with Family

11:37:38  9  Dollar?

11:37:38  10     A.   Yes, sir.

11:37:39  11     Q.   In what capacity?

11:37:40  12     A.   I was manager down in Miami, Florida.

11:37:44  13     Q.   And let's focus on the time period here -- so the

11:37:49  14  last time you were employed at Family Dollar, 2000, did

11:37:53  15  you tell me 2001?

11:37:54  16     A.   Yes.

11:37:55  17     Q.   What store?

11:37:56  18     A.   It was the Cleveland Avenue store in Ft. Myers,

11:38:00  19  Florida.

11:38:01  20     Q.   During the time you were store manager in

11:38:05  21  Ft. Myers, Florida, did you work more than 40 hours a

11:38:09  22  week?

11:38:09  23     A.   Yes, sir.

11:38:10  24     Q.   Did you work more than 48 hours a week?

11:38:12  25     A.   Oh, yes, sir.

11:38:13  1    Q.   And did you work more than 52?

11:38:15  2    A.   Yes, sir.

11:38:15  3    Q.   Was there ever a week where you worked less than

11:38:19  4    40 hours?

11:38:19  5    A.   No, sir.

11:38:20  6    Q.   Less than 48?

11:38:21  7    A.   No, sir.

11:38:22  8    Q.   Or less than 52?

11:38:23  9    A.   No, sir.

11:38:25  10    Q.   During the time you were store manager, were you

11:38:29  11   compensated overtime for any hour that you worked above

11:38:31  12   40?

11:38:34  13    A.   No, sir.

11:38:34  14    Q.   Or compensated overtime for any of the hours you

11:38:35  15   worked above 48 or 52?

11:38:37  16    A.   No, sir.

11:38:38  17    Q.   And how many hours a week on average did you

11:38:43  18   work?

11:38:43  19    A.   About 82 hours a week.

11:38:44  20         MR. CALAMUSA:   Thank you.

11:38:49  21         THE COURT:   Cross-examination?

11:38:49  22                    **CROSS-EXAMINATION**

11:38:51  23   **BY MR. KALLON:**

11:38:52  24    Q.   Mr. Papp, good morning, sir.

11:38:55  25    A.   Good morning.

11:38:55  1      Q.   I am Abdul Kallon.

11:38:58  2           You worked for Family Dollar as a store manager

11:39:01  3   on three different occasions; correct?

11:39:03  4      A.   Yes, sir.

11:39:03  5      Q.   And on each occasion you worked for Family

11:39:06  6   Dollar, you knew you would be paid a salary, regardless

11:39:08  7   of how many hours you worked?

11:39:11  8      A.   I knew that whatever I was -- there is a certain

11:39:16  9   amount of time I had to work, but beyond that, it was

11:39:20  10  just one set price.

11:39:21  11     Q.   Mr. Papp, I think it's a simple question, and I

11:39:25  12  apologize for not being clear.  The first time you

11:39:28  13  worked as a manager you knew you were paid a salary?

11:39:31  14               MR. CALAMUSA:  Object, Your Honor.  It was

11:39:32  15  a --

11:39:34  16               THE REPORTER:  One at a time, please.

11:39:34  17               THE COURT:  Yeah.  Thank you.  One at a

11:39:37  18  time, please.

11:39:38  19     Q.   (By Mr. Kallon)  First --

11:39:39  20               THE COURT:  The objection is overruled.

11:39:41  21     Q.   First time you worked as a manager, you knew you

11:39:44  22  were paid a salary, regardless of how many hours you

11:39:47  23  worked?

11:39:47  24     A.   Yes.

11:39:47  25     Q.   And you left Family Dollar?

11:39:48  1    A.   Yes.

11:39:49  2    Q.   And then you came back as a manager again?

11:39:51  3    A.   Yes.

11:39:51  4    Q.   And you were paid a salary the second time as

11:39:54  5    well; correct?

11:39:55  6    A.   Yes.

11:39:55  7    Q.   And that salary, again, was for however many

11:39:58  8    hours you worked?

11:40:00  9    A.   Yes.

11:40:00  10   Q.   And you left Family Dollar a second time and came

11:40:03  11   back a third time; correct?

11:40:05  12   A.   Yes.

11:40:05  13   Q.   And, again, you were paid a salary for however

11:40:09  14   many hours you worked; correct?

11:40:10  15   A.   Yes.

11:40:11  16   Q.   And the last time you worked as a manager, how

11:40:14  17   much did you make a week?

11:40:14  18   A.   800.

11:40:15  19   Q.   And how much was that annually, sir?

11:40:17  20   A.   How much was that annually?

11:40:20  21   Q.   Yeah.

11:40:22  22   A.   There's --

11:40:23  23   Q.   Do you remember how much you made a year?

11:40:25  24   A.   Not right off the bat, no.

11:40:26  25   Q.   But it was $800 a week?

| | | |
|---|---|---|
| 11:40:27 | 1 | A.   800 a week. |
| 11:40:29 | 2 | Q.   And Family Dollar paid you what it promised it |
| 11:40:33 | 3 | would pay you every week; correct? |
| 11:40:34 | 4 | A.   Yes. |
| 11:40:35 | 5 | Q.   You got your salary every week? |
| 11:40:36 | 6 | A.   Yes. |
| 11:40:38 | 7 |         MR. KALLON:   Thank you. |
| 11:40:39 | 8 |         THE WITNESS:   May I say something? |
| 11:40:39 | 9 |         **REDIRECT EXAMINATION** |
| 11:40:41 | 10 | **BY MR. CALAMUSA:** |
| 11:40:42 | 11 | Q.   When you came back the last time, Mr. Papp, did |
| 11:40:45 | 12 | the DM tell you anything about the working conditions |
| 11:40:47 | 13 | this time around? |
| 11:40:47 | 14 | A.   Yes.  Every time I did come back, the DM said -- |
| 11:40:50 | 15 | I had known three DM's -- they have told me, "things |
| 11:40:53 | 16 | change, you are not going to have to work so many |
| 11:40:55 | 17 | hours," but they never did. |
| 11:40:57 | 18 | Q.   And -- |
| 11:40:58 | 19 |         THE COURT:   Who are the DMs? |
| 11:41:01 | 20 |         THE WITNESS:   Ralph -- |
| 11:41:02 | 21 |         THE COURT:   District manager? |
| 11:41:04 | 22 |         THE WITNESS:   The district manager, yes, |
| 11:41:06 | 23 | sir. |
| 11:41:06 | 24 | Q.   (By Mr. Calamusa)  And did you actually report |
| 11:41:07 | 25 | your hours, these average of 82 hours? |

11:41:10  1      A.  Yes.  Not always, but once I punch out, I will go

11:41:14  2  back to turn off the lights and turn on the alarm, and

11:41:16  3  you see things that need to be done.  So you say, "well,

11:41:18  4  this is not going to take long," you do it.

11:41:22  5      Q.  More often than not, did you report your hours

11:41:25  6  accurately?

11:41:26  7      A.  Yes.

11:41:27  8              MR. CALAMUSA:  That's all I have.

11:41:28  9              THE COURT:  Thank you, sir.

11:41:30  10              MR. KALLON:  Redirect, Your Honor?

11:41:31  11              THE COURT:  No, sir.

11:41:32  12              MR. KALLON:  Recross, I mean?

11:41:34  13              THE COURT:  No, sir.

11:41:34  14              MR. KALLON:  Same ruling?

11:41:36  15              THE COURT:  Yes, sir.

11:41:37  16              Plaintiffs will call their next witness.

11:41:39  17              MR. QUINN:  Sam Kennerson.

11:41:48  18      **SAM KENERSON, JR., PLAINTIFFS' WITNESS, SWORN**

11:41:51  19              THE CLERK:  State your name for the record,

11:41:53  20  please.

11:41:54  21              THE WITNESS:  Sam Kenerson.

11:41:57  22              THE CLERK:  Spell your last name, please.

11:41:59  23              THE WITNESS:  K-E-N-E-R-S-O-N.  Junior.

11:42:02  24                      **DIRECT EXAMINATION**

11:42:06  25  **BY MR. QUINN:**

11:42:06  1      Q.   Mr. Kenerson, where do you live?

11:42:07  2      A.   Baton Rouge, Louisiana.

11:42:10  3      Q.   Did you work for Family Dollar?

11:42:12  4      A.   Yes, sir.

11:42:13  5      Q.   When did you work for Family Dollar?

11:42:14  6      A.   March of 1998, to February 15th of 2004.

11:42:19  7      Q.   And what positions did you hold with Family

11:42:22  8  Dollar?

11:42:22  9      A.   Store manager.

11:42:23  10     Q.   How many stores?

11:42:27  11     A.   I worked at five stores.

11:42:28  12     Q.   Were they all in Louisiana?

11:42:30  13     A.   Yes, sir.

11:42:31  14     Q.   And did you work over 40 hours each week that you

11:42:38  15  worked at all of those stores?

11:42:39  16     A.   Yes, sir.

11:42:40  17     Q.   Did you work over 48 hours each week that you

11:42:43  18  worked at each of those stores?

11:42:44  19     A.   Yes, sir.

11:42:45  20     Q.   Did you work over 52 hours each week that you

11:42:50  21  worked at those stores?

11:42:51  22     A.   Yes, sir.

11:42:51  23     Q.   What hours did you average weekly?

11:42:54  24     A.   I averaged 60 to 70 hours per week.

11:42:58  25     Q.   As far as you know, was that your week -- those

| | | |
|---|---|---|
| 11:43:02 | 1 | were the hours you worked? |
| 11:43:03 | 2 | A.  Yes, sir. |
| 11:43:03 | 3 | Q.  Each week?  Were you paid any overtime for any of |
| 11:43:09 | 4 | those hours? |
| 11:43:09 | 5 | A.  No, sir. |
| 11:43:10 | 6 | Q.  Did you accurately report your hours while |
| 11:43:14 | 7 | working in the stores that you were assigned to? |
| 11:43:18 | 8 | A.  Yes, sir. |
| 11:43:19 | 9 | MR. QUINN:  That's all. |
| 11:43:21 | 10 | THE COURT:  Cross-examination? |
| | 11 | MR. UMBACH:  Mr. Quinn, may we have the same |
| | 12 | stipulation on Mr. Kenerson's resume? |
| | 13 | MR. QUINN:  Let me see it. |
| | 14 | MR. UMBACH:  And there's more than one. |
| | 15 | MR. QUINN:  Because I haven't seen this. |
| | 16 | MR. UMBACH:  Okay. |
| 11:43:21 | 17 | **CROSS-EXAMINATION** |
| 11:43:22 | 18 | **BY MR. UMBACH:** |
| 11:43:35 | 19 | Q.  What was your salary, Mr. Kenerson? |
| 11:43:38 | 20 | A.  Starting salary was $485, and it ended at 768. |
| 11:43:50 | 21 | Q.  So 485 back in '98? |
| 11:43:50 | 22 | A.  Yes, sir. |
| 11:43:50 | 23 | Q.  And 768 in 2004? |
| 11:43:51 | 24 | A.  Correct. |
| 11:43:52 | 25 | Q.  Okay.  And you got that salary every week; in |

| | | |
|---|---|---|
| 11:43:59 | 1 | other words, most recently when you made 768, you got |
| 11:44:02 | 2 | that salary every week? |
| 11:44:04 | 3 | A.  Based on 52 hours a week, yes, sir. |
| 11:44:06 | 4 | MR. UMBACH:  Thank you. |
| 11:44:07 | 5 | THE COURT:  What's your educational |
| 11:44:09 | 6 | background? |
| 11:44:10 | 7 | THE WITNESS:  Sir? |
| 11:44:11 | 8 | THE COURT:  What is your educational |
| 11:44:13 | 9 | background? |
| 11:44:14 | 10 | THE WITNESS:  High school education. |
| 11:44:15 | 11 | THE COURT:  All right.  Thank you, sir. |
| 11:44:19 | 12 | MR. UMBACH:  Your Honor, the issue of the |
| 11:44:21 | 13 | stipulation before he steps down? |
| 11:44:25 | 14 | MR. G. WIGGINS:  We are not willing to |
| 11:44:29 | 15 | stipulate to it without discussion.  I am not going to |
| 11:44:35 | 16 | stipulate to that. |
| 11:44:37 | 17 | MR. UMBACH:  Should I question this witness |
| 11:44:38 | 18 | to authenticity of the resume, Your Honor? |
| 11:44:41 | 19 | THE COURT:  Bring it here. |
| 11:44:50 | 20 | MR. WHITE:  Let me give you an exhibit |
| 11:44:52 | 21 | number, Judge.  It's Defendant's Exhibit Number 1499. |
| 11:44:57 | 22 | THE COURT:  All right. |
| 11:45:02 | 23 | MR. WHITE:  Here.  1499. |
| 11:45:06 | 24 | THE COURT:  Is this your resume, |
| 11:45:08 | 25 | Mr. Kenerson? |

| | | |
|---|---|---|
| 11:45:11 | 1 | THE WITNESS:  Yes, sir. |
| 11:45:15 | 2 | THE COURT:  All right. |
| 11:45:17 | 3 | MR. UMBACH:  May I question him about it? |
| 11:45:18 | 4 | THE COURT:  No.  It's stipulated. |
| 11:45:20 | 5 | MR. UMBACH:  Your Honor, then, should we |
| 11:45:22 | 6 | offer Exhibit 1499? |
| 11:45:25 | 7 | THE COURT:  It's not received at this point. |
| 11:45:27 | 8 | MR. QUINN:  Objection. |
| 11:45:30 | 9 | THE COURT:  Anything else for this witness? |
| 11:45:31 | 10 | MR. UMBACH:  No further questions. |
| 11:45:32 | 11 | THE COURT:  All right.  Thank you, sir.  You |
| 11:45:35 | 12 | may come down. |
| 11:45:36 | 13 | MR. WHITE:  Judge? |
| 11:45:36 | 14 | THE COURT:  Yes, sir. |
| 11:45:37 | 15 | MR. WHITE:  One quick housekeeping matter. |
| 11:45:40 | 16 | The stipulation on Mr. Powell's resume, it |
| 11:45:43 | 17 | is our Exhibit Number 1551.  For purposes of |
| 11:45:46 | 18 | authentication only, I will deliver a copy to the clerk. |
| 11:45:50 | 19 | THE COURT:  All right.  Plaintiffs will call |
| 11:45:53 | 20 | their next witness. |
| 11:45:55 | 21 | MR. G. WIGGINS:  Plaintiffs call Lana |
| 11:46:01 | 22 | Radosh. |
| 11:46:04 | 23 | **LANA RADOSH, PLAINTIFFS' WITNESS, SWORN** |
| 11:46:06 | 24 | THE CLERK:  State your name for the record, |
| 11:46:12 | 25 | please. |

11:46:14  1              THE WITNESS:  Lana Radosh, R-A-D-O-S-H.

11:46:23  2                        **DIRECT EXAMINATION**

11:46:23  3   **BY MR. G. WIGGINS:**

11:46:26  4       Q.  Ms. Radosh, are you employed with Family Dollar?

11:46:29  5       A.  Yes, I am.

11:46:29  6       Q.  How long have you been employed there?

11:46:31  7       A.  Since November 27th, 1997.

11:46:42  8       Q.  Has there ever been a week where you did not work

11:46:47  9   40 hours a week?

11:46:48  10      A.  No.

11:46:48  11      Q.  Has there ever been a week wherein you did not

11:46:50  12  work 48 hours a week?

11:46:51  13      A.  No.

11:46:52  14      Q.  Has there ever been a week when you did not work

11:46:55  15  52 hours a week?

11:46:56  16      A.  No.

11:46:56  17      Q.  Have you ever been paid any overtime compensation

11:46:59  18  for overtime hours you worked?

11:47:02  19      A.  No, not at all.

11:47:02  20      Q.  Do you have a guesstimate as to the number of

11:47:05  21  hours you averaged working per week?

11:47:08  22      A.  Average about 68 to 70.

11:47:10  23      Q.  Did you receive any overtime compensation for any

11:47:16  24  of those hours?

11:47:17  25      A.  No, sir.

| | | |
|---|---|---|
| 11:47:22 | 1 | MR. G. WIGGINS:  No further questions. |
| 11:47:24 | 2 | THE COURT:  Cross-examination? |
| 11:47:25 | 3 | **CROSS-EXAMINATION** |
| 11:47:25 | 4 | **BY MR. KENT:** |
| 11:47:26 | 5 | Q.  Good morning, Ms. Radosh.  My name is Ron Kent. |
| 11:47:31 | 6 | I have a few questions I would like to follow up on. |
| 11:47:34 | 7 | Would you say you reported your time accurately? |
| 11:47:36 | 8 | A.  Yes, sir, except for when I was out of the store, |
| 11:47:39 | 9 | I didn't get paid for those hours either. |
| 11:47:41 | 10 | Q.  I'm sorry? |
| 11:47:42 | 11 | A.  I got pulled out other stores to work, and I did |
| 11:47:46 | 12 | not get paid for those hours either. |
| 11:47:48 | 13 | Q.  When you got pulled out to work at other stores, |
| 11:47:50 | 14 | did you report that time? |
| 11:47:51 | 15 | A.  We couldn't report it on our sheet at all. |
| 11:47:53 | 16 | Q.  Why couldn't you report it? |
| 11:47:56 | 17 | A.  Because we don't have the payroll. |
| 11:47:57 | 18 | Q.  How would you reporting your time affect your |
| 11:48:03 | 19 | store's payroll if you were paid a salary? |
| 11:48:06 | 20 | A.  I was paid a salary for 52 hours. |
| 11:48:09 | 21 | Q.  You understand my question, don't you? |
| 11:48:11 | 22 | A.  Yes. |
| 11:48:11 | 23 | Q.  Whether you reported working 52 hours or 72 |
| 11:48:17 | 24 | hours, your payroll for your store remained the same; |
| 11:48:21 | 25 | correct? |

11:48:21   1      A.   Yes.

11:48:22   2      Q.   So why would that prevent you from reporting your

11:48:26   3  time accurately?

11:48:27   4      A.   I would report my time accurately at my store.

11:48:32   5            THE COURT:   As I understood your testimony,

11:48:34   6  you were talking about the times you didn't work in your

11:48:36   7  store?

11:48:36   8            THE WITNESS:   When I did not work in my

11:48:38   9  store, I did not get paid for all the hours for the

11:48:41  10  other stores I worked at.

11:48:42  11            THE COURT:   Did you report your hours you

11:48:45  12  were not working in your store?

11:48:46  13            THE WITNESS:   I reported the hours in my

11:48:48  14  store, yes, at the time I worked in my store.

11:48:50  15            THE COURT:   Did you report the hours that

11:48:51  16  you worked in another store?

11:48:52  17            THE WITNESS:   No, sir, we couldn't report it

11:48:54  18  to anyone.

11:48:55  19            THE COURT:   That's what --

11:48:56  20            THE WITNESS:   -- the other stores.

11:48:59  21      Q.   (By Mr. Kent)  You could not -- take an example,

11:49:02  22  you work away from your home store one day, let's assume

11:49:07  23  it's eight hours; correct?

11:49:08  24      A.   Maybe twelve.

11:49:09  25      Q.   Okay.  Twelve hours.  You did not work at your

11:49:13   1   home store that day; correct?

11:49:15   2   A.   Sometimes I had to go back if the truck came

11:49:18   3   late, yes.

11:49:18   4   Q.   Okay.   Then why could you not report your time

11:49:21   5   when you went back and say "I worked twelve hours"?

11:49:24   6              MR. G. WIGGINS:   Object.   Asked and --

11:49:27   7              THE COURT:   Just one minute.   Just one

11:49:29   8   minute.

11:49:31   9              Now, you reported your time at the store

11:49:37  10   where you worked; is that correct?

11:49:38  11              THE WITNESS:   Yes, sir.

11:49:39  12              THE COURT:   And when you were working at

11:49:44  13   some other store, did you know of any way by which you

11:49:53  14   could report your time working at that other store?

11:49:56  15              THE WITNESS:   No, sir.

11:50:02  16   Q.   (By Mr. Kent)   Would you agree with the Family

11:50:16  17   Dollar records if they showed that on an average you

11:50:19  18   reported about 55 to 56 hours per week?

11:50:23  19   A.   No, sir.

11:50:26  20              MR. KENT:   That's all I have.

11:50:27  21              THE COURT:   Redirect?

11:50:28  22              MR. G. WIGGINS:   No, sir.

11:50:29  23              THE COURT:   Thank you, ma'am.

11:50:32  24              Plaintiffs will call their next witness.

11:50:35  25              MR. G. WIGGINS:   Call David Hood.

| | | |
|---|---|---|
| 11:50:38 | 1 | **DAVID HOOD, PLAINTIFFS' WITNESS, SWORN** |
| 11:50:51 | 2 | THE CLERK:  State your name for the record. |
| 11:50:54 | 3 | THE WITNESS:  David Hood, H-O-O-D. |
| 11:51:05 | 4 | **DIRECT EXAMINATION** |
| 11:51:05 | 5 | **BY MR. G. WIGGINS:** |
| 11:51:06 | 6 | Q.  Mr. Hood, did you ever work for Family Dollar? |
| 11:51:08 | 7 | A.  Yes, I did. |
| 11:51:09 | 8 | Q.  Were you -- can you tell us what position you |
| 11:51:12 | 9 | were employed as? |
| 11:51:12 | 10 | A.  Store manager. |
| 11:51:13 | 11 | Q.  Did you work more than 40 hours a week? |
| 11:51:17 | 12 | A.  Yes, I did. |
| 11:51:18 | 13 | Q.  Did you work more than 48 hours a week? |
| 11:51:20 | 14 | A.  Yes, I did. |
| 11:51:21 | 15 | Q.  Work more than 52 hours a week? |
| 11:51:22 | 16 | A.  Yes, I did. |
| 11:51:23 | 17 | Q.  Did you ever receive any overtime compensation |
| 11:51:26 | 18 | for the hours you worked over 40 hours a week? |
| 11:51:28 | 19 | A.  No, I did not. |
| 11:51:29 | 20 | Q.  Approximately how many hours a week did you |
| 11:51:32 | 21 | average working? |
| 11:51:32 | 22 | A.  Roughly 60 to 70 hours a week. |
| 11:51:34 | 23 | Q.  Did you always report all your hours? |
| 11:51:36 | 24 | A.  No, I did not. |
| 11:51:37 | 25 | Q.  Can you tell us why? |

11:51:40    1      A.   Because my pay stub always said 48; it didn't

11:51:44    2   matter what I reported.

11:51:45    3      Q.   Have you ever been paid any overtime compensation

11:51:52    4   by Family Dollar for working excess of 40 hours?

11:51:55    5      A.   No, I haven't.

11:51:56    6           MR. G. WIGGINS:   No further questions.

11:51:57    7           THE COURT:   Cross-examination?

11:51:58    8                    **CROSS-EXAMINATION**

11:51:58    9   **BY MR. UMBACH:**

11:52:00   10      Q.   What state did you work in?

11:52:01   11      A.   Pennsylvania.

11:52:02   12      Q.   What stores?

11:52:03   13      A.   Aliquippa and Midland.

11:52:06   14      Q.   Those are the cities?

11:52:09   15      A.   Yes.

11:52:09   16      Q.   Do you remember the store numbers?

11:52:10   17      A.   Aliquippa was 1952; and I think Midland was 3649,

11:52:16   18   but I am guessing.

11:52:17   19      Q.   What was your salary?

11:52:18   20      A.   When I left Family Dollar, it was 610 a week.

11:52:23   21      Q.   And you left Family Dollar when?

11:52:28   22      A.   May of 2003.

11:52:31   23      Q.   And you were a store manager for how many years?

11:52:36   24      A.   Four.

11:52:36   25      Q.   The only records you are aware of the hours you

| | | |
|---|---|---|
| 11:52:45 | 1 | worked at Family Dollar would be the Family Dollar |
| 11:52:47 | 2 | payroll records for you; isn't that correct? |
| 11:52:50 | 3 | A.   That's correct. |
| 11:52:51 | 4 | MR. UMBACH:  Thank you. |
| 11:52:56 | 5 | THE COURT:  Thank you, sir. |
| 11:52:58 | 6 | Plaintiffs will call their next witness. |
| 11:53:00 | 7 | MR. CALAMUSA:  David Rogers -- I'm sorry, |
| 11:53:05 | 8 | David Rose, Your Honor. |
| 11:53:06 | 9 | MR. WHITE:  Your Honor, there is one |
| 11:53:08 | 10 | outstanding discovery issue on that, if you've got it -- |
| 11:53:12 | 11 | MR. CALAMUSA:  I'm sorry? |
| 11:53:13 | 12 | MR. G. WIGGINS:  I wouldn't classify it as |
| 11:53:16 | 13 | an outstanding discovery issue. |
| 11:53:19 | 14 | MR. WHITE:  I will be happy to -- I thought |
| 11:53:22 | 15 | we could handle it lawyer to lawyer. |
| 11:53:25 | 16 | MR. G. WIGGINS:  I am looking for it. |
| 11:53:26 | 17 | THE COURT:  Call another witness. |
| 11:53:38 | 18 | MR. G. WIGGINS:  Oh, call another witness. |
| 11:53:39 | 19 | I'm sorry.  Julie Bly. |
| 11:53:46 | 20 | **JULIE BLY, PLAINTIFFS' WITNESS, SWORN,** |
| 11:53:48 | 21 | THE CLERK:  State your name for the record, |
| 11:53:54 | 22 | Please. |
| 11:53:55 | 23 | THE WITNESS:  Julie Bly. |
| 11:54:11 | 24 | THE CLERK:  And spell your last name for the |
| 11:54:12 | 25 | record. |

| | | |
|---|---|---|
| 11:54:13 | 1 | THE WITNESS:  B-L-Y. |
| 11:54:14 | 2 | **DIRECT EXAMINATION** |
| 11:54:15 | 3 | **BY MR. CALAMUSA:** |
| 11:54:22 | 4 | Q.  Ms. Bly, were you employed as a store manager at |
| 11:54:29 | 5 | Family Dollar? |
| 11:54:30 | 6 | A.  Yes, sir. |
| 11:54:30 | 7 | Q.  What time period? |
| 11:54:33 | 8 | A.  I became a store manager in October of 1992, and |
| 11:54:39 | 9 | I left the company August 15th of 2002. |
| 11:54:44 | 10 | Q.  And during that time period, where were you |
| 11:54:46 | 11 | employed? |
| 11:54:47 | 12 | A.  Approximately eight stores. |
| 11:54:49 | 13 | Q.  And where were those stores located? |
| 11:54:51 | 14 | A.  There was -- the last store that I was in, was in |
| 11:54:56 | 15 | Decatur, Illinois, which is Store 1201.  There was |
| 11:55:00 | 16 | another store in Decatur, which was 1819. |
| 11:55:05 | 17 | There was three stores in Springfield, Illinois. |
| 11:55:10 | 18 | I was in a store in Muscatine, Iowa and also Rock |
| 11:55:16 | 19 | Island, Illinois. |
| 11:55:17 | 20 | Q.  During your employment as a store manager with |
| 11:55:24 | 21 | Family Dollar, were you required to work more than 40 |
| 11:55:28 | 22 | hours a week? |
| 11:55:28 | 23 | A.  Yes, sir. |
| 11:55:29 | 24 | Q.  Were you required to work more than 48 hours a |
| 11:55:31 | 25 | week? |

11:55:31   1       A.   Yes, sir.

11:55:32   2       Q.   And more than 52?

11:55:34   3       A.   Yes.

11:55:34   4       Q.   Was there ever a week during your employment with

11:55:36   5   Family Dollar where you did not work more than 40 hours

11:55:41   6   a week?

11:55:41   7       A.   No.

11:55:42   8       Q.   Was there ever a week where you did not work more

11:55:44   9   than 48 hours a week?

11:55:46   10      A.   No.

11:55:46   11      Q.   What would you say was your average hours per

11:55:50   12   week that you did work as a store manager?

11:55:53   13      A.   In the Store 1201, I averaged 60 to 70 hours a

11:55:58   14   week.

11:55:58   15      Q.   And did you receive overtime for any hour in

11:56:04   16   which you worked over 40?

11:56:06   17      A.   No, sir.

11:56:06   18      Q.   Did you receive overtime for any hour you worked

11:56:09   19   over 48?

11:56:10   20      A.   No.

11:56:10   21      Q.   Or over 52?

11:56:12   22      A.   No, sir.

11:56:15   23           MR. CALAMUSA:   Thank you, Ms. Bly.

11:56:18   24           THE COURT:   Cross-examination?

11:56:18   25                         **CROSS-EXAMINATION**

11:56:19   1   **BY MR. MAYS:**

11:56:20   2      Q.   Ms. Bly, my name's Joe Mays.  I am one of the

11:56:32   3   lawyers for Family Dollar, and I have a few questions to

11:56:35   4   ask you just in the way of follow up.

11:56:37   5         You worked for Family Dollar as a cashier from

11:56:41   6   1990 until 1991; correct?

11:56:43   7      A.   Yes.

11:56:46   8                  MR. CALAMUSA:   Object, Your Honor.

11:56:47   9      Q.   And you were an hourly employee at that time?

11:56:49  10      A.   Yes.

11:56:49  11      Q.   And then you worked as an assistant store manager

11:56:51  12   from 1991 to 1992; isn't that right?

11:56:55  13      A.   Yes.

11:56:55  14      Q.   And you were an hourly employee at that time?

11:56:57  15      A.   Yes.

11:56:58  16      Q.   And while you were a cashier and an assistant

11:57:02  17   manager, you had the opportunity to observe the way the

11:57:06  18   stores were operated?

11:57:09  19                  MR. CALAMUSA:   Object, Your Honor.

11:57:09  20                  THE COURT:   Your objection is sustained.

11:57:09  21      Q.   Then you were a store manager from 1992 forward;

11:57:13  22   right?

11:57:13  23      A.   Yes.

11:57:13  24      Q.   And when you accepted the position of store

11:57:19  25   manager, you had already worked as a cashier and an

11:57:22  1   assistant manager?

11:57:23  2              THE COURT:  Your objection is sustained.

11:57:25  3       Q.  When you accepted that position, were you told

11:57:27  4   you would be making a salary?

11:57:28  5       A.  Yes.

11:57:29  6       Q.  Were you told you would not be eligible for

11:57:31  7   overtime compensation?

11:57:33  8       A.  I was never told I wouldn't be eligible for

11:57:36  9   overtime compensation.  It was never brought up.

11:57:38 10       Q.  In fact, that is because you knew you would not

11:57:40 11   be eligible for overtime; isn't that right?

11:57:42 12              MR. CALAMUSA:  Object, Your Honor.

11:57:43 13              THE COURT:  Sustained.

11:57:44 14       Q.  You knew you were being paid as a salaried

11:57:47 15   employee; correct?

11:57:47 16       A.  Yes.

11:57:48 17       Q.  Okay.  And at the last -- when you left, or your

11:57:53 18   last compensation, you were paid about $700 a week;

11:57:56 19   isn't that right?

11:57:57 20       A.  No.  When I left the company, I was making $600 a

11:58:00 21   week, because the last pay raise I was given was taken

11:58:03 22   away because I said that I would not do the duties that

11:58:09 23   they were wanting me to do.

11:58:10 24       Q.  Okay.  So at that time you were making 600.  At

11:58:13 25   one time you were making as much as 700?

11:58:15   1      A.   When I temporarily held a district.

11:58:17   2      Q.   As a district manager?

11:58:19   3      A.   Yes.

11:58:19   4      Q.   What is your education?

11:58:21   5      A.   High school diploma.

11:58:22   6      Q.   With a high school diploma, you were made store

11:58:26   7  manager then district manager?

11:58:27   8      A.   Yes.

11:58:28   9      Q.   Did you fairly and accurately reflect your time

11:58:30  10  to Family Dollar when you turned in your time?

11:58:32  11      A.   When I was with -- when I was in the store that I

11:58:37  12  was based in, I accurately reported my time.  When I was

11:58:41  13  sent to other stores to clean up, those hours were never

11:58:45  14  reported.

11:58:45  15      Q.   Okay.  You don't have -- you are not aware of any

11:58:49  16  records, other than Family Dollar's records, of the time

11:58:51  17  that you worked, are you?

11:58:52  18      A.   No.

11:58:53  19              MR. MAYS:  That's all.

11:58:54  20              THE COURT:  Thank you, ma'am.

11:58:56  21              Plaintiffs will call their next witness.

11:58:58  22              MR. G. WIGGINS:  Your Honor, we have had

11:59:02  23  several witnesses that have just arrived that are just

11:59:04  24  getting here.  If we could take a lunch break now, I

11:59:08  25  think we could -- our experts are on their way in.

| | | |
|---|---|---|
| 11:59:13 | 1 | THE COURT:  All right.  Ladies and |
| 11:59:16 | 2 | gentlemen, as you've seen, we have moved a little fast |
| 11:59:20 | 3 | this morning. |
| 11:59:21 | 4 | (Laughter.) |
| 11:59:23 | 5 | THE COURT:  So we will have a long lunch |
| 11:59:26 | 6 | break.  We will be in recess until 1:30. |
| 11:59:28 | 7 | Please do not discuss the case among |
| 11:59:31 | 8 | yourselves or with anyone else.  Do not allow the case |
| 11:59:33 | 9 | to be discussed in your presence.  Keep an open mind. |
| 11:59:36 | 10 | Have a good lunch. |
| 11:59:37 | 11 | (Jury out at 11:50 a.m.) |
| 11:59:46 | 12 | MR. MAYS:  Your Honor, I have one matter. |
| 11:59:49 | 13 | THE COURT:  Yes, sir. |
| 11:59:49 | 14 | (In open court, jury not present.) |
| 12:00:20 | 15 | THE COURT:  As I understand it, there is a |
| 12:00:21 | 16 | matter you wish to take up with me? |
| 12:00:23 | 17 | MR. MAYS:  Your Honor, I need to |
| 12:00:24 | 18 | authenticate Ms. Bly's resume.  I didn't want to do it |
| 12:00:29 | 19 | in front of the jury. |
| 12:00:30 | 20 | THE COURT:  Is Ms. Bly around? |
| 12:00:32 | 21 | MR. CALAMUSA:  Ms. Bly, you still here? |
| 12:00:34 | 22 | MS. BLY:  Yes. |
| 12:00:35 | 23 | THE COURT:  Is this your resume? |
| 12:00:40 | 24 | Now, I take it the plaintiffs will call |
| 12:00:43 | 25 | their experts this afternoon? |

| | | |
|---|---|---|
| 12:00:48 | 1 | MR. G. WIGGINS:  Just Dr. Bradley, Your |
| 12:00:50 | 2 | Honor. |
| 12:00:50 | 3 | THE COURT:  All right. |
| 12:00:55 | 4 | MR. R. WIGGINS:  Our only expert will be on |
| 12:00:56 | 5 | the hours, Judge. |
| 12:00:58 | 6 | THE COURT:  Okay.  And so when do you -- you |
| 12:01:00 | 7 | don't have to take the witness stand.  Is that your |
| 12:01:02 | 8 | resume? |
| 12:01:03 | 9 | MR. MAYS:  Ms. Bly, is that your resume, |
| 12:01:06 | 10 | please, ma'am? |
| 12:01:06 | 11 | THE WITNESS:  Yes. |
| 12:01:07 | 12 | MR. MAYS:  Your Honor, for purposes of |
| 12:01:09 | 13 | identification, it's Defendant's Exhibit 1445, which we |
| 12:01:13 | 14 | will offer to the clerk for identification purposes |
| 12:01:16 | 15 | only. |
| 12:01:16 | 16 | MR. KENT:  Your Honor, Dr. Bradley has |
| 12:01:18 | 17 | submitted evidence on three issues:  Damages; two, |
| 12:01:24 | 18 | employee compliance; and hours worked.  Will his |
| 12:01:27 | 19 | testimony deal strictly with the hours that the store |
| 12:01:31 | 20 | managers worked? |
| 12:01:32 | 21 | THE COURT:  Well, he could testify to |
| 12:01:34 | 22 | damages, because damages are a part of -- of course, the |
| 12:01:37 | 23 | plaintiffs have to prove damages as part of their case, |
| 12:01:42 | 24 | yes. |
| 12:01:45 | 25 | And you have got another -- do you have |

12:01:48  1    enough other witnesses to take up the rest of the

12:01:50  2    afternoon?

12:01:51  3             MR. G. WIGGINS:  Your Honor, we probably --

12:01:53  4    at this speed, I would -- how long do you think we will

12:01:58  5    need?

12:01:58  6             MR. R. WIGGINS:  Well, the Judge limited us

12:02:01  7    to an hour --

12:02:03  8             Dr. Bradley, I think, will probably be 30

12:02:05  9    minutes on our side.  And you've got a limit on their

12:02:07  10   side.  So I assume an hour and a half to two hours at

12:02:12  11   the maximum, as allowed under the rule.

12:02:14  12            MR. G. WIGGINS:  I would not make that

12:02:16  13   guarantee, Your Honor.

12:02:18  14            MR. CALAMUSA:  We will be close.

12:02:20  15            MR. G. WIGGINS:  We will be close, but --

12:02:22  16            THE COURT:  So you have exhausted every

12:02:23  17   other name on the list that you gave --

12:02:26  18            MR. CALAMUSA:  For 20 today.  The 20 today,

12:02:30  19   we will exhaust by this afternoon.

12:02:33  20            MR. G. WIGGINS:  And, plus, we have others

12:02:34  21   that are coming in this afternoon that are not on the

12:02:37  22   list that I will put on, pursuant to your request.

12:02:40  23            But -- no, that's all.

12:02:41  24            THE COURT:  All right.  Now, how many do you

12:02:44  25   expect to call tomorrow?

12:02:47  1          MR. G. WIGGINS:  May I answer that after

12:02:49  2   lunch, Your Honor?  because I am not positive.

12:02:53  3          I didn't realize the speed and everything,

12:02:56  4   and I am not positive exactly who is going to be here

12:02:59  5   tomorrow.

12:02:59  6          THE COURT:  Well, as I see it, given the

12:03:06  7   fact that this is using representative evidence, you

12:03:10  8   really don't have to put on any other witnesses on the

12:03:16  9   issue of your case.  And so --

12:03:34  10         MR. R. WIGGINS:  The only thing we might

12:03:36  11  use -- anything beyond -- is depending on Dr. Bradley's

12:03:39  12  testimony, if there's some other issue --

12:03:41  13         THE COURT:  All right.  So the defendants

12:03:43  14  should be prepared to go forward tomorrow.

12:03:45  15         MR. KALLON:  Judge?

12:03:45  16         THE COURT:  Yes.

12:03:46  17         MR. KALLON:  We have logistical issues

12:03:49  18  Mr. May alluded to earlier.

12:03:50  19         We certainly have Mr. -- the company

12:03:52  20  president, Mr. Alexander, is with us, Your Honor.  But I

12:03:56  21  told my witnesses that I have lined up will come from

12:03:59  22  various parts of the country.  And we likely will not

12:04:02  23  get to them until Monday.  And I am not sure if I can

12:04:05  24  get all of them here by Thursday.  We definitely will

12:04:08  25  make an effort to do so.  But it's a strong possibility

| | |
|---|---|
| 12:04:10 | 1 |

that we may not be able to call enough witnesses to --

THE COURT:  Are most of your witnesses from outside of Alabama?

MR. KALLON:  Yes, sir.  We have one witness -- two witnesses from Alabama, Your Honor.

THE COURT:  Are you going to call any of the plaintiffs as adverse witnesses?

MR. KALLON:  No, sir.  We are just going to cross-examine them.  Well, that decision has not been made yet, let me not represent that to the Court.  We will discuss that over lunch.

THE COURT:  Well, if you are going to call any of the plaintiffs as adverse witnesses, you will call them tomorrow.

MR. MAYS:  Yes, sir.

MR. WHITE:  Okay.

THE COURT:  Well, why don't you make sure they're all here, which means that you should give your list -- be prepared to give your list to plaintiffs' counsel this afternoon.

I am instructing all of the plaintiffs who testified here today to be available --

MR. WHITE:  Okay.

THE COURT:  -- to be called as adverse witnesses tomorrow.

12:05:10  1          MR. KALLON:  Are we limited to the ones that

12:05:13  2    are here only?

12:05:13  3               THE COURT:  Pardon me?

12:05:13  4          MR. KALLON:  Are we limited to the ones that

12:05:14  5    are here only?

12:05:14  6               THE COURT:  No.  No, you are not limited.  I

12:05:17  7    am -- all I am saying is this:  For the ones who are

12:05:20  8    already here, if you are going to call them in your

12:05:25  9    case, they should be prepared to go forward tomorrow.

12:05:30  10               MR. KALLON:  Thank you, Your Honor.

12:05:32  11               MR. G. WIGGINS:  Your Honor, we would simply

12:05:34  12    say to the Court that many of these witnesses will come

12:05:37  13    in and leave, and they have jobs to go back to, families

12:05:39  14    to go back to, and they were not planning on being here.

12:05:41  15    And they have not identified them as adverse witnesses,

12:05:44  16    or anything.

12:05:45  17               THE COURT:  Well, they have said that they

12:05:46  18    intend to call any witness listed by you, though the --

12:05:49  19               MR. G. WIGGINS:  Right.

12:05:50  20               MR. WHITE:  Yes, sir.  Yes, sir.

12:05:51  21               THE COURT:  All right.  Well, the ones that

12:05:53  22    they want to call, they will let you know this

12:05:59  23    afternoon.

12:06:01  24               And the witnesses -- these plaintiffs should

12:06:11  25    be prepared to spend another day here.  And that's what

| 12:06:15 | 1 | we're talking about. |
| 12:06:17 | 2 | MR. WHITE:  They were headed that way, |
| 12:06:20 | 3 | anyway, until you kind of cranked it up a notch. |
| 12:06:22 | 4 | THE COURT:  Yes. |
| 12:06:23 | 5 | MR. WHITE:  Judge, it sounds like we will |
| 12:06:26 | 6 | sort of be swapping lists this afternoon.  Because to |
| 12:06:28 | 7 | the extent he has plaintiffs tomorrow, I assume if he |
| 12:06:33 | 8 | gives us that list today, you want us to try to |
| 12:06:35 | 9 | determine as best we can if we want to use -- |
| 12:06:38 | 10 | THE COURT:  Right.  The plaintiffs are |
| 12:06:40 | 11 | probably going to rest this afternoon. |
| 12:06:51 | 12 | All right.  Thank you. |
| 12:06:56 | 13 | (Lunch recess at 11:49 a.m. until 1:30 p.m.) |
| 13:36:43 | 14 | (In open court, jury not present.) |
| 13:36:43 | 15 | THE COURT:  Mr. Childs? |
| 13:36:44 | 16 | MR. CHILDS:  Yes. |
| 13:36:45 | 17 | THE COURT:  Do you want to come up here? |
| 13:39:13 | 18 | MR. CHILDS:  Dr. Bradley is not here, and we |
| 13:39:13 | 19 | have talked about taking him out of order and doing it |
| 13:39:13 | 20 | first thing in the morning. |
| 13:39:13 | 21 | The defendant -- |
| 13:39:13 | 22 | THE COURT:  Is he on his way? |
| 13:39:13 | 23 | MR. CHILDS:  He is on his way. |
| 13:39:13 | 24 | THE COURT:  Don't you have some other |
| 13:39:13 | 25 | witnesses? |

13:39:13  1          MR. CHILDS:  We have four other witnesses,

13:39:13  2   20 minutes, Your Honor.

13:39:13  3          THE COURT:  All right.

13:39:13  4          MR. CHILDS:  I would like to have a chance

13:39:13  5   to talk with him before he gets in here, if the Court

13:39:13  6   would at least let us do that.

13:39:13  7          THE COURT:  All right.  All right.  We will

13:39:13  8   see where we are.

13:39:13  9          MR. WHITE:  Did you have any luck finding

13:39:13  10  that questionnaire on Mr. Rose?

13:39:13  11          MR. UMBACH:  I forgot to tell you.  Mark's

13:39:13  12  got it.

13:39:13  13          MR. G. WIGGINS:  We did find it.

13:39:13  14          (In open court, jury present.)

13:39:13  15          THE COURT:  Ladies and gentlemen, the

13:39:13  16  plaintiff will call their next witness.

13:39:13  17          MR. JOHNSON:  Thank you, Your Honor.  We

13:39:13  18  call Tom Brown.

13:39:20  19          **THOMAS W. BROWN, PLAINTIFFS' WITNESS, SWORN**

13:39:22  20          THE CLERK:  State your name for the record,

13:39:25  21  please.

13:39:26  22          THE WITNESS:  Thomas W. Brown, B-r-o-w-n.

13:39:34  23                  **DIRECT EXAMINATION**

13:39:34  24  **BY MR. JOHNSON:**

13:39:39  25    Q.  Mr. Brown, were you employed with Family Dollar

| | | |
|---|---|---|
| 13:39:48 | 1 | as a store manager? |
| 13:39:49 | 2 | A.   Yes, sir. |
| 13:39:50 | 3 | Q.   Of what period of time? |
| 13:39:52 | 4 | A.   From September 1993 until May of 2001. |
| 13:40:00 | 5 | Q.   Okay.  Just of focus on the period of June of |
| 13:40:05 | 6 | 1999 until 2001, okay? |
| 13:40:07 | 7 | A.   That is correct. |
| 13:40:08 | 8 | Q.   Where were you employed as a store manager for |
| 13:40:12 | 9 | Family Dollar during that period as a store manager? |
| 13:40:15 | 10 | A.   '99 through 2001? |
| 13:40:17 | 11 | Q.   Yes. |
| 13:40:18 | 12 | A.   Rocky Mountain, North Carolina. |
| 13:40:20 | 13 | Q.   And on those occasions when you were employed as |
| 13:40:22 | 14 | a store manager, did you work more than 40 hours per |
| 13:40:27 | 15 | week? |
| 13:40:27 | 16 | A.   Yes, I did. |
| 13:40:28 | 17 | Q.   Did you work more than 48 hours per week? |
| 13:40:31 | 18 | A.   Yes, I did. |
| 13:40:32 | 19 | Q.   Did you work more than 52 hours per week? |
| 13:40:35 | 20 | A.   Yes, I did. |
| 13:40:36 | 21 | Q.   Did you ever work less than 40 hours per week? |
| 13:40:39 | 22 | A.   No.  Vacation time -- when I took vacation, it |
| 13:40:44 | 23 | was always over 52 hours. |
| 13:40:45 | 24 | Q.   Okay.  So you always were working more than 52 |
| 13:40:49 | 25 | hours? |

13:40:50  1    A.   That's correct, yes.

13:40:51  2    Q.   Now, how many hours did you work per week on

13:40:54  3  average?

13:40:55  4    A.   I'd say somewhere between 60 and 70 or more.

13:40:58  5    Q.   And did you report your hours accurately?

13:41:03  6    A.   No.

13:41:03  7    Q.   Why not?

13:41:04  8    A.   After a year, we had a change in district

13:41:11  9  managers.  The new district manager told us that we were

13:41:14  10  to work 52 hours a week.  I just posted 52 hours a week.

13:41:20  11    Q.   And when did the district manager tell you this?

13:41:22  12    A.   This is about a year and a half after I started

13:41:25  13  with the company.

13:41:26  14    Q.   So that would be about '94, '95, thereabouts?

13:41:30  15    A.   Somewhere thereabouts, yes.

13:41:32  16    Q.   Okay.  Now, did you receive overtime compensation

13:41:37  17  when you worked more than 40 hours a week?

13:41:39  18    A.   No.

13:41:40  19    Q.   Did you receive overtime compensation when you

13:41:43  20  worked more than 48 hours per week?

13:41:44  21    A.   No.

13:41:45  22    Q.   What about 52 hours?

13:41:47  23    A.   No.

13:41:49  24         MR. JOHNSON:  That's all.

13:41:50  25         THE COURT:  Cross-examination?

| | | |
|---|---|---|
| 13:41:51 | 1 | MR. JOHNSON:  I object to the double team, |
| 13:42:03 | 2 | Your Honor. |
| 13:42:03 | 3 | (Laughter.) |
| 13:42:07 | 4 | MR. UMBACH:  Age before beauty. |
| 13:42:11 | 5 | **CROSS-EXAMINATION** |
| 13:42:11 | 6 | **BY MR. MAYS:** |
| 13:42:12 | 7 | Q.  Mr. Brown, my name is Joe Mays, and I am one of |
| 13:42:16 | 8 | the lawyers for Family Dollar.  I am going to ask you a |
| 13:42:18 | 9 | few questions. |
| 13:42:20 | 10 | When you went to work for Family Dollar and |
| 13:42:25 | 11 | accepted a store manager's position, you understood you |
| 13:42:27 | 12 | would be on salary, didn't you? |
| 13:42:29 | 13 | A.  Yes, that's correct. |
| 13:42:29 | 14 | Q.  And the whole time you were employed as a store |
| 13:42:32 | 15 | manager, you knew that you were being paid a salary and |
| 13:42:35 | 16 | not eligible for overtime? |
| 13:42:37 | 17 | A.  I was paid a salary, yes, sir. |
| 13:42:38 | 18 | Q.  And you -- it wasn't clear to me from your |
| 13:42:47 | 19 | testimony, you did get the schedule -- the staff |
| 13:42:49 | 20 | scheduler that came from Family Dollar? |
| 13:42:52 | 21 | MR. JOHNSON:  Objection, Your Honor, going |
| 13:42:54 | 22 | beyond the scope of direct. |
| 13:42:56 | 23 | THE COURT:  Sustained. |
| 13:42:57 | 24 | MR. MAYS:  Your Honor, if I may, it goes |
| 13:42:59 | 25 | directly to the number of hours he worked. |

13:43:03   1          MR. JOHNSON:  I don't understand the

13:43:05   2   relevance of the staff scheduling hours to do --

13:43:08   3          THE COURT:  What is the relevance of that?

13:43:09   4          MR. MAYS:  If the staff schedule had him

13:43:12   5   scheduled for 52 hours per week or not.

13:43:15   6          THE COURT:  All right.  Overruled.

13:43:16   7          THE WITNESS:  Staff schedule order, what's

13:43:19   8   that?  I am not familiar with that term.

13:43:21   9          THE COURT:  All right.  Next question.

13:43:22   10     Q.  (By Mr. Mays)  You didn't get a staff scheduler

13:43:24   11   from --

13:43:25   12          MR. JOHNSON:  Objection, Your Honor.

13:43:27   13          THE COURT:  Sustained.

13:43:27   14          MR. MAYS:  That's all I have, Your Honor.

13:43:29   15          THE COURT:  All right.  Thank you, sir.

13:43:31   16          MR. JOHNSON:  No more questions.

13:43:32   17          THE COURT:  Plaintiffs will call their next

13:43:34   18   witness.

13:43:35   19          MR. JOHNSON:  We call Elden Heim.

13:43:40   20          **ELDEN HEIM, PLAINTIFFS' WITNESS, SWORN**

13:43:55   21          THE CLERK:  State your name for the record.

13:44:05   22          THE WITNESS:  Elden Heim, H-E-I-M.

13:44:10   23                    **DIRECT EXAMINATION**

13:44:10   24   **BY MR. JOHNSON:**

13:44:11   25     Q.  Thank you, Mr. Heim.

13:44:13   1          First, were you ever employed with Family Dollar

13:44:16   2   as a store manager?

13:44:17   3      A.   Yes.

13:44:18   4      Q.   For what period of time?

13:44:20   5      A.   I was employed as a store manager from November

13:44:25   6   of 1997 until March of 2000; I was a district manager

13:44:32   7   from March of 2000 until September of 2001; and then a

13:44:43   8   store manager from September 2001 until March of 2004.

13:44:48   9      Q.   Okay.   I just wanted to focus upon a period of

13:44:54  10   time from June of 1999 until 2004, when -- just when you

13:45:01  11   were a store manager.   Okay?

13:45:04  12      A.   Okay.

13:45:04  13      Q.   Where did you work as a store manager during that

13:45:06  14   time period?

13:45:07  15      A.   Omaha, Nebraska; Grand Island, Nebraska; Des

13:45:10  16   Moines, Iowa.

13:45:14  17      Q.   And on those occasions when you worked as a store

13:45:17  18   manager, did you work more than 40 hours per week?

13:45:19  19      A.   Yes, I did.

13:45:20  20      Q.   Did you work more than 48 hours per week?

13:45:22  21      A.   Yes, I did.

13:45:23  22      Q.   Did you work more than 52 hours per week?

13:45:26  23      A.   Yes, I did.

13:45:27  24      Q.   Did you ever work less than 40 hours per week?

13:45:30  25      A.   The only time I did is I had an automobile

13:45:32  1   accident on the job and was placed on restricted duty,

13:45:36  2   which was honored six months later.  And it was 40 hours

13:45:40  3   a week.

13:45:42  4      Q.  When did this occur?

13:45:44  5      A.  The accident occurred in June of 2000, and I came

13:45:49  6   back to work in January of 2001.

13:45:54  7      Q.  And that's when you were placed on restrictive

13:45:58  8   duty?

13:45:58  9      A.  That's when I was placed on restrictive duty,

13:46:01  10  although it wasn't honored until six months later.

13:46:05  11     Q.  So around June, 2001?

13:46:07  12     A.  Yeah, May or June.

13:46:08  13     Q.  Okay.  So what were the number of hours you were

13:46:12  14  working from January 2001 to June of 2001 when you were

13:46:16  15  just placed on restrictive duty?

13:46:20  16     A.  Before they honored it?

13:46:22  17     Q.  Yes.

13:46:22  18     A.  Around 55 hours a week.

13:46:24  19     Q.  Okay.  Now, other than those occasions when you

13:46:29  20  were on restrictive duty after June of 2001, did you

13:46:33  21  ever work less than 40 hours per week?

13:46:36  22     A.  No.

13:46:36  23     Q.  Did you ever work less than 48 hours per week?

13:46:39  24     A.  No.

13:46:39  25     Q.  Did you ever work less than 52 hours per week?

13:46:42  1    A.  No.

13:46:42  2    Q.  Other than that occasion when you were on

13:46:45  3  restrictive duty, how many hours a week would you

13:46:48  4  average?  How many hours after work would you average?

13:46:52  5    A.  I would say average between 60 and 65 hours per

13:46:55  6  week.

13:46:55  7    Q.  And did you report all of the hours that you

13:46:57  8  worked?

13:46:58  9    A.  There was some additional hours I worked that I

13:47:00  10  didn't report.

13:47:00  11    Q.  And why not?

13:47:01  12    A.  It didn't affect my paycheck.  I was salaried, so

13:47:07  13  I didn't get paid for those additional hours.

13:47:09  14    Q.  Okay.  Now, did you receive overtime compensation

13:47:14  15  when you worked more than 40 hours per week?

13:47:16  16    A.  No.

13:47:17  17    Q.  Did you receive overtime when you worked more

13:47:19  18  than 48 hours per week?

13:47:20  19    A.  No.

13:47:21  20    Q.  Did you receive overtime when you worked more

13:47:23  21  than 52 hours per week?

13:47:25  22    A.  No.

13:47:26  23            MR. JOHNSON:  That's all I have.

13:47:27  24            THE COURT:  Cross-examination?

13:47:32  25                    **CROSS-EXAMINATION**

13:47:32 1    **BY MR. UMBACH:**

13:47:34 2        Q.  Mr. Heim, am I correct that when you were last a

13:47:42 3    store manager, your salary was $845 a week?

13:47:47 4        A.  That's correct.

13:47:47 5        Q.  And was that the last salary that you made as a

13:47:51 6    store manager?

13:47:52 7        A.  Correct.

13:47:53 8        Q.  And that would be in March of 2004?

13:47:57 9        A.  Correct.

13:47:57 10       Q.  One other question:  What is your educational

13:48:05 11   background?

13:48:05 12       A.  I am a graduate of Texas Christian University.

13:48:09 13           MR. UMBACH:  Thank you.

13:48:13 14           THE COURT:  Anything else?

13:48:14 15           MR. CALAMUSA:  No, Your Honor.

13:48:15 16           THE COURT:  Thank you, sir.

13:48:17 17           Plaintiffs will call their next witness.

13:48:20 18           MR. JOHNSON:  Your Honor, we call Alice

13:48:23 19   Duessler.

13:48:30 20           **ALICE DUESSLER, PLAINTIFFS' WITNESS, SWORN**

13:48:33 21           THE CLERK:  State your name for the record,

13:48:38 22   please.

13:48:39 23           THE WITNESS:  Alice Duessler.

13:48:49 24           THE CLERK:  And spell your last name for the

13:48:49 25   record.

| | | |
|---|---|---|
| 13:48:49 | 1 | THE WITNESS:  D-U-E-S-S-L-E-R. |
| 13:48:53 | 2 | **DIRECT EXAMINATION** |
| 13:48:53 | 3 | **BY MR. JOHNSON:** |
| 13:48:54 | 4 | Q.  Good afternoon, Ms. Duessler. |
| 13:48:58 | 5 | Now, were you employed with Family Dollar as a |
| 13:49:01 | 6 | store manager? |
| 13:49:01 | 7 | A.  Yes. |
| 13:49:02 | 8 | Q.  For what period of time? |
| 13:49:04 | 9 | A.  2000 to 2001. |
| 13:49:06 | 10 | Q.  2000 to 2001? |
| 13:49:09 | 11 | A.  Right. |
| 13:49:10 | 12 | Q.  And where were you employed as a store manager? |
| 13:49:12 | 13 | A.  Madison, Wisconsin. |
| 13:49:13 | 14 | Q.  Now, on that occasion when you worked as a store |
| 13:49:17 | 15 | manager for Family Dollar, did you work more than 40 |
| 13:49:21 | 16 | hours per week? |
| 13:49:22 | 17 | A.  Yes. |
| 13:49:22 | 18 | Q.  Did you work more than 48 hours per week? |
| 13:49:24 | 19 | A.  Yes. |
| 13:49:25 | 20 | Q.  Did you work more than 52 hours per week? |
| 13:49:27 | 21 | A.  Yes. |
| 13:49:28 | 22 | Q.  Did you ever work less than 40 hours per week? |
| 13:49:32 | 23 | A.  No. |
| 13:49:33 | 24 | Q.  Did you ever work less than 48 hours per week? |
| 13:49:35 | 25 | A.  No. |

13:49:36  1      Q.   And did you ever work less than 52 hours per

13:49:39  2   week?

13:49:39  3      A.   No.

13:49:40  4      Q.   How many hours of work would you average a week?

13:49:44  5      A.   Between 80 and a 110, plus.

13:49:49  6      Q.   And did you report all of the work -- all of the

13:49:52  7   hours that you worked?

13:49:53  8      A.   No.

13:49:53  9      Q.   And why not?

13:49:55  10     A.   I was salary.  It didn't matter, after your time

13:49:59  11  frame.

13:49:59  12     Q.   Okay.  And did you receive overtime compensation

13:50:03  13  when you worked more than 40 hours per week?

13:50:06  14     A.   No.

13:50:06  15     Q.   Did you receive overtime when you worked more

13:50:09  16  than 48 hours per week?

13:50:10  17     A.   No.

13:50:11  18     Q.   Did you receive overtime when you worked more

13:50:13  19  than 52 hours per week?

13:50:15  20     A.   No.

13:50:15  21     Q.   I'm sorry?

13:50:16  22     A.   No.

13:50:17  23             MR. JOHNSON:  That's all I have.

13:50:20  24             THE COURT:  Cross-examination?

13:50:20  25                     **CROSS-EXAMINATION**

**BY MR. UMBACH:**

13:50:21  1

13:50:22  2    Q.  Ms. Duessler, you worked for Family Dollar for

13:50:28  3    one year; is that correct?

13:50:29  4    A.  Correct.

13:50:29  5    Q.  Did you work in one store or more than one?

13:50:35  6    A.  I worked at one store, but helped out at other

13:50:40  7    stores.

13:50:41  8    Q.  What were the hours of that store, total hours on

13:50:45  9    the week, if you remember?

13:50:47  10   A.  Store hours, or my hours?

13:50:50  11   Q.  The hours that the store was open.  Total hours

13:50:53  12   for the week, you know.

13:50:56  13   A.  Seven days a week.  And I believe the hours were

13:51:04  14   from 8:00 o'clock in the morning until 9:00 o'clock at

13:51:07  15   night.

13:51:11  16   Q.  Is it fair to say that you worked more hours than

13:51:19  17   the store was actually open?

13:51:21  18   A.  Yes.

13:51:21  19   Q.  Did your store have an alarm system?

13:51:26  20   A.  I don't --

13:51:26  21          MR. JOHNSON:  Your Honor, objection.  This

13:51:28  22   is going beyond the scope of direct.

13:51:30  23          THE COURT:  Sustained.

13:51:36  24   Q.  Ms. Duessler, you don't have any record of the

13:51:39  25   hours that you worked, other than what you turned in to

| | | |
|---|---|---|
| 13:51:43 | 1 | Family Dollar, do you? |
| 13:51:44 | 2 | A. Correct. |
| 13:51:45 | 3 | Q. Ma'am? |
| 13:51:46 | 4 | A. No, I do not. |
| 13:51:47 | 5 | Q. You do not. |
| 13:51:48 | 6 | MR. UMBACH: Thank you. |
| 13:51:50 | 7 | MR. JOHNSON: I have one question, Your |
| 13:51:52 | 8 | Honor. |
| 13:51:52 | 9 | **REDIRECT EXAMINATION** |
| 13:51:52 | 10 | **BY MR. JOHNSON:** |
| 13:51:54 | 11 | Q. Ms. Duessler, did you have to work outside of the |
| 13:52:04 | 12 | store hours? |
| 13:52:05 | 13 | A. Yes. |
| 13:52:06 | 14 | Q. And how often did you have to do so? |
| 13:52:08 | 15 | A. Every day. |
| 13:52:09 | 16 | Q. Okay. |
| 13:52:12 | 17 | MR. JOHNSON: That's all. |
| 13:52:12 | 18 | **RECROSS EXAMINATION** |
| 13:52:15 | 19 | **BY MR. UMBACH:** |
| 13:52:15 | 20 | Q. Ms. Duessler, was your salary 725 a week, your |
| 13:52:19 | 21 | final salary? |
| 13:52:19 | 22 | THE COURT: No, no, no, that's it. |
| 13:52:21 | 23 | Thank you, ma'am. You may come down. |
| 13:52:27 | 24 | Plaintiffs will call their next witness. |
| 13:52:28 | 25 | MR. CALAMUSA: Vada Rose. |

13:52:35  1          MR. WHITE:  Your Honor, my understanding

13:52:36  2   Ms. Rose is going to be called -- and we are going to

13:52:40  3   try to accommodate the Court's schedule, the

13:52:43  4   representation is the document we are waiting on will be

13:52:46  5   here, but we are going to try and go ahead and get this

13:52:49  6   witness; is that fair?

13:52:50  7          MR. CALAMUSA:  That's fair.

13:52:53  8          MR. WHITE:  I thought you said the document

13:52:55  9   was on the way.  The document will be here sometime

13:53:02  10  today?

13:53:05  11         **VADA ROSE, PLAINTIFFS' WITNESS, SWORN**

13:53:12  12         THE CLERK:  State your name for the record,

13:53:14  13  please.

13:53:14  14         THE WITNESS:  Vada Rose, R-O-S-E.

13:53:23  15         THE CLERK:  Okay.

13:53:25  16                  **DIRECT EXAMINATION**

13:53:25  17  **BY MR. CALAMUSA:**

13:53:28  18    Q.  Ms. Rose, were you employed as a store manager

13:53:33  19  for Family Dollar?

13:53:34  20    A.  Yes, sir, I was.

13:53:34  21    Q.  What period of time?

13:53:35  22    A.  From November of 1999 to November of 2003.

13:53:39  23    Q.  And from 1999 to 2003, where were you employed as

13:53:44  24  a store manager with Family Dollar?

13:53:45  25    A.  I was employed at Ledington, Missouri, Store

13:53:49  1    Numbers 3535; and for a short period of time, also I had

13:53:54  2    a store in St. Louis, 2830 was its number; and both of

13:53:59  3    them at the same time.

13:54:00  4        Q.   During the time that you were store manager with

13:54:06  5    Family Dollar, did you work more than 40 hours a week?

13:54:09  6        A.   Yes, sir, I did.

13:54:10  7        Q.   And did that -- did you work more than 48 hours a

13:54:13  8    week?

13:54:13  9        A.   Yes, sir, I did.

13:54:14  10       Q.   And did -- were you required to work more than 52

13:54:17  11   hours a week?

13:54:18  12       A.   To get the job done, yes, sir, I was.

13:54:20  13       Q.   Do I understand you have two stores?

13:54:22  14       A.   Yes, sir.

13:54:22  15       Q.   At the same time?

13:54:23  16       A.   Yes, sir.

13:54:23  17       Q.   When you worked as a store manager, was there

13:54:33  18   ever a week in which you worked less than 40 hours a

13:54:37  19   week?

13:54:37  20       A.   No, sir.

13:54:38  21       Q.   Or less than 48 hours a week?

13:54:40  22       A.   No, sir.

13:54:41  23       Q.   Less than 52?

13:54:43  24       A.   No, sir.

13:54:43  25       Q.   Did you receive overtime compensation for any

13:54:47   1   hours in which you worked that was in excess of 40?

13:54:49   2        A.   No, sir.

13:54:50   3        Q.   Or 48?

13:54:51   4        A.   No, sir.

13:54:52   5        Q.   Or 52?

13:54:53   6        A.   No, sir.

13:54:54   7        Q.   How many hours would you say you averaged per

13:54:59   8   week, actually working?

13:55:00   9        A.   On a regular basis, between 65 and 70.   And

13:55:04   10  during the time period I had both stores, in excess of

13:55:08   11  85.

13:55:09   12       Q.   When you had two stores, and you were working in

13:55:12   13  excess of 85, did you report your hours?

13:55:16   14       A.   No, sir, I didn't.

13:55:17   15       Q.   Why not?

13:55:18   16       A.   I was told by the district manager he would take

13:55:20   17  care of it.

13:55:21   18       Q.   And who was that district manager?

13:55:22   19       A.   That would be Rob Lowes, L-O-W-E-S.

13:55:26   20       Q.   And when did Mr. Lowes inform you of this?

13:55:29   21       A.   The first month of 2001.

13:55:35   22            MR. CALAMUSA:   Thank you, Ms. Rose.

13:55:37   23            THE COURT:   Cross-examination?

13:55:38   24                      **CROSS-EXAMINATION**

13:55:38   25  **BY MR. WHITE:**

13:55:40  1      Q.   Ms. Rose, I am Mark White.  Good afternoon.

13:55:49  2      A.   Good afternoon, sir.

13:55:50  3      Q.   Ms. Rose, your Store Number 3535 unfortunately

13:55:55  4  had to close in 2003, didn't it?

13:55:58  5      A.   2003, yes.

13:55:59  6      Q.   And that's when you left Family Dollar?

13:56:02  7      A.   Yes.

13:56:03  8      Q.   And the store closed because of lack of sales?

13:56:07  9      A.   Yes, sir.

13:56:08  10     Q.   And are you presently employed?

13:56:12  11     A.   No, sir.

13:56:14  12              MR. CALAMUSA:  Object, Your Honor.

13:56:15  13              THE COURT:  Sustained -- well, overruled.

13:56:20  14              MR. CALAMUSA:  That's fine.

13:56:21  15     Q.   (By Mr. White)  Were you -- did you get

13:56:23  16  employment right after that?

13:56:25  17     A.   I had employment --

13:56:26  18              MR. CALAMUSA:  Objection, Your Honor.

13:56:27  19              THE COURT:  Does this go to damages,

13:56:32  20  Mr. White?

13:56:32  21              MR. WHITE:  I think it does, Your Honor.

13:56:35  22  And I will ask the question that --

13:56:36  23              THE COURT:  All right.  Unless it goes to

13:56:38  24  damages, I am going to sustain the objection.

13:56:45  25     Q.   (By Mr. White)  Let me ask this question, Ms.

| 13:56:48 | 1 | Rose -- hold up one second. |
| 13:56:49 | 2 | MR. WHITE:  I was going to ask her if it -- |
| 13:56:53 | 3 | is it not a fact that she got a job at Dollar General |
| 13:56:56 | 4 | when she left Family Dollar -- when Family Dollar |
| 13:57:01 | 5 | closed.  And I was going to ask her what position she |
| 13:57:05 | 6 | took there. |
| 13:57:06 | 7 | MR. CALAMUSA:  Does that have to do with |
| 13:57:08 | 8 | damages? |
| 13:57:08 | 9 | THE COURT:  Sustained. |
| 13:57:13 | 10 | Q.  (By Mr. White)  You understood -- let me ask you |
| 13:57:16 | 11 | this:  Am I correct that you previously said at your |
| 13:57:20 | 12 | deposition that when you first went with Family Dollar, |
| 13:57:23 | 13 | you were told you were expected to work 52 hours a week, |
| 13:57:28 | 14 | but later that was changed to 48? |
| 13:57:31 | 15 | A.  Yes, sir. |
| 13:57:31 | 16 | Q.  And am I correct that at your deposition you |
| 13:57:33 | 17 | testified you understood the pay would be the same if |
| 13:57:37 | 18 | you had to work more than 52 or 48?  the salary? |
| 13:57:41 | 19 | A.  I understood the pay would be the same if I |
| 13:57:44 | 20 | worked 52 hours or the 48, yes, sir. |
| 13:57:47 | 21 | Q.  Or more? |
| 13:57:50 | 22 | A.  Well, it's -- when I asked him about more, he |
| 13:57:54 | 23 | said it was to my credit that I worked more. |
| 13:57:56 | 24 | Q.  Well, do you recall testifying at your |
| 13:57:57 | 25 | deposition, Ms. Rose? |

13:57:58  1    A.   Yes, I remember.

13:58:00  2    Q.   Do you remember being asked through your counsel,

13:58:15  3    page 36, line 14 -- "and were you told what would happen

13:58:20  4    if you worked more than 42 hours?"  Your answer:  "That

13:58:26  5    was through their gain and my loss"?

13:58:27  6    A.   Uh-huh.

13:58:28  7    Q.   And question:  "In other words, your pay would

13:58:30  8    stay the same?"  Your answer:  "My pay would stay the

13:58:35  9    same"?

13:58:35  10   A.   Right.  Their gain, my loss.

13:58:36  11   Q.   And that's what you testified at that time;

13:58:39  12   right?

13:58:39  13   A.   Right.  Their gain and my loss.

13:58:41  14   Q.   How do you report the hours as a store manager at

13:58:50  15   Family Dollar?

13:58:51  16   A.   You do it by computer.  You pull up the computer

13:58:59  17   screen, and it has your name there.  And you put in what

13:59:03  18   time you started, what time you left, what time you

13:59:06  19   started, what time you left.  That's how you do it.

13:59:09  20        The cashiers check in on the registers; we check

13:59:12  21   in on the computer.

13:59:13  22   Q.   And you did that on a weekly basis?

13:59:15  23   A.   Yes, sir, I did.

13:59:18  24   Q.   The store that you were working at, Number 3535,

13:59:26  25   was a very rural area, wasn't it?

13:59:28    1      A.   Yes, sir, it was.

13:59:29    2      Q.   The other store that you said you worked at, how

13:59:32    3  close was it to the Store 3535?

13:59:35    4      A.   Between 65 and 70 miles one way.

13:59:38    5      Q.   And what period of time does it -- you say --

13:59:41    6  were you the store manager at both stores?

13:59:43    7      A.   Yes, sir, I was.

13:59:44    8      Q.   And what period of time did you stay as store

13:59:47    9  manager at both stores?

13:59:49   10      A.   During the month of January, I believe, and part

13:59:53   11  of February.

13:59:55   12      Q.   What year?

13:59:56   13      A.   2001.

14:00:00   14      Q.   And you mentioned Rob, your district manager?

14:00:11   15      A.   Yes.

14:00:12   16      Q.   Did he work at either one of those stores while

14:00:15   17  you were at both stores?

14:00:17   18      A.   Yes, sir.  He was the district manager for both

14:00:19   19  stores.

14:00:19   20      Q.   No, but did he actually fill in as store manager,

14:00:23   21  or were you filling in as store manager?

14:00:25   22      A.   No, sir, I was store manager.

14:00:26   23      Q.   He was some distance from you, wasn't he?

14:00:28   24      A.   I don't really know where he was at.  He was just

14:00:32   25  there a short time, but he was just district manager.

14:00:35   1       Q.   Okay.   Thank you.

14:00:37   2       A.   Uh-huh.

14:00:38   3                   **REDIRECT EXAMINATION**

14:00:39   4   **BY MR. CALAMUSA:**

14:00:40   5       Q.   When you were store manager of two stores at the

14:00:43   6   same time, did your salary increase?

14:00:44   7       A.   No, sir.

14:00:46   8                   MR. CALAMUSA:   Thank you.   That's all I

14:00:48   9   have.

14:00:48   10                   THE COURT:   Thank you, ma'am.

14:00:52   11                   MR. CHILDS:   Your Honor, the only other

14:00:54   12   witness for the Plaintiffs' case is Mr. Bradley, who as

14:00:58   13   I indicated to the Court, is on the way.

14:01:00   14                   We had talked to the defendants to take him

14:01:03   15   out of turn and would like to have the opportunity to do

14:01:07   16   that, but it's beyond our control.

14:01:10   17                   THE COURT:   Well, had you planned to call

14:01:12   18   any of the defendants -- defendant officers as adverse

14:01:20   19   witnesses?

14:01:22   20                   MR. CALAMUSA:   Not in our case in chief,

14:01:24   21   Your Honor.   They're not here.

14:01:26   22                   MR. CHILDS:   Not in our case in chief.

14:01:29   23                   MR. WHITE:   Alexander's here.

14:01:31   24                   THE COURT:   Pardon me?

14:01:32   25                   MR. MAYS:   Mr. Alexander's here, Your Honor.

14:01:35   1          MR. CHILDS:  We had not planned on that at

14:01:37   2   this point.

14:01:38   3          MR. R. WIGGINS:  Your Honor, the 30(b)(6)

14:01:40   4   witness that they designated as their spokesman is not

14:01:43   5   here.  We would call him if he was here, but he is not

14:01:46   6   within the hundred miles of subpoena.

14:01:50   7          MR. MAY:  That fellow happens to be the CEO

14:01:54   8   of another company, a public company.

14:01:56   9          MR. R. WIGGINS:  But Mr. Broome, I think,

14:01:58  10   was the designated spokesman under Rule 30(b)(6) for the

14:02:03  11   company.  He still works for the company.

14:02:05  12          MR. MAY:  He is no longer in that position,

14:02:08  13   Your Honor.

14:02:08  14          THE COURT:  All right.

14:02:13  15          MR. R. WIGGINS:  That's the first word that

14:02:16  16   we have been told that he is not the spokesperson, if

14:02:18  17   that's what they're trying to say --

14:02:20  18          THE COURT:  No, they're not saying he is not

14:02:22  19   the spokesman.  They're saying he's not in the

14:02:26  20   position --

14:02:27  21          MR. MAY:  He is not in Tuscaloosa, Your

14:02:29  22   Honor.

14:02:29  23          THE COURT:  And I take it the defendant, at

14:02:36  24   this point, is not ready to go forward.

14:02:38  25          MR. MAY:  No, sir.  We thought we had a list

14:02:40  1  of 20 witnesses the plaintiff was going to call, and was

14:02:43  2  going to be considerably longer --

14:02:45  3           THE COURT:  Yeah.

14:02:46  4           MR. MAY:  -- given the changes that have

14:02:48  5  occurred.

14:02:50  6           THE COURT:  All right.  Well, ladies and

14:02:59  7  gentlemen, I hate to do this; but, apparently, we have

14:03:07  8  exhausted all of our witnesses for today.

14:03:10  9           MR. WHITE:  And the lawyers.

14:03:12  10           THE COURT:  And I promise you, it won't

14:03:14  11  happen again.  But we are going to take our recess today

14:03:21  12  until tomorrow morning at 9:00 o'clock.

14:03:24  13           Please do not discuss the case among

14:03:26  14  yourselves or allow the case to be discussed in your

14:03:28  15  presence.  Please keep an open mind.

14:03:31  16           Have a good evening.  See you tomorrow.

14:03:33  17              (Jury out at 1:54 p.m.)

14:03:37  18           THE COURT:  If everyone will remain until

14:03:40  19  the jury is out.

14:03:56  20           (In open court, jury not present.)

14:03:56  21           THE COURT:  Now, for purposes of the record,

14:03:58  22  let us establish what it will be tomorrow.  Tomorrow

14:04:02  23  morning, the other two named plaintiffs will be here and

14:04:14  24  we will take their testimony, and we will take

14:04:14  25  Dr. Bradley's testimony and that will be the end of the

14:04:16  1    plaintiffs' case.

14:04:19  2              MR. KALLON:  One correction, sir, I think

14:04:21  3    there are seven named plaintiffs.  I am embarrassed to

14:04:24  4    say I don't have the list in front of me, but we can get

14:04:29  5    it to you shortly.

14:04:30  6              MR. G. WIGGINS:  Well, Judge, the defendant

14:04:32  7    has taken the opposite position, in regards to --

14:04:36  8              THE COURT:  Just a moment.

14:04:37  9              MR. G. WIGGINS:  I'm sorry.

14:04:40  10             THE COURT:  I've got a pretrial order up

14:04:42  11   here among these papers.  The pretrial order lists six

14:06:23  12   plaintiffs --

14:06:30  13             MR. KALLON:  Judge, I believe there is a

14:06:33  14   Linda Smith I think was missing.

14:06:35  15             THE COURT:  Pardon me?

14:06:36  16             MR. KALLON:  I think there is a Linda Smith

14:06:38  17   who is missing from the pretrial order.

14:06:42  18             MR. G. WIGGINS:  Judge, if I may?

14:06:44  19             THE COURT:  Has the pretrial order been

14:06:46  20   amended?

14:06:47  21             MR. KALLON:  No, sir.

14:06:48  22             THE COURT:  All right.  Under the pretrial

14:06:50  23   order, the plaintiffs are Janice Morgan, Barbara

14:06:55  24   Richardson, Cora Cannon, William Giles, Lori Trout and

14:07:00  25   Gloria Charles, on behalf of themselves and others.  Is

14:07:08  1  there any disagreement with that?

14:07:10  2           MR. G. WIGGINS:  Well, yes, sir, there is,

14:07:12  3  from the standpoint that the defendant filed a brief --

14:07:17  4  and I forget exactly what the brief was, Your Honor --

14:07:20  5  and they named four plaintiffs.  We came back and said

14:07:23  6  there were six plaintiffs.  They argued no, there's only

14:07:26  7  four plaintiffs, because the other people are opt-in

14:07:30  8  plaintiffs; they've not filed an intervention, they've

14:07:30  9  not filed a motion to amend the complaint.

14:07:33  10          It's been the defendant's position all along

14:07:34  11  is that there are only four named plaintiffs.

14:07:36  12          THE COURT:  Just a moment.  Is that true?

14:07:39  13          MR. MAY:  I have -- looking around at my --

14:07:41  14  the folks, my colleagues here, and I -- none of us have

14:07:44  15  gotten any knowing -- I don't -- I thought there were

14:07:48  16  seven, Your Honor, quite frankly.

14:07:50  17          THE COURT:  Well, it's going to be fairly

14:07:52  18  easy, even though it's going to be time consuming, but

14:07:58  19  we've got all the records here.

14:08:02  20          MR. MAY:  Yeah.

14:08:03  21          THE COURT:  And Mr. Wiggins has just made a

14:08:06  22  representation that Family Dollar has represented to the

14:08:10  23  Court that there are only four named plaintiffs.

14:08:14  24          Now, if I have to go through the records and

14:08:19  25  verify that, and find out that it's true, somebody's

14:08:22  1   going to pay some money.

14:08:24  2           MR. MAY:  We will go look, Your Honor.  I

14:08:26  3   don't have any idea -- any recollection -- and I don't

14:08:29  4   believe anyone on my side has any recollection of that,

14:08:31  5   but I don't dispute that he may have said that.

14:08:35  6           I was under the impression we actually had

14:08:38  7   seven.

14:08:40  8           MR. G. WIGGINS:  Judge, I can assure the

14:08:43  9   Court what I just represented to the Court is accurate.

14:08:45  10          THE COURT:  All right.  What you have

14:08:48  11  represented to the Court is that Family Dollar has filed

14:08:50  12  a document in this court taking the position that there

14:08:54  13  are only four named plaintiffs.

14:08:56  14          MR. G. WIGGINS:  Yes, sir.

14:08:57  15          MR. MAY:  It certainly --

14:08:59  16          THE COURT:  And Family Dollar disputes this.

14:09:01  17          MR. MAY:  It certainly wasn't filed after

14:09:02  18  the pretrial order.

14:09:03  19          THE COURT:  Well, does Family Dollar dispute

14:09:05  20  this?

14:09:08  21          MR. KALLON:  Judge, there's no one in this

14:09:12  22  room who, I guess, can answer that.

14:09:15  23          MR. WHITE:  We will go look.

14:09:17  24          MR. MAY:  We will look, Your Honor.

14:09:19  25          THE COURT:  Well, I am going to look.  I am

14:09:21  1  going to look, because --

14:09:23  2          MR. MAY:  Well, we may save you the trouble,

14:09:25  3  Your Honor.

14:09:25  4          THE COURT:  All right.  Well, how long is it

14:09:27  5  going to take you?

14:09:27  6          MR. MAY:  About a minute.

14:09:28  7          THE COURT:  All right.

14:09:30  8          MR. KENT:  Your Honor, we are pulling up --

14:09:31  9          MR. WHITE:  -- don't give him a minute; you

14:09:33  10  better give him five.

14:09:35  11          MR. MAY:  Five.  Five minutes?

14:09:36  12          MR. WHITE:  I don't have a clue, Judge, so

14:09:38  13  give us five minutes, at least.

14:09:40  14          THE COURT:  All right.  Five minutes.

14:09:42  15          Well, you haven't been in this case all

14:09:44  16  along, Mr. White.

14:09:45  17          MR. WHITE:  I know, but I have been in it

14:09:48  18  long enough to not agree to give you something in a

14:09:52  19  minute.

14:09:52  20          THE COURT:  All right.  Five minutes.

14:09:54  21                  (Recess at 2:10 p.m.)

14:11:58  22          MR. MAY:  We will agree it's four, Your

14:12:00  23  Honor.

14:12:00  24          THE COURT:  All right.  And who are the

14:12:03  25  four?  Who are the four plaintiffs?

14:12:08  1          MR. G. WIGGINS:  It will be Janice Morgan,

14:12:10  2   Barbara Richardson, Lori Trout-Wilson and Cora Cannon.

14:12:47  3          THE COURT:  And Ms. Trout has not testified?

14:12:50  4          MR. G. WIGGINS:  I'm sorry?

14:12:51  5          THE COURT:  Ms. Trout has not testified?

14:12:54  6          MR. CALAMUSA:  No, she has not.

14:12:55  7          THE COURT:  So tomorrow morning, Ms. Trout

14:12:58  8   will testify and Dr. Bradley will testify.

14:13:01  9          MR. G. WIGGINS:  We are flying Ms. Trout in

14:13:03  10  from New York this afternoon.

14:13:04  11         THE COURT:  And it doesn't take a plane 18

14:13:07  12  hours to fly from New York to Birmingham --

14:13:12  13         MR. CHILDS:  Unless you go through Atlanta.

14:13:14  14         (Laughter.)

14:13:15  15         MR. WHITE:  Judge, I am not trying to help

14:13:17  16  them, but I have been on that flight.

14:13:21  17         THE COURT:  All right.  So she will be here

14:13:23  18  tomorrow morning.

14:13:23  19         MR. G. WIGGINS:  Yes, sir.

14:13:24  20         MR. KALLON:  Judge, is Cora Cannon going to

14:13:27  21  be here as well?  I think she is the fourth.

14:13:31  22         MR. G. WIGGINS:  My understanding was

14:13:34  23  Mr. Schreiber was attempting to contact her, and the

14:13:36  24  last communication, he had not been able to contact her

14:13:39  25  yet.

| | | |
|---|---|---|
| 14:13:39 | 1 | THE COURT:  All right.  Well, I will take |
| 14:13:41 | 2 | the position that if a class representative doesn't show |
| 14:13:45 | 3 | up for trial, that plaintiff is not a class |
| 14:13:51 | 4 | representative.  So either she'll be here tomorrow or |
| 14:13:54 | 5 | she can proceed on an individual case, but not in a |
| 14:13:58 | 6 | representative capacity. |
| 14:14:00 | 7 | MR. G. WIGGINS:  All right. |
| 14:14:03 | 8 | THE COURT:  So, at most, we may have three |
| 14:14:07 | 9 | additional plaintiffs' witnesses? |
| 14:14:11 | 10 | MR. CHILDS:  Yes, sir. |
| 14:14:12 | 11 | MR. G. WIGGINS:  That's my understanding, |
| 14:14:14 | 12 | yes, sir. |
| 14:14:14 | 13 | THE COURT:  And then we will begin with the |
| 14:14:16 | 14 | defendant's case tomorrow. |
| 14:14:17 | 15 | MR. WHITE:  Yes, sir.  We've got the wheels |
| 14:14:19 | 16 | turning, and we will get a list by the end of the day |
| 14:14:22 | 17 | today. |
| 14:14:22 | 18 | THE COURT:  All right. |
| 14:14:23 | 19 | MR. WHITE:  As you ordered. |
| 14:14:24 | 20 | THE COURT:  All right. |
| 14:14:26 | 21 | MR. CALAMUSA:  And the agreement was 30 |
| 14:14:28 | 22 | minutes after close -- |
| 14:14:30 | 23 | MR. MAY:  Well, Your Honor, we don't have |
| 14:14:31 | 24 | any idea right now.  We just started the wheels turning |
| 14:14:34 | 25 | when all this came about.  There's no way I can give you |

14:14:38    1    30 minutes after you adjourn today.

14:14:40    2             THE COURT:  Of course not.  By 5:30.

14:14:43    3             MR. MAY:  5:30, we will give them an update

14:14:46    4    and give them an order.  It will be as flexible as

14:14:49    5    theirs they gave me.

14:14:50    6             THE COURT:  All right.  Fine.

14:14:51    7             Now, as I understand it, the parties might

14:14:55    8    be interested in broaching the issue of settlement?

14:15:01    9             MR. WHITE:  Your Honor, we understand the

14:15:04   10    Court --

14:15:04   11             THE COURT:  And let me just put it all on

14:15:06   12    the record.

14:15:07   13             MR. WHITE:  Yes, sir.

14:15:08   14             THE COURT:  Either this morning or

14:15:10   15    yesterday, I saw lawyers for both sides in the hall and

14:15:16   16    indicated to them that I would like the parties to try

14:15:19   17    to settle the case if they could, and that I would be

14:15:23   18    willing to facilitate the settlement in any way

14:15:30   19    possible.  That's how that ball got rolling.

14:15:34   20             MR. WHITE:  Correct.

14:15:35   21             THE COURT:  It may go nowhere, but that's

14:15:38   22    how it started.

14:15:39   23             MR. WHITE:  It got both sides' attention, I

14:15:42   24    assure the Court.  And I am prepared to represent on

14:15:44   25    behalf of the defendants, after consultation with

14:15:48    1    co-counsel, general counsel, and the president, that we

14:15:51    2    are willing for the Court to engage in that process and

14:15:54    3    we would waive ex parte, so that the Court could have

14:15:57    4    the liberty and the luxury of consulting with both sides

14:16:01    5    without them being present.

14:16:03    6                    THE COURT:  Plaintiffs?

14:16:04    7                    MR. G. WIGGINS:  Plaintiffs would take the

14:16:06    8    same position, Your Honor.  We would not argue with that

14:16:09    9    at all, as far as ex parte communications, et cetera.

14:16:12   10                    THE COURT:  All right.  Well, let's start

14:16:13   11    now.  And let's take four representatives from either

14:16:25   12    side and let's meet in chambers.

14:16:31   13                    Court's adjourned until 9:00 o'clock

14:16:33   14    tomorrow morning.

14:16:35   15                    (Court adjourned at 2:07 p.m.)

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25

1                           CERTIFICATE

2

3

4        I certify that the foregoing is a correct

5   transcript from the record of proceedings in the

6   above-entitled matter.

7

8

9

10

11  _____        07-28-05

12  Christina K. Decker, RPR, CRR                Date

13  Federal Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25